UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.

AT LAW AND IN ADMIRALTY

RICHARD BURGESS individually and
by and through DARREN HENZE
as Guardian of the Person and Estate
of Richard Burgess, incapacitated and
as agent under that certain durable power
of attorney dated November 20, 2006.

       Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD.,
a Liberian Corporation, d/b/a
ROYAL CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL,
JOAO PEREIRA,
MICHIEL ADRIAAN ETSEBETH.

       Defendants.

_____/

## COMPLAINT FOR DAMAGES

The Plaintiffs, RICHARD BURGESS individual and by and through DARREN HENZE

as Guardian of the Person and Estate of Richard Burgess and as Agent under that certain durable

power of attorney dated November 20, 2006, hereby sue the Defendants and file this Complaint

for Damages and say:

## THE PARTIES AND JURISDICTION

1.      This is an action for damages which exceed $75,000 exclusive of interest, costs, and attorney's fees.

2.      **THE PLAINTIFFS.**

    a.      **RICHARD BURGESS:** The Plaintiff, RICHARD BURGESS is sui juris and residents of York, Pennsylvania.  At all times material hereto, the Plaintiff RICHARD BURGESS was a passenger onboard the cruise ship RCCL Harmony of the Seas operated by the cruise line Defendant, Royal Caribbean Cruises, Ltd., and/or Royal Caribbean International.  As the result of the defendant's negligence, Burgess suffered a stroke, locked-in syndrome and deemed incapacitated.  And at all times material hereto, the Plaintiff RICHARD BURGESS received medical care and treatment from the physicians and medical staff onboard that ship.  Those physicians include but are not limited to the Defendants Pereira and Etsebeth.

    b.      **DARREN HENZE:** The Plaintiff, DARREN HENZE is sui juris and residents of York, Pennsylvania.  DARREN HENZE has been appointed by a court of competent jurisdiction in the state of Pennsylvania as Guardian of the Person and Estate of Richard Burgess. and as Agent under that certain durable power of attorney dated November 20, 2006.

3.      **THE DEFENDANTS**.

    a.      **ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL**: The Defendant, ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL (hereinafter be referred to collectively as RCCL, Defendant, or the cruise line) is a corporation registered and incorporated in Liberia. RCCL's principal place of business in Miami, Florida.  This defendant does business as Royal Caribbean Cruise Line and as Royal Caribbean International and is authorized to do business in

2

the State of Florida, and at all times material hereto was and is doing business in Miami-Dade County, Florida. The Defendant RCCL is a Florida citizen for the purposes of diversity of citizenship under 28 U.S.C. § 1332. At all times material hereto, the Defendant RCCL owned and/or operated the cruise ship on which the subject negligence occurred.

b. **JOAO PEREIRA**: The Defendant Joao Pereira is a physician licensed outside the state of Florida. At all times material hereto Pereira was an employee, agent, apparent agent and/or joint venturer of Defendant RCCL which does business in the State of Florida and which at all times material hereto was doing business in Miami Dade County, Florida. At all times material hereto, the Defendant Pereira worked as one of the shipboard physicians on the cruise ship owned and/or operated by the Defendant RCCL on which the subject negligence occurred and provided negligent medical care to the Plaintiff which caused permanent injury to the plaintiff.

c. **MICHIEL ADRIAAN ETSEBETH**: The Defendant Michiel Adriaan Etsebeth is a physician licensed outside the state of Florida. At all times material hereto, Etsebeth was an employee, agent, apparent agent and/or joint venturer of Defendant RCCL which does business in the State of Florida and which at all times material hereto was doing business in Miami Dade County, Florida. At all times material hereto, the Defendant Etsebeth worked as one of the shipboard physicians on the cruise ship owned and/or operated by the Defendant RCCL on which the subject negligence occurred and provided negligent medical care to the Plaintiff which caused permanent injury to the plaintiff.

4. **FEDERAL SUBJECT MATTER JURISDICTION**. Federal subject matter jurisdiction arises under and is by virtue of Diversity of Citizenship pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of different States and/or citizens of a State and citizens or subjects of a foreign state. This action also arises under and is by virtue of the

admiralty or maritime jurisdiction pursuant to 28 U.S.C. § 1333. Further, this action is being filed in Federal Court in Miami Dade County, Florida, as required by the venue selection clause in the Passenger Contract Ticket issued by the Defendant.

5.      **VENUE AND PERSONAL JURISDICTION**.   The Defendants, at all times material hereto, through agents or representatives, in the County and in the District in which this Complaint is filed:

(a) Operated, conducted, engaged in or carried on a business venture in this state and/or county; and/or

(b) Had an office or agency in this state and/or county; and/or

(c) Engaged in substantial activity within this state; and/or

(d) Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193.

6.      All conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

## OTHER ALLEGATIONS COMMON TO ALL COUNTS

7.      **DATE OF THE INCIDENT**.  The incident described in this section occurred on February 21, 2019

8.      **LOCATION OF THE INCIDENT.**   This incident occurred onboard the vessel RCCL *Harmony of the Seas*, a ship in navigable water while the Plaintiff, RICHARD BURGESS was a passenger onboard. Accordingly, the Plaintiffs' claims are governed by the general maritime law.

9.      **STATUS OF PLAINTIFF AS OF DATE AND TIME OF THE INCIDENT.** At all times material hereto, the Plaintiff, RICHARD BURGESS was a passenger on the subject cruise ship described herein and, accordingly, was an invitee while on the vessel.

4

10.   **DUTIES OWED.**   RCCL owes a duty of reasonable care under the circumstances and the highest duty of care to its passengers as a common carrier.  The fact that RCCL voluntarily undertook to provide medical care to its passengers, including the Plaintiff, RICHARD BURGESS, herein, also forms a part of the basis for the duty of RCCL to provide medical care onboard its ships of a certain quality and capability.  *See, e.g., Horton v. Freeman*, 943 So.2d 1016 (Fla. 4th DCA 2006); *Estate of Sharp v. Omnicare, Inc.* 879 So.2d 34 (Fla. 5th DCA 2004); and *Roos v. Morrison*, 913 So.2d 59 (Fla. 1st DCA 2005); *Kerfoot v. Waychof*, 501 So.2d 588 (Fla. 1987).  "A duty may arise from multiple sources: '(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.' *Clay Elec. Co-op., Inc. v. Johnson,* 873 So.2d 1182, 1185 (Fla. 2003) (quoting *McCain,* 593 So.2d at 503 n. 2)." *Goldberg v. Florida Power & Light Co.*, 899 So.2d 1105 (Fla. 2005). The present case falls within the judicial precedent and the general facts of this case.

11.   These duties arise from the law and from the fact and circumstances of this cruise which include but are not limited to the following:

(a) the Defendant cruise line represents in its advertising and literature that the cruise line provides a Medical Center staffed with medical professionals;

(b) the Defendant cruise line holds out the ship's medical staff and physicians as its employees, actual agent, apparent agent and/or joint venturers;

(c) the Defendant cruise line voluntary undertook in this case to provide medical care and treatment to the Plaintiff;

(d) the cruise ship is isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship;

(e) the cruise line and this ship caters to U.S. citizens who are used to and expect first world medical care;

(f) the cruise line markets this cruise as safe and secure for its passengers;

(g) the cruise line profits off of providing onboard medical care to its passengers;

(h) the subject doctor represented herself as working for and as an agent of the Defendant; and

(i) the subject cruise ship takes its passengers to the waters off of developing countries which can provide only third world medical care or medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

12.     Relying on the representations of the cruise line about the medical and other facilities and amenities on the cruise ship, RICHARD BURGESS and Darren Henze took a cruise on February 17, 2019 on the RCCL *Harmony of the Seas.*

13.     **DESCRIPTION OF INCIDENT: RCCL's REPRESENTATIONS**. RCCL has a duty to provide medical care through its established obligations under the General Maritime Law, through the fact that it voluntarily undertook to provide medical care to Burgess, and through the fact that the cruise line makes numerous representations to the public generally, including to Burgess and Henze, about the fact that medical care is provided onboard and about the quality of medical care provided.

14.     RCCL deliberately chose to enter the business of medicine by providing medical services to its passengers and crew members on its ships.  RCCL reaps the tangible benefits from providing such services as part of its business strategy. RCCL represents in its marketing materials to prospective passengers for them to rely on these representations that each ship contains an onboard Medical Center which is staffed by doctors and nurses.  RCCL boasts online that every ship in the fleet is has a "dedicated medical facility, staffed with doctors and nurses".

15.     The cruise line made representations in marketing, on its websites and brochures that the cruise line provided:

(a)  Medical care to the cruise line's passengers on its ships;

(b)  Medical care of a certain quality complying with certain established standards, including the American College of Emergency Physicians;

(c)  A fully equipped medical facility onboard its ships including the subject ship for the purpose of providing medical care to its passengers including the Plaintiff herein;

(d)  Physicians and medical staff onboard its ships that the cruise line selected and hired;

(e)  Physicians and medical staff that the cruise line regularly advised about the cruise line's policies and procedures of the ship and of the ship's medical facility;

(f) Physicians and medical staff that the cruise line supervised and controlled the actions and conduct of the physicians and medical staff onboard its ships;

(g) Physicians and medical staff on its ships that the cruise line held out as its own agents or employees, apparent agents and/or entered into a joint venture with to provide medical care to cruise passengers and crew members;

(h) Physicians and medical staff that were the cruise line's employees, agents, apparent agents, and or entered into a joint venture with to provide medical care to cruise passengers, including but not limited to the Plaintiff RICHARD BURGESS and crew members.

16. For example, RCCL represented:



***Medical (Facilities Onboard, Training Staff)***

Every ship in the RCL fleet has a dedicated medical facility, staffed with contract medical doctors and nurses. Shipboard medical facilities are available to both guests and crew in the event medical treatment becomes necessary while they are onboard. The medical facilities are generally open six hours daily, but medical professionals are available 24 hours a day for acute guest or crew medical needs that may arise. There are procedures for emergency communications and deployment of the medical teams anywhere on the ship where services are needed. These teams are supplemented by personnel trained to carry equipment and stretchers if needed.

https://www.rclcorporate.com/safety-security-health/.

 Q    What licensed medical staff/doctor and services are available onboard a Royal Caribbean cruise ship?

 A    We have a minimum of one fully licensed doctor, and a minimum of two licensed nurses onboard every ship.

Our medical facilities are stocked with a variety of equipment, including cardiac monitors, automated external defibrillators, ventilators, x-ray machines and processors, laboratory equipment, a formulary of acute care medications and a variety of minor surgical and orthopedic supplies. Our doctors also have access to online informational sources and 24-hour support from shore side medical professionals for additional assistance. Royal Caribbean Cruises Ltd. also requires all doctors and nurses to maintain Advanced Cardiac Life Support (ACLS) training. In responding to medical emergencies, our goal is to first stabilize emergency patients and, where indicated, evacuate the patient to an appropriately equipped and staffed shore side medical facility as soon as practical.

*See* complete RCCL webpage at, https://www.royalcaribbean.com/faq/questions/medical-services-onboard-regulations.

17.    RCCL represents in its marketing and websites that its shipboard medical staff, doctors and medical center offers clinic hours as well as available 24 hours for emergencies.

Depending on the size of the ship and number of passengers and Crew members, each RCL ship has one to three doctors and three-to-five Nurses, available to passengers and Crew members 24 hours a day, seven days a week.

*See* full RCCL webpage at https://www.royalcaribbean.com/faq/questions/medical-services-onboard-regulations.

In emergency medical care situations, such as heart attacks, congestive heart failure and cardiac arrhythmias, our ships maintain special medications onboard to stabilize the patient until the patient is able to be medically evacuated to an appropriate shoreside medical facility. Evacuation of emergency medical patients from a ship may take place at a scheduled port-of-call, or may require a deviation from the ship's scheduled itinerary to the nearest appropriate port. Another alternative that may be available for use in life-threatening situations is evacuation via helicopter from a ship's helipad or via basket lift.

*See* full RCCL webpage at https://www.rclcorporate.com/safety-security-health/.

18. The fact that RCCL has a Medical Center onboard its ships and represents to the public that the medical staff is on call 24 hours a day for emergencies attracts prospective passengers to purchase tickets for RCCL cruises even though those cruises travel to developing countries and to isolated waters of the world.

19. RCCL also represents that it has a ship's physicians that meet or exceed the credentialing guidelines established by the cruise ship medicine section of the American College of Emergency Physicians who are experienced with general medicine or general practice including emergency or critical care.

Each ship is staffed by one to three medical doctors and two to five nurses, generally depending on the size of the ship and the number of guests and crew. RCL follows strict requirements regarding the credentials of medical staff in our facilities. We confirm licenses and medical school graduation and closely examine post-graduate training for prospective medical personnel. Prior to serving onboard, medical personnel must also successfully complete Basic and Advanced Cardiac Life Support Training Courses. In addition to cardiac care skills, our medical staff are expected to be able to manage complex problems, such as respiratory and airway emergencies, sutures, orthopedic issues, interpret routine x-rays and perform and interpret basic, but comprehensive, laboratory analysis.

To meet the needs of our guests and crew, RCL medical facilities stock a variety of equipment, including cardiac monitors and defibrillators, ventilators, x-ray machines and processors, laboratory equipment for a variety of acutely needed tests, and minor surgical and orthopedic supplies. Each ship also has a well-stocked formulary of medications (including "clot-busting" thrombolytics), based upon ACEP-established, shipboard appropriate categories of pharmaceuticals.

*See* full RCCL webpage at https://www.rclcorporate.com/safety-security-health/.

Every Royal Caribbean ship offers limited professional medical services through licensed (international or domestic) physicians and nurses. All Royal Caribbean Cruises Ltd. ships have shipboard medical facilities that are built, staffed, stocked and equipped to meet or exceed guidelines established by the American College of Emergency Physicians Cruise Ship & Maritime Medicine Section.

\*\*\*

professionals for additional assistance. Royal Caribbean Cruises Ltd. also requires all doctors and nurses to maintain Advanced Cardiac Life Support (ACLS) training. In

*See* full RCCL webpage at https://www.royalcaribbean.com/faq/questions/medical-services-onboard-regulations.

20.     RCCL also makes representations in its literature, online, and in its onboard video about the ease of travel for its primarily U.S. citizen passengers. Thus, even though RCCL ships travel throughout the Caribbean, in and near ports, some of which are developing countries and/or areas that suffered significant damage due to natural disasters including hurricanes and earthquakes, RCCL represents that its medical centers are staffed by qualified physicians and nurses who are committed to providing the highest quality of shipboard medical care to maintain a safe and comfortable environment for its guests.

21.     These representations made by RCCL form a part of the basis for the duty of RCCL to provide medical care onboard its ships of a certain quality and capability.

22.     Three days prior to docking in San Juan Puerto Rico, Burgess slipped and fell and hit his head.  On February 21, 2019 Burgess suffered a medical emergency separate and distinct from February 18, 2019's slip and fall and head trauma.  At about 7:00 a.m. on February 21, 2019, RCCL's *Harmony of the Seas* docked in San Juan, Puerto Rico.  Early that morning, Burgess was on Deck 17 and started to suffer from the inability to move the fingers in his right hand, had an unsteady gait, weakness in his right lower leg, vision changes in his right eye.  Burgess called his family and sought assistance from an RCCL crew member.  The RCCL crew member called 911 for medical assistance.  RCCL's medical personnel responded to the call.  Mr. Burgess told the responding personnel that he thought he was having a stroke and described his inability to move his fingers in his right hand, unsteady gait, weakness in his lower leg and vision changes.  RCCL's

medical personnel and crew went to the cabin of Burgess and brought Burgess down to the medical center in a wheelchair.

23.     RCCL and RCCL's shipboard medical personnel and doctors store, maintain, and have access to electronic medical forms and medical records.  RCCL's Nurse Mary Bremner electronically entered Mr. Burgess's triage notes at 9:25 a.m.  RCCL's medical records document that Burgess's presentation at the infirmary and his condition were "urgent" and that Burgess was "to be seen by Dr in ICU", intensive care unit, for "? CVA", that is, cerebrovascular accident or incident, that is, a stroke.  RCCL's shipboard doctor, Joao Pereira, diagnosed Burgess with acute cerebrovascular insufficiency priority level 4.  And Pereira knew or should have known from the ship's own records about the head trauma 3 days before.

24.     However, Dr. Pereira electronically wrote and filled out RCCL's shoreside medical form requesting that Mr. Burgess be sent to shore in Puerto Rico for medical care and treatment without noting any priority level or emergency.  Dr. Pereira recommended that he be taken shoreside for an evaluation "(including CT-scan if you see fit) and treat accordingly)".  RCCL provides and maintains electronic medical records in its computer system which include Mr. Burgess's medical records and RCCL's shoreside referral form.  RCCL and/or Dr. Pereira's shoreside referral form did not indicate that Mr. Burgess was suffering from a medical emergency, did not request a medical evacuation and did not provide a diagnosis.

25.     Despite, Mr. Burgess's emergent and critical condition, RCCL refused to immediately disembark and/or medically evacuate Mr. Burgess.  Instead, Mr. Burgess was forced to remain onboard despite showing obvious signs of a stroke and/or other cerebrovascular emergency.  Dr. Pereira and/or the medical personnel did not demand, initiate and/or request for Mr. Burgess to be emergently medically evacuated off RCCL's ship nor did RCCL did not emergently medically evacuate Mr. Burgess off its ship despite his condition.  Instead the cruise

line required Burgess to stay on the cruise ship.  RCCL, RCCL's shipboard doctor and/or medical personnel kept Burgess on the ship for at least two and a half hours demanding payment for medical services despite having Burgess and Henze's credit cards on file, Burgess and Henze's passports, and sent Henze to back up his cabin.  Burgess's family traveling with Burgess and Henze repeatedly offered to resolve the finances and packing on behalf of Burgess and Henze, but RCCL refused.  At no time did Burgess, Henze and/or Burgess's family witness and/or hear anyone from RCCL, RCCL's medical personnel and/or doctor act or state that Mr. Burgess was suffering from a medical emergency.

26.    After at least two and a half hours from the time RCCL's shoreside medical referral form was signed by Dr. Pereira, RCCL allowed Mr. Burgess off the ship and took him to the ambulance arranged for by RCCL.   RCCL arranged for and controlled which hospital Burgess would be taken to for treatment and care.  RCCL controlled, directed and/or instructed the ambulance to take Burgess to HIMA San Pablo Caguas hospital, a distant hospital instead of the closer hospitals located much closer to the port in San Juan, Puerto Rico.  Neither Burgess nor his family were familiar with Puerto Rico and/or its medical facilities or the location of medical facilities The hospital that RCCL and/or its medical personal coordinated and sent Mr. Burgess to for care and treatment for his medical emergency was located approximately an hour and a half away from the port in San Juan, Puerto Rico further delaying his medical care and treatment. RCCL, its medical personnel and/or its doctors including Dr. Pereira chose to keep Mr. Burgess on its ship for hours and then send him to a hospital an hour and a half away despite his time sensitive medical emergency.  The ambulance that transported Burgess did not use lights and sirens indicating that RCCL did not inform them Burgess was suffering from a medical emergency. RCCL, its medical personnel and/or doctors including Dr. Pereira knew that there were numerous emergency rooms fully equipped and able to treat Mr. Burgess's emergent condition that were

located significantly closer to the port that could have treated Mr. Burgess significantly earlier and faster than HIMA San Pablo Caguas.

27. **BUSINESS RELATIONSHIP WITH HIMA PABLO SAN CAGUAS**. Based on information and belief RCCL, like Celebrity Cruises LTD, a wholly owned and/or majority owned subsidiary of Royal Caribbean Cruises, LTD., have a long-standing business relationship with HIMA San Pablo Caguas. In the *Hill case for example, the* Celebrity cruise ship also docked in San Juan, Puerto Rico and sent Hill to HIMA San Pablo Caguas which delayed his treatment and aggravated his condition, loss of blood leading to organ shutdown and hypoxic brain injury.

28. Burgess arrived at the hospital in Puerto Rico approximately four hours after Dr. Pereira signed and entered the shoreside referral form requesting a neurological consult for Mr. Burgess and nearly 5 hours from Mr. Burgess's initial presentation of symptoms when Mr. Burgess told RCCL he thought he was having a stroke. At HIMA San Pablo Caguas, the medical staff immediately noted the Mr. Burgess's recent history of head trauma three days prior and the fact Mr. Burgess was outside the window for TPA (tissue plasminogen activator), a protein used to breakdown blood clots. The medical team were playing 'catch up' from the misdiagnosis and/or significant time delay in providing the emergency care and treatment Mr. Burgess needed to prevent and/or minimize damage to his brain.

29. As a result of RCCL, RCCL's doctor and/or medical personnel which occurred on February 21, 2019 Burgess to suffer significant and permanent injuries. RCCL, Dr. Pereira and RCCL's medical personnel misdiagnosed, mismanaged, improperly monitored and provided aftercare instructions medical personnel and/or shipboard physician's misdiagnosis, mismanagement of Mr. Burgess's stroke on February 21, 2019. The misdiagnosis of Burgess's medical emergency and/or significant delay in proper medical treatment caused Mr. Burgess to suffer from severe and permanent damage to cerebrovascular system and/or brain. Had RCCL,

13

RCCL's medical personnel, and doctor appropriately diagnosed, appropriately managed Mr. Burgess's medical emergency and/or timely medically evacuated and/or sent Mr. Burgess to a hospital close to port and/or timely evacuated Mr. Burgess off RCCL's ship, he would have arrived at a medical facility and would have received medical care and treatment within the window for certain medications which would have dramatically changed the outcome of his medical condition and/or prognosis. As a result of the negligence of the Defendants, including but not limited to the misdiagnosis of Mr. Burgess's condition, failure to monitor the Mr. Burgess's medical condition, failure to administer the correct medications, failure to timely and emergently transport to a hospital, and failure to evacuate Mr. Burgess off of the ship caused irreparable harm to Mr. Burgess. Mr. Burgess suffered from basilar syndrome, blood clot, occlusion, vertebral dissection and/or stroke which caused Mr. Burgess to suffer severe and permanent brain damage resulting in locked-in syndrome (also known as a pseudocoma in which the patient is aware but cannot move or communicate verbally due to complete paralysis of nearly all voluntary muscles in the body) and other complications, all of which could have been prevented with a proper timely diagnosis, monitoring, timely medical evacuation and/or transport for treatment within time for medications Mr. Burgess need to control what was a treatable condition.

30.     The Plaintiff suffered the following injuries due to the Defendants' February 21, 2019 negligence aboard the subject cruise ship which include, but are not limited to: paralysis in whole or in part from neck down and locked-in syndrome, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, vertebrobasilar artery occlusion with extensive brain stem infarction, locked-in syndrome with preserved eye movements, left myringitis otorrhea, oropharyngeal dysphagia, acute hypoxic respiratory failure

with vent dependency, gastrointestinal bleed, purulent secretions from neck wound after tracheotomy (thick yellow secretion), pseudomonas pneumonia, tracheostomy complication, disease of the vocal cords, and inability to speak.  Some or all of these conditions are permanent as a result of the Defendant cruise line and Defendant doctor's negligence.

**COUNT I:**
**NEGLIGENT FAILURE TO WARN – DANGEROUS CABIN FLOOR PLAN**
**AND SLIPPERY FLOORING**

31.     The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1-33, above.

32.     This is an action for negligence of RCCL for failing to warn passengers, including the Plaintiff, of its hazards, risks, dangerous conditions including its slippery highly polished stone and/or flooring and/or dangerous passenger cabin floor plan.  The circumstances are as follows. Onboard the RCCL cruise ships, RCCL offer its passengers onboard a vacation experience, not just transportation. The vacation experience includes private passenger cabins, including upgraded passenger cabin suites.  RCCL's passenger cabins also offer private bathrooms located immediately adjacent to the entry way of each passenger cabin.  RCCL's passenger cabin bathrooms have doors to provide privacy.  Some of RCCL's passenger cabins have highly polished marble and/or stone flooring with a stone counter bar area.



Grand Suite 8660 Video Tour Harmony of the Seas

*See* https://www.youtube.com/watch?time_continue=5&v=oojnKoqBvIE&feature=emb_logo



Harmony of the Seas Grand Suite Details

33.    RCCL knows that its passenger cabins with highly polished stone and/or marble flooring must walk into the cabin to turn on the cabin lights.  To do so forces RCCL passengers to undergo an obstacle course since passengers must navigate the front cabin door, the bathroom door, the entry bar area in order, and the highly polished stone and/or marble flooring to turn on cabin lights. RCCL knew long before this incident that these obstacles are extremely and unreasonably dangerous to navigate in the dark.  RCCL also knew that the highly polished stone and/or marble stone surface is unreasonably slippery especially in the dark when passengers unexpectedly bump into obstacles and/or bump into doors and/or other features in passenger cabins.  RCCL also knows that passengers are not familiar with their cabins and/or layout of their cabins at the start of their cruises, especially in the dark.

34.     RCCL's design and arrangement of the cabin and/or the cabin's highly polished marble and/or stone floors violated industry standards.  Upon information and belief RCCL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe walkways, staircases and floor materials.  Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of star and walkway safety standards and guidelines which apply to the marine environment.  See, *e.g.*, IMO, MSC Circular 735 (24 June 1996); U.S. Access Board, Draft Passenger Vessel Accessibility Guidelines  (2000-present) and ADA Accessibility Guidelines; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; Life Safety Code; and Safety of Life at Sea SOLAS) Treaty.

35.     Upon information and belief RCCL, at all times relevant, created its own internal policies and procedures to provide safe walkways including inside passenger cabins.  Therefore RCCL knew or should have known it must provide safe, clear, clean and secure passenger cabin walkways.  Upon information and belief RCCL, at all relevant times, knew or should have known of industry safety standards of ASTM International, ANSI, ISM Code and Regulations and other industry standards applicable to providing and maintaining safe walkway and floor materials.

36.     RCCL knows that its passenger cabins with highly polished stone and/or marble flooring must walk into the cabin to turn on the cabin lights.  To do so forces RCCL passengers to undergo an obstacle course since passengers must navigate the front cabin door, the bathroom door, the entry bar area in order, and the highly polished stone and/or marble flooring to turn on cabin lights. The dangerous nature of the cabin floor plans and/or cabin highly polished stone and/or marble floors is an ongoing, continuous problem on all RCCL ships including the *Harmony of the Seas*.  Therefore, RCCL knew or should have known to warn its passengers that the highly polished stone and/or

flooring and/or passenger cabin floorplan can be hazardous, risky and/or a dangerous condition which may cause a passenger to slip and fall.

37.     The dangerous nature of the cabin and/or cabin highly polished stone and/or marble floors is an ongoing, continuous problem on all RCCL ships including the *Harmony of the Seas*. Upon information and belief RCCL is aware of prior incidents of passengers slipping and/or falling in its passenger cabins due to the obstacles in the entry walkway and/or highly polished stone and/or marble flooring.

38.     **DUTIES OWED BY RCCL**: RCCL owes a "duty to exercise reasonable care for the safety of its passengers," including the Plaintiff herein. *See Hall v. Royal Caribbean Cruises, Limited*, 2004 WL 1621209 (Fla. 3d DCA 2004). The Defendant also owes a "duty to exercise reasonable care under the circumstances." *See Harnesk v. Carnival Cruise Lines, Inc.*, 1991 WL 329584 (S.D. Fla. 1991). Additionally, the Defendant's "duty is to warn of dangers known to the carrier in places where the passenger is invited to or may reasonably be expected to visit." *See Vierling v. Celebrity Cruises, Inc.,* 339 F.3d 1309 (11th Cir. 2003) ("Courts sitting in admiralty have long recognized an obligation on the part of a carrier to furnish its passengers with a reasonably safe means of boarding and leaving the vessel, that this obligation is non-delegable, and that even the slightest negligence renders a carrier liable."); *Carlisle v. Ulysses Line Limited*, 475 So.2d 248 (Fla. 3d DCA 1985).

39.     RCCL, at all relevant times, was also under a legal duty to comply with mandatory international vessel safety regulations that are promulgated by the International Maritime Organization (IMO) under authority expressly conferred by the U.S. Senate-ratified international Safety of Life at Sea (SOLAS) treaty, including *Part C*, *Regulation 13*, <u>subpart 1.1</u> "safe escape routes shall be provided."); <u>subpart 1.2</u> ("escape routes shall be maintained in a safe condition

clear of obstacles.")  RCCL's passenger cabin walkways are escape routes that RCCL knew or should have known it must maintain in a safe, clear, clean and secure condition.

40.     Upon information and belief RCCL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe walkways, staircases and floor materials.  Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of star and walkway safety standards and guidelines which apply to the marine environment.  See, *e.g.*, IMO, <u>MSC Circular 735</u> (24 June 1996); U.S. Access Board, <u>Draft Passenger Vessel Accessibility Guidelines</u> (2000-present) and ADA <u>Accessibility Guidelines</u>; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; <u>Life Safety Code</u>; and Safety of Life at Sea SOLAS) Treaty.

41.     Upon information and belief RCCL, at all times relevant, created its own internal policies and procedures to provide safe walkways including inside passenger cabins.  Therefore RCCL knew or should have known it must provide safe, clear, clean and secure passenger cabin walkways.  Upon information and belief RCCL, at all relevant times, knew or should have known of industry safety standards of ASTM International, ANSI, ISM Code and Regulations and other industry standards applicable to providing and maintaining safe walkway and floor materials.

42.     RCCL owes a duty as a common carrier to its passengers of dangers known to RCCL where RCCL invite or reasonably expect passengers to go.  RCCL owes a duty of reasonable care under the circumstances. The circumstances are as follows.  RCCL encourage passengers to walk socialize, drink and eat, enjoy the views, attend activities, events and entertainment and other amenities on RCCL's ships.  It is expected that passengers including the Plaintiff, will enjoy RCCL's amenities and activities until late into the night.  RCCL knows passengers will eventually return to their assigned cabins after the sun goes down and there is no light inside passenger cabins.

RCCL knows that its passenger cabins with highly polished stone and/or marble flooring must walk into the cabin to turn on the cabin lights.  To do so forces RCCL passengers to undergo an obstacle course since passengers must navigate the front cabin door, the bathroom door, the entry bar area in order, and the highly polished stone and/or marble flooring to turn on cabin lights.  RCCL knew long before this incident that these obstacles are extremely and unreasonably dangerous to navigate in the dark.  RCCL also knew that the highly polished stone and/or marble stone surface is unreasonably slippery especially in the dark when passengers unexpectedly bump into obstacles and/or bump into doors and/or other features in passenger cabins.  RCCL also knows that passengers are not familiar with their cabins and/or layout of their cabins at the start of their cruises, especially in the dark. RCCL's design and arrangement of the cabin and/or the cabin's highly polished marble and/or stone floors violated industry standards.  The dangerous nature of the cabin and/or cabin highly polished stone and/or marble floors is an ongoing, continuous problem on all RCCL ships including the *Harmony of the Seas*.  RCCL has documented prior slip and falls in passenger cabins in various ways which may include prior shipboard safety meetings; logs or databases of prior similar incidents of slip and falls; prior complaints made to guest services throughout its fleet; safety testing and/or inspections testing of floor surfaces and/or passenger cabin floorplan and/or cabins.  RCCL also distribute crew member training materials; safety warning messages including those made through verbal announcement, newsletters and safety videos.  RCCL train its crew members to warn passengers of hazards.

43.  **RCCL BREACHED ITS DUTY**: RCCL breached its duty to warn the Plaintiff of dangerous condition inside its passenger cabins. RCCL breached its duties to the Plaintiff by its actions and conduct.  RCCL failed to reasonably and regularly place signs, stickers, lights, and other visual notices or written on or near passenger cabins. RCCL crew members failed to reasonably and regularly make audible announcements that the passenger cabin highly polished

stone and/or marble flooring and/or passenger cabins are dangerous especially in the dark. RCCL also failed to comply with comply with applicable industry standards, statutes, and/or regulations which invokes the Pennsylvania Rule and shifts the burden of proof to the Defendant in the proof of negligence or proof of the absence of negligence. RCCL's violation of applicable and mandatory safety regulations and standards constitutes negligence *per se*.

44.     **PROXIMATE CAUSE**: RCCL's failure to properly warn the Plaintiff of the dangerous cabin floorplan and/or highly polished stone and/or marble flooring proximately caused the Plaintiff's injuries. Had RCCL properly warned the Plaintiff of the dangerous condition, the Plaintiff would never have walked into the passenger cabin in the dark and/or taken precautions to minimize and/or avoid the physical obstacles inside the passenger cabin when turning on the cabin lights. The Plaintiff therefore would never have slipped and fallen or smashed his head.

45.     **DAMAGES**: The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

        WHEREFORE, the Plaintiffs demand Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future;

lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT II:**
**NEGLIGENT DESIGN, CONSTRUCTION AND SELECTION OF MATERIALS**

46.     The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1-33, above.

47.     This is an action for negligence due to RCCL's negligent design, construction and selection of materials.  RCCL owes a duty of reasonable care under the circumstances. The circumstances are as follows.  RCCL custom built the *Harmony of the Seas* cruise ship in the Chantiers de l'Atlantique shipyard in Saint-Nazaire, France. The *Harmony of the Seas* is a cruise ship which RCCL had custom built to specifications and designs which were made by or under the supervision and participation of RCCL. The *Harmony of the Seas* was designed by or at the direction of RCCL's shoreside New Build and other shoreside departments. RCCL employ architects, designers, and engineers.

48.     The *Harmony of the Seas* has a maximum capacity for 6,780 passengers.  The exterior and interior of the ship was built in France at a shipyard under the constant supervision of RCCL's onsite construction managers, designers, architects, and engineers. Under the contract with the shipyard, RCCL not only had full access to the ship to inspect and the ability to inspect the designs used for construction, but also has the ability to reject and change any design or construction at the shipyard and for a period of time thereafter. RCCL holds the ultimate control under their contract

with the yard, if an item or design is rejected or at issue and not resolved, RCCL can withhold payment.  That includes the flooring materials which caused this fall and these injuries.

49.     The *Harmony of the Seas* was delivered to RCCL as finished on May 13, 2016 and maiden voyage was on May 29, 2016. RCCL has operated and maintained the ship continuously since that time.  RCCL's *Harmony of the Seas* is an *Oasis* class cruise ship.  RCCL also own and operate the rest of the *Oasis* class ships which include the *Oasis of the Seas*, *Allure of the Seas*, *Symphony of the Seas* and *Wonder of the Seas* which is under construction as of April 24, 2019.  RCCL has operated and maintained the aforementioned ships continuously since the time when each of those ships were first built and put into service. RCCL also custom built to specifications and designs which were made by or under the supervision and participation of all *Oasis* class RCCL ships. The design and construction of these ships was under the supervision and with the participation of RCCL personnel who were stationed onsite in the shipyard during construction.  All of RCCL *Oasis* class ships, including the *Harmony of the Seas* have passenger cabins with marble and/or highly polished stone flooring in the entry of the cabin.

50.     Onboard the RCCL cruise ships, RCCL offer its passengers onboard a vacation experience, not just transportation. The vacation experience includes private passenger cabins, including upgraded passenger cabin suites.  RCCL's passenger cabins also offer private bathrooms located immediately adjacent to the entry way of each passenger cabin.  RCCL's passenger cabin bathrooms have doors to provide privacy.  Some of RCCL's passenger cabins have highly polished marble and/or stone flooring with a stone counter bar area.



Grand Suite 8660 Video Tour Harmony of the Seas

*See* https://www.youtube.com/watch?time_continue=5&v=oojnKoqBvIE&feature=emb_logo



Harmony of the Seas Grand Suite Details

51.     RCCL knows that its passenger cabins with highly polished stone and/or marble flooring must walk into the cabin to turn on the cabin lights.  To do so forces RCCL passengers to undergo an obstacle course since passengers must navigate the front cabin door, the bathroom door, the entry bar area in order, and the highly polished stone and/or marble flooring to turn on cabin lights. RCCL knew long before this incident that these obstacles are extremely and unreasonably dangerous to navigate in the dark.  RCCL also knew that the highly polished stone and/or marble stone surface is unreasonably slippery especially in the dark when passengers unexpectedly bump into obstacles and/or bump into doors and/or other features in passenger cabins.  RCCL also knows that passengers are not familiar with their cabins and/or layout of their cabins at the start of their cruises, especially in the dark.  RCCL's design and arrangement of the cabin and/or the cabin's highly polished marble and/or stone floors violated industry standards.  Upon information and belief RCCL, at all relevant

times, knew or should have known of industry safety standards applicable to maintaining safe walkways, staircases and floor materials.  Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of star and walkway safety standards and guidelines which apply to the marine environment.  See, *e.g.*, IMO, MSC Circular 735 (24 June 1996); U.S. Access Board, Draft Passenger Vessel Accessibility Guidelines (2000-present) and ADA Accessibility Guidelines; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; Life Safety Code; and Safety of Life at Sea SOLAS) Treaty.

52.     Upon information and belief RCCL, at all times relevant, created its own internal policies and procedures to provide safe walkways including inside passenger cabins.  Therefore RCCL knew or should have known it must provide safe, clear, clean and secure passenger cabin walkways.  Upon information and belief RCCL, at all relevant times, knew or should have known of industry safety standards of ASTM International, ANSI, ISM Code and Regulations and other industry standards applicable to providing and maintaining safe walkway and floor materials.

53.     RCCL chose to create, design, and provide passenger cabins with highly polished stone and/or marble flooring and/or passenger cabin floorplans for its passengers, including the Plaintiff, to enter and exist between times relaxing in passenger cabins, sleeping, spending  time enjoying the rest of the ship's amenities throughout the day and night provided by RCCL. RCCL operate passenger cabins aboard all of its ships, including the *Harmony of the Seas*.

54.     RCCL knew or should have known the design, construction and selection of flooring materials for its passenger cabins and/or layout and/or floorplans for its passenger cabins was unreasonably dangerous. RCCL knew or should have known that RCCL's design, construction and selection of the flooring materials for its passenger cabins and/or layout and/or floorplans for its passenger cabins failed to comply with industry standards.

55.     The dangerous nature of the cabin and/or cabin highly polished stone and/or marble floors is an ongoing, continuous problem on all RCCL ships including the *Harmony of the Seas*.  Upon information and belief RCCL is aware of prior incidents of passengers slipping and/or falling in its passenger cabins due to the obstacles in the entry walkway and/or highly polished stone and/or marble flooring.

56.     **DUTIES OWED BY RCCL**: RCCL owes a "duty to exercise reasonable care for the safety of its passengers" including the Plaintiff herein. *See Hall v. Royal Caribbean Cruises, Limited* 2004 A.M.C. 1913, 2004 WL 1621209, 29 FLWD 1672, Case No. 3d03-2132 (Fla. 3d DCA Opinion filed July 21, 2004). The Defendant also owes a "duty to exercise reasonable care under the circumstances**."** *See Harnesk v. Carnival Cruise Lines, Inc,* 1992 A.M.C. 1472, 1991 WL 329584 (S.D. Fla. 1991). The cruise line is directly negligent for negligently shipboard crewmembers.

57.     RCCL, at all relevant times, was also under a legal duty to comply with mandatory international vessel safety regulations that are promulgated by the International Maritime Organization (IMO) under authority expressly conferred by the U.S. Senate-ratified international Safety of Life at Sea (SOLAS) treaty, including *Part C*, *Regulation 13*, subpart 1.1 "safe escape routes shall be provided."); subpart 1.2 ("escape routes shall be maintained in a safe condition clear of obstacles.")  RCCL's passenger cabin walkways are escape routes that RCCL knew or should have known it must maintain in a safe, clear, clean and secure condition.  Upon information and belief RCCL, at all relevant times, knew or should have known of industry safety standards applicable to maintaining safe walkways and floor materials.  Prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, and the American Society for Testing and Materials (ASTM) International has led to the formulation and promulgation of star and walkway safety standards and guidelines which apply to the marine

environment.  See, *e.g.*, IMO, <u>MSC Circular 735</u> (24 June 1996); U.S. Access Board, <u>Draft Passenger Vessel Accessibility Guidelines</u> (2000-present) and ADA <u>Accessibility Guidelines</u>; 46 CFR §§72.05-20(n), 116.438(h); ASTM F-1166-07; <u>Life Safety Code</u>; and Safety of Life at Sea SOLAS) Treaty.

58.     RCCL, at all times relevant, created its own internal policies and procedures to provide safe, clear, clean and secure passenger cabin walkways; warn passengers of the dangerousness of its highly polished stone and/or marble walkways and/or passenger cabin floorplans.  Upon information and belief RCCL inspects and/or tests its passenger cabin highly polished stone and/or marble walkways and/or passenger cabins on a regular basis and maintains internal policies and procedures regarding minimum standards for its passenger cabins and/or passenger cabin highly polished stone and/or marble walkways.  Therefore, RCCL knew or should have known it must provide safe, clear and clean passenger cabins and/or passenger cabin walkways; warn passengers of the dangerousness of passenger cabins floorplans and/or passenger cabin highly polished stone and/or marble walkways. Upon information and belief RCCL, at all relevant times, knew or should have known of industry safety standards of ASTM International, ANSI, ISM Code and Regulations and other industry standards applicable to providing and maintaining safe walkways and floor materials.

59.     RCCL's duty to design, construct and select materials for all areas and features of its vessels, including the flooring in its passenger cabins and/or passenger cabins on board the *Harmony of the Seas*, is part of RCCL's duty of reasonable care under the circumstances. RCCL had a duty design its passenger cabin and/or passenger cabin walkways in a reasonably safe manner and in accordance with industry standards.  RCCL's duty is part of its duty of reasonable care under the circumstances.

60.     **<u>RCCL CRUISES BREACHED ITS DUTY</u>**: RCCL breached its duty of care owed to the Plaintiff and was negligent by failing to design, construct, select, approve and/or reject

the passenger cabin floor materials and/or passenger cabin floorplans.  RCCL failed to design, construct, select, approve and/or reject materials that complied with industry standards.  The design and/or materials RCCL selected and used to construct its passenger cabin walkways and/or passenger cabins was unreasonably dangerous.

61.     Because RCCL had the ultimate control over the design, construction and selection of materials for its ships, RCCL could refuse to approve the design, construction and selection of materials used for its passenger cabins and/or passenger cabin walkways.  RCCL knew or should have known about the dangerousness of the passenger cabin walkways and/or passenger cabins.

62.     RCCL knew or should have known of the dangerousness of its passenger cabins and/or passenger cabin walkways since their installation in 2016 and/or any changes or modifications made to its passenger cabins and/or passenger cabin walkways.  RCCL's violation of applicable and mandatory safety regulations and standards constitutes negligence *per se*.

63.     **PROXIMATE CAUSE**: RCCL's negligent design, construct and select materials proximately caused the Plaintiff's injuries.  Had RCCL properly designed, constructed and selected the materials of the passenger cabins and/or passenger cabin walkways, the Plaintiff would never have slipped and fallen while attempting to locate the light switch in his passenger cabin.  The Plaintiff therefore would never have slipped and fallen down or smashed his head.

64.     **DAMAGES**: Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain,

suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT III:**
**NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE:**
**ACTUAL AGENCY/RESPONDEAT SUPERIOR**
**FIRST MEDICAL EMERGENCY**

65.     The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1 through 33, above.

66.     This is an action for negligent medical treatment of the Plaintiff, Richard Burgess, by the shipboard physicians and medical staff.  The facts and circumstances are as follows: In the very early hours of February 18, 2019 Burgess slipped and fell in his cabin and hit his head.  Later on that day Mr. Burgess and Mr. Henze realized Mr. Burgess's head did not stop bleeding. Relying on RCCL's representations regarding the quality of care in RCCL's medical center, Burgess and Henze went to the medical center for treatment.  RCCL doctor Dr. Michiel Adrian Etsebeth and Nurse Lilibeth Rivera treated Mr. Burgess.  Dr. Etsebeth found that Mr. Burgess sustained a head

laceration in the occipital area (back of head) approximately 10 cm (4 inches) in length through the full depth of Mr. Burgess's scalp.  RCCL's shipboard doctor and/or nurse sutured the occipital area of Mr. Burgess's laceration.

67.     RCCL did not provide any further care, treatment and/or follow up evaluations of Burgess's head injury despite the significant trauma to the back of Burgess's head.  Henze was present during the care and treatment of Burgess and at no time did RCCL's medical personnel and/or doctor ask either Burgess or Henze whether Burgess lost consciousness.  If the RCCL medical personnel had asked the right question, that is, whether and for how long Burgess lost consciousness, Burgess and Henze would have advised the medical personnel that Burgess did lose consciousness for a significant period of time and that Burgess was dazed after that.  And instead of advising Burgess on the proper follow up care for a head injury, RCCL investigated Burgess' fall by, among other things, going into the cabin of Burgess and taking photographs.

68.     Dr. Etsebeth and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Etsebeth and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Etsebeth and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  The shipboard physicians, including Dr. Etsebeth and the medical staff failed to asses and monitor Mr. Burgess's injuries.  Because Dr. Etsebeth and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Mr. Burgess's injuries, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019.  As a direct result of the shipboard physician

and medical staff's failings, the Plaintiff received improper aftercare instructions and delayed medical treatment, and injuries which could have been prevented.

69.     The Defendant RCCL is vicariously liable and responsible for the negligent acts of its shipboard medical personnel including those persons who were employees and/or actual agents of the Defendant. *See Franza v. Royal Caribbean Cruise Line, Ltd.*, 772 F.3d 1225 (11th Cir. 2014).  The cruise line is vicariously liable for the negligence for the shipboard physicians and medical staff.  This ultimately is based on the fact that the physicians and medical staff are employees or actual agents of the cruise line.  Therefore, under respondeat superior and actual agency the cruise line is liable for the negligence of the physicians and medical staff.

70.     **PRIOR SIMILAR INCIDENTS**: RCCL is aware of prior incidents of negligent treatment provided by its employees or actual agents:

    a.  <u>Lewis Masotti</u>: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

    b.  <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days.  The delay caused permanent complications including permanent disability and disfigurement.

    c.  <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip.  By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

    d.  <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

    e.  <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition.  In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient.  Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

71.    Defendant Michiel Adriaan Etsebeth was an employee or actual agent of RCCL on the date of the subject incident.  This is an action based on the agency relationship between RCCL and the shipboard physicians and medical staff in which the physicians and medical staff acted and act as the actual agents of RCCL in providing medical services, medical supplies and medications

to RCCL's passengers on a regular basis.   RCCL employed the shipboard physicians, including Dr. Etsebeth, and the medical staff aboard the subject ship to provide medical and emergency medical treatment to its crew and thousands of passengers aboard its ships.  The Defendant, as owner of the ship and its medical center, is liable to its passengers for medical negligence of its medical employees.  RCCL represented to RCCL's passengers that the shipboard physicians and medical staff would provide RCCL passengers a safe and comfortable environment for cruise passengers and that the medical center would meet or exceed the standards established by the Cruise Lines International Association (CLIA) and the American College of Emergency Physicians (ACEP).  The shipboard physicians and medical staff consented and accepted this relationship and in exchange provided payment, and benefits including senior officer status, round-trip transportation from residence to ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, and daily housekeeping services.  RCCL maintained and exercised control over the shipboard physicians and medical staff's actions and conduct aboard the ship and the shipboard medical center.  This is evidenced by the fact that RCCL maintained an ongoing relationship with the shipboard medical physicians and medical staff whereby RCCL exclusively provided its passengers for medical services, controlled the stocking of the medical center, offered Royal Caribbean Travel Protection Plan for reimbursement of medical related expenses, controlled the medical center's hours of operation, allowed and required the ship's physicians to operate and provide services out of RCCL's ship medical center, required the shipboard physicians and medical staff to be on call 24 hours to attend to passenger medical emergencies, and controlled termination of the employment relationship between the shipboard physicians and medical staff with RCCL.

72.     The onboard doctors and medical staff owed a duty to provide medical care and treatment to its passengers which was proper and reasonable under the circumstances and within

the standard of care. These duties arise in this case from the law and from the facts and circumstances of this cruise which includes but is not limited to the following: (a) thousands of cruise passengers rely on the shipboard doctor and medical personnel for medical care; (b) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (c) the shipboard doctor and medical personnel know and are advised through training and materials that RCCL provides medical care on its ships and RCCL voluntarily undertakes to provide medical care and to passengers; (d) the cruise line and this ship cater to U.S. citizens who are used to and expect first world medical care; and (e) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

73.     RCCL's shipboard physician(s) including Defendant Dr. Etsebeth and the shipboard medical personnel knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and breached their duty of  reasonable under the circumstances in its medical treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

74.     The shipboard physicians and medical staff failed to warn Burgess that the medical center and staff were not equipped to properly handle Burgess's condition.  The shipboard doctor and the medical staff knew or should have known to warn Burgess as to the medical center's, physician, and medical staff's limitations to provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

75.     The negligent acts of the Defendant's actual agents that occurred aboard the Defendant's ship caused severe and permanent damage to Mr. Burgess on February 18, 2019.  As a direct and proximate result of the negligence of the ship's medical staff including the onboard doctor as described above, Mr. Burgess suffered severe and permanent injuries.

76.     The cruise line is liable for the shipboard physicians and medical personnel because of the actual agency where RCCL's shipboard doctors including Defendant Etsebeth and the medical personal are agents of RCCL.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Burgess suffered severe and permanent injuries.

77.     The negligence of RCCL's shipboard doctors, including Defendant Dr. Etsebeth and medical personnel proximately caused permanent injuries and damages to Burgess in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  Mr. Burgess has suffered these losses in the past and will continue to suffer them in the future.

78.     RCCL is liable for these damages alleged herein because of the respondeat superior and actual agency relationship of the parties as described herein.

79.     The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess.  Those injuries and damages include

but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

### COUNT IV:
### NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE:
### APPARENT AGENCY/AGENCY BY ESTOPPEL
### FIRST MEDICAL EMERGENCY

80. The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1 through 33, above.

81. This is an action for negligent medical treatment of the Plaintiff, Richard Burgess, by the shipboard physicians and medical staff. The facts and circumstances are as follows: In the very early hours of February 18, 2019 Burgess slipped and fell in his cabin and hit his head. Later on that day Mr. Burgess and Mr. Henze realized Mr. Burgess's head did not stop bleeding. Relying

on RCCL's representations regarding the quality of care in RCCL's medical center, Burgess and Henze went to the medical center for treatment.  RCCL doctor Dr. Michiel Adrian Etsebeth and Nurse Lilibeth Rivera treated Mr. Burgess.  Dr. Etsebeth found that Mr. Burgess sustained a head laceration in the occipital area (back of head) approximately 10 cm (4 inches) in length through the full depth of Mr. Burgess's scalp.  RCCL's shipboard doctor and/or nurse sutured the occipital area of Mr. Burgess's laceration.

82.    RCCL did not provide any further care, treatment and/or follow up evaluations of Burgess's head injury despite the significant trauma to the back of Burgess's head.  Henze was present during the care and treatment of Burgess and at no time did RCCL's medical personnel and/or doctor ask either Burgess or Henze whether Burgess lost consciousness.  If the RCCL medical personnel had asked the right question, that is, whether and for how long Burgess lost consciousness, Burgess and Henze would have advised the medical personnel that Burgess did lose consciousness for a significant period of time and that Burgess was dazed after that.  And instead of advising Burgess on the proper follow up care for a head injury, RCCL investigated Burgess' fall by, among other things, going into the cabin of Burgess and taking photographs.

83.    Dr. Etsebeth and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Etsebeth and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Etsebeth and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  The shipboard physicians, including Dr. Etsebeth and the medical staff failed to asses and monitor Mr. Burgess's injuries.  Because Dr. Etsebeth and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Mr. Burgess's injuries, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation

of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019.  As a direct result of the shipboard physician and medical staff's failings, the Plaintiff received improper aftercare instructions and delayed medical treatment, and injuries which could have been prevented.

84.     The Defendant RCCL is vicariously liable and responsible for the negligent acts of its shipboard medical personnel including those persons who were apparent agents of the Defendant. *See Franza v. Royal Caribbean Cruise Line, Ltd.*, 772 F.3d 1225 (11th Cir. 2014).  The cruise line is vicariously liable for the negligence for the shipboard physicians and medical staff because of the relationship of the physicians and medical staff as apparent agents of the Defendant cruise line.

85.     PRIOR SIMILAR INCIDENTS: RCCL is aware of prior incidents of negligent medical treatment provided by its apparent agents:

      a.  <u>Lewis Masotti</u>: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

      b.  <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which

delayed her care and treatment by four days. The delay caused permanent complications including permanent disability and disfigurement.

    c.   <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip. By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

    d.   <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

    e.   <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International. In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition. In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient. Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

86.    Further, the cruise line holds out the ship's physicians and medical staff as the apparent agents of the cruise line. The Defendant through its actions and conduct represents to its

cruise passengers including, but not limited to the Plaintiff herein, that the shipboard physicians and medical staff work for the benefit of the Defendant. These actions and conduct of the cruise line include but are not limited to the following:

a. RCCL controls cruise line physician and medical personnel's attire, which includes, at times, a uniform with epaulettes and stripes similar to other crewmembers and display the RCCL name and logo;

b. RCCL offers physicians benefits including senior officer status, round-trip transportation from residence to the ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, daily housekeeping services, and indemnification and health care;

c. RCCL requires that the ship's physicians sail with the ship;

d. RCCL provides shipboard medical care;

e. RCCL allows and requires the ship's physicians to operate and provide services out of the ship's medical center which is provided by the cruise line and which is equipped by the cruise line;

f. RCCL charges the services of the medical center, which includes services of the ship's doctors and other medical staff and charges for the medical equipment and goods provided by the cruise line, to the passenger's shipboard charge account;

g. The ship's physicians represented themselves to passengers that they are employees of RCCL;

h. RCCL limits the hours and area of the ship where passengers can receive medical services to the ship's medical center, which is staffed exclusively by shipboard medical personnel;

      i.   RCCL publishes the medical center's daily office hours in its shipboard newspaper/flyer which RCCL distributed to all passengers aboard its ships; and

      j.   RCCL requires the shipboard physicians and medical staff to be on call 24 hours to attend to passenger medical emergencies;

      k.   RCCL has the right to hire and fire the physicians and medical personnel including Dr. Etsebeth.

87.    The ship's physician is considered to be an Officer on board the vessel and a member of the crew and introduced to passengers as one of the ship's officers.  Both the ship's doctors and medical personnel were held out to the passengers by RCCL as members of the ship's crew.

88.    RCCL placed the ship's doctor and medical personnel under the command of the ship's superior officers, including the Master of the ship.

89.    RCCL represents to immigration authorities that shipboard doctors and medical personnel are members of the ship's crew.

90.    RCCL is in the business of providing medical services to its passengers. The cruise line also benefits from providing such services. The fact that the cruise line has a Medical Center onboard its ships and represents to the public that "the medical staff is on call 24 hours a day for emergencies" attracts prospective passengers to purchase tickets on the cruise line which cruises go to foreign countries, often third world countries, with little or no medical care for such passengers.

91.    At all times material to this action, the shipboard physicians, including Dr. Etsbeth, and all the shipboard medical staff, were acting within the course and scope of their agency.

92.     At all times material to this action, the Defendant cruise line represented to the passengers onboard the subject cruise ship including Burgess herein that the ship's doctors and medical personnel were the cruise line's apparent agent, in one or all of the following ways:

a.   Defendant controls cruise line physician and medical personnel's attire, which included, at times, a uniform with epaulettes and stripes similar to other crew members and display the RCCL name and logo;

b.   The Defendant cruise line offers physicians benefits including, but not limited to senior officer status, round-trip transportation from residence to the ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, daily housekeeping services, and indemnification and health care;

c.   Defendant controlled the pricing of services provided in the Defendant's Medical Center by shipboard physicians such as Dr. Etsebeth;

d.   Defendant required that passengers seeking medical attention do so in the shipboard Medical Center with the shipboard doctors including Dr. Etsebeth;

e.   RCCL directly charged Plaintiff for the shipboard physician services, including Dr. Etsebeth, by using Plaintiff's shipboard charge card, which also served as his cabin room key, immediately following the receipt of services in the Defendant's Medical Center;

f.   Dr. Etsebeth represented himself as an employee of RCCL;

g.   RCCL required that shipboard physicians, including Dr. Etsebeth, to sail with the ship;

h.   RCCL requires that the ship's physicians to sail with the ship;

i.   RCCL provides the onboard Medical Center;

j.   RCCL allows and requires the ship's physicians to operate and provide services out of the ship's Medical Center which is provided by the cruise line and which is equipped by the cruise line;

k.   The Defendant cruise line charges the services of the medical center, which includes services of the ship's doctors and other medical staff and charges for the medical equipment and goods provided by the cruise line, to the passenger's onboard charge account;

l.   The ship's physicians represent themselves to passengers that they are an employee of RCCL;

m.   RCCL limits the hours and area of the ship where passengers can receive medical services to the ship's Medical Center, which is staffed exclusively by shipboard medical personnel;

n.   RCCL publishes the Medical Center's daily office hours in its newspaper/flyer which RCCL distributed to all passengers aboard its ships;

o.   RCCL requires the shipboard physicians and medical staff to be on call 24 hours to attend to passenger medical emergencies;

p.   RCCL controlled where the shipboard physicians provided medical services by requiring that they operate out of the Defendant's onboard Medical Center;

q.   RCCL provided the onboard Medical Center and provided within that Medical Center the medical equipment, diagnostic machines, disposable goods, medications, and other materials necessary for the onboard physicians including Dr. Etsebeth to provide services; and

r.   The Defendant exercises control over whether to terminate the employment relationship of the shipboard physicians and medical staff with the Defendant.

93.     The cruise line acknowledged that the shipboard physicians, including Dr. Etsebeth would act for it by designating them as a shipboard physician and by requiring them to operate out of the RCCL's Medical Center. The shipboard physicians, including Dr. Etsebeth, manifested an acceptance of this undertaking by accepting this position of shipboard physician and by providing medical care to RCCL's passengers, including Burgess herein. RCCL, as principal, exercised control over the shipboard physicians including Dr. Etsebeth and medical staff's actions.

94.     Burgess relied on the cruise line's apparent agents and relied on the cruise line's agents in good faith. Burgess reasonably believed that the shipboard doctor and medical staff were acting as agents of the cruise line. Burgess and his husband, Henze knew of and relied upon the cruise line's online representations as described herein. Burgess agreed to purchasing the cruise line tickets based on his reasonable belief that the ship's doctor and medical staff would be acting as an agent of the cruise line. Burgess and his husband, Henze, researched the cruise line's shipboard amenities in their decision to select a cruise vacation and read that RCCL many amenities including world class medical facilities which included doctors and medical staff approved and provided by RCCL. Burgess, relying on these representations, agreed that he and Henze should purchase RCCL cruise line tickets based on a reasonable believe that any doctor and medical personnel were acting as an agent of the cruise line.

95.     Burgess justifiably relied upon the care or skill of the cruise line's shipboard doctor and medical staff. Burgess justifiably relied on the apparent agency of the shipboard doctor and medical personnel because he submitted to treatment by the ship's medical staff and doctor; followed the advice of Dr. Estebeth and let him prescribe and administer medicine, perform a physical examination and relied on him to monitor and appropriate treat Mr. Burgess on February 18, 2019 Dr. Etsebeth and the medical personnel's representations that they would medically evacuate him to a nearby hospital in order to treat him as soon as possible; and that Dr. Etsebeth

and the medical personnel could appropriately treat Burgess until he could be taken off the cruise ship.

96.     Ultimately, Burgess relied on the apparent agency to his great detriment. The shipboard doctors including Dr. Etsebeth and medical personnel were not world class and unfit to treat and/or monitor the Plaintiff's condition.   The Plaintiff relied on the shipboard doctors including Dr. Etsebeth and the medical personal's representations that immediate and timely evacuation to a qualified and nearby hospital were being coordinated for the timely and appropriate medical care Mr. Burgess needed to treat his condition.  Unbeknownst to Burgess, he could have been medically evacuated from the ship by air and/or diverted the ship to a nearby port.   Earlier and better medical treatment would have prevented Burgess's severe an permanent injuries.  Thus Burgess and his husband, Henze relied on the representations and assurances by the Defendant cruise line's apparent agents to their detriment.  If not for these representations and assurances, Burgess would never have agreed that he and his husband purchase RCCL cruise tickets; go on the subject cruise ship and cruise; and Burgess and his husband, Henze would have made efforts to speak with the ship's captain, shoreside employees, called a shoreside ambulance and/or helicopter and/or nearby hospital and/or contacted the United States Coast Guard themselves for medical evacuation, treatment and/or assistance.

97.     The shipboard doctor owed a duty to provide medical care and treatment to its passengers which was proper and reasonable under the circumstances and within the standard of care. These duties arise in this case from the law and from the fact and circumstances of this cruise which includes but is not limited to the following: (a) over 1000 cruise passengers rely on the shipboard doctor and medical personnel for medical care; (b) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (c) the shipboard doctor and medical personnel know and are

advised through training and materials that RCCL provides medical care on its ships and RCCL voluntarily undertakes to provide medical care and to passengers; (d) the cruise line and this ship cater to U.S. citizens who are used to and expect first world medical care; and (e) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

98.     The shipboard doctors including Dr. Etsebeth and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Etsebeth and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Etsebeth and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  The shipboard physicians, including Dr. Etsebeth and the medical staff failed to asses and monitor Burgess's head injury and/or asses, recognize and/or appreciate the gravity of Burgess's condition.  Because Dr. Etsebeth and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Burgess's medical condition, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019 severe and permanent injuries which could have been prevented.

99.     RCCL's shipboard physician(s) including Defendant Dr. Etsebeth and the shipboard medical personnel knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and breached their duty of  reasonable under the circumstances in its medical

treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

100.    The shipboard physicians and medical staff failed to warn Burgess that the medical center and staff were not equipped to properly handle Burgess's condition.  The shipboard doctor and the medical staff knew or should have known to warn Burgess as to the medical center's, physician, and medical staff's limitations to provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

101.    The negligent acts of the Defendant's apparent agents that occurred aboard the Defendant's ship caused severe and permanent damage to Burgess on February 18, 2019 and setting in motion Burgess' severe and permanent injuries.  As a direct and proximate result of the negligence of the ship's medical staff including the onboard doctor as described above, Burgess suffered severe and permanent injuries.

102.    The cruise line is liable for the shipboard physicians and medical personnel because of the apparent agency where the shipboard doctors including Dr. Etsebeth and the medical personal are apparent agents of RCCL.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Burgess suffered severe and permanent injuries.

103.    The negligence of the shipboard doctors including Dr. Etsebeth and medical personnel proximately caused permanent injuries and damages to Burgess in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring,

disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. Burgess has suffered these losses in the past and will continue to suffer them in the future.

104.    RCCL is liable for these damages alleged herein because of the apparent agency relationship of the parties as described herein.

105.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendant for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT V:
## NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE:
## JOINT VENTURE – FIRST MEDICAL EMERGENCY

106.    The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1 through 33, above.

107.    This is an action for negligent medical treatment of Burgess by the shipboard physician.  The facts and circumstances are as follows: In the very early hours of February 18, 2019 Burgess slipped and fell in his cabin and hit his head.  Later on that day Mr. Burgess and Mr. Henze realized Mr. Burgess's head did not stop bleeding. Relying on RCCL's representations regarding the quality of care in RCCL's medical center, Burgess and Henze went to the medical center for treatment.  RCCL doctor Dr. Michiel Adrian Etsebeth and Nurse Lilibeth Rivera treated Mr. Burgess.  Dr. Etsebeth found that Mr. Burgess sustained a head laceration in the occipital area (back of head) approximately 10 cm (4 inches) in length through the full depth of Mr. Burgess's scalp.   RCCL's shipboard doctor and/or nurse sutured the occipital area of Mr. Burgess's laceration.

108.    RCCL did not provide any further care, treatment and/or follow up evaluations of Burgess's head injury despite the significant trauma to the back of Burgess's head.  Henze was present during the care and treatment of Burgess and at no time did RCCL's medical personnel and/or doctor ask either Burgess or Henze whether Burgess lost consciousness.  If the RCCL medical personnel had asked the right question, that is, whether and for how long Burgess lost consciousness, Burgess and Henze would have advised the medical personnel that Burgess did lose consciousness for a significant period of time and that Burgess was dazed after that.  And instead of advising Burgess on the proper follow up care for a head injury, RCCL investigated Burgess' fall by, among other things, going into the cabin of Burgess and taking photographs.

109.    Dr. Etsebeth and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Etsebeth and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Etsebeth and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  The shipboard physicians, including Dr. Etsebeth and the medical staff failed to asses and monitor Mr. Burgess's injuries.  Because Dr. Etsebeth and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Mr. Burgess's injuries, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019.  As a direct result of the shipboard physician and medical staff's failings, the Plaintiff received improper aftercare instructions and delayed medical treatment, and injuries which could have been prevented.

110.    The Defendant RCCL is vicariously liable and responsible for the negligent acts of its shipboard physicians who were joint venturers with the Defendant. *See Franza v. Royal Caribbean Cruise Line, Ltd.*, 772 F.3d 1225 (11th Cir. 2014).  The cruise line is vicariously liable for the negligence for the shipboard physician because of the relationship of the physician as a joint venturer with the Defendant cruise line.

111.    **PRIOR SIMILAR INCIDENTS**: RCCL is aware of prior similar incidents of its joint venturers providing negligent medical treatment:

> a.  <u>Lewis Masotti</u>: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and

failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

b. <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days.  The delay caused permanent complications including permanent disability and disfigurement.

c. <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip.  By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

d. <u>Mitchell Allen</u>:  Case  No.  19-cv-24061  involved  RCCL's  doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e. <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor  misdiagnosed  Mr.  Hill's  progressive  and  life  threatening condition.  In Hill, just as here the cruise line delayed in transporting Hill to

a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient.  Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

112.    The cruise line and the physicians aboard the Defendant's ships engaged in a joint venture to provide medical services to the cruise passengers. The parties intended to engage in a joint venture; maintained joint control or the right to control; joint proprietary interests in the shipboard medical care and medical facility that was the subject of the joint venture; and all parties held the right to share in the profits and duty to share in the ventures losses.

113.    **THE PARTIES' INTENT**.  It was the joint intention and common purpose of the Defendant cruise line and the shipboard physicians to provide healthcare to the thousands of passengers who come aboard the Defendant's ships to enjoy the cruise experience with the peace of mind that their medical and emergency healthcare needs are satisfied.  The cruise line and the physician on board the Defendant's ships entered into a long-term business agreement to provide passengers and crewmembers medical care and treatment aboard the cruise line's ships.  The purpose of the venture was to profit from providing medical services to cruise passengers and crewmembers.  A written agreement between joint venturers is not necessary to establish a joint venture. *Fulcher's Point Pride Seafood, Inc v. M/V Theodora Maria*, 935 F.2d 208, 213 (11th Cir. 1991).  The "true intent of the parties, their conduct (and intent thereby evidenced) created a joint venture." *Terry v. Carnival Corporation*, 2017 WL 5135599 at \*4 (S.D. Fla. Aug. 10, 2017).

114.    The Parties maintained verbal agreement and their conduct indicate their intent to a long-term agreement to provide medical services and care to passengers and crewmembers in

exchange for payment.  RCCL incorporated medical facilities onboard its cruise ships, including the RCCL *Harmony of the Seas*, as part of its business model.  The cruise line profits from the revenue generated from its shipboard infirmaries.  With medical personnel working onboard its ships, the cruise line's ships do not have to divert or reroute to provide medical care as required by international law.  This saves the cruise line significant fuel costs and costly port fees.  The Defendant cruise line is also able to market that they provide medical care to persuade people to cruise with them.  This generates increased ticket sales.  Defendant Dr. Etsebeth purposefully reached out to Defendant RCCL to its Florida shoreside medical department to enter into a long-term business arrangement to provide medical services to cruise passengers and crewmembers for profit.

115.    **JOINT CONTROL OR RIGHT OF CONTROL**.  The cruise line and shipboard physicians, including Dr. Etsebeth, maintain joint control or right of control over the medical care and services provided to passengers and crewmembers aboard the Defendant cruise line's ships. The Defendant cruise line has the right of control over the medical facility from a shoreside perspective.  RCCL's shoreside medical department monitored and supervised Dr. Etsebeth through its shoreside orientation trainings, standard operating procedures, and other standards, policies, procedures and guidelines he was required to follow.  The cruise line also required Dr. Etsebeth to continuously communicate with RCCL's shoreside medical department for shoreside to control the restocking of medical supplies and medicine; sending medical equipment technicians to cruise ships to fix and maintain medical equipment; providing final approval and authorization on proposed medical evacuations; providing shoreside 24/7 on-call doctors for medical consultations.  The cruise line has the right to control marketing its shipboard physicians and make use of the physicians' name, voice, pictures, photographs and other likenesses for the purpose of promoting and publicizing the Defendant cruise line's vessels in any and all media.  The Defendant

cruise line has the right of control over proprietary interests including the medical operational procedures, medical trainings and other intellectual property.

116.    Shipboard physicians control and oversee the day-to-day operations of the shipboard medical facilities and medical personnel aboard the cruise line's ships.  Here, Dr. Etsebeth was a Senior Medical Officers onboard the RCCL *Harmony of the Seas* who exercised day-to-day control over and oversaw the operation and maintenance of the medical facility's treatment of passengers and crewmembers onboard the ship. Dr. Etsebeth controlled the day-to-day operations which included ensuring continuous updating computerized inventory of the infirmaries medical supplies and medicine; providing consultations, treatment and care, maintaining clinic hours; providing and maintaining 24/7 on-call emergency response of a physician (himself) and nurses; logging the billing for treatment, care and supplies provided to crewmembers and passengers; ensuring the physician (himself) and medical personal write medical notes and medical records for all consultations, treatment and care provided; initiating, requesting, and/or advocating for prompt medical evacuation for passengers and crewmembers requiring care or treatment that exceeds what the medical facility can provide, calling shipboard security to report passenger and crewmember accidents; ensuring all paperwork to document accidents requiring more than first aid treatment is written and maintained; and prescribing and filling prescription medications to passengers and crewmembers aboard cruise ships; ensuring continuous communication with RCCL's shoreside medical department.

117.    **JOINT PROPRIETARY INTEREST**.  The Defendants share a joint interest in the business enterprise between the parties. *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 212 (11th Cir. 1991).  Therefore the parties shared a joint propriety interest in the subject matter of the contract, that being RCCL owned the RCCL *Harmony of the Sea*'s medical facilities and Dr. Etsebeth supervised and invested all of their time and efforts operating

the medical center and all of its day-today services.  On board the *Harmony of the Seas*, Dr. Etsebeth invested his time and efforts by ensuring continuous updating computerized inventory of the infirmaries medical supplies and medicine; providing consultations, treatment and care, maintaining clinic hours; providing and maintaining 24/7 on-call emergency response of a physician (himself) and nurses; logging the billing for treatment, care and supplies provided to crewmembers and passengers; ensuring the physician (himself) and medical personnel write medical notes and medical records for all consultations, treatment and care provided; initiating, requesting, and/or advocating for prompt medical evacuation for passengers and crewmembers requiring care or treatment that exceeds what the medical facility can provide, calling shipboard security to report passenger and crewmember accidents; ensuring all paperwork to document accidents requiring more than first aid treatment is written and maintained; prescribing and filling prescription medications to passengers and crewmembers aboard cruise ships; and ensuring continuous communication with RCCL's shoreside medical department.

118.   **PROFITS AND LOSSES.**  The cruise line and the shipboard physician share in profits and losses based on the circumstances of their agreement.  In this arrangement Dr. Estebeth supplied his labor, experience, and skill while RCCL provided the necessary capital to outfit the medical facility.  RCCL incorporated medical facilities onboard its cruise ships, including the RCCL *Harmony of the Seas*, as part of its business model.  The Defendant cruise line profits from the revenue generated from its shipboard infirmaries.  With medical personnel working onboard its ships, the cruise line's ships do not have to divert or reroute to provide medical care as required by international law.  This saves the cruise line significant fuel costs and costly port fees.  The Defendant cruise line is also able to market that they provide medical care to persuade people to cruise with them.  This generates increased ticket sales.  In the event of a loss, Dr. Etsebeth would

have exercised his skills in vain and RCCL's capital investment would financially suffer, and thus both parties would effectually share in the losses if the venture failed.

119.   Additionally, the cruise line and the physicians and medical staff therefore relied on a single billing system and unified strategy of advertisement on RCCL's website.  The cruise line and shipboard physicians and medical staff share profits and losses and split revenue from medical services and supplies rendered to the thousands of cruise passengers.  The shipboard physicians and medical staff increase profits by servicing passengers and prescribing them medications and supplies.  Shipboard physicians have the sole discretion to sell prescription medication and medical supplies to passengers and crewmembers.  Shipboard physicians have the sole discretion to render medical care, treatment and services to passengers and crewmembers aboard the Defendant's cruise ships during its day-to-day operations.  Shipboard physicians who oversee the medical personnel's actions have the sole discretion to input medical services and supplies provided to passengers and crewmembers.  RCCL's compensation for the shipboard physicians and medical staff's services is dependent in part on the medical center's revenues and the medical center's revenues depend in part on the recommendations and prescriptions of the physicians to the passengers as to the medical care that they need or should have and whether these passengers should evacuate the ship to receive medical care off the cruise ship.

120.   The shipboard doctor owed a duty to provide medical care and treatment to its passengers which was proper and reasonable under the circumstances and within the standard of care. These duties arise in this case from the law and from the fact and circumstances of this cruise which includes but is not limited to the following: (a) over 1000 cruise passengers rely on the shipboard doctor and medical personnel for medical care; (b) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (c) the shipboard doctor and medical personnel know and are

advised through training and materials that RCCL provides medical care on its ships and RCCL voluntarily undertakes to provide medical care and to passengers; (d) the cruise line and this ship cater to U.S. citizens who are used to and expect first world medical care; and (e) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

121.    The shipboard doctors including Dr. Etsebeth and medical personnel breached his duties of reasonable care under the circumstances.  Dr. Etsebeth and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Etsebeth and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  The shipboard physicians, including Dr. Etsebeth and the medical staff failed to asses and monitor Burgess's injuries and/or asses, recognize and/or appreciate the gravity of Mr. Burgess's injuries.  Dr Etsebeth and/or the medical staff failed to provide appropriate aftercare for Burgess's injuries.  Because Dr. Etsebeth and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Burgess's condition, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019.  As a direct result of the shipboard physician and medical staff's failings, the Plaintiff's condition deteriorated and Burgess arrived at the hospital outside the window to receive certain medications which could have prevented Burgess severe and permanent injuries which could have been prevented.

122.    RCCL's shipboard physician(s) including Defendant Dr. Etsebeth and the shipboard medical personnel knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications

and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and breached their duty of  reasonable under the circumstances in its medical treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

123.    The shipboard physicians and medical staff failed to warn Burgess that the medical center and staff were not equipped to properly handle Burgess's condition.  The shipboard doctor and the medical staff knew or should have known to warn Burgess as to the medical center's, physician, and medical staff's limitations to provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

124.    The negligent acts of RCCL's joint venturers occurred aboard the Defendant's ship caused severe and permanent damage to Burgess on February 18, 2019 and setting in motion the deterioration of Burgess.  As a direct and proximate result of the negligence of the ship's medical staff including the onboard doctor as described above, Burgess suffered severe and permanent injuries.

125.    The cruise line is liable for the shipboard physicians and medical personnel because of the joint venture where the shipboard doctors including Dr. Etsebeth and the medical personal are joint venturers of RCCL.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Burgess suffered severe and permanent injuries.

126.    The negligence of the shipboard doctors including Dr. Etsebeth and medical personnel proximately caused permanent injuries and damages to Richard Burgess in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income

earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  Burgess has suffered these losses in the past and will continue to suffer them in the future.

127.    RCCL is liable for these damages alleged herein because of the joint venture relationship of the parties as described herein.

128.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident

under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT VI:
## NEGLIGENT MEDICAL CARE – DIRECT LIABILITY OF DOCTOR MICHIEL ADRIAAN ETSEBETH

129.     Plaintiffs readopts and re-alleges each and every allegation in paragraphs 1-33, above.

130.     This is an action for negligent medical treatment of the Plaintiff by Dr. Michiel Adriaan Etsebeth, a shipboard physician.  The facts and circumstances are as follows: In the very early hours of February 18, 2019 Burgess slipped and fell in his cabin and hit his head.  Later on that day Mr. Burgess and Mr. Henze realized Mr. Burgess's head did not stop bleeding. Relying on RCCL's representations regarding the quality of care in RCCL's medical center, Burgess and Henze went to the medical center for treatment.  RCCL doctor Dr. Michiel Adrian Etsebeth and Nurse Lilibeth Rivera treated Mr. Burgess.  Dr. Etsebeth found that Mr. Burgess sustained a head laceration in the occipital area (back of head) approximately 10 cm (4 inches) in length through the full depth of Mr. Burgess's scalp.  RCCL's shipboard doctor and/or nurse sutured the occipital area of Mr. Burgess's laceration.

131.     RCCL did not provide any further care, treatment and/or follow up evaluations of Burgess's head injury despite the significant trauma to the back of Burgess's head.  Henze was present during the care and treatment of Burgess and at no time did RCCL's medical personnel and/or doctor ask either Burgess or Henze whether Burgess lost consciousness.  If the RCCL medical personnel had asked the right question, that is, whether and for how long Burgess lost consciousness, Burgess and Henze would have advised the medical personnel that Burgess did lose consciousness for a significant period of time and that Burgess was dazed after that.  And

instead of advising Burgess on the proper follow up care for a head injury, RCCL investigated Burgess' fall by, among other things, going into the cabin of Burgess and taking photographs.

132.     Dr. Etsebeth and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Etsebeth and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Etsebeth and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  The shipboard physicians, including Dr. Etsebeth and the medical staff failed to asses and monitor Mr. Burgess's injuries.  Because Dr. Etsebeth and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Mr. Burgess's injuries, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019.  As a direct result of the shipboard physician and medical staff's failings, the Plaintiff received improper aftercare instructions and delayed medical treatment, and injuries which could have been prevented.

133.     **PRIOR SIMILAR INCIDENTS**: RCCL is aware of prior incidents of its medical staff including Dr. Estebeth providing negligent medical treatment:

> a.   Lewis Masotti: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.
>
> b.   A.C. (a minor): Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL

failed to properly diagnose A.C.'s displaced left hip fracture. RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017. RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days. The delay caused permanent complications including permanent disability and disfigurement.

c.  <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip. By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

d.  <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e.  <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International. In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition. In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient. Just as here, the

delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

134.     At all times material hereto, Defendant Michiel Adriaan Etsebeth held himself out to the public in general and to the Plaintiff herein as a healthcare provider who was capable of and who undertook the corresponding duty to Mr. Burgess of providing medical services to Mr. Burgess in accordance with that level of care and skill that is recognized as acceptable and appropriate by reasonably prudent similar healthcare providers under the same or similar circumstances.

135.     Notwithstanding the duties undertaken, Defendant Etsebeth breached his duties of reasonable care under the circumstances owed to Burgess.  Dr. Etsebeth failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Etsebeth failed to properly assess, monitor, follow, provide appropriate aftercare and/or medical instructions.  Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  Dr. Etsebeth failed to order appropriate diagnostic testing and scans to further assess the extent of Plaintiff's traumatic head injury which required sutures.  Dr. Etsebeth failed to asses and monitor Burgess's head injury and/or asses, recognize and/or appreciate the gravity and time sensitivity of Burgess's progressive condition.  Dr. Etsebeth failed to accurately describe, characterize and/or advise RCCL's shoreside on-call physical, captain, staff captain, officers and/or the RCCL personnel who assist, approve and/or participate in the treatment and care of passenger patients such as Burgess.  Dr. Etsebeth failed to request, initiate and/or demand medical evacuation and/or coordination of shore side care as to the nature of the Plaintiff's severe medical condition.   Dr. Etsebeth failed to use or ask for resources such as manuals and treatises, access or use reasonable procedures to contact medical

professionals in the United States for consultation about the care and treatment for the Plaintiff's condition.

136.    Because Dr. Etsebeth failed to recognize the severe nature of Burgess's medical condition, he failed to initiate, request, advocate and/or effectuate a prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019.  As a direct result of Dr. Etsebeth's failings, the Plaintiff suffered severe and permanent injuries, all of which could have been prevented.

137.    Defendant Dr. Etsebeth knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and breached their duty of  reasonable under the circumstances in its medical treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

138.    Dr. Etsebeth failed to warn Burgess that the medical center and staff were not equipped to properly handle Mr. Burgess's condition.  Dr. Etsebeth knew or should have known to warn Burgess as to his, the medical center's, other physician's, and medical staff's limitations to provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

139.    The negligent acts of the Dr. Etsebeth that occurred aboard the Defendant's ship caused severe and permanent damage to Mr. Burgess on February 18, 2019 and setting in motion the deterioration of Mr. Burgess.  As a direct and proximate result of the negligence of Dr. Etsebeth as described above, Mr. Burgess severe and permanent injuries.

140.    These failures constituted unreasonable and below standard medical care.

141.    The Defendant's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Mr. Burgess's condition deteriorated, causing permanent injury and nearly causing his death.

142.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future;

lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

<u>**COUNT VII:**</u>
<u>**NEGLIGENT FAILURE TO EVACUATE PASSENGER AND/OR EVACUATE PASSENGER APPROPRIATELY – DIRECT LIABILITY OF THE CRUISE LINE**</u>

143.    The Plaintiff hereby adopts and re-alleges each and every allegation in Paragraphs 1-33, above.

144.    This is an action for negligence of the Defendant cruise based on RCCL's failing to evacuate the passenger who was in need of emergent medical care.  The facts and circumstances are as follows: In the very early hours of February 18, 2019 Burgess slipped and fell in his cabin and hit his head.  Later on that day Mr. Burgess and Mr. Henze realized Mr. Burgess's head did not stop bleeding. Relying on RCCL's representations regarding the quality of care in RCCL's medical center, Burgess and Henze went to the medical center for treatment.  RCCL doctor Dr. Michiel Adrian Etsebeth and Nurse Lilibeth Rivera treated Mr. Burgess.  Dr. Etsebeth found that Mr. Burgess sustained a head laceration in the occipital area (back of head) approximately 10 cm (4 inches) in length through the full depth of Mr. Burgess's scalp.  RCCL's shipboard doctor and/or nurse sutured the occipital area of Mr. Burgess's laceration.

145.    RCCL did not provide any further care, treatment and/or follow up evaluations of Burgess's head injury despite the significant trauma to the back of Burgess's head.  Henze was present during the care and treatment of Burgess and at no time did RCCL's medical personnel and/or doctor ask either Burgess or Henze whether Burgess lost consciousness.  If the RCCL

medical personnel had asked the right question, that is, whether and for how long Burgess lost consciousness, Burgess and Henze would have advised the medical personnel that Burgess did lose consciousness for a significant period of time and that Burgess was dazed after that. And instead of advising Burgess on the proper follow up care for a head injury, RCCL investigated Burgess' fall by, among other things, going into the cabin of Burgess and taking photographs.

146.    Dr. Etsebeth and medical personnel breached their duties of reasonable care under the circumstances. Dr. Etsebeth and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein. Dr. Etsebeth and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition. The shipboard physicians, including Dr. Etsebeth and the medical staff failed to asses and monitor Mr. Burgess's injuries. Because Dr. Etsebeth and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Mr. Burgess's injuries, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019. As a direct result of the shipboard physician and medical staff's failings, the Plaintiff received improper aftercare instructions and delayed medical treatment, and injuries which could have been prevented.

147.    The cruise line failed to arrange for this evacuation, advise the passengers that evacuation was possible and how it was possible, divert the course of the ship to ensure that the ship was in port sooner than it was, and failure to arrange or provide air or sea evacuation from the ship in order to obtain medical care ashore. The cruise line personnel also refused and/or failed to timely evacuation of the plaintiff for the plaintiff to receive emergent medical care ashore when it became clear that the passenger's medical emergency required such care.

148.     RCCL through the ship's command and through the home office owes a duty to provide reasonable and proper transportation of its passengers including the Plaintiff herein who are suffering from a significant medical problem. The duty is to provide such transportation (a) to get that passenger to the nearest hospital when the passenger is on land if time is of the essence or critical in the medical treatment of the passenger; (b) by evacuating the passenger off of the ship by air or sea; and/or (c) to the nearest port by means of diverting the ship when the diversion of the ship's course will make significant effect on a significant medical condition of the passenger.

149.     **PRIOR SIMILAR INCIDENTS**.  Despite RCCL's representations to the public, RCCL is aware of numerous incidents involving RCCL, RCCL's doctors and/or medical personnel's failure to medically evacuate its cruise passengers receiving medical care and treatment below the standard of care as well as incidents of delayed medical care and delayed medical evacuation.  Examples of these prior incidents are as follows:

    a.  <u>Lewis Masotti</u>: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

    b.  <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which

delayed her care and treatment by four days.  The delay caused permanent complications including permanent disability and disfigurement.

   c.   <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip.  By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

   d.   <u>Mitchell Allen</u>:  Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

   e.   <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition the Celebrity cruise ship also docked in San Juan, Puerto Rico and sent Hill to HIMA San Pablo Caguas which delayed his treatment and aggravated his condition, loss of blood leading to organ shutdown and hypoxic brain injury. Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

150.   RCCL through the ship's command and through the home office breached its duty to the Plaintiff herein to provide reasonable and proper transportation of the Plaintiff who was at the time of this cruise suffering from a significant, time sensitive and progressive medical problem. The Defendant RCCL breached its duties by failing to initiate, request, advocate and/or effectuate

for prompt medical evacuation of the Plaintiff from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 18, 2019.  The Defendant RCCL breached its duties by failing to timely transport the Plaintiff to the nearest hospital upon presentation of severe injuries; failing to evacuate the Plaintiff off the ship by means of a helicopter or other medivac transport mechanism on February 18, 2019, when Mr. Burgess's condition was known to be a severe medical emergency and/or required care, treatment and/or testing that was known to be unavailable on the ship and/or required medications that can only be administered within a certain timeframe which would drastically alter the outcome of Mr. Burgess's medical condition and/or prognosis; failing to transport the Plaintiff to the nearest hospital by helicopter or medivac transport mechanism by means of diverting the ship when the diversion of the ship's course would have made a significant effect on a significant medical condition of the Plaintiff; and failing to properly advise the closest Medical Facility and Emergent Transport the Plaintiff's condition.

151.    Once it was apparent that the Plaintiff's condition was severe the measures of transporting the Plaintiff off of the ship and/or diverting the ship's course should have been taken to minimize damage to the Plaintiff.

152.    RCCL knew of Plaintiff's severe medical condition.  RCCL also knew that the physician and medical staff were incapable of handling the Plaintiff's condition.  RCCL was advised of the Plaintiff's severe condition through Dr. Etsebeth who called and emailed RCCL's on-call shoreside physicians and personnel.  Dr. Etsebeth and the medical personnel knew of the Plaintiff's severe medical condition by the Plaintiff as well as their own opportunity to evaluate the Plaintiff's physical condition.  RCCL further knew or should have known of Plaintiff's significant medical condition because the Plaintiff was under the care of RCCL's actual agents, apparent agents and/or joint venturer Defendant Pereira and other RCCL Medical Center employees.  Such care was provided

to Plaintiff inside the onboard Medical Center which is owned and outfitted with supplies by Defendant RCCL.

153.    As a direct result of the Defendant's prolonged delay to initiate, request, and/or advocate for prompt medical evacuation of evacuate the Plaintiff off the subject ship on a timely basis to a land based medical center capable of handling the Plaintiff's medical condition, the shipboard physicians and medical personnel continued in providing faulty medical care which did not comport with the standard of care and thereby continued the prolonged delay of proper medical treatment. The Plaintiff suffered severe and permanent injuries.

154.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring,

disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT VIII:**
**NEGLIGENT HIRING, SELECTION, RETENTION, MONITORING, AND TRAINING**
**OF THE ONBOARD MEDICAL STAFF – DIRECT LIABILITY OF THE CRUISE LINE**

155.    The Plaintiff hereby adopts and re-alleges each and every allegation in Paragraphs 1-33, above.

156.    This is an action for negligence due to RCCL's negligent hiring, selection, retention, monitoring, and training of the onboard medical staff including Defendant Michiel Adriaan Etsebeth.  RCCL owes a "duty to exercise reasonable care for the safety of its passengers" including the Plaintiff herein. *See Hall v. Royal Caribbean Cruises, Limited* 2004 A.M.C. 1913, 2004 WL 1621209, 29 FLWD 1672, Case No. 3d03-2132 (Fla. 3d DCA Opinion filed July 21, 2004). The Defendant also owes a "duty to exercise reasonable care under the circumstances**."** *See Harnesk v. Carnival Cruise Lines, Inc,* 1992 A.M.C. 1472, 1991 WL 329584 (S.D.Fla. 1991). The cruise line is directly negligent for negligently hiring, training, and retaining the doctor onboard and the medical staff.

157.    RCCL owes a duty to provide medical care and treatment to its passengers and to the Plaintiff herein which is proper and reasonable under the circumstances and within the standard of care. These duties arise in this case from the law and from the facts and circumstances of this cruise which includes but is not limited to the following: (a) RCCL's duty under the General Maritime Law to provide its passengers with a voyage and a ship which are reasonably safe or reasonably safe under the circumstances; (b) RCCL's representations in its advertising and

literature that the cruise line provides a medical facility, and that the ship provides medical staff that is on call 24 hours a day for emergencies; (c) RCCL's holding out the ship's physicians as its apparent agent; (d) RCCL's apparent agent physicians' failure to provide medical care and properly diagnose and treat the Plaintiff; (e) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (f) RCCL caters to predominately U.S. citizens who are used to and expect first world medical care; (g) RCCL markets this cruise as safe and secure for its passengers, and (h) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

158.    **PRIOR SIMILAR INCIDENTS**:  RCCL is aware of prior similar incidents the company failed to reasonably hire, select, retain, monitor, and train its onboard medical staff on its ships:

    a.  <u>Lewis Masotti</u>:  Case  No.  1:19-cv-22078  involved  RCCL's  doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

    b.  <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which

delayed her care and treatment by four days.  The delay caused permanent complications including permanent disability and disfigurement.

c.  <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip.  By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

d.  <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e.  <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition.  In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient.  Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

159.    RCCL owes a duty to use reasonable care in providing competent medical staff and medical staffing agencies.  RCCL, as a result of its duty to provide its passengers medical care

which is reasonable under the circumstances, owes a duty to reasonably hire, select, retain, monitor, and train its onboard medical staff.

160.    RCCL failed to reasonably hire, select, retain, monitor, and train its onboard medical staff on the subject ship.  RCCL hired Dr. Etsebeth back in 2018.  On or about May 23, 2018 Dr. Etsebeth failed to recognize rapidly deteriorating vitals, bloodwork and chemistry which resulted in severe and permanent injuries to Lewis Masotti on or about May 23, 2018.  *See Lewis Masotti and Judith E. Masotti v. Royal Caribbean Cruises, Ltd.*, Case No. 19-cv-22078-KMW. RCCL knew or should have known something was wrong with Dr. Etsebeth's abilities.  Upon information and belief RCCL required Dr. Etsebeth to undergo written tests on rudimentary medical knowledge and/or training before rehiring Etsebeth for the contract he served during the Plaintiff's incident. RCCL knew or should have known that Dr. Etsebeth lacked some of the basics of medicine and medical care and certainly was not equipped to handle an emergency.

161.    RCCL knew or should have known that medical education for medicine, particularly emergency medicine, in countries outside the United States, including South Africa are subpar compared to any reasonable medical education in most developed country.  For example, foreign doctors do not undergo residency training in order to practice in an emergency room.  Upon information and belief foreign doctors are only required to complete medical school; one year of rotational training in different specialties which switch every couple of months; and if selected, one year of social services practicing in first level medical facility treating only minor conditions such as the common cold and fever.  RCCL knew or should have known to investigate Dr. Etsebeth's level of training to work in an emergency room prior to hiring them, particularly Dr. Etsebeth after his May 2018 contract.  If RCCL had reasonably investigated Dr. Etsebeth's prior training and experience RCCL would have discovered that they either had no emergency room experience or no substantial emergency room experience, but only experience at first level

medical facilities treating illnesses such as the common cold and fever.  RCCL knew or should have known of Dr. Etsebeth's inexperience and accordingly harmful propensities prior to hiring and/or retaining Dr. Etsebeth.

162.    Dr. Etsebeth were not equipped either through their education, training, skills, or environment, to properly diagnose the Plaintiff's time sensitive medical condition and/or to create a reasonable plan for the care and treatment of the Plaintiff.  Dr. Etsebeth were not equipped either through their education, training, skills, or environment to initiate, request and/or advocate for a prompt medical evacuation of the Plaintiff to a land based medical center capable of handling the Plaintiff's time sensitive medical condition to the ship's command and/or RCCL's shoreside on-call physician to arrange for the evacuation of the Plaintiff off the ship.  Dr. Estebeth lacked the education, training, or skills to handle severe medical conditions.  Dr. Etsebeth only worked at first level medical facilities prior to working for RCCL.

163.    RCCL knew or should have known to investigate Dr. Etsebeth's educational credentials and training prior to retaining Dr. Etsebeth as a RCCL doctor.  RCCL knew or should have known to investigate the medical facilities that Dr. Etsebeth worked at prior to working for RCCL.  Dr. Etsebeth did not have significant experience working with emergencies.  RCCL knew or should have known to investigate and contact the medical boards and/or equivalent regulatory body as well as Dr. Etsebeth's medical school and the medical facilities where Dr. Etsebeth previously worked to verify their backgrounds.  If RCCL had verified and investigated the background of Dr. Etsebeth, RCCL would not have retained Dr. Etsebeth.  RCCL breached its duty to hire and/or retain by failing to screen its shipboard physicians, including Dr. Etsebeth, in order to provide a qualified and competent physician.  RCCL knew or should have known Dr. Etsebeth was unqualified to provide reasonable emergent medical care after RCCL conducted an internal investigation and a committee decided not to retain and/or hire Dr. Etsebeth prior to Dr.

Etsebeth's additional contracts.  RCCL failed to adequately investigate its shipboard physician's background, including prior employment with other cruise lines and medical providers as well as educational credentials and recent training.

164.    RCCL knew or should have known to provide adequate training to all shipboard medical personnel regarding all aspects of providing shipboard medical care, including situations where passengers should be transported off RCCL's ships.  The Defendant failed to provide Dr. Pereira and/or Dr. Etsebeth and the medical staff the necessary training as to all aspects of shipboard medical care.  As a result of the Defendant's failure to monitor and provide adequate training to its shipboard medical staff, Dr. Etsebeth failed to initiate, request and/or advocate for a prompt medical evacuation to a land based medical center capable of handling the Plaintiff's condition.

165.    The Defendant owes a duty to use reasonable care to monitor the activities of onboard medical personnel in the shipboard Medical Center, including Defendant Etsebeth.  The Defendant also knew or should have known not to retain incompetent physicians and/or medical personnel with insufficient experience in medical care and/or emergent medical care including Defendant Etsebeth.  The Defendant knew or should have known of the Dr. Etsebeth's unfitness to provide adequate medical care to its shipboard passengers based on her lack of experience practicing emergent care and through RCCL's own committee investigation which initially decided not to retain Dr. Etsebeth and then subsequently retained Dr. Etsebeth, but only because of a test on rudimentary medicine which is evidence that RCCL knew that Dr. Etsebeth lacked some of the basics of medicine and medical care  and certainly was not equipped to handle an emergency. The Defendant breached its duty to use reasonable care to monitor and retain physicians who were equipped through experience, education, skills, training, or environment to properly examine, diagnose and treat the Plaintiff's medical condition.

166.    The shipboard physician and medical staff did not have the mental temperament and analytical abilities and did not have sufficient knowledge and training to properly diagnose or to create a reasonable and appropriate plan for emergent care and treatment including evacuation of the patient and getting the Plaintiff to a medical center on an expedited basis appropriate for emergent care.   Dr. Etsebeth could not reasonably handle the stress and pressure of an emergent medical situation.   Dr. Estebeth panicked and avoided the Plaintiff and/or Plaintiff's family's questions and concerns.   RCCL knew or should have known to investigate and test Dr. Etsebeth's mental temperament and ability to analytically handle an emergent medical case.   RCCL breached its duties of reasonable care to hire and retain Dr. Etsebeth sent forms to Dr. Etsebeth'sreferences which offer no information as to Dr. Etsebeth's ability to treat emergent.   Mr. Burgess's condition deteriorated, causing permanent injury and nearly causing his death.

167.    RCCL was incompetent in its evaluation of doctors for purposes of hiring and/or retention.   After the Plaintiff's incident demonstrating Dr. Etsebeth's inability to provide reasonable medical care, RCCL nevertheless negligently continued to employ them.   Because RCCL could not reasonably evaluate Dr. Etsebeth's ability to provide reasonable medical care, the doctors committed medical malpractice again.   Nine months before the Plaintiff's incident, Dr. Etsebeth committed medical malpractice by failing to medically evacuate Passenger Lewis Masotti on or about May 23, 2018.  *See Lewis Masotti and Judith E. Masotti v. Royal Caribbean Cruises, Ltd.*, Case No. 19-cv-22078-KMW.

168.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and

past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiff demands Judgment against the Defendant for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT IX:
## NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE: ACTUAL AGENCY/RESPONDEAT SUPERIOR SECOND MEDICAL EMERGENCY

169. The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1 through 33, above.

170. This is an action for negligent medical treatment of the Plaintiff, Richard Burgess, by the shipboard physicians and medical staff. The Defendant RCCL is vicariously liable and responsible for the negligent acts of its shipboard medical personnel including those persons who were employees and/or actual agents of the Defendant. *See Franza v. Royal Caribbean Cruise Line, Ltd.*, 772 F.3d 1225 (11th Cir. 2014). The cruise line is vicariously liable for the negligence for the shipboard physicians and medical staff. This ultimately is based on the fact that the

physicians and medical staff are employees or actual agents of the cruise line.  Therefore, under

respondeat superior and actual agency the cruise line is liable for the negligence of the physicians

and medical staff.

171.   **PRIOR SIMILAR INCIDENTS**: RCCL is aware of prior similar incidents of its

employees or actual agents providing negligent medical treatment:

> a. <u>Lewis Masotti</u>:  Case  No.  1:19-cv-22078  involved  RCCL's  doctor,
> Defendant Etsebeth who failed to timely recognize Massotti's progressive
> condition and rapidly deteriorating vitals, bloodwork and chemistry and
> failed to timely disembark and/or medically evacuate Mr. Masotti on May
> 23, 2018 which resulted in severe and permanent injuries.
>
> b. <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke
> her left hip which required emergency surgical repair.  However, RCCL
> failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's
> doctor told A.C.'s parents that there was nothing to worry about and
> discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL
> also failed emergently disembark and/or medically evacuate A.C. which
> delayed her care and treatment by four days.  The delay caused permanent
> complications including permanent disability and disfigurement.
>
> c. <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who
> failed to timely disembark Wilcox who fell and broke her hip.  By the time
> RCCL disembarked, two days later, Wilcox suffered severe and permanent
> injuries including but not limited to significant internal bleeding on or about
> March 4, 2018.

d. <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e. <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition.  In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient.  Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

172. Defendant Joao Pereira was an employee or actual agent of RCCL on the date of the subject incident.  This is an action based on the agency relationship between RCCL and the shipboard physicians and medical staff in which the physicians and medical staff acted and act as the actual agents of RCCL in providing medical services, medical supplies and medications to RCCL's passengers on a regular basis.   RCCL employed the shipboard physicians, including Dr. Pereira and the medical staff aboard the subject ship to provide medical and emergency medical treatment to its crew and thousands of passengers aboard its ships.  The Defendant, as owner of the ship and its medical center, is liable to its passengers for medical negligence of its medical employees.  RCCL represented to RCCL's passengers that the shipboard physicians and medical

83

staff would provide RCCL passengers a safe and comfortable environment for cruise passengers and that the medical center would meet or exceed the standards established by the Cruise Lines International Association (CLIA) and the American College of Emergency Physicians (ACEP). The shipboard physicians and medical staff consented and accepted this relationship and in exchange provided payment, and benefits including senior officer status, round-trip transportation from residence to ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, and daily housekeeping services.  RCCL maintained and exercised control over the shipboard physicians and medical staff's actions and conduct aboard the ship and the shipboard medical center.  This is evidenced by the fact that RCCL maintained an ongoing relationship with the shipboard medical physicians and medical staff whereby RCCL exclusively provided its passengers for medical services, controlled the stocking of the medical center, offered Royal Caribbean Travel Protection Plan for reimbursement of medical related expenses, controlled the medical center's hours of operation, allowed and required the ship's physicians to operate and provide services out of RCCL's ship medical center, required the shipboard physicians and medical staff to be on call 24 hours to attend to passenger medical emergencies, and controlled termination of the employment relationship between the shipboard physicians and medical staff with RCCL.

173.    The onboard doctors and medical staff owed a duty to provide medical care and treatment to its passengers which was proper and reasonable under the circumstances and within the standard of care. These duties arise in this case from the law and from the facts and circumstances of this cruise which includes but is not limited to the following: (a) thousands of cruise passengers rely on the shipboard doctor and medical personnel for medical care; (b) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (c) the shipboard doctor and medical

personnel know and are advised through training and materials that RCCL provides medical care on its ships and RCCL voluntarily undertakes to provide medical care and to passengers; (d) the cruise line and this ship cater to U.S. citizens who are used to and expect first world medical care; and (e) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

174.    Dr. Pereira and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Pereira and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Pereira and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  The shipboard physicians, including Dr. Pereira and the medical staff failed to asses, recognize and/or appreciate the gravity and time sensitivity of Burgess's progressive condition.  Because Dr. Pereira and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Mr. Burgess's  time sensitive, progressive medical condition, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 21, 2019.  As a direct result of the shipboard physician and medical staff's failings, the Plaintiff received severely delayed medical treatment, his condition deteriorated and Burgess arrived at the hospital outside the window to receive certain medications which could have prevented Burgess from suffering from vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or

vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications, all of which could have been prevented.

175. RCCL's shipboard physician(s) including Defendant Dr. Periera and the shipboard medical personnel knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and breached their duty of reasonable under the circumstances in its medical treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

176. The shipboard physicians and medical staff failed to warn Burgess that the medical center and staff were not equipped to properly handle Burgess's condition. The shipboard doctor and the medical staff knew or should have known to warn Burgess as to the medical center's, physician, and medical staff's limitations to provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

177. The negligent acts of the Defendant's actual agents that occurred aboard the Defendant's ship caused severe and permanent damage to Burgess on February 21, 2019 and setting in motion the deterioration of Burgess. As a direct and proximate result of the negligence of the ship's medical staff including the onboard doctor as described above, Burgess suffered vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications including but not limited to locked-in syndrome.

178.     The cruise line is liable for the shipboard physicians and medical personnel because of the actual agency where RCCL's shipboard doctors including Defendant Pereira and the medical personal are agents of RCCL.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Burgess's condition deteriorated, causing permanent injury and nearly causing his death.

179.     The negligence of RCCL's shipboard doctors, including Defendant Dr. Pereira and medical personnel proximately caused permanent injuries and damages to Burgess in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  Burgess has suffered these losses in the past and will continue to suffer them in the future.

180.     RCCL is liable for these damages alleged herein because of the respondeat superior and actual agency relationship of the parties as described herein.

181.     The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering,

disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT X:**
**NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE:**
**APPARENT AGENCY/AGENCY BY ESTOPPEL**
**SECOND MEDICAL EMERGENCY**

182.    The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1 through 33, above.

183.    This is an action for negligent medical treatment of the Plaintiff, Richard Burgess, by the shipboard physicians and medical staff.  The Defendant RCCL is vicariously liable and responsible for the negligent acts of its shipboard medical personnel including those persons who were apparent agents of the Defendant. *See Franza v. Royal Caribbean Cruise Line, Ltd.*, 772 F.3d 1225 (11th Cir. 2014).  The cruise line is vicariously liable for the negligence for the shipboard physicians and medical staff because of the relationship of the physicians and medical staff as apparent agents of the Defendant cruise line.

184.     PRIOR SIMILAR INCIDENTS: RCCL is aware of prior similar incidents of its apparent agents providing negligent medical treatment:

   a. <u>Lewis Masotti</u>: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

   b. <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days.  The delay caused permanent complications including permanent disability and disfigurement.

   c. <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip.  By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

   d. <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e. <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International. In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition. In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient. Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

185. Further, the cruise line holds out the ship's physicians and medical staff as the apparent agents of the cruise line. The Defendant through its actions and conduct represents to its cruise passengers including, but not limited to the Plaintiff herein, that the shipboard physicians and medical staff work for the benefit of the Defendant. These actions and conduct of the cruise line include but are not limited to the following:

a. RCCL controls cruise line physician and medical personnel's attire, which includes, at times, a uniform with epaulettes and stripes similar to other crewmembers and display the RCCL name and logo;

b. RCCL offers physicians benefits including senior officer status, round-trip transportation from residence to the ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, daily housekeeping services, and indemnification and health care;

c. RCCL requires that the ship's physicians sail with the ship;

d.  RCCL provides shipboard medical care;

e.  RCCL allows and requires the ship's physicians to operate and provide services out of the ship's medical center which is provided by the cruise line and which is equipped by the cruise line;

f.  RCCL charges the services of the medical center, which includes services of the ship's doctors and other medical staff and charges for the medical equipment and goods provided by the cruise line, to the passenger's shipboard charge account;

g.  The ship's physicians represented themselves to passengers that they are employees of RCCL;

h.  RCCL limits the hours and area of the ship where passengers can receive medical services to the ship's medical center, which is staffed exclusively by shipboard medical personnel;

i.  RCCL publishes the medical center's daily office hours in its shipboard newspaper/flyer which RCCL distributed to all passengers aboard its ships; and

j.  RCCL requires the shipboard physicians and medical staff to be on call 24 hours to attend to passenger medical emergencies;

k.  RCCL has the right to hire and fire the physicians and medical personnel including Dr. Pereira.

186.  The ship's physician is considered to be an Officer on board the vessel and a member of the crew and introduced to passengers as one of the ship's officers.  Both the ship's doctors and medical personnel were held out to the passengers by RCCL as members of the ship's crew.

187.  RCCL placed the ship's doctor and medical personnel under the command of the ship's superior officers, including the Master of the ship.

188.    RCCL represents to immigration authorities that shipboard doctors and medical personnel are members of the ship's crew.

189.    RCCL is in the business of providing medical services to its passengers. The cruise line also benefits from providing such services. The fact that the cruise line has a Medical Center onboard its ships and represents to the public that "the medical staff is on call 24 hours a day for emergencies" attracts prospective passengers to purchase tickets on the cruise line which cruises go to foreign countries, often third world countries, with little or no medical care for such passengers.

190.    At all times material to this action, the shipboard physicians, including Dr. Joao Pereira and all the shipboard medical staff, were acting within the course and scope of their agency.

191.    At all times material to this action, the Defendant cruise line represented to the passengers onboard the subject cruise ship including Burgess herein that the ship's doctors and medical personnel were the cruise line's apparent agent, in one or all of the following ways:

a.   Defendant controls cruise line physician and medical personnel's attire, which included, at times, a uniform with epaulettes and stripes similar to other crew members and display the RCCL name and logo;

b.   The Defendant cruise line offers physicians benefits including, but not limited to senior officer status, round-trip transportation from residence to the ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, daily housekeeping services, and indemnification and health care;

c.   Defendant controlled the pricing of services provided in the Defendant's Medical Center by shipboard physicians such as Dr. Pereira;

d.   Defendant required that passengers seeking medical attention do so in the shipboard Medical Center with the shipboard doctors including Dr. Pereira;

92

e.   RCCL directly charged Plaintiff for the shipboard physician services, including Dr. Pereira by using Plaintiff's shipboard charge card, which also served as his cabin room key, immediately following the receipt of services in the Defendant's Medical Center;

f.   Dr. Pereira represented himself as an employee of RCCL;

g.   RCCL required that shipboard physicians, including Dr. Pereira to sail with the ship;

h.   RCCL requires that the ship's physicians to sail with the ship;

i.   RCCL provides the onboard Medical Center;

j.   RCCL allows and requires the ship's physicians to operate and provide services out of the ship's Medical Center which is provided by the cruise line and which is equipped by the cruise line;

k.   The Defendant cruise line charges the services of the medical center, which includes services of the ship's doctors and other medical staff and charges for the medical equipment and goods provided by the cruise line, to the passenger's onboard charge account;

l.   The ship's physicians represent themselves to passengers that they are an employee of RCCL;

m.   RCCL limits the hours and area of the ship where passengers can receive medical services to the ship's Medical Center, which is staffed exclusively by shipboard medical personnel;

n.   RCCL publishes the Medical Center's daily office hours in its newspaper/flyer which RCCL distributed to all passengers aboard its ships;

o.   RCCL requires the shipboard physicians and medical staff to be on call 24 hours to attend to passenger medical emergencies;

p.  RCCL controlled where the shipboard physicians provided medical services by requiring that they operate out of the Defendant's onboard Medical Center;

q.  RCCL provided the onboard Medical Center and provided within that Medical Center the medical equipment, diagnostic machines, disposable goods, medications, and other materials necessary for the onboard physicians including Dr. Pereira to provide services; and

r.  The Defendant exercises control over whether to terminate the employment relationship of the shipboard physicians and medical staff with the Defendant.

192.  The cruise line acknowledged that the shipboard physicians, including Dr. Pereira would act for it by designating them as a shipboard physician and by requiring them to operate out of the RCCL's Medical Center. The shipboard physicians, including Dr. Pereira manifested an acceptance of this undertaking by accepting this position of shipboard physician and by providing medical care to RCCL's passengers, including Burgess herein. RCCL, as principal, exercised control over the shipboard physicians including Dr. Pereira and medical staff's actions.

193.  Burgess relied on the cruise line's apparent agents and relied on the cruise line's agents in good faith.  Burgess reasonably believed that the shipboard doctor and medical staff were acting as agents of the cruise line.  Burgess and his husband, Henze knew of and relied upon the cruise line's online representations as described herein.  Burgess agreed to purchasing the cruise line tickets based on his reasonable belief that the ship's doctor and medical staff would be acting as an agent of the cruise line.  Burgess and his husband, Henze, researched the cruise line's shipboard amenities in their decision to select a cruise vacation and read that RCCL many amenities including world class medical facilities which included doctors and medical staff approved and provided by RCCL.  Burgess, relying on these representations, agreed that he and

Henze should purchase RCCL cruise line tickets based on a reasonable believe that any doctor and medical personnel were acting as an agent of the cruise line.

194.    Burgess justifiably relied upon the care or skill of the cruise line's shipboard doctor and medical staff.  Burgess justifiably relied on the apparent agency of the shipboard doctor and medical personnel because he submitted to treatment by the ship's medical staff and doctor; followed the advice of Dr. Pereira and let him prescribe and administer medicine, perform a physical examination and relied on him to monitor and appropriate treat Mr. Burgess on February 21, 2019; relied on Dr. Pereira and the medical personnel's representations that they would contact an ambulance to transport the Plaintiff to a nearby hospital in order to treat him as soon as possible; and that Dr. Pereira and the medical personnel could appropriately treat Burgess until he could be taken off the cruise ship.

195.    Ultimately, Burgess relied on the apparent agency to his great detriment. The shipboard doctors including Dr. Pereira and medical personnel were not world class and unfit to treat and/or monitor the Plaintiff's condition.  The Plaintiff relied on the shipboard doctors including Dr. Pereira and the medical personal's representations that immediate and timely transportation to a qualified and nearby hospital were being coordinated for the timely and appropriate medical care Burgess needed to treat his condition.  Unbeknownst to Burgess, he could have been medically evacuated from the ship by air and/or by a close and prompt ambulance as well as taken to a hospital close to the ship that was docked at San Juan, Puerto Rico.   Earlier and better medical treatment would have prevented Burgess's severe injuries including vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion

with extensive brain stem infarction which also caused a series of complications including but not limited to locked-in syndrome.  Thus, Burgess and his husband, Henze who acted on his behalf once incapacitated, relied on the representations and assurances by the Defendant cruise line's apparent agents to their detriment.  If not for these representations and assurances, Burgess would never have agreed that he and his husband purchase RCCL cruise tickets; go on the subject cruise ship and cruise; and Burgess and his husband, Henze would have made efforts to speak with the ship's captain, shoreside employees, called a shoreside ambulance and/or helicopter and/or nearby Hospital in San Juan, Puerto Rico and/or contacted the United States Coast Guard themselves for medical evacuation, treatment and/or assistance.

196.    The shipboard doctor owed a duty to provide medical care and treatment to its passengers which was proper and reasonable under the circumstances and within the standard of care. These duties arise in this case from the law and from the fact and circumstances of this cruise which includes but is not limited to the following: (a) over 1000 cruise passengers rely on the shipboard doctor and medical personnel for medical care; (b) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (c) the shipboard doctor and medical personnel know and are advised through training and materials that RCCL provides medical care on its ships and RCCL voluntarily undertakes to provide medical care and to passengers; (d) the cruise line and this ship cater to U.S. citizens who are used to and expect first world medical care; and (e) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

197.    The shipboard doctors including Dr. Pereira and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Pereira and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied

with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Pereira and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.   The shipboard physicians, including Dr. Pereira and the medical staff failed asses, recognize and/or appreciate the gravity and time sensitivity of Burgess's progressive condition.   Because Dr. Pereira and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Mr. Burgess's time sensitive, progressive medical condition, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 21, 2019.  As a direct result of the shipboard physician and medical staff's failings, the Plaintiff's condition deteriorated and Burgess arrived at the hospital outside the window to receive certain medications which could have prevented Burgess from suffering from vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications, all of which could have been prevented.

198.    RCCL's shipboard physician(s) including Defendant Dr. Periera and the shipboard medical personnel knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and breached their duty of  reasonable under the circumstances in its medical treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

199.    The shipboard physicians and medical staff failed to warn Burgess that the medical center and staff were not equipped to properly handle Burgess's condition.  The shipboard doctor and the medical staff knew or should have known to warn Burgess as to the medical center's, physician, and medical staff's limitations to provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

200.    The negligent acts of the Defendant's apparent agents that occurred aboard the Defendant's ship caused severe and permanent damage to Burgess on February 21, 2019 and setting in motion the deterioration of Burgess.  As a direct and proximate result of the negligence of the ship's medical staff including the onboard doctor as described above, Burgess suffered vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications including but not limited to locked-in syndrome.

201.    The cruise line is liable for the shipboard physicians and medical personnel because of the apparent agency where the shipboard doctors including Dr. Pereira and the medical personal are apparent agents of RCCL.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Burgess's condition deteriorated, causing permanent injury and nearly causing his death.

202.    The negligence of the shipboard doctors including Dr. Pereira and medical personnel proximately caused permanent injuries and damages to Burgess in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related

expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  Burgess has suffered these losses in the past and will continue to suffer them in the future.

203.    RCCL is liable for these damages alleged herein because of the apparent agency relationship of the parties as described herein.

204.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring,

disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT XI:**
**NEGLIGENT MEDICAL TREATMENT – VICARIOUS LIABILITY OF CRUISE LINE:**
**JOINT VENTURE**

205.    The Plaintiffs hereby adopts and re-alleges each and every allegation in paragraphs 1 through 33, above.

206.    This is an action for negligent medical treatment of Mr. Burgess by the shipboard physician.  The Defendant RCCL is vicariously liable and responsible for the negligent acts of its shipboard physicians who were joint venturers with the Defendant. *See Franza v. Royal Caribbean Cruise Line, Ltd.*, 772 F.3d 1225 (11th Cir. 2014).  The cruise line is vicariously liable for the negligence for the shipboard physician because of the relationship of the physician as a joint venturer with the Defendant cruise line.

207.    PRIOR SIMILAR INCIDENTS: RCCL is aware of prior similar incidents of its joint venturers providing negligent medical treatment:

      a.  <u>Lewis Masotti</u>: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

      b.  <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's

100

doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017. RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days. The delay caused permanent complications including permanent disability and disfigurement.

c.   <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip. By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

d.   <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e.   <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International. In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition. In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient. Just as here, the

delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

208.    The cruise line and the physicians aboard the Defendant's ships engaged in a joint venture to provide medical services to the cruise passengers. The parties intended to engage in a joint venture; maintained joint control or the right to control; joint proprietary interests in the shipboard medical care and medical facility that was the subject of the joint venture; and all parties held the right to share in the profits and duty to share in the ventures losses.

209.    **THE PARTIES' INTENT**.  It was the joint intention and common purpose of the Defendant cruise line and the shipboard physicians to provide healthcare to the thousands of passengers who come aboard the Defendant's ships to enjoy the cruise experience with the peace of mind that their medical and emergency healthcare needs are satisfied.  The cruise line and the physician on board the Defendant's ships entered into a long-term business agreement to provide passengers and crewmembers medical care and treatment aboard the cruise line's ships.  The purpose of the venture was to profit from providing medical services to cruise passengers and crewmembers.  A written agreement between joint venturers is not necessary to establish a joint venture.  *Fulcher's Point Pride Seafood, Inc v. M/V Theodora Maria*, 935 F.2d 208, 213 (11th Cir. 1991).  The "true intent of the parties, their conduct (and intent thereby evidenced) created a joint venture."  *Terry v. Carnival Corporation*, 2017 WL 5135599 at *4 (S.D. Fla. Aug. 10, 2017).

210.    The Parties maintained verbal agreement and their conduct indicate their intent to a long-term agreement to provide medical services and care to passengers and crewmembers in exchange for payment.  RCCL incorporated medical facilities onboard its cruise ships, including the RCCL *Harmony of the Seas*, as part of its business model.  The cruise line profits from the revenue generated from its shipboard infirmaries.  With medical personnel working onboard its ships, the cruise line's ships do not have to divert or reroute to provide medical care as required

by international law.  This saves the cruise line significant fuel costs and costly port fees.  The Defendant cruise line is also able to market that they provide medical care to persuade people to cruise with them.  This generates increased ticket sales.  Defendant Dr. Pereira purposefully reached out to Defendant RCCL to its Florida shoreside medical department to enter into a long-term business arrangement to provide medical services to cruise passengers and crewmembers for profit.

211.  **JOINT CONTROL OR RIGHT OF CONTROL**.  The cruise line and shipboard physicians, including Dr. Pereira maintain joint control or right of control over the medical care and services provided to passengers and crewmembers aboard the Defendant cruise line's ships. The Defendant cruise line has the right of control over the medical facility from a shoreside perspective.  RCCL's shoreside medical department monitored and supervised Dr. Pereira through its shoreside orientation trainings, standard operating procedures, and other standards, policies, procedures and guidelines she was required to follow.  The cruise line also required Dr. Pereira to continuously communicate with RCCL's shoreside medical department for shoreside to control the restocking of medical supplies and medicine; sending medical equipment technicians to cruise ships to fix and maintain medical equipment; providing final approval and authorization on proposed medical evacuations; providing shoreside 24/7 on-call doctors for medical consultations. The cruise line has the right to control marketing its shipboard physicians and make use of the physicians' name, voice, pictures, photographs and other likenesses for the purpose of promoting and publicizing the Defendant cruise line's vessels in any and all media.  The Defendant cruise line has the right of control over proprietary interests including the medical operational procedures, medical trainings and other intellectual property.

212.  Shipboard physicians control and oversee the day-to-day operations of the shipboard medical facilities and medical personnel aboard the cruise line's ships.  Here, Dr. Pereira

was the Senior Medical Officers onboard the RCCL *Harmony of the Seas* who exercised day-to-day control over and oversaw the operation and maintenance of the medical facility's treatment of passengers and crewmembers onboard the ship. Dr. Pereira controlled the day-to-day operations which included ensuring continuous updating computerized inventory of the infirmaries medical supplies and medicine; providing consultations, treatment and care, maintaining clinic hours; providing and maintaining 24/7 on-call emergency response of a physician (himself) and nurses; logging the billing for treatment, care and supplies provided to crewmembers and passengers; ensuring the physician (himself) and medical personal write medical notes and medical records for all consultations, treatment and care provided; initiating, requesting, and/or advocating for prompt medical evacuation for passengers and crewmembers requiring care or treatment that exceeds what the medical facility can provide, calling shipboard security to report passenger and crewmember accidents; ensuring all paperwork to document accidents requiring more than first aid treatment is written and maintained; and prescribing and filling prescription medications to passengers and crewmembers aboard cruise ships; ensuring continuous communication with RCCL's shoreside medical department.

213.    **JOINT PROPRIETARY INTEREST**.  The Defendants share a joint interest in the business enterprise between the parties. *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 212 (11th Cir. 1991).  Therefore the parties shared a joint propriety interest in the subject matter of the contract, that being RCCL owned the RCCL *Harmony of the Sea*'s medical facilities and Dr. Pereira supervised and invested all of their time and efforts operating the medical center and all of its day-today services.  On board the *Harmony of the Seas*, Dr. Pereira invested their time and efforts by ensuring continuous updating computerized inventory of the infirmaries medical supplies and medicine; providing consultations, treatment and care, maintaining clinic hours; providing and maintaining 24/7 on-call emergency response of a

physician (himself) and nurses; logging the billing for treatment, care and supplies provided to crewmembers and passengers; ensuring the physician (himself) and medical personnel write medical notes and medical records for all consultations, treatment and care provided; initiating, requesting, and/or advocating for prompt medical evacuation for passengers and crewmembers requiring care or treatment that exceeds what the medical facility can provide, calling shipboard security to report passenger and crewmember accidents; ensuring all paperwork to document accidents requiring more than first aid treatment is written and maintained; prescribing and filling prescription medications to passengers and crewmembers aboard cruise ships; and ensuring continuous communication with RCCL's shoreside medical department.

214.    **PROFITS AND LOSSES.**  The cruise line and the shipboard physician share in profits and losses based on the circumstances of their agreement.  In this arrangement Dr. Pereira supplied his labor, experience, and skill while RCCL provided the necessary capital to outfit the medical facility.  RCCL incorporated medical facilities onboard its cruise ships, including the RCCL *Harmony of the Seas*, as part of its business model.  The Defendant cruise line profits from the revenue generated from its shipboard infirmaries.  With medical personnel working onboard its ships, the cruise line's ships do not have to divert or reroute to provide medical care as required by international law.  This saves the cruise line significant fuel costs and costly port fees.  The Defendant cruise line is also able to market that they provide medical care to persuade people to cruise with them.  This generates increased ticket sales.  In the event of a loss, Dr. Pereira would have exercised his skills in vain and RCCL's capital investment would financially suffer, and thus both parties would effectually share in the losses if the venture failed.

215.    Additionally, the cruise line and the physicians and medical staff therefore relied on a single billing system and unified strategy of advertisement on RCCL's website.  The cruise line and shipboard physicians and medical staff share profits and losses and split revenue from

medical services and supplies rendered to the thousands of cruise passengers.  The shipboard physicians and medical staff increase profits by servicing passengers and prescribing them medications and supplies.  Shipboard physicians have the sole discretion to sell prescription medication and medical supplies to passengers and crewmembers.  Shipboard physicians have the sole discretion to render medical care, treatment and services to passengers and crewmembers aboard the Defendant's cruise ships during its day-to-day operations.  Shipboard physicians who oversee the medical personnel's actions have the sole discretion to input medical services and supplies provided to passengers and crewmembers.  RCCL's compensation for the shipboard physicians and medical staff's services is dependent in part on the medical center's revenues and the medical center's revenues depend in part on the recommendations and prescriptions of the physicians to the passengers as to the medical care that they need or should have and whether these passengers should evacuate the ship to receive medical care off the cruise ship.

216.    The shipboard doctor owed a duty to provide medical care and treatment to its passengers which was proper and reasonable under the circumstances and within the standard of care. These duties arise in this case from the law and from the fact and circumstances of this cruise which includes but is not limited to the following: (a) over 1000 cruise passengers rely on the shipboard doctor and medical personnel for medical care; (b) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (c) the shipboard doctor and medical personnel know and are advised through training and materials that RCCL provides medical care on its ships and RCCL voluntarily undertakes to provide medical care and to passengers; (d) the cruise line and this ship cater to U.S. citizens who are used to and expect first world medical care; and (e) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

217.     The shipboard doctors including Dr. Pereira and medical personnel breached their duties of reasonable care under the circumstances.  Dr. Pereira and the medical personnel failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Pereira and the onboard medical staff failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.   The shipboard physicians, including Dr. Pereira and the medical staff failed asses, recognize and/or appreciate the gravity and time sensitivity of Burgess's progressive condition.  Because Dr. Pereira and RCCL's shipboard physicians and/or the medical staff failed to recognize the nature of Burgess's time sensitive, progressive medical condition, he failed to initiate, request, and/or advocate for prompt emergency medical evacuation of Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 21, 2019.  As a direct result of the shipboard physician and medical staff's failings, the Plaintiff's condition deteriorated and Burgess arrived at the hospital outside the window to receive certain medications which could have prevented Burgess from suffering from vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications, all of which could have been prevented.

218.     RCCL's shipboard physician(s) including Defendant Dr. Periera and the shipboard medical personnel knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and

breached their duty of  reasonable under the circumstances in its medical treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

219.    The shipboard physicians and medical staff failed to warn Burgess that the medical center and staff were not equipped to properly handle Burgess's condition.  The shipboard doctor and the medical staff knew or should have known to warn Burgess as to the medical center's, physician, and medical staff's limitations to provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

220.    The negligent acts of RCCL's joint venturers occurred aboard the Defendant's ship caused severe and permanent damage to Burgess on February 21, 2019 and setting in motion the deterioration of Burgess.  As a direct and proximate result of the negligence of the ship's medical staff including the onboard doctor as described above, Burgess suffered vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications including but not limited to locked-in syndrome.

221.    The cruise line is liable for the shipboard physicians and medical personnel because of the joint venture where the shipboard doctors including Dr. Pereira and the medical personal are joint venturers of RCCL.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Burgess's condition deteriorated, causing permanent injury and nearly causing his death.

222.    The negligence of the shipboard doctors including Dr. Pereira and medical personnel proximately caused permanent injuries and damages to Richard Burgess in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. Burgess has suffered these losses in the past and will continue to suffer them in the future.

223.    RCCL is liable for these damages alleged herein because of the joint venture relationship of the parties as described herein.

224.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic

damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate

**COUNT XII:**
**NEGLIGENT MEDICAL CARE – DIRECT LIABILITY**
**OF DOCTOR JOAO PEREIRA**

225.     Plaintiffs readopts and re-alleges each and every allegation in Paragraphs 1-33, above.

226.     This is an action for negligent medical treatment of the Plaintiff, Richard Burgess, by Dr. Joao Pereira, a shipboard physician.

227.     PRIOR SIMILAR INCIDENTS: RCCL is aware of prior incidents of its doctors providing negligent medical treatment:

   a.   Lewis Masotti: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

   b.   A.C. (a minor): Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and

110

discharged A.C. and prescribed her ibuprofen on April 11, 2017. RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days. The delay caused permanent complications including permanent disability and disfigurement.

c.  Marcia Wilcox: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip. By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

d.  Mitchell Allen: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e.  Allen Hill: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International. In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition. In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient. Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

111

228.     At all times material hereto, Defendant Joao Pereira held himself out to the public in general and to the Plaintiff herein as a healthcare provider who was capable of and who undertook the corresponding duty to Mr. Burgess of providing medical services to Mr. Burgess in accordance with that level of care and skill that is recognized as acceptable and appropriate by reasonably prudent similar healthcare providers under the same or similar circumstances.

229.     Notwithstanding the duties undertaken, Defendant Pereira breached his duties of reasonable care under the circumstances owed to Mr. Burgess. Dr. Pereira failed to administer the medical care and treatment which was necessary, reasonable and which complied with the standard of care for the treatment of the Plaintiff, Richard Burgess, herein.  Dr. Pereira failed to properly assess, monitor and/or follow Plaintiff's medical condition and correctly diagnose Plaintiff's medical condition.  Dr. Pereira failed to order appropriate diagnostic testing and scans to further assess the extent of Plaintiff's condition.  Dr. Pereira failed to asses and monitor Mr. Burgess's head injury and/or asses, recognize and/or appreciate the gravity and time sensitivity of Mr. Burgess's progressive condition.  Dr. Pereira failed to accurately describe, characterize and/or advise RCCL's shoreside on-call physical, captain, staff captain, officers and/or the RCCL personnel who assist, approve and/or participate in the treatment and care of passenger patients such as Mr. Burgess.  Dr. Pereira failed to initiate, request and/or demand medical evacuation and/or coordination of shore side care as to the nature of the Plaintiff's severe and progressive medical condition.   Dr. Pereira failed to coordinate, direct, instruct the ambulance called to the ship to take Burgess to the closest emergency room in San Juan, Puerto Rico equipped to care and treat Burgess's medical condition.  Dr. Pereira also failed to send, instruct, direct, advise and/or otherwise inform the ambulance that RCCL, an RCCL doctor, Dr. Pereira and/or RCCL's medical personnel that responded to the ship that Burgess was suffering a medical emergency and the ambulance must travel in emergency mode to the hospital.  Dr. Pereira failed to use or ask for

resources such as manuals and treatises, access or use reasonable procedures to contact medical professionals in the United States for consultation about the care and treatment for the Plaintiff's condition.

230.   Because Dr. Pereira failed to recognize the nature of Mr. Burgess's time sensitive, progressive medical condition, he failed to initiate, request, advocate and/or effectuate a prompt emergency medical evacuation of Mr. Burgess from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 21, 2019.  As a direct result of Dr. Pereira's failings, the Plaintiff's condition deteriorated and Burgess arrived at the hospital outside the window to receive certain medications which could have prevented Burgess from suffering from vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications, all of which could have been prevented.

231.   Defendant Dr. Periera knew or should have known the limitations in terms of quality and competency of themselves and their facilities, in terms of the equipment, supplies and medications and in terms of the ability of that system onboard to cope or deal with significant medical emergencies, and breached their duty of  reasonable under the circumstances in its medical treatment and its failing to properly monitor, diagnose, recognize their own limitations and to timely evacuate or recommend immediate evacuation of the patient.

232.   Dr. Pereira failed to warn Burgess that the medical center and staff were not equipped to properly handle Burgess's condition.  Dr. Pereira knew or should have known to warn Mr. Burgess as to his, the medical center's, other physician's, and medical staff's limitations to

provide medical services due to competency, training and experience, medical supplies, medical equipment, and medications to passengers.

233.    The negligent acts of the Dr. Pereira that occurred aboard the Defendant's ship caused severe and permanent damage to Burgess on February 21, 2019 and setting in motion the deterioration of Burgess.  As a direct and proximate result of the negligence of Dr. Periera as described above, Burgess suffered vertebral dissection, acute left posterior cerebral artery stroke syndrome, acute cerebrovascular insufficiency cerebral infarction due to thrombosis of basilar artery, basilar artery stroke basilar artery occlusion, right vertebral artery occlusion, hypoplastic left vertebral artery ending in left PICA, cerebral infarction (stroke) with grave prognosis, and/or vertebrobasilar artery occlusion with extensive brain stem infarction which also caused a series of complications including but not limited to locked-in syndrome.

234.    These failures constituted unreasonable and below standard medical care.

235.    The Defendant's negligence proximately caused permanent injuries and damages to the Plaintiff in the past and in the future. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.  As a direct result of the shipboard physician and medical staff's negligent treatment, for which the cruise line bears responsibility, Mr. Burgess's condition deteriorated, causing permanent injury and nearly causing his death.

236.     The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future.  Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess.  Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT XIII:
## NEGLIGENT PROVISIONING AND EQUIPPING OF MEDICAL FACILITY – DIRECT LIABILITY OF THE CRUISE LINE

237.     The Plaintiff hereby adopts and re-alleges each and every allegation in Paragraphs 1-33, above.

238.     This is an action for negligence of the Defendant cruise line in failing to provide reasonable medical facilities onboard its ship, the RCCL *Harmony of the Seas*.

239.     **PRIOR SIMILAR INCIDENTS**: RCCL is aware of prior incidents of RCCL failing to provide reasonable medical facilities onboard its ships:

    a.   <u>Lewis Masotti</u>: Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

    b.   <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair. However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture. RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017. RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days. The delay caused permanent complications including permanent disability and disfigurement.

    c.   <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip. By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

    d.   <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay

in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e. <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition.  In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient.  Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

240.   The Defendant cruise line has a duty to properly man the ship's medical facilities, to provide the appropriate resources to the medical staff, and to provide reasonable and appropriate equipment, supplies, and medications for the ship's medical facility.

241.   These duties arise in this case from the law and from the fact and circumstances of this cruise which includes but is not limited to the following: (a) the Defendant cruise line's duty under the General Maritime Law to provide its passengers with a voyage and a ship which are reasonably safe or reasonably safe under the circumstances; (b) the Defendant cruise line's representations in its advertising and literature that the cruise line provides a medical facility; (c) the Defendant cruise line's holding out the ship's physicians as its apparent agent; (d) the Defendant cruise line's voluntary undertaking in this case to provide medical care and treatment to the Plaintiff; (e) the cruise ship is in fact isolated on the open seas for periods of time and thus

117

the only medical care reasonably available to the passenger is onboard the ship; (f) the cruise line and this ship caters to U.S. citizens who are used to and expect first world medical care; (g) the cruise line markets this cruise as safe and secure for its passengers; and (h) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

242.    The Defendant deliberately made the decision to enter the business of medicine. The Defendant chose to construct, outfit and staff medical centers aboard its ships with physicians and medical staff whom the cruise line hired, trained, outfitted, paid, and controlled.   The Defendant also paid to stock and maintain its medical centers with supplies, various medicines and medical equipment.   The Defendant therefore knows about its purchases and has institutional knowledge of medicine

243.    The cruise line breached its duty of reasonable care under the circumstances in this case by its actions and conduct.  The Defendant failed to supply its shipboard medical center with resources such as manuals and treatises, and access and reasonable procedures for contacting medical professionals in the United States for consultation about the care and treatment of significant medical conditions of its passengers including the Plaintiff.  The Defendant failed to supply and/or maintain its shipboard medical center with operational medical equipment including an operational x-ray machine.  The Defendant knew or should have known to appropriately stock and/or maintain its shipboard Medical Center with adequate diagnostic and medical testing equipment and medications for its Physicians and medical staff to properly diagnose, treat and care for its passengers.  The Defendant failed to properly provide its shipboard medical facility with properly maintained equipment, supplies, and resources which they should have there to provide for the medical care of thousands of people onboard its ships which ply the waters off of third world countries with third world medical care.

244.    The Plaintiff herein while under the care and treatment of the ship's physicians, including Dr. Pereira and/or Dr. Etsebeth, was treated improperly and unreasonably under the circumstances, below the standard of care, and negligently as more fully described in the paragraphs above. The negligent acts of the Defendant occurred aboard the Defendant's ship caused severe and permanent damage to the Plaintiff's brain on February 18, 2019 and/or February 21, 2019 and setting in motion the deterioration of the Plaintiff. As a direct and proximate result of the negligence of the ship's medical staff including the onboard doctor as described above, the Plaintiff condition deteriorated, causing permanent injury and nearly causing his death.

245.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring,

disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT XIV:
## NEGLIGENT FAILURE TO EVACUATE PASSENGER AND/OR EVACUATE PASSENGER APPROPRIATELY – DIRECT LIABILITY OF THE CRUISE LINE

246.    The Plaintiff hereby adopts and re-alleges each and every allegation in Paragraphs 1-33, above.

247.    This is an action for negligence of the Defendant cruise based on RCCL's failing to evacuate the passenger who was in need of emergent medical care.  The cruise line failed to arrange for this evacuation, advise the passengers that evacuation was possible and how it was possible, divert the course of the ship to ensure that the ship was in port sooner than it was, and failure to arrange or provide air or sea evacuation from the ship in order to obtain medical care ashore.  The cruise line personnel also refused and/or failed to timely evacuation of the plaintiff for the plaintiff to receive emergent medical care ashore when it became clear that the passenger's medical emergency required such care.

248.    RCCL through the ship's command and through the home office owes a duty to provide reasonable and proper transportation of its passengers including the Plaintiff herein who are suffering from a significant medical problem. The duty is to provide such transportation (a) to get that passenger to the nearest hospital when the passenger is on land if time is of the essence or critical in the medical treatment of the passenger; (b) by evacuating the passenger off of the ship by air or sea; and/or (c) to the nearest port by means of diverting the ship when the diversion of the ship's course will make significant effect on a significant medical condition of the passenger.

249.    **PRIOR SIMILAR INCIDENTS**.  Despite RCCL's representations to the public, RCCL is aware of numerous incidents involving RCCL, RCCL's doctors and/or medical personnel's failure to medically evacuate its cruise passengers receiving medical care and treatment below the standard of care as well as incidents of delayed medical care and delayed medical evacuation.  Examples of these prior incidents are as follows:

a.   Lewis Masotti:  Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

b.   A.C. (a minor):  Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days.  The delay caused permanent complications including permanent disability and disfigurement.

c.   Marcia Wilcox:  Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip.  By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent injuries including but not limited to significant internal bleeding on or about March 4, 2018.

      d.   <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

      e.   <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition the Celebrity cruise ship also docked in San Juan, Puerto Rico and sent Hill to HIMA San Pablo Caguas which delayed his treatment and aggravated his condition, loss of blood leading to organ shutdown and hypoxic brain injury. Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

250.    RCCL through the ship's command and through the home office breached its duty to the Plaintiff herein to provide reasonable and proper transportation of the Plaintiff who was at the time of this cruise suffering from a significant, time sensitive and progressive medical problem. The Defendant RCCL breached its duties by failing to initiate, request, advocate and/or effectuate for prompt medical evacuation of the Plaintiff from the cruise ship to a land based medical center capable of handling the Plaintiff's medical condition on February 21, 2019.  The Defendant RCCL breached its duties by failing to timely transport the Plaintiff to the nearest hospital upon the Plaintiff's symptoms consistent with a vertebral dissection, basilar syndrome and/or stroke on February 21, 2019; failing to evacuate the Plaintiff off the ship by means of a helicopter or other medivac transport mechanism on February 21, 2019, when Mr. Burgess's condition was known to be a severe, time sensitive medical emergency and/or required care, treatment and/or testing that

was known to be unavailable on the ship and/or required medications that can only be administered within a certain timeframe which would drastically alter the outcome of Mr. Burgess's medical condition and/or prognosis; failing to transport the Plaintiff to the nearest hospital by helicopter or medivac transport mechanism by means of diverting the ship when the diversion of the ship's course would have made a significant effect on a significant medical condition of the Plaintiff; and failing to properly advise the closest Medical Facility and Emergent Transport the progressive, time sensitive nature of the Plaintiff's condition.

251.    Once it was apparent that the Plaintiff's condition was progressive and time sensitive the measures of transporting the Plaintiff off of the ship and/or diverting the ship's course should have been taken to minimize damage to the Plaintiff and Plaintiff's nervous system.

252.    RCCL knew of Plaintiff's severe and time sensitive medical condition.  RCCL also knew that the physician and medical staff were incapable of handling the Plaintiff's condition. RCCL was advised of the Plaintiff's severe and time sensitive condition through Dr. Pereira who called and emailed RCCL's on-call shoreside physicians and personnel.  Dr. Pereira and the medical personnel knew of the Plaintiff's severe and time sensitive medical condition by the Plaintiff as well as their own opportunity to evaluate the Plaintiff's physical condition.  RCCL further knew or should have known of Plaintiff's ongoing and progressive medical condition because the Plaintiff was under the care of RCCL's actual agents, apparent agents and/or joint venturer Defendant Pereira and other RCCL Medical Center employees. Such care was provided to Plaintiff inside the onboard Medical Center which is owned and outfitted with supplies by Defendant RCCL.

253.    As a direct result of the Defendant's prolonged delay to initiate, request, and/or advocate for prompt medical evacuation of evacuate the Plaintiff off the subject ship on a timely basis to a land based medical center capable of handling the Plaintiff's medical condition, the shipboard physicians and medical personnel continued in providing faulty medical care which did not

comport with the standard of care and thereby continued the prolonged delay of proper medical treatment.  The Plaintiff's condition therefore deteriorated and the Plaintiff condition deteriorated, causing permanent injury and nearly causing his death.

254.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future.  Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess.  Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

**COUNT XV:**
**NEGLIGENT FAILURE TO PROVIDE OR ARRANGE FOR EMERGENCY**
**TRANSPORT TO CLOSEST MEDICAL FACILITY– DIRECT LIABILITY OF THE**
**CRUISE LINE**

124

255.    The Plaintiff hereby adopts and re-alleges each and every allegation in Paragraphs 1-33, above.

256.    This is an action for negligence of the Defendant cruise based on RCCL's failure to provide or arrange for emergency transportation of Burgess to the closest capable medical facility without regard to cost or pre- arranged contractual or other relationships.  The cruise line failed to arrange for this evacuation, advise the passengers that evacuation was possible to a significantly closer capable medical facility, but chose not to do so.  Instead RCCL directed, instructed, and/or advised emergency transportation to take Burgess to HIMA San Pablo Caguas, over an hour away from the port, due to a pre-existing business relationship.  The cruise line personnel also refused and/or failed to provide or arrange for emergency transportation to take Burgess to the closest capable medical facility, of which there were several, in order to maintain, comply and/or benefit from its business relationship with HIMA San Pablo Caguas instead of putting Burgess's medical needs ahead of RCCL's financial interests.

257.    RCCL through the ship's command and through the home office owes a duty to provide reasonable and proper transportation of its passengers to the closest medical facility equipped to handle a patient's medical emergency, including the Plaintiff herein who are suffering from a significant emergent medical problem.  RCCL through the ship's command and through the home office breached its duty to the Plaintiff herein to provide reasonable and proper transportation to the closest medical facility for the Plaintiff who was at the time of this cruise suffering from a significant, time sensitive and progressive medical problem. The Defendant RCCL breached its duties by failing to initiate, request, advocate and/or effectuate for prompt medical evacuation and directing emergency transportation to take Burgess to the closest capable medical facility, of which there were many on February 21, 2019.  The Defendant RCCL breached its duties by failing to timely transport the Plaintiff to the nearest hospital upon the Plaintiff's

symptoms consistent with a vertebral dissection, basilar syndrome and/or stroke on February 21, 2019; failing to evacuate the Plaintiff off the ship by means of a helicopter or other medivac transport mechanism on February 21, 2019 to the closest capable medical facility, when Mr. Burgess's condition was known to be a severe, time sensitive medical emergency and/or required care, treatment and/or testing that was known to be unavailable on the ship and/or required medications that can only be administered within a certain timeframe which would drastically alter the outcome of Mr. Burgess's medical condition and/or prognosis; failing to transport the Plaintiff to the nearest hospital by helicopter or medivac transport to the closest capable medical facility would have made a significant effect on a significant medical condition of the Plaintiff; and failing to properly advise the closest Medical Facility and Emergent Transport the progressive, time sensitive nature of the Plaintiff's condition.

258.    Once it was apparent that the Plaintiff's condition was progressive and time sensitive the measures of transporting the Plaintiff off of the ship and directing emergency transport to take Burgess to the closest capable medical facility should have been done to minimize damage to the Plaintiff and Plaintiff's nervous system.

259.    RCCL knew of Plaintiff's severe and time sensitive medical condition.  RCCL also knew that the physician and medical staff were incapable of handling the Plaintiff's condition. RCCL was advised of the Plaintiff's severe and time sensitive condition through Dr. Pereira who called and emailed RCCL's on-call shoreside physicians and personnel.  Dr. Pereira and the medical personnel knew of the Plaintiff's severe and time sensitive medical condition by the Plaintiff as well as their own opportunity to evaluate the Plaintiff's physical condition.  RCCL further knew or should have known of Plaintiff's ongoing and progressive medical condition because the Plaintiff was under the care of RCCL's actual agents, apparent agents and/or joint venturer Defendant Pereira and other

RCCL Medical Center employees. Such care was provided to Plaintiff inside the onboard Medical Center which is owned and outfitted with supplies by Defendant RCCL.

260.    **PRIOR SIMILAR INCIDENTS**: RCCL was on notice of prior similar incidents regarding failure to provide or arrange for emergency transportation to the closest capable medical facility without regard to cost or pre- arranged contractual or other relationships.  In the *Hill* case, Case No. 03-23815-cv-Moreno, for example, the Celebrity cruise ship also docked in San Juan, Puerto Rico and sent Hill to HIMA San Pablo Caguas which delayed his treatment and aggravated his condition, loss of blood leading to organ shutdown and hypoxic brain injury.

261.    As a direct result of the Defendant's prolonged delay to initiate, request, and/or advocate, direct for prompt medical evacuation and/or emergency transportation to the closest capable medical facility without regard to cost or pre-arranged contractual or other relationships, the shipboard physicians and medical personnel continued in providing faulty medical care which did not comport with the standard of care and thereby continued the prolonged delay of proper medical treatment. The Plaintiff's condition therefore deteriorated and the Plaintiff condition deteriorated, causing permanent injury and nearly causing his death.

262.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and past lost wages and compensation and loss of income earning capacity for the future.  Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss

of capacity for the enjoyment of life.  The losses are either permanent or continuing.  The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

## COUNT XVI:
## NEGLIGENT HIRING, SELECTION, RETENTION, MONITORING, AND TRAINING OF THE ONBOARD MEDICAL STAFF – DIRECT LIABILITY OF THE CRUISE LINE

263.    The Plaintiff hereby adopts and re-alleges each and every allegation in Paragraphs 1-33, above.

264.    This is an action for negligence due to RCCL's negligent hiring, selection, retention, monitoring, and training of the onboard medical staff including Defendant Joao Pereira. RCCL owes a "duty to exercise reasonable care for the safety of its passengers" including the Plaintiff herein. *See Hall v. Royal Caribbean Cruises, Limited* 2004 A.M.C. 1913, 2004 WL 1621209, 29 FLWD 1672, Case No. 3d03-2132 (Fla. 3d DCA Opinion filed July 21, 2004). The Defendant also owes a "duty to exercise reasonable care under the circumstances**."** *See Harnesk v. Carnival Cruise Lines, Inc,* 1992 A.M.C. 1472, 1991 WL 329584 (S.D.Fla. 1991). The cruise line is directly negligent for negligently hiring, training, and retaining the doctor onboard and the medical staff.

265.     RCCL owes a duty to provide medical care and treatment to its passengers and to the Plaintiff herein which is proper and reasonable under the circumstances and within the standard of care. These duties arise in this case from the law and from the facts and circumstances of this cruise which includes but is not limited to the following: (a) RCCL's duty under the General Maritime Law to provide its passengers with a voyage and a ship which are reasonably safe or reasonably safe under the circumstances; (b) RCCL's representations in its advertising and literature that the cruise line provides a medical facility, and that the ship provides medical staff that is on call 24 hours a day for emergencies; (c) RCCL's holding out the ship's physicians as its apparent agent; (d) RCCL's apparent agent physicians' failure to provide medical care and properly diagnose and treat the Plaintiff; (e) the cruise ship is in fact isolated on the open seas for periods of time and thus the only medical care reasonably available to the passenger is onboard the ship; (f) RCCL caters to predominately U.S. citizens who are used to and expect first world medical care; (g) RCCL markets this cruise as safe and secure for its passengers, and (h) the subject cruise ship plies the waters off of third world countries with third world medical care which is either non-existent or below the standard of care for medical care in the United States and elsewhere.

266.     RCCL owes a duty to use reasonable care in providing competent medical staff and medical staffing agencies.  RCCL, as a result of its duty to provide its passengers medical care which is reasonable under the circumstances, owes a duty to reasonably hire, select, retain, monitor, and train its onboard medical staff.

267.     RCCL failed to reasonably hire, select, retain, monitor, and train its onboard medical staff on the subject ship.  RCCL hired Dr. Pereira prior to 2019.  Upon information and belief Dr. Pereira's medical work has been found to be subpar and/or has been previously accused of medical malpractice and/or untimely evacuating patients requiring emergent medical care.

Upon information and belief RCCL required Dr. Pereira to undergo written tests on rudimentary medical knowledge and/or training before rehiring Pereira for the contract he served during the Plaintiff's incident. RCCL knew or should have known that Dr. Pereira lacked some of the basics of medicine and medical care and certainly was not equipped to handle an emergency.

268.   **PRIOR SIMILAR INCIDENTS**:  RCCL is aware of prior similar incidents the company failed to reasonably hire, select, retain, monitor, and train its onboard medical staff on its ships:

a.   <u>Lewis Masotti</u>:  Case No. 1:19-cv-22078 involved RCCL's doctor, Defendant Etsebeth who failed to timely recognize Massotti's progressive condition and rapidly deteriorating vitals, bloodwork and chemistry and failed to timely disembark and/or medically evacuate Mr. Masotti on May 23, 2018 which resulted in severe and permanent injuries.

b.   <u>A.C. (a minor)</u>: Case No. 18-cv-21035 involved A.C. who severely broke her left hip which required emergency surgical repair.  However, RCCL failed to properly diagnose A.C.'s displaced left hip fracture.  RCCL's doctor told A.C.'s parents that there was nothing to worry about and discharged A.C. and prescribed her ibuprofen on April 11, 2017.  RCCL also failed emergently disembark and/or medically evacuate A.C. which delayed her care and treatment by four days.  The delay caused permanent complications including permanent disability and disfigurement.

c.   <u>Marcia Wilcox</u>: Case No. 19-cv-20641 involved an RCCL doctor who failed to timely disembark Wilcox who fell and broke her hip.  By the time RCCL disembarked, two days later, Wilcox suffered severe and permanent

injuries including but not limited to significant internal bleeding on or about March 4, 2018.

d. <u>Mitchell Allen</u>: Case No. 19-cv-24061 involved RCCL's doctor misdiagnosed Mr. Allen's fractured ribs and vertebrae which caused a delay in medical treatment which resulted in severe and permanent injury on or about January 2, 2019.

e. <u>Allen Hill</u>: Case No. 03-23815-cv-Moreno involved Celebrity Cruises Inc, which operates a cruise line jointly with RCCL and both of whom are owned by Royal Caribbean International.  In Hill, just as here the cruise line's doctor misdiagnosed Mr. Hill's progressive and life threatening condition.  In Hill, just as here the cruise line delayed in transporting Hill to a medical center in Puerto Rico and just as here the cruise line arranged and recommended that Hill be taken to a hospital in Puerto Rico which was not the closest hospital to the port, thus resulting in a delay in treatment and a difference in and worsening of the condition of the patient.  Just as here, the delay in treatment of a life-threatening condition caused Mr. Hill severe and permanent injuries.

269. RCCL knew or should have known that medical education for medicine, particularly emergency medicine, in countries outside the United States are subpar compared to any reasonable medical education in most developed country.  For example, foreign doctors do not undergo residency training in order to practice in an emergency room.  Upon information and belief foreign doctors are only required to complete medical school; one year of rotational training in different specialties which switch every couple of months; and if selected, one year of social services practicing in first level medical facility treating only minor conditions such as the common

cold and fever. RCCL knew or should have known to investigate Dr. Pereira level of training to work in an emergency room prior to hiring them, particularly Dr. Pereira. If RCCL had reasonably investigated Dr. Pereira's prior training and experience RCCL would have discovered that they either had no emergency room experience or no substantial emergency room experience, but only experience at first level medical facilities treating illnesses such as the common cold and fever. RCCL knew or should have known of Dr. Pereira's inexperience and accordingly harmful propensities prior to hiring and/or retaining Dr. Pereira.

270.   Dr. Pereira were not equipped either through their education, training, skills, or environment, to properly diagnose the Plaintiff's time sensitive medical condition and/or to create a reasonable plan for the care and treatment of the Plaintiff. Dr. Pereira were not equipped either through their education, training, skills, or environment to initiate, request and/or advocate for a prompt medical evacuation of the Plaintiff to a land based medical center capable of handling the Plaintiff's time sensitive medical condition to the ship's command and/or RCCL's shoreside on-call physician to arrange for the evacuation of the Plaintiff off the ship. Dr. Pereira lacked the education, training, or skills to handle an emergent and progressive medical condition. Dr. Pereira only worked at first level medical facilities prior to working for RCCL.

271.   RCCL knew or should have known to investigate Dr. Pereira's educational credentials and training prior to retaining Dr. Pereira as a RCCL doctor. RCCL knew or should have known to investigate the medical facilities that Dr. Pereira worked at prior to working for RCCL. Dr. Pereira did not have significant experience working with emergencies. RCCL knew or should have known to investigate and contact the medical boards and/or equivalent regulatory body as well as Dr. Pereira's medical school and the medical facilities where Dr. Pereira previously worked to verify their backgrounds. If RCCL had verified and investigated the background of Dr. Pereira RCCL would not have retained Dr. Pereira. RCCL breached its duty to hire and/or retain

by failing to screen its shipboard physicians, including Dr. Pereira in order to provide a qualified and competent physician.  RCCL knew or should have known Dr. Pereira were unqualified to provide reasonable emergent medical care after RCCL conducted an internal investigation and a committee decided not to retain and/or hire Dr. Pereira prior to Dr. Pereira's additional contracts. RCCL failed to adequately investigate its shipboard physician's background, including prior employment with other cruise lines and medical providers as well as educational credentials and recent training.

272.    RCCL knew or should have known to provide adequate training to all shipboard medical personnel regarding all aspects of providing shipboard medical care, including situations where passengers should be transported off RCCL's ships.  The Defendant failed to provide Dr. Pereira and the medical staff the necessary training as to all aspects of shipboard medical care.  As a result of the Defendant's failure to monitor and provide adequate training to its shipboard medical staff, Dr. Pereira failed to initiate, request and/or advocate for a prompt medical evacuation to a land based medical center capable of handling the Plaintiff's condition.

273.    The Defendant owes a duty to use reasonable care to monitor the activities of onboard medical personnel in the shipboard Medical Center, including Defendant Pereira.  The Defendant also knew or should have known not to retain incompetent physicians and/or medical personnel with insufficient experience in medical care and/or emergent medical care including Defendant Pereira.  The Defendant knew or should have known of the Dr. Pereira's unfitness to provide adequate medical care to its shipboard passengers based on her lack of experience practicing emergent care and through RCCL's own committee investigation which initially decided not to retain Dr. Pereira and then subsequently retained Dr. Pereira, but only because of a test on rudimentary medicine which is evidence that RCCL knew that Dr. Pereira lacked some of the basics of medicine and medical care  and certainly was not equipped to handle an emergency.

The Defendant breached its duty to use reasonable care to monitor and retain physicians who were equipped through experience, education, skills, training, or environment to properly examine, diagnose and treat the Plaintiff's progressive medical condition.

274.    The shipboard physician and medical staff did not have the mental temperament and analytical abilities and did not have sufficient knowledge and training to properly diagnose or to create a reasonable and appropriate plan for emergent care and treatment including evacuation of the patient and getting the Plaintiff to a medical center on an expedited basis appropriate for emergent care.  Dr. Pereira could not reasonably handle the stress and pressure of an emergent medical situation.  Dr. Pereira panicked and avoided the Plaintiff and/or Plaintiff's family's questions and concerns.  RCCL knew or should have known to investigate and test Dr. Pereira's mental temperament and ability to analytically handle an emergent medical case.  RCCL breached its duties of reasonable care to hire and retain Dr. Pereira sent forms to Dr. Pereira's references which offer no information as to Dr. Pereira's ability to treat emergent.   Mr. Burgess's condition deteriorated, causing permanent injury and nearly causing his death.

275.    RCCL was incompetent in its evaluation of doctors for purposes of hiring and/or retention.  After the Plaintiff's incident demonstrating Dr. Pereira's inability to provide reasonable medical care, RCCL nevertheless negligently continued to employ them.  Because RCCL could not reasonably evaluate Dr. Pereira's ability to provide reasonable medical care, the doctors committed medical malpractice again.

276.    The Defendants' negligence proximately caused permanent injuries and damages to the Plaintiffs in the past and in the future. Henze has paid and will continue to pay medical expenses and costs of care on behalf of Plaintiff Burgess. Those injuries and damages include but are not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; household and other related expenses in the past and in the future; and

past lost wages and compensation and loss of income earning capacity for the future. Those injuries and damages also include but are not limited to non-economic damages including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing. The Plaintiff has suffered these losses in the past and will continue to suffer them in the future.

WHEREFORE, the Plaintiffs demands Judgment against the Defendants for damages recoverable under the general maritime law and state law including but not limited to economic damages including medical, psychological, and other related expenses in the past and in the future; lost income in the past and lost income and earning capacity in the future; non-economic damages in the past and in the future including pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; all court costs, all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law, and any and all other damages which the Court deems just or appropriate.

By:   *s/Sarah Anne Lobel*
**JOHN H. HICKEY (FBN 305081)**
E: hickey@hickeylawfirm.com
**SARAH A. LOBEL, ESQ. (FBN 88716)**
E:  slobel@hickeylawfirm.com
**HICKEY LAW FIRM, P.A.**
1401 Brickell Avenue, Ste. 510
Miami, Florida 33131-3504
Telephone: (305) 371-8000
Facsimile: (305) 371-3542