UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 1:20-cv-20687-Otazo-Reyes

RICHARD BURGESS individually and
by and through DARREN HENZE
as Guardian of the Person and Estate
of Richard Burgess, incapacitated and
as agent under that certain durable power
of attorney dated November 20, 2006.

    Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD.,
a Liberian Corporation, d/b/a
ROYAL CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL,

    Defendant.
_____/

## DEFENDANT ROYAL CARIBBEAN CRUISE, LTD.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, ROYAL CARIBBEAN CRUISES, LTD., (hereinafter "RCCL") by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 56, S.D. Fla. L.R. 7.1 and S.D. Fla. L.R. 56.1, hereby moves for final summary judgment or, alternatively, motion for partial summary judgment on three issues, and states as follows:

### INTRODUCTION

Plaintiffs Richard Burgess and his guardian and husband Darren Henze bring this maritime medical malpractice matter arising from an incident that occurred aboard the Royal Caribbean vessel, *Harmony of the Seas*, in February 2019. Plaintiff, Richard Burgess, fell in his cabin on February 18, 2019 resulting in a cut on his head, fell asleep, and then reported to the ship's medical center after he awoke. Three days later, he returned to the ship's medical center while it was docked in San Juan, Puerto Rico with symptoms of a stroke that required transfer to a shore-side hospital for further medical care. Mr. Burgess was medically disembarked from the ship to HIMA San Pablo Caguas Hospital (hereinafter "HIMA Caguas") in San Pablo, Puerto Rico for treatment.

Plaintiffs allege numerous claims against RCCL relating to the treatment he received after his scalp laceration and after he reported symptoms of stroke, but principally Plaintiffs claim that

1

RCCL took too long to facilitate the medical transfer from the Port of San Juan to HIMA Caguas, resulting in a missed opportunity for time-sensitive medical treatment that they claim could have prevented permanent injury to Mr. Burgess's brain. On this claim, Plaintiffs' experts opine that RCCL was negligent because: (1) it should have called 911; (2) it did not have an emergency care protocol for stroke victims; (3) it should have directed the ambulance to transport Mr. Burgess to a closer hospital; (4) it should have been more aggressive with the ambulance service; and (5) it should have assigned to Mr. Burgess a "Care Team" Associate. None of these theories, however, relies on competent evidence; they rely on inadmissible hearsay and speculation. And even if these arguments had any merit, RCCL's actions did not proximately cause Mr. Burgess's damages.

Plaintiffs' claim that RCCL's delay precluded him from receiving critical clot-busting medication also fails because Plaintiffs have no competent evidence of causation. Indeed, Plaintiffs' expert conceded that there was only a 30% chance of a different outcome which is insufficient to meet the more-likely-than-not standard. It is also entirely speculative that the delay in transporting Mr. Burgess to HIMA Caguas contributed to his injury because the treating physician testified that regardless of when Mr. Burgess arrived at the hospital, he would not have given this medication because it was contraindicated by a CT scan.

Plaintiffs' claim that RCCL negligently hired or selected its shipboard doctors also cannot survive summary judgment. Plaintiffs cite unsworn complaints in three prior cases which are inadmissible hearsay and have no probative value. Moreover, Plaintiffs' experts do not opine that Drs. Etsebeth or Pereira were unqualified or that RCCL did not diligently inquire into their fitness. Moreover, there is no competent evidence that their treatment was the proximate cause of the injury.

RCCL is also entitled so summary judgment on any claim premised on the length of the transfer because RCCL contracted with a port agent, Continental Shipping, to handle Mr. Burgess's transfer to the hospital. Because the port agent was an independent contractor, Plaintiffs cannot impute liability to RCCL for any putative negligence.

Plaintiffs' other claims against RCCL—for its treatment of his scalp laceration, its failure to evacuate him after his scalp laceration and before his stroke; or its allegedly inadequately equipped medical facility—also fail as a matter of law because there is no evidence, expert or otherwise, to support them.

In short, Mr. Burgess's outcome was not attributable to any action or lack of action by

2

RCCL or its medical staff. It was the result of his underlying medical problems, which were not caused by RCCL, and no action by RCCL or subsequent providers would have changed the outcome.

## **THE SUMMARY JUDGMENT STANDARD**

One of the principal purposes of a motion for summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). "Evidence inadmissible at trial cannot be used to avoid summary judgment." *Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) (internal quotations omitted). And testimony "not based upon personal knowledge," *id.* (internal quotations omitted), and evidence "consisting of one speculative inference heaped upon another" are "entirely insufficient" to withstand summary judgment. *Josendis v. Wall to Wall Residence Repairs Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011). "[U]nsupported speculation [also] . . . does not meet a party's burden of producing some defense to a summary judgment motion" and "does not create a genuine issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). "[I]nstead, it creates a false issue, the demolition of which is a primary goal of summary judgment. *Id.* "[C]onclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997), *abrogated on other grounds by Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019).

To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Likewise, although all justifiable inferences are to be drawn in favor of the nonmoving party the "nonmovant need not be given the benefit of every inference but only of every *reasonable* inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (emphasis added). If the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).

## ARGUMENT

**I. RCCL IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM THAT IT NEGLIGENTLY FAILED TO ARRANGE FOR EMERGENCY TRANSPORT TO THE CLOSEST MEDICAL FACILITY FOR MR. BURGESS'S STROKE[1]**

Plaintiffs allege that RCCL was negligent in failing to arrange for emergency transport to the closest medical facility in Puerto Rico, where the ship was docked, after diagnosing Mr. Burgess with a stroke. DE 48 ¶ 98-105. Plaintiffs' experts raise five theories in support of this claim: **(A)** RCCL's medical staff should have called 911 instead of coordinating the transfer through a private transfer service; **(B)** RCCL should have had an emergency care protocol for stroke victims; **(C)** RCCL should have directed the ambulance to deliver Mr. Burgess to a closer hospital; **(D)** RCCL should have been more aggressive in facilitating Mr. Burgess's transport; and **(E)** RCCL should have assigned a "Care Team" Associate to accompany Mr. Burgess on his trip to HIMA Caguas. As discussed below, none of these theories relies on competent evidence, are grounded on fundamental misunderstandings of the conditions in Puerto Rico, rely on inadmissible hearsay or speculation, or did not proximately cause Mr. Burgess's damages.

**A.    Calling 911**

Plaintiffs' experts, Drs. Nidorf and Gomez, suggest that the RCCL medical staff should have dialed 911, which they contend would have been quicker than coordinating a private transfer service. *See* DE 87-1 at 17 ¶ 1; *id.* at 72. This opinion is speculative and is not competent evidence to stave off summary judgment. Neither Dr. Nidorf nor Dr. Gomez have ever actually dialed 911 in Puerto Rico, and both admit that they do not know how the public emergency system works. DE 87-2 at 24:15-17; *id.* at 25:13-24; DE 87-3 at 30:17-20; *id.* at 115:13-16. Thus, for them to opine that calling 911 would have been quicker is not based on any personal knowledge or evidence but is purely conjectural.

The deposition testimony of Dr. Ulises Nobo, the vascular neurologist at HIMA Caguas in Puerto Rico who accepted RCCL's medical transfer request and treated Plaintiff, illustrates that their opinion is not based in fact:

> Q:   So I'd like to ask you a little bit about challenges in facilitating patient transfers around the island of Puerto Rico as well. So, back in February of 2019, was Puerto Rico experiencing difficulties with ambulance resources?
>
> A:   We're still struggling with that.

---

[1] This corresponds to Count VI in the Second Amended Complaint. *See* DE 48 at 29-31.

4

> Q: Tell me what it was like back in February of 2019 trying to facilitate a patient transfer by ambulance in Puerto Rico.
>
> A: Literally a nightmare. So they call you to transfer the patient to you. And if I remember correctly, in this case they called me to accept this patient, which I did. Now, the typical experience is that you might accept the patient now---now I don't know—what time is it? 11:24. The patient might come to your institution an hour, two hours, five hours, eight hours later, easily. Depending on where they find an ambulance that will accept to transfer the patient or that it is available to transfer the patient. So transferring patients in Puerto Rico by ambulance is a huge issue, it's a huge problem. It was a problem in 2019 and still is a major issue now.
>
> Q: Why is it such a big issue?
>
> A: Because the way the system works. I mean, here it's not like the 911 in the States. 911 in the States, in a matter of a few minutes you have an ambulance in your house. Here, you know, you call the 911 and they might activate the state ambulance or they might activate the private system. And some in the private system might be transferring some other patients for different stuff, they are not available right away.
>
> \* \* \* \*
>
> Q: So back in February of 2019, there was a national shortage of ambulance resources?
>
> A: I don't know if there was a national shortage or not, **but the system was working like crap**. I'm sorry for the word.

DE 87-5 at 29:14 – 30:24; *id.* at 31:10-14 (emphasis added).

Contrary to Plaintiffs' contention, the only competent evidence establishes that if RCCL had called 911 rather than arranging for private transport, Plaintiff would not have been delivered either to a stroke-capable or a better-equipped hospital than HIMA Caguas. Both Dr. Nobo and Continental Shipping, RCCL's port agent, testified that in Puerto Rico when an ambulance transfer is coordinated via 911, the patient is taken to the nearest medical facility *regardless of whether the facility has the necessary resources or capabilities to handle the patient's care needs*. DE 87-5 at 31:23 – 32:6; DE 87-4: 31:1 – 34:5. Therefore, according to Continental Shipping, even if Mr. Burgess's medical transfer had been possible via a 911-initiated ambulance service, he would have been taken from the Port of San Juan to nearby Hoare Medical Clinic which is "barely a hospital" with "very rudimentary services." DE 87-4 at 34:1-5. ***Dr. Gomez admitted that he has no idea where Mr. Burgess would have been transferred had 911 been called***. DE 87-3 at 115:13-16.

Dr. Nidorf also admitted that if Mr. Burgess was taken to a facility that did not have t-PA[2] available — which was likely if 911 were called — it would have lengthened the time before he ultimately received care. DE 87-2 at 75:12-18. Accordingly, there is no competent evidence that dialing 911 would have expedited Mr. Burgess's transfer or changed the outcome.

### B.     Emergency Care Protocol

Dr. Gomez opines that RCCL was negligent in failing to have an emergency care protocol for stroke victims and that had one existed Mr. Burgess's transfer to a stroke-capable hospital could have been "noticeably shorter." DE 87-1 at 17 ¶ 2. This is entirely speculative. Dr. Gomez pinpoints no competent evidence that Mr. Burgess's outcome would or could have been different had there been such a protocol. Also, even if Mr. Burgess had arrived sooner, he would not have received any different medical treatment. The treating physician at HIMA Caguas testified that he would not have administered the t-PA no matter what time he reached the hospital. DE 87-5 at 66:5-20.

### C.     Plaintiff's Transport to HIMA Caguas

Drs. Nidorf and Dr. Gomez suggest that valuable time could have been saved had RCCL transported Mr. Burgess to another stroke-capable hospital closer to the Port in San Juan. DE 87-1 at 18 ¶ 6; DE 87-1 at 72. As discussed below, however, there is no competent evidence that there was a closer stroke-capable hospital or that Mr. Burgess's outcome would have been any different.

Dr. Nidorf performed a Google search of the surrounding hospitals near the Port of San Juan in order to identify nine alternative locations that he claims were closer to the ship than HIMA Caguas. DE 87-2 at 36:13 – 45:4. After completing his Google search, Dr. Nidorf claims he then called each of the nine hospitals to confirm "that they provided twenty-four hour service for neurologic emergencies." DE 87-2 at 42:5-10. Hence, any opinion Dr. Nidorf offers in this case pertaining to alternative hospital locations on the date in question is dependent upon what he purportedly learned during his review of unidentified internet websites and/or over the telephone — both of which are inadmissible hearsay. *See e.g.*, *St. Clair v. Johnny's Oyster & Shrimp, Inc.*, 76 F. Supp. 2d 773, 775 (S.D. Tex. 1999) ("[A]ny evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretation of the hearsay exception rules.").

---

[2] "t-PA," which is a thrombolytic medicine, is an abbreviation for tissue plasminogen activator and is used to dissolve blood clots.

Even if this information were admissible, it would still not be competent evidence to survive summary judgment. Dr. Nidorf does not know the name or title of anyone he spoke to at any of the hospitals, the date or time of day he made any of the calls, or even what phone numbers he dialed. DE 87-2 at 44:2-17. Moreover, *he admits that he did not ask what kind of neurologic services each of the proposed alternative hospitals had to offer*, what medications they had in stock (including whether they carried t-PA), *or if they were even open and available to treat Mr. Burgess on the date in question*. DE 87-2 at 42:22 – 43:13. Additionally, Dr. Nidorf conceded that he does not know whether any of the alternative locations were better than any other for stroke treatment. DE 87-2 at 57:15 – 58:2. Most importantly, *Dr. Nidorf admitted that HIMA Caguas provided Mr. Burgess with the "best chance for the best outcome"* which negates this entire theory. DE 87-2 at 85:9-23.

Dr. Gomez's testimony concerning alternative hospitals is equally incompetent. While he contends that HIMA Caguas was "not the closest stroke-capable hospital to the ship," he could not identify an alternative suitable hospital by name either in his expert report or during his deposition. DE 87-1 at 9-19; DE 87-3 at 117:8 – 119:12. In fact, *Dr. Gomez admits that he cannot identify any other hospital other than HIMA Caguas that was capable of providing t-PA medication to Mr. Burgess*. DE 87-3 at 118:17 – 119:1.[3]

In sum, there is no competent evidence to support the theory that had the ambulance transported Plaintiff to a different medical facility, his outcome would have been different. Quite the contrary, the evidence shows that transporting Plaintiff to HIMA Caguas provided him with the best possible outcome.

### D. RCCL's Alleged Failure to Be More Aggressive

Drs. Nidorf and Gomez suggest that an ambulance transfer could have been effectuated faster had RCCL been more aggressive. Dr. Nidorf believes that the medical staff on the ship "should have insisted on a faster arrival and not taken no for an answer." DE 87-1 at 71-72. He also contends that "if it became clear that the first ambulance company could not send an

---

[3] RCCL's neurovascular expert, Dr. Alcedo Guardia, *who practices medicine in Puerto Rico*, corroborated that HIMA Caguas was "the *only* medical center in the island that managed strokes at that time." Report of Dr. Alcedo-Guardia at 4 (emphasis added) (attached as **Composite Exhibit 1**). As such, Mr. Burgess would not have received t-PA at another medical center. Report of Dr. Alcedo-Guardia at 5 ¶ 4.

ambulance more quickly, then other ambulance companies should have been called." *Id.* at 72. Captain Keijer parrots in more general terms this opinion—he believes that RCCL "failed to act on the delayed arrival" of the ambulance." Report of Capt. Keijer at 11 ¶ 4.4 ; *id.* ¶¶ 5.3, 5.7 DE 86-1). Dr. Gomez opines that "the delay incurred in transferring [Mr. Burgess] from the *Harmony of the Seas* cruise ship to a stroke-capable hospital was unnecessarily excessive" due to the lack of a "sense of urgency."[4] DE 87-1 at 15; DE 87-3 at 38:22 – 39:14.

This theory of liability is not based upon any competent evidence. Dr. Nidorf merely speculates that "not taking no for an answer" would somehow compel an ambulance company to respond sooner. Although Dr. Nidorf suggests that "another company should have been called" if the first company did not respond soon enough, he admits that he has no personal knowledge of what resources are available in San Juan for ambulance service, the average response time for ambulance service, or even the total number of ambulances (public or private) that were available at the time. DE 87-2 at 22:22 – 36:7.

Dr. Gomez's opinion, on the other hand, is speculative because he admits that he "has no idea" what took place between the time RCCL first requested the ambulance and the time the ambulance arrived at the Port of San Juan. DE 87-3 at 49:23 – 52:19. For example, Dr. Gomez does not know how many phone calls were made to request an ambulance, who made what calls, how many different entities were contacted, or the response from any ambulance service that was contacted. DE 87-3 at 50:1-16. Dr. Gomez also does not know what information ambulance companies require in order to accept a patient transfer request. DE 87-3 at 50:17-20. This is significant because Continental Shipping Inc, the port agent who coordinated the ambulance service on the date in question, testified that that Puerto Rican ambulance companies will not agree to accept a transfer request until confirmation is received that a shore-side facility will accept the patient—a point Dr. Gomez agrees he has no basis to challenge. DE 87-4 at 24:4 – 25:6; *see also* DE 87-3 at 50:21 – 51:4. Dr. Gomez also conceded that the execution of a medical transfer can be "undoubtedly" affected by the resources that are available, but did not know whether there were

---

[4] Dr. Gomez's criticism is not focused on the time it took the ship physician to evaluate Mr. Burgess and order a medical disembarkation, but is directed at the amount of time that passed after the request for an ambulance was made. DE 87-3 at 47:16-22.

8

any other ambulance service (public or private) available at the time RCCL made the request. DE 87-3 at 51:14 – 52:19.

Finally, even if Mr. Burgess had arrived sooner he still would not have been qualified to receive t-PA for his stroke, so the timing issue is irrelevant. *See* DE 87-5 at 66:5-20 (testimony of treating physician at HIMA Caguas).[5]

### E. Assignment of a Care Team Associate

Captain Keijer, Plaintiff's marine expert, opines that RCCL violated their own policy by not assigning a Care Team Associate to facilitate Mr. Burgess's arrival at HIMA Caguas. *See* Report of Capt. Keijer at 12 See DE 86-1; *id*. at 13 ¶ 5.4. There are three reasons why this theory cannot survive summary judgment.

First, Plaintiff offers no competent evidence that the assignment of a Care Team Associate would have produced a different outcome. Any suggestion that Plaintiff would have been transported sooner because of the presence of a Care Team Associate is speculative.

Second, even if Plaintiff had been transported sooner because of the presence of a Care Team Associate, he would not have received any different medical treatment. The treating physician at HIMA Caguas testified that he would not have administered the t-PA no matter what time Plaintiff arrived there. DE 87-5 at 66:5-20.

Third, Captain Keijer's opinion rests on a misunderstanding of the Care Team Associate's role. The job duties of a Care Team Associate do not include coordinating medical disembarks to shore-side hospitals and do not choose where a patient should be treated**.** *See* Dep. Tr. of Ben

---

[5] *Accord* Report of Dr. Alcedo-Guardia Report at 5 ¶ 3 ("The history and the head CT findings would have made tPA contraindicated regardless of the applicable time window.") (attached as **Composite Exhibit 1**); Report of Dr. Merkler at 4 ¶ 3 ("Mr. Burgess' initial CT head was interpreted by Dr. Nobo as showing a left PCA stroke and an ipsilateral subarachnoid hemorrhage (SAH). Intracranial hemorrhage on CT is an absolute contraindication to administer IV tPA as there is a high risk for expansion of the hemorrhage and thus catastrophic outcome. Given the concern for subarachnoid blood, especially with the history of recent head trauma, this would have made tPA contraindicated regardless of the applicable time window for intravenous tPA.") (attached as **Composite Exhibit 1**); Report of Dr. Yavagal at 2 Op. 1 ("When Richard Burgess presented to HIMA Hospital on 2/21/19 at 2:00 PM (AST), he would not have been a candidate for t-PA regardless of reported symptom onset time. This is because t-PA would have been contraindicated due to the recent head trauma he sustained when he fell in his cabin on 2/18/19.") (attached as **Composite Exhibit 1**).

Shore at 186:23 – 187: 5; *id.* at 239:21-23; *id.* at 240:18-19; *id.* at 241:2-3 (attached as **Exhibit 2)**. Care Team Associates, who are based shore-side in Miami, provide emotional support to guests and crew in the event of a crisis and assist the guests/family members with any supportive needs including: transferring the patient's luggage, contacting family members, arranging for the travel of family members to join the patient; and arranging hotel accommodations for family members and the patient after discharge. Dep. Tr. of Ben Shore at 186:23 – 187: 5; *id.* at 239:16-20; *id.* at 240:21-24.

## II. RCCL IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM IT NEGLIGENTLY TREATED PLAINTIFF'S STROKE[6]

To plead a negligence claim under maritime law, a plaintiff must allege that: (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm. *Spall v. NCL (Bahamas) Ltd.*, 275 F. Supp. 3d 1345, 1348 (S.D. Fla. 2016). "The failure to show sufficient evidence of each element is fatal to a plaintiff's negligence cause of action." *Tonelli v. NCL (Bahamas) Ltd.*, 428 F. Supp. 3d 1313, 1318 (S.D. Fla. 2019). A shipowner is only liable to its passengers for medical negligence if its conduct breaches the carrier's more general duty to exercise "reasonable care under the circumstances." *Rojas v. Carnival Corp.*, 93 F. Supp. 3d 1305, 1309–10 (S.D. Fla. 2015). The exercise of reasonable care is defined as the "duty to . . . furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances." *Id.*

When exercising admiralty jurisdiction, this Court looks to Florida state law for the causation standard. *See, e.g., Diczok v. Celebrity Cruises, Inc.*, 263 F. Supp. 3d 1261, 1266 (S.D. Fla. 2017); *In re Royal Caribbean Cruises Ltd.*, 991 F. Supp. 2d 1171, 1183 (S.D. Fla. 2013). "In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla.1984). "A mere possibility of such causation is not enough; and *when the matter remains one of pure speculation or conjecture*, or the probabilities are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant*." *Id.* (emphasis added; quoting Prosser, THE LAW OF TORTS § 241 (4th ed. 1971)). *Accord Daubert v.*

---

[6]This claim is alleged in Counts IV and V in the Second Amended Complaint under theories of actual agency (Count IV) and apparent agency (Count V). *See* DE 48 at 25-29.

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) ("Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past.").

As discussed below, Plaintiffs have no competent evidence of causation on this claim because: (1) if t-PA had been given, there was only a 30% chance of a different outcome; and (2) it is entirely speculative that the delay in transporting Mr. Burgess to HIMA Caguas was the proximate cause of him not qualifying for t-PA.

Dr. Gomez's testimony as to the efficacy of t-PA had it been administered does not constitute competent evidence of causation because he could not provide the requisite expert testimony for Plaintiffs to establish medical causation:

> Q: So what you're saying is the clot in the PCA would have dissolved before any tissue to the brain died?
>
> A: If it's given appropriately, yes.
>
> Q: Okay. And so are you then saying that the tPA would've also dissolved the mother ship?[7]
>
> A: Yes.
>
> Q: In its entirety?
>
> A: That we don't know.
>
> Q: All right.
>
> A: But at least it would've decreased the clot burden significantly.
>
> Q: Can you tell me to what degree it would've decreased?
>
> A: That's unpredictable.
>
> Q: So it's it—
>
> A: But we do know—we do know two things. First of all, let me back up a little bit on your statement. **There is no way that anybody can tell you that if you give IV tPA to a patient like Mr. Burgess the clot in the posterior cerebral artery will be dissolved to the point that there is no brain injury.** Typically, the treatment of stroke is taking what is going to be this much brain injury and minimizing it. But they're, you know, minimizing it to the point that the functional outcome and the mortality. The functional outcome is better and the mortality is reduced. There is no way anybody can predict to what degree the clot in the vertebral artery would've been dissolved. **But we**

---

[7] The "mothership" is what defense counsel informally named the subject clot during questions pertaining to the evolution of Mr. Burgess's stroke during Dr. Gomez's deposition for ease of reference. DE 87-3 at 126:16-24; *id.* at 128:2-9.

11

> **do know that patients with this kind of pathology when given tPA have about a 30 percent chance of a better outcome than when they do not get IV tPA.**

DE 87-3 at 131:2 – 132:10 (emphasis added); *accord* Report of Dr. Sze at Composite Exhibit 1 ("[I]t is not more likely than not that intravenous tPA will allow most patients to recover from infarctions.) (attached as Composite Exhibit 1)

Dr. Gomez's opinion that Mr. Burgess would have had only a 30% chance of a better outcome had t-PA been administered does not meet the more-likely-than-not standard of causation. Dr. Gomez's testimony means that there was a greater chance (70%) of no medical benefit. Accordingly, Plaintiffs cannot meet his burden of proof on causation on this claim.

It is also speculative that the delay in transporting Mr. Burgess to HIMA Caguas was the proximate cause in him not qualifying for t-PA. Dr. Gomez contends that the delay incurred in transferring Mr. Burgess from the ship to a stroke-capable hospital "deprived Mr. Burgess of the possibility of being treated with intravenous thrombolysis" which he believes "directly contributed to the ultimate bad outcome and disability of the patient." DE 87-1 at 15. To support of his opinion, Dr. Gomez points to the results of CT imaging studies that were taken of Mr. Burgess's brain at HIMA Caguas *following his transfer* from the ship. Dr. Gomez opined that Mr. Burgess did not receive t-PA because the CT images showed that the tissue in his brain had already died where the stroke occurred, thus negating his candidacy for the clot dissolving medication. DE 87-3 at 58:19 – 59:20; *id.* at 77:21 – 83:6. He further contends that the brain tissue was dead because too much time had passed between the onset of the stroke and the time of treatment. DE 87-3 at 78:18 – 79:2; *id.* at 81:5-19.

Dr. Gomez's opinion, however, that Mr. Burgess qualified for t-PA at some point before his arrival to HIMA Caguas is also speculative because he cannot pinpoint when his brain tissue died. DE 87-3 at 83:7 – 85:3. Thus, Dr. Gomez cannot establish when Mr. Burgess would have qualified for t-PA. This is critical because Dr. Gomez agrees that stroke patients only qualify for t-PA up to 4½ hours from the onset of their stroke (i.e. the "window of opportunity"), but he conceded that Mr. Burgess arrived at HIMA Caguas for CT imaging studies of his brain three hours and forty-five minutes after the onset of stroke symptoms. DE 87-3 at 80:14 – 83:6. Although he had another 45 minutes to receive t-PA, the brain tissue was also dead, which disqualified Plaintiff from receiving t-PA. DE 87-3 at 80:19 – 81:13; *id.* at 78:14-17. Therefore, Plaintiff was disqualified from receiving t-PA at some unknown time before the expiration of the

12

4½ hour window of opportunity. As such, Dr. Gomez admits "we don't know" and "will never know" at what point in time his brain tissue was still viable, if at all, to receive t-PA medication. DE 87-3 at 84:23 – 85:1.

Dr. Gomez's insistence that the passage of too much time was the only reason why Mr. Burgess did not receive t-PA is also belied by the only physician who was in a position to make the decision whether he qualified for t-PA — Dr. Nobo — who was the physician who treated Plaintiff at HIMA Caguas and is one of only two board-certified vascular neurologists in Puerto Rico. Dr. Nobo testified in this case that he would not have administered t-PA to Mr. Burgess *regardless of how soon he was delivered to him at HIMA Caguas after the onset of his stroke* because the CT images of Mr. Burgess's brain showed evidence of a hemorrhage, which immediately disqualified him from receiving t-PA regardless of the amount of time that had passed since the onset of his symptoms as the following exchange reveals:

> Q: So once you saw that finding that you believed to be blood in the head, did that mean that definitively Mr. Burgess was not going to qualify for TPA no matter what?
>
> A: Correct. Even if I saw him an hour from the onset, two hours, three hours. With that kind of imaging studies, I would not have given him IV TPA.
>
> Q: So, let me ask it this way, if Mr. Burgess was flown by helicopter the moment he showed signs and symptoms of a stroke and delivered directly to you at HIMA, Caguas, on February 21, 2019, as soon as you saw that image that showed that blood, would you have given him TPA or not?
>
> A: No.

DE 87-5 at 66:5-20.

Dr. Gomez agrees that evidence of hemorrhage on a CT scan is an absolute contraindication to administering t-PA, but disputes Dr. Nobo's interpretation of the images and speculates that if Mr. Burgess had reached HIMA Caguas earlier, clinicians would have had more time to review the imaging studies and reach a different conclusion as to whether there was evidence of a hemorrhage or not. DE 87-3 at 90:8-15; *id.* at 96:16 – 98:10. Dr. Gomez speculates that clinicians at HIMA Caguas would have eventually determined that the CT images did not show evidence of an internal brain-bleed and ultimately changed course and decided to administer t-PA *if they had more time to analyze the films*. DE 87-3 at 96:16 – 97:13.

This opinion is not grounded on any competent evidence and cannot satisfy Plaintiffs' burden of proof. It does not matter if Dr. Nobo read the film correctly or not; he is the only

vascular neurologist who was at HIMA Caguas and in a position to address the situation. Dr. Gomez cannot re-create history by fictionalizing a hypothetical scenario to support a narrative that completely contradicts Dr. Nobo's testimony. The only witness who can testify to Dr. Nobo's thought-process is Dr. Nobo, and there is no evidence to support Dr. Gomez's conjecture that Dr. Nobo interpreted the CT images a certain way because he was rushed for time. As noted above, Dr. Nobo specifically stated that time was not a factor that affected his analysis of the film images as he would have made the same decision "even if I saw him an hour from onset, two hours, three hours." DE 87-5 at 66:9-10. As a result, Dr. Gomez's opinions as to Mr. Burgess's candidacy for t-PA are speculative and do not constitute competent evidence to support the claim for negligence.

### III. RCCL IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM THAT IT NEGLIGENTLY HIRED AND SELECTED SHIPBOARD DOCTORS ETSEBETH AND PEREIRA[8]

Under general maritime law, a shipowner who elects to provide a physician for its passengers has a duty to use reasonable care in selecting competent medical staff. *Jackson v. Carnival Cruise Lines, Inc.*, 203 F. Supp. 2d 1367, 1374 (S.D. Fla. 2002). A plaintiff bringing a claim for negligent hiring or selection must prove that "(1) the contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury." *Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F. Supp. 2d 1308, 1318 (S.D. Fla. 2011) (quoting *Davies v. Commercial Metals Co.*, 46 So.3d 71, 73–74 (Fla. Dist. Ct. App. 2010)). The relevant inquiry on the second element is whether the employer/principal diligently inquired into the employee/contractor's fitness. *Smolnikar*, 787 F. Supp. 2d at 1319; *see Jackson*, 203 F. Supp. 2d at 1374 (shipowner's duty to use reasonable care in selecting a competent independent contractor for the ship's medical staff is "sufficiently fulfilled when the physician's fitness is diligently inquired into"). Further, "[t]he fact that the physician errs in his treatment does not prove that he was incompetent or that the company was negligent in appointing him." *Jackson*, 203 F. Supp. 2d at 1375 (quoting *Bonaventure v. Home Lines, Inc.*, 536 F. Supp. 100, 103 (E.D. Pa. 1982)).

Determining whether the medical staff were properly qualified requires expert testimony. *See Rinker v. Carnival Corp.*, 836 F. Supp. 2d 1309, 1317 (S.D. Fla. 2011). If a plaintiff fails to

---

[8] This corresponds to Count VII in the Second Amended Complaint. *See* DE 48 at 31-35.

present expert evidence, then a plaintiff cannot meet his or her burden to show "that specific facts exists demonstrating a genuine issue for trial." *Id.*

In this case, none of Plaintiffs' experts opine that Drs. Etsebeth or Pereira were unqualified or unfit for their positions or that RCCL did not diligently inquire into their fitness. Accordingly, Plaintiffs have not met his burden of establishing "that specific facts exist demonstrating a genuine issue for trial." regarding their qualifications. Thus, if there is no issue as to whether Drs. Etsebeth or Pereira were properly qualified, then there is no basis for a negligent hiring/selection claim. Moreover, the evidence filed with this Motion shows that Drs. Etsebeth and Pereira met all the qualifications for their positions. *See* **Composite Exhibit 3**; Dep. Tr. of Dr. Etsebeth at 11:20 – 19:8 (attached as **Exhibit 4**); **Composite Exhibit 5** (Dr. Pereira's CV, license, degree); Dep. Tr. of Dr. Pereira at 15:21 – 23:5 (attached as **Exhibit 6**).

Finally, there is no competent evidence that Drs. Etsebeth or Pereira's treatment of Mr. Burgess was the proximate cause of his injury. Thus, Plaintiff cannot establish the third element for his claim. Accordingly, this Court should grant summary judgment on this claim.

Plaintiff relies on the allegations in two prior lawsuits against Dr. Etsebeth and one prior lawsuit against Dr. Pereira to buttress his claim that that they were unqualified and should not have been hired by RCCL. *See* DE 48 ¶ 110(b) (citing *Cordani v. NCL (Bahamas) Ltd., et. al.*, No. 1:15-cv-23414-FAM (S.D. Fla.)) (hereinafter "*Cordani*"); DE 48 ¶ 110(c) (citing *Masotti v. Royal Caribbean Cruises, Ltd.*, No. 19-cv-22078-KMW (S.D. Fla.)) (hereinafter "*Masotti*"); DE 48 ¶ 111(b) (citing *Pack v. Royal Caribbean Cruises, Ltd.*, No. 1:15-cv-22828-GAYLES (S.D. Fla.)) (hereinafter "*Pack*"). All three, however, were settled without any adjudication of whether Drs. Etsebeth and Pereira's treatment constituted negligence. *See* DE 48 ¶ 110(b) (*Cordani*); DE 48 ¶ 111(b) (*Pack*); See **Composite Exhibit 7**.

Moreover, unsworn complaints[9] are inadmissible hearsay and therefore cannot be used to prove a claim or to create a disputed issue of fact. *See Shannon R. Ginn Const. Co. v. Reliance Ins. Co.*, 51 F. Supp. 2d 1347, 1354 (S.D. Fla. 1999); *see also Hernandez v. CGI Windows & Doors, Inc.*, 347 So. 3d 113, 118 (Fla. Dist. Ct. App. 2022); *Straub v. Vill. of Wellington*, 941 So. 2d 1269, 1270 (Fla. Dist. Ct. App. 2006) (reiterating that "a complaint is not admissible into evidence to prove or disprove a fact in issue" because a complaint is "merely a tentative outline of

---

[9] *See Cordani*, DE 1; *Masotti*, DE 1; *Pack*, DE 1.

the pleader's positions"). Accordingly, these prior lawsuits do not create a disputed issue of material fact as to whether RCCL negligently hired these two doctors.

IV. **RCCL IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS RELATING TO THE DELAY IN TRANSFERRING MR. BURGESS BECAUSE THE NEGLIGENCE, IF ANY, OF THE PORT AGENT CANNOT BE IMPUTED TO RCCL**

The crux of Plaintiff's liability claim in this case is that the delay in transfer to a stroke-capable hospital deprived him of the opportunity to receive certain clot-busting medication that could have produced a better outcome. RCCL, however, contracted with a port agent, Continental Shipping, to handle the transfer .p. As discussed below, because the port agent was an independent contractor, Plaintiffs cannot impute liability to RCCL for any putative negligence in the transfer of Mr. Burgess to the hospital.

"The essence of the common law's test for whether an agent is an employee or an independent contractor is the control of details; that is, whether the principal has the right to control the manner and means by which the agent accomplishes the work." *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011). "Significantly, it is the right and not the actual exercise of control that is the determining element of employment." *Id.* In assessing whether a principal had the right of control several considerations may be probative including: " (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for the agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent." *Id.*

In this case, RCCL contracted with Continental Shipping to be its port agent in San Juan, Puerto Rico. *See* DE 87-4 at 161-88. The contract was for one year and RCCL paid Continental based on the specific services it provided. *See* DE 87-4 at 161 ("Compensation"); *id.* at 163-69. The contract delegated Continental, among other things, to "[c]oordinate ground ambulance as requested by ship medical facility/crew medical/Care Team" and to "[a]rrange emergency medical transportation." DE 87-4 at 167 § 1.1.34. Continental was responsible for hiring its own personnel and determining whether they were qualified. DE 87-4 at 172 § 1.7. Continental also "ha[d] the right and obligation to control all of the personnel engaged by [it] to perform its obligations" and its "personnel [we]re solely the employees of [Continental]." DE 87-4 at 172 § 1.7. Either RCCL

or Continental could terminate the contract upon proper notice and under certain conditions. DE 87-4 at 174 Arts. 2.1, 2.3, 2.4. With respect to their relationship, the contract provided:

> **The relationship of the parties to this Agreement shall be and at all times shall remain one of an independent contractor** and that parties agree that this Agreement does not in any way create a partnership or joint venture relationship between RCL and the Port Agent. Except as may be specifically provided herein, RCL reserves no control over Port Agent, or any of Port Agent's employees, subordinates or associates as to how the Services to be rendered by Port Agent hereunder shall be performed.

DE 87-4 at 176 Art. 9 (emphasis added). Continental specifically agrees that RCCL did not have control over its actions during the subject time period. *See* Dep. Threadgill at PG 15 LN 6- PG 16 LN 20. Based on the foregoing, Continental Shipping was an independent contractor and not an agent or employee of RCCL.

Even assuming, *arguendo,* that it was pled, Plaintiffs also cannot impute liability to RCCL under a non-delegable duty theory. Cruise ship operators owe non-delegable duties to their passengers in only limited circumstances and this is not one of them. *See, e.g., Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 913 (11th Cir. 2004) (to protect passengers from crew member assaults); *McBride v. Carnival Corp.*, 1:16-CV-24894-JLK, 2019 WL 3503338, at *2 (S.D. Fla. Aug. 1, 2019) (to provide safe means for passengers to board and disembark). This Court has also explicitly rejected that cruise ship operators owe passengers a non-delegable duty to provide reasonable medical care. *See McFee v. Carnival Corp.*, No. 19-22917-CIV, 2019 WL 13189061, at *7 (S.D. Fla. Sept. 16, 2019); *Sexton v. Carnival Corp.*, No. 18-20629-CIV, 2018 WL 3405246, at *3 (S.D. Fla. July 12, 2018).

Accordingly, any delay attributable to Mr. Burgess's transfer for medical treatment cannot be imputed to RCCL

V. **RCCL IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO COMPETENT EVIDENCE THAT RCCL NEGLIGENTLY TREATED MR. BURGESS FOR HIS SCALP LACERATION OR NEGLIGENTLY FAILED TO EVACUATE MR. BURGESS AFTER HIS SCALP LACERATION OR THAT RCCL NEGLIGENTLY PROVISIONED AND EQUIPPED ITS MEDICAL FACILITY[10]**

---

[10] This relates to claims pled in Counts I, II, III and VIII in the Second Amended Complaint. *See* DE 48 at 19-25; *id.* at 35-37.

A. **Negligent Treatment of Mr. Burgess's Scalp Laceration**[11]

"[A]n essential element of Plaintiff's negligence claim is his burden of introducing expert testimony to establish medical causation." *Jones v. Royal Caribbean Cruises, Ltd.*, No. 12-20322-CIV, 2013 WL 8695361, at *6 (S.D. Fla. Apr. 4, 2013); *see also Poole v. Carnival Corp.*, No. 14-20237-CIV, 2015 WL 1566415, at *5 (S.D. Fla. Apr. 8, 2015) ("In order to establish that Carnival's breach of its duty of care proximately caused her injuries, Plaintiff requires the testimony of an expert."). Likewise, plaintiff must introduce expert testimony to establish the standard of care and that the physician's treatment violated the applicable standard of care. *Lambert v. United States*, 198 Fed. Appx. 835, 839 (11th Cir. 2006); *see also* W. Page Keeton et al., PROSSER & KEETON ON THE LAW OF TORTS 188 (5th ed. 1984) (stating that "[s]ince juries composed of laymen are normally incompetent to pass judgment on questions of medical science or technique, it has been held in the great majority of malpractice cases that there can be no finding of negligence in the absence of expert testimony to support it").

In this case, Plaintiffs allege under theories of actual and apparent agency that RCCL is liable for Dr. Etsebeth's treatment of Mr. Burgess after he sustained the cut to his head. Plaintiffs have no expert evidence that Dr. Etsebeth's treatment constituted negligence or that it was the proximate cause of Mr. Burgess's disability. For example, there is no evidence that a preemptive diagnostic image should have been taken for Mr. Burgess' head laceration. *But see* Report of Dr. Merkler at 4 ¶ 2 ("There was no indication to perform head imaging such as a CT or MRI scan following Mr. Burgess' presentation after his fall on February 18, 2019.") See DE 97-Ex Q; Report of Dr. Khoury at 4 ¶ 1 ("Treatment on 2/18 by Dr. Etsebeth was appropriate and at all times met with the standard of care.") (attached as **Exhibit 1**). Accordingly, RCCL is entitled summary judgment on Counts I and II.

B. **Negligent Failure to Evacuate After Scalp Laceration & Negligent Provisioning and Equipping of Medical Facility**[12]

"The failure to show sufficient evidence of each element is fatal to a plaintiff's negligence cause of action." *Tonelli v. NCL (Bahamas) Ltd.*, 428 F. Supp. 3d 1313, 1318 (S.D. Fla. 2019). Negligence claims also require expert testimony "where they involve issues . . . beyond the

---

[11] This relates to Counts I and II in the Second Amended Complaint. DE 48 at 19-23.

[12] This relates to the claims alleged in Counts III and VIII in the Second Amended Complaint. DE 48 at 23-25; *id.* at 35-37.

common experience and understanding of the average jury." *Diaz v. Carnival Corp.*, 555 F. Supp. 3d 1302, 1309 n.6 (S.D. Fla. 2021).

In this case, RCCL is entitled to summary judgment on these claims because there is no record evidence, expert or otherwise, that establishes that RCCL breached any duty to Mr. Burgess by failing to evacuate him after he sustained his scalp laceration on February 19, 2019 or that it was negligent in provisioning the ship's medical facility.

## CONCLUSION

Based on the foregoing, Defendant Royal Caribbean Cruises Ltd. respectfully requests that this Court enter summary judgment in its favor on all counts in the Second Amended Complaint. To the extent that this Court grants RCCL's pending *Daubert* motion [DE 86] and motion in limine [DE 87], RCCL moves for summary judgment on those claims which will then lack the required expert testimony.

## REQUEST FOR HEARING

Pursuant to S.D. Fla. L.R. 7.1(b)(2), RCCL requests a hearing on this Motion. A hearing would help the Court understand the complex medical issues in this case and the sequence of events that led to the Plaintiff's injury. RCCL estimates that two hours should be sufficient time for argument.

Respectfully submitted,

GrayRobinson, P.A.
515 North Flagler Drive, Ste. 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747

By: */s/ Michael Drahos*
    Michael J. Drahos
    Florida Bar No. 0617059
    michael.drahos@gray-robinson.com
    Jack R. Reiter
    Florida Bar No. 0028304
    jack.reiter@gray-robinson.com
    Robert C. Weill
    Florida Bar No. 0009962
    Robert.weill@gray-robinson.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

/s/ Michael Drahos

**SERVICE LIST**
**CASE NO.: 1:20-CV-20687-AOR**

John H. Hickey, Esq.
Sarah A. Lobel, Esq.
Hickey Law Firm, P.A.
1401 Brickell Avenue, Suite 510
Miami, FL 33131
Telephone: (305)371-8000
Facsimile:  (305) 371-3542
hickey@hickeylawfirm.com
slobel@hickeylawfirm.com