UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-cv-20687-AOR

RICHARD BURGESS, individually and by and through DARREN HENZE, as guardian of the Person and Estate of RICHARD BURGESS, incapacitated and as agent under that certain durable power of attorney dated November 20, 2006,

Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL,

Defendants.
/

VIA ZOOM
Miami, Florida
January 4, 2022
Tuesday, 11:01 a.m.

VIDEOTAPED DEPOSITION OF MICHIEL ETSEBETH, M.D.

Taken before Theresa M. Cohen, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

- - -

APPEARANCES:

HICKEY LAW FIRM
By: SARAH A. LOBEL, ESQUIRE
slobel@hickeylawfirm.com
1401 Brickell Avenue
Sutie 510
Miami, Florida 33131
On behalf of the Plaintiff.

GRAY ROBINSON
By: MICHAEL J. DRAHOS, ESQUIRE
Michael.Drahos@Gray-Robinson.com
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
On behalf of the Defendant.

ALSO PRESENT:
CARLOS COELLO, Videographer.

INDEX


| WITNESS | DIRECT | CROSS |
|---|---|---|
| MICHIEL ETSEBETH | 5 | 125 |
| | (Lobel) | (Drahos) |


NO EXHIBITS MARKED

THEREUPON:

THE VIDEOGRAPHER: Good morning. We are now on the record.

Participants should be aware that this proceeding is being recorded and, as such, all conversations held will be recorded unless there is a request and agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording the witness is being spotlighted on all video screens while in speaker view.

We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness.

For anyone who doesn't want the witness' video to take up the large part of your screen you may click the gallery view button in the upper right corner of the remote depo interface.

This is the remote video recorded deposition of Dr. Michiel A. Etsebeth being taken by counsel for the plaintiff.

Today is Tuesday, January 4th, 2022. The time is

now 1601 UTC, 11:01 a.m. EST.

We are here in the matter of Richard Burgess versus Royal Caribbean Cruises, Ltd.

My name is Carlos Coello, remote video technician on behalf of U.S. Legal Support. I'm not related to any party in this action, nor am I financially interest in the outcome.

At this time will the reporter Teri Cohen on behalf of U.S. Legal Support please enter the statement for remote proceedings into the record.

THE REPORTER: The attorneys participating in this proceeding acknowledge that I am not physically present in the proceeding room and that I will be reporting this proceeding remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MS. LOBEL: Sarah Lobel on behalf of the plaintiff and I do not object to the witness being sworn in remotely.

MR. DRAHOS: Michael Drahos for the defendant stipulates.

THE REPORTER: Raise your right hand.

Do you swear the testimony you're about to give is the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

MICHIEL ETSEBETH, M.D.

called as a witness on behalf of the Plaintiff herein and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LOBEL:

Q Good morning, doctor. How are you?
A I'm fine, thank you.
Q Doctor, where are you right now?
A I'm on the "SYMPHONY OF THE SEAS" and we docked in St. Maarten this morning.
Q Where did the "SYMPHONY OF THE SEAS" dock this morning?
A St. Maarten.
Q Are you physically on the ship right now?
A That's correct.
Q Where on the ship are you?
A The medical facility in our office.
Q Okay. And who is with you in the office right now?
A The attorney, Mr. Michael Drahos.

Q Okay. And when did Mr. Drahos get on the ship today?
A Earlier today.
Q When today?
A I didn't look at the time. An hour ago.
Q Okay. And where is he in the room with you right now?
A On my left-hand side slightly behind me.
Q Okay. And he's not on the camera today, is he?
A I don't know what you can see on the camera.
Q Okay. Do you see his face on the screen anywhere?
A No.
Q Okay.
A Not on my screen.
Q Okay. Well, he's not on my screen either and I can't see him right now.
Do you have anything in front of you today?
A Just the keyboard and my notes from the case when I attended to the plaintiff.
Q Okay. What notes are you referring to?
A The case summary.
Q What else?
A And a copy of our system where we capture all our notes.

Q Are you looking at a printed out version or are you looking at a separate computer screen?
A No. It's a printed version.
Q Okay. What else printed do you have in front of you that's on the table?
A Nothing.
Q Okay. What else is on the table that is where you are sitting? Because I am not with you right now. I am in my home and you are on the ship.
A Certainly I don't follow that question.
Q Certainly. Since we're not together and I'm asking my questions from my house and you are on the "SYMPHONY OF THE SEAS" and I can't be in the medical department with you I just want to know what all else is on the desk or the table that's in front of you other than the notes and the keyboard?
A A mouse and some water on my right-hand side.
Q Okay. What else?
A Nothing.
Q Okay. How far does this desk -- well, is it a desk that's in front of you or a shelf?
A No. It's a desk.
Q Okay. How big is the desk?
A I would say 500 millimeters by about 1.5.
Q Okay. Are there any books or anything on the

desk?
A Nope.
Q Okay. Are there any other medical equipment or anything else that's used in the medical center on that desk other than the computer, the keyboard, the mouse and the medical case summary notes?
A Nope.
Q Understood. Now, in anticipation for today's deposition what, if anything, did you review other than the case summary notes that you mentioned?
A Just that.
Q Did you speak to anyone in preparation for today's deposition?
A Only Mr. Drahos.
Q Who else?
A Nobody.
Q Okay. Did you speak with Dr. Pereira about this incident?
A Nope.
Q Okay. When is the last time you spoke with Dr. Pereira?
A At the end of that contract.
Q Okay. How many times did you speak with Mr. Drahos in anticipation for today's deposition?
A This is now the second time.

Q Okay. When was the first time?
A That was a week ago. It was in St. Maarten here in my office.
Q So Mr. Drahos was on the ship with you a week ago to prepare?
A That's correct.
Q Okay. Was anyone else with him?
A Nobody.
Q Okay. What did you review? Without telling me what you discussed what did you review at that time?
A Just the case.
Q Okay. Did you review any documents?
A Just the case documents.
Q Okay. What other -- what else other than the case documents, the medical notes?
A Nothing.
Q How long was your meeting with Mr. Drahos a week ago in St. Maarten on the ship?
A I didn't check the time, but it was definitely more than an hour.
Q Okay. Did you speak with him over the phone at any point in time to prepare for today's deposition?
A No, we didn't have telephonic conversation.
Q Okay. Did you have any Zoom conversation kind of like what we're doing here where we're on screen speaking

with each other?
A I think once. I'm not sure.
Q Okay. Do you recall when that was?
A I'm sorry. Repeat the question.
Q Do you recall when that Zoom conversation was?
A That was prior to his visit last week.
Q Okay. Do you recall how long that conversation was?
A Not at all.
Q Okay. Was anyone else present other than you and Mr. Drahos?
A Never.
Q Okay. Was anyone present during your meeting on the ship the "SYMPHONY OF THE SEAS" last week other than you and Mr. Drahos?
A No. It was behind closed doors.
Q Okay. And how about today? Anyone else present with you and Mr. Drahos today prior to you logging on to talk about the case?
A No.
Q Okay. How long was your meeting with Mr. Drahos today before you signed on?
A Half-hour to an hour. I didn't check the time.
Q Okay. Now, the ship that you're currently working on, are you the only doctor assigned to work on

the ship?
A Am I the only doctor? What is the question?
Q Yes.
A No.
Q Are there more than one doctor assigned to work on the "SYMPHONY OF THE SEAS" during your current contract?
A Yes.
Q How many doctors?
A It varies. When I came we were three. Then at a time we were only two and at the moment we're four.
Q Why did the number of doctors on the ship change from three to two to now four?
A Because of the COVID situation.
Initially it was difficult and it's still difficult for the company to get our permanent Royal doctors back so they now send us assistants via agency doctors.
Q By what doctors?
A It's through an agency in America.
Q Okay. All right. Now, you're currently a Royal Caribbean employee. Correct?
A Correct.
Q All right. What is your official title?
A Senior doctor.

Q How long have you been a senior doctor?
A I've been a senior doctor for quite a number of years.
Q More than five?
A About five.
Q Okay. How long have you been working for -- well, let me back up.
Have you ever held any other titles or positions for Royal Caribbean over the course of your career with the company?
A It is custom when you join the company to begin as a so-called junior doctor.
Q Okay. How long were you a junior doctor?
A That was about two contracts.
Q Okay. How long were those contracts, more or less?
A Contracts are four months each.
Q Okay. And after you finished the two contracts four months each as a junior doctor did you then become a senior doctor?
A Correct.
Q Okay. When did you start working for Royal Caribbean?
A It was about April 2015, if I remember correctly.
Q Okay. Before April of 2015 who did you work for?

A Norwegian Cruise Line.
Q How long did you work for Norwegian?
A That was about six contracts. Three and a half months each.
Q Okay. And before you worked for NCL who did you work for?
A Disney Cruise Line.
Q All right. How long did you work for Disney Cruise Line?
A That was two contracts. One was an extension so it was sort of like two and a half contracts.
Q And how long were the contracts and then how long was the extension?
A Contracts with Disney was also three and a half months and I think it was about -- the second one was about a month longer.
Q All right. And before you started working for Disney who did you work for before that?
A I was in private practice. I joined --
Q Where were you in private practice?
A Cape Town, South Africa.
Q Was it with -- what type of facility?
A Just like a family physician.
Q All right. Did you work in a hospital?
A Once a week night shift in an ER unit in a local

hospital.
Q How many beds did the local hospital have?
A How many beds?
Q Yes. Just so I can get a sense of how big your local hospital was.
A It was fairly large. I can't remember. It's large private hospital.
Q Was it a Level I trauma center?
A I don't know. We don't categorize ERs like that.
Q How do you categorize ERs in South Africa just so I understand what type of hospital this was?
A I was never informed what kind of category.
I suppose for our medical board to get their license for a private hospital, but we were never informed you're now working in a Category 1, 2 or whatever.
Q Okay. Now, was working -- well, why was it that you worked in the hospital one time per week and did a night shift if you were in private practice? How did that work?
A It's for experience and for additional income.
Q Okay. So were you doing one night a week as additional income and it was separate from your private family practice?
A Correct.
Q Okay. Got it. All right. Was the family --

strike that.

The family practice that you worked at, was that your private practice or were you in a group of doctors?

A It belonged to another doctor. I worked what we call a permanent assistant.

Q What does that mean?

A That means you are like a full-time employee, but you are -- you don't have a financial interest in the practice.

Q So you weren't like a partner of the practice?

A Not a partner.

Q Okay. Was this period of time part of your training or were you -- or had you already completed your training?

A That was very long after.

Q What was the name of this family practice group?

A Doctor fat with a.

Q Can you say that again? You broke up a little bit. I apologize.

A Dr. F. C. Lotter and I'll spell it phonetically for you.

Q Please. That would be helpful.

A Lima, Oscar, tango, tango, echo, Romeo with two dots on the O, but it's not important.

Q My last name used to have those two dots as well

once upon a time so I understand.

Okay. How many doctors worked in that family practice?

A It was only me.

Q And Dr. Lotter?

A He had several practices all run by assistants and occasionally he would go to some of the practices.

He was never at that one.

Q Okay. So you worked alone to run the family practice on his behalf?

A Yes.

Q Got it. And were you essentially working as what we know here as kind of like an internal medicine doctor, a person you see for an annual checkup?

A That's correct.

Q Okay. It was a non-emergency clinic?

A Correct.

Q Okay. Now, the hospital that you worked at one time a week and did a night shift, what was the name of that hospital?

A Mediclinic Panorama.

Q Can you spell it?

A Yes. Papa, alpha --

THE REPORTER: I'm sorry. I missed the first one.

BY MS. LOBEL:
Q T-a-n-a --
A Papa, P.
Q Oh. P-a-n. Forgive me.
A Romeo, Oscar, mike, alpha. Panorama.
Q Got it. Panorama.
A And it's one of the three largest hospital groups called Medi, M-e-d-i, Clinic, C-l-i-n-i-c.
Q Now, is it an urgent care facility or an emergency room?
A It's a general hospital for all types of specialties plus an emergency room.
Q Okay. Was this hospital stroke capable?
MR. DRAHOS: Object to the form.
THE WITNESS: There were neurologists, but to my knowledge it wasn't seen as a stroke unit.
BY MS. LOBEL:
Q Have you ever worked at a hospital with a stroke unit?
A No.
Q Okay. How long did you work for additional income at Panorama Hospital in addition to working at the private practice you were in in South Africa?
A Four years.
Q Okay. And how long did you work at the private

practice, the family practice?
A The same period.
Q Sorry?
A The same period. Four years.
Q Four years, okay.
Now, before you were working at this particular private practice and doing the once per week shift at Panorama Hospital where did you work?
A I worked for other practices in the same capacity and prior to that I had my own practice.
Q Okay. How long did you work at other practices before working for the private practice with Dr. Lotter?
A That was also about four years.
Q Okay. And how long did you run your own practice?
A That was about eight years in one spell and about two years in another spell.
Q Two years in another -- what did you say?
A I worked in private practice for two years. Then I had another occupation and I went back to private practice for about eight years.
Q What did you do in between the two years and eight years you were in private practice owning your own practice?
A I was a medical superintendent, which in South

Africa means in medical management. I didn't do clinical work for about four, five years.

Q Where did you do medical management?

A With a teaching hospital in Cape Town.

Q Were you doing any teaching?

A No.

Q Okay. Who were you supervising?

A Various departments: OB-Gyne, general surgery, pediatrics, medical.

Q Are you qualified to perform surgeries?

A No.

Q Have you ever performed a surgery under supervision during your education and training?

A No.

Q Have you ever worked full-time in an ER department or an urgent care facility?

A No.

Q All right. Why did you decide to leave private practice to start working for cruise lines?

A I wanted to work for the cruise lines earlier in my life, but due to my children being still small I had to wait until around about the time that I started.

Q Why did you want to work for cruise lines as opposed to private practice mainland?

A Mainly the opportunity to be overseas, see

something else. That was the main reason.
Q Okay. Now you're currently working as a -- well, strike that.
As a Royal Caribbean doctor do you typically wear a uniform when you're on duty? Because I see you look like you're, at least from what I can see, in plain clothes right now.
A We have a uniform that we occasionally use here in the medical facility.
There are no rules about it. Mostly we wear scrubs because it's just more comfortable.
Q Okay. When you're wearing scrubs and working in the medical facility do you wear a name tag to identify yourself to passengers and crew?
A Always.
Q What does the name tag say?
A (Indicating.)
Q Oh, thank you. So for the record -- well, go back because I got to read it out. It's A-d-r-i-a-a-n and it says senior doctor, South Africa, and would you agree with me there's a logo on it that's Royal Caribbean's logo?
A That's correct.
Q Got it. So you're required to wear that name tag with your name and Royal Caribbean's logo at all times

while on duty?
A Yup.
Q Okay. Do you have officer status? Forgive me.
A Yes.
Q What's your officer status?
A Three and a half stripes.
Q Okay. How long have you been three and a half stripes?
A That's the period I'm a senior doctor so that's about what I said, about five years.
Q Okay. Were you a senior doctor back in 2019 when this particular incident occurred?
A Correct.
Q Okay. All right. Would you agree with me that the capabilities of Royal Caribbean's medical facilities are limited compared to what's available at a shoreside hospital?
MR. DRAHOS: Object to the form.
THE WITNESS: Depends on the situation and for some things we're completely capable. For some things not.
BY MS. LOBEL:
Q Okay. Would you agree with me you can't perform surgery in a cruise ship medical facility?
A That's correct.

Q Okay. And would you agree with me that Royal Caribbean's medical facilities don't have the capability of a trauma center?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q You may answer.

A It depends on the type of things that we see.

Q Such as?

A Some things we can deal with and some things we can't.

Q Okay. Right. And so there are certain things that you can't deal with that, say, a hospital on shore can deal with.

Would you agree with that?

MR. DRAHOS: Object to the form.

THE WITNESS: It depends on what kind of hospital is available as to where we are.

BY MS. LOBEL:

Q Okay. Do you agree with me that the shipboard infirmary is not capable of treating patients with a stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: Depends on the circumstances of that patient and the location of the stroke.

BY MS. LOBEL:

Q Okay. Can you treat patients who are suffering with stroke by administering thrombolytics?

A We don't have scanning facilities.

Q So you'd agree with me that the ship does not have the scanning facilities in order to diagnose a patient with a stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, my clinical diagnosis, but only a scan tells you whether it's ischemic or a bleed.

BY MS. LOBEL:

Q Right. And, therefore, under those circumstances medical clinics on Royal Caribbean ships cannot make a determination to give a patient thrombolytics or not due to the lack of that equipment. Correct?

A Yes. For that reason we must try and send the patient to a facility, appropriate facility.

Q Okay. And Royal Caribbean's medical facilities don't have CT scanners. Correct?

A Correct.

Q Okay. And Royal Caribbean's medical centers don't have MRIs?

A No.

Q And the scanners that we were talking about to

determine if a person has a stroke or not, that's a CT scan. Correct?

A I'm not familiar. I don't have the training that well to know the distinction of which scan must be done, CT with or without contrast or MRI.

Q Okay. On -- strike that.

Within the medical center on Royal Caribbean ships the infirmary doesn't have thrombolytics. Correct?

MR. DRAHOS: Object to the form.

THE WITNESS: We have tPA, but it's only used for myocardial infarction and also if the patient qualifies.

BY MS. LOBEL:

Q Qualifies for what?

A For tPA for the MI.

Q Oh. For an MI did you say?

A MI, myocardial infarction.

Q Understood. That's what I thought you said. I just wanted to be crystal clear.

And if somebody is suffering a stroke and needs a clot removed surgically, that's not something that can be done on a Royal Caribbean ship. Correct?

A Correct.

Q Okay. So you agree with me that if the Royal Caribbean doctor can't provide the care and treatment to

the standard of care of a patient that that patient should be medically disembarked or evacuated?

MR. DRAHOS: Object to the form.

THE WITNESS: Depends where we are. Depends on the circumstance.

BY MS. LOBEL:

Q Okay. Do you agree that a Royal Caribbean doctor should at least consider recommending medical evacuation or disembarkation of a patient when it appears there's a medical situation that requires urgent care?

MR. DRAHOS: Object to the form.

THE WITNESS: We always consider it.

BY MS. LOBEL:

Q Okay. Do you agree that a Royal Caribbean doctor should consider a medical evacuation or disembarkation when a patient has a progressive medical condition, meaning it gets worse with time?

MR. DRAHOS: Object to the form. Improper hypothetical.

BY MS. LOBEL:

Q You can answer.

A It depends on the situation.

Q What does it depend on?

A How long we can deal with the situation appropriately or not.

Q Okay. Would you agree with me there's certain progressive medical conditions that the ship cannot deal with for an extended period of time?
A That's correct.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q And under those circumstances that's when a patient should be considered for a medical disembarkation or evacuation?
MR. DRAHOS: Object to the form.
THE WITNESS: Considered, yes.
BY MS. LOBEL:
Q Okay. Would you agree with me that the time can be a very important factor when treating a patient suffering an urgent medical condition?
MR. DRAHOS: Object to the form.
THE WITNESS: It depends on the situation.
BY MS. LOBEL:
Q Do you agree with me that time is an important factor when treating a patient who's suffering from a progressive medical condition, meaning it gets worse with time?
MR. DRAHOS: Object to the form.
THE WITNESS: It also depends on the situation.

BY MS. LOBEL:
Q What does it depend on?
A The clinical condition.
Q Okay. Well, would you agree with me there's certain clinical conditions that the ship cannot treat and can get worse with time?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, but it doesn't mean that we can debark the patient.
THE WITNESS: That we can't what?
THE WITNESS: Debark. It doesn't mean that we can debark the patient.
BY MS. LOBEL:
Q Do you agree that if a patient presents with symptoms that may require emergent care you should not wait to initiate a medical evacuation of that patient?
MR. DRAHOS: Object to the form. Improper hypothetical.
THE WITNESS: Depends on the situation.
BY MS. LOBEL:
Q What does it depend on?
A The position of the ship.
Q Right. Understood. But shouldn't that be something that be brought to the captain's attention immediately to see what can be done for the patient?

MR. DRAHOS: Object to the form.
THE WITNESS: We discuss it with Miami medical.
BY MS. LOBEL:
Q So when there's a situation with a patient that the medical center cannot appropriately treat to the standard of care who's suffering a medical emergency the first step is to contact the Miami office?
MR. DRAHOS: Object to the form. Misstates his testimony. Improper hypothetical.
BY MS. LOBEL:
Q You may answer.
A The help line, yes.
Q And the help line that you're referring to, is that to the Miami office?
A That's mainly the Miami office. There are doctors that they use that are not in Miami.
Q Who are the doctors who are available on the Miami office help line?
A It's our medical managers in Miami.
Q How many medical managers are there?
A There used to be two. There are now four.
Q Okay. Back in 2019 do you recall who the medical managers were?
A I think it was Drs. Parejo and Ben Shore.
Q Now, doctor, if there was a -- strike that.

If there was a situation where a patient needed to be medically disembarked from a ship as opposed to evacuated from a ship at sea is the procedure to still call the medical help line to speak with either Dr. Parejo or Dr. Ben Shore?

MR. DRAHOS: Object to the form. Vague.

THE WITNESS: Depends on the situation.

BY MS. LOBEL:

Q What situation would be a situation where there's a medical disembark for an emergent medical condition where the help line would not be called?

A If we deemed the situation so critical that we have to proceed and know for sure that they will agree in terms of debark and we'll start the process first and then notify them afterwards.

If we have time we will get the opinion first and then proceed.

Q Okay. Now, if it's a situation where medical disembark -- say you're at port and there's a patient suffering an emergency, say it's an MI and obviously the infirmary can't treat the MI and they need to go to the hospital, is that a situation where the help line would be called first or second?

MR. DRAHOS: Object to the form.

THE WITNESS: It depends on the situation.

BY MS. LOBEL:
Q Now, the communications with the Miami office if there's a medical disembarkation for a medically emergent condition, is that done telephonically or is that done via e-mail?
A Telephonically.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q Is there a specific phone number that's called?
A The help line number, I guess.
Q Okay. And if you are, just as you are now, in the medical center do you use like a satellite phone, cellphone or is there what I'm going to call a ship landline that's used to call shoreside?
A I can't answer that one.
Q I'm sorry?
A We use the phone. I don't know the technicalities of how the signal goes. As far as I know it has to be via satellite.
Q Okay. Let me ask it a little bit better.
Do you have a cellphone that's assigned to you to use for medical emergencies?
A No.
Q Okay. How many phones are available to the shipboard doctors when working in the medical facilities?

A We have a fixed phone on the desk and a hand phone, what's called a deck phone.
Q Okay. A deck phone.
Do you have a deck phone on your person at all times when working as a doctor on Royal Caribbean ships?
A Yes.
Q Okay. Is the deck phone that you use assigned to you and you take it with you from ship to ship or do you get a new deck phone at the beginning of each contract?
A Deck phone is through the position. In other words, when I sign out, it stays here. My replacement takes the phone.
Q Okay. So when you're off-duty the next doctor picks up duty with the deck phone?
A Correct, at end of the contract.
Q At the end of the contract, okay.
So if there are two doctors assigned to a Royal Caribbean ship, are there two deck phones for each doctor or is there one deck phone?
A Each one has a deck phone.
Q Okay.
A Nurses as well.
Q Okay. So each nurse also has a deck phone?
A Correct.
Q Okay. Can the deck phone call anyone on shore?

A Mine can. I don't think the nurse's phone can.

Q I've never seen a deck phone before. Is it like a -- can you describe what they look like?

A It's like the old cellphones.

Due to the deposition situation I had to give my phone to the other doctor to carry on if someone phones so I can't show you now one.

Q Understood. But is it like a flip phone? Is it a smartphone? Is it like an old Nokia that's like a singular brick?

A A singular brick.

Q So does it look similar to the old Nokia phones? Do you know what I'm talking about that used to be like a candy bar?

A Larger.

Q Okay. Are they capable of text messages or just making phone calls?

A I think they can do a text message, but we never use it like that.

Q Okay. Can you use them while you're at sea?

A Always.

Q Okay. Is the deck phone the phone -- well, let me back it up.

If there's a situation where you needed to call shoreside for a medical disembark, would you use the

landline, what I'm going to call the landline in the medical center or would you use the deck phone that's on your person?

MR. DRAHOS: Object to the form.

THE WITNESS: Depends where I am.

BY MS. LOBEL:

Q If you're in the medical center do you use the deck phone or would you use the landline or it just depends on what you decide?

MR. DRAHOS: Object to the form.

THE WITNESS: What I decide. I don't need to come to my office to make the call if I want to make it in private or come to my office, but I can still use the deck phone.

BY MS. LOBEL:

Q Okay. Can the -- just so I'm clear, can the phone that's in your office call shoreside as well?

A Yes.

Q Okay. All right. Is there a specific phone number that's designated to each shipboard infirmary?

A No.

Q Okay. So if I, hypothetically, wanted to call you in the shipboard infirmary, what phone number would I use to do that?

A There isn't a phone number that people from

outside can call the ship. Forward to us from outside and that's it.
Q So is there a switchboard on the ship that will receive a call from shoreside and redirect it to the medical center?
A Not really.
Q How does it work?
A I don't know. Guest services.
Q Okay. If I -- well, let me back it up.
When you receive phone calls from shoreside while on the ship, does it go to your deck phone typically?
A Usually, yes, but it also comes in at the same time to my office phone.
Q Okay. If there's a medical emergency, emergent situation involving either a medical disembark or a medical evacuation, do you use your deck phone or the office phone or both?
MR. DRAHOS: Object to the form. Asked and answered.
THE WITNESS: Can be any one.
BY MS. LOBEL:
Q Okay. Now, if you're going to be calling the bridge of the ship to communicate with the captain or staff captain regarding a medical disembark or evacuation, do you use the office phone or the deck phone?

A Can use both.
Q Okay. All right. Now, you're familiar with what a stroke is. We talked about strokes a little bit. I just want to make sure we're on the same page.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q You may answer.
A Yes.
Q Okay. Would you agree with me that a stroke is a situation where the blood supply to a portion of the brain is either interrupted or reduced?
A Correct.
Q Okay. Would you agree with me that a stroke is when blood doesn't properly flow to the brain as it's supposed to?
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q You may answer.
A Correct.
Q Okay. And would you agree with me that blood carries oxygen to the brain?
A Correct.
Q And blood carries nutrients to the brain that it needs in order to function properly?
A Correct.

Q And would you agree with me that a stroke is a situation where the blood doesn't get the oxygen and nutrients that it needs?

MR. DRAHOS: Object to the form.

THE WITNESS: Correct.

BY MS. LOBEL:

Q Okay. So when the brain doesn't get the oxygen and nutrients that it needs, would you agree with me that's a situation when brain cells can die?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes, it can.

BY MS. LOBEL:

Q Okay. And during a stroke brain cells can die?

A Depends on severity and conditions.

Q Okay. But would you agree with me that a stroke is a type of medical condition that can kill brain cells?

A Yes, it can.

Q Okay. And would you agree with me that when brain cells die, they don't regenerate and come back to life again?

MR. DRAHOS: Object to the form.

THE WITNESS: No, they don't.

BY MS. LOBEL:

Q Okay. So when brain cells die that's permanent?

MR. DRAHOS: Object to the form.

THE WITNESS: In most cases, yes. It depends on the stroke.
BY MS. LOBEL:
Q Okay. Do you consider a stroke a medical emergency?
MR. DRAHOS: Object to the form.
THE WITNESS: It depends on the situation.
BY MS. LOBEL:
Q What does it depend on?
A If the patient presents five, six hours or whatever after the stroke started, then it's completely different from a recent stroke situation.
Q Okay. Would you agree with me on a Royal Caribbean ship you do not have the capabilities to determine whether a stroke is completed, currently active or just beginning?
MR. DRAHOS: Object to the form.
THE WITNESS: Depends on whether there's progression and time of last normal.
BY MS. LOBEL:
Q Okay. Would you agree with me that a person can have more than one stroke?
A There's usually a progression. Could have completely different courses of stroke at the same time. I'm not a neurologist.

Q Would you agree with me that based off of -- well, strike that.
Would you agree with me that in order to determine the patient's current condition with regards to a stroke medical imaging is needed?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, but it depends where we are.
BY MS. LOBEL:
Q Understood. But would you agree with me it's generally accepted in medicine that a person who is suffering, currently actively suffering a stroke is considered to be a medical emergency?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, but circumstances.
BY MS. LOBEL:
Q Okay. Do you agree with me that prompt treatment is crucial for somebody who is actively suffering from a stroke?
MR. DRAHOS: Object to the form.
THE WITNESS: If you can get to it.
BY MS. LOBEL:
Q Okay. Do you agree with me that early action can help reduce brain damage for somebody who's suffering an active stroke?
MR. DRAHOS: Object to the form.

THE WITNESS: If you can get to it.

BY MS. LOBEL:

Q Do you agree that if you do not take early action, the resulting brain damage for somebody suffering from a stroke can be catastrophic?

MR. DRAHOS: Object to the form.

THE WITNESS: Only if you can get to it.

BY MS. LOBEL:

Q Okay. Do you agree with me that getting a patient to early intervention can help reduce complications that can be caused by a stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: If possible.

BY MS. LOBEL:

Q Do you agree with me that if you do not take early action with a patient who is suffering from a stroke the results can be catastrophic?

MR. DRAHOS: Object to the form.

THE WITNESS: It really depends on the situation, the circumstances.

BY MS. LOBEL:

Q What circumstances?

A Well, you can have a situation with a very serious critical stroke clinically, but not able to get the patient to a scanner in the time limits for clearly

tPA.

Q You agree with me that there's other interventions that can be taken for a patient other than tPA, such as a thrombectomy?

MR. DRAHOS: Object to the form.

THE WITNESS: That would be in a stroke center and/or hospital that can deal with it.

BY MS. LOBEL:

Q Right. So do you agree?

A You'd need a neurosurgeon.

Q Right. So do you agree with me the sooner you get the patient to a facility with either a CT scanner, tPA or somebody who's able to do surgical intervention, the better it is for the patient?

MR. DRAHOS: Object to the form.

THE WITNESS: That's the theory.

BY MS. LOBEL:

Q I'm sorry. That's the what?

A That is the theory.

Q Would you agree with me that the standard of care for somebody with a suspected stroke is to get them to a capable medical facility as fast as possible?

MR. DRAHOS: Object to the form.

THE WITNESS: If possible.

BY MS. LOBEL:

Q Okay. Now, I think we can agree to this. Royal Caribbean offers medical care to passengers on board its ships?

A Is that a question or a statement?

Q It's a question. Do you agree with me that RCCL, Royal Caribbean offers medical care to its passengers on its ships?

A Yes, we have to.

Q Okay. All right. My understanding is that Royal Caribbean advertises to patients that they comply with the American College of Emergency Physicians. Is that accurate?

MR. DRAHOS: Object.

THE WITNESS: I don't see that.

BY MS. LOBEL:

Q Okay.

A I don't deny it, but we don't see that.

Q I just want to know what you know. Okay?

Is it your understanding that the medical care and treatment provided within Royal Caribbean's medical facilities is supposed to comply with the standards of care delineated by the American College of Emergency Physicians?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know what is acceptable for that organization in terms of cruise lines.

BY MS. LOBEL:

Q What standard of care does Royal Caribbean expect its doctors to comply with?

MR. DRAHOS: Object to the form. He's not here as Royal Caribbean's corporate representative.

BY MS. LOBEL:

Q You may answer.

A I'm only required to have active ACLS, PALS, BLS certificates which we're to renew every two years. That's all I know about the standards.

Q Okay. Do you know -- do you agree with me that in medicine there is what's known as a standard of care?

MR. DRAHOS: Object to the form.

THE WITNESS: That is very detailed.

BY MS. LOBEL:

Q Okay. And would you agree with me that there's a generally accepted standard of care with how to handle stroke patients?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know. What?

BY MS. LOBEL:

Q Is that funny? What was funny about my question?

MR. DRAHOS: There was nothing funny about it at

all. It's extremely vague and a trick question.
MS. LOBEL: It's not a trick question.
BY MS. LOBEL:
Q Doctor, are you a familiar there is a standard of care with regards to how to handle a stroke patient?
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q You may answer.
A There may be, but it depends on what you have available and where you are.
Q Okay. If you are a doctor who doesn't have the medicine, equipment or means to treat a patient who is suffering or potentially suffering a stroke, do you agree with me the standard of care is to get that patient to a facility that can as soon as possible?
MR. DRAHOS: Object to the form.
THE WITNESS: I've agreed to that before. Depending on the circumstances.
BY MS. LOBEL:
Q Okay. What circumstances does it depend on for you?
MR. DRAHOS: Object to the form.
THE WITNESS: I answered that. Time of last normal and where we find ourselves and how long it will take to get the patient to such a facility.

BY MS. LOBEL:

Q Do you agree with me that wherever the facility, the closest facility is, that should be the facility chosen that can be capable of treating the patient?

MR. DRAHOS: Object to the form.

THE WITNESS: We cannot make that decision --

BY MS. LOBEL:

Q Why not?

A -- from the ship.

Q Why not?

A We don't have the means of deciding which facility will be used.

The only ability we have is depending where we are that if, let's say, there's a port closer to us, but we have knowledge that they do not have the facilities, then obviously it's useless to see the patient there and then we have to consider the real closest possible port with the facilities and then the time and the means to get there with the patient.

Q Okay. What is the situation where the ship is docked at port? How does the decision under those circumstances go?

Would you agree with me that -- well, let strike that.

When there's a situation when a ship is docked at

the port of a major city, would you agree with me that under those circumstances the patient should be brought to the nearest capable facility of treating the patient with a stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: We only work through the port agent so what the port agent is doing and arranging for us is out of our hands.

BY MS. LOBEL:

Q Why is that?

A That's the system. There's never been different since I've been on the ship.

Q Okay. The port agent is not a medical treater. Correct?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q You may answer.

A No, he's not. No. To our knowledge he doesn't have any medical background. Maybe he has, but that's the only channel that we can use. All ships.

Q You'd agree with me you have access to a phone?

MR. DRAHOS: Object to the form. Argumentative.

THE WITNESS: Access to a phone? Me? Yes.

BY MS. LOBEL:

Q Yes. You have access to a phone to call, for

example, a local hospital?
MR. DRAHOS: Object to the form.
THE WITNESS: We don't have the numbers of the hospitals.
BY MS. LOBEL:
Q Do you have on the ship a computer?
A Do I have a computer? Yes. That we established in the beginning.
Q Okay. And does the computer that you have have access to the Internet?
A That's correct.
Q Does your computer always have access to the Internet while working aboard the ship?
A Except if the signal fails, yes.
Q Okay. Is there anything prohibiting you as a doctor in the medical facility from researching local hospitals to find an appropriate local hospital to transfer a patient on the ship?
MR. DRAHOS: Object to the form.
THE WITNESS: It's time-consuming and we don't have full information.
BY MS. LOBEL:
Q What full information are you lacking?
A As to what capabilities the hospital really has. All hospitals doesn't -- I don't trust it.

Q Do you agree with me you could call the hospital to see what capabilities they do or do not have?
MR. DRAHOS: Object to the form.
THE WITNESS: We don't do that.
BY MS. LOBEL:
Q Are you allowed to do that?
MR. DRAHOS: Object to the form.
THE WITNESS: It's not the process. The process that we have to do is the port agent.
BY MS. LOBEL:
Q Would you agree with me that if there is a medical disembark or medical evacuation until the patient is transferred to somebody else's care the patient remains in your care?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
BY MS. LOBEL:
Q Okay. So, for example, if the patient is suffering a medical emergency on a Royal Caribbean ship and it's docked at port, until the patient is transferred to the next medical facility that patient remains in your career as a Royal Caribbean doctor?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct. There's no other option.

BY MS. LOBEL:
Q Okay. All right. So under the circumstances of a medical disembark or a medical evacuation Royal Caribbean's doctors remain responsible for the care and treatment of the patient until the patient is transferred to the next doctor or medical facility?
MR. DRAHOS: Object to the form.
THE WITNESS: What we do under the circumstances, yes.
BY MS. LOBEL:
Q Okay. So, in essence, the care and responsibility for the patient never transfers to the care of the port agent or does it transfer to the port agent?
MR. DRAHOS: Object to the form.
THE WITNESS: It transfers to the ambulance personnel or the paramedics once they arrive and take over the patient.
BY MS. LOBEL:
Q Okay. Does the patient's care ever get transferred to the responsibility of the port agent?
A I don't think it's possible. It's not --
Q I'm sorry. You broke up a little bit. I apologize.
A You can't use the port agent as a -- it's not a medical person, even if he has medical knowledge.

Q Let me reask the question. I asked, Dr. Etsebeth, if there's ever a circumstance where a patient, a Royal Caribbean patient is ever transferred to the care of the port agent?

MR. DRAHOS: Object to the form of that question.

THE WITNESS: The patient remains in our care until the time that we hand over physically to the ambulance personnel or paramedics.

BY MS. LOBEL:

Q Now, when caring for Royal Caribbean patients, whether it be crew member or it be passenger, am I correct in understanding there's a computer system that's used to input the records?

A Correct.

Q Is the computer system -- well, strike that.

What time is used to document entries into the medical system?

A The system documents the time automatically at the time when you enter.

Q Can you set the time to a different time zone when entering your records?

A No, not that I know of.

Q Okay. Understood.

What time zone are all medical records -- well, strike that.

What time zone is used for Royal Caribbean's medical records?

A I don't know. From what I see, the time that my computer itself is the time and what I see is reflected in the system it seems to be Eastern Time.

Q Okay. Does the time on the computer -- well, strike that.

Does the time on the computer reflect the same time that's used for ship time?

A Yes.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q So the time that's used for all of the clocks on the ship should match the time on your computer?

A That's my understanding.

Q And that time on all the clocks on the ship will match the timestamps for the medical records?

MR. DRAHOS: Object to the form.

THE WITNESS: That's my understanding.

BY MS. LOBEL:

Q Okay. So your understanding is that all ship times and all record times on Royal Caribbean ships is Eastern Standard Time?

MR. DRAHOS: Object to the form.

THE WITNESS: Seems to be the case.

BY MS. LOBEL:

Q Okay. Have you ever seen medical records or documents that use any other time zone while working for Royal Caribbean?

MR. DRAHOS: Object to the form.

THE WITNESS: I can't comment on that.

BY MS. LOBEL:

Q Okay. Now, after you input -- well, strike that.

If you input a note into the medical records system, do you enter the time or does the computer put the time for you?

A Computer. That's a problem.

Q Why is that a problem?

A You see the patient, you deal with something and let's say it's 10:00 a.m., but by the time you can enter notes it may be 11:00 or 11:30 so it seems as if you've only done it at 11:30, which is not correct.

Q When you enter notes can you enter the time yourself manually and say saw patient at 10:00?

MR. DRAHOS: Let her finish the question --

THE WITNESS: Oh, sorry.

MR. DRAHOS: -- and then you can answer.

BY MS. LOBEL:

Q I think I know what you're thinking, but my question is a little bit different.

I understand that when you enter the note the computer automatically enters the timestamp and that reflects the time that you're actually physically typing the note, but my question to you is can you manually enter the time say, you know, performed physical examination at 10:00 a.m. yourself? Are you permitted to do that?

MR. DRAHOS: Object to the form.

THE WITNESS: If you typed it, you can, but you can't change the clock.

BY MS. LOBEL:

Q Okay. That's what I wanted to know.

Now, Royal Caribbean hired you directly to become a doctor for the cruise line. Is that accurate?

A Correct.

Q Okay. When you first applied to be a doctor for Royal Caribbean did they make you perform any tests before they hired you?

A No. It's just an interview.

Q Okay. So you never had to take like a multiple choice test, for example?

A No.

Q Okay. During the interview were you given, for example, clinical scenarios that you were required to work through and answer questions regarding?

A No.

Q All right. So when you were hired the only interaction that -- well, strike that.

When you were hired by Royal Caribbean the only thing that was done was an interview?

A I was approached by telephone by Dr. Ben Shore. He was my medical operations manager at Norwegian.

Q Forgive me. When did Dr. Shore leave Norwegian?

A I can't remember that.

Q Did you and Dr. Shore start working for NCL around the same time or was there a gap in time?

MR. DRAHOS: Object to the form.

THE WITNESS: He was there before me.

BY MS. LOBEL:

Q Okay. Do you know if Dr. Shore started working for Royal Caribbean before you, for example, multiple years before you or a matter of months before you?

A I don't have the time that he was with Royal before he approached me.

Q Okay. Why did you decide to leave NCL and join Royal Caribbean?

A Better prospect.

Q What do you mean by that?

A Better salary.

Q Okay. Anything else?

A No. That was it.

Q Okay. So what did Royal Caribbean do to determine whether you were capable of handling medical emergencies on Royal Caribbean ships?

MR. DRAHOS: Object to the form.

THE WITNESS: My contracts. I don't know.

BY MS. LOBEL:

Q Okay. So in considering you for hire did Royal Caribbean do anything else than perform an interview with you?

MR. DRAHOS: Object to the form.

THE WITNESS: Not to my knowledge.

BY MS. LOBEL:

Q Did you submit any documents?

A I had to submit all my training, et cetera, my medical degree and proof of full-time registration with the South African Medical Council.

Q Okay. Now, what was -- can you explain to me what was discussed or happened during your interview when you were being considered for hire?

A That's way too long ago.

Q Do you remember anything that was discussed during the interview?

A Dr. Shore knew me. He asked me to come and work.

Q Do you know if -- strike that.

Do you recall if anyone else was present during

your interview other than Dr. Shore?
A I don't know who was with him. He phoned me in Cape Town at my home.
Q Okay. So if I'm understanding you correctly, was your interview with Royal Caribbean before you were hired over the telephone?
A Yes. There was no Zoom or video capabilities then.
Q Okay. At the time of your interview were you still working for Norwegian Cruise Line?
A Yup.
Q Okay. Sorry. I'm just catching up with my notes. Forgive me.
Since you've been hired by Royal Caribbean have they ever had you undergo any testing or examinations?
A No. Just keep up, renew the certificates I've already mentioned.
Q Okay. Has NCL -- sorry. Strike that.
Has RCCL ever required that you undergo any additional training or education other than the certificates?
A No.
Q When you first started working for Royal Caribbean did you ever undergo any training provided to you by the company?

MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MS. LOBEL:
Q Okay. When you first started working for Royal Caribbean did you have to undergo an orientation shoreside?
A No.
Q Okay. Do you recall which ship you first started working on when you first started working with Royal Caribbean?
A It was "HORIZON" of Pullmantur. Pullmantur used to be --
THE REPORTER: Pullmantur?
MS. LOBEL: Yes.
THE WITNESS: P-u-l-l-m-a-n-t-u-r, Pullmantur.
THE REPORTER: Thank you.
THE WITNESS: Spanish cruise line.
BY MS. LOBEL:
Q Is Pullmantur part of the Royal Caribbean Group?
A Yes, but -- yes.
Q Okay. What other lines within Royal Caribbean Group have you worked on other than Royal Caribbean and Pullmantur?
A Only Pullmantur.
Q Okay. How long did you work on Pullmantur before

you started working on the Royal Caribbean line?
A Two contracts. Four months each.
Q Okay. All right. Now, when you started working on the "HORIZON", the Pullmantur ship, the very first ship did you have any training provided to you by the company?
MR. DRAHOS: Object to the form.
THE WITNESS: Training only as far as ship safety, that kind of thing. Nothing medical.
BY MS. LOBEL:
Q Okay. That was my next question.
So as far as you can recall when you first started working for the Royal Caribbean Group did you receive any training with regard to the medical care and treatment that you were to provide on the ship?
A No.
Q Did you receive any training from Royal Caribbean with regard to its shipboard -- well, strike that.
Did you receive any medical -- strike that.
Did you receive any training from Royal Caribbean having to do with the medical center's procedures?
MR. DRAHOS: Object to the form.
THE WITNESS: No formal training. When you get there they show you around and inform you how they operate on that ship.

BY MS. LOBEL:
Q Okay. Did you receive any training on Royal Caribbean's -- well, strike that.
Are the procedures for the operations of the shipboard medical infirmaries for the Pullmantur line the same as the Royal Caribbean line?
A It's for the whole group the same.
Q Okay. So every cruise line or brand within the Royal Caribbean Group has the same procedures that are applicable to all medical centers. Is that correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
BY MS. LOBEL:
Q Okay. All right. So the procedures for a medical evacuation on, say, "CELEBRITY", one of the lines and one of the Royal Caribbean ships would be the same. Is that correct?
MR. DRAHOS: Object to the form.
THE WITNESS: That's what I experienced.
BY MS. LOBEL:
Q All right. Did you receive any training on Royal Caribbean's procedures for medical evacuations of patients?
A It is getting informed once you're on the ship. There's no formal process for that.

Q Okay. So how did you become -- well, strike that.

How did you learn Royal Caribbean's procedures for medical disembarkations and medical evacuations for passengers and crew?

A Direct communication from the doctor who was my senior at that stage.

Q Okay. Were you ever required to read the procedures that Royal Caribbean had with regard to, for example, medical disembarks and evacuations?

A No.

Q Okay. Were you ever tested on any of Royal Caribbean's policies and procedures with regards to medical disembarkations or evacuations?

A There is no test for that.

Q Okay. Now, the procedures that Royal Caribbean has with regard to medical disembarkations and evacuations, is that in a system known as SQM?

A Some of it can be, yes.

Q Okay. Are there procedures that are for medical disembarkations and evacuations that are not in Royal Caribbean's SQMs?

A I can't answer that.

Q Well, I just want to know because you mentioned just a second ago some of them are in SQMs.

I just want to know if there are any other procedures other than the SQMs with regard to medical disembarkations and evacuations that you're aware of?

A Anything that is in writing about procedures and policy, whatever, is in SQM.

Q Okay.

A The answer was I can't give you what is not written down in SQM.

Q Okay. Are there unwritten procedures that are just generally accepted, understood within the company with regard to medical disembarks or evacuations that are not delineated or written down in the SQMs?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, I can't say so because I don't know every little SQM.

We refer to SQM when we are uncertain about something or two people have a different opinion. Then we refer back to SQM.

BY MS. LOBEL:

Q How did you learn, for example -- well, let's back up.

Have you ever participated in a medical evacuation and disembarkation of a patient suffering an emergent medical condition before while working for Royal Caribbean?

MR. DRAHOS: Object to the form.
THE WITNESS: Yes.
BY MS. LOBEL:
Q Okay. How did you know what procedure to follow or what to do during that situation if you didn't have formal training on the specific procedures Royal Caribbean has?
MR. DRAHOS: Object to the form.
THE WITNESS: As stated before, it is communicated by the staff that has done it before.
BY MS. LOBEL:
Q Okay. When was your first experience dealing with a medical evacuation or disembarkation of a Royal Caribbean patient?
MR. DRAHOS: Object to the form.
THE WITNESS: That's impossible to say.
BY MS. LOBEL:
Q Well, I'm trying to get a feeling for when or under what circumstances you were told by a staff member who had done a disembark or evaluation before. What do you recall?
MR. DRAHOS: Object to the form.
THE WITNESS: It would have been when I was at Pullmantur.

BY MS. LOBEL:
Q Do you know approximately how many medical evacuations or medical disembarks you have participated in?
A Not at all. I don't keep count of it.
Q Would it be more than five?
MR. DRAHOS: Object to the form.
THE WITNESS: Certainly more than five.
BY MS. LOBEL:
Q Would it be more than ten?
MR. DRAHOS: Object to the form.
THE WITNESS: That I can't answer. It's really speculative.
BY MS. LOBEL:
Q Okay. Have you ever medically disembarked or evacuated a patient suffering from a stroke before?
A Yes.
Q How many times?
MR. DRAHOS: Object to the form.
THE WITNESS: I can't recall.
BY MS. LOBEL:
Q Okay. The circumstances where you participated in a medical disembarkation of a patient suffering from a stroke, was that at sea or was that while the ship was at port?

MR. DRAHOS: Object to the form.
THE WITNESS: That I can't recall.
BY MS. LOBEL:
Q Do you recall any circumstances related to any of the patients that you've disembarked who were suffering a suspected stroke on a Royal Caribbean ship?
A I wasn't involved with the Burgess case. That was in port, yes.
Q Were there any other patients that you can recall that you were a doctor on the ship other than this particular case where a patient was disembarked who was suspected of suffering a stroke?
A It is most likely possible, but I can't give you a situation.
Q Okay. So you don't remember any details whatsoever of any situation in your career working for Royal Caribbean involving a patient who was suffering a stroke. Is that accurate?
MR. DRAHOS: Object to the form.
THE WITNESS: We see so many cases just on one contract I can't give you specifics.
BY MS. LOBEL:
Q Do you see that many people who are potentially suffering from a stroke while serving on Royal Caribbean ships?

MR. DRAHOS: Object to the form.
THE WITNESS: Many or few. Not precise terminology. If I say one person is many, it is not many to another person. I can't remember.
BY MS. LOBEL:
Q Well, help me understand.
What would you say is the frequency of a patient presenting with a suspected stroke that you've encountered while working for Royal Caribbean?
MR. DRAHOS: Object to the form. Calls for speculation.
THE WITNESS: I can't even recall the last one.
BY MS. LOBEL:
Q Well, I'm not asking you to recall the last one.
I'm just asking do you see somebody with a suspected stroke every contract, once every couple of years, twice a week? What is your experience?
MR. DRAHOS: Object to the form.
THE WITNESS: Not twice a week. Once a contract is possible.
BY MS. LOBEL:
Q Okay. Does Royal Caribbean give shipboard doctors information regarding the medical facilities available at each port of call?
A No.

Q Okay. Does Royal Caribbean encourage doctors to go ashore to educate themselves regarding available medical care?
A No.
Q Has anyone from Royal Caribbean ever encouraged you to go off the ship to see locally what's medically available for patients?
A No.
Q Okay. Have you ever asked for permission to go ashore to see what medical facilities are locally available for patients?
A No.
Q Okay. Why not?
A It's impractical in my opinion.
Q Why is that?
A Circumstances changes.
Q Okay. Would you agree with me that when -- strike that.
When you're assigned to a contract with Royal Caribbean approximately how many months is each contract?
A Four months.
Q Okay. And during the four months of the specific contract do you go -- is the itinerary the same throughout the entire contract?
A Not necessarily.

Q How frequently does the itinerary change while you work a given contract for Royal Caribbean?

A I can't even answer that. It's not -- we don't decide on that. It's decided at the head office and given to the ship management where they should sail.

Q I understand. I just want to know what your experience has been.

So, for example, if you were on a four-month contract and the itinerary is in the Caribbean, do you typically go to the same ports over and over again throughout the entire contract or does it constantly change and you never know where you're going to go?

MR. DRAHOS: Object to the form.

THE WITNESS: Mainly the same.

BY MS. LOBEL:

Q Okay. So if you're in a contract that's a ten-day cruise, do you repeat the same ten-day cruise itinerary, meaning going to the same places every ten days over and over again for the duration of the contract?

A Correct.

Q Okay. When you stop at port during the contract are doctors permitted to disembark?

MR. DRAHOS: Object to the form.

THE WITNESS: Pre-COVID, yes.

BY MS. LOBEL:
Q Understood. I understand. COVID has changed everything.
So before the pandemic, and that's a very good point, before the pandemic started in early 2020 were you as a shipboard doctor permitted to disembark at ports?
A Correct.
Q Okay. How frequently would you disembark at a port?
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q Pre-COVID. Pre-COVID.
A I understand it's pre-COVID. It's really different.
Q When you would disembark from the ship pre-COVID during the contract what would you typically do during the demarcation?
MR. DRAHOS: Object to the form.
This is getting really far afield of what could even be reasonably construed as material to the case.
What the doctor does when he gets off the ship, if he gets off the ship, how does that in any way have anything to do with this case?
BY MS. LOBEL:
Q You may answer.

A Might go to a beach. Might go to a restaurant and eat different foods.

Q Would you ever --

A Usually the first time to take photos and afterwards don't take photos every time of the same things.

Q Understood. Would you ever disembark for work purposes as opposed to pleasure when you would disembark at a port?

MR. DRAHOS: Object to the form.

THE WITNESS: Never.

BY MS. LOBEL:

Q Okay. Is there a shipboard stroke protocol?

MR. DRAHOS: Object to the form.

THE WITNESS: Sorry. Repeat.

BY MS. LOBEL:

Q Certainly. Does Royal Caribbean have a shipboard stroke protocol?

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MS. LOBEL:

Q Okay. Have you ever worked at a hospital where there's a stroke protocol?

A No.

Q Are you familiar with what a stroke code is?

A It differs from center to center.
Q How do stroke codes differ from center to center?
A I've never been confronted with one.
Q Okay. Well, I'm just trying to understand the basis for your statement that stroke codes can differ from center to center, and I understand you've never been confronted with a stroke code, but what is your knowledge with regard to differences in different stroke codes?
A Certainly I can't imagine that with every hospital or clinic it will be the same. That's all. That's a personal comment.
Q Okay. I just wanted to know --
A Not experience. Not experience.
Q When you were working -- strike that.
Before you started working in the cruise lines and you were doing a night shift at the local hospital in Cape Town were you trained on that hospital's stroke code?
A There was no stroke code to my knowledge.
Q Okay. And just so I'm clear, during your time working at any hospital in your career you've never encountered a patient with a stroke?
MR. DRAHOS: Object to the form.
THE WITNESS: I've encountered patients with stroke, yes.

BY MS. LOBEL:

Q Okay. What do you recall with your encounters dealing with a patient with a stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: At the one hospital which I mentioned where I worked for four years there was a scanner.

So when we see such a patient and the patient was in the time limit to perform a scan for the possibility of a TIA, the patient was sent immediately as soon as possible to the scanner.

We would call the neurologist and he would take over from there.

BY MS. LOBEL:

Q Okay. When you were dealing with the patient that you just described, was that a time sensitive medical emergency?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't deal with that part.

BY MS. LOBEL:

Q Under the circumstances of the patient that you've described at the hospital that you worked for for four years before you started working for Disney did you request that that patient see the neurologist as soon as possible or did you wait?

MR. DRAHOS: Object to the form.

THE WITNESS: I already answered that one.

When the decision -- when the diagnosis of a stroke or possible stroke was made there in the ER by myself or colleagues, the patient was sent immediately to the scanner, and we informed the neurologist giving whatever clinical information we had at that time and then he took over.

BY MS. LOBEL:

Q Okay. Now, did you send the patient immediately to the scanner because the medical condition was deemed to be a time sensitive condition?

MR. DRAHOS: Object to the form.

THE WITNESS: If it was out of the time limits, we would discuss it with the neurologist whether they still wanted the scan used or not.

BY MS. LOBEL:

Q Would you agree with me that there are other treatments other than tPA to treat patients with stroke, including medical intervention?

MR. DRAHOS: Object to the form. That has already been asked and answered. We already covered this.

MS. LOBEL: I don't need the commentary, Michael. I just need the answer.

MR. DRAHOS: Well, I'd prefer you not waste our time. We've gone through this already.

MS. LOBEL: Okay.

BY MS. LOBEL:

Q You may answer, doctor. I apologize.

A Depending on the circumstances the patient still needs a scan before the method of treatment can be decided.

Q Okay. When there's a situation on Royal Caribbean ships with a patient who is suffering from an emergent condition is the captain supposed to be notified?

MR. DRAHOS: Object to the form.

THE WITNESS: When we consider an evacuation and there is time the help line is consulted.

Once the decision is made on the ship with the help line that evacuation is needed and we're at sea we have to discuss it with the captain because then other facilities needs to be called in.

If we're in port we only inform the bridge that we have requested an ambulance.

BY MS. LOBEL:

Q Okay. When there's communications with the bridge, either the captain or the staff captain regarding a patient suffering a medical emergency or has an emergent condition, is the doctor supposed to document that

interaction?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MS. LOBEL:
Q Why not?
A MR. DRAHOS: Object to the form.
THE WITNESS: It's simply not a requirement.
BY MS. LOBEL:
Q Is it something a --
A Some doctors will make it and some not. It's not a requirement.
Q Okay. Is the conversation with the help line or the Miami office regarding a medical disembark or evacuation documented?
MR. DRAHOS: Object to the form.
THE WITNESS: Also not a requirement. We will usually just put in the notes that the help line was contacted and it's approving or disapproving our opinion our opinion on the ship.
BY MS. LOBEL:
Q Does anyone document what the conversation is between the ship and shoreside with regard to consultation or discussions with regard to medical care of a patient on a ship?
A You mean a specific document?

Q A document or is shoreside responsible for documenting the conversation?
A No, I don't know what Miami does. We don't necessarily, but it's usually put in the notes.
Q So if the company wants to know what the conversation was between the shipboard doctor and the Miami office, is everybody supposed to rely on their memory or is there any documentation is where I'm trying to figure this out?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't know because it never came up.
BY MS. LOBEL:
Q Okay. Would you agree with me that relying purely on human memory is not a very good way to document an important medical decision such as medical disembark or an evacuation of a patient?
MR. DRAHOS: Object to the form. Argumentative.
THE WITNESS: It's not for me to comment on that.
BY MS. LOBEL:
Q Would you agree with me having detailed medical records is important?
MR. DRAHOS: Object to the form.
THE WITNESS: It's not always possible.
BY MS. LOBEL:

Q Why not?
A Circumstances.
Q What circumstances would there be where a doctor would not have the means or ability to memorialize the conversation between the Miami office and the ship when deciding an important decision such as medically disembarking a patient?
MR. DRAHOS: Object to the form.
THE WITNESS: So far in my experience the help line or Miami whatever the situation was there was no communication afterwards and any questions about documentation, et cetera.
BY MS. LOBEL:
Q Does Royal Caribbean have a set of policies or procedures with regard to how a patient should be handled that is potentially suffering a stroke?
MR. DRAHOS: Object to the form. Asked and answered.
THE WITNESS: No official protocol to my knowledge. There will be guidelines or there may be guidelines in SQM. I don't know.
BY MS. LOBEL:
Q Okay. At the end of each of your contracts with Royal Caribbean is there a performance review?
A Yes.

Q Is there a performance review at the end of every single contract you've ever had with Royal Caribbean?

A To my knowledge, yes.

Q Who performs the performance review for the company?

A Used to be the staff captain, but it's now done by one of the medical managers in Miami.

Q When did that switch occur where the performance review is no longer the staff captain and now the medical officer from Miami?

A I can't recall exactly when it happened.

Q Okay. Do you know if in 2019 the staff captain or the medical officer in Miami conducted the performance review?

A What I can recall is it was pre-COVID.

Q The switch happened pre-COVID?

A Yes.

Q Understood. Now what's the difference between the performance review that was done by the staff captain that's now being performed by the medical officer in Miami?

A Exactly the same format.

The staff captains' claimed objective because the questions is mainly about medical matters of which they have no knowledge so they claimed, stated they can't give

out opinion.

Q So how does the Miami medical officer perform their performance review at the end of your contracts since they're not on the ship with you during the contract? How does that work?

A You will have to ask them. All I know is it's made by them.

Q Understood. Do you have a conference call or an interview with the Miami medical officer?

A No.

Q Okay. Do you know if the Miami medical officer reviews, for example, the medical records that you generate during a contract?

A I do not know.

Q Do you know anything whatsoever about what the Miami medical officer does to evaluate a Royal Caribbean doctor's performance?

A No.

Q Do you receive a copy of any documentation having to do with that performance evaluation from the Miami medical officer?

A Not lately, but I can't tell you when it was.

Q All right. Is it the Miami medical officer who tells you whether or not you're going to be renewed for another contract or is it somebody else?

A Nobody in particular informs us.
There is a website for the company that deals with various matters and amongst others you renew your next assignment.
So at present yesterday I have the dates there of my next assignment, and I normally about two weeks before the time they start getting the flights and I get the flight details.
So I don't know how it appears there, but that's how we are informed and can check it yourself.
Q Okay. Have you ever been made aware of any complaints or issues that Royal Caribbean has ever had with the care and treatment you've provided to any of its passengers or crew members?
A No.
Q Okay. Have you ever had any negative performance reviews from Royal Caribbean that you've been made aware of? Because I understand you don't always get documentation of them.
A No, none.
Q What about with NCL? Did you ever have any complaints that you were made aware of about medical care and treatment you provided to passengers or a crew member back then?
MR. DRAHOS: Object to the form.

THE WITNESS: No.
BY MS. LOBEL:
Q Do you recall a former passenger by the last name of Cordoni?
A No.
Q Okay. Do you remember an incident back in November of 2014 where a patient came in complaining of back pain, was given muscle relaxers, was eventually diagnosed with pneumonia, kept on the ship, eventually disembarked from the ship and passed away?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MS. LOBEL:
Q Okay. Have you ever been aware of being named in a lawsuit before?
MR. DRAHOS: Object to the form.
THE WITNESS: There was someone where they wanted to have a deposition with me. The case was closed before it took place, my deposition, but I can't recall details of it.
BY MS. LOBEL:
Q Do you recall if that was when you were working for Royal Caribbean, Norwegian or Disney?
MR. DRAHOS: Object to the form.
THE WITNESS: I think it was with Norwegian.

BY MS. LOBEL:
Q Okay. Do you recall approximately how long ago that was, more or less?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, five years with Royal. About seven years ago.
BY MS. LOBEL:
Q Okay.
A A guess.
Q Do you know what happened in that case?
A No.
Q Okay. Has anyone ever asked you anything about that case since the case resolved one way or the other and you didn't have to do the deposition?
A No.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q Did Royal Caribbean ever ask you about that case?
A No.
Q Okay. Did you ever tell Royal Caribbean about that case?
A No.
Q Okay. Did Royal Caribbean when you applied ever ask whether or not you'd ever been named in a lawsuit

before?

A No. Because, as I've stated, I was approached by Dr. Ben Shore, who was my medical manager with Norwegian, so if it took place there, then he would have had knowledge about it.

Q Is it possible you got named in the lawsuit after Dr. Shore left Norwegian and was already with Royal Caribbean?

MR. DRAHOS: Object to the form.

THE WITNESS: No idea.

BY MS. LOBEL:

Q Okay. All right. So it's possible. You don't know one way or the other whether Dr. Shore --

MR. DRAHOS: Wait for the question before you answer.

BY MS. LOBEL:

Q Let me finish the question. Otherwise we're going to drive Miss Cohen crazy.

My question is -- strike that.

Am I correct in understanding you don't know one way or the other whether Dr. Shore knew you had ever been named in a case against Norwegian?

A I can't remember.

Q All right. Does Royal Caribbean do periodic reviews of your performance during a contract?

A Not to my knowledge.

Q Okay. When you worked for Norwegian did they do periodic performance reviews or reviews of your work during the contract?

A Not to my knowledge and definitely not official.

Q Okay. Does the Miami office have the ability to see in realtime the medical records that a shipboard doctor inputs in the ship?

A Yes, they have access to.

Q For example, if there's a patient who's suffering from an emergent condition and the shipboard doctor calls the help line, the Miami office can see the medical records just as they are on the ship at the same time. Is that correct?

A That's my understanding because they all have access.

Q Okay. Understood.

Is there anything else that's part of the procedure for a medical evacuation or disembarkation other than speaking with the Miami office and speaking with the captain about making arrangements?

MR. DRAHOS: Object to the form.

THE WITNESS: When we're in port, the port agent.

BY MS. LOBEL:

Q Okay. And what's supposed to be done with regard

to the port agent?
A We as doctors don't deal with that unless it's a ship where we don't have a medical secretary. The "HARMONY" and the "SYMPHONY" has a medical secretary.
That person is doing the communication with the port agent by e-mail and by phone.
On the ships where we don't have it the doctor will do it or the nurse.
Q Does the doctor supervise the medical secretary to make sure that the medical emergency or emergent situation is being handled properly?
MR. DRAHOS: Object to the form. Improper hypothetical.
THE WITNESS: They're all fully trained in their job and there's no reason to oversee the person whether he or she is doing it correctly.
BY MS. LOBEL:
Q Is the doctor the -- well, strike that.
Is the doctor responsible for -- is the doctor responsible for all actions taken by the medical secretary?
A No.
Q Who's responsible for the actions taken by the medical secretary?
MR. DRAHOS: Object to the form.

THE WITNESS: The medical secretary.
BY MS. LOBEL:
Q Who is the medical secretary's supervisor?
A Falls under the senior doctor.
Q Okay. So if the medical secretary isn't doing their job correctly, is it the senior doctor who's responsible for correcting the situation?
A Correct.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q Okay. So would it be fair to say that the senior doctor supervises the actions taken by the medical secretary?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, but it's not done in each and every case.
We discover if there is anything that needs to be rectified or improved, then it will be done by either a senior nurse or the senior doctor, but these people are highly skilled in their jobs so in my experience I've never encountered a situation where I had to criticize or to rectify taking action about a medical secretary.
BY MS. LOBEL:
Q Okay. If there's a situation where the medical

secretary has been instructed to get immediate ground transport to transport a patient from a ship docked port, if it's taking too long is the doctor supposed to be stepping in to expedite the process?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: Doctors can't insist better response at all.

BY MS. LOBEL:

Q Is the doctor the person who's ultimately responsible for the expedited transport of a patient suffering a medical emergency or is it the medical secretary?

MR. DRAHOS: Object to the form.

THE WITNESS: It's not the point of who's responsible for that.

The medical secretary gets the request to start the full procedure for a medical evacuation, whether it is a routine or whether it is emergency, whether it a PALS ambulance or an ACLS ambulance needed and the medical secretary takes responsibility, executes it, and for a doctor to phone or write an e-mail if the medical secretary does not get the response we want won't have any impact.

BY MS. LOBEL:

Q How do you know?
MR. DRAHOS: Object to the form.
THE WITNESS: We've tried it before.
BY MS. LOBEL:
Q Can you explain when you've tried that before?
A No, I can't give you specific cases, whatever.
Q Well, I'm just trying -- go ahead. Go ahead.
A I can just repeat that we have the experience that if a doctor now phones the port agent, he's not going to do more because he can't.
These guys are also qualified in their jobs. We do not have, to my knowledge, any port where the port agent doesn't understand what is urgent what is not urgent and can't perform their job so it's a waste of their time and the doctor's whose responsibility it is to take care of the patient.
That patient is critical when we need to do that, so for the doctor now to take over the phone from the medical secretary and phone the port agent there's no change in the situation. It's unnecessary. He's doing his job.
Q So if there's a patient who is in critical condition and it's taking hours and hours to get anything done the doctor's hands are tied? He can't do anything? Is that what you're telling me? I just want to

understand.

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: No. The medical secretary is trained and they know their job. They're skilled. They do convey the message and the urgency to the port agent and that's where our input stops.

BY MS. LOBEL:

Q But if things are not going as they're supposed to and taking too long what I want to know is what is the doctor supposed to do under those circumstances to remedy the situation?

MR. DRAHOS: Object to the form.

THE WITNESS: Tell the medical secretary, well, you phone again.

BY MS. LOBEL:

Q Does the -- can the doctor call the Miami office?

MR. DRAHOS: Object to the form.

THE WITNESS: Miami office can't do anything under those circumstances.

BY MS. LOBEL:

Q Can the doctor call 911?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't deal with 911.

BY MS. LOBEL:

Q Why not?

MR. DRAHOS: Object to the form.

THE WITNESS: 911 is unknown to us and it's not in all ports.

BY MS. LOBEL:

Q Do you know if it's available in the port of San Juan?

MR. DRAHOS: Object to the form.

THE WITNESS: It may be because it's an American territory, but whether it is because it's not mainland U.S. I don't know.

BY MS. LOBEL:

Q Okay.

MR. DRAHOS: We've been going two hours. I need to take a quick bathroom break.

MS. LOBEL: Sure.

THE VIDEOGRAPHER: We are now going off the video record. The time is 1803 UTC, 1:03 p.m. EST.

(A brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1813 UTC, 1:13 p.m. EST.

BY MS. LOBEL:

Q Okay. We took a brief break. Doctor, are you ready to continue?

A Yup.

Q All right. Lovely.

Did you speak to anyone from Royal Caribbean during the break?

A Nope.

Q Did you speak with anyone during the break?

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MS. LOBEL:

Q Okay. Just asking because I know you're on the ship.

Okay. So let me just catch up with my notes. Give me -- I just hit it and it jumped.

Okay. All right. Doctor, are you familiar with what a vertebral dissection is?

A No.

Q Okay. Are you familiar with the condition in which there's a tearing in the vertebral artery?

A No.

Q Are you aware that the vertebral artery is located in the neck?

A Yes.

Q Are you aware that the vertebral artery supplies blood to the brain?

A Yes.

Q Would you agree that an artery that I can

describe is kind of like a hose that is a tube that has blood flowing through it?

MR. DRAHOS: Object to the form.

THE WITNESS: That's general anatomy.

BY MS. LOBEL:

Q Okay. Would you agree that if an artery is torn, blood can clot?

MR. DRAHOS: Object to the form.

THE WITNESS: Not always.

BY MS. LOBEL:

Q Understood. But --

MR. DRAHOS: Object to the form.

THE WITNESS: Anything can.

BY MS. LOBEL:

Q Okay. Would you agree with me that a blood clot can cause a stroke?

A If it is sufficient.

Q Okay. Do you agree that a tearing to the vertebral artery could happen due to head trauma?

MR. DRAHOS: Object to the form.

THE WITNESS: That's for a specialist. I'm not a specialist in that field.

It can happen or it can't happen.

BY MS. LOBEL:

Q Just so I'm clear with your answer, are you

telling me you don't know one way or the other whether head trauma can cause a tearing to the vertebral artery?

MR. DRAHOS: Object to the form.

THE WITNESS: There may be circumstances, yes. It's not my field of specialty.

BY MS. LOBEL:

Q Okay. Can a tearing to the vertebral artery be caused by a massage?

MR. DRAHOS: Object to the form.

THE WITNESS: I can't answer that.

BY MS. LOBEL:

Q Okay. If somebody suffers trauma to the back of their head -- well, strike that. Let me go back.

If a patient has a history of trauma to the head and then presents later after the trauma to the head with numbness in the face, arms, legs, has trouble seeing, walking, is that a situation where a doctor should suspect that the patient has a vertebral artery dissection?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: You really need a super specialist on the clinical grounds to say with certainty where that blood or obstruction is.

It's certainly not my specialty.

BY MS. LOBEL:

Q Would a vertebral artery dissection be within the differential diagnosis of that patient?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: Again, it's out of my specialty. We can only identify a stroke clinically.

BY MS. LOBEL:

Q Okay.

A Nothing more.

Q And to clinically identify a stroke what are you looking for?

A Stroke symptoms.

Q What would those include?

A Usually eye symptoms, drooping of the face, mouth, drooping corner.

If it is more extensive you can start getting neurological deficits in the arms and, even worse, in the legs.

Q Okay. Now, if a patient presented with the symptoms that you just described with the visual disturbance, drooping of the face, mouth, neurological deficits in the arms and, worse yet, the legs, is that a circumstance where a Royal Caribbean doctor should be suspecting a stroke?

MR. DRAHOS: Object to the form. Calls for

speculation. Improper hypothetical.

BY MS. LOBEL:

Q You can answer.

A If any doctor is presented with that clinical picture of a patient, that is certainly what he should expect.

Q Now, the patient with the clinical presentation with visual disturbances, face mouth droop, neurological deficits in the arms and legs, would that be considered a patient who is suffering a time sensitive medical condition?

MR. DRAHOS: Object to the form.

THE WITNESS: Depends on the circumstances.

BY MS. LOBEL:

Q What circumstances with this scenario?

A Where the ship is.

THE REPORTER: I'm sorry?

THE WITNESS: The position where the ship is and how long it is present.

BY MS. LOBEL:

Q If the ship is at a port of a major city and has the presentation that you described with the visual disturbance, face droop, mouth droop, neurological deficit in the arms and legs and the ship is docked at a port of a city, is that a time sensitive medical emergency?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: It's all depending on when it started.

BY MS. LOBEL:

Q Why does when the presentation started effect whether the situation is a medical emergency or not?

A IF it started twelve hours prior to presentation to the medical facility, it's not really time sensitive anymore. It's beyond the scope of tPA.

If it's an obstruction and it can be removed, yes, we will still send that patient as soon as we can, but it depends on other factors as well.

Q What other factors would it depend on?

A As I said, when it started.

Q Okay. Other than when it started what other factors would it depend on?

A Can the patient breathe? Do we have to intubate the patient? How long can you maintain ventilation? So it can sometimes, not necessarily.

Q If it is a patient who is breathing has the visual disturbances, mouth droop, face droop, neurological deficit in the arms and legs which you described and time of onset is, I don't know, 8 o'clock in the, 9 o'clock in the morning and the patient presents to you within thirty

minutes of onset, is that a time sensitive medical emergency or emergent condition?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: If that is the specific scenario, it can be.

BY MS. LOBEL:

Q Okay. Do you know if when there's a medical disembarkation if the Miami office monitors the situation?

A I don't know what they do.

Q Okay. Sorry. I'm just catching up with my notes.

How many times have you had a contract where the ship has had the port of San Juan as part of the itinerary?

A Definitely one. I can't recall more.

Q Do you know how long Royal Caribbean has been including the port of San Juan as part of its itinerary?

A Not at all.

Q Okay. And as far as you can recall you just recall the one contract coming in and out of the port of San Juan?

A To my recollection, yes.

Q Okay. During the contract in which the ship was sailing in and out of San Juan were you involved in any

medical disembarks or evacuations of patients?
A I can't recall.
Q Okay. In this incident do you know which hospital the patient was sent to?
A Not at all.
Q Do you recall what you were doing on November 21st of 2019?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
MR. DRAHOS: Give us some context.
THE WITNESS: You're just giving me a date. I can't remember what I did on a date.
BY MS. LOBEL:
Q Well, you've reviewed the medical case notes related to this incident. Correct?
A Yes. My notes, yes.
Q Okay. And you are familiar that there are medical records for a patient by the name of Richard Burgess that start on November 18th and continue through November 21st of 2019 based off of the notes. Correct?
MR. DRAHOS: Object to the form.
THE WITNESS: I was involved on the 18th, yes.
BY MS. LOBEL:
Q Okay. Well, what I want to know is what were you doing -- were you working in the medical center on

November the 21st of 2019?
A I can't recall. We're three doctors and only two work every day. The third one is night call.
I can't remember whether I was on night call the previous night or not.
Q Is there a schedule that would tell us where you fell within the rotation during this timeframe?
A I don't know if that schedule still exists.
Q But would there have been a schedule?
A We work according to a fixed schedule, yes.
Q Who devised the fixed schedule?
A It was either the medical secretary or the senior nurse.
Q Okay. During this particular contract were you the senior doctor out of the group of doctors?
A No. What I have to point out is that on the three doctor ships like this one there are two senior doctors and a junior doctor, but only one doctor is either the senior senior or what we used to normally call the chief doctor.
I was not the chief doctor.
Q Why not?
A I was -- that is how my contract was given.
Q It's not a criticism. I just don't know how this gets decided. Does shoreside tell you? I don't mean to

be funny. I just don't know what the procedure is.
A No. Shoreside decides that.
Q Okay. So during this contract Dr. Pereira was the chief doctor for the group of three?
A Sounds like you're referring to Dr. Parejo in Miami. He wasn't there.
Q No, not Dr. Parejo. Pereira.
A Pereira?
Q Yes.
A No. He was in the junior doctor position.
Q Okay. So the doctor who was -- so are you telling me that the doctor who was treating Richard Burgess on February 21st of 2019 was the junior doctor during that contract?
MR. DRAHOS: Object to the form.
THE WITNESS: Only by title.
BY MS. LOBEL:
Q Okay. What was happening in actuality if not by title?
MR. DRAHOS: Object to the form.
THE WITNESS: All doctors coming on board for the first time on a Royal contract are called junior doctors.
Some of them are even medical specialists and they still go by the term junior doctor.

BY MS. LOBEL:

Q Why is that? Just because they're on the ship for the first time?

A Ask Miami. We object to that term.

Q Okay. Who was dedicated to being in charge of the three doctors during this contract in 2019?

A I can't recall.

Q How would we be able to determine who was in charge of the three -- who was deemed to be the most senior status between the three doctors during this contract?

A I don't really know whether Miami keeps records of this. That's the only place I can refer you to.

Q Okay. Was there a doctor who you reported to during the contract that was controlling in November of 2019?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q February of 2019. Forgive me. February.

A It would have been the chief doctor, but, as I say, I can't recall who the doctor was.

Q Okay. Do you remember --

A We had several.

Q Go ahead. I'm sorry.

A We had several of them.
Q Okay. Who was the third doctor during this contract?
A That was Dr. Pereira.
Q So it was you, Dr. Pereira and who was the third doctor?
A The third doctor was the chief.
Q Right. But who was that?
A I can't recall his name because they come and go at different times to my contract.
Q How long does the chief doctor come and go during a contract to work on a ship?
MR. DRAHOS: Object to the form.
THE WITNESS: The same period of four months, but he may be -- he or she may be on contract for two months and then I join.
So after two months there the doctor goes on vacation. Then another one comes in his place.
So that's why I say there is most of the time more than one in that position during my contract.
BY MS. LOBEL:
Q But not at the same time. So you don't have two chief doctors on the ship at the same time?
A No.
Q So there's --

A Senior doctor, junior doctor.

Q There's always three doctors and the doctors get spaced out. Essentially your contracts don't start and finish at the same time?

A No.

Q Okay. Do you agree that it's a rule for doctors that if the patient is suffering a stroke that they need to be taken to a hospital as soon as possible for treatment?

MR. DRAHOS: Object to the form. That's been asked and answered at least twice. This is the third time you've asked him now.

BY MS. LOBEL:

Q You may answer.

MR. DRAHOS: Object to the form.

THE WITNESS: What can I say? Yes.

BY MS. LOBEL:

Q Do you agree that's a good rule the doctors should follow?

MR. DRAHOS: Object to the form.

THE WITNESS: That's what we are taught.

BY MS. LOBEL:

Q Okay.

A Just a second, please. Just a second, please.

MR. DRAHOS: There's somebody in the room.

MS. LOBEL: What is going on?

MR. DRAHOS: There's somebody that walked into the room so I didn't think this person was going to be here, so we're trying to find out what he's doing.

While we're at this, Sarah, what is your timeframe? How much longer do you think you're going to need the doctor for?

MS. LOBEL: I don't know. Why?

MR. DRAHOS: Because I have a flight that I'm going to have to catch and so it's not looking to me like we're going to finish.

MS. LOBEL: Well, what time is your flight? Nobody told me about this constraints. Otherwise I would have made accommodations.

MR. DRAHOS: No, no. We talked about timeframes and what kind of time you were going to need this doctor for when we set this deposition.

MS. LOBEL: No, we didn't. I specifically accommodated to start at 11:00 so you could get to where you needed to be so we could do this.

I moved this from last year to now specifically to accommodate you.

MR. DRAHOS: And you told me that you weren't going to need all day. That's why we agreed to this date.

MS. LOBEL: I'm not going to need all day. Michael, we started at 11:00 it's only 1:30.

MR. DRAHOS: Okay. So how much more time do you need?

MS. LOBEL: What time do you need to get off the ship.

MR. DRAHOS: I need to be off the ship in an hour sharp or I'm going to miss my flight.

MS. LOBEL: This is the first I'm being of told of that. I will do the best I can.

MR. DRAHOS: Well, if you don't finish, then you'll have to take it off and ask what other remainder of questions you have, but I'm just trying to get a gauge as to where you are. That's all.

MS. LOBEL: I'll do the best I can. I don't know because it depends on how he answers. That's all I can say.

BY MS. LOBEL:

Q Doctor, let's try to go back to where we left off after somebody walked into the room and you needed to leave for reasons unknown.

We were talking about you agreed -- just to give you some context so I can continue my questions, we had just discussed that you agreed that it's a good rule that if a patient is suffering from a stroke they need to be

taken to a hospital as soon as possible for treatment.

My next question to you with that context is would you agree with me that people within the medical community rely on others in the medical community to follow that rule?

MR. DRAHOS: Object to the form.

THE WITNESS: I would imagine, yes, if their training is the same as mine.

BY MS. LOBEL:

Q Okay. Do you think that it would be negligent of a doctor not to follow the rule of getting a patient who is suffering from a stroke to the hospital or medical facility that can provide the care and treatment they need as soon as possible?

MR. DRAHOS: Object to the form.

THE WITNESS: I really can't comment on other doctors' conduct.

BY MS. LOBEL:

Q Would you agree that it's a rule that a doctor who has a patient in their care should monitor the process of getting a patient to an ambulance to transfer the patient to a facility that can provide the patient appropriate care and treatment?

MR. DRAHOS: Object to the form.

THE WITNESS: I disagree. The doctor's

obligation is toward the patient.

Therefore, we have assistance in the way of nursing staff, admin staff and I have to deal with that.

If the doctor indicates to them that what you have described as an emergency or time sensitive, a doctor can't be responsible for that. He must attend to the patient.

BY MS. LOBEL:

Q Who's responsible to ensure that a patient gets the medical care and treatment that they need to care for them if it's not the doctor?

MR. DRAHOS: Object to the form.

THE WITNESS: Everybody on the team.

The doctor can't be held responsible for everything. It's not possible. He must look after the patient.

BY MS. LOBEL:

Q You'd agree with me in the medical community there is a chain of command similar to having a chain of command on a ship?

MR. DRAHOS: Object to the form.

THE WITNESS: If the next guy in the chain of command doesn't do his job, the doctor can't be responsible for it.

BY MS. LOBEL:

Q Do you participate in meetings having to do with medical care and treatment provided to passengers and crew for Royal Caribbean?

MR. DRAHOS: Object to the form.

THE WITNESS: Don't have specific meetings.

BY MS. LOBEL:

Q Are there meetings, fleet-wide meetings with Royal Caribbean's doctors?

A No.

Q Do you ever have meetings with the head of medical operations?

MR. DRAHOS: Object to the form.

THE WITNESS: Nothing clinical.

BY MS. LOBEL:

Q Okay.

A Unless there's a specific reason.

Q Have you ever had a meeting with the medical officer for a specific reason while working for Royal Caribbean?

A No.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q Okay. Are you familiar with a monthly meeting in

which the doctors within the fleet log into a video conference meeting?

A It's not a monthly meeting, to my knowledge.

It is notified by e-mail to the ships and it's not about clinical methods.

Q What does it regard?

A Mainly admin and personnel issues. What CDC is saying lately, there's a new change, the isolation period, short-term, long-term, that kind of thing.

Q Before COVID what sort of matters would be discussed during the fleet-wide video conference meetings that you would have on the ship?

A Really only admin matters.

Q You mentioned there would also be personnel matters.

What would be discussed having to do with personnel?

MR. DRAHOS: Object to the form.

THE WITNESS: If they can't find someone to fill on the ship and that doctor or that ship command has written to Miami and complained about the fact that there isn't a replacement for the doctor or the nurse or the medical secretary.

BY MS. LOBEL:

Q Does the administrative matters that are

discussed ever have to do with shipboard medical procedures?

A I've already said if procedures change, then they will notify us sometimes during a meeting. Sometimes just in an e-mail.

Q Okay. I've been told that if a doctor can't participate in the meeting or in advance of a meeting there's an agenda that's sent around.

Do you recall receiving agendas having to do with these meetings?

MR. DRAHOS: Object to the form.

THE WITNESS: We get minutes usually of the meeting.

BY MS. LOBEL:

Q Okay. And do you receive -- well, let me ask you how do you receive the meeting minutes?

A E-mail.

Q Okay. Do you always receive meeting minutes after these meetings?

A Mostly.

Q Okay. Are there any other types of meetings you participate in other than the fleet doctors meeting?

A No.

Q Okay. Have you ever attended a meeting or any other gathering with any personnel from Royal Caribbean

having to do with medical evacuations or disembarkations?
A No.
Q Okay. At any point in time did you discuss the medical care and treatment that you provided to Mr. Burgess on the 18th with Dr. Pereira?
A No.
Q Would Dr. Pereira have had access to your medical notes that you inputted on the 18th as part of the medical history available to him?
A If he enters into the SeaCare program, he can see all notes of anybody that was seen on the ship.
Q Okay. Now, in a situation like this where there's a new doctor seeing a patient who's returning to the medical facility is there a procedure requiring the second doctor to speak with the first doctor to discuss the care and treatment of the patient?
A No procedure.
Q Okay. At any point in time did Dr. Pereira consult you with regard to the patient Richard Burgess while he was on the ship back in February of 2019?
A No.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q When did you first become aware that Richard Burgess returned to the medical center?

A I really can't answer because I don't know. I can't remember.
Q Okay. Do you know if you were still on contract when you first learned of Mr. Burgess' return to the medical center?
A Whether I was still on contract?
Q Yes.
A Yes, I was still on contract.
Q Okay. So at some point in time when you were still on contract you did become aware that Richard Burgess returned to the medical center?
A Sometime, yes.
Q Okay. Do you recall what -- I understand you don't recall the exact date, but do you recall what you learned when you first learned that Mr. Burgess returned to the medical center?
A Everything known to you.
Q Well, I don't know what you know that is known to me so if you could describe for me as best you could tell what you learned.
MR. DRAHOS: Doctor, in answering that question you're not to reveal anything you may have learned from discussions with me.
What she wants to know, and I want to make clear before you answer that question, she wants to know

did you learn anything about Richard Burgess from anyone else other than me upon his return to the medical center after your care.

Do you understand? So if in order to answer that question you have to reveal information you learned from me, then I'm going to instruct you not to answer, but if you learned information about Richard Burgess about what happened in the medical center after your care and treatment then you can answer the question.

THE WITNESS: All I can answer is that I really can't recollect exactly what was told to me about the case.

I might have been off the ship in the port in a restaurant or whatever, came back later before we sail out and it depends who I see first: Medical secretary, nurse, senior nurse, whoever, doctor himself. Oh, you know that patient that you did the stitching on? This happened this morning and we had to evacuate the patient.

That's the way it goes on the ship and that's all I can answer you.

BY MS. LOBEL:

Q Did anyone from Royal Caribbean, not the other medical personnel on the ship during your contract, ever

ask you about Richard Burgess?

And I'm not talking about your attorney. I'm talking about any other medical personnel, any administrative staff, anyone else employed by Royal Caribbean ask you about care and treatment provided to Richard Burgess?

MR. DRAHOS: Other than me.

THE WITNESS: Not to my recollection.

BY MS. LOBEL:

Q Was there ever a meeting or conversation after this incident between Royal Caribbean and the medical personnel who were on ship during this incident after the incident occurred?

A No, not to my recollection. If it was, I wasn't involved.

Q Okay. Based off of what you know regarding this incident would you have done anything differently?

A I can't comment on another doctor's action.

MR. DRAHOS: She asked about you.

THE WITNESS: Would I have done something differently? I don't think so. What I've seen and what I know of Dr. Pereira I'm not aware of anything that he has either did or did incorrectly.

BY MS. LOBEL:

Q Do you know anything that happened on that day?

A No. I wasn't there.
Q Okay. So --
A I might have been on the ship, but I wasn't there.
Q Okay. So you wouldn't be able to comment whether he did everything correctly or he didn't do everything correctly because you weren't there?
A No.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q Do you think it is an unreasonable delay to transport a patient who is docked at the port of San Juan from the ship to a hospital in four to five hours when the onset of stroke symptoms was an hour before, more or less, from the initial encounter of the doctor?
MR. DRAHOS: Object to the form.
THE WITNESS: In general, yes, but it depends what has happened.
BY MS. LOBEL:
Q Do you agree if a doctor is unsure if the patient is suffering from a stroke that the standard of care would be to assume the worst and to transport the patient to a medical facility capable of handling that condition as soon as possible?
MR. DRAHOS: Object to the form.

THE WITNESS: Could you rephrase that question because I've lost you?

BY MS. LOBEL:

Q Absolutely. It's not a problem.

My question to you is do you agree that if a doctor is unsure if a patient is suffering from a stroke but thinks they might be suffering from a stroke, would you agree that the medical standard of care is to assume the worst that the patient is suffering from a stroke and to do everything possible to get that patient to a facility capable of handling that condition as soon as possible?

MR. DRAHOS: Object to the form.

THE WITNESS: It sounds like you want to know from the doctors at shore whether they should have realized the urgency? Is that your question or whether we should have realized the urgency? Because it was --

BY MS. LOBEL:

Q I can break it down.

If the doctor suspects that a patient might be suffering from a medical emergency but can't definitively determine one way or the other, say for limitations based on what's available to them medically at the time, would you agree with me that the standard of care is to assume

the worst, pray for the best, but assume the worst and transport that patient as soon as possible to treat for the worst case scenario?

MR. DRAHOS: Object to the form. Improper hypothetical. Calls for speculation.

THE WITNESS: I think you've stated that already several times, so, yes.

BY MS. LOBEL:

Q Okay. Were you copied on any of the communications having to do with the handling of any care and treatment of Richard Burgess on February 21st of 2019?

A I can't remember anything. In general normally when we send out e-mails the whole medical team is copied so that everybody has knowledge.

Q Why is everyone copied, especially if, say, you're not on call at that point in time? Is there an expectation that you participate or do anything?

A No expectation of participating.

It's a matter of at a later stage in time they can be asked something, and if that person in the medical team didn't receive a copy, then they reply, well, we don't know of the situation, and it could have been of help for that person to say yes, I know and to expedite whatever issue may arise later on.

Q Okay. When there's a situation for a disembark

or evacuation of a shipboard patient is there an expectation from Royal Caribbean that the other doctors assist the doctor who's caring for the patient?

MR. DRAHOS: Object to the form.

THE WITNESS: Purely on circumstances.

BY MS. LOBEL:

Q Okay. Is the other doctor -- well, strike that.

Is the doctor who is in care of the patient who is suffering from an emergent condition supposed to seek assistance or consult the other doctors on the ship?

A Not necessarily.

MR. DRAHOS: Object to the form.

THE WITNESS: It depends on the circumstances.

BY MS. LOBEL:

Q Under what circumstances does Royal Caribbean expect the doctors to consult each other?

MR. DRAHOS: Object to the form.

THE WITNESS: There is no official viewpoint from Royal Caribbean. It's a general consensus of opinion in the medical world that if one doctor can't cope with the situation as one person and a second one is required and if a second doctor is available, they should be asked to assess.

It depends on what needs to be done. There are many critical situations where one doctor can deal

with it.

BY MS. LOBEL:

Q In this instance did Dr. Pereira ever reach out to you which indicated to you at any point in time that he couldn't cope with the situation?

A I don't know because I can't even remember whether I was on the ship or in town.

Q Okay. If a Royal Caribbean doctor feels he or she cannot cope with the situation, would you agree with me that they should be reaching out to the other doctors on the ship for assistance?

MR. DRAHOS: Object to the form.

THE WITNESS: I've already stated that is worldwide in the medical field.

BY MS. LOBEL:

Q Okay. And is it under the circumstances where if the initial doctor feels they can't cope, they consult with the other doctors on the ship, that if the group can't come to a consensus that's when they're supposed to call shoreside?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q Is that the procedure?

A The doctor dealing with the patient can -- there's no formal procedure. He can call Miami himself.

He doesn't need the consensus or agreement of the other doctors.
Q When are the shipboard doctors required to consult the Miami office related to the care and treatment of a patient?
A There's no requirement.
Q Okay. Would the no requirement to call Miami regarding care and treatment of a patient also include situations including a medical disembark or evacuation?
A Any situation.
Q Okay. Any situation.
Aside from completing medical records such as the case summary, which is an example of what I mean in this case, is there any other paperwork or documentation that Royal Caribbean doctors complete in the normal course of their job duties?
MR. DRAHOS: Object to the form.
THE WITNESS: Everything is done in the system.
BY MS. LOBEL:
Q What else is -- what other work is done within the computer system other than filling out case notes in SeaCare that I've learned them to be as case summaries?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't follow that question.
BY MS. LOBEL:

Q Not a problem. I'm trying to think of the best way to phrase it because my understanding is the name for the medical record for a patient when they come in for care and treatment is known as the case summary.

What I want to know is what other electronic paperwork do the doctors complete within the system other than these case summaries in the normal course of your job?

A Just that.

Q Okay.

A Everything is completed in there.

Q Is there -- strike that.

Is there anything that's written and documented by the doctors if there's a medical disembarkation or evacuation providing a summary of what happened that's filled out by the doctors?

A No.

Q Okay. Is there a log or a way that Royal Caribbean doctors track how many times or what circumstances patients have been disembarked or evacuated from ships?

A No.

Q Have you participated in any meetings or conversations with Royal Caribbean having to do with medical disembarkations or evacuations of patients or

crew?

A No.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q Okay. I'm sorry. I asked you some things out of order so I'm just checking my notes. Bear with me, doctor.

Doctor, the medical officer who you said that now does the -- well, strike that.

The medical officer who started doing performance evaluations and you said it started before the pandemic, is it one person who does it or is there a team from the Miami shoreside office that does that?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know.

BY MS. LOBEL:

Q Okay. Do you know who from the -- strike that.

Do you know which medical officer is the medical officer who has previously done your reviews or evaluations?

A No.

Q Okay. During your time working for Royal Caribbean have you ever had to do like mock-ups as to like acting out how to handle a medical evacuation or disembarkation of a patient, whether it be crew or

passenger?

MR. DRAHOS: Object to the form.

THE WITNESS: No, that's not part of our drills.

BY MS. LOBEL:

Q Not part of your, what? Sorry.

A We have certain drills on the ship. There is no such a drill.

Q Have you ever been reprimanded or put on probation or undergone any disciplinary action that you can recall while working for Royal Caribbean?

A No.

Q What about Norwegian?

MR. DRAHOS: Object to the form.

THE WITNESS: Also not.

BY MS. LOBEL:

Q Okay. What about Disney?

A Also not.

Q Okay. Have you ever been disciplined suspended or terminated from any of your positions when you worked in South Africa or any other country?

A No.

Q Have you ever worked as a physician in the United States?

A No. United States don't accept -- I'm only accepted only to work on ships.

Q Okay. So you haven't undergone any of the conversion testing to be qualified to practice medicine --

A No.

MR. DRAHOS: Let her finish the question.

BY MS. LOBEL:

Q Let me finish. I know you're anticipating and it's okay.

Have you undergone any of the conversion tests or training to become qualified to practice medicine in the United States?

A No, and I've never applied.

Q Okay. Have you practiced medicine in any other country other than South Africa?

A I've done work in Ireland.

Q How long did you work in Ireland?

A It was also in about a two-month period from about April 2002 to about July 2002.

Q Was this part of your training or was this after you'd already completed your training?

A Many years after my training.

Q Why did you decide to work in Ireland for that period of time?

A Income and experience.

Q Why did you leave?

A Didn't suit me anymore. I wanted to come back to

South Africa full-time.

Q What type of facility was it?

A It was in family practice, practices where I just covered when the doctor was on leave. It was from a week to one or two days or a weekend.

Q Okay. Where in Ireland was this?

A All over.

Q So if I'm understanding correctly, you were a coverage doctor in Ireland?

A That's right.

Q So you were kind of what we call in the United States doing locums?

A It's called locum work, yes, that's correct.

Q All right. In SeaCare is there a specific section within the system specifically dedicated to documenting medical disembarks or medical evacuations of patients?

A There's no specific area.

Q Okay. Has Royal Caribbean developed or generated any form or location that doctors are supposed to document medical disembarks or evacuations other than SeaCare?

MR. DRAHOS: Object to the form. Asked and answered.

THE WITNESS: No.

BY MS. LOBEL:

Q Okay. Do you know if the captain was made aware of this particular incident?
A I can't recall.
Q Should he have been?
MR. DRAHOS: Object to the form.
THE WITNESS: No. We were in port.
BY MS. LOBEL:
Q Is a doctor permitted to notify the captain if there's a medical emergency or emergent situation involving a patient when the ship is at port?
MR. DRAHOS: Object to the form.
THE WITNESS: The doctor is permitted to do so, but there's no reason to do so.
All we need to do is to inform the bridge that we have requested an ambulance.
BY MS. LOBEL:
Q Okay. How is the bridge supposed to be notified?
A Phone call.
Q When doctors work for Royal Caribbean are you provided with any materials by Royal Caribbean when you start a contract other than the actual physical contract?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MS. LOBEL:
Q Okay. When you first started working for Royal

Caribbean were you given any materials, procedures, books, pamphlets, anything of that nature when you first started working for Royal?

A No.

Q Okay. Is there a bonus system for doctors who work for Royal Caribbean?

MR. DRAHOS: Object to the form.

THE WITNESS: A what?

BY MS. LOBEL:

Q A bonus system.

A No.

Q Okay. Does salary go up or down depending on how well or not well a doctor is doing within the company?

MR. DRAHOS: Object to the form.

THE WITNESS: No.

MS. LOBEL: Doctor, I think that's all I have for you on direct examination. I truly appreciate it.

CROSS EXAMINATION

BY MR. DRAHOS:

Q Doctor, you were asked several questions here today here in your deposition concerning -- this is my opportunity to ask questions. She's finished.

THE REPORTER: Michael, can you speak up?

BY MR. DRAHOS:

Q Doctor, you were asked a lot of questions today

concerning general circumstances, none of which were specific to Richard Burgess.

My question for you is in your experience working as a cruise ship doctor is every single circumstance of every single patient you've seen the same?

MS. LOBEL: Form.

THE WITNESS: No.

BY MR. DRAHOS:

Q Does every single patient coming to this medical center get treated the same?

MS. LOBEL: Form.

THE WITNESS: Same principles. Everybody is equal in our eyes, but, no, you can't treat everybody if you're talking about the medical treatment.

BY MR. DRAHOS:

Q Is the practice of medicine going to be identical in every single patient that you see?

MS. LOBEL: Form.

THE WITNESS: No.

BY MR. DRAHOS:

Q Is the practice of medicine then variable from patient to patient?

MS. LOBEL: Form.

BY MR. DRAHOS:

Q In other words, one patient's response to

treatment could differ. You could give the same treatment to one patient and their response could differ with that same exact treatment to another patient. Agreed?

A Definitely.

Q Okay. So does that also relate to how evacuations are done on a cruise ship? Is every evacuation done the same?

MS. LOBEL: Form.

THE WITNESS: The same principles, but it's different every time.

BY MR. DRAHOS:

Q In other words, when you say the principles, what do you mean by that? The criteria?

MS. LOBEL: Form.

THE WITNESS: The criteria when we decide to evacuate and to have your practicals for each case what should be done, but for each case you will leave out a certain step because it's not required or you will be in another state if that particular question or circumstance is required, if that answers your question.

BY MR. DRAHOS:

Q In your experience serving as a cruise ship doctor for various cruise lines has the process always been that when effectuating a patient medical disembark in

a port of call that you are to call the port agent to facilitate that transfer?

MS. LOBEL: Form.

THE WITNESS: That's always through the port agent. I never had a different channel to do it.

BY MR. DRAHOS:

Q Why is it that that is the process in order to effectuate a medical disembark in a port of call?

MS. LOBEL: Form.

THE WITNESS: I don't know the answer. That is what they taught me when I got with the first company and first evacuation and next company was the same thing. We always went through the port agent.

BY MR. DRAHOS:

Q In your experience why is it -- strike that.

In your experience has that been a meritorious process to work through the port --

MS. LOBEL: Form.

BY MR. DRAHOS:

Q -- agent?

A In my opinion and experience that worked well.

Q Okay. Why is it that in every cruise line you've worked for, whether it's Disney, Norwegian or Royal Caribbean, it's worked well to work through a port agent when facilitating a medical disembark in a port of call?

MS. LOBEL: Form.

THE WITNESS: I can only speculate on the answer.

BY MR. DRAHOS:

Q Why based on your observation and experience has it been effective to use a port agent in a foreign port of call to facilitate a medical disembark?

MS. LOBEL: Form.

THE WITNESS: They have a huge knowledge base and resource base of that particular port and town, city.

BY MR. DRAHOS:

Q Okay. So, in other words, it's been your experience whether working for Disney, Norwegian or Royal Caribbean that the port agent is the most specialized, most experienced, most knowledgeable asset to facilitate a medical transfer in a foreign port of call?

MS. LOBEL: Form.

THE WITNESS: Definitely, in my opinion.

BY MR. DRAHOS:

Q And is that because it's the port agent whose knowledge you rely upon in order to determine what the appropriate facility would be to transfer a patient at a foreign port of call?

MS. LOBEL: Form.

THE WITNESS: Yes.

BY MR. DRAHOS:

Q In other words, based upon your years of experience with various cruise lines would it be more effective for you to research on the Internet what an appropriate hospital location would be in a foreign port of call for a patient you're treating or go to the highly trained, specialized and experienced port agent to make that decision for you?

MS. LOBEL: Form.

THE WITNESS: Definitely the port agent.

BY MR. DRAHOS:

Q And have you always in your years of experience when going to the port agent and requesting their assistance in facilitating a medical transfer have you always been able to get the answer from the port agent?

MS. LOBEL: Form.

THE WITNESS: Always.

BY MR. DRAHOS:

Q Do you know the port agent Continental Shipping?

A There's so many we deal with. No names.

Q Do you know the port agent by name who works for Continental Shipping in San Juan, Puerto Rico?

A Puerto Rico, no.

I have a database, keep it on my computer so I can look it up when I need it.

We're informed before we get to a port by the

case admin officer and he sends us the details for that particular visit.

Q Okay. So, in other words, before going to a port of call you know the port agent to reach in order to facilitate a medical transfer?

A Yes, always.

Q All right. So you were not involved in Mr. Burgess' transfer on February 21st of 2018. Correct?

A No.

Q You don't have any knowledge -- outside of what you may have spoken with me about confidentially you don't have any personal knowledge of what was going on that day?

A No.

Q And you haven't spoken to Dr. Pereira about the specifics of what went on?

A No.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q Did you speak to the port agent about what was going on?

A No.

Q Do you have any personal knowledge of what the available resources were in San Juan specifically as it relates to ambulances on February 21st of 2018?

MS. LOBEL: Form.

THE REPORTER: Is it 2018 or 2019?

MR. DRAHOS: 2019. Sorry. February 21st, 2019.

BY MR. DRAHOS:

Q Go ahead, doctor.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q Do you have personal knowledge as it relates to what resources were available, specifically ambulances, on February 21st of 2019 in San Juan, Puerto Rico?

A No.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q Do you have any personal knowledge as it relates to what efforts the port agent was making to facilitate a medical transfer for Richard Burgess on February 21st of 2019?

MS. LOBEL: Form.

THE WITNESS: No.

BY MR. DRAHOS:

Q So when you were asked the general question of how long it should take for a medical transfer and whether or not four and a half hours is reasonable, in this particular case do you have any opinions as it relates to the length of time it should have taken Richard Burgess to be transferred in San Juan, Puerto Rico on February 21st

of 2019?

MS. LOBEL: Form.

THE WITNESS: No opinion except that the port agents are really good that we deal with, and I'm pretty sure or my assumption is that they would have done the utmost to get the ambulance as soon as possible.

BY MR. DRAHOS:

Q Do you have any criticism of either Dr. Pereira, any member of the Royal Caribbean medical staff or any port agent working for Continental Shipping on February 21st, 2019 as it relates to how they treated Mr. Burgess' transfer?

MS. LOBEL: Form.

THE WITNESS: No.

BY MR. DRAHOS:

Q And so when you were asked a question about whether or not a four and a half hour delay in transfer is reasonable, you indicated it depends on what happens.

Do you know in this circumstance what happened on February 21st of 2019?

A Nothing in particular.

Q So if it's more than an hour to transfer Richard Burgess to a shoreside medical facility, you don't know in this circumstance whether or not that's reasonable or

unreasonable if you don't have enough information. Is that what you're telling me?

A Yes.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q And if it was ultimately the testimony of the port agent that Mr. Burgess' transfer was delayed due to limited resources in San Juan, Puerto Rico, do you have any different knowledge or information to rebut that individual's testimony?

MS. LOBEL: Form.

THE WITNESS: No. I would believe him from his previous work with us.

BY MR. DRAHOS:

Q Has it been your experience in dealing with Continental Shipping in Puerto Rico that they're a reliable port agency?

MS. LOBEL: Form.

THE WITNESS: I've already stated yes.

MR. DRAHOS: At this point I need to suspend my cross-examination until I have an opportunity to finish because I've got to run to the airport.

So for now I'm going to suspend Dr. Etsebeth's deposition and we'll reconvene so that I can finish my cross at a later date.

MS. LOBEL: I do not waive my right to examination.

MR. DRAHOS: Okay. Thank you. Madam Court Reporter, I'm going to request a copy of the transcript, please.

THE REPORTER: Are you ordering it, Sarah?

MS. LOBEL: Yes. I'll need one as well, Teri.

THE VIDEOGRAPHER: Video as well, counselor?

MS. LOBEL: No video at this point. Thank you, Carlos.

THE VIDEOGRAPHER: We're now going off the video record. The time is 1926 UTC, 2:26 p.m. EST.

(Thereupon, the deposition was adjourned at 2:26 p.m.)

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)
: SS
COUNTY OF DADE)

I, THERESA M. COHEN, a Florida Registered Reporter, certify that I was authorized to and did stenographically report the deposition of MICHIEL ETSEBETH, M.D.; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties', nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 7th day of January 2022.

Theresa M. Cohen
Registered Professional Reporter