EXHIBIT 5

europass Curriculum Vitae João Manuel Pombo Fidalgo Pereira

PERSONAL INFORMATION

# João Manuel Pombo Fidalgo Pereira

Largo Conde do Bonfim, nº3, R/C esquerdo, 1500-200 – Lisboa, Portugal

00351 966896366

jfidalgo7@hotmail.com

Sex Male | Date of birth 20/12/1980 | Nationality Portuguese

## WORK EXPERIENCE

04/2014 – 2/2020

### Senior Doctor, Royal Caribbean Cruise Lines

As a ship doctor he practiced general, emergency and remote site medicine, being responsible for treating a wide range of pathologies. He currently holds BLS, ACLS, PALS and ITLS certification.

08/2013 – 4/2014

### Medical doctor, Emergency Department

General Emergency Department, Hospital de Cascais, Cascais, Lisboa

- In order to accumulate experience and to keep himself updated, he worked weekly in the General Emergency Department at the Hospital de Cascais, where he observed and treated the wide range of Internal Medicine pathologies plus minor ear, eye and orthopaedic conditions.

04/2010 – 07/2013

### Medical doctor, resident in Vascular Surgery

Department of Angiology and Vascular Surgery, Hospital de Santa Marta, Lisbon (main department in the country)

- Until July 2013 he was in the residency in Vascular Surgery. During this time he worked weekly, 24 hour periods, in the emergency department of Vascular Surgery, responsible for both inpatient and outpatient emergencies. In inpatients, these emergencies went from coronary syndromes, strokes, pulmonary embolisms, acute heart failure, lung oedema, cardiac arrest, acute limb ischemia or acute renal failure to common urinary, gastrointestinal or respiratory tract infections or pain control. The outpatient emergencies ranged from limb ischemia, venous thrombosis with pulmonary embolism, major or minor vascular trauma, to small haemorrhages caused by varicose veins. On average he treated about 180 outpatients per year and was co-responsible for about 40 inpatients during each weekly 24 hour period (including a 4 bed intermediate care unit).
- Besides emergency department work he also performed 312 major surgeries and participated in another 193 as helping surgeon.
- As part of the training he performed about 200 vascular ultrasound exams per year.

04/2009 – 04/2010

### Medical doctor, resident in Vascular Surgery

Department of General Surgery, Hospital de São José, Lisbon (3rd largest hospital in the country, reference trauma centre for the area south of Lisbon)

- The first year in the Vascular Surgery residency program is in General Surgery. He worked weekly 24 hour periods in the General Surgery Emergency Department where he treated over 250 patients, from trauma to urgent gastrointestinal pathology or smaller injuries like skin wounds and burns.
- In addition, he also operated on 73 patients as primary surgeon and helped in another 183 procedures.

08/2008 – 04/2009

## Medical doctor, Internal Medicine

Hospital de Santarém, Santarém, Portugal

- During this 8 month transition period, between the previous and latter residency programs, he worked unregularly in the Internal Medicine Emergency Department at the Hospital de Santarém. The nature of the work done here was essentially the same as described next, in the Internal Medicine residency.

01/2007 – 08/2008

## Medical doctor, resident in Internal Medicine

Department of Internal Medicine, Hospital de São José, Lisbon (3rd largest hospital in the country)

- He did one year and 8 months of residency in Internal Medicine. During this time, he worked weekly 24 hour periods in the Internal Medicine Emergency Department were he treated, on average, about 15 to 20 patients during each period. The range of pathology was wide, varying from common infectious conditions (skin, soft tissues, respiratory, urinary and gastrointestinal tracts), to stroke and other neurologic conditions, organ failure such as renal or cardiac, coronary syndromes, and other cardiologic conditions such as arrhythmias or cardiopulmonary arrest, also cardiogenic, septic or anaphylactic shocks. Uncomplicated ear and eye problems were also common.
- Besides emergency department work he also treated inpatients during the remainder of the working week.

01/2006 – 01/2007

## Medical doctor, General Internship

Hospital de Santarém, Santarém, Portugal

- This year is mandatory before the beginning of any residency program. During this time he gained crucial experience during his rotations through the following departments: Internal Medicine (4 months), Paediatrics (2 months), General Surgery (2 months), Family Medicine (2 months) and Public Health (2 months). In every one of these (excluding public health) he did supervised emergency department work.

# EDUCATION AND TRAINING

2018 **Paediatric Advanced Life Support**
American Heart Association certificated paediatric advanced life support course

2018 **Basic Life Support**
American Heart Association certificated life support course

2018 **Advanced Cardiac Life Support**
American Heart Association certificated advanced cardiac life support course

2007 **Fundamental Critical Care Support**
Certificated by the American Society of Critical Care Medicine

10/1999 – 10/2005

## Medical Degree

Medical Degree by the University of Coimbra, Portugal. The 4th year (10/2002 – 10/2003) was done in the University of Cologne, Germany, part of the Socrates-Erasmus student exchange program.

# PERSONAL SKILLS

Mother tongue: Portuguese

Other languages

| | UNDERSTANDING | | SPEAKING | | WRITING |
|---|---|---|---|---|---|
| | Listening | Reading | Spoken interaction | Spoken production | |
| English | Very good | Very good | Very good | Very good | Good |
| French | Moderate | Moderate | Scarce | Scarce | Scarce |
| Spanish | Good | Good | Good | Good | Moderate |
| German[1] | Good | Good | Good | Good | Good |

[1] – B1 Level German Language course at Goethe Institute Lisbon in July 2013

Computer skills
- Good command of Microsoft Office™ tools
- Good general computer use

Driving licence
Driving licence category:
- B

**ORDEM DOS MÉDICOS**
**Portuguese Medical Association**



GR000232

CÉDULA PROFISSIONAL Nº 45538

**0018 0501 0047 5396**

VÁLIDO ATÉ
GOOD THRU 01/21

**JOÃO FIDALGO**

JOÃO MANUEL POMBO FIDALGO PEREIRA

This card is issued by Banco Santander Totta, S.A., pursuant to license by MasterCard International or its Affiliates.

Este cartão é propriedade do Banco Santander Totta, S.A.
A sua utilização é pessoal e intransmissível e pressupõe o conhecimento e aceitação das Condições de Utilização.

SUPERLINHA
707 21 24 24
www.santandertotta.pt

ASSINATURA CLÍNICA AUTORIZADA / AUTHORIZED CLINICAL SIGNATURE

"A SAÚDE DO MEU DOENTE SERÁ A MINHA PRIMEIRA PREOCUPAÇÃO" HIPÓCRATES

DATA DE INSCRIÇÃO
REGISTRATION DATE 23-11-2005

ESPECIALIDADES
SPECIALTIES

PRESIDENTE DA SECÇÃO REGIONAL CENTRO
CENTRE REGIONAL SECTION PRESIDENT

Santander Totta

MB

paypass

Maestro

OBERTHUR C.S. 03 1183113B10/13 - S.I.B.S.

GR000233

# DIPLOMA

Sílvia de Fátima Sousa Soares Figueiredo, Diretora do Serviço de Gestão Académica da Universidade de Coimbra:

Certifico, face ao arquivo respetivo, que João Manuel Pombo Fidalgo Pereira, portador de Cartão de Cidadão Português com o número 11629261, filho de Manuel Fidalgo Pereira e de Arminda Maria Pombo Teixeira Fidalgo Pereira, natural da freguesia de São Sebastião da Pedreira, concelho e distrito de Lisboa, concluiu no dia 21 de setembro de 2005 a Licenciatura em Medicina da Faculdade de Medicina da Universidade de Coimbra.- -

O presente diploma vai autenticado com o selo branco desta Universidade.

Universidade de Coimbra, 5 de agosto de 2013.

A Diretora

Emol. 20.00€
Conf.

Im_0866_03
Página 1 de 1

89

ROYAL CARIBBEAN CRUISES LTD.
1050 CARIBBEAN WAY
MIAMI FL 33132
US (305) 539-6000

Sign On Employment Agreement * RC *

Page 1 of 4

Ship : HARMONY OF THE SEAS Voyage # : 34158

IMO#: 9682875 Flag State Official # : Gross Tonnage : 227,700

| | |
|---|---|
| Crew ID : | 886253 |
| Name | POMBO FIDALGO PEREIRA, JOAO MANUEL |
| Marital Status : | S |
| Sex : | M |
| Birthdate : | 12/20/1980 |
| Place of Birth : | LISBON |
| Nationality : | PRT Portugal |
| Address (home) ...... | RUA ADRIANO CORREIA OILVEIRA L |
| ...... | |
| ...... | |
| City, State, Zip .... | BARREIRO 2830232 |
| Nation .......... | PT Portugal |
| Telephone (home) ... | |
| Airport of Origin : | LISBON, PORTUGAL |

| | |
|---|---|
| Position: | RDCS SR. DOCTOR |
| First Date of Hire : | 4/23/2014 |
| Sign-On Date : | 2/3/2019 |
| Projected Sign-Off Date : | 5/9/2019 |
| Effective Payroll Date : | 2/3/2019 |

Guaranteed Monthly basic pay:

Pay for initial overtime hours:

Pay for supplemental overtime hours including Public Holidays:

Pay for accrued vacation / leave:

Pay for travel wages:

Monthly Minimum Guaranteed Pay:

**Total Monthly Guaranteed Pay :**

Additional Pay:

Social Program Compensation:

**Total Monthly Pay:**

Extra Overtime Threshold (hours) :

Extra Hourly Overtime Rate :

Government Allotment:

Daily Sick Wage Rate:

*Contract Printed On: 1/28/2019 19:31:31*

Name : POMBO FIDALGO PEREIRA, JOAO MA

Empl ID : 886253

In recognition that other employees often assist in the performance of services, any gratuities/service fees paid to the employee by passengers, or collected by the company from the passengers, shall be shared with such other employees who assist with the service. The company shall determine the gratuity sharing guidelines at its sole discretion. Gratuity/service fee sharing guidelines will be published and available to the employees in the HR Center. The company shall also set guidelines for the timing of gratuity/service fee payments to employees at its sole discretion. These guidelines will also be available for review upon request in the HR Center. For CAT C positions, the Monthly Total Guaranteed Pay including Guaranteed Overtime and Vacation Pay is made up of gratuities and service fees provided by passengers. The Company will recommend that passengers pay gratuities or will assess a service fee upon passengers. If the hourly overtime rate has a value of 0.00 the position is not eligible for extra overtime pay.

I understand and accept that the employer may terminate this agreement without cause provided 30 days notice is given or monthly total guarantee pay through the end of the employment contract period up to a maximum of 30 days is paid in lieu of notice. The employer may terminate this agreement with cause immediately without notice and in this case no compensation shall be due. I further understand and agree that the Collective Bargaining Agreement between the Company and the Union is incorporated into and made part of this Employment Agreement and that I and the Company are bound by its terms and conditions.
I accept the position on the ship indicated above for the date shown. I understand that if I fail to show up to join the ship on the date shown above that I waive the right to work for the Company and any of its subsidiaries at any time in the future.
Leave (Vacation) Pay may be included in the Total Monthly Guaranteed Pay. The receipt of such Pay does not indicate permanent or continuous employment, nor does it constitute an indication that the Company will provide a future offer of employment.

It is agreed and understood that the Seafarer's Monthly Pay shall include a payment which is allocated as Social Program Compensation. The value of this payment will be itemized in this Employment Agreement, and although the payment may be included in the Monthly Total Guaranteed Pay or itemized separately it is understood and agreed that this payment is not part of the Seafarer's wages and represents an additional payment from the Company for Social Programs. The Social Program Compensation shall be paid directly to the Seafarer, unless a government program makes it mandatory for the Company to pay social compensation to the government on behalf of the Seafarer, in which case the payment shall go directly to the government agency requiring the payment as the Company's contribution. It is understood that where the Social Program Compensation is paid directly to the Seafarer, it is meant to be used by the Seafarer to purchase medical insurance covering the Seafarer when on vacation, medical insurance for the Seafarer's family and to enable the Seafarer to participate in a pension fund scheme in the Seafarer's country of residence. I acknowledge having received a copy of the Collective Bargaining Agreement referred to above effective on the date of this Employment Agreement.

ADDITIONAL TERMS AND CONDITIONS OF EMPLOYMENT:
By signing this Employment Agreement, the Seafarer grants the perpetual, worldwide and assignable right to Employer/Cruise Line to use his/her name, image, likeness, voice, or any or all of them in any type of media format now known or unknown for any purpose. Seafarer acknowledges that he/she will not receive any compensation for any of the above. If on any occasion Seafarer does not wish to grant the above rights, the Seafarer must inform his/her Department Head or HR Manager in writing and use reasonable efforts to avoid being recorded.
ARTICLES OF AGREEMENT:
Employee understands that the Articles of Agreement, including conduct policies, drug and alcohol policies, the name of the ship, IMO no., Flag State Official no., gross tonnage, propulsion power of the ship and a description of itineraries and schedules may be accessed electronically as part of the Company' s SQM policies.
NOTICE: If the Employee signing this Agreement is employed in the position of Ship Doctor/Physician, it is understood and agreed that any medical records generated in the course of employment by the doctor/physician shall be owned by the Employer/Cruise Line.
IMPORTANT WARNING:
The Company's rules and regulations concerning crew conduct are maintained in the Crew Conduct Policy and in other shipboard rules and regulations. Seafarers must comply with all ship rules and regulations, whether verbal or written, at all times. While all Company rules and regulations are important and must be followed, the Company is providing an excerpt of the Crew Conduct Policy concerning sexual misconduct in this agreement.
Criminal penalties for alleged sexual misconduct can lead to many years in prison. All crew members must understand that the company has a zero tolerance to any form of sexual contact between crew members and guests, on or off the ship, at anytime during the guest's cruise vacation. Any such sexual contact will subject the crew member to immediate termination without warning.

Name : POMBO FIDALGO PEREIRA, JOAO MA

Empl ID : 886253

As part of this policy the Company shall also:

1. Report all alleged sexual assaults to law enforcement for investigation and prosecution, including those allegations where a victim consented to the sexual encounter, but later claimed the activity was not consensual.

2. Cooperate fully with law enforcement or other government officials in the criminal investigation and prosecution of all such incidents to the fullest extent of the law regardless of where in the world the ship is located.

3. Respond to inquiries from any future prospective employer that any crew member terminated for violating this policy, even without criminal charges, is not eligible for rehire. Crew members therefore must understand that, because job opportunities in the cruise industry are limited, sexual contact with any guest in violation of company policy will have the likely practical effect of making the crew member ineligible to work for other cruise line employers.

Every crew member to whom this policy applies consents to and hereby agrees to be fully bound by these provisions.

CONCILIATION CONFERENCE:

Prior to the initiation of any arbitration procedure outlined in the next section, the Union, the Seafarer and the Owners/Company shall confer to resolve any disputes. If the Seafarer appoints his/her own representative, then that representative will attend the conference with the Owners/Company. The conference may be held in person or via Skype/internet, video or telephone conference, and the Seafarer must be available to listen to and participate in the entire conciliation conference. In the event of medical incapacity or geographical limitations make it impossible for phone or internet connection, the Seafarer may be excused from fully participating in the mediation. If either party prefers to have a neutral mediator attend the conference to assist in facilitating a settlement/agreement, then the other party must agree to allow the mediator to attend and the requesting party shall pay the costs of the mediator. The parties must agree to the identity of the mediator, and if the parties cannot agree, then each party shall write the names of three proposed mediators and all the proposed names will be placed in a hat or bowl, and in the presence of all parties or their representatives, one name will be randomly selected from the submitted names. For the avoidance of doubt, the outcome of the Conciliation Conference is not determinative of the grievance or dispute unless the parties and the Seafarer so agree. However, it is understood that the Conciliation Conference is a mandatory step before any party can initiate an arbitration and either party may refuse to arbitrate until the mandatory conciliation process is completed.

ARBITRATION:

1. All grievances and any other dispute whatsoever, whether in contract, regulatory, statutory, common law, tort or otherwise relating to or in any way connected with the Seafarer's service for the Owners/Company under the present Agreement, including but not limited to claims for personal injury/disability or death, no matter how described, pleaded or styled, and whether asserted against the Owners/Company, Master, Employer, Ship Owner, vessel or vessel operator shall be referred to and resolved exclusively by mandatory binding arbitration pursuant to the United Nations Conventions on the Recognition and Enforcement of Foreign Arbitral Awards (New York 1958), 21 U.S.T. 2517, 330 U.N.T.S, (" The Convention" ), except as provided by any government mandated contract.

2. All arbitrations must be commenced within two (2) years from the date of the occurrence giving rise to the grievance or dispute, or the date the Seafarer knew or should have known of the occurrence giving rise to the grievance or dispute, except for claims for personal injury or death, which must be commenced within three (3) years from the date of the occurrence giving rise to the injury or death or the date the Seafarer knew of should have known of the occurrence giving rise to the grievance or dispute. Claims brought forth thereafter will not be recognized and will be time-barred.

3. Subject to the exception noted in Section 4, the seat of any arbitration and the venue for the final hearing of any arbitration shall take place in the Flag State of the vessel. or in any location agreed by the Owners/Company and the Union or the representative of the Seafarer. The laws of the Flag State shall govern over any dispute in arbitration without regard to any Flag State conflict of law principles and the parties to this Agreement recognize that Flag State law will apply to all disputes, notwithstanding and without regard to any provision of Flag State law that may be construed to preclude the application of Flag State law to non-resident Seafarers.

4. Jurisdiction and venue over disputes between Filipino Seafarers and the Owners/Company shall be governed by the terms of the Standard Philippines Overseas Employment Administration Contract of Employment ("POEA Contract") and the POEA Contract jurisdictional and venue terms shall supersede and take precedence over any conflicting terms set forth in this Agreement.

5. The language of any arbitral proceedings shall be English.

6. Subject to the exception noted in Section 4, any arbitration shall be administrated by the American Arbitration Association (" AAA" ) - International Dispute Resolution (" ICDR" ) in accordance with its Employment Rules, as amended with agreement of the parties, with the ICDR as the appointing authority. The initiating party shall file a written notice of its intention to arbitrate by forwarding a demand to arbitrate to the ICDR with a copy to the other party identifying each party to the dispute, the initiating party' s representative, if any, and shall include a detailed description of the nature of the claim, the estimated amount in controversy and the relief and/or damages sought. The Owners/Company shall have the right to authorize an additional or alternate administrator as long as the new administrator

follows the AAA - IDCR employment rules noted above and the rules in this agreement.

7. All arbitrations must be brought by or on behalf of Seafarers in their own names, and not on behalf of others on an unnamed basis, but similar claims asserted on behalf of individual Seafarers may be grouped in one arbitration proceeding.

8. The Owners/Company and the Union shall jointly appoint one arbitrator unless the Seafarer has his or her own representative then the Owners/Company and Seafarer shall appoint the arbitrator, or if there is no agreement, the arbitrator shall be appointed from the pre-approved panel of arbitrators selected by the ICDR. In any case, an arbitrator shall be appointed with ninety (90) days of the dispute being presented for arbitration.

9. Subject to the exception noted in Section 4, the ICDR Employment Rules of the American Arbitration Association shall govern matters of discovery and procedure not specifically addressed in this Agreement. The parties shall have the right in arbitration to conduct depositions under oath of parties and witnesses, however depositions shall be limited to a maximum of three (3) per party and to a maximum of seven (7) hours in duration each. Additional depositions may be scheduled only with good cause shown and require a written order from the arbitrator. The parties are entitled to medical examinations to verify any injuries or damages claimed, or to rebut any defenses. Such medical examinations shall occur in the venue of the final arbitration hearing. To maintain the impartiality of the examination, neither party' s attorney, agent, nor representative shall be present during the Owner's/Company's examination. The parties will exchange documentation to be relied upon at the final arbitration hearing in accordance with the ICDR procedures.

10. Each party shall bear its own attorney's fees and costs incurred in connection with the arbitration, but the Owners/Company shall pay for the costs of the arbitration itself, including charges by the arbitrator.

11. The Union may, at its sole discretion, decline a Seafarer's request for representation at any stage of the Grievance Procedure including arbitration. The Seafarer is likewise free to reject Union representation at any stage. If the Seafarer does not solicit Union representation or rejects the representation appointed by the Union at any stage of the process, then the Seafarer will be responsible for the cost of his or her legal representation, if any. The Union shall have the right of observer status to the ICDR docket when the Seafarer is independently represented.

12. If the Seafarer is not represented by the Union, then the Seafarer's representative shall take the place of the Union in the arbitration process save that before making a decision, the arbitrator shall seek the Union's opinion on any issue concerning the interpretation of this Agreement. If the Arbitrator requests guidance from Union, the Union will be included onwards as an interested party to be notified of all further incidents in the case.

13. In any arbitration in which the Seafarer is represented by his/her own counsel, the Owners/Company agree that they will keep the Union informed about the grievance or dispute and its outcome, if the Union was involved during the grievance process or the arbitration involves a core principle of the Agreement.

14. The arbitrator, and not any federal, state or local court or agency shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable and as to choice of law. The arbitrator shall also have the power to provide any remedies necessary to address the dispute such as, but not limited to, damages, specific performance, and injunctive relief.

By signing this Agreement, Employee expressly consents to and authorizes the Company to pay wages into an account to secure a payroll, debit or stored value card as may be arranged by the company from time to time. Any Employee electing not to participate in the payroll, debit or stored value card program must provide a written request to the Payroll Office prior to the first payroll closing date after joining or the Employee will automatically be enrolled in the program for the duration of the Agreement.

Employee Signature [signature] Date 02/03/2019

Location / port where agreement is signed Fort Lauderdale

Employee's signature certifies that the employee has read, understood, and agreed to the terms of this agreement. Employee also acknowledges that he/she has been provided with a copy of this agreement.

Employer representative Signature [signature] Date 29 JAN 2019

Employer representative - Printed Name [stamp: Royal Caribbean International — Gary Aitken ID# 825639 — Human Resources Manager] JDE ID# ____________