EXHIBIT 6



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-CV-20687-AOR

RICHARD BURGESS individually and
By and through DARREN HENZE
As Guardian of the Person and Estate
Of Richard Burgess, incapacitated and
As agent under that certain durable power
Of attorney dated November 20, 2006,

Plaintiffs,

V.

ROYAL CARIBBEAN CRUISES LTD.,
A Liberian Corporation, d/b/a
ROYAL CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL,

Defendant.
______________________________________________/

| | |
|---|---|
| VIDEOCONFERENCE DEPOSITION OF: | DR. JOAO PEREIRA |
| DATE TAKEN: | NOVEMBER 14, 2021 |
| TIME: | 10:00 A.M. - 4:00 P.M. |
| PLACE: | VIA VIDEOCONFERENCE AT MIAMI-DADE COUNTY, FLORIDA |
| TAKEN BEFORE: | WENDOLYN ISON, COURT REPORTER and NOTARY PUBLIC |

REMOTE APPEARANCES:

APPEARING ON BEHALF OF THE PLAINTIFF:

SARAH LOBEL, ESQUIRE
HICKEY LAW FIRM, P.A.
1401 BRICKELL AVENUE
SUITE 510
MIAMI, FLORIDA 33131

APPEARING ON BEHALF OF THE DEFENDANT:

MICHAEL DRAHOS, ESQUIRE
GRAY ROBINSON, P.A.
515 NORTH FLAGLER DRIVE
SUITE 650
MIAMI, FLORIDA 33401

ALSO PRESENT: JOHN SCHMITZER, VIDEOGRAPHER

C O N T E N T S

EXAMINATION OF DR. JOAO PEREIRA
Direct Examination By Ms. Lobel............. 6
Cross-Examination By Mr. Drahos:............ 229
Re-Direct Examination By Mr. Lobel:......... 236
Certificate of Oath......................... 249
Certificate of Reporter..................... 250
Witness Notification Letter................. 251
Errata Sheet............................... 252

E X H I B I T S

(RETAINED BY COUNSEL)

| Exhibit No./Ltr. | Description | Page |
|---|---|---|
| Plaintiff's Exhibit No. 1 | Timeline | 8 |

REPORTED REMOTELY AT MIAMI-DADE COUNTY, FLORIDA
NOVEMBER 14, 2021, 10:00 A.M.

THE VIDEOGRAPHER: We're on the record at 15:02 UTC on November 14, 2021. Audio and video recording will continue to the take place until all parties agree to go off the record. Please note that the microphones are sensitive and may pick up whispering and private conversations. Private conversations and/or attorney/client interactions should be held outside of the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who does not want the witnesses video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the remote interface.

This is the remote video recorded deposition

of Dr. Pereira being taken by counsel for the plaintiff. My name is John Schmitzer. I'm the videographer on behalf of U.S. Legal Support. I'm not related to any party in this action nor am I financially interested in the outcome. At this time the court reporter will enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness who will verbally declare her testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MS. LOBEL: Sarah Lobel on behalf of the plaintiff. I stipulate.

MR. DRAHOS: Michael Drahos on behalf of the defendant. I stipulate.

Thereupon,

DR. JOAO PEREIRA,

was called as a witness and, having been duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MS. LOBEL:

Q. Would you please state your full name for the record?

A. Joao Manuel (inaudible) Pereira.

Q. Good morning, Doctor. Where are you right now?

A. I'm in Lisbon, Portugal.

Q. Okay. Where within Lisbon are you as you sit in front of me right now?

A. Where within Lisbon. We're in a hotel.

Q. Which hotel are you at?

A. The Palace Hotel.

Q. Okay. Are you in a conference room?

A. Yes.

Q. Okay. Who else is in the conference room with you?

A. Michael Drahos.

Q. Anyone else with you?

A. No.

THE COURT REPORTER: I'm having a hard time

hearing him.
THE VIDEOGRAPHER: Can we go off the record quickly to fix the audio issue.
MS. LOBEL: That's fine with me. Doctor, you're very hard to hear.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Counsel, no objection?
MR. DRAHOS: No. Go ahead.
THE VIDEOGRAPHER: We're going off the record. The time is 15:05 UTC.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 15:10 UTC. Please proceed.
BY MS. LOBEL:
Q. Okay. So Doctor, I apologize. I think the last thing I asked you is who is present in the room with you and I believe I couldn't fully hear you. Is it just you and Mr. Drahos who are in the conference room with you?
A. Yes. Just me and Mr. Drahos.
Q. You're too quiet.
A. Just me and Mr. Drahos.
Q. Thank you. That's much better. Okay. Do you have any notes or materials in front of you?
A. Yes.
Q. What notes and materials do you have in front of

you?
A. I have just the timeline, written timeline.
Q. Okay. Anything else?
A. No.
(Plaintiff's Exhibit No. 1, Timeline, was marked for identification.)
BY MS. LOBEL:
Q. Okay. I'm going to move to attach that timeline as Plaintiff's Exhibit 1. How many pages is that timeline?
A. It's one page.
Q. Okay. Do you have it with you in digital format or in a hard copy?
A. In a hard copy.
Q. Okay. So I'm going to ask since we're not together, because normally when we're together, we would like make a photocopy or the court reporter would take it and then photocopy it and then attach it to the record. So I'm going to ask that either you or Mr. Drahos take a photograph of it and then we'll e-mail it or text it to the court reporter when we're done. Okay. Is that fair?
A. Yes.
Q. Lovely. Okay. Do you have any other materials that are in front of you or that could be available to you for purposes of today's deposition other than that

timeline?
A. Yes.
Q. What else do you have?
A. Well, not -- there is some things here, but I don't know exactly what specifically -- what they are.
Q. Have you reviewed them?
A. I have reviewed some documents that are within the folders, yes.
Q. Okay. How many folders are there in front of you or next to you?
MR. DRAHOS: Hold on. They are my folders. So I brought -- I brought documents with me. He can tell you what he has looked at if he can recall what I showed him, but I do have documents here in case you were asking him about stuff.
MS. LOBEL: Well, I just want to know if there is anything that he is relying on that he's going to be testifying from, because then I'm going to attach it to the transcript, because otherwise I can't see what he is looking at, because I'm not there.
BY MS. LOBEL:
Q. So, Doctor, every time you look at something or refer to something and I don't have it up on the screen I'm going to ask that you tell me so I know what you're

referring to. I may already have copies of those documents, but I'm just going to go through it and you will tell me what it is and we'll go through it step by step. Is that fair?

A. Yes. That's fine.

Q. All right. So if you could tell me everything that you did to prepare for today's deposition.

A. Well we -- I spoke with Mr. Drahos.

Q. Okay.

A. Yesterday. And then I reviewed some documents, you know, that were -- that concerned this case.

Q. Okay. Can you tell me all of the documents you recall reviewing concerning this case?

A. So we reviewed some medical charts and one more and two e-mails and one ambulance, you know, document, one ambulance document, I would call it.

Q. Okay. You mentioned that you reviewed some medical charts. What medical charts do you recall reviewing?

A. My medical chart.

Q. Understood. Medical charts from Royal Caribbean or something --

A. Royal Caribbean, yes.

Q. Okay. And I assume and correct me if I'm wrong,

the medical chart that you're looking at or have looked at is the one pertaining to somebody named Richard Burgess?
A. Yes.
Q. Did you look at any other medical charts other than those pertaining to Richard Burgess from I believe February 18, 2019 and February 21st of 2019?
A. I reviewed the chart, but they need to -- with Mr. Burgess from February 21st.
Q. Okay. Did you review any other medical charts in anticipation for today?
A. No. Just the one from February 21st, which is mine.
Q. Okay. And then you stated you reviewed two e-mails. What e-mails are you referring to?
A. That would be one e-mail that was sent to the port agent by the medical secretary and then one e-mail that has the reply.
Q. Okay. So if I'm understanding you correctly there is an e-mail that you reviewed that the medical secretary sent to the port agent and then there's a reply from the port agent?
A. I'm sorry. Was the one that we sent to the port agent and then the other one is sorry, it's actually still the same e-mail. It's still the same e-mail.

Q. Okay.
MR. DRAHOS: Sarah, I will not do this often, but I think it will make it easier. He's going to review the Bates numbers for you.
MS. LOBEL: Yes. Yes.
THE WITNESS: So it's GR000097 and GR00088.
BY MS. LOBEL:
Q. Okay. Did you review any other copies of those e-mails with different Bates stamp numbers if you know?
A. No. Just a few pages.
Q. All right. And then you stated you reviewed ambulance documents. I think I know what you're referring to, but I just want to make sure since we are not sitting together. Which ambulance documents did you review?
A. So it's the ambulance report. I don't know exactly how you call it. It's the ambulance register when they came to the ship and picked up the patient for transportation. The transportation records for the ambulance for Mr. Burgess.
Q. How many pages is that for your copy, two pages?
A. Two pages, yes.
Q. Which ambulance company?
A. I didn't -- I'd have to go back to the document.
Q. I assume Mr. Drahos is talking to you. No

problem.
MR. DRAHOS: This is why I brought folders.
THE WITNESS: So it's Sunny Ambulance.
S-u-n-n-y. Sunny Ambulance, Inc.
BY MS. LOBEL:
Q. Okay. When was the very first time that you've seen the report from Sunny Ambulance, Inc.?
A. It was yesterday.
Q. Okay. You hadn't seen it back in 2019 when this all happened?
A. Well, I the only thing I saw was one page that I had signed to release the patient to the ambulance staff to the care of the ambulance staff.
Q. Is that part of -- sorry, go ahead.
A. It's one of the pages of the document and it says certification of medical needs and so I had to sign that page as a way to you know transfer the patient to the ambulance staff.
Q. Since you have that in front of you, can you show me on the -- if you mind, since we are not together, show me where your signature is on the page. And you can just hold it up to the screen, so I know where you're referring to on the document where you signed. Okay. Okay.
A. Is that okay?

Q. Yes. And is that the second page of the two pages that you have?
A. Yes. I mean, I'm not sure if it's the second or the first page are not numbered, so there are two pages they are not numbered. So this is --
Q. Okay. You're going too fast.
A. So this would be one page.
Q. Okay. Okay.
A. And this would be the page that's signed.
Q. Okay. All right. You mentioned that you spoke with your lawyer. I don't want to know what you discussed, because that's privileged, but I just want to know the first time that you spoke with Mr. Drahos regarding this indication without telling me what was said?
A. The very first time?
Q. Yes, sir.
A. That would be -- that was a long time ago. That was probably maybe two years ago, I would say.
Q. Do you know approximately how long after February 21, 2019, the first time that you spoke with Mr. Drahos, more or less?
MR. DRAHOS: Object to form.
BY MS. LOBEL:
Q. You can answer.

A. I would say probably later that year, I would say.
Q. Okay.
A. Perhaps more or less around this time of the year.
Q. Okay. Do you recall how many times after that first communication with Mr. Drahos you then next spoke with Mr. Drahos about this case?
A. I can't recall the exact number but I would say maybe seven, eight times.
Q. Approximately how long were your conversations those seven to eight times?
A. They were probably all of them probably around maybe I'd say an hour or so.
Q. Okay.
A. 45 minutes. I'm sure maybe --
Q. I didn't catch the end of that. I heard 45 minutes to an hour and then I didn't catch what you said. Sorry.
A. That's what I'm saying, some probably shorter, some a little bit longer, but within more or less half an hour or 45 minutes and a hour.
Q. Okay. And then how much time did you spend with Mr. Drahos specifically preparing for today's deposition?
A. I met with Mr. Drahos yesterday. We spent

about maybe I would say three or four hours.
Q. Okay.
A. Maybe reviewing the case.
Q. Okay. Were there any other times other than yesterday, the three to four hours that you spent with Mr. Drahos or any other lawyer to prepare for today's deposition?
A. No.
Q. Did you take time by yourself to prepare for today's deposition?
A. What do you mean exactly?
Q. The time that you personally were trying to prepare for today without Mr. Drahos?
A. No.
Q. Okay. Did you speak with anyone other than Mr. Drahos in your preparation for today?
A. No.
Q. Have you since February 21, 2019 spoken to anyone other than Mr. Drahos about this incident?
A. No.
Q. All right. I just want to get some background information from you. My understanding is that you used to be an RCCL employee as a doctor; is that correct?
A. Yes. That is correct. I am an RCCL employee.
Q. Are you currently an RCCL employee?

A. Yes.
Q. Okay. And you are employed by RCCL as you sit here today in what capacity?
A. A medical doctor.
Q. Okay. Do you have a future contract or seafarer's agreement with Royal Caribbean?
A. As of now, no.
Q. Are you anticipating that you will have one moving forward?
A. Yes.
Q. Okay. When do you anticipate going back to serving as a shipboard doctor for Royal Caribbean?
A. Well, I just finished the contract, so I'm, you know, after my vacation period, which would be probably about a month or so.
Q. Do you know which ship you're going to sign on to after your vacation?
A. No. No. There's no contract.
Q. Okay. Which ship did you just sign off from?
A. Celebrity Apex.
Q. The Apex?
A. Yes. Sorry, the Apex.
Q. My accent versus your accent. I come from the Midwest. I have a very lateral nasal accent, so I apologize to everyone listening to my squeaky voice. So

anyway, so you were on the Celebrity Apex how long were you on that vessel serving?

A. I was there for one month.

Q. Okay. How many times have you served as a shipboard doctor for the company for Celebrity as opposed to Royal Caribbean ships?

A. I've been mostly on Royal Caribbean ships. Celebrity, I did probably three contracts.

Q. Okay.

A. Three to four contracts.

Q. Okay. Do you know, more or less, when the three to four contracts with Celebrity were?

A. Well, I can't exactly tell you which date it was, but it was probably 2017 and 2018.

Q. Okay. When did you first start serving on Royal Caribbean ships as opposed to Celebrity ships?

A. Well, I started with Royal Caribbean ships, that was April 2014.

Q. Okay. And then did you serve on and off various contracts between 2014 through 2017?

A. I'm sorry, could you repeat.

Q. Absolutely. So I just want to check between 2014 and 2017 or 2018 when you first started doing contracts on Celebrity ships from that time frame, were you continuously serving on Royal Caribbean ships or did

you go back and decide to serve in a hospital shoreside or something to that effect?

A. No. That is correct. I was the whole time with Royal Caribbean.

Q. Okay. So, if I'm understanding you correctly, from more or less April 2014 until now, November of 2021 you've continuously been serving as the shipboard doctor for either Royal Caribbean or Celebrity?

A. Yes. That is correct.

Q. Okay. Have you served as a shipboard doctor for any other cruise lines?

A. No.

Q. Okay. Have you ever served for any other of the Royal Caribbean Group cruise lines other than Celebrity and Royal Caribbean?

A. Yes.

Q. What other --

A. I did one contract in 2018. I did one contract with Azamara.

Q. Okay. Did you do any other contracts with any other lines other than Azamara, Celebrity and Royal Caribbean for the company?

A. No.

Q. Okay. Do you recall more or less how long your contract was with Azamara?

A. It was four months.

Q. Okay. Do you recall approximately what year that would have been?

A. That was 2018.

Q. Do you know why you were -- well, let me back up, did you choose to work on the other brands or did Royal Caribbean Group decide we're just going to send you to Celebrity or Azamara?

A. All the previous times with Azamara and Celebrity I was able to choose to go to these ships. The last time on Celebrity Apex I was asked to go to help with the -- you know, due to short staff.

Q. Okay. And have you ever worked for any other cruise lines such as Carnival, NCL or any other brand?

A. No.

Q. Now, you are not licensed to practice medicine in the United States; correct?

A. That's correct.

Q. Okay. Your license is from Portugal?

A. Yes. That's correct.

Q. Okay. Did you ever do any medical training in the United States?

A. No.

Q. Did you do any medical training -- sorry, go ahead.

A. The only medical training I have done, small trainings, namely ACLS and BLS, I've done in the United States, but it's basically the same the ones that are done in Portugal.

Q. Okay. Did you do any training outside of Portugal other than the certifications that you just mentioned?

A. I did some training in Germany, in Colon in Germany, but that was part of my medical degree.

Q. Okay. How long did you train in Colon, Germany?

A. One year.

Q. One year. Okay. And what type of training was it?

A. It was the standard university training, program in an exchange. This was an exchange program, so the program is the same basically that I would have had in Portugal the fourth year of college.

Q. That's what I was going to ask you. Was it part of your undergraduate degree or postgraduate degree?

A. Well, I'm not sure. I don't think it works the same as the United States. We don't have that. We get out of high school, then we have six years of university straight, so this was part of those six years. It was the fourth year of the six years.

Q. And when did you get your medical degree after

completing the six years of school?
A. That was 2005.
Q. Okay. Did you have any -- like we do in the United States after you have your medical degree, are there required trainings that you had to do afterwards, like a residency or a fellowship?
A. Yes. In Portugal there's one year mandatory internship and that is, you know, mandatory for everyone and then we go on to the residency program.
Q. Okay. So what I'm trying to get at is when were you done with all of your medical training and were then, you know, a completed doctor so that you could practice in the field?
A. So that would be 2006, at the end of that internship.
Q. Okay. Got it. All right. When did you first decide you wanted to work as a shipboard doctor?
A. That was 2013.
Q. Okay. Why did you decide you wanted to work on a ship versus in a hospital or a practice group?
A. Well, one of my colleagues at my hospital -- at the hospital I was at the time, he went to work for Royal Caribbean and so he was the one that kind of, you know, convinced me to join the ship medicine.
Q. Okay. Was the pay with Royal Caribbean better

to work on the ship than in shoreside practice?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. You can answer.

A. Okay. So yes, it was.

Q. Okay. Now, as you're sitting here today, I see -- well, at least your top half, it looks like you're wearing a suit or at least a jacket and a button-down shirt. Would I be correct in assuming that you are not wearing your Royal Caribbean uniform?

A. That is correct.

Q. Okay. Would I be correct in saying that Royal Caribbean does provide shipboard doctors with uniforms it expects people to wear when working on the ships?

A. Yes. That's correct.

Q. Okay. Now. Is the uniform that you wear as a shipboard doctor for Royal Caribbean the white suit with the epaulets on the shoulders?

A. Yes. It's a white shirt and blue pants and the stripes.

Q. Okay. Let me see if I can pull this up real fast. One second. I'm going to share my screen. This is going to be, Michael, Bates 507.

A. Okay.

Q. I don't know why it wants to be blue, but it's

showing it with a bit of a blue filter, but does that look like a fair photograph of what the shipboard doctor uniforms look like?

A. Yes, it does.

Q. Okay. All right. And do you see -- let me see if I can -- I'm connecting my mouse back so that I could have control here. There we go. Do you see the name tag on the shirt?

A. Yes.

Q. Okay. It's hard for me to see in this photograph, but do the Royal Caribbean name tags or shipboard doctors have the anchor logo on them?

A. Yes.

Q. Okay. And then would it have had your name on the name tag?

A. Yes. It would have my first name.

Q. Okay. Would it say underneath it, doctor, or something to that effect?

A. Yes.

Q. Okay. And are you required as a shipboard doctor to wear that name tag at all times that you're on duty?

A. Yes.

Q. Okay. All right. Let me pull that down. Just one second. Let me make a note that Plaintiff's

Exhibit 1 -- I'll extract it, Wendy, as Bates 507 for the record. Is the purpose -- well, strike that.

When the doctors work in the shipboard medical infirmary, are they expected to wear the uniform that we just looked at?

A. Yes.

Q. Okay. Are there ever any other outfits or clothing that you're allowed to wear as a shipboard doctor other than that uniform?

A. Just regular scrubs.

Q. Okay. When would you wear scrubs as opposed to the uniform that we just looked at at Bates 507?

A. Probably when there's either a medical emergency or a -- or outside working hours.

Q. Okay.

A. Off duty or between clinic hours.

Q. Okay. Now on all of Royal Caribbean ships, I guess Celebrity ships and Azamara there is a designated area known as the medical center; is that correct?

A. That is correct.

Q. Okay. And the medical center is sometimes also known as the shipboard infirmary?

A. No. That's not a very common denomination maybe the medical or just plain medical probably would be what it's known as.

Q. Okay. Just wanted to check. And typically the medical center is on one of the lower decks of the vessel?
A. Yes. It's correct.
Q. Okay. And my understanding is the medical centers have multiple rooms within the designated area; is that accurate?
A. Yes. That is accurate.
Q. Great. Royal Caribbean's Medical Centers have like a -- when you first walk in, there's a waiting area?
A. Uh-huh. Correct. Yes.
Q. Okay. And then if somebody were to walk in and go to check-in?
A. I'm sorry. You froze there for a while. What was the question?
Q. Certainly. Let me switch because it's like my computer today is preferring if I'm hard wired, but I can't have a mouse and hardwire at the same time. That should be better.
So my question to you was if I were a patient walking into Royal Caribbean Medical Center, is there a front desk or receiving area?
MR. DRAHOS: Let her finish the question before you answer.
THE WITNESS: Okay. Sorry, sorry.
BY MS. LOBEL:

Q. Okay. It happens. So what I want to know is is there a front desk or a window that's designated for Royal Caribbean to receive patients in the medical center?
A. Yes. There is a front desk.
Q. Who is stationed at that front desk?
A. That is one of the nurses.
Q. Okay. All right. Because I wanted to know is the medical secretary ever stationed at that window?
A. No. The medical secretary is stationed in a different room.
Q. Is where?
A. She's in different room. He or she is in a different room.
Q. So if I'm a patient and I'm taken back from the waiting room to go into the rest of the medical center, can you please explain to me what is in the back area that is provided by the cruise line?
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q. You can explain.
A. Okay. So it depends from ship to ship, because there is no -- not -- no ships are alike. So I don't know if you want to know specifically about this ship or in general, just --
Q. Let's talk in general what's typically provided

and then I'm going to ask you about the Harmony of the Seas. So generally speaking, what areas are provided by Royal Caribbean or Celebrity or Azamara in the medical centers that's not part of the waiting room area?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. Go ahead.

A. So there is usually I would say six to seven other rooms. Two, three, it depends on the layout, but two or three rooms will be doctor's rooms. One room would be considered a treatment room and another room would be what we have as -- what do you call it, like a small ICU and then there is two to three rooms that are used as infirmary so where we have patients stay overnight or stay for as long as they need to stay. And then usually, some ships, the ships that do have a medical secretary, there is a room allocated to the medical secretary.

Q. What is inside the room allocated to the medical secretary?

A. Usually, it's, you know, usually just a computer and printer and some of the records that we are required to have for inspection for general inspections, so our ship records.

Q. Okay.

A. Not clinical records, but records of, you know, whatever other things that we need for inspections.
Q. What would those records include, more or less?
MR. DRAHOS: Object to form.
THE WITNESS: It includes, for example, shower head, we need to, you know, flush the shower heads and we need to log that and things like that.
BY MS. LOBEL:
Q. Would it have records, for example, the medical center's list of medication and supplies, things like that?
A. No. It would have like records, like for example, medication wise, it would have records for the controlled substances. So that would include narcotics and a couple other types of medication that we need to keep records for.
Q. Understood. Now, you mentioned that there is a room that's designated as an ICU, on a Royal Caribbean ship what is inside the room designated as the ICU?
MR. DRAHOS: Object to form.
THE WITNESS: Okay. So we would have what we call a crash cart, we'd have a ventilator. We'd have a defibrillator. We'd have -- there's a bed. There's the IV medication. IV medication. Yes,

that's basically what there is inside. Yes.
BY MS. LOBEL:
Q. Okay. Would you agree with me that the shipboard medical centers are limited as to what care and treatment can be provided as compared to, say, a hospital?
MR. DRAHOS: Object to form.
THE WITNESS: I wouldn't be able to answer that. It all depends.
BY MS. LOBEL:
Q. What do you mean?
A. Well, it depends on what we're comparing it to and which kind of hospital.
Q. Okay. That's fair. For example, would you agree with me that the Royal Caribbean shipboard medical centers are not equipped so they can be akin to like a level one trauma center?
MR. DRAHOS: Object to form.
THE WITNESS: Really, I wouldn't be able to answer that. Only a person that works in the trauma center and then, you know, comes in to see what we have on the ship, then they would probably be able to answer that question, but I wouldn't know.
BY MS. LOBEL:
Q. Have you worked in a trauma center before?

A. I haven't worked in a trauma center.
Q. Okay. All right. That's fair. Is there a CT scan on the ship?
A. There is no CT scan.
Q. Okay. Is there an MRI?
A. No.
Q. Okay. Can you perform surgery on the ship?
A. We cannot.
Q. So if somebody came in and they have appendicitis, you can't remove an appendix, for example?
A. No.
Q. Okay. So it doesn't have like a -- what I call here a surgical opera --
A. Sorry to interrupt. No. It doesn't have one.
Q. Okay.
A. We have a room for small treatments, but we wouldn't be able to do surgery.
Q. So would it be fair to say that the medical center is not equipped to care and treat for somebody who is suffering from a stroke?
MR. DRAHOS: Object to the form.
THE WITNESS: No. It depends.
BY MS. LOBEL:
Q. What does it depend on?
A. It depends on what kind of patient we're

talking about and what kind of treatment he needs and what kind of, you know, assessment he needs.

Q. Well, to assess a stroke, would you agree you need to use a CT scan?

MR. DRAHOS: Object to form.

THE WITNESS: Well, again, that would kind of depend on the patient. It would have to be a case by case, a case-by-Case scenario there.

BY MS. LOBEL:

Q. Well, you would agree with me to -- well, let's back up. A stroke involves a blockage in an artery; correct?

A. That may be. Maybe some of them, yes.

Q. Okay. What else? Well, let's start there. If somebody had a blockage in an artery that was causing a stroke, is that something that you couldn't treat in a shipboard infirmary; correct?

MR. DRAHOS: Object to form.

THE WITNESS: Well, it depends. Again, it depends. It all depends on the diagnosis. You know if somebody had a blockage and we knew that somebody had a blockage, then that would depend on the person, what the person needed and, you know, many things actually.

BY MS. LOBEL:

Q. Can you treat a blockage in an onboard ship infirmary?
MR. DRAHOS: Object to the form.
THE WITNESS: We can treat the blockage.
BY MS. LOBEL:
Q. How?
A. We can dissolve in general a blood blockage. We would be able to dissolve the clot.
Q. Okay. How would you dissolve the clot?
MR. DRAHOS: Object to the form.
THE WITNESS: We would use thrombolytic drugs.
BY MS. LOBEL:
Q. What thrombolytic drugs are on the ship or available in a shipboard infirmary?
A. Well, that kind of depends from ship to ship.
Q. What would have been available on the Harmony of the Seas?
MR. DRAHOS: Object to form.
THE WITNESS: To be honest, I don't recall exactly what we had at the time.
BY MS. LOBEL:
Q. What thrombolytics do you recall seeing available on Royal Caribbean ships?
A. Tenecteplase would be one. Tenecteplase.
Q. Can you spell it?

A. T-E-N. T-E-N yes.
Q. T-E-N. Yes.
A. C-T-E. Sorry, A-P-L-A-S-E.
Q. Okay. That medication is used to dissolve clots, what type of clots?
MR. DRAHOS: Object to the form.
THE WITNESS: Blood clots.
BY MS. LOBEL:
Q. Okay. Where in the body?
A. This drug is injected into the blood stream so it dissolves blood clots wherever they are in the blood stream.
Q. Okay. Now, if you're working on any of Royal Caribbean shipboard medical centers there isn't any imaging available to be able to determine one way or another if there's in fact a blood clot though; correct?
A. That is correct. You would need a CT scan.
Q. Okay. So in order to definitively complete a differential diagnosis, if the patient is or is not having a stroke on a Royal Caribbean ship, the infirmary doesn't have that capability, correct?
MR. DRAHOS: Object to form.
THE WITNESS: It wouldn't have that capability, no.
BY MS. LOBEL:

Q. Okay. So in order to complete a differential diagnosis for somebody who is suspected to have a stroke they would need to be transferred to a facility that could do the full workup; correct?

MR. DRAHOS: Object to form.

THE WITNESS: Yes. To definitely diagnose it, yes.

BY MS. LOBEL:

Q. Okay. All right. And you mentioned that there was at least one type of clot buster that's on some of Royal Caribbean's ships. Do you know if a medication known as TPA is available on any Royal Caribbean ship?

A. Yes. I believe so.

Q. Which ships have you known have TPA?

A. I wouldn't be able to answer that.

Q. Was TPA available on the Harmony of the Seas?

A. Again, I'm not sure because it's been a while.

Q. Okay. But you're confident that some of the ships have TPA available?

A. I mean, I'm not sure. Again --

Q. I just want to know what you know.

A. They would probably have some kind of thrombolytic drug.

Q. Okay. Have you ever administered TPA for a patient on any cruise ship?

A. On any cruise ship?
Q. Yes, sir.
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, I have.
BY MS. LOBEL:
Q. Okay. What instance was that, if you can describe that for me.
A. That would be cardiac infarction.
Q. And you personally administered TPA for a cardiac infarction on one Royal Caribbean ship at some point in time?
A. Yes. At some point, yes.
Q. Okay. Do you recall if that incident was before or after February 21st of 2019?
A. I'm not sure. We see a lot of patients and Harmony was a busy ship.
Q. Okay. Would you agree with me that you wouldn't be able to perform any form of surgical intervention to remove a clot from a patient on a Royal Caribbean ship?
A. To remove the clot, surgical intervention, no.
Q. Okay. All right. That would have to be done at a shoreside facility with a specialist; correct?
A. Yes. If that was the case, if it needed to be done, yes, we would have to do it on shore.
Q. And my understanding is that Royal Caribbean has

a procedure the doctors are supposed to follow if they cannot provide the medical care necessary to treat a patient on the ship; is that correct?

MR. DRAHOS: Object to the form.

THE WITNESS: No. I mean, you would have to be more specific, but I don't know exactly --

BY MS. LOBEL:

Q. Well, there are certain circumstances when shipboard doctors don't have the means or ability to treat certain conditions on the ship. We've talked a little bit about that; right?

A. That's correct. Yes.

Q. Okay. And under those circumstances Royal Caribbean has procedures what's supposed to be done for those patients who the shipboard doctors can not provide the care required, correct?

MR. DRAHOS: Object to form.

THE WITNESS: That's correct.

BY MS. LOBEL:

Q. Okay. Can you tell me what those procedures are?

MR. DRAHOS: Object to the form.

THE WITNESS: You mean in terms of sending a patient to another facility?

BY MS. LOBEL:

Q. Correct. So if a patient is on the ship, say, they are having -- let's use the example of somebody's in cardiac arrest and suffering from a heart attack on the ship, what is the procedure that you're expected to follow to handle that situation?

MR. DRAHOS: Object to the form.

THE WITNESS: Okay. So let's say medically we have reached the limits on the ship and then we would have to send -- the correct procedure would be to evacuate the patient if there was a possibility, but that depends on a lot of the circumstances.

BY MS. LOBEL:

Q. Okay. Now, if the circumstance is such that a Royal Caribbean cannot provide the treatment that would meet the standard of care in the shipboard infirmary and the ship is at a port, what would be the evacuation procedure?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, it depends on the circumstances. Again, everything depends on a lot of the circumstances.

BY MS. LOBEL:

Q. Well, okay. Can you walk me through a situation if a ship is at port and there's a city at that port and

somebody is suffering from a heart attack what would be the procedure to evacuate that patient so they can receive the care and treatment that meets the standard of care shoreside?

MR. DRAHOS: Object to the form.

THE WITNESS: To be honest, I mean you would have to be -- I would have to be in that situation to really answer that question because it varies case by case, city to city. It depends on a lot of circumstances, so each case we evaluate individually.

BY MS. LOBEL:

Q. What are you looking at for a case-by-case circumstance to figure out what to do?

A. Well, we take a look at a lot of things. One is the patient itself. And the patient's pathology whatever is happening to the patient and then obviously we take a look at the possibility and all the procedures and whatever is needed to evaluate the patient, then we take a look at the conditions that the patient would need in case we evacuate them. So it really depends on a lot of things.

Q. Okay. Under the circumstances when it's determined that the shipboard infirmary cannot provide the care that would meet the standard of care for the patient

because it exceeds the capabilities of the infirmary, that would be a situation where a medical evacuation procedure would be initiated; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, again, not necessarily, not necessarily. That would still depend on the circumstances.

BY MS. LOBEL:

Q. Well, I'm trying to understand what these circumstances are, because --

A. Royal Caribbean and the ship medical team, we provide medical care in the medical center and then ships obviously travel around the world. So we're stopping at all sorts of different ports, different circumstances, different patients, different times, so everything has to be taken into account to decide whether or not the correct step would be to disembark a patient.

Q. If the next step is to disembark the patient, what would be the procedure?

MR. DRAHOS: Object to the form, asked and answered.

BY MS. LOBEL:

Q. Go ahead.

A. Okay. So you say. So if the next step was to

disembark the patient.
Q. Yes, sir, what's the procedure?
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q. Go ahead.
A. Okay. I understand your question, but again, you would have to be more specific because that would depend on the city, that would depend on the country, that would depend on a lot of things.
Q. Why would it depend on the city and country, what would be different from example city A or city B?
A. Okay. So, for example, just the mere fact that one port is let's say 200 or 300 kilometers away from the hospital and one port is you know, has a different geography. That alone has to be taken into account, so it's just not the fact that you're in port doesn't mean that an evacuation is initiated.
Q. Okay. When would there be a circumstance where an evacuation wouldn't be initiated even though the ship is at a port with a patient that requires medical care and treatment that the infirmary cannot provide?
MR. DRAHOS: Object to form.
THE WITNESS: Well, again, I'm obviously repeating myself a little bit. Again, that depends on the circumstances, on the patient, on the

problem that the patient has, what kind of problem you're dealing with. What's the timing, how far away is the hospital, is the patient transport possible. So it depends on so many -- there's so many circumstances that can only be answered with a specific patient at hand and a specific port. So we have to take it case by case.

BY MS. LOBEL:

Q. Well, I would think there would be a rough procedure. If I'm going to disembark a patient and you decided as the shipboard doctor that the person needs to be medically disembarked, what would be step number one? Would it be to let the captain know?

MR. DRAHOS: Object to the form, asked and answered.

BY MS. LOBEL:

Q. Go ahead.

A. So if we feel like, obviously like you say, that the medical clinical capability treating a patient or let's say if the patient could benefit from a higher care, then we would have to make sure that the care is possible.

Q. How do you do that?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, it depends on the port.

BY MS. LOBEL:

Q. Understood it depends on the port, but how do you determine what's supposed to be done when you arrive to a port. I just don't understand. Okay. I'm at a port. I decided this patient needs to be medically disembarked because they are suffering from a time-sensitive medical emergency like a heart attack. What am I supposed to do if I'm a shipboard doctor? Step one would be fill in the blank.

MR. DRAHOS: Object to the form.

THE WITNESS: Okay. So if we needed to be -- to evacuate the patient again, depending on a lot of circumstances possibly we would have to speak to somebody that somebody local that can ally us with the local conditions, that can assess the local conditions like a port agent, like a port agent, for example.

BY MS. LOBEL:

Q. Okay.

A. If there is one. It depends.

Q. Okay. All right. So if I'm understanding you correctly, if we're at a port and there is a medical emergency step one is possibly to speak with the port agent; correct?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. Go ahead.

A. That's correct.

Q. Okay. When in the process would you -- well, strike that.

If you contact the port agent, do you let the ship captain know I have contacted the port agent to initiate a medical emergent disembark?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, if the medical evacuation is established we need to inform the ship's management, either the staff captain or the captain.

BY MS. LOBEL:

Q. How do you inform the staff captain or the captain?

MR. DRAHOS: Object to the form.

THE WITNESS: We will call and we write.

BY MS. LOBEL:

Q. Okay. And what?

A. And/or write.

Q. And when you say write, would that be via e-mail?

A. That's correct.

Q. Okay.

A. Usually a phone call.
Q. Okay. And that would be from the medical center to the bridge?
A. Yes. Exactly. Yes.
Q. All right. Now, if a patient it's suffering from a medical emergency, do you agree with me that timing can be an important factor in the process?
MR. DRAHOS: Object to the form, improper argumentative.
THE WITNESS: Yes. Obviously, that's a very vague question. We would -- it would depend on the circumstances again. The circumstances, because obviously with every patient the circumstances change. And medicine is not a very simple field. It a very complicated field so even within the same pathology, the same pathology, the same problem, the same medical problem changes from patient to patient. So the variations are so big it's impossible to not depend on the circumstances. What we have in front of us, what kind of patient, what kind of problem and how they -- what's an emergency, what kind of emergency it is.
BY MS. LOBEL:
Q. Well --
A. It does depend on the circumstances.

Q. You would agree with me that there are certain well-known medical conditions that are time sensitive, though, that can't be treated in a shipboard infirmary no matter what the circumstances are, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I mean, there probably are. I mean, medicine is a very vast field. I'm sure there are emergencies that can't be treated like in any hospital.

BY MS. LOBEL:

Q. Right. Well, no, because, you have less capabilities in a shipboard infirmary than a medical hospital though; correct?

A. That would have to depend on the hospital and I couldn't answer that without comparing to, let's call it medical facilities so --

Q. Well, I'm saying hospital, not medical facilities, because I understand an urgent care center versus an ER are two different things. But you don't have the capabilities that an emergency room has in a shipboard infirmary; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: No, I wouldn't say that. I would say it depends on -- we have capabilities for certain things. We don't have capabilities for

other things, but in certain things, obviously, you know, the hospital we have, the hospital is a huge medical center so we would have more capability at least more to treat more things than in the medical, but as far as some things go, then we also have the capability.

BY MS. LOBEL:

Q. Okay. Well, for example, a gunshot wound. If somebody got shot hypothetically on the ship, that would not be something that you can treat in the shipboard infirmary; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, that depends on what we were talking about. A gunshot wound is something very vague.

BY MS. LOBEL:

Q. Well, you can't perform surgery; correct?

A. We would not be able to perform surgery, no.

Q. So --

A. I would say if the treatment of that specific gunshot wound involved surgery, we wouldn't be able to do that on board.

Q. Okay. So if somebody had a condition that required potentially surgery, that's something that would involve a medical disembark; correct?

MR. DRAHOS: Object to form.

THE WITNESS: Not specifically, no. Not -- again, it depends. That also depends.

BY MS. LOBEL:

Q. Okay. But you would agree with me that there are certain conditions, even like what we're here to talk about today, a stroke, that are time-sensitive conditions though; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, I don't see -- you know, but again, it depends because a stroke, again, these are very vague concepts. When you say stroke, it depends on the circumstances. It depends on the patient. It depends on what we have in front of us. So it's -- again, it's a case by case. It's always a case-by-case decision. That's why there are doctors on the ship who evaluate to be able to evaluate each person because the person is always the same, you know -- because the procedure is not always the same.

BY MS. LOBEL:

Q. My question is a little bit different. My question is would you agree with me that a stroke is a time-sensitive condition?

MR. DRAHOS: Object to the form, asked and

answered.

THE WITNESS: Yes. Like I said, it's been answered. It depends. It depends on the patient.

BY MS. LOBEL:

Q. What does it depend on? What would make a stroke a nontime-sensitive situation?

A. Well, for example, it depends on the timing, the timing, the symptoms. It depends on the timing of the stroke. It depends on the capability and people being able to diagnosis a stroke. It depends on the stroke itself. A stroke is a very broad term and that includes many, many types of -- many types of circumstances.

Q. Well, a shipboard infirmary can't treat a stroke though?

MR. DRAHOS: Object to the form.

THE WITNESS: The medical facility on the ship wouldn't be able to undoubtedly diagnosis a stroke.

BY MS. LOBEL:

Q. Right. So if --

A. To be able to treat it.

Q. Right. So if you have a circumstance where somebody might be having a stroke and you cannot complete the differential diagnosis, that is the time-sensitive situation where you need to get the person from the ship

to somebody who can make the diagnosis in a timely manner; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: That would be -- sorry, sorry, sorry. I'm just trying to figure out how to turn my phone off.
MS. LOBEL: No problem.
THE WITNESS: I'm sorry, I'm going to just ask you to repeat the question. Sorry.
BY MS. LOBEL:
Q. Let's back up a second so we can establish this. You're familiar with what a stroke is; correct?
A. Correct.
Q. Okay. That's a situation when the blood supply to a portion of the brain is either partially interrupted or reduced?
MR. DRAHOS: Object to form.
THE WITNESS: Yes. That is correct.
BY MS. LOBEL:
Q. Okay. And that means blood is not being properly supplied to the brain; correct?
A. Well, again, that's already something I wouldn't be able to answer because that, again, would depend on the patient.
Q. Okay. But my understanding is a stroke is a

situation when the blood flow is not being properly supplied to the brain; is that accurate?

A. No. That's not really accurate.

Q. Okay. Why is that not accurate?

A. Because it depends on the patient's blood supply. So it depends on many circumstances.

Q. Such as?

A. Well, it would be a medical debate, medical lesson here. So I mean, I would have to, you know, explain what a stroke is and if you like, I'm here to explain what a stroke is.

Q. Well, my question to you, can you explain for me what a stroke is or what your understanding a stroke is then?

A. Well, a stroke is basically an interruption of a blood supply of a portion of the brain.

Q. Okay. A stroke is a interruption of the blood supply to the brain; do I have that correct?

A. A portion of the brain, yes.

Q. Okay. Doctor, so am I correct in understanding that the blood supply that goes to the brain is bringing oxygen to the brain?

A. Yes. That is correct.

Q. Okay. And the blood that brings -- strike that. The blood supply that goes to the brain is bringing

nutrients to the brain so it's functioning properly; correct?

A. Yes, the blood and yes, that's correct.

Q. And my understanding is that during a stroke that's a situation where the blood supply may not be going to the brain properly; correct?

A. Yes. That is correct. It may not be going to the brain.

Q. And the risk in that situation is that the brain maybe starved of the oxygen and nutrients it needs to function correctly; is that right?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. Go ahead.

A. Yes. That is correct.

Q. Okay. And am I correct in saying that when the brain doesn't get enough oxygen or nutrients, brain cells can die under those circumstances?

A. Eventually, yes, that might be a consequence.

Q. And during the stroke, brain cells can die quickly?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. You can answer.

A. Yes. Brain cells die quickly.

Q. I'm sorry?

A. Most cells die quickly.

Q. Right. But including the brain, is my point?

A. Yes. It's part of the brain.

Q. So my understanding is when there's a stroke it's a time-sensitive situation, because the longer the stroke is going on, more brain cells are dying because they're not getting their nutrients; is that correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, that will depend on the patient itself and the circumstances and how long the stroke lasts.

BY MS. LOBEL:

Q. You would agree with me that, you know, you don't want to just sit and let a patient have a stroke, because the longer the patient is just sitting suffering a stroke without treatment, the more brain cells are going to die, is that a fair statement?

MR. DRAHOS: Object to form.

THE WITNESS: Well, again, you'd have to be more specific. You'd have to specify exactly what patient we're talking about, what kind of stroke. It depends on the circumstance.

BY MS. LOBEL:

Q. Okay. Well, let's talk about a circumstance

where it's not a hemorraghic stroke. Okay. We're talking about a stroke, not hemorraghic and there's a blood clot and that's the circumstance, okay, would you agree the circumstance when somebody has a blood clot blocking the blood flow that brings the nutrients to the brain, it's a situation where that person needs prompt medical care?

MR. DRAHOS: Object to form.

THE WITNESS: Honestly, I'm feeling like I'm repeating myself over, but yes, again, that would depend on the patient and the circumstance and what kind of -- at what point I see that patient.

BY MS. LOBEL:

Q. Okay. If you see a patient -- well, strike that.

Would you agree that early action in treating a stroke can help reduce the brain damage?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sorry, could you repeat the question.

BY MS. LOBEL:

Q. Absolutely. Would you agree that early action can help reduce the level of brain damage to the brain when somebody is having a stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. Again, I would have to

evaluate that patient and based on that evaluation.
I wouldn't be able to answer the question, but it
would be a case-by-case scenario.
BY MS. LOBEL:
Q. Do you agree if early action is not taken to treat a patient suffering a stroke, the resulting brain damage can be catastrophic?
MR. DRAHOS: Object to the form.
THE WITNESS: No. I wouldn't be able to say that. I wouldn't be able to answer.
BY MS. LOBEL:
Q. Would you agree that the earlier the action is taken to treat a patient with a stroke, the less complications that person is susceptible to suffering?
MR. DRAHOS: Object to the form.
THE WITNESS: No. I wouldn't be able to say that. It depends on the circumstances.
BY MS. LOBEL:
Q. What circumstances?
A. It depends on the patient. It depends on the patient. It depends on the patient. We don't know what would happen. It depends on the patient. Every patient will have, you know, every patient has a clinical -- how can I say this in English, every situation is its own situation, so I wouldn't be able to generalize.

Q. Well, you would agree with me that in a shipboard infirmary you can't determine whether -- strike that.

You would agree with me in a shipboard infirmary you can't clinically determine how bad a blockage there may or may not be for somebody suffering a stroke on a ship?

A. Well, we can -- we don't have the CT scan, so we wouldn't be able to confirm a stroke, an acute stroke.

Q. So if you can't determine whether or not somebody is suffering from an acute stroke, that's a circumstance where time is of the essence and you need to get that person to a hospital, to have somebody who can make that determination; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, it depends on the patient and which symptoms and the timing of the symptoms. That would depend on a lot of things.

BY MS. LOBEL:

Q. Okay. Do you agree that at or around 9:26 in the morning Richard Burgess presented to medical infirmary with signs and symptoms of a stroke?

A. Yes. I agree. Yes. 9:25. Yes.

Q. I'm sorry?

A. Yes. Around 9:25, yes.

Q. At approximately 9:25, at least there's a first note that indicates that the medical center believed Richard Burgess had signs and symptoms of a stroke; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'd have to see those records.

BY MS. LOBEL:

Q. What are you looking at?

A. Okay. So these are not my notes, though. These are notes done by the nurse.

Q. Okay. You would agree with me that the triage nurse suspected a stroke upon initial encounter with Richard Burgess; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: You would have to ask her. She would be the person to answer that question.

BY MS. LOBEL:

Q. Well, what does the note indicate?

A. Ability to move fingers on right hand, unstable gait, to be seen by doctor in ICU.

Q. And it also see says CVA question mark; correct?

A. Yes. CVA question mark, yes.

Q. And that's an indication she suspected this patient maybe suffering from a cerebral vascular accident;

correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sorry. I wouldn't be able to tell you what she was thinking. It would have to be something she wrote CVA here, but I'm not sure exactly what she meant by that. I wouldn't be able to comment on somebody else's notes, because obviously she wrote it.

BY MS. LOBEL:

Q. You would have spoken to her though; correct?

A. Yes. She called me. Yes.

Q. Okay. And you would have reviewed the note that she inputted into the system; correct?

A. No. That's not correct.

Q. Why would you not look at the triage nurses notes to see what they did or believed at the time she first saw the patient?

A. The nurse tells me why the patient is coming in and I do my own assessment.

Q. Well, the nurse would have told you she expected a CVA; correct?

A. She would have told me that the patient's symptoms.

Q. She wouldn't have told you whether or not she suspected a stroke?

A. No. She wouldn't -- she wouldn't refer to the patient in terms of diagnosis. She wouldn't give me her own diagnosis.

Q. Okay.

A. She would tell me the patient's symptoms and the reason why he was coming. That she would tell me.

Q. You would agree with me the symptoms that she indicated are classic signs of a potential stroke though; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: That depends. Not necessarily.

BY MS. LOBEL:

Q. Okay. You would agree with me that the symptoms that she reported in that note are signs and symptoms of a stroke though; correct?

MR. ROTHMAN: Object to the form.

THE WITNESS: No. I wouldn't be able to tell you that.

BY MS. LOBEL:

Q. Why not?

A. Because there are many conditions that you know that come with the same --

Q. One of the conditions you would consider, though, is a stroke?

A. Well, based on the notes, based on her notes,

you mean.
Q. Yes.
A. Reading her notes, yes. Well, it would probably definitely be a differential diagnosis, yes.
Q. So if hypothetically all you had is that particular note that you just read, one of the things that you would be considering is whether or not this person is potentially suffering from a stroke; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sorry. I just didn't catch the beginning of your question.
BY MS. LOBEL:
Q. Certainly. If you read a note that read just as you read to me with the changes in vision, the numbness and tingling and loss of sensation on one side, well, let me back up. Let me back up for a second. The numbness and tingling on one side of the body is known is paresthesia; correct?
MR. ROTHMAN: Object to the form.
THE WITNESS: Paresthesia.
BY MS. LOBEL:
Q. Yes, sir.
A. Possibly, yes.
Q. Okay. And paresthesia is one of the signs and symptoms of a potential stroke; correct?

A. That's correct.
Q. And sudden changes of vision are signs and symptoms of a potential stroke; correct?
A. Well, I would say there are signs and symptoms but a stroke can obviously cause those symptoms, yes.
Q. Okay. One second. I'm just want to move to a different place in my notes. One second. Sudden vision changes are symptoms of a stroke; correct?
A. Was that a question? Sorry.
Q. Yes. Yes. Sudden vision changes like inability to see out of one eye, that can be signs of a stroke; correct?
A. A stroke -- let's put it the other way, a stroke might cause those symptoms, yes.
Q. And a stroke may cause trouble speaking; correct?
A. That's correct.
Q. Stroke can cause numbness in the face?
A. That is correct.
Q. A stroke can cause numbness in the arms; correct?
A. Yes. That is correct.
Q. And a stroke can cause numbness in your legs; correct?
A. That is correct.

Q. A stroke can cause a really bad headache?
A. Eventually it can, yes.
Q. Okay. And a stroke can cause somebody to have difficulty standing?
A. That is correct.
Q. And a stroke can cause somebody to have difficulty walking?
A. Yes. That's correct.
Q. Okay. So if you had a patient that had difficulty speaking, had numbness in the face, arms, legs, sudden vision problems and had difficulty walking or standing, would you consider stroke as part of the differential diagnosis?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. It depends on the patient.
BY MS. LOBEL:
Q. But if in my hypotheticals those were all the symptoms presented, that's somebody who might be suffering from a stroke; correct?
MR. DRAHOS: Object to form.
THE WITNESS: I mean, obviously, if those are symptoms of a stroke, you would have to be -- it depends on the patient. It depends on the patient what we're seeing, obviously, it depends on the patient.

BY MS. LOBEL:

Q. Well, I'm telling you that the patient, sorry. Hang on a second. I'm telling you that the patient walks into the infirmary and their symptoms are trouble speaking, sudden vision loss, numbness in the face arms, legs, difficulty standing, moving and headache, that's somebody you would expect may be having a stroke; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, it depends. It depends on the patient. It depends on what I see. It depends on the story. It depends on a number of circumstances.

BY MS. LOBEL:

Q. If the circumstances were a sudden loss of vision, sudden numbness in the face, arms and legs, difficulty seeing and speaking, difficulty walking, that would be a patient who might be having a stroke; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: That is correct.

BY MS. LOBEL:

Q. And if a patient came in with those symptoms, that would be a situation where you would need to act quickly to get that patient to a facility that can treat for a potential stroke; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: If the -- if there was a differential diagnosis, then we would have no way of confirming that on the ship.

BY MS. LOBEL:

Q. Right. And if you can't confirm on the ship, you'd need to quickly act so that you can get that patient to somebody who can confirm whether or not there's a stroke, correct?

MR. DRAHOS: Object to form.

THE WITNESS: If there was that possibility, yes.

BY MS. LOBEL:

Q. Okay. And that would be a time-sensitive situation because strokes need to be treated quickly; correct?

MR. DRAHOS: Object to the form, asked and probably about five times.

BY MS. LOBEL:

Q. Go ahead.

A. Well I'm going to answer the first part of your question, which is would that be the case that you gave me, would that be time sensitive? Yes, that would have to be addressed quickly.

Q. Okay. And it would have to be addressed quickly because that's a situation where a portion of that

person's brain may die if not treated within a certain window?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. That is correct.
BY MS. LOBEL:
Q. Okay. In order to treat a patient with that kind of presentation, that's somebody who may be administered TPA?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, I wouldn't be able to tell you.
BY MS. LOBEL:
Q. Do you know that TPA can only be administered within a certain time frame from onset of symptoms?
A. Yes.
Q. Okay. And that window is a small window; correct?
MR. DRAHOS: Form.
THE WITNESS: That is correct.
BY MS. LOBEL:
Q. And that window is only a matter of hours, correct?
MR. DRAHOS: Form.
THE WITNESS: Usually depends on the doctors that administrates the medication since obviously

it's his criteria whether to administer it or not, but yes, that would be a short period, I would say.

BY MS. LOBEL:

Q. Okay. And that short period is typically like three hours; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. Typically the guidelines say -- the guidelines are typically three hours.

BY MS. LOBEL:

Q. Okay. And also would you agree with me that the sooner that an interventionalist can remove a clot from somebody suffering a stroke, the better; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, I wouldn't be able to answer that. That would have to be asked of a interventionalist.

BY MS. LOBEL:

Q. Is it your understanding as a medical doctor that the sooner an interventionalist can remove a clot, the sooner that blood flow can be reconnected to the brain?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, again, things in medicine, they depend on so many things that that answer -- that question would be better answered by a

specialist, somebody that actually does better, the interventionalist.

BY MS. LOBEL:

Q. Okay. And maybe this is a US hospital thing, but have you heard of the phrase time is brain?

A. No, I haven't.

Q. Okay. Were you trained that the treatment of stroke is a time-sensitive situation?

MR. DRAHOS: Object to the form, asked and answered.

THE WITNESS: Well, it would depend on the patient.

BY MS. LOBEL:

Q. But were you taught in medical school that strokes are a time-sensitive condition that the sooner you treat the stroke the better the outcome?

MR. DRAHOS: Object to the form.

THE WITNESS: Well. Again, it depends on the stroke on this circumstances.

BY MS. LOBEL:

Q. Okay. Let's say it's not a hemorraghic stroke. Let's exclude that from the situation because that is a totally different animal. Let's say it's a thrombolytic stroke. In the circumstance of a thrombolytic stroke were you trained in medical school that the sooner you treat

the clot the better the outcome?
MR. DRAHOS: Object to form.
THE WITNESS: No. I mean, that answer can only -- that question can only be answered after evaluating the patient, including --
BY MS. LOBEL:
Q. Including a CT scan?
A. Yes. Including a CT scan. Yes.
Q. And the sooner you get a CT scan the sooner a doctor can understand the situation now, correct?
MR. DRAHOS: Object to form.
THE WITNESS: Yes. The CT scan is necessary to a diagnosis.
BY MS. LOBEL:
Q. Okay.
A. The truth is the stroke is (inaudible).
Q. So if there is somebody who has a suspected stroke, the standard of care is to get that patient to a CT scan as soon as possible for the workup; correct?
MR. DRAHOS: Object to form.
THE WITNESS: If that is the suspicion, the clinical suspicion, yes, that would be the correct procedure.
BY MS. LOBEL:
Q. Okay. I want to go back up to my notes for a

second. Forgive me.
MR. DRAHOS: Sarah, when we get to a good breaking point, we've been going a hour and a half, if we can take a break.
MS. LOBEL: Let me find a good breaking point. I have a quick section I want to get through. I just want to find where it is in my notes. One second, Michael.
MR. DRAHOS: Okay.
BY MS. LOBEL:
Q. So the nurses that work -- well, let's go back. Okay, in the Harmony of the Seas there is a shipboard medical center; correct?
A. That is correct.
Q. And you were talking to me just a moment ago about the setup of the medical center just generally on the vessels. What I want to know from you is can you describe for me the setup of the medical center on the Harmony of the Seas?
A. So the Harmony of the Seas has a front desk, has a waiting room that meets the front deck where the nurse is and where the nurse performs the triage and then there's two separate corridors. One leads to the ICU, which connects to the -- it would be the first room and then that corridor leads to the infirmary rooms,

which are three rooms. And then the other corridor, the one that comes out of the triage area, the other corridor leads to three doctor rooms and one treatment room.

Q. Do the doctors -- when you say doctors rooms, are those doctors offices?

A. Yes. Sorry, it's offices.

Q. Okay. All right. So how many doctors are assigned to work on the Harmony of the Seas?

A. There are three doctors.

Q. Okay. At the time of this incident, it was you and Dr. Espeth. Who was the third doctor?

A. There is only two doctors working at any given day. So there is --

Q. There is a indication of three? I just want to know who the third person was?

A. I believe Dr. Edna.

Q. Edmond?

A. E-d-n-a, Edna.

Q. Oh, okay, Edna. Forgive me. And how many nurses would have been working in the medical center at that time?

A. At that time there were probably three nurses there.

Q. Okay. And is that three nurses on ship or three

total assigned to the ship?
A. No. Assigned to the ship, there is five nurses.
Q. Okay. Five. And then three are on duty during hours of operation?
A. Yes. That is correct.
Q. Okay. And how many medical secretaries are there?
A. There is one medical secretary.
Q. So the medical secretary works everyday of the week?
A. That's correct.
Q. Okay. Understood. Does the medical secretary only work with the shipboard doctors or with the nurse as well?
A. Yes. She works with, you know, with all the whole team.
Q. Okay. All right. And whose responsible for the maintenance of the infirmary medical equipment, is that the nurse or the medical secretary?
MR. DRAHOS: Object to the form.
THE WITNESS: That would be the senior nurse.
BY MS. LOBEL:
Q. Okay. All right. And all the equipment that's supplied in the shipboard medical centers is supplied by

Royal Caribbean; correct?
A. It's supplied by a company, by a different company to Royal Caribbean's, yes.
Q. You didn't bring any of your own medical equipment to perform your duties on the ships; correct?
A. That's correct.
Q. Okay. All of the medications supplied in the infirmary is supplied by Royal Caribbean; correct?
A. Yes.
Q. Okay. And there is a computer system that the doctors and nurses use in order to perform their duties?
A. That is correct.
Q. And that computer system, I believe is called Sea Care?
A. Yes.
Q. Are there any other online programs or data bases that you would use other than Sea Care to perform your job?
A. No.
Q. Does the Sea Care program enable the shipboard doctors and nurses to keep tabs and track of all the medications available on the ship?
A. Like inventory, you mean?
Q. Yes, sir.
A. I believe so. I believe so and when I say I

believe so, it's because that since it was two years ago I believe at that time we were already able to keep inventory.

Q. Okay. Now, my question to you is when notes are inputted into the Sea Care system when treating a patient, is the time stamp supposed to reflect the time that the action by the doctor and nurse is taken or does it reflect the time in which the note is inputted?

A. It depends. It reflects the time when the note is inputted.

Q. Okay. So there could be a circumstance where you stitch somebody who has a cut on their hand and then you input the note after you stitch the person?

A. That is correct. Yes.

Q. Okay. So if a nurse, for example, triages the patient they handle the patient first and type the note second?

A. Well, triage, it works a little different, because it's more of an interview coming from -- so they usually type as the patient describes what they have.

Q. Okay. When the doctor, input doctor like you inputs their notes, that's after you have already performed care and treatment, rendered care and treatment to the patient?

A. Usually that's the case. It depends -- varies

case by case. But that's usually the case.

Q. Okay. Is the same true when a shoreside referral form is filled out, that you make the request for the shoreside referral and then fill out the form?

A. Well, the form is a request.

Q. Okay. So then this is part of that procedure that I wanted to understand. When there's a situation where you want to refer somebody shoreside for a medical emergency, what I want to know is is there a procedure that you're supposed to do first to start getting the referral in the works or do you fill out the form first?

MR. DRAHOS: Object to form.

THE WITNESS: The referral that we need to be filled out is a referral -- is a note is a transfer note for someone else to read, either the transportation or the person that's receiving the patient in case we transfer the patient to somewhere else. So it's a note. It's a summary of -- it's not part -- it's not necessary, let's say, for the procedure to begin. Or it's a note, it's a medical note, so that the other person is aware of the clinical problems.

BY MS. LOBEL:

Q. Who does the shoreside referral form go to?

A. The shoreside referral, we usually do three

referrals, three referral notes, three copies, which are the same note obviously. One goes to the hospital or the hospital, yes, the hospital that treats the person. One goes to the ambulance or the staff that transports the patient and one goes to the patient himself, so he has a summary of his own, you know, medical condition.

Q. If you're going to do a shoreside referral and you fill out the form, is there a procedure as to how you have to alert or notify that you're going to be issuing a shoreside referral form?

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MS. LOBEL:

Q. So how does anyone know whether or not a patient has been referred shoreside from the ship?

A. What do you mean?

Q. Anyone. So my understanding is that the ship keeps track of everybody who's on the ship, so if the passenger is left shoreside, you need to know if somebody is on or off the ship. Right. So if I go off the ship and I go for an excursion, for example, for the day to the port, the ship can see I went off and then they are going to be on notice whether or not I'm coming back on. So with that context, here's my question: My question is since a passenger is going to get disembarked, when

there's a shoreside referral what's the procedure to notify the ship or anyone from Royal that this is going to take place?

A. Okay. I understand. You. So for that circumstance we notify the guest services and we notify the guest services so that they can arrange for, you know, for the disembarkation on their side, including obviously all the luggage and whatever the patient has with them.

Q. Who else do you notify?

MR. DRAHOS: Object to form.

THE WITNESS: So we notify, we have to notify the staff captain.

BY MS. LOBEL:

Q. Okay.

A. Or the captain.

Q. Okay.

A. We have to notify guest services on the ship, guest services and that's basically the two people and then they notify whoever they think should be notified including security, obviously, because they are part of the process, but then they are the ones that go ahead and notify other people that may be involved.

Q. Does the shipboard doctor notify the security?

A. We notify the staff captain, which is my

supervisor.

Q. Okay. All right.

A. Which is the captain as well.

Q. Right. So for purposes of notification the two folks that need to be notified is either the staff captain or the captain on the bridge and guest services; correct?

A. Right.

Q. Okay. And you notify guest services how?

A. We notify usually by phone and by e-mail.

Q. Okay. And would that phone call and e-mail, would that be directly from the doctor or somebody from the infirmary?

A. That would depend. That would depend. There is -- nobody has that task being assigned.

Q. When would it be a circumstance the nurse would do it as opposed to you, the doctor?

A. There wouldn't be any specific circumstance.

Q. Okay. It would be your responsibility as the doctor to ensure that those notifications are made; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: The responsibility of the notification is whoever does the notification. Yes, I need to supervise. I supervise --

BY MS. LOBEL:

Q. Right. Because you supervise all the nurses in the infirmary; correct?
A. Yes. That's my -- yes.
Q. And you also are required to supervise, I believe what is it called, the medical secretary, who is on duty as well?
A. Yes. I am the supervisor.
Q. Okay. And does a copy of the shoreside referral form go to the staff captain and guest services as well via e-mail or other means?
A. No.
Q. Okay. Okay. Michael, I promised you a restroom break and I need more coffee and one as well. So on that note, if this is good for you, it's good for me.
MR. DRAHOS: That's fine.
MS. LOBEL: All right. Lovely.
THE VIDEOGRAPHER: We are going off the record. The time is 16:39 UTC.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 16:47 UTC. Please proceed.
BY MS. LOBEL:
Q. Okay, Doctor, welcome back. Am I correct in understanding that the only way to determine whether a patient is suffering from a hemorraghic stroke versus a

thrombolytic stroke is by CT or MRI imaging?
A. Yes.
MR. DRAHOS: Form.
THE WITNESS: To be able to distinguish.
BY MS. LOBEL:
Q. So you wouldn't be able to determine if somebody is having a hemorraghic stroke or a thrombolytic stroke in a shipboard infirmary; is that correct?
A. That is correct.
Q. Okay. Are you aware that Royal Caribbean advertises to passengers that medical centers are offered on its ships?
MR. DRAHOS: Object to form.
THE WITNESS: I'm sorry, can you repeat that.
BY MS. LOBEL:
Q. Sure. Of course. Of course. Are you aware that Royal Caribbean advertises to the public that it offers shipboard medical centers on its ships?
A. I'm not aware.
Q. Okay. In the medical -- well, strike that.
On Royal Caribbean ships, is it advertised to passengers that there is a medical center available should they need care or treatment?
A. Yes. I believe so.
Q. Okay. And does the ship indicate to passengers

the hours of operation for the medical center?
A. Yes. That is on the door.
Q. And does the ship indicate to passengers that there is a Royal Caribbean doctor available on call 24/7?
A. I'm not aware of that.
Q. Okay. Do you know if you are supposed to be, you being a Royal Caribbean doctor, supposed to be on call should there be a medical emergency for either a passenger or crew member at any time?
A. You mean if there is somebody on call, if there is a doctor on call?
Q. Yes. There's a doctor on call throughout every cruise 24/7 to be on call for a medical emergency for passenger crew?
A. Yes. That is correct.
Q. Okay. Does the medical center -- well, strike that.
Does the ship indicate to passengers that if there is a medical emergency, the medical center is available for their care and treatment?
A. I'm not aware of that.
Q. Okay. Does the medical center have -- strike that. Doctor, the medical center indicate to passengers that it will arrange for medical transportation should it be necessary?

MR. DRAHOS: Object to form.

THE WITNESS: Well, that depends. It depends on what you mean by that, but --

BY MS. LOBEL:

Q. Is there anything in the medical center indicating that, for example, that if you're at port, a port agent will be contacted to arrange for ground transport for your medical emergency, for example?

MR. DRAHOS: Object to form.

THE WITNESS: If there is anything in the medical center, no.

BY MS. LOBEL:

Q. Okay. Do the shipboard doctors tell patients that it uses a port agent in order to coordinate ground transportation for medical care?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, you mean if the patient is getting evacuated.

BY MS. LOBEL:

Q. Yes.

A. It depends, but not necessarily.

Q. Okay. Let me just catch up with my notes. One second. Are you aware that the Sea Care program enables shoreside to see in real time the medical records that are filled out on ships?

A. I wouldn't be able to tell you that.
Q. Okay. Are you as a shipboard doctor able to request that certain medications be added to the medication's inventory, such as TPA?
A. Well, on a regular basis, no that wouldn't be possible.
Q. Okay. On an ad hoc basis, would that be possible?
MR. DRAHOS: Object to form.
THE WITNESS: Well, that would have to be a specific situation and that depends on the situation obviously.
BY MS. LOBEL:
Q. Okay. What would it depend on if the situation was one where you wanted to request from Royal Caribbean that an infirmary or medical center be supplied with TPA?
A. The supplies that we have in the medical facility they are not directly supplied -- they are not directly acquired by the medical team.
Q. Who are acquired by?
A. They are acquired by the companies.
Q. Being Royal Caribbean?
A. Yes. Correct.
Q. Okay. So Royal Caribbean decides what medications will or won't be supplied in medical centers?

A. Yes. Yes. Mostly. Unless there's a specific circumstance.

Q. Have you ever encountered a specific circumstance that you're alluding to?

A. No.

Q. Okay. Why is it that there are different medical inventories on certain ships versus others?

MR. DRAHOS: Object to form.

THE WITNESS: I wouldn't be able to answer that.

BY MS. LOBEL:

Q. Have you ever seen a situation where the inventory on one ship is different than another ship?

A. Not that I've noticed.

Q. Okay. So typically, if you went to the Harmony of the Seas inventory and you compared it to the Symphony of the Seas inventory, they should be the same?

A. That's correct.

Q. Okay. Is the purpose of that so as a doctor, a shipboard doctor you could go from any ship and know what to expect will be available for you to use for care and treatment?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not sure, but I can imagine yes, that's correct.

BY MS. LOBEL:
Q. Okay. All right. I want to talk to you a little bit about the hiring process when you were first hired by Royal Caribbean. When you first applied to be a shipboard doctor, was that directly to or directly with Royal Caribbean?
A. Yes. Yes. That's correct.
Q. Okay. Can you tell me how that came about?
A. How did that happen? How did it happen?
Q. Yes, sir, please.
A. Okay. So I contacted the director of medical operations.
Q. Who was that?
A. Steve Williams.
Q. Okay. Was that via e-mail or telephone call?
A. That was via e-mail.
Q. And how did you get William's e-mail address?
A. That was from a journal, a journal of emergency medicine.
Q. Okay. All right. So you were telling me that you applied originally to Royal Caribbean through an e-mail to the medical operations director, who was Steve Williams at the time and you learned about his contact information from an ER medical journal?
A. Uh-huh.

Q. So what I want to find out is after you e-mailed -- is it Dr. Williams?

A. He's from my understanding registered --

Q. Registered nurse?

A. Yes.

Q. All right. Is Nurse Williams still with the company?

A. No. He's not. No. 2018 or so, earlier than that, 2016.

Q. Okay. So after you contacted Nurse Williams, what was the next step in the process in ultimately going through the hiring phase with Royal Caribbean?

A. Okay. So then there was that letter of credentials and my CV analyzed by him and then there was an interview and an exam, an oral exam to assess, you know, and that interview took place --

THE COURT REPORTER: Keep your voice up, sir. You're trailing off.

THE WITNESS: So what I was saying is that there was an assessment. There was an interview, an exam by Steve Williams and that took place in Lisbon.

BY MS. LOBEL:

Q. Did Nurse Williams come with anyone to do the assessment or he came alone?

A. He came alone.
Q. Okay. Did Nurse Williams administer the test, the written test?
A. It was an oral test.
Q. Did you ever complete a written test?
A. No.
Q. Throughout your time working with Royal Caribbean, Celebrity or Azamara or any line, have you ever had to do any written tests?
A. From the company, you mean?
Q. Yes.
A. No.
Q. Okay. Now during the oral examination conducted by Nurse Williams, do you recall what happened?
A. I have -- it was a long time ago, so I don't have like a specific recollection, but I did have an exam.
Q. Do you recall any of the questions from the oral examination?
A. Not specifically. It was an extensive exam. It was a long time ago.
Q. Okay. Do you recall if Nurse Williams took notes during the examination?
A. I don't recall.
Q. Okay. Do you recall more or less how long the

oral examination was?
A. It was probably -- it took over an hour or so, hour and a half, I would say.
Q. Okay. So over an hour. Do you recall if during the oral exam you were given clinical hypotheticals as to what you would or would not do?
A. Yes. I remember there was clinical scenarios.
Q. Did any of the clinical scenarios include a situation where the patient may be suffering from a stroke?
A. Honestly, I wouldn't be able to answer.
Q. Okay. Got to ask. Now, after you -- well, okay. Once you completed the oral examination, what was the next step in the hiring process?
A. Then, to be honest, I just waited.
Q. You what, I'm sorry?
A. I just waited.
Q. Okay. Okay.
A. We had the interview. We had did the exam and then I waited to, you know, to see if I would be hired or not.
Q. Okay. And then presumptively, obviously you were hired and then you started working for the cruise line; correct?
A. That's correct.

Q. Now, at the end of each contract, do you get reassessed to see whether or not they are going to sign you for another contract?
A. No, but we are required to do credits, continuing medical education credits.
Q. Okay. Does Royal Caribbean tell you which credits you need to complete?
A. No.
Q. Does Royal Caribbean tell you where you need to get the credits from?
A. No.
Q. Okay. How many credits are you required to have?
A. Well, I was referring to back when Steven Williams was the medical director and that was 60.
Q. 60?
A. Yes. That's correct. 60 CMEs.
Q. Okay. And what was the reporting period? Every year, every couple years?
A. One year.
Q. One year. Okay. Would Royal Caribbean pay for them?
A. No.
Q. Okay. At any point in time from when you first started working for the Royal Caribbean Group through

today, have you ever had to undergo a reevaluation or testing since that initial oral exam with Nurse Williams?

MR. DRAHOS: Object to form.

THE WITNESS: I do have to do every two years. Every two years I have to renew an ACLS, a BLS, a PALS, a CLS. I'm sorry, an APOS training.

BY MS. LOBEL:

Q. Okay. Does Royal Caribbean do any review of your medical records cases or anything to that nature?

A. I wouldn't be able to tell you that.

Q. Okay. Have you ever been called in by anyone to go over any particular cases that you've handled through the time that you have worked for the company?

A. Not that I recall, no.

Q. Have you ever participated in any shoreside meetings with the medical department?

A. Yes.

Q. Can you tell me about those?

MR. DRAHOS: Object to the form.

THE WITNESS: So there's -- there was in 2014 and then 2016, we began -- there was a medical conference and that conference, it was just a week of lectures.

BY MS. LOBEL:

Q. What did these lectures cover?

MR. DRAHOS: Object to form.
THE WITNESS: To be honest, I wouldn't be able to tell you now, but just general medical knowledge, I guess.
BY MS. LOBEL:
Q. Did the medical lectures have anything to do with how to handle medical emergencies or medical disembarkations?
MR. DRAHOS: Object to the form.
THE WITNESS: No. No. They are not mandatory.
BY MS. LOBEL:
Q. Okay. Have you ever participated in any shoreside medical meeting having to do with anything else other than the one-week trainings?
A. No.
Q. Okay. Have you -- well, strike that.
At the end of the contract you have performance evaluations?
A. Yes. Yes. I had performance evaluations, yes.
Q. Who do you have the performance evaluations with?
A. The staff captain.
Q. Anyone from the medical department?

A. No.
Q. You would agree with me that the staff captain doesn't have a medical license?
A. I mean --
Q. They are not doctors?
A. No. They are not doctors. I mean, I suppose not.
Q. Okay. So the shipboard staff captain or captains can't evaluate the medical care that you're providing; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: They supervise the overall function of the medical facility, but not the clinical aspect, no.
BY MS. LOBEL:
Q. Okay. Who reviews the clinical aspect of the care and treatment provided in the medical centers?
MR. DRAHOS: Object to form.
THE WITNESS: I wouldn't be able to tell you that, but there is -- we have a medical ops director that's our clinical supervisor. I wouldn't call it supervisor, but that's the clinical connection that we have, because obviously the staff captain is not a clinical connection. It's, you know, a function, I would say --

BY MS. LOBEL:
Q. Do you ever have meetings with the medical operation director?
MR. DRAHOS: Object to form.
THE WITNESS: There are weekly or bi-weekly -- sorry, every 15 days there are calls, there are meetings with the whole fleet.
BY MS. LOBEL:
Q. Is that done via like Zoom or some other --
A. Yes. Yes. That's correct. Zoom or whatever.
Q. Okay. And those meetings that are more or less every two weeks, is it with the whole fleet, meaning just with Royal Caribbean ships or is it Royal Caribbean, Azamar, Celebrity and all the other lines?
MR. DRAHOS: Objection to form.
THE WITNESS: I believe it's every line is --
BY MS. LOBEL:
Q. Okay. And what's discussed during these meetings?
MR. DRAHOS: Object to form. I'm going to instruct you not to answer if an attorney was present during those calls and if you don't know whether or not an attorney was present, I'm going to invoke the attorney/client privilege and instruct you not to answer. So unless you know for

sure that an attorney wasn't on that call, you can answer. If you don't know, then I'm invoking the attorney/client privilege and instructing you not to answer the question.

THE WITNESS: Yes. I'm not sure.

MR. DRAHOS: Okay.

BY MS. LOBEL:

Q. Do you know who participates in these meetings?

A. Usually it's the medical staff. Medical staff from the ship.

Q. Okay. Can you see everybody who's on the screen or participating in these meetings?

A. No.

Q. Why not?

A. Because some people, they are -- how can I explain it? Some people will connect via Zoom. Some people will connect through telephone and not all of them are identified.

Q. Okay. Does anyone take notes during these meetings to document what's discussed?

MR. DRAHOS: Object to form.

THE WITNESS: Anyone, you mean, who --

BY MS. LOBEL:

Q. Anyone who is a part who participate in these meetings, do they take notes?

A. I wouldn't be able to answer that.
Q. Do you get copies of any materials in anticipation of these meetings?
MR. DRAHOS: Object to the form.
THE WITNESS: Not in anticipation.
BY MS. LOBEL:
Q. How do you know what's doing to be discussed during these meetings?
A. Not generally.
Q. What is typically discussed during these meetings?
MR. DRAHOS: Object to form. Same instruction.
THE WITNESS: What's that?
MR. DRAHOS: If you don't know whether or not an attorney is present on these calls I'm going to instruct you not to answer the question in an abundance of caution to preserve the attorney/client privilege.
THE WITNESS: Okay. So I wouldn't be able to answer.
MS. LOBEL: Well, then I'm going to earmark these questions to be addressed at a later time because I don't understand the objection. Because well, let me back up.

BY MS. LOBEL:
Q. Are these meetings done in the regular course of the company's business?
MR. DRAHOS: Object to the form.
THE WITNESS: In the regular course of the business.
BY MS. LOBEL:
Q. Every two weeks do you have this meeting?
A. Yes. Yes. It happens. It doesn't happen always, but it usually happens every two weeks or so.
Q. Is it part of your job to participate in these meetings every time that they are held?
A. It's not mandatory.
Q. Why is it not mandatory?
MR. DRAHOS: Object to form.
THE WITNESS: I wouldn't be able to answer that. It's not mandatory.
BY MS. LOBEL:
Q. So if you don't show up to these meetings, what happens?
MR. DRAHOS: Object to form.
THE WITNESS: If for any reason we are not able to attend the meeting, then we are not able to attend the meeting.
BY MS. LOBEL:

Q. Are you supposed to notify somebody if you're unable to attend?
A. No. We are not.
Q. Is at least one doctor per ship supposed to attend these meetings?
MR. DRAHOS: Object to the form.
THE WITNESS: I mean, again, we are supposed to attend the meetings, but it's not mandatory.
BY MS. LOBEL:
Q. Okay. How do you find out whether or not a meeting is going to be conducted?
A. We get an e-mail.
Q. Does the e-mail -- well, who does the e-mail come from?
A. Usually the e-mail comes from the head office.
Q. Okay. Does the e-mail alert you what's going to be discussed during the meeting?
A. No.
Q. What does the e-mail typically advise you?
MR. DRAHOS: Object to form.
BY MS. LOBEL:
Q. Go ahead.
A. It just says conference call, the date and the time.
Q. Who runs the meeting?

A. I'm sorry?
Q. Who runs the meeting?
A. Well, it depends. It depends who -- it depends. But there is not one specific person that runs the meeting. Sometimes the medical director, medical operations is present. Sometimes our ship managers are present. Sometimes other people from other areas, like public health is present. It depends on what content of the meeting is and, you know, whoever is available to be at that meeting.
Q. For the e-mails alerting you of the meetings, is there ever any materials attached to those e-mails?
MR. DRAHOS: Object to the form.
THE WITNESS: E-mails to the ones that notify us.
BY MS. LOBEL:
Q. Yes, sir.
A. No. No. They are not.
Q. Do you ever get e-mails that have attachments to it that are supposed to be looked at or maybe referred to during these meetings?
A. No.
Q. Do you ever get materials after the meeting is concluded or during the meeting?
MR. DRAHOS: Object to the form.

THE WITNESS: Not during the meeting, but afterward we get the minutes from the meeting. I hope I'm saying that word correctly.
BY MS. LOBEL:
Q. The meeting minutes?
A. Yes. The meeting minutes.
Q. Okay. Do you know who takes the meeting minutes?
A. No, I don't.
Q. Okay. And you get copies of meeting minutes after every meeting?
A. Yes.
Q. So that enables you to know what was discussed even if you couldn't participate?
A. Yes. That is correct. I mean, at least whatever it says in the minutes.
Q. Okay. Now, are the minutes embedded in the e-mail or is it attached to the e-mail?
MR. DRAHOS: Object to form.
THE WITNESS: I wouldn't be able to answer that. I believe they are attached.
BY MS. LOBEL:
Q. Like a PDF and then you click on it and it opens?
A. I believe so. That's my memory of the

minutes.

Q. Understood.

A. I usually try to attend the meetings.

Q. Understood. Understood. But you know if there's -- well, if you attend the meeting or not, you get the e-mail with the meeting minutes; correct?

A. Yes. That is correct.

Q. Okay. Do you ever have meetings after the group meetings, either Zoom or telephone with the shipboard, specific shipboard staff?

MR. DRAHOS: Object to the form.

THE WITNESS: Did you say after these meetings if I ever have a specific meeting?

BY MS. LOBEL:

Q. Correct?

A. Not necessarily. But I am able to contact the ship's manager, if I need to.

Q. Do you have meetings with the team on the ship to discuss what was discussed during the shipboard -- sorry, let me rephrase it. Let me strike that. Do you ever have meetings with the shipboard's team to discuss what was discussed during the Zoom or telephonic meeting throughout the fleet?

A. So what we have is a weekly meeting. We don't have meetings specifically to discuss what the content

of the meeting was, but we have a weekly staff meeting where we can discuss, you know, whatever we think is important for our team.

Q. When do you have the weekly meetings?

A. Well, that depends. There is no specific date or time. Whenever it's convenient. Weekly. It has to be weekly.

Q. Okay. Is there documentation of these meetings?

A. Yes.

Q. How do you document or how are these meetings documented?

A. These meetings are usually documented in a normal Word document.

Q. Okay. Do you send that to anyone?

MR. DRAHOS: Object to form.

THE WITNESS: No.

BY MS. LOBEL:

Q. Do you create like an agenda as to what's going to be discussed during the meeting?

A. No.

Q. What do you put in the Word document to document your meetings?

A. So we put who is at the meeting.

Q. Okay.

A. Who attended the meeting and what was

discussed.
Q. Okay. And where are those notes kept?
A. These notes should be kept on the ship.
Q. You don't delete them?
A. There is -- I believe there is what do you call it, a number of months that we are required to have them and then we are able to delete.
Q. Okay.
A. I believe so.
Q. Does shoreside, does the shoreside department get a copy?
A. No.
Q. Okay. Does shoreside have access to those?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, it depends. They are -- we keep them. We keep them, so if they need them, eventually they would be able to have access, yes.
BY MS. LOBEL:
Q. Okay. Is it the company procedure that you have these weekly meetings documented?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. That is a required (inaudible).
BY MS. LOBEL:
Q. Okay. But they don't give you like a form

specifically to use for these meetings?

A. Yes. There is a form.

Q. Okay. What is that form called?

A. I wouldn't be able to tell you exactly, but it's something like weekly meeting form, something like that.

Q. Is it specific to the medical department?

A. It is. It is.

Q. Okay. Is it -- because I have seen other forms before with other cruise lines, is it like a list. You put everyone that attended on the top, the date, ship and then there is like a little summary of all the meeting highlights of what was discussed?

A. Yes. Yes. That's it.

Q. Okay. What do you typically discuss during these meetings?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, it varies greatly from week to week. There is no specific subject that we need to discuss.

BY MS. LOBEL:

Q. Does it discuss sometimes the care and -- well, does it discuss -- well, strike that.

Have you ever discussed medical emergencies or medical disembarks during these meetings?

A. I wouldn't be able to tell you that. I don't know.

Q. Okay. Do you discuss the operations of the medical center?

MR. DRAHOS: Object to the form.

THE WITNESS: Usually that wouldn't be the usual topic, but again, it depends. It depends on every week -- what I mean is there is nothing specific that we have to enter that. So there is nothing -- nothing in the form tells us that we have to enter a specific information regarding, you know, whatever happened specifically so it's general things, whatever the team and the doctor at that time feels he needs to discuss or he needs to -- sometimes it's a conversational things that happen in the medical end, but nothing -- it varies greatly. Really varies a lot.

BY MS. LOBEL:

Q. Just so I have a sense of what's discussed and documented, can you give me some examples of what would be discussed and documented in these notes?

MR. DRAHOS: Object to the form.

THE WITNESS: For example, we would possibly discuss team-building activities.

BY MS. LOBEL:

Q. What else?
A. And then anything that might be going on in the medical or, you know, for example going over SQM policies, instructing the team, make sure that they remember, you know, certain passages of STM regarding the medical operation and that kind of thing. Sometimes the staff captain participates if he wants. He brings, you know, whatever information he feels like it's pertinent. It depends. It depends. Anything can go on in that record. It doesn't have -- there is nothing that instructs us that we need to have medical information with him.
Q. Okay. During these meetings, who else other than the nurses, the doctors, the medical secretary and the staff captain would participate?
A. No one else. The captain, eventually if he wanted to, but I have never seen that.
Q. Guest services or housekeeping or those other departments don't participate?
A. Not -- I have never seen that happen.
Q. Okay. Okay. Understood. One second. Let me just catch up here. Do you undergo any training provided to you by Royal Caribbean with regard to medical care and treatment or procedures?
A. We are required to have an updated training,

like I said before, an ACLS, BLS, PALS and ACLS, but that usually -- I usually do that in Portugal.

Q. Okay. Do you undergo any other forms of training?

MR. DRAHOS: Object to the form.

THE WITNESS: Medical training?

BY MS. LOBEL:

Q. Like shipboard procedures. Like, did you ever have any training specifically with regard to medical disembarkation or medical emergencies on ships?

A. Well, we -- every doctor that starts working with the company starts as a junior doctor, like a regular doctor and so, then the senior doctor usually runs the medical offices. He is the one that -- you kind of learn situation by situation how things are done.

Q. Are you ever trained at any point in time before you start working on the ships how to handle a medical evacuation or medical disembark?

A. Yes. I believe I have had that experience based on, you know, what was happening with the senior doctor at the time.

Q. My question is a little bit different. My question is, do you have training from Royal Caribbean before you even get onto the ship to work as a shipboard

doctor about the procedures and how to handle a shipboard medical disembark or medical evacuation?

A. Okay. Okay. So before I even joined the company?

Q. No. Not before you joined the company. Let me back up. So once you get hired by the company, but before you start working in the medical center, that period of time, did you ever have any training shoreside how Royal Caribbean expects you to handle medical disembarks or medical evacuations?

A. We've had -- when I was first hired before I started working I went to Miami for, you know, a few days training with Steve Williams but I wouldn't be able to tell you exactly, because again, it was almost ten years ago. So I wouldn't be able to tell you exactly. I remember we had a three-day training going on, because obviously there were specific things about ships that probably needed to be addressed at the time. I don't know exactly what was the content, but we had some kind of training.

Q. Was that training that you had before you started working on the ship with Nurse Williams? Was it just you and Nurse Williams or was there like a classroom with other doctors and nurses?

A. At the time there was two other new hires. We

were hired exactly at the same time, so they were also there, because we were all starting at the same time.

Q. Okay. And those two other new hires, were they doctors or nurses?

A. They were both doctors.

Q. Okay. At the time you had this training shoreside, did you review any materials?

MR. DRAHOS: Object to form.

THE WITNESS: It's like I'm saying I wouldn't be able to tell you, because I do recall being at the training. I was there for three days, but I can't tell you exactly what we discussed.

BY MS. LOBEL:

Q. Okay. And so during those three days, you don't recall one way or the other if you covered what the procedures are or expectations for medical disembarks or medical evacuations on the ships?

A. No. I don't recall.

Q. Okay. Do you recall if you were shown any videos or tutorials or anything like that?

A. I think there might be -- there might have been some PowerPoint presentations.

Q. Okay. At the conclusion or at any point during the training, were you given like a manual or any materials for your review?

A. No.
Q. Were you given anything else? Not a manual, but other materials of any type?
A. No. I don't believe so.
Q. Okay. Okay. So who -- well, strike that.
How were you trained as a shipboard doctor how to handle a medical emergency, for example, at sea versus at port?
MR. DRAHOS: Object to form.
THE WITNESS: At sea versus at port. So like I explained before, the person that is responsible for the disembarkation procedure. So I spent three years as a junior doctor learning, but not taking the responsibility for the emergency situation.
BY MS. LOBEL:
Q. Okay. Since 2014 through 2021, how many medical disembarkations or medical evacuations have you been a part of whether it be as a junior doctor or as a senior doctor?
MR. DRAHOS: Object to form.
THE WITNESS: I would say a lot.
BY MS. LOBEL:
Q. More than five?
A. Yes.
MR. DRAHOS: Object to form.

THE WITNESS: Definitely.

BY MS. LOBEL:

Q. More than ten?

MR. DRAHOS: Object to form.

THE WITNESS: I wouldn't be able to tell you the exact number, but I would say if we had to put a --

BY MS. LOBEL:

Q. Correct?

A. I would say more than 20.

Q. Okay. Have any of those medical disembarks or medical evacuations in the more than 20 group, that you can recall involve a patient who you suspected might be suffering from a stroke?

A. I wouldn't recall that.

Q. Was this incident that we're here to talk about today the first and only medical disembark evacuation involving a patient who was suspected of suffering from a stroke?

A. I wouldn't be able to, because we did a lot of disembarkations, so I wouldn't be able to recall all of them.

Q. Understood you may not remember all of them, but would it be more than just this one incident?

MR. DRAHOS: Object to form.

THE WITNESS: I don't recall all of them. There might have been one that I don't recall, so I couldn't answer that.

BY MS. LOBEL:

Q. I'm not trying to be difficult. I'm just trying to understand was this, for example, the very first time that you encountered a patient who might be suffering from a stroke on a Royal Caribbean, Celebrity or Azamara ship?

MR. DRAHOS: Object to the form.

THE WITNESS: The first time, no. This is not the first time. No.

BY MS. LOBEL:

Q. Was that the first time that you were involved, as best as you can recall, in disembarking a passenger or crew member who you suspected might be suffering from a stroke?

MR. DRAHOS: Object to form, asked and answered.

THE WITNESS: If this was the first time? This was not the first time that I encountered the patient that might be suffering from a stroke, is that the question?

BY MS. LOBEL:

Q. My -- it's a little different because I want you to note if you encountered other instances before. My

next question is okay, and now knowing that you've encountered other instances with people who may be suffering from strokes, at any point in time were there instances for those folks that you were involved in a medical disembark other than the incident we're here to discuss today or was that the very first time?

MR. DRAHOS: Object to form.

THE WITNESS: This wasn't the first time that I was involved.

BY MS. LOBEL:

Q. This was or was not sorry?

A. This was not.

Q. Okay. Was this the first time that you were ever involved in a disembark or evacuation of a patient or be it crew or passenger involving the port of San Juan?

A. This wasn't the first time, no.

Q. Okay. How many times, as best as you can recall, have you disembarked a passenger, be it crew or a civilian passenger that you disembarked or medically evacuated, involving the port of San Juan?

MR. DRAHOS: Object to form, calls for speculation.

THE WITNESS: Yes. I wouldn't be able to give you a specific number, just more than once, few times. I wouldn't want to, you know, say something

that's not accurate. I would say more than once for sure. Two, three, five, I'm not sure.

BY MS. LOBEL:

Q. Okay. Would it be less than ten?

MR. DRAHOS: Object to the form, asked and answered.

THE WITNESS: Yes. I mean I wouldn't be able to tell you if it's less than ten or not, because I don't recall, but I have done disembarkations.

BY MS. LOBEL:

Q. Okay. Okay. Were those instances before or after this incident or both?

A. Probably both.

Q. Okay. Do you recall if any of those other instances involved a passenger or crew member who was suspected of suffering from a stroke?

MR. DRAHOS: Object to form.

THE WITNESS: Well, like I said, I don't remember the exact number or exact reasons why those disembarkations occurred. So I wouldn't be able to tell you if it was -- if a patient had a suspected stroke or not.

BY MS. LOBEL:

Q. Okay. Understood. I'm just trying to again get a feel if this incident was the very first time that you

had a situation where you disembarked or medically evacuated anyone who is suspected of suffering from a stroke at the port of San Juan?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. That's what I explained.

BY MS. LOBEL:

Q. Okay.

A. Although I have disembarked patients in some form before. Not only do I not recall exactly when or how many, but I also don't recall the cause for the disembarkation, so I wouldn't be able to tell you if it was a stroke or not.

Q. Would that be documented, if I wanted to find out -- my question is since you don't remember how many times you have disembarked passengers at the port of San Juan or for what reasons, do you know if there would be some form of documentation that Royal Caribbean, Celebrity, Azamara would have which could tell me that?

MR. DRAHOS: Objection.

THE WITNESS: I'm not sure.

BY MS. LOBEL:

Q. Okay. For those other instances, would there be medical records that you would have generated?

A. I imagine so.

Q. Would there have been a shoreside referral form?

A. Yes.

Q. Would there be e-mails to guest services and to the captain or staff captain apprising them of the situation?

MR. DRAHOS: Object to the form.

THE WITNESS: I mean it's part of the procedures, so I imagine so.

BY MS. LOBEL:

Q. Okay. In these instances, would you have communicated with the port agent?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. If there was an disembarkation, yes, we would have notified the port agent, yes.

BY MS. LOBEL:

Q. And the notification to the port agent, would that have been via telephone, text or e-mail? How does that work?

A. Well -- -

MR. DRAHOS: Object to form.

THE WITNESS: Well that depends, that depends on the case. Either one. Either one might have had.

BY MS. LOBEL:

Q. Okay. Under what circumstances would you call

the port agent versus e-mail the port agent?
A. Well, we usually, me specifically, I usually call. Call the port agent. I usually call the port agent, because obviously and/or and write the or just call. Usually I call and I write them or the secretary calls, just because it expedites things and obviously makes things a little bit more clear.
Q. Okay. And why do you make efforts to expedite things?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, it depends on the circumstances, but usually if you're disembarking a patient, it's always better to contact people directly.
BY MS. LOBEL:
Q. Okay. And after you contact the port agent, do you maintain communication with the port agent until the patient is transferred to whatever facility they are going to?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, I wouldn't be able to answer you, because not recalling the evacuation, I don't recall exactly what happened with each situation.
BY MS. LOBEL:

Q. Is there a expectation from Royal Caribbean that you monitor the actions taken by the port agent to assist you in the medical disembark?

MR. DRAHOS: Object to the form.

THE WITNESS: I am not sure what the expectation is.

BY MS. LOBEL:

Q. Okay. Do you monitor the actions taken by the port agent to ensure that they are doing what you need them to do to assist you in the medical disembark?

A. The port agent does not answer to me, so the port agent has their own procedures so we inform them they do whatever procedures they need to do and then we disembark the patient.

Q. Okay. But my understanding is the patient remains in your care until transferred to the next facility; correct?

A. Yes.

MR. DRAHOS: Object to form.

THE WITNESS: On the ship, you mean?

BY MS. LOBEL:

Q. Yes. So if the patient is in your care on the ship, they remain in your care until transferred to the next medical facility; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sorry, I don't understand exactly what the question is. Do you mean, if they remain under my care while they are on the ship?

BY MS. LOBEL:

Q. Right. So unless and until the ambulance comes and the patient is delivered to the next hospital, does that patient remain in your care until that point?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, the patient remains in our care when they are on the ship, because obviously, they are in our care in the medical facility. Then we hand them over to the transport, usually obviously an ambulance, so we hand the patient over to them so the transport obviously is the ambulance's responsibility, but yes, if there's any clinical doubts or then the ambulance would contact us, being the last, you know, being the last medical team that assisted the patient. We would be able to answer any clinical questions the ambulance may have until they are delivered to a hospital, where the other medical team takes over the case and then obviously we kind of contact -- we lose track of -- we hand over the patient.

BY MS. LOBEL:

Q. To the next treater; right?

A. To the -- then they become the treater, yes.

Q. Okay. So what I'm trying to get at is you don't transfer the care of the patient to the port agent so that the port agent is responsible for the care and treatment and status of the patient until they are transported to the next facility?

MR. DRAHOS: Object to form.

THE WITNESS: The port agent is not a medical person, so but we transfer the patient from the ship to the ambulance.

BY MS. LOBEL:

Q. Right. But Royal Caribbean is the one in charge of requesting and getting the transportation; correct?

A. That is not correct.

MS. LOBEL: I'm sorry. Michael, did you say something?

MR. DRAHOS: No. No. I was clearing my throat.

MS. LOBEL: Sorry. Okay. It sounded like you said something.

BY MS. LOBEL:

Q. But the patient is in the shipboard medical center's care until the ambulance takes the patient to the next facility; correct?

A. Yes. The ambulance the people from the

ambulance, they come and pick up the patient from the medical facility and until the patient is under our care, yes.

Q. And when the cruise line requests that the port agent start making arrangements for ground transport, that undisclosed agent isn't identified to the patient; correct?

MR. DRAHOS: Object to the from.

THE WITNESS: I wouldn't be able to tell you that. It depends. There is nothing that says that either way that not having to -- it may or may not be disclosed.

BY MS. LOBEL:

Q. You don't tell the patient that some undisclosed port agent is going to be the one requesting your ground transport. You tell the patient that we're requesting ground -- we're making arrangements for you to have ground transport; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: We -- well, that depends on the circumstances. I don't know what is said to the patient in each case. Each case is different. I wouldn't be able to tell you what happens. Each case is different.

BY MS. LOBEL:

Q. In your cases when you're the doctor and you've requested ground transport, you don't tell the patient that the port agent is going to be requesting and taking care of your ground transport; correct?

MR. DRAHOS: Object to form, asked and answered.

THE WITNESS: Again, that's not something that I would be able to answer, because then every instance is there. Every case is different. It depends. I may or may not say. That's something that I wouldn't be able to tell you. I never say or I always say or, you know, it's nothing that I specifically do a certain way. It depends on the case.

BY MS. LOBEL:

Q. Okay. Under what circumstances would you tell the patient that there is some port agent who is going to be responsible for getting the ground transport?

MR. DRAHOS: Object to the form, argumentive.

THE WITNESS: Well, again, there's no specific circumstances that dictate what I have to say or not say. Obviously, the patient, while I'm with the patient while we're talking about -- we're talking about a lot of things here, it comes up, it depends. I wouldn't -- what I mean in answering

your question is there is no specific circumstances where I always tell the patient that there's a port agent involved or there are specific circumstances where I don't tell the port agent that don't tell the patient that there is a port agent involved, if that answers the question.

BY MS. LOBEL:

Q. Do you tell the patient that I am working on getting ground transportation for you to get you to a hospital?

MR. DRAHOS: Object to the form.

THE WITNESS: It's again, obviously my answer. Not very specific, but that's question that I can't answer, because I wouldn't be able -- I tell the patient this or I tell the patient that. That varies. It varies the situation. You know, every patient is different. Every conversation is different. So I wouldn't be able to tell you.

BY MS. LOBEL:

Q. Does someone -- sorry. Someone from Royal Caribbean tells the patient we're getting you ground transport to get you to a hospital for your medical emergency?

MR. DRAHOS: Object to the form, asked and answered, argumentative.

THE WITNESS: Again, the same answer that was for me goes for everybody else. You know, it depends.

BY MS. LOBEL:

Q. How does the patient know anyone is getting emergency ground transport then or do they just not know?

MR. DRAHOS: Object to the form.

THE WITNESS: How does a patient know that they're getting transportation?

BY MS. LOBEL:

Q. Yes. Like because if I'm a patient in the medical center, for example, and I'm suffering from a medical emergency and you're my doctor and you decided I'm going to disembark you at the port of San Juan, how do I know that Royal Caribbean is working to make arrangements for emergency ground transport for me?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, how can I put this. Again, it depends. How would you know if you get that information you will get it from the medical team.

BY MS. LOBEL:

Q. Okay. That's what I'm trying to get at. It's not like the port agent calls the ship to tell the patient they are getting my ground transport and the medical team

is no longer involved; correct?

MR. DRAHOS: Object to form.

THE WITNESS: Well, again, that I can't answer that doesn't happen or that happens. It depends on the port. It depends on so many things. Every country is different. Every port is different. Circumstances are different. So it depends. It depends. There is no specific rule or specific situation where that may or may not happen.

BY MS. LOBEL:

Q. If I'm a patient at the port of San Juan, specifically the port of San Juan and I'm suffering a medical emergency while I'm at the -- while ship is docked, I as the patient am not communicating on working on my ground transport with the port agent, correct, that's with the medical treatment?

A. You, the patient, communicated on getting the ground transportation?

Q. Correct.

A. I wouldn't be able to tell you exactly what happens always, but in this case, no.

Q. Okay.

A. This specific one that we're talking about, no.

Q. That would have been the communications about

arrangements for medical transport, would have been communicated to the patient through Royal Caribbean's staff; correct?

A. I do not recall, but that is likely.

Q. Okay. Royal Caribbean doesn't expect the patient to coordinate their ground transport to get themselves to a hospital off the ship; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I wouldn't be able to tell you what Royal Caribbean expects.

BY MS. LOBEL:

Q. Well, if I'm in the medical center and I'm suffering a medical emergency and you tell me I'm suffering from a medical emergency as a passenger, the process isn't for me, the passenger, to call 911 for my own ground transport, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Are you talking about this specific case?

BY MS. LOBEL:

Q. I'm talking about general procedure.

A. General procedure. In general from my experience, my experience, the procedure would not be for the patient to do that.

Q. It would be for Royal Caribbean to do that;

correct?

MR. DRAHOS: Object to form.

THE WITNESS: The disembarkations I was involved in, I did that or the team did that.

BY MS. LOBEL:

Q. Team being somebody from Royal Caribbean?

A. From the medical team, yes.

Q. Okay. Okay. And in this particular case, now just focusing on this case, there wasn't an expectation that Richard Burgess called 911 for himself to get his own ambulance; correct?

A. There was an expectation.

Q. Royal Caribbean arranged transportation in this case; correct?

MR. DRAHOS: Object to form.

THE WITNESS: We -- no. Like I said before, the procedure for us is to treat the patient, identify a problem and then call the port agent.

BY MS. LOBEL:

Q. And so Royal Caribbean participates in getting the ground transportation and uses the assistance of the port agent?

A. So we call, yes, we call the port agent for whenever we need an evacuation we call the port agent and does his, you know, whatever his procedures are.

Q. Okay. And if the port agent is taking too long, then you, the doctor from the ship, would contact the port agent to check in to see what's going on; correct?

MR. DRAHOS: Object to form.

THE WITNESS: We are in contact with the port agent, so we -- I don't understand exactly the question to be honest.

BY MS. LOBEL:

Q. You're monitoring the status of the port agent's progress in assisting Royal Caribbean in getting ground transport; correct?

MR. DRAHOS: Object to form.

THE WITNESS: We tell the port agent what we need. We explain the situation, our needs and then the port agent has their own procedures. So we don't monitor the port agent's activities because obviously we are on the ship. So the port agent has their own procedures. We wouldn't be able to intervene there.

BY MS. LOBEL:

Q. How do you know if the port agent is doing what they are supposed to do in a timely manner?

MR. DRAHOS: Object to form.

THE WITNESS: I have no control over what the port agent does or not.

BY MS. LOBEL:

Q. That's not my question. My question is how do you know that the port agent is doing as they were requested to get ground transportation one way or the other?

MR. DRAHOS: Object to form.

THE WITNESS: That's what I mean. Since I have no control, since I don't know exactly what the procedures of a port agent are, I wouldn't be able to evaluate that. You know what I mean. So I wouldn't be able to evaluate that from the moment that we from the moment that we request the port agent's services, there is not -- we wouldn't be able to evaluate or monitor what he's doing because he has his own procedure. So we would only be able to monitor if he was doing our procedures, if he was following our procedure, for example, if he was part of our team he was part of Royal Caribbean. So since he really has his own thing going on, so you know what I mean, it's not possible. It's not possible to know or, like you were asking me, it's not possible to know if he is doing everything that he can because we don't know exactly what the procedures are for a port agent, because port agents, they have different procedures in every

country and there is a lot of countries. So there's no way that we could ever be able to control them.

BY MS. LOBEL:

Q. You can call the port agent, right, you've got a phone?

A. Yes.

MR. DRAHOS: Object to form.

THE WITNESS: But that doesn't put us in a situation where we can control what he is doing or suggest or evaluate what he's doing or what his performance is. Let's call it like that because obviously he is doing his job and we can only trust that he's doing his job as best as he can basically.

BY MS. LOBEL:

Q. You can call the port agent to find out what he or she is doing now; correct?

A. Yes. But here's the thing. Even if I called him and he's telling me, yes, I'm doing everything that I can theirs is no way for me to know if that is correct or not so.

Q. You can e-mail the port agent to get an update as to the status of their efforts to get ground transport; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. That would be correct, but that -- again, that doesn't tell us anything of what the port agent is doing. We can just ask him how's -- what's the status and he says you know he's doing his, you know, whatever his procedures and that's it. That's basically it. There's no way. So what I'm telling you is obviously we can communicate with the port agent, does he have that means of communicating with him, but and we can ask him how things are, but that doesn't mean that we can control what he is doing or evaluate if what he is doing is the best way of doing things. Especially because even if there was a specific procedure, which there is not for a port agent, then there is so many countries and there is so many set of circumstances that it would be really impossible for us to control.

BY MS. LOBEL:

Q. San Juan, you know is part of the United States; correct?

MR. DRAHOS: Object to from.

THE WITNESS: That is correct.

BY MS. LOBEL:

Q. And Puerto Rico is part of the United States;

correct?

MR. DRAHOS: Object to from.

THE WITNESS: I think so. Yes.

BY MS. LOBEL:

Q. And you're aware there is multiple medical facilities in San Juan; correct?

A. I'm not aware.

Q. Okay. You have access to the internet in the medical center; correct?

A. That's correct.

Q. And you have access to a cell phone in the medical center; correct?

A. That is correct.

Q. And you have access to a landline on the ship; correct?

A. Yes. That's correct.

Q. And you have access to call the captain for assistance if you need assistance with something; correct?

A. Yes. That's correct.

Q. Okay. If you needed assistance with getting somebody off a ship faster, you can call the captain for help?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't see -- I don't see how.

BY MS. LOBEL:

Q. Okay. You can use the internet to research what medical facilities are at a port; correct?

MR. DRAHOS: Object to form.

THE WITNESS: That wouldn't be a procedure, no.

BY MS. LOBEL:

Q. You have access to do that with the wi-fi connection that you have at the computer in the medical center though; correct?

MR. DRAHOS: Object to form.

THE WITNESS: Yes. We have wi-fi connection but the procedure is to notify the port agent and the port agent is the person that can tell us who -- what's the best facility because obviously we wouldn't be able to rely on really what we read on the internet and then send the patient based on that. The information is not always accurate.

BY MS. LOBEL:

Q. You can call 911 in San Juan; correct?

A. Yes. That's correct.

Q. Okay. Because 911 in San Juan does work because it's part of the US territory?

MR. DRAHOS: Object to form.

MS. LOBEL: Sorry, what are you saying, Michael. I can't hear you.

MR. DRAHOS: I'm telling him wait for a question before he acknowledges you.
MS. LOBEL: Sorry, I couldn't hear you.
BY MS. LOBEL:
Q. Okay. So if you had a situation where the port agent is taking a long time to get an ambulance you could call 911, correct, for a local ambulance?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, calling 911 is always a possibility because of the emergency telephone.
BY MS. LOBEL:
Q. Okay. And the local ambulances would know which hospital can handle which patient, because they are local paramedics; correct?
MR. DRAHOS: Object to form.
THE WITNESS: I wouldn't be able to tell you.
BY MS. LOBEL:
Q. You would agree with me that the local paramedics would be familiar with -- more familiar with the medical facilities in their area than you would be though, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Again, that would be speculating. I'm not sure.
BY MS. LOBEL:

Q. Okay. When you deal with the situation with a medical disembark or medical evacuation, do you document everything that you do during the evacuation process?

A. We try to document as much as possible without interfering with the care of the -- that we're providing the patient.

Q. Okay. Where do you document what you do in your efforts to evacuate a patient off the ship?

MR. DRAHOS: Object to form.

THE WITNESS: Do you mean documenting the evacuation itself?

BY MS. LOBEL:

Q. Yes. Like I called so-and-so requesting ambulance. I communicated to captain patient suffering from the bubonic plague, I don't know. Like how do you document every step that you take in order to effectuate the medical evacuation?

MR. DRAHOS: Object to the form, improper hypothetical.

THE WITNESS: Yes. That depends on case by case.

BY MS. LOBEL:

Q. Okay. Well, what do you in your practice do to document what you do to evacuate a patient from a ship during a emergency?

MR. DRAHOS: Object to form.

THE WITNESS: Well, that depends. That depends.

BY MS. LOBEL:

Q. It depends on what?

A. It depends on the circumstance. Each circumstance is different. Each patient is different. It's different, but my medical records, I put them on Sea Care. And then my medical referral goes on Sea Care. So the medical referral, the clinical referral and the medical notes would be documented on Sea Care.

Q. But the medical notes, for example, in this case and the shoreside referral in this case don't mention anything about what your role was in transporting this patient off the ship to receive care and treatment elsewhere. So I'm trying to understand where I should look to find out what you did?

A. Well, the document, the documents would be the e-mail sent to the port agent.

Q. Okay. Because I've seen on e-mail from the medical secretary requesting a BLS ambulance and nothing else. Where else would there be documentation as to what you did to effectuate this medical disembarkation?

A. Well, everything else was done by telephone.

Q. What telephone?

A. I'm sorry.
Q. What telephone did you use?
A. We use the phone in the medical facility.
Q. Is it a cell phone or was it a landline?
A. It's a landline, probably satellite connection somewhere.
Q. Okay. So you didn't use the ship medical center's cell phones?
A. No.
Q. Okay. Do you know what the phone number is, for example, if the port agent wanted to reach you, the doctor in the medical center, what number he or she would have to call?
A. I'm not sure.
Q. So how would you know which phone number to give the port agent so that you can communicate with the port agent to coordinate the medical transport?
A. The phone number is usually in the medical facility. Usually in the medical facility.
Q. Okay. Did you call in this particular case the port agent?
A. Yes. In this specific Mr. Burgess case?
Q. Yes.
A. Yes.
Q. When did you call the port agent?

A. As soon as I decided that the patient needed to be evacuated.

Q. Do you recall what time that would be?

A. I don't recall. Probably around -- I would say probably around 10 o'clock.

Q. Okay. And what did you tell the port agent as far as you can recall?

A. I can't recall the specifics, but, you know, that a patient needed to be evacuated.

Q. Okay. Would you have told --

A. And the needs and what we needed.

Q. Okay. And sorry, go ahead, go ahead, forgive me.

A. So yes, not only that we have the basic information about the patient also and then what we need for this specific patient, which type of facilities and specialties and/or specialties we need for this specific situation.

Q. What type of facilities did you indicate were needed in this case?

A. Well, we needed a facility that would have CT scan capability and neurology and intensive care unit.

Q. Did you indicate to the port agent that this particular patient was suspected of having a stroke?

A. I don't recall.

Q. Did you indicate to the port agent that this was a time-sensitive situation?

A. I told the port agent that this patient needed to be transported to the hospital as soon as possible.

Q. Okay. So you knew the second that you had the shoreside referral that the patient needed to get to a hospital that was capable of treating him as soon as possible?

A. I'm sorry, would you mind repeating that.

Q. Certainly. You recognized the fact that this particular patient needed to be transferred to a hospital that could provide care up to the standard of care to treat a stroke?

A. Yes. Yes. That's correct.

Q. And you recognized that it was a time-sensitive situation?

A. Yes. This is a time-sensitive situation.

Q. And you recognized the fact that the longer it took to disembark the patient -- well, strike that.

You recognized that this was not a patient who could sit and wait an indefinite amount of time for transport?

MR. DRAHOS: Object to the form.

THE WITNESS: This patient needed to be checked at the hospital as soon as possible.

BY MS. LOBEL:
Q. And you recognized the fact that this patient needed to get to a capable hospital as soon as possible, otherwise he may suffer a catatropic result; correct?
MR. DRAHOS: Object to form.
THE WITNESS: No. I would say that based on what I saw in the possibility that there was a stroke this patient needed to get to a hospital as soon as possible to have a CT scan then and to confirm or rule out a stroke.
BY MS. LOBEL:
Q. Okay. And you knew that that needed to be done in a urgent time frame to ensure that this patient could get treatment within a window such as TPA?
A. Treatment within a window.
Q. Correct. Like TPA can only be provided within a certain time frame of onset of symptoms?
MR. DRAHOS: Object to the form.
THE WITNESS: So your question is if I knew that --
BY MS. LOBEL:
Q. Correct. Let me re-ask the question. Did you -- you appreciated the fact that this patient needed to get to the hospital as soon as possible so the patient could get to the hospital within the window to receive TPA

potentially?

A. I knew that this patient needed to be at the hospital as soon as possible. As soon as possible.

Q. And one of the reasons is so that patient could have the ability to have TPA within the window?

MR. DRAHOS: Object to form.

THE WITNESS: My purpose at that time was to have the patient diagnosed with a CT scan as soon as possible. That was my purpose at the time.

BY MS. LOBEL:

Q. Okay. But was one of your considerations that the differential diagnosis be done, but also that this patient could get to a facility so that they could get TPA within the window?

MR. DRAHOS: Object to form.

THE WITNESS: Then there is a lot of possibilities when a CT scan is done. There's whole possibilities that I wouldn't need to be able to tell you, but my purpose was to have this patient go to a hospital to have a CT scan done and to rule out or rule in a potential stroke.

BY MS. LOBEL:

Q. And that needed to be done as soon as possible, because otherwise certain interventions would not need to be done; correct?

MR. DRAHOS: Object to form.
THE WITNESS: Well, from what I understand from the question, this was my differential diagnosis was a stroke so this patient needed to go to a place that was both able to diagnosis by a CT scan and that had the capability to treat the patient if, if in fact the CT scan worst-case scenario showed in fact this was a stroke.
BY MS. LOBEL:
Q. Right. And because you didn't know one way or another if there was in fact a stroke, one of the conditions is to ensure the patient gets to a hospital fast enough so if they are having a stroke, they can get the medical care and treatment required to treat the stroke; correct?
A. Yes. Yes. We have to make sure that the patient gets to the right place as soon as possible.
Q. Right. In order for the doctors to do things such as give TPA within the window?
MR. DRAHOS: Object to form.
THE WITNESS: That depends on the doctors' observation, the results of tests and whatever they think is the proper procedure to treat the patient. I wouldn't be able to answer that because that depends on the other doctor.

BY MS. LOBEL:
Q. Understood. But one of your considerations as a doctor to provide medical care within the standard of care, if somebody might be having a stroke you need to get them to the hospital as soon as possible. So if they need TPA they can have TPA within the window?
MR. DRAHOS: Object to form.
THE WITNESS: Hypothetically, hypothetically again, it's difficult to say because all this is hypothetical, but what I can say about this specific case is that my purpose was to get Mr. Burgess to the hospital as soon as possible to diagnosis a stroke and eventually to a place where he would have the means to be treated or not and in whatever treatment those doctors decided to administer. So that would be -- that would be impossible to say right now, because obviously without having a CT scan I don't know when I'm on the ship exactly what's going on.
I have a suspicion it's a stroke, I have to send him to a place where they can actually see if there is a stroke, see what kind of stroke it is and then be able to treat whatever needs to be treated and however they think that needs to be treated. But that's why there are specialists and

that's why they specialize in the treatment of the patient.

BY MS. LOBEL:

Q. Sure. And I completely understand that, but from a doctor from your perspective, who doesn't know one way or the other if the patient has a stroke but suspects it's likely a stroke you want to get that patient to a hospital as fast as possible so the doctors who can provide the care and treatment can do what they need to do as soon as possible because the more time progresses, the more damage to the brain there could be to the patient?

MR. DRAHOS: Object to the form, asked and answered.

THE WITNESS: Yes. Yes. So I mean here how can I tell you, what I told you before, here the purpose is to get the patient to the hospital to the right hospital as soon as possible to have a CT scan done and then have a specialist evaluate the patient and then decide whatever needs to be done or can be done or cannot be done. So that then that's, you know, I wouldn't be able to answer, give you a specific answer because from then on it's the hospital care. They decide what to do with the patient.

BY MS. LOBEL:

Q. But based off of your education, training and experience dealing with strokes you know that there are certain care and treatment that can only be provided within a certain window; correct?

MR. DRAHOS: Object to form.

THE WITNESS: No. I wouldn't say that. Things really don't function like that and it's a case-by-case scenario, so whether the doctor, the specialist that sees the patient whether they decide to do the administration in what country they choose, then that's, you know, that's really up to specialists. That's why the specialists are there and, you know, guidelines are guidelines. Specialists, they can decide whatever they think is best for the patient regardless of anything else.

BY MS. LOBEL:

Q. Based off of your education training and experience, the sooner a patient who is suffering from a stroke is treated, more likely than not the better the outcome; correct?

MR. DRAHOS: Object to form.

THE WITNESS: I wouldn't be able to say that. Based on my experience I wouldn't be able to say that.

BY MS. LOBEL:

Q. But you would agree with me that strokes are time sensitive in the sense that the sooner you get a person who is suffering a stroke from onset, the better the outcome because they get the care and treatment that they need sooner and faster?

MR. DRAHOS: Objection, asked and answered four or five times.

THE WITNESS: You know, obviously, I'll keep answering the same question; the answer is the same. It depends on the patient. It depends on the stroke. It depends on there is a lot of evaluations that need to be done to that patient, including CT scan, including specialist consult, including -- there's so many details that I can't give a general answer to that question.

BY MS. LOBEL:

Q. But there is a general protocol within the medical community when you're dealing with a patient with a stroke. You need to get that person to get medical care and treatment as soon as humanly possible; correct?

MR. DRAHOS: Object to the form, asked and answered.

THE WITNESS: Yes, I mean if a person is diagnosed with a stroke, that person needs to be -- and depending on the stroke, then that person needs

to be seen by a doctor that evaluates what kind of treatment, that specific stroke in that specific person benefits more from.

BY MS. LOBEL:

Q. But I'm trying to establish the fact that a stroke and you know that a stroke is a medical emergency that is time sensitive?

MR. DRAHOS: Object to form.

THE WITNESS: Again, obviously this is not going to change much, because again, it depends on what patient we have in front of us, what's the results of the workup that we do, including the CT scan, including a number of other variables and the specialist's opinion and the evaluation; there's no definite answer for that. There's no specific answer for each -- for all cases. Each case has to evaluated and then the CT scan information plays a major role in what's done to that patient and then the hospital's capability, that plays a role also. The patient's condition plays a role, the fact that they are specialists, that plays a role. So you know it is 100 percent a case-by-case decision.

BY MS. LOBEL:

Q. Okay. Do you know what a stroke code is?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know what a stroke code is.

BY MS. LOBEL:

Q. You have never worked in a hospital where a stroke code has been called?

MR. DRAHOS: Object to form.

THE WITNESS: No.

BY MS. LOBEL:

Q. You've never worked in a hospital where a patient has been brought into the hospital and they announce that there's a stroke and everybody has to drop everything and run to expedite the care and treatment for that patient?

MR. DRAHOS: Object to form.

THE WITNESS: No. That doesn't exist in Portugal.

BY MS. LOBEL:

Q. Okay. Have you heard that the United States hospitals have stroke codes?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not familiar with what's happening in the United States hospitals.

BY MS. LOBEL:

Q. Okay. When you've worked in a hospital dealing with strokes, in your experience, have those been medical

emergencies?

MR. DRAHOS: Object to the form.

THE WITNESS: In the hospital you mean.

BY MS. LOBEL:

Q. Yes.

A. Well, again, it depends. It depends. It depends. Some patient are considered a medical emergency. Some are not.

Q. What strokes -- what patients who've been suspected of having strokes are not a medical emergency?

MR. DRAHOS: Object to form.

THE WITNESS: I would have to -- really, we have to see the patient as a whole. So there is a lot involved in that, so some patients for several reasons, including the onset of symptoms, the patient himself, the result of the CT scan. Some people might be considered a medical emergency, some people might not be considered a medical emergency.

BY MS. LOBEL:

Q. Before you get to the CT scan and can see what's going on in the brain, okay, before that point in time is a suspected stroke at that point in time considered a medical emergency?

MR. DRAHOS: Object to the form, asked and

answered.

THE WITNESS: Again, that depends on who oversees the patient and what they see based on the story and the medical examination and the likelihood of there being a stroke and what the story of the symptoms is. You know, I wouldn't be able to answer because that varies from medical professional to medical professional and the situation to situation and patient to patient, honestly.

BY MS. LOBEL:

Q. In this particular case the patient had all of the signs and symptoms to lead you to believe he was suffering from a stroke though; correct?

MR. DRAHOS: Object to form.

THE WITNESS: This patient had complaints consistent with that -- consistent with the differential diagnosis of a stroke. So until that -- until that patient had a CT scan done, a stroke wouldn't be able to be ruled out.

BY MS. LOBEL:

Q. Right. So his condition was deemed to be a medical emergency?

MR. DRAHOS: Object to form.

THE WITNESS: His condition was that he needed

a CT scan as soon as possible. That was his -- because obviously, like I said, if you include a stroke in the differential diagnosis, that person needs to have a CT scan as soon as possible to rule out a stroke. Hopefully, rule out a stroke or confirm that there's a stroke. It depends, but it's not just a CT can. So this patient, as far as me evaluated him need a CT scan as soon as possible, which could either confirm or rule out a stroke, either an ischemic stroke or hemorrhagic stroke. All we knew is that he needed a CT scan.

BY MS. LOBEL:

Q. Okay. And he needed a CT scan as soon as possible to rule in whether or not he had a stroke or not; correct?

A. That's correct.

Q. Why is it time sensitive to determine whether or not a person is having a stroke or not?

MR. DRAHOS: Object to the form.

THE WITNESS: Because obviously a stroke, it depends. It depends on the patient, the diagnosis of a stroke or to rule out or to rule in or to make another diagnosis needs to be done as soon as possible.

BY MS. LOBEL:

Q. Why? Why does that need to be done as soon as possible?

MR. DRAHOS: Object to the form.

THE WITNESS: Because a stroke, the patient needs the patient obviously needs to -- we need to know if the patient has a stroke.

BY MS. LOBEL:

Q. Why?

MR. DRAHOS: Object to the form.

THE WITNESS: Because if the patient doesn't have a stroke, that's one thing. If the patient has a stroke, that's another thing that opens up and then a series of questions that needs to be answered and, you know, depending upon which patient it is from the time that diagnosis of a stroke is established by a CT scan, then that person may or may not be a medical emergency. But that has to be a case-by-case evaluation by the person that does the test and by the specialist that then sees the patient and talks to the patient and listens to the story of the patient. So obviously you can't delay we can't delay doing the exam, but after the exam is done, then the person that sees the patient, the specialist that sees the patient, then he decides what kind of patient and

what kind of treatment that patient needs and what's the windows and whatever, what's the timing, you know, it depends and it depends on so many things, including the story and including the results of the CT scan. So I wouldn't be able to -- what we know, what we know on the ship, not having the capability of doing the CT scan on the ship is that a CT scan needs to be done as soon as possible so the person that sees the CT scans and sees the patient and treats sees the patient and evaluates the patient and has the results of the CT scan then they can decide whether or not that person is an emergency whether or not that person has a time window, whether or not that person -- which kind of treatment that person needs or if they need any treatment at all or if something else is found, then that person needs a treatment for something else. It might not be stroke it might be something else. So the stroke is one of the differential diagnosis. We need a CT scan to see if there's another problem that needs a different treatment and needs to be addressed so we're thinking at that point we're thinking about the CT scan as a form of ruling out stroke and other things.

BY MS. LOBEL:
Q. What's the risk if there's a delay in getting the CT scan?
MR. DRAHOS: Object to the form.
THE WITNESS: I wouldn't be able to tell you that without knowing exactly what patient we're talking about.
BY MS. LOBEL:
Q. Well, in this case, why was it a situation where you felt you couldn't delay -- well, let me strike that.
Why did you feel this was a situation where there shouldn't be a delay in getting this patient a CT scan?
A. Why I thought this was -- I'm sorry, it was a little fast. Why I thought that this was a situation where I couldn't delay the CT scan. That was the question?
Q. Right.
A. Because obviously when you're on the ship and we don't have the CT scan, you don't know, you have no means of diagnosing or ruling out or ruling in anything that might be going on. So that information needs to come as soon as possible.
Q. What was the risk if this patient didn't receive or undergo the CT scan in a timely manner?

MR. DRAHOS: Object to the form.
THE WITNESS: I wouldn't be able to answer that question. That question is -- it's not possible to answer.
BY MS. LOBEL:
Q. Then why did you feel the need that the CT scan needed -- that the CT scan needed to be done as soon as possible if you don't know the risk as to if there was a delay or not?
A. Well, because like I explained, without having a definite diagnosis, we need a CT scan as soon as possible to have that definite diagnosis. And then that opens up a lot of questions that the hospital needs to address.
Q. Okay. So you need the CT scan as soon as possible to get the diagnosis to determine whether there's a stroke or not, but why does that -- what's the risk involved if you don't do that as soon as possible?
MR. DRAHOS: Object to the form, asked and answered.
THE WITNESS: Yes. That's exactly the same question.
BY MS. LOBEL:
Q. Well, I'm not hearing the -- I just don't understand from what you're telling me other than it

depends, it depends, it depends, it depends, but I don't understand why you felt the need that a CT scan needed to be done as soon as possible, because I don't understand what's the risk -- what would be the risk if he didn't get the CT scan as soon as possible?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, it depends on -- because and I know that I do repeat it depends a lot because it does depend, because we didn't -- we although and that's why you call it a differential diagnosis. A stroke is one of the differential diagnosis that this patient had certain symptoms that required a specific diagnosis, whatever that diagnosis is, as soon as possible because obviously we need to know what's doing on with the patient so then we can treat it from our part from on our side. All we are concerned is stroke being a differential diagnosis, a number of differential diagnosis being in play, we need to have the CT scan done as soon as possible to know, you know, to allow the people that treat the patient, you know, to have an answer as soon as possible and to rule whatever they think needs to be done, depending on the result of the CT scan.

BY MS. LOBEL:

Q. Well, let me put it this way, why was it so time sensitive that this differential diagnosis be done as opposed to having a complete workup if somebody had a cold or the flu, for example? What's different about this situation as opposed to somebody who has a cold versus allergies for example?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, because here in this case we have no way -- so let's put it like this on the ship we're a little in the dark in cases like this, because we don't have the capability of reaching a diagnosis whatever that diagnosis might be. So we have we cannot stay in the dark with the patient that requires a CT scan. We cannot stay in the dark so that patient gets a cold a diagnosis might be then easily through other means, but if a patient requires a CT scan to have a specific diagnosis, then that CT scan has to be done as soon as possible. And if we're in a place where we have eventually access to a CT scan, then the CT scan has to be done quickly.

BY MS. LOBEL:

Q. I'm just trying to understand why the CT scan has to be done as soon as possible as opposed to waiting 12 hours and/or waiting for the next day. Why does it

have to be done as soon as possible as opposed to wait?

MR. DRAHOS: Object to form. It's been asked and answered.

THE WITNESS: I don't know exactly. Maybe if I tried to explain it a little differently.

BY MS. LOBEL:

Q. Well, let me ask it differently. What could happen if this patient didn't have a CT scan done as soon as humanly possible?

A. If he didn't have a CT scan done, we wouldn't have a diagnosis.

Q. Why do we need a diagnosis as soon as possible when it comes to a stroke?

A. Because obviously we don't know what's going on. That's why we need a diagnosis as soon as possible, because we are really in the dark. So there's no -- there's no way of knowing what's doing on without a CT scan, so that has to be done as soon as possible to determine what the diagnosis is and then to proceed accordingly. So our concern is the CT scan. That's our concern and then the treatment that the person might benefit from that depends on the results of the CT scan.

Q. But why do you need a CT scan to determine if somebody has a stroke or not? Why is that such a time-sensitive issue to get that diagnosis?

MR. DRAHOS: Objection to form.

THE WITNESS: The CT scan is the only way we have to diagnose a stroke. A stroke is an image diagnosis.

BY MS. LOBEL:

Q. I understand that. I completely understand that, but my question has to do with the time sensitivity of why is it so important to determine if somebody is having a stroke or not as fast as possible?

MR. DRAHOS: Object to the form. Sarah, I can't let you argue with him. You've asked that question more than once.

MR. LOBEL: He is not answering my question. He is avoiding my question very effortlessly from very good preparation, but I'm still not hearing the answer. I want to know why is a stroke different from say a broken wrist that would need to have the imaging as soon as possible. What is different about a stroke in particular as opposed to a broken wrist.

MR. DRAHOS: You have asked him that question in the context of the flu and of a cold and everything else. And he keeps giving you the same answer, so I can't let you argue with him. Make your argument at trial, but it's nothing at this

point to argue with the guy. You have asked him and he has answered. I can't let you keep asking the same questions over and over again. I haven't interrupted now. We've gone several hours and, you know, you can't ask him questions repeatedly until you get an answer that you deem acceptable.

MS. LOBEL: No. It has nothing to do with acceptability, Michael, but that's fine.

BY MS. LOBEL:

Q. I want to know, Doctor, what is unique about a stroke as opposed to other diagnosis that it's time sensitive? What is it about a stroke in particular as opposed to any other situation that you've have seen? Why is a stroke unique?

A. I mean, there's -- we don't put it like that in medicine, a stroke is unique or not. We don't --

Q. Why is a stroke time sensitive versus a broken wrist?

A. Well, you see that question is -- that question is not answerable. Let's put it like that, because there's no one answer to the same question. So it's not possible to give you one answer to that question. That's what I'm trying to make you understand. Theirs is no why is a stroke different or why is a stroke -- every patient that we see, we

evaluate for the probability or the possibility of a stroke. Then we have a CT scan done and then based on all the information that we collect, including the story, including the patient's condition, including the scan results, then maybe that question might be roughly answered. After all this information, after all this information, do you understand what I mean. So there's no definite basis. You can't simplify things to the point of saying, why is a stroke different or why is a stroke time sensitive, or why it's time sensitive when somebody decides, based on all the information that they have, that it is a stroke based on the story until that person then decides what to do and how time sensitive that situation is.

From my side, from what I consider time sensitive is to have the CT scan done, you know, that's my priority. That's the high priority. And what happens after, because you keep asking if for me that's time sensitive because of what can happen next, what can happen next, it depends on a lot of things. I don't know and really at that point being in the medical facility, being in the medical center, not being able to do anything that treats the patient is really not my concern. My concern is to establish the diagnosis and give the specialist all the information as soon as

possible.

Q. Okay. So you can't talk about what the doctors, once the CT scan has been done, but maybe I'm not asking my question well enough and shame on me.

So what is your concern? Why are you so concerned about timing with regards to getting a CT scan with somebody where the top of the list of the differential is a stroke? What are you worried about?

MR. DRAHOS: Object to form, asked and answered.

THE WITNESS: So my main concern is that the patient has a diagnosis as soon as possible so then a treatment plan can be implemented. You know, I really don't know if I can answer this any differently.

BY MS. LOBEL:

Q. Well, I want to know why because you keep saying your worry is that the diagnosis is made as soon as possible, but I want to know why you're worried about a diagnosis being made as soon as possible with somebody who might have a stroke?

MR. DRAHOS: Object to the form, asked and answered. This is the last time. I can't let you ask him again, because at this point it's harassing.

MS. LOBEL: I'm not.

MR. DRAHOS: He has answered the question recently.

MS. LOBEL: No. You're just -- okay, go ahead, Doctor.

MR. DRAHOS: Thank you, Sarah. I have given you as long a leash as I possibly can. This has gone on now 10, 15 minutes.

MS. LOBEL: He has yet to answer why he is worried that a diagnosis be made as soon as possible with somebody who is suspected to have a stroke. I don't understand what the risk and concern is.

MR. DRAHOS: He has explained. So that they can make a diagnosis to determine a treatment plan.

BY MS. LOBEL:

Q. Right. What are you worried about, Doctor? Why are you so concerned about if the doctor's being able to make a treatment plain as soon as possible when it comes to somebody suffering a stroke. That's what I have yet to hear. I'm not trying to be mean or difficult and harass you. I just want to know what the concern is.

A. I understand, but that's the thing because my answer is my concern is obviously -- you're saying what's my concern beyond the exam. But my concern is to

have the exam done as soon as possible, so then we can know what's going on, and then have a -- because without knowing, obviously we can't rule out a stroke. We can't rule out anything or other conditions for that matter, so you know, my concern at this point and that's my sole concern is to have this patient diagnosed and then be at a facility where we can get the proper treatment, if necessary whatever treatment plan that might be. That's based on a lot of things that I explained before, but that's my concern.

When you ask hopefully, not again, but you ask what's my concern when I ask. No, my concern is to ask to reach a diagnosis and to have the patient in a place where he can have the best treatment possible and the treatment plan that he needs at that point.

Q. Okay. So you want to get him to the hospital as soon as possible to get diagnosed. What's the risk if the patient doesn't get diagnosed as soon as possible? What could potentially happen?

MR. DRAHOS: Objection to form.

THE WITNESS: Again, that's so vague. It's impossible to know. I don't think in those terms. I mean, I think in terms for me in my mind is this patient needs a CT scan done to rule in or rule out a stroke. I don't think what's the risk or what's

the likelihood of this happening, no. That's impossible to calculate to be honest. There is no doctor that can calculate that, no.

BY MS. LOBEL:

Q. Is part of the assessment a concern if the patient can get the treatment that they need fast enough to prevent a bad outcome?

MR. DRAHOS: Object to the form.

THE WITNESS: To be honest, the concern is to send the patient to a place where they can have the proper diagnosis done and the proper treatment done. That's really the concern. And then we rely on the specialist who -- to, you know, to apply which ever treatment they think is best. That's our concern from the ship point of view -- from the shipboard point of view.

MR. DRAHOS: Sarah, if you're at a breaking point this would be probably a good time. We have gone another hour and a half or so. Okay. You're allowed to have bathroom break. Just let her know.

MS. LOBEL: Yes. This isn't a captive situation. You are more than welcome to ask for break or rephrase questions. This is not a -- you know.

THE WITNESS: Would you mind if I go to the

bathroom?

MS. LOBEL: Yes.

THE VIDEOGRAPHER: We're going off the record at 10:35 UTC.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 18:47 UTC. Please proceed.

BY MS. LOBEL.

Q. Okay. Doctor I just want to bring you back, we have already discussed that Royal Caribbean was responsible for the medical care of Richard Burgess at the time he presented at the medical infirmary at around 9 a.m. until he got to HIMA San Pablo Caguas; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, I don't know if I answered before. So the medical team takes care of the patient while they are on the ship and then we transfer the patient to the ambulance and then the ambulance takes over. We are available to answer any clinical questions that the ambulance might have at that point until he gets to the hospital and until another medical team takes over.

BY MS. LOBEL:

Q. You're the doctor of care until transferred to a second doctor though; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I am the last doctor that the patient sees before they get into the ambulance, if that makes sense. So obviously during the transportation if a doctor is needed for any clinical reason, then they will contact the -- they will contacting me as the physician that saw the patient last.

BY MS. LOBEL:

Q. Okay. And Royal Caribbean took responsibility for arranging the transport to HIMA San Pablo Caguas ultimately; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: So Royal Caribbean, so we were responsible for contacting the port agent to arrange transportation and hospital.

BY MS. LOBEL:

Q. And so the port agent of Royal Caribbean arranged for the ambulance?

MR. DRAHOS: Object to the form.

THE WITNESS: So no, the hospital -- so the shipboard medical team contacts the port agent and the port agent works at the port. He is not a Royal Caribbean port agent. So they work at the port. So we contact them, to sorry, sometimes I

forget some words, to arrange -- to arrange hospital and transportation for this patient.
BY MS. LOBEL:
Q. Royal Caribbean hires the port agent to assist the medical team in arranging transport; correct?
MR. DRAHOS: Object to form.
THE WITNESS: I don't know exactly what you mean by hiring. I'm not sure.
BY MS. LOBEL:
Q. Okay.
A. The port agent works -- is local. It's a local agency.
Q. Okay. But the agent is not disclosed to the patient?
MR. DRAHOS: Object to form, asked and answered.
THE WITNESS: Yes. Yes. That depends. There is no definite answer, like I told you before.
BY MS. LOBEL:
Q. It's not Royal Caribbean's procedure to advise their passengers or patients that they, Royal Caribbean, turn over responsibility of arranging transport to the undisclosed agents; correct?
MR. DRAHOS: Object to form.
THE WITNESS: If that is a standard procedure

in the U.S.
BY MS. LOBEL:
Q. My question is Royal Caribbean does not advise passengers or patients that they, Royal Caribbean, turns over responsibility for arrangements for ground transport to the undisclosed agent to its passengers or crew; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: I wouldn't be able to answer that. That's in the name of Royal Caribbean. I wouldn't be able to answer that. There is nothing that says nothing for or against that. No, it depends on -- it's case by case.
BY MS. LOBEL:
Q. Richard Burgess wasn't told that Royal Caribbean turned over responsibility for arranging ground transport to the undisclosed agent in San Juan; correct?
A. I don't remember if the patient was inquired about --
Q. Was this your very first contract ever sailing in and out of or being on a itinerary where the vessel comes in and out of San Juan?
A. No. This wasn't the first time.
Q. How many contracts have you had where the itinerary included the port of San Juan?

A. I wouldn't be able to tell you, but we -- several, several contracts to begin with and then the itinerary, I do four months contract, so the itinerary is -- changes and sometimes it includes San Juan and sometimes it includes other islands.

Q. But --

A. But I have been several times to San Juan.

Q. Okay. Okay. So this -- essentially you've had numerous contracts where the itinerary included the Port of San Juan, but you don't recall how many?

A. I only do two contracts a year, so I wouldn't call it numerous and all over the world, so...

Q. Okay. At the Port of San Juan, there is a specific terminal that Royal Caribbean uses; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'll have to think about it. Perhaps. I can't be sure. One terminal, yes. Sorry. Now I remember. All the times that I have been there, it has the same port.

BY MS. LOBEL:

Q. Okay. And Royal Caribbean has employees that work at the terminal; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not sure. I don't know.

BY MS. LOBEL:

Q. Okay. Royal Caribbean has offices at the Port of San Juan terminal though, correct?
MR. DRAHOS: Object to form.
THE WITNESS: I have no way to tell you. I know that what's going on on the ship.
BY MS. LOBEL:
Q. You've disembarked the vessel in San Juan before; right?
A. Yes.
Q. What do you do to investigate the medical facilities in San Juan?
MR. DRAHOS: Object to form.
THE WITNESS: I've never investigated the medical facilities in San Juan.
BY MS. LOBEL:
Q. Okay. Royal Caribbean encourages its doctors to familiarize themselves with medical facilities in each port that the ship stops in; correct?
MR. DRAHOS: Object to form.
THE WITNESS: I have never -- I've visited literally probably hundreds of ports, so that wouldn't be feasible.
BY MS. LOBEL:
Q. Has Royal Caribbean ever encouraged you to disembark to familiarize yourself with the local medical

facilities in the ports in the itinerary you're traveling?

A. No. We rely on the port agent. Port agent is what's called the authority of the port, so -- and also that would mean probably it wouldn't make such sense because things change very much. So it wouldn't be advisable. The local authority needs to do that -- that work.

Q. The port agent used by Royal Caribbean isn't a public agency. You're aware of that; correct?

MR. DRAHOS: Object to form.

THE WITNESS: I'm not aware of that.

BY MS. LOBEL:

Q. The port agent specifically in San Juan is Continental Shipping?

A. Okay.

Q. You're aware of that?

A. No. No. I don't remember exactly who -- what each company it is.

Q. How do you know which port agent you're supposed to call?

A. We have the contact of the port agent.

Q. Who gives that to you?

A. It's available on the ship. I wouldn't be able to tell you exactly how we get that contact. I imagine the port agent gives it to the ships.

Q. Well, on this contact list, what other points of contacts do you have on the list?

A. We have the contact of the port agent. Do you mean from the shoreside?

Q. Well, you're telling me that there is a list that you're given to use in the shipboard infirmary that would have given you the phone number for the port agent; right?

A. No. No. The phone number -- there is no list. The phone number is given to us usually by the port agent himself. He informs the ship that that's his contact in case the ship needs.

Q. How do you know which port agent to contact?

A. So we have one contact. I don't know exactly which port agent it is. I wouldn't be able to tell you that, because there is one contact. They probably change that, I don't know.

Q. Who gives --

A. We have the contact of the person that's responsible at that point on land. The person that's responsible should do the connection between the ship and, you know, the place the country or the city.

Q. There's a different port agent at each port; correct?

A. That is correct.

Q. It's not like you call a main line and then you get transferred to San Juan versus Saint Martin; right?
A. No. No.
Q. Okay. So where do you look to know the phone number and contact information for the port agent in this scenario, San Juan?
A. Well, obviously the ship, I don't know exactly the definite answer for that question is when I got to the ship, the ship had that contact.
Q. Where?
A. The medical facility has that contact. So that's --
Q. Where?
A. The medical secretary has that contact. She has that information. So how he got there, it was before I got to the ship.
Q. Okay.
A. The medical secretary has that contact.
Q. Do you have the contact or only the medical secretary has the contact?
A. The medical secretary has the contact on Harmony. That contact, yes, the medical secretary has the contact. I just ask him because if there is any updates on the contact, he's the one that will know.
Q. Okay. Now, the contact information that the

medical secretary has for the port agent, for example, in San Juan, is it just a phone number or is it a phone number and more information?

A. I believe it's a phone number and e-mail.

Q. Okay. Is there a specific person designated to be the point of contact or is it just that company?

A. It's the company. It's the company. Sorry to interrupt you.

Q. Go ahead.

A. I believe that whoever carries that phone and whoever reads that e-mail, whose ever ship it is, then he's the person to contact.

Q. Who have you spoken to from that port agency company, Continental Shipping, before?

A. Before this?

Q. At any point in time. I mean, who do you know works for this port agency, this particular company?

A. I couldn't tell you a specific name, so we can call the port agent, whoever is working as a port agent at the time that you call. We don't know exactly who it is to give you a name. I don't recall.

Q. Do you recall who you spoke to with regards to this particular incident?

A. With the port agent at the time I don't know. I don't know his name.

Q. Was it a man or a woman, for example?
A. To be honest, I don't recall.
Q. Okay. Do you recall how many times you spoke to this port agent?
A. I spoke to the port agent at the very beginning. And I can't be sure if I spoke to him again, but at least once I spoke to him.
Q. Okay. Are you familiar with the hospital named HIMA San Pablo Caguas?
A. I know the hospital, yes, I know.
Q. Okay. You know that hospital is not located in San Juan; correct?
A. I don't know exactly where the hospital is located.
Q. Okay. Were you aware that the hospital is located in a separate city known as Caguas?
A. No.
Q. Okay. Did you know that HIMA San Pablo Caguas is approximately 22 to 23 miles away from the port?
MR. DRAHOS: Objection to form.
THE WITNESS: I wasn't aware.
BY MS. LOBEL:
Q. Were you aware how much time it would take to drive from the port to this hospital?
A. No, I wasn't aware.

Q. Don't you think that's something important to know?

MR. DRAHOS: Object to form, argumentative.

THE WITNESS: It depends on what you mean.

BY MS. LOBEL:

Q. Don't you think, for example, in this case where you wanted the patient to have a CT done as fast as humanly possible because he might be having a stroke, don't you think it would be important to know how far away the hospital is where the patient is going?

A. Well, at that time for me what's important to know is that patient is going to the best hospital for his condition and obviously, if that -- if that is the closest one, but the main concern is the best one because obviously sending him to a hospital that can't give him the proper care didn't make any sense even if it's close.

Q. Wow, I mean for example one of the best hospitals that treats stroke would be Johns Hopkins Hospital up in mainland United States. You's not saying that we're going to send a person to the best hospital I can find regardless of distance though; correct?

MR. DRAHOS: Object to form.

THE WITNESS: No. No. That's not what I said. What I did is our concern is our main

concern is to get the person to a hospital that can effectively treat the condition and then within these hospitals, the closest one.

BY MS. LOBEL:

Q. Okay. So if you have options, say there are three hospitals that all can treat strokes at a port or close, relatively close to the port, you're going to pick or should pick the one that's closest to the port?

MR. DRAHOS: Objection to form.

THE WITNESS: Well, to be honest we convey that information to the port agent, what we need and the sense of urgency as soon as possible and then he's the one that we need -- can assess which one is the best hospital for this specific situation and the nearest one. So I know this hospital, because that's the hospital that I will send the patient to.

BY MS. LOBEL:

Q. Okay.

A. But I don't know --

Q. So you'd agree with me that the shipboard doctor such as yourself should tell the port agent to find the closest hospital available to treat the patient?

MR. DRAHOS: Object to form.

THE WITNESS: Again, there is two criteria.

The main criteria, which is to send the person to the hospital that is indicated for this patient's condition and then within this, this hospital, it's whatever if there is one if there is more than one, then the closest. But the main concern is that he goes to the hospital that is able to treat exactly what he -- to assess the patient properly, you know.

BY MS. LOBEL:

Q. Okay. But you -- a doctor should tell the port agent, you know, to pick a location that can treat the condition and under that guise, pick the closest one possible?

MR. DRAHOS: Object to the form.

THE WITNESS: I mean, like I said, before being what I asked for qualification is a hospital that has these characteristics, as close as possible, obviously.

BY MS. LOBEL:

Q. Okay. I just want to make sure it's not like a two-step process where you tell the port agent I need a hospital that can handle a stroke and then there's a separate conversation where they pick a hospital and then you say, well, I need the closest one. Do you see what I'm saying?

A. More or less, but yes, I guess but the point is it's all part of the same conversation. We need a hospital that has this type of care, whatever that may be, and then, you know, as close as possible, and as quick as possible.
Q. Okay. Does the ship have a list of preferred hospitals to send its patients at a given port?
A. No.
Q. Do you know if Royal Caribbean has an agreement or relationship with HIMA San Pablo Caguas or any other hospital?
MR. DRAHOS: Object to form.
THE WITNESS: No. I'm not aware.
BY MS. LOBEL:
Q. Have you ever been to HIMA San Pablo Caguas before?
A. No.
Q. Have you been to any hospital in San Juan before?
A. No.
Q. What time was the hospital advised that Mr. Burgess was suffering from a stroke and coming to the hospital?
A. At what time?
Q. Yes.

A. I wouldn't be able to tell you exactly what time that was. It was as soon as the port agent gave me the contact of the hospital, then I called the hospital.

Q. Okay. Do you know when -- well, how did the port agent give you contact information for the hospital?

A. I'm sorry?

Q. How did the port agent give you the contact information for the hospital?

A. Over the phone.

Q. Okay. Which phone did you receive that phone call?

MR. DRAHOS: Object to form.

THE WITNESS: I wouldn't be able to tell you, no. Probably the landline I imagine.

BY MS. LOBEL:

Q. Okay. I just wasn't sure under these circumstances, since there was an active emergency going on if you had a cell phone so somebody could reach you wherever you were on the ship?

MR. DRAHOS: Object to form.

THE WITNESS: In those circumstances, I don't leave the medical facility.

BY MS. LOBEL:

Q. Okay. So what --

A. I do have a deck phone. What we call a deck

phone.

Q. What is a tech phone?

A. A deck phone. A deck phone, it's a ship phone but obviously like a portable phone, you call it. I don't know what else to call it. It's like a cell phone, but a ship radio cell phone.

Q. Okay.

A. And the radio. We can also use a radio in cause we need to leave the medical.

Q. Do you have a specific phone number that people can reach you on the deck phone?

A. Yes.

Q. Okay. What was your deck phone number?

MR. DRAHOS: Object to form.

THE WITNESS: I can remember. I'm sorry, I can't remember.

BY MS. LOBEL:

Q. Is the deck phone like a smart phone?

A. It's not like a smart phone. It's like an old phone. I would call it like an old phone. Like an old Nokia phone.

Q. I was just about to say is it like a Nokia. So it's got the buttons on it and it's just one little --

A. The screen is black.

Q. All right. And you can be reached on that deck

phone at any point in time while you're on the ship?
A. Yes. That's correct.
Q. Okay. Even from shoreside?
A. From shoreside you would have to go through the ship's main line and then the guest services probably would be able to connect you to my phone, yes.
Q. Okay. So if I wanted to know what time you received the phone call from the port agent to tell you the contact information for the hospital, would that be in the phone records?
MR. DRAHOS: Object to the form.
THE WITNESS: Like I told you, I'm not sure exactly where I got that phone call, so I wouldn't know. I wouldn't know if that's in the phone records, because first of all, we have deck phones so that could be a possibility then we have land lines and we have several phones in the medical facility. We very often use other phones because it depends on where we are.
BY MS. LOBEL:
Q. Okay. What time did the port agent call you with the contact information from to reach HIMA San Pablo Caguas?
A. I don't recall. It was sometime after I told them that I needed to evacuate the patient.

Q. Did you document this?

A. I did not.

Q. Why not?

A. I don't document every single thing that happens in medical.

Q. But you'd agree with me that a medical emergency disembark is a little different than just a regular encounter with the patient; correct?

MR. DRAHOS: Object to form.

THE WITNESS: From a clinical point of view, yes.

BY MS. LOBEL:

Q. Okay. So when you spoke to the port agent, at least the second time -- we know at least the first time you requested -- you're telling me you spoke to the port agent asking for the ambulance and then you received a call from the port agent advising you of a hospital do you know which hospital -- well strike that.

Do you know if the port agent advised you of more than one hospital as being capable of accepting the patient?

MR. DRAHOS: Object to form.

THE WITNESS: No. The port agent gave me a specific hospital number, which would be the best for -- which would be the hospital that had the

characteristics that I asked for.
BY MS. LOBEL:
Q. How do we know that the port agent didn't give you options as to multiple hospitals you could send the patient?
A. How do you know --
Q. How would I know?
A. You can ask me.
Q. Okay. Well, I'm asking you how many hospitals were mentioned by the port agent, since we have to rely on your memory I guess?
A. Well, you asked that before and the answer is one.
Q. Okay. And what's the name -- is it HIMA San Pablo Caguas or HIMA Cupey?
A. The port agent referred us to HIMA hospital.
Q. Okay. Well, there's more than one HIMA hospital in San Juan, so how would I know which one?
A. I only got one number, so I assume that's really it, because I wasn't even aware there is two.
Q. Now, did you call the hospital?
A. Yes.
Q. How did you speak with?
A. I spoke to the doctor, the number, the doctor that the port agent told me would be expecting my phone

call.

Q. What doctor was that?

A. I don't recall who. I don't recall if the doctor identified herself or himself or if the doctor or even the name. I don't even recall that.

Q. Was the doctor a male or a female?

A. I don't recall that.

Q. Okay. Did you document your conversation as to what was discussed between you and whomever you spoke to at HIMA San Pablo Caguas?

A. No. I didn't document it.

Q. Do you know what department you spoke with?

A. I can't recall that detail, no, but -- I don't recall, to be honest. I don't want to lie because I don't recall exactly which department it is. I asked to speak -- I asked for, you know, a specific hospital with the specific characteristics and the port agent gave me that number of that doctor that would be responsible for this specific condition. I'm not sure exactly which specialty this doctor was -- is from. I want to say, I could say a specialty, but I'm not sure so --

Q. I'm just trying to figure out what you remember with regard to anything having to do with this physician. What was discussed?

A. Just basically explaining what symptoms the

patient had, when the symptoms started and then, you know, if they had the ability to receive the patient.

Q. I thought the port agent was supposed to do that.

A. Yes. But the port agent, the hospital requires a confirmation with the doctor.

Q. Okay. So ultimately --

A. Sorry, so they wouldn't -- so the port agent contacts the hospital, but the hospital and the hospital probably discusses it with the port agent within the hospital policy, that they need the doctor -- to the doctor from the ship to hand over, let's say, verbally hand over the patient to the hospital.

Q. Okay. So in order to complete the medical transport arrangements the shipboard doctor has to speak with the receiving hospital.

A. Yes. I would say to make that transfer possible, the doctor needs to speak to the doctor in the hospital, otherwise it's not possible.

Q. Okay. All right. And you don't recall what time this conversation occurred?

A. I don't recall.

Q. Okay. Do you recall what the doctor on the other end of the line told you?

A. Doctor told me that I could send the patient.

Q. Did the doctor say anything else?
A. Not that I recall.
Q. Okay.
A. So I explained what patient I had and probably -- she had been obviously she had been informed by the port agent previously, so she just wanted a direct contact with the doctor, I guess.
Q. You're saying she and before I asked you was it a male or a female and now you're saying she. Is there a reason?
A. I mean that's why I didn't answer if it was a male or female, because I wouldn't be able to give you 100 percent guarantee so it might have been a female or a male.
Q. Okay.
A. I believe that it might be a female, but if I had to choose one because I can't call it it. I could say doctor, but to choose one that I would go with female, but to give you an answer, I'd have to be 100 percent sure.
Q. Have you spoken with that physician since this incident?
A. No.
Q. Have you been shown any records from that hospital since this incident?

A. No.
Q. Did the physician, whoever he or she was, ask you to fill out any paperwork?
A. No. Not that I recall.
Q. Did you advise anyone from Royal Caribbean about this conversation?
MR. DRAHOS: Object to the form.
THE WITNESS: Not that I recall.
BY MS. LOBEL:
Q. Did you --
A. Not that I recall.
Q. Did you send an e-mail to let anyone from Royal Caribbean, either shoreside or on the ship know that you spoke with this physician and that's where the patient was going?
A. The care team. We have a care team that was informed that the patient --
Q. Who informed the care team?
A. We have a specific form that's filled out by the medical team and the team sent to the care team. And that's a disposition kind of form, so the patient has been released and then to where the patient is going.
Q. And what is this form called?
A. I can't be sure.

Q. Did you fill out the form?
A. No.
Q. Who did?
A. Medical. Usually or one of the nurses. Yes landing form. Yes, that's landing form. The medical secretary or the medical or the other nurses usually fills out the form.
Q. Okay. So this would have been filled out at what point in time in relationship to your phone conversation with the doctor at the hospital?
A. This would be filled out after my consult.
Q. Immediately or just at some point afterwards?
A. At some point afterwards. Usually when the patient effectively leaves the ship.
Q. So after you spoke with the doctor from the hospital, what did you do next?
A. What do we do in regards to what? I'm sorry.
Q. Getting the patient to where they needed to go.
A. Oh, okay. So then I -- obviously the -- after I spoke to the doctor and he said okay. Then I told the port agent okay so I spoke to the hospital and you can go ahead and, you know, arrange for the transportation to this hospital, because the hospital is willing to receive the patient.
Q. Okay. Let me back up, because now I'm getting

confused as to what happens. So you call the -- you speak with the port agent, you say you need a hospital to send the patient, that's the first part of the process?

A. That's correct.

Q. And then the second part of the process is then to request transport to take the patient from the ship to the specific hospital?

MR. DRAHOS: Object to form.

THE WITNESS: So the procedure is we call the port with whatever we need with regards to the unit, the medical hospital whatever it is and then he finds whatever hospital is the best suited and then we speak to the physician. The physician requires us to -- the receiving physician requires us to call him just to, you know, do a handover, verbally explain that doctor to authorize it and then we relay that information to the port agent saying that the hospital is indeed willing to accept the patient. And ask the port agent to arrange for the transportation to that hospital from the ship to that hospital.

BY MS. LOBEL:

Q. Okay. So an ambulance is not requested until after a hospital is selected and confirmed?

A. That is correct.

Q. So what time was an ambulance requested?

A. I am not sure. It was after I spoke to the port agent and then I imagine, you know, I spoke to the ambulance right after I spoke to him, because I don't know exactly how that goes.

Q. Did you request for the ambulance?

A. No. So I called the port agent and the port agency requests the ambulance, so I'm not sure exactly. I wouldn't be able to tell you exactly when that happened, but I imagine it was, you know, after I called him.

Q. Well, how would the port agent know to request the ambulance other than speaking with you?

MR. DRAHOS: Objection to form.

THE WITNESS: I tell the port agent to request an ambulance.

BY MS. LOBEL:

Q. Okay. And you don't know what time that was; correct?

A. No.

Q. Were there any e-mails that you sent to or from the port agent? Sorry, strike that. Let me rephrase that. That was poor.

Are there any e-mails that you sent or received from the port agent in connection to this incident?

A. Me personally or --
Q. Yes. You personally?
A. No.
Q. Did you send any e-mails to anyone regarding this incident?
A. No.
Q. Just to wrap up this point, would you agree with me that if a medical facility isn't capable of treating a stroke patient, they need to call for an ambulance for transport to a facility that can treat the patient as soon as possible?
MR. DRAHOS: Object to the form.
THE WITNESS: Sorry, that again, like before that depends on the circumstances.
BY MS. LOBEL:
Q. Okay. Would you agree with me that it's a rule that if the Royal Caribbean doctor can't care for a patient suspected of a stroke, they need to transport the patient to a facility that can as soon as possible?
MR. DRAHOS: Object to the form, asked and answered probably eight times.
THE WITNESS: Again, it depends on what patient we're talking about.
BY MS. LOBEL:
Q. Would you agree if the doctor notices that it's

taking too long to get an ambulance to transfer a patient suffering from a medical emergency that they need to take action?

MR. DRAHOS: Object to the form.

THE WITNESS: I wouldn't be able to answer that question, because I wouldn't be able to answer the first part of the question. So I wouldn't be able to answer the second part.

BY MS. LOBEL:

Q. So Royal Caribbean doctors don't do anything to check on the timing of and status of requests for ambulances for medical disembarks?

MR. DRAHOS: Object to form.

THE WITNESS: We rely on port agents to -- for all the procedures, so there's no way that we can evaluate like your question was before, like the question that you asked before. There is no way to evaluate if it's taking too long or not, we just rely on the port agents to --

BY MS. LOBEL:

Q. You don't call to check on the status?

MR. DRAHOS: Object to the form.

THE WITNESS: We're in contact with the port agents, but we don't know exactly which procedures are the port agent's procedure so we wouldn't be

able to tell you how long some procedures take.

BY MS. LOBEL:

Q. There's nothing preventing a shipboard doctor from asking the port agent?

MR. DRAHOS: Object to the form.

THE WITNESS: Asking what?

BY MS. LOBEL:

Q. Asking the status and timing on receipt of transport?

A. No. There's nothing that stops us.

Q. Okay. And there's nothing stopping a shipboard doctor from making their own inquiries with regard to hospital's availability to treat patients shoreside?

MR. DRAHOS: Object to the form.

THE WITNESS: That wouldn't be -- that wouldn't be the correct procedure in my opinion.

BY MS. LOBEL:

Q. In your opinion or is that Royal Caribbean's policy?

A. No. Royal Caribbean's policy is to contact the port agent.

Q. But there's nothing preventing you from using the wi-fi to look up a hospital that is stroke capable of making a decision that the hospital is good, making a phone call yourself and then arranging transport?

MR. DRAHOS: Object to the form.

THE WITNESS: Okay. So let me see if I could explain this a little better. There is no purpose in looking up on the internet what hospital we think might be suited for the patient, because in that each port and we visit a lot of ports, Royal Caribbean and obviously the medical team visit a lot of ports, dozens and dozens of ports.

So it would be futile to try to figure out which hospital and probably dangerous to figure out which hospital to be best suited for the patient instead of relying on the port authority, which is the one that knows exactly the best way and the best place and the best place and best way to get the patient to the hospital. So it wouldn't make any sense to try to look up and probably could end up in a bad situation for the patient, because we don't have enough information.

There is not enough information to make a decision like that and go above what the port agent is telling us. The port agent is the authority of the port. So you have to rely on what the -- I mean it's what they do. They -- all they do is this and things change, so whatever information you may find on the internet today might not updated

and that might end up in a bad situation.
BY MS. LOBEL:
Q. You would agree with me that a doctor or somebody with a medical license or degree would be better situated to evaluate the appropriateness of the hospital as compared to somebody who doesn't have a medical license or medical degree, though; correct?
MR. DRAHOS: Object to form, argumentive.
THE WITNESS: I wouldn't agree with that, no.
BY MS. LOBEL:
Q. So you believe that a port agent who has no medical license or medical degree is better suited in determining whether a hospital is stroke capable than you with a medical degree?
MR. DRAHOS: Objection to form, argumentative.
THE WITNESS: I believe that every port is different, because every hospital is different, because we don't have the capability of knowing everything about every hospital. The port agent is, in fact, more capable of looking and deciding which is the best hospital based on the medical information that we give him. So we give them the medical information and the needs that we have and then, she has a very much broader view of the place we're at. So he is more suitable or suited to find

the right location, even if it's not a medical, you know, it's obviously not a medical person. It's not about medical, it's not about treating patients. It's about finding a hospital that has the characteristics that we want and he is able to move that much faster and --

BY MS. LOBEL:

Q. Okay. So the patient was first evaluated at shortly after 9 o'clock in the morning on February 1st of 2018 and then wasn't received by the ambulance until around 1 o'clock in the afternoon and didn't arrive at the hospital until 2 o'clock in the afternoon. What I want to know is what were you doing during the four to five hours when this was all taking place other than making two phone calls to the port agent?

MR. DRAHOS: Object to the form.

THE WITNESS: Okay. So that information is not very accurate. So we received the patient at 9:15, 9:25, 9:25 and then we hand it over to the paramedics at 11:40.

BY MS. LOBEL:

Q. You handed the paramedics -- you handed the patient over to the paramedic at 11:40?

A. Yes.

Q. What's the basis for that statement?

MR. DRAHOS: Objection to form.

THE WITNESS: That information was given to me by --

MR. DRAHOS: Don't reveal anything that you learned through discussions with me. If it's a source outside of what you learned from me, you can share, but if your only source of information is me I'm invoking the attorney/client privilege.

THE WITNESS: Sorry.

MR. DRAHOS: It's all right.

THE WITNESS: So yes, I obtained that information, but I'm not able to state where -- how I retained that information.

BY MS. LOBEL:

Q. So you can't tell me the source and document as to how you know the patient was transported at 11:40 a.m.

MR. DRAHOS: Object to the form. That's not what he said.

THE WITNESS: Yes. We at 11:40 the paramedics came and then we handed over the patient to the paramedics at 11:40.

BY MS. LOBEL:

Q. How do we know that? What documents that?

A. I wouldn't be able to tell you.

Q. Because you're telling me that would violate

conversations that you had with your attorney?

A. Yes.

Q. Okay. But there isn't a single piece of paper or document or record that you can point to that substantiates the fact that the ambulance allegedly picked up the patient at 11:40?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, to answer that and probably I've have to, you know, I'd have to --

MR. DRAHOS: No, you can't tell her --

BY MS. LOBEL:

Q. You're looking at your attorney. I want to know from you, not what your lawyer thinks. So I want to know from you what's the basis of the 11:40 a.m. time frame that you're saying that the patient was purportedly picked up at 11:40?

A. Okay. So there is documentation.

Q. What documentation?

A. Documentation in the paramedic team was registered to leave the ship at 12, 12 o'clock roughly and that's the gangway documents.

Q. Okay. Because you're looking down at something --

A. 11:40 and they left the ship with the patient and they passed the gangway and that is documented by

the gangway, which is the exit from the ship.

Q. What document are you referring to, because I can see you're look at something?

A. It's the security records.

Q. I don't know which security records you're looking at.

MR. DRAHOS: Give her the Bates.

THE WITNESS: So GS000001.

BY MS. LOBEL:

Q. Can you show me?

MR. DRAHOS: Yes. Go ahead. It's okay.

BY MS. LOBEL:

Q. Show me. I want to know what you're referring to is what I know it to be because we're not together and normally I would be able to see what you're looking at. So if you could hold it up to the screen so that I can see. Can you move the page up so that I can see the bottom of the page?

MR. DRAHOS: Bring it back towards your body.

BY MS. LOBEL:

Q. Okay. I just wanted to see the Bates stamp at the stop is the same at what I have got.

A. Okay.

Q. But this isn't a record from the ambulance company; correct?

A. This is the records from the ship.
Q. Have you seen the record from the ambulance company?
A. I have seen the records from the ambulance company, yes.
Q. Okay. One second. Are you familiar that when an ambulance company picks up a patient they typically take their vitals and take some intake information to check the status of the patient?
A. Yes.
Q. Okay. And the team will document when they did those things typically in their records; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sorry. Sorry.
BY MS. LOBEL:
Q. Not a problem. Like you do with your medical records, you note the time that you do whatever it is that you do to care for a patient?
A. I'm not sure. Whatever the procedure and ambulance staff is, but --
Q. Okay. Can you see my screen?
A. Yes.
Q. Okay. Can you see right where my cursor is that I'm circling hora. That means time? Right here.
A. Okay. Hora. Yes.

Q. Yes. And it says 1:10 p.m.; correct?
A. Yes. Yes. Yes. Yes.
Q. Okay. All right. And it also gives information about date and time in the upper left-hand corner with my mileage stamps. Do you see that?
A. Yes. I see that.
Q. And it indicates the initial time at 12:21. Do you see that?
A. Uh-huh.
Q. Okay. And that typically is when they are dispatched. Would you agree with that?
MR. DRAHOS: Object to the form.
THE DEFENDANT: I'm not able to answer that.
BY MS. LOBEL:
Q. And then the pickup time would be the next stamp when they go to retrieve the patient at 12:54. Do you see that?
A. Uh-huh.
Q. Okay. And then the next time stamp is 13:08, do you see that?
A. Okay. I see that.
Q. And that's close in time for when the vitals were taken, do you see that?
A. I see that.
Q. All right. And it also says -- it indicates the

vessel is the Harmony of the Seas and that's in the middle of the page where my cursor is with the little hand, do you see that?

A. Yes.

Q. And then it says, it gives the date and it says fecha. What does that mean?

A. I'm Portuguese.

Q. Do you know what that means? Do you speak Spanish?

A. I assume that it's date.

Q. Okay. And then so that indicates that that's from the date of the incident?

A. Uh-huh.

Q. Okay. And then you see the hora is 12:54; right?

A. Uh-huh. That is correct.

Q. And it would make sense that they went to the Harmony of the Seas at 12:54 and then took the vitals shortly thereafter at 1:10; correct?

MR. DRAHOS: Objection to form.

THE WITNESS: I mean, we -- I wouldn't be able to answer for anything that's written on that form. Obviously I didn't write it, but there is a local time and ship time and the local time is not the same as the ship time.

BY MS. LOBEL:
Q. What's the ship time as it relates to the local time?
A. We -- usually the ship time is one hour before.
Q. Okay. So it's one hour back from local time?
A. One hour back, yes.
Q. Okay. So if ship time would be 9 a.m., then local time would be 10 a.m.?
A. That is correct.
Q. Okay. So if I look at the time stamps on the ship, then they are one hour -- the local time is one hour later?
A. That's correct, yes.
Q. Okay. So when I look at the records in this case, for example, the medical center, which uses ship time, then I can interpret the time, local time being an hour forward?
A. Yes.
Q. Okay. Understood. So that would make sense then, because then if the ship time is talking about 11:40, that's really 12:40; correct?
MR. DRAHOS: Object to form.
THE WITNESS: Yes.
BY MS. LOBEL:

Q. Okay. And that would make sense with this record, right, because then it would indicate that the pickup time is at 12:54, which is relatively close to what would be 12:40; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. That's correct.
BY MS. LOBEL:
Q. Okay. And then the next thing that I wanted to ask you is that if we go down to where it looks like it's -- is this your signature here where it says Dr. Pereira?
A. No.
Q. Okay. Your name is there, correct, Doctor Pereira?
A. Uh-huh.
Q. All right. And my question is it says above it, hospital HIMA Cupey. Why does it say that?
A. I didn't write it, so I wouldn't be able to answer.
Q. Do you know if HIMA Cupey ever came up in conversation?
A. No.
MR. DRAHOS: Object to form.
BY MS. LOBEL:
Q. Do you see at the bottom of the document that it

looks like it's in Spanish, but it says transport, HIMA Cupey. Do you see that?

A. Uh-huh. Yes.

Q. Okay. You still have no understanding why there would be any mention of HIMA Cupey?

A. I didn't write it, so I'm not sure.

Q. I understand. All right. Did you receive -- did the ship receive a copy of this document when the ambulance picked up the patient for the ship records?

A. No.

Q. Why did the ambulance company not leave, you know, a copy with the agency or medical center where the patient's picked up at, a copy for the patient and then a copy for the ambulance. Do you know why that wasn't done?

A. I don't know why. No.

Q. Okay. All right. Let me stop this for a second. Now, if the initial request for the ambulance from the ship in the e-mail is at, say, 11 o'clock in the morning and then the patient doesn't get to the hospital until 2 o'clock in the afternoon, would you agree that that's a unreasonably long delay for this type of patient?

MR. DRAHOS: Object to the form.

THE WITNESS: I wouldn't be able to say that, no.

BY MS. LOBEL:

Q. Why?

A. Because, you know, from the moment that the patient leaves the ship, you know, we rely on transportation and, you know, we don't know -- we don't know what's -- I mean, to qualify it as reasonable or not, I wouldn't be able to tell you that, because obviously that depends on the transportation.

Q. Your shoreside referral form, based off of the time stamp of the documents I believe is at, if I recall, correctly like 9:56 a.m. Do you recall that?

A. Which document? I'm sorry.

Q. The shoreside referral form?

A. Shoreside referral. Okay.

Q. My recollection is that it's time stamped from the ship is 9:56 a.m.

A. Yes. That's 9:55 yes.

Q. 9:55 excuse me. Which Bates stamp are you looking at, so I make sure I'm looking at the same thing with you?

A. Yes. I'm looking at it now.

Q. What Bates date stamp are you looking at?

A. Sorry, sorry, sorry.

Q. No. No. You don't have to show me. I just want to know the number because I'll pull it up. I want to make sure I'm looking at the same page that you're

looking at?

A. GS000038.

Q. 38. All right. Because I think I have more than one copy; that's why I'm asking. One second. 32. Bear with me. 36. One second. I'm going to share my screen and I'm just going to confirm you're looking at the same thing I'm looking at. Do you see what I'm looking at?

A. Yes. Yes. Yes. That is the same. Yes.

Q. Okay. So the time stamp here is and I'll highlight it since we're not together. You're looking at 9:55, February 21, 2019?

A. Yes.

Q. Okay. Now as we discussed before the local time would be one hour forward, so it's really -- sorry, 10:55?

A. Yes.

Q. So at 10:55 you're telling me that you put in the shoreside referral?

MR. DRAHOS: Object to form.

BY MS. LOBEL:

Q. Okay. And when was the first time -- at what point in time did you first see the patient?

A. I saw the patient -- well obviously it's ship time so that's the timeline I used. So the first time I saw the patient was at 9:50 and then, sorry, at 9:30 and

then I did the referral at 9:55.

Q. Okay. And the patient reported to you that at 9:15 in the morning that day they had sudden onset weakness in lower, in right lower limb plus vision changes in right eye was asymptomatic when he woke up; is that accurate?

A. That is accurate.

Q. Okay. All right. So your understanding that the sudden onset of all the symptoms that were reported was at 9:15 in the morning?

MR. DRAHOS: Object to form.

THE WITNESS: I'm sorry, I don't think -- did you say the onset was at 9:15 in the morning?

BY MS. LOBEL:

Q. Yes, sir.

A. Yes. That's what information the patient gave us.

Q. And then your actual request for the shoreside referral wasn't until nearly 11 o'clock local time?

MR. DRAHOS: Object to form.

THE WITNESS: That would be at 9:56 ship time.

BY MS. LOBEL:

Q. But ship time is an hour back from local time; correct?

A. That is correct.

Q. Okay. So it would really be 11:50 sorry, 10:55 a.m. the shoreside referral went out?

MR. DRAHOS: Object to form.

THE WITNESS: Yes. It was done at 9:56. It was done at 9:55 ship time, which is 10:55 local time.

BY MS. LOBEL:

Q. Got it. All right. Thank you. That helps me. Let me just make a note so that I remember this. If you go to the first page of the medical record from February 21st so that looks like it's I believe Bates 37 I think you have in front of you. It says patient attends clinic for 911 call to Suite Lounge Deck 17, question mark, CVA inability to move fingers of right hand, unstable gait. Do you see that?

A. Yes.

Q. I'm going to put this on the screen so we're both looking at it at the same time. So when there's a -- and this is Bates 37. If there's a 911 call, does everyone on the ship get that information or is there an alert that's received in the medical center?

A. That goes to the nurse.

Q. Okay. How does the nurse get that on duty?

A. I'm sorry.

Q. How does he or she receive that information if

there's a 911 message put into the system? Is it a phone call or is there an e-mail or some other means of --

A. It's a phone call.

Q. Okay. If there's a 911 call and the patient requires immediate assistance, how else is it documented other than in the medical record?

A. I'm not sure if there's any other records.

Q. Okay. Does the nurse keep a log as to all 911 calls received?

A. No.

Q. Okay. Is the nurse supposed to notify anyone if there's a received 911 call?

A. No.

Q. What are they supposed to do with regards to a 911 phone call?

A. They are supposed to assess the situation.

Q. Okay. Under a situation like this where it's a 911 call and you know there's a report of a possible stroke, does anyone from the medical center go up to assist the patient in wherever he or she may be on the ship?

MR. DRAHOS: Object the form.

THE WITNESS: Well, that depends. That depends. The 911 call is just a simpler way to reach the ship's command center and then the ship

command center talks to the nurse and then evaluates the situation and then sees what should be done.
BY MS. LOBEL:
Q. Okay. Have you heard of a hospital by the name of Ashford Presbyterian Community Hospital in San Juan?
A. No.
Q. Were you aware that it's approximately 2.5 to 2.7 miles away from the port?
MR. DRAHOS: Object to form.
THE WITNESS: I don't know that hospital.
BY MS. LOBEL:
Q. Okay. Did you know it's approximately 11 minutes drive time from the ship?
MR. DRAHOS: Object to form.
THE WITNESS: I don't know the hospital, so I wouldn't know where it was.
BY MS. LOBEL:
Q. Okay. So you didn't know that Ashford Presbyterian Community Hospital was capable of treating strokes?
MR. DRAHOS: Object to form, argumentative.
THE WITNESS: I don't know the hospital whatever, you know, with anything that's related to that hospital. I don't know because I don't know

the hospital itself.

BY MS. LOBEL:

Q. Okay. So you weren't aware that they have a neurosurgeon that works at that facility?

MR. DRAHOS: Object to the form.

THE WITNESS: I wasn't aware.

BY MS. LOBEL:

Q. Okay. Have you heard of a hospital called Doctors Center Hospital in San Juan?

A. No.

Q. Were you aware that that hospital is located 2 to 4 miles away from the port?

A. No.

MR. DRAHOS: Object to form.

BY MS. LOBEL:

Q. Did you know that that hospital is approximately 11 to 15 minutes drive time away from the port?

A. No.

Q. Did you know that that hospital facility was stroke capable?

MR. DRAHOS: Object to the form.

THE WITNESS: No. I don't know that the hospital exists, so I don't know.

BY MS. LOBEL:

Q. Okay. All right. Have you heard of a hospital

called Hospital Pavia Santurce in San Juan?
A. No.
Q. Okay. Did you know that that hospital has a neurosurgeon and neurosurgical department at that facility?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't.
BY MS. LOBEL:
Q. So therefore you wouldn't know that that hospital is approximately three miles away from the port?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't know that, no.
BY MS. LOBEL:
Q. And you wouldn't know it's approximately a 9-minute drive time from the port to the hospital?
A. No. I wouldn't know that either.
Q. Okay. Were you aware of a hospital called Hospital San Francisco in San Juan?
A. No, I'm not.
Q. Okay. So therefore, you wouldn't have known that that hospital is about 8 to 9 miles away from the port?
A. No.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:

Q. So you wouldn't have known that that facility has a neurology department?

MR. DRAHOS: Object to the form.

THE WITNESS: No. I didn't know that.

BY MS. LOBEL:

Q. Have you heard of the hospital in San Juan named Hospital -- the University Hospital?

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MS. LOBEL:

Q. So you're not aware that that's the level one trauma center, the largest trauma center in Puerto Rico?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. So you didn't know that they have a neurosurgical department capable of handling strokes?

MR. DRAHOS: Object to the form.

THE WITNESS: No, I wouldn't know.

BY MS. LOBEL:

Q. Okay. So you wouldn't have known that that hospital is seven miles away from the port?

A. No.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. Have you heard of the hospital called Auxilio

Mutuo Hospital that's also in Puerto Rico?

A. No.

Q. So you weren't aware that that was 10.4 miles from the port?

MR. DRAHOS: Objection to the form.

THE WITNESS: No, I didn't know that.

BY MS. LOBEL:

Q. And therefore you wouldn't have known that they have the neurosurgical and neurological department capable of handling strokes?

A. No.

Q. Okay. Have you heard of the hospital called Hospital Pavia de Hato Rey.

A. No.

Q. Okay. So you didn't know that hospital is in San Juan?

A. No, I didn't know that.

Q. Okay. So you didn't know that that hospital is 6.2 miles away from the port?

MR. DRAHOS: Object to the form.

THE WITNESS: I didn't know that.

BY MS. LOBEL:

Q. Okay. So you didn't know that they also were a stroke capable hospital?

MR. DRAHOS: Object to form.

THE WITNESS: No.
BY MS. LOBEL:
Q. So you weren't aware that there were multiple hospitals in San Juan that were closer to the port capable of handling strokes?
MR. DRAHOS: Object to form.
THE WITNESS: No.
BY MS. LOBEL:
Q. And you didn't speak to any hospital other than HIMA San Pablo Caguas, which is outside of San Juan?
A. No, I didn't.
Q. Do you know somebody by the name of James Russell?
A. James Russell, yes.
Q. Who is that?
A. That is a medical secretary.
Q. Okay. Is that the medical secretary involved in this case?
A. Yes.
Q. Okay. Do you know -- well, strike that.
Have you spoken to this medical secretary since this incident?
A. No.
Q. Do you know if Mr. Russell is still employed with Royal Caribbean?

A. I'm not sure.
Q. Okay. Did you speak with Dr. Estevez about this case?
A. No.
Q. Did you speak with Dr. Estevez about the care and treatment of this patient while he was still on the ship?
A. I'm not sure. I don't recall.
Q. Okay. Is that something that you would have done?
MR. DRAHOS: Object to form.
THE WITNESS: It depends.
BY MS. LOBEL:
Q. Do you know if you consulted anyone regarding the care and treatment of this particular patient?
A. I'm not sure. I may or may not have talked to the other doctor that was on duty, which I don't remember who it was actually.
Q. Okay. Who did you speak to other than the port agent two times and the doctor who you don't recall at HIMA San Pablo Caguas about this incident on the date it occurred?
MR. DRAHOS: Object to form.
THE WITNESS: I don't recall speaking to anybody else.

BY MS. LOBEL:
Q. Okay. Did you ever speak to the captain about this?
A. Spoke to the staff captain, I believe.
Q. When did you speak to the staff captain?
A. When, after we made the decision to disembark the patient.
Q. What did you discuss?
A. That we needed to disembark the patient.
Q. Did the staff captain follow up with you?
A. No.
Q. Did you e-mail the staff captain?
A. I didn't e-mail the staff captain personally. I don't know if the medical secretary did.
Q. Okay. Is it your practice to tell the medical secretary to e-mail the staff captain?
MR. DRAHOS: Object to the form.
THE WITNESS: That depends. It depends on the case.
BY MS. LOBEL:
Q. Is this the type of case where you would have typically have told the medical secretary to advise the captain?
MR. DRAHOS: Object to the form.
THE WITNESS: There's no typical case where

that happens. Sometimes it happens. Sometimes I see them or speak to them personally. They need --- they just require us to notify them somehow that the patient is disembarked because obviously that impacts the operation.

BY MS. LOBEL:

Q. Okay. Did you tell the staff captain why you were disembarking this patient?

A. No.

Q. Why not?

A. Because that's not a regular procedure. We don't review medical information to the staff captain.

Q. Did the staff captain -- strike that.

When it comes to a medical emergency or disembark, doesn't the staff captain play a part in assisting with the disembarkation of the patient?

MR. DRAHOS: Object to form.

THE WITNESS: The staff captain may assist if we ask them to assist in a specific way, but otherwise, no, they need to be notified if it's -- if there's an evacuation and they need to be notified. If there's any safety concerns on the ship, we need an evacuation, but other than that, no, unless there's a specific thing that he can help with.

BY MS. LOBEL:
Q. So that's what I was going to ask you. So if there's something that you need assistance with, the staff captain is available to help effectuate a disembark?
A. I suppose, yes.
Q. Okay. Does the port agent communicate with the staff captain to keep them in the loop as to what's going on?
A. I don't believe so.
Q. Okay. I'm just marking my notes to make sure I covered everything. One second. Do you recall an incident involving a former passenger by the last name of Peck?
A. Yes.
Q. Do you recall that that incident also involved a passenger who was suffering from a stroke?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm not sure. I'm not sure. I recall that patient, but that patient was disembarked and then we -- I lost track, so I don't know exactly what the patient was diagnosed with.
BY MS. LOBEL:
Q. Okay. Do you remember why you made the decision to disembark this patient?
MR. DRAHOS: Object to the form.

THE WITNESS: Yes. I remember that. Yes.

BY MS. LOBEL:

Q. Okay. Why?

A. This patient was in a comatose state.

Q. Do you recall that there was a complaint with a delayed medical evacuation made by this passenger?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not sure what the complaint was, but I remember there was a complaint.

BY MS. LOBEL:

Q. Did Royal Caribbean do anything to review this case with you?

MR. DRAHOS: Object to the form.

THE WITNESS: Review the Peck, no.

BY MS. LOBEL:

Q. Okay. Did Royal Caribbean ask that you do any additional training as a result of that incident?

MR. DRAHOS: Object to the form.

THE WITNESS: As a result of that incident, no. No. No.

BY MS. LOBEL:

Q. Okay. That's fine. Did Royal Caribbean suspend you for a period of time as a result of this incident?

A. No.

MR. DRAHOS: Object to form.

BY MS. LOBEL:
Q. Did Royal Caribbean deny any contracts?
A. No.
MR. DRAHOS: Object to form.
BY MS. LOBEL:
Q. Okay. Have you ever been disciplined by Royal Caribbean?
A. I'm sorry. I didn't hear.
Q. That's okay. Have you ever been disciplined by Royal Caribbean?
A. No.
Q. Have you ever been questioned by Royal Caribbean about the medical decisions that you've made in a case before?
MR. DRAHOS: Objection.
THE WITNESS: I can't recall, but that is possible.
BY MS. LOBEL:
Q. Okay. Do you recall any other instances when there's been a complaint about a delayed medical evacuation of a patient that was in your care?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't know. I don't recall.
BY MS. LOBEL:
Q. Okay.

A. I don't recall any cases.

Q. Okay. Okay. When there is a situation when a patient, whether it be passenger or a crew member is medically disembarked, is that logged in a specific place to keep track of medical disembarks?

MR. DRAHOS: Object to form.

THE WITNESS: We keep -- we put it in Sea Care.

BY MS. LOBEL:

Q. Is it documented anywhere else so that you can keep track of all the medical emergencies requiring a disembark or evacuation?

A. Not that I'm aware of.

Q. Okay. So if Royal Caribbean wanted to determine which patients, be it crew or passenger were medically disembarked for medical emergencies, how would they be able to determine that?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not sure. I only reviewed it from my end, so I wouldn't be able to answer that.

BY MS. LOBEL:

Q. Okay. Has Royal Caribbean at any point in time, whether it be -- whichever line it be, be it Celebrity, Royal or Azamara or any other line ever denied you a

contract?

A. No.

Q. You're aware that the SQMs have specific procedures the doctors are expected to follow with regard to medical disembarks; correct?

MR. DRAHOS: Object to form.

THE WITNESS: There is guidance in SQM.

BY MS. LOBEL:

Q. And Royal Caribbean expects that you follow those SQM procedures with regard to medical disembarks?

MR. DRAHOS: Object to form.

THE WITNESS: That depends on the case. That's as I said those are guidances and then we have to tailor them to (inaudible).

BY MS. LOBEL:

Q. Does Royal Caribbean have SQMs particularly as they relate to care and treatment involving a potential stroke or stroke?

A. Not that I'm aware of.

Q. Because you're aware that there's cardiac SQMs?

MR. DRAHOS: Object to the form.

THE WITNESS: No. Not that I'm aware.

BY MS. LOBEL:

Q. Okay. I just wanted to note there was substantial equivalence.

MR. DRAHOS: Object to form.
BY MS. LOBEL:
Q. And at the time of this incident you were the senior ship doctor; correct?
A. That's correct.
Q. You were responsible for ensuring all members of the medical team follow Royal Caribbean's procedures?
A. The company requires everyone to follow the procedures. So it's everyone's responsibility to follow the procedure, everyone onboard.
Q. But you were -- sorry.
A. I supervise the daily activity and the medical, but the responsibility to follow SQM is each worker.
Q. But you're responsible for ensuring that the nurses follow the SQMs as they relate to the medical center; correct?
A. Yes. I'm their supervisor, yes.
Q. And the same would be true of the medical secretary. You're required to ensure that the medical secretary adheres to the SQM applicable to their position on the ship; correct?
A. As far as medical SQM goes?
Q. Yes.
A. That might be considered correct. Yes.

Q. Okay. So eventually as senior doctor you would have been the boss over the medical team, every person that works in the medical center?

MR. DRAHOS: Object to the form.

THE WITNESS: Well the role of the senior doctor is also on the SQM. As I recall, there's nothing specific about you know making sure everyone is following the SQM, but as in general you -- obviously we're responsible to make sure that the medical is working well, but there's no specific rule in SQM that says that we should supervise other people's -- other people following this and our role and other people's roles in the company, they are actually dictated by HR. It's HR SQM, not medical.

BY MS. LOBEL:

Q. I don't understand. So HR is responsible for ensuring that the medical team abides by the SQMs?

A. Yes. HR is responsible for determining what's the role of each person -- of each of the persons that work in the medical facility. And as they are they also determine what my role is. And my role is to supervise activity in the medical facility, so I as a general rule you could say that I indirectly supervise if they are following SQM or not, but that's not my role in the

company. So that's not SQM as a role of the senior doctor. The role of the senior doctor is to supervise activity in the medical facility and then it's everyone's obligation to know SQM if that makes sense. Sorry.

Q. Doctor, would you kindly -- because we talked about this way at the beginning of the depo, but I foolishly didn't ask you to put it up, because I attached as Plaintiff's Exhibit 1 the timeline that you were relying on. Could you hold that up so that I can see it. Can you bring it closer to the screen because it's a glare. Keep coming. Keep coming. Go down. Okay. Slower. Go to the top. Go to the top. Stop. Thank you. 9:15 onset. 10:15 onset. 9:25 MC chart. Does that mean medical chart when you write MC at the top. 9:25 MC chart?

A. Medical, yes.

Q. Okay. All right. 9:30 vitals. 10:30 vitals. 9:30 to 9:35 exam. 10:30, 10:35 exam. 9:56 a.m. referal. 10:56 referal. 9:59 an e-mail to agent. 10:59 a.m. e-mail to agent. 11:40 a.m. paramedic. 12:40 p.m. paramedics. 12 p.m. paramedics off ship. 1:02 paramedics off ship. 12:08 p.m. paramedics leave. 1:08 paramedics leave. 12:50 p.m. paramedics arrive to HIMA. 13:50 paramedics arrive at HIMA. Can you keep going down. Is

there anything else? That's it. Okay. Is that your handwriting?

A. That's -- Mr. Drahos's handwriting.

Q. So you didn't write that document?

A. No. I mean, we went over the document.

Q. I don't want to know what you discussed. I just want to know, you did not create that document?

A. No. I didn't write it myself. No.

Q. If you could because the -- hang on. Hold it right there and just pause. Okay. One second. One second. I'm not as good with technology as I should be. Can you go down. Stop right there. Lovely. Thank you. That was a slightly further process. I have nothing further on direct examination. Okay. Mr. Drahos may have questions for you on cross.

MR. DRAHOS: Let's take a break so that I can go over my notes and I don't have much, but I want to get a chance to read up.

MS. LOBEL: How much time do you need?

MR. DRAHOS: Stretch for a minute then --

THE VIDEOGRAPHER: Going off the video record. The time is 20:18 UTC.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 20:23 UTC. Please proceed.

CROSS-EXAMINATION

BY MR. DRAHOS:

Q. So, Dr. Pereira, I know we've been here for a while. I intend to be very brief to cover a couple areas that I just want to make sure are clear on the record. Okay. So I'm going to go back over some of the testimony that's been asked of you by my colleague.

Do you recall at the very beginning of the deposition you were asked some questions about the availability of thrombolytic medications and ship meds. Do you recall that line of questioning?

A. Yes.

Q. Okay. And specifically you had given some testimony about a particular medication called Tenecteplase, do you recall?

A. Yes.

Q. Would you ever give Tenecteplase to a patient you suspected was suffering a stroke?

A. No.

Q. And in this case did you ever give any thrombolytic medications to Richard Burgess?

A. No.

Q. Would you ever give any type of anti-thrombolytic medication to a cruise ship patient who you suspect was suffering a stroke?

A. No.

Q. So you're not suggesting here when you say would you give medication to dissolve a clot, you're not speaking about stroke patients?

A. No.

Q. You're speaking about other types of clots?

A. Other types of clots in other places.

Q. Okay. You were asked some questions about an oral exam that was done by Steve Williams approximately eight years ago?

A. Yes.

Q. Do you recall that line of questioning?

A. I recall, yes.

Q. And specifically you were asked about whether or not you were given a clinical hypothetical that involved a stroke. Do you recall that question?

A. Yes.

Q. And your answer was, honestly, I wouldn't be able to answer. Are you saying you wouldn't be able to a hypothetical answer about stroke, or you wouldn't be able to answer, because you don't remember what was asked of you?

A. No. I don't remember what was asked of me.

Q. Okay. You were asked questions about 911 and its availability in Puerto Rico, do you recall that line?

A. Yes, I do recall.

Q. All right. And specifically you had given an answer 911 is always a possibility. Do you recall saying that?

A. Yes, I do.

Q. Was 911 a possibility for Mr. Burgess on February 21, 2019?

A. No. Not in this case. No.

Q. Why not?

A. Because we needed to make sure that the patient goes to a facility that can actually diagnose and treat this specific patient and --

Q. Okay. So it's your understanding in Puerto Rico that an ambulance responds to a 911 call and brings the patient to whatever the closest facility is or to the best facility?

MS. LOBEL: Form.

THE WITNESS: TO whatever facility. That's something that we wouldn't be able to control. If we called the 911 we wouldn't be able to control where that patients would end up.

BY MR. DRAHOS:

Q. So, in other words, if 911 had been called in this instance regarding Mr. Burgess, he could have been taken anywhere and it could have been somewhere that had

no ability to treat this condition whatsoever?
A. That is correct.
Q. So is that why you relied upon the port agent to determine the proper location for him to be transferred to?
A. That is correct.
Q. To make sure where he was being taken was the proper place?
A. Exactly.
Q. Okay. You were asked questions about your conversation -- Doctor, you were asked questions about your conversation with the physicians at HIMA Hospital. Do you recall that line of testimony?
A. Yes, I do.
Q. And your answer was that you spoke to him about Mr. Burgess' symptoms and when the symptoms started. Do you recall giving that answer?
MS. LOBEL: Form.
THE WITNESS: Yes.
BY MR. DRAHOS:
Q. Did you tell the physician at the time a specific time that the symptoms started or a specific duration of how long the symptoms had been going on for?
A. No. I told him the duration of the symptoms.
Q. So, in other words, you didn't call him and say

that the stroke symptoms started at 9:15 in the morning. You said the symptoms had been going on for X amount of time?

A. Yes. That's correct.

Q. You were asked questions about the specific times that this conversation with this physician at HIMA Hospital occurred and it was your testimony that you can't recall the specific time. Do you recall that line of questioning?

A. Yes.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. Did you call this physician at HIMA Hospital as soon as you received the number from the agent, the port agent?

A. Yes.

Q. Would you have sat on that number and said I'll get around to it when I feel like it?

A. No.

Q. So you understood that when the port agent gave you this number you were going to call it the second you got that number?

A. That's correct.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. And did you talk to that physician as soon as you made that phone call?

A. Yes.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. You were asked questions about the Peck litigation and I want to ask you about that.

A. Okay.

Q. I don't want to get too in depth with the particular patient's medical circumstances, but I need to ask you a certain kinds of questions so that the court understands the circumstances.

A. Okay.

Q. Can you tell me what acts prompted Mr. Peck to report to the ship's medical center?

MS. LOBEL: Form.

THE WITNESS: He got hit by a sliding door.

BY MR. DRAHOS:

Q. And were you present in the medical center when Mr. Peck first arrived following that incident?

A. No.

Q. Were you involved in any of the care and treatment of his encounter in the medical center during this first particular visit?

A. No.

Q. Did you have any role in discharging him back to his cabin following that encounter in the medical center?

A. No.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. When did you first became involved with Mr. Peck's circumstances?

A. Well, the next day there was a call to us that this particular patient, Mr. Peck, had been found in a comatose state.

Q. And were you the junior doctor or the senior doctor at the time?

MS. LOBEL: Form.

THE WITNESS: I was the junior doctor.

BY MR. DRAHOS:

Q. And did the senior doctor get involved in Mr. Peck's case when this call came in?

A. Yes.

Q. And was it the senior doctor who was responsible for determining whether or not he was a candidate for evacuation?

A. Yes.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. It was the senior doctor who handled all of

those decisions and arrangements?

A. Yes.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. And would you have deferred to the senior doctor during the Peck circumstance, but relative to both his qualifications for evacuation and the actual execution of it?

A. That is correct.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. So that was not your responsibility nor your role at all during the care and treatment of Mr. Peck?

A. No. No, it wasn't.

Q. Those are all the questions I have, Doctor. Thank you.

RE-DIRECT EXAMINATION

BY MR. LOBEL:

Q. Okay. Dr. Pereira you remember quite a bit more about the Peck situation than when I asked you questions, so I'm going to follow up a little bit.

A. Sure.

Q. The doctor who made the call that you're now saying made the call for the disembark was a Royal Caribbean doctor; correct?

A. That is correct.

Q. So that was somebody who was a Royal Caribbean employee?

MR. DRAHOS: Object to the form.

THE WITNESS: I suppose. I don't know his contract, but I suppose, yes.

BY MS. LOBEL:

Q. Royal Caribbean knows about that case, correct, of what happened?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, I imagine so, yes.

BY MS. LOBEL:

Q. The medical records were submitted in the Sea Care system?

A. Yes.

Q. And that is Royal Caribbean's system?

A. That is Royal Caribbean's system, yes.

Q. Okay. And so if there was an issue about the decision with the timing of the medical evacuation, that still would have been a situation involving Royal Caribbean's shipboard doctor; correct?

A. The decision to evacuate, you mean?

Q. Yes.

A. That's correct.

Q. So if anything was done wrong, forgive me, Royal

Caribbean would know about what, if anything, was done wrong in that instance?

MR. DRAHOS: Object to the form.

THE WITNESS: I wouldn't be able to answer that. If they would know in that instance.

BY MS. LOBEL:

Q. Okay. Mr. Peck was in the care of Royal Caribbean's doctor at the time that the patient was evaluated?

MR. DRAHOS: Object to form.

THE WITNESS: I'm sorry, but this patient was evaluated twice. Which one do you mean?

BY MS. LOBEL:

Q. Both times the patient was evaluated, it was by a Royal Caribbean doctor?

A. Oh, yes. That's correct.

Q. And the medical evacuation was handled by Royal Caribbean?

MR. DRAHOS: Object to the form.

THE WITNESS: The medical evacuation, I don't recall the details of the evacuation, but probably a similar procedure to the one with Mr. Burgess.

BY MS. LOBEL:

Q. Okay. And just to be abundantly clear, because there is a lot more details coming out about the call with

the doctor from HIMA San Pablo Caguas, nothing about the details of that call is documented anywhere; correct?

A. That is correct.

Q. Okay. So you can't say one way or another exactly what you did or did not discuss with that doctor?

MR. DRAHOS: Object to the form.

THE WITNESS: I can only say what I recall and that's it.

BY MS. LOBEL:

Q. You would agree with me that onset of symptoms is an important fact in the evaluation of the patient; correct?

A. That is correct.

Q. So it would be very important to tell the receiving hospital when somebody first starts experiencing symptoms related to a stroke?

MR. DRAHOS: Object to form.

THE WITNESS: What do you mean, if it's important to say when the onset of symptoms were.

BY MS. LOBEL:

Q. Literally. That's very important information to convey to the receiving hospital.

A. Yes. I would say that's a very important part of the history of the patient.

Q. Right. Because if they don't know the history

of the patient, they do not know the facts and circumstances of how the patient is being received?

MR. DRAHOS: Object to form.

THE WITNESS: I mean, that is the preliminary information, then they collect their own story.

BY MS. LOBEL:

Q. And one of the reasons why it's so important for you as the shipboard doctor to appreciate onset of symptoms for a person who may or may not be suffering from a stroke has to do with timing and having to do with the receipt of medication such as TPA; correct?

MR. DRAHOS: Object to the form, asked and answered.

THE WITNESS: Yes. I'm sorry. This time I didn't understand the question.

BY MS. LOBEL:

Q. Certainly. You testified on cross-examination that you could not administer thrombolytics to Mr. Burgess; correct?

A. I wouldn't be able to diagnosis a stroke on board.

Q. You didn't have the means or ability to administer TPA?

MR. DRAHOS: Object to form.

THE WITNESS: I wouldn't have the means to

diagnosis a stroke, so there is no treatment of the stroke. It depends on the full evaluation, including a scan. So there's no chance to treat it on board.

BY MS. LOBEL:

Q. But one of the most important factors in evaluating whether a patient can have thrombolytics when they're undergoing a stroke is onset of symptoms; correct?

MR. DRAHOS: Object to form.

THE WITNESS: I mean, that would depend on the treating physician, I guess, yes.

BY MS. LOBEL:

Q. Well, we discussed TPA can only be administered within a small window of time for a patient?

MR. DRAHOS: Objection to the form.

THE WITNESS: There is a window of time, yes.

BY MS. LOBEL:

Q. And that window is limited to onset of symptoms through receipt of the patient -- strike that.

MR. DRAHOS: Object.

BY MS. LOBEL:

Q. I'm misstating that. I want to make sure the record is clear. Thrombolytics can only be given between the window of onset of symptoms and approximately three hours after onset of symptoms; correct?

MR. DRAHOS: Object to form.
THE WITNESS: That depends on other factors also.
BY MS. LOBEL:
Q. What other factors?
A. Well, it all depends on the image results and it depends on the treating physician.
Q. Okay. Fair enough. But in order for the treating physician to even be able to consider whether or not they can administer TPA they have to be within the window of when they can even administer TPA; correct?
MR. DRAHOS: Object to form.
THE WITNESS: That window itself depends on the treating physician to a certain degree.
BY MS. LOBEL:
Q. And it also depends on onset of symptoms of the patient?
MR. DRAHOS: Object to the form.
THE WITNESS: That would be one -- obviously one point to consider yes.
BY MS. LOBEL:
Q. Okay. And with regards to the availability of ambulances by calling 911, I want to ask you a few followup questions. Okay.
A. Okay.

Q. You don't know whether or not the local ambulances were incapable of identifying an appropriate hospital for Mr. Burgess?

MR. DRAHOS: Object to form.

THE WITNESS: I wouldn't be able to know that.

BY MS. LOBEL:

Q. So you don't know if they are better equipped to handle a patient -- strike that.

You don't know if the local ambulances are better equipped to identify and transport stroke patient than whoever the port agent has a contract with; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: What do you mean, the contract?

BY MS. LOBEL:

Q. Well, the port agent has a contract with a private ambulance company in which it uses to transport patients. You knew that; correct?

MR. DRAHOS: Object to form.

THE WITNESS: I did not know that.

BY MS. LOBEL:

Q. Okay. You knew that the -- well, did you know whether or not the port agent uses 911 in order to get transport for patients?

MR. DRAHOS: Object to form.

THE WITNESS: I don't know that.

BY MS. LOBEL:
Q. So for all you know the port agent calls 911 in order to arrange for transport?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, I can tell you what I know. I know that the information that I gave the port agent is that we needed a specific type of medical facility and so I assume that he arranged for that specific medical facility and then for the transportation to that medical facility. That's really -- that's all I know.
BY MS. LOBEL:
Q. Okay. You can't say one way or the other whether the selection of the hospital and the ambulance was all arranged through 911?
MR. DRAHOS: Object to form.
THE WITNESS: No. What I know is that it was arranged through the port agent because he's the one that I spoke with. Then I don't know the meanders of the operation that's his responsibility and his procedure. I don't know that.
BY MS. LOBEL:
Q. Okay. And you don't know the port agent's abilities as they compare to the local 911 ambulance agency in Puerto Rico one way or the other?

MR. DRAHOS: Object to form.

THE WITNESS: I don't know that.

BY MS. LOBEL:

Q. Okay. One last question having to do with the Peck litigation. That was a situation where there were two evaluations of that patient on two separate days; correct?

A. That is correct.

Q. The medical records that were available from the first encounter would have been available during the second encounter; correct?

A. That is correct.

Q. So in evaluating the patient on the second encounter, it would have been part of the procedure as a doctor to review the medical records from the first encounter?

A. Yes. I review all the information that I have available.

Q. Because the medical history of the patient is very important to conduct a differential diagnosis; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Well, in this case the patient wasn't able to give any history.

BY MS. LOBEL:

Q. Right. So you had to look at the medical records from the previous encounter in order to look at what medical history was available?

A. That's correct.

Q. And otherwise, you had to rely on the family?

A. Yes. I had to rely on the -- yes. I believe there was the partner he was traveling with.

Q. Did you speak with Darren Henze, Mr. Burgess's husband?

A. I did not.

Q. Why?

A. You mean since this happened?

Q. No. The time on the ship, you never spoke with Darren Henze?

MR. DRAHOS: Object.

THE WITNESS: It is possible. I don't recall.

BY MS. LOBEL:

Q. Okay. I've got nothing further. Thank you, Doctor, for your indulgence.

MR. DRAHOS: We're going to read the transcript. And thank you to everybody for working on a Sunday.

MS. LOBEL: Yes. Likewise, Doctor. I really appreciate it and Michael, the same, thank you for making this happen. Wendy, John, thank you both as

well.

THE COURT REPORTER: Thank you.

MS. LOBEL: Wendy we're going to take a copy. I'm going to work on getting those exhibits to you. I have got to extract them from PDF.

THE COURT REPORTER: Okay. Let me give you my e-mail.

MS. LOBEL: I'm just going to put on the record that we're ordering a copy of the transcript with the index.

MR. DRAHOS: I'm ordering a copy.

THE VIDEOGRAPHER: Would either party like a video?

MS. LOBEL: Not at this time.

THE VIDEOGRAPHER: This will conclude today's deposition. The time is 20:42 UTC. We're now off the record.

(Reading and signing of the deposition was not waived by the witness and all parties.)

CERTIFICATE OF OATH

THE STATE OF FLORIDA,

COUNTY OF MIAMI-DADE.

I, WENDOLYN ISON, Court Reporter, Notary Public, State of Florida, certify that Dr. Joao Pereira personally appeared before me on the 14th of November, 2021 and was duly sworn.

Signed this 9th of December, 2021.

WENDOLYN ISON, COURT REPORTER
Notary Public, State of Florida
Commission No.: #GG 971692
Commission Expires: May 5th 2024

NOTARY PUBLIC STATE OF FLORIDA

WENDOLYN ISON
Commission # GG 971692
Expires May 5, 2024
Bonded Thru Budget Notary Services

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA,
COUNTY OF MIAMI-DADE.

I, WENDOLYN ISON, Court Reporter Reporter, certify that I was authorized to and did stenographically report the deposition of Dr. Joao Pereira; pages 1 through 248; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 9th of December, 2021.

Wendolyn Ison

WENDOLYN ISON, COURT REPORTER