EXHIBIT C



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
* * *

RICHARD BURGESS, Individually, and by and through DARREN HENZE as Guardian of the Person and Estate of Richard Burgess, incapacitated and as agent under that certain durable power of attorney dated November 20, 2006,

Plaintiffs, CASE NO.: 1:20-CV-20687-JEM

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL, JOAO PEREIRA, MICHIEL ADRIAAN ETSEBETH,

Defendants.
* * *

VIDEOTAPED DEPOSITION OF:

DARREN HENZE,

was held on Thursday, September 16, 2021, commencing at 11:10 a.m., at 50 South Yale Street, York, Pennsylvania, before Jeaninn Alexis, a Certified Court Reporter.

HUSEBY GLOBAL LITIGATION
1230 West Morehead Street, Suite 408
Charlotte, NC 28208
(800) 333-2082
E-mail: calendar@huseby.com

APPEARANCES:

On behalf of the PLAINTIFF:

JOHN H. HICKEY, ESQ.
HICKEY LAW FIRM
1401 Brickell Avenue
Suite 510
Miami, Florida 33131
(888) 913-4296
E-mail: Hickey@hickeylawfirm.com

On behalf of the DEFENDANT:

MICHAEL DRAHOS, ESQ.
GRAYROBINSON, P.A
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
(561) 268-5727
E-mail: Michael.drahos@gray-robinson.com

ALSO PRESENT:

William Bill Chan, Videographer

-oOo-

I-N-D-E-X

Videotaped Deposition of Darren Henze

September 16, 2021


| EXAMINATION BY: | PAGE: |
| --- | --- |
| Mr. Drahos | 6, 377 |
| Mr. Hickey | 289 |

| EXHIBITS MARKED: | PAGE: |
| --- | --- |
| Exhibit A - Plf's Answers to Interrog | 51 |
| Exhibit B - Guest Ticket Booklet | 102 |
| Exhibit C - Activity Details GS000001 | 108 |
| Exhibit D - Final Statement | 108 |
| Exhibit E - Receipt Request | 109 |
| Exhibit F - Photographs | 130 |
| Exhibit G - Guest Injury Stmt. Form 1 | 153 |
| Exhibit H - Guest Injury Stmt. Form 2 | 163 |
| Exhibit I - SEACARE | 230 |
| Exhibit J - Guest Care Team Letter | 242 |
| Exhibit K - Photographs (1 through 4) | 378 |
| Exhibit 1 - Packet - Safety, Health | 292 |
| Exhibit 2 - Document (4 pages) | 299 |
| Exhibit 3 - Case Summary | 307 |

I-N-D-E-X (cont'd.)


| EXHIBITS MARKED: | PAGE: |
|---|---|
| Exhibit 4 - Photo of suite details | 315 |
| Exhibit 5 - Document | 328 |


(Exhibits included with transcript.)

-oOo-

P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER: We are now on the video record. The time is 11:11 a.m., Eastern. Today's date is Thursday September 16th, 2021.

This begins the video deposition of Darren Henze, taken by the defense in the matter of Richard Burgess versus Royal Caribbean Cruises Limited, et al, which is filed in the United States Direct Court, Southern District of Florida.

This video deposition is taking place at 50 South Yale Street, York, Pennsylvania.

My name is Bill Chan. I am the videographer with Precise Inc. The court reporter is Jeaninn Alexis representing Huseby Reporting.

Counsel, please introduce yourselves for the video record, and the court reporter will swear in the witness.

MR. HICKEY: Hi. Good morning. My name is Jack Hickey and I have the pleasure of representing Darren Henze as the guardian and personal representative now of Mr. Burgess. Thank you.

MR. DRAHOS: Michael Drahos on behalf of the defendant, Royal Caribbean.

WHEREUPON --

DARREN HENZE,

a Plaintiff, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DRAHOS:

**Q. Good morning. Can you please state your name for the record?**

A. Darren Henze.

**Q. Thank you. My name is Michael Drahos. I had the opportunity to introduce myself before we got started. Because this is being filmed, I just want to explain for**

the members of the jury and also take a moment to thank you.

You and Mr. Burgess were kind enough to welcome me into your home today for the purposes of these depositions. The partitions are up and we are wearing masks in an effort to minimize any risk of COVID exposure.

So with that, I'd like to spend a little bit of time getting to know you, Mr. Henze. But before I do, I want to make sure you are aware of the ground rules for today.

I'm sure your attorneys have done so but so that we are all on the same page, I want to do the same. By the way, do you have any trouble seeing me through this partition?

A. No.

Q. And I know I'm speaking to you through a mask. If at some point in time you have any trouble understanding what I'm

saying either because of the mask getting in the way or I mumble or it doesn't make any sense, please let me know and I will be happy to rephrase it.
Have you ever given a deposition before?
A. No.
Q. All right. So as you can see, this is a formal question and answering session, so everything that is being said in the room is going to be recorded by the court reporter here on this transcript. So the style of communication is a little different than normal conversation in the sense that we have to answer out loud for everything.
So although I'm seeing you nodding your head, and as you may have seen when you were sitting in on Mr. Burgess' deposition, from time to time if you nod your head, I'm going to prompt you to say --

is that a yes or is that a no. I'm not doing that to be obnoxious but so the record is clear later on and how you exactly answered that question when we go back and try to read the transcript. Okay?

A. Okay.

Q. Obviously, this is going to be a while, so if at any point in time you need to stop to take a break whether it's to attend something here in the house, make a phone call, whatever, just let me know and we will stop. Otherwise, it's my style to push through and get it done as quickly as possible. Okay?

A. Okay.

Q. We don't want you to guess, so if at some point in time I ask you a question that you don't know the answer to, you don't remember, that you are not aware of, let us know that. I'd prefer that we avoid guessing here if at all possible.

A. I will.
**Q. So with that, let's start with background about you. Have you gone by any other names in your life other than Darren Henze?**
A. No.
**Q. And what's your date of birth, sir?**
A. June 4th, 1960.
**Q. And your current address, please.**
A. 50 South Yale Street, York, PA 17403.
**Q. And that's where we are today?**
A. Correct.
**Q. And how long have you lived here?**
A. Going on 30 years.
**Q. Okay. And as I understand it, you've been named guardian and personal representative on behalf of Richard Burgess?**
A. Yes, I am.
**Q. Okay. And when did that process**

**take place?**
A. That process took place officially -- I couldn't give you -- it's within the last year. We got married November 7th of '13.
**Q. Okay.**
A. But for me to -- I got his official guardianship within the last year.
**Q. And was that guardianship handled here in York, Pennsylvania?**
A. Yes.
**Q. And just layman's terms, what is your understanding of what that guardianship allows you to do on behalf of Mr. Burgess?**
A. It permits me to make all the decisions for him.
**Q. So that means all financial, all medical decisions?**
A. All financial, all medical decisions.
**Q. And do you, indeed, make all**

financial and medical decisions for Mr. Burgess?

A. Yes, I do.

Q. All right. So from time to time, if there comes to be an issue of medical treatment, a particular treatment that's being recommended by a doctor, do you consult with Mr. Burgess about that or do you make that decision independently?

A. I consult with Richard.

Q. And is it your impression that when you were consulting with him on particular medical procedures, that he has the comprehension and the capabilities to weigh those decisions and make an educated decision on his behalf?

A. No.

Q. All right. So what is the purpose then of consulting with him?

A. Because I want to make him feel that he is involved in the decision.

Q. Has there been any instances where you made a medical decision over an objection that he's raised or perhaps a protest or disagreement of some sort?
A. No.
Q. Okay. So far then, all medical decisions that have been made on behalf of Mr. Burgess has been made with your authority, however, he has been in agreement with them all?
A. If you're asking -- from what point?
Q. From the point and time of the subject cruise until now.
A. No.
Q. So --
A. I did not consult with Richard from the point of the cruise, okay, up until last October or this past October. The first time I consulted with Richard on anything would have been his Botox

injections. Everything else prior to that, I've made those decisions on my own not consulting Richard.

**Q. Okay. And the Botox injection, what were those for?**

A. He's receiving Botox injections now to help relieve the pain and possibly get more extension in his arms and fingers.

**Q. Okay. So when you consulted with him on the Botox injections, was he in agreement with that at that point?**

A. Yes.

**Q. Okay. So let me take a step back. I jumped way too far.**

**What is the highest level of education you've obtained?**

A. I went to college for six years.

**Q. Where did you go to school?**

A. I first started out of Penn State York, and then I went to Penn State Main Campus, and then I returned to York College

in Pennsylvania.
Q. Did you obtain a degree?
A. No.
Q. Was there a particular field of study that you were focused on during those years in college?
A. Yes, accounting.
Q. Accounting. Do you hold any type of professional license or certificate of any sort?
A. No.
Q. Any other schooling, formalized schooling other than what you told me about at Penn State York and Penn State Main?
A. Yes.
Q. Okay. And you also said York College?
A. Yes.
Q. Any other formal education other than --
A. No.

**Q. Are you currently employed?**
A. Currently, no.
**Q. When was the last time you held regular employment?**
A. February of 2020.
**Q. And what were you doing back in February of 2020?**
A. I was a driver for United Parcel Service.
**Q. For how long a period of time did you work for a driver of UPS?**
A. I worked for UPS for 35 years. Driver -- I was a driver for 32, yeah, 32 years.
**Q. And was that your position at the last date of employment at UPS?**
A. Yes.
**Q. Okay. What other positions did you work at in UPS?**
A. I started out as a part timer when they were short lined and then I went

to part-time supervision.
**Q. Okay. And as a driver for UPS, did you have a particular route that you were responsible for?**
A. Yes.
**Q. And what was that route?**
A. When I retired, it was in the Glen Rock area here in York County, but prior to that, I was the driver for Dover in Wellsville in York County. I drove in Dover and Wellsville for probably about 20 years.
Then they moved the Dover area to a different location to Carlisle, Pennsylvania which would have meant that I was driving to and from work an hour. And they -- this happened at the time of Richard's incident. So I could not afford an extra two hours on the road back and forth to work when presently, it was only taking me 20 minutes to get to work. So I chose to stay at the building I was at and

take on a different area.
Q. Okay. And so in February of 2020, you would have retired from UPS?
A. I retired from UPS.
Q. Do you receive a pension from --
A. Yes, I do.
Q. All right. And so since the time of your retirement then, you've held any other type of informal or formal employment?
A. Informal employment, yes, here at the house.
Q. Okay.
A. Taking care of Richard as a caregiver, not as a husband.
Q. Okay. We are going to get to that --
A. That's informal.
Q. Okay. So I asked Richard a little bit of questions about the family in the area and I want to clarify to make sure I got it correct.

**As I understand it, you have three sisters and two brothers?**

A. No. I have five sisters and two brothers.

**Q. Okay. And how many of them live here in the York area?**

A. All but one.

**Q. All right. Which is the one that does not live in the York area?**

A. Her name would be Brenda. She lives in the Harrisburg area.

**Q. Okay. And so what are the names of the sisters that do live in this area?**

A. Kim Correct, Dana Spangler, Diedra Grim, and Sandra Henze.

**Q. Sandra Henley?**

A. Henze.

**Q. And how about your two brothers?**

A. Robert Henze Junior and Scott Henze.

**Q. And so of the four sisters,**

**Sandra, Kim, Dana, and Diedra, how many of them assist in caring for Richard?**

A. What do you mean by assist?

**Q. How many of them come to the home and provide assistance to you and Richard in day-to-day activities?**

A. Day-to-day activities, if you are asking me if they come to assist daily or anything like that, they don't.

**Q. Okay.**

A. Now, if you are asking me, like, today while I'm sitting here and I needed somebody to watch Richard, then I can get them on the phone, or if I need to run to the grocery store, I call them on the phone and they will come and they will sit with him.

**Q. Okay. So let me see if I can ask this in a way that gets the information I need as quickly as possible without -- so there was some interrogatory answers that**

**were given to us, and there are some people that are classified in this response as caregivers --**

A. Okay.

**Q. -- so I'm trying to get some clarity on how it came to be that they proceeded --**

A. Okay. At that time when you asked me those questions, Dana and her husband were here in the home while I was at work because at that time, one of the caregivers that I had hired had left. So at that time, they came every day while I was at work and took care of him.

**Q. Okay. They would be Dana and Gordon Spangler?**

A. Gordon Spangler.

**Q. All right. So since the time of your retirement, they are no longer rendering that type of assistance?**

A. Correct.

**Q. Okay. So what period of time was it that Dana and Gordon would come every day and help?**

A. When was that? I would have to look back. I couldn't give you a specific date right now.

**Q. Okay.**

A. I know when this all started, I started with -- ended up getting three caregivers for Richard.

**Q. What who were those individuals?**

A. One was -- her name was a Heather Carpenter, a Richard Helfrick, and Kelcie Fitchball. Heather worked --

MR. HICKEY: Can you say those names again.

THE WITNESS: Heather Carpenter, Richard Helfrick, and Kelcie Fitchball.

BY MR. DRAHOS:

**Q. Who is Megan Santiago?**

A. Megan Santiago is the person that

I eventually found after Heather Carpenter quit.

**Q. Okay. So who is Heather Carpenter? Let's start with that.**

A. Heather Carpenter is a caregiver that I found to take care of Richard when he first arrived home.

**Q. Okay. And do you recall what period of time Heather was rendering those services?**

A. A period of time? At this moment, I couldn't give you specific dates.

**Q. All right. Can you give me an approximation? Two or three months? Six months?**

A. Heather was here for approximately -- we got home in July so July, October, September, October -- she was here probably -- October, four months, five months.

**Q. Okay.**

A. Four to five months, I believe it was.
**Q. So when Heather quit, was Megan the person that came in --**
A. No. Once Heather quit, I could not find anybody, but I still needed to work. So that is when Dana and Gordy took over what Heather was doing.
**Q. Okay.**
A. And then I also had some help at that time from Kelcie, I believe.
**Q. And who is Kelcie?**
A. Kelcie was a caregiver that I had hired when we first brought Richard home.
**Q. Okay. And for how long a period of time did Kelcie render caregiving services?**
A. Kelcie only rendered caregiving services for about -- I think it was maybe three months.
**Q. Okay. What about Richard**

**Helfrick?**

A. Richard Helfrick care gave until -- he care gave in July. Richard Helfrick care gave until this past June.

**Q. And who is Richard Helfrick? How do you know him?**

A. He was a friend and a client and a nurse.

**Q. When you say, client, he would --**

A. A client of Richard.

**Q. And he also had nursing expertise?**

A. Yes.

**Q. And what were the circumstances that led to his discontinuing services in June?**

A. Well, I think he got -- I think he got tired of working also, but I think Richard's attitude.

**Q. Okay. And then Megan Santiago. Where does she fall in the timeline?**

A. She -- I also ended our arrangement in June because I'm paying for that care out of pocket. And because I was here, I was -- I figured that at that point, I could help take care of Richard instead of depleting our savings to pay other people at this point while I'm still healthy.

**Q. Okay.**

A. So what I did was instead of me being the one to clean the house and everything, then we brought in -- I brought in -- her name is Carol Stephens. She was our old cleaning lady and she knew Richard good, so she would watch after Richard a bit and she would clean the house.

And that way, while she was here, I figured I would have Richard here Mondays and Fridays. Instead of having someone here Monday, Tuesday, Wednesday, Thursday, Friday, I would have someone here Monday and Friday with Richard, and then Carol came to

sit with Richard and to clean the house on Tuesdays and Thursdays, so the only day I would tend to him by myself would be on Wednesdays. But then Richard quit. So then I just have right now -- I have Carol on Tuesdays and Thursdays.

**Q. And I'm sorry. Can you tell me Carol's last name?**

A. Stephens.

**Q. Carol Stephens. Is that with a V or PH?**

A. A PH.

**Q. Okay. Thank you for that. So you said that you and Richard got married in -- let me see how good my memory is -- October -- no, November of 2013.**

A. Okay.

**Q. I don't think I caught when you guys first met. When did you all meet?**

A. I wouldn't know the exact date, but probably around '91.

**Q. What were the circumstances?**

A. We were at a restaurant bar. I was there during the day for somebody's birthday party. And back in those days, they didn't have gay clubs. What they had was a bar may have gay dancing on a Sunday night.

And so I stayed after the birthday party at the club scene and a friend of Richard, who had met me a week or two prior and brought Richard because she wanted us to hook up. She wanted us to meet.

**Q. Got you. So from the time you all met in 1991 up through the time of the marriage, did you date the entire time frame or was it --**

A. We were together the whole time.

**Q. Okay.**

A. Well, we didn't live together the whole time. I can't remember what the dates

would be but I did move out of here for approximately two years, but we still saw each other on the weekends. And he either came over to where I was living or I would come over here.

**Q. Okay. So Richard bought this house that --**

A. No.

**Q. Was this the house that you first moved into --**

A. This was the house we moved into.

**Q. Okay. And there was a period of time, about two years, when you moved out of here to another location?**

A. Yes.

**Q. Okay. Do either of you have any prior marriages?**

A. No.

**Q. Do either of you have any kids?**

A. No.

**Q. Have you ever been involved in**

**any litigation prior to this case?**
A. No.
**Q. How about Richard to your knowledge?**
A. To my knowledge, no. And the reason we didn't get married because it was the law.
**Q. Understood. Did you get married here in Pennsylvania?**
A. No. We went to Maryland.
**Q. Maryland?**
A. They recognized same-sex marriage before Pennsylvania did.
**Q. Okay.**
A. And then at that time because then we were married, then Richard could be covered under my health insurance.
**Q. And the health insurance at work, I was going to ask about that later but being that you brought it up, we might as well do it now.**

Is that insurance still providing coverage to Richard up until today?
A. Yes, it is.
Q. And it still provides you coverage as well?
A. Yes.
Q. And has that been the only insurance that has covered expenses related to Richard's care following the cruise?
A. Following the cruise, yes. But now, as of August 1st of this year, he is on Medicare also.
Q. As of August 1st, 20201?
A. Yes.
Q. So these individuals that were coming to provide the home healthcare, their services were not covered under the insurance policy?
A. No.
Q. Did the insurance policy provide any coverage for any home healthcare?

A. Yes. But it was -- you could not find the home healthcare that he need.

**Q. What do you mean by that?**

A. What I mean is because of his trach, home healthcare people from, like, visiting nurses or any of these other healthcare, they had to be trach certified.

**Q. Okay.**

A. But he was at the rehabilitation center before he came home here. They tried everywhere. No one had trach-certified nurses and so they had -- so insurance could not cover it. They would have covered for those types of nurses but they couldn't be found.

**Q. So let me make sure I understand what you are saying.**

**In order for the insurance company, which would have been Central Pennsylvania Teamsters Health and Welfare?**

A. Um-hum.

Q. In order for them to cover home healthcare services, they need to be a certified trach specialty?
A. Certified.
Q. Okay. And so did, at any point in time, there ever be a home health certified trach specialist render services in this house?
A. No.
Q. So --
A. I took care of that myself. They trained me on how to take care of it.
Q. Okay. So Heather Carpenter, was she trach --
A. She wasn't trach certified.
Q. And Kelcie or Richard --
A. None of them were trach certified. I trained them when they came here.
Q. Okay. So did Central Pennsylvania Teamsters Health and Welfare,

did they ever send somebody here and you say no, we don't like you or --

A. No.

Q. -- nothing like that?

A. No. It wasn't for them to set it up.

Q. Okay. What about Magee Rehab. Did they make a recommendation for you for somebody?

A. No. They couldn't. They tried everything. They kept him there an extra week because they couldn't find anybody.

Q. Got you. So the health coverage provided from Central Pennsylvania Teamsters Health and Welfare, would they render coverage to Richard for the remainder of his life?

A. As far as -- he's on Medicare now.

Q. Right. As a supplemental insurance?

A. As a supplemental insurance, yes, but I pay for that.
Q. Okay. So just to kind of wrap up that area, other than Medicare, the Central Pennsylvania and your out-of-pocket expenses, has there been any other revenue source that has paid for medical care for Mr. Burgess following the subject cruise up until the present day?
A. No.
Q. Okay. Have you ever filed a workers' compensation claim?
A. No.
Q. How about a disability insurance --
A. No, sir.
Q. -- claim? How about Richard. Has he ever filed any type of disability compensation claim?
A. I could not answer that question. I don't know.

Q. Okay. I want to ask you a little bit of background on Richard that I wasn't able to get to during the time I was with him.

Has he gone by any other names in his life to your knowledge?

A. No.

Q. And what is the highest level of education that he's obtained?

A. I believe he has a high school diploma and then he went to beauty school.

Q. Do you know where he went to high school?

A. Hagerstown. Hagerstown High, I think.

Q. And forgive me. Hagerstown is in Pennsylvania?

A. Maryland.

Q. Maryland. Is that where Richard is from?

A. Yes.

**Q. He was born in Maryland?**

A. Yes.

**Q. And do you know where he went to beauty school?**

A. He went to beauty school in Lancaster. Empire Beauty School, I think it was.

**Q. Empire. Okay. And so Richard was telling me that he moved here really through employment is what prompted him to move to Pennsylvania.**

**What is your understanding of how he ended up in Pennsylvania?**

A. He ended up in Pennsylvania. He was working for the Double Image which was a men's clothing store and they were opening a store or had a store at the Park City Mall, which is in Lancaster, Pennsylvania.

And so Richard came from Hagerstown to Lancaster to be the manager at the Parks City Mall at the Double Image.

Q. Okay. And so if I've got this story straight, he came here to be the manager, eventually he went to beauty school and decided to become a hair stylist?

A. Correct.

Q. Do you know when he finished beauty school?

A. No idea.

Q. So let me just do the same with you so I understand your story.

Are you from Pennsylvania?

A. Yes.

Q. Okay. And York --

A. York, Pennsylvania, yes.

Q. So as I understand it then, Richard was saying to me then that for a period of time, he owned a business called Casablanca?

A. Yes.

Q. What do you know about that? When was that?

A. From what he has told me, when he first got out of beauty school, he worked at one of the big salons in Lancaster under a gentleman named Joe. He's passed away since then.

And after about a year or two of working under Joe, then Richard decided to go out on his own. And so then, he started with just himself in the back of this mill and he called it Casablanca. And then he rented the whole bottom of the mill and opened the salon which had about seven other stylists, three or four manicurists, and he owned that when we met.

**Q. Okay. And he sold that company?**

A. Yes.

**Q. According to Richard, he sold that company in 1996?**

A. That's possible.

**Q. Okay. And then from 1996, is that when it opened up --**

A. After '96 after he left there, he worked for a year or two for -- just in a little -- him and one of the stylist from Casablanca had a friend who had a nail salon. And so then they had convinced her to let them cut hair, style hair there for a while. And so they styled hair for a while for about a year I think it was, a year maybe two.

And then we opened -- we had an addition built onto our home at that time and that's where Hair Art Studio came from.

**Q. Okay. And so if you could explain that for me. You said there was an addition built onto the home?**

A. Correct.

**Q. I erroneously walked to the garage as I was coming in here today.**

A. Correct.

**Q. Is it back there in the garage --**

A. It is on the other side of the

garage.
Q. Okay. And that was an area that was devoted exclusively to the business?
A. Correct.
Q. So is there still a salon there with chairs and mirrors and sinks and --
A. There is a sink still out there, but we have now converted the salon into a gym area for Richard.
Q. And is the gym for therapy stuff?
A. That's where he does his occupational and speech therapy.
Q. All right. And I want to get to that in a little bit, but while I'm on the subject, there's occupational and speech therapists that come to the home?
A. Correct. And a physical therapist.
Q. Okay. How often do they come?
A. Presently they some twice a week.
Q. All three specialist come twice a

**week?**

A. Correct.

**Q. What days do they come?**

A. Oliver, who is his physical therapist, comes Monday and Wednesdays. Right now, Jenny, who is his occupational therapist, comes Tuesdays and Thursdays. And then Karen, who is his speech therapist, comes Wednesdays and Fridays. And then Fridays also, he gets a massage every week.

**Q. And who is that that provides the massage?**

A. Jill Van Duson.

**Q. And are these people -- Jill, Karen, Oliver, Jenny -- are they rendering services that are being paid for through insurance or Medicare?**

A. Yes. Everyone but Jill. I pay Jill out of pocket.

**Q. Jill is out of pocket. Okay. Do you at least get massages?**

A. No.
Q. You should squeeze one or two in there yourself.
A. No.
Q. Okay. Did Richard ever have any employees work for Hair Art Studio?
A. No.
Q. It was just himself?
A. Just himself.
Q. Did you ever work for the company?
A. No.
Q. Richard is -- how old is Richard?
A. Sixty-four this year.
Q. Sixty-four this year. When is his birthday?
A. March 14th, 1957.
Q. What is your understanding of how much longer he was intending to work?
A. He intended to work probably until he died.

Q. Did you all ever have any discussions about retirement?
A. No, not really. We didn't because I wasn't going to retire if he was still working and he said that he was going to continue working because he loved what he did.
Q. So how many years did you need to get UPS to qualify for your full pension?
A. Thirty years.
Q. Thirty years. Does Richard receive any type of pensions or anything of that nature at all?
A. He -- we -- I withdraw $2,000 from an IRA, which Richard contributed to through his work.
Q. Okay.
A. And then he gets Social Security.
Q. So he has an IRA and Social Security?
A. Correct.

**Q. Okay. And where is the IRA? What --**

A. Morgan Stanley. Has a balance, right now, of approximately 56,000.

**Q. And do you recall what the balance was prior to the cruise?**

A. The balance was 150-something thousand.

**Q. Okay. And how about you. Do you have a separate retirement account?**

A. No. I have just the pension.

**Q. Do you also receive Social Security?**

A. No. I'm only 61.

MR. HICKEY: As you are looking through that, can we take a bathroom break?

THE VIDEOGRAPHER: Going off the video record. The time is 11:52 a.m.

(Recess 11:52 a.m. to 12:10 p.m.)

THE VIDEOGRAPHER: We are back on the video record. The time is 12:10 p.m.

BY MR. DRAHOS:
Q. So Mr. Henze, when we left off, we were talking a little bit about the retirement accounts and things of that nature and I just wanted to clarify something with you.
What was the total amount that Richard receives from Social Security at the moment?
A. At the moment, it's 2690 minus the 154, I believe, for the Medicare payment.
Q. Okay. Thank you.
A. Can I clarify something also?
Q. Yes.
A. A question about his caregivers. I just wanted to -- I just want to make it clear that when he left Magee, there was the option to put him in a nursing home. And I decided that for Richard's recovery, for his -- for him, it would be best for him to

be here in his home surroundings --
Q. Okay.
A. -- with his dogs.
Q. Thank you.
A. That is why I had to hire -- we tried to get nursing staff. And Richard was trach certified.
Q. He was?
A. Yes, he was.
Q. Okay. And I'm going to get into that a little later but thank you for the clarification.
So what I would like to do next is talk a little bit about Richard's medical history and the extent that you know about it. And if you don't know the answers to some of these questions, just let me know and I will find the information from other sources.
Okay. So as I understand and in reviewing the answers to interrogatories,

**Richard is HIV positive?**
A. Correct.
**Q. And for how long a period of time has he been HIV positive?**
A. He's been HIV positive for 20 years.
**Q. Does he have a particular doctor that treats him for HIV?**
A. Yes. Deweese.
**Q. Can you spell the last name for me?**
A. D-E-W-E-E-S-E, I believe.
**Q. And where is she located?**
A. She is in the WellSpan Group. She's one of the -- one of the forms I signed for you for her records, you have that.
**Q. Yeah. And that's another issue that I wanted to ask you about. We will get to that later. There's a form that's been pending that we signed and I wanted to ask**

you what that's about, but we will get to that in a minute.

So Lisa Deweese, from the WellSpan Group, has she been treating Richard for 20 years?

A. Yes.

Q. Okay.

A. That's who she -- he has gone to, yes.

Q. Okay. And has he seen any other doctors other than Dr. Deweese for treatment for HIV?

A. No. Not that I'm aware of.

Q. Has he had any type of exacerbation or reaction which required him to be hospitalized for HIV?

A. No.

Q. In the Answers to Interrogatories, there's reference to him taking what has been referred to, quote, high risk medication use, end quote.

What did you mean by that?
A. Can you --
Q. Sure. I'm happy to show you.
MR. DRAHOS: I unfortunately only have one copy of these, the Answers to Interrogatories.
MR. HICKEY: Sure. That's fine.
BY MR. DRAHOS:
Q. I would like to hand you what we will mark as Exhibit A to your deposition. These are Answers to Interrogatories that you and your attorneys helped you complete for us. And if you turn your attention to page 4, which will be Question No. 5.
Actually, before we get there, why don't we do this: Let's start with No. 3 on page 3, No. 1.
A. Okay.
Q. Answers to Interrog- --
MR. HICKEY: Okay. Hold on. Page 3, No. 1?

MR. DRAHOS: Yes. Page 3, No. 1.
BY MR. DRAHOS:
**Q. And the question is: What is the name and address of the person answering these interrogatories. And, first of all, the person's official position or relationship with the party.**
**Is that correct? Did you see that there?**
(Henze Deposition Exhibit A was marked for identification.)
(Document tendered to the Witness.)
A. Correct.
**Q. And the answer there is yourself; correct?**
A. Yes.
**Q. Through your power of attorney for Richard Burgess; right?**
A. Correct.
**Q. With the assistance of Ms. Sarah**

Lobel who is with the Hickey Law Firm?
A. Correct.
Q. So did you work with Ms. Lobel on completing these Answers to Interrogatories?
A. I answered them and submitted them to her, yes.
Q. Okay. And so they're around 40-some-odd pages in length. I don't intend to ask you on every single one of these questions, but the one I'm focusing on for the moment is Interrogatory No. 5.
A. Okay.
Q. And you will see there, the question asks was Richard Burgess suffering from any physical infirmity, disability, or sickness one month prior to the subject cruise. And if so, what was the nature of it and tell us what the --
MR. HICKEY: Sorry. What number?
MR. DRAHOS: No. 5.
THE WITNESS: I see that.

BY MR. DRAHOS:
Q. All right. And the answer there is in case past or slash other medical history. And about one, two, three, four, five bullet points down there, there is reference to high risk medication use.
Do you know what's being referred to there?
A. I do not know what was being referred to there.
Q. Okay. Was it high risk or -- strike that. Do you, whether it's a different qualification or description, do you consider there to be any aspect of risk associated with Richard's medication use related to his HIV medication?
A. No.
Q. Okay. Do you know what medications he's taking for HIV?
A. Yes.
Q. What medications are those?

A. BIKTARVY.

**Q. Can you spell it?**

A. Bik, B-I-K-T-A-R-V-Y.

**Q. One more time.**

A. B-I-K-T-A-R-V-Y.

**Q. T-A-R-V-Y. And has he been taking that medication for the past 20 years?**

A. No.

**Q. How long has he been taking it.**

A. He's been taking BIKTARVY for about two or three years now. Prior to that, he was take Atripla.

**Q. Would you mind spelling that?**

A. I can't. I would say A-T-R-I-P-L-A.

**Q. Okay. For how long a period of time was he taking that medication?**

A. I would not know the years, the amount of years. I couldn't say for sure.

**Q. Okay. So in the last 20 years,**

**has Mr. Burgess required to be admitted to a hospital for treatment related to his HIV?**

A. No.

**Q. Okay. How frequently does he see Lisa Deweese?**

A. Every six months. And then he has blood work done. They send somebody to draw his blood.

**Q. And how frequently do they draw his blood?**

A. I believe -- I don't know for sure, but I believe it's twice a year.

**Q. Okay. Do you know when he's next due to have his blood work done for --**

A. She will let me know.

**Q. The doctor will let you know?**

A. Yes, she lets me know.

**Q. And when you say they check his numbers, what are they checking for to your knowledge?**

A. What are they -- well, when he

has his blood drawn, they check his viral load numbers, and then they -- at that time, they do his cholesterol and just --

**Q. All right. But is the --**

A. -- relating to the HIV, just his viral load.

**Q. All right. And so is there a range that they are hoping to keep it within?**

A. Um-hum.

**Q. Is that a yes?**

A. Yes.

**Q. Thank you. You've been doing good. That's the first time in about an hour. That's good.**

**So what is your understanding of what the range is that they are looking to keep it within?**

A. I don't know offhand but when you look up the -- when they -- you can look at the test results on the myWellSpan app when

they show you your test results and they have something there.

They have -- they have it already posted on there between this or this level is this good, so I just go by what they are showing on their medical records.

**Q. Okay.**

A. When I'm looking at it.

**Q. So when this blood work has been drawn for the last 20 years or so, has there ever been any instances that you are aware of that Richard was outside the desired range?**

A. Not that I'm aware of.

MR. DRAHOS: By the way, we might as well mark that exhibit. Can you hand me the stickers and I'll just make it so that you're not doing it?

BY MR. DRAHOS:

**Q. We are going to go ahead and mark the Answers to Interrogatories as Exhibit A.**

**And what I will ask you to do is, on our next break, if you can take a look through those and let me know if there is something in there that you want to correct, whatever you think is mistaken. But on the next break. Okay.**

**So --**

A. To clear this up, when you are asking -- when you asked me that question about the high risk medication uses --

**Q. I'm asking what you meant by it.**

A. What I meant by it. Okay. Because the question, like, basically is, no. And then these are things from his past. Because your question is asking in the month prior.

**Q. Understood.**

A. So he wasn't using -- to my knowledge, there was no high risk medication use.

**Q. So just so that we are both clear**

then, since the time you've known Richard up until the present day, has he ever taken any medications with which --

A. That I would deem high risk, no. Now, I don't know if the physician may have deemed them high risk.

Q. Okay. In your capacity as his legal guardian who is communicating with his physicians, have they told you of any medications he's taken which they deem to be high risk?

A. No.

Q. Okay. You also indicated here in the Answers to Interrogatories that Richard suffered from hypertension and high cholesterol.

For how long a period of time, to your knowledge, has he suffered from those conditions?

A. To my knowledge, I do not know.

Q. Is there a particular doctor who

**treats him for that condition?**
A. All his -- anything would have been treated through Lisa Deweese.
**Q. Is Lisa Deweese considered his primary care physician?**
A. Lisa Deweese is his primary care.
**Q. So, in other words, he didn't have a pulmonologist or cardiologist or internal medicine doctor --**
A. No.
**Q. Lisa was the doctor for him?**
A. Lisa was the doctor for him. And then any care he needed, she would have sent him to have something done would have been within the WellSpan Group.
**Q. Okay.**
A. The WellSpan Group.
**Q. Okay. So you also make reference to environmental allergies. What did you mean by that?**
A. Well, grass, pollen, you know,

allergies from -- I don't know if you have them in Florida, but here, you get grass, pollen, tree pollen.

**Q. And how does Richard react to those particular --**

A. Sneezing, runny nose.

**Q. Has --**

A. Watery eyes.

**Q. Sorry. Has he ever had any type of allergy testing done?**

A. I don't know.

**Q. He also suffers from a deviated septum?**

A. Yes.

**Q. For how long a period of time has he had that?**

A. I couldn't answer that question.

**Q. Has his deviated septum in any way affected his sleep?**

A. Not that I'm aware of.

**Q. Has he ever been to a sleep**

specialist?
A. Not that I'm aware of.
Q. And how about he has esophageal reflux disease?
A. He does now. He was taking like a Pepcid so to the best of my knowledge, he was talking, you know, an antacid tablet that he would take.
Q. And for how long a period of time prior to the cruise had he been taking an antacid?
A. I would not know for sure how long.
Q. Okay. It's also indicated here he suffered from cervical radiculopathy. Do you know when he was diagnosed with that?
A. No, I do not.
Q. Was he seeing Lisa for that condition or did he see an orthopedist or a neurologist?
A. I believe -- I'm not sure. I

think he saw an orthopedic surgeon but I could not answer.

Q. Okay. Same question for the lumber herniation. Do you know when that was diagnosed?

A. No, I do not.

Q. And do you know the name of the doctor he had been seeing for that --

A. No, I do not.

Q. Was Richard ever recommended for surgery for either his cervical or lumbar conditions?

A. Not that I am aware of.

Q. When did Richard have his gallbladder removed?

A. I would not be able to say for sure.

Q. Did he have it done here in York?

A. I can't say for sure. I can't remember.

Q. Would that have been treatment

that would have been rendered within the WellSpan Group?

A. If it was in York, off the top of my -- if it was done in York, it would have been done under the WellSpan Group.

Q. Okay. And how about gastritis. When was Richard diagnosed with that condition?

A. I couldn't answer that question.

Q. Okay. And it says here that Richard also suffered from erectile disorder of organic origin. Do you know when he was diagnosed with that condition?

A. The date I would not know.

Q. Do you know the year?

A. The year I would not know.

Q. Do you know how old he was approximately?

A. I would say between 50 and 60.

Q. Did he treat that condition with medication?

A. In the beginning, he did.
**Q. When you say in the beginning he did, sorry --**
A. In the beginning, he had a blue pill --
**Q. Okay.**
A. -- but the -- like, he didn't want to do it then.
**Q. Okay. So he tried for a while and wasn't pleased with --**
A. Correct.
**Q. Did he do anything further in an attempt to treat his erectile dysfunction?**
A. Not that I'm aware of.
**Q. And how about restless leg syndrome. When was he diagnosed with that?**
A. I do not know.
**Q. So has Lisa been his primary care physician for the last 20 years?**
A. I believe. Ever since he started getting treated for HIV, she's been his

caregiver.

Q. Okay. I'm going to run down the field of several specialists. I just want to know whether or not you're able to identify any of them.

Has Richard, at any point in time, prior to the subject cruise ever gone to a neurologists, to your knowledge?

A. To my knowledge, I know prior to the cruise at one point, Richard had gone to have a brain scan, but I'm -- that, I don't know if he went to a neurologist for that.

Q. Okay. Where did he go to get the brain scan?

A. To the WellSpan Group.

Q. How soon before the subject cruise did he have the brain scan?

A. I think it would have been three or four months prior to. I think it was either November or December.

Q. What were the circumstances that

**prompted him to go seek that?**
A. He said he was -- that he had an incident in the salon where his vision got blurred.
**Q. And this would have been --**
A. And that would have deign --
**Q. Sorry, sir. Go ahead.**
A. That would have been in October or November.
**Q. Of 2019?**
A. Of 2018.
**Q. Of 2018. Thank you. Did he seek medical treatment for that incident?**
A. As far as treatment, yes, he went to -- he went and had a CAT scan done.
**Q. Did he see a doctor before getting the CAT scan?**
A. I would think he probably saw Lisa Deweese. I am not -- I couldn't verify that for sure.
**Q. Okay. So when did you first come**

**to learn of this incident in the salon when his vision was blurred?**

A. In October when it happened.

**Q. Did he tell you the same day that it happened?**

A. Yes.

**Q. And I assume you were working at the time?**

A. Well, he didn't tell me -- he told me when I got home.

**Q. That's understood. So you were working at the time --**

A. Yes.

**Q. -- when you came home from work --**

A. Yes.

**Q. -- and he told you about this episode that happened?**

A. Yes.

**Q. By the way, one of the other, kind of, ground rules -- if we talk at the**

same time, it makes it impossible for her. So if you can let me get the question out before you answer, it will be a lot more clear and a lot easier for her.

Okay?

A. Okay.

Q. So let me go back then. In October of 2018, you would have been working for UPS doing the delivery routes?

A. Yes.

Q. And what time did you typically get home?

A. 7 o'clock.

Q. Okay. So you would have come home approximately 7 o'clock p.m. on this particular day?

A. Um-hum.

Q. Is that a yes?

A. Yes.

Q. Okay. And tell me exactly what Richard said to you.

A. I wouldn't be able to tell you exactly what he said.
**Q. All right. Can you give me the general sense of what it was he said?**
A. That he was standing at his shampoo bowl and his vision got blurry.
**Q. Did he describe for you the degree of blurriness he experienced?**
A. No.
**Q. Was it blurriness to such a degree that he was incapable of seeing?**
A. No. Not that -- no, not that I'm aware of.
**Q. Was he alone or with somebody at the time?**
A. He had a client at the time.
**Q. Do you happen to recall the name of the client?**
A. No.
**Q. Was he capable of finishing the day?**

A. Yes.
**Q. Did he say for how long a period of time the blurriness went on for?**
A. A moment.
**Q. And when he said, a moment, what did you understand that to mean? Five seconds? Ten seconds? One second? One minute?**
A. Thirty seconds.
**Q. Had he ever experienced anything like that, to your knowledge?**
A. No.
**Q. What was your reaction when you heard?**
A. My reaction was, well, are you okay? Maybe you need to go have it checked.
**Q. And what did he say in response?**
A. I would not -- probably okay. I don't know for sure. I don't know exactly what I said to him --
**Q. Understood.**

A. -- and what he said to me in response --

**Q. And I appreciate --**

A. -- but the bottom -- the gist of it all would have been that after the episode, he did go get checked.

**Q. Okay. And so I just want to drill down a little more and find out if there was anything else you have to offer.**

**So when you came home and had this discussion, was it your impression that Richard was ready and willing to go immediately seek some sort of clarity on what happened?**

A. No. And as you say, discussion, we didn't have a discussion about it.

**Q. Okay.**

A. What he had was a moment, which would have been this happened to me today. Why don't you get it checked out. It's not like we sat down and discussed what was

going on at that time.

Q. Okay. And that's the whole purpose of this process is so I can understand these kind of things and walk away from here with an accurate description.

So, in other words, this was a brief back and forth between the two of you. You didn't have some sort of discussion or plan --

A. No.

Q. All right. And how soon after he mentioned this to you do you recall him going and getting treatment or input from somebody?

A. Probably he -- the next day.

Q. And other than Lisa, is there any other doctor you are aware of who he may have called?

A. No.

Q. Did he go in to see Lisa for this?

A. I don't know.
Q. Okay. Do you know who it was who wrote the order for him to have the MRI or --
A. I don't know. I don't know if it was a CAT scan. I don't know if it was an MRI or CAT scan. Like I said earlier in my -- in our back I forth here, you have all that information.
Q. Okay.
A. You have all that information of when he went in for this. I don't know the specific days or who did it.
Q. All right.
A. Or when he went for it. I know he probably went to York Center for it.
Q. Okay. And, yes, as I ask these questions, if you don't know the answers, that's perfectly fine. Just let me know. I still have to ask them.
Okay?

A. Okay. Well, yeah, I just --
Q. All right. So you didn't go with him then --
A. No, I did not go with him.
Q. And do you know if he met with anyone to discuss the findings?
A. I do not know.
Q. As you sit here today, do you have any understanding of what that image showed?
A. As I sit here today, I have the understanding that it showed nothing.
Q. How is it that you have that understanding?
A. Because Richard showed me it showed nothing.
Q. So I don't -- I want to be clear when I say this. I don't want you to reveal anything you talked to your lawyers about, but as you sit here today, is it your testimony that no doctor has ever told you

**that the image showed a prior stroke?**
A. No doctor ever told me had he a prior stroke.
**Q. Has any doctor ever told you that on Richard's images, there is evidence of prior stroke that predate the subject cruise?**
A. No. The doctor told me the images showed there was nothing. No anomaly.
**Q. Okay. So from the time of the images until the time of the cruise, did Richard ever complain of any vision disturbances?**
A. No.
**Q. Do you know whether or not he went to go and get his eye checked?**
A. I did not.
**Q. Do you know where he went to get his eyes checked?**
A. I do not know. I know it was

somewhere in Manchester, Pennsylvania.

**Q. Did he go to an eye doctor or one of these lens corrector places or --**

A. To an ophthalmologist, yes. It was a woman who was one of his clients who had a practice in Manchester, PA here, and he wanted to return -- basically, since you come to me, I would come to you. And it wasn't covered under our insurance, so we paid out of pocked for her.

**Q. Okay. Is there a way that you can identify who that person was?**

A. Unless I can get it out of Richard, no.

**Q. Does Richard keep any type of records of the clients that he --**

A. Yes. And I have a whole cabinet in here of files of about 160 to 200. If you would like to give them all a call to see which one.

**Q. Well, I think we can figure out a**

way to get the identity of the eye doctor, so I will work with your attorney and we can figure something out that works for everybody --

A. Because I have no idea who it was.

Q. Okay. Other than this eye doctor who was a client, did Richard go anywhere else to receive treatment for his vision, to your knowledge, prior to the cruise?

A. No. And I don't know -- if your question to me was did he go to the eye doctor before going to the cruise, it would be no also.

Q. Okay. So I read some references and some records about Richard having a prior history of brain surgery?

A. Yes.

Q. What can you tell me about that?

A. All I know about that was when he was approximately, I believe, 16 years old,

that he had twisted capillaries in his brain and he had a brain operation.

**Q. Do you know if he was under the care or supervision of a vascular surgeon?**

A. He wasn't, no. Not that I'm aware of.

**Q. Do you know if he's ever been to see a vascular surgeon?**

A. Not that I'm aware of.

**Q. Do you know if he's ever been to see a neurosurgeon?**

A. Not that I'm aware of.

**Q. So this operation of the twisted capillary was a one-time thing and never required any further treatment, to your knowledge?**

A. To my knowledge, no.

**Q. Other than this episode -- I don't want to call it an episode.**

**Other than this surgery and the gallbladder surgery, are you aware of any**

other surgeries that Richard ever had done on him for any reason?

A. No, not that I'm aware of.

Q. Same question but a little bit different. Other than the gallbladder surgery and the brain surgery, are you aware of any other instances prior to the cruise where Richard was admitted to the hospital?

A. Any other --

Q. Hospital admissions.

A. That he was admitted?

Q. Yes, sir.

A. As far as operation?

Q. For any reason.

A. What do you mean by admitted?

Q. When you go to the hospital -- how about I do it this way: I will break it up.

Are you aware of any instances where Richard had to go to the emergency room for medical care?

A. No.
Q. All right. Are you aware of any instances where he had to go to the hospital for medical care other than the gallbladder and the brain surgery?
A. Where he went to seek care? Yes.
Q. You said where he went to seek care --
A. Seek care.
Q. Oh, seek care?
A. Yes. Within what time span?
Q. Well, I'm drawing a real broad net to narrow it down. So in the last ten years, are you aware of any instances, ten years prior to the cruise --
A. No.
Q. All right. What instance are you aware of where we had to go to the hospital to seek --
A. I'm aware of an incident, maybe -- some years ago where he went to the

hospital to seek psychological help.
Q. Okay. So let's put a pause on that for a second.
To your knowledge before the subject cruise, was Richard going anywhere for psychological or psychiatric or mental health --
A. No.
Q. All right. Other than this instance where he went to the hospital that you told me about, in the last ten years, did he ever have any reason to seek psychological, psychiatric, or mental health counseling?
A. He has. Has it been within the past ten years? I don't know.
Q. In other words, it could have been within the last ten years and you are not sure?
A. I know he was seeing a therapist 20 years ago.

Q. Okay.

A. If he was -- as fast as time goes, if it was within the last ten years, I can't say for sure.

Q. Was it the same therapist all along or are you thinking there's another one that he may have been seeing --

A. No. It would have been the same therapist all along.

Q. All right. So this is a good time for me to ask you about this HIPPA form we asked to be signed. We had sent a form to WellSpan York Hospital. And what this is, it is a form that allows for us to obtain records by subpoena.

So we would send a subpoena to the hospital and provided that we receive your signature, the hospital will then have the permission to give us the records. And so it's been brought to my attention that you didn't want to sign this form.

Do you know of any --
A. No, I signed all forms that have been sent here. Now, the one form, I checked on that because I didn't feel this HIV status had anything to do with this.
Q. Okay.
A. You know, but every form that I have been forwarded to, I have graciously signed for you.
Q. Okay.
A. I exactly -- I mean, if you look at the bottom of your forms you sent me, it says, this form will be good for two years. Okay.
Now I sent -- I signed at least ten copies to a five or six or seven of where you wanted to get information twice.
Q. Okay.
A. And the only thing I checked off was HIV relevance.
Q. Okay.

A. Because I didn't think that was relevant to what we have. If it is, you are more than welcome to that information.

**Q. Okay.**

A. But there is every form. I probably have those same copies downstairs in my files showing them signed.

**Q. All right.**

A. And forwarded to you.

**Q. Yeah. And, again, part of today's purpose is to get any of these issues that aren't clear clarified. So whether it's just an issue of communication with my office or I don't know, but I wanted to ask you while I was here.**

A. You asked me why I did not sign them. That's what you asked me.

**Q. Understood. And so I --**

A. You didn't say there could have been a clerical error. You accused me of not wanting to sign these forms and I signed

every form that you sent to me.
Q. Okay. Well, if you took it as an accusation, that wasn't my intent.
A. Well, that was.
Q. I --
A. That was an accusation that I was hiding something.
Q. All right. Well, I'm certainly not intending to do that. So what I will do is talk to your lawyer off the record during the break and we will see if we can get this issue clarified.
All right?
A. I would be glad to sign your forms for you now.
Q. Okay.
A. If you have those forms. But instead of accusing me of not wanting to sign them for you, that pisses me off.
Q. All right. Well --
A. -- twice, scanned, put them in

the computer. And at the bottom of this form, it says, this form is good for two years.

**Q. Okay.**

A. Hey something is wrong with this form. Can you sign it again? Sometimes I think you're just sending them just to irritate me.

**Q. No, we are not doing that. Are you okay to continue or --**

A. Yes, you can -- no. We can continue.

MR. HICKEY: So I did want to bring something up unrelated to that issue about forms. And I apologize. I'm doing this late.

I'm objecting to the form of Mr. Drahos' questions about the prior films showing that Richard Burgess had had strokes before he got on the cruise ships. I object to that because that is not what the films

show. But to the extent that those questions imply that that's what those films show, I object to the form.

MR. DRAHOS: All right. So --

MR. HICKEY: And you are free to clarify or ask the witness that or rephrase those questions. What I think you probably, Mr. Drahos, probably will amend those questions, but in any event, I'm objecting to the form of those questions.

MR. DRAHOS: All right. I like the way I asked them. So, thank you.

MR. HICKEY: And to clarify, I'm objecting to the form because the way Mr. Drahos asked them implies the scan showed prior strokes when, actually, they do not.

BY MR. DRAHOS:

**Q. My. Henze, other than that MRI that you told me about or CAT scan -- I'm not sure if you know which one of the two whether MRI or CAT scan, but other than that**

instance, are you aware of any other instances where Mr. Burgess needed to have any part of his body imaged?

A. No.

Q. Let me go back and clarify something. Has any doctor ever told you up until present day that Richard had a stroke prior to the subject cruise?

A. No.

Q. Prior to the subject cruise, has Richard ever required the need of any type of physical, occupational, or speech therapy?

A. No.

Q. What medications, if any, was Richard taking prior to the cruise?

A. As far as I'm aware, BIKTARVY.

Q. And how about for his blood pressure and high cholesterol. Is he taking any medication for that?

A. He may have been. I don't know.

Q. Prior to the subject cruise, has Richard ever suffered any type of trauma to his head?
A. Not that I'm aware of.
Q. Was he ever in a car accident?
A. Not that I'm aware of.
Q. Has he ever suffered any type of slip-and-fall type of accident?
A. Not that I'm aware of.
Q. Let's switch gears. Prior to the subject cruise, had you and Richard ever been on a cruise before?
A. Yes.
Q. How many times?
A. Probably at least 11.
Q. All with Royal Caribbean I hope?
A. No.
Q. What other cruise lines have you sailed?
A. We started out on Princess --
MR. HICKEY: Can we go off the

record?

THE VIDEOGRAPHER: Going off the video record. The time is 12:52 p.m.

(Recess 12:52 p.m. to 1:18 p.m.)

THE VIDEOGRAPHER: We are back on the video record. The time is 1:19 p.m.

BY MR. DRAHOS:

**Q. Okay, Mr. Henze. So when we left off, we were talking about your prior experiences with the cruise lines.**

A. Yes.

**Q. You told me that you believe there was about 11 before the subject cruise.**

A. Yes.

**Q. And so we were beginning to rattle off which particular cruise lines you had sailed with. You told me about Princess.**

A. Princess, Celebrity, and then Royal Caribbean.

Q. Which Celebrity vessels did you sail on?

A. I forget the name of it right now.

Q. And how about other Royal Caribbean vessels? Which ones do you recall sailing on?

A. We sailed on Freedom of the Seas, we sailed on the Allure, Harmony, Oasis.

Q. Okay. When was the last cruise you had been on before this one?

A. I believe it was the Allure. I believe we went on the Allure twice and the Oasis twice.

Q. Okay. In any of these instances whether they were on Royal Caribbean vessels, the Celebrity vessels, or the Princess vessel, was there ever an occasion where either you or Richard needed to seek medical care in the ship's medical center?

A. No, not that I'm aware of.

Q. On any of these particular voyages, was there any reason for you and Richard to go down to the ship's medical center?

A. Not that I'm aware of.

Q. On any of these prior sailings, had either you or Richard had occasion to seek medical care at any of the foreign ports of call?

A. No.

Q. Any negative experiences on any one of these particular Royal Caribbean vessels that you sailed on?

A. No.

Q. How about the Celebrity?

A. No.

Q. Other than a cruise experience, have you and Richard ever traveled abroad outside of the U.S.?

A. Yes.

Q. How often?

A. We made two trips. We made one trip back in early '90s to Canada, and then one trip in the early '90s to Jamaica.
**Q. Okay. And either of those instances, did you ever receive medical care while you were in Canada or Jamaica?**
A. No.
**Q. And just the way I worded that, let me be thorough.**
**Has Richard ever needed to seek medical care in Canada or Jamaica on either one of those two trips?**
A. No.
**Q. Why was the subject cruise booked? Any particular occasion?**
A. Why was this cruise booked?
**Q. Yes, sir.**
A. It was booked because five years ago, five or six years ago, we had reconnected with his cousins down in Alabama and they invited us on a cruise. And so we

booked that cruise. And then from that year on, we just continued cruising with them because they took a cruise once a year in February.

**Q. And what are their names, please.**

A. Their names are Jimmy and Ilene Landrum.

**Q. And these are Richard's cousins?**

A. Correct. And Joey Joe and Susey Hiatt, H-I-A-T-T.

**Q. And what relationship, if any, do you and Richard have to Joe and Susey Hiatt?**

A. Richard's cousins.

**Q. And similarly to the Landrums, have you and Richard ever traveled with the Hiatts before?**

A. No.

**Q. Okay. So the Landrums, the Hiatts, you and Richard were on this cruise?**

A. Correct.

**Q. Did anyone else accompany you?**

A. There was a girl -- what was her name -- from Mississippi. There was a -- I think another couple, and there was couple from Alabama. I think there were two other couples from Alabama and the girl from Mississippi.

**Q. And the girl from Mississippi, how does she fit into this group?**

A. The first -- when Jimmy, Ilene, Joey, and I all started cruising, they met her.

**Q. So she's a friend of theirs?**

A. She's a friend of theirs. And as for the other ones, they are friends with Jimmy and Ilene.

**Q. The couple from Alabama?**

A. Correct, I believe so, yes.

**Q. So the girl from Alabama -- Mississippi and the two couples from Alabama, had you ever meet them before the subject cruise?**

A. Yes.
**Q. How many times have you met them prior?**
A. When we begin -- when we first started cruising with them, with Jimmy and Ilene, which would have been five years ago.
**Q. And so --**
A. If you can -- if you have Royal Caribbean's records, then you can show me -- like, we cruised each year and I'm -- so I would think they would have records of the cruises that we have taken in the five, six -- or when it started. If it was five years ago or six years ago.
**Q. Okay.**
A. But we went from the day of the incident, any cruise straight back that -- the year to year to year, we would have started that very first year. And I think that's why -- it was.
**Q. Let me just see if I can identify**

them here. The Hiatts are from Alabama?
A. Correct.
Q. Okay. I just have the Hiatts and the Landrums here, but we will look it up.
All right. So the girl from Mississippi, was she ever in the medical center at any point in time --
A. No.
Q. -- while Richard was there -- you've got to let me finish the whole question so you can answer the one that you think I'm asking.
So was the girl from Mississippi ever in the medical center at any point in time that Richard was?
A. No.
Q. How about the two couples from Alabama. Were there ever in the medical center at any point in time when Richard was there?
A. The two couples, no. The only

ones that were in were Jimmy and Ilene and Joey and Susey.

**Q. Okay. And how about at the time of the initial incident before you had learned that someone -- Richard was up in the lounge deck was either the girl from Mississippi there or the two couples from Alabama?**

A. No.

**Q. Okay.**

A. We were the only couple in the group that was allowed on that deck.

**Q. Okay. So who in your family, either you or Richard, booked this cruise?**

A. I did.

**Q. Did you speak to anyone at Royal Caribbean in advance of the cruise about the cruise itself?**

A. No.

**Q. Did you do any research at all about the cruise?**

A. Yes.
**Q. What research did you do?**
A. I searched to see the islands they were going on. And on all cruises I reached out to, you know, as far as, you know, medical staff. You know, they have a thing on their website, just making sure everything is kosher. And they said -- you know, probably on the ship, they had anywhere from two to three doctors and four to five nurses. They were all ACLS certified.
**Q. So you made a point to look at the medical center?**
A. Yes, I did.
**Q. Why?**
A. Just because I want to be safe. You never know.
**Q. Okay. Anything else that you looked up other than the islands and the medical?**

A. I looked up, say, the restaurants, the restaurants that they had on, you know, where we might want to eat because when we would go on a cruise, we would always get the free restaurant meal.

**Q. And so would you book any excursions?**

A. No.

**Q. Why not?**

A. Because we were there to relax.

**Q. Okay. So you are not --**

A. We are not into the excursions.

**Q. I'm going to hand you what we are going to mark as Exhibit B to your deposition.**

MR. DRAHOS: I have an extra copy for you, if you want.

MR. HICKEY: That's fine.

BY MR. DRAHOS:

**Q. And, Mr. Henze, take all the time that you need to, but the question I have**

**for you is: Does that appear to you to be the guest ticket booklet contract that applies to the subject cruise that we are here to talk about today?**

MR. HICKEY: If you know.

THE WITNESS: It looks like it is.

BY MR. DRAHOS:

**Q. And would you agree that in all instances, of these 11 cruises that you have been on --**

(Phone Interruption.)

**Q. All right. Were you required to acknowledge the terms and conditions of the contract before you were allowed on the vessel?**

(Henze Deposition Exhibit B was marked for identification.)

(Document tendered to the Witness.)

A. Yes.

Q. Would you, in this instance, have had an opportunity and, indeed, acknowledge the terms and conditions of the contract prior to boarding the vessel?
A. Yes, I do.
Q. Okay. So according to the ship's itinerary, this cruise would have begun on Sunday February 17th out of Fort Lauderdale.
A. Correct.
Q. And how did you all get from Pennsylvania to Fort Lauderdale?
A. We flew into Fort Lauderdale on February 16th.
Q. So prior to leaving -- you said you flew out of Pennsylvania?
A. We flew out of Baltimore.
Q. That's the same exact route that I took. Prior to leaving on February 16th, do you know when the last time was that Richard was seen by any healthcare provider?
A. Prior to -- would have been --

would have been when he had the MRI CAT scan, which was in October or whenever that was done.

**Q. Okay. Did he have any pending medical appointments for when he got back?**

A. No. Not that I'm aware of.

**Q. In the days leading up to the vacation, how was Richard's health from your observation?**

A. Good from my observation, normal.

**Q. Did he make any complaints at all about how he was feeling?**

A. No.

**Q. Okay. Did you stay in Fort Lauderdale on February 16th?**

A. Yes.

**Q. Where did you stay?**

A. We stayed at the Hyatt Place on 12th Street.

**Q. And did anyone else accompany you at that time or was it just you and --**

A. No. It was just Richard and I. Sorry for speaking.
Q. That's okay. So when did you meet up with the rest of your traveling companions?
A. The next day on the ship.
Q. Did you all board the ship together or --
A. No, we met on the vessel.
Q. Do you happen to know when the last time was that Richard had his eyes checked prior to leaving in February of --
A. I have no idea, no.
Q. Okay. Did at any point in time from the time you got on the plane to the time you got on the ship, did Richard ever make any complaints to you that he was feeling dizzy?
A. No.
Q. That he had a headache?
A. No.

Q. Or was having any vision disturbances?
A. No.
Q. Did Richard bring any medicine on board?
A. To the best of my knowledge, yes.
Q. What medicines did he bring?
A. BIKTARVY.
Q. Did he bring any medications for his blood pressure?
A. I don't know.
Q. Did Richard bring any medical devices on? For example, did Richard ever check his blood pressure on his own?
A. No.
Q. Do you have any complaints at all as it relates to the embarkation process, getting on the ship and things like that?
A. Did I?
Q. Yes, sir.
A. No.

Q. What did you do when you got on the ship while it was still in port? Tell me about what you did?

A. When we first got on -- when I first got on -- when we got on the ship, we just walked around. Richard went off to the spa and booked his appointments. I think he may even have had -- he might have had a massage the first day or a facial the first day.

Q. Okay. So what we are going to do -- I find it's easier by doing it this way. Forgive me but it will work better when we're all done. Trust me. So we are going to mark as Exhibit C a copy of what's called your activity details. And I will be referring to that from time to time.

According to Royal Caribbean records, you would have boarded the ship around 1:11 p.m. on February 17th.

Does that sound right to you?

(Henze Deposition Exhibit C was marked for identification.)

(Document tendered to the Witness.)

A. At 1:11.

**Q. At 1:11 p.m.?**

A. Yes, it does.

**Q. And get I think this one is going to be D. So we are going to mark as Exhibit D a copy of your folio, what we're calling your folio.**

(Henze Deposition Exhibit D was marked for identification.)

(Document tendered to the Witness.)

A. This is --

**Q. That's D. Yes. And as you had stated, Mr. Henze, it is your recollection that Richard went to the spa shortly after arriving on the ship?**

A. Yes.

Q. And we are going to mark as --
A. Either went to the spa. I don't know if making his appointment he met with a spa representative there.
Q. I'm going to hand you what we are calling the receipt. The spa receipt is --
MR. HICKEY: This is E.
BY MR. DRAHOS:
Q. E as in echo. All right. So according to Exhibit E, it indicates here that Richard would have gone in for a shave at the spa at 2:47 p.m.
Does that sound correct to you, sir?
(Henze Deposition Exhibit E was marked for identification.)
(Document tendered to the Witness.)
A. Yes.
Q. Okay. And if you turn your attention back to Exhibit D, that being your

final statement. I want to ask you questions about that.
You see in the lower right-hand corner, there's a GS?
A. Um-hum.
Q. All right. So if you look at -- starting with GS No. 53, according to Royal Caribbean's records, Richard would have purchased two Coors Light beers on February 17th at 4:18 p.m.
Do you see that there?
A. Yes, I do.
Q. Okay. Any reason to dispute the accuracy of this --
A. No.
Q. -- report. Okay. And if you turn your attention to page 54, the next one. According to Royal Caribbean's records, Richard would have purchased a Coors Light beer at 4:41 p.m.
Do you see that there, sir?

A. Yes.
Q. Any reason to dispute that?
A. No.
Q. Okay. If you turn again to page 56, according to Royal Caribbean's records, Richard would have purchased a beer at 5:29 p.m.
Any reason to dispute that?
A. No.
Q. And then if you turn your attention to page 57. According to Royal Caribbean's records, Richard would have purchased a beer at 5:06 p.m.?
A. Yes.
Q. Any reason to dispute that record?
A. Um-um.
Q. Is that a no?
A. No.
Q. Okay. And if you can turn your attention to page 58. According to Royal

Caribbean's records, Richard would have purchased a beer at the pool bar at 5:38 p.m.
Do you see that there?
A. Yes, I do.
Q. Any reason to dispute the accuracy of that?
A. No.
Q. Page 60. According to Royal Caribbean's records, Richard would have purchased a beer at the Sand Bar at 5:57 p.m.
You see that there?
A. Yes, I do.
Q. Any reason to dispute the accuracy of that?
A. No.
Q. If turn your attention to page 63. At 6:12 p.m., Richard would have purchased a beer at the Sand Bar.
Do you see that there?

A. 63?
Q. Yes.
A. Yes.
Q. Any reason to dispute that?
A. No.
Q. Okay. If you turn your attention to page 64. According to Royal Caribbean's records, Richard would have purchased a beer at 8:56 p.m. at the Rising Tide?
A. Correct.
Q. And page 65. According to Royal Caribbean's records, Richard would have purchased a beer at 9:46 p.m. at the casino bar.
Do you see that there?
A. Yes.
Q. Any reason to dispute that?
A. No.
Q. And on page 66, according to Royal Caribbean's records, Richard would have purchased a beer at 10:21 p.m. at the

SchoonerBar.
A. No reason to.
Q. To dispute?
A. No.
Q. And page 67, according to Royal Caribbean's records, Richard would have purchased a Jägermeister at 11:06 p.m. at the Schooner Bar?
A. No reason to dispute.
Q. And if you turn to page 68. At 11:27 p.m., Richard would have purchases a beer, according to Royal Caribbean's records at Schooner Bar.
Any reason to dispute the accuracy of that?
A. No reason to dispute it.
Q. All right. Turn to page 69. According to Royal Caribbean's records, Richard would have purchased a beer at 12:02 a.m. at the comedy club.
Any reason to dispute the

accuracy of that report?
A. No.
Q. And finally on page 70 at 1:05 a.m., according to Royal Caribbean's records, Richard would have purchased a beer at the comedy club.
Do you see that there?
A. Yes, I do.
Q. So all told from 4:18 p.m. until 1:05 a.m., according to Royal Caribbean's records, Richard would have purchased 13 beers and one Jägermeister.
Any reason to dispute the accuracy of those records?
A. Purchasing them, no.
Q. Okay. And when you qualify it that way, are you saying that he didn't drink the 13 beers?
A. I'm saying that I'm not aware that he drank all 13 beers.
Q. Okay. Who else, if anyone, would

**have had those beers?**
A. That I -- either anyone in our group or maybe he was buying something for anyone else. He was a very generous individual.
**Q. Do you know, as we sit here today, of any particular instance where any of these drinks --**
A. Do I, no.
**Q. Let me make sure I finish the question. As you sit here today, do you know if any of these particular drinks that we've talked about that Richard purchased for someone else?**
A. Well, I do know for the first one. For the first one, he purchased two.
**Q. Okay.**
A. One of them was for myself and one was for him.
**Q. Other than that instance?**
A. Other than that instance, no.

**Q. Okay. And so what time did you all return to your cabin that evening?**

A. That evening, I returned to the cabin I believe around midnight. Richard didn't return to the cabin until about 2:00 or 3:00.

**Q. Okay. So from the time that you returned to your cabin at midnight until the time Richard arrived between 2:00 and 3:00, were you, at any other point in time?**

A. No. And I was not with Richard from 9:00 on.

**Q. Okay.**

A. Or it could have been before then.

**Q. Let me take a step back then. What time that evening did you separate from Richard?**

A. That, I could not tell you.

**Q. So you told me earlier that you believe around 9 o'clock you left where he**

was?
A. Yes.
Q. Where did you go?
A. I went to the casino.
Q. Okay. So at 9 o'clock, you went to the casino. Where did Richard go?
A. They were at the Rising Tide and then Schooner Bar.
Q. Okay. So from the time you left at 9:00 p.m. to go to the casino until the time you went back to the cabin around midnight, did you see Richard again?
A. No.
Q. So from the time you left at 9 p.m. to the time he returned to the casino around 2:00 or 3:00, you weren't with him at all?
A. No. When he returned to the cabin, not the casino.
Q. Let me rephrase the question again. So when you left him at 9:00 p.m. to

go to the casino, the next time you would have seen him would have been when he returned to the cabin between 2:00 and 3:00 a.m.?

A. Correct.

Q. What were you doing at the time?

A. Gambling at the casino.

Q. And at the time that he returned to the cabin, were you asleep?

A. Yes.

Q. Do you know who Richard was with between the time of 9:00 p.m. and the time he returned between 2:00 and 3:00 a.m.?

A. He would have been with Jimmy and Ilene because that's what's they did.

Q. Prior to the subject cruise, what was Richard's typical intake of alcohol?

A. Nothing.

Q. He didn't drink at all?

A. No.

Q. So when you say nothing, I need

**to make sure I'm understanding what you mean by that. So does that mean he had never had alcohol in his life or --**

A. No. He drunk one time a year.

**Q. Okay.**

A. And that was on the day of sailing out of port.

**Q. And why was that his habit or custom?**

A. Because Richard, in the past, has had trouble with alcohol. And he swore 20 years ago that he was not going to drink any longer.

**Q. Okay.**

A. And so probably until we started cruising, he didn't drink at all during the year. And then when we started to cruise, then because the other people are drinking, he asked if it would be okay if he had beers on the first night on the cruise, and I said yes. That was it. He did not drink any

other time.
Q. Okay. So he had one hall pass, so to speak, for alcohol and that was the first night of the cruise?
A. That one night of the cruise.
Q. So within the last ten years, had Richard ever been to any type of alcohol rehabilitative care of any sort?
A. No.
Q. Okay. And when you said he had trouble with alcohol 20 years ago, did he have to undergo any sort of rehabilitative or specialized treatment of any sort for alcohol addiction?
A. Yes. He went to an alcohol rehab.
Q. Okay. So what happened when Richard returned to the cabin that evening?
A. He ended up falling.
Q. Did you see him fall?
A. No.

Q. When he returned to the cabin, was there lights on or was it dark?
A. Dark.
Q. Do you know what caused him to fall?
A. No, I do not.
Q. In retrospect -- strike that.
So what happened when he fell?
A. I don't know. I wasn't there.
Q. Well, you were in the cabin at the time; correct?
A. Not at the time of him falling. I was there after he fell. So, like, he came in and hit the bathroom door or the bathroom door swung open and hit him and knocked him over or if he tripped on something, I can't say that.
I can say I heard him -- when I heard the commotion and then I got out of bed, I saw him laying on the foyer floor.
Q. Okay. So when he came in that

**evening, you were asleep in bed?**
A. Right.
**Q. The lights were off?**
A. Yes.
**Q. Were you awakened by him falling?**
A. I was awakened, I believe, by the sound of the door slamming shut.
**Q. Okay. So he opens the door, slams shut. That --**
A. That wakes me up.
**Q. All right. Did he stumble into anything before this fall, to your knowledge?**
A. No. I don't know.
**Q. How soon after he entered did he fall?**
A. I would say within the first minute or two.
**Q. Did he attempt to go into the bathroom before he fell?**
A. I don't know.

Q. So the moment he opens that door until the time he fell, you don't know what --
A. I don't know.
Q. And you don't know what caused him to fall?
A. No.
Q. Subsequent to this incident, did you do any type of investigation to determine whether something in the cabin caused him to fall?
A. No.
Q. As you sit here today, do you have any opinion based upon your observation and experience as to whether or not there was anything wrong with the cabin itself that could have caused him to fall?
A. My -- from my experience, the only thing I think possibly would be the bathroom door swinging outward and knocking him off balance.

Q. Do you know whether or not he opened the bathroom door that evening prior to that fall?
A. I do not know. But I do not also know if the bathroom door was secured.
Q. All right. What do you mean by that, that you don't know if it was secured?
A. That it was latched. You know, the door swings open this way.
Q. Okay.
A. Okay so the bathroom could be left open.
Q. Okay.
A. Because it doesn't always close.
Q. Did he tell you at any point in time that the bathroom door caused him to --
A. No.
Q. Did he tell you at any point in time what he believed caused him to cause the fall?
A. No.

**Q. All right. As we sit here today, then, as it relates specifically to the bathroom door, he did not say anything nor did you observe anything that would have allowed you to conclude that's what caused this incident?**

MR. HICKEY: Object to the form.

BY MR. DRAHOS:

**Q. Correct?**

A. Correct.

**Q. Okay. So what happened after he fell?**

A. Well, after I heard, then I got out of bed and I'm like, Richard, Richard. And I didn't get a response. I saw him laying on the floor and his head was bleeding, so I rushed into the bathroom and I dampened a towel and I put pressure on his head.

**Q. When you said, Richard, Richard, and he didn't respond, was he unconscious or**

was he intoxicated? What was the reason why he didn't -- did he not hear you or do you know why he didn't respond?

A. I don't know why he didn't respond.

Q. Did you observe him to be unconscious at any point that evening?

A. No.

Q. So you went to get the towel. Where did you wet the towel?

A. In the bathroom.

Q. Was there anything wrong with the door when you went in or came out?

A. The door was open.

Q. Okay.

A. So I went in, wet a towel, and put pressure on his head because his head was bleeding.

Q. Okay. What is the first thing you remember him saying?

A. I can't remember.

Q. Were you mad at him?
A. No.
Q. Did you think that he had had too much to drink?
A. Possibly.
Q. From your observation, did he appear intoxicated to you?
A. No.
Q. Was he slurring his words?
A. No.
Q. Was he staggering on his feet?
A. No.
Q. Did he smell of alcohol?
A. No.
Q. Did you help him off the floor?
A. Yes, I did.
Q. And where did you take him to?
A. I sat him down on the bed.
Q. Did Mr. Burgess seek medical care that evening?
A. No.

Q. Why not?
A. Because we got the blood to stop.
Q. And where specifically did he hit his head, to your knowledge?
A. To my knowledge, I don't know.
Q. Was it the front or --
A. It was the back.
Q. The back?
A. The back of his head.
Q. And what did he hit his head on?
A. I don't know.
Q. As you sit here today, you do not know what he hit --
A. I don't know. I can assume but I'm not going to assume.
Q. Was there blood anywhere on any part of the furniture or any aspects of the cabin itself?
A. Not that I'm aware of.
Q. I'm going to hand you what we will mark as Exhibit F. Thank you.

**Do you recognize, Mr. Henze,**
**what's is depicted in Exhibit F?**
(Henze Deposition Exhibit F was
marked for identification.)
(Document tendered to the
Witness.)
A. Yes, I do.
**Q. What does that appear to you?**
A. That is the bar area that is in
the foyer area.
**Q. Okay. And you see the separation**
**between what appears to be tile and carpet?**
A. Correct.
**Q. All right. Did Mr. Burgess fall**
**on the floor of the carpet?**
A. No.
**Q. Did he fall into the carpeted**
**area?**
A. No.
**Q. Does this picture depict where he**
**had fallen specifically?**

A. He was laying in this area. He was laying in the area around the bar.
**Q. Okay.**
MR. HICKEY: The tile floor?
THE WITNESS: The tile floor area where the bar is.
BY MR. DRAHOS:
**Q. And so did any aspect of his body breach the tile into that carpet area?**
A. No.
**Q. Okay. So does that suggest then to you that he fell on the tile floor?**
A. Yes.
**Q. Okay. And did he hit his head on this counter area that's depicted off to the left?**
A. I don't know.
**Q. Okay. Did Mr. Burgess ever tell you where he hit his head?**
A. No. And the bathroom door from this picture is here (indicating).

**Q. Off to the right?**
A. Off the right here (indicating).
**Q. And where would the door be located?**
A. The door of the cabin is located in this direction, so the door of the cabin swung out this time instead of swinging in.
**Q. Swung out towards what?**
A. Towards the hallway.
**Q. Towards the hall. So the cabin door, to enter the cabin, it's swing out into the hallway?**
A. Swing out into the hallway this time. Every other cruise we were on, it swang inward. This one swung outward. And as you walk in and you walked in, there was a section of wall, I would say approximately 48 inches, maybe a little longer, and there was the bathroom door.
**Q. Okay.**
A. And this was a wide open space

here on this side of that area.
**Q. All right. And so to be clear, you are not sure whether or not Mr. Burgess went into the bathroom at all prior to his fall?**
A. No.
**Q. No, you don't know or --**
A. I don't -- prior to this fall, if we went into the bathroom.
**Q. When he entered the cabin that night prior to the fall, did he attempt to go into the bathroom?**
A. No, I do not know.
**Q. You did not hear the toilet flushing or the sink on or --**
A. No.
**Q. So what happened for the remainder of that particular evening? You said you got the blood to stop?**
A. I got the blood to stop by putting pressure on the head. So I laid him

on this side of the picture.
**Q. The right side of the bed?**
A. The right side of the bed. And then I laid on the left side of the bed. And I, for the most part, went to sleep the rest of the night. Because of him hitting his head, I wanted to make sure it -- because he did state that, you know, because we got everything stopped and that there's no need to bother anybody at 3:00 in the morning to go down into the infirmary.
**Q. Okay.**
A. And so -- but because of him hitting his head, I didn't know -- I do know that if, you know, there is a possibility that he could have gotten a concussion from that. So I just wanted to make sure his head didn't start bleeding again or there was nothing wrong with him.
**Q. Okay.**
A. So that night of sleep was not

very -- was restless for me.
Q. Okay.
A. I was up and aware.
Q. So throughout the time that you were up and aware, did he sleep through the evening okay.
A. He slept through the evening fine.
Q. Would you mind handing that back to me? I didn't put a sticker on it.
Okay. So what time did you guys wake up that next morning?
A. I think it was approximately 9:00, 9:30.
Q. Is that typical for you all in the mornings, later than usual or --
A. Later than usual.
Q. Any particular reason why you got up later than usual?
A. Probably because of drinking. The first night, we slept in.

**Q. Did Mr. Burgess vomit at any point in time that evening?**
A. No.
**Q. Did he vomit at any point in time that night, to your knowledge?**
A. No.
**Q. So what did you guys do that morning when you first woke up?**
A. Well, when we first woke up, I looked at his head. I said, I believe you might need stitches. And his cousin Susey had stopped by the room and she looked at his head and said, you guys need to go get stitches. So we went down to the infirmary to have him stitched.
**Q. So Susey, does she have any type of medical background?**
A. No.
**Q. Anyone in your group have any type of medical background?**
A. No.

Q. And what I mean by group, I mean the traveling people --
A. Not that I'm aware of.
Q. Okay. So Susey saw it and said, you should go get stitches for that and that prompted you all to go to the medical center?
A. Um-hum.
Q. Is that a yes?
A. Yes.
Q. Did you go anywhere between the cabin and the medical center --
A. No --
Q. -- that morning. Okay. Did you make any phone calls before presenting to the medical center?
A. No. I think we went right down.
Q. Did you have anything to eat before arriving?
A. No, I don't think we did.
Q. Okay. Other than this laceration

on the back of his head, was Richard complaining of any other symptoms?
A. No.
Q. Was he complaining of any visual disturbances?
A. No.
Q. Okay. And so was he hungover?
A. I can't say yes or no to that. I don't know.
Q. Did you observe anything which would be consistent with him being hungover?
A. No.
Q. Did he make any complaints to you saying he felt hungover?
A. No.
Q. And were you with him when he went to the medical center that morning?
A. Yes.
Q. Did anyone else accompany him?
A. No.
Q. Okay. I think you have my

exhibit or I have your exhibit. That one there has your name at the top or Richard's name at the top. The No. 1 right there. This one. It says GS0001.
A. Oh.
Q. That should be mine and this should be yours. I just want you to have the ones with the sticker. Thank you.
A. I wanted to clarify something too, if you don't mind. When we started this process of me saying, yes, Richard bought this drunk, Richard bought this drink, Richard bought that drink, I think you missed all the waters that he had also purchased on that day.
Q. Okay.
A. So I also want to clarify that if he did drink -- if he did drink those, I think we need to look at the water consumption that he also drank that day.
Q. Okay. So when we left off, we

were talking about the visit to the medical center. And according to Royal Caribbean's records, he was presented that morning at 11:00 a.m.

Does that sound right to you?

A. Yes.

Q. Okay.

A. I don't know for sure. If they're saying that's the time he got there, that's the time we got there.

Q. So prior to this presentation to the medical center at 11 o'clock a.m., did either you or Richard or anyone else from your traveling party inform Royal Caribbean about what happened the night before in the cabin?

A. No. Only Richard and I were privy to that information.

Q. Okay. So when Richard came in at 11 o'clock a.m. on February 18th, 2019 and reported having fallen and hit his head,

**this would be the first instance then that**
**you all had told anyone about what happened?**
A. Except for Susey when she stopped
in the cabin. We would have told her. That
was all we said to her.
**Q. So other than Susey, this would**
**have been the first instance that you told**
**anyone about what happened the night before?**
A. Correct.
**Q. And did the nurse get it right**
**here? Did you all tell her that Richard**
**fell and hit his head and did not lose**
**consciousness?**
A. I'm not sure we told her that. I
told her -- yes, because from my
perspective, he was awake when I got to him.
If he lost consciousness before I got to
him, I was not aware.
**Q. All right. But in this**
**particular encounter with this particular**
**nurse, did she get --**

A. I think she did.
Q. You --
A. To my knowledge.
Q. All right. And was the doctor in the medical center at the time you presented?
A. I believe so.
Q. And do you recall the name of the doctor?
A. I do not.
Q. Do you recall him by appearance?
A. I believe it was a woman.
Q. Is there anything about the doctor that you can remember?
A. No.
Q. Okay. And so tell me about the encounter. Were you with Richard for the entirety of the visit in the medical center that morning?
A. Yes, I believe I was.
Q. And did you wait in the waiting

room while he went in or did you go into the room with him?

A. I went into the room with him, but I believe I went back to the waiting room.

Q. So what portion did you witness of the interaction between the doctor and Richard? The beginning portion. Tell me about that. What do you recall the doctor saying?

A. Before he was stitched, I don't recall anything.

Q. Okay. Meaning you don't recall anything that the doctor said?

A. Correct.

Q. You don't recall anything that the doctor did, specifically?

A. No.

Q. Did you have any questions for the doctor?

A. No.

Q. Did Richard have any questions for the doctor?
A. No.
Q. Do you know how long you were in there before you left?
A. Maybe a half hour. I am not sure.
Q. Let me ask you a better question. Do you know how long you were in the room with Richard and the doctor before you went out of the waiting room?
A. No. Cruise time.
Q. So is it your testimony that the two of you were in the medical center for a total of half an hour?
A. I can't say that's for sure. I can't say how long we were in the medical center.
Q. If according to the doctor's note, Richard did not demonstrate any signs or symptoms of any neurologic deficits

during his visit to the medical center that morning, do you have any reason to dispute that as you sit here today by observation or something said to you?

A. From that morning when she said that, no, I have no medical -- if I'm -- if I'm talking to a doctor or a medical person and they tell me that if that's what she did. If she was telling me, no, there was nothing, then I would assume there was nothing.

Q. Do you have any memory of the doctor specifically telling you that Richard doesn't have any neurologic deficits?

A. No, I do not. The only thing I remember about that is them stating that we would need to have the stitches removed.

Q. Okay. So I want to be sure that I ask all the questions that I can ask while I have you here. So let me make sure that I understand your answers.

If the doctor were to testify in this case that by observation and examination there was no evidence of any neurologic deficit in Richard at the time of care rendered on this morning, did you see anything about by the way he was acting or did he make any complaints to you at all which you would say, that's inconsistent. He told me this on the right side or he felt like there was some numbness or tingling, anything like that at all?
A. No.
Q. Okay. As far as you were concerned about what you observed or what was said to you, the only issue Richard had going on that morning was the laceration on back of his head?
A. Correct.
Q. Were you there for -- I mean instructions by the medical staff on what Richard needed to do after the treatment?

A. Yes. That he needed to have the stitches removed in, like, 14 days.

**Q. Other than that instruction, were there any other instructions given?**

A. No.

**Q. Do you know whether or not he was told to come back if he started experiencing any type of symptoms?**

A. No.

**Q. No, you don't know or, no, he was not told that?**

A. No, he was not told that. So going back to your original question, I was with him the whole time during that. I was with him the whole time they stitched him up now that I remember.

I so was there the whole time while he was being stitched and at no time did the medical staff tell us that he needed to return for a checkup or anything else. All they let us know is that these stitches

would need to be removed.
**Q. So earlier --**
A. So as I stated earlier that I waited out in the waiting room, that's false. I did not do that. Now that I'm thinking about it, I was in there the whole time.
**Q. How clear is your memory of this encounter?**
MR. HICKEY: Object to the form.
THE WITNESS: How clear is it?
BY MR. DRAHOS:
**Q. Do you have any recollection of this encounter or --**
A. I have a vivid recollection of the encounter. I mean, I have a vivid recollection of him sitting there on the bed and the doctor doing this with his head and she puts -- you know, putting a big 'ol patch on it, I can see it.
**Q. Okay.**

A. If I step -- I may have stepped out of the room, I don't know. But I do know the last instructions that we were given were just to have the stitches removed. No checkup or nothing.

**Q. Did you have any questions for the medical staff that they didn't answer?**

A. No.

**Q. Okay. How did you feel the experience went from beginning to end in the medical center that morning?**

A. I thought it went good.

**Q. Any complaints at all --**

A. No complaints at all.

**Q. Okay.**

A. We were treated very professionally.

**Q. Okay. What did you do the remainder of that day?**

A. Probably walked around the ship, went up to -- probably after that, we went

up to the -- I went up to the 17th floor and got my lattes and walked around the ship.

**Q. Were any pictures taken of Richard's head?**

A. There was one picture taken of Richard's head by somebody who was sitting in a Jacuzzi and then that was it. But not nobody that we know.

**Q. Somebody in the Jacuzzi?**

A. He went to the spa after getting his hair cut and just wanted to see what the back of his head looked like. And so somebody that was sitting in the Jacuzzi with him took a picture of his head and showed it to him. And that's all I know.

**Q. So who was that person?**

A. I have no idea. One of the 2000 people on board.

**Q. And did you ever see that picture?**

A. I never saw that picture. But

after that point, he started wearing a baseball cap.

**Q. Did someone from Royal Caribbean approach you to investigate the cause of Richard's fall?**

A. Yes. They approached me. They approached us while we were down in the infirmary.

**Q. Okay. So do you know that person's name?**

A. No, I do not.

**Q. Do you know who they were by title?**

A. No.

**Q. And can you tell me what you can recall about your discussions with this particular individual?**

A. He just said -- he just asked if it was okay to go up to the room and take pictures, meet us at the end for me to fill out a statement.

Q. All right. And did this individual have permission to go through the cabin?
A. Yes. And he went through the cabin. He walked up to the cabin with us and he took pictures.
Q. Okay.
A. And I believe I took the statement while I was down in the infirmary with Richard.
Q. Okay. At any point in time with this particular individual from the moment you first met him until the last time you spoke with him, did you at any particular time ever tell him that you thought there was something wrong with the tile on the floor or anything that could have caused Richard's fall?
A. No.
Q. All right. I'm going to hand you what we will mark as Exhibit G. Exhibit G,

**Mr. Henze, is a guest injury statement, and I'd like to ask you if you recognize the handwriting there on that document.**

(Henze Deposition Exhibit G was marked for identification.)

(Document tendered to the Witness.)

A. I do.

**Q. Whose handwriting is that?**

A. That is mine.

**Q. Although it indicates Richard Burgess, did you fill it out for Richard?**

A. Yes.

**Q. And did -- if you turn to page 2, that is also your handwriting?**

A. The first part is my -- the top of the second part is my handwriting.

**Q. Okay. So when it says describe in detail how the incident happened, that's your handwriting?**

A. Yes.

Q. And it says -- well, can you read that for me?
A. Became unstable and fell on the foyer.
Q. And what does it say on the second line?
A. Hit his head. He became unstable and fell on the foyer hitting his head.
Q. And the next section says what you believe caused this incident?
A. Excess of alcohol.
Q. Is that also your handwriting?
A. No.
Q. Whose handwriting is that?
A. That I do not know but that is not the same handwriting as mine.
Q. So did Richard -- is that Richard's handwriting?
A. That I do not know.
Q. So if I'm understanding you correctly, your understanding is the

**entirety of page 1 is completed by you?**
A. And the top of page 2 is completed by me and somebody else wrote excessive alcohol in that place.
**Q. Did you say to the person who you were speaking to about this incident that you believe the incident was due to excessive alcohol?**
A. Did I?
**Q. Yes, sir.**
A. Not that I'm aware of.
**Q. And did Richard?**
A. I don't know.
**Q. And whose signature is that there?**
A. I believe it's Richard.
**Q. Okay. And did you observe Richard sign this document on February 18th, 2019?**
A. No.
**Q. Okay. But you recognize that to**

**be his signature?**
A. I don't believe so. I'm not saying for sure.
**Q. All right. And so it's your testimony then that the section that says what you believe caused this incident. Excessive alcohol, that's not your handwriting or Richard's?**
A. I don't believe so. I know it's not my handwriting. If you look at the handwriting from the first page and you look at the handwriting from that section, you can see there is no similarity to what was written.
**Q. Okay.**
A. So that is not my handwriting.
**Q. But you are not sure whether or not it's Richard?**
A. I do not know for sure if that's Richard's.
**Q. And do you know, as you sit here**

today, whether or not that section, excess alcohol, was completed at the time Richard signed this document?

A. I don't know that it was. I don't know if it could have been after he signed this document.

Q. So you don't know whether or not it was there at the time he signed it or it was put in afterwards?

A. I don't know if it was there at the time. If that is his signature that he signed it or if it was placed there after he signed it.

Q. All right. Because the way -- let me make sure.

When you look at that signature, that appears to you to be Richard's signature? In other words, you have no reason --

A. To the best of my -- there's no reason to believe that that's not his

signature.
**Q. All right. And then as it relates to this particular part, excess of alcohol, you can neither say it was there or it was not there at the time Richard signed this document?**
A. Correct.
**Q. Okay.**
A. I don't know if anybody else put it in after Richard signed the document.
**Q. Do you disagree with that --**
A. Do I disagree? Yes.
**Q. You do not believe the cause of the fall was due to excessive alcohol?**
A. No.
**Q. Okay. What else could have been the cause of the fall other than --**
A. I don't know. Since the proximity of where he fell was in line with the bathroom, I don't know if there may have been wet residue on the floor or not.

**Q. Did you see any wet residue on the floor?**
A. After the fact, no.
**Q. Did you report to anyone that you believe --**
A. No.
**Q. -- wet --**
A. No. But like I said before, I did not see anything, but do I know it was there when Richard fell, he fell on top of it so it would not be there anywhere. I do not know that either.
But back to this, that is neither -- that I filled out his front form and I printed everything. Okay. And then they gave Richard to sign the back form. Okay. I don't believe this is Richard's printing nor is it my printing. I don't believe it is Richard's printing on that second form.
**Q. Okay. And so --**

A. I believe it was placed after that, after the fact.
**Q. What makes you believe that?**
A. Because it doesn't match -- if I watched -- if I fill out this form, I would fill out the whole form. I would have filled out the whole form and said, Richard, I filled this out for you. Could you please sign it. That's how the transaction would have taken place. It wouldn't have taken place, here, Richard, I filled out all of this. Could you fill out this section for me.
**Q. So let me explore your theory. It would be your contention that you filled out the first part, you filled out the first box on the second page and you left Box 2 and Box 3 blank?**
A. Yes, that would be my contention.
**Q. Why would you have left Box 2 and Box 3 blank?**

A. I don't know why Box 3 is still blank.

**Q. So as you sit here today, do you have an explanation for why you would have left Box 2 and Box 3 blank?**

A. No, I do not.

**Q. Okay.**

A. But I also don't have the explanation of why the print doesn't look the same.

**Q. And --**

A. As I'm sitting here, once again, I will reiterate. This document was in somebody else's hands after the fact with the signature. And this document could have been doctored after the fact of his late -- the incident that we are here for in the first place just to make him look bad the first night.

**Q. And so if Box 2 and Box 3 were left blank --**

A. Correct.
**Q. -- why didn't you on February 18th, 2019 include in Box 2 that there may have been residue on the floor or there could have been something by the door or any other explanation for this incident?**
A. Why didn't I?
**Q. Yes, sir.**
A. Because I was not -- I could not say there was possible residue on the floor. I don't know. I don't know why, but because we got him down to there, got him stitched up, he was fine. Even the reason for him falling, I don't know why he fell and that's why I didn't put anything in there.
**Q. So did you also have an opportunity to fill out a form?**
A. For what?
**Q. In addition to Richard's?**
A. No, I don't know. I think I did. I don't know.

Q. Let me hand you what I will mark as Exhibit G -- H. Thank you. So we are looking at Exhibit H.
Do you recognize the handwriting on page 1?
(Henze Deposition Exhibit H was marked for identification.)
(Document tendered to the Witness.)
A. Yes.
Q. Is that your handwriting, sir?
A. Yes.
Q. Okay. And on page 2, is that also your handwriting?
A. Yes.
Q. And would you read that for me, please.
A. Richard lost his balance and fell on the foyer floor striking his head.
Q. Okay. Thank you. And is that your signature down there at the bottom?

A. Yes.
**Q. Okay. So how was Richard feeling throughout the remainder of the day?**
A. His head was sore but besides that, he was feeling normal, from my perspective.
**Q. Did he make any complaints at all?**
A. He didn't complain about anything.
**Q. What did you guys do for the remainder of the day on the ship?**
A. Just -- he -- well, I think he might have want to the spa again. And then just hung out on Deck 15, went back to the room, got ready for supper, went to supper, probably walked around a little bit.
They went to Schooners or may have come to the casino with me because Schooners -- the piano player doesn't start until 9 o'clock, so that was our day.

Q. Okay. So if you go back to the spa invoices, it's probably going to be like -- there you go. If you can turn to page 473. If according to Royal Caribbean's records, Richard would have gone into the spa at 8:30 p.m. that evening for a massage, any reason to dispute that?

A. 8:30 p.m.?

Q. Yes, sir. You see the time there, it says 20:32. Let me ask you what time do you think he went into the spa on February 18th?

A. I think he went in around 2 o'clock in the afternoon.

Q. 2 o'clock in the afternoon?

A. Yeah.

Q. And he went in for the purposes of having a deep tissue massage?

A. That I do not know.

Q. All right. Did Richard go back to the medical center at any point on

February 18th?
A. No, not that I'm aware of.
Q. All right. And did -- what time did you all go to bed that night?
A. I would say Richard probably went to bed around 9 o'clock. I mean, around 11:00.
Q. And how about you?
A. I probably didn't get in until maybe, 1:00, 2:00.
Q. So you were out late and he was in early?
A. Right. I stayed out and gambled at the casino.
Q. So from the point in time throughout the entire day until he went to bed, did he ever make any points as to how he was feeling other than having the laceration on the back of his head?
A. No.
Q. Did he demonstrate any unusual

signs or symptoms to you?
A. No.
Q. Okay. So that next morning then, this now being Day 3 of the cruise, February 19th, what time did you wake up that morning?
A. The third day of the cruise?
Q. Yes, sir.
A. I would say Richard woke up around 7:30, 8:00 and I probably woke up at 9:00.
Q. Is that a typical routine for you guys --
A. No. Richard would get up, he would go to the 17th floor, he would do his Bible studies, get something to eat, and then he would walk around the deck. He would walk around the top deck for an hour.
Q. Okay.
A. I would get up, I would go up to the 17th floor, I would get two lattes out

of the machine, then I would come out of the 17th floor, walk across the top, go to the section that was in suite only on the middle of the ship and I would sit there and I would smoke my cigarette and I would drink my lattes, and I would watch him walking around the ship. And when he would come down to this side, I would walk around and, hey, how are you doing, and then he would continue his walk.

**Q. Okay. I didn't ask you about this before. I didn't realize you were a smoker. How often do you smoke?**

A. How often do I smoke?

**Q. Yeah.**

A. I probably smoke a pack a day.

**Q. Okay. So in 2000 -- strike that.**

**How long has that been your habit?**

A. For 50 years.

**Q. Okay. And how about Richard.**

**Was he a smoker?**
A. He stopped smoking about 30 years ago.
**Q. What was the frequency that he smoked, to your knowledge?**
A. To the best of my knowledge, would have been a pack a day.
**Q. So --**
A. He quit smoking about 25 years ago.
**Q. So what do you recall doing the majority of the day on February 19th? This is Tuesday, the second day at sea. You were scheduled to be in St. Martin the next morning.**
A. We would have been sitting around the pool talking to Jimmy and the gang.
**Q. Lounging?**
A. Lounging and walking around the ship.
**Q. So from the moment Richard woke**

up that morning until the time he went to bed, did you observe any unusual signs or symptoms in how he was acting?

A. No.

Q. Did he make any complaints to you at all about how he was feeling?

A. No.

Q. Did he complain of any visual disturbances?

A. No.

Q. So remember how I was telling you how I found this?

A. Um-hum.

Q. So the only thing I was able to see there is that you guys or at least Richard was in Dazzles at 11:48 p.m. that night.

A. Okay. That's possible.

Q. Do you have any reason to dispute?

A. I have no reason to dispute that.

Q. Do you know what time he went to bed on February 19th?
A. No, I do not.
Q. But what we do know is he was at least there until 11:48 p.m.
A. Okay.
Q. Is that right?
A. That is correct. Where is that at?
Q. Is it on the -- it would be on Exhibit D and then --
A. Yes, while he was at Dazzles.
Q. Yes, sir. I'm more interested in knowing where he was.
A. Well, I think that -- I just want to make sure that we are clear that although he may have stopped at Dazzles because Dazzles is right there before we go to our estate room.
Q. Okay.
A. So he may have just stopped in

there, and if he knew he was there from -- and we knew he was there from -- how?

**Q. I have the invoice details. You are going to say there's a ping at 11:48 p.m. at Dazzles.**

A. So maybe on his way back to the room that night, he peeked his head in Dazzles to see what was going on.

**Q. Okay.**

A. Do you have -- I mean you have this information here? Would you happen to have the information of the pings on the door when the card go in the door to tell what time.

**Q. Unfortunately, I'm the only one asking the questions today.**

A. I'm just thinking you would know what time he got to the room that evening instead of stopped by Dazzles. After I leave him at 9 o'clock when I go to the casino, I just assume that that is his

habit.
Q. Okay.
A. For the most part, he goes up to -- the Rising Tide, he goes -- we went dancing this time.
Q. Okay. So now Day 4 is Wednesday February the 20th. The ship is scheduled to arrive in St. Martin. This would be your first point of call. I say that to orient you.
Would it have been similar as other days where Richard got up around 7 a.m. and gone to --
A. Yes.
Q. And did you get off the ship that day?
A. Yes, we did.
Q. Okay. And so prior to getting off the ship, did Richard demonstrate any unusual signs or symptoms to you?
A. No.

Q. Did he make any complaints as to how he was feeling?

A. No.

Q. Okay. And so according to Royal Caribbean's records, you would had gotten off the ship at 11:39 a.m.

Does that sound accurate to you?

A. That, I do not know.

MR. HICKEY: Is this the 20th?

MR. DRAHOS: Yes.

BY MR. DRAHOS:

Q. So are you looking at it in detail there?

A. Yes.

Q. So if you see that --

A. I see the door ping. That's the time I got off.

Q. Okay. So if you look at that there, it looks like you got off about ten minutes before Richard did.

Do you happen to have memory as

**to why it was that you got off sooner than he did?**

A. Well, sometimes people in our group forgot something, so maybe they had to go back and get something.

**Q. Do you know whether or not that was the reason?**

A. That was the reason.

**Q. Okay. Were you and Richard getting on okay?**

A. Yes, we were getting on just fine.

**Q. Okay. So what was the plan for St. Martin?**

A. We were going down town, getting a bite to eat, and then just shopping.

**Q. Do you recall where you went to eat in St. Martin?**

A. I don't know the name of the place, but I can see it in my mind.

**Q. Okay.**

A. And it's right downtown and it's an open-air -- they have everything open and there's a large step that goes right up and there's a -- although, I but as a Matre d' box right there. And there's a bar at the end around this way and then tables.

**Q. Okay.**

A. And they serve burgers and shrimp.

**Q. Did you spend the majority of the time in the downtown area or hang out in the port?**

A. Downtown area.

**Q. Did Richard have anything to eat?**

A. Yes.

**Q. What specifically, if you can recall?**

A. He specifically would have had the hot shrimp. And besides that, he would have had a burger or something else.

**Q. Did he drink any alcohol?**

A. No. No alcohol other than the first night of the cruise.

**Q. Okay. Other than having lunch, did you guys make any other purchases in St. Martin while you were off the ship that day?**

A. Yes, we did.

**Q. What else did you purchase?**

A. He purchased three pairs of shoes. Haven't been able to wear them.

**Q. All right. How about you. Did you buy anything?**

A. No.

**Q. Did you and Richard, back in February of 2019, have separate checking accounts or was it a joint account?**

A. He had -- we had joint accounts and he had a separate account for his business.

**Q. So when he made a purchase of the three pairs of shoes, did he do it in the joint checking account?**

A. I don't know what he used. We put it on our credit card. I mean I put it on my credit card.

Q. Do you recall what credit card was used?

A. I think it was the Citi double diamond, Citi double cash card, I believe. Don't quote me on that.

Q. Okay. So according to Royal Caribbean's records, you both would have returned to the ship at 2:43 p.m.

Does that sound right to you?

A. I guess.

Q. And how was the experience in St. Martin overall?

A. Good.

Q. Through the time, did Richard demonstrate any unusual signs or symptoms?

A. No.

Q. Did he make any complaints as to how he was doing?

A. No. Not at all.
Q. All right. So would you have been keeping in your regular habit at separating at 9 p.m. for you to go to the casino?
A. Yes.
Q. Okay. And if, according to our records, Richard was in the comedy club at 10:38 p.m., does not sound right to you?
A. It's possible. I don't know.
Q. Okay. If you look at the folio charges, there was a purchase made for water --
A. Correct.
Q. -- on page 79 at the Attic Comedy Club. That's the spa. You are going to want to look at the thicker one there. That one there, yes.
MR. HICKEY: Exhibit D.
MR. DRAHOS: Page 79.
BY MR. DRAHOS:

Q. Okay. There's a purchase there made by Richard. It's 10:38 p.m. in the Attic Comedy Club; correct?
A. Yes.
Q. Do you have any reason to dispute the accuracy of that?
A. No, I do not.
Q. Do you know how late Richard was out that evening?
MR. HICKEY: This is Bates stamped 79?
MR. DRAHOS: Yes, should be GS 79.
MR. HICKEY: Where does it say that? Oh, I see it. In the middle of the page.
BY MR. DRAHOS:
Q. So he gave a tip to somebody at a point being 10:38 p.m. Do you have any reason to dispute that he was in there at that time?

A. No.
**Q. Do you know how late --**
A. No.
**Q. Did you guys reconvene and go back to --**
A. No.
**Q. Did you go back to the cabin before he did?**
A. No.
**Q. Did he -- okay. So you don't know what time he went back to the cabin?**
A. No, I don't know what time he came back to the cabin.
**Q. What time did you go back to the cabin?**
A. Once again, I probably didn't go back to the cabin until 2:00, 3:00 in the morning.
**Q. All right. And was Richard asleep at the time?**
A. Richard was asleep at the time.

**Q. All right. And so the next day --**

A. I can't want to be held to any of these times that I'm telling you that I got back to the cabin because I can't say for sure it was 2:00 or 3:00 I got back because I wasn't -- I wasn't looking at my watch.

**Q. Okay.**

A. So I don't want to say, I got back around 2:00 or 3:00 and then you come back at me with what you have and say, well, no, this says you didn't get back until 4:00 in the morning. So I just want to make it clear that we had -- Richard and I had the arrangement of that we did.

**Q. Okay. So the following morning February 21st, the ship is scheduled to be in San Juan?**

A. Yes.

**Q. When you woke up, was the ship already in port?**

A. Yes.
**Q. And do you know what time Richard woke up?**
A. No.
MR. HICKEY: Can we take a break now that you are on that day?
MR. DRAHOS: Yes.
THE VIDEOGRAPHER: We are going off the video record. The time is 2:43 p.m.
(Recess 2:43 p.m. to 2:57 p.m.)
THE VIDEOGRAPHER: We are back on the video record. The time is 2:57 p.m.
BY MR. DRAHOS:
**Q. So, Mr. Henze, when we had left off, we were talking about the morning of February 21st, this being Thursday and the ship is in San Juan. Okay.**
**Before I get any further down the road on that, can you tell me from the point that Richard had left the medical center on February 18th until this morning on February**

**the 21st, you would agree he never went back to the medical center; correct?**

A. Correct.

**Q. Why not?**

A. Because we were -- we weren't instructed to come back to the medical center and nobody ever called and said we have to see you again.

**Q. Did he, at any point in time, ever experience anything or complained of anything or demonstrated anything which led either of the two of you to believe, hey, maybe we need to go back down there?**

A. No.

**Q. All right. So do you know what time he woke up that morning?**

A. No.

MR. HICKEY: So now we are on the morning of --

MR. DRAHOS: Morning of February --

MR. HICKEY: 2/21.
BY MR. DRAHOS:
**Q. Okay. So did you have any interaction with him on account of that morning before he left?**
A. No.
**Q. When was the next time you heard anything at all about Richard?**
A. It was approximately at 9 o'clock from Susey Hiatt.
**Q. And what did Susey say?**
A. Susey said Richard's been trying to get ahold of you. He thinks he's having a stroke. He's on the 17th floor.
**Q. Do you know what he was doing to try to get ahold of you?**
A. I believe he was trying to call my cell phone.
**Q. Okay. So you had your cell phone on the cruise?**
A. Yes.

Q. And what is your number?
A. (717) 578-4490.
Q. And what about Richard. Did he have his cell phone?
A. Yes.
Q. What's his number?
A. 717 -- I can get it for you. On the last is 7001 but I forget what the first three digits are.
Q. 7001?
A. Were the last four, but I don't remember what the first three were.
Q. Did you all text each other during the cruise?
A. Yes, I believe we did.
Q. Did you call each other during the cruise?
A. Yes.
Q. Who was your provider?
A. Our provider is Verizon.
Q. Do you still have those numbers?

A. Same numbers I gave you.
Q. Understood. Do you both still have those same numbers?
A. Yes.
Q. Does Richard use his phone today?
A. He doesn't use -- we use it if we want to say, call -- if he want for me to send a message to one of his clients or something.
Q. Okay.
A. But as far as -- he can't use the phone.
Q. So on that phone, it has his clients' names and numbers, obviously?
A. Yes, I would believe so.
Q. What about the eye doctor. Is her name and number in that phone?
A. That I do not know. It's possible that could be on there. I don't know.
Q. So back Susey. So she presented

to your cabin?
A. Yes.
Q. Were you still asleep at the time or --
A. Yes, I was asleep.
Q. Was he calling your phone or texting you?
A. I believe he was calling. He was trying to call me.
Q. Do you know if he sent any texts messages as well?
A. He didn't send me any text messages, I don't believe.
Q. And why didn't you answer the phone when he was calling?
A. I was asleep.
Q. I figured that was going to be your answer but I wanted --
A. I'm not sure but the volume on my phone could have been turned down.
Q. Okay. So you were asleep and

didn't hear the call?
A. Correct.
Q. Did he leave any voice messages?
A. No.
Q. Are you sure of that?
A. Yes.
Q. Okay. Did he leave voice messages on anyone's phone?
A. To my knowledge, no.
Q. Do you know if he attempted to call anyone else?
A. No.
Q. How did he -- how did Susey come to learn of Richard's circumstances?
A. He called Susey.
Q. So he did call her?
A. Yes.
Q. What's her phone number?
A. That, I do not know.
Q. But that number would have been saved on his phone, on Richard's phone?

A. I can get the number for you, but I don't know it off the top of my head.
Q. Okay. We will make a note of that one as well. So other than you and Susey, do you know of anyone else Richard attempted to call?
A. No.
Q. Do you know if he attempted to text message anyone?
A. No.
Q. No, he didn't or no, you don't know?
A. I don't know.
Q. What was your understanding of what Richard was hoping to accomplish by calling you that morning?
A. He wanted to know if we had any aspirin. Susey said he wanted to know we had aspirin. He thought he was having a stroke.
Q. Okay. Had Richard ever made any

**type of request like this before for aspirin?**

A. No.

**Q. What was your reaction when you learned this from Susey?**

A. Got out of bed, got dressed, and went up to the 17th floor.

**Q. All right. Was your reaction of genuine concern or was it Richard, what is it now?**

MR. HICKEY: Richard what?

MR. DRAHOS: Richard, what is it now.

BY MR. DRAHOS:

**Q. More of a general concern than annoyance?**

A. Yes.

**Q. You didn't have any feeling like maybe he was exaggerating or --**

A. Richard didn't complain. He didn't exaggerate.

Q. So how long do you think it took you to get changed and get out of the cabin?
A. Get changed and get out of the cabin?
Q. Yes.
A. Maybe ten minutes.
Q. All right. So Susey comes in and she said this is going on. Did you call Richard back?
A. No. I -- my concern was getting dressed right away and going to the scene.
Q. Why didn't you call him?
A. Because when Richard called Susey, Susey told me Joey was up with him. Joey went up.
Q. Okay. Hold on. Let me back track then. So do you know what time Richard called Susey?
A. No.
Q. But as you sit here today, you are certain that there was a call made from

**Richard's cell phone that was received by Susey's cell phone?**
A. Yes.
**Q. Do you know how long that conversation was?**
A. No.
**Q. And in response to that, Joe went up to meet Richard?**
A. Yes. Joe went up to meet Richard, Susey came to get me.
**Q. Where was Susey's cabin in relation to yours?**
A. I'm not sure.
**Q. Was she on the same deck?**
A. I believe they were on the same deck but they were on the opposite side of the ship, down quite a way.
**Q. Were you on the port side or the starboard side?**
A. I was in 8660 I believe.
**Q. You were in 8660. So do you know**

**how long it took Susey to receive the**
**message from Richard and come get you?**

A. No. I would say -- I would probably say with a lot of confidence that when Susey got the message, she came to me right away.

**Q. All right. But specifically how much time passed, you don't know?**

A. That I don't know.

**Q. And do you know how long it took Joe to receive the message from Susey and go up to --**

A. I would say as I'm probably talking to you because he called them when they were in their stateroom. So as soon as Susey was talking to Richard on the phone, I know she probably said, Joe, Richard thinks he's having a stroke. He's up on the 17th floor. You might want to go up there. So I would say exactly the same time as Richard was relaying the message to Susey, Susey was

relaying the message to Joe.

Q. All right. Do you know how long Richard was feeling this way before he decided to call anyone?

A. I have no idea.

Q. Was anyone else with Richard that morning before Joe?

A. No.

Q. So as you sit here today, as far as you are aware, the first person among your group to physically see Richard that morning would have been Joe?

A. Correct.

Q. And the first person who would have spoken to him among your group would have been Susey?

A. Correct.

Q. And just to make sure I cover it, you don't know what time you got up nor do you know what time you left the cabin?

A. Correct.

Q. Did you hear him get up early in the cabin?

A. No.

Q. Okay. And were you fast asleep when Susey came and got you or were you kind of just waking up --

A. I was fast asleep.

Q. All right. So you got changed. You brushed your teeth?

A. No, I didn't -- I didn't get changed. I just got dressed.

Q. Dressed. Okay.

A. I didn't brush my teeth, ran and got dressed, and got out of the room.

Q. Okay. Do you know what time it was that you saw Richard for the very first time that morning?

A. No. At this point, time is not -- I mean, I'm not looking at my watch.

Q. Okay. What did you observe when you first started?

A. He was sitting in one of the chairs and I observed Joe beside him and a gentleman from Royal Caribbean coming in with a wheelchair and them helping Richard into the wheelchair.

**Q. Do you know how the gentleman from Royal Caribbean got there with a wheelchair?**

A. Because Joey called and somebody up in at the concierge or somebody called 911.

**Q. Joe called 911 or --**

A. I don't know if Joe called or if he had the concierge.

**Q. Someone called 911 --**

A. Someone called 911 or called -- I believe Joey went and told somebody who would have been the concierge --

**Q. Okay.**

A. -- that he needed help.

**Q. Okay. So you saw Richard sitting**

**in the chair. Was he able to speak?**
A. No.
**Q. What else did you observe about his physical appearance, if anything?**
A. That his -- the one side of his body, he felt numb.
**Q. One side of his body felt numb?**
A. Yes.
**Q. Which side?**
A. I believe his left side.
MR. HICKEY: I'm sorry. One side of his body was feeling --
THE WITNESS: Feeling numb.
BY MR. DRAHOS:
**Q. Did you hear him say that while he was up on the deck?**
A. No.
**Q. Did you observe that?**
A. I observed that.
**Q. What was it that you observed that lead you to believe that one side of**

**his body was numb?**
A. With them lifting him.
**Q. Who lifted him?**
A. Joey and one of the Royal Caribbean staff members.
**Q. How long was he sitting there for before they ultimately moved him?**
A. Not long. I wouldn't be able to -- just a matter of time.
**Q. More or less than five minutes?**
A. Less.
**Q. Did you speak to him at all?**
A. I probably asked him how he was doing and he said fine. He said fine. You know.
**Q. So he could speak?**
A. Yes, he could speak.
**Q. So you approached and said how are you doing and he said fine?**
A. I would think. Well, meaning that not fine as fine but, you know.

**Q. Did you say anything else?**
A. I don't think I did.
**Q. Did he say anything else?**
A. No. We went down to the infirmary. Took the elevator down to the infirmary.
**Q. Did you observe anything else about him before he was taken to the infirmary?**
A. No.
**Q. Did you hear anyone else say anything in the area before he was taken?**
A. No.
**Q. Did Joe report anything to you about what he saw?**
A. On the 17th floor?
**Q. Yes, sir.**
A. No.
**Q. Did Joe report anything to you about what he said or what was said?**
A. No, not that I remember.

Q. Okay. How long did it take from getting to the Lounge Deck 17 to the ship's medical center?
A. The lounge deck to the infirmary?
Q. Yes.
A. That I do not know.
Q. Did you know what time Richard arrived to the medical center that morning?
A. That I do not know. I believe it was like 9:30.
Q. If according to the ship's medical records, Richard would have arrived in the medical center at or around 9:25 a.m., would you have any reason to dispute that?
A. No.
Q. And were you there when Richard reported his symptoms to the medical center staff?
A. No.
Q. Where were you?

A. Where was I? I was probably in the waiting room.

**Q. Okay. So did you accompany them from Deck 17 to --**

A. Yes, I did. And they took Richard back to the doctor I nobody was allowed in.

**Q. Understood. During the transport from Deck 17 to the medical center --**

A. Correct.

**Q. -- was there anything said among any of you all as you recall as you sit here today?**

A. No.

**Q. So when Richard was brought into the center, he went directly into an observation room?**

A. No. He went back into where he was when they were doing the stitching, I believe.

**Q. I call it an observation room.**

A. Is there an observation room and then a waiting room?
Q. He was brought up from the ship's medical center into a room where they treat patients; correct?
A. Right.
Q. Okay. And so did you go into that room with him?
A. No.
Q. You stayed in the waiting room?
A. Yes.
Q. So were you present then at any point in time while Richard reported his symptoms to the ship's medical staff?
A. No.
Q. All right. And so if, according to the nurse's note, Richard would have stated that he had the inability to move the fingers of his right hand, were you present --
A. When he made that statement? No.

**Q. Did you observe him having the inability to move his fingers?**

A. Later, I had -- right hand specifically, no.

**Q. Okay. So were you -- was the doctor present in the medical center when you arrived?**

A. That, I don't know. I didn't -- when I arrived in the medical center, I was there for -- they took him back to what you call the waiting -- the emergency room or whatever, and then maybe about five minutes later, someone stepped out and asked me if we had any insurance coverage.

**Q. Do you know who that person was?**

A. One of the nurses. The person that was attending the front desk.

**Q. Okay.**

A. So at that time, then I went back up to the room to retrieve the medical card.

**Q. Okay. So would you agree as you**

sit here today that you were not present for any of the initial interactions between Richard and the ship's doctor on the February 21stc?
A. Correct.
Q. All right. Did Richard's condition change at all from the time you saw him on Deck 17 throughout the time he was in the ship's medical center?
A. No.
Q. Did he -- strike that.
So if it's the ship's position or contention in this case that during the time they saw Richard on the 21st, he did not demonstrate any neurologic deficits, would you agree or disagree with that contention?
A. I would disagree.
Q. And why?
A. Well, first off, what does he mean by neurologic deficits?
Q. Okay. What do you understand

**neurologic deficits to mean?**
A. I would think, well, if he was feeling any numbness in his arms or those areas, that would be my -- what they are.
**Q. So for right now for the way I'm asking these questions, I'm trying to qualify what you understand to mean certain things so I know how to --**
A. Well, I'm not a medical professional so from that point, I would say I don't understand anything.
**Q. Okay. So did you, at any point in time observe Richard having any difficulty moving the right side of his body?**
A. Yes.
**Q. Okay. Can you describe for me what it was --**
A. He wasn't able to move the right side of his body.
**Q. At all?**

A. At all.

**Q. So he --**

A. Right. Might have been able to move it like this (indicating). From that point, I did not observe much of Richard.

MR. HICKEY: Let the record reflect when he said, might have been able to move it like this, the witness had his right arm down at his right -- the witness's right side and lifted it probably 10 or 15 degrees up.

BY MR. DRAHOS:

**Q. So how much time in total did your spend in the medical center on February 21st?**

MR. HICKEY: Objection to form. At what point in time?

THE WITNESS: You mean in total?

BY MR. DRAHOS:

**Q. Yes, sir.**

A. I would probably say I spent

maybe 45 minutes in the medical center.
**Q. In total?**
A. In total, I believe. To the best of my knowledge, I would say 45 minutes.
**Q. All right. So the first episode for lack of a better word of -- let me -- strike that.**
**Your first encounter in this ship's medical center on February the 21st when Richard first arrived, how long were you there before you left to get your insurance card?**
A. Maybe ten minutes.
**Q. The entirety, you were --**
A. In the waiting room.
**Q. Okay. And then you went to get the insurance card --**
A. I went up to the 8th floor to get the insurance card.
**Q. And then --**
A. Then I came back down and handed

it to the individual at the front desk. I gave him the insurance card.
**Q. Okay. Do you know what time --**
A. Would have been about an hour that spent in there.
**Q. Okay. So how long -- how much time had passed from time you left to get the insurance card to the time you came back and gave it to the person at the front desk?**
A. Probably 15 minutes.
**Q. All right. And you have come back and gave him the insurance card. Did you remain in the waiting room?**
A. I believe for a little bit but then I went -- because Susey and Ilene was in the waiting room and I believe I talked to them for a couple minutes and then Richard was put in, say, like a hospital room on board, and Jimmy and Joe were back with him. So I went back into that room and we were back there talking.

**Q. All right. So how long were you with Jimmy and Joey and Richard for -- once he was put in the hospital room?**

A. I believe we were probably back in there for maybe 15 minutes talking.

**Q. Where did you go from there?**

A. Then somebody entered the room and told me that I needed Richard's passport.

**Q. And did you have to return to the cabin to get it?**

A. I went back up to the cabin and retrieved the passport.

**Q. How much time passed from the time you had left the medical center to get the passport to the time you came back?**

A. Probably 15 minutes.

**Q. Where did you go when you returned now for this third --**

A. I came back to the room.

**Q. Back to what you were calling the**

**hospital room?**
A. What I'm calling the hospital room where Richard was laying.
**Q. And was Jimmy and Joey still there?**
A. Jimmy and Joey were there.
**Q. And how long were you in there for now for this encounter?**
A. Maybe for another ten, 15 minutes.
**Q. Okay. What prompted you to leave now that --**
A. Then the gentleman who came up to our room on the first day to take the pictures stepped in and said that you guys are getting off the ship.
**Q. Okay.**
A. So I left the room and I went out and told Ilene and Susey that we were getting off the ship. That gentleman followed me out into the waiting room and he

stated to me -- he goes, you need to go pack your bags.
Ilene at that time popped up and said, we can pack the bags, we can take the bags with us. This gentleman said, no, they need to take their luggage with them. I will send -- someone will help you pack your bags.
So I waited there in the infirmary waiting room for about ten minutes and nobody showed up so I thought, well, I better go pack my bags. So I went up to the room and I packed our four bags and nobody came up to help me.
It wasn't until I was struggling trying to pull four bags out of the door that the gentleman, once again, he told me that we were getting off and that I needed to pack my bags showed up.
**Q. How much time do you think it took you to pack the bags --**

A. An hour. And in that mean time, Jimmy had called me while I was packing the bags because he wanted to know where the passports were. I said, well, I have the passports with me.

The gentleman that asked me for them never came back to get the passports from me. Jimmy says, I'm going to come up and get the passports for you. So I continued packing and Jimmy came up and got the passports and took them back to the infirmary.

**Q. Okay. Once you finished packing, where did you go from there?**

A. From there, we went into the elevator and down to the infirmary.

**Q. Did you have your luggage with you or did someone take it?**

A. No, I had all four bags with me.

**Q. And where were you in the medical center when you returned with your bags?**

A. We were in the waiting room.
**Q. And the waiting --**
A. And the gentleman informed me at that time that I was going to need to go back up and clear the bill before we left the ship.
**Q. Okay. How long were you in the medical center for in the waiting area with your bags before you were told you had to go clear your bill?**
A. He told me that on the way down the elevator, so once I got the bags and everything, sitting them with Ilene and Susey, then I went back up to the 5th floor, I believe it is, and waited in line and my bill.
**Q. I mean, so other than just dropping off your bags, were you there for any other period of time?**
A. At the medical center? After I came back from paying my bill, we were

probably in the medical center for about a half hour until the ambulance crew arrived.

**Q. Where were you in the medical while you were waiting for the ambulance to arrive?**

A. In the waiting room.

**Q. And Richard was in the hospital room?**

A. Richard was in the hospital room.

**Q. And you said you waited in there for about a half hour?**

A. I believe it was a half hour.

**Q. Okay. How long did it take you to clear the bill?**

A. I'd say five, ten minutes. To clear the bill, it was probably I'd say five minutes. But waiting, the gentleman told me I needed to pay the bill. And I believe he was like security or -- whoever he was didn't take me up and take me to the front of the line.

I got up there waiting in line, got up to the person to pay my bill and he pops up from the outside and whispers something in the gentleman's ear was waiting on me.

**Q. Okay. So you think --**

A. I don't know what he said but I assume -- I will assume on this instant.

**Q. Okay.**

A. And that was that he made sure there was enough room on my credit card to pay the bill that was coming from the infirmary.

**Q. Okay.**

A. He made no effort to hurry me or to get back down because we were getting off the ship.

**Q. Do you know who this gentleman was?**

A. No.

**Q. And you said earlier that this**

was the same guy that took your photograph?
A. Yes, he was the same gentleman that took our photograph.
Q. Okay. All right. So I've done sort of a rough sketch of the timeline, so I want to go back over it and I want to focus on the times you were in the medical center. And you let me know if I left out anything.
So we have you arrived to the medical center with Richard first presentation. You were in the waiting room for about ten minutes. You were asked to go and get your insurance card and you went up to your room to get the insurance card.
You came back down. Richard was put into a hospital room with Jimmy and Joey. You waited in the hospital room with Jimmy, Joey, and Richard for 15 minutes. At that point, you were asked to get your passport. You went back to get the passport; correct?

A. Correct.
Q. Okay. After you got the passport, you came back to the hospital room where Jimmy and Joey were with Richard. You waited in the room where Richard was for 15 more minutes and then the gentleman came in to tell you you guys were going to be getting off of the ship.
At that point, you left and told Ilene and Susey that you had to get off the ship and that you were going to be -- Susey offered to pack the bags but this gentleman --
A. No, Ilene.
Q. Ilene -- thank you -- offered to pack the bags but this gentleman said that you needed to go do it. You, at that point in time, left to go pack your bags for about an hour you said, you put the bags together. This gentleman returned as you were struggling to get out the door. And at this

**point, Jimmy had called you about the passports --**

A. No. The gentleman came up as I was getting ready to leave. Jimmy came up --

**Q. While you were packing --**

A. -- while I was packing.

**Q. Okay. After you packed your bags, you came down to the medical center to drop the bags off. You were there about a minute or two and then left to go clear the bill --**

A. Correct.

**Q. Okay. You cleared the bill --**

MR. HICKEY: I have to object to the form. You say clear the bill. I don't know what that means.

Does that mean pay the bill?

MR. DRAHOS: That's what --

THE WITNESS: I paid the balance of what was due for anything that we had

charged that we didn't --
MR. HICKEY: Pay the bill. I'm just curious as to -- Mr. Drahos is now using clear the bill and I think even you used this word clear, but I don't know what that means.
THE WITNESS: Pay the bill.
MR. HICKEY: Oh, pay the bill. Okay.
BY MR. DRAHOS:
**Q. After you paid the bill, you went back to the medical center and you were in the waiting room for about 30 minutes before you all left?**
A. I believe, yes.
**Q. Okay. During these encounters in the ship's medical center, did you, at any point in time, have any discussion with the ship's position about Richard's condition?**
A. No, I did not.
**Q. Did the ship's position ever make**

any specific diagnosis to you?
A. No.
Q. Did you speak to any of the ship's nursing staff?
A. No. I was too busy running around trying to get what they needed that I wasn't in the room with Richard.
Q. Okay.
A. And from previous encounters with medical staff, you know, I felt he was in good hands.
Q. So --
A. So.
Q. Were you present when the paramedics arrived?
A. Yes.
Q. Okay. To the medical center?
A. Yes.
Q. From that point, was Richard's condition better, worse, or the same as when you had first seen him up on Deck 17?

A. I would say the same.
Q. When the paramedics arrived, was Richard capable of speaking?
A. Yes.
Q. When the paramedics arrived, was Richard capable of moving his right side?
A. Not that I'm aware.
Q. Is there anything else about Richard's condition that you can describe for me that you observed at the time the paramedics arrived?
A. No, because we were in the waiting room while the paramedics went back.
Q. Did Richard know where he was that morning?
A. Yes.
Q. Did he know the date, time, and place?
A. I don't know he did for sure.
Q. Was there any drooping of one side of his face versus the other?

A. That I don't believe there was,
but I'm not a medical professional.
**Q. Was Richard making any complaints**
**about one side being numb versus the other?**
A. As far as complaints, I don't
know that it was a complaint. It would have
been he didn't feel one side.
**Q. Did he tell you that, that he**
**couldn't feel one side versus the other?**
A. Yes.
**Q. Was he complaining of any pain?**
A. No.
**Q. Do you know what efforts, if any,**
**were being made to coordinate Richard's**
**transfer to a hospital in San Juan?**
A. Yes, I know somebody came out
from -- this would be hearsay. But because
while they were making these arrangements, I
was up doing other things.
**Q. Okay.**
A. But I believe they came out and

they told Jimmy and them that they were taking care of everything and that an ambulance had been called. So when I got back down to the room, Jimmy had let me know that's what they were doing. And the ambulance has been called, that they were taking care of things.

**Q. Okay.**

A. So --

**Q. So if we were to use our timeline that we had worked on before, do you know when in the timeline you were told by Jimmy that the ambulance had been called? Was this before or after you went to get the insurance card?**

A. I was -- it would have been way past then.

**Q. Was it before or after --**

A. It would have been -- because I -- it would have been after I had come back down with the luggage.

Q. Okay. You knew at the time you were getting the luggage that you were going to be sent somewhere?

A. Correct.

Q. All right. And so it's your testimony that the first time you had heard that an ambulance was coming was after the luggage was packed?

A. Yes, because I assumed that's what they had done. Nobody told me that they were calling an ambulance.

Q. Do you know what time the first request was made by anyone on the Royal Caribbean ship in the medical center for an ambulance for Richard?

A. From being there? No.

Q. Okay. Do you know who among the Royal Caribbean medical staff was responsible for making those calls?

A. I would think with their expertise, it would have been the doctor or

one of the nurses for making that call.

**Q. I understand --**

A. If they felt -- you know, I relied on their expertise and their actions. And I would have thought that, you know, they would have made -- they would have been making the right calls at the right time.

**Q. So my question is much more specific --**

A. I don't know who made that call or who would make that call.

**Q. All right.**

A. If someone was in need of an ambulance, but I would assume it would be someone on the medical staff.

**Q. Were you present for any discussions from anyone in the medical staff of the Royal Caribbean vessel and anyone in San Juan regarding Richard's --**

A. No.

**Q. -- circumstances?**

A. I was in -- I had no contact with any of the medical staff who told me what was going on with Richard.

**Q. All right. So you didn't observe anyone nor did you hear anyone making any calls in that regard?**

A. No.

**Q. Okay. So as you sit here today, you don't know how many calls were made; correct?**

A. Correct.

**Q. Nor do you know what calls were made to who?**

A. No. But if I'm in a medical facility, I assume they will do -- well, they -- because of how they -- because of how they treated us before, I would think if it was a medical emergency, okay, or if it was something urgent, that they would take the proper steps.

What that didn't see from the

medical staff that was in the infirmary that this situation was neither emergent or urgent.

**Q. So what -- help me understand why it is your impression that the medical staff was not taking urgent action.**

A. Because, I mean, my impression why they weren't taking urgent action?

**Q. Yes.**

A. Is because I would have thought if they were taking urgent action, someone would have approached me and said an ambulance is on its way. We are going to send Richard to a hospital. I will tell you where he's going. You can meet up with them later.

Or the staff at Royal Caribbean would have said, okay, your room is paid for. Your friends can take your luggage with them. But none of that was -- you know, it was I had to get my luggage. It

was I had to pay my bill. So to me, the staff wasn't acting like it was a medical emergency.

They did nothing to show me that it was a medical emergency. For all I knew, maybe he did suffer a concession when he fell. I don't know.

**Q. Okay. And so do you know what time the ambulance arrived?**

A. I believe the ambulance arrived 12:30, 1 o'clock.

**Q. Let's look at your --**

A. We have looked at that. I know what time it says.

**Q. So if it says you were off the ship at 12 --**

A. That's a lie.

**Q. That's not accurate?**

A. That's not accurate.

**Q. Why do you believe that is incorrect?**

A. Because I knew that it took about an hour to get to the hospital and I didn't arrive to the hospital until after 2 o'clock. And so it did not take me two hours to leave the Royal Caribbean ship to get to the hospital.

**Q. All right.**

A. And this time also, I think it is strange they took my sea pass when I was exiting the cruise too.

**Q. We are going to get to that, but I'm going to hand you what we have marked as Exhibit I to your deposition.**

**So we have already agreed that according to the ship's medical records, Richard would have come in at 9:29 a.m. that morning; correct?**

(Henze Deposition Exhibit I was marked for identification.)

(Document tendered to the Witness.)

A. Um-hum.

Q. And you see the short side of the form here that we have marked as Exhibit I? Do you see there's a signature there?

Do you see that?

A. Um-hum.

Q. And the time stamp on that is 9:56 a.m. Do you see that there?

A. Um-hum.

Q. And this is a referral form that's requesting transfer to a hospital in San Juan for --

A. Okay. And this was at 9:56.

Q. Do you any reason to dispute that by 9:56 a.m., the ship's doctor made the decision that Richard needed to be transferred?

MR. HICKEY: Hold on. You are asking this gentleman about documents created by Royal Caribbean that --

MR. DRAHOS: Form --

MR. HICKEY: -- he had no part --
MR. DRAHOS: Form --
MR. HICKEY: -- or memory.
BY MR. DRAHOS:
**Q. You can answer. Do you have any reason --**
MR. HICKEY: Excuse me. Excuse me. You asked the witness a question. You referenced, Mr. Drahos, a time stamp. Can you just point that out to me?
MR. DRAHOS: Sure. Underneath February 21, 2019 0956.
MR. HICKEY: Are we on page 1 --
THE WITNESS: Page --
MR. HICKEY: I'm not asking the witness, I'm asking Mr. Drahos.
So it's under the -- okay. So it's under this electronic signature of Dr. Pereira?
MR. DRAHOS: Yes.
MR. HICKEY: Okay. And

electronically -- says February 21, 2019 956 UTC-05:00.

Is that it?

MR. DRAHOS: That's it.

MR. HICKEY: Okay. Doesn't have a -- does it have a time zone there?

MR. DRAHOS: So that's all that has for now.

BY MR. DRAHOS:

**Q. Mr. Henze, I'll ask the question since I don't think it was answered. I thought it was but maybe we didn't get it on the transcript.**

**As you sit here today, do you have any reason to dispute that at 9:56 a.m., the ship's position that there was a form and transfer for Mr. Burgess?**

MR. HICKEY: Object -- excuse me. Object to the form.

MR. DRAHOS: Object to the form is fine.

MR. HICKEY: You are asking him about a document he didn't generate.

MR. DRAHOS: Object to the form is fine.

MR. HICKEY: You are asking about a time zone. You're not --

MR. DRAHOS: You know that objecting to the form is all that we need. If you want to try to get the answers stricken later, you can. But objecting to the form is all that is necessary at this point.

BY MR. DRAHOS:

**Q. Mr. Henze, do I need to ask the question again?**

MR. HICKEY: If you understand the question, you can answer it, but if you don't understand, say you don't understand. If you do understand, answer it.

THE WITNESS: My understanding that you gave me a form from Royal Caribbean

stating that with these times, I don't know if these time are accurate or not.

BY MR. DRAHOS:

**Q. As you sit here today, do you have any reason to dispute the ship's position that by 9:56 a.m., they had ordered a shoreside referral for Mr. Burgess?**

A. If that's what time he is saying he did it, then I would like to know why I didn't get to the hospital until 2:00.

**Q. Okay. But for purposes of the question now --**

A. Right.

**Q. -- do you have any basis as you sit here today --**

A. No.

**Q. -- observation or --**

A. I do not.

**Q. Okay. Thank you. And so if it's Royal Caribbean's position in this case that the ambulance didn't arrive until noon time**

**because an ambulance wasn't available, do you have any reason to dispute that?**

A. Yes.

**Q. Okay. What would be the basis for your dispute in that regard?**

A. The fact that I don't believe it would take two hours to get an ambulance, three hours to get an ambulance to a ship. Royal Caribbean has their own court down there. They deal with those people, they deal with those people in Puerto Rico all the time.

**Q. So --**

A. There was -- to say there because no ambulance available and if there was not an ambulance available and it was such an urgent situation to get him to the hospital, I would think that they're expert doctors because I trusted them so much and their actions and their, you know, and their advice on everything, that they would have

told me.

That, you know, this is a dire situation. We can't get an ambulance here until 12. And then I would have taken that a different -- a different course of action than that course of action. And, of course, they didn't treat this as an urgent or emergent situation nor did they tell me it would take three hours or two hours to get an ambulance to the ship.

They did not tell me that Richard was suffering from stroke symptoms. For all I knew, he was suffering a concession. So there was no urgent -- urgency from the medical staff.

**Q. What would you have done?**

A. What I -- what I would have done if I would have known what I know now would have been different.

**Q. What specifically would you have done?**

A. I just would have done things differently.

**Q. Can you tell me --**

A. No, I will not share that with you.

**Q. Are you refusing to answer the question?**

A. I'm not refusing. What I would have done personally, I relied on Royal Caribbean's doctors and staff because of -- they showed me that they were -- if I wanted something delivered, I would rely on United Parcel Services. If I wanted my roof fixed, I would call the professional roofer. Okay.

I was in a medical facility with, quote unquote, qualified, supposedly, doctors and nurses. When -- I put my trust in them, they acted professional, they're experts in the field of medicine, I'm not. So I followed their advice and their actions.

What I would have done differently since you asked, I would have made sure he got to the hospital quicker.

**Q. How?**

A. If I was one of the doctors, I would have called an ambulance. And if they called in the -- so you are telling me they called for an ambulance at 9:56? Is that what you are -- you are telling me?

**Q. Sorry, sir, I can't answer questions --**

A. You showed me a form that said the doctor was at 9:56. So now are you -- if the ambulance was called at 9:56? Then I would agree to that document if you're telling me that the ambulance was called at 9:56.

**Q. Okay.**

MR. HICKEY: He's not -- it's questions. He's only allowed to ask questions. He's not telling you anything.

He is implying things but you need to listen to the questions. And if you understand the question, you give him an answer. If you don't understand the question, you can't give him the answer.

You are making stuff up now. You're asking -- you think it's going back and forth like this and he's playing the game. He's only allowed to ask you questions but he implies things, and you are taking it as gospel truth. Just listen to what he's saying. Now there's no outstanding question and you're talking.

THE WITNESS: Okay.

MR. HICKEY: And can we take a break because there is something wrong with my computer or the notes where I'm not allowed to work on the document anymore. Unless you were in the middle of something.

MR. DRAHOS: No. No. Of course.

MR. HICKEY: I've just got to

take a break and figure out Word and maybe somebody like Bill can help me out. It's like I did --

THE VIDEOGRAPHER: We are going off the video record. The time is 3:48 p.m.

(Recess 3:47 p.m. to 4:22 p.m.)

THE VIDEOGRAPHER: We are back on the video record. The time is 4:22 p.m.

BY MR. DRAHOS:

**Q. Mr. Henze, did the shift medical staff make any other statements to you at any point in time that we have not already spoken about?**

A. No.

**Q. Did you overhear anybody on the ship's medical staff make any statements while you were in the medical center that we haven't already spoken about?**

A. No.

**Q. At the time that Richard was transferred off of the ship, did you receive**

a letter from the care team providing you with contact information from the port agent?

A. Yes.

Q. I'm going to hand you what we are going mark as Exhibit J to the deposition and ask you whether or not that is, indeed, the letter you received from Royal Caribbean prior to exiting the vessel.

(Henze Deposition Exhibit J was marked for identification.)

(Document tendered to the Witness.)

A. I believe so.

Q. And that contains the name of the port agent, Continental Shipping; correct?

A. Yes.

Q. Was the contact Jennifer?

A. Yes.

Q. And a phone number?

A. Yes.

**Q. And Lyn Garcia with a phone number?**
A. Yes.
**Q. Okay. And you kept that letter?**
A. Did I keep this letter?
**Q. Yes, sir.**
A. I believe. I'm not sure, but I do believe I have that letter.
**Q. Because this appears to be a photograph of that letter that was produced to us in discovery. So did you take a photograph of this letter?**
A. Yes.
**Q. And that would mean this letter made it home with you?**
A. Yes, it made it home with me.
**Q. Okay. Were you in the ambulance ride?**
A. Yes, I was.
**Q. And was there traffic in San Juan that particular day?**

A. I don't know.
Q. Did there come a period of time when the ambulance was at a complete stop for approximately ten minutes?
A. Not that I'm aware of, no.
Q. Did there come any point in time during the transport in the ambulance where either an accident or congestion on the highways slowed the ambulance to a complete stop?
A. No.
Q. So it's your testimony then that from the moment the ambulance left the port to the time it arrived to the hospital, it did not encounter any type of traffic which brought it to a complete stop on the highway?
A. They may have come to a stop at a stop light but no traffic.
Q. Okay. So there weren't any accidents along the way?

A. No.
Q. And you were taken to HIMA San Pablo; correct?
A. Correct.
Q. Had you ever heard of that hospital before?
A. No.
Q. Did you know anything about HIMA San Pablo before you arrived?
A. No.
Q. When you got there, were you greeted by the hospital's medical staff?
A. Yes.
Q. And did they appear to you to be aware of Mr. Burgess' pending arrival?
A. Yes.
Q. In other words, they knew you were coming?
A. Yes.
Q. Okay. And was there a doctor that you spoke to more than another?

A. The only doctor that I spoke to upon arrival would have been just -- just the one doctor.
**Q. Do you recall that doctor's name?**
A. I don't recall that doctor's name.
**Q. Was it a male or female?**
A. It was a male.
**Q. Do you know what area of specialty this doctor was?**
A. I am not aware.
**Q. Can you describe this doctor by appearance?**
A. Not any more, no.
**Q. Do you recall what this doctor said to you when you arrived?**
A. He said we have to get Richard in and get him a CAT scan, I believe it was. They would take him in.
**Q. Was he able to get a CAT scan?**
A. Yes, he was.

Q. Did his condition change at all in the ambulance ride from the port to the hospital?
A. No.
Q. So is it your testimony that from your observation, he appeared to be in the same condition when he arrived in HIMA as when we left the Royal Caribbean vessel?
A. Yes.
Q. Did anyone tell you what the CAT scan revealed?
A. Yes.
Q. Was it the same doctor?
A. Yes.
Q. What did the doctor say to you?
A. The doctor said that the CAT scan shows that Richard had a blockage here and that there's nothing they could do for him because we had arrived at the hospital past -- it took us too long to get us to the hospital.

**Q. So you said the doctor said there is a blockage here. Did you point -- I was writing when you said that.**
**Did you point to your head?**
A. It was either on his side or this side. I think it was on this side (indicating).
**Q. To the left side of his head?**
A. I believe that's what he said. Either the side or the right side there was a blockage.
**Q. And you are pointing to an area behind your ear.**
A. I'm pointing right here (indicating).
**Q. Okay. Thank you.**
A. Down at the neck.
**Q. Did the doctor describe the size of that blockage?**
A. He just said he had a blockage. We arrived at the hospital too late and he

could not administer a clot buster. If we would have gotten there earlier, things would have been different.

**Q. Did the doctor say that?**

A. Yes.

**Q. The doctor said things would have been different if you got there earlier?**

A. Yes.

**Q. Did the doctor make mention of any other clots or just that one clot?**

A. Just that one clot.

**Q. Did the doctor have any other treatment plan in mind?**

A. The treatment plan was they were keeping him in the hospital for three days.

**Q. And --**

A. For observation.

**Q. Three days for observation?**

A. Yes.

**Q. Did they advise whether or not they would be administering any medication?**

A. They administered a blood thinner, I believe.

**Q. Did they explain to you what the purpose of that blood thinner was?**

A. No.

**Q. Did Richard's condition remain the same throughout the remainder of that day?**

A. Yes.

**Q. In other words, is it your testimony that he was incapable of moving his right side?**

A. Yes.

**Q. Did he exhibit any other signs or symptoms other than that that you observed?**

A. No.

**Q. Was he capable of speaking?**

A. Yes.

**Q. Did he know where he was?**

A. Yes. Yes, he was capable so his symptoms would have changed because he was

capable of having a conversation.
Q. He could have a full conversation?
A. Yes.
Q. Was that an improvement?
A. Yes.
Q. And so his symptoms on the right side, did they stay the same, get better, or worse?
A. Stayed the same.
Q. Did something happen to Richard late that evening?
A. Yes.
Q. Can you tell me what it is you understand happened to him?
A. From what I understand is the clot that was down at his lower neck line had shot off and went to the top of his head.
Q. Who told you that?
A. The neurosurgeon.

**Q. So the neurosurgeon told you that there was a clot in his lower neck line that shot up and went to the top of his head?**

A. Um-hum.

**Q. Was it the same clot?**

A. Yes.

**Q. And that was what was told to you by the neurosurgeon?**

A. Um-hum.

**Q. Is that a yes?**

A. Yes.

**Q. What was the neurosurgeon's plan?**

A. Once that happened, the neurosurgeon's plan was to go in and try to break up the clot.

**Q. How was the neurosurgeon going to do that? Did he explain?**

A. That they were going to go in with a scope or something and go up and try to break the clot up in his brain.

**Q. Why was the surgeon going to do**

that now as opposed to earlier? Did he explain?
A. No.
Q. Was that surgery successful?
A. No.
Q. So is it your understanding that this is the same clot or a second clot that caused this worsening of Richard's symptoms?
A. No, it's the same clot.
Q. And that's your impression because that's what's the doctor told you?
A. Yes.
Q. Has anyone ever told you it was a second clot?
A. No. They said that clot moved.
Q. Was it explained to you why that surgery was not successful?
A. Yes.
Q. What did they tell you?
A. They told me that when they tried going up the side to get to Richard's clot,

they couldn't get through this clot on this side and they can get through the remainder of the clot that was here.

And so what they usually do is they go up this side and they go up and these meet. And with Richard, those didn't meet.

**Q. Okay. During the time that you were in the hospital at HIMA, did you any communications at all with anyone at Royal Caribbean?**

A. No. I did call this girl one time.

**Q. When you say, "this girl," are you talking about the port agent?**

A. Yes.

**Q. When did you call her?**

A. I called her in the afternoon. All she wanted to do was basically charge me money to make hotel arrangements and stuff like that there. That's what her job was.

**Q. Okay. So you called her for --**
A. No. I didn't -- that's -- I didn't --
**Q. You weren't interested?**
A. I wasn't interested.
**Q. And then beyond that one discussion --**
A. That's it.
**Q. -- with her?**
A. No.
**Q. And, I'm sorry. What day was that that you called her?**
A. I have a Jennifer but I don't think it was Jennifer. I am not sure anymore.
**Q. But what day was it that you spoke?**
A. The day?
**Q. The day that you were transferred to HIMA?**
A. The day I was transferred to HIMA

earlier in the afternoon.
Q. Whose idea was it to coordinate the air ambulance? Yours or the hospital staff at HIMA?
A. My sister.
Q. Which sister is that?
A. Sam Samantha Sandra.
Q. Sandra?
A. Sandra Henze and her wife Stacey Bailey.
Q. Did anyone at HIMA express an opinion to you as to whether that was a good or bad idea?
A. No.
Q. What was the reasoning behind the transfer?
A. To get him home.
Q. Did you consult with anyone at HIMA before you made the arrangements on whether or not they thought it was a good idea?

A. I don't know. I don't know that
I consulted with anybody, no.
**Q. Okay.**
A. I consulted -- I had spoken to --
but -- to my sister.
**Q. Okay.**
A. We thought it was -- let's get
him -- he needs to come home.
**Q. Okay. So the transfer --**
A. -- of the quality of care. We
knew there was a better quality of care up
here.
**Q. Do you have any complaints at all
as you sit here today as it relates to the
medical care that was rendered to you -- to
Richard at HIMA?**
A. No.
**Q. Do you have any complaints as to
how anyone at HIMA treated you or Richard?**
A. No.
**Q. So the transfer was accomplished**

on February the 25th; correct?
A. Correct.
Q. And who was it that made the arrangements?
A. Stacey Bailey.
Q. And there was a GoFundMe page that was set up?
A. Yes.
Q. Did the amount raised for the GoFundMe account pay for the entirety of the air ambulance trip?
A. No.
Q. How much was the air ambulance trip?
A. $256,000. They told us it was going to be --
Q. So -- give me a minute. Express Air Medical Transport?
A. Yes.
Q. Charged you $256,000 for this transport?

A. I think that's what it was. It may have been 400-and-some thousand.

**Q. Okay. So Stacey Bailey made all of the arrangements with Air Medical in advance?**

A. Yes.

**Q. And did she tell you while you were at HIMA that it was going to cost $256,000?**

A. No. They had relayed to her that it would cost, like, $28,000.

**Q. They told her $28,000?**

A. Yes.

**Q. And so when this transport was initiated, it was your understanding that it was going to cost $28,000?**

A. Yes.

**Q. Okay. What happened between the time that this transport was initiated and the time you received the bill?**

A. That, I don't know.

**Q. So what is, to your knowledge, Air Medical's explanation for why such a different price then what you were quoted?**

A. That I do not know.

**Q. Have they sent an invoice?**

A. They sent an invoice to the Teamsters and the Teamsters paid it.

**Q. So they sent an invoice to Teamsters for the medical transport?**

A. Correct.

**Q. And Teamsters paid for that?**

MR. HICKEY: Teamsters Health Insurance.

BY MR. DRAHOS:

**Q. Do you have a copy of the bill that they sent to Teamsters?**

A. I have it somewhere, yes.

MR. DRAHOS: Do you know if that's been produced in the case?

MR. HICKEY: I have no idea. I have no idea whether we have it. If we have

it, we probably have produced it to you. If you don't have it, probably we don't have it.

MR. DRAHOS: Okay. Between the two of us, let's write that down because that's --

BY MR. DRAHOS:

**Q. So the GoFundMe page raised a total of $19,654; correct?**

A. Um-hum.

**Q. Is that a yes?**

A. Yes.

**Q. And what did that money go towards if it did not go towards the air ambulance?**

A. It went to help pay for Richard's care.

**Q. Okay. So, for example, the home health people that were coming here, it went towards that?**

A. Yes.

**Q. Okay. Have you received anything further from the Air Medical Transport?**

A. No.

**Q. How did the --**

A. What do you mean have I received --

**Q. Have hey sent you any other bills or correspondences or --**

A. We paid them $28,000. Okay. Then after -- and then they sent the bill to the Teamsters.

MR. HICKEY: The health insurance.

THE WITNESS: To the health insurance. But Teamsters had to fight them to return that money back to me.

BY MR. DRAHOS:

**Q. Okay.**

A. Minus the co-pay.

**Q. You and did they return to money to you?**

A. Yes. And that that money first went to pay for his transport.

**Q. Understood.**

A. And then they wrote a check, they refunded me the money I paid to them, and that money helped me with Richard's care.

**Q. Okay. Understood. So -- all right. How did the transport go from HIMA to Pennsylvania? Were there any complications that you observed or were told about?**

A. Nope. They went from PuertoRico. They refueled in Fort Lauderdale, I believe. And then they went from Fort Lauderdale to York Hospital.

**Q. Anyone else go with you other than you and Richard, obviously?**

A. Me and Richard and the medical staff.

**Q. Was there a doctor on the plane?**

A. Not a doctor but an EMT or

somebody medical professional or something.
Q. So it was you, Richard, this individual --
A. Two medical professionals and the pilot.
Q. Okay. And so you would have arrived to York Hospital February 25th, 2019; correct?
A. Correct.
Q. Was there a particular doctor at York Hospital? I'm calling it York Hospital but I don't think that's the official name.
A. It's WellSpan at York Hospital.
Q. So I just want to make sure I'm referring to the email I'm referring to. So when you arrived to York Hospital, was there a particular doctor that you communicated more with than others?
A. I would say Dr. Sterling.
Q. Dr. Sterling. And what kind of doctor is Dr. Sterling?

A. A neurologist.
**Q. Was Dr. Sterling overseeing the management of Richard's care while he was in York?**
A. He was one of their doctors. He was one of the doctors. He had a group of doctors that was overseeing his care.
**Q. Okay.**
A. While he was in the ICU.
**Q. So Richard was in the York Hospital from February 25th until April the 3rd?**
A. I think it was longer than April 3rd.
**Q. When did he get discharged from York?**
A. He was at York Hospital. Here, it's two different places. He was at York Hospital in the ICU for, I believe, it was five days. Then within York Hospital on the seventh floor I think it was, was something

called select medical services.

And so then he was transferred down to the seventh floor and was there until -- he was there until April, May -- he was there until May, at least the end of May I believe.

**Q. All right. And --**

A. He was there until the first day of and he transferred from York Hospital.

**Q. That's exactly what I want to ask you. I had a gap in my timeline. So he went from York to Magee?**

A. Correct.

**Q. And he stayed at Magee and went from Magee and transferred home?**

A. Correct.

**Q. And then that's when he received WellSpan Home Care?**

A. Correct.

**Q. From July 20, 2019 until present?**

A. Correct.

Q. Okay. And so WellSpan Home Care, are they providing any services here other than occupational, physical therapy, and speech?
A. They draw blood.
Q. Okay. Do they provide any nursing services?
A. No.
Q. Any caretaker services?
A. No.
Q. So other than drawing blood, but, otherwise, their role is to provide therapy treatment?
A. Yes.
Q. Does Richard ever do any therapy treatment at an outpatient center?
A. No.
Q. Meaning does he leave the house and go somewhere?
A. No.
Q. Has he left the house for any

**reason?**
A. Yes.
**Q. How often does he leave?**
A. We leave, I believe four times a year. We go to Dr. Good who is his ENT, ear, nose, and throat doctor. And we go to Dr. Contract, who is his physical doctor.
**Q. Okay. Dr. Contract? Spelled like it sounds?**
A. Yes.
**Q. C-O-N-T-R-A-C-T?**
A. Correct.
**Q. And Dr. Goods is G-O-O-D-S?**
A. Dr. Good.
**Q. Good. Okay. Who are the other two? You said four times a year?**
A. Twice. Well -- four times -- no, we have been -- we will be going. We go to Dr. Contract every three months for his Botox and then we go to Dr. Good every six months for an updates on his trach.

**Q. What about Dr. Lisa?**

A. Lisa, she comes to the house.

**Q. How often does Dr. Lisa come to the house?**

A. Twice a year. Last time we did go to Dr. Lisa.

**Q. When was the last time?**

A. The last time we went to see Dr. Lisa I believe was a year ago. But we did a video call because of COVID.

**Q. Okay. Any other doctors that Richard had seen within the last year?**

A. We went to -- he went to see the pulmonologist.

**Q. And what --**

A. I forget what her name is. It's an Indian name.

**Q. Did he go to the doctor?**

A. Yes, we went to the doctor.

**Q. And when was that visit?**

A. It would have been a year ago at

least. It could have been more than a year
ago.
MR. HICKEY: Can I ask that we
call for the -- is that with the wellness --
THE WITNESS: She's part --
MR. DRAHOS: They are all --
THE WITNESS: Except for the EMT.
York EMT isn't associated with WellSpan.
BY MR. DRAHOS:
**Q. Okay. EMT is the name of the**
**group that Dr. Good is part of?**
A. Correct.
**Q. So Dr. X the pulmonologist is**
**part of WellSpan?**
A. Yes.
**Q. Any other doctors that Richard**
**has seen in the last year?**
A. No.
**Q. Does he have any kind of**
**appointments?**
A. Yes, we have an appointment next

week with Dr. Contract.
Q. Has Richard been to see any psychologists, psychiatrists, or home health counselors?
A. No.
Q. Have any come to the house?
A. No.
MR. HICKEY: You mean after this incident?
MR. DRAHOS: Yes.
BY MR. DRAHOS:
Q. Okay. So other than Dr. Contract, are there any pending appointments with anyone else?
A. Not at this time, no.
Q. And the therapy you told me about, are there any other therapists who are coming here other than the four you told me about?
A. No.
Q. Okay. Has there's been any

discussions about how much longer that
therapy is going to be continuing on for?
A. No.
Q. Have you notice any improvements
that Richard has made in the last six
months?
A. Yes.
Q. Can you give them for me, which
ones you have noticed or observed?
A. That he is able to speak a lot
better.
Q. Okay.
A. And I understand.
Q. Meaning you can understand him
better?
A. I can understand -- you know, he
can speak more -- he can speak longer
sentences now or phrases then what he could
before.
Q. Okay. What about physically.
Have you noticed any improvements at all in

his range of motion or strength?
A. Very little.
Q. Can you describe for me what you've noticed?
A. That is -- his hands are coming open a little bit more. You know, nothing great, you know.
Q. The right hand, the left hand, or both.
A. Both.
Q. Any other improvements in the last six months?
A. In the last six months? He's been -- well, he has -- I don't want to say -- he's up with a great trainer now trying to step.
Q. And who is --
A. So that would be Oliver his physical therapist.
Q. Oliver is doing that. I want to ask you the same question but take it back a

little bit. Can you tell me what improvements you have noticed in him within the last year?
A. He can talk.
Q. Okay.
A. He's capable of feeding himself with a fork and spoon depending on what the substance is.
Q. How about his range of motion or strength. Any improvements within the last year?
A. Very little.
Q. Okay. So I want to --
MR. HICKEY: What was the question?
MR. DRAHOS: Range of motion or strength.
MR. HICKEY: Okay.
BY MR. DRAHOS:
Q. So I want to cover some questions with you I covered a little bit with

Richard.
What time does he typically wake up in the morning?
A. Anywhere between 8:00 and 9 o'clock.
Q. And as I understand it, his room is downstairs?
A. No. It's right here (indicating).
Q. Right there in the living room?
A. Right there.
Q. And you sleep upstairs?
A. Um-hum.
Q. Is that a yes?
A. Yes.
Q. Do you wake him every morning?
A. No.
Q. If you don't wake him, who else does, if anyone?
A. Nobody.
Q. So are there mornings where he

gets up on his own?
A. Yes.
Q. Can he sit up independently?
A. No.
Q. So he's not capable of getting up out of bed on his own?
A. No.
Q. Do you get him up every day?
A. Yes.
Q. And when you get him out of bed, do you put him in the wheelchair?
A. We first get into a shower chair, then I take him and give him a shower. Then he comes back to bed, get in bed, then I dress him and put his pants on get him out and him in the wheelchair. And then I finish dressing him.
Q. Okay. So he had mentioned to me he is learning to shave with a mechanical razor?
A. Yes.

**Q. What about brushing his teeth?**
**Has he been able to do that on his own?**
A. No.
**Q. And comb his hair?**
A. No.
**Q. What percentage of the day does**
**he spend in his chair?**
A. 100 percent. I would say 95
percent.
**Q. Okay.**
A. Depending on the day. It depends
on the day. If Oliver is here, maybe up in
a standing frame or now they are in the big
trainer which gets him up out of his chair
standing.
And then once a week or
something, I will get him up and get him in
the standing frame so he's standing for
about an hour or so. Some days he's in his
chair all the time.
**Q. Okay. And has there been any**

**discussions at all about him using a power chair?**

A. Yes.

**Q. Tell me about that.**

A. I told him -- I asked him if he wanted an electric chair and he said no.

**Q. Okay. Same answer he gave me.**

A. He said he doesn't want an electric chair because his mother had an electric chair and he thought it made her lazy.

**Q. So as it relates to his diet, does he have certain dietary restrictions?**

A. No.

**Q. So can he eat a cheeseburger if he wants one?**

A. No.

**Q. That was a random --**

A. So he would have dietary restrictions, yes. He needs something mushed.

Q. So it has to be grinded up for him?
A. If -- it doesn't -- everything doesn't have to be grinded. He could eat a pasta noodle.
Q. Okay. Could he eat, say, ice chips?
A. Yes.
Q. Could he eat a chocolate chip cookie?
A. Yes.
Q. So can you give me an example of something that he needs to be altered in order for him to eat it? I said cheeseburger --
A. Cheeseburger would probably be one. Chicken breast, any kind of meat that has the possibility of being dry.
Q. Like a steak?
A. He couldn't eat a steak.
Q. So he's physically capable of

chewing?
A. Yes, he can chew.
Q. Can he swallow solid foods?
A. No. We can swallow --
Q. Pureed --
A. Pureed or pasta, something that is soft food. But as far as taking a bite out of a cheeseburger, no.
Q. Can he swallow liquids?
A. He can swallow liquids, yes.
Q. Can he swallow pills?
A. Yes.
Q. Has he significantly gained or lost weight in the last year?
A. No.
Q. Is there a nutritionist or someone that creates his diet plans for him?
A. No.
Q. Have you noticed any changes at all in his vision?
A. He cannot see out of the part of

the left.
**Q. The left eye?**
A. The left eye I believe it is.
**Q. Is he capable of reading?**
A. No. He -- he can read. He could not sit down and read a book. If I would put a card in front of him, with the big lettering, he could read the words, but he doesn't -- he doesn't read.
**Q. So he had mentioned to me about wanting to read the Bible. Does he read the Bible?**
A. No. I read -- I read him parts of the Bible.
**Q. So other than you reading, does he do audio books?**
A. If he likes them.
**Q. Okay. So what do you mean? Like, if he likes the subject matter?**
A. If he likes the subject matter or the person. We've tried a couple he didn't

like. One we had, he likes.
Q. Does he ever complain of headaches?
A. No.
Q. Dizziness?
A. No.
Q. Can he write?
A. No.
Q. Can he dictate?
A. Yes, he could tell me what to write.
Q. Okay. So in other words, earlier I was asking you does he use his phone.
A. Correct.
Q. And you said sometimes you would use his phone to dial out, you know, someone he wants to reach or something.
Can he physically use the phone independently on his own?
A. No.
Q. Could he voice dictate a text

**message?**
A. No, because the phone wouldn't understand his voice.
**Q. Okay. So earlier when I was asking if he likes TV and he said he watches Everybody Loves Raymond on MSNBC.**
A. Yes.
**Q. Does he spend his day watching television?**
A. No.
**Q. So what percentage of his day does he spend watching television?**
A. I would say two hours in the morning and two hours in the evening.
**Q. What does he spend most of his time doing most of the day?**
A. Most of the time, he sits in the room here and listen to Christian music or he likes sitting near the door so he can see outside or sit out in the gym. Since it's been nice, we go outside and he sits

outside.

**Q. Okay. Out in the -- the pond?**

A. Yes, he sits there and there's a patio on this side, there's a patio that he sits on.

**Q. Does he get visitors?**

A. Yes.

**Q. So who are some of the people that visit and --**

A. Bonny Stanball and Carol Gance.

**Q. Who are they?**

A. They were clients. And we go to dinner with them every once in a while. He gets Josey Campezy from church stops by. Once in a while, a couple of his clients have stopped by. Not as much now as what they used to.

**Q. And how about your family. I know you had told me they were helping out quite a bit. Do they still stop by and visit?**

A. Yes. Gordy, the Spanglers, they stop by every Friday night for dinner. And then they come back, they stop by also on Sunday afternoons. My sister Sam, she comes every once in a while. She tries to get over to see them. When the -- they been down to see him a couple of times.

**Q. Okay.**

A. But the regulars Dave and Gordy.

**Q. They're the ones that are here today?**

A. Correct.

**Q. Okay.**

MR. HICKEY: Regulars are what?

MR. DRAHOS: Dana and Gordy --

THE WITNESS: The Spanglers, regulars --

MR. HICKEY: Say their names.

THE WITNESS: Dana and Gordy Spangler.

BY MR. DRAHOS:

Q. So from your observation, is he aware of the date, the time?
A. Yes.
Q. And when he's following along with these news programs, is he capable of following along with what is being reported?
A. I'm not sure.
Q. Okay. Does he do any type of crosswords or puzzles or anything?
A. No.
Q. Does he decide what meals he wants to eat?
A. Yes, he has a say in it.
Q. Okay. And does he decide what he wants to wear every day?
A. Yes. Well, black. He wants to wear black all day. Anything but black -- I mean, he just wants black.
Q. Got it. So is there anything else about the experience on the cruise ship that you think is important for me to know

when I'm evaluating this case? Perhaps I didn't ask you the right question or something on your mind that you want to share with me that you think will be worth it for me to know.

MR. HICKEY: Object to the form. Go ahead.

BY MR. DRAHOS:

Q. I do this in the deposition where I turn the floor over to you. This is the last time we're going to get a chance to talk to you before mediation, so just in case I didn't ask you a question or there's something about your experience on this ship you want to share with me, now is your chance to tell me. If I've heard it all, that's fine to.

MR. HICKEY: Object to the form. Go ahead.

THE WITNESS: All I feel is that I had depended on Royal Caribbean for their

expertise, their advice in this instance and I -- they told me that they had this under control so I believe that they did.

And it turns out that they didn't. They didn't do the right thing. If they -- if they would have done what they should have done, this could have been -- everything, all this -- you wouldn't even be here.

**Q. Okay.**

A. You know, I depended on them.

MR. DRAHOS: Thank you, Mr. Henze. I appreciate your time today. Those are all the questions that I have.

THE VIDEOGRAPHER: Mr. Hickey, any questions?

MR. HICKEY: Yes. Do you need a break?

THE WITNESS: No, I'm fine.

THE VIDEOGRAPHER: Your microphone.

MR. HICKEY: I appreciate that.
Is that good on the sound?
THE VIDEOGRAPHER: Yes.
EXAMINATION
BY MR. HICKEY:
**Q. Okay. Before you went on the cruise, you were the one, Mr. Henze, as I understand it, who chose which cruise and which cruise line; correct?**
A. As a group. When the previous cruise -- they choose -- Jimmy and everyone would choose -- we would choose what cruise we were going on next year and I would be the one to book it.
**Q. And you, before this cruise, you took this cruise with a group including the folks from Alabama?**
A. Correct.
**Q. Whose names -- I'm not trying to recall right now. And that group took cruises how many times? This was the first,**

second, third, fourth how many?
A. For them, this could have been the tenth with them. This would have been our fifth or sixth with them.
Q. Okay. Before you went on this cruise and the others, did you research the cruise?
A. Yes.
Q. And in the process of researching the cruise, one of the things -- one of the many things you looked at was the medical care that this cruise line offered to its passengers; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
BY MR. HICKEY:
Q. And some of those representations of those cruise lines about the medical care it offered to its passengers is in the -- is on the website or websites of the cruise line and its parent corporation; correct?

A. Correct.
Q. And the -- one of the representations is of this cruise line is in its safety, security, and health document, which I will mark as Plaintiffs Exhibit 1.
And I will put that in the lower right-hand corner with a circle around it. And let me hand this document to you now.
MR. DRAHOS: Can I see what it is?
MR. HICKEY: Of course.
BY MR. HICKEY:
Q. Does that appear to be one of the documents you would have reviewed before this cruise?
A. Yes.
Q. And could I see that back, please, because now this Exhibit 1 which is the safety, security, and health document on the Royal Caribbean website.
On the sixth page, it's not

numbered, but on the sixth page as you printed it out has a section on medical facilities on aboard and training staff. On Exhibit 1.
Do you see that?
(Henze Deposition Exhibit 1 marked for identification.)
(Document tendered to the Witness.)
A. Yes.
Q. And is that something you would have read before this cruise?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes.
BY MR. HICKEY:
Q. And are those representations about the medical facility and the medical staff something you would have relied on in going onboard this ship?
A. Yes.
Q. And if I can see that back. So

it says here -- there's a section here of Exhibit 1 from the Royal Caribbean website under medical facilities on board, training staff, it says, quote, every ship in the ACL fleet has a dedicated medical facility staffed with contract doctors and nurses. Ship board medical facilities are available to both guests and crew in the event medical treatment becomes necessary while they were on board, end quote.

My question to you is: When you read that, did that sound like a good thing and give you assurance that if any medical problem arose, you or Richard were going to get medical care --

MR. DRAHOS: Object to form.

BY MR. HICKEY:

Q. -- on board the ship?

MR. DRAHOS: Sorry.

THE WITNESS: Yes.

BY MR. HICKEY:

Q. It goes on to talk about the hours of the medical facility. It says, but medical -- quote, medical professionals are available 24 hours a day for acute guest or crew medical needs that may arise. These are procedures, there are procedures for emergency communications and deployment of the medical teams anywhere on the ship where services are needed, end quote.

Did you review that as well?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HICKEY:

Q. It also says in this Exhibit 1 on the next page, page 7 as it's printed out on the top. I'm going to quote this. Quote, our ship's medical facilities and operations are subject to guidelines from national and international agencies and organizations. The principle guidelines is applicable to our ship's medical facilities are those

established by the American College of Emergency Physicians. In parenthesis, A-C-E-P, end parenthesis, comma, cruise ship and medical -- medicine section, period. Our ship's medical facilities are built, stocked, and equipped and staffed to meet or exceed ACEP's guidelines, end quote.

Did you read that also before you got on board the ship?

MR. DRAHOS: Object to the form.

THE WITNESS: I did. And because of what they stated, I figured we would be in good hands if anything were to ever happen.

BY MR. HICKEY:

Q. Did any ship onboard doctor or nurse at any time when you were on this cruise ship, I believe the Harmony of the Seas in February of 2019, say anything or do anything -- say anything that made you believe that these reputation by the cruise

lines were not true?
A. No.
Q. It also says on page -- on Exhibit 1 at the top of the seventh page as it's printed out -- the pages are not numbered -- quote, each ship is staffed by one to three medical doctors and two to five nurses generally depending on the size of the ship and the number of guests and crew. Our CL follows strict requirements regarding the credentials of the medical staff in our facilities, end quote.
And did you also read that before you got on the ship?
A. Yes.
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. Now when you read that, does that give you the impression that it's the cruise line that regulates their credentials of both the doctors and the nurses on the

cruise ship?
MR. DRAHOS: Object to form.
THE WITNESS: Yes.
BY MR. HICKEY:
Q. And regardless of whether the doctors and nurses are employees or independent contractors, the cruise line regulates and enforces rules on their credential; correct?
A. Yes.
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. And the credentials for American College of Emergency Physicians, ACEP, we know from this statement of the cruise line in Exhibit 1 the credentials apply not only to the staff, that is the doctors and the nurses, but also to the facility itself; right?
MR. HICKEY: Object.
BY MR. HICKEY:

Q. And you went to the infirmary on the ship; correct?
A. Yes.
Q. And you went there with -- or Richard went there and I believe you went there on February 18, 2019; correct?
A. Yes.
Q. And you went there, and over a multi-hour period on the day you got off the ship, that is February 21, 2019; correct?
A. Correct.
Q. And when I say, there, I mean the ship's infirmary; right?
A. Yes.
Q. And you saw that there were doctors and there were nurses there?
A. Yes.
Q. And -- okay. Okay. And the -- so that's Exhibit 1. Excuse me.
Did you -- when reviewing online materials of this cruise line, did you also

see that they had frequently asked questions FAQs?
A. Yes.
Q. Let me mark -- let me show you what I'll mark as Exhibit 2 and I will hand it to Mr. Drahos before so he can read it. I'm sure he's read it many, many times before, these frequently asked questions.
I think this Exhibit 2 from the Royal Caribbean website is one, two, three, four pages. I've stapled them together. I've stapled the four pages together. That is my stapling and I'm handing you now what I've marked as Exhibit 2. It's a printout of the FAQs. I hope they all go together from the website.
But does that appear to be pages of the Royal Caribbean?
(Henze Deposition Exhibit 2 was marked for identification.)
(Document tendered to the

Witness.)
A. Yes.
Q. And does -- okay. And does that appear, that exhibit that I have just handed you, to be something you would have read before this cruise?
A. Yes.
Q. And it says there one of the -- two of the FAQs on one of the last pages talks about medical facilities and medical personnel; correct?
A. Correct.
Q. And are those the kinds of things you would have read before this cruise?
A. Yes.
Q. Did you rely on those things, those representations shown in Exhibit 2 representations made by Royal Caribbean Cruise Line, did you rely on them when you were of the judgment on February 21, 2019 that you should, in fact, rely on the

expertise and the actions and the representations of the ship board medical personnel?

A. Yes.

Q. And there on Exhibit 2, the cruise line says -- and if I could see that back -- there on Exhibit 2 which are the FAQs, some of the FAQs of the cruise line says -- one question that they pose on their website, quote, what happens if I get on board the Royal Caribbean cruise ship.

The answer they give on the Royal Caribbean website says, quote, should you get sick on board, you will need to go to the medical facilities. The doctor will diagnose the illness and advise accordingly.

Do you feel like the doctors on board on February 21, 2019 diagnosed and advised you?

A. No, I do not.

Q. And Richard?

A. No.
Q. Referring back to the same document, Exhibit 2, the Royal Caribbean FAQ about, among others things, medical care, Royal Caribbean asks the question that they put out to the public in order to sell tickets on their cruise ships, in order to assure the public, quote, what licensed medical staff slash doctor and services are available on board the Royal Caribbean cruise ship. Question.
The answer provided by Royal Caribbean is, we have a minimum of one fully licensed doctor and a minimum of two licensed nurses onboard every ship. Every Royal Caribbean ship offers limited professional medical services through licensed, paren, international and domestic, end paren, physicians and nurses, end quote.
Is that the kind of assurance that you saw before got on this ship?

MR. DRAHOS: Object to form.
THE WITNESS: Yes.
BY MR. HICKEY:
**Q. Now --**
A. From reading that stuff, I felt confident that if anything happened, the right steps would have been taken.
**Q. Did -- okay. Let's move now to February 18, 2019. You are in the cabin asleep and you hear a bang, Richard fell down; right?**
A. Um-hum.
**Q. Yes?**
A. Yes.
**Q. You have to verbalize things. You can't say uh-huh. That was only the second time in about five hours, so you are doing really good.**
**So we know that Richard came into the room; correct?**
A. Correct.

Q. And we know for a fact that the lights were not on; correct?
A. Correct.
Q. We know for a fact that Richard fell; correct?
A. Correct.
Q. All right. And we know for a fact that Richard fell back and hit the back of his hid; right?
A. Right, yes.
Q. And we know that because there's a gash in the back of his head which was bleeding; right?
A. Yes.
Q. And we know that because Richard told you at that time or did he, that he fell and hit the back of his head?
A. No, he didn't tell me at that time. I found him.
Q. You found him.
A. On the floor.

**Q. Okay.**
A. I saw the back of his head was bleeding.
**Q. Okay. Was he incapable of telling you that at that time?**
A. I don't think at that time he was aware he was bleeding.
**Q. Was he incapable of talking?**
A. No.
**Q. Did he talk to you?**
A. Yes, but I think the shock of what had happened and then me rushing to --
**Q. Okay.**
A. -- get a towel --
**Q. Okay.**
A. -- to put pressure on his head --
**Q. Okay.**
A. It just all went fast.
**Q. Okay. Then Richard went to sleep and you went to sleep?**
A. I wouldn't say I went to sleep.

Q. Then you and Richard -- you went back to bed and Richard went to bed?

A. Yes.

Q. And sometime in the morning, you took Richard down to the ship's infirmary, the same morning February 18, 2019?

A. Yes.

Q. And it was about something around 11, 11:24 a.m.? Sometime around 11:00 a.m. both of you got to the infirmary?

A. Yes.

Q. And they put in the record, and Mr. Drahos showed you -- I think it is an exhibit. We'll sort that out, the medical records from the first visit. And that says that Richard fell and hit the occiput.

Do you remember that? Did you see that?

A. No, I didn't see that.

MR. DRAHOS: Object to the form.

BY MR. HICKEY:

Q. Well, I don't know if they are an exhibit. The medical records on board. But -- maybe not.
So let me mark the Royal Caribbean records from the first visit of February 18th, 2019 is Exhibit 3. And it says, guest stated he fell and hit his head.
Is that what you or Richard told the infirmary at that time?
(Henze Deposition Exhibit 3 was marked for identification.)
(Document tendered to the Witness.)
A. Yes.
Q. Who told the infirmary person at that time? You or Richard?
A. I believe both. I'm not sure.
Q. Okay. And you told -- and this was Beth Rivera? Is that correct? That's the nurse?
MR. DRAHOS: Object to the form.

BY MR. HICKEY:
Q. Or do you recall?
A. I don't recall her name.
Q. The nurse that you and Richard saw on February 18, the nurse that you saw, you and Richard saw on February 18, in the records of Royal Caribbean identify her as Beth Rivera.
Did you know that was her name?
A. No.
Q. Okay. That same woman is identified in the record several days later of February 21, 2019. Did you recall that it was the same nurse who saw Richard on February 18, same Royal Caribbean nurse that saw Richard on February 18th, 2019 as who saw Richard on February 21, 2019?
A. No.
Q. You did not recall that?
A. No.
Q. In any event, I'm telling you the

records do show that Beth Rivera was involved in Richard's care both times.

Let me ask you this: When you and Richard went down to see the medical personnel on February 18, was it just the nurse you saw or someone else?

A. The nurse and the doctor.

Q. But only one nurse; correct?

A. Yes.

Q. And did that nurse understand at that time that you were the significant other, in fact, the husband of Richard Burgess?

MR. DRAHOS: Object to the form.

THE WITNESS: I believe she did.

BY MR. HICKEY:

Q. Did you tell her? I'm sure she was wondering who is this guy?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sure I told her. She would have known that we were

together.

BY MR. HICKEY:

Q. Okay. So on February 18, 2019 when you and Richard went down about 11:00 a.m. to the infirmary on the ship, to the Royal Caribbean infirmary at about 11:00 a.m., you were there -- were you -- when you were talking -- when you and Richard are talking to the nurse and talking to the doctor? You were present?

A. Yes.

Q. And you and Richard told the nurse and the doctor that Richard fell; correct?

A. Correct.

Q. That Richard hit the back of his head?

A. Correct.

Q. How tall was Richard at that time?

MR. DRAHOS: Object to the form.

THE WITNESS: How tall? About 5'8.

BY MR. HICKEY:

Q. About 5'8. And when you saw the doctor and nurse on February 18, 2019, you told the doctor and nurse that Richard fell from a standing position. He walked in and fell; correct?

A. Correct.

Q. And you heard Richard tell the medical personnel that when that -- in that first visit?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HICKEY:

Q. So 5'8, so Richard would have fallen back and if he hit the floor, that's -- he fell from a standing position to -- his head is at the top of his body fell all the way over 5 feet to the floor; correct?

MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
BY MR. HICKEY:
Q. And the floor that he fell on, was that hard tile that is shown in the photograph that Mr. Drahos marked as an exhibit; correct?
A. Correct.
Q. And did you tell that to the ship's personnel?
A. Yes.
Q. And I'm handing you now Exhibit F as in Frank. And let's hold that up. Can you hold that up for the ladies and gentlemen of the jury? That's Exhibit F as in Frank. And that shows the inside of the cabin; correct?
A. Correct.
Q. Point out the tile floor, please. Do a circle around it. There you go.
MR. HICKEY: Can the camera see

that, Bill?
BY MR. HICKEY:
Q. You have to move it over. We want the camera to see it.
So that's ceramic tile?
MR. DRAHOS: Object to the form.
THE WITNESS: Ceramic or marble.
BY MR. HICKEY:
Q. Okay. Hard as rock?
A. Yes.
Q. Okay. And let me see that Exhibit F as in Frank. So this, by the way, this is talking about the room itself. Mr. Drahos asked you several questions about how did this happen.
Inside the cabin, looking at Exhibit F, the photographer would be standing more or less in the doorway of the cabin looking in; correct?
MR. DRAHOS: Form.
THE WITNESS: No. When taking

that picture, no. He would have been standing if -- he would have been -- there -- this bar leads over to here and then there's a row of closets along -- he would have been standing along the wall.

BY MR. HICKEY:

**Q. Okay. The photographer?**

A. The door would have been here. The door would have been here (indicating).

**Q. Okay. So that -- okay. So --**

A. So there's more tile over here.

**Q. Okay. So looking at Exhibit I, you are saying there's more tile to the right-hand side of that photo?**

A. Correct.

**Q. And there's more tile to the left as well?**

A. Yes.

**Q. Okay. Fine. Thank you. Let me show you what I will mark as Exhibit 4 to the deposition, which is from the website of**

Royal Caribbean of -- it's the Harmony of the Seas grand suite details, which shows a bird's-eye view of this kind of suite on the ship.

I'm going to hand that first to Mr. Drahos. He's seen that many times on the website. I'm handing you now Exhibit 4 diagram from the Royal Caribbean website.

Does that look like a diagram of the suite where you all stayed?

(Henze Deposition Exhibit 4 was marked for identification.)

(Document tendered to the Witness.)

A. Yes, it does.

Q. And can you turn that around? Can you -- the -- can I see that, please. But what we have here is -- what he have here is -- I'm not going to get close to you because of COVID, but can you hold that up and point to -- the doorway is right --

A. Correct.

MR. HICKEY: And, Bill, can the folks on the jury see that?

THE WITNESS: Yes.

BY MR. HICKEY:

Q. So on the -- to verbalize this, on Exhibit 4 on the left-hand, bottom left-hand plane or side, we see above your finger now the front doorway. And then as you walk in, there's the tile floor; correct?

A. Correct.

Q. And then there's this table that jumps out into the -- the area where the tile floor is; correct?

A. Correct.

Q. And that table, there's no light on that table, are there that are illuminated all the time?

A. No.

Q. So if you walk in in the dark,

the way this is arranged, you can bump into the table and fall back and hit your head on the floor, can't you?
MR. DRAHOS: Object to form.
BY MR. HICKEY:
Q. And is that one possible scenario, possibly, that happened here with Richard Burgess when he walked in that night February 18th, 2019?
A. Yes.
Q. And how -- was this the first night you had been in the cabin --
A. Yes.
Q. -- or second --
A. It was the very first night.
Q. Okay.
A. The bathroom door that -- you come in this door but the bathroom door can swing back this way --
Q. So the bathroom door swings -- opens out into the tiled area?

A. Yes.

Q. Okay. So here -- you need to hold that up for the folks in the jury. So what you're saying is this table on Exhibit 4, which is the diagram of this suite from the Royal Caribbean site, this table jumps out into the time area.

That's the No. 1 obstacle; right?

MR. DRAHOS: Object to the form.

BY MR. HICKEY:

Q. Right?

A. Yes.

Q. And the No. 2 obstacle was the doorway comes out into this space; correct?

A. Yes.

Q. Thank you. Now when you went going forward again to the infirmary visit on the ship, on the Harmony of the Sea ship on February 18, did the doctor, the Royal Caribbean doctor or the Royal Caribbean nurse tell you or tell Richard that Richard

had a concussion?
A. No.
Q. Did the doctor or the nurse on the ship tell you or tell Richard the signs and symptoms of concussion to look out for?
A. No.
Q. Did the doctor or the nurse on the ship on that first visit after the fall in the cabin tell you or Richard, hey, don't take Richard for a massage on the ship because that can cause people to have what's called a vertebral artery dissection where the artery is basically broken.
Did they tell you that?
A. No.
Q. Did the doctors or nurses on the ship tell you or tell Richard, which you were with him the whole time in that visit, tell you or tell Richard not to do any particular activity when you're on the ship or off the ship at any time after that?

A. No.
Q. Did the doctor and nurse that you saw along with Richard on February 18th, 2019 tell you to come back to the infirmary either on a regular basis or on in irregular basis?
A. No.
Q. Did the doctor or nurse that you saw on February 18, 2019 on board the Harmony of the Seas ever call you or call Richard that you know of to check up on Richard at any time after that visit?
A. They didn't call me. And not that I'm aware of with Richard.
Q. And if they called Richard, you probably would have known about it?
A. Yes.
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. And did the doctor or the nurse on board the Harmony of the Seas after that

February 18, 2019 visit ever come to your cabin and ask about Richard?
A. No.
Q. Did they give you a sheet as to what to do or what to look for after you have had a head injury?
A. No.
Q. Did the doctor or nurse on board the Royal Caribbean ship on that February 18, 2019 visit give to Richard any sheet or aftercare, what are called in hospitals as after-care instructions when somebody hits their head?
A. No.
Q. Do you have any medical training?
A. No.
Q. Does Richard have any medical training?
A. No.
Q. And by the way, do you have any legal training?

A. No.
Q. Does Richard have any legal training?
A. No.
Q. And Mr. Drahos' marked as an Exhibit the -- and I think it's his Exhibit 1, the cruise passenger ticket and various documents from the website of Royal Caribbean.
And did you -- do you remember reading those before acknowledging them before bought the ticket?
A. No.
Q. And by the way, did -- and that was Exhibit B as in boy. You testified that you would have acknowledged that, I guess, in order to buy a ticket?
A. I did acknowledge it.
Q. Well, I haven't asked you a question. You have to wait for the question.

A. Oh.
Q. Yeah. You have to wait for me to finish because, otherwise, I might ask you what your favorite color is you gave the wrong answer.
Let me start over on that. Mr. Drahos asked you questions about this Exhibit B, the guest ticket booklet. I think it's -- Bates No. 005 to 23. So that means it's 18 pages. You didn't read 18 pages before you bought the ticket, did you?
A. No. But I will say I didn't read it.
Q. Did you understand any of the legalese that -- strike that.
A. No.
Q. Okay. Did you understand any of the legalese under the cruise tour ticket contract?
A. No.
Q. So Mr. Drahos asked you about

whether you saw any signs or symptoms, any problems with Richard after the fall in the cabin on, you know, the middle of the night on February 18th, 2019. He asked you whether you had seen any problems with Richard over the next several days.

Do you remember those questions?

A. Yes.

Q. My question to you is, and maybe I will ask it this way. My question to you is: Did any personnel on the Royal Caribbean ship tell you either verbally or in writing what to look for in Richard over the next several days?

A. No.

Q. If Richard -- well, strike that.

I know what I wanted to ask you. We know that Richard fell from a standing position, 5'8 man?

A. Um-hum.

Q. Correct?

A. Yes.
Q. We know that he fell and hit the back of his head; correct?
A. Correct.
Q. We know that he hit the back of his head on the ceramic or tile stone floor; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
BY MR. HICKEY:
Q. And we know that that floor, whatever it's made out from, you can testify it's hard as rock; right?
A. Yes.
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. And you saw it. You saw that floor in that cabin with the tile and you felt it; right?
A. Yes.
Q. So you know it's hard as rock;

right?
A. Yes.
Q. And did any doctor or nurse when you or Richard -- you and Richard went to the infirmary on February 18th, 2019 tell you that the most vulnerable place for someone to hit their -- for someone to hit their head is the back of the head, the occiput is the most vulnerable place to hit your head and the most likely to give you a traumatic brain injury.
Did anyone tell you that?
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. Did anyone tell you how vulnerable the back of your neck and your brain stem is when you hit the back of your -- and all of the structures around your neck and up into your skull when someone hits the back of their head?
Did anyone ever tell you that?

MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MR. HICKEY:
**Q. What was the weight of Richard at that time that is -- at the time of this cruise?**
A. Approximately 175 or 180 pounds.
**Q. 5'8 and 175 or 180 pounds was Richard Burgess at the time of his cruise; correct?**
A. Correct.
**Q. Okay. Now, fast forward to February 21, 2019. Your -- you wake up to that morning to a phone call, was it?**
A. No. I woke up to Susey.
**Q. Susey knocking on the door?**
A. She was in my room because obviously when Richard left --
**Q. He didn't lock the door?**
A. The door didn't latch.
**Q. The door didn't latch. Okay. So**

anyway. Susey is in your room and she says, hey, wake up.

A. Yes.

Q. And so she was the one who told you because your phone was on vibrate or what was it?

A. Yes.

Q. And so is mine. And so we know from the medical record from that day which we will mark as Exhibit 5 that the Royal Caribbean generated medical records from the harmony of the Seas that according to Royal Caribbean, you or Richard presented at the ship's infirmary at 9:25 that day.

Does that sound about right?

(Henze Deposition Exhibit 5 was marked for identification.)

(Document tendered to the Witness.)

A. Yes.

Q. Were you with Richard at that

time?
A. Yes.
Q. So you were with Richard at the time Richard first got there on that morning when the ship was in PuertoRico; right?
A. Yes.
Q. By the way, the ship on February 21, 2019 was in port in San Juan, PuertoRico; right?
A. Yes.
Q. In the cruise port in San Juan, Puerto Rico?
A. Yes.
Q. And it came into port probably, what, two or three hours before 9:25 a.m.; correct?
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. That's when the ships come in. Early in the morning around 7:30.
MR. DRAHOS: Object to the form.

BY MR. HICKEY:
Q. So by 9:25 a.m., the ship had been in the cruise part of San Juan, PuertoRico almost two and a half hours?
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. So -- and that's by -- we are going by Royal Caribbean's own documents; right?
A. Yes.
Q. All right. And also your knowledge of these cruises when they generally pull into port early in the morning?
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. And there's nothing -- this 9:25 a.m. at the infirmary seems to be correct according to your recollection; right?
A. Yes.
Q. And so it says here in the Royal

Caribbean medical record from February 21, 2019, Exhibit 5, it says here, patient attends planning for 911 call to suite lounge Deck 17. First of all -- okay.

First of all, someone made a 911 call; right?

A. Yes.

Q. Who was that?

A. I believe that was Joey.

Q. Joey. And that was a gentleman in your --

A. Joey Hiatt.

Q. Joey Hiatt and he's from Alabama?

A. Yes.

Q. And 911 means an emergency; right?

A. Yes.

Q. It says Deck 17. And that's the lounge on Deck 17?

A. Yes.

Q. And then it says, question mark

CVA. Do you know what that means in medical language?
A. No.
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. They are questioning or considering whether it's a cardio vascular event. You know, a stroke is a cardiovascular event.
Did you know that?
A. No, I did not know that.
Q. And it says, quote, inability to move fingers of right hand, unstable gate, end quote.
Do you know what that is?
A. Able to stand.
Q. How you walk. So you're not stable while you walk. And, in fact, when you brought Richard to the infirmary at 9:25 a.m., he was brought in on a wheelchair?
A. Yes.

Q. And who -- were pushing the wheelchair or --

A. Someone else. Someone from the medical or from the Royal Caribbean staff was pushing the wheelchair.

Q. So they saw, they being the Royal Caribbean personnel saw Richard Burgess on that day when he comes in in a wheelchair; correct?

A. Correct.

Q. And then it says under the note, questions getting back to this Exhibit 5, the Royal Caribbean notes, question CBA. Inability to move right fingers on hand. Unstable gate. To be seen by doctors in ICU. I wonder what ICU means.

MR. DRAHOS: Object to the form.

BY MR. HICKEY:

Q. So that's 9:25. And Mr. Drahos was very careful to try to pin you down as far as 15 minutes here and 15 minutes there.

Do you remember those questions?
A. Yes.
Q. Are you here and are you telling the folks on the jury that you know for certain how many minutes it took to go up to your room and get the passport and go down?
A. No.
Q. Are you here telling anybody that folks on the jury or the judge in this case that you know how long it took you exactly to go up and go to the front desk and pay your bill that they wanted you to pay?
A. No.
Q. All you know is that between 9:25 a.m. and the time you finally got off the ship because they -- Royal Caribbean arranged it that you got off the ship, you were either in the infirmary or you were doing something that the nurse or others personnel told you to do?
A. That's correct.

Q. And one of those personnel was the nurse who gave you instructions and you went over that?
A. Yes.
Q. And the other person told you what to do was the safety officer who investigates claims and accidents onboard or incidents onboard; right?
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. And he was the same officer who investigated the fall in the cabin several days before; correct?
A. Correct.
Q. And he took photos of the cabin several days before, didn't he?
A. Yes.
Q. And he generated -- do you know if he wrote down notes or if he generated a report?
A. I believe he did.

**Q. Okay. Why do you believe he did?**
A. Since he came -- because he was coming up taking pictures, and everything else, and he -- I believe he stated he had to go investigate. So I figured any investigating anything would then make a report of what had happened or occurred.
**Q. Okay. And did you see this safety officer, by the way, take photos in your cabin?**
A. Yes, I did.
**Q. Okay. So we know he took photos in your cabin. Okay.**
**And did he ever give you copies of the photos?**
A. No.
**Q. Okay. When I say did he, I mean the safety officer who investigated the fall in the cabin.**
MR. DRAHOS: Object to the form.
BY MR. HICKEY:

Q. So what time was it that the ambulance finally came and -- let me go back. Let me establish something right here and now.

You and Richard relied on Royal Caribbean to tell you what to do in this medical situation, I will call it. It was a medical emergency, but I will call it a medical situation.

A. Yes, I relied on their staff's expertise and their actions and, you know, their opinion on how to get this done.

Q. Did anybody ever -- did any doctor or nurse or even that safety officer that keeps popping up in the infirmary and your cabin, did any one of them ever tell you this is a medical emergency, you need to get Richard Burgess off this ship right now and hail a cab or a car or an ambulance and get him to a medical center?

MR. DRAHOS: Object to the form.

THE WITNESS: Nobody ever said anything like that.

BY MR. HICKEY:

Q. And if somebody had told you that one minute after you showed up in the infirmary get off the ship right now. San Juan, PuertoRico, take him to a medical center in San Juan, one of the many, many medical centers in San Juan capable of treating him at that point in time, time is of the essence.

If somebody had said that to you, you would have gotten off the ship right then and there and gotten him somehow to a medical center; correct?

MR. DRAHOS: Objection to the form. Move to strike.

THE WITNESS: Yes. Yes.

BY MR. HICKEY:

Q. But he, Richard Burgess, on that morning February 21, 2019, he was in the

infirmary the whole time that you were running back and forth at the request of the Royal Caribbean personnel; right?

MR. DRAHOS: Object to the norm.

THE WITNESS: Correct.

BY MR. HICKEY:

Q. He didn't leave the infirmary, did he --

A. No.

Q. -- at any time, did Richard Burgess leave the infirmary at any time?

MR. DRAHOS: Object.

THE WITNESS: No, Richard never left.

BY MR. HICKEY:

Q. So as far as you know -- strike that.

So Richard Burgess from 9:25 a.m. on February 21, 2019 through noon or 1:00 p.m. when they finally got him into an ambulance was always under the medical care

of Royal Caribbean Cruise Line; correct?
A. Yes.
Q. Is there one minute of that period of time whenever it is, whether we accept this phony baloney statements -- strike that.
MR. DRAHOS: Thank you.
BY MR. HICKEY:
Q. For every minute between 9:25 a.m. February 21, 2019, and whenever Royal Caribbean got Richard Burgess off that ship and onto an ambulance, every minute during that period of time whatever it was, Royal Caribbean cruise line was tending to the medical care of Richard Burgess; correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
BY MR. HICKEY:
Q. And every minute of that time that Royal Caribbean is tending to the medical care of Richard Burgess, that ship

was in the port, the cruise port of San Juan, PuertoRico; correct?

A. That's correct.

Q. And did any medical personnel of Royal Caribbean or their safety officer ever say to you, to any member of your group, or to Richard that you know of that you should do something other than allow Royal Caribbean to have control of the medical care of Richard Burgess in that period of time?

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MR. HICKEY:

Q. Did anybody from Royal Caribbean, either the doctor, the nurse, the safety officer, the captain of the ship, the staff captain of the ship, first officer, second officer, third officer ever say to you or to Richard or to anyone in your party that you should not rely on Royal Caribbean cruise

line for the medical care of Richard Burgess at that time?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MR. HICKEY:
Q. They told Jimmy in your party that they, Royal Caribbean, had this taken care of, this being the medical care.
A. Yes.
Q. So they -- who was it that -- who was it that sent you to go pay the bill?
A. The security officer who sent me to pack my bags.
Q. So the first chore that you were sent to do, you were sent to do, like, chores; right? One is pack the bags, two is get the passports, and three is pay the bills; is that right?
MR. DRAHOS: Object to form.
THE WITNESS: I had to get my insurance card.

BY MR. HICKEY:
Q. So that is four different trips they sent you on?
A. Um-hum.
Q. Yes?
A. Yes.
Q. Okay. And was pack your bags the first one?
A. No. Go to get my insurance card was the first one.
Q. So I want to write this down. So it was insurance card.
What was the next one?
A. Passport.
Q. Passport is the next one.
A. Pack your bags --
Q. Hold on. Just a minute. I'm writing it down. Okay. Pack the bags.
And what's the fourth one?
A. Pay your bill.
Q. Pay your bill. You've got to pay

the bill. Can't take care of medical care before paying that bill.

MR. DRAHOS: Move to strike.

BY MR. HICKEY:

Q. So there are four -- on February 21, 2019, there -- you are -- at the time that Royal Caribbean had control of the medical care or Richard Burgess between 9:25 a.m. and whenever it was that they got Richard Burgess off that ship, sometime midday, some Royal Caribbean personnel had sent you on these four errands; is that correct?

A. That is incorrect.

MR. DRAHOS: Object.

BY MR. HICKEY:

Q. Who sent you to go get the insurance card?

A. The person in the front desk at the infirmary.

Q. And the person at the front

desk --
A. Same person.
Q. Okay. Hold on. Now when you say the infirmary, you mean the ship's infirmary?
A. Yes.
Q. And the person at the front desk, was that a man or a woman?
A. I believe it was a gentleman.
Q. Was he in dress whites?
A. He was in -- he was in scrubs.
Q. In scrubs?
A. Yes.
Q. So he appeared to be medical personnel?
A. Yes.
Q. Did you get a name?
A. No, I did not.
Q. But he had a Royal Caribbean name tag on?
A. I'm sure, yes.

**Q. And so he said go and get your insurance card. And so you had to run back to the cabin and do that?**
THE VIDEOGRAPHER: Off the video record at 6:09 p.m.
(Recess 6:09 p.m. to 6:12 p.m.)
THE VIDEOGRAPHER: We are back on video record. The time is 6:12 p.m.
BY MR. HICKEY:
**Q. The next chore that you were sent to do was the passport, to get the passport.**
**Who asked you to get the passport?**
A. The nursing staff I believe it was.
**Q. The nursing staff in the Royal Caribbean --**
A. Yes.
**Q. -- on the ship?**
A. Yes.
**Q. And was it -- was it a nurse that**

asked you to do it?
A. It was a nurse, yes.
Q. Was it the same nurse that treated and saw Richard several days before?
A. No, I don't know.
Q. Okay. Was it -- do you remember what the nurse was wearing? If you don't, that's fine.
A. No.
Q. Was whomever asked you to get the passport, were they wearing the Royal Caribbean name tag?
A. Yes.
Q. And then you got the passport and you came back. Passports, yours and Richard's, and you came back to the infirmary; correct?
A. Yes.
Q. Okay. And you the next chore you were sent was to pack the bags?
A. Yes.

Q. And I think you said there was a safety officer who asked you to do that?
A. Yes.
Q. And where was the safety officer, the Royal Caribbean safety officer? Where was he? Was he in the infirmary area?
A. He was in the infirmary area.
Q. He had gone back with the doctors and nurses?
A. Yes.
Q. What -- were you back with the doctors --
A. No.
Q. -- and nurses? Why not?
A. We were -- we were because at that time, we were with Richard and say -- like the -- the room he was in.
Q. I see. But the safety officer apparently spoke to the doctors and nurses?
A. Yes. Obviously he was speaking to the doctors and nurses.

**Q. Did he come into the room where you and Richard were in the infirmary to tell you to go pack your bags?**

A. No. At that point, he came in there and said he would be getting off the ship.

**Q. Okay. He, being the safety officer --**

A. Him being the safety gentleman. Then he left Richard's room and went back to where the doctors were.

**Q. Right.**

A. And then at that time -- okay.

**Q. But I wanted to establish something. So the safety officer came into the room in the infirmary where you and Richard were?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HICKEY:

**Q. And the safety officer, he also**

was wearing a Royal Caribbean name tag?
A. Yes.
Q. And wearing a uniform?
A. Yes.
Q. And was he in dress whites?
A. Yes.
Q. Do you know what that is, dress whites, where they have got on the white shirt and white pants?
A. I figured they were an officer.
Q. Okay. I didn't ask anything about whether he was officer. I just asked about his white shirt and white pants, and if you can remember.
A. Yes.
Q. So he asked you to go pack your bags. He, the safety officer. And did you do that?
A. Yes.
Q. And did you then come back down to the infirmary after that?

A. Yes.
**Q. And when you were packing your bags in the cabin, did anybody call up there and say where are you? You need to come back down?**
A. Not come back down, but I did get a call while I was in the room and that was from Jimmy asking where our passports were.
**Q. Okay.**
A. What I had done with the passports.
**Q. When you were in the cabin packing your bags, did anyone from Royal Caribbean call you and say you need to come back down right now. It's a medical emergency?**
A. No.
**Q. But you packed your bags and you went back down to the infirmary; is that right?**
A. Yes.

Q. And the fourth chore someone sent you on was to pay your bill?

MR. DRAHOS: Object.

BY MR. HICKEY:

Q. And when I say your bill, that includes you and Richard; right?

A. Yes.

Q. Who was it that asked you to pay the bill?

A. The security guy.

Q. The security guy --

A. The gentleman that sent me to pack.

Q. The safety officer, security officer who investigated the accident where Richard fell and hit his head on that floor?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HICKEY:

Q. And where was this safety officer, security officer when he asked you

**to go and pay the bill? Where was he? Was he in the infirmary?**

A. Yes. He walked down -- he told me I needed to pay my bill on the way down the elevator with my luggage, taking it down to the infirmary. And then he came into -- he brought the luggage into the infirmary.

And since he told me while we were coming down the elevator that my bill needed to be settled for that, that he brought the luggage in the infirmary with me, then he disappeared. And then I went up on my own to -- pay the bill. Pay the bill.

**Q. That's what he told you to do?**

A. Yes.

**Q. He met you at the elevator on the way down?**

A. He met me at my cabin door.

**Q. Okay.**

A. As I was trying to get the luggage out of the cabin.

Q. Okay. Did he help you with the luggage?
A. He helped me.
Q. And right away he told you you need to pay the bill after you took the luggage down?
A. Not until we got into the elevator.
Q. Okay. In any event, on the way down before you got to the infirmary, he said you need to pay the bill?
A. Yes.
Q. Did someone from the cruise line walk with you to the front desk to pay the bill?
A. No.
Q. Okay. But you did what you were told to do which was pay the bill?
A. Yes.
Q. So you went to the front desk, guest services they call it now, and you

stood in line and you paid the bill?
A. Yes.
Q. And then you went back to the infirmary again?
A. That is correct.
Q. Okay. And approximately what time of day was it that the ambulance that Royal Caribbean got for Richard, what time did that ambulance get to the ship, if you know?
A. I believe it got to the ship about 12:30.
Q. 12:30 p.m.?
A. 12:30 p.m.
Q. Okay. Now, Mr. Drahos asked you about this document, his Harmony of the Seas document that's supposed to be generated by a Dr. Pereira. Do you know that Dr. Pereria was the doctor who was supposed to be responsible for your -- for the medical care of Richard Burgess on the ship?

MR. DRAHOS: Object to the form.
THE WITNESS: I do now, yes.
BY MR. HICKEY:
**Q. And that was Exhibit I. You didn't -- you didn't generate this document, did you?**
A. No.
**Q. And you have no idea when Dr. Pereira called the ambulance; right?**
A. I do not.
**Q. So Mr. Drahos asked you whether you had anything to dispute in this document. You have nothing -- you know nothing about when Pereira called for the ambulance?**
MR. DRAHOS: Object to the form.
THE WITNESS: No, I do not.
BY MR. HICKEY:
**Q. All you know is the ambulance didn't come until 12:30 or so; right?**
A. That is correct.

Q. And did Dr. Pereira ever come out and tell you at any time in those hours between 9:25 and 12:30, did Dr. Pereira ever tell you in those three hours, over three hours that he had called an ambulance?

A. No.

Q. Did Dr. Pereira ever tell you or anyone else in your party that you know of that an ambulance was necessary?

MR. DRAHOS: Object to the form.

THE WITNESS: Necessary?

BY MR. HICKEY:

Q. Yes.

A. Not that I'm aware of.

Q. Did Dr. Pereira ever tell you or anyone in your party that he had called an ambulance and there's some sort of delay?

A. No. Not that I'm aware of. He didn't tell me.

Q. Mr. Drahos marked as Exhibit H, the witness to injury statement, which has

your name on it. And it says that at the top of the second page, Richard lost his balance and fell on the floor striking his head.
Did anybody ask you why or how he lost his balance?
A. No.
Q. You were here when parts of the deposition of Richard, and Richard said that the other day, we watched a movie. We watched the Wizard of Oz.
Did he watch the Wizard of Oz the other day?
A. No, he did not.
Q. Richard testified about the number of sisters, I believe, that you have; correct?
A. Correct.
Q. He testified incorrectly about that, didn't he?
MR. DRAHOS: Object to the form.

THE WITNESS: I believe so.
BY MR. HICKEY:
**Q. And Richard has known you for how many years?**
A. Thirty years.
**Q. And for 30 years, at least before this incident on the cruise ship, he knew how many sisters you had; correct?**
A. Yes.
**Q. I know what I want to ask you. It was Royal Caribbean who arranged for which hospital for you and Richard to go to in San Juan, PuertoRico?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes.
BY MR. HICKEY:
**Q. You had no input --**
A. Correct.
**Q. -- as to which hospital it was?**
A. Correct.
**Q. Neither Richard nor any family**

member had any input as to which hospital it was; correct?
A. Correct.
Q. Did you have any familiarity with San Juan, Puerto Rico before that day?
A. None at all.
Q. Did Richard have any familiarity with San Juan or the medical facilities in, for, around San Juan, PuertoRico before that day?
A. No.
Q. Did anyone in your party that you know of have any knowledge about medical facilities in San Juan, PuertoRico before that day?
A. No.
Q. Did -- nobody from Royal Caribbean asked you, Richard, or anybody in your party for input as to where to take him; correct?
MR. DRAHOS: Objection to the

form.
THE WITNESS: That is correct. I relied on their expertise.
BY MR. HICKEY:
**Q. So that was Royal Caribbean's decision and their planning, not yours?**
MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
BY MR. HICKEY:
**Q. Talking about the -- talking about the drinks purchased on February 17th and February 18th, 2019, Mr. Drahos was showing you the Royal Caribbean, you know, account receipt.**
**We know only that those drinks were charged to Richard's account; correct?**
A. Correct.
**Q. Was that your account as well or did you have a separate account?**
A. We had the same account but if I would have had a drink, it would have showed

up on my account or charged by my card.
Q. Okay. Fair enough. I guess -- I guess I can understand that. And so Richard was a sociable person; right?
A. Yes.
Q. Richard was a person who he was apt to -- likely to buy drinks for other people?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes.
BY MR. HICKEY:
Q. You were not in his presence at all times during that first night. So you don't know who he bought drinks for?
A. That right.
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. Going back to that first night. I made a note about something. Going back to that first night when Richard walks in the door and falls. He fall right way;

right?

MR. DRAHOS: Object to the form.

BY MR. HICKEY:

**Q. As far as you know?**

A. As far as I know, yes.

**Q. Right when he walked in the door, you said something like one to two minutes. I mean, as far as you know, he opened the door, walked in, and fell; right?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HICKEY:

**Q. There's no -- you don't know about any delay, do you?**

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MR. HICKEY:

**Q. Okay. I just read a note of mine. Going back to the examination of the doctor on the ship on February 18, 2019, did the doctor do any neurological testing like**

**tracking the eyes?**
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
**Q. Did the doctor do any of that?**
A. I'm not sure.
**Q. Did the doctor take a scope with that bright light and look into Richard's eyes?**
MR. DRAHOS: Object to the form.
THE WITNESS: I don't think so.
BY MR. HICKEY:
**Q. Did the doctor request that Richard walk a straight line like they do -- the police do sometimes?**
A. No.
**Q. At all times -- now I'm asking you questions about February 21. I'm skipping ahead now. February 21, 2019. At all times in those hours when Richard Burgess was in that infirmary from 9:25 when he first appeared to 12:30 or whenever it**

was that Royal Caribbean finally got him on an ambulance, was Richard Burgess' condition the same?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HICKEY:

Q. He never improved in that time, did he?

MR. DRAHOS: Object to the form.

BY MR. HICKEY:

Q. Sorry?

A. No.

Q. You -- Mr. Drahos was asking you about -- a small thing but an important thing about eating. And he asked about eating a cookie. In order for Richard to eat a cookie, did someone have to break it up for him?

A. No.

Q. He eats it? Does he hold it with his hands? Is he capable?

A. Yes, he is capable of holding it with his hand.

**Q. You mentioned that Richard wants to wear black all the time now. Did he before this happened?**

A. No.

**Q. No?**

A. No.

**Q. That some sort of behavior or conduct he acquired since then?**

MR. DRAHOS: Object to the form.

THE WITNESS: This is something that probably just came about in the last four months because all last year, I was -- he was wearing color -- all colors. He was wearing shirts of all colors, and then just all of a sudden, one day he wanted to wear just black.

**Q. Okay. I'm looking through my other notes. Is Richard aware enough to know of his condition and limitations?**

MR. DRAHOS: Object to the form.
THE WITNESS: I believe so.
BY MR. HICKEY:
**Q. He knows that his life has changed forever?**
A. Yes.
MR. DRAHOS: Object to the form?
BY MR. HICKEY:
**Q. Does he suffer and have mental anguish about the future?**
MR. DRAHOS: Object.
THE WITNESS: Yes.
BY MR. HICKEY:
**Q. Does he understand that his life has changed, and, obviously, lost --**
MR. DRAHOS: Objection.
BY MR. HICKEY:
**Q. -- his prior life?**
A. Yes, he does.
**Q. One of -- one of -- you said early on in the deposition that Richard --**

something to the effect that his career, his job as a hair stylist was fulfilling.
I don't know if that was the word but you said something like that. Do you remember that?
MR. DRAHOS: Object to the form.
BY MR. HICKEY:
Q. I may not by using the exact words that you used but was it fulfilling?
A. It was fulfilling. I mean it was fulfilling but it was his whole life.
Q. When you say it was his whole life. What do you mean?
A. I mean his world evolved around the salon. He -- I mean, he spent his days there, he loved creating colors for all his clients, different colors for his clients' hair, different styles. I mean, his whole world revolved around the salon.
One of his clients had an appointment on a Wednesday during the day

and she called and said I have to cancel this appointment. You know, he said, well -- he'd say, okay. Like, what are you doing Sunday afternoon.

If she was free that Sunday afternoon, he said I'll do your hair. His life, it was probably only in the last -- I will say two years that I have told him he needs to put three or four people in on a Sunday. I'd say, Richard, you have to start just backing down. You can't -- you've got to do things.

**Q. So --**

A. It was his life.

**Q. -- when you say it was his life, it sounds like he was a giver. He wanted to give to people?**

A. He was a giver.

**Q. Was the -- I mean was the relationship part of it important to Richard?**

A. Very important to him.
**Q. And when you say the relationship part, I mean the relationship between him and his customers?**
A. Yes. That's one of the things one of the reasons Richard -- that's one of the regrets he has the most. He built some of these relationships with some of these women who he's been doing their hair for the past 30 years.
And if he ever would have chosen to retire, he would have been able to, you know, build up to that point. But with this that happened to him, his world was just taken away from him. These relationships were taken away from him.
**Q. Did he plan to retire?**
A. No.
**Q. He planned not to retire?**
A. He planned not to retire.
**Q. Did many of the customers become**

**friends?**
A. All of his customers were friends.
**Q. Was it -- did it affect Richard that he never got to say goodbye to these customers and friends?**
A. Yes.
**Q. Did the hair designing add to Richard's self-worth?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. He took pride in what he did.
BY MR. HICKEY:
**Q. I guess that's a better way to say it. Did he take pride?**
A. Yes.
**Q. Richard also liked gardening?**
A. Yes, he did.
**Q. Tell us about that.**
A. Richard would spend what time -- if he didn't have an appointment on Sunday

and his free Mondays, going around and planted in the yards, pulling weeds, and just taking care of our property.

**Q. Did he design the landscaping we see in the yard?**

A. Yes. All the landscaping, he planted.

**Q. You helped him?**

A. I helped him.

**Q. Who told you -- would someone tell -- would Richard tell you what to do or you told him what to do?**

A. No, he would tell me what to do.

**Q. Was that a love of his?**

A. Yes.

**Q. Did he weed, prune, plant, and water?**

A. Yes, he did.

**Q. And Heidelberg United Church of Christ. Tell us about Richard's relationship with the church?**

A. With Heidelberg, we were going to -- before Heidelberg, we went to a church called LGBC. They played the music that he loves to listen to.

And the one sermon that that preacher gave one Saturday night, he used a circle in his sermon and then he put homosexuality on the outside of Christ.

**Q. Okay.**

A. So that kept -- that made Richard rethink.

**Q. Okay.**

A. And then about the time of the 2016 election and with the way things were starting to be, my church that I had grown up with -- but after the age of 18, I stopped going to -- became an all-inclusive church, a gay, friendly church.

So I asked Richard if he would like to give it a try. So we went one Sunday afternoon and we went every Sunday

afterwards.
Q. Okay.
A. He --
Q. I asked the question poorly because you are talking about something I didn't mean to ask, but that was my fault.
Did you and Richard have a relationship with the church?
A. Yes.
Q. What is -- describe for someone that doesn't know Richard Burgess, describe how important religion is to him in his life.
A. Before this happened, Richard would get up every morning and he would sit in our breakfast nook and he would do at least an hour of Bible readings. Just like on the cruise, he would always spend an hour doing Bible readings.
He also would listen to some preachers on the Internet or on TV. We went

to church, he went to church every Saturday, and then we went to church every Sunday. Religion was -- the Lord was very important to Richard.

**Q. Okay. How important were -- was the relationship between Richard and the people of the church?**

A. We began to really enjoy -- it was nice being able to walk into a church where we can be considered a couple. And our relationship -- we went out to dinner with people that we met from the church, we would hang around every Sunday after service, we would probably hang around for an hour.

Richard would also go in there and weed their garden on Mondays because we had a garden in the back lot that the church had planted so he would go in there and weed that out. He would do things for the church.

The Lord was and is still very important to Richard.

Q. But you all are not really able physically to get him to church?

A. No.

Q. Finally, the other part of Darren's life is you; correct?

A. Yes.

Q. And you have known Darren for some 30 years, I think you said.

A. I believe Richard, yes.

Q. I mean, sorry. I do that frequently. I apologize. You have lived with Richard for some 30 years?

A. There about, yes.

Q. And you were married in Maryland on November 7th, 2013?

A. Yes.

Q. And you retired a year ago as a UPS driver just to take care of Darren?

A. Of Richard, yes.

**Q. Of Richard. And so, now, instead of being just friends, lovers, husband, et cetera, enjoying life, you are now the caretaker of Richard?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HICKEY:

**Q. You still love him?**

A. Yes, I still love him.

**Q. But it's different?**

A. But I'm a caregiver. It's different from a husband.

MR. HICKEY: I don't believe I have anything further.

EXAMINATION

BY MR. DRAHOS:

**Q. Actually, Mr. Henze, just one matter I have forgot. Just some photographs in the case. Would you mind looking at these and telling me if any of them were taken after --**

MR. HICKEY: Can I --
MR. DRAHOS: Yes.
BY MR. DRAHOS:
**Q. They were taken after February 18, 2019?**
(Henze Deposition Exhibit K was marked for identification.)
(Document tendered to the Witness.)
A. I can't say for sure. I think these two may have been. These are after the first nights. These may have been. This might have been -- I believe this one was taken the first night and this one was taken the first day that we were --
**Q. Would you mind putting them in order for me?**
MR. HICKEY: So I don't understand what's going on. Are you guessing? You said, I don't know but these might have been. I don't understand what's

going on. If you know, you know. If you don't know, you don't know.
THE WITNESS: I'm not sure.
BY MR. DRAHOS:
**Q. And you had mentioned that the last two, Nos 3 and 4 appear to be ones taken after February 18th; correct?**
A. That is correct.
**Q. And you had told me that after Richard saw the laceration at the back of his head, that he bought a hat; correct?**
A. Correct.
**Q. And is that the hat that's depicted in Pictures 3 and 4?**
A. I didn't say he bought the hat. He wore a hat. He could have brought that hat with him. He wore a hat after that.
**Q. He is wearing a hat in Picture 3 and 4; correct?**
A. Yes.
MR. DRAHOS: Those are all the

questions that I have.

MR. HICKEY: Reads.

THE VIDEOGRAPHER: This further concludes the video deposition at 6:49 p.m.

MR. HICKEY: Are you having this transcribed?

MR. DRAHOS: Yes. But I'm not ordering video.

MR. HICKEY: Okay. So, Ms. Alexis, I'll take a copy.

THE COURT REPORTER: Okay. Thank you.

(Reading and signing reserved.)

(Deposition concluded 6:49 p.m.)

CERTIFICATE OF COURT REPORTER

I, JEANINN ALEXIS, do hereby certify that the proceedings were recorded by me stenographically and electronically, at the place and time mentioned on the cover sheet hereof and, thereafter, transcribed; that said hearing is a true record of the statements made; that I am neither counsel for, related to, nor employed by any of the parties to this proceeding;

And further, that I am not financially or otherwise interested in the outcome of this matter.

As Witnessed by my hand and signature as indicated below.

-------------------------
JEANINN ALEXIS
Certified Court Reporter