EXHIBIT H



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

RICHARD BURGESS, Individually,
and by and through DARREN HENZE
as Guardian of the Person and
Estate of Richard Burgess, incapacitated
and as agent under that certain
durable power of attorney dated
November 20, 2006,

Plaintiffs,

vs. CASE No. 1:20-CV-20687-AOR

ROYAL CARIBBEAN CRUISES LTD., a
Liberian Corporation d/b/a
ROYAL CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL, JOAO
PEREIRA, MICHIEL ADRIAAN ETSEBETH,

Defendants.

* * * * * * * *

The deposition of JOSEPH HIATT was taken before Bethany Whaley, Certified Court Reporter, ACCR 661, as Commissioner, on Monday, June 6, 2022, commencing at approximately 10:00 a.m., at 4000 Eagle Point Corporate Drive, Birmingham, Alabama.

APPEARANCES

Representing the Plaintiffs:

Sarah A. Lobel
Hickey Law Firm, PA
1401 Brickell Avenue
Suite 510
Miami, Florida 33131
305.371.8000
slobel@hickeylawfirm.com

Representing the Defendants:

Michael J. Drahos
GrayRobinson, PA
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
561.268.5727
michael.drahos@gray-robinson.com

INDEX

| WITNESS: JOSEPH HIATT | PAGE |
|---|---|
| Examination By Mr. Drahos | 4 |
| Examination By Ms. Lobel | 184 |

INDEX OF EXHIBITS

| | |
|---|---|
| Defendants' 1 - Folio | 61 |
| Defendants' 2 - Verizon phone records | 96 |

* * * * * * * *

JOSEPH HIATT,

being first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

EXAMINATION

BY MR. DRAHOS:

**Q. Good morning. Can you please state your name for the record?**

A. Legal or just Joe?

**Q. Your legal name, sir, yes.**

A. Joseph Thomas Hiatt, but I go by Joe.

**Q. And that was actually the very next question. So do you go by any other names other than Joseph Thomas Hiatt?**

A. Only from what my wife calls me, and I can't tell you that.

**Q. So in other words, other than your wife, you're either legally recognized as Joseph Hiatt or people call you Joe?**

A. Yes.

**Q. Have you ever given a deposition before?**

A. Once.

Q. What were the circumstances?
A. Personal injury of a friend of ours. Horseback riding.
Q. And how long ago was that?
A. Fifteen years ago or more. Been a while.
Q. So by virtue of the fact that you haven't done this in 15 years, I'm going to kind of go over the ground rules from the beginning so we're both on the same page.
A. All right.
Q. As you can see, this is a formal question-and-answering session. So throughout the next -- I don't know -- hour or so, maybe two, three, I'll be asking you a bunch of questions about Richard Burgess and a cruise that you were on, as I understand it, with Richard Burgess.
A. Uh-huh.
Q. So because it's a formal proceeding, we treat this as if we're in a courtroom, so all the same rules apply. You just saw the court reporter swore you in, so you're obligated to tell the truth.
A. Right.

Q. But the way we speak has to be a lot more formal than normal. So, for example, if you let me ask the entirety of my question before you go to answer, even though you may know exactly what I'm asking you, it makes it a lot easier on her --

A. Okay.

Q. -- because if we're talking at the same time, it's very difficult to try and capture that.

And secondly, nobody here wants you to answer a question that you thought I was going to ask, and it ends up being something totally different. So first rule of thumb, let me get the question out before you go to answer.

If you nod your head, I'm going to know what that means as I sit here. But, you know, two months from now when I go to read this, I won't remember.

So I'm going to say, Is that a yes, Is that a no? I'm not doing that to be obnoxious. I'm doing it so the record is clear on how you answer.

A. Okay.

Q. I don't expect you're going to have a crystal clear memory of everything that happened.
A. No.
Q. And so when you don't remember something, I need you to tell me that. And, obviously, and if you don't understand a question that I ask, whether it's because I mumbled through it or I used words that had too much legalese or it just didn't make sense, let me know and I'll rephrase. Okay?
A. Uh-huh.
Q. Otherwise, if you answer, I'm going to assume that you understood what I was asking you.
A. Okay.
Q. Are you under any medication --
A. No.
Q. -- or anything that would affect your ability to testify?
A. No.
Q. So lastly, you know, this by no means is intended to be torture. So if you need to take a break for whatever reason, to call somebody or use the restroom or just get a

**drink of water or something, let me know. Otherwise, it's my practice to just power through and get it over with.**

A. Okay.

**Q. So where do you currently reside?**

A. Home address?

**Q. Yes, sir.**

A. 200 Coves, C-O-V-E-S, Drive.

**Q. Where is that?**

A. Vincent, Alabama.

**Q. Vincent, Alabama?**

A. Yeah.

**Q. How far is that from here?**

A. About 25, 30 minutes. And ZIP code is 35178.

**Q. How far is that from downtown?**

A. About 40, 45 minutes.

**Q. And I mean downtown Birmingham, which I assume is 45 minutes?**

A. Yes.

**Q. And how long have you lived there?**

A. We moved in, in February. We've been building a house there on the lake.

**Q. So it's a single-family home?**

A. Yes.

Q. New house?
A. Correct.
Q. Congratulations.
A. Yeah. I built during COVID when everything doubled and tripled, yeah.
Q. But, you know, it's all relative. The market's red hot --
A. Yep.
Q. -- or at least it's been red hot, so, you know, everything's up.
Okay. So who else lives there with you, if anyone?
A. My wife.
Q. And is your wife's name --
A. Susie.
Q. -- Susie?
A. Susie. Susan.
Q. Anyone else live there?
A. No.
Q. Do you own any other properties?
A. No.
Q. Do you have any plans to leave the area anytime soon?
A. No.
Q. I would certainly hope not.

And you mentioned your wife, Susie. When did you all get married?
A. February 1978.
Q. Any prior marriages?
A. No.
Q. Any divorces or legal separations with Susie?
A. No.
Q. Do you have any children?
A. Three boys.
Q. How old?
A. I knew you were going to ask that. 36, 34, and 30.
Q. Okay.
A. I hope that's right. I'm close.
Q. Close enough. They're never going to find out if you're wrong.
So any of those boys work in the medical profession?
A. No.
Q. And how about you? What's the highest level of education obtained?
A. High school.
Q. Where did you go to school?
A. Fairfield High School, west of

Birmingham.
Q. So you spent the majority of your life here in the Birmingham area?
A. Yes, sir. Moved here in '68.
Q. Are you a University of Alabama football fan?
A. Hell, yes.
Q. I went to Florida State.
A. Oh, did you?
Q. Yeah.
A. All right.
Q. I blame you all for the downfall of our program. We lost a big game against you guys a few years ago. We haven't been the same since. In any event -- okay.
A. I think Jimbo Fisher threw it.
Q. Well, yeah, that too.
A. Yeah.
Q. He certainly didn't help us. We can talk about that off the record at some point.
Okay. So you have a high school education. What about any licenses or certifications of any sort? Do you hold any?
A. No.

Q. So what do you do for employment, if anything?

A. Right now I'm doing consulting work back with Alabama Power. That's where I worked for over 39 years and retired and started back with them back in the middle of March to help them on a new release on an application I helped build and release and everything there.

Q. And do you have any medical training of any sort?

A. No.

Q. All right. So now that you're back on a consulting basis, do you have to travel around at all, or do you --

A. No.

Q. -- just stick to Alabama?

A. I just work from the house.

Q. You and your wife are sort of moving targets. We were trying to pin you all down for a deposition for a while.

Do you travel a lot on vacation or something?

A. No. It's just those previous dates were just -- hit the bull's eye when we

had plans.

Q. All right. So were you served with a subpoena to be here today?

A. Yeah. I found it in the -- it was rolled up in the handle of our front door Friday.

Q. So saw the subpoena?

A. Yes.

Q. And really what I was interested in mostly, Mr. Hiatt -- I mean, I expected you to show up, but what I was mostly interested in was whether or not you and your wife had any photographs from the subject cruise.

A. I do not. She may have a couple on her phone. She was looking.

Q. But in any event, you had an opportunity to check, and as you sit here today, you don't have any photos?

A. I didn't take any pictures.

Q. Do you have a social media account?

A. No.

Q. Lucky.

A. Tried it once. I didn't like what I saw.

Q. Well, you're better off. Trust me.

All right. So ever been involved in any kind of litigation before?
A. No. Just that one with my friend on the horseback injury.
Q. Have you ever filed a workers' comp or disability claim for any reason?
A. No.
Q. Ever been arrested?
A. No.
Q. Sorry. I have to ask.
MR. DRAHOS: Can we go off the record for just a second?
(Discussion off the record.)
MR. DRAHOS: Back on.
BY MR. DRAHOS:
Q. All right. So I've learned enough about you. What I'd like to know now is how you know Richard Burgess.
A. He's my wife's cousin.
Q. So does that mean you've known Mr. Burgess since approximately 1972 when you were married?
A. No.
Q. So when did you first meet Richard Burgess?

A. I probably didn't meet Richard until sometime in the '90s over at my wife's parents' house. And I just met him, you know, maybe twice a year at best. Probably less than that, really, over the years.

**Q. So like, for example, was Richard at your wedding?**

A. I don't -- you know, I don't know.

**Q. And what about when Richard and Darren got married, did you go to --**

A. No. Like I said, I only saw him occasionally. We didn't see each other frequently at all.

**Q. I'm just going to dive into that a bit, so I can understand the context of what you mean by, you know, infrequently.**

**Did you all ever -- before the subject cruise, ever talk on the phone for any reason? You and Richard.**

A. No.

**Q. Did you ever text each other?**

A. No.

**Q. Did you ever write each other any emails?**

A. No.
Q. So I myself am married. There are various members of my wife's family who I only communicate with when we're at family functions. We kind of talk, nice to see you, how have things been, and then, you know, we move on our merry way.
Does that sort of describe your relationship with Richard Burgess; you'd see him at family functions and things of that nature? But did you ever socialize with him separately and independently?
A. No. It was at family functions only.
Q. So I mean, how well did you get to know him over the years? How would you describe how well you got to know him?
A. Got to know him more on the cruises because we were around each other more. Family functions, it was mainly their family doing their thing. But we talked but got to spend time with him and Darren on the cruises --
Q. Okay.
A. -- when we really got to know

each other.
Q. All right. And same line of questioning, before we get there, on Darren. When did you meet him?
A. On our first cruise, we were together, I believe.
Q. Okay.
A. I take that back. They did come in town once and go to Jimmy and Ilene's on the lake, and I did go out to dinner with them.
Q. That would be Jimmy and Ilene Landrum?
A. Correct.
Q. All right. So aside from the cruise experiences, then, you can recall one other instance when you spent any time socializing with Darren, and that would have been out to dinner while they were visiting, in town, Jimmy and Ilene Landrum?
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
Q. How well do you think you got to know Darren prior to the subject cruise?

A. Oh, before the cruise?

**Q. Yes, sir.**

A. This last cruise?

**Q. Yes, sir.**

A. Well, we were on other cruises together, but -- so got to know him, you know, fairly well. We talked a good bit on the cruises.

**Q. Okay. So let's go there next. Before the subject cruise -- and that's the cruise that we're going to talk about that's the subject of the litigation.**

**Before the subject cruise, how many cruises had you been on with Richard and Darren?**

A. Probably two others.

**Q. And in both instances, both Richard and Darren were on the cruise?**

A. Yes.

**Q. Do you recall which particular ships those were?**

A. Royal Caribbean. But I don't remember the name of the boat.

**Q. Do you remember the years?**

A. Well, this one was '19. So may

have been about '18 or '17. Maybe '16.
Q. So sometime between 2016 and 2018?
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:
Q. And how long were those two prior voyages that you had been on?
A. They were seven-day cruises.
Q. And in each of those prior cruises, did you have occasion to visit the port of San Juan?
A. Yes.
Q. Which one -- or strike that.
How many times?
A. Probably -- counting this one, probably twice.
Q. So other than the subject cruise, there had been one prior instance when you had visited the port of San Juan?
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
Q. And you told me that you believe this time period was somewhere between 2016 and 2018. Do you recall specifically which cruise

it would have been that you would have visited San Juan?
A. No.
Q. And did you specifically get off the ship and visit the San Juan area?
A. I had been in San Juan once, yes.
Q. I'm sorry. I don't know if I follow. Was the one and only time that you had ever been in San Juan before the subject cruise during this particular cruise --
A. No.
Q. -- on a Royal Caribbean vessel?
A. No. It was before then.
Q. Oh. So you'd been in San Juan before?
A. Yes, on one of the other cruises. Yes.
Q. And that was without Richard and Darren?
A. Probably was with them on the boat, but -- I think it was, yeah.
Q. All right. So as we sit here today, how many times in total have you been to San Juan in your life?
A. Probably twice.

**Q. So the subject incident and one prior incident?**
A. Yes.
**Q. And then the prior incident, do you have any memories of anything that you saw or did in San Juan?**
A. My wife and I, we just walked around the port, went to a few shops. Probably went and got something to eat and came back on. We didn't do an excursion or anything.
**Q. Right. You toured around that whole San Juan area?**
A. Yeah. Just walked around.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. And then did Richard and Darren go with you?**
A. No.
**Q. Do you know what they did in San Juan?**
A. No.
**Q. Did either you, your wife, Richard or Darren have any reason to seek any medical care while they were in San Juan during this**

prior occasion?
A. Say that again.
Q. Sure. During this prior occasion when you were in San Juan with your wife kind of touring around old San Juan --
A. Oh, no. We were touring stuff. So it's not this 2019.
Q. Not the subject --
A. The one before.
Q. -- the one before that?
A. Okay. No, we didn't have any medical attention. No.
Q. Anyone that you were associated with on that cruise require any medical care in San Juan?
A. No, I don't believe so.
Q. How many cruises have you personally been on in your lifetime prior to the subject cruise?
A. Maybe 14 or 15.
Q. That's a lot. All Royal Caribbean?
A. Maybe about half and half. We started off with Carnival because we were young and crazy.
Q. But you can only recall one prior

**cruise that involved the port of San Juan?**
MS. LOBEL: Form.
A. That's all I can remember.
BY MR. DRAHOS:
**Q. So in all of these instances, the 14 or 15 cruises that you've been on, have you ever required medical care in the ship's medical center for any reason?**
A. Myself, no.
**Q. Anybody that you traveled with?**
A. My wife came down with a norovirus once.
**Q. And was that on a Royal ship or Carnival ship?**
A. I don't know. I know we were in Mexico. I don't remember which cruise line.
**Q. Do you recall where in Mexico you were?**
A. I know we went to Grand Cayman's and Cozumel and somewhere else, but it was early on the cruise where she had to go get a shot and some medicine.
**Q. All right. So you don't recall which particular cruise line this was?**
MS. LOBEL: Form.

A. No.
BY MR. DRAHOS:
**Q. Anything about that experience memorable in any way?**
MS. LOBEL: Form.
A. She was bad sick.
BY MR. DRAHOS:
**Q. All right. What about the nature of the medical care that you received; any complaints of criticisms about that experience?**
A. I think the -- I mean, they gave her some medicine and gave her some Gatorade and crackers when she could actually start drinking something and keeping it down, but she was quarantined in the room for three or four days. It kind of ruined the cruise.
**Q. Right. Right. Okay.**
**In any of these cruises that you've ever been on, have you or your wife ever required to seek medical care in any foreign port of call?**
A. No.
**Q. How about anybody that you ever traveled with --**
A. No.

**Q. -- before the subject cruise, obviously?**
A. No.
**Q. How did it come to be that you all started traveling with Richard and Darren?**
A. I think they came into town for that visit with Jimmy and Ilene. They stayed at the lake a few days. I think they got talking about our previous cruises, and they said they'd like to go on the next one. So it just went on from there.
**Q. Up until this point, had you all been traveling with Jimmy and Ilene Landrum as well?**
MS. LOBEL: Form.
A. Driving?
BY MR. DRAHOS:
**Q. Traveling.**
A. Traveling?
**Q. Yeah.**
A. Yes.
**Q. So when they came to town to visit the Landrums, you and Susie had previously gone on cruises with the Landrums before?**
MS. LOBEL: Form.

A. Yes.
BY MR. DRAHOS:
Q. So the four of you were sharing your experiences with Richard and Darren, and they said, That sounds like fun, we'd like to go along. Is that kind of how it happened?
MS. LOBEL: Form.
A. I think that's how it started, yes.
BY MR. DRAHOS:
Q. Up until this point, had anyone, either you or Susie or the Landrums, shared any negative experiences that they had with any of these cruise lines with Richard and Darren?
MS. LOBEL: Form.
A. I know I didn't.
BY MR. DRAHOS:
Q. Other than going on cruises, had you and Susie gone on any other vacations of any sort with Richard and Darren prior to the subject cruise?
A. No. Oh. Prior to the subject cruise?
Q. Yes, sir.
A. We went on previous cruises with

them.
**Q. Right. We've talked about two, yeah. But what I'm wondering is any other travel experience with Richard and Darren prior to the subject cruise?**
A. No.
**Q. How much, if anything, did you know about Richard Burgess's health before the subject cruise?**
A. Not much. I mean --
**Q. Tell me what the level of your knowledge was.**
A. I know at some point he had a drinking problem, but he overcame it.
**Q. How did you come to learn of that in particular?**
A. Someone told me. I don't remember if -- it might have been Jimmy or -- who told me.
**Q. Do you recall what was reported to you about that?**
A. Just that he -- he overdid it way too much, and it was causing some issues with Darren and his work and that he finally realized he had a problem and dealt with it.

Q. Do you know specifically when these issues arose?
A. No.
Q. Do you know specifically when Richard recognized he had the problem and had to deal with it?
A. I do not.
Q. Do you know what specific issues were being caused or were affecting Darren's work?
A. Just -- basically, that's what I heard. It was affecting his job, and it was affecting his relationship.
Q. When you say "his job," you're talking about Darren's job or Richard's?
A. Richard's job.
Q. It was affecting Richard's job?
A. Yes.
Q. And his relationship with Darren?
A. Correct.
Q. Other than potentially Jimmy, did you have any other source for this information?
A. I may have talked to my wife on it, but I don't remember. I mean, we didn't talk much about it.

Q. Okay. Did you ever talk to Richard about it?
A. No.
Q. Did you ever talk to Darren about it?
A. No.
Q. On the prior cruises that you'd been on with Richard, did you ever observe him drinking alcohol?
A. Yes.
Q. And from your observation, did he consume alcohol in excess?
A. Not while I was around him.
Q. In other words, did you ever observe him intoxicated?
A. No.
Q. And do you know whether or not Richard's realization that he needed to do something to address his problem with alcohol was before or after your cruise experiences with him?
A. It was before.
Q. So what you're saying, then, is by the time you had gone on the cruises with him, this realization and his request to fix his

problem had already occurred?
MS. LOBEL: Form.
A. That's correct.
BY MR. DRAHOS:
Q. Are you aware of some sort of an agreement between Richard and Darren that when he's on these cruises, he's able to drink for one particular day of the voyage?
A. I knew that's what he did. I didn't know they had an agreement on that.
Q. How did you know that that was his practice?
A. He spoke about it. He said he'd give himself one day.
Q. And did he tell you that on the very first cruise that you'd been on with him --
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. -- or on the subject cruise?
A. It may have been the first one.
Q. And from your observation, did Richard follow that practice?
A. Yes.
Q. And on the first cruise that you

went on with them, do you recall the type of alcohol that he drank?

A. When I was with him, he drank beer.

Q. So was that the case on every cruise, including the subject cruise?

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

Q. Are you aware of instances where Richard ever consumed shots of Jagermeister?

A. He never did it around me.

Q. Did you ever observe any instances where Darren was visually upset with Richard over his alcohol intake?

A. No. It was just that one day they did it, and after that, it was done.

Q. For the sake of completeness, let me ask that question just slightly different. At any point in time up until present, have you ever heard Darren ever express any displeasure to Richard or anyone about Richard's alcohol consumption?

A. No.

Q. From the moment you first met

Darren up until present day, have you ever observed him ever express any displeasure with Richard about anything?

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. In other words, you may have heard that Richard's alcohol consumption had an effect on his relationship with Darren, but you never observed Darren say or do anything consistent with that displeasure?

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. How about Darren, does he drink alcohol, to your knowledge?

A. He drank a few beers, yes.

Q. And how would you characterize a few beers? What does that mean?

A. Well, we'll go sit by the pool for four or five hours; he may have two or three.

Q. So socially, the two of them, Richard and Darren, is one more outgoing than the other?

A. I would say Richard is more outgoing.

**Q. Is Darren more reserved?**

A. Yeah.

**Q. So in all of the cruises that you went on with them, would it be common for Darren to retire to the cabin before Richard?**

MS. LOBEL: Form.

A. I don't know if he retired to the cabin. He liked to gamble.

BY MR. DRAHOS:

**Q. Darren did?**

A. Yeah.

MS. LOBEL: Form.

A. Now, did that or go to the cabin, I don't know. I mean, I didn't stay out with them late at night. I don't know.

BY MR. DRAHOS:

**Q. So I guess that may be a better way to go at it. To your knowledge, would Richard often stay out late at night during these cruises?**

MS. LOBEL: Form.

A. He probably did a night or two, yeah.

BY MR. DRAHOS:
Q. And when he would stay out late a night or two on these cruises, who would he typically spend his time with from your observation?
A. With Jimmy and Ilene, my wife.
Q. So in your relationship, you and your wife, who is the more outgoing, and who is the more reserved?
A. She's probably more outgoing.
Q. When you had this occasion at the lake, at the Landrum's house, was Richard drinking alcohol there?
A. I don't think he was.
Q. How about at the family events, did you ever observe Richard drinking at any of those?
A. No.
Q. So have you ever seen Richard intoxicated?
A. Not really. I mean, like I said, the first day we kind of blow it out, but then, you know, everybody goes their own way. So...
Q. I think I know what you mean, but

**can you explain to me when you say, "the first day we kind of blow it out," what does that mean?**

A. You know, your vacation starts. You're excited. And we all meet. We go have a -- get a beer or two and then start checking out the boat.

And the first night is normally a long night because you're trying to get in what you can, have a late dinner or something. And we'd go to the piano bar and listen to the guy sing, and some would go to the casino or some would go dancing.

**Q. So when you say, like, "the first night we kind of blow it out," does that mean like the first night is a party night, typically?**

MS. LOBEL: Form.

A. Well, I mean, I wouldn't say that. I'm just -- you just want to go get as much as you can in, but -- and then call it a night. And we slow down after that.

BY MR. DRAHOS:

**Q. So did you personally enjoy Richard's company?**

A. Yes.
**Q. How about Darren, did you enjoy his company as well?**
A. Uh-huh.
**Q. Did you have a good relationship with Richard?**
A. Well, I mean, we got along, but we didn't -- we didn't hang out or see each other that often. But we would go workout together on the cruise. We would go walking on the track. Well, he would be running. I can't run. But we'd get on the elliptical, do some weights and things together.
**Q. So other than exercising, were there any other activities that you all would typically do on these cruises, just you and Richard?**
A. No.
**Q. Like -- you don't seem like the kind of guy that goes to a spa.**
A. I do.
**Q. Oh, you do. Really? Damn, I was way off on that one.**
A. I like a massage, and I love to get a steam.

Q. Wow. I would have bet my mortgage against that.
Okay. So did you ever go on any spa treatments with Richard?
A. No, not together. No.
Q. Did you ever go into the casino or watch a comedy show or do any type of social activity on the ship, just you and Richard?
A. No.
Q. So if there was ever any alone time between you and Richard, it would have been during the exercising?
A. Exercising, walking. We might grab a sandwich together during the day. Not much.
Q. But in the relationship, then, between you and your wife, it sounds to me like your wife might have had a closer relationship with Richard than you?
A. Yes.
Q. And would the same be true for Darren?
A. Yes.
Q. Your wife had a closer relationship with Darren than you would have with Darren?

MS. LOBEL: Form.
A. Correct.
BY MR. DRAHOS:
**Q. Did you ever do anything socially with Darren on these cruises, just you and he?**
A. No.
**Q. And how about like the exercise routines, would you ever do anything like that with Darren?**
A. No.
**Q. All right. So is it safe to say, then, that you never did anything alone with Darren ever?**
MS. LOBEL: Form.
A. Probably not.
BY MR. DRAHOS:
**Q. All right. So I asked you maybe ten minutes ago what you knew about Richard's health before the subject cruise. You told me about his drinking issue.**
**Do you know of any other health issues that he may have had prior to the subject cruise?**
A. I was not aware of any until I looked at the deposition.

**Q. When you say "looked at the deposition," what deposition are you referring to?**
A. I believe it was Darren's.
**Q. So did you review that deposition in preparation for your deposition?**
A. No.
**Q. When did you review that deposition?**
A. It's been -- I got a copy of it maybe six weeks ago. It's been a while.
**Q. Who did you get the copy from?**
THE WITNESS: I guess from your law office.
BY MR. DRAHOS:
**Q. That's something that's definitely not going to translate on the record.**
**You looked over at Ms. Lobel. You're referring to her law office?**
A. I guess that's where it came from.
**Q. What else did you receive from Ms. Lobel's office other than Darren's deposition transcript?**
A. That's it.

Q. Did you look at Richard's deposition transcript?

A. No.

Q. Did you review any other documents regarding this case?

A. No.

Q. So is it safe to say, then, that the one and only thing that you've read regarding this matter in advance of today's deposition is Darren's transcript?

MS. LOBEL: Form.

A. Yeah. And I didn't read all of it.

BY MR. DRAHOS:

Q. Did you do anything specifically to prepare for today's deposition?

A. Yes.

Q. What did you do?

A. Had a call last week with Sarah talking about the deposition and just talking about what I remembered. And then we met yesterday and went over it in person.

Q. So you had a call with Ms. Lobel last week you said?

A. Yes.

Q. And how long was that call for?
A. About an hour.
Q. And then you met with Ms. Lobel yesterday?
A. Yes.
Q. And for how long did you meet?
A. It took about three and a half hours maybe.
Q. Was Susie with you?
A. Yes.
Q. Was Susie with you during the phone call?
A. Yes.
Q. So it was you, Susie, and Ms. Lobel over the phone?
A. Yes.
Q. And for yesterday's three-and-a-half-hour meeting, it was you, Susie, and Ms. Lobel?
A. And Jimmy and Ilene.
Q. During either your phone call or your meeting with Ms. Lobel yesterday, did she introduce any information to you that you had not otherwise been aware of?
A. No.

Q. By the way, that phone call, were the Landrums on the line for that as well?
A. No.
Q. Just you and Susie?
A. Correct.
Q. During the phone call, did Susie say anything about this event that you were unaware of?
A. No.
Q. Did she say anything that you disagreed with?
A. No.
Q. During yesterday's three-and-a-half-hour meeting, did you learn any information from anyone that you had otherwise been unaware of?
A. No. I mean, I was just trying to shake the cobwebs. It's been over three years. Trying to...
Q. Was there anything in particular that anyone said during the meeting yesterday that helped you shake the cobwebs?
A. No. We just talked about the events that happened, and it just kind of, you know, brings it back. But it wasn't any

earth-shattering news, no.
**Q. Did anyone say anything during the meeting yesterday that specifically refreshed your recollection?**
A. No. Just talking about it helps.
**Q. Did anyone say anything yesterday that you disagreed with?**
A. No.
**Q. Did anyone in the meeting express any disagreement about anything that anyone said? For example, did Susie say, No, Jimmy, I think that's wrong, or Ilene, I think you're incorrect about this?**
A. I mean, there was some discussion on it some but really no disagreements or anything. It was mainly just trying to talk and said, yeah, yeah, I do remember that. But really...
**Q. Who spoke the most? Particularly in yesterday's meeting.**
A. I mean, we all talked but --
**Q. Right. But who spoke the most?**
A. I'd say maybe Jimmy because he was more involved in some of it.
**Q. More involved in what sense?**

A. As far as trying to get medical help for Richard.

**Q. Trying to get help for Richard while he was on the ship?**

A. Yes.

**Q. Who spoke the least?**

A. Maybe Ilene.

**Q. Did you express any criticisms of Royal Caribbean during the meeting yesterday?**

A. Yes.

**Q. Did anyone else?**

A. Yes.

**Q. Who else?**

A. Everyone.

**Q. Did anyone among the four of you make any comments that were in defense of Royal Caribbean?**

A. No.

**Q. So all of you collectively believe that Royal Caribbean is at fault for this incident?**

A. That's correct.

**Q. Obviously, you and I have never had a chance to speak before today, correct?**

A. That's correct.

Q. Have you spoken to anyone at Royal Caribbean?
A. No.
Q. To your knowledge, did anyone in the group, other than Ms. Lobel obviously, speak to anyone at Royal Caribbean following this incident?
A. I'm not aware of anybody talking to Royal Caribbean.
Q. Where was yesterday's meeting?
A. At Jimmy and Ilene's.
Q. At their house?
A. Correct.
Q. And was Ms. Lobel there for the entirety of the three-and-a-half-hour session?
A. Yes.
Q. So as you sit here, is there any specific recollection or information that you now have today that you would not have had but for the fact you had that meeting yesterday?
A. I don't think so.
Q. Did you review any documents?
A. No.
Q. Did you review any videotape footage of Richard's deposition testimony?

A. No.
Q. Was Darren and Richard involved in any sense?
A. No.
Q. So you said that there was some things about Richard's health that you learned following your review of Darren's transcript, correct?
A. Yes.
Q. What specifically?
A. That he was -- had HIV.
Q. Anything else?
A. I think that's all I know.
Q. Did you read the part of Darren's transcript that discussed an incident that occurred involving Richard and work wherein he went and had some testing done afterwards?
A. No.
Q. Are you aware of any testing that had been done on Richard's brain prior to the subject cruise?
A. I remember somebody saying when he was young, he had a issue with the back left side of his head. They had to operate and do something there. I don't know much

about it.
Q. To your knowledge, had Richard ever complained of feeling dizzy or blurred vision prior to the subject cruise?
A. No.
Q. Did you ever talk to Richard at all about his work?
A. No.
Q. How about Darren, did you ever talk to Darren at all about Richard's work?
A. No.
Q. So as you sit here today, would it be fair to say that you have no knowledge of what Richard's career aspirations may or may not have been, before the subject --
A. Well, I knew what --
Q. -- cruise?
A. -- he was doing.
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. Understood. What was he doing?
A. He was a hair stylist, working out of his house.
Q. But beyond that, did you have any knowledge of what his career aspirations were?

A. No.
**Q. So what prompted the subject cruise to be planned?**
A. From the previous cruise. Normally go book the next year.
**Q. So as soon as the other one is over, you start planning for the new one?**
MS. LOBEL: Form.
A. Well, they do it on the cruise --
BY MR. DRAHOS:
**Q. Really?**
A. -- before the end of the cruise, because Royal Caribbean offers you a discount if you book while you're on the boat.
**Q. Yeah.**
A. So they go ahead and book the next year.
**Q. And who among the group is like the ringleader for the plans?**
A. I don't know if there is a ringleader. It's just everybody is going to do it.
**Q. So in other words, though, how do you all correlate your schedules to make sure that whatever date you pick is going to work**

**for everybody?**
A. We normally pick out about the same time every year. It's around Valentine's Day.
**Q. Okay.**
A. We look at what cruise ship and see where it's going to be, if we can get one on the Eastern Caribbean or something.
**Q. So do you have a specific recollection of these discussions among the group with regard to planning the subject cruise?**
A. No. I mean, it was -- it just comes up during the week, and we know we have to go down there and book it.
**Q. So other than the fact that it become your normal course to plan for the next one, do you have any recollection of why the particular ship was chosen?**
A. Because it was one of the new ones, one of the big ones.
**Q. Do you recall any specific discussions about that?**
A. No, not really.
**Q. What about the ports of call? Was**

**there any discussion at all about where the Harmony was going to be sailing?**

A. They don't really care about ports. They just float the cruise.

**Q. And when you say "they," who are you referring to?**

A. Jimmy and Ilene, Richard and Darren, ourselves, and there's another couple that goes.

**Q. Who is that?**

A. Chuck and Teri Daugherty.

**Q. Chuck and Teri Daugherty?**

A. Yeah.

**Q. Were they on the subject cruise?**

A. Yes.

**Q. Where are they from?**

A. Around Birmingham.

**Q. What is their relationship to Richard?**

A. They are just good friends of ours. They don't really know Richard and Darren.

**Q. Oh, they are good friends of you and Susie?**

A. Yeah. I work with Chuck, Alabama

Power, for about four years.
Q. **Was Chuck or Teri Daugherty in the ship's medical center during Richard's medical care?**
A. No.
Q. **Did Chuck or Teri Daugherty have any encounters with Richard on February 21st?**
A. What day was that?
Q. **That's the day that the ship was in San Juan.**
A. No, because everything started early that morning. So no.
Q. **Do you know if Chuck and Teri Daugherty had any interactions with Richard the evening prior on February 20th?**
A. I don't know.
Q. **Have you ever spoken to Chuck or Teri Daugherty about this particular case?**
A. Yes.
Q. **When?**
A. Oh, I guess after every time I have to do something. We just -- we see each other. They live up at the lake too now. I mean, we talk.
Q. **To your knowledge, has anyone from**

Ms. Lobel's office contacted Chuck or Teri?
A. Don't believe so.
Q. So you all started talking on these cruises about planning for the next one. You don't recall the specific discussions that were had about the Harmony?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. But I'm taking from you, though, that y'all don't care about the ports of call?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Do you do any research at all about the capabilities of the ship?
A. No.
Q. In other words, did anybody research or look into the medical capabilities of the Harmony's medical center before booking this cruise to your knowledge?
A. No.
Q. So having booked 13 or 14 prior cruises in the past, do you recognize the fact that part of the risk of going on cruises like

this is that you could have a medical emergency in a remote area?
MS. LOBEL: Form.
A. Yeah. But that wasn't a remote area.
BY MR. DRAHOS:
Q. Well, I'm not talking about the subject incident just yet.
A. Okay.
Q. But you recognize that that's unique to the cruising experience, correct?
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:
Q. And do you also recognize that by virtue of these remote areas or environments, these maritime environments, there may be instances where a medical emergency may occur that cannot be fully treated?
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:
Q. Do you specifically recall anyone at Royal Caribbean making any specific representations about the Harmony of the Seas

before the subject cruise was booked?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. So you live in the -- is it the Birmingham area? I mean, is that an accurate description of where you live?
A. When that cruise happened?
Q. If you were -- if you were on the cruise and someone said, oh, hey, Joe, where are you from? What would you say?
A. I would tell them we actually live in Pell City. We're a little bit east of Birmingham.
Q. But Birmingham is like the marker?
A. Yeah.
Q. So how did you arrive to Fort Lauderdale for the subject cruise back in February of 2019?
A. I believe I flew.
Q. You and Susie?
A. Yes.
Q. Did the Landrums accompany you?
A. No. We flew by ourselves. They drove.

Q. So the Landrums drove. How about the Daugherty's? How did they get --
A. They drove.
Q. All right. And what day did you arrive to Fort Lauderdale if the cruise began on Sunday, February 17th?
A. Then we probably got there Saturday.
Q. I assume you stayed in a hotel somewhere in Fort Lauderdale?
A. Yes.
Q. Did you meet up with Richard or Darren at some point prior to boarding the ship?
A. Yes. We had dinner that night with the group.
Q. And when you say "with the group," everyone was there for dinner? Landrums and the Daughertys?
A. Everybody, yeah.
Q. Where did you guys meet?
A. Good question. I don't remember.
Q. Okay.
A. It wasn't far from the hotels.
Q. All right. Well, sometimes it'll

be a memorable place like, I don't know, Hard Rock or something. Nothing like that stands out?

A. I don't remember.

Q. This is going to become a theme as we go, so get used to this question. But the one I have for you is, during the time that you were at dinner with Richard that evening, did he make any complaints at all as to how he was feeling?

A. No.

Q. Did you observe any unusual signs or symptoms from him?

A. No.

Q. Did he appear to be his normal typically self?

A. Yes.

Q. Did you all do anything after dinner, or did you go back to the hotel?

A. We went back to the hotel.

Q. Were Richard and Darren staying at the same hotel --

A. No.

Q. -- or did you have different accommodations?

A. Yes.
Q. By the way, you've got to let me get those questions out. Remember I was saying before, you may think I'm asking you something. I may have asked you something about Richard plane flight or something.
A. Okay.
Q. All right. So did you all meet back up again on the ship, or did you meet somewhere in the morning beforehand?
A. We met on the ship.
Q. All right. By the way, who is Matthew?
A. My son.
Q. And how old is Matthew?
A. He's 34, if I'm right.
Q. All right.
A. Yeah.
Q. And did he go on this cruise as well?
A. Yes.
Q. Did he bring anybody with him?
A. His girlfriend.
Q. And what's her name?
A. Kelly.

Q. Kelly?
A. Yep.
Q. Are they still together?
A. Yes.
Q. So how well does Matthew know Richard Burgess?
A. He doesn't.
Q. Is this the first cruise that he's ever been on with Richard and Darren?
A. I believe so.
Q. So in other words, did they meet at dinner the night before?
A. Trying to think if they were there at dinner. They may have done their own thing. I don't remember if they were there.
Q. Did they meet, then, on the subject cruise?
A. Yes.
Q. Did Matthew have any interaction with Richard the night before the subject incident on February 20th, to your knowledge?
A. Not that I'm aware of. Like I said, I wasn't with them at night.
Q. We're going to get to that in

greater detail in just a minute.
A. Okay.
Q. How about on February 21st while the ship was in San Juan, did Matthew have any interaction with Richard at all?
A. No.
Q. How about his girlfriend Kelly, to your knowledge, did she have any interaction with Richard either the evening prior on February 20th or the morning of on February 21st?
A. No.
Q. So according to our records, Richard Burgess boarded the ship at 1:11 p.m., and you and Susie and Matthew boarded about 14 minutes later at 1:25 p.m.
So does that appear accurate to you? You all wouldn't have seen each other until being on the ship?
MS. LOBEL: Form.
A. We wouldn't have got together until after we were all on board.
BY MR. DRAHOS:
Q. Do you recall what the first things you did with Richard that particular late

afternoon?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. So what is your typical alcohol habits? Do you drink a lot?
MS. LOBEL: Form.
A. Well, I mean, it depends on what you think. I mean, we do get together and have a few beers.
BY MR. DRAHOS:
Q. Correct. I'm not casting any judgment, Mr. Hiatt. I do depositions of cruise passengers nearly every day, so I've seen it all.
A. Yeah.
Q. But I'm trying to get to know you a little bit. So sometimes you got people like --
A. We go to extreme on the boat.
Q. Okay. And what do you -- you mean -- when you say "we," who are you referring to?
A. Me and my wife.
Q. So in other words, you are --

strike that.
So do you drink more on the boat than you typically would out of that environment?
A. Yes.
Q. All right. So I'm going to hand you what we're going to mark as Exhibit 1 to the deposition.
This is a copy of your folio statement for you and your wife during the subject cruise.
A. Yep.
(Defendants' Exhibit 1 was marked for identification.)
BY MR. DRAHOS:
Q. You're welcome to take all the time that you need. Did you have a chance to review Defendants' Exhibit 1?
A. Yes.
Q. And so first and foremost, according to Royal Caribbean's records, you would have obtained 11 drinks on February 17, 2019. Do you have any reason to dispute the accuracy of that as you sit here?
MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. And according to Royal Caribbean's records, Susie would have obtained eight drinks on February 17, 2019. Do you have any different impression or recollection than that as you sit here today?

A. No.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. So we also have records for Richard Burgess's alcohol purchases, and according to our records, he would have had his first drink at 4:18 p.m. Were you with him at that time?

A. If I wasn't, I was there fairly soon to that, yeah.

Q. So in looking at Richard's purchases and yours, it seems that there are several that kind of coincide. For example, there are both purchases made at the Wipeout Bar. There are both purchases made at the Sand Bar.

Do you recall specifically being at the Wipeout Bar and the Sand Bar with Richard?

MS. LOBEL: Form. And I'll note

that the witness doesn't have the benefit of looking at both records, and you're reading it to him. Go ahead.

A. I mean, I'm sure we were together at those, yeah.

BY MR. DRAHOS:

**Q. Do you have any idea how many drinks Richard had on February the 17th?**

A. No.

**Q. Okay. According to Royal Caribbean's records, Richard's last drink purchase was at a comedy club at 1:05 a.m.**

**Were you with him --**

A. No.

**Q. -- during that particular time?**

A. No.

**Q. How long were you out until on February 17th?**

A. I left the piano bar when it closed, probably about 10:30, roughly, if I remember right.

**Q. Was Richard at the piano bar at the time?**

A. He was there for some of the time, yes.

**Q. So what is the last time that you think you would have seen Richard on February the 17th?**
A. At the piano bar.
**Q. Somewhere around 10:30?**
MS. LOBEL: Form.
A. I'm not sure when he left. I don't know. I know I was there 'til roughly -- I think they normally close about 10:30, so I probably left around then.
BY MR. DRAHOS:
**Q. Right, but I think maybe just the way I'm asking the question. What I'm trying to get at is, what time was the last time you saw Richard Burgess on February 17th, to your recollection?**
A. I'm not sure exactly if he was still there. We weren't all sitting together. But most of the group was there until it closed, so he may have been there at the same time. I'm just not sure.
**Q. All right. So would it be safe to say, then, that your estimate was the last time you saw him could not have been any later than 10:30 at night?**

MS. LOBEL: Form.
A. That's correct.
BY MR. DRAHOS:
**Q. Was he intoxicated at the time?**
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
**Q. Do you know how many drinks he had had up until that point?**
A. I do not.
**Q. Do you have any knowledge of how many more drinks, if any, he had after you saw him that evening?**
A. No.
**Q. Do you know who he was with that evening, if anyone, after you left to go back to your cabin?**
A. I'm not sure who all went where. I went on to the room.
**Q. So when you left, did the rest of the group stay?**
MS. LOBEL: Form.
A. The place was shutting down, so they -- most times they like to go get some pizza.

BY MR. DRAHOS:
Q. **Who is "they"?**
A. Jimmy and them, Richard and Darren. There's a little pizza place there, and they go get a couple of pieces of pizza. Then they may go gamble. They may go to another bar. I don't know. But I retired for the night.
Q. **Was Darren still there at the time?**
A. I'm not sure.
Q. **Do you have any knowledge of how late Richard was out until that evening?**
A. No.
Q. **Do you have any knowledge of what Richard was doing that evening after you left and went back to your cabin?**
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. **And do you know specifically who he was with?**
A. No.
Q. **Did you hear of an instance or event that occurred upon his return to the cabin that night?**

MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. What did you hear?**
A. I heard he slipped, and he busted his head.
**Q. Who told you that?**
A. My wife.
**Q. When did she tell you?**
A. The next morning.
**Q. And can you tell me specifically what it was that she said?**
A. Basically, when he came in that night, he was trying not to make noise. Darren was already asleep. And he didn't turn a light on, and he slipped, and he fell and busted his head.
**Q. Do you know what caused him to slip?**
A. No.
**Q. Do you know how he fell?**
MS. LOBEL: Form.
A. He fell backwards. His feet came out from underneath him.
BY MR. DRAHOS:

Q. Any other detail beyond that?
A. I mean, he slipped, and I know he had to go get stitches that morning.
Q. Do you know what he hit his head on?
A. No.
Q. Do you know if he was intoxicated when he returned to the cabin that night?
A. I do not.
Q. Did anyone report to you that he was intoxicated when he came back to the cabin that night?
A. No.
Q. So let me just make sure I understand your testimony when I leave here. Are you saying that he was not intoxicated or that you just don't know?
MS. LOBEL: Form.
A. I don't know. I didn't see him after about 10:30.
BY MR. DRAHOS:
Q. Understood.
Did anybody explain why Richard did not seek medical treatment that evening after he fell?

A. No.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. How did Susie come to learn of this event?**
A. I'm trying to remember, but she called Richard and Darren that morning.
**Q. Do you know why?**
A. They just start talking to see where everybody's going.
**Q. Do you know what time she called?**
A. No.
**Q. Do you know whether she called Richard or Darren?**
A. No. I don't know if she called their cell phone or the room. I'm not sure.
**Q. So where was your state room in relation to Darren and --**
A. We were on the same level, but we were way apart. They had the suites on the end of the boat, and we were about halfway in the boat.
**Q. So you were both on deck 8?**
A. Yes. I think there was 40 or 50 rooms in between us, so it was a long way.

Q. All right. So could you estimate for me how long it would take you to get from your room to Richard's room?
MS. LOBEL: Form.
A. Three or four minutes maybe. Not long.
BY MR. DRAHOS:
Q. Had you been in his cabin before February 21st?
A. No.
Q. Did you ever go in his cabin ever?
A. I went after they left.
Q. So in other words, when Susie told you about this instance, you didn't like go into the cabin and investigate anything, did you?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Did you talk to Richard about it?
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:
Q. All right.
A. He showed me his scar and some of

his stitches. He just said he slipped and fell.

**Q. So after Susie reported this event to you, when is the next time, to your knowledge, Susie saw Richard?**

A. She went then to go see him.

**Q. So she heard about it over the phone?**

A. Yeah. And then she went to their room.

**Q. And you stayed behind?**

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

**Q. And how long was Susie in Richard's cabin before you saw her again?**

A. It wasn't long. I mean, I kind of think she's the one that told him to go get stitches. So they went to the infirmary.

**Q. Does Susie have any medical training?**

A. No. She's a mother.

**Q. I know, man. Trust me.**

**Okay. So Susie went to go examine Richard. She looks at it and says, You should**

**go get stitches, and then she came back to the cabin?**

MS. LOBEL: Form.

A. Maybe. I don't know.

BY MR. DRAHOS:

**Q. Do you know whether she went down to the medical center with them?**

A. She did not.

**Q. All right. Did you go down to the medical center with them?**

A. No.

**Q. So the next time you saw Richard, it was after he already had the stitches?**

A. Correct.

**Q. And can you tell me specifically what it was that he said?**

MS. LOBEL: Form.

A. I just told him -- he was wearing a ball cap, and I said, Let me see. And he showed me the back of his head. He said he was coming in that night and slipped on some marble -- some marble entrance in there somewhere or something. He slipped on it and fell backwards.

BY MR. DRAHOS:

Q. He didn't say that he was drunk at the time?
A. No.
Q. Other than him saying he slipped on the marble floor, did he give any other detail?
A. No.
Q. Did you have any marble floor in your cabin?
A. No. We were in the cheap seats.
Q. When you went into his cabin, did you slip on the marble flooring at all?
A. No.
Q. Did Susie?
A. No.
Q. So this now being the second day of the cruise, it being Monday, February 18th, the ship's at sea, just to kind of orient you. All right.
Do you know what time of the day it was that you first saw Richard with this hat and stitches?
A. It may have been around noon or lunchtime.
Q. How did he appear to you?
A. Fine.

Q. Did you see anything about him at all, aside from the stitches, that troubled you about his condition or how he was acting or anything?

A. No. He was alert, talking plain, moving around fine.

Q. And so he seemed exactly the same as he had the last time you saw him?

MS. LOBEL: Form.

A. Yeah.

BY MR. DRAHOS:

Q. Did anyone have any discussion or suggestion, like, Hey, Richard, maybe you should get further medical care when the ship goes into port the next day in St. Maarten?

A. No.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. Did anyone at any point in time from the moment you saw him with the hat and stitches on until the time you left St. Maarten ever make any suggestion, like, maybe we should seek medical care here at St. Maarten for you, Richard?

MS. LOBEL: Form.

A. No.
BY MR. DRAHOS:
Q. It was never discussed; either Richard never brought it up, Darren never suggested it, nobody in your group ever made any discussion?
MS. LOBEL: Form.
A. I never heard it.
BY MR. DRAHOS:
Q. So as you sit here today, do you have any knowledge about what took place in the ship's medical center on Monday, February 18th?
A. No. All I know is he received stitches.
Q. All right. Did you ever have any interactions with the doctor who treated him?
A. No.
Q. Or any of the medical staff?
A. No.
Q. Did Richard have any drinks that day?
A. No.
Q. Do you know why not?
A. He allows himself the first day. That's it.

Q. Like he didn't have a sip of anyone else's drink is what you're saying?
MS. LOBEL: Form.
A. No. I never saw him drink.
BY MR. DRAHOS:
Q. Did you spend the entirety of the day with him?
A. No.
Q. How often, if at all, did you see him on February 18th after this initial encounter with the hat and stitches?
A. We probably met before dinner and went to dinner together and probably went back to the piano bar for a little while.
Q. So other than when you saw him at noon and you said, Let me see it, and he took the hat off and showed you his stitches, is it your testimony that you don't recall seeing him again until dinnertime?
MS. LOBEL: Form.
A. I just don't know. I mean, maybe I run into him during the afternoon. I don't know.
BY MR. DRAHOS:
Q. That's fine. But what you're

saying is you don't have a specific recollection of doing anything with him between the time of noon and the time you went to dinner?

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. Was Darren with you when Richard showed you the stitches?

A. I believe he was.

Q. So from the moment in time that you had this initial encounter and he showed the stitches up until the present date, has Darren ever expressed any criticisms to you about how the doctor acted during this treatment on February 18th?

A. No.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. Do you know if anyone within your group was with Richard and Darren when he went and got those stitches?

A. No, I'm not aware of any of them going. No.

Q. So according to our records,

Richard went into the spa that evening around 8:30 at night for a 75-minute massage. Did you happen to be in there with him at the time?

A. No.

Q. So do you recall having dinner with Richard that night?

A. I'm sure we did, but --

Q. Anything --

A. -- I couldn't tell you definite because we split up sometimes, but we normally go to one of those specialty restaurants or something as a group.

Q. So anything stand out to you at all about Richard's behavior during dinner? In other words, was his appetite different? Was his demeanor different? Was his attitude different? Did he make any complaints? Anything like that at all?

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. And I know that was a compound question. I can ask it five different ways or just ask it that way. I got the gist of what you said.

A. That's fine.
Q. So as far as you're concerned, based upon all your observations and interactions with Richard on February 18th, he was his normal self?
MS. LOBEL: Form.
A. He was fine.
BY MR. DRAHOS:
Q. So the next day being Tuesday, February 19th, the ship was at -- strike that.
Before I move on, do you have any idea what Richard did that night on the ship, what he was doing, his activities?
A. No.
Q. Do you know how late he was out 'til?
A. I do not.
Q. Do you know whether or not he and Darren separated at any point in time that evening?
A. No.
Q. Okay.
MR. DRAHOS: How's everybody doing by the way? We've been going about an hour and 15 minutes. We all good to keep going?

MS. LOBEL: I'm fine.
THE WITNESS: Let's go.
MR. DRAHOS: You good too?
THE COURT REPORTER: Yeah, I'm okay.
MR. DRAHOS: Just let me know if you want me to stop; I'll stop. Otherwise, we keep going.
BY MR. DRAHOS:
**Q. So the next day being Tuesday, February 19th, this is the second day the ship is scheduled to be at sea all day. Okay? Do you recall when you next saw Richard?**
A. I do not.
**Q. What time do you typically wake up on these cruises?**
A. I normally wake up about 7:00.
**Q. Really?**
A. Early. I see sunlight, I wake up. That's why I go to bed.
**Q. So you're an early riser?**
A. Yes.
**Q. What about your wife?**
A. Well, she sleeps in a little bit. Yeah.

**Q. All right. So by virtue of the fact that you get up before she does, do you typically leave the cabin?**
A. Yes.
**Q. What do you do? Do you have a routine?**
A. There's a little -- they call it Central Park out there on the eighth level. I go get coffee and a bagel or something, and I sit out there and have a cup of coffee or two.
**Q. Does anybody ever join you?**
A. Yes.
**Q. Who?**
A. It just varies. Chuck and Teri, they will start moving. Everybody -- when they wake up, they come out to Central Park to get coffee and a little breakfast.
**Q. Okay.**
A. The time just varies.
**Q. Would Richard ever meet you out there for that?**
A. No.
**Q. From your observation, whether you know this or not, what was Richard's typical**

morning routine like on these cruises, if he had one?

A. Typically, from what he talked about and where I found him that day when things happened, he goes to that restaurant that they can go to because they have a suite. And he goes there and eats, and he meditates and some days reads his Bible.

Q. All right. So before the subject incident, were you aware that Richard had any type of routine like that?

A. I knew that's where he went every morning, yes.

Q. So he would not come to Central Park is what you're saying?

A. No.

Q. So it would not be typical for you two, Richard and yourself, teaming up in the mornings as everyone was getting up?

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. I know you said that you didn't take any photographs --

A. Nope.

**Q. -- during the cruise.**
**To your knowledge, did your wife?**
A. She probably did because she keeps her phone on her. I lock mine in the safe when I get on the boat and get it when we leave.
**Q. So have you seen any photographs of yourself on the subject cruise?**
A. Oh, I'm sure I did. Am I in there?
**Q. I didn't find any on the ones I just had.**
A. Good. I don't want some attorney to get ahold of my picture.
**Q. Trust me, I'm harmless.**
A. I don't really do much for pictures. I tend to avoid every one I can.
**Q. I don't see you in any of these. You must be the one taking these photographs.**
A. Nope. Like I said, I don't -- I lock my phone up so I won't lose it.
**Q. So moving right along.**
MR. DRAHOS: Off the record.
(Discussion off the record.)
MR. DRAHOS: Back on.

BY MR. DRAHOS:
Q. So when we left off, we were talking about the morning of February the 19th, second ship sea day.
A. Uh-huh.
Q. You told me that was typically your routine to be out in Central Park having coffee.
Do you recall when you first saw Richard that day?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Do you recall seeing Richard that particular day?
A. I'm sure I did, but actually when and where, I don't know. But at some point, we all run together.
Q. Any particular encounters with Richard on February 19, 2019, that stand out for you as a specific recollection?
A. The 19th?
Q. Yes, sir.
A. What day was that?
Q. So this is the -- it's day three,

second day of the --
A. Okay. Tuesday?
Q. -- of the voyage.
You're at second sea day of the voyage, and this is the day prior to your first port of call in St. Maarten.
A. Yeah. I don't know. I'm sure we ran into each other because we have certain places we know people gather, and you'll make your rounds and just see who's there.
Q. But as you sit here today, what I need to pin down is that you don't have a specific recollection of any particular encounter or any particular experience with Richard on February the 19th?
A. No.
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. Did you hear of anything that Richard was doing on February the 19th?
A. No.
Q. In other words, do you have any knowledge as to how late he was out?
A. No.
Q. Or who he was spending his time

with?
A. Uh-uh, no.
Q. Or how he was getting along with Darren?
A. No.
Q. Are you aware prior to the ship docking in St. Maarten of any disputes or disagreements between Richard and Darren?
A. No.
Q. So the next day being day four, February 20th, the ship's scheduled to arrive to St. Maarten that morning. According to our records, everybody got off the ship at 11:39 a.m. except for Richard.
Do you know why Richard didn't get off the ship until approximately 11:49 a.m., about ten minutes later?
A. I do not.
Q. If it's -- if it's noted in our movement reports that you, your wife, and Matthew got off at 11:40 a.m., would you have any reason to dispute that?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:

**Q. Did you get off with Darren? He got off at 11:39 a.m.**
MS. LOBEL: Form.
A. I'm sure we were there close together, yeah.
BY MR. DRAHOS:
**Q. Did you have any specific plans for St. Maarten?**
A. Normally, at St. Maarten, we get off, and we go to the airport to watch the people get blown off the beach.
**Q. Yeah. Yeah. I've been there for that.**
A. Yeah.
**Q. So, what, you take like a -- you got to take a taxi to get there, right?**
A. Yeah.
**Q. It's too far to walk.**
A. It's a long --
**Q. So you take a taxi there?**
A. Yeah.
**Q. That's Maho Beach, I think they call it?**
A. Yeah. It's a good 20, 30-minute ride.

**Q. All right. And so did the entire group go, including Richard?**

A. I don't know. I don't think everybody went.

**Q. Well, did Richard go with you guys?**

A. I don't remember him being there. He may have. We went, my son and his girlfriend. They wanted to get out to the beach, and so we stood near that to watch them.

**Q. So just circling around this again one more time to make sure I ask the questions right. So if according to our records everyone in your group got off at 11:40 or about that time, but Richard didn't get off until 11:49, and he was the only one in your group to leave at a later point, you have no recollection of why that was the case?**

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

**Q. Do you know if it had anything to do with how he was feeling that morning?**

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:
**Q. Do you know if it had anything to do with how he was getting along with Darren?**
A. No.
**Q. Did you do anything else other than watch the planes at Maho Beach? I think it's M-A-H-O Beach.**
A. We had something to eat there.
**Q. In St. Maarten?**
A. Yes, near the airport. There's a tiki hut bar or something right nearby. You just walk over.
**Q. Do you recall if Richard was there for that?**
A. No.
**Q. So is it fair to say you don't have a specific recollection of Richard being in St. Maarten?**
MS. LOBEL: Form.
A. That's correct.
BY MR. DRAHOS:
**Q. So as you sit here, you have no idea what he did or didn't do?**
MS. LOBEL: Form.
A. I don't recall.

BY MR. DRAHOS:
Q. Do you have any knowledge as to whether or not he made any complaints at all as to how he was feeling while in St. Maarten?
A. No.
Q. Do you have any knowledge as you sit here today as to whether or not he demonstrated any unusual signs or symptoms to anyone in your group while he was in St. Maarten?
A. No.
Q. Do you know whether or not he sought any medical care in St. Maarten?
A. Not that I'm aware of, no.
Q. Do you know if he had any alcoholic beverages?
A. I would say he did not.
Q. Why do you say that?
A. Because he gives himself one day.
Q. So what you're saying is that in keeping with his practice, he should not have had any alcohol?
MS. LOBEL: Form.
A. That's correct.
BY MR. DRAHOS:

Q. Do you recall meeting back up with Richard at some point in time that evening after you guys got back onto the ship?
A. I'm sure we went and had dinner together.
Q. Some people have crystal clear memories. They know exactly what they were wearing.
A. Not me.
Q. I'm just poking at you to find out what you know.
A. I don't pay attention to that.
Q. So once again, do you have a specific recollection at all of any encounter or experience with Richard on Wednesday, February 20th?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. All right. And more specific to that, do you know when the last time was that you saw Richard on February 20th?
A. No.
Q. Do you know whether or not you saw him in the evening at all?

MS. LOBEL: Form.
A. I cannot be 100 percent certain.
BY MR. DRAHOS:
**Q. Do you know what he was doing on the evening of February 20th on the ship?**
A. No.
**Q. Do you know who he was spending his time with?**
A. No.
**Q. Do you know what time he went to bed?**
A. No.
**Q. Do you know anything at all about his health on the evening of February 20, 2019?**
A. No.
**Q. So is it your testimony, then, that the last time you saw Richard at some indeterminant point of time on February 20th, he was his normal usual self?**
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. Up until that point in time, you had never seem him exhibit any unusual signs or symptoms to you?**

A. No.
Q. He never made any complaints to you at all as to how he was feeling?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Have you since come to learn either in discussion with your wife or during these meetings that you had with the Landrums anything about Richard's health that evening?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Do you know whether or not he and Darren went to bed at the same time that night?
A. No.
Q. Is your wife's cell phone number (205)937-1840?
A. That's correct.
Q. So the next day, being day five, February 21st, the ship is scheduled to be in San Juan, Puerto Rico.
What time did you wake up that morning?
A. Probably about 7:00.

**Q. Do you have a memory of going to Central Park?**
A. Yes.
**Q. Did you go alone?**
A. Yes.
**Q. Did Susie remain in the cabin?**
A. Yes.
**Q. Had Richard ever called you on his cell phone prior to February 21st, 2019?**
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
**Q. Were you aware that Richard had his cell phone with him during the subject cruise?**
A. Yes.
**Q. How did you come to know that?**
A. He talked to my wife quite often.
**Q. Do you know what time Richard woke up that morning?**
A. No.
**Q. And you told me that he went to a particular -- did you call it a restaurant, or what did you call it?**
A. Well, it's a -- I call it a private restaurant for the people that

purchase the suites. I don't know what the official name is.

**Q. All right. Let's see if we can come up with a name together so that we know we're referencing the same point.**

A. It's on the 18th level. It's a private restaurant.

**Q. So why don't we call it the level 18 private area?**

A. Okay.

**Q. So had you ever been to the level 18 private area prior to February 21st?**

A. No.

**Q. To your knowledge, did --**

A. Excuse me. I may be getting cruises confused, but Susie and I did go eat with Richard and Darren at that restaurant one evening. I'm not sure if it's that cruise or the year before.

**Q. Other than the fact that you guys had been in the area for a private dinner once before, do you have any memory of it otherwise?**

A. No.

**Q. To your knowledge, did Richard attempt to contact your wife on the morning of**

February 21st?
A. Yes.
Q. Do you know what time?
A. Probably shortly before 9:00, because that's when I was almost back at the room and we met at the door.
Q. I'm going to hand you what we are going to mark as Exhibit B to the deposition --
MR. DRAHOS: Are we using numbers?
(Defendants' Exhibit 2 was marked for identification.)
BY MR. DRAHOS:
Q. -- Exhibit 2 to the deposition.
These are copies of phone records that we've obtained in the case, and they are really not going to mean much to you other than that I want to use them as a reference point as we're asking -- I'm asking you questions.
If you'll turn to the last page, it's got a number 12 in the lower right-hand section.
A. Okay.
Q. So according to these records, Richard would have placed a phone call at 9:55 a.m. that morning, which would be 9:55 Puerto

Rico time, to Richard -- to Darren's cell phone.
A. Yes.
Q. As you sit here today, do you know whether or not that call was received?
A. No, I don't know.
Q. Do you know whether or not Richard left a message on Darren's phone at 9:55 a.m.?
A. I don't know that.
Q. According to the records, next phone call was placed at 9:59 a.m., and that would be to your wife's cell phone. Agreed?
MS. LOBEL: Form.
A. Agreed.
BY MR. DRAHOS:
Q. And it was for one minute in duration. Do you see that there?
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
Q. Do you know whether or not that call was received by your wife at what would have been 9:59 a.m. Puerto Rico time?
A. Yes.
Q. When I say "received," does that

**mean, to your knowledge, your wife picked up the call?**

A. Yes.

**Q. And she spoke to Richard?**

MS. LOBEL: Form.

A. Correct.

BY MR. DRAHOS:

**Q. What is your understanding of what Richard said?**

A. Richard told my wife that he thought he was having a stroke and he could not get ahold of Darren.

**Q. Did he say where he was?**

A. Yes. He was in that 18th level restaurant.

**Q. Did he say what it was about his condition that led him to believe he was having a stroke?**

A. He said he was going numb. He couldn't stand up, and he was having some difficulty seeing.

**Q. Did he say anything else to your knowledge?**

A. No, I don't think so.

**Q. So in this one-minute call, he**

reported to Susie that he couldn't get ahold of Darren, he was at the level 18 -- you call it a restaurant. I want to make sure we're using the same words -- private area at level 18?

MS. LOBEL: Form.

A. Yeah.

BY MR. DRAHOS:

Q. And that he was going numb, couldn't stand and was having difficulty seeing?

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

Q. Was any other information relayed during that call to your knowledge?

A. That's all I know.

Q. All right. So if you look here at the records, another call is placed at 10:01 a.m., this being to Darren's cell phone number for one minute.

Do you know, as you sit here today, whether or not Darren received that call?

MS. LOBEL: Form.

A. I do not know that. I don't believe he did because Susie had to go to the

room to get him.
BY MR. DRAHOS:
**Q. So we're going to get there in just one second, but before we do, do you know whether or not Richard left a message on Darren's phone at 10:01 a.m.?**
A. I do not.
**Q. Now, as I understand your testimony, you happened to be coming back to the cabin --**
A. Yes.
**Q. -- from your morning coffee?**
MS. LOBEL: Form.
A. Right.
BY MR. DRAHOS:
**Q. And you told me that you met Susie at the door?**
A. Yeah. I think when I walked in the door, she was about to walk out.
**Q. Tell me what she said.**
A. She told me that she heard from Richard and that he thinks he's having a stroke, and she's going to find Darren and I needed to get up there with Richard.
**Q. Anything else said between the two**

**of you?**
A. No. It was a really quick conversation. She was in a hurry.
**Q. Did she seem panicked to you?**
A. Oh, yeah.
**Q. How did you take this information? Were you surprised?**
MS. LOBEL: Form.
A. Yeah, I was surprised.
BY MR. DRAHOS:
**Q. Why were you surprised?**
A. Surprised that somebody had a stroke. I mean, I wasn't expecting it.
**Q. In other words, Richard had not demonstrated to you any particular behaviors or anything at all, complaints that would have led you to believe that this was a potential risk?**
A. No.
MS. LOBEL: Form.
A. We had been at the exercise room during the week and on the track, and he was fine physically.
BY MR. DRAHOS:
**Q. How many times had you been on the exercise --**

A. I may have went once with them.
**Q. So you went into the exercise room and he went on, you said, the track?**
A. I walked on the track. He ran. We did the elliptical and worked out on machines a little bit.
**Q. Was this after his stitches?**
A. Yes.
**Q. So after the stitches but before February 21st, you had at least one occasion where you were sharing time together in the exercise room?**
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. And you had also shared time together on the track where he ran and you walked?**
MS. LOBEL: Form.
A. Right.
BY MR. DRAHOS:
**Q. For how long a period of time was this encounter in the exercise room?**
A. Maybe 45 minutes most.
**Q. What specifically did you see him**

doing in the exercise room during that 45-minute?
A. He would do cardio on the elliptical, and he would do some of the weight machines.
Q. And did he appear to be having any difficulty using those devices?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. And then you said you all saw him running on the track.
Do you recall when specifically that was?
A. No.
Q. But it was after --
A. It was after the stitches.
Q. But what particular day; you don't remember?
A. I don't know.
Q. And did he appear to be running fine to you?
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:

Q. So you meet your wife. She says Richard's -- she's in a hurry because she's trying to get Darren, I guess is what you were saying?
MS. LOBEL: Form.
A. She was running to their room.
BY MR. DRAHOS:
Q. And she told you that you needed to go up and meet Richard --
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:
Q. -- that he may be having a stroke?
MS. LOBEL: Form.
A. That's correct.
BY MR. DRAHOS:
Q. Did she give you any other information?
A. No.
Q. Did you immediately turn around and head back to that area?
A. Yes.
Q. So do you know what time it was that this encounter with Susie occurred?
MS. LOBEL: Form.

A. It was right at 9 o'clock.
BY MR. DRAHOS:
**Q. So there's another call here. You see it -- if you look at the record there, there's a call at 10:14 a.m. It's for two minutes. And that's a phone call that Susie placed to Richard.**
**Do you see that there?**
A. I see it.
**Q. So if we're trying to orient ourselves based upon these phone calls, do you know whether or not your encounter with Susie took place before or after this two-minute call at 10:14?**
A. It was before.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. It was before.**
A. It was dead on 9:00 a.m. because that's -- because she was heading out the door when I was coming in, so it was right around 9:00.
**Q. Do you know why Susie called at 10:14 a.m.?**
MS. LOBEL: Form.

A. Just to check probably.
BY MR. DRAHOS:
Q. Check?
A. Make sure I was there or what, I don't know.
Q. So were you there, and do you have a recollection of Susie calling Richard's phone?
A. At 9:14, I was there, but I do not -- I don't recall that phone.
Q. All right. Let me make sure that I ask the questions in their entirety in fairness to us all so that you answer --
A. Excuse me.
Q. That's all right.
So the question I was going to ask is, when you were with Richard up on this private area of deck 18, do you have a recollection of Susie calling his cell phone?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. So let me ask you an alternative scenario, and you ask me -- or you tell me whether or not if this is not possible.

**Is it possible that Richard called Darren at 9:55 a.m., didn't reach him; called Susie at 9:59 a.m., didn't reach her; attempted to call Darren again at 10:01, didn't reach him; and then connected -- Susie called back at 10:14 and connected with Richard?**

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

**Q. No. So you're saying your encounter had to have happened before 10:14 a.m.?**

MS. LOBEL: Form.

A. That's correct.

BY MR. DRAHOS:

**Q. Do you know what time it was when you arrived to deck 18?**

A. I left immediately, so right at 9:00. It probably took me about ten minutes maybe to get up there.

**Q. So if we're using your timeline, then, that would mean that you would have first encountered Richard that morning at approximately 9:00 a.m.?**

A. That's correct.

Q. Tell me what you saw when you got there.
A. I saw him sitting by himself. I sat down by him, and he grabbed my leg and said, Don't leave me. And he said he couldn't walk. He couldn't see good. And I told him I'd go get help and be right back.
Q. Was Richard alone in the area at the time?
A. Yes.
Q. Do you know how long he had been there for?
A. No.
Q. Do you know how long he'd been feeling that way before he spoke to Susie?
A. No.
Q. And do you know what time he woke up that morning?
A. I do not.
Q. Do you know whether or not that particular area of deck 18 has hours of operation?
A. I don't.
Q. And you didn't see any members of the ship's crew at the time in that area?

MS. LOBEL: Form.
A. Members of the ship's crew?
BY MR. DRAHOS:
**Q. Yes. So I asked, I said, was Richard alone when you got there; you said yes.**
A. Yeah. He was sitting by himself, yes.
**Q. So did you see any members of the -- I want to make sure I'm thorough with the questioning. Did you see any members of the ship's crew in that private area of deck 18 when you got there?**
A. I saw the concierge.
**Q. Where?**
A. In the restaurant. He was sitting at a table.
**Q. And was Richard sitting at a table as well?**
A. It was kind of a booth near the glass where he could look out toward the ocean.
**Q. All right. So the only thing that you told me that you recall him saying, at least at this point in time, was he grabbed your leg, said, Don't leave me. He can't walk**

or see good. And you said, I'll go get help and be right back.

MS. LOBEL: Form.

A. That's correct.

BY MR. DRAHOS:

Q. Any other information exchanged between the two of you during this initial encounter?

A. No.

Q. Where did you go?

A. I went to the concierge.

Q. Is this a man or woman?

A. Man.

Q. And he was sitting at a table?

A. Yes.

Q. What did you say?

A. I said, I need medical. My friend is having a stroke.

Q. Do you know this person's name?

A. No.

Q. Is there a description you could provide for me other than that he was the concierge?

A. No.

Q. In other words, tall? short? fat?

**thin?**

MS. LOBEL: Form.

A. He wasn't tall, but maybe thin.

BY MR. DRAHOS:

**Q. Anything about his descent at all?**

A. No.

**Q. What did this person do in response?**

A. He got on the phone.

**Q. In front of you?**

A. Yes.

**Q. What did he say?**

A. Once he got on the phone, I left because I told Richard I'd be right back, and I went back and sat with him until they showed up.

**Q. How soon, if you know, did someone arrive after this person made that phone call?**

A. No more than ten minutes.

**Q. Could it have been less than ten minutes?**

A. Could have been.

**Q. Could it have been less than five minutes?**

MS. LOBEL: Form.

A. No.
BY MR. DRAHOS:
**Q. So somewhere between five and ten minutes?**
A. Closer to ten.
**Q. Who arrived next?**
A. Somebody came with the wheelchair.
**Q. So is it your testimony, then, that you sat there in this booth with Richard between five to ten minutes?**
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. And what did you discuss during that time period?**
A. Mainly, we just talked. I tried to calm him down. He was scared to death. I just trying to reassure him that it was going to be okay, that help is coming.
**Q. So he was able to communicate with you?**
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:

Q. So in other words, you could understand the words that were coming out of his mouth?
MS. LOBEL: Form.
A. At that time, yes.
BY MR. DRAHOS:
Q. And he could understand the words that were coming out of yours?
MS. LOBEL: Form. Leading.
BY MR. DRAHOS:
Q. And was he slurring his words at all?
A. A little.
Q. Did he give you any further information as to how he was feeling?
A. No.
Q. So that's a big gap of time, right? Five to ten minutes is a long time to be sitting there.
MS. LOBEL: Form.
A. Right.
BY MR. DRAHOS:
Q. So are you saying that you guys were sitting there in silence the whole time?
MS. LOBEL: Form.

A. No. Like I said, I talked to him, trying to calm him down.
BY MR. DRAHOS:
**Q. So what else was being discussed?**
MS. LOBEL: Form.
A. I just told him we're getting him help, and he's going to be okay.
BY MR. DRAHOS:
**Q. Okay. But that still eats up maybe 35 seconds.**
MS. LOBEL: Form.
A. Right. But you keep telling him, Stay positive, just stay calm. I mean --
BY MR. DRAHOS:
**Q. Is there anything else that you recall him saying specifically?**
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
**Q. Did you talk about getting medical care in Puerto Rico?**
A. No.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Did you talk about getting medical**

care in the ship's medical center?
A. Yes. I told him we -- the medical group was on their way to get him to help him.
Q. Did you see him attempt to get up?
A. When the wheelchair got there, he could not get up, so we had to put him in the chair.
Q. During this five to ten minutes, did you do any other kind of small talk, like talk about the University of Alabama football team or --
A. No.
Q. -- or go over your favorite movies? No?
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. Sometime when people are in stressed-out situations like that, the other person will try and get their mind off of it by talking about benign things that no one really cares about.
MS. LOBEL: Form.
A. If I did, I don't remember.
BY MR. DRAHOS:

Q. All right. So what I'm trying to get at is, did you do anything like that with him?

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. And as best as I can extract from you, you don't remember him saying much else other than that what you've told me?

MS. LOBEL: Form.

A. He told me he's scared.

BY MR. DRAHOS:

Q. Did he say anything about Darren at all?

A. I think we did talk. I told him that Susie was going to get Darren, yes.

Q. So by process of elimination here, if you're able to rule off definitively that the 10:14 a.m. phone call was made after your encounter with Susie and if you're telling me that you got there some point around 9:10, that means that this 9:00 -- well, actually, let me stick to Puerto Rico times.

If you got there somewhere around 10:10 a.m. Puerto Rico time and this phone was

**made at 10:14 a.m. by Susie and it was received for two minutes, that must mean there had to have been a phone discussion between Richard and Susie while you were there, right?**

MS. LOBEL: Form.

A. I mean, if the record shows she called, then yes. I just -- you know, with what was going on, I may have been at the concierge when that happened. I don't -- I just don't recall that call.

BY MR. DRAHOS:

**Q. But you would not have picked up the phone and spoken to Susie?**

A. No.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So that means that at 10:14 a.m., Richard must have been the one to accept the phone call and speak to Susie on the phone?**

MS. LOBEL: Form. Leading.

A. Like I said, I just don't remember that phone call.

BY MR. DRAHOS:

**Q. Did anyone else use Richard's phone that morning to your knowledge?**

A. No.
**Q. So the person in the wheelchair was the first person to arrive?**
MS. LOBEL: Form.
A. Yes. And then -- the wheelchair and Darren were real close to getting there at the same time.
BY MR. DRAHOS:
**Q. Was Susie with Darren?**
A. No. She went to go find Jimmy and Ilene.
**Q. Who was the wheelchair guy?**
A. Oh, I don't know. I imagine it was an orderly from the medical department.
**Q. Do you know one way or another what that person's title was?**
A. No.
**Q. Was it a man or a female?**
A. I remember a female getting us in the elevator, but there may have been two people. I just -- let's see. Might have been two.
I know a lady got us in the elevator, and she had a card that she could swipe where we weren't going to stop on every

level.
**Q. So when the person with the wheelchair first arrived, did they have any questions for Richard?**
A. Well, I -- I talked to him.
**Q. What did you say?**
A. Just told him that he was having a stroke. He couldn't stand up, he couldn't move his legs, and his words were slow. And he is having trouble seeing.
And then we pretty much -- Darren was there by then. And that person and me picked Richard up and put him in the wheelchair.
**Q. Did Richard say anything to the person who had the wheelchair?**
A. Not that I'm aware.
**Q. Did the person with the wheelchair render any kind of medical treatment to Richard there while you were on deck 18?**
A. No.
**Q. So the only thing the person did was assist Richard in getting into the wheelchair?**
MS. LOBEL: Form.

A. That's correct.
BY MR. DRAHOS:
**Q. Did Richard and Darren speak at all?**
A. Yes.
**Q. What did Richard say to Darren?**
A. Oh, I couldn't tell you. I know they spoke. Both of them were scared to death.
**Q. So you don't recall what Richard said to Darren?**
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
**Q. Do you recall what Darren said to Richard?**
A. I do not. It was one of those panic situations.
**Q. All right. So let me make sure I understand your testimony correctly, then. What you're saying is you don't recall what was said, not that Richard was incapable of speaking?**
MS. LOBEL: Form.
A. He was able to talk a little,

yes.
BY MR. DRAHOS:
Q. And so did Susie ever meet you guys up in this area?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Did Jimmy and Ilene ever meet you up in deck 18?
A. No.
Q. How long were you there with the person in the wheelchair before you left to go to the elevator?
A. Just a few minutes.
Q. Did Richard or Darren make any specific requests to the person operating the wheelchair to your knowledge?
MS. LOBEL: Form.
A. Not to my knowledge, no.
BY MR. DRAHOS:
Q. Did the person operating the wheelchair make any specific statements to Richard or Darren?
A. No.
Q. So did you accompany them down to

the medical center?
A. Yes.
Q. Were there any complications at all in the transport from deck 18 to the medical center itself?
A. No.
Q. You had made mention of the fact that the person had a card that swiped the elevator to prevent any interruptions?
MS. LOBEL: Form.
A. That's correct.
BY MR. DRAHOS:
Q. And were there any interruptions with the elevator?
A. No.
Q. Let me go back a second. When you first arrived to this private area, deck 18, and see Richard for the very first time, was his appearance any different than the last time you had seen him?
A. Yes.
Q. His physical appearance?
A. I mean, he couldn't move much.
Q. But if you were just looking at him --

A. Looking from a distance?

**Q. Yes, sir.**

**-- did he appear any differently to you? And I don't want it to be from a distance. When you were sitting there at the table waiting for help to arrive, outside of his speaking, just looking at him, did his physical appearance look any different than you last seen him?**

MS. LOBEL: Form.

A. His demeanor was different. He was scared to death.

BY MR. DRAHOS:

**Q. Okay. His demeanor. But what about his physical appearance?**

MS. LOBEL: Form.

A. Physical look?

BY MR. DRAHOS:

**Q. Yes, sir.**

A. I mean, he had trouble moving, but as far as just -- just a glance at him, no.

**Q. All right. When you say he had trouble moving, is there some specific movement that you can recall him trying to make?**

A. He couldn't move his leg. He had trouble moving his arm, and he said he couldn't see good.
**Q. So he had trouble --**
A. He was talking real slow, and Richard normally is a fast talker. He's not from the South like me.
**Q. So he was speaking slow, he appeared scared to death --**
A. Yes.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. -- and you said he was having trouble moving?**
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. And specifically you told me his arm and his leg?**
MS. LOBEL: Form.
A. Yes. Said he could not stand up.
BY MR. DRAHOS:
**Q. Which arm? Which leg?**
A. I believe it was his right.
**Q. Right arm and right leg?**

MS. LOBEL: Form.
A. Yes, I think so.
BY MR. DRAHOS:
**Q. Did you observe him attempting to get up, or did he just report to you that he tried?**
A. He tried to get up when the wheelchair got there. He couldn't move.
**Q. Did he physically lift himself off of the seat without assistance?**
A. He wanted to. He tried to get up, but he couldn't.
**Q. Can you tell me what it was about his body that prevented him from getting up on his own?**
A. He said he couldn't stand up.
**Q. He reported that?**
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. But did you see him physically attempt it?**
A. Yes. He tried to lean over to get up, but he could not do it.
**Q. Did he appear to you to know where**

**he was?**
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:
**Q. Did he appear to know who he was?**
MS. LOBEL: Form.
A. I believe so, yes.
BY MR. DRAHOS:
**Q. By the way, did you know what time it was that morning when you saw Richard?**
MS. LOBEL: Form. Asked and answered.
A. At 9 o'clock I took off to go up there, so about ten after 9:00 is when I saw him.
BY MR. DRAHOS:
**Q. Let me ask the question that was intended. At the time that you saw Richard for the very first time that morning, did you know that there was a difference between what was on your watch and the time in Puerto Rico?**
MS. LOBEL: Form.
A. I did not know we were on Puerto Rico time.
BY MR. DRAHOS:

Q. Did you know that there was a difference between Puerto Rican time and Eastern Standard Time?

MS. LOBEL: Form.

A. I did not.

BY MR. DRAHOS:

Q. At any point in time that morning, did you come to learn that there was a difference between Eastern Standard Time --

A. Not that morning --

Q. -- and Puerto Rican time?

A. -- no.

Q. Make sure you let me finish that question. Okay? I'm going to ask it again --

A. All right.

Q. -- so that it's complete.

At any point in time that morning, did you come to learn that there was a difference between Puerto Rican time and Eastern Standard Time?

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:

Q. As we sit here today, are you aware of the fact that there's a difference between

**Puerto Rican time and Eastern Standard Time during particular times of the year?**

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

**Q. When did you first come to learn that?**

A. Probably in one of our call conversations that that was Atlantic Standard Time or something, whatever they were on during that time of year.

**Q. You learned that from Ms. Lobel?**

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

**Q. Did everyone else in the group, to your knowledge, first learn that from Ms. Lobel as well?**

MS. LOBEL: Form.

A. I can't speak for the group.

BY MR. DRAHOS:

**Q. How about your wife?**

MS. LOBEL: Form.

A. Yeah. She figured -- she knew it then too.

BY MR. DRAHOS:
Q. She? I'm sorry?
A. She found out the same time I did.
Q. So if according to Royal Caribbean's records, Mr. Burgess -- Richard was presented to the ship's medical center at 10:25 a.m. Puerto Rico time, 9:25 Eastern, would you have any reason to dispute the accuracy of that?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Did his condition change at all from the time that you first observed him up on deck 18 in a private area until the time he arrived to the ship's medical center?
MS. LOBEL: Form.
A. Not at the time of arrival, no.
BY MR. DRAHOS:
Q. Did you accompany him -- strike that.
Were you with him during his first encounter with the ship's doctor?
MS. LOBEL: Form.

A. When the nurse came in the room, I left to let her hook him up to the monitors and everything.

BY MR. DRAHOS:

**Q. So you would have accompanied Richard all the way up until the point that he was delivered into an observation room?**

MS. LOBEL: Form. Leading.

A. That's correct.

BY MR. DRAHOS:

**Q. How long was he was in the medical center for before he was put into the observation room?**

A. Just a couple minutes. Not long. They wheeled him -- they had a room available, and they wheeled him in there.

**Q. And so were you present for any interactions between Richard and any of the ship's medical staff that morning?**

MS. LOBEL: Form.

A. I was present with the nurse when she initially came in, and I never saw the doctor come in the room.

BY MR. DRAHOS:

**Q. So do you recall the nurse's name?**

A. No.

**Q. What, if anything, did you hear the nurse say to Richard?**

A. Like I said, initially, I walked out so she could hook him up, and then we went back in. And I remember she came in at least one time when I was in there just to check on him, but there really wasn't a whole lot said by her.

**Q. All right. So I don't know if I grasped what you just said. My understanding was that you were with Richard, he was wheeled into the observation room, and the nurse immediately greeted him?**

MS. LOBEL: Form. Leading.

A. Yes. It was pretty quick.

BY MR. DRAHOS:

**Q. And once the nurse greeted him, though, you left?**

A. I went to the --

MS. LOBEL: Form.

A. -- waiting room.

MS. LOBEL: Leading.

BY MR. DRAHOS:

**Q. Okay. I don't --**

THE COURT REPORTER: I'm sorry. One second. If you will, give her a chance to object --

MS. LOBEL: Please.

THE COURT REPORTER: -- before you answer because it's kind of going on top of each other.

THE WITNESS: Okay.

BY MR. DRAHOS:

**Q. So -- sorry. What was your answer?**

A. Can you repeat the question?

**Q. Sure. You told me that you're with Richard, and the nurse greets him. My understanding is that you left.**

MS. LOBEL: Form. Leading.

BY MR. DRAHOS:

**Q. Right?**

MS. LOBEL: Form. Leading.

MR. DRAHOS: I don't need the qualification. If I ask you for it, I'll ask for it. I'm asking questions --

MS. LOBEL: I'm going to ask that you stop leading the witness.

MR. DRAHOS: I can ask questions however --

MS. LOBEL: Not leading questions.
MR. DRAHOS: -- which way I want to.
(Speaking simultaneously.)
MR. DRAHOS: You can absolutely object later, but I'm taking --
MS. LOBEL: I'm objecting now.
MR. DRAHOS: -- a discovery deposition.
MS. LOBEL: That's fine. I don't care. The rules permit discovery to be taken the same way in court which means --
MR. DRAHOS: And that's fine --
(Speaking simultaneously.)
MS. LOBEL: -- direct examination --
MR. DRAHOS: -- Sarah. If I elicit information --
MS. LOBEL: -- and no leading. Please don't interrupt me so I can lay my record. Please.
MR. DRAHOS: Well, you've been doing that all day. I don't need form objections.
MS. LOBEL: That's fine.

MR. DRAHOS: Just tell me you object to the form, and that's fine. You don't need to tell me that I'm leading.

MS. LOBEL: You are.

MR. DRAHOS: You can absolutely argue that to the Court later.

MS. LOBEL: Great. I'm going to ask you to stop leading the witness, and I'm laying the record for that. Go ahead.

MR. DRAHOS: Either way I'm going to get the information.

MS. LOBEL: Great.

BY MR. DRAHOS:

**Q. So -- I'm sorry. Let's go back. So how long were you in the observation room for in total before the nurse arrived?**

A. Not long.

**Q. More or less than a minute?**

MS. LOBEL: Form.

A. Maybe a couple minutes. It wasn't long.

BY MR. DRAHOS:

**Q. And how long did you stay for the interaction between the nurse and Richard before he left?**

A. The initial time, she came in to get him comfortable and hook him up to the monitor, and I stepped out in the waiting room while she did that.

**Q. Okay.**

A. So I was standing outside the door.

**Q. And how long were you there for outside the door?**

A. For her to hook him up?

**Q. Yes, sir.**

A. I don't know. Maybe five, seven, eight minutes. It wasn't long for her to -- they just put a monitor on him.

**Q. And so were you still there when the doctor first arrived?**

A. I never saw the doctor.

**Q. Where did you go from there?**

A. I stood in the waiting room right outside the door.

**Q. Were you able to observe Richard from where you --**

A. Yes.

**Q. -- moved?**

**So you said you went into the**

**waiting room?**

A. Yeah. They had a little room right out front where all the sick people come in and wait to see the doctor.

**Q. So you moved from the doorstep to the waiting room?**

MS. LOBEL: Form.

A. No. I'm just standing out. I had a -- I had a view at Richard's door where I could see.

BY MR. DRAHOS:

**Q. Could you see Richard or the door? I don't understand.**

A. I could see both. The door wasn't closed all the way.

**Q. All right. Was Richard in there with anyone else?**

A. With the nurse at first.

**Q. What about Darren?**

A. Now, Darren, they got him to start filling out paperwork. So he was -- he was in the waiting room filling out papers.

**Q. With you?**

MS. LOBEL: Form.

A. I was standing there, yes.

BY MR. DRAHOS:
**Q. Was anyone else in the waiting room other than you and Darren?**
A. Yes. There were some other patients to be.
**Q. What about among your traveling group?**
A. At first, no. Then Susie found Jimmy and Ilene, and then all three of them came. Yeah. So we were all in there shortly after that.
**Q. So how long were you in the waiting room for in total?**
MS. LOBEL: Form.
A. I mean, we were there until he left the ship.
BY MR. DRAHOS:
**Q. All right. So I guess where I'm getting disconnected with you, then, is that you're telling me you never at one point in time saw the ship's doctor.**
A. I never did see --
MS. LOBEL: Form.
A. I did not see the doctor in the room with Richard.

BY MR. DRAHOS:
Q. Are you saying that that never happened?
MS. LOBEL: Form.
A. I never saw it.
BY MR. DRAHOS:
Q. So it's your testimony that the ship's doctor -- that you never saw the ship's doctor treat Richard? Are you inferring from that or are you asking me to infer from that, that that never happened?
MS. LOBEL: Form.
A. As far as I'm aware of, the doctor never came in that room.
BY MR. DRAHOS:
Q. And you were out in the waiting room with the view of Richard throughout the entirety of the time he was in the ship's medical center?
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
Q. Did you see any gentlemen, any of the observation with -- observation room with Richard other than Darren at any point in time

**while you were in the waiting room?**

MS. LOBEL: Form.

A. Well, I mean, Jimmy and Ilene, Susie and myself, we all rotated in and out of there. But we all stayed at least in the waiting room. Darren was busy. They had him running all over the place doing things.

BY MR. DRAHOS:

**Q. So other than you and other than Jimmy and other than Darren, any other male enter into the observation room that you saw?**

MS. LOBEL: Form.

A. No, not that I saw. No.

BY MR. DRAHOS:

**Q. Do you know who Dr. Joao Pereira is?**

A. I mean, I guess he's the ship doctor.

**Q. Do you know who he is or not?**

A. I never talked to him, no.

**Q. At any point in time during the ship's voyage, did you have an opportunity to ever come to learn who Dr. Joao Pereira was?**

MS. LOBEL: Form.

A. No.

BY MR. DRAHOS:
Q. Have you ever looked at Richard's medical chart from the Royal Caribbean medical center?
A. No.
Q. So if Dr. Pereira, who was the ship's physician during the subject voyage, has a medical chart of findings that he made during his encounter with Richard on February the 21st, are you saying that that never happened?
MS. LOBEL: Form.
A. Yes, I'm saying that.
BY MR. DRAHOS:
Q. You're saying that Dr. Pereira just made this up?
MS. LOBEL: Form.
A. I never saw him walk in that room.
BY MR. DRAHOS:
Q. Is it possible that you just missed it, that you may have been distracted and been doing other things?
MS. LOBEL: Form.
A. Between the four of us, except for the first couple of minutes when the

nurse was hooking him up, somebody was in that room with him at all times.

BY MR. DRAHOS:

**Q. Somebody from your traveling group?**

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

**Q. And it's your testimony here today that never, at any point in time, did any of your traveling group see a doctor come and examine Mr. Burgess?**

MS. LOBEL: Form.

A. That is correct.

BY MR. DRAHOS:

**Q. So how often, if at all, would you be the one to go from the waiting room into the observation room with Richard?**

A. I went in a few times. We kind of rotated out because it's a very small room.

**Q. So you rotated out with who?**

A. Susie, Jimmy, Ilene, and at times, all four of us were in there. Darren came in when he could.

**Q. So at any point in time, whether**

**you were in the waiting room or in the observation room, did you observe anyone make any efforts to try and have Richard transferred off of the vessel?**

MS. LOBEL: Form.

A. I mean, did I see them do it?

BY MR. DRAHOS:

**Q. No. Let me ask it differently.**

**Throughout the entirety of the time that you were in the ship's medical center, did you overhear anyone making any comments about Richard being transferred off the ship for further medical care?**

A. Yes.

**Q. When was the first time that you overheard anyone make a comment in that regard?**

A. It was probably somewhere around -- maybe about 10:30, there was a -- one of the ship's officers came in and said that he was going to be in charge of getting him off the ship.

MS. LOBEL: For clarity -- I don't mean to interrupt -- if I may, are you talking ship time, or are you --

MR. DRAHOS: I was just going to

ask him to clarify.
MS. LOBEL: I'm sorry. I'm so sorry.
BY MR. DRAHOS:
**Q. When you say 10:30 a.m., sir, are you referring to Puerto Rican time, or are you referring to the ship's time?**
A. Ship's time.
**Q. So it's your testimony that the first time you heard anyone from Royal Caribbean make any comment at all about getting Richard transferred off of the ship would have been at 10:30 a.m., ship time, and it would have been an officer of the vessel?**
MS. LOBEL: Form.
A. Correct.
BY MR. DRAHOS:
**Q. Did that person identify who they were?**
A. He probably did, but I don't -- do not remember.
**Q. Could he have said he was the ship's doctor?**
A. No. He was an officer, tall guy.
**Q. What else -- what other --**

A. He was wearing, you know, the uniform -- the ship's officers wear a little white uniform.

**Q. He was wearing a white uniform?**

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

**Q. Anything else about the uniform that you can recall?**

A. No. But he was a good bit taller than me.

**Q. How many stripes did he have?**

A. I don't know.

**Q. Did he speak with an accent?**

A. Yes.

**Q. Do you know what kind of accent he spoke with?**

A. Kind of Eastern European. I mean, he was -- I don't know -- somewhere from there.

**Q. And it was your impression that this particular person was not a part of the ship's medical staff?**

A. He was not.

**Q. Do you know what particular**

division or department of the ship he was a member of?
A. No.
Q. In other words, is it your impression that he was part of the ship's bridge?
(Reporter clarification.)
MS. LOBEL: Form.
A. I don't know.
BY MR. DRAHOS:
Q. So between the time of Richard's arrival to the medical center, which we talked about being at 9:25 a.m., until this point in time at 10:30 a.m. when this person comes in and announces that they're going to be in charge of getting Richard off of the ship, what medical care, if any, did you observe being rendered to Richard?
A. I saw the nurse come in twice.
Q. Same nurse who greeted you guys?
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
Q. What medical treatment, if any, did this nurse provide?

A. No treatment.
**Q. So what was the nurse doing when she went in?**
A. She just went in to check on him.
**Q. What would she do to check?**
A. She'd just look at the monitor.
**Q. Did she say anything?**
A. No.
**Q. Did she speak to anyone?**
A. Yes. I mean, we asked when was the doctor coming in, and she said he's coming.
**Q. When did you make that request?**
A. Probably around 9:30, 9:40 after they got him settled in.
**Q. So this would have been after the nurse had the initial encounter that prompted you to walk out to the doorway?**
A. Yes.
**Q. There would have been another time when the nurse came in to check the monitor, correct?**
MS. LOBEL: Form.
A. I was waiting for you to finish. Correct.

BY MR. DRAHOS:
Q. And at that point in time, you said "we" asked when is the doctor coming in. Was it someone specific within the group?
A. We asked -- probably Jimmy. But as a group, you know, we -- somebody made it -- asked the nurse, you know, when is the doctor coming in?
Q. And so after that encounter when someone asked when is the doctor coming and she said, He's coming -- that was, you said, in between 9:30 and 9:40 -- you're saying that the only other person to have come into the room between that period of time and this announcement at 10:30 was this same nurse?
MS. LOBEL: Form.
A. Correct.
BY MR. DRAHOS:
Q. And did she do anything again during this second return?
A. No.
Q. Were there any statements made at all between the people in your group and this nurse?
A. Just asking when's the doctor

coming.
Q. Okay. Same question as before?
A. Yeah.
Q. And what did this person say?
A. He'll be in there.
Q. And when was this second encounter?
A. Well, the second encounter was about the 9:40; the original one when we got him down there.
Q. So let me go back and clarify this. It was my understanding that there was a total of three encounters between Richard and this nurse. Did I get that wrong?
MS. LOBEL: Form.
A. No, that's correct. I thought you were talking about the 9:40 time.
BY MR. DRAHOS:
Q. So let's make sure, between the two of us, we get it right. So there was a first encounter when the nurse came, you turned around and went to the doorway?
A. Yeah.
Q. Then there was a second time between 9:30 and 9:40 a.m. when the nurse came back in to look at the monitor and someone

**asked, When's the doctor coming, and she said, He's coming, right?**

MS. LOBEL: Form.

A. Correct.

BY MR. DRAHOS:

**Q. Was there then a third encounter before this unidentified individual came in at 10:30 and said, I'm in charge of getting him off the ship?**

A. I believe there was. The only conversations we had, as far as the group, was to that nurse. And we would -- somebody would ask her. Now, Jimmy asked the doctor a couple of times because he was standing outside at a computer.

**Q. So there was a doctor in the medical center?**

A. There was a doctor in the medical center.

**Q. Was the doctor in the medical center when y'all first presented?**

MS. LOBEL: Form.

A. I didn't see him standing there. But he was there -- I saw him at the counter a couple of times --

BY MR. DRAHOS:
Q. When's the --
A. -- sitting at a computer.
Q. Sorry. When's the first time that you saw him?
A. Probably about that 9:40 time frame because that's what we were asking, when's he coming in.
Q. So you have this encounter with the nurse around 9:40 a.m., When is the doctor coming in? And you're saying at that same time, you're seeing a doctor sitting at a computer desk?
A. That's correct.
Q. Why didn't somebody go in to the doctor and say, Hey --
A. Jimmy did.
Q. Jimmy went in to that doctor?
A. He went to the doctor and said, When are you coming in here? He said, I'll be there in a minute.
Q. Can you describe that doctor?
A. Kind of thin, dark hair.
Q. Any other description? Young? Old? Tall? Short?

A. He wasn't tall but young. And he wasn't gray-haired like me or anything.

**Q. Did you get a name?**

A. No. You told me, but I don't remember.

**Q. Was it Dr. Joao Pereira?**

A. I think that's who -- from what I've been reading, that's who it was, yeah.

**Q. Did he ever say, My name is Dr. Pereira?**

A. No.

**Q. So is it your testimony from the time Richard presented at 9:25 a.m. until the time that this unidentified ship person came in and said, I'm in charge of getting Richard off of the ship, that the ship's doctor who was in there at the time never came and saw Richard?**

MS. LOBEL: Form.

A. That is correct.

BY MR. DRAHOS:

**Q. And from your observation then, it's your testimony that the only person that would have come in was the ship's nurse?**

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:
Q. Did you overhear the doctor, the guy who was at the computer, make any phone calls or any -- strike that.
Did you observe or overhear the doctor who was at the desk make any comments to anyone about getting Richard off of the ship?
MS. LOBEL: Form.
A. I did not.
BY MR. DRAHOS:
Q. How did this individual who came in at 10:30 a.m. know that Richard needed to get off the ship then?
A. I don't know how he was communicated with.
Q. So would you agree there must have been some communications that you did not observe or overhear?
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
Q. And so would you then agree that that means that there were communications about Richard's transfer that you did not hear?
MS. LOBEL: Form.

A. Yes.
BY MR. DRAHOS:
Q. Do you know how many phone calls were made by the ship's -- strike that.
Do you know how many phone calls were made by the ship in order to facilitate Richard's medical transfer in San Juan, Puerto Rico?
A. No.
Q. Do you know when the first phone call was made?
A. No.
Q. Do you know when the last phone call was made?
A. No.
Q. Other than this individual who came in and said, I'm in charge of getting Richard off of the ship, did anyone else come in and identify themselves as having any responsibility to get Richard transferred off the ship?
A. No.
Q. So this person was the one and only that you were aware of who had this responsibility?

MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. Did that person ever return after making this announcement at 10:30 a.m.?**
A. When he came in then, he was wanting Darren to go pack the bags. And Ilene told Darren, Just pack what you need, and we'll pack the rest of it up and take the luggage with us.
And he said, No, the luggage has to go off the ship with him and that he would get them help -- Darren help to get the luggage down.
But that's the only person we dealt with. And Darren waited about 10, 15 minutes for the help, and it never showed. So he just took off running and packed it himself.
**Q. Did anyone in your group assist?**
MS. LOBEL: Form.
A. No. Jimmy had to go back with Darren after he left because Darren had the passports, and they needed their passports. So Jimmy went up to the room to get the

passports from Darren and come back down.
BY MR. DRAHOS:
Q. So when Darren left initially, though, to go pack up his stuff, did anyone among your traveling companions accompany him to the cabin?
A. No.
Q. So you all remained in the medical center?
MS. LOBEL: Form.
A. Yeah.
BY MR. DRAHOS:
Q. From the time that you -- you, personally, first arrived to the medical center until the time Richard was transferred off, did you go anywhere else other than the ship's medical center?
A. No.
Q. From the time that you first presented until the time Richard left the ship, did Susie go anywhere else other than in the medical center?
A. I do not believe so.
Q. How about Jimmy and Ilene? Did they ever leave the medical center after

arriving before Richard --
A. Jimmy had to go get the passports. That's when he left.
Q. Other than Jimmy leaving to go get the passports, did Ilene ever at any point in time leave?
A. No.
Q. Do you know who the port agent was for this cruise?
A. No.
Q. Did anyone at any point in time ever enter the medical center on February the 21st and announce themselves as being affiliated with or serving as the port agent for this ship in San Juan?
A. No. Not to me, no.
Q. Other than this individual who came in at 10:30 a.m., are there any other individuals who made any other comments about getting Richard transferred off the ship that you can identify for me? First, I want to identify speakers.
A. Not getting him off the ship, no.
Q. When you say it like that, when you qualify it like that, I feel like I didn't ask

it the right way.
A. No. As far as getting him off, that was it.
Q. That's the only person that you recall making any comments about getting him off the ship is this --
A. Yes.
Q. -- person at 10:30? Was there any other -- strike that.
Did anyone in the ship's medical center make any comments at all about where Richard would be delivered to?
A. No.
Q. So when Richard got off the ship, you personally had no idea where he was going?
A. We knew he was going to a hospital.
Q. But you had no idea where? You personally.
A. No.
Q. Based upon our records -- strike that.
Did you ever get off the ship in Puerto Rico on February 21st?
A. No.

**Q. Did your wife?**
A. No.
**Q. Did Jimmy or Ilene?**
A. No.
**Q. Your son did though, right?**
MS. LOBEL: Form.
A. I don't know. We were in the infirmary. I don't -- he may have, but we didn't -- of course, after all this happened, we kind of still in shock. Plus I think the ship was only going to be in port another couple of hours or so, and there really wasn't much to see in Puerto Rico anyway. So...
BY MR. DRAHOS:
**Q. So as you sit here today, do you have any personal knowledge about what the traffic was like in San Juan, Puerto Rico that day?**
A. No.
**Q. Did you ever come to hear from anyone about what the traffic was like in Puerto Rico that day?**
A. No.
**Q. Did you ever see the paramedics?**

A. Yes.
**Q. Did they come on board the ship?**
A. Came on board the ship with their gurney, yes.
**Q. Do you know what time they arrived?**
A. It was probably about 11:45, 11:50.
**Q. How -- strike that.**
**Did they say anything to you?**
A. No.
**Q. Did you say anything to them?**
A. No.
**Q. Did you overhear them make any statements at all?**
A. I just heard the paramedic talk to Richard, said, We're going to get you out of here and get you some care.
**Q. The person spoke in English?**
A. Yes.
**Q. Did they say anything else other than what you just told me?**
A. Not that I recall, no.
**Q. Do you know what time the paramedics left the ship?**
A. Probably about noon Eastern time.

Q. And do you know what time the paramedics left the port?
A. No.
Q. From the time Richard left the ship, did you see him at all at any further period during the cruise?
MS. LOBEL: Form.
A. No.
BY MR. DRAHOS:
Q. Did you speak to him at all?
A. No.
Q. Did you speak to Darren?
A. I did not, no.
Q. Did Susie?
A. You know, I would guess she did, but you'd have to ask her. I don't --
Q. When did you first come to learn any further information about Richard's circumstance after he was transferred off the ship?
A. The next day, there was some communication with the group that he had two or three strokes there that first night in the hospital.
Q. Before we get there, let me hit the

pause button on that and go back for a second.
So throughout the entirety of the time that you were in the ship's medical center, did you observe any changes at all in Richard's condition?
A. Yes.
Q. Can you describe for me what you observed?
A. His speech got more impaired. He was slurring his words. And, of course, he just couldn't -- he couldn't get up and move around or anything, but his speech was slurred.
Q. Well, he wasn't able to get up or move around when you saw him in deck 18, right?
MS. LOBEL: Form.
A. Right.
BY MR. DRAHOS:
Q. Did any aspect of that part of his condition change at all from what you were able to observe?
A. I just saw when he was in that room that his motion was less as time went on.
Q. And you're saying that his speech

was more impaired. Is there something in particular you recall him saying?
A. I don't recall the words, but you could tell he was struggling to get any words out.
Q. Any other changes that you observed?
A. No.
Q. Did you say anything to Richard before he left the ship?
A. Yes.
Q. What did you say?
A. I held his hand, and I told him I'd be praying for him.
Q. Did he say anything to you?
A. Uh-uh. He tried, but he just looked at me.
Q. Did you observe Richard say anything to anyone as he was leaving?
A. No. He was crying.
Q. So earlier in the deposition, I asked whether or not anyone in the group had any criticisms of Royal Caribbean. You said, oh, yeah, we did.
Specifically, what are your

**criticisms about what you observed?**

A. The biggest thing? Three hours to get him off the ship when he's a stroke victim. No care on the hospital. They gave him nothing in there. Just hooked him up to a monitor.

It took three hours. And they sat there and had Darren running back and forth to get insurance cards, telling him that his insurance wouldn't cover anything, and he was going to have to go to the purser's desk and settle up his bill.

And that went on and on. And -- but they gave him no treatment, and they were in no rush to get him off the ship, to me, until they got their money.

And then when Darren finally went to the purser's desk and got that straight, then all of a sudden, now we're going to get him off the boat. But three hours went by for a stroke victim with no care. And I'm no doctor, but that's not good.

**Q. So let's talk about it. So as it relates to the three hours to get him off the ship, do you know what the ship had to do to**

**get him transferred off?**

A. Make a phone call.

**Q. Do you know how many phone calls they had to make?**

A. No. But if I had a stroke victim, I'd put him in the back of a truck if I had to if I couldn't get an ambulance.

**Q. So do you know who the person was who was telling Richard that he had to get his insurance cards and stuff? Who was that person?**

A. It was Darren, and it was --

**Q. I'm sorry.**

A. -- the lady at the -- I guess the clerk inside the office there.

**Q. So there was a lady clerk inside the medical center?**

A. Yes.

**Q. A female clerk?**

A. Yes.

**Q. And she was telling Darren that he had to get his insurance --**

A. She said his -- he went and got his insurance card, came back. They ran it and said it wouldn't cover all the expenses.

He said, Well, you're wrong. I forgot his exact words, but he had excellent insurance. He worked for UPS. And said, Try it again. They said they tried it again and still didn't work.

So, at some point, he had to leave and go to the purser's desk and settle up their expenses. I don't know what that pertained to but...

**Q. What time did this encounter occur where they were swiping Darren's insurance card?**

A. It was probably -- we got there about 9:20. He did the paperwork. He had to go back to the room. Probably about 10:30.

**Q. And do you recall the name of this female clerk?**

A. I do not.

**Q. Do you know what this person's job was?**

A. No.

**Q. Were they a member of the ship's crew?**

A. I would assume so, yeah.

**Q. But do you know for sure?**

MS. LOBEL: Form.
A. I mean, she was on the boat working in the infirmary.
BY MR. DRAHOS:
**Q. What was she wearing?**
A. I don't know.
**Q. Do you know whether or not she was running an insurance card to see whether or not the care would be covered in Puerto Rico or on the ship?**
A. I believe it was on the ship.
**Q. Do you know for sure?**
MS. LOBEL: Form.
A. I mean, that's all she was concerned about.
BY MR. DRAHOS:
**Q. Did she say that's all she was concerned about or that was what you observed?**
A. She was concerned about them getting their money.
**Q. Okay.**
A. And they wouldn't be --
**Q. Who is "they"?**
A. -- involved in the money at the hospital.

**Q. Who is "they"?**
A. That lady. She wanted to make sure whatever the bill was there, they were going to get their money.
**Q. How do you know that, sir?**
A. Because that's what she said.
**Q. She said, I want to make --**
A. She said -- she said, Your insurance wouldn't cover your expenses here, and you need to go to the purser's desk.
**Q. Won't cover your expenses here in the ship's medical center?**
A. Yes.
**Q. So are you ruling out the possibility that this person was providing insurance information to an accepting hospital who may have been requesting that?**
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
**Q. You're sure that's not what this person was doing?**
A. Why would he have to go to the purser's desk?
**Q. Well, that could be a separate**

issue. But let me ask you this: If it's Royal Caribbean's position in this case that accepting facilities want to see proof of insurance before they will accept the patient, are you sitting here today, under oath, telling the members of the jury that that's absolutely not what was happening when you observed --

A. In my mind, that's not what happened.

Q. But are you ruling that out as a possibility?

MS. LOBEL: Form.

A. In my mind, yes.

BY MR. DRAHOS:

Q. You're saying that's not what happened?

MS. LOBEL: Form.

A. They were more -- they were concerned about getting their money.

BY MR. DRAHOS:

Q. I heard you and appreciate your answer in that regard.

But if Royal Caribbean's put forward a witness who's going to say they were attempting to try and secure Richard's

acceptance to another facility in Puerto Rico who wanted insurance information, are you saying that what you observed is not what the person at Royal Caribbean is going to testify to?

MS. LOBEL: Form.

A. I would say that, yes.

BY MR. DRAHOS:

Q. So the person who said you need to go to the purser's desk and settle up your expenses is the same person who was swiping the insurance cards?

A. Yes.

Q. Was anyone else involved at all in this regard?

A. Not that I recall.

Q. All right. So thus far, throughout the time that you were in the medical center, I've heard you identify four particular people.

You told me about the nurse who first encountered Richard and came into the room periodically, correct?

MS. LOBEL: Form.

A. Yes.

BY MR. DRAHOS:

Q. You told me about this female who swiped the insurance card. That's a different person than the nurse?
A. Yes.
Q. You told me about the doctor who you saw sitting at the desk, correct?
MS. LOBEL: Form.
A. Yes.
BY MR. DRAHOS:
Q. And you told me about this person who came in and said, I'm in charge of getting Richard transferred off the vessel?
MS. LOBEL: Form.
A. Correct.
BY MR. DRAHOS:
Q. Any other members of the ship's crew have any involvement in the ship's medical center other than those four individuals?
MS. LOBEL: Form.
A. That's all I had.
BY MR. DRAHOS:
Q. That's all what?
A. That's all I had anything to do with.
Q. When you say, "That's all I had

anything to do with," are you saying that no one else was involved, or you're not aware of anyone else?

A. I don't believe anybody else was involved.

Q. Do you know whether or not there are hospitals in Puerto Rico that specifically rejected Richard's case when Royal Caribbean requested that they --

A. No.

Q. -- accept his transfer?

A. No. I don't know anything about that.

Q. If the doctor were to testify in this case that he formally requested that Richard be transferred to a hospital in Puerto Rico at 9:56 a.m. ship time, are you telling the members of the jury that the doctor is lying and that's not true or that you don't know anything about that either?

MS. LOBEL: Form.

A. He may have did that on his computer. I don't know.

BY MR. DRAHOS:

Q. Did you overhear any conversations

**with any representative of any hospitals in San Juan, Puerto Rico while you were in the ship's medical center?**

A. No.

**Q. Do you know when the first phone call was made requesting an ambulance?**

A. I think I'd heard it was somewhere right around almost 11 o'clock.

**Q. You said, you think you heard that.**

A. Yeah.

**Q. Did you hear it yourself, or you're saying someone told you that?**

A. No. I heard it from somebody else.

**Q. Somebody else told you?**

A. Yeah.

**Q. Who was it that told you that?**

A. I think one of the times that Jimmy went out to talk to the people, they told him that they had already requested an ambulance.

**Q. They already requested an ambulance?**

A. Yes.

**Q. At 11 o'clock a.m.?**

MS. LOBEL: Form.
A. Somewhere around 11:00.
BY MR. DRAHOS:
**Q. So Jimmy said, I asked and someone told me they've already requested an ambulance?**
A. I think that's how it went, yeah.
**Q. And that --**
A. I remember hearing that -- it was somewhere around then that an ambulance had been asked for.
**Q. Let me make sure I understand your answer. You're saying that Jimmy went out. Went out where?**
A. Right where the doctor's stands. It may have been when the ship's officer was telling us he was in charge, going to get him off the ship.
**Q. Okay.**
A. It may have come from him later on after Darren got everything packed and everything.
**Q. Right. But I'm trying to pin down exactly what you know. I don't want you to guess. So let's backtrack again.**
**The only source of information that**

**you have as it relates to the communications with the ambulance company is from Jimmy?**

MS. LOBEL: Form.

A. Probably from Jimmy and the officer.

BY MR. DRAHOS:

**Q. So did you speak to the officer directly?**

A. I had -- I did talk to him at times. I was there when he came in saying he was in charge.

**Q. So he came in and said he was in charge at 10:30 a.m. --**

A. Yeah.

**Q. -- according to your testimony?**

A. Uh-huh.

**Q. And are you telling me that at that time you made a request to the officer, Hey, when is someone going to call an ambulance, and he said --**

A. No. I did not request that.

**Q. All right. So you're saying your first source of knowledge, as it relates to when an ambulance was called, was from Jimmy?**

MS. LOBEL: Form.

A. It was -- I don't really remember. I know at some point after Darren finally went up and packed and brought his suitcases down, I heard there was an ambulance. Now, I may be wrong about Jimmy.

BY MR. DRAHOS:

**Q. So is it fair to say then that you have no idea when the ship made the request for an ambulance?**

MS. LOBEL: Form.

A. No. I haven't seen any documentation of that.

BY MR. DRAHOS:

**Q. And so if I'm understanding your answer correctly, what you're saying is, no, you don't know when the ship called?**

MS. LOBEL: Form.

A. No, I do not know.

BY MR. DRAHOS:

**Q. All right. Thank you.**

**So when you say that they were in no rush at all until they got their money and that once they got that straight, they got him off the boat, wouldn't you agree that you have no idea how many calls were made and by whom**

before that whole financial situation got squared away?

MS. LOBEL: Form.

A. That's correct. I don't know what they did.

BY MR. DRAHOS:

Q. So when you express your criticisms that it took Royal Caribbean three hours to get him off of the ship, wouldn't you agree that you don't know how much of that time was attributable to people in Puerto Rico who were receiving a request from the ship?

MS. LOBEL: Form.

A. Yeah, I don't know about that.

BY MR. DRAHOS:

Q. Other than your conversation with this gentleman who said he was in charge, did you have any other conversations with any other members of the ship's crew about Richard prior to his departure?

MS. LOBEL: Form.

A. No.

(Reporter clarification.)

MR. DRAHOS: Why don't we take a quick restroom break? I need to review my

thoughts, make sure I don't have any further questions that I want to ask about before we finish up.

THE WITNESS: Okay.

MS. LOBEL: All right.

(A recess was taken.)

MR. DRAHOS: So back on.

**Q. Just so you're back to my point of reference, when we left off, we were asking questions about the tail end of your encounter with Richard while he was in the medical center.**

A. Uh-huh.

**Q. So I want to bring my point of questioning you a little bit forward now and ask you, when is the next time you heard anything about Richard after he left the ship?**

A. It was the next day.

**Q. Did anyone from your group make any effort to try and contact Darren on the 21st?**

A. I don't know. I didn't.

**Q. When was it the next day -- in the morning, afternoon, or evening -- that you heard anything about Richard?**

A. Might have been close to about

lunchtime.

**Q. And who did you hear the information from?**

A. It was Ilene.

**Q. And what did Ilene say?**

A. That Richard had two or three more strokes that night in the hospital.

**Q. Do you know where Ilene got this information from?**

A. No. I assume she talked to Darren.

**Q. Did she say anything more than that?**

A. No.

**Q. Did you learn anything more about Richard's circumstances beyond that report from Ilene?**

A. No.

**Q. What was the next time you heard anything further about Richard?**

A. I think Ilene was still getting updates while we were on the ship. One of them was talking to Darren, and his condition was deteriorating. I think they even said he was on life support.

**Q. You had told me that at some point in time you went back to -- strike that.**
**You told me at some point in time, you went to Richard's cabin. When was that?**
A. It was after they left with the ambulance.
**Q. Okay. On the 21st?**
A. Yes.
**Q. And remind me again, what were you going up there for?**
A. We were just wanting to see it. Darren gave Susie one of their door keys, and we just went up there to look and then to make sure they -- he didn't leave anything in haste. We just did a walk-through.
**Q. Did you go back at any point in time thereafter?**
A. No.
**Q. Did you get any other information about Richard while on the cruise from anyone else other than Ilene?**
A. No.
**Q. Did you speak to any members of the ship's crew about Richard at any point in time through the remainder of the cruise?**

A. No.
Q. Have you ever spoken to anyone at Royal Caribbean about Richard since your experience on the cruise?
A. No.
Q. Did you ever have reason to go back down to the ship's medical center for -- at any point in time for the remainder of the voyage?
A. No.
Q. Did you sail the remainder of the voyage uninterrupted?
A. Yes.
Q. Any further criticisms of what took place on the cruise beyond this experience with Richard?
A. No.
Q. And I assume you flew home from Fort Lauderdale to Alabama?
A. Yes, through Tampa.
Q. When was the next time you learned anything about Richard after the cruise ended?
A. I mean, we were getting daily updates from Darren. I mean, probably all coming through Ilene.
Q. So was Darren speaking to Ilene?

**Texting with Ilene? What method of communication?**

A. I don't know.

**Q. Did you ever speak to Darren?**

A. No.

**Q. Did Susie?**

A. I'm not sure.

**Q. When was the next time you saw Richard after he left the Harmony of the Seas on February 21st?**

A. I haven't seen him since then, in person.

**Q. Have you spoken to him over the phone?**

A. Yes.

**Q. How many times?**

A. Just maybe a handful, not many. Darren sends us some videos of him.

**Q. When was the last time you got a video from Darren of Richard?**

A. Last week.

**Q. Are these prerecorded videos?**

A. What do you mean "prerecorded"?

**Q. Like, when you say he sends some videos, are you getting, like, real time**

**FaceTime videos, or are you getting prerecorded messages that are being --**

A. It was preordered. We didn't do FaceTime. It was a recording, if I remember right.

**Q. Okay.**

A. We didn't talk.

**Q. And how many of these videos of Richard have you received in total?**

A. I don't know how many she's received.

**Q. How many have you seen?**

A. Oh, at least three probably. I'm sure over the years there may be more than that.

**Q. What do you recall about the last video you saw?**

A. The conversation he did, or what?

**Q. Yeah. What was it that Richard said during that last --**

A. He was thanking us for doing this deposition.

**Q. It was Richard who thanked you?**

A. Yes.

**Q. Did he say anything else other than**

thanking you for doing this?
A. No. He was just telling -- he was thanking us for going to do this for him.
Q. Was he sitting or standing during the video?
A. He was sitting.
Q. Where was he sitting?
A. I would assume in a wheelchair.
Q. Did you see for sure?
A. Well, I mean, I didn't -- I was listening to him. I wasn't paying that close attention.
Q. Right. Was it a close-up of his face, or was it from a distance?
A. It was farther away. Darren was holding the camera.
Q. Has Susie been to visit Richard since the cruise?
A. No.
Q. Do you have any plans to visit Richard any time soon?
A. No.
Q. Do you have any pending cruises scheduled?
A. No.

Q. Have you been on a cruise since?
A. I have not.
Q. Is that because of COVID-19?
A. I'm sure that played a role then.
Q. So this being the last time I get a chance to speak to you before trial, is there anything else on your mind that you'd like to tell me about this experience that I haven't asked you or that you just think would be important for me to know?
A. No. I think you covered it.
MR DRAHOS: Okay. Well, I'm going to turn it over to my colleague then who may have some questions for you. And afterwards, we'll talk about Nick Saban and his recent comments about Jimbo Fisher.

EXAMINATION

BY MS. LOBEL:
Q. I'm going to work backwards, okay, because it's usually easier.
A. All right.
Q. All right. You just testified that you've seen some videos of Richard since the cruise?
A. Yes.

Q. Based off of reviewing the -- you said maybe about three videos that you can recall or so, have you noticed whether or not Richard has changed since the Richard you remember from before this incident?

A. This isn't Richard.

Q. What's changed?

A. Well, he was very physically active. He was an athlete. I mean, he ran. He worked out.

When he first got his Apple Watch, he wanted to double what they were saying he needed to do. He wanted to push himself. Very outgoing. Loved to talk. Loved his job. Loved to work. But those days are gone.

Q. When you have -- well, have you spoken to Richard at all live, whether it be telephone or text or anything of that nature since this incident, have you noticed if the manner in which Richard communicates has changed since this incident?

A. Oh, it's changed drastically.

Q. How?

A. I mean, he can hardly talk. He's

doing a little -- he's doing better now that he can -- but it -- he strains to get a word out, and it's real raspy. And it's -- but he works every day at it. But he can talk a few words.

**Q. Have you noticed since this incident -- since speaking or hearing Richard speak if there have been any cognitive changes?**

A. Yes.

**Q. Meaning how he thinks or perceives things?**

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. Have you noticed that?**

MR. DRAHOS: Sorry.

MS. LOBEL: It's okay.

MR. DRAHOS: Object to the form.

A. Yes.

BY MS. LOBEL:

**Q. What have you noticed?**

A. Well, he -- his conversation is very short. It's not complicated. It's just a few words. And if you ask him something, he just doesn't remember a lot of things anymore.

**Q. When you say he doesn't remember things a lot anymore, do you mean, like, his long-term memory of what he knew about his life before has changed, or he doesn't remember things, like, short-term during a conversation you might have with him?**

A. I was more thinking long-term.

**Q. What have you noticed are the types of things that Richard does not remember anymore since this incident when you've spoken with him?**

A. He just -- he don't remember seeing people, having conversations with people, things we did in the past.

**Q. Do you know if Richard can walk?**

MR. DRAHOS: Object to the form.

A. He -- they kind of -- he thinks he can, but -- and he swears he's going to, but I have not seen him.

BY MS. LOBEL:

**Q. In the videos that you've seen of Richard, what, if any, type of physical activity is he able to do?**

MR. DRAHOS: Object to the form.

A. I mean, he can wave his hand. He

does stand up on occasions. He works on just standing still. They get him up. But that's about all I've seen.

BY MS. LOBEL:

**Q. And when you say he stands up, he's not standing up, going from sitting to standing on his own? He requires assistance?**

A. He requires assistance.

**Q. And then once he's been helped to get to a standing position, he's working on trying to actually stand once up, correct?**

MR. DRAHOS: Object to the form.

A. That's correct.

BY MS. LOBEL:

**Q. All right. Now, you've seen video or photographs of Richard's face since this incident, correct?**

A. Yes.

**Q. Is this facial expression or the way he carries his face the same as it used to be?**

A. No.

**Q. What's different?**

A. It just kind of -- like, his face is kind of limp. He just don't have the

muscles or...
**Q. So if you look at a photograph of Richard from before the incident, and we look at him now, is it the same or different?**
A. Night and day different.
**Q. Have you noticed anything about Richard's demeanor since this incident?**
MR. DRAHOS: Object to the form.
A. He's real -- a lot more docile. I mean, he was very -- you know, like I said, he was active, and he was -- he really -- when you met him, he wanted to talk and do things. Now, it's just kind of -- he just sits.
BY MS. LOBEL:
**Q. Does Richard now get extremely emotional all of a sudden at times?**
MR. DRAHOS: Object to the form.
A. I hear he does, but I haven't seen it.
BY MS. LOBEL:
**Q. All right. Fair enough.**
**And is one of the reasons why your family hasn't gone up to see Richard since this incident due to the pandemic?**

A. Yes.
Q. And is that because of the inherent risks, unlike most people, to Richard because he still has a trach?
A. Yes.
Q. And Darren has been very concerned about general exposure to Richard overall since this incident --
A. Yes.
Q. -- and the risk of getting sick?
A. Yes.
Q. Does Darren have assistance to care for Richard?
MR. DRAHOS: Object to the form.
A. I know he has.
BY MS. LOBEL:
Q. Is Darren Richard's primary caretaker?
A. Yes.
Q. Did Darren have to retire early to take care of Richard?
MR. DRAHOS: Object to the form.
A. Yes.
BY MS. LOBEL:
Q. Has Darren been taking care of

Richard since the day of this incident?
MR. DRAHOS: Object to the form.
A. Yes.
BY MS. LOBEL:
Q. Has Darren, based off of your experience hearing or speaking with him, been exhausted since this has happened?
MR. DRAHOS: Object to the form.
A. Oh, yes.
BY MS. LOBEL:
Q. Has Darren gotten a break, a real break from the stress of caring for Richard --
A. No.
Q. -- since this incident?
Has Darren been with Richard since the day of this incident?
A. Yes.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q. And when I say he's been with Richard since the day of this incident, he hasn't, like, gone on a vacation and left Richard at any point in time to take a breather and relax?
A. No, he hasn't.

Q. So would it be fair to say Darren has been living and breathing this experience Richard has been going through since the day it happened?

A. Every minute, yeah.

Q. Would it be fair to say that since this incident Darren seems very stressed as a result of this?

MR. DRAHOS: Object to the form.

A. Yes.

BY MS. LOBEL:

Q. Would you agree that this change in Richard and Darren's life has taken extreme mental and emotional toll on Darren?

MR. DRAHOS: Form.

A. Yes.

BY MS. LOBEL:

Q. Would you agree it's also taken a significant emotional and physical toll on Richard himself?

MR. DRAHOS: Form.

A. Yes.

BY MS. LOBEL:

Q. I want to go back to -- so I can understand this time line a little bit.

So the day of the incident, your habit is to be an early riser, correct?
A. Correct.
Q. And you -- your habit is to get up and going around 7 o'clock in the morning, regardless of where you are?
A. Correct.
Q. And when you were telling us times from start to finish, you were relying on Eastern Standard Time, correct?
A. That was correct.
Q. And is that because the frame of reference that you had for time were the clocks on the ship?
A. Yes, ship's time.
Q. And is it your understanding from cruising for years and years that ship time isn't necessarily local time?
A. That is correct.
Q. And that's not just something that I told you; that's something I reminded you of when I was trying to understand the times that you were telling at the beginning?
A. When you go to a port and get off the ship, you've got to be on on ship's time

or they'll leave you.
Q. And just so we're clear, how many years have you been cruising, whether it be Royal Caribbean or whomever else?
A. I've been on 15 or 16 cruises.
Q. So you're an experienced cruiser?
A. Yes.
Q. All right. Is one of the reasons why you enjoy cruising is because it's an all-inclusive vacation?
A. All-inclusive, and I get away from the phone.
Q. And is one of the benefits being on a cruise is it's -- it's a controlled environment provided to you by the cruise line?
A. Yes.
Q. And one of the services that you do know that they provide is medical care?
A. That's correct.
Q. And one of the reasons why you take Royal Caribbean cruises as opposed to, say, Carnival is it's more of a higher-end brand?
A. That's correct.
Q. And you expect that the care and services provided to match that higher-end

line?

A. Yes.

Q. And one of those services would be medical care?

A. That is correct.

Q. And based off of your experience, when you go on Royal Caribbean cruises around Valentine's Day, is the crowd a younger crowd or an older crowd?

A. It's an older crowd.

Q. All right. And on the times that you've been on a cruise, have you ever come to be aware of anyone requiring medical care?

A. In our group?

Q. Other than Richard.

A. Just one time. My wife got the norovirus.

Q. And that's the only time you're familiar with?

A. That's it.

Q. I just wanted to be sure. All right.

So going back to the day of the incident. You get up around 7 o'clock in morning, and your habit was to go to the --

**what did you call it?**

MR. DRAHOS: Central Park.

MS. LOBEL: Thank you.

BY MS. LOBEL:

**Q. -- Central Park area which is like a buffet area?**

A. Yeah. You just walk in. You fix your coffee, and they have Danishes or little croissants and fruit. You pick out some stuff, and you just go out to a table and sit there and relax.

**Q. And that was your habit to do every morning before the rest of the group would get up?**

A. Yes.

**Q. And was it the group's practice when cruising together to have a meeting time and place?**

A. Yes, we had certain locations. During the day, it would be a certain pool. And then in the evening, there was a little bar near the restaurants that we knew at some point you could go to -- well, depending on the time of day, you would find somebody in your group there.

Q. And what time was the meeting time in the morning?
A. About 10:00, 10:30.
Q. And where was the meeting location that you would meet approximately 10:00, 10:30 every day?
A. It was around one of the pools.
Q. Now, on the day of the incident, which was February 21st, 2019, did the group have an opportunity to meet up 10:00, 10:30?
A. Sorry. What day was it?
Q. The day of the incident where everything happened, which was February 21st of 2019, did the group have an opportunity to meet by the pool by 10:00, 10:30?
A. No.
Q. All right. And was the 10:00, 10:30 meeting time that everybody would anticipate ship time?
A. Yes.
Q. All right. Now, my recollection is that you came back from having your coffee or Danish and having your morning routine at or just before 9:00 a.m., correct?
A. Correct.

Q. And as you were reaching the room, your wife was coming out of the room?
A. That is correct.
Q. And Susie told you that Richard had reached her and told her that he thought he was having a stroke?
A. That is correct.
Q. And then the plan that was made pretty quickly was that you were going to go upstairs to assist Richard, and she was going to go find Darren?
A. That's correct.
Q. Okay. So you split?
A. That is correct.
Q. So insofar as what Susie is doing with her phone or not doing with your phone, you did not see that?
A. I did not.
Q. And you did not hear the phone call that she had received from Richard saying, I think I have a stroke?
A. I did not.
Q. She relays that to you shortly after she gets off the phone?
A. That is correct.

Q. And that's what she told you?
A. Yes.
Q. And so when you go from the room around 9 o'clock, you go straight from -- what was it -- deck 8, and I think you said to go up to deck 18?
A. Yes.
Q. And you said it took you about ten minutes to get there?
A. That's correct.
Q. Why did it take you ten minutes to get there?
A. It's a long way --
Q. Okay.
A. -- in the elevator.
Q. Did the elevator make stops on your way?
A. Probably.
Q. All right. So when you go to deck 17, do you find Richard right away, or do you have to look in that private suite area?
A. I had to scan it, but I found him.
Q. All right. And so you made contact with Richard. You asked him what's going on,

correct?
A. Yes.
Q. And he describes the symptoms of having the numbness on one side --
A. Yeah.
Q. -- difficulty seeing, and you observed that he's slow with his words?
MR. DRAHOS: Object to the form.
A. Correct.
BY MS. LOBEL:
Q. Okay. And did you -- strike that.
You left Richard momentarily so you could go speak with concierge?
A. That is correct.
Q. And you tell the concierge everything that Richard had told you, that he needed medical help, and it was an emergency?
A. Yes. I told him he was having a stroke and needed medical.
Q. And did you convey the importance of, you know, you needed medical help right away?
MR. DRAHOS: Object to the form.
A. Yeah. I mentioned the word "stroke."

BY MS. LOBEL:

**Q. Did the gentleman at the concierge seem to appreciate that this was an emergency?**

MR. DRAHOS: Object to the form.

A. Yeah. As soon as I told him, he picked up the phone.

BY MS. LOBEL:

**Q. And you waited -- so you waited for the gentleman to pick up the phone long enough to hear that he made contact with somebody?**

A. Yes. He picked up, he dialed, and I went back to Richard.

**Q. Did you hear that he was able to speak with somebody --**

MR. DRAHOS: Object -- sorry.

**Q. -- before you left?**

MR. DRAHOS: Form.

A. Yeah. I don't know if I stayed that long. I wanted to get back to Richard because I told him I'd get back. But I did see him pick up the phone and dial.

BY MS. LOBEL:

**Q. All right. And at some point during this exchange, Darren comes up?**

A. Darren gets there about the same

time as the wheelchair.

Q. And this is when there was about a five- to ten-minute lag between the time you made contact with concierge and --

A. Yeah.

Q. -- the wheelchair person?

A. It took them five to ten minutes to get there, yeah.

Q. All right. And you're trying to keep Richard calm?

A. Yes.

Q. And then once the gentleman with the wheelchair comes, is it you and Darren who assist Richard into the wheelchair, or is it you and the medical person?

A. Me and the medical person.

Q. And so you were not paying attention to what Darren was doing at that point?

A. No.

Q. And you're not listening to what, if anything, Darren is doing at that point?

A. No.

Q. So it's conceivable Darren could have been on the phone with Susie at that

point, and you're dealing with medical trying to get Darren into -- excuse me, Richard into the wheelchair with the medical person and focusing on that?

MR. DRAHOS: Object to the form.

A. Yes.

BY MS. LOBEL:

Q. And at that point in time, you're conveying basically the medical history to the gentleman with the wheelchair as you're, you know, getting him ready to go?

A. I just told him what the symptoms I'd seen.

Q. So do you tell him the symptoms before you move him in -- before you and the gentleman from the cruise line move Richard into the chair?

A. I probably talked to him on the way to the elevator.

Q. Okay.

A. I'm sure we picked him up first.

Q. All right. And then how far away -- well, strike that.

Is there an elevator close to this private dining area?

A. Yes.
Q. And do you use that elevator to go down to the medical infirmary?
A. Yes.
Q. And then you go straight from the elevator all the way down to the belly of the ship to the infirmary without stopping?
A. That's correct.
Q. And there may have been a second person who was assisting with this process?
A. Yes.
Q. Because you do remember there was a female with a card?
A. Yes, ma'am. That's it.
Q. Is it possible she may have already been at the elevator waiting for you to take you down?
MR. DRAHOS: Object to the form.
A. Maybe. Or she may have been behind the person with the wheelchair. I don't know.
BY MS. LOBEL:
Q. All right. But your emphasis on getting Richard into the wheelchair, in the elevator, and down?

A. Yes.
Q. Now, once you get to the infirmary, Richard is taken into a room adjacent to the waiting area, correct?
A. That's correct.
Q. All right. And that's when the nurse starts hooking Richard up to some monitors?
A. That's right.
Q. And you leave the room?
A. Yes.
Q. And Darren is dealing with the front desk?
A. Yes.
Q. And he starts filling out paperwork provided to the person -- the clerk that you mentioned at the front desk of the waiting room?
A. Yes.
Q. Now, shortly after, Ilene, Jimmy, and Susie arrive in the infirmary, correct?
A. Yes.
Q. Would it be fair to say that by that time it's more or less 9:30?
MR. DRAHOS: Object to the form.

A. Yeah. It would have to be because we probably didn't get down there until 9:25 or so. It was just a few minutes after we got in.

**Q. All right. So there was a period of time where it's just you, Darren, the nurse, and Richard --**

A. Right.

**Q. -- before the rest of the group arrived, correct?**

A. That's correct.

**Q. All right. And then you testified that Darren was asked to get an insurance card, correct?**

A. Yes.

**Q. Was that at the beginning after he filled out the initial paperwork?**

MR. DRAHOS: Object to the form.

A. He was fixing to start filling out the paperwork, and I guess when he went to hand it back to her, she informed him that he needed his insurance card.

BY MS. LOBEL:

**Q. And does Darren leave to go get the insurance card?**

A. Yes.
Q. Did Darren tell you that he was leaving to get the insurance card, or did somebody go with him to get the insurance card?
A. Darren said he had to go get the insurance card.
Q. Who did he say that to?
A. I guess all of us that were there. I think he just yelled it out, that he had to get it, and he'll be back.
Q. Do you have a specific memory of Darren advising you that he needed to go get the insurance card?
A. Yes.
Q. And then he leaves and then he -- does Darren come back?
A. Yes.
Q. All right. When Darren comes back with the insurance card, are you in the room with Richard, or are you in the waiting room at that point?
A. I was back in there with Richard. We were all in there.
Q. At some point of time, you mentioned that Darren was asked to go get a

passport, and Jimmy eventually had to get it from Darren. Do you recall that?

A. Yes. Yeah.

Q. All right. Did Darren originally go -- leave to go get his passport?

A. Yes.

Q. When was that in relationship to him returning with the insurance card?

A. It was after he got the insurance cards. He was told to go get the passports. Then he went and got them, but nobody took them from him.

Q. Okay.

A. So then he had to go pack, so they were in his pocket. They just went back up to the room, and he had them.

Q. Now, the conversation about going to pack, I have a note here that you said that was about 10:30 or so?

A. Yeah. 10:30, 10:40.

Q. So that would have been after Darren goes up to get the insurance card, comes down, goes up to get the passport, and then comes down; is that correct?

A. Yes, that's correct.

**Q. And then the conversation about packing, that was when you saw the tall Royal Caribbean officer wearing the whites, correct?**

A. That is correct.

**Q. Were you part of the conversation about packing, or did you just overhear it?**

A. I was standing there, and he was telling Darren what he needed to do. And of course, that's when Susie and Ilene offered to go do the packing but told Darren just pack one bag, and they would get the rest.

**Q. Was this the very first time that you understood that Richard and Darren would be leaving the ship?**

MR. DRAHOS: Object to the form.

A. Yeah. When he had to go get the passports, I knew they were leaving the ship.

BY MS. LOBEL:

**Q. Did somebody tell them that they were leaving the ship?**

MR. DRAHOS: Object to the form.

A. Not that I'm aware of. Not at that time.

BY MS. LOBEL:

**Q. Do you know the purpose of them**

going to get the passports?
A. To get them off the ship.
Q. Did somebody say that?
MR. DRAHOS: Object to the form.
A. No, not before we had the conversation with the officer.
BY MS. LOBEL:
Q. And that conversation that you're referring to is the one at 10:30 about packing up?
A. Yes.
Q. Did the officer -- okay. Let me back up. The conversation -- strike that.
When you learned that Darren had to go upstairs to get the passports, did anyone tell Darren he needed to rush and hurry to go get his passport?
MR. DRAHOS: Object to the form.
A. No.
BY MS. LOBEL:
Q. Was there any sense of urgency that you heard from the clerk at the front desk?
MR. DRAHOS: Object to the form.
A. No.
BY MS. LOBEL:

Q. Was there any sense of urgency that you heard from anything that was said by the nurse?

MR. DRAHOS: Object to the form.

A. No.

BY MS. LOBEL:

Q. And your testimony is you never spoke with the doctor?

A. Never spoke to the doctor.

Q. And the doctor never spoke with you?

A. No.

Q. Now, when the officer has a conversation -- I believe you said it was with Ilene and Susie, and they, you know, told Darren, pack what you need, we'll take care of the rest, and the officer says no -- at that point in time, did the officer say, You need to hurry, we need to get you off the ship?

A. No.

Q. Did the officer -- the tall officer from Royal Caribbean give any indication as to when somebody was going to be coming to get Richard off the ship?

MR. DRAHOS: Object to the form.

A. No.
BY MS. LOBEL:
Q. Did the officer have any sense of urgency, Richard, you need to pack -- or sorry -- Darren, you need to pack as fast as humanly possible and get back down here?
MR. DRAHOS: Form.
A. No.
BY MS. LOBEL:
Q. All right. Did you hear the officer tell Darren that somebody would meet him at the infirmary to help him with his bags?
A. Yes.
Q. Did anyone come to help Richard with his -- excuse me. Strike that.
Did anyone from Royal Caribbean come to the infirmary to assist Darren with his bags?
A. No.
Q. Did Darren wait thinking somebody was going to come help him?
MR. DRAHOS: Object to the form.
A. Yes. He waited about 10, 15 minutes.
BY MS. LOBEL:

**Q. All right. And then Darren just goes up to the room to just start packing?**

A. Yeah. He said, I've got to get this done.

**Q. So now Darren is up in the room. You, Susie, Ilene, and Jimmy are downstairs with Richard in the infirmary, correct?**

A. Correct.

**Q. Do you recall testifying that Jimmy at some point in time goes to get the passport from Darren?**

A. Yes. When Darren went back up to pack, that's when the officer again asked for the passports, and Jimmy said well, he'll run up to the room and get them from Darren and let him finish packing. So Jimmy went and got them and brought them back down.

**Q. And when Jimmy came back down with the passport, was Darren back from packing yet?**

A. No.

**Q. And you had a conversation with the officer -- tall officer wearing white regarding something to settle the bill?**

MR. DRAHOS: Object to the form.

A. Yes, because they kept saying

that there was something wrong with their account there or the medical or whatever, and Darren had to go to the purser's desk. And he went after he came back with the luggage.

**Q. That was my next question. When Darren goes upstairs to go deal with the bill up at the purser's desk, is that -- when is that in relationship to when the ambulance team comes shortly before, you said, 12:00 p.m.?**

MR. DRAHOS: Object to the form.

A. It was probably about 11:45. It was real close to then.

**Q. Okay. All right. So then the team with the ambulance comes. Did you see what the ambulance team -- well, strike that.**

**Did the -- how many people from the ambulance come onto the ship that you recall?**

A. Two.

**Q. Was it a man and a woman? Two men? Two women?**

A. I remember the woman talking.

**Q. All right. And the woman who was talking spoke to Richard, or did she speak to anyone else?**

A. She spoke to Richard, but I think

she talked to the group as a whole saying, We're going to take care of it.

**Q. Did they tell you where they were going to take Richard?**

A. No.

**Q. Would -- the ambulance people come onto the ship shortly before noon, did they leave right away?**

MR. DRAHOS: Object to the form.

A. I'm sure it took them a few minutes to get out, get Richard on the gurney and secured and everything, and then our brief conversation. It wasn't too long after they were on --

BY MS. LOBEL:

**Q. Did --**

A. -- in the medical part. I don't know where they were on the boat before then.

**Q. Did Richard do anything or say anything before the ambulance boat took him off the ship?**

A. No. He just cried.

**Q. Where were you when the ambulance team came onto the ship to get Richard?**

A. Well, we were -- let's see --

might have been in the room with Richard, and when they came, we stepped out and let them get him.

**Q. Did Jimmy remain in the room with Richard when the ambulance team came on?**

A. I don't remember that.

**Q. All right. You don't remember one way or the other is what you're saying?**

A. No.

**Q. So we would have to ask Jimmy, correct?**

A. Yes.

**Q. All right. Fair enough. Okay.**

**So at this time, Darren is still up at the purser's desk, correct?**

A. Yes.

**Q. So when does Darren come back?**

A. When they get Richard out of the room and he's on the gurney leaving, Darren comes in then saying, you know, they're moving him out. They said they were out of here.

**Q. And then folks from the ambulance team leave with Richard on the gurney with Darren?**

A. Yes. Correct.
**Q. With the bags?**
A. They did not have the bags.
**Q. Do you know where the bags were?**
A. That's a good question. I'm trying to picture where they were. Or maybe that officer took them down to the gate area or something. I don't recall seeing the bags.
**Q. Do you know if the bags came down?**
A. Yeah. Darren brought them down, but I think somebody grabbed them for him.
**Q. Okay. Fair enough.**
A. He wasn't carrying the four suitcases.
**Q. Would it be fair to say that by the time the ambulance people come on to the ship shortly before noon, Darren is upstairs, comes back down, we're waiting for Darren, he comes down, everybody leaves the ship would be sometime shortly after or thereabouts noon?**
A. Yes.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
**Q. Fair enough. All right. Did the**

doctor that you -- or person in scrubs that you saw standing at a stool and a desk outside away from Richard but in the medical center, did he come out --

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. -- when the ambulance boat came to take Richard?

MR. DRAHOS: Form.

A. No.

BY MS. LOBEL:

Q. Was there a conversation between the folks from the ambulance and the gentleman who -- with the dark hair and the blue scrubs?

MR. DRAHOS: Form.

A. I don't recall one.

BY MS. LOBEL:

Q. As far as you recall, do you recall ever seeing the doctor -- who you believe to be the doctor, the gentleman in the blue scrubs with the dark hair, ever leave that office area where he was stand -- or sitting on a stool?

A. He probably left that stool area, but he never came in the room with Richard at all. I didn't keep my eyes on him nonstop.

**Q. Were there other patients in the infirmary during the three or so hours you were in the infirmary?**

A. Yes.

**Q. How many other people or patients do you recall seeing in the infirmary?**

MR. DRAHOS: Object to the form.

A. Maybe three or four.

BY MS. LOBEL:

**Q. Did you overhear or learn that there were other medical emergencies?**

MR. DRAHOS: Form.

A. No.

BY MS. LOBEL:

**Q. What, if anything -- if you know -- anything about the other patients that were being cared for in the infirmary?**

A. There was one person sitting in a wheelchair that was suffering from a fall and had some contusions and bruises and things.

But the other two or three, they didn't have any physical injury that you could see. It may have just been -- they may have been sick or something.

**Q. Did you ever overhear a nurse or**

anyone from the medical team talking about another medical emergency other than what was going on with Richard?

MR. DRAHOS: Object to the form.

A. No.

BY MS. LOBEL:

Q. Did you ever hear anyone from the medical infirmary ever describe or characterize Richard's situation as a medical emergency?

MR. DRAHOS: Form.

A. No.

BY MS. LOBEL:

Q. Do you recall being asked multiple times by the defense attorney for Royal Caribbean about how many times Royal Caribbean made phone calls for an ambulance? Do you recall that?

A. Yes.

Q. Do you know if Royal Caribbean ever made multiple phone calls to ask for an ambulance?

MR. DRAHOS: Form.

A. No, I do not know.

BY MS. LOBEL:

Q. Did you ever hear anyone from the

medical center make any phone calls where you heard any conversation about getting an ambulance or medical care for Richard?

MR. DRAHOS: Form.

A. No.

BY MS. LOBEL:

Q. When there was a conversation about the insurance card, at any point of time, did you hear about, well, we need the insurance information for another medical care provider other than the cruise ship?

MR. DRAHOS: Object to form.

A. No.

BY MS. LOBEL:

Q. Did you ever hear that medical clerk at the front desk ever talk about a hospital that they were giving medical information to?

MR. DRAHOS: Object to form.

A. No.

BY MS. LOBEL:

Q. Now, when you sign up for a cruise, you give contact information to the cruise line, correct?

A. Yes.

Q. You provide your home address?
A. Correct.
Q. You provide your email?
A. Correct.
Q. You provide all of your phone numbers?
A. Yes.
Q. At any point of time at or shortly after this incident happened on February 21st of 2019, did anyone from Royal Caribbean ever ask you what happened?
A. No.
Q. Did anyone from Royal Caribbean ever ask you how Richard was doing?
A. No.
MR. DRAHOS: Object to the form of the last question.
BY MS. LOBEL:
Q. Now, you and I have spoken before about your recollection as to what happened in the incident, correct?
A. Yes.
Q. When we spoke, did I ask you what you recalled about this incident?
A. Yes.

Q. Did I give you information about this incident?
A. No.
Q. Did I ask you and the family what they recalled individually as to their -- their recollection as to what happened?
A. No.
Q. I didn't ask the family --
A. Well, you asked --
Q. -- what they recalled?
A. -- about mine.
Q. I asked you what happened.
A. Yeah. We were on the phone as a group.
Q. Okay. And the group, more or less, was all together when this incident happened most of the time?
MR. DRAHOS: Object to the form.
A. Yes.
BY MS. LOBEL:
Q. The only time that the group got separated -- was not all together at the same time was when you and Darren were up with Richard on deck 18 when everything got started and Susie went to go get Darren, Jimmy, and

Ilene?
MR. DRAHOS: Object to form.
A. That's correct.
BY MS. LOBEL:
Q. And the only other time beyond that was when Jimmy went up to Darren's room to go get Darren's passport?
A. That's correct.
Q. Otherwise, the family was in the infirmary from approximately 9:25ish when you started getting there through sometime shortly after noon?
MR. DRAHOS: Object to form.
A. That's correct.
BY MS. LOBEL:
Q. When you saw Richard upstairs at the suite restaurant area, was he drinking alcohol?
A. No.
Q. Did he seem drunk to you?
A. No.
Q. Was the slurred speech and his physical appearance or smell indicate the presence of alcohol at all to you?
A. No.

Q. At any point in time, has anyone told you that Richard's drinking on the first night of the cruise had anything to do with what happened to him on the day he had the stroke?

MR. DRAHOS: Object to form.

A. No. I mean, he slipped that night, but no.

BY MS. LOBEL:

Q. He slipped the night of?

A. The first night on the boat, he slipped.

Q. All right. But insofar as the day that he had his stroke, has anyone told you, at any point of time that the drinking had any effect on the stroke?

A. No.

Q. All right. Do you recall being asked questions about whether you appreciated the risk of having an emergency -- or a medical emergency on a cruise ship? Do you recall that early on in your deposition?

A. That I appreciated it?

Q. Yeah. That there's an inherent risk of being in remote areas when you have a

medical emergency --
A. Yeah. I mean, there is that risk, yes.
Q. Okay. At the time of this incident, wasn't the ship at port?
MR. DRAHOS: Object to the form.
A. Yes.
BY MS. LOBEL:
Q. So if I understand correctly, the ship was right next to land, correct?
A. Yes.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q. The ship was not anchored off some ways from Puerto Rico, correct?
A. That is correct.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q. Sorry. I'm just going through my notes. Bear with me.
Do you recall being asked a line of questions about Richard's drink records and your drink records early on in your deposition?
A. Yes.
Q. Those records don't have time

stamps, correct?
A. No.
Q. Those records also don't indicate what, if anything, has been ordered from that document, correct?
A. That's correct.
Q. So you can order water when you're at the bars, and that would show as a -- as something that you'd gotten from one of the bars, correct?
MR. DRAHOS: Object to form.
A. Correct.
BY MS. LOBEL:
Q. All right. And when you were on cruises with Richard, would he often get two drinks and get one for somebody else?
MR. DRAHOS: Object to form.
A. Yes.
BY MS. LOBEL:
Q. So just because Richard has X amount of drinks, that doesn't necessarily mean that's how many drinks Richard actually had?
A. No.
MR. DRAHOS: Object to form.
BY MS. LOBEL:

Q. And am I correct, Richard wouldn't always finish all of his drinks?
MR. DRAHOS: Object to form.
A. He rarely did.
BY MS. LOBEL:
Q. Now, the days between the night that Richard fell and hit his head through the morning -- excuse me -- the morning that Richard first tells the family that he thinks he's had -- suffering from a stroke, nobody from the family observed any physical or mental abnormalities in Richard, correct?
A. That's correct.
Q. Richard seemed exactly like his normal self, both physically and mentally, between the night he hit his head through the morning that he had his stroke?
A. That's correct.
Q. And the only time that Richard seemed noticeably different was the morning he had his stroke when you first saw him shortly after 9 o'clock in the morning?
A. That's correct.
Q. Now, if there was anything abnormal, either in his speech or the way he

thinks or talks or moves, that would have been something you would have been able to observe?

A. Yes.

Q. All right. Would it be fair to say that the family was relying on the cruise ship to get Richard to the medical care he required?

MR. DRAHOS: Object to form.

A. Very much so.

BY MS. LOBEL:

Q. Did anyone from the medical center on the day of this incident ever explain to you what they thought was going on with Richard?

A. No.

Q. Did anyone explain to you that they believed that Richard might be having a stroke?

A. No.

Q. Did anyone from the cruise line ever indicate to you that they suspected that this was a time-sensitive and medical emergency?

MR. DRAHOS: Object to form.

A. No.

BY MS. LOBEL:

Q. Did you know it was a medical emergency at the time?

A. Yes.

**Q. And did the family try to get Richard off the ship?**

A. Yes.

MR. DRAHOS: Object to form.

BY MS. LOBEL:

**Q. How did the family try to get Richard off the ship?**

A. Jimmy kept going to find the doctor and asking, When are you coming in here? He's having a stroke. He's getting worse. And the doctor just kept, I'll be in there in a minute.

**Q. Do you have any familiarity or did -- strike that.**

**Did anyone from the family have any familiarity with the hospitals or medical facilities in San Juan, Puerto Rico?**

A. No.

**Q. Based off of the years that you've been booking cruises, is it your understanding -- at least in the last 15 years -- that Royal Caribbean has been using San Juan as a port?**

MR. DRAHOS: Object to form.

A. Yes.
BY MS. LOBEL:
**Q. And do you know that from researching and booking cruises over the years?**
MR. DRAHOS: Object to form.
A. Yeah, you look at the ports.
MS. LOBEL: Okay. That's all I have for you on cross-examination. Thank you, sir.
THE WITNESS: All right.
MR. DRAHOS: Okay, Mr. Hiatt. You have the right to read the transcript to make sure that everything has been taken down accurately by the court reporter, or you can waive that right.
It's up to you. If you would like to read, you got to coordinate a time and place with the court reporter and review the transcript with her. That's not something that the lawyers get involved in.
THE WITNESS: I'll waive it.
(Deposition was concluded at 1:43 p.m.)

* * * * * * * * * * * *

REPORTER'S CERTIFICATE

* * * * * * * * * * * *

STATE OF ALABAMA)
COUNTY OF ST. CLAIR)

I, Bethany Whaley, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, do hereby certify that on June 6, 2022, I reported the aforementioned proceedings, and that the pages herein contain a true and accurate transcription of the said proceedings.

I further certify that I am neither of kin nor of counsel to the parties to said cause, nor in any manner interested in the results thereof.

This the 25th day of June, 2022.

Bethany Whaley

s/s Bethany Whaley

Bethany Whaley, ACCR 661
Certified Court Reporter and
Notary Public for the
State of Alabama
My commission expires 4/1/26.