EXHIBIT I



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

RICHARD BURGESS, Individually, and by and through DARREN HENZE as Guardian of the Person and Estate of Richard Burgess, incapacitated and as agent under that certain durable power of attorney dated November 20, 2006.

Plaintiffs,

V.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL, JOAO PEREIRA, MICHIEL ADRIAAN ETSEBETH.

Defendants.

CASE NO: 1:20-cv-20687-AOR

DEPOSITION OF: JIMMIE LANDRUM

Commissioner: Jason Kobielus, RPR, Alabama CCR

Videographer: Paige Ali

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the videotaped deposition of:

JIMMIE LANDRUM,

may be taken before Jason Kobielus, Commissioner and Notary Public, State of Alabama at Large, at the offices of Eagle Point Business Center, 4000 Eagle Point Corporate Drive, Birmingham, Alabama 35242, on the 7th day of June, 2022, commencing at approximately 10:01 a.m. CDT.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

SARAH A. LOBEL
Attorney at Law
Hickey Law Firm, P.A.
1401 Brickell Avenue
Suite 510
Miami, Florida 33131
slobel@hickeylawfirm.com

ON BEHALF OF THE DEFENDANTS:

MICHAEL J. DRAHOS
Attorney at Law
GrayRobinson, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
michael.drahos@gray-robinson.com

***

EXAMINATION INDEX

JIMMIE LANDRUM
BY MR. DRAHOS . . . . . . . . . . . . . . 7
BY MS. LOBEL . . . . . . . . . . . . . . .201
BY MR. DRAHOS . . . . . . . . . . . . . . 258

***

EXHIBIT INDEX

| | | MAR |
|---|---|---|
| Defendant's Exhibit | | |
| 1 | Harmony of the Seas, FINAL STATEMENT, GUEST JAMES LANDRUM | 75 |
| 2 | Three photographs | 102 |
| 3 | CASE SUMMARY, Harmony of the Seas - 34160 (Feb 17, 2019 - Feb 24, 2019) - Feb 21, 2019 09:25 UTC-05:00 | 182 |
| Plaintiff's Exhibit | | |
| 1 | Photograph of a gentleman | 215 |

***

I, Jason Kobielus, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to Rule 30 of the Alabama Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on the 7th day of June, 2022, at the offices of Eagle Point Business Center, 4000 Eagle Point Corporate Drive, Birmingham, Alabama 35242, commencing at 10:01 a.m. CDT. JIMMIE LANDRUM, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This marks the beginning of the deposition of Jimmie Landrum in the matter of Richard Burgess, et al., versus Royal Caribbean Cruises, Ltd., et al., Case Number 1:20-cv-20687-AOR, filed in the United States District Court, Southern District of Florida. The date is June 7th, 2022. Time is 10:01 a.m.

All attorneys present, will you please state your names and whom you represent.

MS. LOBEL: Sarah Lobel on behalf of the plaintiff Richard Burgess.

MR. DRAHOS: Michael Drahos from the law firm of GrayRobinson on behalf of the defendant Royal Caribbean.
THE VIDEOGRAPHER: Court reporter, will you please swear in the witness.
JIMMIE LANDRUM,
having been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. DRAHOS:
**Q. Good morning. Can you please state your name for the record.**
A. Jim -- James R. Landrum is the legal name, but I go by Jim, Jimmie, Jimbo.
**Q. Jim, Jimmie, Jimbo?**
A. Yeah.
**Q. I'm going to just call you Mr. Landrum --**
A. That'll be fine. That'll be fine.
**Q. Okay. So, Mr. Landrum, have you ever given a deposition before?**
A. Not with a defense attorney. I've had to do a corporate deposition before.
**Q. A corporate deposition --**
A. Only with the attorney -- my attorney.

**Q. Okay. Explain that to me. When did that happen?**

A. Oh, that was years ago with Mitsubishi Electronics. We were being challenged by one of our products having a defective chip in it and recalls and stuff like that.

**Q. You said --**

A. It never -- it never went anywhere other than me just giving a deposition to my corporate attorney.

**Q. Okay. So being that that experience sounds a little bit different than the one we're doing here today, I'm going to kind of go over the ground rules, like I said, I was -- right before we started, to make sure that we're on the same page --**

A. Okay.

**Q. -- to make sure you understand how it is going to go today.**

A. All right.

**Q. So as you can see, this is a formal question-and-answering session.**

A. Uh-huh.

**Q. And so we treat this the same as if you were in a courtroom. So in the beginning,**

the court reporter swore you in, so that obligates you to tell the truth in order of --
A. Sure.
Q. And so as we take breaks and we get back on, that obligation remains the same. So all of the testimony today is under oath.
A. Understood.
Q. When we speak, it is a little different than normal conversation, because the court reporter is taking down every word that is being said. So if we talk over each other or at the same time, it makes it impossible for him to capture who is saying what.
A. I understand.
Q. So it's awkward sometimes. But if you can, let me finish my entire question and pause before you go to answer. This way, we're not talking over each other; and, more importantly, that you answer the question that I asked you.
A. Sure.
Q. Sometimes you may think I'm going in a certain direction on a question that has a totally different meaning than what you thought.
A. I understand.
Q. If you nod your head, I'm going to

know what that means and the camera is going to capture it. But later, when I try and read the transcript, I won't remember how you nodded.
So I'm going to say to you, Is that a yes? Is that a no? I'm not doing that to be obnoxious. I'm doing it so that the answer is clearly reflected on the transcript. So, in other words, you got to answer out loud throughout the entirety of the deposition.
A. I understand.
Q. If at any point in time I ask a question that doesn't make any sense, either because I mumbled through it or used legalese or it just doesn't make any sense to you, let me know that. And I'm happy to rephrase the question.
A. Sure.
Q. Otherwise, if you answer it, I'm going to assume you understood what I was asking you.
A. I understand. Okay.
Q. Are you under any medication or anything that would affect your ability to understand questioning --
A. No.
Q. -- or testify truthfully?

A. No.
Q. Okay. And, lastly, this is by no means intended to be a marathon. So if you need to take a break for whatever reason, just tell me I need to take a break. And we'll stop, and you can have all the time you need --
A. Okay.
Q. -- all right?
A. Thank you.
Q. Okay. So where do you currently live, Mr. Landrum?
A. I currently live at 564 Coosa Island Road in Cropwell, Alabama.
Q. Can you spell that for me?
A. C-R-O-P-W-E-L-L, Alabama.
Q. Oh. And I'm sorry -- the street name.
A. Coosa Island -- C-O-O-S-A I-S-L-A-N-D Road.
Q. Okay. And how long have you lived there for?
A. 12 -- 15 years.
Q. Any plans to move any time soon?
A. No.
Q. Okay. And who lives there with you?
A. My wife.

**Q. What is her name?**
A. Ilene -- I-L-E-N-E.
**Q. Are you from the Alabama area?**
A. Born here, but I've lived in Texas and lived in Georgia. Those -- yeah, Texas and Georgia and Alabama, uh-huh.
**Q. Okay. For how long of a period of time did you live in Texas?**
A. 3 years.
**Q. What part?**
A. Montgomery County. We lived in Conroe, Texas, outside of Houston.
**Q. Okay. And you said you lived in Georgia. For what period of time did you live there?**
A. Douglasville, two different stints. First time, we lived there from 19- -- we lived there for 1985 to 1997.
And then 3 years in Texas. And then from 2000 -- and then we moved back to Georgia in 2000 and -- and left Georgia to where we are now in 2000- -- that would be '7, 2007. Yeah.
**Q. All right. Thank you.**
A. Uh-huh.
**Q. Are you -- you said you're currently**

**married to Ilene. Any prior marriages?**
A. No.
**Q. Have any kids?**
A. I have three.
**Q. How old are they?**
A. Oh, my. My oldest, Jennifer, is 40- -- she was born in 1977, so would that make her --
**Q. 44.**
A. 44?
**Q. Same age as me, yeah.**
A. Okay. Same -- and then my middle son was born in '79.
**Q. Okay.**
A. And then my youngest son was 10 years after my daughter, so it would have been '87.
**Q. Were any of your kids on the subject cruise?**
A. No.
**Q. Okay. And what is the highest level of education you've obtained?**
A. Junior college, 2 years.
**Q. Where did you go to high school?**
A. Huffman High School here in Birmingham.

**Q. Are you currently employed?**
A. I am now retired.
**Q. What did you do prior to your retirement?**
A. Majority of my time was Mitsubishi Electronics, 27 years. I was vice president of the Professional Products Division for 13 years of -- of that time. And then I retired because they closed, went out of business.
Then for 4 years, I worked at Casio Electronics just helping them set up a sales force and stuff on the East Coast.
**Q. Okay. And when you say set up a sales force --**
A. Uh-huh.
**Q. -- are you in -- have you been in --**
A. My whole life. My whole life.
**Q. Okay.**
A. Never -- never done anything else.
**Q. All right. So you're a professional salesman, in other words?**
A. Yeah. Yeah.
**Q. Any medical training of any sort?**
A. Yes. Some. Yes, I had some. I was also, for 4 years, the fire chief at Cropwell --

well, New London Volunteer Fire Department. Ran that.

So we had to have education in first aid, A-E- -- how to handle AEDs, recognizing symptoms for -- we would check for high sugar, strokes, things like that.

And worked with the paramedics. We didn't have paramedics in our group. But if we were first on the scene, we'd try to stabilize the patient until the paramedics could get here. In our area up in New London, it's -- it's a rural area. So sometimes it would take an ambulance 30 minutes to get there.

**Q. So I'm not quite familiar with how volunteer --**

A. Uh-huh.

**Q. -- fire service works. Are you, like, a traditional firefighter --**

A. Uh-huh.

**Q. -- on the clock and, if there's a call that comes in, you have to respond to it?**

A. Uh-huh.

**Q. Is that a --**

A. Yes. I'm sorry. Yes. Yes. Yes, we all have radios.

**Q. Right.**
A. And we all have an emergency channel on that radio.
And if it is in our area, there's a certain tone. They would call it getting toned out.
**Q. Okay.**
A. There's a certain tone that comes across the radio.
So we immediately grab our radios, and we find out what the situation is. And every available volunteer fireman, which we had 25 of them, would respond.
And if, like -- yes, so we would all respond until we were called off.
**Q. And you said that you were at some point in time the fire chief?**
A. All 4 years.
**Q. All 4 years?**
A. I just -- July of last year, I -- I quit doing it.
**Q. So what period of time were you in the volunteer fire service?**
A. Well, what is this, 20- -- July 2021 to 4 years prior to that: July 2017.

**Q. Okay. And so when you started this, for lack of a better word, occupation --**

A. Uh-huh.

**Q. -- did you start as a volunteer fireman and work your way up or you came in right as the chief?**

A. I came in right as the chief.

**Q. How did you do that?**

A. Well, the Fire Department is under the Water Department.

**Q. Okay.**

A. We worked for the Water Department. And there was a gentleman on the Water Department that knew me. And I had set up many sales organizations, sales forces, through Mitsubishi and with Casio.

And the Fire Department there was in total chaos. They were just having a very, very difficult time. And so he asked me to come in and organize the Fire Department, get it back on -- on par.

And so I did. That's how I came in. So I came in as chief. I was not welcomed in as chief; I came in as chief.

**Q. Okay.**

A. And it took me about a year for everybody to -- win over. I had to get rid of some people. And then it went well.
**Q. And these are all volunteers?**
A. All volunteers. Hard to fire a volunteer, but I did.
**Q. Right. So is there also a -- a paid fire service --**
A. No.
**Q. -- professional --**
A. 100 percent volunteer. We had three stations. We had seven trucks, what we call a brush truck.
We had a boat. We had to fight fires from the boat, because we -- we actually have a home on the -- on an island on the lake there. So we had to have a boat that could pump water out of the lake.
We were a good fire department at the end. Still are.
**Q. Okay. Why did you leave?**
A. Got tired of herding cats. It just got to be -- I was retired. It got to be more than I wanted to do. A lot of -- I was tired of dealing with the personalities.

**Q. Okay. So you mentioned that you did receive some -- some medical training. And I --**
A. Uh-huh.
**Q. -- thought I heard you mention strokes. To what extent were you trained in identifying --**
A. Just looking for signs -- you know, slurring of words; erratic eye movement; things like that. You know, droopiness, maybe, on one side of the face or the other. Just -- just the signs. Just those signs.
**Q. Any others beyond those that you just mentioned?**
A. Golly. I have to -- yes. I'm trying to think the word we used to recognize strokes. I can't think of it right now.
But it was -- let's see -- vision, slurred speech, droopiness, and -- oh, yeah, lack of mobility of maybe an arm or a leg or something like that.
**Q. Okay. In the time that you worked as a volunteer fireman --**
A. Uh-huh.
**Q. -- did you ever respond to any calls that involved a -- an individual who was**

**suspected of having a stroke?**

A. Yes. One. One very serious one. Sure did. We saved his life. We brought him back.

**Q. So what year was that? Let's start with that.**

A. It was about my second year in, so what -- what would that be? 2018?

Still see the man. He lives right next-door to a restaurant that I go to every Wednesday.

**Q. Okay. And so explain to me what your involvement was in this circumstance.**

A. Well, we -- we responded to the scene. Very close to my house. It was about mile from my house.

So me and three other volunteers responded. Two of the volunteers that responded were much farther along in training than I was because they had been full-time firemen in Birmingham before.

So we just jumped into action. We had to do CPR and kept him going until the paramedics got there. And when we got there, he was nonresponsive. We -- we had nothing. We had

nothing.

**Q. Okay, so --**

A. We used an AED on him, too.

**Q. So this particular individual was unconscious when you arrived?**

A. Absolutely.

**Q. Was he the one who made the initial call, or --**

A. No. His wife did.

**Q. Okay. And so what was it about this individual that had any association with suspected stroke?**

A. Well, we -- she started telling us what had happened, how he had just lost -- he was unable to move his -- I've answered many medical calls. But with him, it was -- I think he had no movement in his left side.

And then he just started -- she said just he -- not foaming at the mouth but could be drooling because he had no control of the -- that side of his face. And then down he went.

**Q. So when she called you, he had already gone into cardiac arrest?**

A. Uh-huh. Yes, sir.

**Q. Okay.**

A. When we got there, he was out, yes.
He was out on the floor.
**Q. All right. And so when you say that the -- the three of you, two were further along in their training, did you actually put your hands on the man?**
A. I did not. I handled the radio and communicated with the ambulance service where -- where we were, because it was a house that was not on a main road. It was on a dirt road. And I was communicating with them and guiding them into the location.
**Q. Understood. So that I have it straight: You didn't use the AED?**
A. I did not, no.
**Q. And you didn't administer any medications?**
A. I did not.
**Q. Okay. All right. So any plans to return to volunteer fire service?**
A. None.
**Q. Okay.**
A. I did my -- and it's not that I didn't enjoy it. I -- I'm 68 years old.
**Q. Uh-huh.**

A. And carrying a -- a three-inch hose up a 45-degree hill to fight a fire is just more than I can do now.
**Q. All right. Understood. So have you ever been involved in any litigation before? I know you told me about the circumstance with the Mitsubishi product, but I'm wondering about you individually.**
A. No, I have not.
**Q. Okay. Ever filed a Workers' Comp or disability claim of any sort?**
A. No, I have not.
**Q. Okay. Ever been arrested before?**
A. No, I have not.
**Q. Sorry to ask, but --**
A. No. They -- I understand.
**Q. -- it's on the checklist of things I have --**
A. Yeah.
**Q. -- to cover.**
A. Yeah.
**Q. Okay, and --**
A. Always able to talk my way out.
**Q. Okay. I -- I sense that in you. I sense that.**

MR. DRAHOS: So let's go off the record for just a second. I'm sorry, ma'am.
THE VIDEOGRAPHER: We're --
MR. DRAHOS: I will only ask you to do this once.
THE VIDEOGRAPHER: We're off the record. The time is 10:15 a.m.
(A discussion was held off the record.)
THE VIDEOGRAPHER: We are back on the record. The time is 10:16 a.m.
**Q. (By Mr. Drahos) Do you maintain any -- any social media accounts?**
A. I do not.
**Q. Okay.**
A. I'm not that interesting.
**Q. How about your wife?**
A. Yes, she does.
**Q. Do you know what platform she uses?**
A. Facebook is the only one I know of.
**Q. And do you ever go on her Facebook page?**
A. I do not.
**Q. So I assume you never post anything --**
A. I do not.

**Q. Okay. So as I understand it, I had an opportunity to meet with the Hiatts yesterday, who I know you --**
A. Yes.
**Q. -- know.**
A. Yeah.
**Q. As I understand it, Ilene is the relative -- she is the cousin to Richard Burgess.**
A. That is correct.
**Q. And for how long of a period of time have you known Richard Burgess?**
A. Well, I've been married to Ilene 48 years, so I have known Richard 38 of those years.
**Q. Okay.**
A. I met -- I met Richard -- he came to Birmingham because Ilene's grandmother had passed away. And that is how I met him the first time, yeah.
**Q. Understood. So you had been married, then, to Ilene for 10 years before you met Richard?**
A. Roughly, yes. Uh-huh.
**Q. All right. And so what kind of relationship do you have with him? And let's be clear. I'm talking about the time period before**

**the subject cruise. We're going to talk about the cruise --**
A. Sure.
**Q. -- and afterwards. But for right now what I'm trying to gauge is what your relationship was -- was like beforehand.**
A. When I first met Richard, it was just a hey, hey, how are you, you know?
**Q. Okay.**
A. Then he left. And then he came back a few years -- a couple of years later, and -- to just visit Ilene's mother. Ilene's mother and his mother were sisters. And I believe she came, too. I believe she was here also.
And then again, it was -- at that time, I think Ilene and I were living in -- probably living in Georgia. And we came over just because Ilene was very close to Richard. Always has been. And so Ilene wanted to come see Richard, so I came over with her. And all's I did was sit in the den and talk to him a little bit.
After that, I cannot remember the next time we saw him. But then we got to just being friends. And he and Darren would come down and

stay with me and Ilene one week every year. I believe it was around Labor Day, every September. And they would stay with us a week. And we would just hang out, get on the boat, ride on the boat.

And I enjoyed Richard and Darren very much. And we became, I would say, very close.

**Q. Okay. So when did this one-week-a-year routine begin approximately?**

A. Before we did our first cruise with them together. So that would have been -- that's when we decided to do a cruise together.

**Q. Okay.**

A. That would have been -- wow, time gets away -- it was at the new house. So that had to be -- we were in the house, so that would have had to been about 11 years ago.

**Q. Okay. So for the past 11 years, they were coming to the house --**

A. Uh-huh. Yeah, because we -- I own the house --

**Q. -- once a year?**

A. I own the house next-door to me --

**Q. Okay.**

A. -- as well as my house. And they would stay in that house, so we were already in

the new house.
**Q. And you're on a lake?**
A. Uh-huh.
**Q. What's the name of the lake you're --**
A. Logan Martin. It's right up the road. It's -- from here, about 20 miles.
**Q. You have a boat?**
A. Oh, yes.
**Q. Are you a fisherman?**
A. I can hold a pole and put it in the water.
**Q. Sounds like me. Okay.**
A. My brother is the fisherman. So every time he comes up, I have to go fishing. But I'm not -- no, I'm not.
**Q. Understood.**
A. I'm a boat rider and a beer drinker.
**Q. All right. So you said that over -- over the years, then, you became close with Richard?**
A. And Darren, yes.
**Q. When he wasn't visiting up here in Alabama, would you speak to him --**
A. On the phone? Called each other every birthday and sang Happy Birthday to -- Happy

Birthday to each -- and they still do it. Richard still tries to do it, even though he has a difficulty doing it on -- on mine and Ilene's birthday, yes.

**Q. Okay. So calls on birthdays. What about text messages? Would you ever --**

A. No. Ilene did with Darren and Richard, and I just communicate through Ilene's texts. But no, I never -- I'm not a texter. I'm not a -- I hate cell phones.

**Q. Okay. So any other forms of communication with him, then, beyond just him coming once a -- a year and calling each other on birthdays?**

A. No.

**Q. All right. So these times that you -- you spent together, it -- it was those times where you developed this close relationship --**

A. Uh-huh. Yes.

**Q. Is that a yes?**

A. Oh, that's a yes. Uh-huh.

**Q. And how about Darren? How well did you get to know him?**

A. I got to know him after -- I never knew him before they started coming, okay?

And then -- then Darren, the first time I met Darren was when they came to the house. And we just hit it off real good except we have varying -- we're one end of the spectrum to the other on politics.

**Q. Okay.**

A. But we argue about that in -- in a fun way, I guess. But, yeah, I got close to him that way.

He is a big Penn State fan; I'm a big Alabama fan. Those are two teams that respect each other quite a bit.

**Q. I went to Florida State.**

A. Oh, did you? Good for you.

**Q. I went through this with the Hiatts yesterday.**

A. Oh, did you?

**Q. You all ruined our program. I'm blaming you for that, the big loss we had a couple of years ago. It hasn't been the same since then.**

A. Oh. Well, I went to the game down in Jacksonville where you all beat us when Saban's first -- second year. Yeah.

**Q. Well, we don't want to play you**

**anytime soon.**
A. Okay.
**Q. All right. So did you go to Richard and Darren's wedding?**
A. I did not.
**Q. Okay.**
A. I did not.
**Q. And did Ilene?**
A. She went up there. Her and Suzie went up there. They did not go to the wedding. They went to see his mother who was sick. No, they did not go to the wedding either, no.
**Q. Okay. So your communications with Darren -- would they be the same? Would you call on his birthday also, or was this just a thing with Richard?**
A. Ilene always calls Darren. But I call -- yeah, no, no.
Yes. We call -- we call Darren all the time, yes. But Ilene talks to Darren all the time.
**Q. Okay.**
A. So you can ask her. She's -- she's real close to Darren.
**Q. Okay. Other than going on these**

cruises, which we're going to talk about in just a second, and other than these instances when Richard and Darren would come visit for a week, did you ever go on any other traveling or trips with them at all?
A. No.
Q. Okay. Did you ever go visit them in Pennsylvania?
A. No. We had plans to go, and we were planning a trip up there. And then this -- what we're talking about now got in the way of it.
Q. Okay. So how much, Mr. Landrum, did you know about Richard's health before the subject cruise?
A. I knew some. Some of it, I did not.
Q. Okay. And what do you mean by that: some of it --
A. I did not know he was HIV-positive until someone told me during the conversations we had.
Q. Okay.
A. It would not have made a difference, but I did not know that.
But I do know that he had the problem when he was a teenager. He had to have surgery

because of -- Ilene said it was a clot -- not a clot, but the veins got twisted. And they had to go in, and -- we've known somebody else that's had to have that surgery.

But he had to have surgery on his head. And I knew about that. And medically, that's all I knew.

**Q. Okay. And what about Richard's habits with alcohol?**

A. I knew about his problems.

**Q. Okay. Tell me what you knew about that.**

A. Well -- the first time they came to visit -- I drink. I mean, I -- I'm a pretty healthy drinker --

**Q. Okay.**

A. -- on weekends and stuff. Don't drink and drive, but I will drink.

And so I offered him a drink when they were there.

And he said, Oh, no. I can't drink.

And I said -- and that's how we got into the conversation. And he told me about his problems that he had with alcohol. He told me Grand Marnier was his drink of choice and that he

was just -- he had to quit it and had to get help to quit it and that he became a different person when he drank too much, and --

**Q. Did he explain what he meant by that? I mean, did he --**

A. Well, Darren just said if he hadn't have quit -- if he had not have stopped drinking, they would not be together today.

**Q. But did you ever learn, either through Darren's description or Richard's, how Richard would change when he was --**

A. Well, all's Richard said to me was he became mean. And, listen: I've become mean, too, by drinking too much, so --

**Q. Okay. So do you know what period of time it was that Richard stopped drinking and sought professional --**

A. I --

**Q. -- help?**

A. I really don't, because I didn't know him then. Although, Ilene told me that the first time he came, he was still drinking when -- the first time I met him, that he was alone and -- I don't think he and Darren were together and -- and that he was drinking then. She told me that

just yesterday or the day before.
**Q. He and Darren were not together?**
A. I don't -- I shouldn't say that. I don't know that for sure. Ask Ilene. She'll know.
**Q. Okay. And I'm sorry. Remind me, then: When was this period of time you were referring to when he did come to visit, and --**
A. About 38 years ago. About 38 years ago.
**Q. 38 years ago?**
A. Yeah. I -- I didn't meet Darren -- I meant Richard until about 10 years into mine and Ilene's marriage, because we were already in Georgia, I think, so that would have been 10 years. And we got married in 1974, so 1984 roughly.
**Q. Okay. And I -- I believe you told me Ilene is the one that would know specifically --**
A. She would know a lot more than --
**Q. -- when Richard stopped?**
A. Yes, uh-huh.
**Q. Okay. And to your knowledge, has Richard ever returned to drinking or -- I don't want to say fall off the wagon, because I don't**

**really --**
A. No, no. You can --
**Q. -- like that saying. But I want you to know what I mean.**
**Has he ever had any relapses --**
A. To my knowledge, no. He allowed himself one day on the -- a day on the boat to drink.
It was kind of funny. He would ask for permission from Darren. He would say, Can I make this my day?
**Q. So --**
A. No hard alcohol. Beers -- Coors Light -- he would drink Coors Light and maybe have a Grand Marnier as his last drink of the night.
**Q. Okay. And so when you say that he would ask Darren for permission, do you know whether or not this was a rule that Darren implemented?**
A. I -- I have no idea. I just saw him ask him on the trip, and I thought it was funny.
**Q. Okay. And how did Darren respond when he --**
A. He laughed, and he said, Sure. I

think he said, Sure, honey.
**Q. Okay. And did you see Richard make that request on the subject cruise?**
A. No. That was just on the first cruise.
**Q. Okay. Do you know if Richard's had any addictions to any other types of substances beyond alcohol?**
A. No. I do not know that.
**Q. Okay. So before we move on, I just want to cover one last area.**
**Did you ever hear of any instances where Richard complained of dizziness or blurred vision before the subject cruise?**
A. Not until -- not until yesterday.
**Q. Okay. When you say yesterday --**
A. I don't know. Ilene said something about it. I had -- I didn't know anything about it.
**Q. And so did you and Ilene have some sort of discussion about today's deposition?**
A. Sure.
**Q. All right.**
A. Yes.
**Q. And why was it that that was brought**

**up specifically, this situation --**
A. I don't know. I don't know. It just -- we were just talking.
**Q. What did Ilene say to you about it?**
A. She said -- we were sitting, watching TV. And we were just -- I was just going over -- we had found -- we had just found out that Joe and Suzie had spent the entire day here, and --
**Q. Okay.**
A. So we were discussing that.
And I said, Oh, my. I wasn't planning for the whole day. And I guess maybe she spoke to Suzie, and Suzie said something about it.
I really -- it wasn't a major topic. It was just a -- that he had complained about dizziness. But he -- it was just kind of an off-of-the-cuff comment, not an in-depth comment.
**Q. So Suzie and Joe conferred with you all yesterday?**
A. All's they did was text us, We are home.
And I think Ilene called her and said, How did it go?
And Suzie said, It wasn't that bad, and --

Q. Thank you.
A. Yeah. And -- you know, I'm trying to remember where I heard about that. It may not have been yesterday. It may have been some -- I knew nothing about it before the cruise, no.
Q. So beyond the text or home and then the phone call -- who initiated the phone call: Suzie, or --
A. Ilene.
Q. Okay.
A. Oh, you can't keep my wife off the phone.
Q. For how long did they talk yesterday --
A. Oh, two, three minutes.
Q. Did Joe get on the phone?
A. Uh-uh. No.
Q. And so during the two-to-three-minute --
A. I got a text from Joe yesterday. He said, Pack a lunch. I was in there four hours.
Q. Okay. And so beyond -- or during this two-to-three-minute phone call, what else was discussed?
A. Just it wasn't -- it wasn't that bad

but it did take all day. That was -- that was the gist of the conversation.

**Q. All right. And so are -- are you saying now that --**

A. Because we were watching a movie on TV.

**Q. Okay. And this discussion about Richard's prior medical issues -- are you saying that was or was not discussed --**

A. I'm going to say that was not last night. It was probably some other time. It was after the cruise and before this deposition. Maybe this last weekend.

Now, Joe and Suzie and I had dinner together Sunday night. We may have talked about it then.

**Q. Okay.**

A. We had dinner -- we watched the golf tournament, the Memorial Golf Tournament, at my house. We -- my house is on the lake; we have a big porch on the lake, and I cook every Sunday.

And so I was barbecuing and watching it, and maybe that's when it came up.

**Q. And who would have been the one to bring it up?**

A. I'd probably say Ilene, because she knows more about this than Suzie does.

**Q. And what do you recall being said in that regard?**

A. I don't recall anything other than -- than I heard them talking about it. I was cooking. I was kind of listening out of one ear and cooking -- cooking over here, too.

**Q. All right. But something about that at least jogged your memory. I mean, you had --**

A. Yeah. They just said, Hey, he had complained about dizziness. That's all. And then when you just said it, it reminded me of it.

**Q. Okay.**

A. I wouldn't have said anything about it at all if you hadn't brought it up.

**Q. So at least at some point, your family and the Hiatts talked about Richard's medical history before the subject cruise?**

MS. LOBEL: Form.

THE REPORTER: Was that an objection? I'm sorry.

MS. LOBEL: Yeah. Sorry.

A. Did we talk about -- repeat the question. I'm sorry.

Q. (By Mr. Drahos) Sure. So what we know of, at least as of right now from your answers, is that at some point in time during your barbecue on Sunday --
A. Yes.
Q. -- there was a comment made about Richard having prior issues of dizziness --
A. Yes, yes. Yes, there was.
MS. LOBEL: Form.
Q. (By Mr. Drahos) So can I take from that, then, can the jury take from that, that at least at some point prior to today, you and your wife and the Hiatts have talked about Richard's preexisting medical history?
MS. LOBEL: Form.
A. That one -- yes.
I -- I mean no. We have not sat down and talked about him being HIV-positive, no. I didn't even know it. We have not talked about anything other than she brought up that dizziness. That's all we talked about.
Q. (By Mr. Drahos) Right. When did you learn that he was HIV-positive?
A. In the last week.
Q. Okay.

A. From Darren.
**Q. Okay. So when did --**
A. Well, not from Darren. From Ilene. I didn't talk to Darren. I have not spoken to Darren hardly any since the cruise.
**Q. All right. So this barbecue that happened on Sunday -- was --**
A. It's every Sunday. We do it every Sunday.
**Q. Was Ms. Lobel there?**
A. No.
**Q. All right. Did you meet with Ms. Lobel at some point prior to today's deposition?**
A. Yes. We had a conversation, yes.
**Q. And when did you meet?**
A. Sunday morning.
**Q. Where did you meet?**
A. My house.
**Q. Was this the first time that you had ever spoken to Ms. Lobel?**
A. No. There was a phone conversation trying to arrange when we could talk: you know, this thing, all of this. I'm not a good e-mail writer or a good texter, so you better call me.

**Q. Okay. So did you speak to Ms. Lobel on the phone prior to the meeting in your house?**
A. Yes.
**Q. And for how long of a period of time did you talk with her?**
A. Not long. Just talked, just getting everything set up.
**Q. So the purpose of the call was --**
A. I had not answered her e-mails about needing -- getting this date confirmed --
**Q. Okay.**
A. -- because I'm just terrible.
**Q. And so did you talk about anything else over the call other than setting up --**
A. She said, Just tell the truth.
**Q. All right. Anything else?**
A. Just, you know, get the facts straight in your head so you can tell the truth. Get -- get everything -- you know, kind of rethink everything that you know.
**Q. Did you share with her any information about what you recalled during the phone call?**
A. Oh. Let's see.
I don't recall that, no. Just get -- tell the truth, get -- sit down, get some quiet

time, write down what you remember, and we need to get this thing set up for June 6.

**Q. Where is the notes that you wrote of your memory?**

A. At my house.

**Q. How many pages are they?**

A. That many. One page that long.

**Q. What did you write in there?**

A. What I saw. What -- what I remember happening. And -- and all the running around we had to do.

**Q. Did your wife write down notes as well?**

A. No. She's not very good at that.

**Q. Okay. So --**

A. I have to write it down.

**Q. So just the one phone call between you and Ms. Lobel before the meeting?**

MS. LOBEL: Form.

A. To my recollection, yes.

**Q. (By Mr. Drahos) And you mentioned e-mails. Have there been e-mail communications between you and attorneys who represent Richard --**

A. Just --

**Q. -- Burgess?**
A. -- we need to get this meeting set up.
**Q. How many e-mails, though, in total?**
A. Because I didn't answer them, probably three.
**Q. Okay.**
A. All saying we need to get this done. And I gave her -- they were using an e-mail address I very rarely look at. I don't know how -- how that happened.
**Q. And were the e-mails written by Ms. Lobel, or --**
A. No. Dolores somebody.
**Q. Okay. So who else was at this meeting on Sunday morning?**
A. Me, Ilene, Joe, and Suzie.
**Q. And did Joe and Suzie get there before Ms. Lobel?**
A. Yes.
**Q. How long were they there for before Ms. Lobel --**
A. Five minutes. They had their grandchildren. They were bringing their grandchildren over.
**Q. And for how long was this meeting?**

A. I kept getting up and walking out. I -- an hour and a half. An hour and a half, two hours.
**Q. And were the Hiatts there for the entirety of the --**
A. Yeah. They -- they come on Sundays. It's a Sunday thing with us. It led into the barbecue.
**Q. Okay. Did Ms. Lobel stay for the barbecue, or did she leave?**
A. No, she did not say. She left.
**Q. So Ms. --**
A. We asked her to stay, but she didn't.
**Q. Ms. Lobel was there for two hours in total?**
A. Uh-huh.
**Q. Is that a yes?**
A. Yes. Two hours.
**Q. And did the five of you all speak together at the same time, or were there breakout sessions where --**
A. No. We all spoke at the same time. Now -- yes. And I'd get up and leave because I was watching the golf tournament.
**Q. Who spoke the most among the five of**

you?
A. Me.
Q. You did?
A. Yeah.
Q. Who spoke the least?
A. Ilene.
Q. So is there any information that you learned during this meeting that you weren't aware of prior to the meeting?
A. No.
Q. So everything that was said among the group, you already knew about?
A. Yes.
Q. Was there anything said by anyone that you disagreed with?
A. No.
Q. Was there anyone that you said that anyone disagreed with you?
A. No.
Q. Did Ms. Lobel share any information with you about the details of this lawsuit?
A. No.
Q. And so the Hiatts stayed after Ms. Lobel left?
A. Uh-huh.

**Q. How --**
A. Yes. Until about 7:00 o'clock. After we finished eating our -- while we were eating our chicken wings, we flipped over to the Cooking Channel to learn how to cook some more stuff.
**Q. Okay.**
A. So they were there until about 7:00 p.m.
**Q. And they typically come over every Sunday --**
A. Uh-huh. We live about a mile apart.
**Q. All right. So you're pretty close with them?**
A. Oh, yes. They lived in my house for the last year and a -- for the last year while they were building their house.
**Q. The house next-door to yours?**
A. No. They lived -- I got a pretty big house.
**Q. They lived in your house?**
A. In my house. Downstairs.
**Q. You're a nice guy.**
A. Yeah. And we didn't kill each other, so that was pretty cool.
**Q. Yeah, right?**

A. Yeah.
Q. It sounds like a reality show.
So how often have you spoken to the Hiatts about this circumstance?
MS. LOBEL: Form.
Q. (By Mr. Drahos) When I say this circumstance, I mean the cruise and everything that happened.
A. Off and on, it -- you know, we just feel bad for Richard. We talk about we just feel bad for Richard.
Not in-depth, like, let's get our story straight. Ain't just -- yeah, we've had casual conversation quite often.
Q. Uh-uh. And -- and over the time period that you all have talked about it, the four of you --
A. Uh-huh.
Q. -- has your mind ever been changed about anything that happened?
A. No.
Q. Have the four of you always collectively felt like Royal Caribbean was at fault for --
A. Yes.

Q. And is there any information or any discussions that you could have with anyone that would ever change your mind?
A. No.
Q. Do you think that you know the full story about what happened?
A. I know what I saw.
Q. Okay. Understood. You know what you saw.
A. And I --
Q. But do you --
A. And I begged the doctor to come in there, and he wouldn't come in there.
Q. We're going to get to that in --
A. Okay.
Q. -- just a bit.
A. Okay.
Q. But I'm speaking just in general here.
A. Yes. Okay.
Q. Do you think that there were things that were occurring behind the scenes that you have no knowledge about?
A. Well, I'm sure there were. But I -- they were making arrangements behind the scenes to get him off the ship.

**Q. Okay.**
A. But other than that, I don't know of anything, no.
**Q. All right. And would you agree that you don't know the details of what they were doing behind the scenes to try and get him off the ship?**
MS. LOBEL: Form.
A. Yes. I would -- I would agree with that, because I don't know what it takes to get him off the ship.
**Q. (By Mr. Drahos) Okay. Have you ever experienced anything like this before?**
A. No. And I've traveled Japan, China. I've traveled all over the world. Never experienced anything like this.
**Q. In the circumstances where you've traveled all over the world --**
A. Uh-huh.
**Q. -- have you ever required the need for emergent medical care?**
A. I have not.
**Q. Has anybody that you've ever traveled with required --**
A. Yes, they have. Got hit by a car.

**Q. Wow. All right. Tell me about that. Where did that happen?**
A. That -- well, that wasn't out of -- out of this country. I'm sorry. That was in Mexico.
Well, that was out of the country. Yeah, Mexico. Sorry. I'm sorry.
**Q. It's okay. So, I mean, who was it? You don't need to give me the name. But just in general, in relation --**
A. Just an associate. A -- a work associate.
**Q. So you were on a business trip?**
A. Uh-huh.
**Q. And --**
A. Yes.
**Q. -- somebody that you were traveling with got hit by a car?**
A. Yes.
**Q. Where in Mexico were you?**
A. Mexico City.
**Q. Oh. All right.**
A. Not fun.
**Q. Yeah. And so did you have any involvement in getting that person to the --**

A. Yes. Well, I -- I called our HR director, and he took over from there.
**Q. Okay. And just generally, what occurred after -- after the car accident?**
A. Well, just he was in the hospital. His name -- I'm going to tell you his name was Toby. Toby was in the hospital. And we just had to work to get him home and get him transported home.
He had to get stabilized. He -- I think he stayed there three days. I stayed there with him.
**Q. Okay.**
A. And then we just got him transported home.
**Q. Okay. Did you have any involvement on coordinating his --**
A. No. HR --
**Q. This is a perfect example of letting me finish the question --**
A. Yeah. Got it.
**Q. You have no idea about what I'm ready to ask.**
A. Okay, okay. Go ahead.
**Q. As I said yesterday, I could be**

**talking about the lunar launch.**
A. Okay. All right.
**Q. So did you have any involvement in coordinating his transportation from the scene of the accident to the hospital?**
A. Yes and no. Yes, I was there. But I -- when you go to Mexico, you have to travel with an armed guard.
**Q. I'm going to Tulum in two weeks. I don't --**
A. I had to have a -- I had an armed guard. When I would arrive at the place of business I was going to --
**Q. Yeah.**
A. -- my guy with the AK-47 would step out of the car. And I would walk between two or three more guys --
**Q. Okay.**
A. -- with AK-47s to get to the place of business, because they would kidnap Americans for -- in ransom.
So anywhere I went, I had an armed guard with me. And I was greeted with armed guards, and I was escorted out of the building with armed guards.

So when Toby got hit, we stood there with the guards. And -- but the owner of the business called for the ambulance and got everything done.

**Q. Okay.**

A. So I would -- I did not make any arrangements. He did the arrangements; I just stood there, made sure we had security around us.

**Q. Okay. And this was in the middle of Mexico City?**

A. Uh-huh. Yes, sir, middle of Mexico City.

**Q. All right. So let -- let me talk a little bit about your cruise experience before the subject cruise.**

A. Sure.

**Q. How many cruises had you been on?**

A. I am a Diamond with Royal Caribbean, so I think that's a minimum of 12 cruises, 13. I'm not sure. Whatever the minimum is, I'm a Diamond with them.

And then I had been on four cruises prior to that with Carnival.

And then I have three other cruises with Royal Caribbean that I arranged -- that I

arranged through my company for dealer incentive trips that --

**Q. Okay. So by my count, that is, at least, almost 20, if --**

A. Yes, sir.

**Q. -- not 20?**

A. At least 20, yes.

**Q. All right. And in all of those instances, all those 20 instances, had you ever needed to go down to the ship's medical center for care?**

A. I had not, no.

**Q. And when you qualify it like that, then the follow-up question is has anyone who you were traveling with ever required a need to seek medical care in the ship's medical center?**

A. Suzie Hiatt did.

**Q. Okay. Was that the instance where she got the norovirus?**

A. Uh-huh. Yes.

**Q. Okay. Did you accompany her down to the medical center?**

A. I did not.

**Q. So is it fair to say that this instance, the one that we're here to talk about**

**today, is the first and only time you've ever been in a cruise ship medical center?**
A. Yes.
**Q. Okay. And how about in all the foreign ports of call? Was there ever a need for you, when you were traveling on all these prior cruises, to ever seek medical care in a foreign port of call?**
A. No.
**Q. How about anybody that you were traveling with?**
A. No.
**Q. All right.**
A. I -- I hesitate, because we had a lady that cut her foot one time and she refused to go get medical -- she really needed it.
**Q. Okay.**
A. But we took her back to the ship, and we just bandaged it up. It was just -- it wasn't a cut. It was a blister that -- that exploded.
**Q. I've had cases like that, so --**
A. Right. But so no, I have not -- no.
**Q. Okay. Have you ever been to San Juan, Puerto Rico?**
A. I have.

**Q. How many times?**
A. Every cruise almost. Never got off the ship, though.
**Q. So you mean in all these prior 20 cruises?**
A. It's only a -- it's only a three-, four-hour stop. I just stayed on the boat and drank.
**Q. Okay. Understood, but let me just make sure I got it. You're saying in all these 20 prior cruises you've been on, there has always been stops to San Juan?**
A. I can't remember one that wasn't. It's always, like, the first stop they go, and they're there from 7:00 to 2:00 or 8:00 until 2:00, and people -- you know, ship time, so you have to get off and get on. There's no reason to get off.
I had been to Puerto Rico on -- on the other side of the island, and I just don't like Puerto Rico.
**Q. Why not?**
A. I don't know. Just nothing to do there.
**Q. Okay. So just to make sure I got it**

**straight: All the other times, though, where the ship came into that San Juan port, you never got off --**
A. Never got off.
**Q. How about Ilene?**
A. No. She won't get off without me.
**Q. Okay. And so what were the other instances where you've been to Puerto Rico?**
A. I did a dealer -- I used to do dealer incentive trips in my capacity at Mitsubishi. And we did a trip on the -- is it a Four Season of a Ritz on the other side of the island. Chi Chi Rodriguez's golf course over there.
**Q. Yeah, I know that hotel.**
A. Yeah. Okay. And we went on -- we went on a trip over there, a golf trip. Took -- took about 30 people.
**Q. And you didn't like that? That's a nice place.**
A. Oh, no. I liked it, but it was hot. We went in August. It was so hot.
It was so hot, it was -- I quit on the 9th hole. I said, I can't do this. I'm out of here. I went and stood in the ocean.
**Q. I agree. August golf is terrible.**

A. Yes.
**Q. Okay. So while you were there in Puerto Rico, did you ever require any medical care?**
A. I did not.
**Q. Anybody that was in your dealer incentive group?**
A. No, they did not.
**Q. Okay. So is it fair to say, then, that you've never been to a hospital in Puerto Rico in your --**
A. That is fair to say, yes.
**Q. And you have no experience or knowledge of the health care system in Puerto Rico?**
A. I have none.
**Q. All right.**
A. Other than what I've learned.
**Q. What you've learned from this --**
A. From this experience, yes.
**Q. Okay. By the way, that trip that you went on, the dealer incentive trip -- was that before or after -- I think it was Hurricane Maria, the one that --**
A. Oh. Before. Before. Way before,

uh-huh. I actually had some dealers that wouldn't go because they were scared. It was hurricane season. They were scared to go.

**Q. Uh-huh. Okay. So I've learned through the Hiatts that you all had a practice of scheduling the next year's cruise while you were actually on the ship?**

A. Correct.

**Q. And so did you have any involvement in scheduling this particular cruise that we're here to talk about, the Harmony of the Seas, in February of 2019?**

A. Yes.

**Q. What degree of involvement would you have with the planning?**

A. Chuck, one of our guys that goes on the cruise, we -- one year, we went with 20 people; and we've gone with as little as 6. It's just we tell everybody we're going to go. Excuse me. And it is always around Valentine's Day.

And so it's usually Chuck and I go down and go into the book -- book-now-and-save-all-this-money room. And we go in there and just book it.

**Q. Okay. So why the Harmony of the Seas?**

A. It was the only ship leaving out of Fort -- we don't -- we like to go out of Fort Lauderdale. We don't care for Canaveral or Miami. We like Fort Lauderdale.
And it had to do with leaving from Fort Lauderdale and going to the Eastern Caribbean. We're not crazy about the Western.
**Q. Okay. And so did you do any research at all concerning the Harmony itself, or was it just merely a -- an issue of port of call, and --**
A. Port of call and class of ship and Eastern Caribbean.
**Q. When you say class of ship, you mean the size?**
A. Size, uh-huh.
**Q. All right. Had you ever done any research about the medical capabilities --**
A. I never had.
**Q. -- of the medical center?**
A. I never had.
**Q. All right. How about Puerto Rico itself? Had you ever done any research at all about Puerto Rico before the subject cruise?**
A. No.
**Q. And did anyone in the group protest**

**and say No, I don't want to do the Harmony. I want to do the Independence, or, you know, something like --**

A. They -- they could have. And they go wherever they want to. This is where we wanted to go.

**Q. All right. So -- I mean, are you the ringleader of this group?**

A. I've been called that. But me and Chuck.

**Q. Okay.**

A. Chuck's been on twice as many cruises as I have.

**Q. By the way, I appreciate the loyalty to the Royal --**

A. Oh. Well, thank you.

**Q. Okay. So --**

A. I was the -- just so you know about Royal Caribbean, I was the first one that started the drink package. They didn't have a drink package, and I didn't want my dealers to have to pay for a -- when my dealers got on that boat, I didn't want them to pay for anything.

And all's they did was put a little green dot on our card. That was the first drink

package ticket.

**Q. How long ago was that?**

A. They didn't know how to do it. They didn't know how to calculate it or anything.

That would have been -- let's see -- '13, 2013 -- about 2008, 2009.

**Q. Okay.**

A. Maybe 2007. I -- I did three cruises, and the first cruise was when I wanted it done. I did an -- an Alaskan cruise, and I did two three-day cruises.

**Q. And so when you book these cruises, you always include the drink package in your reservation?**

A. Every time, yes.

**Q. Okay. And were you present when -- well, who among Richard and Darren was responsible for coordinating their trip?**

A. Darren.

**Q. Okay. Was Darren with you in that save-the-money-now room --**

A. No. We -- we went up, told Darren here's what we're -- Darren always could find a better deal than we could.

**Q. Okay.**

A. So we went up and told Darren, Here's the dates.
And Darren -- we booked our rooms so we could stay side by side. Darren and Richard would only stay in suites. They wouldn't -- they wouldn't downgrade to our class. So they -- they were always up in a suite.
So we would take the information to Darren. And -- but he'd get on his phone right then and he would have something worked out by the end of the cruise.
**Q. Okay. So you didn't have any involvement, though, in Darren's coordinating --**
A. I did not.
**Q. -- plans? Okay.**
**Do you know whether or not Darren signed up for the drink package?**
A. No. He doesn't drink.
**Q. Okay. Does Darren drink alcohol?**
A. He might drink a beer or two. I -- no.
He might have a beer -- yes. He had -- he drank Coors Light that day we got on the boat. He drank some -- some, not like -- Darren's a gambler and a smoker. That's what he

goes on the cruise ship to do.
Q. Okay. Are you a gambler?
A. I am not anymore. I have been cured.
Q. Okay. So let's fast-forward a bit.
A. Okay.
Q. I'd like to take you to the -- the first day of the cruise itself, which is --
A. Okay.
Q. -- Sunday, February 17th. And as you said, the ship was leaving out of Port Canaveral -- or no, I'm sorry --
A. Oh. Lauderdale, uh-huh.
Q. Yeah. Port Everglades, I think --
A. Yeah.
Q. I don't know why they call it that. They should just call it Fort Lauderdale, but --
A. Yeah.
Q. -- whatever.
A. Yeah.
Q. Okay. So when did you arrive to the Fort Lauderdale area before this cruise? If it was on Sunday --
A. Oh, Wednesday. Wednesday before.
Q. You came down on Wednesday?
A. Yes.

**Q. All right.**
A. Here's what we do. I'm trying -- was that the year that we had the possible snowstorm?
Anyway, we -- Chuck and Terry and Ilene and I would go down early. And we would stop at Lake City, Florida, and spend the night in Lake City. And this is just our normal routine.
And we would go in Lake City, and we'd hang out. We got a -- this is going to be a common theme of mine, but they had a bar that we'd like to hang out there.
So then after -- after Lake City, then we'd go down to Fort Lauderdale. We'd check in and we'd head to another bar right across the street from the hotel that we -- it was up the street from where we stayed.
Then, we'd get on the water taxi, and we just rode the water taxis all week.
**Q. Through Fort Lauderdale?**
A. Uh-huh.
**Q. Okay. And --**
THE REPORTER: Was that a yes? Sorry.
THE WITNESS: Huh?
THE REPORTER: Was that a yes?

A. Yes.
THE REPORTER: Thank you.
MR. DRAHOS: Thanks. I missed one.
A. Yeah.
**Q. (By Mr. Drahos) And so at what point prior to boarding the vessel did you all -- strike that.**
**Did you meet with Richard and Darren before getting on the ship, or did you meet them on the ship?**
A. No. They were supposed to meet with us, but I think their flight was delayed, if I remember. I was trying to remember that last night. Their flight was late.
And we called them to meet us at the restaurant that we go to. And they just said they were too tired. They were going to stay in.
**Q. All right. So they came into town, then, what, late Saturday evening?**
A. Late Saturday, uh-huh.
**Q. And they did not meet up with you guys?**
A. No. No, they were tired.
**Q. Okay. So the first time, then, you would have seen Richard would have been on the**

**ship?**
A. On the ship.
**Q. Okay. When was the last time you had seen him before seeing him on the ship? So February 17th, Sunday, 2019 -- when would have been the last time you would have seen him before that?**
A. Oh, probably the September 2018. They used to come on September.
**Q. Okay.**
A. As far as I know, they came that September also.
**Q. All right. And according to our records, you and your wife would have boarded the ship at 2:09 p.m. on Sunday, February --**
A. That sounds about right, yes.
**Q. All right. Now, Richard had been on the ship for about an hour beforehand.**
A. Okay.
**Q. Do you recall when, specifically, during the day on February 17th you would have actually finally met up with --**
A. About five minutes after that. We go --
**Q. Five minutes --**

A. When we walk on the fifth deck there and we walk on the 5th floor, board the ship on the 5th floor, there's a little Irish bar right there. And that's our tradition to go there first. That's where everybody meets.

**Q. Okay.**

A. We -- we are creatures of habit. We do the same thing every trip.

**Q. Yeah. What's the name of that Irish bar?**

A. It just says Irish Pub on it. I'm sure it has a name.

**Q. Schooner's -- is that --**

A. That might be it. Yeah, that might be it.

**Q. Okay. So you all would have -- that was, like, your rendezvous point?**

A. That -- that's where everybody rendezvoused -- rendezvoused on the boat when you first got on, absolutely.

**Q. Did you accompany Richard to the spa that afternoon?**

A. No.

**Q. Are you a spa kind of guy?**

A. No. I -- I used to be, but I'm not

anymore, no.
**Q. All right.**
A. I don't think anybody needs to see this body.
**Q. I'm not judging, Mr. Landrum.**
**So we have detailed records on these ships. I'm sure you can imagine that -- or appreciate having been on them several times before.**
A. Sure.
**Q. And so according to our records, Richard had his first drink of alcohol, which was a beer, at 4:18 p.m.**
A. Okay.
**Q. Were you with him for that?**
A. Yes. Yeah, yeah. And -- and I bet that was -- I bet that was the bar -- all right, after we would go to the -- the Irish diddy -- we called it the Irish diddy bar -- after we would go there, we would go see if our bags were at our room, put them in.
And then we -- we'd all meet on the back of the ship. There was a bar up by the water -- the surfing machines and stuff like that. There's a bar, and we always -- we'd sit

there and have a beer and watch the boat. And the boat pulls out at 5:00. So yeah, that's probably where it was.

**Q. Okay. And earlier, you had told me that you recalled an instance where Richard asked Darren for permission to --**

A. Uh-huh.

**Q. -- start drinking, and he said, Yes. Was that this cruise --**

A. No, no, it was not.

**Q. All right. So there was never any sort of formal declaration --**

A. No.

**Q. -- by anyone, whether it was Richard or Darren, like Today's going to be my day?**

MS. LOBEL: Form.

A. If -- no, there was no declaration. But we -- for some reason, we just knew that he was going to drink one day and that was going to be it.

I think Darren told me, We drink one time on the ship, and that'll be it.

**Q. (By Mr. Drahos) Understood. But when you saw Richard have his first beer --**

A. Uh-huh.

**Q. -- were you thinking anything, like, well, this must be his day, or I wonder if he's fallen off the wagon -- you know, anything like that?**
A. No. No thoughts like that at all.
**Q. Would you ever speak to him --**
A. No, I would not.
**Q. So that's not something you would say? Like Hey, Richard, is everything all right?**
A. Yes.
**Q. Is that your place, and would you typically step in and say, Richard, you --**
A. If I thought somebody was out of line, I would step in, yes.
**Q. Okay. What about specifically Richard, though? If you thought he was having too much alcohol --**
A. I had no problem standing -- stepping in with Richard, no.
**Q. Okay. And so let me hand you what we're going to mark as Exhibit A to the deposition.**
A. Okay. I need some -- I didn't bring my glasses. No -- I got --
**Q. No rush.**

A. Okay.
MS. LOBEL: You're doing letters?
MR. DRAHOS: Oh. What did I do yesterday: numbers?
MS. LOBEL: You did numbers.
MR. DRAHOS: Oh. Well, let's just stick with numbers. Yeah.
MS. LOBEL: Okay. That's fine. I just --
MR. DRAHOS: We're going to call --
MS. LOBEL: -- so I can keep track, okay.
MR. DRAHOS: We're going to call it Defendant's Exhibit 1.
MS. LOBEL: Okay.
THE WITNESS: Okay.
MS. LOBEL: Not a problem.
(Defendant's Exhibit 1 was marked for identification.)
MS. LOBEL: Are these the drink record?
MR. DRAHOS: Yes.
MS. LOBEL: Okay. Thank you.
MR. DRAHOS: You're welcome.
**Q. (By Mr. Drahos) Okay. Mr. Landrum,**

you're welcome to --
A. Yeah, baby.
Q. You're welcome to take all the time you need to review this, but I'm --
A. Okay.
Q. -- going to take you through a couple questions that I have about this.
If you'll turn to you page -- page 6. It is in the lower right-hand corner.
A. Got it.
Q. You're going to see there it says James Landrum there. That's you, right?
A. Uh-huh.
Q. Okay. Now, you can check my math for me, if you'd like. But according to Royal Caribbean's records, did you have 16 drinks on February --
A. Now, my page 6 says Ilene Landrum.
Q. I'm sorry?
A. My page 6 says, Charges for Ilene Landrum.
Q. Those are charges from the page prior.
A. I see. I'm sorry. Got you.
Q. Yeah. Her charges are -- are ahead. Yours begin on --

A. I got you. I understand now. Yes.
Q. Okay. So do you have any reason to dispute Royal Caribbean's records which indicate that on February 17, 2019, you had 16 drinks?
A. I --
MS. LOBEL: Form.
A. I wouldn't -- yes. I agree with that.
Q. (By Mr. Drahos) Okay. And so were you also drinking with Richard throughout the day and evening on February 17th?
A. No.
Q. Did you spend any part of the day of February 17th with Richard after you -- this initial beer that you talked about as the ship was pulling away?
A. 17th was the Sunday, right?
Q. It's the first day of the cruise. Now, I'm going to try and use these benchmarks to help your --
A. Okay.
Q. -- memory.
A. Thank you.
Q. You told me that you have a memory of everybody sitting there in the back of the ship watching it pull off?

A. Correct.
Q. And you believe that that's the time that Richard had this beer I was telling you about at 4:18 p.m.?
A. If you said --
MS. LOBEL: Form.
A. -- that's what his records showed, then yes. We were on the back of the ship.
Q. (By Mr. Drahos) All right, so --
A. Right.
Q. -- so from that point until dinner, did you spend the entirety of that time with Richard?
A. No. Because Richard and Darren ate at a different restaurant than we did. They had the suite restaurant. They had the private restaurant.
Q. Okay.
A. We -- we sat at the table, at the organized table.
Q. Okay. Do you know -- let me just get right to the point. Do you know how many drinks Richard had --
A. I do not.
Q. Let me -- let me try and ask that full

question.
Do you know how many drinks Richard had from February 17, 2019, until the time he went to the bed in the early morning hours of February 18th?
A. I do not.
Q. Okay. Were you with Richard, by chance, when he had a shot of Jägermeister at 11:06 p.m.?
A. I like Jägermeister.
Q. Really? I don't.
A. No, I love it. That's the drink that I take before I go to bed. It calms me down.
Q. Really?
A. Yeah.
Q. Okay. Do you recall --
A. I'm going to say yes. I was -- we went out. I -- I don't usually go out late. But that night, we were all having a good time.
And yes, I think we went. And all of us went: Chuck and Terry. And then I probably had the -- and probably had the Jägermeister. And after that, I probably went to bed.
Q. Okay. Do you have a recollection of having a Jägermeister shot with Richard?

A. No.
**Q. Okay.**
A. With Chuck, yes. With Richard, no.
**Q. All right. Does that mean you're saying that Richard never had a Jägermeister shot?**
A. No. I wasn't -- he didn't have it with us.
**Q. Okay. Do you have any idea how late you were out until that night?**
A. Probably -- after that shot, I probably went to bed. I don't stay out late after I have a Jäger.
**Q. Okay. And so do you know how late Richard was out until that night?**
A. Yeah. He and Chuck and Terry stayed out even later. I think they went to bed after midnight.
**Q. Chuck and Terry.**
A. Uh-huh.
**Q. Why am I drawing a blank? Who's Terry?**
A. Chuck and Terry are my friends that I've always gone on a cruise with.
**Q. Oh. Okay. That's right. The --**

what's their last name?
A. Daugherty.
Q. Daugherty. Chuck and Terry Daugherty. All right. So Chuck and Terry Daugherty stayed out with Richard?
A. Yes.
Q. But you don't know how late they were out until?
A. No.
Q. Okay.
A. Chuck's not a super late person. Terry is, but Chuck's not. So I -- I wouldn't imagine they stayed out -- after midnight, yeah. After midnight.
Q. All right. I say this with all respect -- or I ask this with all respect.
A. No, that's fine.
Q. Were you intoxicated on the evening of February 17?
A. Probably.
Q. Okay. And how about Richard?
A. Probably.
Q. Was he intoxicated?
A. And Chuck, probably. Terry, probably. Ilene, probably.

**Q. All right. So the four -- five of you?**

A. Not -- when I talk intoxicated, we're -- we're on a nice buzz ride. But we're -- we're not falling down drunk, no.

**Q. But when you left Richard or when you last saw Richard, if you had this shot around 11:00 o'clock and then retired for the evening, you're saying that at that point in time, Richard probably was intoxicated?**

A. Yeah. But he was out dancing with Terry. He was staying moving where I wasn't. He was dancing, so he may not have been. I don't know.

**Q. Well, he's out later, though, in time, right?**

MS. LOBEL: Form.

**Q. (By Mr. Drahos) At that point?**

MS. LOBEL: Form.

A. He and Terry stayed out later. And Terry said they danced all night.

**Q. (By Mr. Drahos) Okay. And so you don't know how many more drinks, if any, he had after you saw him?**

MS. LOBEL: Form.

A. No. But dancing -- it wouldn't have been many. You can't drink and dance.
**Q. (By Mr. Drahos) And so do you know what happened that evening after Richard returned to his cabin?**
A. The next morning, I found out, yes.
**Q. And who did you find out from?**
A. Richard.
**Q. What did he tell you?**
A. He came up and showed me the stitches.
**Q. Okay. So he showed you the stitches. But what did he tell you?**
A. Said he fell down in the room. Tripped over something, slipped, fell.
**Q. Well, what did he say exactly?**
A. Slipped.
**Q. That's it?**
A. He fell and hit his head.
**Q. Let's do it this way --**
A. Okay.
**Q. -- Mr. Landrum, in -- in fairness to us both.**
**Can you recall specifically what Richard said to you when he showed you the stitches?**

A. He said, I fell down, I busted my head open, and I got these stitches. And he showed them to me.
**Q. Okay. And you just pointed to somewhere in your head?**
A. Uh-huh.
**Q. Is that where you recall the stitches being?**
A. Uh-huh. Yes.
**Q. Can you show me again, please.**
A. Right here.
**Q. Okay.**
A. Best I remember.
**Q. And so --**
A. And then he put a hat on. He had a hat over on them.
**Q. All right. So he -- he said, I fell down, busted my head. And that's it? You didn't ask for any details?**
A. No.
MS. LOBEL: Form.
A. He just -- no. He -- no. He just said he slipped in the room, hit his head on the floor, and had to get stitches.
**Q. (By Mr. Drahos) Did he tell you what**

**caused him to slip?**
A. No.
**Q. Did, at any point in time, he indicate to you that he fell because he had too much to drink?**
A. No. No. He never -- he never said that to me.
**Q. So he never blamed the alcohol at all for what had occurred?**
A. No, sir.
**Q. Did anybody in the group joke at all that it was the alcohol that caused that fall?**
A. I don't recall.
**Q. Did you learn anything else about what occurred that night from anyone else other than Richard?**
A. Not until Richard told me.
**Q. Understood. But after Richard now tells you.**
A. Oh, yeah. Golly. Who did -- maybe Suzie said -- I -- I don't remember.
Somebody else said, Did you hear that Richard fell and busted his head? I don't remember.
And I said, Yes. I saw it. I've

already talked to Richard. He was already up when I was up.

**Q. Okay. What time of the day was this that you saw him?**

A. Probably around 10:00 o'clock at -- we had a tradition of everybody meeting up at the pool, but we call it the pool bar. And we'd meet there at 10:00 o'clock, and everybody would decide what we were going to do for the day, whether we wanted to do it together or separately, and kind of planned our day out. It was every day at 10:00 o'clock, and that is when I saw Richard.

**Q. Do you know how early Richard would get up in the mornings, typically, during these cruises?**

A. Probably 8:00 o'clock, 7:00 o'clock. By the time I saw Richard at 10:00 every day, he had already been exercising.

He does a -- a morning Bible devotional or a study or he -- he has a quiet time. And every time I see him, he's already done all that.

**Q. All right. Do you know --**

A. At 10:00 o'clock.

**Q. Do you know how much time he would spend towards the Bible devotional study?**

A. I think he devoted an hour.

**Q. And do you know how much time he would spend on exercise?**

A. He would do -- I think he said three miles on the track, walking on the track.

**Q. Do you know how long it would take for him to do those three miles?**

A. No. I know how long it would take me. But Richard is in much better shape than me.

**Q. Okay. And so what sort of clothing would he wear for -- strike that.**

**When you would see him in the mornings at 10:00 a.m. --**

A. Uh-huh --

**Q. -- would he be wearing, like, exercise clothes?**

A. He would have on gym shorts and a tank top and tennis shoes, and -- yes, that's all.

**Q. All right. And so earlier -- you said it so fast, so I want to make sure I got it.**

A. Sure.

**Q. Earlier, I asked you do you know typically what time Richard would wake up in the**

**mornings? And I think you said 7:00, 8:00?**
A. Yeah. 8:00 at the latest, between 7:00 and 8:00.
**Q. Okay. And he did that every morning, to your knowledge?**
A. Yes. And Richard was a spa guy. Usually after 10:00 o'clock, he had a 2:00 o'clock spa appointment or something.
**Q. All right. So when you saw him at 10:00 o'clock in the morning --**
A. Uh-huh.
**Q. -- at the pool bar --**
A. Yes.
**Q. -- how did he look to you?**
MS. LOBEL: Form.
A. That morning after the -- after the stitches?
**Q. (By Mr. Drahos) Yes, sir.**
A. He looked embarrassed.
He -- he came up to me, and he said, Did you hear I fell?
And I said, No. What happened?
He said, I -- I slipped and fell last night. Look at these stitches.
**Q. Did he make any comments at all about**

**the medical care he received in the ship's infirmary?**

A. I don't recall him saying anything negative.

**Q. Do you recall him saying anything at all?**

A. Yes. But I don't remember what it was. I think he said they -- he just went down there and they stitched him up and he came right out.

**Q. Okay. Now, you said that he -- he looked embarrassed. But I'm looking for a little bit more specifics.**

**Did you notice anything different at all about -- let's just start with his strength. Did he seem weaker, stronger, or the same to you as he always looks?**

A. The same.

MS. LOBEL: Form.

**Q. (By Mr. Drahos) Okay.**

THE WITNESS: Sorry.

MS. LOBEL: That's okay.

**Q. (By Mr. Drahos) And did you notice anything about his manner of speech? Did -- was that any different at --**

A. No.
**Q. All right. So other than the fact that he was embarrassed by the -- you know, by having fallen, did you notice anything at all differently about him?**
MS. LOBEL: Form.
A. No, I did not.
**Q. (By Mr. Drahos) Anything concern you at all about what you saw? Like, hey, maybe he needs to someone else for additional care?**
A. No, no. No. I didn't see anything to make me think that, no.
**Q. Okay. And so did you spend any time with him that day?**
A. After that, not much. He went to the spa at 2:00. I -- I think he went to the spa. I think he said he -- he always had a spa every day almost. You can check his records; I don't know. He always seemed to have a spa appointment.
We may have seen each other again late that afternoon. We -- after we would do that, we would go sit in the pool. We wouldn't get in the pool. We -- we'd put our legs in the pool and sit -- sit on the edge.
**Q. Okay.**

A. And he probably came down there and talked to us then, yeah. We always talked right before we went to -- to our rooms to prepare for dinner.

**Q. Okay. So, in other words, then, when you all met and decided what you were going to do for the day, it sounds to me like Richard had different plans than the rest of you?**

MS. LOBEL: Form.

A. Usually always did.

**Q. (By Mr. Drahos) Okay. So, then, did you spend any time with him that evening after dinner?**

A. Yes. Me and Ilene went to eat with them in their private dining room that evening. Sure did.

**Q. How did it come to be that you all ate with them in the dining room?**

A. They could always invite two people, and we were the ones they invited.

**Q. Okay.**

A. We were -- we were close to Richard and Darren, probably closer than Suzie and Joe.

**Q. Okay.**

A. But I think they would always invite

Suzie and Joe, too, one night. They could always invite somebody -- we went into a thing, a -- a place to eat. It had a theme: like, Alice in Wonderland or something like that. Anyway, that -- yes, we ate with them that night.

**Q. Okay. And so anything at all unusual about the way Richard was acting during dinner?**

A. No. No, he had a great time.

**Q. All right. So as far as you're concerned, he's of his normal health?**

A. Yeah.

**Q. Nothing concerning to that --**

A. Uh-huh.

**Q. -- at all?**

MS. LOBEL: Form.

A. Uh-huh.

**Q. (By Mr. Drahos) Okay.**

A. He's fine. We're having a good time. Had a picture made together, everything. You know, the usual tourist stuff.

**Q. So you had the first port of call coming up on February 20th, that being Wednesday.**

**From the time that you first saw Richard with the stitches until the time the ship docked in Saint Martin on February the 20th, did**

you ever hear Richard make any comments at all, like, that he felt like he should be seen by somebody or he needs further medical care than what he's previously received?
A. No.
MS. LOBEL: Form.
Q. (By Mr. Drahos) Did anyone in the group ever make any suggestion like, hey, Richard, maybe you should be seen by somebody when we get to Saint Martin?
MS. LOBEL: Form.
A. No.
Q. (By Mr. Drahos) Did you feel at any point in time like maybe Richard should see somebody in Saint Martin?
A. No.
Q. Up until that point, then, you had never noticed anything about Richard's demeanor or the way he was moving about that would concern you about his health?
A. No.
MS. LOBEL: Form.
Q. (By Mr. Drahos) So -- actually, let's see if you can help me with something, Mr. Landrum.

A. Okay.
**Q. I'm skeptical, but --**
A. Yes.
**Q. -- I can give you a shot.**
A. Okay.
**Q. I'm going to hand you what we've previously marked as Defendant's Composite Exhibit 1 to Ms. Hiatt's deposition yesterday.**
A. Okay.
**Q. They're three photographs. Would you happen to know what days those photographs were taken?**
MS. LOBEL: Are you going to attach it to this exhibit?
MR. DRAHOS: I'm just going to refer to them. I don't think we need to attach them.
A. I think -- yeah. I can -- yeah.
MR. DRAHOS: Well, maybe I will.
MS. LOBEL: Yeah, just so we know what he looked at.
A. Who is that with Meemaw? That's me. No, that's me right there.
This would have been -- all right, this is the pool bar. This is the 10:00 o'clock meeting place.

MS. LOBEL: And for --
Q. (By Mr. Drahos) And when you're -- you're holding up Defendant's Composite Exhibit --
A. All of -- those two. Those two were at the pool bar.
Q. All right. Let me -- let me slow you down for just a bit --
A. Okay.
Q. -- so we can get this down.
A. All right.
Q. So you're saying Defendant's Composite Exhibit 1B and 1C are pictures of the 10:00 a.m. meeting point at --
A. That's correct.
Q. -- the pool bar?
A. Correct.
Q. Do you know whether that was taken before or after Saint Martin?
A. It was after the accident, because Richard's got a hat on.
Q. Okay.
A. He doesn't usually wear a hat. Let's see if I can tell.
I think this is after Saint Martin,

because I believe that hat I have there is -- I bought in Saint Martin. I still have that hat. That floppy-eared hat -- I think that was bought in Saint Martin.

**Q. Okay. Let me take a look at this for a second.**

A. Okay.

**Q. So it's most important to me that we get these things --**

A. Sure.

**Q. -- as accurately --**

A. I understand.

**Q. -- as we can. So Saint Martin was on February the 20th, and the ship came into port in San Juan on February the 21st. And so Richard was already in the medical center on February the 21st before 10:00 a.m.**

A. Okay.

**Q. So first, is Defendant's Composite Exhibit 1B and C a 10:00 a.m. meeting at the pool bar, or could it have been earlier in the day?**

A. Not earlier.

MS. LOBEL: Form.

A. We didn't -- we didn't get off the boat right at dock. We would hang around two or

three hours. We didn't like to get in the crowds getting on and off the boat.
**Q. Okay.**
A. And -- and ports of call were not the purpose of our trip.
**Q. Okay. And so if we -- if we know that on February the 21st, there would not have been a 10:00 a.m. pool bar meeting with Richard, because he's already in the medical center at that point --**
A. Okay. Then it could be --
MS. LOBEL: Form.
A. Okay. All right. You're -- you're correct. I agree. But we also, when we got off the -- when we went and did do the port of call, we did go back to the pool bar to meet up before dinner. So that could have been around 4:00 o'clock in the afternoon.
**Q. (By Mr. Drahos) So this would have been 4:00 o'clock on the 20th?**
MS. LOBEL: Form.
A. Uh-huh. Yes. I'm thinking yes. I -- I remember, that hat I'm wearing -- I think I bought it in Saint Martin.
**Q. (By Mr. Drahos) Okay. So then that**

**means -- again, you're talking about you bought it in Saint Martin during this cruise?**
A. Because I didn't --
MS. LOBEL: Form.
A. -- I forgot to bring a hat, correct.
**Q. (By Mr. Drahos) Okay. So that would mean, then, that by virtue of the fact you were wearing this hat, it had to have been after you had gotten off the ship on February 20th in Saint Martin?**
MS. LOBEL: Form.
A. Yeah. I couldn't buy it without getting off the ship, correct.
**Q. (By Mr. Drahos) Okay.**
A. If that's where I bought the -- if that's the hat I bought in Saint Martin, and it looks like it is.
**Q. So to the best of your recollection, then, this photograph, 1B and 1C, was taken on February 20th?**
MS. LOBEL: Form.
A. Let me look at it again, please.
**Q. (By Mr. Drahos) Sure.**
THE WITNESS: I'm sorry.
A. Where is Sandra? Sandra's not here.

**Q. (By Mr. Drahos) Who's Sandra?**
A. Jim's wife. This gentleman here.
**Q. And what's Jim's last name?**
A. Brown.
**Q. So Jim and Sandra Brown were part of your group as well?**
A. They were --
MS. LOBEL: Form.
A. They always are, yes.
**Q. (By Mr. Drahos) Okay.**
A. I wish I could see the hat better.
**Q. Do you have any other floppy hats like that one?**
A. Uh-huh. I have two.
**Q. What makes you think that that's the one you bought in Saint Martin?**
A. Because I don't usually take them with me. I wear them on my boat at the lake to keep my ears from getting sunburned.
There's Sandra. There's Sandra right there.
**Q. Is there anything else about what clothing everyone is wearing there that would help you date it?**
A. Yes. That's what I'm looking for.

Where is Chuck? Chuck must be the one taking the picture. And Chuck must be taking the picture.

You know what?

MR. DRAHOS: I need to make sure -- can we go off the record for just a second? I got to take this call.

THE VIDEOGRAPHER: We're off the record. The time is 11:21 a.m.

(A break was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:22 a.m.

**Q. (By Mr. Drahos) So, Mr. Landrum --**

A. All right, here --

**Q. -- anything further to identify?**

A. All right. I'm just going to -- the hat that I'm wearing -- Richard didn't usually wear a hat, because he liked his hair. And he's got a hat on here, so this -- I would think this is what he put on to cover up his stitches.

**Q. Okay.**

A. So this is after the accident.

**Q. Okay.**

A. That -- that's how I'm interpreting this picture.

And I -- I feel like I bought that hat in Saint Martin.
Q. **Well, if it helps, there were no other ports of call before Saint Martin, so --**
A. Okay.
Q. **-- that would have been your first one.**
A. Yes.
Q. **So would you have brought that floppy hat onto the ship?**
A. No.
Q. **All right. So then that's not --**
A. Then this probably narrows it down then, yeah.
Q. **All right. So then by kind of the arithmetic we've worked through here, it sounds to me, then, that that photograph was taken on February 20th?**
MS. LOBEL: Form.
A. When was the accident?
Q. **(By Mr. Drahos) February 21st is when Mr. Burgess had a stroke.**
A. But after the -- after the --
Q. **Yes, sir.**
A. -- after the bump.

Yes, I would -- I would say that adds up.

**Q. Okay. Thank you. We're going to go ahead and mark these as an exhibit to the deposition as well: 1 through -- 1A, B, and C.**

MS. LOBEL: As 2?

MR. DRAHOS: What are we on: 2?

MS. LOBEL: You're on 2.

MR. DRAHOS: Let me throw another sticker on this now.

(Defendant's Exhibit 2 was marked for identification.)

**Q. (By Mr. Drahos) All right. I didn't think you were going to be able to do that, but I'm glad I asked.**

A. The main thing was Richard wearing a hat. He -- he didn't wear a hat until he had the accident.

**Q. Okay. So according to Royal Caribbean's records, you and your wife and the Hiatts and Darren all got off the ship in between 11:39 and 11:40 a.m. to Saint Martin on the morning of February --**

A. Sounds right, uh-huh.

**Q. By the way, would you have met at the**

**pool bar --**
A. Yes.
**Q. -- beforehand?**
A. Uh-huh. We would have, yes.
**Q. Okay. But Richard did not get off the ship until 11:49 a.m., nearly -- almost ten minutes after the --**
A. He forget something, had to go back up and get it.
**Q. That wasn't the question. Do you know why it was that he got off the ship later in time than --**
A. We waited on him down there, yes.
**Q. What did he forget?**
A. I don't remember.
**Q. Okay. What did you guys do in Saint Martin?**
A. Just went bar to bar to bar.
Now, Richard and Darren didn't go with us to all of them.
Oh, yes. We went and ate at the Hard Rock. They did go with us to eat at the Hard Rock.
**Q. So you left the port, and you went to the Hard Rock?**

A. Yes.
**Q. For lunch?**
A. Yes. And had to wait a very long time to get in.
**Q. Did the Hiatts go with you guys?**
A. Yes. That's why we had a hard time getting a place to seat: was trying to get close together.
**Q. Okay. And how long were you there for?**
A. Oh, I -- I bet at least two hours.
**Q. And where did you go from the Hard Rock?**
A. To a bar next door.
**Q. And so, what, did you go barhopping --**
A. Yes.
**Q. -- for the rest of the time?**
A. Yeah.
**Q. Do you know the names of any of the bars that you went to?**
A. I have -- I have no idea.
Now, that might have been the time, too -- and, I mean, I'm -- I'm glad I'm as -- as old as I am and still alive. But we -- we act like high school idiots when we're on these

cruises.
And we rented some Segways after being on the bars. Richard and Darren didn't, but the rest of the group did. So I learned how to ride a Segway somewhere on that trip.
**Q. Was that in Saint Martin?**
A. Yeah. Up and down the beach.
**Q. Was Richard driving those --**
A. No. Richard and Darren did not go. They went elsewhere. They went shopping.
**Q. Okay. So you rode the Segways around town. What else did you do?**
A. Then -- then it was just barhopping after that.
**Q. With the Hiatts?**
MS. LOBEL: Form.
A. Yeah. We went as a group.
**Q. (By Mr. Drahos) Okay.**
A. Wait. Wait. Yes, with the Hiatts. Yes. Absolutely. And the Browns and the Daughertys.
**Q. So Royal Caribbean's records indicate that you got back on the ship at 2:45 p.m. Does that sound right to you?**
A. That does sound close to -- yeah,

yeah. There's no reason to doubt it, yeah. I may be off on how long we were at the Hard Rock, because we -- we waited so long to get a table. But we rode the Segways.

And the reason we left and came back is Chuck got sick.

**Q. Okay. Chuck got sick from alcohol. Is that a yes?**

A. Yes. He took -- he had a hot shot of -- of that cinnamon drink. What do you call that cinnamon one?

**Q. Fireball?**

A. Yeah.

**Q. Oh, God.**

A. And he got sick; so we had to go.

**Q. Okay. So we also have records here that indicate that Richard and Darren boarded the ship at 2:43 p.m. as well, so it would have been the same time as you all?**

A. Yeah. Probably around it, yeah.

**Q. At what point did you guys get back together if they went shopping?**

A. They have a ferry that takes you from the beach area.

Oh, wait. No, that's -- is that the

one we did the ferry on? Saint Martin?
Yeah. Yeah, we do that ferry over. And we would have met at the point where you got on the ferry, the little boat that takes you from where we were on the island over back to your ship to the -- to the port.
**Q. Okay.**
A. Could have just run into them there.
**Q. All right, so --**
A. But it wasn't coordinated. Could have just run into each other.
**Q. All right. So --**
A. And I'm going to need to take a break whenever you feel like it's a good --
**Q. Let's do it now.**
A. Okay.
**Q. That's perfectly fine.**
A. Okay.
THE VIDEOGRAPHER: We're off the record. The time is 11:28 a.m.
(A break was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:36 a.m.
**Q. (By Mr. Drahos) Okay. So, Mr. Landrum, when we left off, we were talking**

about your return to the ship on February the 20th while you all were in Saint Martin.
So after you got back on the ship that day, we -- we talked about what would have been 2:45 p.m. Did you see Richard at any point from your return to the ship until dinnertime?
A. All right. When we always went back to the ship, first thing we did was we went back to the pool bar. And that's where we're thinking that might have been made.
Q. Okay. So this photograph, as best as you can recollect --
A. I've -- I've already come off of Saint Martin. I got the hat.
Q. -- was taken upon --
A. At the pool bar upon the return.
Q. Okay. And so when you saw Richard, did he appear any different to you?
A. No. Full of life. Just having fun.
Q. Anything at all about his demeanor or the way he was speaking that in any way was different than the way you've seen him in the past?
A. None.
Q. Okay. And so what did you all do for

**the remainder of the day before dinnertime?**
A. There's -- we were either at that bar or they've got another bar called the Trellis Bar. And it -- it would be on here as the Trellis Bar, so we may have gone there.
But a lot of times Ilene and -- Ilene and Chuck and Terry and I and Jim Brown would go there. And they'd get their nighttime margarita. And then -- but Richard and Darren would not have gone with us there.
**Q. Where would they have gone?**
A. Up -- up to get ready to go out to eat. Their -- their place of dining was more formal than ours was.
**Q. Okay. And so you had told me that earlier you had eaten dinner with them.**
A. Uh-huh.
**Q. Did you eat dinner with them again at any point in time for the remainder of the cruise?**
A. I do not -- no.
**Q. All right. So is it safe to say, then, that you did not have dinner with Richard and Darren on February 20th?**
MS. LOBEL: Form.

A. February 20th.
**Q. (By Mr. Drahos) This is the Saint Martin day.**
A. Is that -- and that's the Wednesday?
**Q. This is Wednesday, and --**
A. Is it --
**Q. -- it's the evening before the --**
A. The stroke. Okay. I need to go back.
We had dinner with Darren and Richard the night before the stroke in their -- in their restaurant, not when I said. I'm off a day.
**Q. Okay. So you did have dinner with them, then, on --**
A. That night.
**Q. -- February 20th?**
A. Correct.
**Q. All right. And is your answer still the same: You didn't notice anything at all about --**
A. No.
**Q. -- Richard?**
A. No.
**Q. He appeared to be in his normal state of health?**
A. Yes.

MS. LOBEL: Form.
A. Yes.
**Q. (By Mr. Drahos) He was speaking fine?**
A. Yes.
MS. LOBEL: Form.
**Q. (By Mr. Drahos) He was eating fine?**
A. Yes.
MS. LOBEL: Form.
**Q. (By Mr. Drahos) And --**
A. We had a -- a great time. I'm sorry to interrupt, but we were having a great time.
**Q. (By Mr. Drahos) How -- how late were you out with Richard and Darren for?**
MS. LOBEL: Form.
A. We were probably through at 8:00 o'clock. Probably met at 6:00 and were through at 8:00.
**Q. Did Richard have anything to drink, any alcoholic --**
A. No.
**Q. -- beverages?**
A. No.
**Q. You --**
A. Water.
**Q. You got to let me finish.**

A. I'm sorry.
**Q. Did Richard have anything -- any alcoholic drinks during dinner?**
MS. LOBEL: Form.
A. No.
**Q. (By Mr. Drahos) Did you?**
A. Yes.
**Q. Do you know how many you had?**
A. Three. Three drinks. And they would probably have been alcohol, not beer.
**Q. Okay.**
A. And probably would have been vodka.
**Q. Okay. So what happened after dinner?**
A. We -- we went different ways. We went -- we had tickets to a show.
**Q. Do you know where Richard and Darren went?**
A. I do not.
**Q. Do you know what Richard did for the remainder of the evening?**
A. I do not.
**Q. Did you see him at any point in time from the time you left at dinner until the time he went to bed?**
A. I did not.

**Q. Do you know how late he was out until?**
A. I did not.
I did run into Darren. I'm sorry.
**Q. What time was it that you ran into Darren?**
A. In the casino. In the casino.
**Q. What time was that?**
A. It was 8:00, 9:00 -- I'm going to say 10:00 o'clock.
And now that I think of it, Richard might have been there.
**Q. Do you have memory one way or another whether or not Richard was there?**
A. I don't have a complete memory, no. I -- I can't say that he was, and I couldn't say he was not. I went -- Darren was on the slot machines.
**Q. Okay. Do you know how long Darren had been there for?**
A. Looked like a while. He was -- he was in for the duration that night, smoking -- smoking his cigarettes and pulling that arm.
**Q. Okay. So you have a specific memory of Darren but not so sure about Richard?**
MS. LOBEL: Form.

A. Yeah. Because I don't gamble. And -- and what would happen when we meet -- every night we met at the casino, too, if we were out and the casino was open.

Jim Brown, one of our guests, is a huge gambler: I mean, to a fault. Darren is a huge gambler. Terry likes to gamble $100. Chuck and I sit at the bar and drink, and everybody comes by and talks to us.

So everybody would know -- we're in the casino for a period of time. So if they wanted to see us, speak to us or something, they would know me, Chuck, and Ilene are sitting at the bar.

**Q. Okay. So same question now -- just because you've had this memory --**

A. Uh-huh.

**Q. -- I want to make sure it's the same answer.**

**Do you know how late Richard was out until that night?**

A. Yeah. He was out "late" late. Like, that was his -- I think he was out until, like, 4:00 in the morning, something like that, 2:00 in the -- yeah, "late" late. Later than I've been

out in a long time.
**Q. Why is it that you have this understanding that Richard was out late that night?**
A. Just we'd always talk about what we did the night before the next day.
**Q. And do you have another source of information?**
A. Jim Brown.
**Q. So was Richard out with Jim Brown?**
A. They both gambled until -- until they couldn't gamble anymore together, not -- Jim Brown likes to play that five-handed poker or whatever that thing's called. And -- and Richard likes to -- Darren likes to do the slot machines and blackjack.
**Q. So let me make sure you answered the question I thought you did.**
A. Okay.
**Q. Was it Darren that was out "late" late at night or Richard?**
A. Darren.
**Q. Darren was out late at night?**
A. Yeah. Oh, did I say Richard? I'm sorry. Darren is the gambler.

**Q. So Darren was out until approximately what time?**
A. Just remembering what Jim -- they both would gamble until 2:00, 3:00, 4:00 o'clock in the morning. And they wouldn't get up until 9:00 or 10:00 o'clock.
So I don't know it for a fact, but I just know that's what he usually did. That was his usual thing.
**Q. All right. So did you have a conversation with Jim Brown about what Darren was up to at some point?**
A. I'm sure I did. We all made fun of Jim because he never won -- he always lost -- and asked him how much he lost that night.
**Q. Okay.**
A. And then he'd deflect by telling who all was down there with him.
**Q. So let me go back to Richard, then.**
A. Richard.
**Q. I'll ask the question just to make sure we're clear.**
A. Okay.
**Q. Do you know how late Richard was out --**

A. I do not. I'm sorry.
**Q. Let me finish the --**
A. I'm sorry.
**Q. Do you know how late was Richard out until on the night of February the 20th?**
A. To my -- to my recollection, he just walked by and said, Darren is over there gambling. I'm going to bed. Good night. And that would have been around 10:00 o'clock.
**Q. So, then, you do have a memory of Richard in the casino?**
MS. LOBEL: Form.
A. Yes. Yes, I do. Just -- just we always did.
**Q. (By Mr. Drahos) And your memory of Richard is that he said around 10:00 o'clock, think he's going to bed?**
A. Can I change that time?
**Q. Sure.**
A. I can say it was before 10:00 o'clock, because we always went to the piano bar at 10:00 o'clock. It was probably about 9:30. We went to the -- we went to the casino to wait to go to the piano bar.
**Q. Okay. So you're in the casino, and**

the piano bar is at 10:00 o'clock?
A. 10:00 o'clock, correct.
Q. And you have a memory of Richard saying he was going to bed before the piano bar?
MS. LOBEL: Form.
A. Said, I think I'm going to bed. That's my recollection, yes.
Q. (By Mr. Drahos) So do you have a memory of Richard meeting at the piano bar or not?
A. I do not.
Q. Okay. So if Richard was going to bed at 9:30 or approximately 9:30 p.m. on the night of February 20th, that would be an early -- early time for him --
MS. LOBEL: Form.
Q. (By Mr. Drahos) -- wouldn't it?
MS. LOBEL: Form.
A. I don't know. I would -- there'd be a night I'd be tired, I'd go to bed at 9:30.
Q. (By Mr. Drahos) Okay. But comparatively versus the other nights on this cruise, this would have been the earliest that you recall him going to bed?
MS. LOBEL: Form.

A. Yes.
**Q. (By Mr. Drahos) Did he --**
A. But -- yes.
**Q. Did he give any explanation for why?**
A. No.
**Q. I mean, you seem to me to be the type of guy that, if I'm in a group and I come up to you and say, Good night, and it's early, you give me a hard time and say, Oh, no, no, no, stay out a little.**
A. I'd say -- but he didn't drink. So that's usually how you get to stay out: You'll say, Have another drink with me. Let's have one more drink. He -- he didn't drink.
**Q. Understood. But did you do anything like that with him when he said he was going to bed?**
A. I probably did. I -- I probably did.
**Q. Did he give any explanation for why it was he was going to --**
A. No. He never gave an explanation.
And you know what? You know, I've been drinking all day. He might have showed up at the piano bar for a minute or two and then left. I -- I don't recall him going there.

But Ilene will. If Ilene went to the piano bar, he went. She didn't go with me every night. I went to the piano bar every night.
**Q. All right. So as far as you are concerned, as you sit here today, the last time you saw Richard on the night of February 20th, there was nothing about his appearance at all that was unusual to you?**
A. Absolutely --
MS. LOBEL: Form.
A. -- nothing, correct.
**Q. (By Mr. Drahos) And there was nothing unusual about his demeanor or his way of speech?**
MS. LOBEL: Form.
A. No. He was having a good time.
**Q. (By Mr. Drahos) Okay. When is the next time you heard anything about Richard?**
A. The next morning at about 9:00 -- right around 9:00 o'clock. Somewhere around 9:00 o'clock.
**Q. What did you hear?**
A. Suzie came and got us. I was going to go get coffee or had already gone and got coffee, because I was already dressed.
And Suzie came to the room -- our

rooms were about next to each other -- knocked on the door and said, Joe's run up to -- she said, Richard called me, said he thinks he's having a stroke. Joe is up there now. We need to get up there.

And I said, Well, certainly, they've got him in the infirmary by there. So we -- Ilene finished getting dressed, and we went down to the infirmary and got there 9:25, 9:30.

**Q. What time was it that Suzie knocked on your door?**

A. Around 9:00 o'clock.

**Q. And when you say around 9:00 o'clock, can you give me any more specifics than that? Like, 9:03, 9:17? What is around --**

MS. LOBEL: Form.

A. I'm trying to give you a point of reference of what -- 9:05.

**Q. So have you and your wife and the Hiatts practiced this time line?**

A. No.

**Q. Have you discussed it at all in advance of today's deposition?**

A. Have we discussed the whole time line?

**Q. Yeah.**

A. No. We just kind of talked about who was down there first, and -- because, see, once we got down there, we were -- we got separated. We -- I stayed in the room or either I was running up to Darren's room to help him get stuff to get off the ship. And Joe was doing something else, and Ilene was staying in there with Richard, or -- and we were all just kind of running around.
So we don't know what our time lines -- our time lines are not the same.
**Q. Okay. So in other words, though, when the four of you were together, did you have this discussion and say okay, what time, Suzie, did you knock on my door? What time did you go upstairs? Or anything like that? Have you practiced any of that at all?**
A. Uh-uh.
MS. LOBEL: Form.
A. No. We hadn't practiced it, no. Uh-uh.
**Q. (By Mr. Drahos) Okay. So it's your recollection that when Suzie knocked on your door, though, your wife was not dressed yet?**
A. No. I was. I remember I was standing

up looking out the -- at the ocean. And Ilene was not an early riser. If she -- if she could, she'd get up at the crack of noon every day.

And so I had gone down -- I had gone down or I was going down to Starbucks. I always went down and got her a Starbucks, which was on the 5th floor. We were on the 8th floor.

**Q. Okay.**

A. So I was -- I can't remember if I had already gone and came in and Suzie was there or if Suzie came after I brought the coffee.

But somewhere in there between all that, Suzie was in the room. And she said -- you talked to Suzie yesterday. She's -- she's not excitable, you know?

She just said, Richard thinks he's had a stroke, and Joe's up there with him.

I said, Where?

And she said, Up on the 17th floor.

I went, Oh, my gosh.

And then she was, like, I -- at that time, I said, Okay.

And then she said, And they're taking him to the infirmary. So I guess she had been talking to Joe.

And so I said, Well, let's get down there. So we went down there.

**Q. Okay. So by the time Suzie knocked on your door --**

A. Uh-huh.

**Q. -- Joe had already been with Richard?**

MS. LOBEL: Form.

A. He had already left to go be with Richard. I don't know if he was there yet or not.

Well, he must have been, because they -- we knew they were taking him to the infirmary, so yes.

**Q. (By Mr. Drahos) Okay. So by the time she knocked on your door, they were already en route to the infirmary, Richard and Joe?**

A. I -- I don't know. I don't know. Did -- is it okay for me to ask: Did Suzie tell you what time he called her?

**Q. So I -- unfortunately, this is just --**

A. Okay. I got it. I got it.

So it was -- it was sometime after she had called Suzie, so you can figure that out. I -- for us, it was after 9:00 o'clock.

**Q. Okay. And so you were very specific,**

**though, when you said that you came into the medical center. And you gave me a time. What was the time that you came into the medical center?**

A. No, you asked me to give you a time: 9:05.

Oh, I didn't say what I -- you hadn't asked me what time I got to the medical center.

**Q. Oh. Well, I thought you had already given me a time. But why don't you give it to me --**

A. Okay.

**Q. What time did you --**

A. You -- all you asked me for is what time she came to my room.

**Q. Okay.**

A. And that was 9:0- -- you said, 9:0-what?

And I said, 9:05 --

**Q. Okay.**

A. -- okay?

**Q. So what time did you arrive to the medical center that morning?**

A. We hustled down there -- medical center is down -- I would say up and down an

elevator, 20 minutes. Took us 20 minutes to get there.
**Q. So what -- what does that mean?**
A. 9:25.
**Q. And was Richard already there?**
A. Richard was there, Joe was there, and Darren was there.
**Q. So do you know anything about the time Richard woke up on the morning of February 21st?**
A. I don't.
**Q. Do you know how Suzie came to learn of Richard's circumstance?**
A. My understanding is Richard called her on her -- Suzie was our cell phone person. She was the one person that had the activated cell phone for -- for wherever we were. So if there was any problem on the mainland, our family knew to call Suzie.
**Q. Okay.**
A. So I didn't have an activated cell phone; my wife didn't.
So it is my understanding that Richard called Suzie and said, I need help. I can't -- I cannot get in touch with Darren.
**Q. Okay. And how is that your**

**understanding?**
A. Of what Suzie told us when we was in the room.
**Q. Okay. So Suzie had told you that Richard had called her?**
A. Yes.
**Q. All right. Did you see Suzie make any phone calls in your cabin?**
A. I did not.
**Q. Okay. So do you know how long Richard had been up on Deck 17 before he called Suzie?**
A. I do not.
**Q. Do you know how long he had been experiencing any symptoms before he attempted to call anyone?**
A. I do not.
**Q. So is it safe to say, then, that you don't know what time his symptoms first arose?**
A. That is a correct statement.
**Q. Okay. So when you went down to the -- the ship's medical center, where was Richard?**
A. Okay. If I walk in the door of the medical center, here's the little waiting area right here. Joe was sitting here, Darren was sitting over here, and there is a -- I guess a

receptionist lady right here. And -- and he was in the first room on the right.
**Q. Richard was in the first room?**
A. Uh-huh.
**Q. Okay. So that we're calling the room the same thing, can we call that the observation room?**
A. Correct.
**Q. All right. So Richard was in the observation room when you first arrived?**
MS. LOBEL: Form.
A. In the bed, correct.
**Q. (By Mr. Drahos) Okay. Was the door open or closed?**
A. Open.
**Q. Did you come down to the medical center with anyone else?**
A. Ilene and Suzie.
**Q. What was Richard wearing?**
A. I want to say a tank top. But he -- he had the sheet over him. He had -- I think he had a tank top on.
**Q. Anything else you remember about what he was wearing?**
A. No. I -- I'm trying to remember, when

I took him -- I'm trying to remember, when I took him, did he have shorts or did he have those, like, medical -- those floppy pant?

I think he had shorts on. I think he had -- yeah, I think he had shorts on, I think.

**Q. What kind of shorts?**

A. Casual, you know, walking shorts. No pocket shorts. You know, not pockets. Just --

**Q. Like --**

A. -- gym shorts maybe.

**Q. Gym shorts?**

A. Yeah.

**Q. And what about on his feet?**

A. I think they had already taken his shoes off. I don't think he had any shoes on. They -- he was covered up. I don't -- I don't remember the shoes.

**Q. When you said they had taken his shoes off, who is --**

A. I would assume whoever put him in the bed.

**Q. Do you know who put him in the bed?**

A. I do not. There was a lady in there. When I walked in -- when I walked in, I stuck my head -- I asked Joe where he was.

And he said, He's in that room there. And I just kind of stuck my head around like that to see what was going on. And he was already in the bed.

And she was pulling the covers up. And she said, It's okay for you all to come in now.

So I walked back out, and I told them. I said, We can go in. I'm going to go in.

**Q. Who is this person?**

A. I don't know. I -- you know, she kind of turned and said, You can come in. I -- I couldn't describe her. I saw the back of her. She just -- You all can come in.

She had white like a nurse maybe. She had a white outfit on, I want to say. And that's the -- I saw her for five seconds, and that was it.

**Q. And that's the only time you saw her?**

A. That's the only time I saw her.

**Q. Did you say anything more to her beyond -- strike that.**

**Did she say anything more beyond It's okay for you all to come in now?**

A. No. That's all she told me. I said,

Thank you, and I went in.
**Q. Did you say anything else to her?**
A. Thank you.
**Q. Do you know how long Richard had been in the medical center by the time you arrived?**
A. No. I -- I got there at, you know, around 9:00 -- somewhere between 9:20, 9:30. So I'm sure you all have got some documentation of what time he got there.
**Q. Are you sure about that time of arrival? You sure you got in there between 9:20 and 9:30?**
MS. LOBEL: Form.
A. I feel -- I feel very confident of that, yeah. Because we hustled down there.
**Q. (By Mr. Drahos) Is there anything that you did specifically to check the time? Did you look at your watch --**
A. There's a clock -- there was a clock on the wall right above Richard.
**Q. There was a clock in the observation room?**
A. Yes, there was.
**Q. Okay. So did you say anything to Richard when you walked into the room?**

A. Yeah. I tried to crack a joke, make him laugh. But he wouldn't laugh.
**Q. What did you joke?**
A. Oh, just way to go. You had to do this to draw attention to -- you know, something stupid like that.
**Q. And he didn't respond?**
A. He -- he was visibly upset.
**Q. Can you describe the difference in appearance from what you had seen from him previously?**
A. Yeah. He looked like he was about to break down and cry. He was holding it in. He was scared.
**Q. Did he say anything at all while you were in the room?**
A. He couldn't.
**Q. So he did not talk at all?**
MS. LOBEL: Form.
A. Not -- not in that first five, ten minutes, no.
**Q. (By Mr. Drahos) Were you in -- so you were in the room for five to ten minutes?**
MS. LOBEL: Form.
A. Very -- I was in there for a short

period of time, yes. Because I left to go find the doctor.
**Q. (By Mr. Drahos) All right. How long were you in the room for?**
A. I'd say ten minutes. And then Suzie came in, and then Ilene came in. They sent -- Darren didn't come in because they made him go get -- he had run up to the room to get his insurance card, I believe. And that was right after I walked in the room.
**Q. So when you walked into the room --**
A. Yes.
**Q. -- who else was in there with Richard, if anyone?**
A. Who -- no. I was the first one in there. And then I went out and got Joe, Suzie, and Ilene.
**Q. So you went in first, saw Richard, made a joke about --**
A. It's a nice --
MS. LOBEL: Form.
A. -- nice way to draw attention to yourself, yeah.
**Q. (By Mr. Drahos) Okay. And then you went and got the rest of the group?**

A. I may have already told them. And they were just gathering their stuff to come in there.

**Q. All right. And so you think you were in there for about how long?**

MS. LOBEL: Form.

A. Well, Darren -- Darren stuck his head in, said, I've got to go up and get an insurance card. So I was there from when he said he had to do that. So I'm going to say I was in there roughly ten minutes.

And we were all saying, Has a doctor been in to see you?

And he -- he shook his head no.

And I said, Well, I'm going to go find one.

**Q. (By Mr. Drahos) So had you spoken to anyone else in the medical center up to this point?**

A. No, sir.

**Q. What did you do after you left the room?**

A. I went out, and I -- I went out the -- the door here, walked down the hall like this.

And then there was a little station.

And there was a gentleman in a blue scrub outfit with a hat. Looked like Hispanic -- Hispanic, possibly. Had a mustache and a goatee.

And I said, We need to get a doctor in there to -- oh, I need to go back. I need -- can I go back?

**Q. Yes, sir.**

A. The -- the reason I went to find the doctor is I was looking at his eyes, and his eyes were moving like this: left to right. They were moving jaggedly like that, like -- they weren't fluid.

And so I said, I'm going to go find a doctor.

So I went in to find the doctor. I said, We need to have a doctor come in here and look at him. He's not acting right.

And the -- and the person I spoke to said, Okay. We'll have somebody in there in a minute.

**Q. We need a doctor to come look at him --**

A. Uh-huh.

**Q. -- he's not acting right?**

A. Correct.

**Q. Did you tell this individual who you were?**

A. No.

**Q. Did you say anything else other than that?**

A. No.

**Q. And this person responded with just Okay?**

A. Correct.

**Q. Where did you go from there?**

A. Back to the room.

And I said, Someone will be here shortly.

**Q. And was Suzie and Joe and Ilene still in the room there?**

A. Joe had left. Joe is claustrophobic. He -- he doesn't like -- and he went and sat back out in the lobby.

**Q. The lobby of the medical center?**

A. Correct.

**Q. Okay. So what happened next?**

A. All right. So we're sitting there. Darren comes back with the insurance card and says he's back, says, I'll be back in a minute. He goes out in the lobby where Joe was.

And then he comes back in the room 10 to 20 minutes later, roughly, and says, Now, I got to go back up and get passports. So he left to go get passports.
**Q. Do you know who Darren was speaking with?**
A. I do not.
**Q. Do you know why it was that he was sent back to get passports?**
A. I do not. Well, not at that time, I did not. I found out later.
**Q. Okay. And so is it your testimony, then, that throughout the time that Darren is going back and forth to get his insurance card and passports, you were in the observation room with Richard?**
A. That is --
MS. LOBEL: Form.
A. -- correct. That is correct.
**Q. (By Mr. Drahos) Did anyone else enter the room while you were in there?**
A. Ilene and Suzie came and went -- mostly stayed. And Joe would pop in and pop out.
**Q. Did you ever leave the observation room, or --**

A. I left it a little bit later, because I was aggravated the doctor hadn't come.
And I went back to the station again, and I said, It's been almost an hour, and nobody's come. We need a doctor in there.
And at that time, I had noticed that Richard's speech had become slurred. I don't know how else to say it.
**Q. How did you notice that?**
A. I was talking to him. He was talking now. We had gotten him to talk.
**Q. What was he saying?**
A. We were debating whether or not he needed to get off the ship.
**Q. You were debating with Richard?**
A. Yes.
**Q. What was the debate?**
A. He didn't want to get off.
**Q. Why not?**
A. I don't know.
**Q. What was his case for why he should not get off?**
A. I -- I mean, we were just talking to him about he -- how he felt. And, of course, Ilene -- we was trying to take his mind off of it

talking about things. And there was a conversation about whether or not we felt like he should get off.

And he said his -- he said his right leg was tingling and that -- and that his right arm was tingling.

And I think that's when we said, No, you probably need to get off.

So then I went -- I went, and that same person is sitting -- that same person in the blue scrubs is sitting on that stool still.

And I said, We need a doctor. It's been an hour.

Okay. We'll have someone in there shortly. And I go back to the room.

**Q. You went back --**

A. I come back to the room.

**Q. No, no. Let -- yeah. Let me -- let me go back.**

**So during the time that you're in the room with Ilene and you said -- who was the other person with you?**

A. Suzie.

**Q. Suzie. Okay. So you, Ilene, and Suzie are in there with Richard. And you're**

**talking about whether or not he should get off the ship?**
A. Uh-huh.
MS. LOBEL: Form.
**Q. (By Mr. Drahos) All right.**
A. Yes. I'm sorry.
**Q. And so you -- you were talking about how he felt.**
A. Yes.
**Q. Okay. And he was responding to you?**
A. Correct.
**Q. And his response was that his right leg is tingling and his right arm is tingling?**
A. Correct.
MS. LOBEL: Form.
**Q. (By Mr. Drahos) Did he give any other description than that?**
A. No.
Yes. The room is -- he was dizzy.
**Q. And so what explanation did Richard give to you all as to why he did not want to get off the ship?**
A. He said he was being too much trouble.
**Q. Did Richard, at any point in time, say that he didn't feel like he was sick enough?**

A. No.
**Q. Just that he was being too much trouble?**
A. Yes.
**Q. Didn't give any other explanations other than that?**
A. Not that I recall --
MS. LOBEL: Form.
A. -- no.
**Q. (By Mr. Drahos) Did you see him get off of the bed at any point in time?**
A. From now until -- how -- how far you want me to go?
**Q. Okay.**
A. Yeah, I got him -- I got him out of the bed to go to the bathroom.
**Q. All right. When was that?**
A. Right before he got on the gurney to get off the ship.
**Q. Okay. So that's the only time that he got out of the bed --**
A. Correct.
**Q. -- that you saw?**
A. That's correct.
**Q. We're going to put a pin in that and**

come back to it.
A. Okay.
Q. So for now, though, we're still in the room. And you said that you went back out a second time and you said to this individual who was sitting on the stool, It's been an hour?
A. Yes.
Q. So does that mean that this was at 10:30?
A. Yeah. If that -- if that's the first time I went.
I -- I had looked at the clock, and I said, It's been almost an hour and they haven't been in here. So I went.
Suzie may have said it. So I said, Well, I'll go find them again.
Q. All right. So to be clear, then, when you went out a second time to go see this individual, it was 10:30 in the morning?
A. I'll say yes.
MS. LOBEL: Form.
Q. (By Mr. Drahos) Do you know who this individual was?
A. I do not.
Q. Do you know what his role was?

A. I do not. I assume -- I didn't know who it was. I didn't know if I was talking to an orderly, I didn't know if I was talking to a nurse, and I didn't know if I was talking to a doctor.

I was just telling this person, I need a doctor.

And this individual said, Okay.

**Q. So did you get the impression at any point in time that this was a doctor?**

A. I would say yes, because everybody else was dressed in white.

**Q. And he was dressed in blue?**

A. Blue.

**Q. Beyond the fact that he was wearing something different, was there anything else about what he said or did that led you to believe he --**

A. No.

**Q. -- was a doctor?**

A. No.

**Q. What was he doing?**

A. Sitting right -- all right, here's the computer monitor and the keyboard right here. He was sitting on a stool with it. And it was here,

and he was sitting on a stool looking this way, not into the hall but into the office or the -- whatever that little cubicle was he was in.
And he was just kind of -- he was just kind of sitting there.
**Q. So let me understand that.**
A. Okay.
**Q. You said he was looking into --**
A. Here's --
**Q. Help me understand where he was looking.**
A. Okay. All right. Here's Richard's room.
**Q. Okay.**
A. Here's the hallway. Going away from the waiting room -- waiting room's right here.
**Q. Okay.**
A. Going away from the waiting room. And then turn left, and here's this little -- like a nurse's station. Like, if you go to a hospital here, like a nurse's station --
**Q. Okay.**
A. -- but only one person could fit in there --
**Q. Okay.**

A. -- okay? And -- and he was sitting like this with the computer like this and his back to the hallway.
**Q. And so when you walked up to him, he wasn't actively doing anything? He was just sitting there?**
A. Uh-huh.
**Q. Yes?**
A. Yes. He was actually -- he was doing nothing. I don't recall him doing anything but sitting there, because the commuter -- computer and the monitor and the keyboard was right here.
**Q. And so when you said he was looking out, what was he just looking out into: nothing?**
A. Like, looking at that wall.
**Q. Just kind of staring at the wall?**
MS. LOBEL: Form.
A. He -- I wasn't paying attention where he was looking at. I was trying to get help for Richard.
**Q. (By Mr. Drahos) All right. But the point being you didn't see him doing any --**
A. I didn't say him physically doing anything. The computer monitor was on. And it was, like -- you know, like, a -- a form screen.

I don't know if you know how you tab white -- this space is tab, so put something in there, tab, go to this space, put something in there, tab -- you know, like a form screen.
And that was -- that seemed like that's what I saw on the screen. It was blue, white, and -- blue and white. And it may have had a third color in it.
But no, he wasn't typing on it, no.
**Q. And so you said that he had a hat on?**
A. He had a scrub hat. You know, a scrub -- one of those --
**Q. Like a surgical --**
A. Like a surgical hat, yeah.
**Q. So he was wearing blue scrubs with a -- a surgical cap?**
A. Uh-huh.
MS. LOBEL: Form.
**Q. (By Mr. Drahos) Did he have anything over his mouth?**
A. No.
**Q. Did he have any gloves on?**
A. Don't recall.
**Q. All right.**
A. But I know he didn't have a mask,

because I -- I saw his facial hair.
**Q. Other than seeing this individual sitting on the stool, did you, at any point in time, see him doing anything else in the medical center?**
A. I did not.
**Q. So the only time you saw him was sitting on that stool?**
A. Correct. Both times.
**Q. Did you ever see him speaking to anyone?**
A. No.
**Q. What do you think he was doing?**
A. I don't know. There -- there was one other patient in there that -- when I was walking down the hall, they were at the room at the end and had busted their nose or something. It was an older gentleman. He had blood everywhere, and they had a thing on his face. And that's the only other person I saw in there other than this doctor.
I don't -- I don't know if he had a pad in his hand. But he wasn't working on the computer, no.
**Q. Okay. Did you see anyone else who you**

**interpreted to be a doctor while you were in the medical center other than this person sitting on the chair?**
A. He is the only person I saw other than that lady when I first went in there.
**Q. So he was the --**
A. He was the only person I saw.
**Q. The lady and this gentleman?**
A. Uh-huh.
MS. LOBEL: Is that a yes?
A. Yeah, I'm sorry. Yes. Sorry.
**Q. (By Mr. Drahos) Okay. So you had this second encounter with this individual at 10:30 in the morning. You went back into the room?**
A. I went back to the room, yes.
MS. LOBEL: Form.
**Q. (By Mr. Drahos) What happened next?**
A. I said, They -- they should be in here in a minute.
And then somewhere in there, someone had come in -- Joe or somebody came and told me, Do you know where the passports are that Darren went and got? And we couldn't find them.
So I took Suzie's phone, and I called Darren, and I said, Where are the passports?

He said, I've got them. They never asked me for them.

I said, Well, they need them. I'll come up and get them, because he was packing. He was packing his bags.

**Q. So you took Suzie's phone and called Darren's cell phone?**

A. Correct.

**Q. And you spoke to Darren?**

A. I did. And just to warn you all, I'm going to need a break soon.

**Q. Okay. Why don't we take one now.**

A. Okay. All right. Thank you.

THE VIDEOGRAPHER: We're off the record. The time is 12:15 p.m.

(A break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:19 p.m.

**Q. (By Mr. Drahos) Okay, Mr. Landrum. So when we left off, we were talking about the morning of February 21st.**

**So did Darren return with the passports?**

A. No. I went and got them.

**Q. Okay. Was that the first time --**

**other than having gone down the hallway to talk to this individual, was that the first time you left the observation room?**

A. Yes.

MS. LOBEL: Form.

**Q. (By Mr. Drahos) And you left the observation room and went where?**

A. All right. After I got in touch with Darren, I walked out.

And then I ran into a -- a gentleman, an officer of the ship. And only way I can describe him is he was very tall: 6'4" or 6'5". And Eastern European, I would say. Heavy accent, Eastern European.

And he said, Do you have the passports?

I said, No. I'm going to get them.

And he introduced himself to me as the person that was -- that was going to get Richard off the ship. He said, I will be getting Richard off this ship.

And I said, Okay. And that's the first time I heard for sure that's what we were going to do, although I should have known because he was packing his bags.

So he said, I'll go with you to help make this -- speed this up.

I said, Okay.

So he went with me to the 8th floor to Darren's room, and we got the passports.

And he said, I'm going to take these down and go ahead and do what I've got to do with them.

And I spoke to Darren for maybe one or two minutes, because he was out of his mind now. He was so nervous and upset and packing the -- packing the bags.

So I went back down to the room. And so -- where am I now? So is it 10:30 we said I went? So let's say that took ever so long -- I got lost coming back down. I got lost coming back down, so it took me longer to get back. For some -- some reason, I got lost and couldn't find my way back in.

And I finally found my way back in. And I go in, and I ask Ilene and Suzie, Has the doctor been here yet?

And they said, No.

**Q. Okay. So let me go back.**

A. Okay.

**Q. This individual that you met in the hallway -- he -- he was coming into the medical center?**
A. Yes. He was in the lobby in the -- in the waiting room.
**Q. He was in the waiting room of the medical center?**
A. Correct.
**Q. Had he spoken with anyone yet?**
A. Had he?
**Q. Yeah.**
A. No. I think I was the first one he spoke to in our group.
**Q. So he spoke with you.**
A. About are you the one that has the passports?
**Q. And you said, No?**
A. I'm going to get them.
**Q. Okay. And so you left with this individual and went --**
A. He went with me, correct.
**Q. Did he speak to anyone else before he left with you?**
MS. LOBEL: Form.
A. No. Just me. We -- we left. He --

he needed to get those passports.

**Q. (By Mr. Drahos) Okay. So you left with him to go get those passports. Did he at any point in time tell you who he was?**

A. Yes. He explained -- he was very nice. He explained, I'm -- I'm the officer in charge of getting him off the ship.

**Q. Okay.**

A. I am working with someone on the port. And I think he said her name was Jennifer. I remember that because that's my daughter's name.

And he said, But I will be in charge as long as he's on this ship. And then I will turn -- and he was just explaining the process to me.

**Q. What else did he explain beyond that?**

A. I will -- you know, we're just arranging for an ambulance to come and get him.

And so we got the passports. He went his way; I went mine.

**Q. Okay. So do you know what his role was on the ship?**

A. He just told me he was the officer in charge of taking care of Richard while he was on the ship until he gets off the ship.

**Q. Do you know what his title was?**
A. I do not.
**Q. Do you know what department he worked in?**
A. No, I -- no, I do not.
**Q. Do you know if he worked for the Medical Department?**
A. I do not. Although I met him in the Medical Department.
**Q. Do you know how this person even came to know of Richard's?**
A. I think -- I think he's the person they called when the medical staff said, We got to get this person off the ship.
**Q. How do you know that?**
A. I don't know that. I just would assume. I'm assuming. I'm sorry.
**Q. So, in other words, you don't know how this individual --**
A. I don't know. I just know --
MS. LOBEL: Form.
A. -- he -- he got me as I was going to get the passports and explained what his role was.
**Q. (By Mr. Drahos) Okay. So by the time**

he saw you for the very first time --
A. Yes.
Q. -- and made the request for the passports --
A. Yes.
Q. -- it was your understanding --
A. Yes.
Q. -- that they were already working with a lady named Jennifer to get Richard off of the ship?
A. Not until --
MS. LOBEL: Form.
A. -- I met him.
Q. (By Mr. Drahos) Understood. But the point is when you saw him and he asked you for the passports, he explained to you that the ship was already working with someone named Jennifer to get Richard off of the ship?
A. That --
MS. LOBEL: Form.
A. -- is correct.
Q. (By Mr. Drahos) Okay. Do you know what had been done up -- up until that point other than them working with someone named Jennifer?

MS. LOBEL: Form.
A. No, I do not.
**Q. (By Mr. Drahos) Do you know how many phone calls had been made up to that point?**
A. No. Just know the two requests I made for a doctor.
**Q. Okay.**
A. That's all I know.
**Q. And you said that as you were walking up the stairs to see Darren to get to Darren, he was explaining the process?**
A. He was saying --
MS. LOBEL: Form.
A. -- I'm in -- oh, I'm sorry. I interrupted.
**Q. (By Mr. Drahos) What -- what process did he explain to you?**
A. That he was in charge of Richard while he was on the ship. He would be with Richard from the room to when he got off the ship. He would be escorting him off the ship. He -- he was in charge. He let me know he was in charge.
**Q. Okay.**
A. And if I needed anything, come to him.
**Q. How would you know where to find him?**

A. He -- he was pretty much in that area from then on.
Q. Okay. Did he give you any other details about the process other than that?
A. No.
Q. Did he give you any other details about the communications with Jennifer other than that he -- they were working with someone named Jennifer?
A. No. That's the only time he mentioned her name.
Q. Okay. Did he give you any type of an estimate as to how long it was going to take to have Richard transferred off the ship?
A. I want to think he thought it was going to be happening pretty quick. He -- he was reassuring me that they were taking the steps to get the ambulance there.
Q. So when he reassured you about the steps to get an ambulance there, that was during the walk up to see Darren?
MS. LOBEL: Form.
A. Yes, sir, it was.
Q. (By Mr. Drahos) So it was your understanding, then, that they were already in

**the process of communicating with an ambulance company by this point?**

MS. LOBEL: Form.

A. He said he would be working with a lady named Jennifer.

**Q. (By Mr. Drahos) Okay. But you --**

A. I don't know that he was already. He said he would be working with his contact at the port named Jennifer.

**Q. Okay. But he made mention of the word ambulance. So he mentioned to you that they were already in the process of trying to coordinate that?**

MS. LOBEL: Form.

A. Oh, yes. Yeah. Yeah, they were going to have to ambulance him off the ship, correct.

**Q. (By Mr. Drahos) And so when you went upstairs, Darren was packing already?**

MS. LOBEL: Form.

A. Oh, yes.

**Q. (By Mr. Drahos) Okay. And Darren gave the passports to this individual?**

A. Gave them --

MS. LOBEL: Form.

A. -- to me, and I handed them to him.

**Q. (By Mr. Drahos) How much longer did the --- this individual stay for after receiving the passports?**
A. Left immediately.
**Q. Do you know where he went?**
A. No.
**Q. Do you know what happened to the passports?**
A. No.
**Q. Did you ever see that individual again after giving him the passports?**
A. Yes.
**Q. Did he ever tell you what he did with the passports?**
A. No.
**Q. So how long were you gone before you returned back to the medical center?**
A. Okay --
MS. LOBEL: Form.
A. -- this is the time I got lost, so --
**Q. (By Mr. Drahos) Right.**
A. -- I would say -- I would say 30 minutes.
**Q. So does that, then, mean that you returned to the medical center at approximately**

11:00 o'clock a.m.?
A. That would --
MS. LOBEL: Form.
A. -- sound about right, yes.
**Q. (By Mr. Drahos) Okay. How soon after you returned -- strike that.**
**When you returned, where did you go?**
A. Straight back to Richard's room.
**Q. Was Richard still in the bed?**
A. Yes, he was.
**Q. What happened next?**
A. Okay. I was in there, and I stood there for -- with Richard 15 minutes. So that would be 11:15, I would guess, something like that, maybe longer. And I'm getting furious that a doctor still hasn't come in to at least see if he's ready to be -- just something, just to come in.
And -- and I'm talking to Joe and Suzie. Joe had come back in by that time. And we're all put out.
So I said, I'm going to go. And if I have to, I'm going to drag him in here.
**Q. Okay. Where did you go?**
A. I walked out and headed that way

again. And I ran into the big, tall man again, white -- the officer in the white outfit.

**Q. Okay. What happened?**

A. And I said, No doctor has come in to see him.

He said, Well, we've got an ambulance on the way. So why don't you just go back in there until the ambulance gets here and then we'll do what we need to do.

**Q. Okay.**

A. So somewhere during this time, Darren pops his head back in and says, Guys, I'm sorry. I've got to go up to the desk to take care of my bill. And he leaves again.

He had come down with the luggage, and we put the luggage in the room. And we said, We'll take care of it.

**Q. Okay. So --**

A. So we've got the luggage in there in this tiny room. And the three of us, the four of us now, are in this room.

The officer is standing outside, the -- the tall man, the tall officer, is standing outside. And then the gurney comes in.

**Q. You had told me that at some point in**

**time before the paramedics arrived you took Richard to the bathroom?**
A. This is when it happens.
**Q. Okay.**
A. So Richard sits up on the -- so I said, The paramedics are here.
And in Richard's own way, he -- he said, Let me see if I can stand up. So Richard turns to stand up. He turns to the side of the bed. And I'm standing in front of him with my arms out, and he's holding onto my arms.
And he stands up, and he plops back down. He says, I can't do it. I -- I can't do it.
I said, Okay. Well, the -- the ambulance is here. The gurney's here. Let me get them in here to get you on the gurney.
He said, I have to go to the bathroom first.
And I said, Okay. Let me go out here and see what we need to do. And they gave me a wheelchair to roll him down there to go to the bathroom.
**Q. Who is they?**
A. You know what? I don't know who got

it. I -- maybe the -- the officer, the tall officer -- he may have been the one to get it, because I still hadn't seen anybody else, nobody.

So I'm going to -- I'm going to say it was the -- I feel like it was the officer. He went and got the wheelchair.

**Q. And how did you get Richard into the wheelchair?**

A. We put him in it.

**Q. Who is we?**

A. Me and Joe.

**Q. And did you take him to the bathroom?**

A. I did. I wheeled him out, turned right, went past the little stand with a man in the blue who's been sitting, and I take him all the way down to the end of the hall.

I turn him. I said, Let me help you in.

He said, Let me see if I can do it myself. He got up, and I got him in there.

And he said, I'm going to be about -- and so he closed the door. He was in there by himself.

**Q. So he got out of the wheelchair on his own power?**

A. No. I --
MS. LOBEL: Form.
A. -- helped him out of the wheelchair. But I -- you know, I was his brace to get out of the wheelchair. He used me to get out of the wheelchair.
**Q. (By Mr. Drahos) All right. But you saw him sit -- stand up?**
MS. LOBEL: Form.
A. I saw him stand up. And I think there were bars in the -- in the little restroom area that he was able to get around with.
**Q. All right. First, as you were wheeling him down the hallway, did you see that gentleman --**
A. I didn't see him. Uh-uh, uh-huh.
**Q. -- on the stool --**
A. I can't say I did. I can't say I did, no.
**Q. Mr. Landrum, let me -- let me ask the question.**
A. Okay. All right.
**Q. When you were wheeling down the hallway, you did not see that individual who you had previously seen sitting on the stool?**

MS. LOBEL: Form.
A. I don't recall seeing him on the stool, no, no.
**Q. (By Mr. Drahos) Okay. And so you went into the bathroom. And did anyone from the medical center assist in this transfer from the observation room to the bathroom?**
A. No.
**Q. And when you got to the bathroom, Richard said, I -- let me --**
A. Help me, and let me see if --
MS. LOBEL: Form.
A. I'm sorry. Go ahead.
**Q. (By Mr. Drahos) Did you have to use any of your strength to lift him up out of the --**
A. Yes.
**Q. How much of your strength?**
A. Well, I -- I grabbed him by this arm, put my arm -- put my arm under here like this, and lifted him up.
**Q. Was he able to get up and use any of his power, or was it entirely your power that got him out of the chair?**
A. He was able to help.
**Q. Okay. And you were able to see him**

**stand independently without you?**
MS. LOBEL: Form.
A. I guess I did, because he got into the bathroom. I didn't walk into the bathroom with him.
**Q. (By Mr. Drahos) Who opened the door to the bathroom?**
A. I did.
**Q. So you open the door. He walked into the bathroom with or without your help?**
A. Without.
**Q. Okay. And then who shut the door?**
A. I did. I said, Holler at me if you need me.
**Q. Okay. How long was he in there for?**
A. Five minutes. Three minutes, five minutes.
**Q. And the paramedics were in the medical center at this point?**
A. Yes, sir. It was a lady.
**Q. Why didn't the paramedics help?**
A. I'm not -- I don't know.
**Q. What were the paramedics doing?**
A. Standing with the gurney with the tall gentleman, the tall officer.

He even told me. He said, You're in luck. This is a good -- the paramedic lady -- he said, She's a good one.
**Q. This tall person --**
A. The tall officer, yes.
**Q. Is there anything more you can tell me about this tall person? You said he was wearing white?**
A. White.
**Q. Did you happen to see whether or not he had any stripes on his shoulder?**
A. Yes, he did.
**Q. How many stripes did he have?**
A. I will say two. It wasn't one, and it wasn't three, so it must be two.
**Q. Did you happen to catch his name tag?**
A. I didn't. But it was -- you know, it was one I couldn't have remembered. It was -- it was like a Czechoslovakian name or something like that.
**Q. When you say it was a Czechoslovakian name, why -- why do you --**
A. It ended in, like, Z-K-Y or, you know, on-jih-ski, or -- you know, it ended -- ended like that.

**Q. Okay. So how did Richard get from the bathroom back to the wheelchair?**

A. He then said, I'm ready. I open the door, and I got him out.

**Q. What did you do to get him out?**

A. I went, lifted him up again.

**Q. From -- from the toilet?**

A. No. He was -- he was standing. I'm sorry. I -- I had put my arm in, and we -- I turned him. He was already standing up, and I -- because he had had his pants on.

So I put my arm under his arm again, and I turned him. And he walked cautiously. And I put him in the chair, and I rolled him back down the hall.

**Q. All right. I'm sorry to be crude, but --**

A. That's okay.

**Q. -- I have to ask.**

A. Yeah.

**Q. Do you know what he was doing in the bathroom --**

A. No, I don't. I don't. I -- I didn't smell anything, so I would assume he was just urinating --

**Q. Urinating?**
A. Uh-huh.
**Q. Okay.**
THE REPORTER: Was that a yes?
MR. DRAHOS: Thank you.
**Q. (By Mr. Drahos) Was that a yes?**
A. Yes.
**Q. And so when you got him back into the wheelchair, where did you take him from there --**
A. Straight to the gurney. And that's when the paramedics got involved.
**Q. Okay. What did they do, if anything?**
A. We -- we got him in the -- on the gurney.
**Q. When you say we, who?**
A. Me, the lady paramedic, and the tall officer.
**Q. Okay. Do you know what time this was?**
MS. LOBEL: Form.
A. Darren comes back from clearing the tab or whatever he did at the purser's desk 12 -- 12:15? 12:15?
**Q. Okay.**
A. And -- and Darren comes in. And they -- we already had him in the gurney. They

finished strapping him down. Darren's completely frazzled and out of breath.
And they started taking him out, and we didn't speak. All's Darren said, Guys, see you all. Have a nice cruise. And they left.
**Q. Okay. Did you say anything else to Richard before he left?**
A. I love you. And that's it.
**Q. Did he say anything back?**
A. I love you. And everything's going to be -- I said, Everything's going to be okay.
**Q. All right. Did you know where he was going?**
A. No.
**Q. Did anyone in your group know where he was going?**
A. No.
**Q. Like, for example, did the paramedics say All right, we're on our way to --**
A. Like the helicopter or something? No, they didn't say.
**Q. Okay.**
A. I -- I think the tall gentleman said, We're going to take him to a hospital to get checked out.

Q. Okay. So was there anyone else involved in this entire circumstance in the medical center beyond the individuals that you've identified for me? And I'm going to go through each one of them.
A. Sure.
Q. The first was the nurse that you saw when you first entered the medical center.
A. She was --
MS. LOBEL: Form.
A. Yes.
Q. (By Mr. Drahos) The second was the gentleman on the stool.
A. In the --
MS. LOBEL: Form.
A. -- blue scrubs, yes.
Q. (By Mr. Drahos) The third was the gentleman in the white uniform?
A. Tall, white --
MS. LOBEL: Form.
A. -- white-uniformed officer, yes.
Q. (By Mr. Drahos) And, then, of course, the fourth is the female paramedic?
A. Correct.
MS. LOBEL: Form.

**Q. (By Mr. Drahos) Beyond those four individuals, was there anyone else involved in any regard in the medical center who you have not already identified for me?**
A. Not that I dealt with, no.
**Q. Did you see anyone else?**
A. No. I heard Joe -- Joe came in. Joe came -- when he came in the room at one time or another, when he first came down, Darren came down with the medical card.
Evidently there was somebody else involved in the waiting room working with Darren and the insurance card. And they got into a discussion about something about the card, didn't -- something about the card. Something was wrong with the card.
**Q. Did you ever see that person?**
A. I never saw that person.
**Q. Okay. And you said that there were -- there was another patient in there with a bloody nose.**
A. Yeah. An older gentleman, yeah.
**Q. Did you see anyone other than the gentleman on the stool or the nurse you had encountered earlier treating this person?**

MS. LOBEL: Form.
A. Well, he was at the room at the very end. And there was a lady in there -- it could have been the same lady I saw when I first came in -- with her back to me, talking to him. And then they wheeled him out in a wheelchair.
Q. Who is they?
A. The medical staff. So that lady wheeled him out.
Q. So when you say the -- the medical staff, who?
MS. LOBEL: Form.
A. A lady in white -- in the white scrubs. The one -- possibly the lady I first saw when I came in with Richard.
Q. Okay. But you're not sure?
A. Not sure --
MS. LOBEL: Form.
A. -- because her back was to me.
Q. (By Mr. Drahos) So you saw her back, and you saw her talking to this guy with a bloody nose?
MS. LOBEL: Form.
A. Yes.
Q. (By Mr. Drahos) Was it a male or a

female --
A. Male.
MS. LOBEL: Form.
Q. (By Mr. Drahos) All right. And then you saw this gentleman being wheeled out in a wheelchair?
MS. LOBEL: Form.
A. Correct.
Q. (By Mr. Drahos) And you believe it to be the lady in the white scrubs who you did encounter previously?
MS. LOBEL: Form.
A. Correct.
Q. (By Mr. Drahos) During the time that you were in the medical center, the entirety of the time you were in the medical center, did you hear anyone talking about arrangements for Richard's transfer off the ship?
A. I did not.
Q. Do you have any information as to what Royal Caribbean specifically had to do in order to coordinate Richard's transfer off of the ship on the morning of February 21st?
A. I do not.
Q. Did you speak to Richard any further

**on February the 21st after he left the vessel?**
A. To Richard? No.
**Q. Did you speak to Darren?**
A. Ilene did.
**Q. When is the next time you heard anything about Richard?**
A. Ilene had a conversation with Darren. I think -- she's out here. So right after they got to the hospital, I believe.
**Q. Was it a phone call or a text?**
A. Phone call. I think at that point I had told Ilene just go ahead and use her phone. Don't worry about the cost.
**Q. What is Ilene's phone number?**
A. It was my phone. She would have used my phone.
**Q. And what was your phone number?**
A. (678) 429-6581.
If she went ahead and used hers -- you know what? She probably used hers. Strike that. She probably used hers, because Darren has her number. Her number is (678) 230-9158.
**Q. Okay. And so did Ilene call Darren, or did Darren call Ilene?**
A. I -- I don't know. Ask her.

**Q. Okay. And what -- what did Darren report to Ilene?**

A. Just that they had arrived at the hospital, I believe.

**Q. Did you learn anything more than that?**

A. No.

**Q. Did he tell you which hospital they were at?**

A. Only -- only thing I know about the hospital is he said it was one on the other side of town.

**Q. Darren said that?**

MS. LOBEL: Form.

A. Ilene told me that Darren said that, yes.

**Q. (By Mr. Drahos) Did you ever get off the ship on February 21st?**

A. That is the date he took Richard off? No.

**Q. So do you have any personal knowledge of the traffic in San Juan that day?**

A. No, I don't.

**Q. Any other information relayed during this phone call between Darren and Ilene, to your knowledge?**

A. No.
MS. LOBEL: Form.
A. Very short call, I believe.
**Q. (By Mr. Drahos) When was the next time you heard anything?**
A. I want to say the next day.
**Q. The next day, the 22nd?**
A. I think Darren got in -- ask Ilene, but I think Darren got in touch with her and said that Richard had had a stroke.
**Q. Richard had had a stroke --**
A. Had had a stroke, yeah.
**Q. Any other detail beyond that?**
A. None that I can tell you. You have to ask her.
**Q. Okay.**
A. I think there was more, but I don't know what it was.
**Q. All right. So can you go back to Defendant's Composite Exhibit 1 for me, please.**
A. 1? Got it.
**Q. Yes, sir. And can you turn your attention to page 9.**
A. 9 -- got it.
**Q. According to Royal Caribbean's**

**records, you would have had 23 drinks on February the 21st?**

A. Sounds about right.

**Q. Okay. No reason to dispute that?**

A. Nah.

MS. LOBEL: Form.

A. No, I will not.

**Q. (By Mr. Drahos) All right.**

A. Now, yes, I will dispute that. And I don't want to get anybody in Royal Caribbean in trouble here.

But those bartenders -- we make friends with them. And we give them big tips at the beginning of the cruise.

And sometimes they'll just say, Hey, give us your cards, and they'll just start scanning them. Now, they don't do it as much now. But back then, they did.

So -- but I wouldn't dispute me having 23 drinks, no. Uh-uh. I can do that.

**Q. Okay. In other words, you don't have any evidence to suggest that any bartender was scanning your card --**

A. No, no.

**Q. -- illegally on February 21st?**

A. No.
MS. LOBEL: Form.
A. No. No.
Now, this also -- if I may -- just 23 drinks sounds like a lot. But they could -- if I'd get me and Ilene a beer, he'd scan it twice. He just -- he wouldn't get Ilene's. He'd just scan ours twice.
**Q. (By Mr. Drahos) Well, according to Royal Caribbean's records, Ilene would have had 11 drinks on February the 21st.**
A. That's light for her. That's light.
**Q. Any reason to dispute that?**
A. Nah. And she -- but she usually keeps up with me. So some of these are probably hers.
**Q. Okay. Regardless, then, that would mean between the two of you, you had 34 drinks on February the 21st?**
MS. LOBEL: Form.
A. Sounds about right.
**Q. (By Mr. Drahos) Okay. So you said that the next time you heard something about Richard would have been on February the 22nd, which would have been the next day?**
MS. LOBEL: Form.

A. Yeah. Yeah. I'm -- from the minute he gets off the ship to the conversations, Ilene was in charge --
Q. (By Mr. Drahos) Okay.
A. -- okay.
Q. So is there anything further that you learned about Richard's circumstances --
MS. LOBEL: Form.
Q. (By Mr. Drahos) -- after he got off the ship --
MS. LOBEL: Form.
Q. (By Mr. Drahos) -- per these communications with Ilene?
MS. LOBEL: Form.
A. Within that week?
Q. (By Mr. Drahos) Yeah.
A. Yeah --
Q. Why -- let me re-ask the question.
A. Okay.
Q. Through the remainder of the voyage on the Harmony of the Seas, did you learn anything further about Richard's circumstance through phone calls between Darren and Ilene?
MS. LOBEL: Form.
A. Yes.

**Q. (By Mr. Drahos) And what else did you learn?**
A. I think that -- that Ilene had talked to Darren. And Darren was making arrangements for his sisters to come be with him.
**Q. In Puerto Rico?**
A. Uh-huh. Yes.
THE WITNESS: Beat you to the punch.
**Q. (By Mr. Drahos) Did you have any alcoholic beverages while Richard was in the medical center --**
A. No.
**Q. -- on February 21st?**
THE WITNESS: Sorry. Sorry, sorry.
MS. LOBEL: Form.
A. No.
**Q. (By Mr. Drahos) Let me ask the entirety of the question --**
A. Go ahead, go ahead --
**Q. -- so it's clean.**
A. Go ahead.
**Q. Did you have any alcoholic beverages at any point in time while Richard was in the medical center on February 21st?**
A. I --

MS. LOBEL: Form.
A. -- did not.
**Q. (By Mr. Drahos) Did Ilene?**
A. No. She did not either.
**Q. Did Joe?**
A. No. None of us did. We never got close to a bar while he was in there.
**Q. Okay. So I'm -- I'm gathering from your testimony that it's your impression that a doctor never saw Richard while he was in the medical center on February 21st?**
MS. LOBEL: Form.
A. That is my impression, yes.
**Q. (By Mr. Drahos) All right. Let me hand you what we're going to mark as Defendant's Composite Exhibit 3 of the deposition.**
A. Okay.
**Q. Give me just one second.**
A. Sure.
(Defendant's Exhibit 3 was marked for identification.)
MS. LOBEL: Thanks.
**Q. (By Mr. Drahos) Have you ever seen Defendant's Composite Exhibit 3 before?**
A. Is that what I'm looking at?

**Q. Yes, sir.**
A. No, I have not.
**Q. By the way, did you look at any documents in advance of today's deposition?**
A. Yeah. Yeah.
**Q. What did you look at?**
A. I -- I had a -- a deposition, but it was -- I'm not a good reader, so I didn't read a lot of it.
**Q. It was a deposition of who?**
A. You know what? I guess -- no, I don't guess it was a deposition. It was a -- a deposition is when you -- we talk to you, right?
**Q. Yes.**
A. There was a -- yes. There was a document that I scanned over -- oh. We had a phone call. We had a phone call with -- a long -- long, long, long time ago of that -- the guy you work for. And he -- they sent it to us to make sure everything was correct.
He said, Read what you said there, and make sure everything you've got is correct.
**Q. Okay. Hold on a second. So you had a phone call with Jack Hickey?**
A. Is that who Jack is?

**Q. You said, The guy you work for. And you pointed to Ms. Lobel, so I assume you're talking about Jack Hickey?**
A. Yeah. That was two years ago.
**Q. All right. And you said read over what you -- and make sure it's accurate. What were you reading over?**
A. He just -- he just was asking me a -- a few questions about what I recall and -- and stuff like that.
And then he sent a thing back to me and said, Is this what you recall?
And I said, Yes.
**Q. And you signed it?**
A. No.
**Q. What happened to the document?**
A. I don't -- it wasn't a written document. It was an e-mail.
**Q. Okay. So it was an e-mail summary --**
A. Uh-huh.
**Q. -- of what you had said to Mr. Hickey?**
A. Correct.
**Q. Which would have then meant that you had a prior discussion with him?**
A. Yeah.

MS. LOBEL: Form.
Q. (By Mr. Drahos) How many times have you talked with Mr. Hickey?
A. Oh, just that one day.
Q. So you had a talk with Mr. Hickey two years ago?
A. Two years ago.
Q. And then Mr. Hickey contacted you afterwards --
A. No. I never talked to him again.
Q. Okay. Hold on a second.
A. Okay. Go ahead, go ahead.
Q. So Mr. Hickey had a phone call with you where you gave him your understanding of what happened --
MS. LOBEL: Form.
Q. (By Mr. Drahos) -- yes?
A. Yes.
MS. LOBEL: Form.
Q. (By Mr. Drahos) Okay. And then an e-mail was written to you summarizing that discussion?
MS. LOBEL: Form.
A. There was a -- yes. There was something. It just said, Make sure this -- can

you think of anything else? If not, thank you for your time.
**Q. (By Mr. Drahos) Okay. And you reviewed that?**
MS. LOBEL: Form.
A. Sure.
**Q. (By Mr. Drahos) And was it accurate?**
A. I don't -- I don't recall changing anything.
**Q. Were you required to sign anything?**
A. No. It was a casual conversation.
**Q. And so, then, was there a -- a follow-up phone call?**
A. No, there was not.
**Q. Because I thought I heard you say, I had talked with the guy you work for, and you pointed to Ms. Lobel.**
A. Yeah.
**Q. About a document, though, and that you were -- he had asked you to sign it.**
A. No.
MS. LOBEL: Form.
A. That's not what I said.
MS. LOBEL: No. That's --
MR. DRAHOS: Well, I'll go --

MS. LOBEL: He never said that. You said that.
**Q. (By Mr. Drahos) I mean, I can read it.**
A. Okay. Yeah. I did not -- I have not signed. You asked me if I'd signed anything, and I said, No. I have never signed a -- any document.
The only thing I've signed is some lady came to my house Sunday morning serving me with a subpoena.
**Q. (By Mr. Drahos) Okay.**
A. That's the only document I've ever signed.
**Q. All right. Can you turn to page 2.**
A. Uh-huh. Of what, this? Yes.
**Q. So there's a section there that says, PHYSICIAN ORDERS. Do you see that there?**
A. Physician's orders, yes.
**Q. And there's a name: Joao Pereira. Do you see that?**
A. I do.
MS. LOBEL: Form.
**Q. (By Mr. Drahos) Have you ever heard the name Joao Pereira before?**
A. No, I have not.

Q. Did you hear anybody say Dr. Pereira or hear Joao or the name Pereira at any point while you were in the medical center?
A. I did not.
Q. Okay. It says here, Thank you for seeing this 61-year-old male. Patient says that this morning at around 9:15, had sudden onset of weakness in the right lower limb plus vision changes in right eye. Do you see that?
A. I do.
MS. LOBEL: Form.
Q. (By Mr. Drahos) Okay. Was asymptomatic when he woke up. No other complaints. Had fall with head trauma in occipital area three days ago. No loss of consciousness, no amnesia, no neurological deficits at the time.
Oriented, normal vitals, normal color. No obvious asymmetry in tonus, strength or sensibility (tactile, proprioceptive. Blurriness in the right eye. No pain anywhere. Normal ECG.
Please evaluate (including CT scan if you see fit) and treat accordingly.
Do you see that?
A. I do.

MS. LOBEL: Form.
Q. (By Mr. Drahos) If it's Dr. Pereira's sworn testimony that he's the one who wrote this note, do you have an explanation as you sit here today as to where he got that information from?
A. I do not. And I will dispute it, because I was in there from 9:00- -- at no time was Richard left alone from 9:30 until the time he got off the ship, and we never saw a doctor.
Q. Okay.
A. We never saw a nurse. We never saw a medical staff person.
Q. And if you could turn your attention to page 4.
A. I will.
Q. Do you see the section there that says Diagnosis?
A. Yes.
Q. And it says, Diagnosis date, February 21, 2019.
And you see there. It says, Performed by Joao Pereira?
A. I do.
Q. Okay. And underneath, it reads, Patient says that this morning at around 9:15,

had sudden onset of weakness in right lower limb plus vision changes in right eye. Was asymptomatic when he woke up. No other complaints.

Had fall with head trauma in occipital area three days ago. No loss of consciousness. No amnesia. No neurological deficits at the time.

Oriented, normal vitals, normal color. No obvious asymmetry in tonus, strength or sensibility. Blurriness in right eye. No pain anywhere. Normal ECG.

For immediate neurological/neurosurgical evaluation (including CT scan if you see fit). Referral done.

See that there?

A. I do.

MS. LOBEL: Form.

Q. (By Mr. Drahos) If it's Dr. Pereira's sworn testimony that he entered this note, is it your testimony that he completely fabricated this?

A. That is my --

MS. LOBEL: Form.

A. -- testimony.

Q. (By Mr. Drahos) And is it your testimony that he's not the one who entered this note?
A. It is my testimony I never saw a Dr. Pereira, I never saw a Nurse Judy. I never saw anybody from 9:30 until 12:00.
Q. Okay. So what you're saying, then, is that he didn't enter this note?
MS. LOBEL: Form.
A. That would be my suggestion. We never saw anybody. I begged people to come in there.
And I have nothing against Royal Caribbean. I went and begged someone to come in there.
Q. (By Mr. Drahos) And so if Dr. -- have you seen Dr. Pereira's deposition transcript in the case?
A. No.
Q. And so if Dr. Pereira were to have testified under oath that he saw Mr. Burgess, examined him, rendered a diagnosis, and made numerous phone calls to transfer him from the ship, are you saying that he perjured himself?
MS. LOBEL: Form.
A. I will --

MS. LOBEL: Go ahead.
A. I will say he may have made the phone calls. But he never came in that room.
**Q. (By Mr. Drahos) So you believe he perjured himself?**
A. I would --
MS. LOBEL: Form.
A. I would have to say yes.
**Q. (By Mr. Drahos) All right. So he -- he lied under oath, and he fabricated a medical record?**
MS. LOBEL: Form.
A. He never came in that room while I was there. And he -- Richard was never alone from 9:30 until he got off the ship.
**Q. (By Mr. Drahos) But there were times that you left?**
MS. LOBEL: Form.
A. There was. But my wife was in there the entire time.
**Q. (By Mr. Drahos) How do you know that if you weren't there?**
MS. LOBEL: Form.
A. Because she told me she was.
No -- you have to know our family. We

would never leave one of our family members alone under any circumstance.

**Q. (By Mr. Drahos) Would it be appropriate for a doctor to examine a patient in the presence of a third party?**

MS. LOBEL: Form.

A. I'm not -- I don't understand the question.

**Q. (By Mr. Drahos) Do you think it would be appropriate for the doctor to examine Mr. Burgess in your presence?**

A. No. But he would have to ask me to leave the room. He would have to ask Ilene to leave the room. He would have to ask Suzie to leave the room.

**Q. (By Mr. Drahos) How do you know that the doctor didn't examine Mr. Burgess before you arrived?**

A. Joe said he had not seen a doctor.

I asked Richard if he had seen a doctor. Richard said, No. That was the first time I went out to get a doctor.

**Q. So, to your knowledge, was the observation room to Richard's -- was the door to the observation room that Richard was in ever**

closed at any point in time while Richard was in the medical center?
MS. LOBEL: Form.
A. Not while I was there.
Q. (By Mr. Drahos) Do you have knowledge as to whether or not at any point in time from the moment Richard arrived in the medical center until the time he left that the observation room was closed to you and the rest of your family?
MS. LOBEL: Form.
A. I -- please say that one more time.
Q. (By Mr. Drahos) Sure.
A. Yeah.
Q. Do you know whether or not at any point in time from the time Richard arrived in the medical center --
A. Yes.
Q. -- until the time he left --
A. Yes.
Q. -- that the observation room that he was in, the door -- let me strike that.
A. I understand.
Q. I'll ask it again. Do you know at any point in time from the time Richard arrived to the medical center until the time he left --

A. Yeah.
**Q. -- that the door to the observation room that he was in was closed to the rest of your family?**
MS. LOBEL: Form.
A. From 9:00 -- here -- here's all I can say.
**Q. (By Mr. Drahos) Okay.**
A. You all know what time he got there; I don't. But from 9:30 on, that door was never closed.
**Q. (By Mr. Drahos) Okay. So whether it was closed to your family before you arrived, you have no idea?**
MS. LOBEL: Form.
A. No. I wasn't there.
**Q. (By Mr. Drahos) Okay.**
A. Joe was there.
**Q. And if Suzie testified yesterday that when she arrived to the medical center, the door was closed, would you have any reason to dispute that?**
A. Yeah. She was wrong.
**Q. Suzie was --**
A. I went straight in the room.

Yeah. I went straight in the room. I didn't stop, pass go, or anything. I went straight in the room.

**Q. So it's your testimony that when you arrived to the medical center and the nurse told you you all could come in, the door was already open?**

A. Yes. I --

MS. LOBEL: Form.

A. -- stuck my head around the corner, and she said, You can come in.

**Q. (By Mr. Drahos) So when was the next time you heard anything about Richard at the conclusion of the cruise?**

A. Every day. Ilene was in touch with Darren every day.

**Q. Did you ever talk to Darren?**

A. I did not.

**Q. So the information you were learning about Richard was coming through these phone calls between Darren and Ilene?**

A. Correct.

MS. LOBEL: Form.

**Q. (By Mr. Drahos) Have you seen Richard since the cruise?**

A. Yes.
**Q. How many times?**
A. Face-to-face or over a Zoom call?
**Q. Good question. Face-to-face, in person?**
A. None.
**Q. How many times have you seen him over Zoom calls?**
A. Probably six times.
**Q. When was the last time?**
A. Ilene's birthday. March 2nd of this year. He called to sing her Happy Birthday.
**Q. Was this a live call or --**
A. Yes.
**Q. -- a prerecorded call?**
A. Good question. Because we did both. This was a -- this one was a video call prerecorded, not live, yes. Check with Ilene, but I think that's right.
**Q. Do you still have that call, by chance?**
A. She probably does.
**Q. It's on her phone?**
A. Uh-huh.
MS. LOBEL: Is that a yes?

A. Yes.
MS. LOBEL: I got you.
**Q. (By Mr. Drahos) Has Richard called your phone at any point in time --**
A. No.
**Q. -- since the cruise?**
A. No.
**Q. So the last one was in March of 20- --**
A. 2022.
**Q. -- '2?**
A. Uh-huh.
**Q. When was the one prior to that?**
A. Probably Christmas of 2021.
**Q. Was this also a prerecorded call?**
A. This one might have --
MS. LOBEL: Form.
A. -- been live. There's a live one in there somewhere, because we talked a long time. So I would -- I'm going to guess that's what that one was.
**Q. (By Mr. Drahos) You said we talked a long time --**
A. Me and Ilene, Darren and Richard.
**Q. Did Richard talk during this call?**
A. Yes. Yes, he did. He tried very

hard.
**Q. And when was the call prior to that? You said you had six calls in there, so --**
A. You know, it's -- it's holidays. It's special days.
Let's see. He probably called on my birthday, which would have been April -- he didn't call April of this year. He missed my birthday; I need to call him. But he probably called last year.
**Q. So he would call -- in other words, these calls would take place during the holidays or --**
A. Yeah, yeah. Birthdays --
MS. LOBEL: Form.
A. -- and stuff like that. And Darren would hold the -- hold the phone for him.
**Q. (By Mr. Drahos) Okay.**
A. Yeah. And they were video -- you know, they're video calls. FaceTime calls.
**Q. During those calls, did you ever see Richard get up or do any type of physical activity?**
A. No, no, I haven't. He was in his chair.

But you know what? Ilene may have -- ask her. I think they just sent her one of him trying to stand up.

**Q. But you haven't seen that one?**

A. I have not.

MS. LOBEL: Form.

**Q. (By Mr. Drahos) Do you have any scheduled plans to visit Richard?**

A. No. Not right now.

**Q. To your knowledge, is there any scheduled plan for Richard to visit you?**

A. We've been talking about it. Darren's not sure he's strong enough right now. They want to come back to the lake.

**Q. Do you know if Richard has done any traveling at all outside the house since the subject cruise?**

A. Just to doctors and stuff like that. No -- no real pleasure travel that I'm aware of.

**Q. Do you know if Richard's tracheotomy tube has been removed?**

A. I don't think it has. I think -- I think that's why they still have to have somebody with knowledge of removing it. It -- I don't think it has, but I -- I'm not sure.

**Q. Okay. So, Mr. Landrum, this being the last time I get the chance to talk to you, is there anything else about this circumstance that you want to share with me that you think would be important for me to know that I haven't already asked you about?**
A. No. I'm just sorry it happened.
**Q. Okay. Thank you, sir.**
A. Okay.
**Q. Those are all the questions I have.**
A. Okay.
MS. LOBEL: Can we take a quick break --
MR. DRAHOS: Absolutely.
MS. LOBEL: -- before we transition.
THE VIDEOGRAPHER: We are off the record. The time is 1:08 p.m.
(A break was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is -- I'm sorry -- 1:22 p.m.

EXAMINATION

BY MS. LOBEL:
**Q. Okay. Mr. Landrum, I have some follow-up questions for you --**
A. Okay.

Q. -- okay? All right.
Now, I want to bring you back to the beginning of the day of the incident, which --
A. Uh-huh.
Q. -- is February 21st of 2019, okay?
A. Okay.
Q. All right. My recollection is when you were asked on direct examination what you were doing in the beginning of that day, you went to get coffee, correct?
A. I was either going or had gone to get coffee, yes.
Q. Understood. Now, were you going to Central Park or were you going someplace else?
A. Starbucks.
Q. Starbucks. All right. And where is the Starbucks on the vessel in relationship to where your cabin was?
A. 5th floor. We were on the 8th door.
Q. Okay. Did anyone go to Starbucks with you that morning?
A. No.
Q. Okay. And your recollection is that by the time you got back to your cabin, Suzie's at your room?

A. Ilene had already gotten the information about Richard, yes.

THE VIDEOGRAPHER: Can I --

MS. LOBEL: Do I need to do this again?

THE WITNESS: Yeah.

MS. LOBEL: Or you got me? Because I can do it all over again. I'm just --

THE WITNESS: You're good.

MS. LOBEL: Are you sure you got me?

THE VIDEOGRAPHER: Uh-huh.

MS. LOBEL: Okay. All right. Great. I apologize for that. I knew I forgot something.

**Q. (By Ms. Lobel) All right. So I got my mic -- mic on. I'll put my hands down.**

**All right. So your recollection is that Suzie's at your room?**

A. My recollection is Ilene has already got the information and Suzie is coming to the room or she may have already been there. Ilene's the one that told me about Richard.

**Q. Okay. Did -- did Suzie come to your room to meet with you to go downstairs?**

A. Yes.

**Q. Is it possible that Ilene got the**

information from a telephone call?
A. Yes.
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) Would it have been on her cell phone, or could it have been from the landline?
A. Landline.
Q. Okay. Because your wife's phone wasn't activated?
A. Correct.
Q. Did -- am I correct in understanding that Suzie went to Darren first before coming to you?
A. Yes.
Q. Okay. And is it your understanding with speaking with Suzie that Darren went to go find Richard and Joe up on Deck 17?
A. Yes.
Q. Okay. And my understanding is that Richard habit in the morning would be to have breakfast up on Deck 17 in that private restaurant area that they had access to due to their suite?
A. Yes.
Q. Okay. And that's something you would

have known?
A. Yes.
Q. Okay. That's not something you were told?
A. No.
Q. All right. Now, when you mentioned on direct examination that you learn of what's going on with Richard approximately 9:05, do you recall testifying to that?
A. It was around 9:00 o'clock, yes.
Q. Okay. So you don't remember to the exact minute when you --
A. No. No. But 9:00, 9:05, whatever, yeah.
Q. Okay. Now, by the time that you -- strike that.
You get the information from Ilene that Richard thinks he's having a stroke, Joe's off to be with him, Darren's going to join them up on Deck 17. At that point of time, is your wife starting to get dressed?
A. Yes.
Q. Okay. You're already dressed?
A. Yes.
Q. Okay. So you wait on your wife to get

dressed?
A. Yes.
Q. And soon after, Suzie comes to your room?
A. Yes.
Q. Is it possible that Suzie used her phone to make a phone call that you didn't hear?
MR. DRAHOS: Object to the form.
A. Oh, sure. Yes.
Q. (By Ms. Lobel) Okay. And Suzie's the only one in the group other than Richard and Darren who have active cell phones, correct?
A. Yes.
Q. All right. Understood. Now, your testimony is that you have to wait on your wife to get dressed, then you wait for Suzie to join you, and then the three of you go down to the medical center, correct?
A. Yes. I waited on Ilene to finish getting --
Q. Oh. Forgive me.
A. -- dressed. She had already started.
Q. Okay. And then you go from -- what is it? -- Deck 5 down to --
A. No. We're Deck 8.

Q. Forgive me. You go to Deck 8. And where -- which deck is the infirmary?
A. It is underneath the ship. Subdeck 4, Subdeck 3 -- I'm not sure, yeah.
Q. It's a lower deck?
A. A lower deck, yeah.
Q. Okay. It's not going up. It's going down, correct?
A. Yeah, it's going down, correct.
Q. All right. Fair enough. All right. And by the time you get to the medical center, you walk in, Joe's already in the waiting room, correct?
A. Yes.
Q. Is Darren already in the waiting room?
A. Yes.
Q. Is Darren filling out paperwork?
A. Yes.
Q. Okay. Darren hasn't left to get his insurance card yet, correct?
A. No.
Q. All right. And when you walk in, how -- strike that.
You walk into the medical center, and you look immediately to find where Richard is in

**the room?**
MR. DRAHOS: Object to the form.
**Q. (By Ms. Lobel) You may answer.**
A. I asked Joe where he is.
And Joe says, He's right there.
**Q. Okay. So Joe tells you which room Richard is in?**
A. Yes.
**Q. And there is a lady in the room who's a nurse?**
A. There's a lady in the room.
**Q. Okay. And is the lady in the room fussing with the medical equipment?**
MR. DRAHOS: Object to the form.
A. Yes. And tucking him -- pulling the covers up.
**Q. (By Ms. Lobel) Okay. And at this point of time, Richard has already been connected to a heart monitor?**
A. He was --
MR. DRAHOS: Object to the form.
A. -- connected to a heart monitor, yes.
**Q. (By Ms. Lobel) Okay. Did he have the stickers on him --**
A. Yes.

Q. Okay. And the stickers are the electrical wires that connect to your chest or different places on your body to give information to the machine about your vitals, correct?
A. Yes.
Q. Okay. All right. So it would be fair to say somebody from the medical center set that up before you got down?
A. Well, he had a pulse ox on.
Q. Okay.
A. He had a pulse ox on.
Yes. He had the stickers hooked up too, yes.
Q. Okay. And at that point of time, you ask Richard, Have you seen the doctor?
A. Yes.
Q. And your recollection is there's a clock above Richard at that point in time?
A. There's a clock on the wall, yes.
Q. Okay. And to your best recollection, I believe you testified that it's more or less 9:30 a.m. at this point?
MR. DRAHOS: Object to the form.
A. Yes. 9:30, somewhere around 9:30, 9:30- -- yes.

Q. (By Ms. Lobel) Okay. And that clock -- to your knowledge, is that local time or ship time?
A. Ship time.
Q. How do you know that?
A. Everything on the ship is ship time. They always tell us, Don't pay attention to what -- what the clocks on the island are. We are on ship time.
Q. Okay. Were -- so for the times that you've been giving us, those are based off the clock that you saw in Richard's room, not someone's cell phone or a watch?
A. No. They were all ship time --
Q. Okay.
A. -- correct.
Q. Understood. All right. Just want to make sure.
All right. So at the point of time, you see it's more or less 9:30. You ask Richard if he had seen a doctor. That's when you go to find the doctor, correct?
A. All right, ask me that again, please.
Q. Certainly. It is approximately 9:30 a.m.?

A. Yes.
**Q. You ask Richard if he's seen a doctor, and he indicates to you no, he has not, correct?**
MR. DRAHOS: Object to the form.
A. Correct.
**Q. (By Ms. Lobel) And that's the point of time where you go look to see where the ship's doctor is?**
A. Within ten minutes of that statement, yes.
**Q. Okay. What are you doing in the ten minutes between asking Richard if he's seen a doctor to ten minutes to finding -- going to look for the doctor?**
A. Waiting for the doctor to come in.
**Q. Okay.**
A. And trying to talk to Richard.
**Q. Okay. And is that the point of time when you notice that Richard's eyes aren't moving normally?**
MR. DRAHOS: Object to the form.
A. Yes.
No --
**Q. (By Ms. Lobel) Okay.**
A. That's -- yes, correct.

Q. Okay. When you're in the room waiting for the doctor shortly after 9:30, I believe you said Darren popped his head in to say he needed to go get the insurance card?
A. Before I went to look for the doctor, he -- he said, Guys, I got to go up and get my insurance card.
Q. Okay. All right. All right. And then I believe you said you exit to -- to try to look for the doctor, you exit Richard's room and you go down a bit of a hallway. And there is a station where you see a gentleman on a stool with a computer with what looked like some electronic forms?
MR. DRAHOS: Object to the form.
A. Yes. On the computer monitor, yes.
Q. (By Ms. Lobel) Okay. So at this point, it's maybe you -- you said you first saw the clock at 9:30. It's been about ten minutes, so it's about 9:40 --
A. Yes.
Q. -- 9:45?
MR. DRAHOS: Object to the form.
A. Yes.
Q. (By Ms. Lobel) Okay.

MR. DRAHOS: And, Mr. Landrum, you got to let me get my objections in. I need you to pause, please.
THE WITNESS: Okay.
MS. LOBEL: As best you can.
**Q. (By Ms. Lobel) All right. The gentleman that you saw is wearing blue scrubs, correct?**
A. Yes.
**Q. And you said he had a -- like, a doctor's cap on, something covering part of his hair?**
MR. DRAHOS: Object to the form.
A. Yes.
**Q. (By Ms. Lobel) Okay. And I believe you testified that he had what appeared to be dark hair?**
A. From what I could see, yes.
**Q. Okay. And he had some facial hair?**
A. Mustache, goatee.
**Q. Okay. And to you, he looked like he might be Hispanic?**
A. Correct.
**Q. Okay. Did he have an accent that you can recall?**

A. Only words --

MR. DRAHOS: Object to the form.

A. -- he said was -- oh, I'm sorry.

MR. DRAHOS: Go ahead.

A. Okay. The only words he said was, Okay.

And I -- I got very few words. But of the few words, I would say Hispanic, yes.

MS. LOBEL: Okay. All right. I know this is electronic, but I will e-mail it to you, Court Reporter, when we're done here.

And, Paige, if you could Zoom into this so the ladies and gentlemen of the jury can see this.

**Q. (By Ms. Lobel) And you can see -- I'm going to show you a photograph of a gentleman. I'm going to show it to you first, and then I'm going to hold it up, okay?**

A. That's him.

**Q. Okay. All right. Now --**

A. That's the gentleman I saw.

**Q. Hang on. I'm showing you what is going to be marked as Plaintiff's Exhibit 1 to this deposition.**

A. Okay.

Q. This is a photograph of a gentleman. Can we agree on that?
A. Yes, it is.
Q. Okay. Is this a fair and accurate photograph of the gentleman who you saw at the computer station who you asked, Where's a doctor? And he said, Okay?
A. Yes.
MS. LOBEL: Okay. All right. Paige, you got that?
(Plaintiff's Exhibit 1 was marked for identification.)
Q. (By Ms. Lobel) All right. So is it your testimony that the gentleman in Plaintiff's Exhibit 1 was the gentleman who was in the blue scrubs who told you, Doctor -- you know, Okay, the doctor will be in the room shortly?
A. Someone will be there shortly, yes.
Q. Okay. Now, you testified that you spoke to the gentleman at the stool twice, correct?
A. That is correct.
Q. Is this gentleman in Plaintiff's Exhibit 1 the same gentleman that you spoke to on the second time?

A. That is correct.
Q. Okay. At any point in time, did you see the gentleman in Plaintiff's Exhibit 1 go to Richard's room?
A. I did not.
Q. Did this gentleman at any point of time, to your knowledge, ever come to speak to Darren that you saw?
MR. DRAHOS: Object to the form.
A. I did not.
Q. (By Ms. Lobel) Did you ever speak to this gentleman other than the two times you went to his station?
A. I did not.
Q. Did you ever -- did you ever see Suzie speak to this gentleman?
A. I did not.
Q. Did you ever see Ilene speak to this gentleman?
A. I did not.
Q. Did you ever see him speak with Joe?
A. I did not.
Q. Okay. And, of course, did you ever see him speak with Richard?
MR. DRAHOS: Object to the form.

A. I did not.
Q. (By Ms. Lobel) Did you see the lady, who you believe to be the nurse when you came down, speak to this gentleman?
A. I did not.
MS. LOBEL: Okay. All right. Thank you, Paige.
Q. (By Ms. Lobel) And is the gentleman that was in Plaintiff's Exhibit 1 -- is that the tall officer?
A. No.
Q. Okay. Just so we're clear.
A. All right.
Q. So the gentleman who was the tall officer who you later speak to, tells you we've got an ambulance coming later on in the time line -- that's not this gentleman, correct?
A. No.
Q. All right. Okay. Did you see Darren when he returned down to the medical center with his insurance card?
A. With the card?
Q. Yeah.
A. I didn't see him with the card, no.
Q. Did you see Richard's exchange with

anyone from the medical center regarding the insurance card when he got down to the infirmary?
A. No, I did not.
Q. All right. Fair enough. Did, at some point, Darren go to his cabin again to get his passport?
A. Yes. After he brought the medical card down.
Q. How did you know that Darren went up for a second time to go get his passport?
A. He came into the room, said, Now they need my passports. Frustrated, he ran -- he left.
Q. Okay. Now, I believe on direct examination, you testified that around an hour later, about 10:30 a.m. ship time, you went to go to the gentleman in the blue scrubs to ask for the doctor a second time. Is that accurate --
A. Yes. That would be an hour later, yes.
Q. Okay.
A. Correct.
Q. And my understanding is you went to go find the doctor, because it had been about an hour and now Richard is slurring his words more?

A. That is correct, yes.
**Q. All right. Okay.**
A. Not more. I never said from the beginning.
**Q. Oh, I'm sorry.**
A. He had started slurring his words.
**Q. Okay. To your recollection, he starts slurring his words --**
A. Yes.
**Q. -- that you heard?**
A. Yes.
**Q. Okay. Now, when you go out and come back, do you learn about Suzie and Ilene speaking with somebody about packing up Darren's room?**
A. Yes.
MR. DRAHOS: Object to the form.
**Q. (By Ms. Lobel) All right. Did Darren tell you that he was told he needed to pack up his room?**
A. No.
**Q. Okay. So you learned that from Suzie and Ilene?**
MR. DRAHOS: Object to the form.
A. Correct.
**Q. (By Ms. Lobel) All right. Did Suzie**

**and Ilene speak with somebody from the ship about having to pack up --**

MR. DRAHOS: Object to the --

**Q. (By Ms. Lobel) -- strike --**

MR. DRAHOS: Sorry.

MS. LOBEL: Hang on.

**Q. (By Ms. Lobel) Did -- did Suzie and Ilene speak with somebody from the ship regarding Darren's need to pack up the cabin?**

MR. DRAHOS: Object to the form.

A. Yes.

**Q. (By Ms. Lobel) Who was that?**

A. I'm not sure.

**Q. Okay.**

A. I think it was the tall gentleman. But they offered to go pack for him. And we offered to take the bags, and we offered to get them back to their home.

And they said, No. Darren has to do it.

**Q. Okay.**

A. That's what Ilene told me.

**Q. All right. Did Suzie and Ilene's conversation about packing the room with somebody from the ship happen while you were trying to get**

the gentleman in the blue scrubs to get the doctor?
A. Yes.
Q. Okay. So is it your understanding when -- when you get back to the room after speaking to the gentleman in the blue scrubs in Plaintiff's Exhibit 1 and Suzie and Ilene join you back in Richard's room --
A. Yes.
Q. -- that Darren had gone back up to the cabin?
A. Yes.
Q. All right. And then I believe you said at around -- let me look at my notes -- at 11:00 that someone asks you where the passports are?
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) Is that correct?
A. Yes.
Q. Okay. Who asked you to go find -- who asked you about where the passports where Richard and -- strike that.
Who asked you about where Darren and Richard's passports were located?
A. I believe it was Joe.

**Q. Okay. And you offered to go up to the cabin to get the passports from Darren?**
A. After I called Darren --
**Q. Okay.**
A. -- and found out he had the passports, I offered to go get them.
**Q. Okay. Did you call Darren's cell phone, or is it possible you called Darren on the landline?**
MR. DRAHOS: Object to the form.
A. I -- I think I called -- I can't remember. I think it could have been the landline, and it could have been Suzie's phone. It'd been one or the other.
**Q. (By Ms. Lobel) Okay.**
A. But I called him -- you know what? Now that I think about it, I don't think he answered. And so I called the landline, and he answered the landline.
**Q. Okay. So however you made the phone call --**
A. I made a phone call to Richard.
**Q. Hang on. Hang on.**
A. I'm sorry.
**Q. No, that is okay. However it**

happened, whether it be a cell phone or the ship landline, you know you spoke with Richard on some form of a -- sorry -- you spoke with Darren on some form of a telephone to ask him if he had the passports?
A. Correct.
Q. All right. And then you decided to be the one to go upstairs to go get the passports?
A. Correct.
Q. All right. And then when you're on your way to go get the passports, that's when you see -- when you personally see the tall 6'4", 6'5" gentleman from the ship?
A. Correct.
Q. All right. And it was apparent to you that that gentleman was a Royal Caribbean crew member, correct?
A. Absolutely.
MR. DRAHOS: Object to the form.
A. Yes.
Q. (By Ms. Lobel) Okay.
THE WITNESS: Oh. Sorry.
Q. (By Ms. Lobel) He was wearing the -- the officer was wearing a uniform that you'd seen on other officers from past cruises?

A. And on that cruise, yes.
Q. Okay. All right. Fair enough. And this was the point in time when -- at around or shortly after 11:00 a.m., that -- hang on. Strike that.
A. Okay.
Q. Understood. So -- okay. At approximately 11:00-thereabouts a.m., you and the officer go up to Darren's room?
A. That is correct.
Q. All right. You get the passports from Darren, you give it to the officer, and then you start making your way back down to the cabin, correct?
A. The officer takes the --
Q. Sorry. Let me strike that. I -- I said the wrong thing.
A. Okay.
Q. Forgive me.
A. Okay.
Q. You go up to -- up to Darren's cabin with the officer?
A. Correct.
Q. You get to the cabin, and you make contact with Richard?

A. Darren.
Q. Darren. Forgive me. Strike that.
You get -- I keep doing that.
You get to Darren and Richard's cabin, and you -- you speak with Darren?
A. Correct.
Q. Darren's packing in the room?
A. Correct.
Q. Darren's panicking at this point?
A. Very frustrated, yes.
Q. Okay. His -- he's packing up their entire suite?
A. The room is a mess, yes.
Q. Okay. You ask Darren for the passports?
A. Yes.
Q. He gives you --
A. No. He hands them to me. I don't have to ask for them. He meets me at the door with them.
Q. Okay. Because Darren already is anticipating you --
A. I already called him, yeah.
Q. Is that correct?
A. Yes.

**Q. Okay. Sorry. No, it's okay. All right. So then you give the passports to the tall officer?**

A. He asks for them, and I give them to him.

**Q. Got it. You start making your way back down to the infirmary?**

A. Correct.

**Q. You get lost on your way back to the infirmary?**

A. Correct.

**Q. Okay. You make your way down to the infirmary about -- my note says about 30 minutes?**

A. 20 to 30 --

**Q. 20 to 30 minutes?**

A. Yes. Yes.

**Q. All right.**

MR. DRAHOS: Object to the form.

**Q. (By Ms. Lobel) So that puts you back down at the room somewhere between 11:30, 11:40?**

MR. DRAHOS: Form.

A. I would say 11:30 to 11:20. Yeah, 11:20 to 11:30.

**Q. (By Ms. Lobel) Okay.**

A. Yes. I'd say something like that.

Q. You --
A. And I went -- yes.
Q. Well, you went up at 11:00?
A. Uh-huh.
Q. And then you said it -- it would take you some time to get upstairs?
A. Sure.
Q. Did it take very long by the time you get to Darren and Richard's cabin to reach Darren to get the passports, or was that --
A. Oh, no. That was instant. He -- as soon as I knocked on the door, he was there.
Q. Got it. All right. And then you make your way back down?
A. Correct.
Q. All right. When you get back down, you go directly into Richard's room?
MR. DRAHOS: Object to the form.
A. Yes.
Q. (By Ms. Lobel) Okay. And when you arrive, Suzie, Ilene, and Joe are with Richard?
A. Yes.
Q. All right. They're still down in the infirmary?
A. Yes.

Q. Okay. Got it. And then is this when you ask the group whether or not the doctor's come?
A. Yes.
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) All right. And then this is when you were going to make your third attempt to find the doctor?
MR. DRAHOS: Object to the form.
A. Yes.
Q. (By Ms. Lobel) Okay. And is this when you run into the tall gentleman?
A. Yes.
Q. So now it's after 11:30, correct?
A. Yes.
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) And the tall Royal Caribbean officer tells you that he is the one in charge of getting Richard off the ship, correct?
MR. DRAHOS: Object to the form.
A. Correct.
Q. (By Ms. Lobel) And he said, I'm responsible for getting Richard off the ship until I pass him to shoreside. And then Jennifer will take over?

MR. DRAHOS: Object to the form.
A. Yes.
**Q. (By Ms. Lobel) Okay. So based off of your conversation with the Royal Caribbean officer, it was the officer, not Jennifer, who was in charge of what was going on?**
MR. DRAHOS: Object to the form.
A. Yes. He made that very clear.
**Q. (By Ms. Lobel) Okay. All right. Was it at this point in time that he told you that Royal Caribbean had ordered an ambulance for Richard to get him off the ship?**
MR. DRAHOS: Object to the form.
A. He said, I have ordered an ambulance.
**Q. (By Ms. Lobel) Okay. All right. So then after you have this conversation with the officer, does the officer stay with you --**
A. Yes.
**Q. -- or does he leave?**
A. Oh, sorry. Yes, he stays with us.
**Q. Okay.**
A. Because I was going to get the doctor. And he stayed with me and -- and told me the ambulance was about to be here. So I didn't see any need to get the doctor.

Q. Okay. And does -- sorry. Strike that.
Does Darren come down before or after the conversation with the officer when he told you that I've ordered the ambulance, they're on their way?
A. After.
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) Okay. Does Darren come down with the bags?
A. He had -- he was already there with the bags. He had already come with the bags.
Q. When does he come with the bags: before your conversation with the officer about the ambulance coming or after?
A. Yes. And then he is -- the officer tells him he has to go up to the purser's desk and take care of his bill.
Q. Okay. All right. Is that the conversation about Darren needing to go up to the front desk to settle his bill before or after you -- the officer tells you, I'm the one in charge, I've ordered the ambulance?
MR. DRAHOS: Object to the form.
A. Was it before or after? Before or --

it was before.
Wait. Say -- all right, say the question again. I'm sorry.
**Q. (By Ms. Lobel) That's fine. Not a problem. I'm just curious if the officer, the tall officer from Royal Caribbean, sent -- told Darren to go settle his bill before or after he told you I've ordered the ambulance.**
A. Darren had already gone up to -- to do his bill. I wasn't there when he -- Joe was with him when they told him he had to go up to the front desk.
**Q. Okay.**
A. Out -- that was done out in the waiting area.
I was in the room -- Richard's room. Joe was out there when -- when the officer -- when they told him he had to go up and take care of his bill.
**Q. Okay.**
A. And then Joe comes in and tells us, Darren had to go up and do that. And then I'm going out to find the doctor.
And that's when I run into the tall gentleman, and he says, The ambulance has been

ordered.

**Q. Okay.**

A. It's on the way. He said, It's on the way.

**Q. Okay. Okay. And now what time is it that the -- the tall officer from Royal Caribbean tells you that the ambulance is on its way?**

A. Oh, me. Let's see. I went and talked to them at 10:30. I came back. I went up -- I came back -- 11:30. This -- all right, so it's about 11:30.

I'm going to say that's around 11:40, 11:45.

**Q. Okay.**

A. Yeah.

**Q. And -- and the ambulance -- do they come -- oh, strike that.**

**When does the ambulance come in relationship to your conversation with the tall officer: the ambulance is on the way?**

MR. DRAHOS: Object to the form.

A. I was waiting on him.

Very shortly after five minutes. They -- ten minutes. They -- they came up. They -- they were there right before 12:00.

**Q. (By Ms. Lobel) Okay. And at the time that you see that the -- the ambulance people come -- come onto the ship where you are right before 12:00, are you in Richard's room?**
A. Yes.
**Q. Okay.**
A. I'm by the door. I'm standing by the door.
**Q. Okay. Now, the paramedics that come onto the ship --**
A. Uh-huh.
**Q. -- was it 1 person? Was it 12 people? How --**
A. 1.
**Q. -- many people?**
A. 1. I only -- I only remember the one.
You know what? There might have been a -- a young man also. I -- I only remember the lady.
Now, it's very crowded.
**Q. Okay.**
A. When you put that gurney in that hall, it takes up the whole hall.
**Q. Okay.**
A. And -- and she rolled it into the --

from the waiting room to the hallway door where Richard's room is. And she's standing back here, because they had to pull it out for her to get around.

And -- and the tall officer is back here, too. And there may have been a third person over here. As a matter of fact, there was. There was a man, a -- a very young-looking man, I believe.

**Q. Okay.**

A. But I -- I really remember the lady. She was the one that did all the work and all the communicating.

**Q. Okay. And the -- is this lady -- female paramedic that you're talking about -- is that the one the officer, the Royal Caribbean officer, said, Oh, she's a really good one?**

A. He -- he looked at me, and he said, You're lucky. She's very good. He's in good hands.

**Q. Okay. So based off of that conversation, did it seem to you that this officer had dealt with this paramedic before?**

MR. DRAHOS: Object to the form.

A. Yes.

**Q. (By Ms. Lobel) He recognized her?**
A. He did.
**Q. Okay. And is it at this time, when they get the gurney set up in the hallway and the paramedics are on the ship, that Richard indicated that he wanted to get up and use the restroom?**
A. He wanted to get up.
**Q. Okay.**
A. He turned to get up; he couldn't. He sat back -- he wanted to see if he could stand up.
**Q. Okay.**
A. He couldn't.
And I said, Well, the -- the paramedics are here to take you off the ship.
He said, I need to go to the restroom before I get in the ambulance.
**Q. Okay.**
A. So that's when we went and got a wheelchair. A wheelchair was brought to me, I believe, by the tall officer.
**Q. Okay.**
A. And I took Richard to the restroom, because he didn't want to be stuck in the

ambulance and not be able to go to the bathroom.

**Q. Understood. Okay. And then Richard uses the restroom, and then he's put on the gurney?**

A. And then I wheel him back, wheel him back.

**Q. Okay.**

A. And they pull the gurney back a little bit. And between me, the tall officer, and the lady paramedic, we get Richard on the gurney.

**Q. Okay. And then I believe you said -- my note is 12- -- 12:15 --**

A. That would sound about right.

**Q. -- they leave?**

A. Yeah. Yeah. And then Darren comes up just completely out of breath and exasperated. And they have -- they get his luggage. They get the -- I think they had four pieces of luggage.

**Q. Okay.**

A. And they get the luggage and proceed off the ship: the tall gentleman, the paramedic people, and Darren and the luggage and might have been somebody helping with the luggage.

And Darren turns and said, I'm sorry, guys. You all have a great cruise.

**Q. Okay. And that's approximately 12:15?**
A. I would say yes.
**Q. Okay.**
A. It was after 12:00, yeah.
**Q. Okay. All right. Now, you recall on direct examination there was a lot of questions about how much alcohol you and various people drank?**
A. Well, yes.
**Q. Okay. All right.**
A. Yes, I do.
**Q. On February 21st --**
A. Uh-huh.
**Q. -- the day of this incident --**
A. Yes.
**Q. -- were you drunk?**
A. I had not had a drink.
**Q. Were you hungover?**
A. I was not.
**Q. Okay.**
A. I'm a good drunk.
**Q. Are you somebody who can consume a lot of alcohol without having severe side effects?**
A. Practiced all my life, yes, ma'am.
**Q. Okay. All right. Do you have a**

**drinking problem?**
A. People might say I do, but I don't.
**Q. All right. All right.**
A. I mean -- I'm sorry I'm being silly. It's not silly. I -- I still drink a lot of beer on weekends --
**Q. Okay.**
A. -- yes, yes.
**Q. Okay. Now, there has been testimony about having, you know, in excess of 10 drinks, for example, on given days. Do you finish every single drink that you have when you have a drink package?**
A. I'm not --
MR. DRAHOS: Object to the form.
A. -- going to lie. I drink every one of them down to the --
**Q. (By Ms. Lobel) Okay.**
A. Ilene doesn't, but I do.
**Q. Okay. All right. All right.**
A. Unless I don't like it --
**Q. Okay.**
A. -- but --
**Q. Okay. Now, is it the family's practice sometimes to get -- order two drinks and**

it's one for me, one for you?
A. Sure.
Q. Okay. So --
A. As a matter of fact, that's a lot of what we do during the day.
Q. Okay. All right.
A. And we eat three meals, too, to keep from being crazy.
Q. Do you drink water as well?
A. Oh, yes. Lots of water.
Q. Okay. Do you recall being asked a question about whether you knew what it takes to get somebody off a ship to medical care? Do you recall that?
A. Yes.
Q. All right. The Harmony of the Seas was at the Port of San Juan, correct?
A. Yes.
Q. It was not off somewhere in the middle of the ocean, correct?
A. We had already docked. We was in port.
Q. Okay. And this port is when the ship is right next to the land, not anchored, and you have to take the --

A. No. It was --
**Q. -- boat?**
A. -- attached to the land, correct.
**Q. All right. Okay. And you travel a lot, correct?**
A. I have all the cards, yes, ma'am.
**Q. Okay. Would you agree with me that San Juan is a major metropolitan city?**
MR. DRAHOS: Object to the form.
A. Yes. Yes. I've done business in San Juan.
**Q. (By Ms. Lobel) Okay. And San Juan is part of the United States?**
A. That is correct.
**Q. All right. And you've been a volunteer firefighter?**
A. Yes.
**Q. Okay. And you have dealt with situations being in a remote area, needing medical care for somebody whose even suffered a stroke?**
A. Yes.
MR. DRAHOS: Object to the form.
**Q. (By Ms. Lobel) Okay. Now, would you agree with me that it's unreasonable for it to**

take three hours to get somebody onto an ambulance to transfer to a hospital in a major United States metropolitan city?
MR. DRAHOS: Object to the form.
A. I would say that is highly unusual.
Q. (By Ms. Lobel) Okay. Do you recall being shown -- I believe it was Defendant's Exhibit 3, which were some medical records?
A. Yes.
Q. Okay. All right. Now, you were asked to --
A. Do we still have it?
Q. Yeah. You've got it.
A. I still got it. Okay.
Q. All right. So I want to turn your attention to page -- you were --
THE WITNESS: Sorry.
Q. (By Ms. Lobel) No. Strike that.
Do you recall being asked to turn to page 2 of 5 of the medical records, which were Defendant's Exhibit 3?
A. I do.
Q. And it's -- there's a section that says Physician's Orders, correct?
A. Yes.

Q. And there's a time stamp --
A. Yes.
Q. -- for these medical records, correct?
A. Yes.
Q. And that time stamp, when it says Pending neurological referral, February 21st, 2019, 9:55 -- do you see that?
A. I do.
Q. All right. So assuming this record is correct, would you agree with me that the ship seemed to know that Richard had a medical emergency or the doctor seemed to know there was a medical emergency by 9:55?
A. Yes.
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) Okay. And based off of what you've been told by conversations with your family, is it your understanding that Joe asked for emergent medical assistance when he went up to assist Richard?
MR. DRAHOS: Object to the form.
A. Joe actually told them, I think my friend's having a stroke.
Q. (By Ms. Lobel) And when you say told them, that would be Royal Caribbean?

MR. DRAHOS: Object to the form.
A. Yes. Royal Caribbean to order help.
**Q. (By Ms. Lobel) Okay. And based off of your understanding, did help come to assist Joe with Richard up on Deck 17?**
MR. DRAHOS: Object to the form.
A. Yes.
**Q. (By Ms. Lobel) Okay.**
A. Wait. Say that again. Did who come?
**Q. (By Ms. Lobel) Did help from the ship come to assist Joe with getting Richard to the medical center?**
A. They did.
MR. DRAHOS: Object to the form.
**Q. (By Ms. Lobel) So Royal Caribbean knew, even before this particular note, that they had a patient on their ship --**
A. Uh-huh.
**Q. -- who is suspected to have a stroke?**
MR. DRAHOS: Object to the form.
A. Yes.
**Q. (By Ms. Lobel) Okay. I also want to turn your attention to the first page of Defendant's Exhibit 3, okay?**
A. Okay.

Q. All right. Have you seen this document before, by the way?
A. Not until just a moment ago.
Q. Okay. All right. And when I refer to this document, you've never seen Richard's medical records ever before today, correct?
A. No. No.
Q. I never showed them to you?
A. No, no.
Q. All right. I never told you what was in them before, did I?
A. No.
Q. All right. Okay. Do you see that there's a section at the top where it says Triage?
A. Yes.
Q. All right. And there is a note inputted on February 21st at 9:25. And it says, Performed Mary Bremner, RN. Do you see that?
A. I do.
Q. Okay. And it says -- there is a section that has Priority. Do you see that?
A. Yes.
Q. And it says URGENT, correct?
A. It -- yes, it does.

Q. So at 9:25, a nurse inputted a note
putting Richard's case as being urgent, correct?
MR. DRAHOS: Object to the form.
A. Yes, that is correct.
Q. (By Ms. Lobel) All right. And do you
see the section where it says, CHIEF COMPLAINTS?
A. Chief complaints -- yes.
Q. All right. And it says, Patient
attends clinic for 9-1-1 call to Suite Lounge
Deck 17: ? cva: inability to move finger of right
hand; unstable gait.
Did I read that correctly?
A. You did, yes.
Q. Okay. So based off of your training
as a volunteer chief firefighter --
A. Yes.
Q. -- do you understand that to mean that
Royal Caribbean knew, certainly by the time this
note was inputted at 9:25, that Richard was
having a 9-1-1 situation with a suspected stroke?
MR. DRAHOS: Object to the form.
A. From my training --
Q. (By Ms. Lobel) Uh-huh.
A. -- when they say they can't move their
fingers of their right hand and they're -- and

they have an unstable gait, my first suspicion would be they're having a stroke.

**Q. Okay. And is it your understanding that a stroke is a time-sensitive medical emergency or could be?**

MR. DRAHOS: Object to the form.

A. Yes. They -- yes, very time --

**Q. (By Ms. Lobel) Okay.**

A. Very time-sensitive.

**Q. Okay. Is that why you were frustrated that a doctor hadn't come to the room?**

A. Absolutely.

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sorry, yeah, on that.

**Q. (By Ms. Lobel) All right. Now, would you agree with me that the first person that you saw when you got to the medical center around 9:30 a.m. appeared to be a female nurse?**

A. Yes.

**Q. Is that consistent or inconsistent with this medical note that there was a female nurse who first made contact with Richard?**

MR. DRAHOS: Object to the form.

A. Yes. I would say this is the person I

saw.

Q. (By Ms. Lobel) Okay. Now, you didn't see this medical record get typed, correct?

A. No, I did not.

Q. Okay. Would it be unreasonable to believe that the nurse may have told the doctor what she physically observed of Richard and then he typed up the note?

MR. DRAHOS: Object to the form.

A. I -- I would say that could have happened, because I never saw him in there.

Q. (By Ms. Lobel) Okay. Did you recall the defense attorney asking -- the defense attorney for Royal Caribbean asking you whether it's your accusation that the -- the doctor's perjuring himself? Do you recall that?

A. I do.

Q. It's conceivable he got information from the triage nurse?

MR. DRAHOS: Object to the form.

A. It is conceivable, yes.

Q. (By Ms. Lobel) Okay. All right. But what we do know from Defendant's own -- Royal Caribbean's own record is that they knew Richard was suffering from a medical emergency?

A. Yes.
MR. DRAHOS: Object to the form.
A. Yes. It says URGENT.
**Q. (By Ms. Lobel) Okay. And they knew that at least by 9:25?**
MR. DRAHOS: Object to the form.
A. Yes.
**Q. (By Ms. Lobel) If not earlier?**
MR. DRAHOS: Form.
A. Yes.
**Q. (By Ms. Lobel) Okay. But Richard did not get transferred to an ambulance and taken off the ship until sometime after 12:00 p.m.?**
A. That is correct.
**Q. All right. Do you recall being asked some questions about communications that you've had with Richard since the incident?**
A. Yes.
**Q. Okay. And you've had an opportunity to see Richard, at least via telephone or video, since the incident?**
A. Yes.
**Q. Okay. And you've seen Richard numerous times before the incident?**
A. Oh, yes.

**Q. How has Richard changed since the incident?**

MR. DRAHOS: Object to the form.

A. Night and day. Richard was vibrant, enjoyed life, was fun to be around. Loved -- loved his family. He -- he loved my family.

I mean, it was just every time he came down to see us -- my daughter lives in Georgia. My son lives in Georgia. I have a son -- if Richard and Darren are in town, they all came. And we all had a big time.

Now, bless his heart, he can't stand and he can't talk. You know, we can -- he can communicate, but it's so difficult. And it's so sad to see.

He's just now learning, I understand, to feed himself by himself again but only certain things. And they all have to be prepared specially. He can't eat meat or anything like that.

And he tries so hard. He -- he tries to be independent. Richard needs his independence. And it's just sad. It's just sad. He -- he can't live without Darren. I mean, Darren is -- you know, he and Darren are one

person now.
**Q. (By Ms. Lobel) You said just a moment ago that Richard needs his independence. Why do you say that?**
A. He's always been independent.
And I didn't know Richard -- I didn't know him in his younger days. But Richard's father had nothing -- you know, basically didn't have anything to do with him.
I know Richard's brother Larry. He's a pig and never has been a good brother to him. As a matter -- he lives down there with you all, by the way: down in Miami. And he's just not a nice person. Been through -- he's just not a nice person.
**Q. Okay.**
A. And Richard has been on -- basically from my understanding, has been on his own since he was 16 years old.
**Q. What do you mean he's been on his own since he was 16?**
A. Now, his mother --
MR. DRAHOS: Object to the form.
**Q. (By Ms. Lobel) Go ahead.**
A. His mother was a sweet lady. She --

she's a -- a Baltimore, Maryland, hard-nosed woman. She -- she was really something. And they had a -- they maintain always a -- a good relationship until the day she died.

And -- but I think Richard moved out. I -- I think shortly after 16, he went out on his own and lived and took care of himself. He didn't need anybody to take care of him. Ilene can tell you more about that, but I know he left home at a very early age.

**Q. Okay.**
A. And has always taken care of himself.
**Q. Okay.**
A. And -- and even if you said, Hey, let me do that, he's -- I can take care of it. You know, just, like, even, like, opening the -- Don't do that. I can do that. Just he had to do everything himself.
**Q. Okay. And did Richard work for himself before --**
A. Yes.
**Q. -- this incident?**
A. Yes. Yes.
**Q. And you --**
A. He had his own --

**Q. -- were aware of that?**
A. Oh, yeah.
**Q. Okay.**
A. He had his own -- he did hair in the -- behind his house in a -- in a separate building behind. They -- they made a -- a shop, a beauty shop, a -- a hairdresser shop for him back there, yeah.
**Q. Did he run his business by himself?**
MR. DRAHOS: Object to the form.
A. Yes, I don't think he had anybody in there, correct.
**Q. (By Ms. Lobel) Okay. All right. Do you know if Richard's business was something that was important to him?**
A. That -- yeah. I know this is a cliché, but it was his whole life.
Even when he would come visit us, he would talk about his shop and his customers and his clientele and how long they had been doing this. And they were -- his clientele -- they were his friends. You know, it was just -- and they just all -- one big, happy family.
**Q. Okay. As a result of this incident, do you know whether or not Richard is still**

operating his -- his hair business?
A. I know he is not.
Q. Okay. Do you know whether or not -- well, strike that.
Before this incident, was Darren employed?
A. Darren? Yes.
Q. What was --
A. Long time.
I'm sorry. Go ahead.
Q. It's okay. What was Darren doing?
A. Long-time and maybe lifelong employee at UPS.
Q. Okay. And is Darren still employed?
A. No. He had to quit.
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) Why?
A. Take care of --
MR. DRAHOS: Object to the form.
Q. (By Ms. Lobel) Why --
A. Take -- take care of --
Q. I'll ask it again, and --
A. Okay.
Q. -- then pause, okay?
A. Okay.

**Q. You just told me that Darren had to quit his employment at UPS. Do you know why Darren quit his job at UPS?**

MR. DRAHOS: Object to the form.

A. He had to take care of Richard, because they couldn't find a nurse that worked for them.

**Q. (By Ms. Lobel) Okay. Has Darren been taking care of Richard full-time since this incident occurred?**

MR. DRAHOS: Object to the form.

A. Since the incident? No. He continued to work shortly after, and they tried to find nurses.

But then -- then Darren just said, I -- I need to stay home. I -- I think something happened. Something happened at Darren's job. I don't know, but Darren said, I'm not going to do another job or do -- anyway, Darren quit.

He said, I'm just going to stay home and take care of Richard.

**Q. (By Ms. Lobel) Did Darren quit because something happened at his job or because somebody needed to take care of Richard?**

A. Because --

MR. DRAHOS: Object to the form.
A. -- somebody needed to take Richard was the primary reason --
**Q. (By Ms. Lobel) Okay.**
A. -- yes.
**Q. All right. All right. Has Darren been taking -- since Darren quit his job, has Darren been taking care of Richard full-time?**
MR. DRAHOS: Object to the form.
A. Yes.
**Q. (By Ms. Lobel) Does Richard need full-time care, to the best of your knowledge?**
MR. DRAHOS: Object to the form.
A. Yes.
**Q. (By Ms. Lobel) Can Darren -- sorry.**
**Can Richard, for example, go to the bathroom by himself: like get up from a chair, go to the bathroom, and come back?**
MR. DRAHOS: Object to the form.
A. No.
**Q. (By Ms. Lobel) Can Richard prepare a meal for himself?**
MR. DRAHOS: Object to the form.
A. No.
**Q. (By Ms. Lobel) Can Richard dress**

himself?
MR. DRAHOS: Object to the form.
A. No.
Q. (By Ms. Lobel) Can Richard get in and out of bed by himself?
MR. DRAHOS: Object to the form.
A. No.
Q. (By Ms. Lobel) Can Richard shower by himself?
MR. DRAHOS: Object to the form.
A. No.
Q. (By Ms. Lobel) Can Richard drive a car?
MR. DRAHOS: Object to the form.
A. No.
Q. (By Ms. Lobel) Okay. Is it your understanding that Richard needs full-time care for the rest of his life?
MR. DRAHOS: Object to the form.
A. Yes, that's my understanding.
Q. (By Ms. Lobel) Okay. When you have spoken to Richard since this incident, is his cognition, meaning the way he thinks when he speaks with you, seem the same as before the incident or after?

A. No. He has to really think about what he's saying.

**Q. Okay.**

A. He can't just talk -- he'll have to stop and think and then try to convey his thoughts.

**Q. Okay. Based off of the conversations that you've had with Richard since this incident, does his memory seem to be the same or different?**

A. No. It's not this same.

**Q. What's changed?**

A. He can't remember -- he can't remember some things. He really has to think.

Like -- like, he -- he couldn't remember Darren's sisters one time. Darren was telling -- he had to tell him who they were, and he's always known them.

But he knows me and Ilene. He's -- just always so sweet to us. And he knows my kids' names, every one of them.

But he -- he has to really think. He has to really think.

And I miss the old Richard. I miss him. Yeah.

**Q. What do you think Richard has lost as**

**a result of this incident?**
MR. DRAHOS: Object to the form.
A. Independence. Ability to be around the people he wants to be around. We miss our September visits.
Richard's a nice person. I know he's in there somewhere, but it's not the same person.
**Q. (By Ms. Lobel) Thank you, Mr. Landrum.**
A. Okay.
**Q. That's all I've got.**
A. Okay.

EXAMINATION

BY MR. DRAHOS:
**Q. So, Mr. Landrum, really quick.**
A. Yeah.
**Q. I have two quick questions in response to my colleague's questioning of you. And I know you've been here --**
A. That's okay.
**Q. -- all day, so --**
A. That's all right. That's all right.
**Q. -- I'll cut right to the chase.**
**The picture that you saw that was shown of you on the --**
A. Yeah.

Q. -- computer screen there --
A. Yeah.
Q. -- had you ever seen that before today?
A. No.
Q. Okay. And the second question was did you know what Darren's cabin -- the telephone number was to Darren's cabin on February 21st?
A. I can't tell you the exact number, no. But we were on the same floor. We were all -- my group, the -- the non-suite group --
Q. Right.
A. -- we had about six rooms together.
Q. Okay.
A. I think -- looking at that picture, I think there was probably 12 of us in this. And we always got it so we can open our balconies together.
Q. Right.
A. And then they were down the hall on the left. They were down on the hall on the left right when the suites start. So I don't know. That would be maybe -- maybe 20 rooms maybe down.
Q. Yeah. I was told yesterday it was about 50 rooms apart --

A. I don't think it's 50. I don't think it's 50.
**Q. Okay. But did you know the number to his cabin?**
A. While I was on the ship?
**Q. Yeah.**
A. Sure.
**Q. Did you know the number to call --**
A. Yes.
**Q. -- if you wanted to dial it?**
A. Yes.
**Q. And what was the number?**
A. Oh, I -- I've been on four cruises since. I don't think I can tell you that.
**Q. Okay.**
A. I -- I knew it when I was on the ship. I don't -- I can't even tell you what cabin I was -- I can't tell you what -- what my room number was. But I can tell you where the cabin was.
**Q. Okay. So what number would you dial to call Darren's cabin?**
A. All right. You did a -- a digit in front of the 8 and then the cabin number.
**Q. Okay. A digit in front of the 8 -- what digit?**

A. 0, 2 -- I don't remember. I'm sorry.
**Q. All right.**
A. I don't remember.
MR. DRAHOS: So you have the right to read the transcript to make sure that everything was taken down accurately by the court reporter.
THE WITNESS: Okay.
MR. DRAHOS: Or you can waive that right. If you decide that you want to read the transcript, you got to coordinate that with the court reporter directly. The lawyers don't have anything to do with it.
THE WITNESS: Okay.
MR. DRAHOS: So it's up to you. You got to let him know, though, now.
THE WITNESS: Oh, I -- I don't need to read it.
MR. DRAHOS: All right. He waives.
THE WITNESS: Okay.
MR. DRAHOS: Thank you, sir. I appreciate all your time today.
THE WITNESS: You're very welcome.
MS. LOBEL: Thank you.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: This ends the

deposition of Jimmie Landrum. The time is now 2:14 p.m.

THE REPORTER: Ms. Lobel, would you like a copy of the transcript? How would you like it: electronic, or --

MS. LOBEL: Electronic. Full mini index, attachments, and I'll e-mail you that --

THE REPORTER: Sure. That's fine.

Mr. Drahos, would you like a copy?

MR. DRAHOS: I'm going to order it, yeah.

THE REPORTER: Yeah. Electronic or paper?

MR. DRAHOS: Electronic, for sure.

(Deposition ended at 2:14 p.m.)

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

______________________________

Jason Kobielus, Commissioner
ACCR #668 - Expires September 30, 2022
RPR #990854 - Expires December 31, 2022