EXHIBIT Q

Weill Cornell Medical College

NewYork-Presbyterian Hospital
Weill Cornell Medical Center

**Alexander E. Merkler, MD, MS**
Assistant Professor of Neurology

Phone: 212-746-0382
Email: alm9097@med.cornell.edu

Department of Neurology
Weill Cornell Medicine
525 East 68th Street, F610
New York, NY 10065

Michael J. Drahos, Esq.
Gray Robinson
515 North Flagler Drive
Suite 1425
West Palm Beach, FL 33401

Re: Richard Burgess

Dear Mr. Drahos:

I am a board certified neurologist and I am certified in the subspecialty of neurocritical care by the United Council for Neurological Subspecialties. I graduated from Brown University and then received my MD from NYU School of Medicine. I completed a neurology residency at New York Presbyterian Hospital/Weill Cornell Medical College where I served as Chief Resident. I then completed a Neurocritical Care Fellowship at Cornell/Columbia University and received a Master's Degree in Clinical and Translational Investigation from Cornell University. I currently serve as an attending neurologist at New York Presbyterian Hospital/Weill Cornell Medical College, where I routinely take care of patients with stroke. I am also an Assistant Professor of Neurology and Neuroscience at Weill Cornell Medical College and the Brain and Mind Research Institute. I have authored more than 100 publications in peer reviewed medical journals on stroke. I also serve as a peer reviewer for several medical journals including *JAMA, Neurology, Stroke, Journal of the American College of Cardiology, Circulation, Neurocritical Care* and *Hypertension.* I have given multiple invited lectures on stroke at the International Stroke Conference, the American Academy of Neurology, and at other courses around the world. Finally, I routinely give lectures to residents, medical students, and nurses at Weill Cornell Medical College on the management and treatment of stroke. Please see my CV for additional details.

I have reviewed the following materials regarding Richard Burgess

1. Second Amended Complaint
2. Medical records from Harmony of the Seas
3. Run report from Sunny Ambulance
4. Medical records form Express Air Medical Transport
5. Medical records from HIMA San Pablo Caguas
6. Medical records from Giant Pharmacy
7. Medical records from Magee Rehab
8. Medical records from TridentCare Imaging

9. Medical records from Select Specialty Hospital and Regency Hospital
10. Medical records from Wellspan VNA Home Care
11. Medical records from York Hospital
12. Medical records from York ENT Associates
13. Medical records from Fast Ambulance
14. Neuroimaging studies from HIMA San Pablo
15. Brain MRI and carotid ultrasound from December, 2018

***History of Present Illness:***

On February 17, 2019, Mr. Burgess boarded the Harmony of the Seas. At the time he was a 61-year-old man with a past medical history significant for HIV and prior brain surgery for unknown reasons at the age 16.

On February 18, 2019 at 11:00AM, he presented to the ship's medical center after he had a mechanical fall and hit his head. There was no loss of consciousness. He was examined by Dr. Michiel Etsebeth at 11:32AM on February 18, 2019. On neurological examination, Dr. Etsebeth documented "higher cortical function: normal. Inspection. Normal. Additional Note: No headache or any neurological deficit." Dr. Etsebeth also documented that Mr. Burgess had a "10cm long laceration through the full depth of scalp across occiput." He received sutures for the wound, a tetanus injection, and was discharged from the clinic. The diagnosis was "open wound of other parts of head."

Mr. Burgess returned to the ship's clinic on February 21, 2019 at 9:25AM. Nurse Mary Bremner documented "? CVA: inability to move fingers of right hand; unstable gait: to be seen by Dr. in ICU." It was noted that he had a fall on February 18, 2019 and had sustained a laceration to the back of his head which was sutured. An electrocardiogram showed normal sinus rhythm. He was evaluated by Joao Pereira, MD who requested a neurology referral and noted in a 9:55AM chart entry that Mr. Burgess reported "sudden onset of weakness in right lower limb, plus vision changes in right eye. Was asymptomatic when he woke up. No other complaints. Had fall with head trauma in occipital area, 3 days ago. No loss of consciousness, no amnesia, no neurological deficits at the time." He also documented that Mr. Burgess had "no obvious asymmetry in tonus, strength or sensibility (tactile, proprioceptive, nociceptive. Blurriness in right eye. No pain anywhere. Normal ECG. Please evaluate (including CT-scan if you see fit) and treat accordingly." His diagnosis was "acute cerebrovascular insufficiency." Mr. Burgess remained on board closely monitored in the ICU while he awaited disembarkation. Around 11:40AM, Mr. Burgess was taken by ambulance to HIMA San Pablo Caguas.

Mr. Burgess arrived at the HIMA San Caguas hospital in Puerto Rico around 1:50PM (AST) on February 21, 2019. Initial vital signs were afebrile, blood pressure 157/104, heartrate 78 beats per minute. Fingerstick glucose was normal at 97. Ulises Nobo, MD evaluated Mr. Burgess. Dr. Nobo documented a last known well time of 930AM. Dr. Nobo documented that Mr. Burgess "woke up today without any problems…developed visual loss over the right side and right side weakness, worse in the leg." He noted that "he fell down to the floor 3 days ago (overdrunk) requiring stiches. Since then, he has been having no kind of neurological problems." On exam, he was alert and oriented. He had right facial weakness and right visual field deficit. He had right arm weakness with strength of 4/5 as well as right leg weakness with strength of 4/5. The left side was full strength. There were no abnormal movements, no ataxia, and no sensory deficits. At 2:00PM, Mr. Burgess' National Institutes of Health Stroke Scale (NIHSS) was 6: 2 points for visual loss, 2 points for facial palsy, 1 point for right arm drift, and 1 point for right leg drift. His Glasgow Coma Scale (GCS) was normal at 15/15. A CT of the head was performed on February 21, 2019 at 2:14PM. The CT was officially read by Maria Muns, MD as "no detectable acute territorial infarcts. No evidence of acute intracranial hemorrhage. Postsurgical changes in the left posterior parietal lobe with underlying postsurgical encephalomalacia. If patient has an acute

neurological deficit, consider further assessment with Brain MRI if no contraindications exist." Dr. Nobo's assessment was that Mr. Burgess had a "full developed L PCA stroke, with a L PCA hyperdense sign and a small, ipsilateral SAH, possible due to trauma." tPA was not administered and Aspirin was prescribed.

A CTA was performed on February 21, 2019 which revealed a dominant right vertebral artery and focal narrowing of the cavernous left intracranial artery, otherwise no large branch vessel occlusion, flow-limiting stenosis, or aneurysm. In addition, there was non-visualization of the left distal V4 segment of the left vertebral artery, which seemed to terminate as a normal posterior inferior cerebellar artery (PICA) and decreased caliber of the distal left posterior cerebral artery. On 2/22/19, an addendum was added to the CTA report which stated that there was a filling defect of the proximal V1 segment of the right vertebral artery, likely due to an intraluminal blood clot. On my review of the imaging, there was evidence of hypodensity in the left posterior artery territory as well as a chronic area of hypodensity in the posterior parietal lobe. I agree there is a proximal right vertebral artery occlusion associated with stenosis and calcification and a left P2 occlusion.

On February 22, 2019 around 3:30AM, he developed new left sided weakness and difficulty with speech. He underwent a brain MRI without contrast at 5:30AM which showed restricted diffusion in the left thalamus, left internal capsule, left occipital lobe and left hippocampal formation, left anterior superior cerebellar hemisphere, vermis, and inferior cerebellar peduncle and occlusion of the left PCA. Repeat CT head performed on February 22, 2019 showed acute left PCA territory infarction involving the left occipital lobe and the posterior left temporal lobe. A CT angiogram and CT perfusion showed non-visualization of the distal vertebral or basilar arteries, decreased cerebral blood volume in the left PCA territory, abnormal mean transit time throughout the right cerebellum and brainstem suggesting at risk tissue. Upon my review of the imaging, I agree with this report. He was transferred to the stroke unit, but due to worsening neurologic examination and a GCS of 9, Mr. Burgess was intubated around 9:30AM.

At 10:30AM on February 22, 2019, Mr. Burgess was in the angiography suite for thrombectomy. Via right radial access, Dr. Juan M. Ramos Acevedo attempted to access the right vertebral artery but failed to advance past the early V1 segment. The left vertebral artery was catheterized which showed a non-occluded but significantly hypoplastic left vertebral artery precluding access to the basilar artery. This also confirmed basilar artery occlusion. He then accessed the right femoral artery, but despite multiple attempts was unable to advance past the first centimeter of the right vertebral artery. Once it was established that neither vertebral arteries offered access to the basilar artery, the procedure was terminated around 2PM on February 22, 2019. Diagnoses included basilar artery stroke/occlusion, right vertebral artery occlusion at early V1 segment at take-off from right subclavian artery, and left vertebral artery hypoplasia.

Post-procedure, Mr. Burgess was admitted to the intensive care unit (ICU). Neurologic examination performed by Dr. Nobo on February 22, 2019 at 3:15PM revealed that Mr. Burgess was intubated, comatose, with sluggishly reactive pupil, absent corneal reflexes, absent gag reflex, with no motor response to pain. Mr. Burgess was started on anticoagulation given the basilar artery clot. His course was complicated by gastrointestinal bleeding requiring discontinuation of anticoagulation on February 24, 2019. He continued on aspirin which he tolerated without any issues. On examination February 24, 2019 Mr. Burgess remained intubated but was able to follow commands with his eyes such as opening and closing them when asked. His pupils were reactive, he had mild left facial weakness, with minimal withdraw to pain on the right greater than left lower extremities. A tracheostomy was placed.

On February 25, 2019 Mr. Burgess was flown from HIMA San Pablo hospital in Puerto Rico to York hospital in Pennsylvania. There, Mr. Burgess was treated for tracheobronchitis and a pneumonia. A percutaneous feeding tube was placed. On March 5, 2019 Mr. Burgess was transferred to Select Specialty Hospital for

ongoing care. He still required ventilatory support. While at Select Specialty Hospital, Mr. Burgess was weaned off the ventilator and tolerated capping of his tracheostomy without requiring supplemental oxygen.

Mr. Burgess was transferred to Magee on May 29, 2019 for ongoing stroke rehabilitation. He underwent physical, occupational, and speech therapies. On July 19, 2019 Mr. Burgess was discharged from Magee rehabilitation. His examination at that time showed that he was able to follow simple commands, he was weak in all four extremities with some very limited movement that was nonfunctional. He had limited head movement, but he was able to nod yes/no to questions. He was discharged home with home health care services.

**Summary**

1. **The initial head trauma on February 18, 2019 was unrelated to the stroke on February 21, 2019.** Mr. Burgess had a mechanical fall while under the influence on alcohol on February 18, 2019. There was no loss of consciousness and no focal neurologic deficit on examination after the fall. Mr. Burgess was later found to have a clot in his vertebral artery, which ultimately led to basilar artery occlusion and significant neurological decline. There was no evidence of a dissection. Furthermore, vertebral dissections occur in either the V2 or V3 segments (where there can be rotational injury against the bones) and not in the V1 segment, which is where the thrombus was found. V1 thrombi are typically the result of long-standing atherosclerosis. Given the absence of evidence of dissection (a tear in the artery which may be due to trauma), the head trauma on February 18, 2019 did not lead to the thrombus formation and consequence did not lead to the stroke. Instead, his thrombus was the result of long-standing atherosclerosis. In sum, the head strike on February 18, 2019 was neither causally related to the development of the left vertebral thrombus nor the stroke.

2. **There was no indication for head imaging following Mr. Burgess' fall on February 18, 2019 and had it been performed, it would not have changed his outcome**. There was no indication to perform head imaging such as a CT or MRI scan following Mr. Burgess' presentation after his fall on February 18, 2019. The guidelines for head imaging following mild traumatic brain injury in adults recommend a CT head for patients who have loss of consciousness, posttraumatic amnesia, vomiting, severe headache, deficits in short-term memory, posttraumatic seizures, GCS<15, or focal neurologic deficits. Mr. Burgess did not exhibit any of these symptoms; therefore, there was no indication to have obtained head imaging following the fall on February 18, 2019. Had a CT of the head been performed, it would have been normal as Mr. Burgess did not exhibit symptoms of stroke until February 21, 2019. There was absolutely no indication to perform vessel imaging following his head trauma.

3. **Mr. Burgess had contraindications to receive intravenous tPA upon evaluation at HIMA San Pablo Hospital**. Mr. Burgess' initial CT head was interpreted by Dr. Nobo as showing a left PCA stroke and an ipsilateral subarachnoid hemorrhage (SAH). Intracranial hemorrhage on CT is an absolute contraindication to administer IV tPA as there is a high risk for expansion of the hemorrhage and thus catastrophic outcome. Given the concern for subarachnoid blood, especially with the history of recent head trauma, this would have made tPA contraindicated regardless of the applicable time window for intravenous tPA. While Dr. Mins interpreted the CT as not being consistent with subarachnoid hemorrhage, Dr. Nobo was the treating physician and was responsible for making a life-or-death judgment call as to whether to give IV tPA in light of the recent head trauma and, for all practical purposes, what he considered to be subarachnoid hemorrhage. When evaluating patients with acute stroke who are within the window for tPA, neurologists are required to make quick decisions in real-time with the information available to them in that moment. As part of their training, Neurologists are taught how to interpret CT scans as in an acute stroke and often cannot rely on waiting for radiologists

to interpret images. Giving tPA to a patient with intracranial hemorrhage is a violation of the standard of care as it may lead to catastrophic outcomes.

4. **Intravenous tPA would not have improved Mr. Burgess' neurologic outcome.** First, at the time of the initial head CT at HIMA San Caguas on February 21, 2019 at 2:14PM, Mr. Burgess already had evidence of permanent brain injury. The CT of his head demonstrated hypodensity in the region of his left posterior cerebral artery territory – a sign that he already had permanent and irreversible brain injury. tPA is only effective in patients who have brain to save. The radiography indicates that Mr. Burgess already had infarction of his left posterior cerebral artery and thus delivery of tPA was not going to benefit Mr. Burgess and would only have placed him at increased risk of a complication – namely bleeding. The risk of intracranial hemorrhage is higher when patients already have evidence of hypodensity on CT. Second, Mr. Burgess' strokes were the result of underlying atherosclerotic disease. The initial stroke in the left posterior cerebral artery territory was the result of a posterior cerebral artery occlusion, which was likely the result of clot breaking off from his proximal right vertebral artery occlusion/stenosis. The proximal vertebral artery is a common location of atherosclerotic deposition. tPA does not work well on proximal, large vessel occlusions as these are difficult to medically break down. Furthermore, in Mr. Burgess' case, even mechanically trying to dislodge the clot proved impossible. When Dr. Ramos tried to recanalize the clot, he was unsuccessful despite many attempts. This was likely the result of the clot being both large and calcified, which made it difficult for him to advance the wire. Given the location, size, and lack of ability to mechanically catheterize the vertebral artery, tPA would not have been successful at breaking up the vertebral artery clot since mechanical thrombectomy is better than tPA at removing large proximal vessel occlusions. Thus, even if Mr. Burgess received IV tPA despite the concern for possible subarachnoid hemorrhage on CT and presence of left posterior cerebral hypodensity, the vertebral artery clot would not have been broken up and his outcome would not have been improved. This is because the next day he developed a basilar artery occlusion which caused significant neurological deterioration. The basilar artery occlusion was also the result of the clot breaking off from his right vertebral artery occlusion. tPA therefore would not have prevented the basilar artery occlusion from occurring. It should also be noted that when Mr. Burgess deteriorated on February 22, 2019, he was still not a candidate for tPA as he was well beyond the 4.5 hour window to receive tPA and had already had a recent (the day prior) stroke.

5. **Mr. Burgess was not a candidate for thrombectomy at his initial evaluation on February 21, 2019 based on the location of the occlusions.** As mentioned above, Mr. Burgess' stroke on February 21, 2019 was due to a proximal right vertebral artery occlusion. V1 vertebral artery occlusions are not indications for thrombectomy. Furthermore, when Mr. Burgess developed a basilar artery occlusion and was taken for thrombectomy on February 22, 2019, Dr. Ramos was unable to pass the clot despite several attempts. This was likely due to the calcified, hard nature of the clot. Regardless, had thrombectomy been attempted on February 21, 2019, it would similarly have been unsuccessful. Notable, there are no guidelines which recommend thrombectomy of vertebral artery occlusions.

6. **Mr. Burgess received timely intervention at the time of his deterioration on February 22, 2019 at HIMA San Pablo Hospital**. After the stroke on February 21, 2019, Mr. Burgess was admitted to HIMA San Pablo Hospital for close monitoring. He was given aspirin for secondary prevention. He was not a candidate for tPA or mechanical thrombectomy as mentioned above. While the initial interpretation of the CTA performed on February 21, 2019 did not mention a V1 vertebral occlusion, had this been noted, it would not have change management (see discussion above). Despite following the standards of acute stroke care, Mr. Burgess had a worsening of his neurologic exam on February 22, 2019 which was immediately noticed by his husband. He further decompensated later that morning requiring intubation. Imaging including a repeat CTA showed a new basilar artery occlusion. He was immediately taken for

thrombectomy. Despite multiple attempts through two different access points, Dr. Ramos was unable to successfully remove the clot due to the inability to pass a catheter through the clot. Unfortunately, when recanalization is unsuccessful, basilar artery occlusions are associated with high rates of morbidity and mortality.

7. **Mr. Burgess' outcome is not attributable to any action or lack of action of Royal Caribbean. His outcome was the result of his underlying medical problems and no action by Royal Caribbean or subsequent providers would have changes his overall outcome.**

**Conclusion**

Based on my knowledge, training, and experience, along with my review of the medical records referenced herein, it is my opinion within a reasonable degree of medical probability that neither the action nor inaction of the ship's medical staff was going to change Mr. Burgess' neurological outcome.

Below is a summary of my opinions:

1. **The initial head trauma on February 18, 2019 was unrelated to the stroke on February 21, 2019.**

2. **There was no indication for head imaging following Mr. Burgess' fall on February 18, 2019 and had it been performed, it would not have changed his clinical management or eventual outcome.**

3. **Mr. Burgess had contraindications to receive intravenous tPA upon evaluation at HIMA San Pablo Hospital.**

4. **Intravenous tPA would not have improved Mr. Burgess' neurologic outcome.**

5. **Mr. Burgess was not a candidate for thrombectomy at his initial evaluation on February 21, 2019 based on the location of the occlusion.**

6. **Mr. Burgess received timely intervention at the time of his deterioration on February 22, 2019 at HIMA San Pablo Hospital.**

7. **Mr. Burgess' outcome is not attributable to any action or lack of action of Royal Caribbean. His outcome was the result of his underlying medical problems and no action by Royal Caribbean or subsequent providers would have changes his outcome.**

All of my opinions are to a reasonable degree of medical certainty and based upon my review of the materials as well as my experience, training and knowledge. I reserve the right to modify and/or supplement my opinions as discovery continues and more information becomes available, or in response to Plaintiffs expert reports or cross examination questioning.

Sincerely,

Alexander E. Merkler, MD, MS