UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:20-cv-20687-OTAZO-REYES

RICHARD BURGESS, Individually,:
and by and through DARREN HENZE
as Guardian of the Person and Estate of
Richard Burgess, incapacitated and
as agent under that certain durable power
of attorney dated November 20, 2006.

Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD.,
a Liberian Corporation d/b/a
ROYAL CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL,
JOAO PEREIRA,
MICHIEL ADRIAAN ETSEBETH.

Defendants.

---

VIDEOTAPED

DEPOSITION OF CAPTAIN HENDRICK J. KEIJER

November 18, 2022
ROBSON FORENSIC, INC.,
14160 Palmetto Frontage Road, Suite 23
Miami Lakes, Florida 33016
10:39 a.m. - 3:15 p.m.

Melanie Stinson-Konstantinidis, RPR
Registered Professional Reporter

A P P E A R A N C E S:

On behalf of the Plaintiff:
SARAH A. LOBEL, ESQUIRE
HICKEY LAW FIRM, P.A.
1401 Brickell Avenue, Suite 510
Miami, Florida 33131
slobel@hickeylawfirm.com

On behalf of the Defendant:
MICHAEL J. DRAHOS, ESQUIRE
GRAY ROBINSON, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
michael.drahos@gray-robinson.com

PRESENT:

DAVID GRIFFEN, VIDEOGRAPHER

W-I-T-N-E-S-S

CAPTAIN HENDRICK KEIJER 6

DIRECT EXAMINATION BY MR. DRAHOS 6
CROSS-EXAMINATION BY MS. LOBEL 144

Case 1:22-cv-20687-AOR Document 81-2 Entered on FLSD Docket 01/06/2023 Page 4 of 265



E X H I B I T S


| | |
|---|---|
| Exhibit A, Expert Report | 42 |
| Exhibit B, Rebuttal Report | 72 |
| Exhibit C, Sunny Document | 73 |
| Exhibit D, Calculations | 94 |
| Exhibit E, Testimonial History | 125 |
| Exhibit F, Manila Folders | 136 |

THE VIDEOGRAPHER: Good morning. We are now on the record. This is the beginning of Media Unit 1 in the deposition of Captain Hendrik Keijer taken in the matter of Richard Burges et al. versus Royal Caribbean Cruises Limited et al.

Today's date is November 18, 2022, and the time is 10:39 a.m. My name is David Griffen. I'm the videographer. Our court reporter is Melanie Stinson. We are here with Huseby Global Litigation.

Will counsel please introduce yourselves after which the court reporter will please swear in the witness. Thank you.

MS. LOBEL: Sarah Lobel on behalf of plaintiff.

MR. DRAHOS: Michael Drahos on behalf of the defendant.

P R O C E E D I N G S

\- - -

Deposition taken before MELANIE STINSON-KONSTANTINIDIS, RPR, Registered Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause:

Case 1:20-cv-20687-AOR Document 81-25 Entered on FLSD Docket 01/26/2023 Page 6 of 265



Whereupon,

CAPTAIN HENDRICK KEIJER,

having been sworn in, testified as follows:

DIRECT EXAMINATION

BY MR. DRAHOS:

**Q. Good morning, Captain. Can you please state your name for the record?**

A. Good morning. Hendrik Jam Keijer.

**Q. Could you spell that for us, please?**

A. Hotel, Echo, November, Delta, Romeo, India, Kilo.

(Off-the-record discussion was held.)

THE WITNESS: First name H-E-N-D-R-I-K. Middle name J-A-M. Last name K-E-I-J-E-R.

BY MR. DRAHOS:

**Q. Thank you, Captain. So in preparation for today's deposition, I had an opportunity to review your curriculum vitae.**

**Have there been any changes made to that since the time you disclosed it in this case?**

A. No. Not at all.

**Q. All right. So I noticed that you have on your CV two current employers. One being**

Case 1:20-cv-20687-AOR Document 81-25 Entered on FLSD Docket 01/26/2023 Page 7 of 265



**Robson Forensic and the other being H&A Maritime, LLC. Is that accurate?**

A. That's correct.

**Q. What is Robson Forensic?**

A. Robson is a forensic firm that retains over 100 experts of which I'm one. The other firm is a maritime firm, h&M Maritime. And that's the company I started for -- I do charts on my private little 38-foot belt just in the weekends or holidays just for the fun of it.

**Q. So, H&M Maritime is a charter company where you captain your own boat and take folks out to sea; is that kind of?**

A. That's correct, yes.

**Q. And Robson Forensic is, as you called it, an expert database of 100 experts for what reason?**

A. It's a firm to provide expertise.

**Q. So if a lawyer wanted to hire an expert, they can go to Robson Forensic, search through the index and find you?**

A. They can, yes.

**Q. Do you do any expert work outside of your capacity at Robson Forensic?**

A. No, I do not.

Q. What percentage of your time is spent being a ship captain for H&A Maritime and paid expert for Robson Forensic?
A. 1% ship captain approximately, maybe 5%. And the rest of the time is my work for Robson Forensic.
Q. When is the last time that you were a captain of a cruise ship?
A. That was 2015, February, is when I resigned.
Q. That was at Holland America?
A. That was Holland America, correct.
Q. Have you ever captained a Royal Caribbean vessel?
A. No.
Q. Did you ever work for Royal Caribbean in any capacity?
A. No, I did not.
Q. Have you ever opined as an expert on the details of a medical transfer that was conducted pier-side?
A. No, I have not.
Q. Just for the sake of clarity, you know what I mean pier-side, right, that's when the --
A. Yes.

**Q. -- tied up to the pier?**

A. Yes.

**Q. Have you ever opined as an expert on the details of a medical transfer in Puerto Rico?**

A. I have assessed numerous medical evacuations including evacuations that occurred when the vessels docked, when the vessel anchored, when the vessel was alongside -- sorry, out at sea. I have conducted a lot of medical evacuations myself, not only in the role of cruise ship captain, but also in the role of commodore at the headquarters in Carnival Cruise Line from a shoreside perspective.

**Q. Captain, I am going to move to strike as nonresponsive. My question was a lot more specific than that. Have you ever opined as an expert in a court of law or in a deposition on the details of a medical transfer conducted in Puerto Rico?**

A. No.

**Q. Have you ever opined as an expert on the details of a medical transfer concerning a patient who was suspected of having a stroke?**

A. I have a nondisclosure agreement with

Carnival Cruise Line, so I won't be able to answer that question.
Q. My question was a lot more specific than that, so I'll ask it again.
Have you ever opined as an expert in a courtroom or in a deposition on the issue of evacuation or medical transfer concerning a patient with a stroke?
A. Can you repeat that question?
Q. Sure. Have you ever opined as an expert whether it was in the courtroom or in a deposition regarding the details of a medical transfer of a patient with a suspected stroke?
A. No.
Q. So --
A. Not alongside.
Q. I'm sorry?
A. You are talking about a ship that is alongside, correct?
Q. I just qualified it as a stroke. So have you testified as an expert regarding a medical transfer of a patient who was suspected of having a stroke, whether it was pier-side or at sea?
A. I do not recall.

**Q. How long have you been an expert witness?**

A. Almost five years.

**Q. So does that mean that in the five years you've been doing this, you can't recall an instance or you don't know whether you did or you didn't?**

A. I do not recall the specifics of the medical evacuation cases that I've handled with regards to the exact medical conditions of those patients, whether that was heart attacks, whether that was strokes.

**Q. So, am I accurate then as you sit here today, you can't name a specific case that you testified in as an expert where the issue was a medical transfer of a patient with a suspected stroke?**

MS. LOBEL: Form.

THE WITNESS: I've already answered that question. I said I do not recall the specifics of the medical condition. I've done a lot of medical evacuations and they're all the same regardless of the condition of the patient.

BY MR. DRAHOS:

Q. We are going to get your capacity at Carnival in just a second, but I am focused strictly on your role as an expert for Robson Forensic. And so before I move on, I want to make sure that we are clear on what I am asking and that I understand your answer.

So as you sit here today, you can't tell me of a case where you've testified as an expert while working at Robson Forensic, wherein the issue that you testified about involved a medical transfer of a patient with a suspected stroke?

A. I opine on not the medical conditions, in cases I'm not a medical expert. I opine on timelines of medical evacuations, which is what a captain does.

Q. Understand.

A. So do I recall whether that patient had a stroke or a heart attack or some other condition, I do not recall it. And the reason for that is, is that for me that's irrelevant.

Q. Okay.

A. Speed is always of the essence in the case of a medical evacuation.

Q. So you would agree then, that you're obviously not a medical doctor?
A. Yeah, I agree.
Q. And that means you don't hold any medical licenses or certifications of any sort?
A. I do.
Q. You do or you don't?
A. I do.
Q. What certifications or licenses do you hold?
A. It's in my CV. It's called limited medical training.
Q. And limited medical training, is this a certificate title or a license title, what?
A. It's a certificate. Every master mariner needs to be in possession of the certificate or he or she is not able to operate a cargo ship or cruise ship or whatever it may be.
Q. Who issued the certificate to you?
A. It was a company located in the Netherlands that Carnival Cruise Line sent their employees to.
Q. Is that license or certification still active?

A. Yes.
**Q. When does it expire?**
A. I think next month.
**Q. This limited medical training, what did it involve?**
A. It involved setting broken bones, it involved dressing wounds, it involved taking blood pressure, doing CPR, it involved operating defibrillators and other items that I do not recall at this -- or all the details that I do not recall at this moment in time.
**Q. So, when would this training have taken place in the Netherlands?**
A. Five years ago.
**Q. All right. So what you just identified for me would -- can we agree is the extent of your medical training and experience?**
A. Uh-huh.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Is that a "yes?"**
A. That is -- I just gave you my answer. What I recall and what I do not recall about that medical training. There are certain other aspects that were provided as well. I don't

recall all the details.

**Q. Would you agree that you are not holding yourself out to this jury as a medical expert?**

A. There are medical doctors who are retained in this case who provide medical opinions.

**Q. You're going to need to answer my questions or we are going to be here a lot longer.**

**Would you agree that you are not holding yourself out as a medical expert in this case to the jury?**

MS. LOBEL: Form.

THE WITNESS: I'm here as a maritime expert, and not a medical expert.

BY MR. DRAHOS:

**Q. Thank you. So you don't have any medical opinions in this case, correct?**

MS. LOBEL: Form.

THE WITNESS: That's correct, yes.

BY MR. DRAHOS:

**Q. So, we know some of the same people. Rick Miller says hello.**

A. Good.

Q. Do you know Nure Curry?
A. No, I don't, no.
Q. So, would you agree, Captain, that you held your position as commodore at Carnival Cruise Line for less than two years?
A. I agree.
Q. The majority of your time at Carnival was spent in this capacity as a commodore?
A. Commodore/director of stability, yes.
Q. Well, director of stability was a new position that you were transferred in after serving some time as a commodore, correct?
A. No, incorrect.
Q. So is it your testimony here today that when you started at Carnival, you started as the director of stability and damage control?
A. As far as I recall I did, yes.
Q. Would you agree that when you started at Carnival, there were four people who also held your same title?
A. No, disagree.
Q. Would you agree that there are four commodores in total?
A. I agree.
Q. You were one of the four?

A. That's correct.
**Q. And each one of you had a particular area that you were responsible for, as it relates to operations?**
A. You are talking about ships or areas?
**Q. I'm talking about as a whole, each one of you were given a particular specialty or area of focus, correct?**
MS. LOBEL: Form.
THE WITNESS: I was given director of stability, correct.
BY MR. DRAHOS:
**Q. And as it relates to operational oversight, you were assigned to the Spirit class, correct?**
A. Yes, correct.
**Q. That was a total of four ships?**
A. That was a total of four ships, yes.
**Q. And Spirit class being the smallest class in the Carnival fleet?**
A. I don't know about smallest. I don't recall.
**Q. As the director of stability and damage control, you're unable to tell me whether or not the Spirit class was the smallest class**

**of vessels in the Carnival fleet?**
MS. LOBEL: Form. Argumentative.
THE WITNESS: I need to do research on the size of ships, gross tonnage. Are you talking net tonnage, gross tonnage, are you talking passengers, are you talking length of vessel?
BY MR. DRAHOS:
**Q. How about just sheer size?**
A. Sorry?
**Q. Sheer size.**
A. Which size, length?
**Q. The total length of the ship?**
A. I believe the Ecstasy class was smaller than the Spirit class.
**Q. So when you --**
A. If you are talking about length. But again, I need to do more research.
**Q. So in your role as commodore, you were tasked with assessing the ship captains, correct?**
A. Correct.
**Q. Your job was not to assess the medical staff?**
A. Captains were in charge of medical

staff.

**Q. Sure. Captains are master of the ship, but you would agree that as a captain yourself, that the ship's physician is the senior ship officer as it relates to medical decisions and the captain will defer to a ship doctor as it relates to medical decisions?**

A. They work together, yes.

**Q. So when you served as a commodore, you didn't have the knowledge or training to be able to assess the skill set of a ship physician?**

A. The captain oversees everybody on board. He oversees cooks, he oversees medical staff, he oversees engineers. Not necessarily areas that he is trained in, but he oversees them and he also is able to fire those people if they don't perform their jobs.

He has access to their job descriptions. He has access to the safety management system. He knows what they are supposed to do and from that perspective, he oversees the entire group, and that includes the ship's physicians.

**Q. I would agree with you that the captain is responsible for the health and safety**

of all souls onboard the ship, but my question to you was: As captain you didn't have the knowledge, experience or training to be able to assess the skill set of the ship's position. In other words, you couldn't say, doctor, you were wrong about that diagnosis or you should have acted quicker as it relates to that particular condition, you don't have that knowledge?

A. I disagree.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. So you believe that you can comment on a doctor's ability to render an accurate diagnosis?

MS. LOBEL: Form.

THE WITNESS: Your previous question contained a timeline. You said that I was not able to opine on the timeline of a medical evacuation and I disagree with that part of the question.

BY MR. DRAHOS:

Q. I don't think that I said anything about that.

A. Yes, you did. I disagree with the -- or sorry, I agree with the medical part that I'm

not able to assess a diagnosis that a doctor made.

**Q. So, when was the fleet operations center opened at Carnival?**

A. Opened?

**Q. Yes, sir.**

A. Approximately one year before my function was taken away and taken over by the fleet operation centers.

**Q. So the fleet operation center was not in existence when you started in 2015 --**

A. No.

**Q. -- agreed? Okay.**

**And at some point in time thereafter, most of the operation center was opened, your role shifted to working as a director of stability and damage control, agreed?**

A. No, I disagree.

**Q. How did I get that wrong?**

A. I started as commodore/director of stability as far as I recall, right from the start.

**Q. And so your role as the director of stability and damage control was to focus on**

overseeing the stability changes and upgrades of the fleet, agreed?
A. Parts of it, yes.
Q. There were other commodores who handled seamanship and nautical issues, agreed?
A. There were and so did I.
Q. So when you are claiming in your CV that you visited ships for audits and inspections, you would agree that you did so in the context of general ship operations, correct?
MS. LOBEL: Form.
THE WITNESS: I visited the ships in the function of commodore/director of stability. That was my function at Carnival corporation -- or sorry, Carnival Cruise Line.
BY MR. DRAHOS:
Q. Specifically though, focused on general operations. In other words, you visit the deck department, you handled the nautical side, but you weren't going and doing inspections as it relates to the medical aspects of the ship?
A. Of course, I did.
MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Of course you did?**

A. Yeah, I did. I visited the medical center. There are shipboard safety inspections of the entire vessel and it includes the galley, that includes the engine room. The captain did that, the staff captain did that, I walked along. Coast Guard inspections, they looked at infirmaries.

**Q. That may be one thing, Captain, but you weren't in a medical center auditing medical charts, were you?**

A. Repeat that, please?

**Q. Sure. You weren't going into the medical centers of these ships and auditing medical charts for accuracy, were you?**

A. Medical charts for accuracy and not as commodore. I had other people who did that for me.

**Q. Okay.**

A. As part of the operations.

**Q. In other words, you weren't going into the ship's medical centers and evaluating the ship's physicians' performance as it relates to how accurate they were in making diagnosis or**

how quickly they were handling certain medical conditions?

MS. LOBEL: Form.

THE WITNESS: There is a medical department shoreside at Carnival Cruise Line that handled that part.

BY MR. DRAHOS:

Q. So when you say here in your CV that -- let me see specifically the way you worded it, that you assessed and analyzed the safety management system.

You would agree that you did so strictly as it relates to stability and damage control issues?

A. Totally disagree.

Q. Can you give me one instance where you, Captain -- is it Keijer?

A. Yeah.

Q. Captain Keijer had a role in assessing or analyzing safety management systems relative to medical care?

A. There are oxygen bottles in the infirmary. Those oxygen bottles need to be tested. They need to be inspected. You asked me for one example, that's just one example.

Q. All right. I asked specifically as it relates to medical care, not medical equipment.
A. It's medical care. Provides medical care. Without oxygen you can't run certain equipment to provide medical care.
Q. Can you give me a specific SMS that you wrote or had any input as it relates to the provision of medical care to a patient?
A. Repeat, please?
Q. Sure. Can you name for me a specific SMS that you authored yourself or had some input in the development of, as it relates to the provision of medical care to a patient in a ship-board medical center?
A. Like I said, I have a nondisclosure with Carnival Cruise Line and I need to stick to that.
Q. It's interesting to me that you don't know who Nure Curry is. That name doesn't ring a bell to you at all?
A. No. Nick Curry?
Q. Nure Curry, N-U-R-E?
A. No.
Q. Did you review his report in this case?

A. Is it in my report? Let's have a look at it.

**Q. Well, no. I am wondering whether or not you've reviewed it.**

A. Yeah, if I reviewed it is in my report. Bear with me. I'm going to look it up.

No, I did not review a report of Nick Curry?

**Q. Nure Curry, N-U-R-E.**

A. Nure. No.

**Q. Who was Carnival's medical director at the time you worked there?**

A. I do not recall.

**Q. Did you ever have any involvement at all with that individual?**

A. I don't recall.

**Q. When you say that you conducted incident investigations, would you agree that you never did an incident investigation on issues related to medical care or treatment of patients?**

A. Nondisclosure with Carnival Cruise Line. I can't comment.

**Q. When you answer that way, it suggests that you did. Is that what you're suggesting to**

the members of the jury, that you did and you just can't comment on the details of it?

A. I'm sticking to the nondisclosure agreement that I have with Carnival Cruise Line and that's my answer.

Q. And that nondisclosure agreement doesn't allow you to answer questions as it relates to what you did for the company?

A. As far as I understand it does not, that's correct.

Q. So then, why do you have Carnival Cruise Line with bullet point details of what you did for the company on your CV?

A. That's part of my CV, my -- there's nothing wrong with stating what my job functions were about my responsibilities.

Q. That's exactly what I am asking you. Did you, yes or no, ever do an incident investigation by Carnival Cruise Line relating to the details of the patient medical care?

A. I do not recall.

Q. According to the research that I've done coming into today's deposition, I'm aware of one incident where you did an investigation relating to stability issues. Can you tell me

**any other occasion where you prepared an incident report and presented it to senior leadership on issues relating to medical transfers?**

A. I don't recall.

**Q. Would you agree with me that if there was some element of the captain's decision making in question, that would fall within your purview of responsibility, but if it was a medical issue, you weren't involved at all?**

A. Disagree.

**Q. Why do you disagree with that?**

A. If a ship's physician comes to a captain, request a medical evacuation, or if I'm a staff captain onboard and I'm in charge of the medical department, I am working with medical staff.

**Q. Are you saying that you were in charge of the medical department at Carnival Cruise Line?**

A. Yes, same as the Royal Caribbean, yeah. Staff captain oversees the --

**Q. That's not what I'm asking.**

A. -- medical department.

**Q. I'm not asking about any Royal**

Caribbean.
A. I answered your question and I elaborated a little bit further.
Q. In your role as commodore/director of stability and damage control at Carnival Corporation, are you saying that you are also in charge of the medical center?
A. I did not say that.
Q. Okay. That's why I am seeking to clarify what you said.
A. Good.
Q. So, would you agree as it relates to the incident investigations that you purportedly did in this role as commodore/director of stability damage and control, that if it was an issue concerning medical, that that wasn't something that you would be involved in?
A. Disagree.
Q. Tell me an instance where you did an incident investigation report presented at the senior leadership on an issue that exclusively involved medical decision-making care?
A. I believe I answered that question. I don't recall, plus I have a nondisclosure with Carnival.

Q. By the way, when does that nondisclosure run out?

A. It doesn't, it's forever.

Q. So, you also claim in your CV that you were part of the emergency response team while in this role as director of stability and damage control at Carnival Corporation.

Are you referring to the Carnival irregular operations team?

A. I'm not familiar with that term. I was called when there were certain emergencies.

Q. You never heard of the CIOT?

A. What does that stand for?

Q. Carnival Irregular Operations Team.

A. I don't recall.

Q. Would you agree that you served less than six months in your role at the fleet operation center at Carnival Corporation?

A. I need to look up those details when the time frame I served in that role, but it could be about six months.

Q. And would you also agree that any involvement that you would have had in the fleet operations center regarding medical evacuations were those that occurred out at sea?

A. Again, I don't recall. I need to do my research, which -- we used to get a lot of phone calls when I was in the fleet operation center. All kinds of situation emergencies and that could have been medical situation, but I don't recall.

**Q. Would you agree that while working in the fleet operations center, you would have no involvement in coordinating a medical transfer once the ship was pier-side, only if it affected the itinerary would you be notified?**

A. Repeat the question?

**Q. Sure. So while you were working in the fleet operations center at Carnival, would you agree that you would never be involved in a medical transfer while the ship was pier-side, the only time you would ever be contacted is if that medical transfer was going to affect the ship's itinerary?**

A. If I had encountered that situation and again, I don't recall, then I could be contacted, so I would not exclude that possibility when the ship is alongside. If it was Spirit class and the captain needed assistance that I would receive a call from the

captain.

Q. So, yes or no, are you telling the members of the jury, that in your role during the fleet -- in the fleet operations center, that you personally participated in medical transfers once the ship is pier-side?

MS. LOBEL: Objection, form.

THE WITNESS: I don't recall.

(Off-the-record discussion was held.)

BY MR. DRAHOS:

Q. Would you agree, captain, that throughout the entirety of your time at Carnival Cruise Line, you had no involvement in picking the hospital that a patient would be transferred to?

A. As far as I recall, I was not involved during that time period as commodore in picking a hospital for a patient.

Q. So, would you agree then, that if this particular medical transfer that we are here to talk about today had occurred on a Carnival vessel during the 2015 to 2017 time period that you were at Carnival, you would not have been involved in this medical transfer?

MS. LOBEL: Form.

THE WITNESS: Repeat, please?

BY MR. DRAHOS:

Q. Sure. If this medical transfer that we're here to talk about today occurred on a Carnival ship in 2015 through 2017 while you were at Carnival, you would not have been involved in this circumstance?

MS. LOBEL: Form.

THE WITNESS: It was a different class of vessel. I did the Spirit class, so...

BY MR. DRAHOS:

Q. The size of the vessel or the characteristics of the vessel make no difference in my question. I'm talking strictly on functionality.

Wouldn't you agree that you would have deferred to the judgment of the medical director in terms of coordinating the details of where this patient would have been sent?

A. It's collaboration between various teams.

Q. At no point in time during that collaboration would you ever have had the authority to overrule the judgment of the medical director?

MS. LOBEL: Form.

THE WITNESS: I would have certainly been provided the opportunity to come up with suggestions such as contacting the Coast Guard, one option. Or looking for an alternate means of transfer if a transfer was known by the company to take a lengthy amount of time.

BY MR. DRAHOS:

**Q. So, are you talking about while the ship is at sea or tied up at pier-side?**

A. Both.

**Q. So are you telling the members of the jury that you would have had the authority at Carnival to overrule the judgment of a medical director in terms of where the patient was going to be sent?**

A. I did not say overrule. I said suggest the means of transport.

**Q. So that means you didn't have the authority to overrule them?**

MS. LOBEL: Form.

THE WITNESS: I would have been -- I did have the authority to come up with suggestions with regard to modes of

transport. When it comes to overruling a medical director with decisions based on medical conditions, no, of course, I wouldn't overrule them.

BY MR. DRAHOS:

**Q. Who is Adriana Yates?**

A. Rings a bell, but I can't recall.

**Q. During your time at Carnival, specifically in this role of commodore/director of stability, did you ever personally execute a pier-side medical transfer of a patient?**

A. At Carnival?

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Yes, sir.**

A. I don't recall.

**Q. Have you ever participated in any capacity of a medical transfer of a patient in San Juan?**

A. Yes.

**Q. In what role?**

A. As captain.

**Q. While you were at Holland America?**

A. Yes.

**Q. And in those instances or that**

**instance, how many times?**

A. I don't recall the exact number of times. I've been with that company for 25 years.

**Q. And so in those instances where, let's say specifically the ship is tied up in the pier in San Juan, what would the captain's role be in executing a medical transfer?**

A. The captain's role will be what a captain does, oversight. Oversight of procedures, safety management system. If the safety management system states that a medical evacuation needs to be carried out with the -- as soon as possible, then that's part of the SMS review. And instant reviews, if I hear of a patient who has to wait two hours for an ambulance to arrive I, as captain, would certainly take action.

**Q. I am not asking about that hypothetical scenario just yet. What I am asking about: When you worked as captain for Holland America, you would agree that when your ship was tied up pier-side, your role in medical transfers was simply to be informed as a courtesy?**

MS. LOBEL: Form.

THE WITNESS: To be informed and to provide oversight, yes.

BY MR. DRAHOS:

**Q. To the extent that that transfer may affect the itinerary, then your involvement may increase?**

A. Then there are additional actions that need to be taken when a vessel is out at sea.

**Q. Can you tell me one instance where you would have handled the execution of a transfer of a medical patient while the ship was tied up pier-side who was suspected of having a stroke?**

A. I'm sure I can, but again, I go back to my nondisclosure. I'm not going to be able to comment on those details.

**Q. Well, your nondisclosure with Carnival concerns your role as a commodore/director of stability?**

A. Carnival Corporation. That includes Holland American Line?

**Q. Have you ever been to Hima Caguas?**

A. No.

**Q. So I looked at the materials that you reviewed in support of your opinion in the case.**

Who's Alberto Pedro Sanchez -- Alberto Pedro Sanchez?

A. Can you show me the page where you see that referral?

Q. His name is not on your report?

A. Right.

Q. So, can we safely conclude then, that you never read his deposition?

A. Can you repeat the first question, please?

Q. Sure. Who is Alberto Pedro Sanchez?

A. No, there was more to that question.

Would you mind reading that out?

(Thereupon: The court reporter was requested to read back the aforementioned question.)

THE WITNESS: If that name does not appear on my expert report, it does not appear on my rebuttal report, I have not had access to that file.

BY MR. DRAHOS:

Q. So, there is a reference in your report to hospitals and medical centers. It's labeled 2.40 in your report. And I was looking at that as I was reviewing the zip drive. You're free to refer to it if you'd like,

**captain, but my question is: I've noticed there are four different maps. Who generated these maps?**

A. Plaintiffs' counsel. I believe I don't have that material in front of me. Would you mind showing me those maps?

**Q. Sure. My computer is pulling back up. Give me just one second. This is in the Schedule A that you've produced to me and --**

A. You said 2.40?

**Q. Yes, 2.40 and 2.41?**

A. Yeah, that's material that I received from plaintiffs' counsel.

**Q. You didn't generate those --**

A. No, no.

**Q. Who was the captain of the Harmony Of The Seas during the subject voyage?**

A. I don't recall.

**Q. Who was the staff captain?**

A. I don't recall the name.

**Q. Who was the chief of security?**

A. I don't. Irrelevant.

**Q. So --**

A. To me, both their names are.

**Q. Did you ever look into who the captain**

**was?**

A. No.

**Q. Have you ever spoken to the captain of the Harmony Of The Seas?**

A. No, I have looked at his job description.

**Q. So, would you agree that your expert report does not offer an opinion as to whether or not there was a better location than Hima Caguas on the date in question?**

MS. LOBEL: Form.

THE WITNESS: I do not believe that that is in my report.

BY MR. DRAHOS:

**Q. So you would agree that opinion is not in your report?**

MS. LOBEL: Form.

THE WITNESS: I agree.

BY MR. DRAHOS:

**Q. Would you agree that your expert report does not offer an opinion as to whether or not there was a better alternative than Sunny Ambulance on the day in question?**

MS. LOBEL: Form.

THE WITNESS: Can you repeat that

question?

BY MR. DRAHOS:

**Q. Sure. Would you agree that your report does not offer an opinion as to whether there was a better alternative than Sunny Ambulance on the date in question?**

MS. LOBEL: Form.

THE WITNESS: I disagree.

BY MR. DRAHOS:

**Q. What ambulance company or mode of transportation did you offer in your report as a better one than Sunny Ambulance?**

MS. LOBEL: Form.

THE WITNESS: There, I've done research. If we go to my research section, there were several options available. There are helicopter companies that provide transportation within San Juan.

BY MR. DRAHOS:

**Q. Can you tell me where in your expert report you expressed that opinion?**

A. See my file, my entire file.

**Q. I asked you a very clear question, Captain.**

A. Yes.

Q. So, let me ask it again for you.
Would you agree that your expert report does not offer an opinion as to whether or not there was a better alternative than Sunny Ambulance on the date in question?
MS. LOBEL: Form.
THE WITNESS: My expert report is my entire file.
BY MR. DRAHOS:
Q. I disagree with you. Let's mark your expert report dated August 25, 2022, as Composite Exhibit A.
(Whereupon, Exhibit A, Expert Report was marked for identification.)
BY MR. DRAHOS:
Q. Would you agree, Captain -- I am going to hand you what I have marked as Composite Exhibit A to the deposition. You are free to look through that. Can you confirm for me that that is the expert report that's disclosed in this case?
A. I agree.
Q. Can you identify for me anywhere within that report that you name a different mode of transportation than Sunny Ambulance that

**could have or should have been used on the date in question?**

A. To produce a report, one needs to do research analysis. That research is part of my file. That file is being provided to you and that includes other means of transport, which leads me to the opinion that Royal Caribbean conducted their actions in an unreasonable matter or inaction, I should say.

**Q. So when you say you gave your file to me, the one that you gave on the zip drive when the deposition started, right?**

MS. LOBEL: Form.

THE WITNESS: This was what you requested for me to provide you the entire poon file at the start of the deposition, yes, correct.

BY MR. DRAHOS:

**Q. I can see that I need to be very specific with my questions with you today.**

A. Uh-huh.

**Q. So, I am going to ask the question one more time.**

**Can you identify for me anywhere in Composite Exhibit A that I just handed you**

**where you identify a different mode of transportation or different ambulance company than Sunny Ambulance as being a better option than what was used in the date in question?**

MS. LOBEL: Form.

THE WITNESS: My entire file is part of my report, research, analysis, documents that was provided. Not every bit of research that I have conducted is in this report, but it's certainly based on the research that I have conducted and that is part of me forming my opinions.

BY MR. DRAHOS:

**Q. So, you agree then that in Defendants' Composite Exhibit A, which is your expert report in this case, there is no alternative mode of transportation or ambulance company that you identify as being a better option than Sunny Ambulance on the day in question?**

MS. LOBEL: Form. Asked and answered.

THE WITNESS: My report contains research analysis, so I disagree with your question.

BY MR. DRAHOS:

**Q. Tell me where, page, paragraph, you**

identify different means of transportation or a different ambulance company than Sunny Ambulance as being the better alternative than Sunny Ambulance on the day in question?

MS. LOBEL: Form.

THE WITNESS: I am not saying better alternatives. There were alternatives available.

BY MR. DRAHOS:

Q. Tell me where you suggest any different alternatives in your notes?

A. Number 6 research or 11 or whatever, 6 I think it is.

Q. What page is that, sir?

A. It is folder number C.

Q. Sir, I'm not referring to your file there that you want to keep referring there to. I'm talking specifically about Composite Exhibit A that's been handed to you. That's the expert report that's been issued in this case?

A. Yes.

Q. So within Composite Exhibit A, can you tell me where you expressed the opinion that there was a different mode of transportation for a different ambulance company than Sunny

**Ambulance that would have been better to use on the day in question?**

MS. LOBEL: Form.

THE WITNESS: One of my findings is Royal Caribbean Cruises Limited's inaction to the unreasonable ambulance arrival time at the time Harmony of the Seas.

(Off-the-record discussion was held.)

THE WITNESS: Royal Caribbean Cruises Limited, finding 5.3, inaction to the unreasonable ambulance arrival time at the Harmony Of The Seas deprived Burgess the opportunity to receive shore-based medical care as soon as possible.

BY MR. DRAHOS:

**Q. Thank you, Captain. I am looking at 5.3 of your report as well, and you would agree that there is no alternative mode of transportation or ambulance company offered here in your report other than Sunny Ambulance?**

MS. LOBEL: Form. Asked and answered.

Go ahead.

BY MR. DRAHOS:

**Q. You can answer.**

MS. LOBEL: Please don't -- Michael,

with the back and forth with me.
Go ahead, Captain.
THE WITNESS: As I mentioned --
MR. DRAHOS: Don't have speaking objections.
MS. LOBEL: You do it all the time.
Captain, go ahead.
THE WITNESS: As I mentioned, my report is produced based on research analysis and my entire methodology, not every single part of research is mentioned in my report.
BY MR. DRAHOS:
**Q. Okay.**
A. But in order to -- for me to come to the conclusion that Royal Caribbean's inaction to the unreasonable ambulance arrival time, that is based on all the work that is included in this report, not directly, but through research and analysis. Without research or analysis, this report could not have been produced.
So the fact that there may not be a specific mention to an alternate means of transport, it does not exclude that alternate means of transport having been available to

Royal Caribbean.

**Q. So, you agree then that in your expert report identified as Composite Exhibit A, you did not provide an alternative mode of transportation?**

MS. LOBEL: Objection. Form. Asked and answered.

Go ahead. You can repeat yourself if you want.

THE WITNESS: Like I said --

BY MR. DRAHOS:

**Q. I don't want to hear about your expert file that I didn't get until the deposition started. What I want to know is -- and I can't believe you're challenging this, you are not answering it in a straightforward fashion.**

**Yes or no, Captain, do you agree that there is no alternative mode of transportation offered in your report on the day in question?**

MS. LOBEL: Objection, form. Argumentative. You may explain your answer.

THE WITNESS: I have produced this report based on research analysis. A lot

of work, a lot of reviews, documents that led me to the conclusion that the fact that the patient who was suffering a stroke had to wait two hours for an ambulance to arrive that that was unreasonable.

BY MR. DRAHOS:

**Q. I'm going to move to strike as nonresponsive.**

**Yes or no: Is there an alternative mode of transportation offered in your report identified as Composite Exhibit A?**

MS. LOBEL: Objection, form. Asked and answered.

Go ahead.

THE WITNESS: Repeat the question?

BY MR. DRAHOS:

**Q. Sure. Yes or no and then you can qualify it any way you want to. Is there an alternative mode of transportation expressed in your expert report identified as Composite Exhibit A in this case?**

MS. LOBEL: Objection, form. Asked and answered.

You can answer.

THE WITNESS: You keep asking the same

question.
BY MR. DRAHOS:
**Q. And you keep talking about an expert file.**
A. Yes.
**Q. So, I am asking you where in here, where in this report did you --**
A. Research.
**Q. Research in a separate file?**
A. Of course.
**Q. Where is it here in this report?**
A. The report is my entire file.
**Q. You would agree there is no alternative mode of transportation offered in this report?**
MS. LOBEL: Objection, form.
THE WITNESS: There is certainly.
BY MR. DRAHOS:
**Q. Where is it?**
A. It's part of the report.
**Q. Where is it, Captain?**
A. It's part of the production of a report.
**Q. Where in the report?**
A. An expert report needs to be based on

facts. We apply the scientific method. We do research, we do analysis. All that basis for a report results in findings. These findings are not just solely based on what is on paper in the report.

There is a lot of work that goes into producing this report and that file has been produced at the time you requested it at the start of this deposition.

**Q. So let's do it this way then, Captain.**

**In Defendants' Composite Exhibit A, do you offer the opinion that a helicopter was available for Mr. Burgess on the date in question?**

MS. LOBEL: Objection form.

Go ahead.

THE WITNESS: It's part of my research. There were several helicopter companies available in Puerto Rico --

BY MR. DRAHOS:

**Q. Do you offer in Composite Exhibit A --**

A. I haven't finished my answer.

There was a Coast Guard station that was available. There was an airport that was only 10 minutes away. The hospital where

Mr. Burgess needed to be transported to could have been reached by helicopter. That's an alternate means of transporting Burgess, yes.

**Q. Captain, where in this report in Defendants' Composite Exhibit A, do you offer the opinion that a helicopter was available for Mr. Burgess?**

MS. LOBEL: Objection, form. Asked and answered.

You may answer and explain.

THE WITNESS: In my finding 5.3, which states Royal Caribbean Cruise's inaction to the unreasonable ambulance arrival time at the Harmony Of The Seas deprived Burgess the opportunity to receive shore-based medical care as soon as possible.

That finding is based on the research that I have conducted. The unreasonable length of time it took to get the medical care for Burgess, which Royal Caribbean was supposed to do as soon as possible.

It took two hours for that ambulance to arrive. It took another 50 minutes approximately for the ambulance to reach the hospital. A helicopter was an

alternate means of transportation that could have been arranged or could have at least been pursued, but we have no evidence that Royal Caribbean took those steps.

BY MR. DRAHOS:

**Q. So, where in Defendants' Composite Exhibit A is the word helicopter?**

MS. LOBEL: Objection, form. Argumentative. Asked and answered.

Go ahead.

THE WITNESS: In my research.

BY MR. DRAHOS:

**Q. So you would agree it's not anywhere in Defendants' Composite Exhibit A?**

MS. LOBEL: Objection, form. Asked and answered about 5.3 about three times now.

Go ahead.

THE WITNESS: Finding 5.3, Royal Caribbean Cruise's limited's inaction to the unreasonable ambulance arrival time at the Harmony Of The Seas deprived Burgess the opportunity to receive shore-based medical care as soon as possible.

I have additional findings. 5.6,

Royal Caribbean Cruises Limited knew or should have known that Burgess' ambulance traveled at approximately 31 miles an hour for 40 minutes on a 22-mile drive to the shore-based hospital. Royal Caribbean Cruises and this is finding 5.7, failed to act on Burgess' 40-minute long and 31-mile per hour slow ambulance drive to the shore-based hospital -- I'm not finished yet.

BY MR. DRAHOS:

**Q. I didn't say anything.**

A. That's good. So, these findings were based on my research, which indicated that alternate means of transportation were available at the port.

**Q. You can do this in this deposition, you can waste my time, you can waste yours, but you are not going to be able to do this in a courtroom.**

**So you would agree that in that answer you just gave me, you didn't say the word "helicopter" at all?**

MS. LOBEL: Objection, form.

Please don't threaten the witness.

You may answer. Go ahead.
THE WITNESS: I believe I mentioned the word "helicopter" in my research, which is part of my report.
BY MR. DRAHOS:
**Q. It's clear. The judge will take it from here.**
MS. LOBEL: I would ask you to refrain from threatening the witness.
MR. DRAHOS: Nobody is threatening anyone. I'm asking him to be professional.
MS. LOBEL: And I am asking the same, Michael. Thank you.
MR. DRAHOS: Which I am most certainly being, despite the circumstances.
MS. LOBEL: Sorry you feel that way.
BY MR. DRAHOS:
**Q. So, Captain, you are critical of the length of time that it took for the ambulance to arrive on the day in question, correct?**
A. That's my finding. Is part of my research, my analysis, yes.
**Q. But you would agree you don't know why it took so long?**
MS. LOBEL: Form.

THE WITNESS: Nit's irrelevant why it took so long.

BY MR. DRAHOS:

**Q. You would agree that you don't know how many phone calls were made and to whom prior to that ambulance arriving?**

A. I have not seen documentation that was provided by defense counsel --

**Q. You don't --**

A. -- supporting a timeline of phone call.

**Q. You don't how many other ambulance options were available, if any, on the date in question?**

A. I do.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. How many other ambulance options were available?**

A. There were at least three helicopter companies ambulances -- they call them air ambulances -- there was a Coast Guard station that was available that could have been contacted to determine whether those options were available to Royal Caribbean. And it would

certainly have expected a reasonable company to take these actions, as the Royal Caribbean support agent who was the representative was well aware of the issues on the island with regards to ambulance road transportation as was the ship's -- sorry, not the ship's, the doctor Mr. Nobo, I believe, he was -- called was, who advises patients to not wait for an ambulance more than 5 to 10 minutes, but to call or to drive to the hospital themselves because that issue of road transportation is well known in San Juan, Puerto Rico.

**Q. Can you give me the names of any automobile ambulance company options that were available other than Sunny Ambulance on the day in question?**

A. No.

**Q. And you made mention of the United States Coast Guard's air station?**

A. Yes. I don't recall if I said air station. I mentioned United States Coast Guard.

**Q. Are you suggesting that the United States Coast Guard would have facilitated a medical transfer of a patient on a ship tied up pier-side?**

A. Potentially, it's definitely worth researching instead of waiting two hours for a road ambulance to arrive --

**Q. Can you --**

A. -- for a patient who would -- I haven't finished yet. Who has a stroke. Coast Guards serve cruise ships. There is a Coast Guard base right at the port of San Juan. Five-minute walk away, 10-minutes walk from pier number 3.

There is a local airport that serves San Juan or Puerto Rico internally. They have flights. Could a helicopter of the Coast Guard landed at either the Coast Guard base or that local airport, potentially. But that option was not even research -- I haven't finished yet.

**Q. I haven't said anything.**

A. I'm just saying I haven't finished, that's all. Continuing my answer: That option was not researched by Royal Caribbean and I would expect a prudent cruise company who has a patient onboard with a stroke to certainly act on a two-hour ambulance wait.

**Q. So, where in Composite Exhibit A, do**

**you express the opinion that the United States Coast Guard should have been consulted on the day in question?**

MS. LOBEL: Objection, form. Asked and answered.

Go ahead.

THE WITNESS: Part of my research.

BY MR. DRAHOS:

**Q. It's not --**

A. Part of my report.

**Q. Where is the United States Coast Guard referenced in Defendants' Composite Exhibit A, can you show it to me because I haven't been able to find one?**

MS. LOBEL: Objection, form. Asked and answered.

Go ahead.

THE WITNESS: It's in the file that I produced.

BY MR. DRAHOS:

**Q. Your research file?**

A. Research analysis.

**Q. Where?**

A. If you don't need my research and my analysis, don't ask for my entire file.

Q. Well, the way it works for Rule 26, is that your opinions need to be expressed in a written report. You can't come in here and express some sort of opinion that's never been disclosed in some research file somewhere. So my preparation for today's deposition was based upon the report of the opinions you expressed.
So can you tell me where in your report you make a mention of an air ambulance option being available on the date in question?
A. In order to state that the inaction of Royal Caribbean it was unreasonable, one needs to conduct research, which I have done to come to that opinion and that opinion is supported by all the work that it took to produce this report, which you have been provided with.
Q. So do you know when Sunny Ambulance was called on the day in question?
A. I will look that up.
The ambulance was dispatched at 12:21 p.m. That's the time that I found in the documentation that has been provided by both plaintiff and defense.
Q. That's the dispatch?
A. That's the dispatch, correct.

Q. So you don't know what time they were called?

A. I do not recall seeing that evidence having been produced.

Q. So, you expressed the opinion in Defendants' Composite Exhibit A, that the care team should have been engaged and would have facilitated a faster transfer of this patient?

A. Which page of the report are you referring to?

Q. Page 11, opinion 4.4, RCC had several safeguards in place on paper to arrange and monitor the coordination of Burgess' medical emergency. RCC or so-called care team, a team of trained specialists, had the duty to provide professional logistical support for Burgess.

That was your opinion as expressed in your report, correct?

A. Just part of my analysis.

Q. What is the basis for your opinion that Royal Caribbean's care team has any role in coordinating a medical transfer from a ship to a shoreside facility?

A. Repeat the question, please?

Q. Sure. What is the basis for your

opinion that Royal Caribbean's care team has any role in coordinating a medical transfer from the ship to a shoreside facility?
A. They are what is called safety quality management system.
Q. Whose safety management quality system?
A. Royal Caribbean's.
Q. Can you tell me specifically which one?
A. Can you repeat the question?
Q. So my question was: What is the basis for your opinion that the care team, the Royal Caribbean care team, has any role in coordinating a medical transfer of a patient from a ship to a shoreside facility?
A. That is 0.00 introduction care team manual.
Q. What --
A. Revision 10304, 2019.
Q. That are numbers along the bottom right corner?
A. GR000186.
Q. Tell me where within that you are telling me that the care team has a role in

**coordinating a medical transfer from the ship to the shoreside facility of the patient?**

A. There is a part that says guidance, and I quote, in 2006 Royal Caribbean Cruises Limited established a dedicated team of trained specialists who provide professional logistical support and reassurance in the event of our guests experience a personal emergency while staying with us.

**Q. Okay.**

A. It mentions logistical support.

**Q. Logistical support when?**

A. It's logistical support.

**Q. Before, during or after a medical transfer?**

A. None of the stated parts of logistics are excluded, so I would say everything.

**Q. So that's your subjective interpretation of how this reads --**

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. -- you think that the care team?**

MS. LOBEL: Sorry.

BY MR. DRAHOS:

**Q. -- is involved in every aspect of the**

medical transfer from the beginning to the actual execution and then as well afterward; is that what you are telling us?

MS. LOBEL: Form.

THE WITNESS: It's not excluded in Royal Caribbean's procedure, so yes.

BY MR. DRAHOS:

Q. Is that the way it worked at Carnival?

A. Irrelevant. We are talking about Royal Caribbean.

Q. It doesn't matter --

A. And I have a nondisclosure with Carnival.

Q. It's a discovery deposition.

Are you telling the members of the jury that the care team at Carnival was involved in the planning and execution of a medical transfer from a cruise ship to shoreside facility?

A. They are -- there are several teams that are included in medical emergencies, especially when an emergency takes an extensive amount of time like an unreasonable amount of time that Burgess had to go through.

Q. Included?

A. That would certainly require a reasonable company to contact shoreside support for additional support including logistical support to see what the options were.

**Q. So what is the role --**

A. I have not finished my answer yet.

And Royal Caribbean Cruises failed to even seek out an alternate method of transportation.

**Q. So, what was the role of the port agent when it comes to executing medical transfers from a cruise ship tied up pier-side to a shoreside facility?**

A. GR triple O, 117, states that the port agent is Royal Caribbean's representative in the port cities.

That's the first part of my answer there. There is another part coming that requires a little reading of this document.

**Q. Okay.**

A. One role is mentioned on GR, triple O, 119, that also pertains to medical evacuations. And I am referring to item 1.1.21 that states in the contract between Royal Caribbean and their representative that the port agent that

participate in advanced planning with the vessel staff corporate office prior to the first call and periodically during the season as requested.

And the agent was requested to assist Burgess as we know in his logistical transportation --

**Q. Okay.**

A. -- to the hospital.

**Q. Okay.**

A. And there is more to my answer.

GR, triple 0, 121 the port agent answering your question third part, 1.1.33, guest and crew medical responsibility of the Royal Caribbean representative. The port agent states that the agent shall understand the role and responsibilities of the Royal Caribbean Cruise Line care team.

The care team is a group of professionals on the medical direction who are able to support guests and crew members who are in the process of being disembarked from the vessel due to a medical emergency or other crisis such as a psychiatric emergency or sexual assault. Agent shall ensure that they have current 24-hour contact information.

And I have not finished my answer. Yes, there is more.

Same document GR, triple O, 121.1.1.34. Guest and crew medical falls under the port agent who was Royal Caribbean's representative. And that state, from time to time as needed unless otherwise agreed upon and documented separately, agent shall at no extra charge and as part of agency fee. And there is always one of those items states that the agent Royal Caribbean's representative will coordinate ground ambulance as requested by ship at facility/crew medical/care team.

He will also coordinate transportation to and from medical appointment. He will also coordinate ground transfers between hotels and hospitals for crew, relatives of guests or CTAs, care team associates.

**Q. Are you finished with your answer?**

A. I am.

**Q. Okay. So would you agree in your own report on page 12, you state the port agent was tasked with arranging Burgess' ambulance?**

A. He did precede that request, yes.

**Q. Are you suggesting to the members of**

**the jury that the care team should have supplanted the role of the port agent in this case?**

A. Can you pick another word for -- what was the word?

**Q. Supplanted?**

A. Another word, please, for that word.

**Q. Sure. Are you suggesting that the care team should have taken over for the port agent?**

A. Absolutely not.

**Q. So do you have any evidence that the Royal Caribbean care team could have done anything differently than what the port agent was doing on the day in question?**

A. The entire team -- the entire company Royal Caribbean Cruises could have certainly explored other means of transport and, yeah, modes to speed up this process.

**Q. Who, a care team associate or a care team specialist?**

A. Either one, anyone, a doctor, a nurse, a care team associate, a care team specialist, somebody who realizes and understands that waiting for an ambulance while you have a stroke

for two hours is unreasonable, while you were docked in a metropolitan city like San Juan, the capital of Puerto Rico.

**Q. So you're suggesting that a care team associate could have made other calls or done other things to help facilitate this transfer; is that what you're saying?**

A. It's not one person who makes that decision. It's a team effort, as in any company. A Royal Caribbean is a huge company.

**Q. I'm not trying to pin you down on specifics.**

A. I have not finished my answer yet.

There are a lot of wheels that take to make things happen. One of those wheels is identified at Royal Caribbean as a care team associate that is one little wheel in their entire process.

Everybody is able to come up with suggestions for improvement and that includes care team associate. They could have identified, and that's actually their role, to assist in the logistics of a patient from A to B. When that takes a two-hour wait time and almost an hour journey on land, I find that is

an unreasonable amount of time.

**Q. So --**

A. So could that care team associate suggested -- suggested an alternate means, certainly. Could have that care team associate have identified that that was taking too long or taken an unreasonable amount of time, certainly, yes.

**Q. Do you know who Ray Gonzalez is?**

A. No.

**Q. Never heard that name?**

A. I don't recall.

**Q. So, you've apparently done some research that discusses the fact that there were three ambulance companies available on San Juan. Can you tell me definitively whether any one of those three had an asset available on the day in question to facilitate a transfer?**

MS. LOBEL: Form.

THE WITNESS: I would say is most -- the most important answer to this question is that Royal Caribbean doesn't even know that answer because they never researched this option.

I'm not -- I did not look whether or

not they were -- had availability of an ambulance or a helicopter. Royal Caribbean as a reasonable company could have and should have identified the issue of this significant delay in providing Burgess with medical care and should have and could have seeked out alternate arrangements to speed up in accordance with his -- with their own policy to speed up this medical evacuation.

BY MR. DRAHOS:

**Q. So do you have any evidence, Captain, that there was any other specific resource by name that was available any sooner than 12/21 on the date in question?**

MS. LOBEL: Form.

THE WITNESS: Defense counsel did not produce phone records, emails or any attempt to seek out alternate means of medical evacuation.

BY MR. DRAHOS:

**Q. So the answer is no, you don't have any specific names of any resources that would have been available any sooner than 1221 on the day in question?**

MS. LOBEL: Form.

THE WITNESS: The Royal Caribbean Cruises didn't provide any information and neither do I. I don't have that.

BY MR. DRAHOS:

**Q. So let's discuss your analysis of the information that you were provided.**

A. Before we do, can we have a little break?

**Q. Absolutely.**

THE VIDEOGRAPHER: Off the record, 11:56.

THE VIDEOGRAPHER: On the record. The time is 12:02 p.m.

BY MR. DRAHOS:

**Q. Before I go any further, just a housekeeping thing here. I'm handing you what we will mark as Composite Exhibit B to the deposition.**

(Whereupon, Exhibit B, Rebuttal Report was marked for identification.)

BY MR. DRAHOS:

**Q. This is a two-page document that was published by you on September 19th of 2022, correct?**

A. Correct.

**Q. That was your rebuttal report?**
A. Yes.
**Q. Okay, thank you. I'm going to hand you what we are going to mark as Defendant's Composite Exhibit 3.**
MS. LOBEL: 3 or C?
MR. DRAHOS: Am I using letters?
MS. LOBEL: Yes.
MR. DRAHOS: C. Thank you.
MS. LOBEL: Okay.
(Whereupon, Exhibit C, Sunny Document was marked for identification.)
BY MR. DRAHOS:
**Q. This is a three-page document. I'd like to ask you whether or not you've seen that before today?**
A. I believe I have that as part of my file, yes.
**Q. What do you recognize Defendant's Composite C to be?**
A. What do I recognize?
**Q. Yes.**
A. Is that the question?
**Q. What do you understand it to be?**
A. I understand that this is a Sunny

Ambulance document.
Q. Do you know what a run report is?
A. Can you repeat that?
Q. Yes. Do you know what a run report is?
A. Run report?
Q. Yes.
A. R-U-N, no, I do not.
Q. Do you speak Spanish?
A. No.
Q. Do you know who amongst the Sunny Ambulance crew was driving the ambulance on the day in question?
A. I know that numbra means name.
Q. Okay.
A. But I do not know who the driver was.
Q. Do you know anything about the qualifications of any of the members of the Sunny Ambulance crew who performed this service on the day in question?
MS. LOBEL: Form.
THE WITNESS: That's totally out of my expertise.
BY MR. DRAHOS:
Q. Do you know where the Sunny Ambulance

**was located at the time of dispatch?**

MS. LOBEL: Form.

THE WITNESS: I know how long it took for them to get to the ship.

BY MR. DRAHOS:

**Q. Do you know where the Sunnny --**

A. Where they came from, whether it was McDonald's or Wendy's or a parking lot somewhere, I don't know.

**Q. So it's your opinion that this ambulance was dispatched at 12:21 p.m. Puerto Rico time?**

A. Give me a moment.

The ambulance records show that the ambulance was dispatched at 12:21 p.m.

**Q. Puerto Rico time?**

A. Puerto Rico time.

**Q. And do you see those numbers in the upper left-hand corner that begin with the three, 334508?**

A. Yes, I see them.

**Q. What do those numbers denote?**

A. That hasn't been translated, but for my limited understanding of the Spanish language that means miles.

**Q. So, is it your contention that those numbers in that box are in miles or in kilometers?**

A. In order to answer that question I need a translator, Spanish translator, whether this is miles or whether that is kilometers, if it is indeed miles.

**Q. So, you don't know?**

A. I don't know. It could be a phone numbers as far as I know. That part has not been translated for me.

**Q. So whether it was miles or kilometers, would you agree that the ambulance was dispatched at 12:21 and arrived to the port at 12:54?**

A. The ambulance arrived at the ship at 12:54 and was dispatched at 12:21, I agree.

**Q. So whether they drove 10 kilometers -- strike that.**

**How many miles are 10 kilometers?**

A. Can I use Google? I don't have my computer here with me.

**Q. Do you have access to Google anywhere?**

A. I can get my phone.

**Q. How about I do this, how about I do**

**this: If I were to represent to you that 10 km equals 6.2 miles; does that seem about right to you?**

MS. LOBEL: Form.

THE WITNESS: I need Google. I need to get my phone.

BY MR. DRAHOS:

**Q. Okay. Why don't you get whatever you need, so that we can do these calculations.**

THE VIDEOGRAPHER: Would you like to go off the record?

MR. DRAHOS: Let's see if it takes him a second. He should be able to just grab his phone.

THE WITNESS: Repeat the question, please?

BY MR. DRAHOS:

**Q. Sure. How many miles are in 10 kilometers, what is the conversion from 10 kilometers to miles?**

MS. LOBEL: Form.

THE WITNESS: 6.21 miles in 10 kilometers.

BY MR. DRAHOS:

**Q. So would you agree whether it was**

10 kilometers or 6.21 miles, they reached that -- it took them 23 minutes to accomplish that time of space?

MS. LOBEL: Form.

THE WITNESS: I need to get a notebook.

BY MR. DRAHOS:

Q. I'm sorry?

A. Can I get a notebook?

Q. Sure. Whatever you need to answer the question.

A. I need to write some stuff down.

Q. Okay. So are we both in agreement then that whether it was 10 kilometers or a 6.21 miles, it took them 23 minutes to accomplish that length of space?

MS. LOBEL: Form.

THE WITNESS: Can you define the length of space?

BY MR. DRAHOS:

Q. Sure. Either 10 Kilometers or 6.21 miles, whatever conversion we are using, it took them 23 minutes to drive that length?

MS. LOBEL: Form.

THE WITNESS: Could you give me a speed?

BY MR. DRAHOS:

**Q. Well, Captain, no. Actually, that's not my question. So let me ask it a different way. Maybe it will be easier to answer.**

**Would you agree that it took them 23 minutes to get from 334508 to 334518?**

A. Can you repeat those numbers?

**Q. Sure. It took 23 minutes for them to get from 334508 to 334518?**

MS. LOBEL: Form.

THE WITNESS: The question was whether 10 kilometer is the same as 6 miles?

BY MR. DRAHOS:

**Q. No, no. The question was simply: Do you agree that it took them 23 minutes to get from 334508 to 334518?**

MS. LOBEL: Form.

THE WITNESS: 23 minutes you said?

BY MR. DRAHOS:

**Q. Yes, sir.**

A. I disagree.

**Q. Let's do it this way. Do you agree that according to this run report at 334508 it**

**was 12:21, yes?**

A. Repeat the question?

**Q. Sure. Would you agree that according to this run report at 334508 it was 12:21 p.m.?**

MS. LOBEL: Form.

THE WITNESS: Yeah, that's what it says. 334568 or is it 334508?

BY MR. DRAHOS:

**Q. You tell me.**

A. It was a little unclear to me.

**Q. You don't know?**

A. That part has not been translated for me, no. I don't know. I did not look at that part.

**Q. So you don't know whether or not they originated at 334508 or 334568; is that what you're saying?**

MS. LOBEL: Form.

THE WITNESS: It's probably 334508, because they were making a journey from A to B.

BY MR. DRAHOS:

**Q. It will be pretty hard for them to reduce the mileage in their vehicle, wouldn't it?**

MS. LOBEL: Form.
THE WITNESS: I'm not a mileage car expert. You need to ask someone else how easy that is.
BY MR. DRAHOS:
**Q. If it was 12:21 at 334508 and it was 12:54 at 334518, doesn't it stand to reason that it took them 23 minutes to travel that length of space?**
MS. LOBEL: Form.
THE WITNESS: No.
BY MR. DRAHOS:
**Q. How much space did they travel in -- actually strike that.**
**How much time did it take for them to travel from 334508 to 334518?**
A. 54 minus 21 equals --
**Q. 33.**
A. -- 33 minutes.
**Q. 33 minutes, okay.**
A. Not 23 minutes as you have been saying all along.
**Q. So do you know why it took them 33 minutes to travel that length of time?**
A. No.

**Q. And you don't know whether or not they traveled 10 kilometers or 10 miles?**

MS. LOBEL: Form.

THE WITNESS: I do not know whether -- it says mileage in Spanish, from what I understand in my limited Spanish proficiency.

BY MR. DRAHOS:

**Q. Okay. So does that mean that it's your contention that according to this run report, it took them 33 minutes to travel 10 miles?**

A. 10 miles, 10 kilometers, whatever it is. It took 33 minutes that distance that they traveled.

**Q. Whether it was kilometers or miles, doesn't matter to you?**

MS. LOBEL: Form.

THE WITNESS: Of course it matters. If there's a different speed that comes out of it as a result.

BY MR. DRAHOS:

**Q. Do you know what the traffic conditions were at the time?**

MS. LOBEL: Form.

THE WITNESS: I know how long it took for them to travel a certain distance from the ship to the hospital and that an ambulance who has a critical care patient onboard with a stroke who needs attention as soon as possible, that he was traveling in an ambulance at about 30 miles an hour.

BY MR. DRAHOS:

**Q. So, I'm going to move to strike as nonresponsive and ask the question again.**

**Do you know why it took 33 minutes for them to travel this length of space?**

A. No.

MS. LOBEL: Norm.

BY MR. DRAHOS:

**Q. You don't know what the traffic conditions were at the time?**

MS. LOBEL: Form.

THE WITNESS: I do not.

BY MR. DRAHOS:

**Q. Does it seem unreasonable to you, an unreasonable amount of time to you, to take 33 minutes to travel 10 miles?**

MS. LOBEL: Form.

THE WITNESS: Whether that's

unreasonable for an ambulance with a patient onboard syrens going, lights going, I think that's -- definitely requires, in my opinion, a reasonable cruise company to research alternate means of transportation.
BY MR. DRAHOS:
**Q. Do you know what roads the ambulance crew took to get from 33508 to 33518?**
A. No.
**Q. Is it your contention that the ambulance crew arrived to the port at 12:54?**
A. My information states that the ambulance arrived at the ship at 12:54, pier entry.
**Q. Is it also your contention that the ambulance left the port at 13:08?**
A. Yes, that is what it states. That's what's been translated for me.
**Q. So then does that mean that it took 14 minutes for the ambulance company to arrive on scene and transport Mr. Burgess from the ship to the ambulance?**
A. Repeat the question?
**Q. Sure. Does that mean that it took the ambulance crew 14 minutes to arrive at the port,**

**pick up Mr. Burgess, and deliver him into the ambulance?**

A. We have an arrival time of 12:54. We have a departure time of 13:08. Who conducted the actual transportation of the patient whether that was the ambulance crew or whether that was the ship's crew or a combination of both is unknown, but we do have a time frame of 14 minutes between ambulance arrival and ambulance departure.

**Q. And you would agree that your report does not offer any criticisms as to the length of time it took to complete this step?**

A. Can you define "this step?"

**Q. Sure. The step of arriving at the ambulance, picking up Mr. Burgess and -- arriving at the port, picking up Mr. Burgess and putting him into the ambulance, that step taking 14 minutes, you would agree you did not offer any criticisms that that was an unreasonable amount of time?**

A. I have an opinion that states Royal Caribbean Cruises inaction to the unreasonable ambulance arrival time at the Harmony Of The Seas deprived Burgess the opportunity to receive

shore-based medical care as soon as possible.

**Q. Right. Arrival time of the ambulance, we have talked about that. But now I'm asking you: From the time the ambulance arrived until the time it left, being 14 minutes, you would agree there are no criticisms in your report as to that length of time being unreasonable?**

A. I would like to continue with my previous answer.

Finding 5.7, Royal Caribbean Cruises Limited failed to act on Burgess' 40-minute long and 31-mile per hour slow ambulance drive to the shore-based hospital. So I have a finding on the arrival. I have a finding concerning the drive from the shore to the shore-based hospital. So my answer is that to your question is, I agree.

**Q. So do you agree that the run report provided details as to the condition of Mr. Burgess?**

A. I don't speak Spanish. I don't have medical expertise to answer that question. You have depositions of various doctors that you can ask that question to.

**Q. So then you don't know?**

MS. LOBEL: Form.
THE WITNESS: I don't speak Spanish.
I don't know.
BY MR. DRAHOS:
**Q. So you would agree that your report does not offer any opinions as it relates to the sufficiency of the information that was relayed from the ship's medical crew to the ambulance team?**
MS. LOBEL: Form.
THE WITNESS: That requires a medical expert to provide an opinion to that matter. That is not me.
BY MR. DRAHOS:
**Q. So, do you have any basis to dispute that when the ambulance company left the port, they were aware that Mr. Burgess's circumstances were an emergency?**
MS. LOBEL: Form.
THE WITNESS: That's a medical question for a medical expert. Like I said, I'm not a medical expert.
BY MR. DRAHOS:
**Q. Do you know what a stroke is?**
A. I've read it in deposition material.

You have that answer from a doctor. And I would like to refer to that answer. I will read it out to you -- let me just find it, if I have it, if I have printed it out, so to say.

**Q. You are going to read to me the medical definition of stroke?**

A. I'm going to read the explanation of a medical expert to what a stroke is.

**Q. That's okay. I don't need you to recite another expert's definition.**

**Would you agree that the word "stroke" is written five times in this two-page ambulance report?**

A. I don't speak Spanish.

**Q. You don't need to speak Spanish.**

A. What is "stroke" in Spanish, is it mentioned there?

**Q. How do you spell stroke?**

A. S-T-R-O-K-E in English.

**Q. So in looking at this form, do you see the word S-T-R-O-K-E written five times in this-two-page document?**

A. Hold on. Let me pull that document up.

Are you also referring to the

written text by hand or just the typed?

Q. No, every instance here where it says S-T-R-O-K-E, would you agree it's written five times in this two-page documents, at least five times?

A. Sunny Ambulance?

Q. Yes, sir.

A. I found two. I may have missed a couple.

Q. So, it's your contention in this case that the ambulance company left the port at 13:08, correct?

A. Yes.

Q. That would be this marker 334518, correct?

A. Yes.

Q. And they arrived at 334560 at 13:50, correct?

A. Yes.

Q. Yes?

A. Yes.

Q. And so do we agree then that it took them -- well, strike that.

How many minutes did it take for them to travel from 334518 to 334560?

A. One hour 29 minutes.
**Q. Let's try that again, Captain. So if they left 334518 at 13:08 and they arrived at 334560 at 13:50, how many minutes in total have elapsed?**
A. 47.
**Q. 47 or 42? 1308 and 1350 is 42 minutes, right?**
A. Oh, you are talking 1350. That's 42 minutes, yes.
**Q. Okay. So 42 minutes?**
A. Uh-huh.
**Q. Do you know what their travel route was?**
A. No.
**Q. Do you know what travel conditions they faced?**
A. No.
**Q. Do you know whether they had to go over any bridges or any tunnels?**
A. No.
**Q. Did you ever drive that route yourself?**
A. I don't know what route they took, so I'm not able to answer that question.

**Q. Have you ever driven from the port of San Juan to Hima Caguas?**

A. Not that I recall.

**Q. Have you ever been to Puerto Rico?**

A. Yeah, I've been to Puerto Rico numerous times, yes.

**Q. When was the last time?**

A. That would have been approximately, 2014 or 2015. I do not recall whether I visited that port in my role as commodore/director of stability with Carnival, but I may have. I don't recall.

**Q. So have you ever been to Caguas, Puerto Rico?**

A. Not that I recall.

**Q. So, you did a MapQuest -- does a MapQuest printout attached to Composite Exhibit** A to your report -- I'd like to ask you about that.

A. Which exhibit are you looking?

**Q. You can look at mine, Composite Exhibit A. It's the last page of it, Composite Exhibit A.**

A. My findings, page 13 of my report.

**Q. The last page.**

A. This is Exhibit A?
**Q. No, there is MapQuest printout there?**
A. No, no, sir. This is not Exhibit A. This is Exhibit A.
MR. DRAHOS: We'll take a break now.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: Off the record at 12:30.
(Recess was taken from 12:30 p.m. to 1:01 p.m.)
THE VIDEOGRAPHER: On the record. The time is 1:01 p.m.
BY MR. DRAHOS:
**Q. So, Captain, when we left off, we were going over what's marked as Defendants' Composite Exhibit A, the last page being a MapQuest printout.**
**Let me know when you get there.**
A. I'm here.
**Q. Okay. First of all, did you prepare this MapQuest printout?**
A. Yes, sir, I did.
**Q. And I'd like to ask you how you came to some of these figures. First of all, the typewritten information along the top of that page, that starts with the shortest distance, is**

**that your work product?**

A. I don't see the shortest distance on the last page of Exhibit A.

**Q. So you don't have a MapQuest printout?**

A. This is marked Exhibit A, this is the last page?

**Q. There should be one more page there that has a MapQuest printout. Did you pull it out before lunch?**

A. No, I did not.

**Q. Do you have this MapQuest printout as part of your file?**

A. That is Exhibit C, is that what it says?

**Q. It says Exhibit D.**

A. I should have a printout of that, maybe.

MS. LOBEL: It's the same folder you have.

BY MR. DRAHOS:

**Q. Just for the sake of clarity, so that there is no doubt later on, let's go ahead and just mark that particular exhibit as -- what number are we on, anybody know?**

MS. LOBEL: D.

(Whereupon, Exhibit D, Calculations was marked for identification.)

BY MR. DRAHOS:

Q. D. Letter D.

I'll hand that back to you, captain?

A. Yeah, thank you.

Q. So along the top there of Exhibit D, it says the shortest distance from the pier, that's your work product?

A. This is my word product, yes.

Q. These typed written calculations on the bottom is also from you?

A. That's correct, yes.

Q. So according to your MapQuest research -- by the way, how did you come to these figures?

A. Type in point of departure at Google Earth, type in arrival point and it comes up with various distances. Out of the three options that we were provided by Google Maps -- excuse me -- not Google Earth, by Google Maps, 21.9 miles was the shortest distance.

Q. So you say three options. I only see two here. Where is the third option?

A. I see -- if I look at the map, one option that says 21.9 miles. I see the second option that says 22.7 miles. I see a third option that says 25.6 miles.

**Q. Go ahead.**

A. And that's one out of three.

**Q. So the end point destination that you used was the physical address for Hima Saint Pablo Caguas?**

A. The hospital, yes, correct.

**Q. So, in looking at this MapQuest research, the ranges for distance are, the shortest destination being 21.9 miles, the longest destination being 25.6 miles, correct?**

A. That's Google Maps came up with, yes.

**Q. Can you go back to the run report that we marked as an exhibit earlier?**

A. Yes.

**Q. So in looking at the starting point being 334518 at 13:08, in the end point being 334560, how many miles did the ambulance company drive from the port until they reached the hospital?**

MS. LOBEL: Form.

THE WITNESS: You told him the time of

13:50 and 13:08?

BY MR. DRAHOS:

**Q. 13:08 to 13:50, yes, sir.**

A. That would be 42 miles.

**Q. Do you know whether or not that's 42 miles or 42 kilometers?**

A. As I said, I don't speak Spanish. I assume it is miles because it says Milaha (phonetic). I don't even know how to pronounce it. As I mentioned, I have not used that part because we didn't -- it wasn't translated for me.

**Q. So in your calculations, you would agree that you chose the shortest distance between the two points in reaching your estimated miles per hour calculation?**

A. I did.

**Q. And so what you did was you took the 21.9 miles and you converted that over 42 minutes, correct?**

A. That's correct.

**Q. Would you agree that what you just testified to a moment ago was that this crew actually drove 42 miles, not 21.9?**

A. I need to get this translated if these

are his miles or if these are kilometers. We need some clarification here as to why there is a discrepancy between my calculations and this Spanish record.

**Q. So, wouldn't you agree that you don't know how fast the ambulance was traveling on the date in question?**

A. I would expect a reasonable ambulance to take the shortest route. Google Maps shows the shorter route.

**Q. I am going to move to strike as nonresponsive.**

**Wouldn't you agree that you don't know how fast the ambulance was traveling on the day in question from the port to the hospital?**

A. If the ambulance took the shortest route in accordance with Googles Maps of 21.9 miles, they would have been traveling at approximately 31 miles per hour. Is that distance longer, did they take a different route, this calculation does not apply to that situation.

**Q. Well, it doesn't apply to any situation because whether or not we calculated as 42 miles, meaning 334518 to 334560 is miles,**

**and that's 42 miles, they would have traveled twice as far as what you have calculated in your calculations over that same 42-minute span, agreed?**

MS. LOBEL: Form.

THE WITNESS: If that is indeed the distance that this ambulance chose, a route that is twice as long as the shortest route to the hospital with a patient onboard who required medical attention as soon as possible.

BY MR. DRAHOS:

**Q. If this was --**

A. -- then, yes.

**Q. -- 334518 to 334560 in Kilometers, that's still doesn't translate to 21.9 miles?**

A. No.

**Q. Agreed?**

A. Correct.

**Q. So, do you know why on your MapQuest it indicates here that the shortest distance, that being the 21.9 miles, should take an hour and 12 minutes?**

A. It takes into consideration traffic based on my experience of working with Google

Maps.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So, wouldn't you agree then that if the ambulance crew traveled that distance from the port to Hima Caguas, they got it done in a much shortest period of time than what MapQuest suggested it should be done?**

MS. LOBEL: Form.

THE WITNESS: Can you repeat the question?

BY MR. DRAHOS:

**Q. Sure. If it took the ambulance crew 42 minutes to get from the port to Hima, they beat the MapQuest calculation by quite a bit; didn't they?**

MS. LOBEL: Form.

THE WITNESS: They drove a distance that was twice as long.

BY MR. DRAHOS:

**Q. That's not the question that I asked.**

**Your MapQuest calculation, the shortest time being an hour and 12 minutes, is much longer than the 42 minutes it took the ambulance crew to actually accomplish the**

**transfer in this case?**

A. I did not take the time as stated by Google Maps into my calculation. It states at this moment in time, if we travel a different times of the day, the time it takes from point A to B changes due to traffic conditions.

**Q. So, I mean, you have absolutely no idea if this ambulance crew traveled 31 miles an hour or they traveled 60 miles an hour, you have just simply taken a MapQuest equation and extrapolated that over 42 minutes and came to a conclusion that they were driving 21 miles an hour?**

MS. LOBEL: Form.

THE WITNESS: I know that the shortest route is 21.9 miles, which is the shortest distance that is available to this ambulance.

BY MR. DRAHOS:

**Q. Right.**

A. It would be a reasonable expectation to expect an ambulance with an urgent patient onboard, Mr. Burgess, to take the shortest route, and not travel a distance of 40 miles or that is twice as long.

**Q. So, we know based upon the mileage, whether it's kilometers or it's miles on the run report, that they did not travel what you believe to be the shortest distance. Do you know why?**

MS. LOBEL: Form.

THE WITNESS: There is a discrepancy between the mileage that is provided on Google Maps and a discrepancy on the Sunny Ambulance report.

BY MR. DRAHOS:

**Q. Okay.**

A. Because that discrepancy on the ambulance report is unknown.

**Q. So in other words, if you are claiming that it should be a 21.9-mile trek between the port and the hospital and the Sunny Ambulance run report is indicating otherwise, you don't know why there is a discrepancy; do you?**

MS. LOBEL: Form.

THE WITNESS: There is a mention in my limited Spanish of hospital Hima Cupey, C-U-P-E-Y there, that could indicate that this ambulance drove 40 miles because -- twice as long as it should have because he

went to the wrong hospital.
BY MR. DRAHOS:
**Q. Do you know where Hima Cupey is located?**
A. I know it's a different hospital from Hima Pablo Caguas.
**Q. Do you have any evidence that they drove to Hima Cupey?**
A. There is a mention of it on the Sunny Ambulance record.
**Q. Other than a mention, is there any evidence in this case that they actually arrived there?**
MS. LOBEL: Form.
THE WITNESS: All I can say is I see it on this report.
BY MR. DRAHOS:
**Q. Again, other than what's written on this report, do you have any evidence that they actually drove there?**
A. Besides what is on the report and the discrepancy in the mileage, no, I do not.
**Q. Have you read Mr. Henze's deposition transcript?**
A. Yes, I have.

Q. And did you make mention of the fact that they went from the port to Hima Caguas?

MS. LOBEL: Form.

THE WITNESS: That's where they ended up, yes.

BY MR. DRAHOS:

Q. Is there any testimony from Mr. Henze that they drove to Hima Cupey, did a stroll around the hospital and then drove over to Hima Caguas?

A. All we know now is that the ambulance traveled the distance that is twice as long as the shortest route.

Q. Do you know whether or not they drove that distance because there was a disruption in the roadway that required them to use an alternative route?

MS. LOBEL: Form.

THE WITNESS: It could be because they went to the hospital in Hima Cupey, which is mentioned on the Sunny Ambulance record.

BY MR. DRAHOS:

Q. Or is it --

A. If we accept that everything on this record is correct, including hospital Hima

Cupey, including the mileage or are we going to say this is incorrect and that's correct or that's correct and that's incorrect.

**Q. So did you opine in your report that they drove to Hima Cupey?**

A. No, I do not.

**Q. All right.**

A. I opine on the final destination.

**Q. Do you have an explanation as you sit here today for why they traveled a different route than the route you are suggesting in your MapQuest?**

A. I see the discrepancy with a different hospital that is mentioned on the Sunny Ambulance record, which could be an explanation as to the difference in mileage between my calculations of it being 21.9 miles and the actual distance that was driven according to the record, which was 42 miles.

**Q. How about this, Captain, is another scenario. Do you know what the road marker, what system of metrics they use in Puerto Rico?**

A. No.

**Q. For road markers?**

A. No, I have not researched that.

Q. Would you be surprised to learn that they use kilometers?

A. Could be.

Q. And would you be surprised to learn that 42 kilometers equals 26.1 miles?

A. Could be.

Q. Be so if they drove 42 kilometers, which equates to 26.1 miles, do you know why it was that they drove 26.1 miles?

A. If we are assuming that Milaya (phonetic) As it is stated on the form of Sunny Ambulance means kilometer, I don't have an explanation for that.

Q. So let me take your scenario here and just ask you about this. Are you telling the members of the jury, that you believe that certified paramedics who made five references in the run report to Mr. Burgess being suspected of a stroke, drove a patient to the only certified stroke center on the island at a rate of speed of 31 miles per hour?

MS. LOBEL: Form.

THE WITNESS: How do I know that is the only stroke facility on the island?

BY MR. DRAHOS:

**Q. Let me ask it a different way then: Are you telling the members of the jury that you believe that the ambulance crew for Sunny Ambulance drove from the port to Saint Hima Caguas at a rate of speed of 31 miles per hour?**

MS. LOBEL: Form.

THE WITNESS: If they chose the shortest distance, that calculation is correct.

BY MR. DRAHOS:

**Q. Did you get any testimony from them in this case that you can rely upon in support of that opinion?**

A. I have this record that's what we have. We have mileage or kilometers. We have a different destination, Cupey versus Caguas. That's the material that I had to work with.

**Q. Did you ever speak to the ambulance drivers?**

A. I am provided with material from plaintiffs' counsel, defense counsel and I have not been provided with a telephone number of the ambulance crew.

First of all, I don't speak

Spanish. I don't know if they speak English, but the answer is me personally, no, I have not spoken with the ambulance driver or the ambulance crew.

**Q. So if there's no deposition testimony from these drivers and you never actually spoke to them, wouldn't you agree that you have no clue what went on between the time that they left the port until the time they arrived at Hima San Caguas?**

MS. LOBEL: Form.

THE WITNESS: What I do have a clue about is that the shortest distance is 21.9 miles and we know how long that took and that results in an average speed of 31 miles an hour. I have no explanation as to why they potentially drove 42 miles or 42 kilometers or went to another hospital first or not.

I would reasonably expect that that ambulance took the shortest route to the hospital that was arranged in Caguas.

BY MR. DRAHOS:

**Q. So let me ask the question again, to give you another shot at it.**

**Wouldn't you agree that since you didn't read any deposition testimony from any ambulance drivers and you never spoke to any of the ambulance drivers who were involved in this incident, you do not know the details of what went on from the moment they left the port until the moment they arrived at Hima Caguas?**

MS. LOBEL: Form.

THE WITNESS: Disagree.

BY MR. DRAHOS:

**Q. Okay. Tell me about the traffic conditions that they encountered?**

A. I know the mileage.

**Q. Tell me about the traffic conditions?**

A. We have the shortest distance. We have the length of time it took. What the traffic conditions was -- were, I don't know.

**Q. Which means you don't know what they encountered on the roadway when they left the port?**

MS. LOBEL: Form.

THE WITNESS: I don't know and I would like to explain why I don't know and why that is not applicable. And it is not applicable because we have a patient

onboard who had to be transferred from point A to point B. The shortest distance is known. The reasonable amount of time that that journey should take should be known to Royal Caribbean.

I have not been provided with any documentation that shows that that information on their journey was transferred over to Royal Caribbean shoreside or to the ship's captain. That information is not available.

BY MR. DRAHOS:

**Q. So, when did you print this MapQuest out, specifically what time of the day and what date?**

A. That was sometime before the production of my report.

**Q. So you would agree that this MapQuest printout is not a printout of the actual transport from the port until Hima Caguas on the date in question during the transport in question, agreed?**

MS. LOBEL: Form.

THE WITNESS: I agree that the time will change. Shortest distance of 21.9

miles remains 21.9 miles.
BY MR. DRAHOS:
**Q. Captain, you would agree that this printout of the MapQuest demonstration showing point A being the port, point B being Hima Caguas, is not a printout of the actual transport that took place in this case?**
A. No, it is not.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. So in your example that you've provided to us, the shortest distance being 21.9 miles was actually longer than the longest distance?**
A. Longer in time.
**Q. Longer duration of time?**
A. Yes, correct.
**Q. And that's because there was a 38-minute slowdown, agree?**
A. Agree.
**Q. How do you know that the ambulance drivers on the day in question didn't encounter any type of slowdown like the one that's depicted in your own MapQuest report?**
A. If they had encountered a slowdown, a

care team associate could have been onboard and should have been aboard and provided that logistical data to Royal Caribbean.

**Q. And I am glad you brought that up.**

A. I have not seen any correspondence or information in that regard that there was an issue.

**Q. Let's take that scenario. Let's say that in Captain Keijer's world, a care team associate is dispatched with the ambulance crew. They encounter some sort of interference during the transport from point A to point B. What do you expect the care team associate to do at that point?**

A. Traffic conditions were known before the departure of the ambulance in most instances. This morning when I had to drive to this location, I checked Google Maps and that provides you with information before the journey starts on how long you can expect that journey to last.

There may be changes, but the main concern is the two-hour wait and this journey itself, the whole process, it warranted notification by somebody of Royal Caribbean for

additional support and speed of this process.

**Q. So, again accepting your hypothetical, and let's say that there is somebody there and they make a notification, what do you expect to happen in response?**

A. Seek alternate means that provides quicker transportation to the hospital as per their SQM, their own procedures says that --

**Q. So you're saying that --**

A. I haven't finished yet.

Their own procedure states that medical care needs to be provided as soon as possible and the ship's position requested a medical evacuation. That requires the quickest means possible to get someone to an appropriate facility.

**Q. So --**

A. If the crew or somebody, the port agent or somebody onboard had been aware that there was -- that the shortest distance of 21.9 miles was going to be covered in approximately 30 miles an hour, in combination with the two-hour delay, alternate arrangements -- somebody could have been notified at Royal Caribbean to attend to speed up that process.

**Q. How would they do that?**

A. They would, first of all, notify the captain. Captain can be made aware, head office can be made aware and they could seek out alternate arrangements like a Coast Guard station for a helicopter or potentially the other companies in Puerto Rico.

**Q. Let me make sure, in fairness to you, that you are answering the question. I'm taking your hypothetical that a care team member is with this dispatch unit, this ambulance company and they are driving to Hima Cupey -- or I'm sorry, Hima Caguas, and it's taking longer than it should. You are saying that that person should contact the captain and notify him, hey, is taking longer to get there than it should, correct?**

A. Yes, correct.

**Q. And what is the captain supposed to do at that point?**

A. Call the office, call the head office of Royal Caribbean.

**Q. What are they going to do?**

A. That's teamwork.

**Q. What are they going to do?**

A. There is a nautical team, there is shoreside, there is the port specialist who works with port agents, there is a medical department.

**Q. Okay. What are they going to do?**

A. They need to -- and they need to come up with a solution, if they can. But at least attempt to come up with an alternate.

**Q. So do you have a solution of what a care team member or the captain or somebody shoreside could have done if this Plans company wasn't driving fast enough to Hima Caguas?**

A. They know how long it's going to take before the ambulance takes -- it takes -- it takes off. They had two hours to figure that out because Burgess was waiting. For two hours. The -- there are various locals who are aware of the traffic situations in Puerto Rico, San Juan.

**Q. Like the port agents?**

A. The delays that are encountered -- yeah, Royal Caribbean's representative, correct.

**Q. Again, let's go back to the hypothetical because in your report you say here, Royal Caribbean Cruises failed to act on Burgess' 40-minute long and 31-mile per hour**

**slow ambulance drive to the shore-based hospital.**

**So what should they have done?**

A. They should have brought it up to higher management.

**Q. And what would they have done?**

A. A care team associate.

**Q. What would they have done?**

A. Try. Make an attempt, make a phone call, send an email out, contact people, try to come up with a solution to this issue and attempt to speed up the medical evacuation.

**Q. So what you are saying is that they should have called the ambulance drivers and said, hey, man, step on it, you are not going fast enough; is that what you are saying?**

A. Up to Royal Caribbean.

**Q. Are you saying --**

A. Maybe there was no solution. Maybe there was a solution, but they didn't even try.

**Q. So you don't know what the solution was?**

A. They didn't even try.

**Q. You don't know what the solution was?**

MS. LOBEL: Form.

THE WITNESS: Coast Guard, Coast Guard helicopter could have been an option.
BY MR. DRAHOS:
**Q. When were you retained in this case?**
A. Ambulance -- there are various companies that provide helicopters for evacuations.
**Q. When were you retained in this case?**
A. 2021, I believe -- I need to look it up.
**Q. So you've had well over a year to look at this situation, right?**
A. Yes.
**Q. You have not come up with a specific alternative way that anyone either on the ship or shoreside could have done something to make this ambulance go faster or get Mr. Burgess to a hospital quicker?**
A. I have. Helicopter.
**Q. So you are saying that when the ambulance company departed from the port and it was taking too long, that a helicopter could have been sent out to intercept the patient in the ambulance and fly him to Hima Caguas; is that what you are saying?**

MR. DRAHOS: Form.

THE WITNESS: Give me a second.

Repeat the question, please?

BY MR. DRAHOS:

**Q. Sure. You're suggesting to members of the jury that when this ambulance dispatched from the port and started making their way towards Hima Caguas, and it was taking too long, that a care team associate could have called the captain or somebody shoreside and the solution that you're proposing is that they could have sent a helicopter to come intercept the patient off the ambulance and fly him to Hima Caguas?**

A. I refer to my research, part of this report, specifically research options it's called.

Can you look at page 4?

**Q. I won't look at that because it's not in your report, Captain.**

A. Okay.

**Q. But is the scenario that you just posed, the one that you're suggesting that a helicopter could have come out and intercept the ambulance?**

A. There are good suggestions, there are

bad suggestions.
**Q. No kidding?**
A. That's why teamwork is so important. With a team, you can come up with the best solution, but they were not able to even make that attempt and determine which solutions are reasonable solutions and which alternatives are unreasonable.
**Q. So that solution, the helicopter could have come out, intercept Mr. Burgess in an ambulance in route; is that a reasonable solution or not?**
MS. LOBEL: Form.
THE WITNESS: In my opinion, it is a solution.
BY MR. DRAHOS:
**Q. Is it reasonable or unreasonable?**
A. Whether it's reasonable or unreasonable, that is up to a team to decide.
MR. DRAHOS: Lilia, what's the name of the case that involved Brett Rifkin in Puerto Rico? No. Brett Rifkin. No, never mind. Text it to me when you get it. Thanks.

BY MR. DRAHOS:

**Q. So, you also mentioned the options that the US Coast Guard could have been contacted?**

A. Yes.

**Q. So you're saying that if the ambulance company was taking too long and this care team associate noticed that, hey, you know they're only going 31 miles an hour and this is a 42 or 22-mile track, we need to get this done faster, you're saying that the United States Coast Guard could have been contacted and sent a helicopter?**

A. I also provided three other options of -- and you don't want to look at it. It's in my research under options, but it shows that a helicopter, not a Coast Guard, but a different company that picks up a patient from a road and they bring him to a hospital as fast as possible.

**Q. I want to go back to the Coast Guard option.**

A. So going back to the Coast Guard option, that is one of the options in the generic complete picture of this entire case.

**Q. No.**

A. That includes the two-hour wait.

**Q. Where, can you tell me in any manual, any Coast Guard manual that exists on this earth, that the United States Coast Guard handles private medical transfers on land?**

A. On land?

**Q. Yes.**

A. We are talking about a ship. Henze was part of a -- he was a passenger on a cruise ship.

**Q. I am asking you about medical transfers on land. Tell me where it says that anywhere on this earth that the United States Coast Guard does private medical transfers on land?**

MS. LOBEL: Form.

THE WITNESS: I never -- I never said that. That they transfer --

BY MR. DRAHOS:

**Q. You are offering it as a solution?**

A. I'm offering it as a solution to the entire process. The Coast Guard responds to vessels. Coast Guard could have potentially assisted with the initial medical evacuation of Mr. Burgess while he was still onboard and

instead of not doing that, they made him wait for two hours.

**Q. No, no, no. Let me ask it this way then.**

A. The road part could have potentially been handled by at least three local air ambulance companies.

**Q. Are you aware of any scenario where the United States Coast Guard has done a private medical transfer of a patient on the land?**

MS. LOBEL: Form.

THE WITNESS: I am not including the Coast Guard in the transfer of Mr. Burgess from the road. I'm providing three other companies that do that work, and there is a photograph of it in my research under their options where a helicopter lands at a road to pick up the patient to transfer him -- transport him to a hospital.

BY MR. DRAHOS:

**Q. Are you saying that the United States Coast Guard could have done a transfer of Mr. Burgess or not?**

MS. LOBEL: Form. Asked and answered.

THE WITNESS: When he was still on the ship, potentially, yes, it certainly would have been an option that they could have considered.

BY MR. DRAHOS:

**Q. While the boat was tied to the pier?**

A. While the boat was tied to the pier, yes. At least try. You can always ask. You may get a no, you may get a yes, but it is definitely worth the try to speed up a medical evacuation to a reasonable degree.

**Q. So, Captain, you're in the field operations center of Carnival Cruise Line and you are working with Rick Miller and the ship is tied to a pier and there is a medical transfer going on. Are you telling me that you go to Rick Miller and say I think we should call the Coast Guard and have them effectuate this transfer?**

MS. LOBEL: Form.

THE WITNESS: I would have done that for sure.

BY MR. DRAHOS:

**Q. I can't wait to let him know that that's your testimony.**

A. Oh, yeah, please do, yeah.

MS. LOBEL: Move to strike the commentary.

BY MR. DRAHOS:

**Q. So, when this ambulance left the port and they were driving toward Hima Caguas and it was taking too long in your estimation, what should Dr. Pereira have done at that point?**

MS. LOBEL: Form.

THE WITNESS: Royal Caribbean should have, first of all, been aware of the length of this journey. I have not been provided with documentation that shows that anyone was aware, whether the captain was notified, whether Royal Caribbean shoreside was notified. That information is missing. That indicates to me that Royal Caribbean didn't take any action to speed up this process, at least try.

MR. DRAHOS: Move to strike as nonresponsive.

BY MR. DRAHOS:

**Q. Captain, under your scenario where there is a care team associate with Mr. Burgess traveling to Hima Caguas from the port, you're**

**saying that others should have been notified that it was taking too long. If Dr. Pereira was notified, what is he supposed to do at that point?**

A. Contact the captain, let the captain know. The captain can make the decision to notify Royal Caribbean headquarters that has teams in place to assist.

**Q. Okay.**

A. With logistics.

**Q. So your report included testimonial history, correct?**

A. Yes.

**Q. Instances where you've testified in the past?**

A. I'll pull that up. That was an exhibit. Is that part of the report?

**Q. No, sir. This is a separate part of it.**

A. Okay.

**Q. So why don't we go ahead and mark this as Exhibit -- I am sorry, I lost the number again.**

MS. LOBEL: E.

MR. DRAHOS: E. Thank you.

(Whereupon, Exhibit E, Testimonial History was marked for identification.)
BY MR. DRAHOS:
**Q. I'm handing you what we have marked as Exhibit E.**
**Is this a current and accurate summary of your testimonial history up to the present day?**
A. Yes, it is.
**Q. In all of these instances that are marked as Defendants' Exhibit E, did you ever testify for the defendant?**
A. As in trial?
**Q. As in deposition or trial.**
A. Yes, I did.
**Q. Can you tell me which of these cases were cases where you testified either in deposition or trial or arbitration for the defendant?**
A. I believe it was -- it was plaintiff -- from memory, defense case there was one.
**Q. Which one was that?**
A. Page number 2, Leonela Treto Cadbarrick (phonetic)

**Q. What was that case about?**
A. That was a case that regarded a -- the boarding -- what was the plaintiff -- can I look this up?
**Q. Whatever you'd like to do to be able to answer it.**
A. I'd like to look that up.
**Q. Okay.**
A. I need to step out to my computer.
**Q. Okay. While you're doing that, then let me just leave another question with you that I'm going to be asking, which is: in any of these cases, did you testify on matters relating to the speed or efficiency of a medical transfer?**
A. Speed may have been the case, but again, this requires further research on my part and it was slow on the part of the cruise, Celebrity Cruises.
**Q. Speed of the medical transfer?**
A. Maybe, potentially. I need to do some digging in my files.
**Q. Okay. Any others other than Despak (phonetic)?**
A. Maybe 8719, Juan Carlos Villas. I

made some speed calculations there.

**Q. Okay.**

A. As far as I recall.

**Q. Is that it?**

A. Richardson versus James Esposito, page number 2, potentially.

Again, I need to look into the details.

**Q. What would you need to do in order to be able to answer that question today?**

A. Have a look at my report.

**Q. Would you -- let's go off the record and if you'd like, you can take a quick look --**

A. Yeah, sure.

**Q. -- and see if you are able to answer that for me, please.**

THE VIDEOGRAPHER: Off the record at 1:39.

(A recess was taken from 1:39 p.m. to 1:43 p.m.)

THE VIDEOGRAPHER: On the record. The time is 1:43 p.m.

BY MR. DRAHOS:

**Q. Okay. So, Captain, we went off so that you can take a look at your files and**

answer some of these pending questions.
Were you able to determine what the Perberg (phonetic) matter was about?
A. Yeah, this was a defense case?
Q. What was the issue?
A. That was a watersports facility and a boat transfer. So the boat transfer -- that was the defense case, by the way.
Q. What do you mean when --
A. That's the only defense case. It was a transfer from a dingy to a jet ski.
Q. Transfer --
A. And visa versa.
Q. So what, the person was injured during the transfer from the dingy to --
A. That was a personal injury case, correct.
Q. Right, but let me just make sure I understand the circumstances.
It was a person that was transferred from a dingy to -- what was it, jet ski?
A. Personal watercraft, yes, or visa-versa.
Q. What were your opinions in that case?

A. I need to dig up the report, which I do not have available at this moment.

**Q. Generally speaking, would you express opinions that the manner in which this injured party was transferred from the watercraft -- from the dingy to the personal watercraft was appropriate?**

A. I don't recall. I need to pull up the report in order to give you an exact answer to this question.

**Q. Then you identified three other matters that could have potentially involved the speed of a medical transfer. Were you able to confirm whether or not --**

A. No, I was not. I don't have those reports on file. They may be on our Robson Forensic system that requires further resource and time.

**Q. All right. So as you sit here today then, you can't identify any -- with any certainty of cases where speed of medical transfer was at issue?**

A. Not with certainty. Requires further research.

**Q. Do you know what a Daubert Challenge**

is?
A. I do.
Q. Have you ever had a Daubert Challenge filed against you?
A. Yes, I have.
Q. On how many occasions?
A. Once right when I started.
Q. So when you say right when you started, would that have been the Despak case?
A. No.
Q. Which case was that that you had a Daubert motion filed?
A. Ryken versus something.
Q. I don't see that on this list here.
A. No, we've never made it to deposition.
Q. So somebody filed a Daubert Challenge against your expert report?
A. That's correct.
Q. How do you spell Ryken?
A. R-Y-K-E-N.
Q. And when you said first started, first case I see on here is 2018, so was this in 2018?
A. Approximately when I first started, not long after I first started, yes.
Q. Where was that Ryken case litigating?

A. Florida.
**Q. In federal or state court?**
A. I can't remember. I don't recall. I need to look it up.
**Q. What was the end result of that Daubert Challenge?**
A. I was able to opine to measurements that I took during a site inspection.
**Q. Okay.**
A. Disregarded a wheelchair that had a -- resulted in a personal injury as the wheelchair was used to board a cruise ship in Port Everglades.
**Q. So was any aspect of your expert opinion limited or excluded in that ruling?**
A. Yes.
**Q. What aspect of your opinion was limited or excluded?**
A. I believe everything but my measurement, to which I disagreed.
**Q. Is that the only Daubert Challenge that's been filed against you?**
A. No, they filed all our Daubert Challenges, but I haven't had a result yet.
**Q. What other case?**

A. Can I go through my file?
**Q. Yes, sir.**
A. Yeah.
THE VIDEOGRAPHER: Off the record?
MR. DRAHOS: Yes, please, thank you.
THE VIDEOGRAPHER: Off the record at 1:47.
(A recess was taken from 1:47 p.m. to 1:52 p.m.)
THE VIDEOGRAPHER: On the record at 1:52.
BY MR. DRAHOS:
**Q. Captain, so we left off -- the question that was pending was what other Daubert Challenges are currently pending against you?**
A. Two -- let's see. Norton Tonk Ho.
**Q. Can you spell it?**
A. Sorry, the case itself is called Jerry Ho, H-O.
**Q. So Jerry, J-E-R-R-Y?**
A. Yeah. H-O.
**Q. Versus?**
A. RCL.
**Q. RCCL?**
A. Yes.

**Q. Is that an arbitration or a personal injury matter?**

A. Personal injury.

**Q. What's that case about?**

A. Medical evacuation.

**Q. Who is the defense lawyer in that case?**

A. I don't recall. I haven't heard -- this was 2019, and I haven't heard since.

**Q. Who was the plaintiff's attorney?**

A. Same thing. I need to look it up. I've got to go back to my files again, if you need that info. I have a case number for you.

**Q. Okay.**

A. That is 18-23541-CIV.

**Q. Okay. Jerry Ho versus RCCL?**

A. Uh-huh.

**Q. And you said there was another Daubert motion?**

A. Yeah, Schleiffe, S-C-H-L-E-I-F-F-E versus RCCL.

**Q. What is that case about?**

A. Medical evacuation from cruise ship.

**Q. Do you have a case number for that one?**

A. 19CV22776.
**Q. The defense lawyer?**
A. Same thing. I need to look it up.
**Q. All right. Those are both pending?**
A. They -- Schleifee, I believe is settled and closed.
**Q. Okay.**
A. So I never got a ruling on that. Jerry Ho versus RCL (verbatim) is active.
**Q. Okay.**
A. No ruling yet.
**Q. All right. Thank you. No other pending Daubert motions that you're aware of?**
A. No.
**Q. You've not given any other deposition testimony?**
A. This is my complete list, yes.
**Q. So the last bit of housekeeping I have is I had raised this in the beginning of the deposition, when you handed me the zip drive, I opened up several of them and they are empty. Can we look into this and figure out why that is?**
A. Yes, we can.
**Q. What I am going to do, Captain, can**

**you explain to me what this is in front of you. So I see there's manila folders that have an A and a B written --**

A. This is -- these are extracts from the file that I provided you this morning. That's the electronic version, that's everything. These are just part of those -- of that file.

**Q. So there is --**

A. Printed out. Yeah, that's my filing system.

**Q. What is that over there to your right?**

A. This is Exhibit B.

**Q. No, no, I know, but those manila folders, they also say A, B?**

A. They're with you.

**Q. So those are hard copies? I'm going to take those.**

MS. LOBEL: Yeah --

THE WITNESS: There you go. That's yours.

BY MR. DRAHOS:

**Q. We are going to mark the hard copies that the captain brought here today as Defense Exhibit?**

A. F.

Q. F. Okay.

(Whereupon, Exhibit F, Manila Folders was marked for identification.)

(Off-the-record discussion was held.)

THE WITNESS: Is this included?

BY MR. DRAHOS:

**Q. So for the benefit of the court reporter, Defense Composite Exhibit F is a 6-manila folder exhibit. The first one being labeled A as a chronology of some sort or what would you call this, Captain?**

A. Yeah, that's a chronology of what's in the folders except for folder number A.

**Q. That also contains the duces tecum for the day?**

A. That does not, I believe or does it?

MS. LOBEL: It does.

THE WITNESS: It does, okay, yes.

MS. LOBEL: The notice has --

BY MR. DRAHOS:

**Q. I am just going to read it off, Captain, unless I need an answer from you, I'll let you know.**

**The second manila folder is labeled with a B on it and it has rebuttal**

letter report by HJ Keijer, expert report by HJ Keijer?

A. Keijer.

Q. Exhibit to expert report by HJ Keijer, being a CV. Exhibits to expert report by HJ Keijer history of testimony by deposition or trial. Exhibits to expert report by HJ Keijer timeline of events. Exhibits to expert report by HJ Keijer time zones and UTC, and lastly, exhibits to expert report distance and speed of ship.

The next one is a manila folder with the C on it and it has research. USCGPSIX. The next one is research USCG National SAR supplement to IAMISAR.

The next one being research IAMSAR. Next one being research Sunny Ambulance records translation.

So somebody did translate these Sunny Ambulance records for you?

A. Yes.

Q. The next one being research ISO8601. The next one being research IAMSAR again. The next one being research facts sheet Harmony Of The Seas. The next one being research DMV

Harmony Of The Seas. The next one being research Harmony Of The Seas deck plans. The next one being research options. That's the end of that subfolder.

The next sub-folder is labeled D. This is notes-second amended complaint for damages. Notes-complaint and demand for jury trial.

The next one being deposition transcript of Darren Henze and exhibits. The next one being plaintiff's answers to initial interrogatories. Next one being Royal Caribbean's initial disclosures GS 1 through 120. The next one being Royal Caribbean cruise's responsive documents to plaintiff's initial request for production GR 81 through 444. The next one being Royal Caribbean's supplemental document production GR 466 through 545.

The next one being deposition transcript of Dr. Ben Shore. Next one being deposition transcript of Ulises Nobo, dated October 25. The next one being notes-various sources.

These various sources, where did

this come from, did you generate this?

A. Yeah.

Q. I think I included it in my manila folders. Let me go and clarify. Defendant's Composite Exhibit F is a 4-manila folder composite.

Is there anything that's contained in your file that I did not read off in my summary review that I just did a moment ago?

A. Oh, yeah. Electronically you have everything. This is a small collection of some of the files in your folder.

Q. Understood. So when I --

A. Full deposition transcripts, to name one example, are not included in these manila envelopes.

Q. So, when I open up this zip drive, there's some that are empty. So can you help me figure out why that is then? I was trying to kind of avoid that, but -- let me -- I'm waiting for the computer to pull up and I'll tell you which ones are empty on mine.

(Off-the-record discussion was held.)

BY MR. DRAHOS:

Q. Captain, when I pull up schedule -- there's a sub-file in here in the zip drive that says schedule A3 and 4 and 6 and 7 and 9 and14.

When I pull that up, it says this folder is empty, there is nothing contained in there. Do you know what should be in A3 and four and six and seven and nine and 14 that's not on this zip drive?

A. Correspondence is not being retained by Robson Forensic for more than 30 days, so I don't have any more correspondence older than 30 days. And the correspondence that are with the Hickey Law Firm state that they are confidential and are not allowed to be shared with anyone else, so that's why I did not include that.

Q. So 8, 3, 4, 6 --

A. Notice of deposition, for example, that's correspondence.

Q. So, A 3, 4, 6, 7 and 9 and, 14 you're saying is correspondence that either the Robson firm that you work for doesn't maintain or the Hickey Law Firm is maintaining that it's privileged?

A. That's what it says on their emails,

yes.

Q. What about for A 5, when I open it up that one it's also empty?

A. Yes, same thing. That's the same item that is covered on the number three that we just talked about communications.

Q. So, where are your timesheets for this case?

A. In your electronic file.

Q. Specifically where under A1?

A. I think it's a number 29 -- whatever it is, if I recall.

Q. I don't see it, Captain. Do you have a physical copy of your timesheets for all time?

A. I'll give you the actual PDF file number if I can run back to my office.

Q. So that you're not running back there more than once, what I'm interested in knowing now and then will be finished, is that I'd like to know how much time you have in total and how much time you have billed in this case to date?

A. That's all in that file.

Q. All right. So if you can get that to us, please?

A. Yeah.

**Q. Thank you.**

THE VIDEOGRAPHER: Off the record at 2:04.

(Recess was taken from 2:04 p.m. to 2:06 p.m.)

THE VIDEOGRAPHER: On the record. 2:06.

BY MR. DRAHOS:

**Q. So, Captain, what I was hoping for is copies of the actual physical timesheets that showed the amount of time you spent in the case to date. Do you have those?**

A. I can print them out for you.

**Q. Yes, that's what I thought you were doing.**

A. No, I was looking up the file number that you requested. It's on the schedule A 1228609. That's the file, the PDF file. So I gave you the electronic version, but if you now want a paper version, I can go and bring that.

**Q. Well, I'm not going to do it unless it's necessary. So you tell me -- you said it should be in the A1?**

A. It's folder Schedule A1. I think it's the second file down.

**Q. It's 2286 underscore?**
A. Yeah.
**Q. Hold on. All right. I have it here. So it's your testimony that this is all of the time that you spent in the case to date?**
A. It was at the time it was printed. I have since done some preparation for deposition.
**Q. Okay. How much time?**
A. Which, I believe, is three hours.
**Q. Three hours to prepare?**
A. That's going to be added into this.
**Q. Any other work in the case other than those three hours?**
A. I did receive a transcript of doctor -- what was his name. Can you refresh my memory?
**Q. Nobo?**
A. Nobo, exactly.
**Q. How much time did you spend looking at that?**
A. Top of my head, about an hour, hour and a half.
**Q. So, you have anywhere from four to four and a half hours of unbilled time in the**

**case?**

A. Approximately, yes.

**Q. How much do you charge for record review?**

A. Robson Forensic charges $450 an hour for my services.

**Q. How much do you charge for trial testimony?**

A. Same. Not me, Robson Forensic does.

**Q. What portion of that do you receive?**

A. I'm on an annual income.

**Q. They just pay you a salary?**

A. Yes.

MR. DRAHOS: All right. Captain, those are all the questions that I have. I'm going to turn it over to my colleague if she has any follow-up.

MS. LOBEL: I do want a second.

(Off-the-record discussion was held.)

THE VIDEOGRAPHER: Off record 2:08.

(A recess was taken from 2:08 p.m. to 2:11 p.m.)

THE VIDEOGRAPHER: On the record 2:11.

CROSS-EXAMINATION

BY MS. LOBEL:
Q. Captain Keijer, can you give me some -- I want to ask you some additional questions about your education, background and training.
I've heard testimony that you became a commodore and part of the operations for Carnival towards the end of your career before you made the switch to doing what you are doing now. Can you walk me back and tell me how you got to that point to be a commodore from the beginning?
A. Yes. I started in nautical academy in Amsterdam. I went to University. Graduated in 1991 with a Bachelor's of Science degree as both a master mariner, which is the highest license one can get as captain in the maritime industry and as a marine engineer. I did both disciplines. That was a four-year course Bachelor's degree, like I said, and then in 19 -- then I worked for a cargo company called Vannieveld Goudrian.
Q. In what capacity?
A. I was a second officer.
Q. Can we get the spelling for the court reporter?

A. Yeah, I will.
**Q. Because I couldn't even attempt.**
A. It is V-A-N-N-I-E-V-E-L-D. Next word G-O-U-D-R-I-A-N.
**Q. You were working in the capacity of second officer, you said?**
A. Correct.
**Q. Then after you worked in the capacity of second officer at that company, for which I will not be able to say correctly and I apologize, what did you do next?**
A. Next I went to the cruise industry. I started at Holland American Line in 1992 as fourth officer. Then worked my way up through the ranks from fourth officer to third officer junior to third officer senior, second officer junior, second officer senior. Then I became chief officer, it was called. Other companies call it staff captain. And then I was promoted to captain and I did that for 10 years.
**Q. How many years?**
A. Ten.
**Q. How many years did you serve as a staff captain and second in command on the vessel?**

A. That was approximately seven years.
**Q. Okay.**
A. That was from -- give me a second. 1999 to 2005. Six years.
**Q. Six years as a staff captain and 10 years as a captain?**
A. Yeah, 2005 until 2015, I was captain at Holland America Line cruise ships.
**Q. When you were a captain for Holland America, were you assigned to a specific ship or did you rotate throughout --**
A. I rotated from ship to ship, yes.
**Q. Is there any rhyme or reason why you go to one ship versus another?**
A. No, it's experience. Different itineraries, different ports, different ships.
**Q. Okay.**
A. It's -- one certainly is able to get a broad range of experience and expertise serving on various ships.
**Q. I know you have a nondisclosure agreement and you can't get into certain facts and details about your job, but during your time as either staff captain, number two of the ship or captain, number one of the ship, were you**

**ever involved in medical evacuations of either passengers or crew?**

A. Yes, I have done a lot of medical evacuations. It starts when you are third officer, fourth officer even, you start to becoming involved in a certain capacity with medical evacuations.

**Q. When you are a third or fourth officer, in what capacity would you participate in a medical evacuation of a patient suffering an emergency?**

A. Helicopter evacuations, making calculations to distances to ports, speeds that are required for certain medical evacuations. Being part of a fire time requires one to be on standby as a fire team member.

When a helicopter evacuation is conducted, tenders are sometimes used or boat transfers during medical evacuations. There are various option to the most speedy means to medically evacuate a patient was always sought.

**Q. In the time that you were serving for Holland America in any capacity, did you ever have the occasion to get involved with medical disembarkation or evacuation of a patient, be it**

**crew or passenger while the vessel was docked at a port or, you know, anchored shortly away from the port?**

A. I have certainly been informed and been aware when those medical evacuations took place. Due to the nature of my nondisclosure agreement, I can't comment any further.

**Q. Understood, understood. But it would be fair to say, you had participation in some capacity to the extent you can't disclose?**

A. Correct.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. Understood.**

**Now, have you ever in your career working for the cruise lines, be it Holland -- well, let's stick with Holland America right now -- dealt with a disembarkation evacuation of any type of a passenger suffering a medical emergency at or around the Port of San Juan?**

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall. I've traveled all over the word.

BY MS. LOBEL:

**Q. Okay.**

A. There may have been medical evacuations in the Port of San Juan.

**Q. Okay.**

A. I'm very familiar with the Port of San Juan. I've been there numerous times. There's not always the need to notify a staff captain or a captain unless the situation gets out of hand, as is the case in a matter that we are discussing here, which warrants notification of the captain.

**Q. Okay. Now --**

A. I do not recall having received the notification. That doesn't mean that that evacuation didn't take place. It meant that it was done reasonably and to acceptable standards.

**Q. Understood. Now when you were a captain or a staff captain, were you ever operating vessels in and out of the Port of San Juan?**

A. Yes.

**Q. For how many years, more or less, would you say you were taking the -- you were captaining vessels cruise ships in and out of the Port of San Juan?**

A. Approximately eight years out of ten.

Q. Now, in your time in 10 years working for Holland America, would you say that you participated or were involved with more or less than 10 medical evacuations, patients with medical emergency?
A. Many more.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q. Would you say you were involved with more or less than 25 medical evacuations?
MR. DRAHOS: Form.
THE WITNESS: Many more.
BY MS. LOBEL:
Q. More than 50 medical evacuations?
A. Yes.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q. More than 100 medical evacuations?
MR. DRAHOS: Form.
THE WITNESS: I would say approximately 100 evacuations.
BY MS. LOBEL:
Q. Now, turning your attention to the time that you started working for Carnival Cruise Line, which falls within the banner of

**Carnival Corporation, did you ever work aboard any Carnival ship?**

A. Yes.

**Q. In what capacity?**

A. As commodore/director of stability. I visited those ships. I was working for Carnival. So yes, I was working -- yeah, for Carnival.

**Q. Forgive me before I transition to focusing on Carnival Cruise Line. Going back to your tenure working for the Holland America Line owned and operated by Carnival Corporation, would you have been -- did you participate in the performance reviews at the end of contracts for the medical personnel on the vessel?**

A. Yes, I did.

**Q. Would it be the captain's determination as to whether or not a -- at the end of the say shipboard doctor's contract, whether that person would be eligible for renewal of their contract?**

A. If there had been a situation such as what we are discussing here, Burgess, in a significant time delay without any action regardless of the policy that Royal Caribbean in

this case had in place, that states that the ship's physician is responsible for its patient until that patient is handed over to the next physician.

And a three-hour time frame is incurred between the time this gentleman actually -- or between the time Royal Caribbean knows and between the time he's admitted to the hospital and he was to wait two hours as part of that process for an ambulance, that's, in my opinion, is a reason to consider disciplinary action.

MR. DRAHOS: Let me object to the form, in light of the answer and move to strike as nonresponsive.

BY MS. LOBEL:

**Q. So my question for you is -- and I know you can't get into very specifics, but as a general matter as a captain or staff captain for Holland America, was it the staff captain or captain in the review at the end of -- I'm not getting my words out.**

**Well, forgive me and let me strike that and try this again.**

**You'd agree with me that**

shipboard doctors have contracts with cruise lines for a specific term of months or specific limited period of time?

A. Yes.

Q. At the end of each contract, there is a performance review for every crew member on the ship including shipboard doctors?

A. Yes.

Q. For the purpose of the end of contract review for shipboard doctors, am I correct in understanding that it is the captain who performs that review?

A. It is done in collaboration with the medical department ashore.

Q. Would you agree with me after reviewing the corporate representative's deposition in this particular case, that the procedure that Holland America used is very similar to one that Royal Caribbean used?

A. Yes, it is.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

Q. So the captain of the ships would be involved in the review of the performance of the medical personnel including ship or doctors?

A. Yes.

**Q. And part of that review would have to do with whether or not doctors are evacuating patients in the timely appropriate manner in compliance with the policies and procedures of the company?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah, indeed. And whether or not certain conditions or emergencies arise due to the need for support and that support is not being provided because a captain is not notified or a company is not notified.

A ship's physician is just one example of the crew members who are certainly be able to identify the need for speed to medically evacuate when he requests a medical evacuation of a patient and that patient requires shoreside assistance as soon as possible. If that doesn't happen as soon as possible, then there are sources available that can help in researching reasonable options to a speedy medical evacuation.

BY MS. LOBEL:

**Q. So, would it be fair to say, in the 17 years that you worked as either a staff captain or captain doing performance reviews for shipboard medical personnel, part of your job was evaluating the reasonable or unreasonableness of a medical evacuation involving a ship?**

A. Yes, certainly, yeah.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. Would it be fair to say then, when you then transitioned to working for Carnival Cruise Line as opposed to Holland America Line for Carnival Corporation, that you also performed a review of evacuations?**

MR. DRAHOS: Object to the form.

THE WITNESS: I have reviewed responses by shipboard teams to numerous emergencies, reviews of safety management systems that require certain procedures to be followed in case of an emergency. One of the requirements is to, yes, you know, conduct a medical evacuation as soon as possible and a review of actions that were

taken in response to a medical evacuation would be on the review to look for room for improvement, so yes.

BY MS. LOBEL:

**Q. Would that be because the cruise line is engaged in the business of medicine?**

MR. DRAHOS: Object to the form.

THE WITNESS: The cruise industry has a duty to look after the health and wellbeing and safety of their guest. And that includes medicine and the infirmary and a physician, yes.

BY MS. LOBEL:

**Q. And does part of the operations involve -- strike that.**

**Does part of the reasonable operations in order to ensure safe operations of medical care include researching, reaching out to the medical services that are at a given port that the company is electing to use as a port?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes, it does. Royal Caribbean, as we have seen in documentation that was provided, had a medical department onboard, a person that could have been

contacted and provide support by the ship's physician.

Should Royal Caribbean identify that there is indeed an issue in transporting a patient to a certain destination and if that process requires intervention in order to speed up that process as it did in the Burgess case, ship staff, a care team associate who was then assigned, they would have been the people or even the port agent who was the representative of Royal Caribbean could have and should have identified the lengthy amount of time that this process took and brought that up with the higher ups, the captain onboard potentially, the medical director shoreside, the port operations department shoreside. They could have all looked into available options, alternate arrangements.

BY MS. LOBEL:

**Q. Would you agree that in order to reasonably operate shipboard infirmaries and medical teams, that the company should educate itself to determine what resources are available at a given port in order to effectuate these**

**evacuations?**

MR. DRAHOS: Object to the form.

THE WITNESS: I've seen a trend or documentation that says that Royal Caribbean had assist hospitals shoreside in the Port of San Juan and on the island of Puerto Rico.

It is not unusual for a cruise company to have a list of hospitals available and destinations where they can transport their patients to, depending on the condition that this patient is in.

BY MS. LOBEL:

**Q. And certainly wouldn't it be reasonable to then educate your ship teams, including the medical department as to what resources are available in order to effectuate reasonable transport for patients and reasonable care for patients, since they are the individuals that were ultimately responsible for the welfare of the patient until the patient received at the receiving location.**

A. Yes.

MR. DRAHOS: Form.

BY MS. LOBEL:

**Q. Yes, it's --**

MR. DRAHOS: Captain, you've got to give me a chance to object.

THE WITNESS: Sorry, yeah.

BY MS. LOBEL:

**Q. You may go ahead.**

A. It's part of the safety management to constantly improve on processes, make assessments and that includes, you know, being aware of the length of time it takes to get from A to B in certain ports.

The port agent was aware. You see that in this transcript of the amount of time it takes to get an ambulance arranged. There is testimony from Dr. Nobo who stated in his testimony, and I would like to quote this, which I have in my notes. Bear with me.

Deposition transcript of Ulisses Nobo, MD, dated October 25th, 2022, on page number 31. That doctor stated I would message to the patients and their families when they come to our facility. When they leave, we always told them, you know what, call the ambulance initially, but if you don't get an

ambulance in 5 to 10 minutes, just put them in a car and come to the hospital because the chances are that the patient might come, really, really late, and too late for doing anything.

And this is a local expert who is familiar with the transportation challenges in Puerto Rico, and so was the agent.

Royal Caribbean should have been aware of these challenges and with road transport by ambulance to get a patient from A to B, and based on that information, they should not have waited until Burgess was actually having the condition that he had, but they should have been aware of this issue prior to and arranged for alternate means or at least thought about it.

And then actions on the preparations that it could have made beforehand or during and line up an ambulance company to transport this gentleman to a suitable hospital.

BY MS. LOBEL:

**Q. Would you agree with me, that the only evidence that we have in this particular case is evidence of one phone call to one ambulance company because we only have one record**

**supporting that Sunny Ambulance is the entity that came and responded?**

MR. DRAHOS: Object to the form.

THE WITNESS: I agree, yes. That's the only document that I have received and seen.

BY MS. LOBEL:

**Q. There are no emails from going back and forth between ship to shore saying, you know, what's taking so long, I've called 12 ambulance companies, anything to that effect?**

MR. DRAHOS: Object to the form.

THE WITNESS: Inaction on Royal Caribbean's part. I've seen no documentation that supports that an attempt was made to speed up this process and to identify this lengthy process of getting Burgess to the medical treatment that he required as soon as possible.

BY MS. LOBEL:

**Q. Is it appropriate to make a request for an ambulance for an individual who was suffering a time sensitive-medical emergency via email to a port agent?**

MR. DRAHOS: Object to the form.

THE WITNESS: A phone call would be the most reasonable and direct means of arranging and transport in addition to an email.

BY MS. LOBEL:

**Q. And there are no records from the ship documenting any phone calls?**

A. Correct.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. There is no documentation received from the port agent to the ship of any documentation or phone calls?**

A. That's correct.

**Q. And there are no text messages going back and forth between ship to shore or shore to ship?**

A. No.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. There is no documentation of any phone calls to the captain saying I'm having a hard time getting an ambulance to help me get transport?**

A. There was not.

MR. DRAHOS: Object to the form.
THE WITNESS: And I have not seen any correspondence with the head office either.
BY MS. LOBEL:
**Q. When you are talking about the head office, you are talking about Miami?**
A. Yeah, correct. Miami, the medical department.
**Q. Okay. Would you reasonably anticipate if a company or a ship or doctor is struggling to get a timely transport, that that sort of communication would be made and documented?**
A. That would have been the most reasonable line of action, yes, that I would expect from a reputable company.
**Q. Now, based off of your experience and, again, I understand you can't get into specifics about specific instances based off of your nondisclosure agreement, but have you had the occasion to work with the United States Coast Guard in evacuating patients whether it be crew or passenger off the ship?**
A. Numerous times, yes.
**Q. Has that accord while the emergencies while the vessel is out at sea?**

A. Yes.

**Q. Has that happened while it's been within, you know, a reasonable range from a port?**

A. Yes.

**Q. Has this occurred while you've been in a port?**

MR. DRAHOS: Object to the form.

THE WITNESS: No, it has not, no. There was no need for me to contact the Coast Guard because the situations that I have been in, evacuations that occurred from a vessel that was docked alongside to a shore-based hospital, did not require intervention from the Coast Guard because the means of transport that was selected and the response to that request were reasonable.

BY MS. LOBEL:

**Q. Now, would you agree with me that the jurisdiction based off of your experience with your credentials that the U.S. -- United States Coast Guard will assist vessels while they are at port?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. Definitely, yeah.

BY MS. LOBEL:

**Q. The line of where, you know, the imaginary line of where the United States Coast Guard will or won't help a vessel in need does not stop once the vessel comes to -- docks at a port, correct?**

A. No.

MR. DRAHOS: Object to form.

THE WITNESS: No, it does not. Coast Guard boards the vessel for inspections, for example. They assist in case of an emergency. If there are situations -- incidents that occur onboard, may or need to be reported to the Coast Guard.

When during a -- in a port in the United States, Coast Guard is involved with cruise ships whether they are docked, anchored or out at sea.

BY MS. LOBEL:

**Q. That would include having the ability to use resources like a helicopter to come to a ship?**

MR. DRAHOS: Object to the form.

THE WITNESS: Definitely worth pursuing.
BY MS. LOBEL:
**Q. But that wasn't even pursued or considered?**
A. Yes, correct, it was not pursued, it was not considered. A phone call to the Coast Guard was not made.
MR. DRAHOS: Object to the form.
THE WITNESS: Unreasonable.
BY MS. LOBEL:
**Q. Is there any documentation or evidence that you've seen with regard to attempting to get other sorts of life-likes available in Puerto Rico?**
A. No, I have not. No.
**Q. And when you came to the ultimate conclusion that the response time and response method for transport in this case was unreasonable, to come to that conclusion did you necessarily have to consider what alternatives were available to determine unreasonability?**
A. Yes.
**Q. Okay.**
A. Naturally, in order to come to the

conclusion that something is unreasonable, one needs to determine what a reasonable alternative is, is there a reasonable solution, is that potential there. And in this case, it wasn't. That was part of my research, which -- in which I found there were reasonable alternatives. Therefore, my findings state that the -- that Royal Caribbean's actions were unreasonable.

**Q. So, would it be fair to say that it is, in fact, included in your report that you considered alternatives because in order to make the opinion of unreasonable transport, you need to know what would reasonable alternatives be?**

MR. DRAHOS: Object to the form.

THE WITNESS: Correct, yes.

BY MS. LOBEL:

**Q. So it's not just some part of research that's extraneous to your report; it's part of your report?**

MR. DRAHOS: Object to form.

THE WITNESS: It's part of my report, yes.

BY MS. LOBEL:

**Q. So let's get into it now since there was a refusal earlier.**

**I want to know what the reasonable alternatives are that would have been available at the time of this particular incident that were not considered, used or attempted in this incident?**

MR. DRAHOS: Object to the form.

Are you going to give me a standing objection, so I don't have to keep objecting to all these questions of reasonable alternatives that weren't included in this expert work or do you want me to just object to every single question?

MS. LOBEL: My job is not to do your job, so whatever you want to do.

MR. DRAHOS: So you are not going to give me the standing objection? I mean, it's not doing my job, it's a courtesy.

MS. LOBEL: It's whatever you'd like.

MR. DRAHOS: Do you want me to do it?

MS. LOBEL: It's whatever you'd like to do, Michael. Whatever you'd prefer, go ahead. Honestly, it doesn't bother me.

MR. DRAHOS: It's either you give me the standing objection, so I don't have to or I object, which is your preference?

MS. LOBEL: It doesn't bother me. That's why I am leaving it to you, whatever you prefer.

MR. DRAHOS: All right. Then I'll object to every single one of these questions.

MS. LOBEL: Okay, that's your choice. It doesn't bother me.

BY MS. LOBEL:

**Q. Let me know, Captain, when you are ready.**

A. Yes. Let me just pull up my file.

**Q. Sure.**

MR. DRAHOS: Can you tell us what file you are going to, so that we can have it on our record where you are getting this information?

THE WITNESS: Can you repeat the question?

BY MS. LOBEL:

**Q. Certainly. What I wanted to do is discuss with you what were the reasonable alternatives that were available to the cruise ship at the time that were considered or executed at the time of this incident for you to**

come to the conclusion in your report, I think it was 5.3 -- that this was unreasonable transport?

MR. DRAHOS: Objection to the form.

BY MS. LOBEL:

Q. And then let us know what you are looking at, so the record is clear.

A. I will.

Q. Thank you.

A. I'm looking at research options.

Q. What sub-folder was that within your excerpts and hard copies that you brought here today?

A. That was in hard copy C folder, the manila folder.

Q. That's also contained within your electronic --

A. It is, yes, correct.

Q. So if you could answer the question now, please?

A. Okay. So Hima --

MR. DRAHOS: Object to the form.

THE WITNESS: Sorry -- Global Air Rescue is one company that provides services to transport patients within the

island of Puerto Rico. That was one option. They have a photograph on their website that indicates that is shown on page number 2, that indicates their intervention on the road with a helicopter hovering above the road. That's one of the situations that they can handle.

There was another company called Air Med. So there are various options available in Puerto Rico for an airlift from the vicinity of the vessel to the hospital. There is an airport, a domestic airport, that according to Google Maps is approximately 10 minutes away. That could have been one port of evacuation for a helicopter. There is an international airport, which is approximately 20 minutes away from the ship where a helicopter evacuation could potentially have taken place to the hospital.

So those are options that I researched and the time to get to the airport plus knowing that an aircraft can fly very fast to the hospital makes a very reasonable option in this case. And so then, of

course, we have the option of the United States Coast Guard.

BY MS. LOBEL:

**Q. Based off of your experience as a cruise line captain, you'd agree with me that these life flight helicopters are capable of coming alongside the ship bringing a basket down and picking up a patient?**

MR. DRAHOS: Object to the form.

THE WITNESS: They do that out at sea. I am not sure what the restrictions are in the port of San Juan.

BY MS. LOBEL:

**Q. Okay.**

A. That's why I did a little further research as to if they are not able to hover above the ship because the vessel is in port for safety reasons, that domestic airport is only a 10-minute drive away.

**Q. Now, that would require notifying the family on the ship, getting consent and then doing a transport and then a transfer, correct?**

A. Yes.

MR. DRAHOS: Object to the form.

THE WITNESS: Correct.

MR. DRAHOS: Captain, you have to let me object, please.

BY MS. LOBEL:

**Q. Now, if the type of research that you did and are talking about as reasonable alternatives today, as opposed to the one that you opined as unreasonable, is that the sort of research that a captain would do on the ship if set in a predicament where there is a difficulty with transport?**

MR. DRAHOS: Object to the form.

THE WITNESS: If there is a known difficulty before the actual situation happens --

BY MS. LOBEL:

**Q. Sure.**

A. -- as in this case, this would have been a reasonable preparation for that emergency. According to the ISM codes, a cruise line company needs to prepare for emergencies, so medical evacuations.

Knowing that this island had road transportation challenges, it would have been reasonable for Royal Caribbean to identify this issue beforehand and take or seek alternate

means in case of an incident to -- what happened to Mr. Burgess, a medical evacuation in San Juan.

**Q. So if I am understanding you correctly, you're saying that before the ship in this particular incident ever even touched the Port of San Juan, that Royal Caribbean should have reasonably already had known that there are transport issues at this port of San Juan to get patients to hospitals?**

MR. DRAHOS: Object to the form.

THE WITNESS: With their frequency of calling at this port. With the -- they -- their visits that they made to these hospitals in prior occasions, with the communications with the port agent being their representative, with local physicians stating that they advised their patient -- patients to seek their own means of transport as opposed to an ambulance to get to the hospital in the time, it would have been reasonable to make preparations for an alternate plan besides a road ambulance in this case.

Even if they hadn't known, they could

have identified the delay of Burgess waiting somewhere on the ship for two hours for an ambulance. That issue was not identified onboard, not brought up to the captain, not brought up to headquarters to seek assistance to speed up this process and that is unreasonable.

BY MS. LOBEL:

**Q. I just want to make sure the record is clear because you mentioned the ISM code and that was the duty to the -- of the company to come up with a plan, basically a game plan of how to evacuate patients, be a crew or passenger from ships, given the problems or difficulties at the Port of San Juan. Can you explain what the ISM code is and what you're referring to that creates that?**

MR. DRAHOS: Object to the form.

THE WITNESS: The ISM code is -- falls under United Nations. They have an agency, the IMO, International Maritime Organization, that requires cruise ships to abide by the IMO or served by the ISM code, International Safety Management code. That code requires every cruise ship to have a

safety management system in place. And that safety management system, any ISM code requires procedures to be put down on paper and to be executed according to what it says on the paper.

So if a -- and this is what happened at Royal Caribbean -- if a code states that the ship's physician is responsible for the patient until that patient is actually handed over to another physician on shore, that requirement needs to be followed, needs to be abided by.

If an ISM code states code or a safety management code states that a medical evacuation needs to take place as soon as possible, that speed is of the essence, that process needs to be followed.

And there are authorities that verify compliance with the ISM code. Serious noncompliance with these requirements can result in the vessel being detained and not being able to sail.

BY MS. LOBEL:

**Q. Based off of the procedures and documentation from Royal Caribbean, was there a**

**procedure in place to address the situation which then arose in this particular case?**

A. Yes, there was. Can I look it up?

**Q. Yes.**

A. I'd like you to give you a quote.

**Q. And let us know what you're referring to.**

A. I'd like to quote Royal Caribbean safety management system. I believe they call it SQM system. GR triple 0, 162.

That describes the position of the doctor and its state that -- and this is a requirement from Royal Caribbean or for Royal Caribbean. And they require that ship's physician, the doctor, to serve as an adviser to the master and staff captain on all matters to medical center services, guests and crew members health matters and IG conditions onboard the vessel.

The master was not informed. I have seen no documentation that the staff captain was informed to the health matter concerning Burgess in the delay that he occurred. There was no request for any further support, so that is something that they didn't

follow.

**Q. Is there anything to go back to what you were saying before though, in the acting, it's called SQMs or safety management system, having to do with when you are going to the port of San Juan given the challenges of response times that -- here is the procedure that we are going to follow to help expedite and address the situation?**

A. There is the care team associate description. We talked about that before.

**Q. Sure.**

A. That the shipboard, and I'm quoting GR, triple 0, 188 that the care team associate is a shipboard member of the shipboard staff who has been specifically selected for their interpersonal skills and empathy and receives special training in how to assist an individual during a crisis.

They act as the liaison between the affected guests or crew members and the shoreside care team specialist to provide immediate emotional and logistical support in a coordinative manner.

The care team associate was not

assigned by Royal Caribbean. Logistical support information was not provided by a care team associate accordingly. This is in their policy. Then we continue.

Then we continue.

(Off-the-record discussion was held.)

THE WITNESS: Then I'll like to quote policy 4.01, Royal Caribbean's policy GR, triple 0, 412. And that states that it should be noted that any time a guest or crew member is disembarked from the vessel, the treating physician is responsible for the care of the patients until he or she arrives at a medical facility or is handed over to the care of another physician.

That was also part of my report, my research. This policy was that -- or stipulates the responsibility of Royal Caribbean in this matter until Burgess was actually handed over to the physician at the destination of the hospital.

But despite that responsibility, there was no intervention for the delay, so the ship's physician did not follow this procedure. That was very unreasonable to

have Burgess wait for two hours for an ambulance to show up.

BY MS. LOBEL:

Q. But I guess my question is a little bit different. My question to you is: Given the fact that, you know, the cruise line knew or should have known the fact or that the island had difficulties with transportation on the island that weren't as comparable as Continental United States, do you have an opinion, and I thought I heard it, but correct me if I'm wrong, do you have an opinion with regard to whether there should have been a policy and procedure in place for the company for how to specifically combat that, so you don't run into a situation like this, where nobody knows what to do and you're left with two and a half hour, two hour waits?

MR. DRAHOS: Object to the form. Asked and answered on this disclosed opinion.

BY MS. LOBEL:

Q. Go ahead.

A. It's part of the IMA -- IMO code requirement to constantly assess the safety

management system first of all, but also to prepare for emergencies. This emergency could have been and should have been identified long time before this occurred to Burgess.

It's a regular port that the ship visits -- San Juan -- or that the company visits. They're familiar with the port of San Juan and they have the port agent ashore. They have the contacts, they visit to the hospitals. So they could have and should have prepared for this emergency to follow that requirement that a medical evacuation needs to be carried out in a reasonable and as soon as possible manner.

**Q. And am I correct in understanding that everything which you just explained, all correlates to your opinion within your report of 5.3 with the unreasonability as to what occurred here?**

MR. DRAHOS: Object to the form.

THE WITNESS: Correct, yes.

BY MS. LOBEL:

**Q. Sorry, just let me catch up with my notes.**

**Is it relevant to you in your analysis in this particular case who the**

**particular captain or staff captain was of the Harmony Of The Seas on the day of the incident?**

A. Not at all. Captains change all the time. Staff captains change out their -- there is a certain amount of time, three months, whatever it may be and then they change. There are other captains.

The reason for those changes are they need to go on vacation at some stage or another captain comes, they might change ships, but in order to standardize the requirements of a captain, there are job functions, there are handover reports, there is the SQM code that standardizes responses to emergencies notifications of medical issues that result in delays. It tells captains who to call shoreside, who to contact in order to get additional support as should have been provided in this case in order to get Burgess to a hospital as soon as possible.

Those procedures are all in place. So who the captain is, it really doesn't matter.

**Q. Would it also be fair to say in this particular set of circumstances, it doesn't**

**matter because they were never involved?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. No, it doesn't matter.

BY MS. LOBEL:

**Q. It's your opinion they should have been be involved?**

MR. DRAHOS: Object to the form.

THE WITNESS: It is my opinion, that the captain should have been informed that the company should have been informed of this significant delay to Mr. Burgess' medical care ashore.

BY MS. LOBEL:

**Q. Do you recall being asked questions about the port agent's role with regard to evacuations of patients on this ship?**

A. I do.

**Q. Do you recall -- and, hopefully, I wrote it down fast enough -- I think it was on GR 119 item 1.1.21 I think you said, having to do with the transport -- if you could go to that section?**

A. GR 119, I'm looking that up.

**Q. Yes, sir. You were reading from it**

earlier it has the charges for the rules and responsibilities?

A. I remember reading it.

Q. So if you can go to 119. I think it was 1.1.21 something to that affect. Do you see it?

A. Yes.

Q. I believe the language that you used -- and I don't have the exact quote from the document. I don't have it in front of me -- mentioned that the port agent is supposed to participate in the transport. Did I hear that correctly?

MR. DRAHOS: Object to the form.

THE WITNESS: It states participation in advanced planning with vessel staff corporate office prior to the first call and periodically during session as requested. (verbatim)

Participation in advanced planning was required in this instance.

BY MS. LOBEL:

Q. Okay.

A. That would have -- could have been -- should have been initiated by a board agent. He

could have and should have made Royal Caribbean aware of the transportation issues on the island of Puerto Rico. That is -- that would have resulted in advanced planning to an alternate means of transportation.

That's something he could have and should have brought up to Royal Caribbean.

**Q. Wouldn't it be the doctor's responsibilities, the individual who is ultimately responsible for the care of the patient to be followed by --**

A. Also --

MR. DRAHOS: Hold on.

Object to the form.

BY MS. LOBEL:

**Q. -- with the port agent?**

A. The ship's physician is another little wheel in this entire big process.

**Q. Okay.**

A. It's not only the port agent that is responsible for the logistics. As we have seen, the care team associate plays a role, the care team place a role, the medical department shoreside place a role. There are so many wheels to make this happen and to -- they should

have called this unreasonable delay by Burgess and somebody should have done something.

**Q. Would you agree with me that it isn't the port agent who is ultimately in charge of effectuating this transport?**

MR. DRAHOS: Object to the form.

THE WITNESS: I agree. It's -- according to SQM is the ship's physician who is in charge. The ship's physician reports to the master. The master is required to report or request assistance when required. The ship's physician could have contacted this medical department. Their own policy in SQM states that they are available 24/7 to provide logistical support.

Numerous parties could have and should have intervened in this unfortunate process as it occurred.

BY MS. LOBEL:

**Q. So based off of the rules, procedures, based off of your experience, would it be fair to say that a doctor can't just send an email say, please, get me an ambulance and then pass the buck to the port agent and whatever happens**

**with the port agent happens or doesn't?**

MR. DRAHOS: Object to the form.

THE WITNESS: That is very unreasonable in a responsibility that a physician has toward his patient.

BY MS. LOBEL:

**Q. I am just catching up with my notes.**

**Did you review the deposition testimony of Mr. Henze, Mr. Burgess' husband, correct?**

A. I did, yes.

**Q. You'd agree with me that Mr. Henze was in the ambulance at the time of transport?**

A. I agree, yes.

**Q. Do you recall the fact that Mr. Henze testified that he never heard any sirens when he was in the ambulance?**

A. I do recall that, yes.

**Q. Do you recall the fact that his perception being physically in the ambulance was that the ambulance wasn't moving very quickly?**

MR. DRAHOS: Object to the form.

THE WITNESS: I recall that, too, yes.

BY MS. LOBEL:

**Q. His testimony was that the transport,**

once in the ambulance going from ship to hospital, was not fast?

MR. DRAHOS: Object to the form.

THE WITNESS: I recall that, yes.

BY MS. LOBEL:

Q. Is that was based off of his physical perception of being physically in the vehicle?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MS. LOBEL:

Q. Did that also inform your opinions with regard to the speed of the transport aside from the other components that you have already testified to earlier?

A. It did --

MR. DRAHOS: Object to the form.

THE WITNESS: -- yes.

MR. DRAHOS: Captain, please, you have got to let me get my objections in, okay?

THE WITNESS: Sorry, yes.

BY MS. LOBEL:

Q. There's no documentation -- strike that.

You'd agree with me there is no documentation that there was any -- well, strike

**that.**

**You'd agree with me that there's no documentation or testimony even, that the shipboard doctor had any conversation as to the condition of Mr. Burgess when the hand off from ship to ambulance occurred?**

MR. DRAHOS: Object to the form.

THE WITNESS: I have not seen that, no.

BY MS. LOBEL:

**Q. So for all we know the observations, physical observations as to Mr. Burgess' condition were made by the paramedics themselves?**

MR. DRAHOS: Object to the form.

THE WITNESS: It could be, yes.

BY MS. LOBEL:

**Q. There's also no documentation or testimony or evidence indicating that when the ambulance company was actually called, that they were made aware that this was a time-sensitive medical emergency?**

A. I have not seen that --

MR. DRAHOS: Object to the form.

THE WITNESS: -- support of

documentation, yes.
BY MS. LOBEL:
Q. You read Dr. Pereira's testimony, correct?
A. Let me have a look.
Q. When I say Dr. Pereira, I'm referring to the shipboard doctor --
A. Yes, I did.
Q. -- who was involved.
A. Yes.
Q. All right. Did you read the portions of his deposition testimony where he couldn't articulate whether or not a stroke was a medical emergency?
A. Yes.
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, I recall.
BY MS. LOBEL:
Q. Did you consider that in your analysis in considering the reasonability of the response in this particular case with the evacuation of his patient?
MR. DRAHOS: Object to the form.
(Off-the-record discussion was held.)
THE WITNESS: Repeat the question,

please.

BY MS. LOBEL:

Q. Not a problem. I'll back it up, I'll back it up.

You read the deposition transcript of the shipboard doctor who was involved in this particular incident Dr. Periera?

A. Yes.

Q. Now, in reading that deposition transcript, did you read the portions during which Dr. Pereira testified that quote, unquote, depends whether a stroke is a medical emergency; do you recall that?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MS. LOBEL:

Q. Would it be fair to say that under the -- based off of -- well, strike that.

Did you consider the fact that Dr. Pereira couldn't articulate whether or not a stroke was a medical emergency in your analysis in this case as to the reasonability of the response for the transport of Mr. Burgess?

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. You may answer.**

A. Yes.

**Q. How did that affect your analysis?**

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. You may answer.**

A. It was part of my entire review. So that became part of the report, part of the analysis, part of research or resulted in research and resulted in my opinions.

**Q. Did it influence your opinion as to the cruise lines consideration of this particular incident as being time sensitive or not and then how that correlated with the documentation that we have, be it the emails that we see in the testimony that you can read?**

MR. DRAHOS: Object to the form.

THE WITNESS: Yes, it's -- when it's doubtful for a ship's physician whether a stroke occurred or a stroke did not occur, once you take the worst scenario into consideration and take appropriate action. (verbatim).

They did request for a medical

evacuation, which requires speed and that speed was not provided. That was not acted on. Very unreasonable by Royal Caribbean.

MR. DRAHOS: -- care if he needs that now.

MS. LOBEL: I didn't ask for side comments.

MR. DRAHOS: I'm sorry.

MS. LOBEL: It was hard earlier because it's been very rude and painful to listen to. I don't know what I've done to deserve this, but that's okay.

MR. DRAHOS: How about not following rule 26 in one iota. This is one of the most egregious violations of rule 26 I've ever seen.

MS. LOBEL: Okay. Sorry you feel that way.

BY MS. LOBEL:

**Q. I'm going to clarify something that was asked on direct examination that got muddled for listening to it with the back and forth -- but do you recall being asked about questions having to do with the timing of the ambulance on the road and being aware of slowdowns in**

traffic?
A. I do recall, yes.
Q. Am I understanding, that your opinion is not that Royal Caribbean should allow an ambulance to go and it's known that there is slow traffic and then pick up somebody via helicopter in the middle of the road, but your opinion was that in preparation and consideration of how to transport the patient, that part of the process should have been researching the status of traffic, researching an ambulance and researching a helicopter and then considering all of these factors together to determine what was the fastest, most effective way to get this patient to a hospital?
A. Exactly.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q. I am not sure if you can answer this because of the NDA, but let me know.
Have you ever testified on behalf of Holland America in your capacity as one of their employees?
A. I can answer that question. No, I have not.

Q. Have you ever testified on behalf of Carnival Cruise Line?
A. No, I have not.
Q. Do you know if you have ever been listed as a witness at any point in time in a case or matter involving Holland America?
A. No.
Q. Similar question with Carnival. Are you aware of ever being listed as a witness in a case when working for Carnival Cruise Line?
A. No.
Q. Again, I don't know if you can reveal this: Did you ever have any disciplinary actions taken against you for your -- in any capacity that you served for Holland America Line?
MR. DRAHOS: Object to the form.
THE WITNESS: Nondisclosure. I'm not going to reveal those kinds of details.
BY MS. LOBEL:
Q. Not a problem. I wasn't sure if you could mention that.
A. Yeah.
Q. Similar I am going to ask the same question for Carnival.

A. Yeah.
Q. Have you ever been disciplined at any point in time working for Carnival Cruise Line?
MS. LOBEL: Object to the form.
THE WITNESS: Same answer.
BY MS. LOBEL:
Q. Not a problem.
Is there anything that I or my colleague haven't asked you that you think is important or relevant to the facts and circumstances of this particular case that we haven't already discussed?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MS. LOBEL:
Q. Are all of the opinions that you've made in this particular case based off of your education, training and experience as a captain?
A. Yes, they are.
Q. And a commodore?
A. And commodore and my entire career.
Q. Is the methodology that you used and relied on in order to come to all of your opinions, are those that would be reasonably used by others in the same field as you are in?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MS. LOBEL:

**Q. Just looking to check my notes.**

**Is notifying a captain with regards to a medical evacuation of a patient be a passenger, crew member a mere courtesy or is a part of the process that is supposed to occur?**

A. It's part of the process. It is a requirement and that goes for any crew member. Not necessarily only the physician. It depends on your status onboard, but the physician reports to the captain. He reports to shoreside medical.

In this case with the physician being responsible for the health of Mr. Burgess, it would have been reasonable for him to notify someone, the captain, the office in Miami of Royal Caribbean, but somebody should have been notified because this case certainly required intervention in order to speed up the process.

MS. LOBEL: Okay, Captain, that's all I have for you. I appreciate it.

THE WITNESS: Thank you.

MR. DRAHOS: Read or waive captain?

THE WITNESS: Read, please.

THE VIDEOGRAPHER: This concludes the deposition. We are off the video record at 3:15.

THE COURT REPORTER: This is the court reporter. Is this going to be ordered?

MR. DRAHOS: Yes.

THE COURT REPORTER: Would you like a copy?

MS. LOBEL: Yes, ma'am.

THE COURT REPORTER: Is this expedited?

MR. DRAHOS: No.

Thank you, everyone.

MS. LOBEL: Thank you.

(Witness excused.)

(Thereupon, the deposition was concluded at 3:15 p.m.)

THE STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that CAPTAIN HENDRICK KEIJER personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 29th day of November, 2022.

_________________________________
MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires: 5/22/25
My Commission No.: HH 116638

C E R T I F I C A T E

THE STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, MELANIE STINSON-KONSTANTINIDIS, RPR, Registered Professional Reporter, State of Florida at large, do hereby certify that I was authorized to and did report said deposition in stenotype; and that the foregoing pages, numbered from 1 to 199, inclusive, are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of November, 2022.

____________________________________

MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires: 5/22/25
My Commission No.: FF 116638

DEPOSITION ERRATA SHEET

BURGESS

vs.

ROYAL CARIBBEAN

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

____________________________________

CAPTAIN HENDRICK KEIJER

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

SIGNATURE:________________________DATE:____________

CAPTAIN HENDRICK KEIJER

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

___________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

___________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

___________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

___________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

___________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

___________________________________________________

Reason for change:__________________________________

SIGNATURE:________________________DATE:____________

CAPTAIN HENDRICK KEIJER

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

Page No._____Line No._____Change to:_______________

____________________________________________________

Reason for change:__________________________________

SIGNATURE:_________________________DATE:____________

CAPTAIN HENDRICK KEIJER

**Exhibits**

**KeijerH A** 4:4

**KeijerH B** 4:4

**KeijerH C** 4:5

**KeijerH D** 4:5

**KeijerH E** 4:6

**KeijerH F** 4:6

**$**

**$450** 144:5

**0**

**0** 178:10 179:14 180:9

**0.00** 62:17

**1**

**1** 5:3 138:13

**1%** 8:4

**1.1.21** 65:23 184:21 185:5

**1.1.33** 66:12

**10** 51:25 57:9 76:18,20 77:1,19,23 78:1,14,21 79:14 82:2,12,13 83:23 146:20 147:5 151:1,4 161:1 172:14

**10-minute** 173:19

**10-minutes** 58:9

**100** 7:6,16 151:18,21

**10304** 62:20

**10:39** 5:8

**11** 45:12 61:11

**117** 65:14

**119** 65:22 184:21,24 185:4

**11:56** 72:11

**12** 67:22 98:23 99:23 162:10

**12/21** 71:13

**120** 138:14

**121** 66:11

**121.1.1.34** 67:4

**1221** 71:23

**1228609** 142:17

**12:02** 72:13

**12:21** 60:21 75:11,15 76:14,17 80:1,4 81:6

**12:30** 92:8,9

**12:54** 76:15,17 81:7 84:11,13 85:3

**13** 91:24

**1308** 90:7

**1350** 90:7,9

**13:08** 84:16 85:4 89:12 90:3 95:20 96:1,3

**13:50** 89:17 90:4 96:1,3

**14** 84:19,25 85:8,19 86:5 140:8,20

**162** 178:10

**17** 156:2

**18** 5:7

**18-23541-CIV** 133:15

**188** 179:14

**19** 145:20

**1991** 145:14

**1992** 146:13

**1999** 147:4

**19CV22776** 134:1

**19th** 72:23

**1:01** 92:9,11

**1:39** 127:18,19

**1:43** 127:20,22

**1:47** 132:7,8

**1:52** 132:9,11

**2**

**2** 125:24 127:6 172:4

**2.40** 38:23 39:10,11

**2.41** 39:11

**20** 172:17
**2005** 147:4, 7
**2006** 63:4
**2014** 91:9
**2015** 8:9 21:11 32:22 33:5 91:9 147:7
**2017** 32:22 33:5
**2018** 130:22
**2019** 62:20 133:9
**2021** 116:9
**2022** 5:7 42:11 72:23 160:20
**21** 81:17 100:12
**21.9** 94:23 95:2,13 96:19,24 97:17 98:16,22 100:16 104:17 107:13 109:25 110:1,12 112:20
**21.9-mile** 101:16
**22-mile** 54:4 119:10
**22.7** 95:3
**2286** 143:1
**23** 78:2,15, 23 79:8, 10,17,20 81:8,21
**24-hour** 66:25
**24/7** 187:15
**25** 36:3 42:11 138:23 151:10
**25.6** 95:4, 14
**25th** 160:20
**26** 60:1 194:14,15
**26.1** 105:5, 8,9
**29** 90:1 141:11
**2:04** 142:3, 4
**2:06** 142:4, 6
**2:08** 144:20,21
**2:11** 144:22,23

**3**

**3** 58:10 73:5,6 140:17,20
**30** 83:7 112:22 140:11,12
**31** 54:3 97:19 100:8 105:21 106:6 107:15 119:9 160:21
**31-mile** 54:7 86:12 114:25
**33** 81:18, 19,20,23 82:11,14 83:11,22
**334508** 75:20 79:8,11, 18,25 80:4,7,16, 19 81:6,16
**334518** 79:8, 11,18 81:7,16 89:14,25 90:3 95:20 97:25 98:15
**334560** 89:17,25 90:4 95:21 97:25 98:15
**334568** 80:7, 16
**33508** 84:8
**33518** 84:8
**38-foot** 7:9
**38-minute** 110:19
**3:15** 199:4, 18

**4**

**4** 117:17 140:4,17, 20
**4-manila** 139:5
**4.01** 180:8
**4.4** 61:11
**40** 54:4 100:24 101:24
**40-minute** 54:7 86:12 114:25
**412** 180:9
**42** 90:7,9, 11 96:4,6,

19,24 97:25 98:1 99:14,24 100:11 104:19 105:5,7 107:17 119:9

**42-minute** 98:3

**444** 138:17

**466** 138:18

**47** 90:6,7

**5**

**5** 57:9 141:2 161:1

**5%** 8:5

**5.3** 46:10, 17 52:11 53:16,19 171:2 182:17

**5.6** 53:25

**5.7** 54:6 86:10

**50** 52:23 151:14

**54** 81:17

**545** 138:19

**6**

**6** 45:12 79:14 140:4,17, 20

**6-manila** 136:9

**6.2** 77:2

**6.21** 77:22 78:1,15,22

**60** 100:9

**7**

**7** 140:4,20

**8**

**8** 140:17

**81** 138:16

**8719** 126:25

**9**

**9** 140:4,20

**A**

**a.m.** 5:8

**A1** 141:10 142:22,23

**A3** 140:4,7

**abide** 176:23

**abided** 177:12

**ability** 20:13 166:22

**aboard** 111:2 152:1

**absolutely** 68:11 72:9 100:7

**academy** 145:12

**accept** 103:24

**acceptable** 150:15

**accepting** 112:2

**access** 19:18,19 38:19 76:23

**accomplish** 78:2,16 99:25

**accord** 164:24

**accordance** 71:8 97:17

**accuracy** 23:16,17

**accurate** 7:2 11:13 20:13 23:25 125:6

**act** 54:7 58:23 86:11 114:24 179:20

**acted** 20:7 194:2

**acting** 179:3

**action** 36:18 123:18 152:24 153:12 164:14 193:23

**actions** 37:8 43:8 57:2 156:25 161:17 168:8 196:14

**active** 13:25 134:9

**actual** 64:2 85:5 104:18 109:19 110:6 141:15 142:9 174:13

**added** 143:12

**addition**

163:3

**additional** 37:8 53:25 65:3 112:1 145:3 183:18

**address** 95:8 178:1 179:8

**admitted** 153:8

**Adriana** 35:6

**advanced** 66:1 185:16,20 186:4

**advised** 175:18

**adviser** 178:15

**advises** 57:8

**affect** 31:18 37:6 185:5 193:4

**affected** 31:10 179:21

**aforementioned** 38:15

**afterward** 64:2

**agency** 67:9 176:20

**agent** 57:3 65:11,15, 25 66:4, 11,14,15, 24 67:5,8, 10,22 68:2,10,14 112:19 158:10 160:13 161:7 162:24 163:12 175:16 182:8 185:11,25 186:16,20 187:4,25 188:1

**agent's** 184:16

**agents** 114:3,19

**agree** 13:1,3 14:16 15:2,11 16:3,6,18, 22,24 19:3,24 20:25 22:9 24:12 26:18 28:6 29:12 30:16,22 31:7,15 32:11,19 33:16 36:22 40:7,15, 18,20 41:3 42:2,16,22 44:14 46:17 48:2,17 50:13 53:13 54:21 55:23 56:4 67:21 76:13,17 77:25 79:7,17,24 80:3 85:11,19 86:6,17,18 87:5 88:11 89:3,22 96:14,22 97:5,13 99:4 107:7 108:1 109:18,24 110:3,19, 20 153:25 154:15 158:21 161:22 162:4 165:20 173:5 187:3,7 188:12,14 189:24 190:2

**agreed** 21:13,18 22:2,5 67:7 98:4, 18 109:22

**agreement** 9:25 27:4, 6 78:13 147:22 149:7 164:19

**ahead** 46:22 47:2,7 48:8 49:14 51:16 53:10,18 55:1 59:6, 17 93:22 95:5 124:21 160:7 169:22 181:23

**air** 56:21 57:19,20 60:9 121:6 171:23 172:8

**aircraft** 172:23

**airlift** 172:10

**airport** 51:24 58:11,15 172:12,13,

17,22 173:18

**Alberto** 38:1,11

**allowed** 140:15

**alongside** 9:9 10:16, 19 31:23 165:13 173:7

**alternate** 34:6 47:23,24 52:3 53:1 54:15 65:8 70:4 71:7, 18 84:5 112:6,23 113:5 114:8 158:19 161:15 174:25 175:23 186:4

**alternative** 40:22 41:5 42:4 44:16 45:3 46:18 48:4,18 49:10,19 50:14 103:17 116:15 168:2

**alternatives** 45:7,11 118:7 167:21 168:6,11, 13 169:2, 10 170:23 174:6

**ambulance** 36:17 40:23 41:6,10,12 42:5,25 44:2,3,17, 19 45:2,4, 25 46:1,6, 11,19,20 47:17 49:4 52:13,22, 24 53:21 54:2,8 55:19 56:6,12,18 57:5,8,14, 15 58:3,24 60:9,17,20 67:12,23 68:25 70:15 71:2 74:1,12, 19,25 75:11,14, 15 76:13, 16 83:4,7 84:1,7,11, 13,16,20, 22,25 85:2,6,9, 16,18,24 86:2,4,13 87:8,16 88:13 89:6,11 95:21 97:6,8,14, 16 98:7 99:5,13,25 100:8,18, 22 101:10, 14,17,24 102:10 103:11,21 104:15 105:12 106:4,5, 19,24 107:3,4,21 108:3,4 110:21 111:10,16 113:11 114:14 115:1,14 116:5,17, 21,24 117:6,13, 24 118:11 119:6 121:7 123:5 137:17,20 153:10 160:15,25 161:1,10, 19,24 162:1,11, 22 163:23 175:20,23 176:3 181:2 187:24 188:13,17, 20,21 189:1 190:6,20 194:24 195:5,12

**ambulances** 56:21,22

**amended** 138:6

**America** 8:11,12 35:23 36:22 147:8,10 148:23 149:17 151:2 152:11 153:20 154:18 156:14 195:22 196:6,15

**American** 37:21 146:13

**amount** 34:8 64:23 70:1,7 83:22

85:21 109:3 142:10 158:13 160:14 183:5

**Amsterdam** 145:13

**analysis** 43:4 44:7, 22 47:10, 20 48:25 51:2 55:22 59:22,25 61:19 72:5 182:25 191:19 192:22 193:4,10

**analyzed** 24:10

**analyzing** 24:20

**anchored** 9:9 149:2 166:20

**and14** 140:4

**annual** 144:11

**answering** 48:16 66:12 113:9

**answers** 138:11

**anticipate** 164:9

**apologize** 146:11

**apparently** 70:13

**applicable** 108:24,25

**apply** 51:1 97:21,23

**appointment** 67:15

**approximately** 8:4 21:7 52:24 54:3 91:8 97:19 112:21 130:23 144:2 147:1 150:25 151:21 172:14,17

**arbitration** 125:18 133:1

**area** 17:3,7

**areas** 17:5 19:15

**Argumentative** 18:2 48:22 53:9

**arise** 155:10

**arose** 178:2

**arrange** 61:12

**arranged** 53:2 107:22 160:15 161:15

**arrangements** 71:7 112:23 113:5 158:19

**arranging** 67:23 163:3

**arrival** 46:6,11 47:17 52:13 53:21 85:3,9,24 86:2,14 94:19

**arrive** 36:17 49:5 52:23 55:20 58:3 84:20,25

**arrived** 76:14,16 84:11,13 86:4 89:17 90:3 102:12 107:9 108:7

**arrives** 180:14

**arriving** 56:6 85:15,17

**articulate** 191:13 192:21

**ashore** 154:14 182:8 184:13

**aspect** 63:25 131:14,17

**aspects** 14:25 22:22

**assault** 66:24

**assess** 18:23 19:11 20:4 21:1 181:25

**assessed** 9:6 24:10

**assessing** 18:20 24:19

**assessments** 160:10

**asset** 70:17

**assigned** 17:14 147:10

158:9 180:1

**assist** 66:5 69:23 124:8 159:5 165:23 166:12 179:18

**assistance** 31:25 155:19 176:6 187:11

**assisted** 120:24

**associate** 68:20,23 69:5,17,21 70:3,5 111:1,10, 13 115:7 117:9 119:8 123:24 158:9 179:10,14, 25 180:3 186:22

**associates** 67:18

**assume** 96:8

**assuming** 105:10

**attached** 91:17

**attack** 12:20

**attacks** 11:11

**attempt** 71:18 114:8 115:9,12 118:6 146:2 162:15

**attempted** 169:5

**attempting** 167:13

**attend** 112:25

**attention** 83:5 98:10 151:23

**attorney** 133:10

**auditing** 23:11,15

**audits** 22:8

**August** 42:11

**authored** 25:11

**authorities** 177:18

**authority** 33:24 34:14,21, 24

**automobile** 57:14

**availability** 71:1

**average** 107:15

**avoid** 139:21

**aware** 27:23 57:4 87:17 112:19 113:3,4 114:17 121:8 123:11,14 134:13 149:5 160:11,13 161:9,14 186:2 190:21 194:25 196:9

**B**

**Bachelor's** 145:14,19

**back** 37:14 38:15 39:7 47:1 94:5 95:16 114:22 119:20,22 133:12 141:16,17 145:9 152:10 162:8 163:16 179:2 192:3,4 194:22

**background** 145:4

**bad** 118:1

**banner** 151:25

**base** 58:8, 14

**based** 35:2 44:10 47:9,18 48:25 50:25 51:4 52:17 54:14 60:6 98:25 101:1 161:11 164:16,18 165:21 173:4 177:24 187:21,22 189:6 192:19 197:17

**basically** 176:12

**basis** 51:2

61:20,25 62:12 87:15

**basket** 173:7

**Bear** 26:6 160:18

**beat** 99:15

**begin** 75:19

**beginning** 5:3 64:1 134:19 145:11

**behalf** 5:16, 18 195:21 196:1

**bell** 25:20 35:7

**belt** 7:9

**Ben** 138:21

**benefit** 136:7

**big** 186:18

**billed** 141:21

**bit** 29:3 44:8 99:15 134:18 181:5

**blood** 14:8

**board** 19:13 131:12 185:25

**boarding** 126:3

**boards** 166:11

**boat** 7:12 122:6,7 128:7 148:18

**bones** 14:6

**bother** 169:22 170:1,8

**bottles** 24:22,23

**bottom** 62:21 94:13

**box** 76:2

**break** 72:8 92:5

**Brett** 118:21,22

**bridges** 90:20

**bring** 119:18 142:19

**bringing** 173:7

**broad** 147:19

**broken** 14:6

**brought** 111:4 115:4 135:23 158:14 171:12 176:4,5 186:7

**buck** 187:25

**bullet** 27:12

**Burges** 5:5

**Burgess** 46:12 51:13 52:1,3,7, 14,20 53:22 61:16 64:24 66:5 71:5 84:21 85:1,16, 17,25 86:20 100:23 105:18 114:16 116:17 118:10 120:25 121:13,23 123:24 152:23 158:8 161:12 162:18 175:2 176:1 178:23 180:19 181:1 182:4 183:19 187:1 190:5 192:24 198:16

**Burgess'** 54:2,7 61:13 67:23 86:11 114:25 184:12 188:9 190:12

**Burgess's** 87:17

**business** 157:6

**C**

**C-U-P-E-Y** 101:23

**Cadbarrick** 125:25

**Caguas** 37:22 40:10 91:2,13 95:9 99:6 102:6 103:2,10 106:6,17 107:10,22 108:7 109:20 110:6

113:13 114:12 116:24 117:8,13 123:6,25

**calculated** 97:24 98:2

**calculation** 96:16 97:21 99:15,22 100:3 106:9

**calculations** 77:9 94:1, 12 96:13 97:3 98:3 104:17 127:1 148:13

**call** 31:25 56:11,21 57:9 66:2 113:21 115:10 122:17 136:11 146:19 160:24 161:24 163:1 167:7 178:9 183:16 185:17

**called** 7:15 13:11 30:11 57:7 60:18 61:2 62:4 115:14 117:9,16 132:18 145:20 146:18 162:10 172:8 179:4 187:1 190:20

**calling** 175:13

**calls** 31:3 56:5 69:5 163:7,13, 22

**capable** 173:6

**capacity** 7:24 8:17 12:2 16:8 35:18 145:22 146:5,8 148:6,9,23 149:10 152:4 195:22 196:15

**capital** 69:3

**captain** 5:4 6:2,6,17 7:12 8:2, 4,8 9:12, 15 12:17 16:3 19:3, 6,12,25 20:2 23:6, 7,10 24:17,19 28:14,15, 22 31:24 32:1,11 35:22 36:10,17, 21 39:1, 16,19,25 40:3 41:24 42:16 46:16 47:2,7 48:17 50:21 51:10 52:4 55:18 71:11 79:4 90:2 92:13 94:6 104:20 109:10 110:3 111:9 113:3,15, 19 114:10 117:10,19 122:12 123:14,23 124:5,6 127:24 132:13 134:25 135:23 136:11,22 140:2 141:13 142:8 144:14 145:2,16 146:19,20, 24 147:5, 6,7,9,24, 25 150:6, 7,10,17 153:19,20, 21 154:11, 23 155:12 156:3,4 158:15 160:3 163:22 170:10 173:5 174:1,8 176:5 178:16,22 183:1,10, 12,22 184:10 189:18 197:18 198:5,13, 18,22,25

**captain's** 28:7 36:7, 9 152:17

**captained** 8:13

**captaining** 150:23

**captains** 18:20,25 19:2 183:3,4,7, 16

**car** 81:2 161:2

**care** 24:21 25:2,3,4, 5,8,13 26:20 27:20 29:22 46:14 52:16,20 53:24 61:6,14,21 62:1,13, 14,17,25 63:22 64:16 66:17,18 67:18 68:1,9,13, 20,23 69:4,16,21 70:3,5 71:6 83:4 86:1 111:1,9,13 112:12 113:10 114:10 115:7 117:9 119:7 123:24 157:18 158:8 159:19 179:10,14, 22,25 180:2,13, 15 184:13 186:10,22 194:4

**career** 145:7 149:15 197:21

**cargo** 13:18 145:20

**Caribbean** 5:6 8:14, 16 28:21 29:1 43:7 46:5,9 48:1 52:12,20 53:4,20 54:1,5 56:25 57:2 58:21 60:12 62:14 63:4 64:10 65:7,24 66:14,16 68:13,17 69:10,16 70:22 71:2 72:1 85:23 86:10 109:5,9 111:3,25 112:25 113:22 114:24 115:17 123:10,15, 17 124:7 138:14 152:25 153:7 154:19 157:23 158:3,12 159:5 161:8 174:24 175:7 177:7,25 178:8,13, 14 180:1, 19 186:1,7 194:3 195:4 198:19

**Caribbean's** 47:16 61:21 62:1,8 64:6 65:15 67:5,11 114:21 138:13,17 162:14 168:8 180:8

**Carlos** 126:25

**Carnival** 9:13 10:1 12:3 13:22 16:4,7,15, 19 17:20 18:1 21:4 22:15 24:5 25:16 26:22 27:4,11,19 28:19 29:5,25 30:7,8,14, 18 31:14 32:12,21, 23 33:5,6 34:15 35:8,12 37:17,20 64:8,13,16 91:11 122:13 145:7 151:24 152:1,2,7, 8,10,12 156:13,15 196:2,8, 10,25 197:3

**Carnival's** 26:11

**carried** 36:13 182:12

**case** 6:22 11:14 12:9,25 15:6,13,19 25:25 37:25 42:21 44:16 45:20 49:21 68:3 89:10 100:1 102:12 106:13 110:7 116:4,8 118:21 119:24 125:21 126:1,2,16 128:4,8, 10,16,25 130:9,11, 22,25 131:25 132:18 133:4,7, 13,22,24 141:8,21 142:10 143:5,13 144:1 150:8 153:1 154:17 156:22 158:8 161:23 166:13 167:19 168:4 172:25 174:17 175:1,24 178:2 182:25 183:19 191:21 192:23 196:6,10 197:11,17 198:15,20

**cases** 11:9 12:15 125:16,17 126:13 129:21

**catch** 182:22

**catching** 188:7

**Celebrity** 126:19

**center** 21:4, 10,15 23:4,11 25:14 29:7 30:18,24 31:4,8,14 32:4 105:20 122:13 178:17

**centers** 21:9 23:15,23 38:22

**certainty** 129:21,23

**certificate** 13:14,15, 17,20

**certification** 13:24

**certifications** 13:5,9

**certified** 105:17,19

**Challenge** 129:25 130:3,16 131:6,21

**challenges** 131:24 132:15 161:6,9 174:23 179:6

**challenging** 48:15

**chance** 160:4

**chances** 161:2

**change** 109:25 183:3,4,6, 10

**characteristic s** 33:13

**charge** 18:25 28:15,18 29:7 67:9 144:3,7 187:4,9

**charges** 144:5 185:1

**charter** 7:11

**charts** 7:8 23:12,16, 17

**check** 198:4

**checked** 111:18

**chief** 39:21 146:18

**choice** 170:7

**chose** 96:14 98:7 106:8

**chronology** 136:10,12

**CIOT** 30:12

**circumstance** 33:7

**circumstances** 55:15 87:17 128:19 183:25 197:11

**cities** 65:16

**city** 69:2

**claim** 30:4

**claiming** 22:7 101:15

**clarification** 97:2

**clarify** 29:10 139:4 194:20

**clarity** 8:23 93:21

**class** 17:15, 19,20,25 18:14,15 31:24 33:9,10

**clear** 12:6 41:23 55:6 171:7 176:10

**closed** 134:6

**clue** 107:8, 12

**Coast** 23:8 34:5 51:23 56:22 57:19,21, 23 58:6,7, 13,14 59:2,11 113:5 116:1 119:3,11, 16,20,22 120:3,4, 14,22,23 121:9,13, 22 122:18 164:20 165:11,15, 23 166:5, 11,16,18 167:8 173:2

**code** 176:10,16, 19,23,24, 25 177:2, 7,13,14,19 181:24 183:13

**codes** 174:19

**collaboration** 33:20,23 154:13

**colleague** 144:16 197:9

**collection** 139:12

**combat** 181:15

**combination** 85:7 112:22

**command** 146:24

**comment** 20:12 26:23 27:2 37:16 149:7

**commentary** 123:3

**comments** 194:7

**commodore** 9:13 16:4, 8,12 18:19 19:9 23:18 32:17 145:6,10 197:20,21

**commodore/ director** 16:9 21:21 22:13 29:4,14 35:9 37:18 91:10 152:5

**commodores** 16:23 22:4

**communication** 164:12

**communications** 141:6 175:16

**companies** 41:17 51:19 56:21 70:15 113:7 116:6 121:7,15 146:18 162:11

**company** 7:8, 11 13:21 27:8,13 34:7 36:3 41:10 44:2,17 45:2,25 46:19 57:1,14 58:22 65:2 68:16 69:10 71:3 84:4,20 87:16 89:11 95:21 113:11 114:11 116:21 119:7,17 145:20 146:9 155:6,13 157:20 158:23 159:8 161:19,25 164:10,15 171:24 172:8 174:20 176:11 181:14 182:6

184:11 190:20

**comparable** 181:9

**complaint** 138:6

**complete** 85:13 119:24 134:17

**compliance** 155:5 177:19

**components** 189:13

**composite** 42:12,17 43:25 44:15 45:18,22 48:3 49:11,20 51:11,21 52:5 53:6, 14 58:25 59:12 61:6 72:17 73:5,20 91:17,21, 22 92:15 136:8 139:5,6

**computer** 39:7 76:22 126:9 139:22

**concern** 111:23

**concerns** 37:18

**conclude** 38:7

**concluded** 199:17

**concludes** 199:2

**conclusion** 47:16 49:2 100:12 167:18,20 168:1 171:1

**condition** 11:21,24 12:21 20:8 86:19 159:11 161:13 190:5,13

**conditions** 11:10 12:14 24:2 35:3 82:24 83:17 90:16 100:6 108:12,14, 17 111:15 155:9 178:18

**conduct** 60:13 156:24

**conducted** 8:21 9:10, 19 26:17 43:8 44:9, 11 52:18 85:4 148:18

**confidential** 140:14

**confirm** 42:19 129:14

**consent** 173:21

**consideration** 98:24 193:13,23 195:9

**considered** 122:4 167:5,7 168:11 169:4 170:24

**constantly** 160:9 181:25

**consulted** 59:2

**contact** 65:2 66:25 113:15 115:10 124:5 165:10 183:17

**contacted** 31:17,22 56:24 119:4,12 158:1 187:13

**contacting** 34:4

**contacts** 182:9

**contained** 20:17 139:8 140:6 171:16

**contention** 76:1 82:10 84:10,15 89:10

**context** 22:10

**Continental** 181:9

**continue** 86:8 180:4,5

**Continuing** 58:20

**contract** 65:24 152:19,21

154:5,9

**contracts** 152:14 154:1

**control** 16:16 17:24 21:17,25 24:14 29:5,15 30:7

**conversation** 190:4

**conversion** 77:19 78:22

**converted** 96:19

**cooks** 19:13

**coordinate** 67:11,14, 16

**coordinating** 31:9 33:18 61:22 62:2,15 63:1

**coordination** 61:13

**coordinative** 179:24

**copies** 135:16,22 142:9

171:12

**copy** 141:14 171:14 199:9

**corner** 62:22 75:19

**corporate** 66:2 154:16 185:17

**corporation** 22:15 29:6 30:7,18 37:20 152:1,12 156:15

**correct** 7:3, 14 8:12 10:19 15:19,21 16:12 17:1,8,11, 15,16 18:21,22 22:10 27:10 43:17 55:20 60:25 61:18 72:24,25 89:12,15, 18 94:14 95:10,14 96:20,21 98:19 103:25 104:2,3 106:10 110:17 113:17,18 114:21 124:12 128:17 130:18 146:7 149:11 154:10 163:8,14 164:7 166:7 167:6 168:15 171:18 173:22,25 181:11 182:14,20 188:10 191:4

**correctly** 146:10 175:5 185:13

**correlated** 193:15

**correlates** 182:16

**correspondence** 111:5 140:10,12, 13,19,21 164:3

**counsel** 5:12 39:4,13 56:8 71:16 106:22

**couple** 89:9

**court** 5:9,13 9:18 38:14 131:2 136:7 145:24 199:5,8,11

**courtesy** 36:25 169:17 198:7

**courtroom** 10:6,11 54:20

**covered** 112:21 141:5

**CPR** 14:8

**creates** 176:17

**credentials** 165:22

**crew** 66:13, 20 67:4,17 74:12,19 84:8,11,25 85:6,7 87:8 96:23 99:5,13,25 100:8 106:4,24

107:4 111:10 112:18 148:2 149:1 154:6 155:15 164:21 176:13 178:17 179:21 180:11 198:7,10

**crisis** 66:23 179:19

**critical** 55:18 83:4

**criticisms** 85:12,20 86:6

**CROSS-EXAMINATION** 144:24

**cruise** 8:8 9:12,13 10:1 13:18,22 16:5 22:16 24:5 25:16 26:22 27:4,12,19 28:19 32:13 58:7,22 64:18 65:12 66:17 84:4 120:9 122:13 126:18 131:12 133:23 146:12 147:8 149:16 150:23 151:25 152:10 154:1 156:13 157:5,8 159:8 166:19 170:23 173:5 174:19 176:22,25 181:6 193:13 196:2,10 197:3

**cruise's** 52:12 53:20 138:15

**Cruises** 5:6 46:5,9 54:1,6 63:4 65:7 68:17 72:2 85:23 86:11 114:24 126:19

**CTAS** 67:18

**Cupey** 101:22 102:3,8 103:8,20 104:1,5 106:17 113:12

**current** 6:25 66:25 125:6

**curriculum** 6:19

**Curry** 16:1 25:19,21, 22 26:8,9

**CV** 6:25 13:11 22:7 24:8 27:13,14 30:4 137:5

D

**damage** 16:16 17:24 21:17,25 24:13 29:5,15 30:6

**damages** 138:7

**Darren** 138:10

**data** 111:3

**database** 7:16

**date** 5:7 40:10 41:6 42:5 43:1 44:4 51:13 56:13 60:10 71:14 97:7 109:15,21 141:21 142:11 143:6

**dated** 42:11 138:22 160:20

**Daubert** 129:25 130:3,12, 16 131:6, 21,23 132:14 133:18 134:13

**David** 5:8

**day** 40:23 44:19 45:4 46:2 48:19 55:20 57:15 59:3 60:18 68:15 70:17 71:24 74:13,20 97:15

100:5 109:14 110:22 125:8 136:15 183:2

**days** 140:11,13

**dealt** 149:18

**decide** 118:19

**decision** 28:7 69:9 124:6

**decision-making** 29:22

**decisions** 19:6,7 35:2

**deck** 22:20 138:2

**dedicated** 63:5

**defendant** 5:19 125:12,19

**Defendant's** 73:4,19 139:4

**Defendants'** 44:14 51:11 52:5 53:6,14 59:12 61:6 92:14 125:11

**defense** 56:8 60:23 71:16 106:22 125:21 128:4,8,10 133:6 134:2 135:23 136:8

**defer** 19:6

**deferred** 33:17

**defibrillators** 14:9

**define** 78:18 85:14

**definition** 88:6,10

**definitively** 70:16

**degree** 122:11 145:14,19

**delay** 71:5 112:23 152:24 176:1 178:23 180:23 184:12 187:1

**delays** 114:20 183:16

**deliver** 85:1

**Delta** 6:10

**demand** 138:7

**demonstration** 110:4

**denote** 75:22

**departed** 116:21

**department** 22:20 24:5 28:16,19, 24 114:4 154:14 157:24 158:17 159:16 164:8 186:23 187:13

**departure** 85:4,10 94:18 111:16

**depending** 159:11

**depends** 192:13 198:11

**depicted** 110:24

**deposition** 5:3,22 6:18 9:18 10:6,12 27:23 38:8 42:18 43:12,16 48:13 51:9 54:17 60:6 64:14 72:18 87:25 102:23 107:5 108:2 125:14,18 130:15 134:15,20 137:6 138:9,20, 22 139:15 140:18 143:8 154:17 160:19 188:8 191:12 192:5,10 199:3,17

**depositions** 86:23

**deprived** 46:12 52:14 53:22 85:25

**describes**

178:11

**description** 40:6 179:11

**descriptions** 19:19

**deserve** 194:12

**Despak** 126:23 130:9

**destination** 95:7,13,14 104:8 106:17 158:5 180:21

**destinations** 159:10

**details** 8:20 9:4,19,23 10:12 14:10 15:1 27:2,12,20 30:19 33:18 37:16 86:19 108:5 127:8 147:23 196:19

**detained** 177:21

**determination** 152:18

**determine** 56:24 118:6 128:2 158:24 167:22 168:2 195:14

**development** 25:12

**diagnosis** 20:6,14 21:1 23:25

**difference** 33:13 104:16

**differently** 68:14

**difficulties** 176:14 181:8

**difficulty** 174:9,13

**dig** 129:1

**digging** 126:22

**dingy** 128:11,15, 21 129:6

**direct** 6:4 163:2 194:21

**direction** 66:19

**directly** 47:19

**director** 16:10,16 17:10,23 21:17,24 26:11 30:6 33:18,25 34:16 35:2 158:16

**disagree** 16:21 20:9,19,24 21:19 24:15 28:11,12 29:18 41:8 42:10 44:22 79:23 108:9

**disagreed** 131:20

**disciplinary** 153:11 196:13

**disciplined** 197:2

**disciplines** 145:18

**disclose** 149:10

**disclosed** 6:21 42:20 60:5 181:20

**disclosures** 138:13

**discovery** 64:14

**discrepancy** 97:3 101:7,9, 13,19 102:22 104:13

**discuss** 72:5 170:22

**discussed** 197:12

**discusses** 70:14

**discussing** 150:9 152:23

**discussion** 6:12 32:9 46:8 136:4 139:24 144:19 180:6 191:24

**disembarkation** 148:25 149:18

**disembarked** 66:21

180:11

**dispatch** 60:24,25 75:1 113:11

**dispatched** 60:20 75:11,15 76:14,17 111:10 117:6

**dispute** 87:15

**Disregarded** 131:10

**disruption** 103:15

**distance** 82:14 83:2 92:25 93:2 94:9,23 95:12 96:14 97:20 98:7,21 99:5,18 100:17,24 101:4 103:12,15 104:18 106:9 107:13 108:15 109:2,25 110:12,14 112:20 137:10

**distances** 94:20 148:13

**DMV** 137:25

**docked** 9:8 69:2 149:1 165:13 166:19

**docks** 166:6

**doctor** 13:2 19:7 20:5 21:1 57:6 68:22 88:1 143:16 160:21 164:10 178:12,15 187:23 190:4 191:7 192:6

**doctor's** 20:13 152:19 186:8

**doctors** 15:5 86:23 154:1,7, 10,25 155:3

**document** 65:19 67:3 72:22 73:11,14 74:1 88:22,23 138:18 162:5 185:10

**documentation** 56:7 60:22 109:7 123:13 157:23 159:4 162:15 163:11,13, 21 167:12 177:25 178:21 189:22,25 190:3,18 191:1 193:16

**documented** 67:8 164:12

**documenting** 163:7

**documents** 44:7 49:1 89:4 138:15

**domestic** 172:12 173:18

**doubt** 93:22

**doubtful** 193:20

**Drahos** 5:18 6:5,16 12:1 14:20 15:17,22 17:12 18:8 20:11,21 22:17 23:1 24:7 32:10 33:2,11 34:9 35:5, 14 37:4 38:20 40:14,19 41:2,9,19 42:9,15 43:18 44:13,24 45:9 46:15,23 47:4,13 48:11 49:6,16 50:2,18 51:20 53:5,12 54:11 55:5,10, 14,17 56:3,17 59:8,20 63:21,24 64:7 71:10,20 72:4,14,21 73:7,9,13 74:24 75:5 77:7,12, 17,24

78:7,20 79:3,15,21 80:8,22 81:5,12 82:8,22 83:8,15,20 84:6 87:4, 14,23 92:5,12 93:20 94:3 96:2 98:12 99:3,12,20 100:19 101:11 102:2,17 103:6,22 106:1,11 107:23 108:10 109:12 110:2,10 116:3 117:1,4 118:16,20 119:1 120:19 121:20 122:5,23 123:4,20, 22 124:25 125:3 127:23 132:5,12 135:21 136:6,20 140:1 142:7 144:14 149:12,21 151:7,11, 16,19 153:13 154:21 155:7 156:10,17 157:7,21 159:2,24 160:3 162:3,12, 25 163:9, 19 164:1 165:8,25 166:9,25 167:9 168:14,20 169:6,15, 19,23 170:4,14 171:4,22 173:9,24 174:1,11 175:11 176:18 181:19 182:19 184:2,8 185:14 186:13 187:6 188:2,22 189:3,8, 16,18 190:7,15, 24 191:16, 23 192:15, 25 193:5, 18 194:4, 8,13 195:17 196:17 197:13 198:1,25 199:7,13

**dressing** 14:7

**drive** 38:24 43:11 54:4,8 57:10 78:23 86:13,15 90:22 95:22 111:17 115:1 134:20 139:18 140:3,9 173:19

**driven** 91:1 104:18

**driver** 74:16 107:3

**drivers** 106:20 107:6 108:3,4 110:22 115:14

**driving** 74:12 100:12 113:12 114:12 123:6

**drove** 76:18 96:24 99:18 101:24 102:8,20 103:8,9,14 104:5 105:7,9,19 106:5 107:17

**duces** 136:14

**due** 66:22 100:6 149:6 155:10

**duration** 110:16

**duty** 61:15 157:9 176:11

**E**

**earlier** 95:17 168:25 185:1 189:14 194:9

**earth** 94:19, 22 120:4, 13

**easier** 79:6

**easy** 81:4

**Echo** 6:10

**Ecstasy** 18:14

**educate** 158:23 159:15

**education** 145:4 197:18

**effect** 162:11

**effective** 195:15

**effectuate** 122:18 158:25 159:17

**effectuating** 187:5

**efficiency** 126:14

**effort** 69:9

**egregious** 194:15

**elaborated** 29:3

**elapsed** 90:5

**electing** 157:20

**electronic** 135:6 141:9 142:18 171:17

**Electronically** 139:11

**element** 28:7

**eligible** 152:20

**email** 115:10 162:24 163:4 187:23

**emails** 71:17 140:25 162:8 193:16

**emergencies** 30:11 31:4 64:21 155:10 156:20 164:24 174:20 182:2 183:14

**emergency** 30:5 61:14 63:8 64:22 66:22,23 87:18 148:11 149:20 151:5 156:22 162:23 166:13 174:19 182:2,11 190:22 191:14 192:13,22

**emotional** 179:23

**empathy** 179:17

**employees** 13:23 195:23

**employers** 6:25

**empty** 134:21 139:19,23 140:6 141:3

**encounter** 110:22 111:11

**encountered** 31:20 108:12,19 110:25 114:20

**end** 95:7,20 131:5 138:3 145:7 152:14,19 153:21 154:5,9

**ended** 103:4

**engaged** 61:7 157:6

**engine** 23:6

**engineer** 145:17

**engineers** 19:14

**English** 88:19 107:1

**ensure** 66:24 157:17

**entire** 19:22 23:5 41:22 42:8 43:15 44:6 47:10 50:12 59:25 68:16 69:18 119:24 120:22 186:18 193:8 197:21

**entirety** 32:12

**entity** 162:1

**entry** 84:14

**envelopes** 139:17

**equals** 77:2 81:17 105:5

**equates** 105:8

**equation** 100:10

**equipment** 25:2,5

**Esposito** 127:5

**essence** 12:24 177:16

**established** 63:5

**estimated** 96:16

**estimation** 123:7

**et al** 5:5,6

**evacuate** 148:21 155:17 176:13

**evacuating** 155:3 164:21

**evacuation** 10:7 11:9 12:25 20:19 28:14 36:13 71:9,19 112:14 115:12 120:24 122:11 133:5,23 148:10,17, 25 149:18 150:14 155:18,24 156:7,24 157:1 172:15,19 175:2 177:15 182:12 191:21 194:1 198:6

**evacuations** 9:7,11 11:22 12:16 30:24 65:22 116:7 148:1,4,7, 12,14,19 149:5 150:2 151:4,10, 14,18,21 156:16 159:1 165:12 174:21 184:17

**evaluating** 23:23 156:6

**event** 63:7

**events** 137:8

**Everglades** 131:13

**evidence** 53:3 61:3 68:12 71:11 102:7,12, 19 161:23, 24 167:12 190:19

**exact** 11:10 36:2 129:9 185:9

**examination** 6:4 194:21

**excerpts** 171:12

**exclude** 31:22 47:24

**excluded** 63:17 64:5 131:15,18

**exclusively** 29:21

**excuse** 94:22

**excused** 199:16

**execute** 35:10

**executed** 170:25 177:4

**executing** 36:8 65:11

**execution** 37:11 64:2,17

**exhibit** 42:12,13, 18 43:25 44:15 45:18,22 48:3 49:11,21 51:11,21 52:5 53:7, 14 58:25 59:12 61:6 72:17,19 73:5,11 91:17,20, 22,23 92:1,3,4, 15 93:3,5, 13,15,23 94:1,8 95:17 124:17,22 125:1,5,11 135:12,24 136:2,8,9 137:4 139:5

**exhibits** 137:5,7,8, 10 138:10

**existence** 21:11

**exists** 120:3

**expect** 58:22 97:8 100:22 107:20 111:13,20 112:4 164:15

**expectation** 100:21

**expected** 57:1

**expedite** 179:8

**expedited** 199:12

**experience** 14:17 20:3 63:8 98:25 147:15,19 164:16 165:21 173:4 187:22 197:18

**expert** 7:16, 20,23 8:3, 19 9:3,18, 22 10:5, 11,21 11:1,15 12:4,10,15 15:4,12,16 38:17 40:7,20 41:20 42:2,7,11, 13,20 44:15 45:19 48:2,12 49:20 50:3,25 81:3 87:12,21, 22 88:8 130:17 131:14 137:1,4,5, 7,8,10 161:5 169:11

**expert's** 88:10

**expertise** 7:18 74:23 86:22 147:19

**experts** 7:6, 16

**expire** 14:2

**explain** 48:22 52:10 108:23 135:1 176:15

**explained** 182:15

**explanation** 88:7 104:9,15 105:13 107:16

**explored** 68:18

**express** 59:1 60:4 129:3

**expressed** 41:21 45:23 49:19 60:2,7 61:5,18

**extensive** 64:22

**extent** 14:17 37:5 149:10

**extra** 67:8

**extracts** 135:4

**extraneous** 168:18

**extrapolated** 100:11

**F**

**faced** 90:17

**facilitate** 69:6 70:18

**facilitated** 57:23 61:8

**facility** 61:23 62:3,16 63:2 64:19 65:13 105:24 112:16 128:6 160:23 180:14

**facility/crew** 67:13

**fact** 47:22 49:2 70:14 103:1 168:10 181:6,7 188:15,19 192:20

**factors** 195:13

**facts** 51:1 137:24 147:22 197:10

**failed** 54:6 65:8 86:11 114:24

**fair** 149:9 156:2,12 168:9 183:24 187:22 192:18

**fairness** 113:8

**fall** 28:8

**falls** 67:4 151:25 176:19

**familiar** 30:10 150:4 161:6 182:7

**families** 160:22

**family** 173:21

**fashion** 48:16

**fast** 97:6, 14 114:12 115:16 119:18 172:23 184:20 189:2

**faster** 61:8 116:17 119:10

**fastest** 195:14

**February** 8:9

**federal** 131:2

**fee** 67:9

**feel** 55:16 194:17

**field** 122:12 197:25

**figure** 114:15 134:22 139:20

**figures** 92:23 94:17

**file** 38:19 41:22 42:8 43:5,10,16 44:6 45:16 48:13 50:4,9,12 51:7 59:18,21, 25 60:5 73:18 93:12 129:16 132:1 135:5,7 139:8 141:9,15, 22 142:15, 17,24 170:12,14

**filed** 130:4, 12,16 131:22,23

**files** 126:22 127:25 133:12 139:13

**filing** 135:9

**final** 104:8

**find** 7:21 59:14 69:25 88:3

**finding** 46:10 52:11,17 53:19 54:6 55:21 86:10,14, 15

**findings** 46:4 51:3 53:25 54:13 91:24 168:7

**finished** 51:22 54:9 58:6,17,19 65:6 67:1, 19 69:13 112:10 141:19

**fire** 19:16 148:15,16

**firm** 7:5,7, 18 140:14, 22,23

**Five-minute** 58:9

**fleet** 17:20 18:1 21:3, 9,10 22:2 30:17,23 31:3,8,14 32:4

**flight** 173:6

**flights** 58:13

**Florida** 5:25 131:1

**fly** 116:24 117:13 172:23

**focus** 17:8 21:25

**focused** 12:3 22:18

**focusing** 152:10

**folder** 45:15 93:18 136:9,13, 24 137:12 139:5,13 140:6 142:23 171:14,15

**folders** 135:2,14 136:2,13 139:4

**folks** 7:12

**follow** 179:1,8

180:24
182:11

**follow-up** 144:17

**forensic** 7:1,4,5, 15,20,24 8:3,6 12:5,10 129:17 140:11 144:5,9

**forever** 30:3

**forgive** 152:9 153:23

**form** 11:18 14:19 15:14,20 17:9 18:2 20:10,15 22:11,25 24:3 32:7, 25 33:8 34:1,22 35:13 37:1 40:11,17, 24 41:7,13 42:6 43:13 44:5,20 45:5 46:3, 21 48:6,21 49:12,22 50:16 51:15 52:8 53:8,15 54:24 55:25 56:16 59:4,15 63:20 64:4 70:19 71:15,25 74:21 75:2 77:4,21 78:4,17,24 79:12,19 80:5,18 81:1,10 82:3,18,25 83:18,24 87:1,10,19 88:20 95:24 98:5 99:2,9,17 100:14 101:6,20 102:14 103:3,18 105:11,22 106:7 107:11 108:8,21 109:23 110:9 115:25 117:1 118:13 120:16 121:11,24 122:20 123:9 149:12,21 151:7,11, 16,19 153:14 154:21 155:7 156:10,17 157:7,21 159:2,24 162:3,12, 25 163:9, 19 164:1 165:8,25 166:9,25 167:9 168:14,20 169:6 171:4,22 173:9,24 174:11 175:11 176:18 181:19 182:19 184:2,8 185:14 186:14 187:6 188:2,22 189:3,8,16 190:7,15, 24 191:16, 23 192:15, 25 193:5, 18 195:17 196:17 197:4,13 198:1

**forming** 44:12

**found** 60:21 89:8 168:6

**four-year** 145:18

**fourth** 146:14,15 148:5,8

**frame** 30:20 85:8 153:5

**free** 38:25 42:18

**frequency** 175:12

**front** 39:5 135:1 185:10

**Full** 139:15

**fun** 7:10

**function** 21:8 22:13,14

**functionality** 33:15

**functions** 27:15 183:12

**G**

**G-O-U-D-R-I-A-N** 146:4

**galley** 23:5

**game** 176:12

**gave** 14:22 43:10,11 54:22 142:18

**general** 22:10,19 153:19

**Generally** 129:3

**generate** 39:14 139:1

**generated** 39:2

**generic** 119:24

**gentleman** 153:6 161:20

**give** 24:16 25:6 39:8 57:13 75:13 79:1 107:25 117:2 129:9 141:15 145:2 147:3 160:4 169:7,16, 23 178:5

**glad** 111:4

**Global** 5:11 171:23

**Gonzalez** 70:9

**good** 5:1 6:6,8 15:25 29:11 54:13 117:25

**Google** 76:21,23 77:5 94:18,21, 22 95:15 97:9 98:25 100:3 101:9 111:18 172:13

**Googles** 97:17

**Goudrian** 145:21

**GR** 65:14,21 66:11 67:3 138:16,18 178:10 179:14 180:8 184:21,24

**GR000186** 62:23

**grab** 77:13

**Graduated** 145:13

**Griffen** 5:9

**gross** 18:4,5

**ground** 67:12,16

**group** 19:22 66:18

**GS** 138:13

**Guard** 23:8 34:5 51:23 56:22 57:21,23 58:8,14 59:2,11 113:5 116:1 119:3,11, 16,20,22 120:3,4, 14,22,23 121:9,13, 22 122:18 164:21 165:11,15, 23 166:5, 11,16,18 167:8 173:2

**Guard's** 57:19

**Guards** 58:7

**guess** 181:4

**guest** 66:13 67:4 157:10 180:10

**guests** 63:8 66:20 67:18 178:17 179:21

**guidance** 63:3

**H**

**H&a** 7:1 8:2

**h&m** 7:7,11

**H-E-N-D-R-I-K** 6:14

**H-O** 132:19, 21

**half** 143:23,25 181:17

**hand** 42:17 73:3 89:1 94:5 150:7 190:5

**handed** 43:25 45:19 134:20 153:3 177:10 180:14,20

**handing** 72:16 125:4

**handle** 172:7

**handled** 11:9 22:5,20 24:6 37:11

121:6

**handles** 120:5

**handling** 24:1

**handover** 183:13

**happen** 69:15 112:5 155:20 186:25

**happened** 165:2 175:1 177:6

**hard** 80:23 135:16,22 163:22 171:12,14 194:9

**Harmony** 39:16 40:4 46:7,12 52:14 53:22 85:24 137:24 138:1,2 183:2

**head** 113:3, 21 143:22 164:3,5

**headquarters** 9:13 124:7 176:5

**health** 19:25 157:9 178:18,22 198:16

**hear** 36:15 48:12 185:12

**heard** 30:12 70:11 133:8,9 145:5 181:11 188:16

**heart** 11:11 12:20

**held** 6:12 16:4,20 32:9 46:8 136:4 139:24 144:19 180:6 191:24

**helicopter** 41:17 51:12,18 52:2,6,25 53:7 54:23 55:3 56:20 58:13 71:2 113:6 116:2,19, 22 117:12, 23 118:9 119:12,16 121:17 148:12,17 166:23 172:5,16, 18 195:7, 12

**helicopters** 116:6 173:6

**HENDRICK** 6:2

**Hendrik** 5:4 6:8

**Henze** 103:7 120:8 138:10 188:9,12, 15

**Henze's** 102:23

**hey** 113:15 115:15 119:8

**Hickey** 140:14,23

**higher** 115:5 158:15

**highest** 145:15

**Hima** 37:22 40:9 91:2 95:8 99:6, 14 101:22 102:3,6,8 103:2,8,9, 20,25 104:5 106:5 107:10 108:7 109:20 110:5 113:12,13 114:12 116:24 117:8,13 123:6,25 171:21

**hire** 7:19

**history** 124:12 125:2,7 137:6

**HJ** 137:1,4, 5,7,9

**Ho** 132:16, 19 133:16 134:9

**hold** 13:4, 10 88:23 143:3 186:13

**holding** 15:3,12

**holidays** 7:10

**Holland** 8:11,12 35:23 36:22 37:21

146:13 147:8,9 148:23 149:16,17 151:2 152:11 153:20 154:18 156:14 195:22 196:6,15

**Honestly** 169:22

**hoping** 142:8

**hospital** 32:14,18 51:25 52:25 54:5,9 57:10 66:8 83:3 86:13,16 95:10,23 97:15 98:9 101:17,22 102:1,5 103:9,20, 25 104:14 107:18,22 112:7 115:2 116:18 119:18 121:19 153:9 161:2,20 165:14 172:12,20, 24 175:21 180:21 183:20 189:2 195:15

**hospitals** 38:22 67:17 159:5,9 175:10,15 182:9

**Hotel** 6:10

**hotels** 67:17

**hour** 54:3,8 69:25 83:7 86:12 90:1 96:16 97:19 98:22 99:23 100:9,13 105:21 106:6 107:16 112:22 114:25 119:9 143:22 144:5 181:17

**hours** 36:16 49:4 52:22 58:2 69:1 114:15,16 121:2 143:10,11, 14,25 153:9 176:2 181:1

**housekeeping** 72:16 134:18

**hover** 173:16

**hovering** 172:6

**huge** 69:10

**husband** 188:9

**Huseby** 5:11

**hypothetical** 36:20 112:2 113:10 114:23

**I**

**IAMISAR** 137:15

**IAMSAR** 137:17,23

**idea** 100:8

**identification** 42:14 72:20 73:12 94:2 125:2 136:3

**identified** 14:16 48:3 49:11,20 69:16,22 70:6 71:4 129:11 158:13 176:1,4 182:3

**identify** 42:23 43:24 44:1,18 45:1 129:20 155:16 158:3 162:17 174:24

**IG** 178:18

**IMA** 181:24

**imaginary** 166:4

**IMO** 176:21, 23 181:24

**important** 70:21 118:3 197:10

**improve** 160:9

**improvement** 69:20 157:3

**inaction**

43:9 46:5, 10 47:16 52:12 53:20 60:11 85:23 162:13

**incident** 26:18,19 27:18,24 28:2 29:13,20 108:5 169:4,5 170:25 175:1,6 183:2 192:7 193:14

**incidents** 166:14

**include** 140:16 157:18 166:22

**included** 47:18 64:21,25 124:11 136:5 139:3,16 168:10 169:11

**includes** 19:22 23:5,6 37:20 43:6 69:20 120:1 157:11 160:10

**including** 9:7 65:3 103:25 104:1 121:12 154:7,25 159:16

**income** 144:11

**incorrect** 16:13 104:2,3

**increase** 37:7

**incurred** 153:6

**index** 7:21

**India** 6:11

**indicating** 101:18 190:19

**individual** 26:15 162:22 179:18 186:9

**individuals** 159:20

**industry** 145:16 146:12 157:8

**infirmaries** 23:9 158:22

**infirmary** 24:23 157:11

**influence** 193:12

**info** 133:13

**inform** 189:11

**information** 66:25 72:2,6 84:12 87:7 92:24 109:8,11 111:6,19 123:16 161:11 170:17 180:2

**informed** 36:24 37:2 149:4 178:20,22 184:10,11

**initial** 120:24 138:11,13, 16

**initially** 160:25

**initiated** 185:25

**injured** 128:14 129:4

**injury** 128:16 131:11 133:2,3

**input** 25:7, 11

**inspected** 24:24

**inspection** 131:8

**inspections** 22:9,22 23:4,8 166:12

**instance** 11:6 24:16 29:19 36:1 37:10 89:2 185:21

**instances** 35:25 36:5 111:17 124:14 125:10 164:18

**instant** 36:15

**intercept**

116:23 117:12,23 118:10

**interested** 141:18

**interesting** 25:18

**interference** 111:11

**internally** 58:12

**international** 172:16 176:21,24

**interpersonal** 179:17

**interpretation** 63:19

**interrogatories** 138:12

**intervened** 187:18

**intervention** 158:6 165:15 172:5 180:23 198:21

**introduce** 5:12

**introduction** 62:17

**investigation** 26:19 27:19,24 29:20

**investigations** 26:18 29:13

**involve** 14:5 157:15

**involved** 12:12 14:6,7,8 28:10 29:17,22 31:15 32:16,24 33:7 63:25 64:17 108:4 118:21 129:12 148:1,6,24 151:3,9 154:24 166:18 184:1,7 191:9 192:7

**involvement** 26:14 30:23 31:9 32:13 37:6

**involving** 156:8 196:6

**iota** 194:14

**irregular** 30:9,14

**irrelevant** 12:22 39:22 56:1 64:9

**island** 57:4 105:20,24 159:6 172:1 174:22 181:7,9 186:2

**ISM** 174:19 176:10,16, 19,23 177:2,13, 19

**ISO8601** 137:22

**issue** 10:6 11:15 12:11 28:10 29:16,21 57:11 71:4 111:7 115:11 128:5 129:22 158:4 161:14 174:25 176:3

**issued** 13:20 45:20

**issues** 22:5 24:14 26:20 27:25 28:3 57:4 175:9 183:15 186:2

**item** 65:23 141:4 184:21

**items** 14:9 67:10

**itineraries** 147:16

**itinerary** 31:11,19 37:6

**J**

**J-A-M** 6:14

**J-E-R-R-Y** 132:20

**Jam** 6:8

**James** 127:5

**Jerry** 132:18,20 133:16 134:9

**jet** 128:11, 21

**job** 18:23 19:18 27:15 40:5 147:23

156:5 169:13,14, 17 183:12

**jobs** 19:17

**journey** 69:25 80:20 109:4,8 111:19,20, 24 123:12

**Juan** 35:19 36:7 41:18 57:12 58:8,12 69:2 70:15 91:2 114:18 126:25 149:20 150:2,5, 19,24 159:6 173:12 175:3,7,9 176:15 179:6 182:6,8

**judge** 55:6

**judgment** 33:17,24 34:15

**junior** 146:16,17

**jurisdiction** 165:21

**jury** 15:3, 13 27:1 32:3 34:14 64:16 68:1 105:16 106:3 117:6 138:7

**K**

**K-E-I-J-E-R** 6:15

**Keijer** 5:4 6:2,8 24:17,19 137:1,2,3, 4,6,7,9 145:2

**Keijer's** 111:9

**kidding** 118:2

**Kilo** 6:11

**kilometer** 79:14 105:12

**kilometers** 76:3,6,12, 18,20 77:19,20, 23 78:1, 14,21 82:2,13,16 96:6 97:1 98:15

101:2 105:2,5,7 106:16 107:18

**kind** 7:13 139:21

**kinds** 31:4 196:19

**km** 77:1

**knew** 54:1 181:6

**knowing** 141:18 172:23 174:22

**knowledge** 19:10 20:3,8

**L**

**labeled** 38:23 136:10,25 138:5

**land** 69:25 120:5,6, 12,15 121:10

**landed** 58:14

**lands** 121:17

**language** 75:24 185:8

**Large** 5:25

**lastly** 137:9

**late** 161:4

**law** 9:18 140:14,23

**lawyer** 7:19 133:6 134:2

**leadership** 28:3 29:21

**leads** 43:7

**learn** 105:1, 4

**leave** 126:11 160:23

**leaving** 170:2

**led** 49:2

**left** 84:16 86:5 87:16 89:11 90:3 92:13 107:9 108:6,19 123:5 132:13 181:17

**left-hand** 75:19

**length** 18:6, 12,13,17 52:19 55:19

78:16,19, 23 81:8,24 83:12 85:12 86:7 108:16 123:12 160:11

**lengthy** 34:7 158:13 162:17

**Leonela** 125:24

**letter** 94:4 137:1

**letters** 73:7

**liaison** 179:20

**license** 13:14,24 145:15

**licenses** 13:5,9

**life** 173:6

**life-likes** 167:14

**light** 153:14

**lights** 84:2

**Lilia** 118:20

**limited** 5:6 13:11,13 14:4 46:10 54:1 63:5 75:24 82:6 86:11 101:22 131:15,18 154:3

**limited's** 46:5 53:20

**lines** 149:16 154:2 193:13

**list** 130:14 134:17 159:9

**listed** 196:5,9

**listen** 194:11

**listening** 194:22

**litigating** 130:25

**Litigation** 5:11

**LLC** 7:2

**Lobel** 5:16 11:18 14:19 15:14,20 17:9 18:2 20:10,15 22:11,25 24:3 32:7, 25 33:8 34:1,22 35:13 37:1 40:11,17, 24 41:7,13 42:6 43:13 44:5,20 45:5 46:3, 21,25 47:6 48:6,21 49:12,22 50:16 51:15 52:8 53:8,15 54:24 55:8,12, 16,25 56:16 59:4,15 63:20,23 64:4 70:19 71:15,25 73:6,8,10 74:21 75:2 77:4,21 78:4,17,24 79:12,19 80:5,18 81:1,10 82:3,18,25 83:14,18, 24 87:1, 10,19 93:18,25 95:24 98:5 99:2,9,17 100:14 101:6,20 102:14 103:3,18 105:22 106:7 107:11 108:8,21 109:23 110:9 115:25 118:13 120:16 121:11,24 122:20 123:2,9 124:24 135:18 136:17,19 144:18 145:1 149:13,24 151:8,13, 17,22 153:16 154:22 156:1,11 157:4,13 158:20 159:13 160:1,6 161:21 162:7,20 163:5,10, 20 164:4 165:19 166:2,21 167:3,11 168:16,23 169:13,18, 20 170:1, 7,9,20 171:5

173:3,13 174:3,15 176:8 177:23 181:3,22 182:21 184:5,14 185:22 186:15 187:20 188:6,24 189:5,10, 21 190:10, 17 191:2, 18 192:2, 17 193:1,6 194:6,9, 17,19 195:18 196:20 197:4,6,15 198:3,22 199:10,15

**local** 58:11, 15 121:6 161:5 175:17

**locals** 114:17

**located** 13:21 75:1 102:4

**location** 40:9 111:18 159:22

**logistical** 61:16 63:6,11, 12,13 65:3 66:5 111:3 179:23 180:1 187:15

**logistics** 63:16 69:23 124:10 186:21

**long** 11:1 54:7 55:24 56:2 70:6 75:3 83:1 86:12 98:8 99:19 100:25 101:25 103:12 107:14 111:20 114:13,25 116:22 117:8 119:7 123:7 124:2 130:24 162:10 182:3

**longer** 15:10 97:20 99:24 110:13,15, 16 113:13, 16

**longest** 95:14 110:13

**looked** 23:8 37:24 40:5 158:18

**lost** 124:22

**lot** 9:10,16 10:3 11:22 15:9 31:2 48:25 49:1 51:6 69:14 75:8 148:3

**lunch** 93:9

**M**

**made** 6:20 21:2 56:5 57:18 69:5 105:17 113:3,4 121:1 127:1 130:15 145:8 161:18 162:16 164:12 167:8 175:14 186:1 190:13,21 197:17

**main** 111:23

**maintain** 140:22

**maintaining** 140:23

**majority** 16:7

**make** 12:6 33:13 60:9 69:15 103:1 112:4 113:8 115:9 116:16 118:5 124:6 128:18 160:9 162:21 168:11 175:22 176:9 186:25

**makes** 69:8 172:24

**making** 23:25 28:8 80:20 117:7 148:12

**man** 115:15

**management** 19:20 24:11,20 36:11,12

62:5,6 115:5 156:20 160:8 176:24 177:1,2,14 178:9 179:4 182:1

**manila** 135:2,13 136:2,24 137:12 139:3,16 171:15

**manner** 129:4 155:4 179:24 182:13

**manual** 62:18 120:2,3

**map** 95:1

**Mapquest** 91:16,17 92:2,16,20 93:4,8,11 94:15 95:11 98:20 99:7,15,22 100:10 104:12 109:13,18 110:4,24

**maps** 39:2, 3,6 94:21, 22 95:15 97:9,17 99:1 100:3 101:9 111:18 172:13

**marine** 145:17

**mariner** 13:16 145:15

**maritime** 7:2,7,11 8:2 15:15 145:16 176:21

**mark** 42:10 72:17 73:4 93:23 124:21 135:22

**marked** 42:14,17 72:20 73:11 92:14 93:5 94:1 95:17 125:2,4,11 136:2

**marker** 89:14 104:21

**markers** 104:24

**master** 13:15 19:2 145:15 178:16,20 187:10

**material** 39:5,12 87:25 106:18,21

**materials** 37:24

**matter** 5:5 43:9 64:11 82:17 87:13 128:3 133:2 150:8 153:19 178:22 180:19 183:23 184:1,4 196:6

**matters** 82:19 126:13 129:12 178:16,18

**Mcdonald's** 75:8

**MD** 160:20

**meaning** 97:25

**means** 13:4 34:6,19,20 43:6 45:1 47:23,25 52:3 53:1 54:15 68:18 70:4 71:18 74:14 75:25 84:5 105:12 108:18 112:6,15 148:20 161:15 163:2 165:16 175:1,19 186:5

**meant** 150:14

**measurement** 131:20

**measurements** 131:7

**Med** 172:9

**Media** 5:3

**medical** 8:20 9:4,6,11, 19,23 10:7,12,22 11:9,10, 16,21,22 12:12,14, 15,16,25 13:2,5,12, 13 14:4, 17,24 15:3,5,6, 12,16,19

18:23,25 19:5,7,13 20:19,25 22:22 23:3,11, 15,16,17, 23 24:1,4, 21 25:2,3, 5,8,13,14 26:11,20 27:20 28:3,10, 14,16,19, 24 29:7, 16,22 30:24 31:5,9,16, 18 32:5, 20,24 33:3,17,25 34:15 35:2,3,11, 18 36:8, 12,23 37:12 38:22 46:13 52:16,19 53:24 57:24 61:13,22 62:2,15 63:1,14 64:1,18,21 65:11,22 66:13,19, 22 67:4,15 71:6,9,19 86:1,22 87:8,11, 20,21,22 88:6,8 98:10 112:12,14 114:3 115:12 120:5,11, 14,24 121:10 122:10,15 126:14,20 129:13,21 133:5,23 148:1,3,7, 10,14,19, 24 149:5, 19 150:1 151:4,5, 10,14,18 152:15 154:14,25 155:18,23 156:5,7,24 157:1,18, 19,24 158:16,23 159:16 162:18 164:7 174:21 175:2 177:14 178:17 180:14 182:12 183:15 184:13 186:23 187:13 190:22 191:13 192:13,22 193:25 198:6,14

**medical/care** 67:13

**medically** 148:21 155:17

**medicine** 157:6,11

**Melanie** 5:10,22

**member** 113:10 114:10 148:16 154:6 179:15 180:11 198:7,10

**members** 27:1 32:3 34:13 64:15 66:20 67:25 74:18 105:16 106:3 117:5 155:15 178:17 179:21

**memory** 125:21 143:17

**mention** 47:23 57:18 60:9 101:21 102:9,11 103:1 196:22

**mentioned** 47:3,8,11 55:2 57:21 65:21 88:17 96:10 103:21 104:14 119:2 176:10 185:11

**mentions** 63:11

**mere** 198:7

**message** 160:21

**messages** 163:15

**method** 51:1 65:8 167:19

**methodology** 47:10 197:22

**metrics** 104:22

**metropolitan** 69:2

**Miami** 164:6, 7 198:18

**Michael** 5:18 46:25 55:13 169:21

**middle** 6:14 195:7

**Milaha** 96:8

**Milaya** 105:10

**mileage** 80:24 81:2 82:5 101:1,8 102:22 104:1,16 106:16 108:13

**miles** 54:3 75:25 76:2,6,7, 12,20 77:2,18, 20,22 78:1,15,22 79:14 82:2,12, 13,16 83:7,23 94:23 95:2,3,4, 13,14,21 96:4,6,8, 16,19,24 97:1,18, 19,25 98:1,16,22 100:8,9, 12,16,24 101:2,24 104:17,19 105:5,8,9, 21 106:6 107:14,16, 17 110:1, 13 112:21, 22 119:9

**Miller** 15:24 122:14,17

**mind** 38:13 39:6 118:23

**mine** 91:21 139:23

**minus** 81:17

**minutes** 51:25 52:23 54:4 57:9 78:2, 15,23 79:8,10, 17,20 81:8,19, 20,21,24 82:11,14 83:12,23 84:20,25 85:9,19 86:5 89:24 90:1,4,8, 10,11 96:20 98:23 99:14,23, 24 100:11 161:1 172:14,17

**missed** 89:8

**missing** 123:16

**mode** 41:10 42:25 44:1,16 45:24 46:18 48:4,18 49:10,19 50:14

**modes** 34:25 68:19

**moment** 14:11 75:13 96:23 100:4 108:6,7 129:2 139:9

**monitor** 61:13

**month** 14:3

**months** 30:17,21 154:2 183:5

**morning** 5:1 6:6,8 111:17 135:5

**motion** 130:12 133:19

**motions** 134:13

**move** 9:15 12:5 49:7 83:9 97:11 123:2,20 153:14

**moving** 188:21

**muddled** 194:21

**N**

**N-U-R-E** 25:22 26:9

**names** 39:24 57:13 71:22

**National** 137:14

**Nations** 176:20

**Naturally** 167:25

nature 149:6
nautical 22:5,20 114:1 145:12
NDA 195:20
necessarily 19:14 167:21 198:11
needed 31:24 52:1 67:7
net 18:5
Netherlands 13:22 14:13
Nick 25:21 26:8
Nit's 56:1
Nobo 57:7 138:22 143:18,19 160:16,20
noncompliance 177:20
nondisclosure 9:25 25:15 26:22 27:3,6 29:24 30:2 37:15,17 64:12 147:21 149:6 164:19 196:18
nonresponsive 9:16 49:8 83:10 97:12 123:21 153:15
Norm 83:14
Norton 132:16
Notary 5:24
notebook 78:6,9
noted 180:10
notes 45:11 160:18 182:23 188:7 198:4
Notes-complaint 138:7
notes-second 138:6
notes-various 138:23
notice 136:19 140:18
noticed 6:24 39:1 119:8
notification 111:25 112:4 150:9,13
notifications 183:15
notified 31:11 112:24 123:15,16 124:1,3 155:12,13 198:20
notify 113:2,15 124:7 150:6 198:17
notifying 173:20 198:5
November 5:7 6:10
number 36:2 45:12,15 58:10 93:24 106:23 124:22 125:24 127:6 133:13,24 136:13 141:5,11,16 142:15 147:24,25 160:21 172:4
numbers 62:21 75:18,22 76:2,10 79:9
numbra 74:14
numerous 9:6 91:6 150:5 156:19 164:23 187:17
Nure 16:1 25:19,22 26:9,10
nurse 68:22

O

object 149:12,21 151:7 153:13 154:21 155:7 156:10,17 157:7,21 159:2 160:4 162:3,12,25 163:9,19 164:1 165:8,25 166:9,25 167:9 168:14,20

169:6,12, 25 170:5 171:22 173:9,24 174:2,11 175:11 176:18 181:19 182:19 184:2,8 185:14 186:14 187:6 188:2,22 189:3,8,16 190:7,15, 24 191:16, 23 192:15, 25 193:5, 18 195:17 196:17 197:4,13 198:1

**objecting** 169:9

**objection** 32:7 48:6, 21 49:12, 22 50:16 51:15 52:8 53:8,15 54:24 59:4,15 169:8,16, 24 171:4

**objections** 47:5 189:19

**observations** 190:11,12

**occasion** 28:1 148:24 164:20

**occasions** 130:6 175:15

**occur** 166:14 193:21 198:8

**occurred** 9:7 30:25 32:21 33:4 165:6,12 178:24 182:4,17 187:19 190:6 193:21

**October** 138:23 160:20

**off-the-record** 6:12 32:9 46:8 136:4 139:24 144:19 180:6 191:24

**offer** 40:8, 21 41:4,11 42:3 51:12,21 52:5 85:12,19 87:6

**offered** 46:19 48:19 49:10 50:14

**offering** 120:20,21

**office** 66:2 113:3,21 141:16 164:3,6 185:17 198:18

**officer** 19:5 145:23 146:6,9, 14,15,16, 17,18 148:5,9

**older** 140:12

**onboard** 20:1 28:15 58:23 83:5 84:2 98:9 100:23 109:1 111:1 112:19 120:25 157:25 158:15 166:14 176:4 178:18 198:12

**open** 139:18 141:2

**opened** 21:4, 5,16 134:21

**operate** 13:17 158:22

**operated** 152:12

**operating** 14:8 150:18

**operation** 21:9,10,15 30:18 31:3

**operational** 17:13

**operations** 17:4 21:3 22:10,19 23:21 30:9,14,24 31:8,14 32:4 122:13 145:6 157:14,17 158:17

**opine** 12:14, 15 20:18 104:4,8

131:7

**opined** 8:19 9:3,17,22 10:5,10 174:7

**opinion** 37:25 40:8,15,21 41:4,21 42:3 43:7 45:23 51:12 52:6 59:1 60:4, 14 61:5, 11,17,20 62:1,13 75:10 84:4 85:22 87:12 106:14 118:14 131:15,17 153:11 168:12 181:10,12, 21 182:16 184:6,9 193:12 195:3,8

**opinions** 15:7,19 44:12 60:2,7 87:6 128:25 129:4 189:11 193:11 197:16,24

**opportunity** 6:18 34:3 46:13 52:15 53:23 85:25

**opposed** 156:14 174:6 175:20

**option** 34:5 44:3,18 58:16,20 60:10 70:24 94:25 95:2,3,4 116:2 119:21,23 122:3 148:20 172:2,25 173:1

**options** 41:16 56:13,18, 24 57:14 65:4 94:21,24 117:15 119:2,13, 15,23 121:17 138:3 155:23 158:19 171:10 172:9,21

**order** 47:15 60:11 76:4 127:9 129:9 157:17 158:6,21, 25 159:17 167:25 168:11 183:11,17, 19 197:23 198:21

**ordered** 199:6

**Organization** 176:22

**originated** 80:16

**overrule** 33:24 34:15,18, 21 35:4

**overruling** 35:1

**overseeing** 22:1

**oversees** 19:12,13, 14,15,22 28:22

**oversight** 17:14 36:10 37:3

**owned** 152:12

**oxygen** 24:22,23 25:4

**P**

**p.m.** 60:21 72:13 75:11,15 80:4 92:9, 11 127:19, 20,22 132:8,9 142:4 144:21,22 199:18

**Pablo** 95:9 102:6

**paid** 8:2

**painful** 194:10

**paper** 51:4 61:12 142:19 177:3,5

**paragraph** 44:25

**paramedics** 105:17 190:13

**parking** 75:8

**part** 20:20, 25 23:21

24:6 27:14 30:5 36:14 43:4 44:6, 12 47:11 50:20,22 51:17 55:4,21 59:7,10 61:19 63:3 65:17,18 66:12 67:9 73:17 76:10 80:12,14 93:12 96:10 117:14 120:9 121:5 124:17,18 126:17,18 135:7 145:6 148:15 153:9 155:2 156:5 157:14,16 160:8 162:14 168:5,17, 18,21 180:16 181:24 193:8,9,10 195:10 198:8,9

**participate** 66:1 148:9 152:13 185:12

**participated** 32:5 35:17 151:3

**participation** 149:9 185:15,20

**parties** 187:17

**parts** 22:3 63:16

**party** 129:5

**pass** 187:24

**passenger** 120:9 149:1,19 164:22 176:13 198:7

**passengers** 18:6 148:2

**past** 124:15

**patient** 9:24 10:8,13,22 11:16,24 12:12,19 25:8,13 27:20 32:14,18 33:19 34:16 35:11,18 36:16 37:12 49:3 57:24 58:5,23 61:8 62:15 63:2 69:23 83:4 84:2 85:5 98:9 100:22 105:19 108:25 116:23 117:12 119:17 121:10,18 148:10,21, 25 153:2,3 155:18,19 158:5 159:12,21 161:3,10 173:8 175:18 177:9 186:11 188:5 191:22 195:9,15 198:6

**patients** 11:11 26:21 57:8 151:4 155:4 159:11,18, 19 160:22 164:21 171:25 175:10,19 176:13 180:13 184:17

**pay** 144:12

**PDF** 141:15 142:17

**Pedro** 38:1, 11

**pending** 128:1 132:14,15 134:4,13

**people** 15:23 16:19 19:16 23:18 115:10 158:10

**Perberg** 128:3

**percentage** 8:1

**perception** 188:20 189:7

**Pereira** 123:8 124:2 191:6 192:12,21

**Pereira's** 191:3

**perform** 19:17

**performance** 23:24 152:14 154:6,24 156:4

**performed** 74:19 156:15

**performs** 154:12

**Periera** 192:8

**period** 32:17,22 99:7 154:3

**periodically** 66:3 185:18

**person** 69:8 113:14 128:14,20 152:20 157:25

**personal** 63:8 128:16,23 129:6 131:11 133:1,3

**personally** 32:5 35:10 107:2

**personnel** 152:15 154:25 156:5

**perspective** 9:14 19:21

**pertains** 65:22

**phone** 31:3 56:5,10 71:17 76:9,24 77:6,14 115:9 161:24 163:1,7, 13,21 167:7

**phonetic** 96:9 105:11 125:25 126:24 128:3

**photograph** 121:16 172:2

**physical** 95:8 141:14 142:9 189:6 190:12

**physically** 188:20 189:7

**physician** 19:4,11 28:13 153:2,4 155:14 157:12 158:2 177:8,10 178:15 180:12,15, 20,24 186:17 187:8,9,12 188:5 193:20 198:11,12, 15

**physicians** 19:23 175:17

**physicians'** 23:24

**pick** 68:4 85:1 121:18 195:6

**picking** 32:13,17 85:16,17 173:8

**picks** 119:17

**picture** 119:24

**pier** 9:1 36:6 58:9 84:13 94:9 122:6,7,15

**pier-side** 8:21,24 10:23 31:10,16 32:6 34:11 35:11 36:23 37:13 57:25 65:12

**pin** 69:11

**place** 14:13 61:12 110:7 124:8 149:6 150:14 153:1 172:20 177:1,15 178:1 181:14 183:22 186:23,24

**plaintiff** 5:17 60:23 125:21 126:3

**plaintiff's** 133:10 138:11,15

**plaintiffs'** 39:4,13 106:22

**plan** 175:23 176:12

**planning** 64:17 66:1 185:16,20 186:4

**plans** 114:11 138:2

**plays** 186:22

**point** 21:14 27:12 33:22 94:18,19 95:7,19,20 100:5 109:2 110:5 111:12,14 113:20 123:8 124:4 145:10 196:5 197:3

**points** 96:15

**policies** 155:5

**policy** 71:9 152:25 180:3,8,17 181:13 187:14

**poon** 43:16

**port** 54:16 58:8 65:10,14, 16,25 66:11,14 67:5,22 68:2,9,14 76:14 84:11,16, 25 85:17 87:16 89:11 91:1,10 95:22 97:15 99:6,14 101:17 103:2 106:5 107:9 108:6,20 109:20 110:5 112:18 114:2,3,19 116:21 117:7 123:5,25 131:12 149:2,3,20 150:2,4, 18,24 157:19,20 158:10,17, 25 159:6 160:13 162:24 163:12 165:4,7,24 166:7,17 172:15 173:12,17 175:7,9, 13,16 176:15 179:5 182:5,7,8 184:16 185:11 186:16,20 187:4,25 188:1

**portion** 144:10

**portions** 191:11 192:11

**ports** 147:16 148:13 160:12

**posed** 117:22

**position** 16:4,11 20:4 112:13 178:11

**possession** 13:16

**possibility** 31:23

**potential** 168:4

**potentially** 58:1,15 107:17 113:6 120:23 121:5 122:2 126:21 127:6 129:12 158:16 172:19

**precede** 67:24

**predicament** 174:9

**prefer** 169:21 170:3

**preference** 169:25

**preparation** 6:17 60:6 143:8 174:18 195:8

**preparations** 161:18 175:22

**prepare** 92:19 143:11 174:20 182:2

**prepared** 28:1 182:10

**present**

125:8
**presented** 28:2 29:20
**pressure** 14:8
**pretty** 80:23
**previous** 20:16 86:9
**print** 109:13 142:12
**printed** 88:4 135:9 143:7
**printout** 91:17 92:2,16,20 93:4,8,11, 16 109:19 110:4,6
**prior** 56:5 66:2 161:14 175:15 185:17
**private** 7:9 120:5,14 121:9
**privileged** 140:24
**problem** 192:3 196:21 197:7
**problems** 176:14
**procedure** 64:6 112:11 154:18 178:1 179:7 180:25 181:13
**procedures** 36:11 112:8 155:5 156:21 177:3,24 183:21 187:21
**process** 66:21 68:19 69:18 111:24 112:1,25 120:22 123:19 153:10 158:6,7,14 162:16,17 176:6 177:17 186:18 187:18 195:10 198:8,9,21
**processes** 160:9
**produce** 43:3 60:15 71:17
**produced** 39:9 47:9, 21 48:24 51:8 59:19 61:4
**producing** 51:7
**product** 93:1 94:10,11
**production** 50:22 109:17 138:16,18
**professional** 5:24 55:11 61:16 63:6
**professionals** 66:19
**proficiency** 82:7
**promoted** 146:19
**pronounce** 96:9
**proposing** 117:11
**provide** 7:18 15:6 25:5 37:3 41:17 43:15 48:4 61:15 63:6 72:2 87:12 116:6 158:1 179:22 187:15
**provided** 14:25 34:3 43:5 44:8 56:8 60:16,22 72:6 86:19 94:21 101:8 106:21,23 109:6 110:12 111:2 112:12 119:13 123:13 135:5 155:12 157:24 180:2 183:18 194:2
**providing** 71:5 121:14
**provision** 25:8,13
**prudent** 58:22
**psychiatric** 66:23
**Public** 5:24

**published** 72:23

**Puerto** 9:4, 20 51:19 57:12 58:12 69:3 75:11,16, 17 91:4,5, 14 104:22 113:7 114:18 118:22 159:7 161:7 167:15 172:1,10 186:3

**pull** 88:23 93:8 124:16 129:8 139:22 140:2,5 170:12

**pulling** 39:7

**purportedly** 29:13

**purpose** 154:9

**pursued** 53:3 167:4,6

**pursuing** 167:2

**purview** 28:9

**put** 161:1 177:3

**putting** 85:18

## Q

**qualifications** 74:18

**qualified** 10:20

**qualify** 49:18

**quality** 62:4,6

**question** 9:16 10:2, 3,9 11:20 20:1,16,20 28:8 29:2, 23 31:12 33:14 38:9,12,15 39:1 40:10,23 41:1,6,23 42:5 43:2, 22 44:4, 19,23 45:4 46:2 48:20 49:15 50:1 51:14 55:20 56:14 57:16 59:3 60:10,18 61:24 62:11,12 66:12 68:15 70:18,21 71:14,24 73:23 74:13,20 76:4 77:15 78:11 79:5,13,16 80:2 83:10 84:23 86:17,22, 24 87:21 90:25 97:7,15 99:11,21 107:24 109:21,22 110:22 113:9 117:3 126:11 127:10 129:10 132:14 153:17 169:12 170:19 171:19 181:4,5 191:25 195:24 196:8,25

**questions** 15:9 27:7 43:20 128:1 144:15 145:3 169:9 170:6 184:15 194:23

**quick** 127:13

**quicker** 20:7 112:7 116:18

**quickest** 112:14

**quickly** 24:1 188:21

**quote** 63:4 160:17 178:5,8 180:7 185:9 192:12

**quoting** 179:13

## R

**R-U-N** 74:8

**R-Y-K-E-N** 130:20

**raised** 134:19

**range** 147:19 165:3

**ranges** 95:12

**ranks** 146:15

**rate** 105:20 106:6

**Ray** 70:9

**RCC** 61:11, 14

**RCCL** 132:24 133:16,21

**RCL** 132:23 134:9

**reach** 52:24

**reached** 52:2 78:1 95:22

**reaching** 96:15 157:18

**read** 38:8, 15 87:25 88:2,5,7 102:23 108:2 136:21 139:8 191:3,11 192:5,11 193:17 198:25 199:1

**reading** 38:13 65:19 184:25 185:3 192:10

**reads** 63:19

**ready** 170:11

**realizes** 68:24

**reason** 7:17 12:21 81:7 147:13 153:11 183:8

**reasonability** 191:20 192:23

**reasonable** 57:1 65:2 71:3 84:4 97:8 100:21 109:3 118:7,11, 17,18 122:11 155:23 156:6 157:16 159:15,18 163:2 164:14 165:3,18 168:2,3,6, 13 169:2, 10 170:22 172:24 174:5,18, 24 175:22 182:13 198:17

**reasons** 173:18

**reassurance** 63:7

**rebuttal** 38:18 72:19 73:1 136:25

**recall** 10:25 11:5,8,20 12:19,21 14:10,11, 23 15:1 16:17 17:22 21:22 26:13,16 27:21 28:5 29:24 30:15 31:1,6,21 32:8,16 35:7,16 36:2 39:18,20 57:20 61:3 70:12 91:3,9,12, 15 127:3 129:8 131:3 133:8 141:12 149:22 150:12 184:15,19 188:15,18, 19,23 189:4 191:17 192:14 194:23 195:2

**receive** 31:25 46:13 52:15 53:23 85:25 143:15 144:10

**received** 39:12 150:12 159:22 162:5 163:11

**receives** 179:17

**receiving** 159:22

**recess** 92:9 127:19 132:8 142:4 144:21

**recite** 88:10

**recognize** 73:19,21

**record** 5:2 6:7 72:10, 12 77:11 92:7,10

97:4 102:10 103:21,25 104:15,19 106:15 127:12,17, 21 132:4, 6,10 142:2,5 144:3,20, 23 161:25 170:16 171:7 176:9 199:3

**records** 71:17 75:14 137:18,20 163:6

**reduce** 80:24

**refer** 38:25 88:2 117:14

**reference** 38:21

**referenced** 59:12

**references** 105:17

**referral** 38:4

**referring** 30:8 45:16,17

61:10 65:23 88:25 176:16 178:6 191:6

**refrain** 55:8

**refresh** 143:16

**refusal** 168:25

**regard** 34:25 111:6 167:13 181:12 184:16 189:12

**regarded** 126:2

**Registered** 5:23

**regular** 182:5

**related** 26:20

**relates** 17:4,13 19:5,7 20:7 22:22 23:24 24:13 25:2,7,12 27:8 29:12 87:6

**relating** 27:19,25 28:3 126:13

**relative** 24:20

**relatives** 67:17

**relayed** 87:7

**relevant** 182:24 197:10

**relied** 197:23

**rely** 106:13

**remains** 110:1

**remember** 131:3 185:3

**render** 20:13

**renewal** 152:21

**repeat** 10:9 23:13 25:9 31:12 33:1 38:9 40:25 48:8 49:15 61:24 62:11 74:3 77:15 79:9 80:2 84:23 99:10 117:3

170:18 191:25

**report** 25:24 26:1,6,7 28:2 29:20 38:5,17, 18,22,23 40:8,13, 16,21 41:4,11,21 42:3,7,11, 13,20,24 43:3 44:7, 10,15,21 45:20 46:17,20 47:9,12, 19,21 48:3,19,25 49:11,20 50:7,11, 12,15,20, 23,24,25 51:3,5,7 52:4 55:4 59:10 60:3,7,9, 16 61:9,18 67:22 72:19 73:1 74:2,4,6 79:25 80:4 82:11 85:11 86:6,18 87:5 88:13 91:18,24 95:16

101:3,10, 14,18 102:16,19, 21 104:4 105:18 109:17 110:24 114:23 117:15,19 124:11,17 127:11 129:1,9 130:17 137:1,4,5, 7,8,10 168:10,18, 19,21 171:1 180:16 182:16 187:11 193:9

**reported** 166:15

**reporter** 5:10,13,24 38:14 136:8 145:25 199:5,6,8, 11

**reports** 129:16 183:13 187:10 198:13

**represent** 77:1

**representative** 57:3 65:15,25 66:14 67:6,11 114:21 158:11 175:17

**representative's** 154:16

**reputable** 164:15

**request** 28:14 67:24 138:16 162:21 165:17 178:24 187:11 193:25

**requested** 38:14 43:15 51:8 66:3,4 67:12 112:13 142:16 185:19

**requests** 155:17

**require** 65:1 156:21 165:14

173:20 178:14

**required** 98:10 103:16 148:14 162:19 185:21 187:11,12 198:20

**requirement** 177:11 178:13 181:25 182:11 198:10

**requirements** 156:23 177:20 183:11

**requires** 65:19 84:3 87:11 112:14 126:17 129:17,23 148:15 155:19 158:6 176:22,25 177:3 194:1

**Rescue** 171:24

**research** 18:3,18

27:22 31:2 41:15 43:4 44:7,9,11, 22 45:12 47:9,11, 19,20 48:25 50:8,9 51:2,18 52:17 53:11 54:14 55:3,22 58:16 59:7,21, 22,24 60:5,13 70:14 84:5 94:16 95:12 117:14,15 119:15 121:16 126:17 129:24 137:13,14, 16,17,22, 23,24,25 138:2,3 168:5,17 171:10 173:16 174:4,8 180:17 193:10,11

**researched** 58:21 70:23

104:25 172:21

**researching** 58:2 155:22 157:18 195:11,12

**resigned** 8:10

**resource** 71:12 129:17

**resources** 71:22 158:24 159:17 166:23

**responded** 162:2

**responds** 120:22

**response** 30:5 112:5 157:1 165:17 167:18 179:6 191:20 192:24

**responses** 156:19 183:14

**responsibilities** 27:16 66:16

185:2 186:9

**responsibility** 28:9 66:13 180:18,22 188:4

**responsible** 17:3 19:25 153:2 159:20 177:8 180:12 186:10,21 198:16

**responsive** 138:15

**rest** 8:5

**restrictions** 173:11

**result** 82:21 131:5,24 177:21 183:15

**resulted** 131:11 186:4 193:10,11

**results** 51:3 107:15

**retained** 15:6 116:4,8 140:10

**retains** 7:5

**reveal** 196:12,19

**review** 6:19 25:24 26:7 36:15 139:9 144:4 153:21 154:6,10,12,24 155:2 156:16,25 157:2 188:8 193:8

**reviewed** 26:4,5 37:25 156:18

**reviewing** 38:24 154:16

**reviews** 36:15 49:1 152:14 156:4,20

**Revision** 62:20

**rhyme** 147:13

**Richard** 5:5

**Richardson** 127:5

**Rick** 15:24 122:14,17

**Rico** 9:5,20 51:19 57:12 58:12 69:3 75:12,16,17 91:4,5,14 104:22 113:7 114:18 118:22 159:7 161:7 167:15 172:1,10 186:3

**Rifkin** 118:21,22

**ring** 25:19

**Rings** 35:7

**road** 57:5,11 58:3 104:21,24 119:17 121:5,14,17 161:9 172:5,6 174:22 175:23 194:25 195:7

**roads** 84:7

**roadway** 103:16 108:19

**Robson** 7:1,

4,5,15,20, 24 8:3,6 12:4,10 129:16 140:11,21 144:5,9

**role** 9:11, 12 12:4 18:19 21:16,24 24:19 29:4,14 30:6,17,20 32:3 35:9, 21 36:7,9, 23 37:18 61:21 62:2,14,25 65:5,10,21 66:15 68:2 69:22 91:10 184:16 186:22,23, 24

**Romeo** 6:10

**room** 23:6 157:2

**rotate** 147:11

**rotated** 147:12

**route** 90:13, 22,24 97:9,10, 17,21 98:7,8 100:16,24 103:13,17 104:11 107:21 118:11

**Royal** 5:6 8:13,16 28:21,25 43:7 46:5, 9 47:16 48:1 52:12,20 53:4,19 54:1,5 56:25 57:2 58:21 60:12 61:21 62:1,8,13 63:4 64:6, 10 65:7, 15,24 66:14,16 67:5,11 68:13,17 69:10,16 70:22 71:2 72:1 85:22 86:10 109:5,9 111:3,25 112:24 113:22 114:21,24 115:17 123:10,15, 17 124:7 138:12,14, 17 152:25 153:7 154:19 157:22 158:3,11 159:4 161:8 162:13 168:8 174:24 175:7 177:7,25 178:8,13 180:1,8,18 186:1,7 194:3 195:4 198:19

**RPR** 5:23

**rude** 194:10

**rule** 60:1 194:14,15

**rules** 185:1 187:21

**ruling** 131:15 134:8,11

**run** 25:4 30:2 74:2, 4,6 79:25 80:4 82:10 86:18 95:16 101:2,18 105:18 141:16 181:15

**running** 141:17

**Ryken** 130:13,19, 25

**S**

**S-C-H-L-E-I-F-F-E** 133:20

**S-T-R-O-K-E** 88:19,21 89:3

**safe** 157:17

**safeguards** 61:12

**safely** 38:7

**safety** 19:19,25 23:4 24:11,20 36:11,12 62:4,6 156:20 157:10 160:8 173:18 176:24 177:1,2,13 178:9 179:4 181:25

**sail** 177:22

**Saint** 95:8 106:5

**sake** 8:23 93:21

**salary** 144:12

**San** 35:19 36:7 41:18 57:12 58:8,12 69:2 70:15 91:2 107:10 114:18 149:20 150:2,4, 18,24 159:6 173:12 175:2,7,9 176:15 179:6 182:6,7

**Sanchez** 38:1,2,11

**SAR** 137:14

**Sarah** 5:16

**scenario** 36:20 104:21 105:14 111:8 117:21 121:8 123:23 193:22

**scene** 84:21

**schedule** 39:9 140:2,4 142:16,23

**Schleifee** 134:5

**Schleiffe** 133:20

**Science** 145:14

**scientific** 51:1

**sea** 7:13 9:10 10:24 30:25 34:11 37:9 164:25 166:20 173:10

**seamanship** 22:5

**search** 7:20

**Seas** 39:17 40:4 46:7, 12 52:14 53:22 85:25 137:25 138:1,2 183:2

**season** 66:3

**section** 41:15 184:23

**security** 39:21

**seek** 65:8 71:18 112:6 113:4 174:25 175:19 176:6

**seeked** 71:7

**seeking** 29:9

**selected** 165:16 179:16

**send** 115:10 187:23

**senior** 19:5 28:2 29:21 146:16,17

**sensitive** 193:14

**sensitive-medical** 162:23

**separate** 50:9 124:18

**separately** 67:8

**September** 72:23

**serve** 58:7 146:23 178:15

**served** 19:9 30:16,20 176:23 196:15

**serves** 58:12

**service** 74:19

**services** 144:6 157:19 171:25 178:17

**serving** 16:12 147:19 148:22

**session** 185:18

**set** 19:11 20:4 174:9 183:25

**setting** 14:6

**settled** 134:6

**sexual** 66:23

**shared** 140:15

**sheer** 18:9, 11

**sheet** 137:24

**shifted**

21:16

**ship** 8:2,4, 8 9:12 10:18 13:18 18:13,20 19:3,5,6, 11 20:1 22:10,23 31:10,16, 23 32:6 33:5 34:11 36:6,23 37:12 57:24 61:22 62:3,16 63:1 64:18 65:12 67:12 75:4 76:16 83:3 84:13,21 116:15 120:8,10 122:2,14 131:12 133:23 137:11 147:10,12, 14,24,25 152:2 154:7,25 156:8 158:8 159:15 162:9 163:6,12, 16,17 164:10,22 166:24 170:24 172:18 173:7,17, 21 174:8 175:5 176:2,25 182:5 184:17 189:1 190:6

**ship's** 19:4, 23 20:4 23:23,24 28:13 31:19 57:6 85:7 87:8 109:10 112:13 153:2 155:14 158:1 177:8 178:14 180:24 186:17 187:8,9,12 193:20

**ship-board** 25:14

**shipboard** 23:4 152:19 154:1,7,10 156:5,19 158:22 179:13,15 190:4 191:7 192:6

**ships** 17:5, 17,18 18:4 22:8,12 23:15 58:7 147:8,16, 20 150:23 152:6 154:23 166:19 176:14,22 183:10

**shore** 86:15 138:21 162:9 163:16 177:10

**shore-based** 46:13 52:15 53:23 54:5,9 86:1,13,16 115:1 165:14

**shoreside** 9:14 24:5 61:23 62:3,16 63:2 64:18 65:2,13 109:10 114:2,11 116:16 117:10 123:15 155:19 158:17,18 159:5 179:22 183:17 186:24 198:13

**shorter** 97:10

**shortest** 92:25 93:2 94:9,23 95:13 96:14 97:9,16 98:8,21 99:7,23 100:15,16, 23 101:4 103:13 106:9 107:13,21 108:15 109:2,25 110:12 112:20

**shortly** 149:2

**shot** 107:25

**show** 38:3 59:13 75:14 181:2

**showed**

142:10

**showing** 39:6 110:4

**shown** 172:3

**shows** 97:9 109:7 119:15 123:13

**side** 22:21 194:6

**significant** 71:5 152:24 184:12

**similar** 154:19 196:8,24

**simply** 36:24 79:16 100:10

**single** 47:11 169:12 170:5

**sir** 21:6 35:15 45:14,16 79:22 89:7 92:3,21 96:3 124:18 132:2 184:25

**sirens** 188:16

**sit** 11:13 12:8 104:9 129:19

**site** 131:8

**situation** 31:4,5,20 97:22,24 116:12 150:7 152:22 174:13 178:1 179:9 181:15

**situations** 114:18 165:11 166:14 172:7

**size** 18:4, 9,11,12 33:12

**ski** 128:11, 22

**skill** 19:11 20:4

**skills** 179:17

**slow** 54:8 86:12 115:1 126:18 195:6

**slowdown** 110:19,23, 25

**slowdowns** 194:25

**small** 139:12

**smaller** 18:15

**smallest** 17:19,21, 25

**SMS** 25:6,11 36:14

**so-called** 61:14

**solely** 51:4

**solution** 114:7,9 115:11,19, 20,21,24 117:10 118:5,9, 12,15 120:20,21 168:3

**solutions** 118:6,7

**sooner** 71:13,23

**sort** 13:5 60:4 111:11 136:10 164:11 174:7

**sorts** 167:14

**sought** 148:21

**souls** 20:1

**sources** 138:24,25 155:21

**space** 78:3, 16,19 81:9,13 83:12

**span** 98:3

**Spanish** 74:9 75:24 76:5 82:5,6 86:21 87:2 88:14,15, 16 96:7 97:4 101:22 107:1

**speak** 74:9 86:21 87:2 88:14,15 96:7 106:19,25 107:1

**speaking** 47:4 129:3

**special** 179:18

**specialist** 68:21,23 114:2

179:22

**specialists** 61:15 63:6

**specialty** 17:7

**specific** 9:17 10:3 11:14 25:6,10 43:20 47:23 71:12,22 116:14 147:10 154:2 164:18

**specifically** 22:18 24:9 25:1 35:9 36:6 45:18 62:9 109:14 117:15 141:10 179:16 181:14

**specifics** 11:8,21 69:12 153:18 164:17

**speed** 12:24 68:19 71:7,9 79:2 82:20 105:20 106:6 107:15 112:1,25 115:12 122:10 123:18 126:14,16, 20 127:1 129:13,21 137:10 155:16 158:7 162:16 176:6 177:16 189:12 194:1,2 198:21

**speeds** 148:13

**speedy** 148:20 155:23

**spell** 6:9 88:18 130:19 132:17

**spelling** 145:24

**spend** 143:20

**spent** 8:1 16:8 142:10 143:5

**Spirit** 17:14,19, 25 18:15 31:24 33:10

**spoke** 107:6 108:3

**spoken** 40:3 107:3

**SQM** 112:8 178:10 183:13 187:8,14

**SQMS** 179:4

**stability** 16:9,10,16 17:11,23 21:17,22, 25 22:1,14 24:13 27:25 29:5,15 30:6 35:10 37:19 91:11 152:5

**staff** 18:24 19:1,14 23:7 28:15,17, 22 39:19 66:2 146:19,24 147:5,24 150:6,17 153:19,20 156:3 158:8 178:16,21 179:15 183:1,4 185:16

**stage** 183:9

**stand** 30:13 81:7

**standardize** 183:11

**standardizes** 183:14

**standards** 150:15

**standby** 148:16

**standing** 169:7,16, 24

**start** 21:23 43:16 51:9 148:5

**started** 7:8 16:15,18 21:11,21 43:12 48:14 117:7 130:7,9, 21,23,24 145:12 146:13 151:24

**starting** 95:19

**starts** 92:25 111:20 148:4

**state** 5:25 6:7 60:11 67:6,22 131:2 140:14 168:7 178:12

**stated** 63:16 100:2 105:11 160:16,21

**states** 36:12 52:12 57:19,21, 23 59:1,11 65:14,23 66:15 67:10 84:12,17 85:22 100:3 112:11 119:11 120:4,13 121:9,21 153:1 164:20 165:22 166:4,18 173:2 177:7,13, 14 180:9 181:10 185:15 187:14

**stating** 27:15 175:18

**station** 51:23 56:22 57:19,21 113:6

**status** 195:11 198:12

**staying** 63:9

**step** 85:13, 14,15,18 115:15 126:9

**steps** 53:4

**stick** 25:16 149:17

**sticking** 27:3

**Stinson** 5:10

**STINSON-KONSTANTINIDIS** 5:23

**stipulates** 180:18

**stop** 166:6

**straightforward** 48:16

**strictly** 12:4 24:13 33:14

**strike** 9:15 49:7 76:19 81:14 83:9 89:23 97:11 123:2,20 153:15,24 157:15 189:22,25 192:19

**stroke** 9:24 10:8,13, 20,23 11:17 12:13,20 37:13 49:3 58:6,23 68:25 83:5 87:24 88:6,8,12, 16,18 105:19,20, 24 191:13 192:13,22 193:21

**strokes** 11:12

**stroll** 103:8

**struggling** 164:10

**stuff** 78:12

**sub-file** 140:3

**sub-folder** 138:5 171:11

**subfolder** 138:4

**subject** 39:17

**subjective** 63:18

**suffering** 49:3 148:10 149:19 162:23

**sufficiency** 87:7

**suggest** 34:19 45:10

**suggested** 70:4 99:8

**suggesting** 26:25 57:22 67:25 68:8 69:4 104:11 117:5,22

**suggestions** 34:4,25 69:20 117:25 118:1

**suggests** 26:24

**suitable** 161:20

**summary** 125:7 139:9

**Sunnny** 75:6

**Sunny** 40:22 41:5,12 42:4,25 44:3,18 45:2,3,25 46:20 57:15 60:17 73:11,25 74:11,19, 25 89:6 101:9,17 102:9 103:21 104:14 105:11 106:4 137:17,20 162:1

**supplanted** 68:2,6

**supplement** 137:15

**supplemental** 138:18

**support** 37:25 57:3 61:16 63:7,11, 12,13 65:2,3,4 66:20 106:13 112:1 155:11 158:1 178:25 179:23 180:1 183:18 187:16 190:25

**supported** 60:14

**supporting** 56:10 162:1

**supports** 162:15

**supposed** 19:21 52:21 113:19 124:3 185:11 198:8

**surprised** 105:1,4

**suspected** 9:24 10:13,22 11:16 12:13 37:13 105:18

**swear** 5:14

**switch** 145:8

**sworn** 6:3

**syrens** 84:2

**system** 19:20 24:11 36:11,12 62:5,7 104:22 129:17 135:10 177:1,2 178:9,10 179:4 182:1

**systems** 24:20 156:21

**T**

**takes** 64:22 69:24 77:12 98:24 100:5 114:14,15 160:11,15

**taking** 14:7 70:6 85:18 113:9,13, 16 116:22 117:8 119:7 123:7 124:2 150:22 162:10

**talk** 32:21 33:4

**talked** 86:3 141:6 179:11

**talking** 10:18 17:5,6 18:5,6,17 33:14 34:10 45:18 50:3 64:9 90:9 120:8 164:5,6 174:5

**tasked** 18:20 67:23

**team** 30:5, 9,14 61:7, 14,21 62:1,13, 14,17,25 63:5,22 64:16 66:17,18 67:13,18 68:1,9,13, 16,20,21, 23 69:4,9, 16,21 70:3,5 87:9 111:1,9,13

113:10 114:1,10 115:7 117:9 118:4,19 119:7 123:24 148:16 158:8 179:10,14, 22,25 180:2 186:22,23

**teams** 33:21 64:20 124:8 156:19 158:23 159:15

**teamwork** 113:24 118:3

**tecum** 136:14

**telephone** 106:23

**telling** 32:2 34:13 62:25 64:3,15 105:15 106:3 122:16

**tells** 183:16

**ten** 146:22 150:25

**tenders** 148:18

**tenure** 152:11

**term** 30:10 154:2

**terms** 33:18 34:16

**tested** 24:24

**testified** 6:3 10:21 11:15 12:9,11 96:23 124:14 125:17 188:16 189:14 192:12 195:21 196:1

**testify** 125:12 126:13

**testimonial** 124:11 125:1,7

**testimony** 16:14 103:7 106:12 107:5 108:2 122:25 134:16 137:6 143:4 144:8 145:5 160:16,17 188:9,25 190:3,19 191:3,12 193:17

**text** 89:1 118:23 163:15

**thing** 23:10 72:16 133:11 134:3 141:4

**things** 69:6, 15

**this-two-page** 88:22

**thought** 142:13 161:16 181:11

**threaten** 54:25

**threatening** 55:9,10

**three-hour** 153:5

**three-page** 73:14

**tied** 9:1 34:11 36:6,23 37:12 57:24 65:12 122:6,7,15

**time** 5:8 6:21 8:1, 5,7 14:11 16:7,12 21:14 26:12 30:20 31:17 32:12,17, 22 33:22 34:8 35:8 43:23 46:6,7,11 47:6,17 51:8 52:13,19 53:21 54:18 55:19 60:21 61:1 64:23,24 67:6,7 69:24 70:1,7 72:13 75:1,12, 16,17 78:3 81:15,24 82:24 83:17,22 85:3,4,8, 13,21,24

86:2,4,5,7 91:7 92:11 95:25 99:7,23 100:2,4,5 107:8,9 108:16 109:3,14, 24 110:15, 16 127:22 129:18 137:9 141:14,20, 21 142:10 143:5,7,9, 20,25 147:23 148:15,22 151:1,24 152:24 153:5,6,7, 8 154:3 158:13 160:11,15 162:23 163:23 167:18 169:3 170:24,25 172:22 175:21 180:10 182:4 183:4,5 188:13 193:14 196:5 197:3

**time-sensitive** 190:21

**timeline** 20:17,18 56:10 137:8

**timelines** 12:16

**timely** 155:4 164:11

**times** 36:1,3 53:16 88:12,21 89:4,5 91:6 100:5 150:5 164:23 179:7

**timesheets** 141:7,14 142:9

**timing** 194:24

**title** 13:14 16:20

**today** 11:14 12:8 16:14 32:21 33:4 43:20 73:16 104:10 127:10 129:19 135:23 171:13 174:6

**today's** 5:7 6:18 27:23 60:6

**told** 95:25 160:24

**Tonk** 132:16

**tonnage** 18:4,5

**top** 92:24 94:8 143:22

**total** 16:23 17:17,18 18:13 90:4 141:20

**totally** 24:15 74:22

**touched** 175:6

**track** 119:10

**traffic** 82:23 83:16 98:24 100:6 108:11,14, 17 111:15 114:18 195:1,6,11

**trained** 19:15 61:15 63:5

**training** 13:12,13 14:4,12, 17,24 19:10 20:3 145:4 179:18 197:18

**transcript** 102:24 138:10,21, 22 143:15 160:14,19 192:6,11

**transcripts** 139:15

**transfer** 8:20 9:4, 19,23 10:7,13,22 11:16 12:12 31:9,16,18 32:20,24 33:3 34:6 35:11,18 36:8 37:5, 11 57:24 61:8,22 62:2,15 63:1,15 64:1,18 69:6 70:18 100:1 120:18 121:10,13, 18,22

122:15,19 126:15,20 128:7,11, 12,15 129:13,22 173:22

**transferred** 16:11 32:14 109:1,9 128:21 129:5

**transfers** 28:4 32:6 36:24 65:12 67:16 120:5,12, 14 148:19

**transition** 152:9

**transitioned** 156:13

**translate** 98:16 137:19

**translated** 75:23 76:11 80:12 84:18 96:11,25

**translation** 137:18

**translator** 76:5

**transport** 34:19 35:1 43:6 47:24,25 68:18 84:21 109:20,21 110:7 111:12 121:19 159:10,18 161:10,20 163:3,24 164:11 165:16 167:19 168:12 171:3,25 173:22 174:10 175:9,20 184:22 185:12 187:5 188:13,25 189:12 192:24 195:9

**transportation** 41:11,18 42:25 44:2,17 45:1,24 46:19 48:5,19 49:10,19 50:14 53:1 54:15 57:5,11 65:9 66:6 67:15 84:5 85:5 112:7 161:6 174:23 181:8 186:2,5

**transported** 52:1

**transporting** 52:3 158:4

**travel** 81:8, 13,16,24 82:11 83:2,12,23 89:25 90:13,16 100:4,24 101:3

**traveled** 54:3 82:2, 15 98:1 99:5 100:8,9 103:12 104:10 149:23

**traveling** 83:6 97:6, 14,18 123:25

**treating** 180:12

**treatment** 26:20 162:18

**trek** 101:16

**trend** 159:3

**Treto** 125:24

**trial** 125:13,14, 18 137:7 138:8 144:7

**triple** 65:14,21 66:11 67:3 178:10 179:14 180:9

**tunnels** 90:20

**turn** 144:16

**turning** 151:23

**two-hour** 58:24 69:24 111:23 112:23 120:1

**two-page** 72:22 88:12 89:4

**type** 94:18, 19 110:23 149:19

174:4

**typed** 89:1 94:12

**typewritten** 92:24

**U**

**U.S.** 165:22

**Uh-huh** 14:18 43:21 90:12 133:17

**Ulises** 138:22

**Ulisses** 160:19

**ultimate** 167:17

**ultimately** 159:20 186:10 187:4

**unable** 17:24

**unbilled** 143:25

**unclear** 80:10

**underscore** 143:1

**understand** 12:7,18 27:9 66:15 73:24,25 82:6 128:19 164:17

**understanding** 75:24 154:11 175:4 182:14 195:3

**understands** 68:24

**understood** 139:14 149:8,14 150:16

**unfortunate** 187:18

**unit** 5:3 113:11

**United** 57:19,21, 23 59:1,11 119:11 120:4,13 121:9,21 164:20 165:22 166:4,18 173:2 176:20 181:10

**University** 145:13

**unknown** 85:8 101:14

**unquote** 192:12

**unreasonability** 167:22 182:17

**unreasonable** 43:8 46:6, 11 47:17 49:5 52:13,18 53:21 60:12 64:23 69:1 70:1,7 83:21,22 84:1 85:20,23 86:7 118:8,17, 19 167:10, 20 168:1, 8,12 171:2 174:7 176:7 180:25 187:1 188:4 194:3

**unreasonableness** 156:7

**unusual** 159:8

**upgrades** 22:1

**upper** 75:19

**ups** 158:15

**urgent** 100:22

**USCG** 137:14

**USCGPSIX** 137:13

**UTC** 137:9

**V**

**V-A-N-N-I-E-V-E-L-D** 146:3

**vacation** 183:9

**Vannieveld** 145:21

**vehicle** 80:24 189:7

**verbatim** 134:9 185:19 193:24

**verify** 177:18

**versa** 128:13

**version** 135:6 142:18,19

**versus** 5:5 106:17 127:5 130:13 132:22

133:16,21 134:9 147:14

**vessel** 8:14 9:8,9 18:7 23:5 32:22 33:10,12, 13 37:9 66:1,22 146:25 149:1 152:15 164:25 165:13 166:5,6,11 172:11 173:17 177:21 178:19 180:11 185:16

**vessels** 9:8 18:1 120:23 150:18,23 165:23

**vicinity** 172:11

**video** 199:3

**Villas** 126:25

**violations** 194:15

**visa** 128:13

**visa-versa** 128:24

**visit** 22:19 182:9

**visited** 22:8,12 23:3 91:9 152:6

**visits** 175:14 182:6,7

**vitae** 6:19

**voyage** 39:17

**W**

**wait** 36:16 49:4 57:8 58:24 69:24 111:23 120:1 121:1 122:24 153:9 181:1

**waited** 161:12

**waiting** 58:2 68:25 114:16 139:21 176:2

**waits** 181:18

**waive** 198:25

**walk** 58:9 145:9

**walked** 23:7

**wanted** 7:19 170:21

**warranted** 111:24

**warrants** 150:9

**waste** 54:18

**watercraft** 128:23 129:5,6

**watersports** 128:6

**website** 172:3

**weekends** 7:10

**welfare** 159:21

**wellbeing** 157:10

**Wendy's** 75:8

**wheel** 69:17 186:18

**wheelchair** 131:10,11

**wheels** 69:14,15 186:25

**wondering** 26:3

**word** 53:7 54:22 55:3 68:4,5,7 88:11,21 94:11 146:3 149:23

**worded** 24:10

**words** 20:5 22:19 23:22 101:15 153:22

**work** 7:23 8:5,16 19:8 47:18 49:1 51:6 60:15 93:1 94:10 106:18 121:15 140:22 143:13 152:1 164:20 169:11

**worked** 26:12 36:21 64:8 145:20 146:8,14 156:3

**working** 12:10 21:16 28:16

31:7,13 98:25 122:14 146:5 149:16 151:1,24 152:6,7,11 156:13 196:10 197:3

**works** 60:1 114:3

**world** 111:9

**worst** 193:22

**worth** 58:1 122:10 167:1

**wounds** 14:7

**write** 78:12

**written** 60:3 88:12,21 89:1,3 94:12 102:18 135:3

**wrong** 20:6 21:20 27:15 102:1 181:11

**wrote** 25:7 184:20

**Y**

**Yates** 35:6

**year** 21:7 116:11

**years** 11:3,5 14:14 16:5 36:4 146:20,21, 23 147:1, 4,5,6 150:21,25 151:1 156:3

**Z**

**zip** 38:24 43:11 134:20 139:18 140:3,9

**zones** 137:9