**David Nidorf, MD**

**Northern Dutchess Hospital**
**6511 Spring Brook Ave, Rhinebeck, NY 12572**
**dave.nidorf@gmail.com**

August 25th, 2022

**Re: Burgess review**

Dear Ms. Lobel,

I have reviewed all of the records you sent me with respect to the Richard Burgess case. They specifically include:

1) Discs with ultrasounds, brain MRI's, brain CT's, CTA brain/neck, chest x-ray, and venous doppler of legs all from various dates and locations
2) Medical records from Wellspan York Hospital
3) Medical records from VNA Home Care
4) Medical records from Wellspan Physiatry/Daniel Contract, M.D.
5) RCCL shipboard records
6) HIMA San Pablo Caguas Hospital medical records
7) SUNNY ambulance records
8) Port agent agreements
9) Deposition of Richard Burgess

10) Deposition of Darren Henze
11) Photographs of cruise medical center
12) RCCL Photograph of medical center hours of operation
13) RCCL credentialing process of medical personnel
14) RCCL senior doctor job description
15) RCCL medical secretary job description
16) RCCL medical director job description
17) Complaint of Pack v. RCCL
18) RCCL Procedures
19) RCCL Procedures-Disembarkation in port
20) RCCL Procedures-landed report
21) RCCL procedures-Transportation
22) RCCL port agent agreement
23) SUNNY ambulance records
24) Pre and post-incident Photos and Videos of Richard Burgess
25) Pre and post-incident Medical Records: York ENT Associates
26) Pre-incident Medical Records: Wellspan Good Samaritan Hospital
27) Express Air Medical Transport records
28) Post-incident medical records: Select Specialty Hospital
29) Post-incident medical records: Magee Rehab Hospital
30) Post-incident medical records: Wellspan Pulmonary and Sleep Medicine
31) Post-incident medical records: Wellspan VNA Home Care
32) Post-incident medical records: Wellspan Physiatry

33) Post-incident medical records: Mobilex USA

34) Post-incident medical records: Aspire Prosthetics & Orthotics, Inc.

35) Post-incident medical records: Young's Medical Equipment

36) RCCL's Answers to Plaintiff's Interrogatories

37) RCCL's Answers to Plaintiff's Second Interrogatories

38) RCCL's Responses to Plaintiff's Requests for Production

39) RCCL's Responses to Plaintiff's Second Request for Production

40) RCCL's Responses to Plaintiff's Request for Admissions

41) RCCL's Responses to RFA

42) RCCL's Responses to RFP

43) Defendant's Rule 26 Disclosures

44) Plaintiff's Answers to Interrogatories

45) Plaintiff's Responses to Discovery

46) Plaintiff's Responses to RFP

47) DE 30 - Plaintiff's Amended Complaint

48) DE 63- Second Amended Scheduling Order

49) Deposition of Joao Pereira, MD

50) Deposition of Ben Shore, MD

51) Deposition of Daniel Threadgill-Colon

52) Deposition of Ilene Landrum

53) Deposition of Jimmie Landrum

54) Deposition of Joseph Hiatt

55) Deposition of Susan Hiatt

56) Deposition of Dr. Mehul Desai

57) Deposition of Dr. Camilo Gomez

I am qualified to review this case because I am an Emergency Medicine physician practicing full time in a community ER in New York. I am double boarded in Family Practice and Emergency Medicine. I have been practicing Emergency Medicine full time for 29 years, including clinical medicine as well as many administrative positions. I routinely take care of adults with ischemic strokes, hemorrhagic strokes, and traumatic head injuries. My CV is attached.

# CASE REVIEW

The incident I am discussing took place on Harmony of the Seas (HOS), a cruise ship which is owned and operated by Royal Caribbean Cruises Ltd (RCCL). RCCL offers a shipboard medical center like it does on all its ships. HOS has a medical center consisting of several rooms, and is staffed by 2 doctors. The hours of operation begin daily at 8am. On February 21st, 2019 HOS was docked in San Juan Puerto Rico. San Juan is a large town with more than 15 hospitals.

Mr. Burgess was a 61 year old man when he awoke on February 21st, 2019 while on board Harmony of the Seas cruise. At the time it was docked in San Juan Puerto Rico. According to ship records, Mr. Burgess awoke feeling fine but around 9:15 am (10:15 am San Juan time) he had sudden onset of right arm and leg weakness and blurriness of the right eye. Of note he had fallen 3 days prior while drinking alcohol sustaining an occipital head injury with a laceration requiring 10 sutures. At the time of his fall he had no loss of consciousness, no amnesia for the event, no focal neurologic deficits, and no imaging was performed. On February 21st he presented to the ship infirmary at 9:25 am (10:25 am San Juan time) and was evaluated by Dr. Joao Pereira. Dr. Pereira documented that Mr. Burgess "was asymptomatic when he woke up" and then had "sudden onset of weakness of the right lower limb, plus vision changes in the right eye." He was noted to be mildly hypertensive with otherwise normal vital signs. He was noted on exam to have normal symmetric strength and sensation of his arms and legs and to have blurry vision on the right. Dr. Pereira diagnosed him with an "acute cerebrovascular insufficiency" (stroke). An EKG was done and was normal.

At 9:59 am (10:59am San Juan time) the Harmony of the Seas medical secretary requested a BLS ambulance. The ambulance dispatched at 11:21 am (12:21pm San Juan time) and arrived at the ship at 11:54 am (12;54 pm San Juan time). EMS left with Mr. Burgess at 12:02 pm (1:02 pm San Juan time), vitals are documented by EMS at 12:10 pm (1:10 pm San Juan time), and the ambulance arrives at HIMA San Pablo Hospital at 12:50 pm (1:50 pm San Juan time). Mr. Burgess was admitted to HIMA San Pablo Hospital at 12:59 pm (1:59 pm San Juan time). Once he arrived his NIH stroke scale was calculated to be 6 accounting for visual changes, facial paralysis, right arm weakness, and right leg weakness. Notes from the receiving hospital indicate that Mr. Burgess was not a tPA candidate due to being "outside the window", meaning it had been too long since the onset of symptoms to use tPA.

The initial CT scan at the hospital was read as acute left PCA ischemic stroke with a small subarachnoid hemorrhage. A CT angiogram was interpreted as a basilar artery thrombosis. His symptoms worsened, he developed aphasia (difficulty speaking) and he required intubation and mechanical ventilation. They did attempt intervention but thrombectomy failed. Ultimately Mr. Burgess was left with significant impairment including locked-in syndrome, upper and lower extremity weakness and spasticity, severe right leg weakness, tracheostomy, and aphasia.

# ANALYSIS

In my opinion Mr. Burgess suffered an ischemic stroke on the morning of February 21st, 2019. Importantly, this was not a "wake-up stroke". He awoke in his normal state of health and then suffered the stroke around 9am. Upon the initial evaluation by Dr. Pereira it was abundantly clear that Mr. Burgess was having an acute stroke. Considering his recent fall with head trauma, it would not have been clear whether this was a hemorrhagic or ischemic stroke or whether the recent head injury caused a delayed subdural hematoma resulting in the stroke symptoms. Irrespective of what type of stroke this was, and irrespective of whether it was caused by the recent head trauma, this should have been considered a true emergency that necessitated immediate transfer from the boat to a qualified emergency department. The reason this was critical was that until a proper evaluation was performed, including a head CT, any treatment or intervention would not be possible. Even potentially helpful medication such as aspirin could not be given until it was proven by head CT that there was no bleeding in the brain. If Mr. Burgess had

reached an ER such that his initial evaluation and head CT were completed in the first 4.5 hours after the onset of his symptoms, then there would be several possible treatments available to the medical providers. If the head CT was negative for blood then aspirin would immediately be given. This helps to thin the blood and improves the outcome of ischemic stroke patients. Furthermore, with the assistance of a neurology consultant, Mr. Burgess may have been eligible for intravenous or intra-arterial tPA (aka clot buster), which is a powerful blood thinner used to treat ischemic or embolic strokes. Another possible treatment could have included interventional procedures such as clot retrieval or intra-arterial tPA or blood vessel stents. Furthermore, if Mr. Burgess had turned out to have a subdural hematoma then a neurosurgeon could have drained the blood from his skull as a life saving and brain saving procedure. For all these reasons, it was imperative that Mr. Burgess be removed from the ship as quickly as possible, and every minute that he stayed on the boat was more time for the stroke to destroy brain tissue. Also, the longer he stayed on the boat the more likely those brain injuries would result in permanent neurologic deficits.

There are many guidelines from various organizations that explain clearly the urgency involved when treating stroke patients. All of these guidelines agree that time is of the essence. One example is the 2018 Guidelines for the Early Management of Patients with Acute Ischemic Stroke: A Guideline for Healthcare Professionals from the American Heart Association/American Stroke Association. Under the topic of urgency, it states the following: "Treatment should be initiated as quickly as possible because time to the treatment is strongly associated with outcome."

In my opinion there was a significant delay in the transfer of Mr. Burgess from the ship to the ER. Once an acute CVA (stroke) is recognized, the standard of care dictates that a patient must get to a facility as soon as possible where they can be cared for by specialists in neurology and neurointerventional radiology. With every minute and hour that goes by, brain cells die and a bigger part of the brain becomes irreversibly ischemic (lacks blood and oxygen), thereby making it less likely for a meaningful recovery. If a physician or facility does not have the capability to provide brain saving care with the proper specialists and imaging, then it is imperative that the transfer process begin immediately. In this case Mr. Burgess presented to the infirmary at 9:25 am (10:25 am San Juan time) and the first call to the ambulance was not made until 9:59am (10:59 am San Juan time) . Once the initial call was made, too much precious time was wasted waiting for the ambulance to arrive. Multiple additional actions should haver been taken by Dr. Pereira and the staff. First, once the staff learned how long it would take for the ambulance to arrive, they should have gotten back on the phone with the

ambulance company and insisted on a faster arrival and not taken no for an answer. Second, if it became clear that the first ambulance company could not send an ambulance more quickly, then other ambulance companies should have been called. Third, once it became clear how long it would take for the ambulance to arrive, and once it became clear that they could not come sooner or another ambulance was not available to come more quickly, then 911 should have been called to get the fastest possible transport available to bring Mr. Burgess to the hospital. One final point is that the phone calls to the ambulance should have been made simultaneously with calls to find an accepting hospital (see more details on this point further down in this report).

In addition to failing to find a way for Mr. Burgess to be transported off the ship faster, Dr. Pereira and staff also failed to send him to the closest possible hospital. Transport time was approximately 48 minutes due to the relatively long travel distance of 17 miles. Knowing there would be mid-day heavy traffic in San Juan, the staff should have called any of a number of closer hospitals. A search of the San Juan area hospitals capable of caring for stroke patients reveal many closer hospitals. I called all of the following hospitals to confirm they have a 24/7 emergency room, they take care of stroke patients, and they have an on-call Neurologist 24/7 as well. It took me less than 5 minutes on the phone to verify this with the ER staff at each hospital. And it is important to note that this is exactly the process that ER doctors do routinely when transferring patients to other hospitals. The following are stroke capable hospitals (all of which I confirmed via phone call to the ER) listed from closest to furthest distance from the port of San Juan: 1) Doctor's Center Hospital which is 2.4 miles away, approximately 11-15 minute drive, 2) Ashford Presbyterian Community Hospital which is 2.5 miles or about an 11 minute drive from the port, 3) Hospital Pavia Santurce which is 3.4 miles or about an 8-9 minute drive from the port, 4) Hospital Pavia Hato Rey, 6.2 miles or a 17 minute drive, 5) Hospital Universitario de Adulto, 7 miles or a 14 minute drive, 6) Hospital San Francisco, 7.9 miles or 16 minute drive, 7) Auxilio Mutuo Hospital, 10.4 miles or 20 minute drive, 8) Professional Hospital Guaynabo, 10.6 miles or 21 minute drive, and 9) Hospital Metropolitano, 12.7 miles or a 27 minute drive from the port of San Juan. Instead of any of these hospitals, they chose to transport Mr. Burgess 17 miles or 48 minutes away.

In terms of which of the above hospitals may or may not have received and cared for Mr. Burgess, one additional point must be made. EMTALA guidelines apply to Puerto Rico hospitals and emergency departments just as they do in the United States. EMTALA provides guidance to acute care hospitals and ER's and mandates that they evaluate and stabilize acutely ill patients prior to determining if a patient is able to pay their fee. In other words, ER's are not allowed under

EMTALA to reject patients due to their inability to pay or due to having a particular insurance they may or may not honor. If RCCL staff had called any of the above hospitals and were told they can't take Mr. Burgess because of the type of insurance he had, this would be an EMTALA violation and the proper response would have been something like "you cannot reject Mr. Burgess because of his insurance and if you do we will be reporting this violation to the proper authorities."

The RCCL Procedures Manual states that the ship physician shall "ensure that the ground transportation arranged is appropriate for the medical condition of the patient." Based on the above list, it is clear that Dr. Pereira failed to meet the ship's own guidelines with respect to medical transportation. The same procedure manual also states that "anytime a guest is disembarked from the vessel, the treating physician is responsible for the care of the patient until he/she arrives at a medical facility." In other words, Dr. Pereira cannot simply rely on his secretary and staff and EMS to make the appropriate transfer, he was in fact responsible for Mr. Burgess's care right up to the time he arrived at the receiving hospital.

Dr. Pereira and the staff at Harmony of the Seas failed to meet the standard of care in their evaluation and treatment of Mr. Burgess. The delay in transfer meant that Mr. Burgess was not afforded the opportunity for a full recovery from his stroke and made it more likely that he would be left with the permanent neurologic deficits that are still present today. It took approximately 3 hours from the time the secretary made the first call for an ambulance to the time Mr. Burgess arrived at the hospital. Three hours is excessive and this delay unfortunately directly resulted in a poorer outcome for Mr. Burgess. This delay in transfer led directly to Mr. Burgess's poor outcome and his now permanent disabilities.

I would like to address comments made by Mr. Threadgill in his deposition. Mr. Threadgill is tasked with helping to facilitate getting patients off the boat and to an acceptable hospital during medical emergencies. If I understand his testimony correctly, he states that there is an order to how Mr. Burgess (and any patient) is transported off the ship. First the ship secretary calls the port agent requesting help with evacuation. They then wait for the port agent to find an acceptable hospital. The ship staff then have a conversation with the accepting hospital. Finally, once all of these conversations and phone calls are completed, ground transportation is requested to make the transfer from the ship to the hospital. This might be a perfectly acceptable plan in a non-urgent situation. However, when there is a true emergency such as an acute stroke (or heart attack), this plan requires way too much time. Mr. Threadgill admits that ambulance transport teams in San Juan are unreliable and not necessarily time efficient. If this is so, then waiting until all

details are secured before calling the ambulance is a potentially catastrophic plan. In urgent situations such as Mr. Burgess's acute stroke, the ambulance should be called simultaneously with the other phone calls. Ideally, as soon as an accepting hospital is secured, the ambulance would be either waiting at the port or soon arriving at the port to effect transport. This would have saved considerable time. Any protocol whereby precious time is wasted waiting for all phone calls to be completed, waiting for an accepting physician and accepting hospital, has to be considered completely unacceptable and potentially dangerous in an emergency situation such as this one.

In my opinion the impairments and disabilities of Mr. Burgess are permanent. There may be some very minor improvements over time with physical and occupational and speech therapy but his current condition is basically what he must live with for the remainder of his life. In my video interview of Mr. Burgess on 8-21-22 I learned that over the prior 6 months the progress that Mr. Burgess was making had plateaued and he was no longer making significant improvements over that time. Again, this indicates that Mr. Burgess's current disabilities are permanent in nature. Those impairments and disabilities include, but are not limited to: breathing through a tracheostomy in his neck, difficulty speaking and difficulty being understood when he does speak (expressive aphasia), requires full assist for any transfer, wheelchair bound, cannot bathe himself, cannot stand or walk without full support, cannot wipe himself after having a bowel movement, cannot have erections or engage in sexual activity, has outbursts of anger/laughter, vision deficits, emotional lability, uses a condom catheter to urinate, and he cannot feed himself. On-going care is significant with round the clock physical care, emotional support, physical therapy, occupational therapy, and speech therapy. These therapies and support will likely be needed indefinitely. The medical expenses and treatments incurred thus far are reasonable and necessary to support Mr. Burgess.

The "methodology" which I used to arrive at the opinions in this case are described in this report. This methodology is generally accepted by medical professionals throughout the United States. This method is taught and followed in medical schools, residencies, internships, and in all training and practices in teaching and non-teaching hospitals, and other facilities and offices throughout the United States. The history is obtained by interviewing the patient as well as by reviewing medical records and diagnostic films from before and after the incident which caused the injuries to the patient. The second part of the method is to perform a physical examination of the patient. While I did not perform a physical exam of Mr. Burgess, I did participate in a video conference with him and was afforded the

opportunity to speak to him and ask him questions and see for myself what his current disabilities are. The third part of the method is to review diagnostic images and other testing if any. That review and the results of those images and tests are described in this report. The fourth part of the method is the differential diagnosis. This involves the thought process which every physician is trained to do in order to arrive at his or her opinions. The process -- which I followed here--is to review and take into account the history, medical records, physical examination, and test results and to use my education, training, and experience to arrive at conclusions and opinions about diagnoses, causation, prognosis, need for and cost of future medical care, permanency, impairment ratings, whether the medical care and treatment after the injuries was necessary and reasonable for treatment of those injuries, whether the billing for that care related to and was caused by the medical care and treatment of the injuries, whether the medical illustrations in this matter are true and accurate, and whether there is a permanent impairment as a result of the injuries and the impairment ratings assigned under AMA or other guidelines. As a part of the differential diagnosis, I considered the closest alternative diagnoses or causes. In considering whether alternative diagnoses and causes are reasonable or likely, I consider or take into account all of the information I have. As part of the differential diagnosis, I considered all of this information together. Some of the closest alternatives I have considered and ruled out include: hemorrhagic stroke, subdural hematoma, hypoglycemia, alcohol intoxication, myocardial infarction, and seizures.

I have made my opinions within a reasonable degree of medical certainty, based on my review of the records, as well as using my experience, training and education on these topics. I reserve the right to provide rebuttal and/or supplemental reports if further information is provided to me.

Thank you for allowing me to review this case. Feel free to contact me for any further assistance.

David Nidorf, MD