UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

RICHARD BURGESS Individually, and by and through DARREN HENZE as Guardian of the Person and Estate of Richard Burgess, incapacitated and as agent under that certain durable power of attorney dated November 20, 2006,

Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL, JOAO PEREIRA, MICHIEL ADRIAAN ETSEBETH,

Defendants.

CASE NO: 1:20-cv-20687 OTAZO-REYES

---

The deposition of:

ULISES NOBO, M.D.,

a non-party deponent, taken on Tuesday, October 25, 2022, at the Law Offices of Saldaña Carvajal & Vélez-Rivé, located at 166 Ave. de la Constitución, San Juan, Puerto Rico 00901, beginning at 10:58 a.m.

APPEARANCES:

ON BEHALF OF PLAINTIFFS:

HICKEY LAW FIRM, P.A.
1401 Brickell Avenue
Suite 510
Miami, Florida 33131-3501
BY: SARAH ANNE LOBEL, ESQ.
Tel.: 305.371.8000
Email: slobel@hickeylawfirm.com

ON BEHALF OF DEFENDANTS:

GRAY ROBINSON, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, FL 33401
BY: MICHAEL J. DRAHOS, ESQ.
Tel.: 561.268.5727
Email: michael.drahos@gray-robinson.com

--AND--

SALDAÑA CARVAJAL & VÉLEZ-RIVÉ
166 Ave. de la Constitución
San Juan, Puerto Rico 00901
BY: LUIS SALDAÑA ROMÁN, ESQ.
Tel.: 787.289.9250
Email: lsaldana@scvrlaw.com

NOTARY PUBLIC:
GRETCHEN ALVARADO, ESQ.
SALDAÑA CARVAJAL & VÉLEZ-RIVÉ

COURT REPORTER:
KATERINA CAYERE DÍAZ

I-N-D-E-X

DEPONENT: PAGE

ULISES NOBO, M.D.,

Examination by:

MICHAEL J. DRAHOS, ESQ.................... 14, 115, 128

SARAH ANNE LOBEL, ESQ....................83, 127

E-X-H-I-B-I-T-S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Defendant's Composite Exhibit A | 51 |

IN SAN JUAN, PUERTO RICO

TUESDAY, OCTOBER 25, 2022

P-R-O-C-E-E-D-I-N-G-S

---

MR. DRAHOS: Good Morning. Can you please state your name for the record?

DEPONENT: Ulises Nobo.

MR. DRAHOS: And, Dr. Nobo, what is your current occupation?

DEPONENT: I am the codirector of the Stroke Center of Menonita, Caguas. Mennonite Hospital, Caguas.

MR. DRAHOS: Mennonite Hospital, Caguas?

DEPONENT: Um-hum.

MR. DRAHOS: And for how long have you served in that capacity?

DEPONENT: We've been there for two years already.

MR. DRAHOS: So you started there sometime in what, 2020?

DEPONENT: Correct.

MR. DRAHOS: Where were you employed back in February of 2019?

DEPONENT: HIMA, Caguas.

MR. DRAHOS: HIMA, Caguas?
DEPONENT: Yes.
MR. DRAHOS: And what was your title there?
DEPONENT: I was initially the director of the stroke center and then, I don't remember if it was in 2018 or 2017, I and my partner, so we were codirectors of the stroke center. Pretty much the same way that we are now.
MR. DRAHOS: So you started as the director of the stroke center at HIMA, Caguas --
DEPONENT: Correct.
MR. DRAHOS: -- in 2017?
DEPONENT: No. I started as a medical director of the stroke center back in 2007.
MR. DRAHOS: And you served in that role until 2017 when you added your partner as codirector?
DEPONENT: Yes. Approximately 2017, 2018.
MR. DRAHOS: And what is your partner's name?
DEPONENT: Julio Rodríguez.

MR. DRAHOS: Is Julio Rodríguez a vascular neurologist?

DEPONENT: Yes.

MR. DRAHOS: We're going to get back to that in just a second but, before we get any further down that road, could you kindly provide the jury with the benefit of your educational background starting with college?

DEPONENT: Sure. I studied my medical school in Argentina. Before that -- we don't have a college, we have a high school. Different than the US. But I did my high school in a small town in the province of Buenos Aires. And then I moved to the University of Buenos Aires when I did my medical training from 1984 to 1990. And then I was doing a residency in neurosurgery for approximately two years.

And then I took the exams to come to the United States, and I started my internship in Danbury Hospital, Connecticut, in 1994. And I completed my internship in 1995 and then I moved to Los Angeles, USC, for the neurology residency

from 1999 to 1998 [sic]. And then from 1998 to 1999 I was chief resident at the same hospital. And then in 1999 to 2001 I did my fellowship at Indiana University.

MR. DRAHOS: Okay. So thank you for that overview. I want to kind of go back over it and make sure I got some of the finer points of what you discussed.

So you had told us that you graduated from medical school at the University of Buenos Aires in 1990.

DEPONENT: Correct.

MR. DRAHOS: And did they confer upon you a medical degree?

DEPONENT: Yes.

MR. DRAHOS: And so following your medical degree, did you receive a license to practice medicine in Argentina?

DEPONENT: Correct.

MR. DRAHOS: And you made mention of the fact that you had taken exams to enter the United States. I assume what you're talking about -- it’s the Medi --

DEPONENT: The USMLE. The kind of exam that is required for applying for the

residency.

MR. DRAHOS: And you passed that test?

DEPONENT: Yes.

MR. DRAHOS: And then that enables you then to do an internship --

DEPONENT: To apply for an internship. Exactly. And residency.

MR. DRAHOS: And what did you do your internship in, what area of medicine?

DEPONENT: Internal medicine.

MR. DRAHOS: And that was done at Danbury Hospital.

DEPONENT: In Danbury Hospital in Connecticut.

MR. DRAHOS: And once you completed your internal medicine internship, then you applied for residency?

DEPONENT: Correct.

MR. DRAHOS: And that was in what field of study?

DEPONENT: In neurology.

MR. DRAHOS: And so you completed a neurology residency at the University of Southern California.

DEPONENT: Correct.

MR. DRAHOS: And what year was that that you completed that?

DEPONENT: I completed it in 1998 but I stay one more year as the chief resident.

MR. DRAHOS: And so following then the completion of your chief residency in neurology at the University of Southern California, you told us that you went on for a fellowship?

DEPONENT: Correct.

MR. DRAHOS: And what was that in, what area of --

DEPONENT: Stroke.

MR. DRAHOS: Cerebrovascular medicine, correct?

DEPONENT: Correct.

MR. DRAHOS: And so, when a physician completes a fellowship in cerebral vascular medicine, that enables them to call themselves a vascular neurologist, right?

DEPONENT: Yes.

MR. DRAHOS: And so a vascular neurologist is a specialist?

DEPONENT: It is.

MR. DRAHOS: In what specific area of

medicine is a vascular neurologist considered a specialist in?

DEPONENT: We specialize in the part of neurology that applies only to people with vascular diseases, namely strokes, ischemic strokes, bleeding, intracerebral hemorrhage, carotid arteries. I mean, anything that is vascular related that affects the brain because of any vascular problem.

MR. DRAHOS: And so I often hear neurologists being called stroke neurologists.

DEPONENT: Um-hum.

MR. DRAHOS: Is a vascular neurologist a stroke neurologist?

DEPONENT: Same. The same. Yes.

MR. DRAHOS: Those terms are used interchangeably?

DEPONENT: Yes. The thing is that when you go, for example, to the APPM, for the board certification, it says vascular neurology. It doesn't say stroke neurology, but it's stroke.

MR. DRAHOS: Are you board certified?

DEPONENT: Yes. I am.
MR. DRAHOS: In what --
DEPONENT: Both. Neurology and stroke neurology.
MR. DRAHOS: All right. So, in other words then, not every neurologist is going to be board certified in stroke neurology, it's just that you did the additional studies to be able to have that added specialty?
DEPONENT: Correct.
MR. DRAHOS: And you maintain that board certification in stroke neurology until present?
DEPONENT: Yes. Yes. Yes. Both.
MR. DRAHOS: Have you ever given a deposition before?
DEPONENT: No.
MR. DRAHOS: So let me go over a little bit of the ground rules so you understand how it works. This is a formal question and answering session. And so this conversation is being recorded by the court reporter and it’s going to be transcribed in its entirety.

DEPONENT: I know. I have taken depositions before.

MR. DRAHOS: Oh, okay. All right.

MR. SALDAÑA: Do you need a notary then?

MR. DRAHOS: Yes. Do you have a notary available?

MR. SALDAÑA: Yes.

MR. DRAHOS: Okay. Why don't we go ahead and do that just --

I mean, unless you're willing to waive that. I mean, I'm willing to waive it but if we -- just to be cautious, we have one here.

MS. LOBEL: Why don’t we just do it --

MR. DRAHOS: All right.

COURT REPORTER: Do you want me to stop?

MR. DRAHOS: Yes, please.

(Whereupon, a brief recess transpires.)

NOTARY PUBLIC: Good morning. For the record, this is attorney Gretchen Alvarado. I will be taking the oath of the court reporter and the deponent for today's

deposition.

So, please, Court Reporter, raise your right hand. Say your complete name for the record.

COURT REPORTER: Katerina Cayere Díaz.

NOTARY PUBLIC: Katerina, do you swear to faithfully transcribe everything that will be said today?

COURT REPORTER: Yes. I swear.

NOTARY PUBLIC: Now the deponent, please raise your right hand. State your complete name for the record.

DEPONENT: Ulises Nobo.

NOTARY PUBLIC: Mr. Novo, do you swear to tell the truth of everything that will be asked today?

DEPONENT: I do.

NOTARY PUBLIC: Okay. Perfect.

So, please, may I be --

MR. SALDAÑA: (Unintelligible).

NOTARY PUBLIC: So I will be excused from the deposition. Thank you.

MR. DRAHOS: Thank you for your help.

MR. SALDAÑA: “Gracias,” Gretchen.

MS. LOBEL: Thank you.

Whereupon,
-----------------------------------------------
ULISES NOBO, M.D.,
------------------------------------------------
having been duly sworn by the notary public, was examined and declared as follows:

EXAMINATION

BY MR. DRAHOS:

**Q. So now that we have that formality out of the way, let me just go back over the ground rules so that you're familiar with how this is going to work today.**

**So, like I was saying, this is a formal question and answering session. Everything that’s being taken is being transcribed by the court reporter, who's going to put it into a transcript. Later on, we may ultimately read this to the jury. So, how we converse is different than normal conversation, unfortunately. It has to be a little bit more formal in the sense that you’ve got to let me complete my full question before you go to answer.**

**If you talk while I'm talking, it makes it impossible for her to try and get it down. So I**

may slow you down from time to time. I'm only doing that so that it's easier for her. If you nod your head, I'll know what you mean by that today. But will I try and figure out what that meant a month from now? I'm not going to remember. So I'm going to prompt you if I see you do that to say, "Is that a yes? Is that a no?" I'm not doing that to be obnoxious, I'm doing it so that the record is clear.

If at any point I ask a question that doesn't make any sense, either because medically it doesn't make sense or I mumble my way through it, just let me know and I'll be happy to rephrase. Otherwise, if you answer, I'm going to assume that you understood what I was asking you. All right? If at any point in time you need to take a break, of course, just let me know and we'll stop. A phone call or whatever. Otherwise, I just push forward to get it over with. Okay?

So, going back over that again, just to be clear, since we took the oath a little bit late, I want to review your background so there's no question about that testimony. So you had told us that you currently serve as the codirector of

the stroke center at -- what was the name of the hospital?
A. Mennonite.
Q. Mennonite Hospital.
And you've been in that capacity since 2020, correct?
A. Yes.
Q. And, as you had told us before, in February of 2019, you were working at HIMA Hospital?
A. Yes.
Q. In Caguas.
A. Yes.
Q. And your role there was the director of the stroke center where you served from 2007 to 2017, correct?
A. Correct.
Q. And in 2017 you added your partner, Julio Rodríguez, as the codirector, correct?
A. Yes.
Q. And Dr. Rodríguez is also a vascular neurologist.
A. Yes.
Q. So we were going back over your educational background. Sorry to do this again,

but since we took the oath afterwards, we're just being careful. Would you mind going back over that with me one more time? So you had told us that you went to medical school in Argentina.
A. Yes.
Q. And graduated in 1990?
A. Yes.
Q. And from there you went and did an internship.
A. Yes.
Q. And where did you do your internship?
A. Danbury Hospital in Connecticut.
Q. And that was in internal medicine?
A. Yes.
Q. And thereafter you went and did a residency in neurology at the University of Southern California.
A. Yes.
Q. And you completed that in 1998?
A. Yes.
Q. And you served as chief resident in the neurology program at the University of Southern California until 1999, correct?
A. Yes.

**Q. And then thereafter you did a fellowship in cerebrovascular medicine at Indiana University.**

A. Yes.

**Q. And you hold board certifications in what areas of medicine?**

A. In neurology and vascular neurology.

**Q. And what particular skillsets does a vascular neurologist have that differ from a board certified neurologist?**

A. That’s a broad question. But in our field, we are pressed with time. We have to take decisions quick. We cannot wait. A phone call at 2:00 in the morning or at 6:00 in the morning is a decision that we cannot postpone, that we have to move and do something, something that other neurologists don't have to do, but we do.

**Q. So, in other words, when a patient presents to the hospital with a suspected stroke, you're the guy they call.**

A. Yes.

**Q. And that's because you have the highest area of specialty in that particular field of medicine?**

MS. LOBEL: Form.
Go ahead.
DEPONENT: Correct.
BY MR. DRAHOS:
**Q. So do you read your own diagnostic imaging films?**
A. Ninety percent of the times we do.
**Q. What about you specifically, Dr. Nobo? Back in February of 2019, did you have the capability and comfort to read diagnostic imaging studies of patients' brains?**
A. Yes.
**Q. Is that something that you routinely do in your practice?**
A. Yes.
**Q. And why do you read your own films?**
A. The main reason is because we know what the patients' symptoms are, so we know where to look for the problem. So we are trained to see what part of the brain might be causing the patient's symptoms, so we can focus on a typical scan more specifically than a radiologist. The radiologist -- don't get me wrong, the radiologist will look at the entire scan and might see things that we don't, initially.

But because we know what the patient looks like, we know where to look for more delicate. And also because of time. The radiologist might take 15 minutes to read a CAT scan or 20 minutes, or half an hour, and I cannot wait 15, 20, 30 minutes. I've got to take a look at it immediately and take a decision immediately about what am I going to do with that patient.

**Q. And I want to get to the urgency in time and things of that nature in just a bit, but in addition to reading your own films, are you the guy who makes the decision as to whether or not a patient qualifies for certain treatments, like administering tissue plasminogen activator, otherwise known as TPA?**

A. Yes.

**Q. And so, back in February of 2019, if a patient presented at HIMA, Caguas with a suspected stroke, would you be the guy who made the decision as to whether or not that patient would receive TPA?**

A. If I was the one on call, yes. That would be me.

**Q. And so, back in February of 2019, how many stroke neurologists like yourself were**

**practicing medicine in Puerto Rico?**

A. Two.

**Q. So you and one other?**

A. And Julio Rodríguez, my partner.

**Q. So you and Julio Rodríguez were the only stroke neurologists in Puerto Rico back in February of 2019.**

A. Actively working, yes.

**Q. And you both were employed at HIMA, Caguas, correct?**

A. Correct.

**Q. So does that mean that there were no other stroke neurologists available at any other hospital in Puerto Rico other than HIMA, Caguas, back in February of 2019?**

A. Correct.

**Q. And you are no longer affiliated with HIMA, Caguas?**

A. No. I'm not.

**Q. And is that when you transferred from HIMA to Mennonite Hospital?**

A. Exactly.

**Q. So your tenure at HIMA ended in approximately 2020.**

A. Yes.

**Q. So I want to ask you some questions about HIMA, Caguas, as you recall it back -- during specifically the February 2019 time period.**
**Back in February of 2019, was HIMA, Caguas the highest rated stroke center in Puerto Rico?**
A. Yes.
**Q. Was it accredited?**
A. Was accredited as a primary stroke center.
**Q. And what does that mean when you receive -- when a facility like HIMA, Caguas receives a primary stroke center accreditation?**
A. It means that you receive an audit, somebody that will come and see what your hospital looks like and whether they are capable of providing care to patients with strokes. So there is a branch with the Joint Commission that inspects specifically hospitals that are applying for its certification in either primary stroke center or comprehensive stroke center. We were the only primary stroke center certified by the Joint Commission at that time.
So it means that somebody who doesn't know you, doesn't know anybody, comes to the hospital, and do a full research about

protocols, about the way patients are handled in the emergency room, in the stroke unit. And based on those observations, they might approve the certification or they might fail it.

**Q. So, in other words then, this Joint Commission is an outside independent agency --**

A. Correct.

**Q. -- with no affiliation to HIMA or Puerto Rico.**

A. They don't care.

**Q. Okay.**

A. They don't care. They are completely independent.

**Q. And so HIMA then would've sought after for this certification?**

A. Say that again, please.

**Q. They would have applied for it?**

A. Yes. We did. We did a long time before 2019. I don't remember when was the first time that we got certified. It could've been 2015, 2014. I don't remember when. But by 2019 I think we got certified like twice or three times already. It's every two years that you're supposed to be recertifying.

**Q. So you would have then been the director**

**of HIMA's stroke center at the time the certification was first obtained.**

A. Correct.

**Q. And so you mentioned that they come to the facility and do like an audit.**

A. Correct.

**Q. So are they looking at how clean the hospital is or do they want to see what the specific capabilities are of the service there?**

A. They look at everything. They might be coming to -- with your mind -- with the set mind of investigating the way you handle stroke patients. They might see something that is out of whack, that had nothing to do with a stroke, and they might fail you. For example, they might find -- you know the little, small table they carry with the defibrillator, with the drugs, if there's something wrong with that even though it had nothing to do possibly with a patient with a stroke, they might fail you. So they look at everything. It's another Joint Commission visit with the focus on strokes. But nevertheless, they look at everything, not only at strokes.

**Q. Now, specifically now as it relates to**

**stroke capabilities, not every hospital ultimately receives this type of certification because they don't have those capabilities, right?**

A. Correct.

**Q. So, in particular, in order to receive or to qualify for this type of an accreditation, what specific type of services does a hospital have to be able to perform?**

A. They have a set of rules that you need to comply to be able to get certified. Not only the issue of administration of TPA, but also the speed in which stroke patients are triaged and managed in the emergency room or anywhere else they have a stroke. They look at radiology and how fast they provide the report. They look at the nursing. They look at the stroke unit, how patients with strokes are treated, how they are handled in the stroke unit. They look at all kind of protocols that you have to have in place, written protocols regarding stroke admissions or sets for ischemic strokes, TIAs, hemorrhagic strokes, pretty much everything. So they look at the practical standpoint and the administrative standpoint.

**Q. So we already talked about back in February of 2019 HIMA, Caguas was the only hospital that had vascular neurologists on staff, you and your colleague, Dr. Rodríguez. Did HIMA also have endovascular neurosurgeons on staff?**

A. Yes.

**Q. And, in particular, was Dr. Ramos an endovascular neurosurgeon who was on staff at HIMA, Caguas?**

A. He is.

**Q. And did the fact that HIMA had endovascular neurosurgeons like Dr. Ramos on staff mean that they were capable of providing endovascular therapy?**

A. Yes.

**Q. And what is endovascular therapy?**

A. Endovascular therapy means that you have to -- you can access the brain through a catheter that you put in the leg, you navigate all the way up to your brain and do what you've got to do. I mean, they do a number of things. They -- those are from removing clots in the brain to treating brain aneurysms or malformations, or embolizations, and brain

tumors. I mean, they can do a lot of stuff. The endovascular field of neurosurgery is quite broad, they do a lot of things. One of the things that they do that pertain to us, because we work closely together, has to do with ischemic strokes. When patients have big clots in the brain they attempt to go in and see if they can remove that clot or not.

**Q. So, like we were talking about, with vascular neurologists having this highly specialized field of training, endovascular neurosurgeons also have the specialty field where they can treat strokes surgically.**

A. Correct.

**Q. So back in February of 2019, was HIMA, Caguas the only hospital that had both endovascular neurosurgeons and vascular neurologists on staff?**

A. Both together, yes. That was the only hospital. But let me tell you, the University Hospital, they do have neurosurgeons that are specialized in endovascular but they are not doing any kind of treatment like that. They didn't and they are not doing it even right now.

**Q. And so, is it true that in February of**

**2019 the only hospital that was administering TPA to stroke patients was HIMA, Caguas?**

A. No. Let me be fair. I'm not traveling around Puerto Rico all the time, but I can tell you with confidence that 99 percent in my answer to you is that we were probably the only hospital giving TPA.

**Q. And so --**

A. Even now.

**Q. Okay.**

**Even today.**

A. Even today.

**Q. So, in your professional opinion, if a patient had a stroke in Puerto Rico in February of 2019, was HIMA San Pablo Caguas the best place for the best chance of recovering for that patient?**

MS. LOBEL: Form.

Go ahead.

DEPONENT: I didn't understand what she --

MS. LOBEL: Don't worry.

BY MR. DRAHOS:

**Q. She's objecting to the way I asked the question.**

A. Objecting.
MS. LOBEL: Don't even worry.
BY MR. DRAHOS:
**Q. Yes. It's an objection so that later the judge can determine whether or not the question I asked you was legally correct.**
MS. LOBEL: Exactly.
DEPONENT: Okay.
Modest apart, because I was the director of the stroke center. Yes. In 2019, that was the place to go for a stroke.
BY MR. DRAHOS:
**Q. So I'd like to ask you a little bit about challenges in facilitating patient transfers around the island of Puerto Rico as well.**
**So, back in February of 2019, was Puerto Rico experiencing difficulties with ambulance resources?**
A. We're still struggling with that.
**Q. Tell me what it was like back in February of 2019 trying to facilitate a patient transfer by ambulance in Puerto Rico.**
A. Literally a nightmare. So they call you to transfer the patient to you. And if I

remember correctly, in this case they called me to accept this patient, which I did. Now, the typical experience is that you might accept the patient now -- now I don't know -- what time is it? 11:24. The patient might come to your institution an hour, two hours, five hours, eight hours later, easily. Depending on where they find an ambulance that will accept to transfer the patient or that it is available to transfer the patient. So transferring patients in Puerto Rico by ambulance is a huge issue, it's a huge problem. It was a problem in 2019 and still is a major issue now.

**Q. Why is it such a big issue?**

A. Because the way the system works. I mean, here it's not like the 911 in the States. 911 in the States, in a matter of a few minutes you have an ambulance in your house. Here, you know, you call the 911 and they might activate the state ambulance or they might activate the private system. And some in the private system might be transferring some other patients for different stuff, they are not available right away.

So at the end of the day, and being completely

honest with you, I would message to the patients and their families when they come to our facility, when they leave, we always told them, "You know what? Call the ambulance initially. But if you don't get an ambulance in 5 to 10 minutes, just put him in the car and come to the hospital." Because chances are that the patient might come really, really late, and too late for doing anything.

**Q. So back in February of 2019, there was a national shortage of ambulance resources.**

A. I don't know if there was a national shortage or not, but the system was working like crap. I'm sorry for the word.

**Q. Okay.**

A. But that's the way it was. The way it is.

**Q. Are you familiar with budget cuts and monetary budget shortfalls that were going on in the Puerto Rican emergency system due to Hurricane Maria?**

A. No.

**Q. So if a patient were to call 911 back in February of 2019 and the state ambulance system was activated, would it have been their practice**

**to deliver that patient to the nearest healthcare facility regardless of what their specific needs may or may not be?**

A. Yes.

**Q. And so that would mean then that if a patient was brought specifically for a stroke to the nearest facility, that could be a facility that doesn't administer TPA and has no capabilities for stroke care, correct?**

A. If a patient gets to that facility, they will call us to get the patient to our hospital.

**Q. So, regardless of where a patient was taken back in February of 2019 by ambulance, ultimately, they would be delivered to you for care. You, being HIMA, Caguas.**

A. For the most part, yes.

**Q. And so you made mention of the fact that even in a situation where a patient transfer had been accepted, it could take anywhere from one to eight hours for an ambulance company to actually facilitate that transfer.**

A. Yes.

**Q. So let’s go back and talk about strokes in a little bit greater detail for the members of the jury who may not be as familiar as you**

**are with this.**

**So, can you explain to us what a stroke is?**

MS. LOBEL: Form.

Go ahead.

DEPONENT: You're distracting me.

MS. LOBEL: I'm sorry. I'm sorry. I'm trying to be as delicate as possible.

DEPONENT: No, no, no. I know. I'm teasing you.

In a nutshell, a stroke is a damage to the brain. And what it makes different a stroke compared to other damages of the brain is that in a stroke the cause of that damage is directly related to blood flow or lack of blood flow to the brain. So the same way that you’ve got damage with a gunshot wound or a stab in the head or a trauma, a stroke is a damage to any part of the brain.

What makes a stroke is the cause, it comes with an alteration in the blood flow coming up to the brain, either because the blood flow stopped going to the brain, because the artery got blocked, or because that same artery broke up and started

bleeding everywhere. One way or the other one, you are depriving the brain from blood flow, from oxygen, from glucose, from everything the brain needs to work.

BY MR. DRAHOS:

**Q. And so you made mention of two different methods in which that occurs. You said a burst and a block. Are there names for those two different types of strokes?**

A. Correct. The first one, when an artery is blocked, interrupting the blood flow to the brain, we call that ischemic stroke. Like, any organ can have ischemia every time you disrupt the blood flow getting to that organ. In the brain, it happens the same and we call that ischemic strokes. And it accounts for 80, 90 percent of all the strokes. So it is the most common one.

**Q. And the other, being the burst artery, what's the name of that stroke?**

A. Hemorrhagic stroke.

**Q. And so you said that's about 10 to 20 percent of strokes.**

A. Yes.

**Q. So in the instance then of a hemorrhagic**

**stroke, is there a particular treatment modality for that?**

A. It depends what kind of bleeding. For example, for intracerebral hemorrhages, we don't have a lot of treatment other than supportive treatments. Sometimes neurosurgery has to go in and remove part of the bleeding to alleviate the pressure inside the brain. But that is not a -- that is not a great treatment. That's something that we do to avoid the patient dying, not necessarily making you better. So there's another type of bleeding called subarachnoid hemorrhage.

Subarachnoid hemorrhage, when it is caused by a brain aneurysm, there is a treatment for that. That’s something that Dr. Ramos, like any endovascular neurosurgeon specialized in treating. Brain aneurysms can cause bleeding in the head. ABM also can present with bleeding in the head and they are typically treated by this specialist.

**Q. So what about then the ischemic stroke, are there treatments that can be rendered for those to try and alleviate damage to the brain?**

A. Yes.

**Q. What are the treatment options for an ischemic stroke?**

A. The treatment option that we have are basically two. One of them involves the use of a medication called TPA, which is a clot buster medication. It’s a medication that we give intravenously, and what it does is break up any clots that we’ll find in any of the blood vessels that the drug circulates in, including the brain. And the problem with TPA is that we have up to specific timeframe to use it, which is a 4.5 hours. So four hours and a half.

**Q. So let me stop there for a second and kind of go back over and do a little bit more elementary review first.**

**So when a stroke occurs, what are you trying to prevent from happening? What is the consequence to the brain when a stroke happens?**

A. The moment that you have a blockage in an artery providing blood flow to the brain, there’s a part of the brain that starts suffering and undergoing sometimes irreversible damage. By trying to unblock that artery to break the clot that is blocking that artery, you're trying to restore the blood flow to that

part of the brain in an attempt to limit the damage that otherwise will be more significant.

**Q. So you talked earlier about an urgency in time. The longer that the blood flow is disrupted the more likely that the tissue in the brain will die as a result of not being fed that blood? Is that how it works?**

A. In general, yes. The issue with timing is a little bit more complex than what it looks like, but in general rule, yes. The sooner you treat somebody the greater the chances that the patient is going to recover.

**Q. So do you agree with me that there's never been any peer-reviewed studies to determine how long brain tissue can go without blood flow?**

A. Ask the same question again because your question is tricky.

**Q. Let me try it a different way.**

**Would you agree that it would be unethical for a clinician to test a human brain to see how long it could go without blood flow?**

A. They did it.

**Q. Has there ever been a study to determine exactly how long tissue can last without blood?**

A. When they did the first trial of TPA, before it got approved by the FDA, they compared two (unintelligible), TPA versus no TPA.
So -- and, again, because of the timing issue, it’s a little bit controversial because some patients can sustain a little damage in a long time, some people can damage an entire brain in an hour. So that is a tricky question. But in general rule, the general rule is the sooner you do it the better. But I don't think there's anybody that specifically, you know, clipped an artery, go into the brain, left it like that and see how long the brain will undergo damage.

Now, we do have evidence from different trials that one (unintelligible) of the trial does not intervene, meaning they don't use TPA, they don't use any thrombectomy, nothing, and we have evidence of approximately how long it takes for the brain to get damaged. And, again, that’s why we have the viability. Like I said, some people in an hour or two will have that part of the brain completely infarcted, even in an hour or two. Some people will have longer --

**Q. Now, the difference in those two patients, the one that gets completely infarcted**

**between an hour or two and another who can last longer, what affect, if any, do collaterals have in that process?**

A. It looks like you did your own research about this.

Collaterals make a huge difference because the more collaterals you have the more alternative pathways you have to deliver blood flow to that part of the brain. So yes, collaterals are highly, highly related with good outcomes and with maintaining little damage in the brain for a longer period of time. But that is not permanent. That will not last forever.

**Q. In other words, when a patient has an ischemic stroke and a pathway through a specific artery is cut off, there could be what we call collateral arteries that branch off and are able to feed that area for the time being.**

A. Correct.

**Q. And each patient is going to differ in terms of what kind of collaterals they have.**

A. Absolutely correct.

**Q. Which means one patient's response with a specific kind of stroke may differ than another's based upon the absence or the presence**

**of collaterals.**

A. Yes.

**Q. So earlier you talked about the fact that TPA can be given up to four and a half hours. And I wanted to clarify what you meant by that. Four and a half hours from what?**

A. We always count the hours from the moment the symptoms began, if that was a witnessed event. If the patient did not have anybody witnessing the event, we go by the last time the patient was seen at baseline. Classical example, patient wakes up with the symptoms, patient attempts to get off the bed and is already paralyzed on one side, that is not the onset time. That is the time that the patient realized he or she couldn't move one side of their body.

So how do we manage that? We try to search and to dig in when was the last time that the patient was at baseline. For example, "Did the patient get up in the middle night to go to the bathroom?" And the wife or the family said, "Yes." "What time was that?" That is the last time -- that's the onset time for us.

**Q. Okay.**

A. Or if somebody had a stroke in front of somebody, that is the onset time.

**Q. So the four and a half hours that you made mention of, is that some artificial or arbitrary number? Or why was it determined that four and a half hours from established onset time is the window of opportunity for TPA?**

A. Well, by the FDA we have approved only zero to three hours for treatment. We incorporated the three to four hours and a half by borrowing that information from a similar study done in Europe with the same medication but in the timeframe from 3 to 4.5 from the onset time. So the 3 to 4.5 hours onset time is not FDA approved, but it's the timeframe that we all use everywhere in every stroke center. Now, we do have -- if possible, we try to have -- having consent from the family because we are in the window that is not FDA approved. But the reality is that in every stroke center anywhere they go up to four and a half hours.

**Q. So what is FDA approved?**

A. After three hours.

**Q. And so that additional hour and a half is not FDA approved --**

A. Correct.
**Q. -- but universally accepted as --**
A. Valid.
**Q. -- potential -- now, what determines whether or not a patient within that additional hour and a half can or cannot qualify for TPA?**
A. The same rules that will make the patient qualify or not qualify for TPA in the 0 to 3 hours applies to the 3 to 4.5 hours. Now, initially, that 3 to 4.5 hours added some other exclusion criteria that were not present in the 0 to 3 hours. But we don't care about that any longer pretty much. We apply the same rules at 4.5 hours that we do from 0 to 3 hours.
**Q. So why is it that we have exclusion criteria in windows of opportunity? I mean, why not just give TPA to everybody?**
A. I wish.
The reason for that is because TPA is not water. TPA is a risky medication that can hurt a patient, that can literally kill a patient if given to the wrong patient.
**Q. So what is it about the timeframe that has an impact on how risky TPA could be for a patient?**

A. Pretty much the reason we don't pass the 4.5 hours is because -- it's not mainly because of safety issues, it’s because from what we see in the study, we lose efficiency after the 4.5 hours. That's why -- or that is the main reason why we don't pass the 4.5 hours. It’s not the main issue of safety, it’s a main issue of benefit. Now, there's another criteria that has to do with the safety itself and not necessarily is the timing.

**Q. So, in other words, a risk benefit analysis after 4.5 hours, the risks are just greater than any potential benefit?**

A. I would say that over 4.5 hours we have less benefit. Correct. And the medication itself, that can cause excessive bleeding. That's the main problem with the medication.

**Q. So you made mention of exclusion criteria. Is another word for that contraindication?**

A. That is one of them, the time.

**Q. So we made mention of time, the timing factor impacts that could disqualify. I want to ask you about some other contraindications. If the symptom onset time is not witnessed, is that**

**a contraindication to TPA?**

A. If we cannot identify anybody who saw the patient before that and witnessed the event -- or that he saw or she saw the patient in a timeframe that by the time the patient got to the hospital she or he makes it in the 4.5 hours, then we can use it. Now, if nobody knows anything and the patient is found on the floor by a neighbor, that's it. Automatically rule out.

**Q. What about recent trauma to the head?**

A. Trauma is a contraindication, specifically severe head trauma. It is a contraindication because this medication can cause excessive bleeding in somebody who has trauma in the head. You might be causing a lot of trauma.

**Q. What about evidence of internal bleeding in the brain?**

A. That is a number one contraindication.

**Q. Why is it that, that it’s such a number one contraindication, as you qualify it?**

A. Because the risk of TPA is to cause excessive bleeding.

**Q. So, in other words, if there's a bleed**

**going on in some area of the brain and you give TPA you can actually make the bleeding worse.**

A. It's like feeding gasoline to a fire.

**Q. How about the severity of the symptoms, does that ever have an impact on whether or not to administer TPA?**

A. No.

**Q. If a patient -- strike that.**

**Are you more inclined to give TPA for a patient who has more severe symptoms than one who has minimal symptoms?**

A. Let me answer, this is the way that I feel about it.

**Q. Okay.**

A. We try to use TPA in patients with symptoms severe enough to justify the risk of the medication, and the risk of the medication is excessive bleeding anywhere including the brain, and death, because of the medication. So because of that, we try to use TPA in patients that have symptoms severe enough that the balance make you, "Hey, you have nothing to lose. Let's try this medication." However, every time we see a patient, even if the symptoms are mild, that is only a time -- a

screenshot, a time shot of what the patient looks like now.

So avoiding to give that patient TPA because the symptoms are mild is really risky because you don't know what the patient's going to look like down the road. And once the patient got worse, let's say, six, ten hours later, then there’s nothing else that you can do. So, some people don't give TPA to patients with mild strokes, which I think is a mystery, personally. Because I have seen the disaster of not doing it many times. But it’s my personal opinion, you know.

Who says what is severe enough or not? I mean, who am I to say that your symptoms are mild? Let's say you cannot write with your right hand and that's the only thing that you have. Who am I to say -- you're right-handed. Who am I to say that your symptoms are mild? Your NIHSS might be two or three. I'm not going to give you TPA when your right-handed? That's the one that you use every day for work. No. That's my idea, personally.

**Q. So if it's a difficult judgment call, whether or not to administer TPA, do you err on**

**the side of caution? You, Dr. Nobo?**

A. If I feel that I have the chance that I'm going to hurt the patient more than to help him, yes. I prefer not to give the medication. Even if I am in the timeframe of being able to use it.

**Q. So you also made mention -- we talked a little bit about endovascular therapy. You are not an endovascular neurosurgeon, correct?**

A. No. I'm not.

**Q. So are you familiar though with what the process is, what endovascular therapy is?**

A. Oh, yes. I work with them every day.

**Q. And are you familiar with what the criteria is for whether or not somebody qualifies for that type of treatment?**

A. Yes.

**Q. And what is the criteria for whether or not a patient can receive endovascular therapy for a confirmed stroke?**

A. There are several criteria. Number one, you need to document, you need to have evidence of a large intracranial vessel occluded by a large clot.

**Q. In other words, there are certain**

**arteries that are too small for this type of a procedure?**

A. No. A clot can be too small and still might be enough to justify a thrombectomy or endovascular therapy. As long as you see a clot, big or small, blocking an artery in patient failed TPA or the patient came after the window for TPA and you see that the brain’s still viable, then the patient might be a candidate for a thrombectomy.

**Q. Are there certain areas of the brain that are not acceptable for the thrombectomy procedure? In other words, it's just too remote of an area or it's in a particular area where it's not been proven to be effective?**

A. No. The only place where they cannot get in is when the clot is way, way too far out in the arteries, in the tiny, tiny arteries, that there is no catheter that can reach that place. But those are really, really, really small. But, technically speaking, for large clots there’s pretty much no artery that cannot be accessed.

**Q. Are there risk factors for this type of a procedure as well?**

A. Risk factors for the procedure? Ask me the same question again.

**Q. Sure.**

**Is there exclusion criteria for endovascular therapy?**

A. Yes. Yes. The main exclusion criteria back then and now is somebody you see has already reversible damage by imaging studies.

**Q. So it sounds like at HIMA, Caguas you would have been the guy that determined whether or not a patient can receive TPA. Who would have been the doctor to determine whether or not a patient qualifies for endovascular therapy?**

A. Me.

**Q. You both.**

A. Um-hum.

**Q. Both decisions.**

A. Of course, you discuss the case with the neurosurgeon on call, you explain to them what's going on. I mean, it's up to them whether they think they can go ahead and do the procedure or not. It's not that I take the decision that he will go in. That’s not what I meant. So you explain to them. But, for the most part, they agree with us to see whether somebody may

qualify for a thrombectomy or not.

**Q. So we're here today to talk to you about a patient by the name of Richard Burgess who presented to HIMA, Caguas back in February of 2019. Do you recall Mr. Burgess?**

A. Yes. I do.

**Q. And why is it that Mr. Burgess is memorable for you?**

A. He and his husband are lovely persons. All lovely persons. As far as I know, they're both alive. I have not spoken to them since they left the hospital. His primary care physician, I don't know his name, he communicated every once in a while with me just to give me an update about this patient. But I remember them. I remember them well. They were really, really nice, super nice, even in the context of coming to the hospital with a severe problem. They were absolutely both really pleasant.

**Q. So I want to hand you what we're going to mark as Defendant's Composite Exhibit A to this deposition. It had previously been marked as Defendant's Composite Exhibit B to your colleague's, Dr. Ramos's deposition. So I want**

to use the same one.
(Whereupon, Exhibit 1 of the deposition is marked, for identification).
BY MR. DRAHOS:
Q. So, doctor, you're free to use that chart for whenever and however you'd like for the remainder of the deposition.
A. Yes. I'm sorry to interrupt you. For the record, I read only my notes, the radiology and that's it.
Q. That's fine.
So, yes. We had talked about that in advance. You said that in preparation for today you reviewed your notes from HIMA, Caguas?
A. Yes. My notes.
Q. Have you and I ever spoken before today's deposition?
A. No.
Q. So were you working on February the 21st of 2019 at HIMA, Caguas?
A. Yes.
Q. And I assume you were working in your capacity as the codirector of the stroke center?
A. Yes.
Q. As an attending physician?

A. Yes.
**Q. And I thought I heard you say towards the beginning of the deposition that you recall receiving a phone call about Mr. Burgess.**
A. If I don't -- if I'm not mistaken, I think they called -- the cruise ship called the hospital to transfer the patient. So they communicated with me. And somehow I think that they reached me directly instead of the -- we have a system in the hospital to take all the phone calls, but somehow they ended up talking with me. And I think it was a woman who initiated the phone call, somebody from the cruise. Nothing with the patient. So she's the one that asked me, and I accepted the patient.
**Q. Have you ever heard of a company called Continental Shipping?**
A. No.
**Q. Do you know the name of the lady who you spoke to?**
A. No.
**Q. So you were aware that Mr. Burgess was coming then.**
A. Yes.
**Q. And did HIMA, Caguas, back in February of**

**2019, have a stroke protocol?**
A. Yes.
**Q. And could you provide for me a brief overview of what the stroke protocol was back in February of 2019?**
A. The protocol involved once the patient arrived by ambulance, or any way, any patient that hit the emergency room will be triaged immediately, symptoms identified. And if the symptoms matched the symptoms any stroke patient has, they will activate a stroke call. What it means is that, in addition to being me the person activate it, there’s a team of nursing from the stroke team, another team in the emergency room, the emergency room physician, the emergency room nurses, that they all come to see this patient. And the protocol is to take the patient right away for a CAT scan, which is our number one priority.
**Q. Why does a CAT scan need to be taken?**
A. Because we need to know whether the patient has bleeding in the brain or has the ischemic stroke.
**Q. And so in this instance, and you're welcome to look at the chart, I doubt you're**

**able to answer this so specifically, are you able to tell me when Mr. Burgess arrived to HIMA, Caguas on February 21st?**

A. No. I didn't look at the emergency room part. I can take a look at it, but I didn't look at it.

**Q. So are you able to determine based upon your review of the chart here when you would have first come in contact with him? And I could point you to a particular page, if you'd like.**

A. If I remember correctly, I was in the emergency room waiting for him.

**Q. And so --**

MR. DRAHOS: Let me take this rubber band off there.

DEPONENT: This is normal.

MS. LOBEL: Oh, it does it in my house all the time except it doesn't have the transformer explosion, which is nice.

COURT REPORTER: Do you want to go off record?

MR. DRAHOS: Yes.

(Whereupon, a brief recess transpires.)

BY MR. DRAHOS:
**Q. So, doctor, what I was getting at there was that I was trying to figure out if you could tell me when Mr. Burgess first presented to you on February 21st of 2019.**
**So you're pointing to page 239. What's labeled as 239?**
A. Two thirty-nine...
**Q. And according to that note, it says time in 13:59. Is that right?**
A. Yes.
**Q. And that would have been 13:59 Puerto Rico time, correct?**
A. Yes.
**Q. And did you speak to Mr. Burgess directly when he arrived?**
A. Yes.
**Q. And is there an area within your report that summarizes your discussion?**
A. History of Present Illness.
**Q. And so, what did Mr. Burgess report to you on February the 21, 2019, when he first arrived to your hospital?**
A. He reported to me that at approximately 9:30 in the morning he lost vision of the right

side, in addition to weakness on the same side. He also told me that he had fallen down three days prior to that, I guess in the ship. And -- but according to the patient, that fall, that trauma, didn't leave him with any kind of deficits.

**Q. So when he fell it says here "requiring stitches." Requiring stitches where?**

A. In the head.

**Q. So he had suffered a head trauma three days prior.**

A. Correct.

**Q. And when he told you that he had woke up that morning, did he tell you at what time he had awakened?**

A. I don't recall that.

**Q. And was he able to tell you what he was doing between the time that he woke up and the time that he reported these symptoms that are around 9:30 AM?**

A. No.

**Q. Were you ever able to discern from him how long of a period of time he waited from the time the symptoms first arose until the time he reported them to anyone?**

A. I'm not sure about that -- whether that conversation took place or not, to be honest with you.

**Q. And, in this particular instance, was this one in which there was not an eyewitness to the symptom onset?**

A. I don't remember whether his husband was present or not when he developed the symptom. But this history, he was able to provide me with that history. He told me that.

**Q. So if the evidence in this case was that Mr. Burgess woke up, his husband doesn't know at what time he woke up, he had gone up to a different deck of the cruise ship and had been alone by himself for an extended period of time until he ultimately made a phone call to tell somebody he wasn't feeling well, under that scenario, would that be an instance where his symptoms were not eye-witnessed by anyone?**

A. He didn't say anything. He didn't talk to anybody. And the patient was unable to provide that information. Yes. We might determine that we have no idea when the symptoms began, which is not this case. Because he was fairly confident, as I remember, about the onset

time.

**Q. But would you be more confident with a symptom onset time when you have an eyewitness in addition to the patient reporting and eyewitness reporting? Would that scenario provide a more definitive onset time than just having a patient trying to recall?**

A. Yes.

**Q. So following this history, did you do a physical exam?**

A. Yes. I did. It's right here.

**Q. And do you know what -- strike that.**

**What is an NIHSS score assessment?**

A. The NIHSS score scale is the National Institute of Health score scale, pretty much designed for the TPA trial in the early 90s. It is a neurological examination, brief, focused mostly to identify areas that are not working well in different parts of the brain.

**Q. And so, do all stroke neurologists use the NIHSS scoring system?**

A. Yes.

**Q. And so they attempt to make these as objective as possible, these score points?**

A. Correct.

**Q. And so based upon how a patient responds to certain testing you assign certain points?**
A. Correct.
**Q. And the more points the more severe the stroke?**
A. Correct.
**Q. And so, on February the 21st, 2019, you did an NIHSS test on Mr. Burgess?**
A. It is right here.
**Q. And what was the total score?**
A. Six.
**Q. What does a score of six or less mean for a patient's prognosis?**
A. Infuriate -- a patient with an NIHSS of 6 means that they are having a mild to moderate stroke.
**Q. Does the patient with a score of 6 or less on an NIHSS scale have a better prognosis than a patient who has a greater than 6?**
A. In general, yes.
**Q. In this particular instance, what were the points that were assigned to Mr. Burgess that rendered the 6 score?**
A. I gave him two points in the vision with the wide side because he could not see, the wide

visual field. I gave him two points for the droopy face on the right side. I gave him one point in the right arm because he has a drift in the right arm and the right leg. So that's why I arrived to an NIHSS of 6.

**Q. And so, in these categories he can receive anywhere from a 0 to a 3. For the visual you give him a 2.**

A. Um-hum.

**Q. Is that a yes?**

A. Yes. I'm sorry.

**Q. And he can receive anywhere from a 0 to a 3 in facial palsy.**

A. Correct.

**Q. What is that? What is facial palsy?**

A. There are two ways that you can have facial weakness. The classical for a stroke is a 2 because it is only the lower part of the face that is affected. If the entire face is affected, that is peripheral 7 of Bell's palsy, which typically is highly unlikely to be a stroke. So whenever you score a 3 in the face, it means that in general it's not a stroke.

**Q. So the other two categories, motor arm and motor leg, those two are also instances**

**where he can get anywhere from a 0 to a 4, 4 being the most maximum points?**

A. Correct.

**Q. And so in this instance then, you measured him as a 1 in motor arm. Can you describe how it came to be that he received a 1?**

A. A 1 means that the patient can sustain -- the right upper extremity, can sustain it at 90 degrees for 10 seconds without touching the bed. So they might have a drift, a little drift, falling the arm a little bit, but it doesn't touch the bed. So that was his case. That's why I gave him a 1. In the leg, it's the same thing, 45 degrees, 5 seconds. Not 10 seconds. In the legs we measure 5 seconds. And, again, for giving him a 1, he has to be able to sustain the leg without touching the bed for a minimum of 5 seconds.

**Q. And so in this instance then, does that mean that on February 21st of 2019 Mr. Burgess was capable of lifting his right arm and his right leg independently?**

A. Yes.

**Q. In addition to a physical exam, did Mr. Burgess receive this expedite CT scan image?**

A. Yes.
Q. And I'd like to ask you about your assessment of those images as they were taken. Again, this is an expedited study, correct?
A. Yes.
Q. And you're doing this because you're trying to get to an answer as soon as possible.
A. Yes.
Q. Which means, as you had said to me earlier, before, you had told me that vascular neurologists have to make quick decisions and they don't always have the benefit of waiting for a radiologist to render a secondary opinion, correct?
A. Correct.
Q. And did that happen in this case for Mr. Burgess?
A. I don't remember when was the official radiology report available. I just went with my own opinion of the CT imaging.
Q. And so I'd like to ask you what your own opinion of the CT imaging was and you're welcome to refer back to page 239, if you'd like. Or if you have an independent memory you're welcome to do that too. But, ultimately, what I'm

**wondering is where was Mr. Burgess's stroke found to be on this initial image on February 21st of 2019.**

A. In my opinion, in my opinion, his initial CAT scan already was showing infarction on the left side of the brain in the back part. When I saw that CAT scan, my interpretation was that that part of the brain was already undergoing damage. I say left PCA because that is the territory, the artery that goes to that part of the brain that provides blood flow to that part of the brain. And, in my opinion, that initial CT already showed that he was having a stroke there.

**Q. So the left PCA, that is the -- the posterior cerebral artery? Is that what that's called?**

A. Correct.

**Q. And the left posterior cerebral artery, is that considered a small or a large vessel?**

A. No. It’s a large vessel.

**Q. And so you had told me earlier that you believed that it had already shown an infarction on that side. Does that mean that by the time you saw the image the brain tissue was dead?**

A. Not necessarily. It means that I was watching the brain undergoing changes that very likely were going to end up in unreversible damage.

**Q. And so, is Mr. Burgess one of these patients who does not have the collaterals like another who can feed an area of the brain longer?**

A. I cannot answer that.

**Q. And so, in this instance, based upon your review of the films, was the only treatment modality available to Mr. Burgess TPA or could he also receive endovascular therapy?**

A. At the time that I saw him, there were two or three problems actually for giving IV TPA. One of them was the time. By the time that I saw him he was already outside the TPA window so it would have been in violation of the rules and guidelines to go over that timeframe. The other problem that I saw, which is actually more important than the stroke itself, he had a small bleed on the outside of the brain called subarachnoid hemorrhage on the same side, that I think it was likely and related to the stroke and possibly related to the trauma he had a few

days before that. He told me that he ended up with stitches because he fell down.

**Q. So I want to ask you about that. Specifically this small bleed that you were looking at, is there a name for that?**

A. Subarachnoid Hemorrhage.

**Q. And so you made mention in your report that you believed you had seen an ipsilateral SAH. What is an ipsilateral SAH?**

A. On the same side of the stroke.

**Q. And so that is a bleed, in other words?**

A. Yes. It is blood in the brain.

**Q. And you believed that that bleed that you were seeing there could have been causally related to this trauma he had reported experiencing three days beforehand, correct?**

A. Probably.

**Q. And so, as we talked about earlier, recent head trauma is considered a contraindication for TPA. Is it not?**

A. A severe head trauma, it is.

**Q. And so a head trauma that potentially caused an ipsilateral subarachnoid hemorrhage would be considered a severe enough head trauma to be contraindicated for TPA, wouldn't it?**

A. It would, in addition to the blood in the head. Blood in the head, any kind of blood in the head, it itself is a contraindication for TPA.

**Q. So once you saw that finding that you believed to be blood in the head, did that mean that definitively Mr. Burgess was not going to qualify for TPA no matter what?**

A. Correct. Even if I saw him an hour from the onset, two hours, three hours. With that kind of imaging studies, I would have not given him IV TPA.

**Q. So, let me ask it this way, if Mr. Burgess was flown by helicopter the moment he showed signs and symptoms of a stroke and delivered directly to you at HIMA, Caguas, on February 21, 2019, as soon as you saw that image that showed that blood, would you have given him TPA or not?**

A. No.

**Q. So then does that mean that in this instance Mr. Burgess's finding of bleeding in the brain was the determining factor for you in deciding not to give TPA to him?**

A. It was one of the main ones to avoid

giving him TPA. Yes.
**Q. So what was your plan of care then following your analysis?**
A. After I see the fact that he was outside the TPA window, he had blood in the head, he had evidence of an ongoing event in the back part of the left side of the brain, he was ruled out for receiving IV TPA. But I put him on antiplatelet medications, specifically aspirin, which is the standard treatment for ischemic strokes, especially if we are not going to give him IV TPA initially. And after that, I proceeded to order a CTA, a CTA of the head and neck.
**Q. And a CTA is a different type of imaging study, is it not?**
A. It’s another one.
**Q. It's more sensitive?**
A. It’s different.
**Q. And so, what were you looking for or what was the reason behind ordering the CTA?**
A. Because with the regular CAT scan, you're looking at the brain itself, whether they have ongoing ischemia, or blood or tumor or whatever. With the CTA, you're looking more specifically at the blood vessels reaching out of the brain.

So you are not paying attention too much of the brain, you're not looking at specifically the arteries. That's why we call that CT angiography. CTA is CT angiography. You're looking at the blood vessels arriving to the brain.

**Q. And was HIMA, Caguas the only facility in Puerto Rico that had CTA capability?**

A. No. CTA is available in multiple places.

**Q. And so what did you learn from the CTA study?**

A. I saw the CTA and my impression was that this is a -- how do I explain this? The part of the brain that Mr. Burgess have affected is the back part of the brain on the left side. That part of the brain receives blood flow from the arteries that are coming in the back of the neck all the way up to the back part of the brain. So when I did review the CTA, I saw that one of the vertebral arteries in the neck, at the origin in the neck, had a brief lack of flow.

I didn't see contrast briefly, which means possibly he had a clot there or a plaque or something blocking that artery specifically. But then I saw the rest of the contrast coming

up to the brain, reaching the brain without difficulties, with exception of the -- where he had the stroke, the PCA. The PCA also was involved. But looking at where the clot came from that affected the posterior cerebral artery, it was my interpretation that likely came from that tiny clot in the vertebral artery at the origin in the neck.

**Q. So at the time -- strike that.**
**Did you pick up on this on February 21st?**
A. Yes. The problem is that I didn't write it because I wrote this after I -- before I saw the CTA. Otherwise, I would have put this in my note.
**Q. So, I mean, is this another word for a filling defect?**
A. Correct.
**Q. So when you saw the filling defect in the vertebral artery on February the 21st, why not operate on it?**
A. For a number of reasons. Number one, it was a brief filling defect. After that, the artery was completely opened. So it was fully receiving blood flow, fully -- all that flow was getting into the brain. And there is not really

an accurate indication for thrombectomy only for the blockage at the origin of the vertebral artery that would constitute fully distantly with an NIHSS of 6.

**Q. So, in other words --**

A. There is no indication for thrombectomy there.

**Q. In other words, if thrombectomy had been attempted on that filling defect in the vertebral artery, could the risks have been such that it would have made it worse?**

A. It could have made him worse. I mean, I don't know the answer at a 100 percent, but it was not indicated.

**Q. So your plan then was to provide antithrombotic medication, which --**

A. That is what the aspirin is.

**Q. And what is the goal of providing aspirin to a patient like Mr. Burgess with this clinical presentation?**

A. The goal of giving any patient antithrombotic medications is to prevent further thrombosis in the arteries affecting the patient’s brain at that time.

**Q. So, in other words, it's not TPA, but**

**it's medicine that's designed to try and prevent any worsening of the condition.**

A. Correct.

**Q. And that is the standard of care for stroke medicine?**

A. It is.

**Q. Okay.**

MR. DRAHOS: Can we go off and take a break for a second? We've been going about an hour and a half or so and I wanted to give everyone a chance to --

DEPONENT: Oh, no. No problem at all.

(Whereupon, a brief recess transpires.)

BY MR. DRAHOS:

**Q. So, doctor, when we left off, we were talking about your plan of care following your evaluation of Mr. Burgess's situation. And so, did there come a point in time -- well, strike that.**

**After you had developed your plan of care, was Mr. Burgess admitted to the hospital as an inpatient?**

A. Yes.

**Q. Did there come a point in time following**

**your initial plan of care where there was a change in his condition?**

A. Yes.

**Q. Approximately, how long after this plan of care had been implemented did Mr. Burgess's condition change?**

A. I am relying on my memory mostly, but let's say that I saw him -- I wrote this note by 2:00 PM approximately. So I think he got admitted the same day. And, overnight, close to really early morning, probably between, I don't know, 5:00, 6:00 in the morning, not quite sure -- probably this is documented in the medical record. I was called by the head nurse and the supervisor to let me know -- he was in the stroke unit, by the way. So he got admitted to the stroke unit. He didn't go to any other part of the hospital. He came with us to the stroke unit.

**Q. He remained in the stroke unit from the time he --**

A. Yes. Once he had admitted in the emergency room, where they formalize all the paperwork, they took him straight to the stroke unit. So he was under the supervision of the

stroke unit, nurses, head nurse and so forth.
**Q. And so this nurse called you in the early morning hours to report a change in condition?**
A. Yes.
**Q. What did they tell you?**
A. He told me that -- the conversation was that the patient's level of consciousness had decreased significantly, that he had some trouble breathing. So pretty much letting me know that he was not the same patient he was a few hours earlier.
**Q. Now, this change in condition, is this something that was as a consequence of the left PCA stroke that we talked about or was there some new pathology causing these new symptoms?**
A. It is highly unlikely that a left PCA stroke is going to give you such a worsening so fast.
**Q. So does that mean --**
A. So my -- no. My impression was that something has happened.
**Q. And so what did you do in response.**
A. Well, number one, I told him to get a stat head CT, to repeat another head CT, and to do another CTA, CT angiography to evaluate

whether the brain changed or not, the way it looked like, whether he had new bleeding or not. And with the CTA to see if there was any new blockage in any artery that was not present originally.

**Q. And were those additional studies performed?**

A. Yes.

**Q. And were there new findings?**

A. The new findings were that the patient had occluded the entire vertebral artery on the right side extending into the basilar artery. And that was the reason why the patient's level of consciousness, his neurological status, changed dramatically.

**Q. So, in other words, this was not due to the left PCA. This was a new pathology in the basilar artery.**

A. Yes.

**Q. And the basilar artery, another name for that would be the brainstem?**

A. The basilar artery is the artery that provides blood flow to the brainstem.

**Q. And so, were you in the hospital when you learned of this new pathology or was it reported**

**to you by phone?**
A. No. I was not in the hospital. They were really early. He called me by phone. He told me and I reviewed the studies myself. Here we have access to fax at home. So I saw both, the CT and the CTA.
**Q. And so what is it --**
A. I'm sorry. The timing might be a little bit different. You might take a look at the chart. I mean, I remember the call. I cannot tell you if it was at 5:00, 6:00, 6:30. I don't remember. I know it was really early.
**Q. And what is the significance of a total occlusion in the basilar artery?**
A. That is the worst nightmare that we all stroke neurologists have.
**Q. And why is that?**
A. Because basilar artery providing blood flow to the brainstem and the brainstem is a part of the brain that is in charge pretty much of everything locally and where all the fibers that are coming from the brain, all the way down to the arms and legs, and the opposite, from the legs and arms all the way up to the brain. They traverse through the same spot. So if we have a

brainstem event, what the brainstem is where you are awake, where you go to sleep, where you breathe, the place that controls your blood pressure, your heart, your lungs, your eyes, your voice, everything.

So whenever you have a brainstem event with a basilar artery occlusion that is providing the blood flow to the brainstem you know that you have an impending catastrophe that -- those are one of the few indications that no matter what you see in the imaging studies, you've got to try to do something. And that something means try to open up that artery.

**Q. So was there anywhere else in Puerto Rico other than HIMA, Caguas that was better equipped to treat a basilar artery occlusion?**

A. No.

**Q. Is that the best possible place for Mr. Burgess to be in at the time of that event?**

A. Yes.

**Q. And did you have treatment options available to him in an effort to try and minimize the impact of that basilar artery occlusion?**

A. Yes.

**Q. And what were the treatment options that you were considering?**

A. Neuroendovascular.

**Q. And that would've been the endovascular therapy we were talking about earlier?**

A. Yes.

**Q. So Mr. Burgess definitively did not come into HIMA, Caguas with a basilar artery occlusion, correct?**

A. Correct.

**Q. This is something that manifested while he was an inpatient at the hospital.**

A. Yes.

**Q. And, despite the antithrombotic medication that had been administered to him, it wasn't preventable. Was it?**

MS. LOBEL: Form.

DEPONENT: He progressed despite the medication.

BY MR. DRAHOS:

**Q. And so, who is Dr. Ramos?**

A. Dr. Ramos is a neurosurgeon with a subspecialty in endovascular neurosurgery.

**Q. And was Dr. Ramos called in?**

A. I called him.

**Q. And how soon after this diagnosis was made was Dr. Ramos called in for input?**

A. Pretty much the moment that I saw the imaging studies I got on the phone and tried to reach him right away.

**Q. And did Dr. Ramos review the patient’s case with you?**

A. Yes. He reviewed the imaging. Yes.

**Q. And --**

A. And then in person we worked together before he went in for the procedure.

**Q. So earlier, when we talked about this filling defect in the vertebral artery not being a candidate for endovascular therapy and now this basilar artery occlusion becoming symptomatic, what's the difference between the two? Why is it that you can do a potentially mechanical thrombectomy of the basilar artery occlusion but not of a filling defect in the vertebral artery?**

A. Because for a number of reasons. The basilar artery occlusion is a catastrophic situation that you have to avoid at any cost. So that itself has a major indication for thrombectomy at any rate. Having one of the

vertebral arteries only a filling defect, that is not an indication when the patient's symptoms are confined to one part of the brain only and he doesn't have anything else. Like it was this case on admission, initially.

**Q. So once this occlusion of the basilar artery was diagnosed, were both you and Dr. Ramos in agreement that it warranted endovascular therapy?**

A. Yes.

**Q. And did Mr. Burgess proceed to that treatment?**

A. Yes.

**Q. And were you present during the surgical procedure?**

A. No. No. I was present with Mr. Burgess's husband. We were explaining the situation to him and I was present also when they took the consent. The anesthesiologist took the consent from Mr. Burgess's husband, I was there. I was there. But I was not in the angio suite when they were doing the procedure. No. I was not.

**Q. So would you then defer to Dr. Ramos as it relates to the specifics of the surgical**

**operation itself?**

A. Absolutely.

**Q. And why it was or was not successful is something that Dr. Ramos could speak to?**

A. Yes. I know why, but, I mean, he -- after, I don't know, two hours pretty much, or two hours and a half, multiple attempts to resolve the issue, he called me. He told me exactly what happened. But, of course, you know, technical details about what he found or why he couldn't, you might want to talk to him. But I know that he tried and he tried everywhere, from everywhere, and he couldn't access the artery, the basilar. He could not.

**Q. Which means he wasn't able to get through the vertebral artery blockage to get there.**

A. Correct. Correct.

**Q. Does that say anything to you as it relates to the chronicity of that particular blockage or its degree of plaque?**

A. That is a good question. The question is whether he had that filling defect from before and it managed to just throw a tiny clot from a preexistent problem there and ended up with the first stroke. But then he managed to thrombose

the rest of the artery and progress the way he did. Now, whether he had that filling defect before or not, we don't know that. What’s kind of surprising to me that the clot was so hard that he couldn't access that.

So that is pretty much telling you that it doesn't seem to be a fresh clot because typically fresh clots, they can be fairly easily retrieved. And the fact that he couldn't, it means that there was probably some chronic component to that clot that made it pretty much impossible for Ramos to pass through to reach the basilar artery and unlock it.

**Q. So the basilar artery occlusion, was that just simply the natural evolution of his condition?**

A. No. It was not the natural evolution. The natural evolution should have been that he ended up with that stroke in the left PCA and that’s it. That would have been the natural evolution in a normal situation. What happened was highly unusual, that he ended up progressing, further thrombosing the vertebral artery and the basilar artery. So the way he progressed is not a natural history for every

patient with a similar problem.
**Q. Would there have been any way for the clinicians that he met to have predicted that this occlusion in the basilar artery was going to eventually occur?**
A. No.
Let me add another answer to that. Every time you have a stroke, one of the reasons we give antithrombotic is because we want to prevent another one from happening. So even though it's not the scenario we were expecting to happen, the basilar thrombosis, the reason we give antithrombotic is actually to prevent another one. Now, we were not expecting such a stroke. But that's why we initiate everyone with an acute stroke in antithrombotics in order to prevent another one from happening.
**Q. And so, in this instance, even though he was given the antithrombotic medication, it still progressed to this basilar artery occlusion.**
A. Yes. And that was highly unusual.
**Q. And so would you agree that there was nothing you could have done to prevent this situation?**

A. No.
**Q. Have all the opinions you've given here today been within a reasonable degree of medical probability?**
A. Yes.
MR. DRAHOS: Those are all the questions I have, doctor. Thank you. I'm going to turn it over to my colleague now.
DEPONENT: Thank you.

EXAMINATION

BY MS. LOBEL:
**Q. Doctor, I want to do more of a follow-up having to do with your medical background, if you could help me with this. What hospitals have you had privileges at in Puerto Rico since you started practicing on the island?**
A. I have privilege in the entire HIMA system. By the time Mr. Burgess came to our facility, I was privileged in all the other hospitals that belong to HIMA only. And now I have privileges at Mennonite Hospital, I think for the most part we have privilege in all the Mennonite Hospitals, because they have many. But I don’t have any privilege at HIMA anymore because I left.

**Q. Now, with that, so long as you were working within the HIMA system, would you be able to have given a patient, for example, TPA at a different HIMA hospital other than HIMA San Pablo Caguas or would it be limited to just HIMA San Pablo Caguas?**

MR. DRAHOS: Object to the form.

DEPONENT: No. I will give them IV TPA at HIMA San Pablo Hospital. In completing the sentence, right now is that some physicians are calling and they are willing to take the risk, only in 2022, of giving the patient TPA, as long, as long as the patient is shipped to us right away. Because they don't want to do anything with that.

But, nevertheless, back in 2019, there wasn't pretty much any hospital that we called up for TPA. And, honestly, I didn't trust any hospital just to give IV TPA over the phone. I'm not going to say that I never did it, I probably did it once in somebody that I knew personally. But that wasn’t a routine practice. It was too risky.

BY MS. LOBEL:
Q. Was it well known throughout the island that HIMA San Pablo Caguas is the hospital where you send stroke patients? Period. End of sentence.
A. Yes.
Q. Was that common knowledge for everybody who is essentially in the business, providing medical care on the island?
A. Yes. Yes.
Q. So if you were somebody who frequented the island providing medical care, you'd already know that HIMA San Pablo Caguas, that's where the stroke patients go.
A. Yes.
Q. So it wouldn't be a situation where you need to research which hospital should I send a patient. They should already know HIMA San Pablo Caguas is the stroke hospital.
A. Yes.
Q. Now, just to get a little bit of background with regard to your administration of TPA. For example, in the year before this incident, say 2018, how many patients would you say you had provided or had ordered TPA to be

**administered?**

A. We have statistics for that. I don't know the number in 2018, but I can tell you that we average at HIMA, by the lab recertification that was around 2018 or 2019, approximately 120 patients per year.

**Q. A hundred and --**

A. Twenty patients every year.

**Q. Would you say that 120 patients per year was the average since you started -- strike that.**

**Would you say the 120 patients receiving TPA was the approximate average when the hospital became certified as a stroke hospital or handling patients and giving them TPA even before it was stroke certified?**

A. No. We began giving IV TPA even back in 2007 when I joined HIMA. But, of course, we were building up the number of patients receiving IV TPA. But by 2019, 2018 we were giving 100, a 120 patients. In fact, we're giving more TPA at HIMA than the Jackson Hospital in Miami. Because the chief of stroke at Jackson Miami is a good colleague of mine and a good friend of mine, so we compared the number

of IV TPAs. So we were giving a little bit more TPA than them.

**Q. As of what timeframe, or just generally?**

A. One year. We're talking about one year. I'm talking about 100 to 120 TPA per year, which is a good number.

**Q. Some of this you have already covered with opposing counsel so let me just -- so based off of the numbers you've given me, would it be fair to say that you regularly give TPA to patients suffering from strokes?**

MR. DRAHOS: Object to the form.

DEPONENT: If they have the criteria, the inclusion criteria, and they don't meet any exclusion criteria, yes.

BY MS. LOBEL:

**Q. And, with that said, that would be the standard of care if the patient meets criteria and that would include being within the three-to-four-and-a-half-hour window.**

A. Correct.

**Q. And, as we discussed and just so we're abundantly clear, by the time Mr. Burgess arrived at HIMA San Pablo Caguas and entered into your care, he was outside the window to**

**receive TPA. Period. End of sentence.**

MR. DRAHOS: Object to the form.

DEPONENT: Like I said before, there were more than one issues with Mr. Burgess. One of them was the time. The second one was the presence of blood in the head that could be made significantly worse with TPA. And also because I saw part of the brain undergoing ischemic changes, which itself might not be an absolute contraindication, but it's a risky situation for bleeding inside the stroke.

That's why we are very careful when we already see signs of ischemia. Even if they come in the timeframe, we are very careful because some of the patients might go on to bleed significantly. So he had a lot of problems that that's why I opted not to give him IV TPA.

BY MS. LOBEL:

**Q. Understood.**

**But even if you hadn't seen the images, based off of the sheer fact that he was so outside of his onset, he was so far outside of the TPA window, you were never going to give him TPA no**

**matter what.**

MR. DRAHOS: Object to the form.

DEPONENT: No. Once he’s outside the window, no.

BY MS. LOBEL:

**Q. Okay. All right.**

**Now, do you recall on direct examination being asked questions about transport and ambulances?**

A. I have a vague recall that he -- this is embarrassed because I think they had to pay the ambulance themselves. I think. I think. If I can't remember -- if I'm not wrong, but he didn't mention anything else. Actually, they were really concerned about what's going on. So they told me something about the ambulance, but that was the only recall that I have. I mean, I don't even remember the room that I examined Mr. Burgess. But the things about the ambulance, the only thing that I know is that they have to pay, for whatever the reason. But whether the ambulance took a long time, or a short time, or what happened with the ambulance, I don't know that.

**Q. If I recall correctly, you stated on direct examination when you're dealing with**

**patients who are suffering a potential stroke, you tell them to call 911, "Try to get the ambulance." But if they don't show on 5 minutes you recommend, "Get them in the car. Get to the hospital." Correct?**

A. Yes. And it's an illegal advice, but I have to put in consideration the system. So if I'm going to wait for the system to work for my benefit, I'm going to have everyone dead. So I said, "You know what? You do this. I have more chances of helping you if you do this instead of waiting forever for an ambulance that is not going to come."

**Q. And would it be fair to say that if a doctor is in this situation on the island, where the ambulance is taking too long, they too should put them in a car, get them to the hospital so they can get care and treatment at HIMA San Pablo Caguas?**

MR. DRAHOS: Object to the form.

DEPONENT: That will not happen. That will not happen because that is my own personal opinion. I'm not sure that another physician will do that. They might do that with their own family maybe, but

I'm not sure that anybody else would do
that with a patient.
BY MS. LOBEL:
**Q. Would it be fair to say that there's nothing that the ambulance can do for purposes of care and treatment other than drive from point A to point B for a patient?**
MR. DRAHOS: Object to the form.
DEPONENT: Yes. They have to go and pick up the patient and take him to me.
BY MS. LOBEL:
**Q. Right.**
**But my point is, for purposes of transport, there's nothing that's going on inside the ambulance, for purposes of care and treatment for the patient, that's going on.**
MR. DRAHOS: Object to the form.
DEPONENT: You're talking about the level of care in the ambulance?
BY MS. LOBEL:
**Q. Correct.**
A. Well, ideally they have to be in an ambulance -- not in any ambulance, but an ambulance that can monitor the patient cardio wise, neurologically wise, basic vital sings,

neuro check and things like that. So they have different systems and different levels of ambulance care. I don't know which ambulance picked him up.

**Q. Understood.**

**But in the ambulance, for example, they're not administering TPA.**

A. Never.

**Q. They're not giving drugs to the patient.**

MR. DRAHOS: Object to the form.

DEPONENT: It depends.

BY MS. LOBEL:

**Q. What does it depend on?**

A. It depends on whether the patient goes into a full cardiac arrest or not.

**Q. Understood.**

**Say the person is alert, coherent, but experiencing vision changes, one-sided weakness, typical stroke symptoms. But other than that, that's all that's going on. The ambulance is not going to be giving medications or providing treatment.**

A. Not really.

**Q. And with Mr. Burgess specifically, when you received him, he didn't come in from the**

**ambulance with an IV drip and medications. He just had the port in his arm for purposes of the transport.**

A. I'm sorry.

MR. DRAHOS: Form.

DEPONENT: I don't remember the details. I don't remember the details.

BY MS. LOBEL:

**Q. If it's documented in the records that he just came in with the port for the IV, would you defer to them?**

A. That’s probably what it is.

**Q. Okay.**

A. Yes.

**Q. In the history of your care and treatment of stroke patients, you've seen them come in various forms, not just in ambulance. Correct?**

A. Yes.

**Q. They've come via car.**

A. Yes.

**Q. They've come via Uber, for example.**

MR. DRAHOS: Form.

DEPONENT: Not Uber, but it can be anybody like that. Yes.

///

BY MS. LOBEL:
**Q. Exactly.**
**Any form of vehicle transport, they come in.**
A. Yes. Yes.
MR. DRAHOS: Form.
BY MS. LOBEL:
**Q. Now, you mentioned that you vaguely recall a phone conversation potentially with a female from the cruise line. You don't recall the name, but do you recall approximately what time that call came to you?**
A. That call was in the morning, but I don't remember the time.
**Q. Do you recall more or less approximately how much time elapsed between the time you got the call about receiving and accepting Mr. Burgess and the time of his arrival?**
MR. DRAHOS: Form.
DEPONENT: I don't remember that. I don't remember there was an excessive amount of time. Because the moment they told me that, I told the emergency room that we had somebody coming in and I was in the emergency room. But I don't know how much time actually passed from the moment

the lady called me, was on the phone with me, until he arrived to the emergency room. I don't remember.

BY MS. LOBEL:

**Q. Would you remember if it was 10 minutes later, for example?**

MR. DRAHOS: Object to the form.

DEPONENT: It would've been impossible, 10 minutes later, from San Juan to HIMA, Caguas. But -- no. I didn't know. I would be grossly guessing. And I'm not -- I don't want to do that.

BY MS. LOBEL:

**Q. When you received Mr. Burgess from the ambulance from the cruise ship, you received a copy of his shipboard medical records, correct?**

A. I don't remember that part.

**Q. Okay. Fair enough.**

**You do remember that he, he being Mr. Burgess, recalled that he woke up feeling normal and had sudden onset of symptoms.**

A. He was able to tell me that.

**Q. Now, for purposes of determining lack -- what I've come to learn, his last known normal, Mr. Burgess was able to provide you his**

**last known normal himself.**
A. Um-hum. Approximately, yes.
**Q. And when you are trying to evaluate whether or not you're going to give a patient TPA, you do rely on patients' own history.**
A. If I consider the patient reliable, I do.
**Q. And under this set of circumstances, did you find Mr. Burgess to be reliable?**
A. Yes.
**Q. And he was able to give you specifics about what he did that morning and when he started to notice the specific symptoms.**
A. No. I don't remember what he did early in the morning. I remember the time he told me about the symptoms and -- now, I don't remember specifically the conversation, but the way that I wrote it, and I know when I wrote -- when I write this way -- I mean, I know my writing. I said -- if I say this is the time, this is the time.
**Q. Okay. Fair enough.**
**Now, do you recall being asked questions as to whether or not you read films in order to treat your patients?**
A. He asked me that question.

**Q. Yes. Do you recall that?**
A. Yes.
**Q. Now, do you have a specific recollection of whether you read the films in this case or you relied on somebody else's read of the films?**
A. I read the film myself.
**Q. Okay. All right.**
**And you testified on direct examination that you found that there was a small subarachnoid hemorrhage, correct?**
A. Um-hum.
**Q. Is that a yes?**
A. I'm sorry. Yes.
**Q. Okay. All right.**
**Did anyone else in review of the film identify a subarachnoid hemorrhage that you said you saw?**
A. I think eventually they reread the CT and I think they reported a -- I don't recall that part. I do recall looking at the CT myself.
**Q. Okay. Okay. Let me just see something really quick. I’ve got notes (unintelligible). I apologize.**
**Had Mr. Burgess arrived at the hospital within the three-hour window, should the CT have had a better chance to have been negative at that**

**point in time?**

MR. DRAHOS: Object to the form.

DEPONENT: I have two answers for you.

BY MS. LOBEL:

**Q. Sure.**

A. Number one, probably. Probably. This is just pure speculation. Probably I would have not seen the ischemic changes that I saw already evolving in the back part of the left side, the occipital lobe. But that small bleed probably would have been there because I thought that was completely unrelated to his stroke and more likely than not related to the trauma he had a few days earlier. So even if he came within 5 minutes, probably that blood was already there. Probably.

**Q. But the ischemic changes that you saw, would you agree with me more likely than not there would have been less of a development, or the ischemic changes would have been completely different had he come to you earlier?**

MR. DRAHOS: Object to the form.

DEPONENT: It's possible that I would have not been able to see it.

///

BY MS. LOBEL:
**Q. And is that based off of your experience of seeing evolutions of strokes over the course of your lengthy career?**
MR. DRAHOS: Object to the form.
DEPONENT: Like I said, I mean, some people evolve quicker than other ones. But, in general, somebody that is coming really, really fast from the onset of the symptoms, less likely that we're going to see an evolving ischemia, in general. But, again, that varies. Not every patient is the same.
BY MS. LOBEL:
**Q. Now, with regard to the criteria that you rely on in order to determine whether you're administering TPA, are the guidelines that you rely on the American Heart Association Stroke Guidelines, more known as the HA or the ASA?**
A. Yes.
**Q. Now, I've got portions of it in front of me, which is why I'm looking at my phone. There is a section within the guidelines with regard to prehospital systems, correct?**
A. Um-hum.

**Q. Is that a yes?**

A. That is in the guideline for the treatment of acute ischemic stroke, only treatment of acute ischemic stroke. Yes.

**Q. Correct.**

**And part of that, and I'll read it, and correct me if I'm wrong, "is activation of 911 system by patients or other members of the public is strongly recommended. 911 dispatchers should make stroke a priority dispatch and transport time should be minimized." Is that an accurate statement of the guidelines, to the best of your knowledge?**

MR. DRAHOS: Object to the form.

DEPONENT: It is.

BY MS. LOBEL:

**Q. And then there's also a section, it's 1.3, with regard to EMS systems, that "regional systems of stroke care should be developed. These should consist of the following: a) health care facilities that provide initial emergency care, including administration of IV alteplase; and, b) centers capable of performing endovascular stroke treatment and comprehensive periprocedural care to which rapid transport can**

**be arranged when appropriate."**

MR. DRAHOS: Form.

BY MS. LOBEL:

**Q. Is that an accurate set of the guidelines?**

MR. DRAHOS: Object to the form.

DEPONENT: It is.

BY MS. LOBEL:

**Q. And then, within the EMS systems, it also says that "patients with positive stroke screen and/or strong suspicion of strokes should be transported rapidly to the closest healthcare facilities that can capably administer IV alteplase."**

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. Is that accurate?**

A. Yes.

**Q. And then there's a section within those guidelines that's very specific to TPA or the alteplase administration, correct?**

MR. DRAHOS: Form.

DEPONENT: Yes.

BY MS. LOBEL:

**Q. And that is section 3.5, which has -- it**

**states that “IV alteplase 0.9 milligrams kilograms maximum dose 90 milligrams over 60 minutes with initial 10 percent of dose given as bolus over 1 minute is recommended for selected patients who may be treated within three hours of ischemic stroke symptom onset or patient last known well or baseline state. Physicians should review the criteria outlined in Table 6 to determine patient eligibility.” Is that an accurate statement within the guidelines?**

MR. DRAHOS: Form.

DEPONENT: It is.

BY MS. LOBEL:

**Q. So you rely on Table 6 as the criteria for when to administer TPA and when not to administer TPA.**

MR. DRAHOS: Object to the form.

DEPONENT: I follow the guidelines.

BY MS. LOBEL:

**Q. Now, where within the guidelines does it state that you cannot administer TPA if there is a small subarachnoid hemorrhage?**

A. If you look at the guideline, the number 1 exclusion criteria is the presence of any bleeding. Even any history of bleeding. Even

if the bleeding was 20 years ago, that itself is a contraindication. You do not administer TPA with anybody with blood in the brain. Subarachnoid hemorrhage is one type of blood. There are multiple types of blood. It can be a subdural hematoma, epidural hematoma, intracerebral hemorrhage. Any kind of bleeding is a contraindication for giving TPA.

**Q. So if the imaging did not show a subarachnoid hemorrhage and there were just some stitches along the base of the head, superficial wound, would that person be eligible for TPA?**

MR. DRAHOS: Object to the form.

DEPONENT: If he came in the window, yes.

BY MS. LOBEL:

**Q. Okay. All right.**

**Because I want you to clarify because you mentioned severe head trauma. Severe head trauma --**

A. That's what the guidelines say.

**Q. Understood. Understood.**

**But I'm just referring to your previous testimony. Okay?**

A. Um-hum.

**Q. So your prior testimony you said severe head trauma. Now, if I slipped and fell, I hit the back of my head, I get a wound, it needs to be stitched and then three days later I suffer stroke symptoms and come to you, and I'm within the window, would I be eligible for TPA?**

MR. DRAHOS: Object to the form.

DEPONENT: If I saw this around me and you didn't lose any consciousness, and as -- I don't see any blood in the head, and you're not having any concussion symptoms, I probably would. Personally. Some people will not do it, but sometimes, you know, we go, we cross the line sometimes. I would personally do it if I don't see blood.

BY MS. LOBEL:

**Q. Would it be within the standard of care to administer TPA based off of the set of circumstances you just described?**

MR. DRAHOS: Object to the form.

DEPONENT: Like I said, it is a tricky situation where some physicians might use it as a reason not to give IV TPA, the history of trauma, requiring stitches. But

you're asking me about me, personally.
BY MS. LOBEL:
**Q. Um-hum.**
A. And me, personally, even if it requires stitches, if you didn't lose any consciousness and I don't see any blood in the head, I will probably use it. I will let you know, “Hey, you might have a higher risk of bleeding because of what you have.” But I will not deprive any patient from TPA if I don’t see blood or any big contraindication in the head.
**Q. And that care wouldn't be below the standard of care, correct?**
MR. DRAHOS: Object to the form.
DEPONENT: I want to pretend that I'm not doing anything illegal. Actually, I'm trying to give the patient the best chance. And, believe me, I'm an easy TPA guy, easy. I give TPA in a lot of reasons that some people wouldn't do it. But in this patient, I have two or three red flags that they were pretty much impossible.
BY MS. LOBEL:
**Q. Now, you were mentioning on direct examination that the FDA has approved the zero**

**to three hours. There's a European model that says 3 to 4.5 hours. And then you said every stroke center uses the 3 to 4.5 hours. Is that the standard of care within the United States medical health?**

A. Yes.

**Q. I just wanted to know who was the "they" you were referring to.**

**I forgot to ask you this. I know you told me you don't recall the exact time that the woman from the cruise line, and you don't recall the name, had communicated with you. Do you recall the content of the communication, what was discussed?**

MR. DRAHOS: Object to the form.

DEPONENT: No. No. I think the details of the conversation, I don't remember that. But she mentioned something about like a possible stroke, whether I accepted this patient or not.

BY MS. LOBEL:

**Q. Did you ever speak with a doctor?**

A. No.

MR. DRAHOS: Object to the form.

BY MS. LOBEL:
**Q. Do you know if anyone from HIMA San Pablo Caguas spoke with any doctor from the cruise ship regarding Mr. Burgess?**
MR. DRAHOS: Object to the form.
DEPONENT: As far as I know, they didn't.
BY MS. LOBEL:
**Q. And that would be important information for your care and treatment, to get that information if it was available.**
MR. DRAHOS: Form.
DEPONENT: If it was available.
BY MS. LOBEL:
**Q. Now, you mentioned on the direct examination, I made a note, that at his time of arrival you were in the ER waiting for him. Were you treating other patients or were you specifically waiting for Mr. Burgess?**
A. I was waiting for him.
**Q. And where were you --**
A. I'm sorry. By the way, it is not uncommon for us to be wandering around the emergency room.
**Q. Okay.**

MR. DRAHOS: Not uncommon or uncommon?
DEPONENT: Not uncommon at all.
BY MS. LOBEL:
**Q. And the reason for that is you're expecting the potential emergency of somebody to be a walk-in into the ER that you have to rapidly treat.**
A. Um-hum.
**Q. Is that a yes?**
A. Correct. Yes. I'm sorry. Yes.
**Q. And the reason for that is the common phrase, time is brain.**
A. Correct.
**Q. You need to treat a patient with stroke as fast as humanly possible because the sooner you treat the more likely you're going to have a better outcome.**
A. That is correct.
**Q. Now, if Mr. Burgess was able to -- well, strike that.**
**If Mr. Burgess had received TPA, would you agree with me the likelihood of him having a secondary clot would have been reduced?**
MR. DRAHOS: Object to the form.
DEPONENT: I would say that having

received IV TPA, probably less chances of having another clot. I cannot say absolutely whether that would have happened or not.

BY MS. LOBEL:

**Q. Sure.**

A. But certainly that's one of the reasons why we give IV TPA.

**Q. So it would be fair to say if Richard Burgess had been able to have -- well, strike that.**

**If Richard Burgess had TPA, it would be more likely than not that secondary major stroke occluding the basilar artery would not have occurred.**

MR. DRAHOS: Object to the form.

You may answer.

DEPONENT: Probably. Probably.

BY MS. LOBEL:

**Q. Now, is the initial stroke that Mr. Burgess had suffered typically had he been able to have TPA, is something that people typically recover from?**

MR. DRAHOS: Object to the form.

DEPONENT: In the kind of stroke he

had, more likely than not, he would
probably have recovered the mild weakness
he had, not much of the vision. The vision
had been probably something that -- I'm not
saying it would have been forever, but he
probably would have been left with some
sort of permanent visual handicap.
BY MS. LOBEL:
**Q. However, his cognitive abilities would**
**have been intact.**
A. Yes.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
**Q. His ability to walk would have been**
**intact.**
A. Very likely.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
**Q. His ability to talk would have been**
**intact.**
MR. DRAHOS: Object to the form.
DEPONENT: Very likely.
BY MS. LOBEL:
**Q. His ability to more or less live a normal**
**life would have been more likely.**

MR. DRAHOS: Object to the form.
DEPONENT: A normal life without driving, I don't know, but certainly not the way he ended up.
BY MS. LOBEL:
**Q. The catastrophic fallout would not have been -- well, strike that.**
**What he would have been left with would have been a life he could have lived, an independent life, as opposed to being fully dependent on full-time care on another.**
MR. DRAHOS: Object to the form.
DEPONENT: More likely.
BY MS. LOBEL:
**Q. Now, with regard to -- you had made a comment that you thought it might be possible that there was some chronicity to the filling defect, if you had the benefit of seeing a previous study from December that showed that he didn't have the filling defect, would that change your opinion?**
MR. DRAHOS: Object to the form.
THE DEPONENT: It would have changed my opinion on whether it was preexisting or not, but it would have not changed the

manner of care.
BY MS. LOBEL:
**Q. Have you treated other patients from cruise ships before?**
A. Yes.
**Q. How many times, would you say?**
A. I cannot tell you how many times, but he was not the first patient that I accepted from a cruise ship. I have accepted quite a few of them. I don't know how many.
**Q. Have you had patients from Royal Caribbean cruise ships before?**
A. I don’t even know the names of the cruise ships, to be honest with you.
**Q. Okay. Fair enough.**
**In the other times that you’ve received patients from the cruise ships, have you administered TPA?**
MR. DRAHOS: Object to the form.
THE DEPONENT: No.
BY MS. LOBEL:
**Q. Why is that?**
A. Most of time, patients that I personally accepted from the cruise ships were not necessarily strokes. They thought they were

strokes, but they were not strokes. So, no. I did not administer any TPA to anybody that I accepted from a cruise ship.

**Q. Have you ever treated any crew from the cruise ships as opposed to a passenger?**

A. Gosh. I don't remember that.

**Q. Okay. Fair enough.**

**Just double checking I didn't miss anything, doctor. Bear with me.**

A. No. No problem.

**Q. I appreciate it.**

**Oh, do you know a doctor by the name of Dr. Camilo Gómez?**

A. Camilo? Yes. I know Camilo.

**Q. How do you know him?**

A. I know Camilo for a number of reasons. Number one, he was one of the pioneers in endovascular kind of treatment for stroke. You know, I'm a little bit old. I am 56. I'm getting to 60, so I know a lot of people. And so he started actually doing this kind of thrombectomy treatments like 25, 30 years ago. He was truly a pioneer. I think at that time he was at University of Alabama or close by.

But how I met him in person, because back in

2016 I got an interview at Loyola University in Chicago because I wanted to move to work with Dr. Biller, with the chairman of neurology at Loyola. And he was my mentor and he was my -- I trained with him at Indiana University. So he offered me an attending position, so I went in 2016 to interview with Biller and I met Camilo there.

That was the first and the only time that I saw Camilo. I think, if I remember correctly, like two or three years ago there was a meeting of neuroradiology and we briefly talked at that meeting because we were both invited. I don't know him in person. I never socialized with him. But I met him in the interview. Yes. I met with Camilo in the interview.

**Q. Do you know if Dr. Gómez trained with any of the same doctors that you trained with?**

A. I don’t think Camilo trained with Biller because he’s older than me. No. I think he worked for some time with Biller at Loyola University but I don't know for how long he stayed there because I didn’t join the program, so I lost track of him.

**Q. Do you know anything about Dr. Gómez’s**

**current practice or his practice in, say, the last five years?**

A. I have no idea.

**Q. Understood.**

(Whereupon, a discussion ensues about A/C.)

MS. LOBEL: Doctor, that's all I have for you in cross examination, unless something really peculiar comes up on redirect. But I appreciate your time.

THE DEPONENT: No problem at all. No problem at all.

ADDITIONAL EXAMINATION

BY MR. DRAHOS:

**Q. Doctor, I want to work my way back through some of your answers on cross exam. You had talked earlier about the fact that HIMA administers TPA somewhere around 120 patients a year. Do you recall that testimony?**

A. Yes.

**Q. And are you aware of a Dr. Rafael Rodríguez Mercado?**

A. Yes.

**Q. Dr. Rodríguez Mercado served as the Secretary of Health here for Puerto Rico.**

A. Yes.
Q. And Dr. Rodríguez Mercado gave an interview with El Nuevo Día, that’s a newspaper here in Puerto Rico?
A. Uh-huh. A newspaper.
Q. And, actually, you’ve done some interviews with them as well, I’ve seen.
A. Yes.
Q. And if Dr. Rodríguez Mercado was quoted of saying that only 8 percent of 5,000 stroke cases that are treated per year on the island actually received treatment within the first six hours, that would mean that less than 5 percent of patients who have strokes in Puerto Rico receive TPA, correct?
A. Correct.
Q. Do you have any reason to dispute the accuracy of Dr. Rodríguez Mercado's statistics?
A. No. No. He's correct. Overwhelmingly, over 90 percent of the patients that may qualify for TPA, they don’t get TPA.
Q. And we want to walk out of here clear on a particular part of your testimony. And that has to do with what was in your mind at the time you were evaluating Mr. Burgess.

**And so, wouldn't you agree with me that time was not the determining factor here, whether or not he was going to get TPA?**

MS. LOBEL: Form.

THE DEPONENT: I disagree a little bit. I took everything in consideration by not giving him TPA, time was one of them. But the main one to me was the presence of subarachnoid bleed and the ongoing ischemia. And that, to me, was very evident in the CT.

BY MR. DRAHOS:

**Q. Understood.**

**So you had said that before that this bleed that you saw was the main factor. And so I want to ask you specifically though about the time issue. So if the bleed wasn't such a primary concern of yours, if the ischemia you saw wasn't so significant, you would have delved into that timing issue a lot more in greater detail wouldn't you have?**

MS. LOBEL: Form.

THE DEPONENT: If the patient didn't have a bleed, didn't have those changes that I saw --

BY MR. DRAHOS:
**Q. Yes, sir.**
A. -- and came in the time window, I would have given him IV TPA with my eyes closed.
**Q. But my question is a little bit different.**
A. Ask it again, please.
**Q. So he reported to you that he believed the onset of his symptoms were at 9:30 in the morning.**
A. Correct.
**Q. He came into the hospital at 2:00 o'clock PM, correct?**
A. Um-hum.
**Q. Which means he's right, according to his timeframe, right at the four-and-a-half-hour window, correct?**
A. Yes. Correct.
**Q. So if you didn't see the blood on imaging and if you weren't concerned about the degree of ischemia, would you have double checked that timeframe being that you were so close already even within the timeframe that he was providing to you?**
A. I double checked the timeframe. I know

it was really close of the four hours and a half. If I didn't see the blood in the head, I probably would have extended a little bit and give him IV TPA.

**Q. Okay.**

A. If I didn't see the blood.

**Q. So then the blood was the determining factor.**

A. The blood was -- it threw me off from giving him IV TPA.

**Q. Okay.**

A. Yes.

Remember -- I mean, I'm not sure I can say this, you know. We're in the middle of this situation. But if we pass that time and something goes wrong with giving him IV TPA, we're in a hot spot. And even though we try to do the best for the patients, we are going to be in the hot chair. So that's why we try to obey the rules, because one way or the other we're going to be sitting here. And it's a lot easier to justify what you did by the guidelines and not by what you felt. But in his case, what threw me off about giving him IV TPA was the blood.

**Q. And so that's why you read your own images, because you're the guy that's responsible for that decision, correct?**

A. Correct.

**Q. So even if you had a slight disagreement with the radiologist, it's your call at the end of the day and how you read those films are what is going to ultimately decide.**

A. Why do you think the CT was reread?

**Q. To make sure you answered my question, if there's a dispute between you and the radiologist, your read of the film is going to control the decision.**

A. Unless I have my doubts and I have some questions about what I'm seeing, 99 percent of the time that I administer IV TPA it is my call reading the CT and CTA.

**Q. Now, you had made this comment about how you sometimes recommend to people like, "Just get in the car and drive here because the ambulance is going to take too long." I'm paraphrasing, but do you recall that answer?**

A. Yes.

**Q. And you actually called that illegal advice. Why do you call it illegal advice?**

A. Because, by guidelines, you're supposed to call the 911. Because, let's say that you tell somebody, “Okay. Put him in the car and come to my hospital,” and something happens in the car, the patient goes into a full cardiac arrest, cardiac arrythmia or stops breathing or whatever, they die in the car, and then you're liable. So -- but again, I have to play the system. And I know that the system doesn't work in the patient's favor. So that's why I tell everyone, “Look, what I'm saying I know it's not what it should be.”

**Q. Okay.**

A. “It's not what it has to be, but that's the way it works. My objective is you bring me your family member as soon as you can because if you wait for too long, I'm not going to be able to do a few things,” you know.

**Q. But you wouldn't expect another doctor to take that kind of a chance, would you?**

MS. LOBEL: Form.

THE DEPONENT: No.

By MR. DRAHOS:

**Q. And you would agree that if a doctor put a patient into a car or an Uber and something**

**did happen, that doctor just breached the standard of care.**

A. They will be in big trouble.

**Q. And so earlier, when you were asked what does the ambulance do, what kind of care do they do, they're there in case something goes wrong. Right?**

A. In case something's wrong. Exactly. Because any patient with a stroke can have anything, pretty much.

**Q. So on the day of the incident in question, which is this February 21, 2019 we've been talking about, you don't recall every conversation you had with everyone about Mr. Burgess, do you?**

A. No. No. No.

**Q. And, I mean, you've done the best you can to kind of recreate what occurred and what was said, but couldn't there have been conversations had with individuals that perhaps you weren't involved in and you just have no knowledge of it as you sit here today?**

MS. LOBEL: Form.

THE DEPONENT: Probably. It could have been. Of course.

BY MR. DRAHOS:
**Q. So, I mean, specifically, if the ship doctor were to have testified in this case that he spoke to somebody at HIMA about Mr. Burgess, even though you don't have a recollection, you're not here to say that that didn't happen and the doctor's lying. You just don't know about it, right?**
A. Absolutely. And the reason I say that is because many times the phone call does not go directly to us, it goes to the system that takes all the phone calls. It could have been that they called them apart and somebody told them to call me. So I don't know whether they talked to the -- they called HIMA Health. And whether they talked to them or not, I don't know.
**Q. So there is a system in place for accepting patient transfers at HIMA San Pablo Caguas, correct?**
A. Correct.
**Q. And that system needs to be followed in order for a patient to be sent there.**
A. Yes.
**Q. And so the number of calls and communications that may have taken place before**

**ultimately you got on the phone, you have no knowledge of?**

A. I have no idea.

**Q. But you would expect that in order for Mr. Burgess to have ultimately been delivered that system at HIMA had to have been followed and those phone calls and communications had to have taken place.**

MS. LOBEL: Form.

THE DEPONENT: I think so. I think so. They probably have to follow that because there is no other way. But whether, you know, he came without talking with the HIMA health system or not, I cannot say one way or the other.

BY MR. DRAHOS:

**Q. So if Mr. Burgess was delivered from the Royal Caribbean cruise ship to HIMA San Pablo Caguas via private ambulance, do you think that there could have been anything done differently to get him to HIMA faster in a safer manner than what was ultimately done?**

MS. LOBEL: Form.

THE DEPONENT: I don't remember how long it took. And, the point is, even if

they came faster, with what I saw in the CT, it would not change the way that I treated initially.

BY MR. DRAHOS:

**Q. So you gave some testimony regarding the efficacy of TPA as it relates to the filling defect that was found in the vertebral artery. Do you recall that line of questioning?**

A. Well, I didn't say anything about the rate of efficacy in the filling defect. I just said that it could have been possible that probably TPA could have break the clot and avoid further clotting, but that is a possibility. I cannot say that that was the absolute mandatory result because of TPA.

**Q. So you couldn't state in this case that within a reasonable degree of medical probability had TPA been given he wouldn't have had the second clot, can you?**

MS. LOBEL: Form.

THE DEPONENT: No.

BY MR. DRAHOS:

**Q. So you were speculating when you were being asked those questions.**

A. That’s why I said “probably.” I mean, I

cannot say that that will not happen even if I give TPA.

**Q. I mean, you could have administered TPA and it could have broken up that filling defect into multiple clots, which could have clotted all throughout his brain just as likely.**

A. And it can get worse.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So just as much as you're speculating, "Hey, it may have prevented the second stroke," it could have caused three or four or five strokes as well, correct?**

MS. LOBEL: Form.

THE DEPONENT: That is correct.

It's just, I'm sorry for you guys, but this is not black and white.

MR. DRAHOS: Understood.

Okay. Thank you, doctor.

Are you done?

MS. LOBEL: Oh, I'm sorry.

Let me doublecheck if you're going to give me one more since this is our last shot to talk to him. One second.

ADDITIONAL EXAMINATION

BY MS. LOBEL:

**Q. Forgive me, I don't recall if you mentioned this on direct examination before the official swearing in. In order to prepare today, I know you said you read your notes. Did you do anything else in order to prepare for today's deposition other than reviewing your notes?**

A. No.

**Q. Did you speak with anyone?**

A. No.

**Q. Did you speak with any lawyers? I know you just said you didn't speak with Mr. Drahos, but did you speak --**

A. This is the first time that I met him. No.

**Q. No, no. I understand.**

**But any other lawyers.**

A. No, no. No. No. No. No.

**Q. Did you review any of the images from this patient’s file?**

A. No. I did not review any of the images. I saw the report, but I saw my notes and I remember the imaging quite well. And I saw

Ramos's notes, and I saw Dr. Ávila who is the neurologist who was following the weekend. And that's pretty much it. I didn't read anything else.

**Q. Okay. All right.**

**And when did you review your notes in order to --**

A. Last night.

**Q. Let me get the question out so we've got a clear record.**

A. Oh, I'm sorry.

**Q. It's okay. I know you know what I'm asking.**

**When did you read your notes in order to prepare for today's deposition?**

A. Last night.

**Q. Got it. All right.**

MS. LOBEL: I've got nothing else.

ADDITIONAL EXAMINATION

BY MR. DRAHOS:

**Q. Let me just go back and clarify something just to be thorough about it. All those answers you gave about Mr. Burgess's prognosis when you said that he would have recovered his weakness, and not so much the vision, that he would have**

**recovered his cognition, that he would have been able to walk, that he would have been able to speak and have a normal life, those answers were all presuming that the second stroke could have been prevented. Correct?**

A. Correct. And I didn't say that they were going to happen no matter what. I said it was a possibility. It was a probability.

**Q. So that possibility is just as likely as the possibility that if he had been given TPA he could have had five or six other strokes.**

A. Correct.

**Q. Okay. Thank you.**

COURT REPORTER: It’s 1:33 PM.

(Whereupon, at 1:33 p.m. the deposition concludes.)

DEPONENT'S CERTIFICATE

I, ULISES NOBO, M.D., after reading the within transcription prepared by Verbatim Reporting Puerto Rico, LLC, certify that (yes) _____ *(no) _____ I am in agreement with the contents of same.

In ___________________, Puerto Rico, the ________ day of ___________________, 2022.

________________________________

ULISES NOBO, M.D.,

*NOTE: If the deponent is not in agreement with any portions of the transcription, he must utilize the enclosed Errata Sheet by indicating the page and line number and indicated correction.

ERRATA SHEET

I, ULISES NOBO, M.D., certify that I have read the foregoing transcript of my deposition taken on October 25, 2022, and have signed it subject to the following changes, if any:

| PAGE | LINE | CORRECTION |
|---|---|---|
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |
| _____ | _______ | ____________________________________________ |

______________________________________ ____________________

ULISES NOBO, M.D., DATE

Sworn and subscribed to on this _____ day of

______________, 2022.

CERTIFICATE OF NOTARY PUBLIC

I, GRETCHEN ALVARADO, ESQ., Notary Public duly commissioned and qualified in and for the Commonwealth of Puerto Rico,

DO HEREBY CERTIFY that the court reporter and the deponent were duly sworn before the commencement of the taking of the deponent's testimony.

IN WITNESS WHEREOF I sign these presents and affix my notarial seal in San Juan, Puerto Rico, this

_______________ day of ______________________, 2022.

_____________________________________

GRETCHEN ALVARADO, ESQ.

REPORTER'S CERTIFICATE

I, KATERINA CAYERE DÍAZ, Court Reporter, do hereby certify that the following transcript is a full, true and correct record transcribed by me.

I further certify that I am not interested in the outcome of the case named in said caption.



KATERINA CAYERE DÍAZ

**0**

**0** 42:8,12, 14 60:7,12 61:1

**0.9** 102:1

**1**

**1** 51:2 61:5,6,7, 13,16 102:4,24

**1.3** 100:18

**10** 31:5 34:22 61:9,14 95:5,9 102:3

**100** 70:13 86:21 87:5

**11:24** 30:5

**120** 86:5,9, 12,21 87:5 115:18

**13:59** 55:10, 12

**15** 20:4,5

**1984** 6:17

**1990** 6:17 7:11 17:7

**1994** 6:23

**1995** 6:24

**1998** 7:1,2 9:3 17:20

**1999** 7:1,2, 3 17:24

**1:33** 129:14,15

**2**

**2** 60:8,18

**20** 20:4,6 34:22 103:1

**2001** 7:3

**2007** 5:17 16:15 86:18

**2014** 23:21

**2015** 23:20

**2016** 114:1, 7

**2017** 5:8, 15,19,21 16:16,18

**2018** 5:7,22 85:24 86:3,5,20

**2019** 4:24 16:9 19:9 20:17,24 21:7,15 22:3,4 23:19,21 26:2 27:15 28:1,15 29:11,17, 22 30:12 31:10,24 32:13 50:5 51:20 53:1,5 55:5,22 59:7 61:20 63:3 66:17 84:17 86:5,20 122:12

**2020** 4:21 16:5 21:24

**2022** 4:2 84:12

**21** 55:22 66:17 122:12

**21st** 51:19 54:3 55:5 59:7 61:20 63:3 69:10,19

**239** 55:6,7 62:23

**25** 4:2 113:22

**2:00** 18:14 72:9 118:12

**3**

**3** 41:13,14 42:8,9,10, 12,14 60:7,13,22 106:2,3

**3.5** 101:25

**30** 20:6 113:22

**4**

**4** 61:1

**4.5** 36:12 41:13,14 42:9,10,14 43:2,4,6, 12,14 44:6 106:2,3

**45** 61:14

**5**

**5** 31:5 61:14,15, 18 90:3 98:14 116:13

**5,000** 116:10

**56** 113:19

**5:00** 72:12 75:11

**6**

**6** 59:14,17, 19,23 60:5 70:4

102:8,14

**60** 102:2 113:20

**6:00** 18:14 72:12 75:11

**6:30** 75:11

**7**

**7** 60:20

**8**

**8** 116:10

**80** 34:16

**9**

**90** 34:16 61:9 102:2 116:20

**90s** 58:16

**911** 30:16, 17,19 31:23 90:2 100:7,9 121:2

**99** 28:5 120:15

**9:30** 55:25 56:20 118:9

**A**

**A/c** 115:6

**abilities** 110:9

**ability** 110:14,19, 24

**ABM** 35:19

**absence** 39:25

**absolute** 88:10 125:14

**absolutely** 39:22 50:19 80:2 109:3 123:9

**abundantly** 87:23

**accept** 30:2, 3,8

**acceptable** 48:12

**accepted** 32:19 42:2 52:15 106:20 112:8,9,24 113:3

**accepting** 94:16 123:18

**access** 26:19 75:5 80:14 81:5

**accessed** 48:23

**accounts** 34:16

**accreditation** 22:12 25:7

**accredited** 22:7,8

**accuracy** 116:18

**accurate** 70:1 100:12 101:4,17 102:10

**activate** 30:19,20 53:11,13

**activated** 31:25

**activation** 100:7

**activator** 20:14

**Actively** 21:8

**acute** 82:16 100:3,4

**add** 82:7

**added** 5:19

11:9 16:18 42:10

**addition** 20:11 53:12 56:1 58:4 61:24 66:1

**additional** 11:8 41:24 42:5 74:6 115:13 127:1 128:19

**administer** 32:8 45:6 46:25 101:13 102:15,16, 21 103:2 104:19 113:2 120:16

**administered** 77:15 86:1 112:18 126:3

**administering** 20:14 28:1 92:7 99:17

**administers** 115:18

**administration** 25:12 85:22 100:22 101:21

**administrative** 25:25

**admission** 79:5

**admissions** 25:22

**admitted** 71:22 72:10,16, 22

**advance** 51:12

**advice** 90:6 120:25

**affect** 39:2

**affected** 60:19,20 68:14 69:5

**affecting** 70:23

**affects** 10:9

**affiliated** 21:17

**affiliation** 23:8

**agency** 23:6

**agree** 37:13, 20 49:25 82:23 98:18 108:22 117:1 121:24

**agreement** 79:8

**ahead** 12:10 19:2 28:19 33:4 49:21

**Aires** 6:15, 16 7:11

**Alabama** 113:24

**alert** 92:17

**alive** 50:11

**alleviate** 35:7,24

**alteplase** 100:22 101:14,21 102:1

**alteration** 33:21

**alternative** 39:7

**Alvarado** 12:23

**ambulance** 29:18,23 30:8,11, 18,20 31:4,5,11, 24 32:13, 20 53:7 89:11,15, 19,21,22 90:3,12,16 91:5,15, 19,23,24 92:3,6,20 93:1,17 95:15 120:21 122:5 124:19

**ambulances** 89:8

**American** 99:18

**amount** 94:21

**analysis** 43:12 67:3

**and/or** 101:11

**anesthesiologist** 79:19

**aneurysm** 35:15

**aneurysms** 26:24 35:18

**Angeles** 6:25

**angio** 79:22

**angiography** 68:4 73:25

**another's** 39:25

**answering** 11:22 14:14

**answers** 98:3

115:16 128:22 129:3

**antiplatelet** 67:8

**antithrombotic** 70:16,22 77:14 82:9,13,19

**antithrombotics** 82:16

**anymore** 83:24

**apologize** 97:22

**applied** 8:17 23:17

**applies** 10:4 42:9

**apply** 8:6 42:13

**applying** 7:25 22:19

**APPM** 10:21

**approve** 23:3

**approved** 38:2 41:8, 15,19,22, 25 105:25

**approximate** 86:13

**approximately** 5:21 6:19

21:24 38:18 55:24 72:4,9 86:5 94:10,14 96:2

**arbitrary** 41:5

**area** 8:9 9:12,25 18:24 39:18 45:1 48:14 55:18 64:7

**areas** 18:6 48:11 58:18

**Argentina** 6:11 7:18 17:5

**arm** 60:3,4, 24 61:5, 11,21 93:2

**arms** 75:23, 24

**arose** 56:24

**arranged** 101:1

**arrest** 92:15 121:6

**arrival** 94:17 107:17

**arrived** 53:7 54:2 55:16,23 60:5 87:24 95:2 97:23

**arriving** 68:5

**arrythmia** 121:6

**arteries** 10:7 39:17 48:1,18 68:3,17,20 70:23 79:1

**artery** 33:24,25 34:10,19 36:20,23, 24 38:12 39:16 48:6,22 63:10,16, 19 68:24 69:6,7,19, 23 70:3,10 74:4,11, 12,18,20, 22 75:14, 18 76:7, 13,16,23 77:8 78:13,15, 18,20,22 79:7 80:14,16 81:1,13, 14,24 82:4,20 109:14 125:7

**artificial** 41:4

**ASA** 99:19

**aspirin** 67:9 70:17,18

**assessment** 58:13 62:3

**assign** 59:2

**assigned** 59:22

**Association** 99:18

**assume** 7:22 15:15 51:22

**attempt** 27:7 37:1 58:23

**attempted** 70:9

**attempts** 40:13 80:7

**attending** 51:25 114:6

**attention** 68:1

**attorney** 12:23

**audit** 22:13 24:5

**Automatically** 44:9

**average** 86:4,10,13

**avoid** 35:10 66:25 78:23 125:12

**avoiding** 46:3

**awake** 76:2

**awakened** 56:15

**aware** 52:22 115:21

**B**

**back** 4:24 5:17 6:4 7:6 14:10 15:21 16:24 17:2 19:9 20:17,24 21:6,15 22:2,4 26:1 27:15 29:17,21 31:10,23 32:13,23 36:14 49:7 50:4 52:25 53:4 62:23 63:6 67:6 68:15,17,

18 84:17 86:17 98:9 104:3 113:25 115:15 128:21

**background** 6:8 15:23 16:25 83:13 85:22

**balance** 45:22

**band** 54:16

**base** 103:11

**based** 23:3 39:25 54:7 59:1 64:10 87:8 88:22 99:2 104:19

**baseline** 40:11,20 102:7

**basic** 91:25

**basically** 36:4

**basilar** 74:12,18, 20,22 75:14,18 76:7,16,23 77:8 78:15,18, 22 79:6 80:14 81:13,14, 24 82:4, 12,20 109:14

**bathroom** 40:22

**Bear** 113:9

**bed** 40:13 61:10,12, 17

**began** 40:8 57:24 86:17

**beginning** 52:3

**believed** 63:23 65:8,13 66:6 118:8

**Bell's** 60:20

**belong** 83:20

**benefit** 6:7 43:8,11, 13,15 62:12 90:9 111:18

**big** 27:6 30:14 48:6 105:10 122:3

**Biller** 114:3,7, 19,21

**bit** 11:20 14:20 15:22 20:10 29:14 32:24 36:14 37:9 38:5 47:8 61:11 75:9 85:21 87:1 113:19 117:6 118:5 119:3

**black** 126:17

**bleed** 44:25 64:22 65:4,11,13 88:17 98:10 117:9,14, 17,24

**bleeding** 10:6 34:1 35:3,7,12, 18,19 43:16 44:15,18, 24 45:2,18 53:22 66:22 74:2 88:11 102:25 103:1,7 105:8

**block** 34:8

**blockage** 36:19 70:2 74:4 80:16,20

**blocked** 33:24 34:11

**blocking** 36:24 48:6 68:24

**blood** 33:14, 15,21,23 34:2,11,14 36:8,20,25 37:4,7,16, 22,25 39:8 63:11 65:12 66:1,2,6, 18 67:5, 23,25 68:5,16 69:24 74:23 75:18 76:3,8 88:6 98:15 103:3,4,5 104:10,16 105:6,10 118:19 119:2,6,7, 9,25

**board** 10:22, 25 11:7,13 18:5,10

**body** 40:17

**bolus** 102:4

**borrowing** 41:11

**brain** 10:9 19:20 26:19,21, 24,25 27:7 33:11,13, 15,19,22, 23 34:2,4, 12,15 35:8,15, 18,24 36:10,18, 20,21 37:1,6,15, 21 38:7, 12,13,19, 22 39:9,11 44:19 45:1,19 48:11 53:22 58:19 63:6,8,11, 12,25 64:2,7,22 65:12 66:23 67:7,22,25 68:2,6,14, 15,16,18 69:1,25 70:24 74:1 75:20,22, 24 79:3 88:8 103:3 108:12 126:6

**brains** 19:11

**brainstem** 74:21,23 75:19 76:1,6,8

**brain's** 48:8

**branch** 22:17 39:17

**breached** 122:1

**break** 15:17 36:7,24 71:9 125:12

**breathe** 76:3

**breathing** 73:9 121:6

**briefly** 68:22 114:12

**bring** 121:15

**broad** 18:11 27:3

**broke** 33:25

**broken** 126:4

**brought** 32:6

**budget** 31:18,19

**Buenos** 6:15, 16 7:11

**building** 86:19

**Burgess** 50:3,5,7 52:4,22 54:2 55:4, 15,21 57:12 59:8,22 61:20,25 62:17 64:5,12 66:7,14 68:14 70:19 71:22 76:19 77:7 79:11 83:18 87:23 88:4 89:18 92:24 94:17 95:14,19, 25 96:8 97:23 107:4,19 108:19,21 109:10,12, 21 116:25 122:15 123:4 124:5,17

**Burgess's** 63:1 71:18 128:23

**Burgess's** 66:22 72:5 79:17,20

**burst** 34:7, 19

**business** 85:8

**buster** 36:5

C

**Caguas** 4:11, 12,14,25 5:1,13 16:12 20:18 21:10,14, 18 22:2,4, 11 26:2,10 27:16 28:2,15 32:15 49:9 50:4 51:14,20 52:25 54:3 66:16 68:7 76:15 77:8 84:5,6 85:3,13,19 87:24 90:19 95:10 107:3 123:19 124:19

**California** 8:24 9:8

17:18,24

**call** 9:19 15:18 18:14,21 20:22 29:24 30:19 31:4,23 32:11 34:12,15 39:16 46:24 49:19 52:4,13 53:11 57:16 68:3 75:10 90:2 94:11,12, 16 120:6, 16,25 121:2 123:10,14

**called** 10:12 30:1 35:12 36:5 52:6, 16 63:17 64:22 72:14 73:2 75:3 77:24,25 78:2 80:8 84:19 95:1 120:24 123:13,15

**calling** 84:11

**calls** 52:11 123:12,24 124:7

**Camilo** 113:13,14, 16 114:7, 10,16,19

**candidate** 48:10 78:14

**capabilities** 24:9 25:1, 3 32:9

**capability** 19:10 68:8

**capable** 22:15 26:14 61:21 100:23

**capably** 101:13

**capacity** 4:17 16:5 51:23

**car** 31:6 90:4,17 93:19 120:20 121:3,5,7, 25

**cardiac** 92:15 121:5,6

**cardio** 91:24

**care** 22:16 23:10,12 32:9,15 42:12 50:12 67:2 71:4,17,21 72:1,5 85:9,12 87:18,25 90:18 91:6,15,19 92:3 93:15 100:19,21, 22,25 104:18 105:12,13 106:4 107:10 111:11 112:1 122:2,5

**career** 99:4

**careful** 17:2 88:13,16

**Caribbean** 112:12 124:18

**carotid** 10:7

**carry** 24:17

**case** 30:1 49:18 57:11,24 61:12 62:16 78:7 79:5 97:4 119:23 122:6,8 123:3 125:16

**cases** 116:11

**CAT** 20:4 53:18,20 63:5,7 67:21

**catastrophe** 76:9

**catastrophic** 78:22 111:6

**categories** 60:6,24

**catheter** 26:20 48:19

**causally** 65:14

**caused** 35:14 65:23 126:12

**causing** 19:20 44:16 73:15

**caution** 47:1

**cautious** 12:13

**Cayere** 13:5

**center** 4:11

5:6,9,12, 17 16:1,15 22:5,9,12, 20,21 24:1 29:10 41:16,20 51:23 106:3

**centers** 100:23

**cerebral** 9:18 63:16,19 69:5

**cerebrovascular** 9:14 18:2

**certification** 10:22 11:13 22:19 23:4,15 24:2 25:2

**certifications** 18:5

**certified** 10:25 11:7 18:10 22:21 23:20,22 25:11 86:14,16

**chair** 119:19

**chairman** 114:3

**challenges** 29:15

**chance** 28:16 47:2 71:11 97:25 105:17 121:20

**chances** 31:7 37:11 90:11 109:1

**change** 72:2, 6 73:3,12 111:21 125:2

**changed** 74:1,15 111:23,25

**charge** 75:20

**chart** 51:5 53:25 54:8 75:10

**check** 92:1

**checked** 118:21,25

**checking** 113:8

**Chicago** 114:2

**chief** 7:2 9:4,6 17:22 86:23

**chronic** 81:10

**chronicity** 80:19 111:17

**circulates** 36:9

**circumstances** 96:7 104:20

**clarify** 40:5 103:18 128:21

**classical** 40:11 60:17

**clean** 24:7

**clear** 15:9, 22 87:23 116:22 128:10

**clinical** 70:19

**clinician** 37:21

**clinicians** 82:3

**clipped** 38:11

**close** 72:10 113:24 118:22 119:1

**closed** 118:4

**closely** 27:5

**closest** 101:12

**clot** 27:8 36:5,24 47:24 48:3,6,17 68:23 69:4,7 80:23 81:4,7,11 108:23 109:2 125:12,19

**clots** 26:23 27:6 36:8 48:21 81:8 126:5

**clotted** 126:5

**clotting** 125:13

**codirector** 4:10 5:20 15:25 16:19 51:23

**codirectors** 5:9

**cognition** 129:1

**cognitive** 110:9

**coherent** 92:17

**collateral** 39:17
**collaterals** 39:2,6,7, 9,21 40:1 64:6
**colleague** 26:4 83:8 86:24
**colleague's** 50:25
**college** 6:9, 12
**comfort** 19:10
**comment** 111:16 120:18
**Commission** 22:17,22 23:6 24:22
**common** 34:18 85:7 108:11
**communicated** 50:14 52:8 106:12
**communication** 106:13
**communications** 123:25 124:7
**company** 32:20 52:16
**compared** 33:12 38:2 86:25
**complete** 13:3,12 14:22
**completed** 6:23 8:15, 22 9:2,3 17:20
**completely** 23:12 30:25 38:22,25 69:23 98:12,20
**completes** 9:18
**completing** 84:10
**completion** 9:6
**complex** 37:9
**comply** 25:11
**component** 81:11
**Composite** 50:22,24
**comprehensive** 22:20 100:24
**concern** 117:18
**concerned** 89:14 118:20
**concludes** 129:16
**concussion** 104:11
**condition** 71:2 72:2, 6 73:3,12 81:16
**confer** 7:13
**confidence** 28:5
**confident** 57:25 58:2
**confined** 79:3
**confirmed** 47:20
**Connecticut** 6:23 8:14 17:13
**consciousness** 73:7 74:14 104:9 105:5
**consent** 41:18 79:19,20
**consequence** 36:18 73:13
**consideration** 90:7 117:6
**considered** 10:2 63:20 65:19,24
**consist** 100:20
**constitute** 70:3
**contact** 54:9
**content** 106:13
**context** 50:18
**Continental** 52:17
**contraindicated** 65:25
**contraindication** 43:20 44:1,12, 14,20,22 65:20 66:3 88:10 103:2,8 105:11
**contraindications** 43:24
**contrast** 68:22,25
**control** 120:13

**controls** 76:3

**controversial** 38:5

**conversation** 11:23 14:19 57:2 73:6 94:8 96:16 106:17 122:14

**conversations** 122:19

**converse** 14:18

**copy** 95:16

**correct** 4:22 5:14 7:12, 19 8:18,25 9:10,15,16 11:11 16:6,16, 17,19 17:24 19:3 21:10,11, 16 23:7 24:3,6 25:5 27:14 29:6 32:9 34:10 39:19,22 42:1 43:15 47:9 55:13 56:12 58:25 59:3,6 60:14 61:3 62:4,14,15 63:18 65:16 66:9 69:17 71:3 77:9,10 80:17 87:21 90:5 91:21 93:17 95:16 97:10 99:24 100:5,7 101:21 105:13 108:10,13, 18 116:15, 16,19 118:11,13, 17,18 120:3,4 123:19,20 126:13,15 129:5,6,12

**correctly** 30:1 54:12 89:24 114:10

**cost** 78:23

**could've** 23:20

**counsel** 87:8

**count** 40:7

**court** 11:24 12:17,24 13:2,5,9 14:16 54:21 129:14

**covered** 87:7

**crap** 31:14

**crew** 113:4

**criteria** 42:11,16 43:8,19 47:15,18, 21 49:4,6 87:13,14, 15,18 99:15 102:8,14, 24

**cross** 104:14 115:8,16

**cruise** 52:6, 14 57:14 94:9 95:15 106:11 107:3 112:4,9, 12,13,17, 24 113:3,5 124:18

**CT** 61:25 62:20,22 63:13 68:3,4 73:24,25 75:6 97:17,19, 24 117:11 120:9,17 125:2

**CTA** 67:13, 14,20,24 68:4,8,9, 10,12,19 69:13 73:25 74:3 75:6 120:17

**current** 4:9 115:1

**cut** 39:16

**cuts** 31:18

**D**

**damage** 33:10,14, 16,18 35:24 36:23 37:2 38:6,7,13 39:11 49:8 63:9 64:4

**damaged** 38:19

**damages** 33:12

**Danbury** 6:22 8:12,13 17:13

**day** 30:25 46:22 47:13

Case 1:20-cv-20687-AOR Document 127-5 Entered on FLSD Docket 01/26/2023 Page 144 of 174


72:10 120:7 122:11

**days** 56:3, 11 65:1,16 98:14 104:4

**dead** 63:25 90:9

**dealing** 89:25

**death** 45:19

**December** 111:19

**decide** 120:8

**deciding** 66:24

**decision** 18:15 20:7,12,20 49:22 120:3,13

**decisions** 18:13 49:17 62:11

**deck** 57:14

**declared** 14:6

**decreased** 73:8

**defect** 69:16,18, 22 70:9 78:13,19 79:1 80:22 81:2 111:18,20 125:7,10 126:4

**Defendant's** 50:22,24

**defer** 79:24 93:11

**defibrillator** 24:17

**deficits** 56:6

**definitive** 58:6

**definitively** 66:7 77:7

**degree** 7:14, 17 80:20 83:3 118:20 125:17

**degrees** 61:9,14

**delicate** 20:2 33:7

**deliver** 32:1 39:8

**delivered** 32:14 66:16 124:5,17

**delved** 117:19

**depend** 92:13

**dependent** 111:10

**Depending** 30:7

**depends** 35:3 92:11,14

**deponent** 4:7,10,15, 18,22,25 5:2,5,14, 16,21,25 6:3,10 7:12,15, 19,24 8:3, 6,10,13, 18,21,25 9:3,10,13, 16,21,24 10:3,14, 17,20 11:1,3,11, 15,18 12:1,25 13:10,13, 17 19:3 28:20 29:8 33:5,8 54:17 71:12 77:18 83:9 84:8 87:13 88:3 89:3 90:21 91:9,18 92:11 93:6,23 94:19 95:8 98:3,23 99:6 100:15 101:7,23 102:12,18 103:14 104:8,22 105:15 106:16 107:6,13 108:2,25 109:18,25 110:22 111:2,13, 23 112:20 115:11 117:5,23 121:22 122:24 124:10,24 125:21 126:15

**deposition** 11:17 13:1,22 50:23,25 51:2,7,17 52:3 127:8 128:15 129:16

**depositions** 12:2

**deprive**

105:9

**depriving** 34:2

**describe** 61:6

**designed** 58:16 71:1

**detail** 32:24 117:20

**details** 80:10 93:7 106:17

**determine** 29:5 37:15,24 49:12 54:7 57:23 99:16 102:9

**determined** 41:5 49:10

**determines** 42:4

**determining** 66:23 95:23 117:2 119:7

**developed** 57:8 71:21 100:19

**development** 98:19

**diagnosed** 79:7

**diagnosis** 78:1

**diagnostic** 19:5,10

**didn't** 28:20 69:11 72:17 95:10 113:8 114:23 117:23,24

**die** 37:6 121:7

**differ** 18:9 39:20,24

**difference** 38:24 39:6 78:16

**differently** 124:20

**difficult** 46:24

**difficulties** 29:18 69:2

**dig** 40:19

**direct** 89:7, 25 97:8 105:24 107:15 127:4

**directly** 33:14 52:9

55:15 66:16 123:11

**director** 5:6,12,17 16:14 23:25 29:10

**disagree** 117:5

**disagreement** 120:5

**disaster** 46:11

**discern** 56:22

**discuss** 49:18

**discussed** 7:8 87:22 106:14

**discussion** 55:19 115:5

**diseases** 10:5

**dispatch** 100:10

**dispatchers** 100:9

**dispute** 116:17 120:11

**disqualify** 43:23

**disrupt** 34:13

**disrupted** 37:5

**distantly** 70:3

**distracting** 33:5

**doctor** 49:12 51:5 55:2 71:16 83:7,12 90:15 106:22 107:3 113:9,12 115:7,15 121:19,24 122:1 123:3 126:19

**doctor's** 123:7

**doctors** 114:18

**document** 47:22

**documented** 72:13 93:9

**doesn't** 10:23 79:4

**don't** 12:15

19:25 23:10,12 28:22 29:2 83:24 105:10 112:13 114:19 116:21

**dose** 102:2, 3

**double** 113:8 118:21,25

**doublecheck** 126:22

**doubt** 53:25

**doubts** 120:14

**Drahos** 4:5, 8,13,16, 20,23 5:1, 3,11,15, 18,23 6:1, 4 7:5,13, 16,20 8:2, 4,8,11,15, 19,22 9:1, 5,11,14, 17,22,25 10:11,15, 18,25 11:2,5,12, 16,19 12:3,6,9, 16,19 13:23 14:8 19:4 28:23 29:3,13 34:5 51:4 54:15,23 55:1 71:8, 15 77:20 83:6 84:7 87:12 88:2 89:2 90:20 91:8,17 92:10 93:5,22 94:5,18 95:7 98:2, 22 99:5 100:14 101:2,6, 15,22 102:11,17 103:13 104:7,21 105:14 106:15,24 107:5,12 108:1,24 109:16,24 110:12,17, 21 111:1, 12,22 112:19 115:14 117:12 118:1 121:23 123:1 124:16 125:4,22 126:9,18 127:14 128:20

**dramatically** 74:15

**drift** 60:3 61:10,11

**drip** 93:1

**drive** 91:6 120:20

**driving** 111:3

**droopy** 60:2

**drug** 36:9

**drugs** 24:18 92:9

**due** 31:20 74:16

**duly** 14:5

**dying** 35:10

**Día** 116:3

**Díaz** 13:5

**E**

**earlier** 37:3 40:3 62:10 63:22 65:18 73:11 77:5 78:12 98:14,21 115:17 122:4

**early** 58:16 72:11 73:2 75:3,12 96:13

**easier** 15:2 119:21

**easily** 30:7 81:8

**easy** 105:18

**educational** 6:8 16:25

**effective** 48:15

**efficacy** 125:6,10

**efficiency** 43:4

**effort** 76:22

**El** 116:3

**elapsed** 94:15

**elementary** 36:15

**eligibility** 102:9

**eligible** 103:12 104:6

**else's** 97:5

**embarrassed** 89:10

**embolizations** 26:25

**emergency** 23:2 25:14 31:20 53:8,15,16 54:4,13 72:23 94:22,24 95:2 100:21 107:24 108:5

**employed** 4:23 21:9

**EMS** 100:18 101:9

**enables** 8:4 9:19

**end** 30:25 64:3 85:4 88:1 120:6

**ended** 21:23 52:11 65:1 80:24 81:19,22 111:4

**endovascular** 26:5,9,13, 15,17,18 27:2,11, 17,22 35:17 47:8,9,12, 19 48:5 49:4,13 64:13 77:4,23 78:14 79:9 100:24 113:18

**ensues** 115:5

**enter** 7:21

**entered** 87:24

**entire** 19:24 38:7 60:19 74:11 83:17

**entirety** 11:25

**epidural** 103:6

**equipped** 76:15

**ER** 107:17 108:6

**err** 46:25

**essentially** 85:8

**established** 41:6

**Europe** 41:12

**European** 106:1

**evaluate** 73:25 96:3

**evaluating** 116:25

**evaluation** 71:18

**event** 40:9, 10 44:4 67:6 76:1, 6,19

**eventually** 82:5 97:17

**evidence** 38:14,18 44:18 47:22 57:11 67:6

**evident** 117:11

**evolution** 81:15,17, 18,21

**evolutions** 99:3

**evolve** 99:7

**evolving** 98:9 99:11

**exact** 106:10

**exam** 7:25 58:10 61:24 115:16

**examination** 14:7 58:17 83:10 89:7,25 97:8 105:25 107:16 115:8,13 127:1,4 128:19

**examined** 14:6 89:17

**exams** 6:20 7:21

**exception** 69:2

**excessive** 43:16 44:15,24 45:18 94:20

**exclusion** 42:11,15 43:18 49:4,6 87:15 102:24

**excused** 13:21

**Exhibit** 50:22,24 51:2

**expect** 121:19 124:4

**expecting** 82:11,14 108:5

**expedite** 61:25

**expedited**

62:4

**experience** 30:3 99:2

**experiencing** 29:18 65:16 92:18

**explain** 33:2 49:19,24 68:13

**explaining** 79:17

**explosion** 54:20

**extended** 57:15 119:3

**extending** 74:12

**extremity** 61:8

**eye-witnessed** 57:19

**eyes** 76:4 118:4

**eyewitness** 57:5 58:3, 5

**F**

**face** 60:2, 19,22

**facial** 60:13,15, 17

**facilitate** 29:22 32:21

**facilitating** 29:15

**facilities** 100:21 101:13

**facility** 22:11 24:5 31:3 32:2, 7,10 68:7 83:19

**fact** 7:21 26:12 32:17 40:3 67:4 81:9 86:21 88:23 115:17

**factor** 43:23 66:23 117:2,15 119:8

**factors** 48:24 49:1

**fail** 23:4 24:15,20

**failed** 48:7

**fair** 28:3 87:10 90:14 91:4 95:18 96:21 109:9 112:15 113:7

**fairly** 57:25 81:8

**faithfully** 13:7

**fall** 56:4

**fallen** 56:2

**falling** 61:11

**fallout** 111:6

**familiar** 14:11 31:18 32:25 47:11,14

**families** 31:2

**family** 40:22 41:18 90:25 121:16

**fast** 25:16 73:18 99:9 108:15

**faster** 124:21 125:1

**favor** 121:10

**fax** 75:5

**FDA** 38:2 41:8,15, 19,22,25 105:25

**February** 4:24 16:9 19:9 20:17,24 21:7,15 22:3,4 26:2 27:15,25 28:14 29:17,21 31:10,24 32:13 50:4 51:19 52:25 53:5 54:3 55:5, 22 59:7 61:20 63:2 66:17 69:10,19 122:12

**fed** 37:6

**feed** 39:18 64:7

**feeding** 45:3

**feel** 45:13 47:2

**feeling** 57:17 95:20

**fell** 56:7

65:2 104:2

**fellowship** 7:4 9:9,18 18:1

**felt** 119:23

**female** 94:9

**fibers** 75:21

**field** 8:20 18:12,24 27:2,11,12 60:1

**figure** 15:4 55:3

**file** 127:22

**filling** 69:16,18, 22 70:9 78:13,19 79:1 80:22 81:2 111:17,20 125:6,10 126:4

**film** 97:6, 15 120:12

**films** 19:6, 16 20:11 64:11 96:23 97:4,5 120:7

**find** 24:16 30:8 36:8 96:8

**finding** 66:5,22

**findings** 74:9,10

**fine** 51:11

**finer** 7:8

**fire** 45:3

**flags** 105:21

**floor** 44:8

**flow** 33:14, 15,21,23 34:3,11,14 36:20,25 37:4,16,22 39:8 63:11 68:16,21 69:24 74:23 75:19 76:8

**flown** 66:14

**focus** 19:21 24:22

**focused** 58:17

**follow** 102:18 124:11

**follow-up** 83:12

**forever** 39:13 90:12 110:5

**Forgive** 127:3

**forgot** 106:9

**form** 19:1 28:18 33:3 77:17 84:7 87:12 88:2 89:2 90:20 91:8,17 92:10 93:5,22 94:3,5,18 95:7 98:2, 22 99:5 100:14 101:2,6, 15,22 102:11,17 103:13 104:7,21 105:14 106:15,24 107:5,12 108:24 109:16,24 110:12,17, 21 111:1, 12,22 112:19 117:4,22 121:21 122:23 124:9,23 125:20 126:8,14

**formal** 11:21 14:13,21

**formality** 14:9

**formalize** 72:23

**forms** 93:17

**forward** 15:19

**found** 44:8 63:2 80:10 97:9 125:7

**four-and-a-half-hour** 118:16

**free** 51:5

**frequented** 85:11

**fresh** 81:7,8

**friend** 86:25

**front** 41:1 99:21

**full** 14:22 22:25 92:15 121:5

**full-time** 111:11

**fully** 69:23, 24 70:3 111:10

**G**

**gasoline** 45:3

**gave** 59:24 60:1,2 61:13 116:2 125:5 128:23

**general** 37:8,10 38:9 59:20 60:23 99:8,11

**generally** 87:3

**give** 36:6 42:17 45:1,9 46:3,9,21 47:4 50:15 60:8 66:24 67:11 71:11 73:17 82:8,12 84:8,20 87:10 88:19,25 96:4,10 104:24 105:17,19 109:8 119:4 126:2,23

**giving** 28:7 61:16 64:15 67:1 70:21 84:13 86:15,17, 21,22 87:1 92:9,21 103:8 117:7 119:10,16, 24

**glucose** 34:3

**goal** 70:18, 21

**good** 4:5 12:22 39:10 80:21 86:24,25 87:6

**Gosh** 113:6

**Gracias** 13:24

**graduated** 7:9 17:7

**great** 35:9

**greater** 32:24 37:11 43:13 59:19 117:20

**Gretchen** 12:23 13:24

**grossly** 95:11

**ground** 11:20 14:10

**guess** 56:3

**guessing** 95:11

**guideline** 100:2 102:23

**guidelines** 64:19 99:17,19, 23 100:12 101:5,20 102:10,18, 20 103:21 119:22 121:1

**gunshot** 33:17

**guy** 18:21 20:12,19 49:10 105:18 120:2

**guys** 126:16

**Gómez** 113:13 114:17

**Gómez's** 114:25

**H**

**HA** 99:19

**half** 20:5 36:12 40:4,6 41:3,6,10, 21,24 42:6 71:10 80:7 119:2

**hand** 13:3, 11 46:17 50:21

**handicap** 110:7

**handle** 24:12

**handled** 23:1 25:19

**handling** 86:15

**happen** 62:16 82:11 90:21,22 122:1 123:6 126:1 129:7

**happened** 73:21 80:9 81:21 89:22 109:3

**happening** 36:17 82:10,17

**happy** 15:13

**hard** 81:4

**head** 15:3 33:17 35:19,20

44:11,13, 16 56:9,10 65:19,21, 22,24 66:2,3,6 67:5,13 72:14 73:1,24 88:6 103:11,19 104:2,3,10 105:6,11 119:2

**health** 58:15 100:20 106:5 115:25 123:15 124:14

**healthcare** 32:2 101:12

**hear** 10:11

**heard** 52:2, 16

**heart** 76:4 99:18

**helicopter** 66:14

**helping** 90:11

**hematoma** 103:6

**hemorrhage** 10:7 35:13,14 64:23 65:6,23 97:10,16 102:22 103:4,7,10

**hemorrhages** 35:4

**hemorrhagic** 25:23 34:21,25

**Hey** 45:22 105:7 126:11

**he's** 89:3 114:20

**high** 6:12, 14

**higher** 105:8

**highest** 18:23 22:5

**highly** 27:10 39:10 60:21 73:16 81:22 82:22

**HIMA** 4:25 5:1,12 16:9 20:18 21:9,14, 18,21,23 22:2,4,11 23:8,14 26:2,5,10, 12 27:15 28:2,15 32:15 49:9 50:4 51:14,20 52:25 54:3 66:16 68:7 76:15 77:8 83:17,20, 24 84:2,4, 5,9 85:3, 13,18 86:4,18,22 87:24 90:19 95:10 107:2 115:17 123:4,15, 18 124:6, 14,18,21

**HIMA'S** 24:1

**history** 55:20 57:9,10 58:9 81:25 93:15 96:5 102:25 104:25

**hit** 53:8 104:2

**hold** 18:5

**home** 75:5

**honest** 31:1 57:2 112:14

**honestly** 84:19

**hospital** 4:12,13 6:22 7:3 8:12,13 16:2,4,10 17:13 18:20 21:14,21 22:15,25 24:8 25:1, 8 26:3 27:16,20, 21 28:1,7 31:7 32:11 44:6 50:12,18 52:7,10 55:23 71:22 72:18 74:24 75:2 77:12 83:21 84:4,9,18, 20 85:3, 17,19 86:13,14, 23 90:5,18 97:23 118:12 121:4

**hospitals** 22:18 83:14,20, 23

**hot** 119:17, 19
**hour** 20:5 30:6 38:8, 21,22 39:1 41:24 42:6 66:9 71:10
**hours** 30:6,7 32:20 36:12 40:4,6,7 41:3,6,9, 10,14,21, 23 42:9, 10,12,14 43:2,5,6, 12,14 44:7 46:7 66:10 73:3,11 80:6,7 102:5 106:1,2,3 116:13 119:1
**house** 30:18 54:18
**huge** 30:11, 12 39:6
**human** 37:21
**humanly** 108:15
**hundred** 86:7
**Hurricane** 31:21
**hurt** 42:20 47:3
**husband** 50:9 57:7,12 79:17,20

I

**idea** 46:23 57:23 115:3 124:3
**ideally** 91:22
**identification** 51:3
**identified** 53:9
**identify** 44:2 58:18 97:15
**illegal** 90:6 105:16 120:24,25
**Illness** 55:20
**image** 61:25 63:2,25 66:17
**images** 62:3 88:22 120:2 127:21,23
**imaging** 19:6,11 49:8 62:20,22 66:11 67:14 76:11 78:4,8 103:9 118:19 127:25
**immediately** 20:7 53:9
**impact** 42:24 45:5 76:23
**impacts** 43:23
**impending** 76:9
**implemented** 72:5
**important** 64:21 107:9
**impossible** 14:25 81:12 95:9 105:22
**impression** 68:12 73:20
**incident** 85:24 122:11
**inclined** 45:9
**include** 87:19
**including** 36:9 45:18 100:22
**inclusion** 87:14
**incorporated** 41:10
**independent** 23:6,13 62:24 111:9
**independently** 61:22
**Indiana** 7:4 18:2 114:5
**indication** 70:1,6 78:24 79:2
**indications** 76:10
**individuals** 122:20
**infarcted** 38:22,25
**infarction** 63:5,23
**information** 41:11 57:22 107:9,11
**Infuriate** 59:14

**initial** 63:2,4,12 72:1 100:21 102:3 109:20

**initially** 5:5 19:25 31:4 42:10 67:12 79:5 125:3

**initiate** 82:15

**initiated** 52:13

**inpatient** 71:23 77:12

**input** 78:2

**inside** 35:8 88:12 91:14

**inspects** 22:18

**instance** 34:25 53:24 57:4,18 59:21 61:4,19 64:10 66:22 82:18

**instances** 60:25

**Institute** 58:15

**institution** 30:6

**intact** 110:10,15, 20

**interchangeably** 10:19

**internal** 8:10,16 17:14 44:18

**internship** 6:22,24 8:5,6,9,16 17:10,12

**interpretation** 63:7 69:6

**interrupt** 51:8

**interrupting** 34:11

**intervene** 38:16

**interview** 114:1,7, 15,16 116:3

**interviews** 116:7

**intracerebral** 10:6 35:4 103:7

**intracranial** 47:23

**intravenously** 36:7

**investigating** 24:12

**invited** 114:13

**involved** 53:6 69:4 122:21

**involves** 36:4

**ipsilateral** 65:8,9,23

**irreversible** 36:22

**ischemia** 34:13 67:23 88:14 99:11 117:10,18 118:21

**ischemic** 10:6 25:22 27:6 34:12,16 35:22 36:2 39:15 53:23 67:10 88:9 98:8,17,20 100:3,4 102:6

**island** 29:16 83:16 85:2,9,12 90:15 116:11

**issue** 25:12 30:11,13, 14 37:8 38:4 43:7 80:8 117:17,20

**issues** 43:3 88:4

**it's** 7:23 10:24 11:24 23:23 24:21 29:4 30:16 36:6 38:5 41:15 43:3,6,7 44:21 45:3 46:12 58:11 60:23 63:21 67:16,18 90:6 98:23 126:16 129:14

**IV** 64:15 66:12 67:8,11 84:8,20 86:17,20 87:1 88:19 93:1,10

100:22 101:13 102:1 104:24 109:1,8 118:4 119:4,10, 16,24 120:16

**I'll** 15:3

**I've** 20:6 97:21 116:7 128:18

J

**Jackson** 86:22,24

**join** 114:23

**joined** 86:18

**Joint** 22:17, 22 23:5 24:21

**Juan** 4:1 95:9

**judge** 29:5

**judgment** 46:24

**Julio** 5:25 6:1 16:18 21:4,5

**jury** 6:7 14:18 32:25

**justify** 45:16 48:4 119:22

K

**Katerina** 13:5,6

**kill** 42:21

**kilograms** 102:2

**kind** 7:6,24 25:20 27:23 35:3 36:14 39:21,24 56:5 66:2, 11 81:3 103:7 109:25 113:18,21 121:20 122:5,18

**kindly** 6:7

**knew** 84:23

**knowledge** 85:7 100:13 122:21 124:2

L

**lab** 86:4

**labeled** 55:7

**lack** 33:15 68:21 95:24

**lady** 52:19 95:1

**large** 47:23, 24 48:21 63:20,21

**late** 15:22 31:8

**lawyers** 127:13,19

**learn** 68:10 95:24

**learned** 74:25

**leave** 31:3 56:5

**left** 38:12 50:12 63:6,9,15, 19 67:7 68:15 71:16 73:13,16 74:17 81:19 83:25 98:9 110:6 111:8

**leg** 26:20 60:4,25 61:13,17, 22

**legally** 29:6

**legs** 61:15 75:23,24

**lengthy** 99:4

**letting** 73:9

**let's** 32:23

**level** 73:7 74:13 91:19

**levels** 92:2

**liable** 121:8

**license** 7:17

**life** 110:25 111:2,9,10 129:3

**lifting** 61:21

**likelihood** 108:22

**limit** 37:1

**limited** 84:5

**literally** 29:24 42:21

**live** 110:24

**lived** 111:9

**lobe** 98:10

**LOBEL** 12:15 13:25 19:1 28:18,22 29:2,7 33:3,6

54:18 77:17 83:11 85:1 87:16 88:20 89:5 91:3,11,20 92:12 93:8 94:1,6 95:4,13 98:4 99:1, 14 100:16 101:3,8, 16,24 102:13,19 103:16 104:17 105:2,23 106:21 107:1,8,14 108:3 109:5,19 110:8,13, 18,23 111:5,14 112:2,21 115:7 117:4,22 121:21 122:23 124:9,23 125:20 126:8,14, 21 127:2 128:18

**locally** 75:21

**long** 4:16 23:18 37:15,22, 25 38:6, 13,18 48:5 56:23 72:4 84:1,13 89:21 90:16 114:22 120:21 121:17 124:25

**longer** 21:17 37:4 38:23 39:2,12 42:13 64:8

**looked** 74:2

**Los** 6:24

**lose** 43:4 45:23 104:9 105:5

**lost** 55:25 114:24

**lot** 27:1,3 35:5 44:16 88:18 105:19 113:20 117:20 119:21

**lovely** 50:9, 10

**lower** 60:18

**Loyola** 114:1,4,21

**lungs** 76:4

**lying** 123:7

**M**

**M.D.** 14:3

**made** 7:20 20:19 32:17 34:6 41:4 43:18,22 47:7 57:16 65:7 70:11,12 78:2 81:11 88:7 107:16 111:15 120:18

**main** 19:17 43:5,7,17 49:6 66:25 117:8,15

**maintain** 11:12

**maintaining** 39:11

**major** 30:13 78:24 109:13

**make** 7:7 15:11,12 39:6 42:7 45:2,22 58:23 62:11 100:10 120:10

**makes** 14:24 20:12 33:11,20 44:6

**making** 35:11

**malformations** 26:25

**manage** 40:18

**managed** 25:14 80:23,25

**mandatory** 125:14

**manifested** 77:11

**manner** 112:1 124:21

**Maria** 31:21

**mark** 50:22

**marked** 50:23 51:3

**matched** 53:10

**matter** 30:17 66:8 76:10 89:1 129:7

**maximum** 61:2 102:2

**meaning** 38:16

**means** 22:13, 23 26:18 39:23 53:12 59:15 60:23 61:7 62:9 64:1 68:22 76:12 80:15 81:10 118:15

**meant** 15:5 40:5 49:23

**measure** 61:15

**measured** 61:5

**mechanical** 78:18

**Medi** 7:23

**medical** 5:16 6:10,17 7:10,14,17 17:4 72:14 83:3,13 85:9,12 95:16 106:5 125:17

**medically** 15:11

**medication** 36:5,6 41:12 42:20 43:15,17 44:14 45:17,19, 23 47:4 70:16 77:15,19 82:19

**medications** 67:9 70:22 92:21 93:1

**medicine** 7:18 8:9, 10,16 9:14,19 10:1 17:14 18:2,6,25 21:1 71:1, 5

**meet** 87:14

**meeting** 114:11,13

**meets** 87:18

**member** 121:16

**members** 32:24 100:8

**memorable** 50:8

**memory** 62:24 72:7

**Mennonite** 4:12,13 16:3,4 21:21 83:21,23

**Menonita** 4:11

**mention** 7:20 32:17 34:6 41:4 43:18,22 47:7 65:7 89:13

**mentioned** 24:4 94:7 103:19 106:18 107:15 127:4

**mentioning** 105:24

**mentor** 114:4

**Mercado** 115:22,24 116:2,9

**Mercado's** 116:18

**message** 31:1

**met** 82:3 113:25 114:7,15, 16 127:16

**methods** 34:7

**Miami** 86:23, 24

**middle** 40:21 119:14

**mild** 45:25 46:4,9,16, 19 59:15 110:2

**milligrams** 102:1,2

**mind** 17:2 24:11 116:24

**mine** 86:24, 25

**minimal** 45:11

**minimize** 76:23

**minimized** 100:11

**minimum** 61:18

**minute** 102:4

**minutes** 20:4,5,6 30:17 31:6 90:3 95:5, 9 98:15 102:3

**mistaken** 52:5

**modality** 35:1 64:12

**model** 106:1

**moderate** 59:15

**Modest** 29:9

**moment** 36:19 40:7 66:14 78:3 94:21,25

**monetary** 31:19

**monitor** 91:24

**month** 15:5

**morning** 4:5 12:22 18:14,15 55:25 56:14 72:11,12 73:3 94:12 96:11,14 118:10

**motor** 60:24, 25 61:5

**move** 18:16 40:16 114:2

**moved** 6:15, 24

**multiple** 68:9 80:7 103:5 126:5

**mumble** 15:12

**mystery** 46:10

**N**

**names** 34:8 112:13

**national** 31:11,12 58:14

**natural** 81:15,17, 18,20,25

**nature** 20:10

**navigate** 26:20

**nearest** 32:1,7

**necessarily** 35:11 43:9 64:1 112:25

**neck** 67:13 68:17,20, 21 69:8

**negative** 97:25

**neighbor** 44:9

**neuro** 92:1

**Neuroendovascular** 77:3

**neurological** 58:17 74:14

**neurologically** 91:25

**neurologist** 6:2 9:20, 23 10:1, 15,16 11:6 16:22 18:9,10 128:2

**neurologists** 10:12,13 18:17 20:25 21:6,13 26:3 27:10,18 58:20 62:11 75:16

**neurology** 6:25 8:21, 23 9:7 10:4,23,24 11:3,4,7, 13 17:17, 23 18:7 114:3

**neuroradiology** 114:12

**neurosurgeon** 26:9 35:17 47:9 49:19 77:22

**neurosurgeons** 26:5,13 27:12,17, 21

**neurosurgery** 6:19 27:2 35:6 77:23

**newspaper** 116:3,5

**nice** 50:17 54:20

**night** 40:21 128:8,16

**nightmare** 29:24 75:15

**NIHSS** 46:20 58:13,14, 21 59:8, 14,18 60:5 70:4

**Ninety** 19:7

**Nobo** 4:7,8 13:13 14:3 19:8 47:1

**nod** 15:3

**normal** 14:19 54:17 81:21 95:20,25 96:1 110:24 111:2 129:3

**notary** 12:4, 7,22 13:6, 10,14,18, 21 14:5

**note** 55:9 69:14 72:8 107:16

**notes** 51:9, 14,15 97:21 127:6,9,24 128:1,6,14

**notice** 96:12

**Novo** 13:14

**Nuevo** 116:3

**number** 26:22 41:5 44:20,21 47:21 53:19 69:21 73:23 78:21 86:3,19,25 87:6 98:6 102:23 113:16,17 123:24

**numbers** 87:9

**nurse** 72:14 73:1,2

**nurses** 53:16 73:1

**nursing** 25:17 53:13

**nutshell** 33:10

**O**

**oath** 12:24 15:22 17:1

**obey** 119:19

**Object** 84:7 87:12 88:2 89:2 90:20 91:8,17 92:10 95:7 98:2,22 99:5 100:14 101:6,15 102:17 103:13 104:7,21 105:14 106:15,24 107:5 108:24 109:16,24 110:12,17, 21 111:1, 12,22 112:19

**objecting** 28:24 29:1

**objection** 29:4

**objective** 58:24 121:15

**obnoxious** 15:8

**observations** 23:3

**obtained** 24:2

**occipital** 98:10

**occluded** 47:23 74:11

**occluding** 109:14

**occlusion** 75:14 76:7,16,24 77:9 78:15,19, 22 79:6 81:14 82:4,21

**occupation** 4:9

**occur** 82:5

**occurred** 109:15 122:18

**occurs** 34:7 36:16

**OCTOBER** 4:2

**offered** 114:6

**official** 62:18 127:5

**older** 114:20

**one-sided** 92:18

**ongoing** 67:6,23 117:9

**onset** 40:15, 24 41:2,6, 14 43:25 57:6,25 58:3,6 66:10 88:24 95:21 99:9 102:6 118:9

**open** 76:13

**opened** 69:23

**operate** 69:20

**operation** 80:1

**opinion** 28:13 46:12 62:13,20, 22 63:4,12 90:23 111:21,24

**opinions**

83:2

**opportunity** 41:7 42:16

**opposed** 111:10 113:5

**opposing** 87:8

**opposite** 75:23

**opted** 88:18

**option** 36:3

**options** 36:1 76:21 77:1

**order** 25:6 67:13 82:16 96:23 99:16 123:22 124:4 127:5,7 128:6,14

**ordered** 85:25

**ordering** 67:20

**organ** 34:13, 14

**origin** 68:21 69:8 70:2

**originally** 74:5

**outcome** 108:17

**outcomes** 39:10

**outlined** 102:8

**overnight** 72:10

**overview** 7:6 53:4

**Overwhelmingly** 116:19

**oxygen** 34:3

**P**

**P-R-O-C-E-E-D-I-N-G-S** 4:3

**p.m.** 129:15

**Pablo** 28:15 84:5,6,9 85:3,13,19 87:24 90:19 107:2 123:18 124:18

**palsy** 60:13, 15,20

**paperwork** 72:24

**paralyzed** 40:14

**paraphrasing** 120:22

**part** 10:3 19:20 32:16 33:18 35:7 36:21 37:1 38:21 39:9 49:24 54:5 60:18 63:6,8,10, 11 67:6 68:13,15, 16,18 72:18 75:20 79:3 83:22 88:8 95:17 97:19 98:9 100:6 116:23

**partner** 5:8, 19 16:18 21:4

**partner's** 5:24

**parts** 58:19

**pass** 43:1,6 81:12 119:15

**passed** 8:2 94:25

**passenger** 113:5

**pathology** 73:15 74:17,25

**pathway** 39:15

**pathways** 39:8

**patient** 18:19 20:1,8,13, 18,20 24:20 28:14,17 29:15,22, 25 30:2,4, 5,9,10 31:7,23 32:1,6,10, 11,12,18 35:10 37:12 39:14,20 40:9,11, 12,13,15, 20,21 42:5,7,21, 22,25 44:3,4,5,8 45:8,10,24 46:1,3,6 47:3,19 48:7,9 49:11,13 50:3,15 52:7,14,15 53:6,7,10, 17,18,22 56:4 57:21 58:4,7

59:1,14, 17,19 61:7 70:19,21 73:10 74:10 82:1 84:3,13,14 85:18 87:18 91:2,7,10, 16,24 92:9,14 96:4,6 99:12 102:6,9 105:10,17, 21 106:20 108:14 112:8 117:23 121:5,25 122:9 123:18,22

**patient's** 46:5 59:13 121:10

**patients** 19:11,18 22:16 23:1 24:13 25:13,18 27:6 28:2 30:10,22 31:1 38:6, 25 45:15, 20 46:9 64:6 85:4, 14,24 86:6,8,9, 12,15,19, 21 87:11 88:16 90:1 93:16 96:5,24 100:8 101:10 102:5 107:18 112:3,11, 17,23 115:18 116:14,20 119:18

**patient’s** 19:21 39:23 70:24 73:7 74:13 78:6 79:2 127:22

**pay** 89:10, 20

**paying** 68:1

**PCA** 63:9,15 69:3 73:14,16 74:17 81:19

**peculiar** 115:9

**peer-reviewed** 37:14

**people** 10:4 38:7,21,23 46:9 99:7 104:13 105:20 109:22 113:20 120:19

**percent** 19:7 28:5 34:17,23 70:13 102:3 116:10,13, 20 120:15

**Perfect** 13:18

**perform** 25:9

**performed** 74:7

**performing** 100:23

**period** 22:3 39:12 56:23 57:15 85:4 88:1

**peripheral** 60:20

**periprocedural** 100:25

**permanent** 39:13 110:7

**person** 53:13 78:10 92:17 103:12 113:25 114:14

**personal** 46:12 90:23

**personally** 46:10,23 84:23 104:12,15 105:1,4 112:23

**persons** 50:9,10

**pertain** 27:4

**phone** 15:18 18:13 52:4,11,13 57:16 75:1,3 78:4 84:21 94:8 95:1 99:22 123:10,12 124:1,7

**phrase** 108:12

**physical** 58:10 61:24

**physician** 9:17 50:13 51:25 53:15

90:24

**physicians** 84:11 102:7 104:23

**pick** 69:10 91:10

**picked** 92:4

**pioneer** 113:23

**pioneers** 113:17

**place** 25:21 28:16 29:11 48:16,19 57:2 76:3, 18 123:17, 25 124:8

**places** 68:9

**plan** 67:2 70:15 71:17,21 72:1,4

**plaque** 68:23 80:20

**plasminogen** 20:14

**play** 121:8

**pleasant** 50:20

**PM** 72:9 118:13

129:14

**point** 15:10, 16 54:10 60:3 71:19,25 91:7,13 98:1 124:25

**pointing** 55:6

**points** 7:8 58:24 59:2,4,22, 24 60:1 61:2

**port** 93:2, 10

**portions** 99:21

**position** 114:6

**positive** 101:10

**possibility** 125:13 129:8,9,10

**possibly** 24:19 64:25 68:23

**posterior** 63:16,19 69:5

**postpone**

18:15

**potential** 42:4 43:13 90:1 108:5

**potentially** 65:22 78:17 94:8

**practical** 25:24

**practice** 7:18 19:14 31:25 84:24 115:1

**practicing** 21:1 83:16

**predicted** 82:3

**preexistent** 80:24

**preexisting** 111:24

**prefer** 47:4

**prehospital** 99:24

**preparation** 51:13

**prepare** 127:5,7 128:15

**presence** 39:25 88:6 102:24

117:8

**present** 11:14 35:19 42:11 55:20 57:8 74:4 79:14,16, 18

**presentation** 70:20

**presented** 20:18 50:4 55:4

**presents** 18:20

**pressed** 18:12

**pressure** 35:8 76:4

**presuming** 129:4

**pretend** 105:15

**pretty** 5:9 25:23 42:13 43:1 48:22 58:15 73:9 75:20 78:3 80:6 81:6, 11 84:18 105:22 122:10 128:3

**prevent** 36:17 70:22 71:1 82:9,13, 17,24

**preventable** 77:16

**prevented** 126:11 129:5

**previous** 103:23 111:19

**previously** 50:23

**primary** 22:8,12, 19,21 50:12 117:17

**prior** 56:3, 11 104:1

**priority** 53:19 100:10

**private** 30:21 124:19

**privilege** 83:17,22, 24

**privileged** 83:19

**privileges** 83:15,21

**probability** 83:4 125:18 129:8

**problem** 10:10 19:19 30:12 36:10 43:17 50:19 64:20 69:11 71:12 80:24 82:1 113:10 115:11,12

**problems** 64:15 88:18

**procedure** 48:2,13,25 49:1,21 78:11 79:15,22

**proceed** 79:11

**proceeded** 67:12

**process** 39:3 47:12

**professional** 28:13

**prognosis** 59:13,18 128:23

**program** 17:23 114:23

**progress** 81:1

**progressed** 77:18 81:25 82:20

**progressing** 81:23

**prompt** 15:6

**protocol** 53:1,4,6, 17

**protocols** 23:1 25:20,21

**proven** 48:15

**provide** 6:7 25:16 53:3 57:9,22 58:6 70:15 95:25 100:21

**provided** 85:25

**providing** 22:16 26:14 36:20 70:18 75:18 76:7 85:8,12 92:21 118:23

**province** 6:15

**public** 12:22 13:6,10, 14,18,21 14:5 100:9

**Puerto** 4:1 21:1,6,14 22:5 23:8 28:4,14 29:16,17, 23 30:11 31:20 55:12 68:8 76:14 83:15 115:25 116:4,14

**pure** 98:7

**purposes** 91:5,13,15 93:2 95:23

**push** 15:19

**put** 14:16 26:20 31:6 67:8 69:13 90:7,17 121:3,24

**Q**

**qualifies**

20:13 47:16 49:13

**qualify** 25:7 42:6,8 44:22 50:1 66:8 116:20

**question** 11:22 14:14,22 15:10,24 18:11 28:25 29:5 37:17,18 38:8 49:2 80:21 96:25 118:5 120:10 122:12 128:9

**questioning** 125:8

**questions** 22:1 83:7 89:8 96:22 120:15 125:24

**quick** 18:13 62:11 97:21

**quicker** 99:7

**quoted** 116:9

**R**

**radiologist** 19:22,23, 24 20:3 62:13 120:6,12

**radiology** 25:15 51:9 62:19

**Rafael** 115:21

**raise** 13:2, 11

**Ramos** 26:8, 13 35:16 77:21,22, 24 78:2,6 79:8,24 80:4 81:12

**Ramos's** 50:25

**Ramos’s** 128:1

**rapid** 100:25

**rapidly** 101:12 108:7

**rate** 78:25 125:10

**rated** 22:5

**reach** 48:19 78:5 81:12

**reached** 52:9

**reaching** 67:25 69:1

**read** 14:17 19:5,10,16 20:4 51:9 96:23 97:4,5,6 100:6 120:1,7,12 127:6 128:3,14

**reading** 20:11 120:17

**reality** 41:20

**realized** 40:16

**reason** 19:17 42:19 43:1,5 67:20 74:13 82:12 89:20 104:24 108:4,11 116:17 123:9

**reasonable** 83:3 125:17

**reasons** 69:21

78:21 82:8 105:19 109:7 113:16

**recall** 22:2 50:5 52:3 56:16 58:7 89:7,9,16, 24 94:8,9, 10,14 96:22 97:1,18,19 106:10,11, 12 115:19 120:22 122:13 125:8 127:3

**recalled** 95:20

**receive** 7:17 20:21 22:11,13 25:6 47:19 49:11 60:7,12 61:25 64:13 88:1 116:15

**received** 61:6 92:25 95:14,15 108:21 109:1 112:16 116:12

**receives** 22:12 25:2 68:16

**receiving** 52:4 67:8 69:24 86:12,20 94:16

**recent** 44:11 65:19

**recertification** 86:4

**recertifying** 23:24

**recess** 12:20 54:24 71:13

**recollection** 97:3 123:5

**recommend** 90:4 120:19

**recommended** 100:9 102:4

**record** 4:6 12:23 13:4,12 15:9 51:9 54:22 72:14 128:10

**recorded** 11:23

**records** 93:9 95:16

**recover** 37:12 109:23

**recovered** 110:2 128:24 129:1

**recovering** 28:16

**recreate** 122:18

**red** 105:21

**redirect** 115:10

**reduced** 108:23

**refer** 62:23

**referring** 103:23 106:8

**regard** 85:22 99:15,23 100:18 111:15

**regional** 100:18

**regular** 67:21

**regularly** 87:10

**related** 10:8 33:14 39:10 64:24,25 65:15 98:13

**relates** 24:25 79:25 80:19 125:6

**reliable** 96:6,8

**relied** 97:5

**rely** 96:5 99:16,18 102:14

**relying** 72:7

**remainder** 51:7

**remained** 72:20

**remember** 5:7 15:6 23:19,21 30:1 50:16 54:12 57:7,25 62:18 75:10,12 89:12,17 93:6,7 94:13,19,20 95:3,5,17,19 96:13,14,15 106:18 113:6 114:10 119:13 124:24 127:25

**remote** 48:13

**remove** 27:8 35:7

**removing** 26:23

**render** 62:13

**rendered** 35:23 59:23

**repeat** 73:24

**rephrase** 15:14

**report** 25:16 55:18,21 62:19 65:7 73:3 127:24

**reported** 55:24 56:19,25 65:15 74:25 97:18 118:8

**reporter** 11:24 12:17,25 13:2,5,9

14:16 54:21 129:14

**reporting** 58:4,5

**required** 7:25

**requires** 105:4

**requiring** 56:7,8 104:25

**reread** 97:17 120:9

**research** 22:25 39:4 85:17

**residency** 6:18,25 8:1,7,17, 23 9:6 17:17

**resident** 7:2 9:4 17:22

**resolve** 80:8

**resources** 29:19 31:11

**responds** 59:1

**response** 39:23 73:22

**responsible** 120:3

**rest** 68:25 81:1

**restore** 36:25

**result** 37:6 125:15

**retrieved** 81:9

**reversible** 49:8

**review** 15:23 36:15 54:8 64:11 68:19 78:6 97:15 102:8 127:21,23 128:6

**reviewed** 51:14 75:4 78:8

**reviewing** 127:8

**Rican** 31:20

**Richard** 50:3 109:9,12

**Rico** 4:1 21:1,6,14 22:5 23:9 28:4,14 29:16,17, 23 30:11

55:13 68:8 76:14 83:15 115:25 116:4,14

**right-handed** 46:18,21

**risk** 43:11 44:23 45:16,17 48:24 49:1 84:12 105:8

**risks** 43:12 70:10

**risky** 42:20, 24 46:4 84:25 88:11

**road** 6:6 46:6

**Rodríguez** 5:25 6:1 16:19,21 21:4,5 26:4 115:22,24 116:2,9,18

**role** 5:19 16:14

**room** 23:2 25:14 53:8,15,16 54:4,13 72:23

89:17 94:22,24 95:2 107:24

**routine** 84:24

**routinely** 19:13

**Royal** 112:11 124:18

**rubber** 54:15

**rule** 37:10 38:9 44:9

**ruled** 67:7

**rules** 11:20 14:11 25:10 42:7,13 64:19 119:20

S

**safer** 124:21

**safety** 43:3, 7,9

**SAH** 65:9

**SALDAÑA** 12:4,8 13:20,24

**San** 4:1 28:15 84:4,6,9 85:3,13,18

87:24 90:19 95:9 107:2 123:18 124:18

**scale** 58:14, 15 59:18

**scan** 19:22, 24 20:4 53:18,20 61:25 63:5,7 67:21

**scenario** 57:18 58:5 82:11

**school** 6:11, 13,14 7:10 17:4

**score** 58:13, 14,15,24 59:10,12, 17,23 60:22

**scoring** 58:21

**screen** 101:10

**screenshot** 46:1

**search** 40:18

**secondary** 62:13 108:23

109:13

**seconds** 61:9,14, 15,18

**Secretary** 115:25

**section** 99:23 100:17 101:19,25

**selected** 102:4

**send** 85:4, 17

**sense** 14:21 15:11,12

**sensitive** 67:17

**sentence** 84:10 85:5 88:1

**serve** 15:25

**served** 4:17 5:18 16:15 17:22 115:24

**service** 24:9

**services** 25:8

**session** 11:22 14:14

**set** 24:11

25:10 96:7 101:4 104:19

**sets** 25:22

**severe** 44:13 45:10,16, 21 46:14 50:18 59:4 65:21,24 103:19 104:1

**severity** 45:4

**sheer** 88:23

**She's** 28:24

**ship** 52:6 56:3 57:14 95:15 107:4 112:9 113:3 123:2 124:18

**shipboard** 95:16

**shipped** 84:14

**Shipping** 52:17

**ships** 112:4, 12,14,17, 24 113:5

**short** 89:22

**shortage** 31:11,13

**shortfalls** 31:19

**shot** 46:1 126:24

**show** 90:3 103:9

**showed** 63:13 66:15,18 111:19

**showing** 63:5

**shown** 63:23

**sic** 7:1

**side** 40:14, 16 47:1 56:1 59:25 60:2 63:6, 24 64:23 65:10 67:7 68:15 74:12 98:9

**significance** 75:13

**significant** 37:2 117:19

**significantly** 73:8 88:7, 17

**signs** 66:15 88:14

**similar**

41:11 82:1

**simply** 81:15

**sings** 91:25

**sir** 118:2

**sit** 122:22

**sitting** 119:21

**situation** 32:18 71:18 78:23 79:18 81:21 82:25 85:16 88:11 90:15 104:23 119:15

**skillsets** 18:8

**sleep** 76:2

**slight** 120:5

**slipped** 104:2

**slow** 15:1

**small** 6:14 24:16 48:1,3,6, 20 63:20 64:22 65:4 97:9 98:10 102:22

**socialized** 114:14

**something's** 122:8

**sooner** 37:10 38:9 108:15

**sort** 110:7

**sought** 23:14

**sounds** 49:9

**Southern** 8:24 9:7 17:18,23

**speak** 55:15 80:4 106:22 127:11,13, 14,15 129:3

**speaking** 48:21

**specialist** 9:23 10:2 35:21

**specialize** 10:3

**specialized** 27:11,22 35:17

**specialty** 11:10 18:24 27:12

**specific** 9:25 24:9 25:8 32:3 36:11 39:15,24 96:12 97:3 101:20

**specifically** 19:8,22 22:3,18 24:25 32:6 38:11 44:13 54:1 65:4 67:9, 24 68:2,24 92:24 96:16 107:19 117:16 123:2

**specifics** 79:25 96:10

**speculating** 125:23 126:10

**speculation** 98:7

**speed** 25:13

**spoke** 52:20 107:3 123:4

**spoken** 50:11 51:16

**spot** 75:25

119:17

**stab** 33:17

**staff** 26:4, 6,9,14 27:18

**standard** 67:10 71:4 87:18 104:18 105:13 106:4 122:2

**standpoint** 25:24,25

**started** 4:20 5:11,16 6:21 33:25 83:16 86:10 96:12 113:21

**starting** 6:8

**starts** 36:21

**stat** 73:24

**state** 4:6 13:11 30:20 31:24 102:7,21 125:16

**stated** 89:24

**statement** 100:12 102:10

**states** 6:21 7:22 30:16,17 102:1 106:4

**statistics** 86:2 116:18

**status** 74:14

**stay** 9:4

**stayed** 114:23

**stitched** 104:4

**stitches** 56:8 65:2 103:11 104:25 105:5

**stop** 12:18 15:18 36:13

**stopped** 33:23

**stops** 121:6

**straight** 72:24

**strike** 45:8 58:12 69:9 71:19 86:10 108:20 109:10 111:7

**stroke** 4:11 5:6,9,12, 17 9:13 10:12,16, 23,24 11:3,7,13 16:1,15 18:21 20:19,25 21:6,13 22:5,8,12, 20,21 23:2 24:1,12, 14,20 25:1,13, 15,17,19, 21 28:2,14 29:10,12 32:6,9 33:2,10, 12,13,18, 20 34:12, 20,21 35:1,22 36:2,16,18 39:15,24 41:1,16,20 47:20 51:23 53:1,4,10, 11,14,23 58:20 59:5,16 60:17,22, 23 63:1,13 64:21,24 65:10 66:15 69:3 71:5 72:16,17, 19,20,24 73:1,14,17 75:16 80:25 81:19 82:8,14,16 85:4,14,19 86:14,16, 23 88:12 90:1 92:19 93:16 98:12 99:18 100:3,4, 10,19,24 101:10 102:6 104:5 106:3,19 108:14 109:13,20, 25 113:18 116:10 122:9 126:11 129:4

**strokes** 10:5,6 22:16 24:22,24 25:18,22, 23 27:6,13 32:23 34:9,16, 17,23 46:10 67:10 87:11 99:3 101:11 112:25 113:1 116:14 126:13 129:11

**strong** 101:11

**strongly** 100:9

**struggling** 29:20

**studied** 6:10

**studies** 11:9 19:11 37:14 49:8 66:11 74:6 75:4 76:11 78:4

**study** 8:20 37:24 41:12 43:4 62:4 67:15 68:11 111:19

**stuff** 27:1 30:23

**subarachnoid** 35:12,14 64:23 65:6,23 97:9,16 102:22

103:4,10 117:9

**subdural** 103:6

**subspecialty** 77:23

**successful** 80:3

**sudden** 95:21

**suffer** 104:4

**suffered** 56:10 109:21

**suffering** 36:22 87:11 90:1

**suite** 79:22

**summarizes** 55:19

**super** 50:17

**superficial** 103:11

**supervision** 72:25

**supervisor** 72:15

**supportive** 35:5

**supposed** 23:24 121:1

**surgical** 79:14,25

**surgically** 27:13

**surprising** 81:4

**suspected** 18:20 20:19

**suspicion** 101:11

**sustain** 38:6 61:8,9,17

**swear** 13:6, 9,14

**swearing** 127:5

**sworn** 14:5

**symptom** 43:25 57:6,8 58:3 102:6

**symptomatic** 78:16

**symptoms** 19:18,21 40:8,12 45:4,10, 11,16,21, 25 46:4, 15,19 53:9,10 56:19,24 57:19,23 66:15 73:15 79:2 92:19 95:21 96:12,15 99:10 104:5,12 118:9

**system** 30:15,21 31:13,20, 24 52:10 58:21 83:18 84:2 90:7,8 100:8 121:9 123:11,17, 21 124:6, 14

**systems** 92:2 99:24 100:18,19 101:9

**T**

**table** 24:16 102:8,14

**takes** 38:18 123:11

**taking** 12:24 90:16

**talk** 14:24 32:23 50:2 57:20 80:11 110:19 126:24

**talked** 26:1 37:3 40:3 47:7 51:12 65:18 73:14 78:12 114:12 115:17 123:14,16

**talking** 7:23 14:24 27:9 52:11 71:17 77:5 87:4,5 91:18 122:13 124:13

**team** 53:13, 14

**teasing** 33:9

**technical** 80:10

**technically** 48:21

**telling** 81:6

**ten** 46:7

**tenure** 21:23

**terms** 10:18 39:21

**territory** 63:10

**test** 8:2 37:21 59:8

**testified** 97:8 123:3

**testimony** 15:24 103:24 104:1 115:19 116:23 125:5

**testing** 59:2

**that's** 14:15 18:11 35:16 38:19 40:24 49:23 51:10 81:20 93:12 103:21 115:7 116:3 125:25 128:3

**therapy** 26:15,17, 18 47:8, 12,19 48:5 49:5,13 64:13 77:5 78:14 79:9

**there's** 36:21 46:8 48:22 53:13 106:1

**thing** 10:20 46:17 61:14 89:19

**things** 19:25 20:10 26:22 27:3,4 89:18 92:1 121:18

**thirty-nine** 55:8

**thought** 52:2 98:11 111:16 112:25

**three-** 87:19

**three-hour** 97:24

**threw** 119:9, 24

**thrombectomy** 38:17 48:4,10,12 50:1 70:1, 6,8 78:18, 25 113:22

**thrombose** 80:25

**thrombosing** 81:23

**thrombosis** 70:23 82:12

**throw** 80:23

**TIAS** 25:22

**time** 15:1, 16 17:3 18:12 20:3,9 22:3,22 23:18,19 24:1 28:4 30:4 34:13 37:4 38:7 39:12,18 40:10,15, 19,23,24 41:2,7,14 43:21,22, 25 44:5 45:24,25 46:1 54:19 55:9,13 56:14,18, 19,23,24 57:13,15 58:1,3,6 63:24 64:14,16 69:9 70:24 71:19,25 72:21 76:19 82:7 83:18 87:23 88:5 89:21,22 94:11,13, 15,17,21, 25 96:14, 19,20 98:1 100:11 106:10 107:16 108:12 112:23 113:23 114:9,21 115:10 116:24 117:1,7,16 118:3 119:15 120:16 127:16

**timeframe** 36:11 41:13,15 42:23 44:5 47:5 64:19 87:3 88:15 118:16,22, 23,25

**times** 19:7 23:22 46:12 112:6,7,16 123:10

**timing** 37:8 38:4 43:10,22 75:8 117:20

**tiny** 48:18 69:7 80:23

**tissue** 20:14 37:5,15,25 63:25

**title** 5:3

**to-four-and-a-half-hour** 87:20

**today** 13:8,16 14:12 15:4 28:11,12 50:2 51:13 83:3 122:22 127:6

**today's** 12:25 51:16 127:8 128:15

**told** 7:9 9:8 15:24 16:8 17:4 31:3 56:2,13 57:10 62:10 63:22 65:1 73:6,23 75:4 80:8 89:15 94:22 96:14 106:9 123:13

**total** 59:10 75:13

**touch** 61:12

**touching** 61:10,17

**town** 6:14

**TPA** 20:15,21 25:12 28:2,7 32:8 36:5,10 38:1,3,16 40:4 41:7 42:6,8,17,19,20,24 44:1,23 45:2,6,9,15,20 46:3,9,21,25 48:7,8 49:11 58:16 64:12,16,17 65:20,25 66:4,8,12,19,24 67:1,5,8,12 70:25 84:3,9,13,19,20 85:23,25 86:12,15,17,20,22 87:2,5,10 88:1,7,19,24,25 92:7 96:5 99:17 101:20 102:15,16,21 103:2,8,12 104:6,19,24 105:10,18,19 108:21 109:1,8,12,22 112:18 113:2 115:18 116:15,21 117:3,7 118:4 119:4,10,16,24 120:16 125:6,12,15,18 126:2,3 129:10

**TPAS** 87:1

**track** 114:24

**trained** 19:19 114:5,17,18,19

**training** 6:17 27:11

**transcribe** 13:7

**transcribed** 11:25 14:15

**transcript** 14:17

**transfer** 29:22,25 30:9,10 32:18,21 52:7

**transferred** 21:20

**transferring** 30:10,22

**transfers** 29:15 123:18

**transformer** 54:20

**transpires** 12:21 54:25 71:14

**transport** 89:8 91:13 93:3 94:3 100:11,25

**transported** 101:12

**trauma** 33:18 44:11,12,13,16,17 56:5,10 64:25 65:15,19,21,22,24 98:13 103:19,20 104:2,25

**traveling**

28:3

**traverse** 75:25

**treat** 27:13 37:11 76:16 96:23 108:7,14, 16

**treated** 25:18 35:20 102:5 112:3 113:4 116:11 125:3

**treating** 26:24 35:18 107:18

**treatment** 27:23 35:1,5,9, 15 36:1,3 41:9 47:16 64:11 67:10 76:21 77:1 79:12 90:18 91:6,15 92:22 93:15 100:3,4,24 107:10 113:18 116:12

**treatments** 20:13 35:6,23 113:22

**triaged** 25:13 53:8

**trial** 38:1, 15 58:16

**trials** 38:14

**tricky** 37:18 38:8 104:22

**trouble** 73:9 122:3

**true** 27:25

**trust** 84:20

**truth** 13:15

**TUESDAY** 4:2

**tumor** 67:23

**tumors** 27:1

**turn** 83:8

**Twenty** 86:8

**type** 25:2, 7,8 35:12 47:16 48:1,24 67:14 103:4

**types** 34:9 103:5

**typical** 19:21 30:3 92:19

**typically** 35:20 60:21 81:8 109:21,23

**U**

**Uber** 93:21, 23 121:25

**Uh-huh** 116:5

**Ulises** 4:7 13:13 14:3

**ultimately** 14:17 25:2 32:14 57:16 62:25 120:8 124:1,5,22

**Um-hum** 4:15 10:14 49:16 60:9 96:2 97:11 99:25 103:25 105:3 108:8 118:14

**unable** 57:21

**unblock** 36:23

**uncommon** 107:23 108:1,2

**undergo** 38:13

**undergoing** 36:22 63:8 64:2 88:9

**understand** 11:21 28:20 127:18

**understood** 15:15 88:21 92:5,16 103:22 115:4 117:13 126:18

**unethical** 37:20

**unintelligible** 13:20 38:3,15 97:21

**unit** 23:2 25:17,19 72:16,17, 19,20,25 73:1

**United** 6:21 7:22 106:4

**universally** 42:2

**University** 6:16 7:4, 10 8:23 9:7 17:17, 23 18:3 27:20 113:24 114:1,5,22
**unlock** 81:13
**unrelated** 98:12
**unreversible** 64:3
**unusual** 81:22 82:22
**update** 50:15
**upper** 61:8
**urgency** 20:9 37:3
**USC** 6:25
**USMLE** 7:24

**V**

**vague** 89:9
**vaguely** 94:7
**Valid** 42:3
**varies** 99:12
**vascular** 6:2 9:18,20,22 10:1,5,8, 9,15,22 16:21 18:7,9 26:3 27:10,17 62:10
**vehicle** 94:3
**versus** 38:3
**vertebral** 68:20 69:7,19 70:2,10 74:11 78:13,20 79:1 80:16 81:23 125:7
**vessel** 47:23 63:20,21
**vessels** 36:9 67:25 68:5
**viability** 38:20
**viable** 48:9
**violation** 64:18
**vision** 55:25 59:24 92:18 110:3 128:25
**visit** 24:22
**visual** 60:1, 8 110:7
**vital** 91:25
**voice** 76:5

**W**

**wait** 18:13 20:5 90:8 121:17
**waited** 56:23
**waiting** 54:13 62:12 90:12 107:17,19, 20
**waive** 12:11, 12
**wakes** 40:12
**walk** 110:14 116:22 129:2
**walk-in** 108:6
**wandering** 107:23
**wanted** 40:5 71:10 106:7 114:2
**warranted** 79:8
**wasn't** 84:24
**watching** 64:2
**water** 42:20
**ways** 60:16
**weakness** 56:1 60:17 92:18 110:2 128:24
**weekend** 128:2
**weren't** 118:20
**we'll** 15:18 36:8
**we're** 17:1 87:4,22
**whack** 24:14
**What's** 81:3
**white** 126:17
**wide** 59:25
**wife** 40:22
**window** 41:7, 19 48:8 64:18 67:5 87:20,25 88:25 89:4 97:24 103:14 104:6 118:3,17
**windows** 42:16
**wise** 91:25

**witnessed** 40:8 43:25 44:3

**witnessing** 40:10

**woke** 56:13,18 57:12,13 95:20

**woman** 52:12 106:10

**wondering** 63:1

**word** 31:14 43:19 69:15

**words** 11:6 18:19 23:5 39:14 43:11 44:25 47:25 48:13 65:11 70:5,8,25 74:16

**work** 14:12 27:5 34:4 46:22 47:13 90:8 114:2 115:15 121:9

**worked** 78:10 114:21

**working** 16:9 21:8 31:13 51:19,22 58:18 84:2

**works** 11:21 30:15 37:7 121:15

**worry** 28:22 29:2

**worse** 45:2 46:7 70:11,12 88:7 126:7

**worsening** 71:2 73:17

**worst** 75:15

**would've** 23:14 77:4 95:8

**wound** 33:17 103:12 104:3

**write** 46:16 69:11 96:18

**writing** 96:18

**written** 25:21

**wrong** 19:23 24:18 42:22 89:12 100:7 119:16 122:6,8

**wrote** 69:12 72:8 96:17

**Y**

**year** 9:1,4 85:23 86:6,8,9 87:4,5 115:19 116:11

**years** 4:19 6:19 23:23 103:1 113:22 114:11 115:2

**you'd** 51:6

**you've** 14:21 16:5 26:21 33:16 76:11 112:16 116:6

**á**

**ávila** 128:1