UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:20-cv-20687- OTAZO-REYES

AT LAW AND IN ADMIRALTY

- - - - - - - - - - - - - - - - - - - - - - -
RICHARD BURGESS individually and :
by and through DARREN HENZE, :
as Guardian of the Person and Estate :
of Richard Burgess, incapacitated and :
as agent under that certain durable power :
of attorney dated November 20, 2006, :

Plaintiffs, :

v. :

ROYAL CARIBBEAN CRUISES LTD., :
a Liberian Corporation, d/b/a :
ROYAL CARIBBEAN CRUISE LINE and/or :
ROYAL CARIBBEAN INTERNATIONAL. :

Defendants. :
_______________________________________________/

The 30(B)(6) deposition of Continental Shipping, Inc., through its designated corporate representative, DANIEL THREADGILL-COLÓN, called as a witness by the Defendants, pursuant to the Federal Rules of Civil Procedure, before Saul Berrios Bautista, Puerto Rico notary public, and Dennis Zambataro, certified and Registered Professional Reporter, held at the offices of Continental Shipping, Inc., 360 San Francisco Street, San Juan, Puerto Rico, commencing at 10:23 a.m. on January 27, 2022.

APPEARANCES OF COUNSEL:

On behalf of the Plaintiffs:

SARAH A. LOBEL, ESQUIRE [Present via teleconference]
Hickey Law Firm, P.A.
SARAH A. LOBEL, ESQUIRE
1401 Brickell Avenue, Suite 510
Miami, FL 33131-3504
Telephone: (305) 371-8000
slobel@hickeylawfirm.com

On behalf of the Defendants:

MICHAEL J. DRAHOS, ESQUIRE
Gray Robinson, P.A.
222 Lakeview Avenue, Suite 800
West Palm Beach, FL 33401
Telephone: (561) 618-4450
Michael.drahos@gray-robinson.com

On behalf of Continental Shipping and the witness:

LUIS SALDAÑA, ESQUIRE
Saldaña, Carvajal & Vélez-Rivé, P.S.C.
166 Avenida de la Constitución
San Juan, PR 00901
Telephone: (787) 289-9250

Also Present:  Nelson Dfreitas, Videographer

# I N D E X

| Witness: DANIEL THREADGILL-COLÓN | Page |
|---|---|
| Examination by Mr. Drahos | 6 |
| Examination by Ms. Lobel | 62 |

DEFENDANTS' EXHIBITS

| | |
|---|---|
| Composite Exhibit A GR000115 - -142 | 11 |
| Composite Exhibit B GR000087 - -108 | 41 |

- TRANSCRIPT OF DEPOSITION -

VIDEOGRAPHER: One moment, please.

This is the beginning of media number 1 in the deposition of Continental Shipping, Inc. -- [electronic feedback].

Sorry -- through the corporate representative, Mr. Daniel Edward Threadgill-Colón, in the matter of Richard Burgess, et al. versus Royal Caribbean Cruises, Ltd., et al., case number 1:20-cv-20687.

Today's date is January 27, 2022, and the time on the monitor is 10:23 a.m.

My name is Nelson Dfreitas, I'm the videographer. The court reporter is Dennis Zambataro. We are here with Huseby Global Litigation Support.

Counsel, please introduce yourself, after which the notary will swear the witness.

MS. LOBEL: Sarah Lobel.

MR. DRAHOS: Sarah, we lost half of your name. Try that again.

MS. LOBEL: Certainly.

MR. DRAHOS: We're not picking up

your sound. We're not picking up your sound.

THE WITNESS: Where is the sound coming from, from the phone, the computer or both?

MR. DRAHOS: It's coming from the computer and it was working and then when you went to say your name we only heard your first name.

MS. LOBEL: Just let me know. This is Sarah Lobel on behalf of the plaintiffs.

MR. DRAHOS: Okay, we've got that. Michael Drahos on behalf of the defendant.

MR. SALDAÑA: The Luis Saldaña on behalf of Continental Shipping.

MR. DRAHOS: Go ahead, sir.

NOTARY PUBLIC: My name is Saul Berrios Bautista, attorney and notary public of Puerto Rico. I'll be administering the oath for this deposition.

To the videographer, raise your right hand and state your full name for

the record.

[The videographer, Nelson Dfreitas, was first duly sworn by the notary public.]

NOTARY PUBLIC: To the court reporter, will you please raise your right hand and state your name for the record?

[The court reporter, Dennis Zambataro, was first duly sworn by the notary public.]

NOTARY PUBLIC: Will the deponent please raise your right hand and state your name for the record?

THE WITNESS: Daniel Threadgill.

DANIEL THREADGILL-COLÓN

was called as a witness by the Defendants, having been first duly sworn by the notary public, was examined and testified as follows:

NOTARY PUBLIC: May I be excused?

MS. LOBEL: Yes, sir.

MR. SALDAÑA: Yes, sir, thank you.

EXAMINATION

BY MR. DRAHOS:

**Q. Okay. Are we ready, everyone? Good**

**morning, can you please introduce yourself to the members of the jury?**

A. Yes. My name is Daniel Threadgill. I am the operations manager for Continental Shipping.

**Q. Mr. Threadgill, where are we today?**

A. We're in San Juan, Puerto Rico.

**Q. And specifically where in San Juan, Puerto Rico are we?**

A. In San Francisco Street, 360 San Francisco Street.

**Q. Is this the corporate headquarters for Continental Shipping here in San Juan, Puerto Rico?**

A. Yes, sir.

**Q. You indicated a moment ago you are the director of operations; is that right?**

A. Operations manager, yes, sir.

**Q. And you understand that you've been produced here today in the case of Richard Burgess versus Royal Caribbean Cruises as Rule 30(b)(6) corporate representative on behalf of Continental Shipping Incorporated.**

A. Yes, sir.

**Q. Do you understand your testimony here today in the case binds the corporation?**

A. Yes, sir.

**Q. All right. So why don't we start out, if we will, please, sir, can you tell us a little bit about Continental Shipping?**

A. Continental Shipping, we're a logistics agency for about 80 to 90 percent of the cruise lines that come into Puerto Rico.

**Q. So when you say you're a logistics agency, for those of us who are not familiar with how the administration of how the cruising industry works, can you give us a little bit of a summary of exactly what that involves?**

A. I would say a cruise ship is a floating hotel, basically. It comes in and out of port in a very limited amount of time, so all the governmental processes, paperwork, pier assignments, immigration, customs formalities, logistical needs, garbage, medical services, transportations, you know, food provisioning, anything of that nature we try to coordinate.

**Q. Okay. And so what you serve as is like the local representative here in San Juan for the various cruises that come into port**

**here?**
A. Yes, sir.
**Q. And how long has Continental Shipping been doing this?**
A. Continental Shipping was founded in 1974 by Mr. José Busto, who was also on the cruise ships for many years. And he started a family-owned and run business here. Met his wife here and started providing these services, I believe, in 1974.
**Q. And so this is a family-owned business?**
A. Yes, sir.
**Q. And what do you do as the director of operations for Continental Shipping?**
A. Well, I oversee the day-to-day operations; make sure for the most part that things run as smoothly as possible.
**Q. For how long of a period of time have you been working for Continental Shipping?**
A. I started in 1996.
**Q. What was it that brought you to Continental?**
A. I used to be a teacher for approximately ten years or so, and I was

actually the teacher for Mr. Busto's son. And we had a very good relationship. And, you know, little by little, time -- time, economics -- you know, the constraints of teaching -- unfortunately, I would have loved to have continued teaching, but economically speaking I had to find better things to pursue.

I had a good relationship with them. They brought me over and I've been here ever since.

**Q. When you were hired at Continental Shipping, when did you say that was, 19-what?**

A. In December of '96, if I am not mistaken.

**Q. In December of 1996 were you hired to be director of operations?**

A. No, no, I came in on ground level. I never had previous experience in this business. And so I started on the ground level as an agent in training. And then little by little worked my way up.

**Q. Okay. And so how many people now do you supervise on a day-to-day basis? Actually let me strike yet and rephrase it.**

**Back in 2019, February,**

**specifically, of 2019, how many employees here at Continental Shipping did you supervise?**
A. Directly in the operations department, probably 12 to 16.
**Q. And back in February of 2019, did Continental Shipping serve as the port agent for Royal Caribbean Cruise Line?**
A. Yes, sir.
**Q. And did you also serve as the port agent for multiple other cruise lines?**
A. Yes, sir.
**Q. How many in total do you believe that you were serving as port agent for back in 2019?**
A. The major lines, I would say close to probably 90 percent.
**Q. Okay. What I would like to do, I'm going to hand you what we are going to mark as Composite Exhibit A to the deposition, and Sarah for your -- I'm going to identify the Bates numbers for you.**
MS. LOBEL: All right.
[Defendants' Composite Exhibit A was marked for identification.]
MR. DRAHOS: You let me know when

you are ready and I'll ask him a question.

So I'm going to hand the witness what we are going to mark as Composite Exhibit A to the deposition. For purposes of the record it is Bates number GR115 through GR142.

I'll hand a copy for Mr. Saldaña as well.

MR. SALDAÑA: Thank you, sir.

MR. DRAHOS: Sarah, let me know when you are there, GR115.

MS. LOBEL: Give me a second.

MR. DRAHOS: Okay.

MR. SALDAÑA: Go ahead.

BY MR. DRAHOS:

**Q. So, Mr. Threadgill, do you recognize what's been put in front of you today as the Defendants' Composite Exhibit A?**

A. I've seen this contract before, yes, sir.

**Q. What is Defendants' Composite Exhibit A?**

A. It's a port agent agreement between the cruise line and the agency, which is

Continental Shipping.
**Q. Between Royal Caribbean Cruises and Continental Shipping?**
A. Yes, sir.
**Q. How is it that you recognize this document?**
A. I've been here 25 years. I've seen them before.
**Q. Okay. And does the Defendants' Composite A appear to be an accurate copy of the port agent agreement between Continental Shipping and Royal Caribbean Cruises?**
A. Yes, sir.
**Q. And is this kept in the regular course and scope of business operations, this record? Is it kept in the regular course and scope of business operations at Continental Shipping?**
A. Normally, at the present level, yes, sir.
**Q. As the director of operations, do you have regular access to this kind of document if you wanted to pull it and take a look at it?**
A. Yes, sir.
**Q. What I would like to do, if you**

**would turn your attention, please, to page 16 of the document which would be Bates number 130.**

MR. DRAHOS: Sarah, let me know when you are there.

MS. LOBEL: I'm already there.

BY MR. DRAHOS:

**Q. You're already there? Okay.**

**So, Mr. Threeadgill, does the Defendants' Composite Exhibit A truly and accurately convey the relationship between Continental Shipping and Royal Caribbean Cruises as you understand it existed back in February of 2019?**

**MR. SALDAÑA: Objection. Calls for a legal conclusion, but I'm going to allow the witness to answer.**

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

**Q. And if you will note there Article 9, does Continental Shipping agree back in February 2019 to served as an independent subcontractor in its relationship with Royal Caribbean Cruises?**

A. Yes, sir.

MR. SALDAÑA: Again let me object

here. It calls for a legal conclusion, but I'm going to allow the witness to answer.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

**Q. Does Continental also agree that Royal Caribbean Cruises had no control over Continental Shipping or any employees of Continental Shipping back in February of 2019?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. And do you also agree that Continental Shipping was responsible for all salaries, employee benefits, taxes, and any unemployment insurance for any and all employees who worked for Continental Shipping back in February of 2019?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. And would you agree that neither any -- neither Continental or any employee of Continental or agents of Continental were employees of Royal Caribbean back in February of**

**2019?**

**MR. SALDAÑA: Objection. Calls for a legal conclusion, but I'm going to allow the witness to answer that.**

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

**Q. Okay. Would you also agree that Continental could not tell Royal Caribbean how to do its job, nor could Royal Caribbean tell Continental how to do its job back in February of 2019?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Would you then agree these two companies, Continental Shipping and Royal Caribbean Cruises, were two separate and independent companies from each other back in February of 2019?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So when we were talking a little bit about what some of the duties are for Continental Shipping when serving as a port**

**agent for the various cruise lines, one of the tasks that you had identified was helping to facilitate medical disembarks from the ship of cruise and guests; is that right?**

MS. LOBEL: Form.

THE WITNESS: Yes.

BY MR. DRAHOS:

**Q. So has that service been provided to Continental Shipping to various cruise lines over the past 30 years of this company's existence?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. By the way, have you as director of operations had some role or had some experience in facilitating these medical transfers over the last 25-some years that you have been here?**

A. Yes, sir.

MS. LOBEL: Objection.

BY MR. DRAHOS:

**Q. Has this experience, serving as a port agent here in San Juan, required Continental to have knowledge of medical care that's available here on the island of Puerto**

**Rico?**

MS. LOBEL: Form.

THE WITNESS: Based on that experience, yes, sir.

BY MR. DRAHOS:

**Q. And so does Continental agree then that part of the function of serving as a local port agent is to regularly communicate with area hospitals in facilitating medical transfers?**

MS. LOBEL: Form.

THE WITNESS: When the cases arise, yes, sir.

BY MR. DRAHOS:

**Q. And can you give us even an estimate of approximately how many medical transfers Continental Shipping has facilitated either for crew or guests aboard various cruise lines on an annual basis?**

MS. LOBEL: Form.

THE WITNESS: Educated guess would be approximately around a hundred maybe a year.

BY MR. DRAHOS:

**Q. Okay. So what I would like to do then --**

MS. LOBEL: I didn't hear his answer, the first part of it.

THE WITNESS: Approximately, maybe a hundred a year.

BY MR. DRAHOS:

**Q. Okay. So what I would like to do then is ask you a little bit about how the process works of facilitating medical transfers from a cruise ship to a shoreside facility here in Puerto Rico, okay, sir?**

A. Yes.

**Q. What is the first step in that process?**

A. Well, obviously the notification from the vessel, either by phone, email or sometimes direct communication, if the agent specifically happens to be on board. It could be one of those three ways.

**Q. Okay. And so during this process, when there's a communication had between the ship's medical facility and the agent here at Continental Shipping, what information is exchanged?**

A. Normally we need to begin the process with the name of the patient, the date

of birth, the brief diagnosis, and any of the medical insurance history available.

**Q. And so once you obtain this information, what do you do with it?**

A. Usually the next step would be to contact a local hospital to try to establish a communication with the ER doctor on duty; the ER doctor, once we have established communication with the ER doctor on duty, we connect him with the ship's doctor on board to present the case officially.

**Q. So I don't understand, why do you even have to do that? Why not just send the patient to any hospital that's close?**

A. Well, because there's a distinction, at least here in Puerto Rico, that if you're in the street, and you're in a car accident, and you're in an emergency, well, you have to go to the nearest medical facility.

But if you're under a doctor's care, it's considered more of a doctor-to-doctor transfer, or -- doctor-to-doctor transfer, yes, sir.

So, normally, so that everything is coordinated accordingly, we have to contact the

doctor so the doctors can confer and make sure that the hospital is ready for the transfer when it occurs.

**Q. So is every hospital here in Puerto Rico capable of providing the same standard of care?**

A. No, sir.

**Q. Does every hospital here in Puerto Rico have the same resources?**

A. No, sir.

**Q. Does every hospital here in Puerto Rico have the same specialists, the same medical specialists?**

A. Unfortunately not, no sir.

**Q. So in obtaining this information and in making these phone calls as you do, is part of your goal to make sure that wherever you're going to send this patient that the facility that's going to accept them has the capabilities with which to render that care that that person may need?**

MS. LOBEL: Form.

THE WITNESS: Absolutely. A lot of times, yes, during those first communications, depending on the case,

that's usually the first communication.
Before we actually put the doctors together we will ask -- find out from the hospital -- because a lot of times the hospitals say, What is the particular case? And we'll say, This is what we've been told. And they will say, We don't have specialists or whatever.
And so then we would have to go to the next hospital.

BY MR. DRAHOS:

**Q. So does every hospital here in Puerto Rico have to accept every patient?**

A. Yes, sir.

**Q. So in instances where you call a private hospital, and perhaps they may not be interested for whatever reason, has it been your experience that they will turn you away and just simply say, We don't want the patient?**

A. We've heard from communications that they are full, they don't have a specialist available, for, you know -- yes, for a variety.

**Q. So, then, does that then mean that not every hospital is going to accept every patient's request?**

MS. LOBEL: Form.
THE WITNESS: Yes, sir.
BY MR. DRAHOS:
**Q. There may be instances where for whatever reason the hospital has to turn you away?**
MS. LOBEL: Form.
THE WITNESS: Yes.
BY MR. DRAHOS:
**Q. Is that part of the goal then to make sure that that administrative red tape is handled before a patient is sent? Because I would imagine it would be a pretty terrible thing if you sent somebody to a hospital and they turned you away and you have no alternative plan for where else to send the patient, correct?**
MS. LOBEL: Form.
THE WITNESS: Yes, sir.
BY MR. DRAHOS:
**Q. Has it been your experience in the years of doing this, it's most efficient and most effective for the safety of the parent to work out the arrangement ahead of time that that hospital is going to accept that patient?**

MS. LOBEL: Form.
THE WITNESS: Yes, sir.
BY MR. DRAHOS:
**Q. Okay. And what about the actual logistics of the transfer itself?**
**Does the port agent also get involved in coordinating ambulance services?**
A. Yes.
MS. LOBEL: Form.
THE WITNESS: Yes, it's part of the process. Once we have established a hospital, a receiving facility, that is communicated to the ambulance company, because usually when we coordinate the ambulance the first thing they are going to ask us is the name of the hospital and their receiving physician.
BY MR. DRAHOS:
**Q. So why does the ambulance company want to know that?**
A. Because when they arrive to the hospital they have to have -- to be able to transfer the patient over to the hospital. They will be asked who is receiving this patient.
**Q. So in Continental's 30-plus years of**

**providing medical transfer services here in San Juan, will an ambulance company accept a service request without the accepting-facility being confirmed?**

THE WITNESS: No, sir, not from a cruise ship.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So they will not come unless you all are able to tell them there is a facility who has accepted the patient?**

MS. LOBEL: Form.

THE WITNESS: They will not move the patient, correct.

BY MR. DRAHOS:

**Q. Is this an easy process?**

A. No, sir.

**Q. Why not? What are some of the challenges that you all face when trying to facilitate this kind of arrangement?**

MS. LOBEL: Form.

THE WITNESS: I've lived her close to 35 years of my life. I love my island very much. But I would say one of the areas that we're definitely lacking is

our medical services. And, you know, it's three and a half million people in a small 100-mile by 35-mile wide island.

It's just difficult. To get anything coordinated via telephone is difficult. Just to get anything from Point A to Point B is difficult because of the congestion, the traffic. You know, it's -- yes, it's challenging, yes, sir.

BY MR. DRAHOS:

**Q. You made mention of the fact that getting anything done by telephone is difficult.**

**Explain to me some of the challenges that Continental Shipping faces when trying to just simply make a phone call.**

A. Well, first, just to get them to answer the phone can be challenging. And once we do get them -- get them answered, if it happens to answer -- then a lot of times we get in the process of being transferred. We'll call and maybe a nurse will pick up and she'll put us on hold or transfer us over to somebody else. And somebody else won't know. And they will transfer us again.

So, then, we've had situations where we eventually have been put on hold and the actual line cuts off and drops and then we have to call again.

So, yeah, it can being quite challenging.

**Q. So tell me a little bit about your knowledge of the resources for ambulance services here on the island as well. What's that like?**

MS. LOBEL: Form.

THE WITNESS: It falls in line in the same lane. I mean everything is -- there's just -- the system is definitely overburdened. And ambulance companies, we've gone through a myriad of different companies just to try to establish consistent service from them also.

BY MR. DRAHOS:

**Q. What do you mean by that?**

A. Well, sometimes you can call an ambulance. And by the time they arrive it might not necessarily be the time that you called when they dispatch the ambulance.

When they dispatch it and it

arrives, we've had cases where we've had ambulances arrive and, you know, we asked for an ACL, a more advanced life support system ambulance, and we get a basic life support system arrive. We've had to turn them away and call the right ambulance to get it into place.

So, yeah, it's a challenge.

**Q. When you make a phone call to request an ambulance service, are you essentially competing with the other 3.5 million people on this island who may necessarily also need ambulance services as well?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So tell me a little bit about the unique nature of the logistics of this island itself; how many roadways are there into -- strike that.**

**Let me ask you first: Where is the Port of San Juan located on island?**

A. In Old San Juan.

**Q. In Old San Juan?**

A. Yes, sir.

**Q. How many roads are there into Old**

**San Juan?**

A. There is basically a bridge. You come in on one in, and one out.

**Q. So there's one road in and there's one road out.**

A. It's a small island on an island.

**Q. So on a particular day, if there happens to be an accident -- or strike that.**

**Have you encountered situations where traffic becomes a major issue in trying to facilitate a medical transfer?**

A. Absolutely.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Tell me about some of the experiences that you have had in that regard.**

A. It is -- San Juan is the major hub for politics; the governor's mansion is there; Capitol Building is there; it's also the main tourist section with El Morro Castle up on the top.

It's a tradition in Puerto Rico that on weekends, more so than during the week, that everybody kind of takes the family, takes a trip to Old San Juan to see the sights.

So there's a lot of movement in and out of the city, yes, sir.

**Q. Okay. So no matter what day of the week that a request for medical transfer occurs, that one road in and one road out is also competing with any and all traffic to and from the government buildings; any and all traffic to and from these major tourist sights; and any and all traffic that could be related to the castle and all of the other --**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. What would you call them, landmark areas that are in this --**

A. The whole city is basically a landmark in itself.

**Q. Okay. So what ambulance service was used in this particular case regarding a passenger or a guest named Richard Burgess?**

A. Sunny Ambulance, S-U-N-N-Y, I believe is the way they spell it.

**Q. Is Sunny Ambulance a public or a private ambulance company?**

A. It is a private.

**Q. So I don't understand, why not just call 911 when you have a medical emergency at the port?**

A. As I mentioned earlier, 911, first of all, is very inconsistent as most other services are, so you lose complete control over communications. You don't know when they are going to arrive.

And also with 911 we have no -- they take typically -- their mandate is to take the patient to the nearest facility, regardless of the condition, to stabilize and then transfer from that point.

**Q. So --**

A. So we use that usually as the last-ditch option or last measure, so to speak, if that would be the case.

**Q. In other words, you only resort to 911 when there's literally no other option available to transfer the patient?**

A. Yes, sir.

**Q. And --**

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. -- you said earlier that you lose**

**communication with them.**

**Can you tell me the differences in communication between when you would facilitate a transfer with a private ambulance company and when you turn it over to 911?**

MS. LOBEL: Form.

THE WITNESS: Well, with private we have direct lines to their supervisors and dispatch, so we can constantly call and find out, you know, what's the status? What's going on? Where is the ambulance? We're not seeing anything.

But in 911, outside, re-calling 911, which gets you probably transferred to a different 911 operator, there's no way for us to know when the actual ambulance will arrive.

BY MR. DRAHOS:

**Q. Okay. And you also made mention of the fact that it's 911's policy to transfer the patient to the nearest destination; is that correct?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:
**Q. And what is the nearest destination from the Port of San Juan where a guest from a cruise ship would be transferred if 911 was to follow that directive?**
A. To a clinic called Hoare, H-O-A-R-E, if I'm not mistaken.
**Q. So tell me about the Hoare Clinic; what is that exactly?**
THE WITNESS: I wouldn't say -- it is a very small dispensary type clinic operation, usually for minor type incidents. But we've had cases where patients in the past were transferred to that facility and it was not a positive experience.
BY MR. DRAHOS:
**Q. So, pointblank, Mr. Threadgill: If a request was made to transfer a stroke patient, would sending them to the Hoare Clinic be a wise move?**
A. No, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Why not?**

A. Because they are barely a hospital. Like I said, based on the experience that we have, you know, they have very rudimentary services that they can offer. It's more of a clinic, a dispensary -- I don't know the term.

**Q. Okay. So is there a hospital in Puerto Rico that's the preferred choice for stroke care?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. And what is the name of that of hospital?**

A. The Hima Caguas.

**Q. And why is Hima Caguas the preferred choice for stroke care here in Puerto Rico?**

A. Based on our experience, you know, this has always been where we have been referred by many doctors to go. And they have -- as far as we know, the best -- the only center that can best handle these cases.

**Q. So is Hima, in your experience, the top-ranked hospital facility in the country for stroke patients?**

A. Yes.

**Q. Do they have the highest accreditation by the Joint Commission for stroke care?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Do they offer 24/7 medical care in a stroke unit?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Are they the only hospital in Puerto Rico capable of providing 24/7 care in a stroke unit?**

MS. LOBEL: Form.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

**Q. Do they also offer 24/7 neuro-intensive care?**

MS. LOBEL: Form.

THE WITNESS: Based on our experience, yes, sir.

BY MR. DRAHOS:

**Q. And do they also have advanced imaging studies capable of reading and**

**interpreting brain injuries on a 24/7 basis?**
A. Yes, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. And what's the reputation in this country -- what is Hima Hospital -- strike that.**
**What is Hima San Caguas's [sic] reputation here in Puerto Rico?**
A. Well, I'm not medically trained or anything, but if it was my family member that's probably where I would want them to go to, a loved one.
**Q. Okay. And how about the working relationship with Hima and Continental Shipping; have you had some experience with them?**
A. Yes, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Prior to February of 2019, had you ever had any kind of medical transfers sent to Hima before?**
A. Yes, sir.
**Q. And what has the experience been like?**
A. It has been fairly positive.

Q. Okay. You need to speak up just a little bit.
A. It's been fairly positive, fairly positive.
Q. Have you had any negative experiences with Hima San Caguas?
A. Not that I recall, no, sir.
Q. Is there any financial incentive for Continental Shipping to transfer a patient to Hima San Caguas?
A. No, sir.
Q. In other words, do you get any kickbacks or bonuses?
A. No, sir.
Q. So I want to direct your attention to the matter that we're here today about that involves a guest aboard of Royal Caribbean Harmony of the Seas named Richard Burgess, specifically a request for a medical transfer that took place on February 21, 2019.
Were you working for Continental Shipping that day?
A. Yes, sir.
Q. What role were you serving in?
A. In the office probably conducting

day-to-day operations, specifically I couldn't -- I wouldn't remember.

**Q. Do you have an independent recollection of what you were doing on February 21st?**

A. No.

**Q. All right. Who was the boarding agent who was assigned to the Harmony of the Seas on February 21, 2019?**

A. Jennifer Robles and the field supervisor Mr. José Ubiñas.

**Q. Can you spell his last name for me?**

A. U-B-I-Ñ-A-S.

**Q. Okay. And so what does a boarding agent do when a cruise vessel arrives at the port?**

A. Well, we break down operations in pre-arrival, vessel arrival, and post arrival.

Pre-arrival we would prepare the documentation and get everything going. And then the agent is to be on the pier about 30 minutes prior to the arrival to assure that the linesman is there, that the pier is in preparation to accept the arrival of the cruise ship.

Make sure that CBP is there, Customs and Border Protection, just to make sure that the vessel gets alongside, gets its gangways down, and is cleared to go as soon as possible for its port call in San Juan.

**Q. So when you broke this down into categories of pre-arrival, vessel arrival and post arrival, I want to focus on the vessel arrival part of that job.**

A. All right.

**Q. Does that mean when the vessel arrives into port, the boarding agent physically gets on the ship?**

MS. LOBEL: Form.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

**Q. So on February 21, 2019, when the Harmony of the Seas arrived into port, did Jennifer Robles get on the ship?**

A. Yes, sir.

**Q. For how long of a period of time did she remain on the ship?**

A. She was probably there most of the day.

**Q. When you say "most of the day,"**

**what, into the afternoon?**

A. She's assigned the vessel, to monitor and be there for the vessel's needs, and to make sure all services are coordinated.

If she would have had to have left the pier, which rarely happens, because we have other agents in training, or other types of gophers, if you want to call them that, that would run around, but she should be on the vessel most of the time, yes, sir.

**Q. Okay. So if the Harmony of the Seas was scheduled to arrive to the Port of San Juan on February 21, 2019, at 7:00 a.m., what time would Jennifer Robles have been at the port?**

A. Probably at 6:30.

**Q. And what time would she have boarded the ship?**

A. As soon as the first gangway was put up.

**Q. Okay. I'm going to hand you what we are going to mark as Composite Exhibit B to this deposition.**

MR. DRAHOS: And, Sarah, for your purposes, it's the emails that were disclosed in the case. The Bates number

for Exhibit B is GR87 through GR107 [sic].

Let me know when you get there and I'll wait.

[Defendants' Composite Exhibit B was marked for identification.]

MS. LOBEL: Just one second. One second, I have to scroll back.

MR. DRAHOS: No problem.

MS. LOBEL: Okay.

BY MR. DRAHOS:

**Q. Okay. So, Mr. Threadgill, I would turn your attention to GR88, which is the second page contained within Defendants' Composite Exhibit B; do you have it there in front of you?**

A. Yes, sir.

**Q. I would like to ask you, do you see about a quarter of the way down the page there's a heading there that says "From: HM Medical Secretary."**

**Do you see that?**

A. Yes, sir.

**Q. And it says, "To: Operations@ContinentalShipping.com"; do you see that, sir?**

A. Yes, sir.

**Q. Is that Continental Shipping's email address?**

A. Yes, sir.

**Q. It has a comma there, and it says, "Continental@coqui.net"; what address is that?**

A. That's a backup email that we use in emergencies should something happen to our primary email, which is the first one. Like a technical difficulty, which happens.

**Q. Okay.**

A. Sometimes the service provider -- very rarely does it happen -- but the service provider had a crash or something that we cannot access those emails, we have another option which is the secondary continental@coqui.net option.

**Q. And so based on what we see in GR88, what time did the Royal Caribbean notify Continental Shipping for a medical disembark for Richard Burgess, on February 21, 2019?**

A. We received the email at 10:59.

**Q. All right. So what time does it indicate there on GR88 that this email was sent?**

A. It's like 9:59.

**Q. And can you turn your attention to GR99 -- actually on mine GR99 runs through to GR100.**

**But do you see on GR99 what appears to be midway down a response written by Continental Shipping; do you see that?**

A. I think I'm lost here -- here it is on the bottom, 10:59 a.m.

**Q. So does the email that's contained in GR99 through GR100 appear to be identical to the email that's contained within GR88?**

A. Yes, sir.

**Q. With the exception that the GR99 email indicates that it was sent at 10:59 a.m.?**

A. Yes, sir.

**Q. And the email that's contained within GR88 says it was sent at 9:59 a.m.?**

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Why is there an hour discrepancy between these two emails, even though they're identical?**

A. The vessel operates on Eastern Standard Time, while we operate on Atlantic Standard Time.

**Q. So does that then mean that Atlantic Standard Time is an hour ahead of Eastern Standard Time?**

A. When the clocks change in the fall, you guys fall back -- or spring forward in spring. We do not. We stay the same. So we do not change the time.

**Q. So, then, your email accounts run off of Atlantic Standard Time?**

A. Yes, sir.

**Q. And the email accounts for the ship run off of Eastern Standard Time?**

A. Yes, sir.

**Q. Okay.**

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So if the request was made for medical disembark for Richard Burgess at 9:59 Eastern Time, or 10:59 Atlantic, would Jennifer Robles still have been aboard the Harmony of the Seas at the time?**

A. Yes, sir, probably most likely, yes, sir.

**Q. And if she were still aboard the vessel, would she then physically report to the**

**medical center herself?**
A. Yes, sir.
**Q. And if she was physically in the medical center herself, would there be any need for phone calls between the medical center and Jeff Robles at that point?**
A. Not if she's there, no sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Based upon what you reviewed in GR88, does Continental Shipping agree that the requests made by Royal Caribbean was done so in a clear and comprehensive manner?**
A. Yes, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Was there any confusion at all about what was being requested from Royal Caribbean?**
A. Based on this email, no, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. And so did Continental Shipping understand the medical urgency of the request?**
A. Absolutely.
**Q. Okay.**

A. Any medical situation, the minute we get an alert to a medical, everything is dropped and it's the first thing they attend to, is our standard procedure.

**Q. In other words, when you get a request for a medical disembark, do you wait around until it's convenient to get to it or do you get to it immediately?**

A. Regardless of what the situation is, the minute we get that emergency code red, we're moving quickly, yes, sir.

**Q. And so does Continental Shipping then agree that they understood the time-sensitive nature of the request that was being made by Royal Caribbean on February 21, 2019?**

A. That would be my understanding, yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Did Continental Shipping also understand the particular medical care needs that would be required for Mr. Burgess in facilitating this transfer?**

MS. LOBEL: Form.

THE WITNESS: The stroke? Yes, sir.
Might not know all of the details of the stroke, but I understand that's a pretty serious situation, yes, sir, and so do our agents.
BY MR. DRAHOS:
**Q. Okay. So did Jennifer Robles speak to the ship physician aboard the Royal Caribbean Harmony of the Seas on February 21, 2019 about this transfer?**
A. Yes, sir.
**Q. How would you know that?**
A. Because she would have had to facilitate the communication between the hospital and the doctor on board.
**Q. Okay. So whether or not this communication was done over the phone or face-to-face, in person, would Jennifer Robles have ever reached out to Hima Hospital to facilitate a transfer without having first spoken to the doctor?**
MS. LOBEL: Form.
THE WITNESS: No.
BY MR. DRAHOS:
**Q. So as you sit here today as the**

**corporate representative for Continental Shipping, are you able to testify to the specifics of what was discussed between Jennifer Robles and the ship's doctor?**

A. No, sir.

**Q. Is the only person who can speak to the specifics of what took place between Continental Shipping and the ship's doctor here at Continental Shipping, Jennifer Robles?**

A. Yes, sir.

**Q. All right.**

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. In other words, there isn't anyone else here at Continental Shipping who can speak to what happened between the agent and the ship doctor other than Jennifer Robles?**

A. Yes, sir.

**Q. Okay.**

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So where was Richard Burgess ultimately transferred to on February 21, 2019?**

A. Hima Caguas.

**Q. And why was it that he was**

**transferred to Hima?**

A. Well, based on the experience that we've had, that would have been the best place to take him.

**Q. And that would have been the best place to take him because he was under suspicion for a potential stroke?**

A. Yes, sir.

**Q. Why not just transfer him to Ashford Presbyterian Hospital? That's the nearest hospital on the port.**

A. Based on our experience, Ashford has never accepted these kind of cases in the past.

**Q. How many years have you worked for Continental Shipping?**

A. About twenty-five years.

**Q. So in the 25 years that you've worked for Continental Shipping, Ashford Presbyterian Hospital has never accepted a transfer a stroke patient?**

A. Not that I am aware of, no, sir.

**Q. So I want to ask you if the evidence in this case were to indicate that Sunny Ambulance, which was the ambulance that you testified was used to transfer Mr. Burgess,**

**dispatched at 12:21 p.m., what does that indicate to you in terms of when Hima Hospital confirmed their availability?**

MS. LOBEL: Form.

THE WITNESS: That could be a little challenging to pinpoint, because I would assume that at that point, that is when they had their confirmation that the case was accepted.

However, I don't know, because it might have been accepted earlier.

If they dispatched -- that was the time they dispatched. I don't know the time that they actually received the call and the confirmation.

BY MR. DRAHOS:

**Q. Okay. So in attempting to recreate retrospectively what happened on February 21, 2019, if we were to go off of the run report of Sunny Ambulance, which indicates that they dispatched at 11:21 a.m. Eastern Time, 12:21 p.m. Atlantic, does that then mean to you, as the corporate representative for Continental Shipping, that Hima San Caguas must have confirmed their willingness to take Richard**

**Burgess by at least 11:21 a.m. Eastern, 12:21 Atlantic Time?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Because Sunny Ambulance wouldn't have come without that confirmation in place?**

MS. LOBEL: Form.

THE WITNESS: They would not have moved the patient, correct.

BY MR. DRAHOS:

**Q. And so if the request was made by Royal Caribbean at 9:59 a.m. Eastern, 10:59 a.m. Atlantic, and the confirmation had to have been accomplished by at least -- the confirmation from Hima had to have been accomplished by at least 11:21 p.m. Eastern, 12:21 p.m. Atlantic, does that then mean that at most it took Continental Shipping an hour and 22 minutes to facilitate this transfer?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So what I would like to do then -- again, assuming that Sunny Ambulance left the**

**minute they received word of this confirmation -- I would like for you to go through with me, please, for the benefit of the members of the jury, everything that Continental Shipping would had to have done in order to get that done within that time frame, okay, sir?**

A. Okay.

**Q. So let's go back over and review.**

**What is the first thing that Continental Shipping would have had to have done in order to facilitate this transfer within one hour and 22 minutes?**

A. Well, the first thing, they would have to receive the notification. In that case if the vessel is in port, the agent would go immediately -- drop everything and go to the medical facility to --

**Q. So in this instance, then, when a notification was received, Jennifer Robles would have stopped what she was doing and gone directly to the ship's medical center?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. And then at that point, Jennifer**

**Robles would need to get the information from the doctor as to what the condition of the patient was and the medical needs?**

A. Yes, sir.

**Q. All right. And so at that point is it Jennifer Robles that calls Hima Hospital?**

A. Normally, yes, we call to try to establish the contact --

**Q. And so --**

A. -- because of the challenges that we've had in the past where, you know, ships have called directly. We've had cases where they tried to call and they can't get through; language barrier issues; nobody picks up.

Just the things that we discussed earlier. The challenges, since we're a little more attuned to those challenges and we understand how they operate, we try to facilitate that part of the -- to expedite as best as possible.

And then usually she reaches out and it's very rarely that she'll immediately speak to the ER doctor on duty.

**Q. So when Continental Shipping facilitates a medical transfer to Hima San**

**Caguas, is there a particular line that has to be called first in order to get that communication under way?**

A. Yes, sir.

**Q. What is that line that you all have to call?**

A. Hima is three hospitals, basically.

They have a branch in Bayamon; they have a branch in Caguas; and they have a branch in Fajardo, which is another town in Puerto Rico.

**Q. So does Jennifer Robles have to call all three of those branches?**

A. No, sir.

**Q. Who does she call?**

A. She calls -- there's a general line where she would speak to a facilitator or a medical secretary, or some sort like that where we present the case.

And then usually they would say, Okay, we'll call you back. And kind of guide you through in the direction that you need to call or go.

**Q. So Jennifer Robles would call this Hima help line; speak to this particular**

**representative; and then that representative makes the phone calls to the various hospitals?**

MS. LOBEL: Form.

THE WITNESS: They would usually be the one to guide, yes, sir.

BY MR. DRAHOS:

**Q. Okay.**

A. I am sure in this particular case they said Hima Caguas, and then they would have to connect us to whoever the doctor is. And Jennifer would have to wait for the information, because once she had that she could contact the doctor and then put those two doctors together to finally present the case.

**Q. So when you are going through this line of communication at Hima Hospital, you are reliant, then, upon the speed and efficiency of this representative at Hima to work through their system and identify somebody who can eventually make the decision; is that correct?**

A. Absolutely.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. In your experience typically, how long does it take for Hima to do this due**

**diligence on their end?**

A. Best-case scenario it would be 15, 20 minutes; worst-case scenario would be 30, 40 minutes.

**Q. So anywhere between 15 to 40 minutes, it's been your experience, that it takes for Hima to do this due diligence?**

A. Yes, sir; educated guess yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So in this instance, then, by virtue of the fact that Richard Burgess was transferred to Hima, does that mean that this process must have been followed? You couldn't just drop him off without Hima saying that they would accept him, right?**

A. No, no, sir.

**Q. Does that then mean that that process must have been followed?**

A. Yes, sir.

**Q. So once Hima calls back to advise that they have somebody who's willing to listen to the case, what does Jennifer do then?**

A. At that point she will contact the point of contact given. And usually at that

point she'll hand the phone over to the doctor on board who will then consult with the receiving physician.

And then at that point it's determined if they will receive the patient. And if it is, the doctor will confirm that Dr. -- we usually require a name, so we can then call the ambulance company and confirm that the hospital has accepted the patient, and Dr. X will be the receiving physician.

**Q. All right. So in your experience, is there two different ways that this doctor-to-doctor communication can be facilitated, either the doctor on the cruise ship can call the hospital or if Jennifer Robles is physically in the medical center, she can hand her phone to the doctor and have the doctor on the cruise ship speak to the doctor at Hima?**

A. Inside the ship, being a metal structure, sometimes the cell phones don't work that well. So if the doctor, when they were inside the ship, it was probably communicated through the ship's telephones, or they went out to the gangway and she called from outside the gangway, which I've seen done also. The doctor

and the agent go out to the gangway to make the call.

**Q. How does Jennifer Robles -- if she's on board the ship -- how does she know what number to call?**

MS. LOBEL: Form.

THE WITNESS: After all these years of experience, we have all -- all of the agents have the -- in their memory have all of the hospital contacts.

BY MR. DRAHOS:

**Q. So in the memory of her phone she can go to it, go to Hima, and dial it right off her cell phone?**

A. Yes, sir.

**Q. All right. So is there potentially a scenario, sir, where Jennifer Robles is physically in the medical center, gets the communication that Hima is willing to listen to the case --**

A. Yes.

**Q. And handed her phone to the ship's doctor for this discussion to be had?**

A. It would have had to have happened that way.

**Q. Okay. So once the ship doctor and the Hima doctor talk, what happens next?**

A. At that point the doctor will either say, Okay, I'll take the case or I won't take the case.

And that the doctor will turn to Jennifer and say, They are accepting the case, and the doctor -- whatever his name is -- and that way then she can call the ambulance company back and give them the information required for them to move the patient.

**Q. Okay. So once this confirmation is had then Continental Shipping is able to call the ambulance to facilitate transfer; is that right?**

A. Yes.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So for instance, by virtue of the fact that Richard Burgess was transferred to Hima San Caguas, does that then mean that Jennifer Robles and the ship's doctor spoke; she obtained --**

MS. LOBEL: Form.

BY MR. DRAHOS:
Q. -- the information that she needed; she contacted Hima, the help line, spoke to that representative.
That representative then called various different departments and personnel at Hima to confirm their availability.
Jennifer Robles heard back from that representative; put the doctor in touch with the physician for Hima; and then contacted a private ambulance service, all within an hour and 22 minutes?
A. Yes, sir.
Q. Based upon your 27 years --
A. Twenty-five.
Q. Twenty-five years with Continental Shipping, for a stroke patient like Richard Burgess in the Port of San Juan, would this type of response time, an hour and 22-minute response time, have been a below-average, average or above-average performance by Continental Shipping?
A. Above average.
Q. Why is it that you believe it to be above?

A. Because of the challenges that we spoke about before previously.

**Q. Okay. Those are all of the questions that I have for you.**

**Well, actually, let me ask this: Do you think that there's anything that either Continental Shipping or Royal Caribbean could have done to get Richard Burgess transferred to Hima Hospital any faster than what was done on February 21, 2019?**

A. No, sir.

MS. LOBEL: Form.

MR. DRAHOS: Those are all the questions that I have. Ms. Lobel will have an opportunity to ask you whatever questions that she would like to ask.

Sarah, is it all right if we take a quick bathroom break?

MS. LOBEL: Yeah, we can take a ten-minute break.

VIDEOGRAPHER: We are going off the record. The time is 11:19.

[Recess taken from 11:19 a.m. until 11:26 a.m.]

VIDEOGRAPHER: Back on the record.

The time is 11:26. On the record.

EXAMINATION

BY MS. LOBEL:

**Q. Good afternoon sir; how are you?**

A. Good afternoon, yes, ma'am.

**Q. Sorry?**

MR. DRAHOS: There were just pleasantries being exchanged, How are you doing? That's it.

MS. LOBEL: I'm sorry.

MR. DRAHOS: The court reporter is saying that the computer is too far away; you may want to move it up.

MS. LOBEL: That's fine, because I can't hear him at all.

(Microphone and computer monitor is moved.)

MS. LOBEL: All right. Let's try this again.

BY MS. LOBEL:

**Q. Okay. Good afternoon, sir; how are you?**

A. Good afternoon, yes, fine.

**Q. All right. My name is Sarah Lobel. My understanding is that my office sent you a**

**subpoena for deposition, for a deposition like we're doing here today; were you aware of that?**

A. Yes.

**Q. And we also requested numerous documents from your company, but none were ever sent in response to our subpoena; were you aware of that?**

A. Yes, ma'am.

**Q. Why is that?**

MR. DRAHOS: Object to form.

BY MS. LOBEL:

**Q. You may answer.**

A. It was referred to our --

**Q. You may answer.**

**MR. SALDAÑA: Let him answer, please.**

THE WITNESS: I said as far as I'm aware, that's when our lawyer was brought in and at that time I deferred to my lawyer.

BY MS. LOBEL:

**Q. Okay. Did you get documents over to Royal Caribbean from your company when requested?**

MR. DRAHOS: Object to the form.

THE WITNESS: No, ma'am. Not that I am aware of.

BY MS. LOBEL:

**Q. Okay. Why is it you are willing to appear here today without a subpoena, but refused to come for a deposition when we sent a subpoena with the same request?**

**MR. SALDAÑA: Objection to the form of the question.**

MR. DRAHOS: Form. Join.

BY MS. LOBEL:

**Q. You may answer.**

**MR. SALDAÑA: If you can.**

THE WITNESS: Because I was asked to by the lawyer.

BY MS. LOBEL:

**Q. I see. Can you tell me everything that you did to prepare for today's deposition?**

A. I was at a meeting yesterday. We talked nearly four hours where we discussed it.

**Q. Who was at the meeting?**

A. Mr. Saldaña and Mr. Drahos; Mr. Christian Busto from within our company; Mr. José Ubiñas, who is the field supervisor.

**Q. How many meetings did you have with**

**Mr. Drahos present?**

A. That was the second time I met Mr. Drahos, yesterday.

**Q. When was the first time that you met Mr. Drahos other than yesterday?**

A. He came in, I believe in November, if I'm not mistaken, for a meeting, a meet-and-greet, and mentioned the possibility of this happening.

**Q. Okay. And that was in November of 2021?**

A. Yes, ma'am.

**Q. How long did your meeting with Mr. Drahos last in November of 2021?**

A. I would say probably less than an hour.

**Q. What did you discuss with Royal Caribbean's lawyer in November of 2021?**

**MR. SALDAÑA: Object to form, and admonition of the attorney-client privilege. And I'm instructing the witness not to answer that.**

MR. DRAHOS: Objection to the form.

MS. LOBEL: The attorney-client privilege would have been waived if a

third party was present. Mr. Drahos represents Royal Caribbean.

BY MS. LOBEL:

**Q. So what did you and Mr. Drahos discuss?**

**MR. SALDAÑA: Objection and admonition of the attorney-client privilege and I'm instructing you not to answer any of those questions.**

MS. LOBEL: I don't understand the basis, sir, if there was a third party present which would have waived any client privilege.

Can you please advise me so I can take it up with the Court?

MR. SALDAÑA: Take it up with the Court.

MS. LOBEL: I don't understand the basis of your objection since the attorney client privilege was waived.

MR. SALDAÑA: No, the basis of my objection is that we have what is called a JDA, a Joint Defense Agreement, with counsel. And it specifically states that we do not waive any of those rights and

privileges.
So you can take it up with the Court.
BY MS. LOBEL:
**Q. Okay. Sir, is it your understanding that you are also represented by Royal Caribbean's lawyers in addition to your company's attorney?**
MR. DRAHOS: Objection to the form.
BY MS. LOBEL:
**Q. You may answer.**
**MR. SALDAÑA: No, no, you won't.**
MS. LOBEL: Okay. I see.
BY MS. LOBEL:
**Q. But, sir, are you refusing to answer any question about what you discussed with Mr. Drahos who represents Royal Caribbean?**
**MR. SALDAÑA: I'm instructing you to do that, yes.**
BY MS. LOBEL:
**Q. You may answer, sir.**
**MR. SALDAÑA: You have to say yes, I'm refusing.**
THE WITNESS: Yes, I'm refusing. I'm sorry.

BY MR. SALDAÑA:

**Q. Okay. Just so I'm clear, who else was present during the meeting that you had with Mr. Drahos, the lawyer, and your employer in November of 2021, other than Mr. Drahos?**

A. Okay, Mr. Christian Busto.

MS. LOBEL: Who is that?

THE WITNESS: He is the president of Continental Shipping; Mr. José Ubiñas is field supervisor; Ms. Jennifer Robles and Ms. Line García.

BY MR. SALDAÑA:

**Q. How long was this meeting, would you say?**

A. Less than an hour, I would say.

**Q. All right. Let's talk about your meeting yesterday. How long was your meeting yesterday with Mr. Drahos?**

A. Excuse me? I'm sorry, please repeat.

**Q. Certainly. How long was your meeting with Royal Caribbean's lawyer yesterday?**

A. Approximately --

MR. DRAHOS: Objection to the form.

THE WITNESS: Approximately four

hours.
BY MR. SALDAÑA:
**Q. Who else was present?**
A. Mr. Saldaña, our lawyer here; Mr. Christian Busto, president of Continental Shipping; Mr. José Ubiñas, field supervisor of Continental Shipping; and Ms. Line García, ex-employee of Continental Shipping.
**Q. Was Ms. Robles there?**
A. No, ma'am.
**Q. And Mr. Line García was there, correct?**
A. Yes, ma'am.
It's written as "Line," but it's pronounced "Lynn."
**Q. Okay. Mr. Line García was there too, correct?**
**MR. SALDAÑA: Mrs.**
THE WITNESS: Yes.
BY MR. SALDAÑA:
**Q. And is Mr. García an employee of the company?**
**MR. SALDAÑA: Ms. García please.**
THE WITNESS: Ms. García.
No, ma'am.

THE INTERPRETER: Apologize, Mr. García. When did Mr. García leave the company?

MR. SALDAÑA: Ms. García, Ms. García.

MR. DRAHOS: Line García is a female.

MR. SALDAÑA: It's a female.

THE WITNESS: I'm so sorry. It's not coming through clearly. Forgive me.

BY MR. SALDAÑA:

**Q. When did Ms. García leave the company?**

A. We had to shut down due to the pandemic and all of our staff was laid off.

And when we finally began to restart after 18 months of being down, Ms. García decided that she no longer wanted to continue this line of work and she didn't come back.

**Q. Okay. Who was representing Ms. García yesterday?**

**MR. SALDAÑA: Luis Saldaña as well.**

**Her participation --**

MS. LOBEL: Sorry.

MR. SALDAÑA: It was me; Luis

Saldaña; Continental Shipping's attorney. Her participation in the meeting was to decide who was going to represent in the 30(b)(6) deposition Continental Shipping.

So anything that we discussed with her was pursuant to attorney-client privilege and work product doctrines. And he's not going to answer anything that has to do with what we discussed.

MS. LOBEL: Okay. I see.

BY MR. SALDAÑA:

**Q. Sir, what did you review materials-wise? Any documents? Any paragraphs? Anything of that nature?**

**MR. SALDAÑA: You may answer.**

THE WITNESS: Oh. We basically discussed --

MR. DRAHOS: No, no, you're not supposed to talk about what you discussed. She asked you what you reviewed.

MR. SALDAÑA: What you reviewed.

MR. DRAHOS: What you reviewed in preparation for your testimony, if anything.

MS. LOBEL: Correct.
THE WITNESS: Reviewed.
BY MS. LOBEL:
**Q. Do you need me to reask the question?**
A. Yes, please, I'm sorry.
**Q. Certainly. Let me reask the question.**
**Sir, what I want to know is in preparation for today's deposition, what documents or other materials did you review in order to prepare?**
**MR. SALDAÑA: Objection. You may answer. What material did you review?**
THE WITNESS: We just reviewed the contracts and the emails that we were discussing today.
BY MS. LOBEL:
**Q. I didn't hear the last half of your sentence; you reviewed the contract and what else?**
A. The contract and the emails that we were reviewing today.
**Q. All right. Did you have to do any personal research in order to prepare yourself**

**for today, any materials from the company that would have been accessible to you?**

MS. LOBEL: Objection to the form.

You may answer.

THE WITNESS: No, ma'am.

BY MS. LOBEL:

**Q. Did you speak with Jennifer Robles?**

A. Not since -- I haven't spoken to Jennifer in more than -- since I think October.

MR. SALDAÑA: It is a yes or no.

THE WITNESS: I'm sorry. No.

BY MS. LOBEL:

**Q. All right. You spoke with Jennifer in October; what did you speak with her about?**

**MR. SALDAÑA: Objection to the form.**

THE WITNESS: Of her coming back to work for Continental Shipping.

BY MS. LOBEL:

**Q. Okay. When was the last time before October of 2021 that you spoke with Ms. Robles?**

A. Probably the month before.

During the pandemic we were talking, I was trying to keep in touch with our ex-employees to gauge if when we returned to service if they were going to be interested in

coming back.
**Q. Okay. And is Ms. Robles going to be coming back to the company?**
A. No. The door is always open. She has not -- for some reason we have not been able to contact her.
**Q. Okay. Are you aware of her last-known contact information, if you wanted to get in touch with her?**
A. Yes, I have her personal cell phone.
**Q. I can't hear you.**
A. Yes, ma'am, I have her personal cell phone.
**Q. Okay. Does Ms. Robles still live in Puerto Rico?**
MR. DRAHOS: Object to form.
THE WITNESS: As far as I'm aware, yes, ma'am.
BY MS. LOBEL:
**Q. Do you know where she is currently working?**
MR. DRAHOS: Object to form.
THE WITNESS: No, ma'am.
BY MS. LOBEL:
**Q. Okay. When was the first time**

**Continental Shipping communicated with Royal Caribbean after this incident occurred?**

A. Please repeat the question, I'm sorry.

**Q. I can't hear you.**

A. Please repeat the question, I'm sorry.

**Q. Certainly.**

**When was the first time that Continental Shipping communicated with Royal Caribbean about this incident after it happened?**

MR. DRAHOS: Object to the form.

THE WITNESS: Normally Ms. García would follow up and send an email, either a day or two after the incident, a follow-up email.

BY MS. LOBEL:

**Q. Was there any communication as to that follow-up email from Ms. García?**

MR. DRAHOS: Objection to the form.

MR. SALDAÑA: Join.

THE WITNESS: I don't know if there was an additional follow-up or not. I'm not aware.

BY MS. LOBEL:

**Q. Okay. When was the first time that Continental Shipping became aware of this lawsuit?**

**MR. SALDAÑA: Object to the form. You may answer.**

THE WITNESS: About a year, year and a half ago maybe.

BY MS. LOBEL:

**Q. Okay. How did you find out?**

A. I received a call from you Mr. Drahos.

**Q. Okay. What did the company learn?**

MR. DRAHOS: Object to form.

MR. SALDAÑA: Join.

THE WITNESS: Well, he just let us know that this was going to happen and at some point this deposition, or something of this nature, was going do happen.

BY MS. LOBEL:

**Q. Okay. And this was about a year and a half ago?**

A. Yes, ma'am.

**Q. All right. Would you agree with me that Continental Shipping has been working with**

**Royal Caribbean for a long time?**
**MR. SALDAÑA: Object to the form of the question.**
MR. DRAHOS: Join.
MR. SALDAÑA: You may answer.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
**Q. How long has Continental Shipping been working with Royal Caribbean?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.
THE WITNESS: When I started working 25 years ago, the relationship was already there.
BY MS. LOBEL:
**Q. Okay. So 35 years ago Continental Shipping was working with Royal Caribbean; is that what you're saying?**
A. Twenty-five, yes, ma'am.
MR. SALDAÑA: Objection.
MR. DRAHOS: Join.
BY MS. LOBEL:
**Q. Twenty-five, excuse me.**
A. Yes, ma'am.
**Q. All right. So in the last 25 years,**

**Royal Caribbean has been working with Continental Shipping?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. All right. Is Royal Caribbean one of Continental Shipping's major clients?**

A. Yes.

MR. SALDAÑA: Objection.

MR. DRAHOS: Join.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. All right. How frequently before the pandemic did Royal Caribbean cruise ships come to the Port of San Juan, that would need your services?**

**MR. SALDAÑA: Objection, convoluted.**

**Was that a question?**

MS. LOBEL: You may answer.

THE WITNESS: Okay.

Approximately -- I would say yeah, about maybe 200 to 250 calls a year.

BY MS. LOBEL:

**Q. I'm not asking about calls. I want**

**to know how many ships would you work with per week, for example, before this pandemic started?**

**MR. SALDAÑA: Object to form.**

MR. DRAHOS: Join.

THE WITNESS: Every time a ship comes to port, that would be about 200, 250 different dates of ships arriving from Royal Caribbean, right.

MR. SALDAÑA: Let him finish his answer.

BY MS. LOBEL:

**Q. I can't hear him.**

A. I'm sorry.

**Q. Go ahead, sir, if you are not finished, I want to hear everything that you have to say.**

A. No, that's it. About 200, 250 calls a year.

**Q. Okay. When the Royal Caribbean ships come into port they ask you to perform certain services, correct?**

MS. LOBEL: Object to form.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. All right. And a cruise ship can**

**ask for assistance for all sorts of types of needs; would that be accurate?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. And if the cruise line wasn't happy with the way a task was performed by your company, they have the ultimate right to use a different port agent, correct?**

**MR. SALDAÑA: Objection.**

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. Okay. And how many times would you say per year Royal Caribbean specifically requests for medical disembark at the Port of San Juan?**

MR. DRAHOS: Object to form.

THE WITNESS: Specifically -- educated guess -- maybe 30, 40 times.

BY MS. LOBEL:

**Q. Are the thirty to 40 times, is that per year?**

A. Yes, ma'am.

**Q. Thank you. And the 30 to 40 times**

**per year that Royal Caribbean requested a medical disembark, is that relatively consistent for the 25 years that you have worked for Continental Shipping?**

MR. DRAHOS: Object to form.

MR. SALDAÑA: Objection.

MS. LOBEL: You may answer.

THE WITNESS: This is an estimated guess. Medical emergencies aren't something that are consistent, other than, you know, when it happens.

So sometimes we'll have cases where it might not be anybody coming off a ship for a month, but other times we might have one particular vessel that has three, four or five cases in one call -- excuse me.

BY MS. LOBEL:

**Q. Understood. I apologize. I understand.**

**But would it be fair to say that this particular incident was not the first time Royal Caribbean had ever requested for a medical disembark?**

A. Yes, ma'am.

**Q. Okay. Would it be fair to say that Royal Caribbean has experience working with Continental Shipping in handling medical disembarks involving medical emergencies at the Port of San Juan?**

**MR. SALDAÑA: Objection. You may answer.**

MR. DRAHOS: Join.

THE WITNESS: If you're talking about a specific cruise operation seeking the ship's medical teams that they have been at the particular -- they rotate them out sometimes, so -- but normally, yes, they should understand.

BY MS. LOBEL:

**Q. Okay. Understood.**

**Now, when there's medical emergencies, does Continental Shipping assume the patient as being under their care until the ambulance or some form of medical transport arrives, or is it the cruise ship that maintains the care of the patient?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

THE WITNESS: No, ma'am. We just

are intermediaries. We are assisting. We don't have any medical training. So, no, ma'am, we would not take over the care of the patient.

BY MS. LOBEL:

**Q. Would it be fair to say that the cruise line has the ultimate responsibility for the medical care of the patient, not Continental Shipping?**

MR. DRAHOS: Object to the form.

MR. SALDAÑA: Object to form.

THE WITNESS: At the end of the day, yes, ma'am.

BY MS. LOBEL:

**Q. You may answer. Okay.**

**Would it be fair to say that Royal Caribbean monitors the process when Continental Shipping assists with medical disembark of the patient at the Port of San Juan?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Object to form.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. Okay. Would it be fair to say that the shipboard doctor oversees process working**

with Continental Shipping in transferring the patient to a hospital in San Juan?

MR. SALDAÑA: Objection.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. And Royal Caribbean is ultimately responsible for ensuring that there's appropriate ground transport for the patient; is that correct?

MR. DRAHOS: Objection to form.

MR. SALDAÑA: Objection.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. You may answer. Okay.

And would you agree with me that Royal Caribbean is also ultimately responsible to ensure that the patient is transferred to a hospital that can appropriately care for the patient's needs?

MR. SALDAÑA: Objection.

MR. DRAHOS: Objection to the form.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. Now, when there was a request for a medical assistance or -- am I correct in

**understanding that the relationship with the parties requires Continental Shipping to keep the cruise line up to date as to the their effort?**

**MR. SALDAÑA: Objection. You may answer.**

THE WITNESS: Usually it's hand in hand; absolutely, yes, ma'am.

BY MS. LOBEL:

**Q. I couldn't hear you.**

A. Yes. Yes, ma'am.

**Q. Okay. Now -- strike that. Forgive me.**

**Now, my understanding is that Continental Shipping agents are supposed to assist Royal Caribbean with regards to medical emergencies as instructed by the cruise line; is that correct?**

MR. DRAHOS: Object to form.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. Okay. And my understanding is that the port agent is not allowed to engage in a service or engage with a service provider, such as ambulance companies, without the approval of**

**Royal Caribbean; is that correct?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Join.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
**Q. Now, are you familiar with somebody by the name of Nancy Heartlein?**
A. Excuse me? Please repeat. Sorry.
**Q. Certainly. Are you familiar with somebody lie by the name of Nancy -- H-E-A-R-T-L-E-I-N -- Heartlein?**
A. No, ma'am.
**Q. Sorry, sir.**
**Can you answer? I haven't heard anything.**
A. I said "no, ma'am."
**Q. Okay. No problem.**
**Are you familiar with someone by the name of Joseph Dueñas? D-U-E-Ñ-A-S.**
A. Yes, ma'am.
**Q. Who is that?**
A. Works for Royal Caribbean Care Team, I believe.
**Q. Have you ever worked with this person before?**

MR. DRAHOS: Object to form.
MR. SALDAÑA: Join.
THE WITNESS: Yes. We've had communications before.
BY MS. LOBEL:
**Q. Now, I want to ask you some questions.**
**You said Ms. Robles was on the Harmony of the Seas --**
[Reporter requests clarification.]
You testified on cross-examination that Ms. Robles was on Harmony of the Seas on the date of incident; do you recall that?
A. Yes, ma'am.
**Q. How do you know that she was on the ship?**
MR. DRAHOS: Object to form.
THE WITNESS: That's where she was assigned. She should have been on the ship. Physically I can't say that she was 100 percent on the ship. But that's where she should have been.
BY MS. LOBEL:
**Q. Okay. But you don't know, as you're sitting here today, if she was on the ship at**

**all on the date of the incident, correct?**

**MR. SALDAÑA: Objection.**

THE WITNESS: I know that she was there for the ship, for the boarding, and was there on arrival because the field supervisor informed me of such.

But if she was there the entire time during the day, I cannot confirm.

BY MS. LOBEL:

**Q. Okay. So you don't know one way or the other if she was on the ship or even at the medical center on February 21, 2019, correct?**

MR. DRAHOS: Object to the form.

BY MS. LOBEL:

**Q. You can answer.**

A. I know that she was on the ship.

**Q. Okay. But you don't know when, correct?**

A. Specifically the whole time, no, ma'am.

**Q. Okay. Understood.**

**And did Ms. Robles document what she did while she was on the ship?**

[Inaudible unidentified voice speaking.]

A. No, ma'am.
**Q. Why not?**
A. A lot of times it's in the field, the agent is handling multiple situations. And we try -- they normally, if they are very busy or whatever the situation might be, we have a folder where she would put any reports of anything that should have -- that happened during the day.
**Q. Well, wouldn't you agree with me that medical disembark involving something as serious as a stroke should be documented?**
MR. DRAHOS: Object to form.
MS. LOBEL: Objection.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
**Q. You may answer.**
A. I did. Yes, ma'am.
**Q. Did she document what she did in regards to this incident?**
A. It's my understanding that she received a text message stating the name of the patient; the receiving facility; and the accepting physician, which then the responsibility would follow up with Ms. Line

García.
**Q. How do you know that she received a text message?**
A. It was a text message that was sent -- it is like a chat; all of the agents have it.
So they would have all received a text message.
**Q. Would the text message have been preserved by the company?**
A. I do not have it.
**Q. Okay. Then how do you know what was the content of the text message with information about Mr. Burgess?**
A. I believe that there's a copy of that around here somewhere, but I don't have it.
**Q. Who has a copy of that?**
A. Who has a copy? I would have to check. I don't know.
**Q. Okay. Now, would the phone number in which Ms. Robles received the text message have been on a Continental Shipping cell phone?**
A. Yes, ma'am.
**Q. Do you know what phone number she would have received this text message?**
A. Jennifer would have been the one who

was sending the text message. Are you asking Jennifer or Line? Sorry.

**Q. I couldn't hear you. You've breaking up. I apologize.**

A. I said repeat the question. I didn't hear the name clearly. Who would have received the text message?

MR. SALDAÑA: Let her reask the question.

MS. LOBEL: Yeah, let me ask the question again.

BY MS. LOBEL:

**Q. I want to know how much -- strike that.**

**Do you know what the phone number was -- strike that.**

**Is the phone number where Ms. Robles would leave the text message about Ms. Burgess, was that a Continental Shipping cell phone?**

A. It would have been sent to all of the cell phones of all the agents, yes, ma'am.

**Q. Okay. Would she have the specific agent's cell phone assigned to her --**

A. Yes, ma'am.

**Q. -- to use while she was on the job?**

A. Yes, ma'am.
Yes. Yes, ma'am.
**Q. Okay. All right.**
**Does the company know which phone was assigned to her on the date of this incident?**
A. Yes, ma'am.
**Q. All right. What was the phone number that was assigned to Ms. Robles at the time of this incident?**
A. (787) 667-5305, if I'm not mistaken.
**Q. I have (787) 667-53 -- and then I lost the rest.**
A. 0-5, zero-five.
**Q. Okay. All right. Thank you, sir.**
**Okay. Now, what cell phone provider did the company use back in 2019?**
A. If I'm not mistaken, it's AT&T.
**Q. Okay. Now, would the cell phones that the agents would use, were they Smart phones?**
[Reporter requests clarification.]
BY MS. LOBEL:
**Q. Certainly. Would the cell phones that the port agents would use, were they like a**

**Smart Phone or an iPhone, or something similar?**
A. Yes, ma'am.
**Q. Okay. Would Ms. Robles have been able to receive emails on her cell phone?**
A. No, ma'am.
**Q. Why not?**
A. Well, emails are sent to our office, email only. And from there they are distributed to the agents.
**Q. Okay. Would the agent be able to receive a copy of the forwarded emails on their cell phone?**
A. No, no, ma'am. We would send information either by text or by -- [Inaudible. Counsel speaking over the witness].
**Q. I'm sorry. Okay.**
**How many text messages were sent to Ms. Robles about this incident?**
MR. DRAHOS: Object to form.
THE WITNESS: Probably none. Because she was probably either contacted -- and this is like I'm speculating -- she was either contacted directly by the ship, or by somebody in our office to go to the medical facility

to begin working the case.
BY MS. LOBEL:
**Q. Did she receive all of these calls on the cell phone that we just discussed?**
[Ringing bell. Reporter requests clarification.]
BY MS. LOBEL:
**Q. Certainly.**
**Would Ms. Robles have received all of the phone calls that you are speculating that she may have received on her port agent cell phone assigned to her by the company?**
A. Yes, ma'am.
**Q. So the only way -- the first time -- Ms. Robles would receive information about this incident would be to look at her cell phone records; would that be fair to say?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
**Q. Okay. Did the company preserve all of Ms. Robles' text messages and call history from the date of the incident?**
A. No, ma'am.
**Q. I didn't hear you.**

A. Oh. No, ma'am.

**Q. Okay. Why not?**

MR. DRAHOS: Object to the form.

THE WITNESS: Because it's not our -- we do not keep the records -- sorry -- unfortunately.

BY MS. LOBEL:

**Q. Okay. Who would have texted Ms. Robles from the company to give her the initial information, since she can't receive emails?**

A. It would have been a call probably. I don't think they would have texted with an emergency. Medical emergency, usually we would be calling.

**Q. Okay.**

A. Either called through -- directly through her contact on the ship; it could have been that way, or it could have been usually through Ms. Line García, which would have been our -- from our office.

**Q. Who would have -- forgive me.**

**Who from the ship would have been Ms. Robles' point of contact?**

**Strike that. Forgive me.**

**Who from the ship was Ms. Robles' point of contact?**

A. Typically it's the guest administration officer on board the vessel.

**Q. So the guest administration officer.**

A. Or the medical facility also would have been aware of her contact information.

**Q. Okay. Does the company know who first contacted Ms. Robles about this incident?**

**MR. SALDAÑA: Objection.**

THE WITNESS: No, ma'am.

BY MS. LOBEL:

**Q. Did Ms. Robles write a report to the captain with regard to her effort in the medical disembark?**

A. No, ma'am.

**Q. How can you tell which hospital she called in order to try to set up a transfer of Mr. Burgess?**

A. Well, the doctor received the patient, so I assume the doctor on board had to have generated [inaudible] from Jennifer to Hima.

**Q. Would her phone records show us which hospitals she attempted to speak with and**

**when?**

MR. DRAHOS: Objection to form.

THE WITNESS: If she was able to get through, absolutely. I would assume so.

BY MS. LOBEL:

**Q. Okay. What was the phone number that -- strike that.**

**Did the company have a list of phone numbers of hospitals to call for particular emergencies?**

A. Yes, ma'am.

Part of our agency information list.

**Q. I can't hear you.**

A. Yes, ma'am.

**Q. Where was that list?**

A. That list is usually provided to all of the vessels; it has all of our agency information list; it has all of the agents' cell phone numbers on it. It has fire, Coast Guard numbers, some hospitals -- not all the hospitals but some of the closer hospitals -- and ambulance companies also listed on that list.

**Q. Where is that list kept?**

A. We usually distribute it out to the vessels, they come by email.

**Q. Give it to the vessels?**

A. Yes, ma'am.

**Q. So if I'm understanding you correctly, there's a list that the port agent gave to Royal Caribbean that includes phone numbers for local hospitals, the Coast Guard and direct contact information for the port agent; is that accurate?**

**MR. SALDAÑA: Objection. You may answer.**

MR. DRAHOS: Join.

THE WITNESS: Normally, yes, ma'am, we distribute them when they arrive.

BY MS. LOBEL:

**Q. Do you know which hospitals were listed on this list for Puerto Rico?**

A. Off the top of my head, I don't know, no, ma'am.

**Q. Okay. Why does the port agent give a list of phone numbers which includes local hospitals to the ship?**

**MR. SALDAÑA: Objection. You may answer.**

THE WITNESS: Okay. Just to be as thorough as -- have them give as much

information as possible to everybody.
BY MS. LOBEL:
**Q. Okay. Is there anything preventing the ship from calling the hospitals directly?**
MR. DRAHOS: Objection to the form.
THE WITNESS: No, ma'am.
BY MS. LOBEL:
**Q. Okay. So if a doctor wanted to help expedite the process in communicating with the hospital for transfer of the patient, they would be free to do so; is that correct?**
MR. DRAHOS: Objection to the form.
THE WITNESS: Yes, ma'am. Yes.
MR. SALDAÑA: Join.
BY MS. LOBEL:
**Q. Okay. Did the company have a list to -- strike that.**
**Does the company have a list to inform the port agent which hospitals are best for specific types of medical conditions?**
**MR. SALDAÑA: Objection.**
THE WITNESS: Other than the agency info list, no, ma'am.
BY MS. LOBEL:
**Q. So how would they figure out which**

**hospital to call for a stroke?**

A. The majority of the agents have been with us for more than 20 years, so most of them know that.

**Q. Okay. Are there other hospitals in the San Juan area that are capable of treating patients with strokes other than Hima Caguas and San Pablo Caguas?**

MR. DRAHOS: Object to form.

MR. SALDAÑA: Objection.

THE WITNESS: Not that I am aware, no, ma'am.

BY MS. LOBEL:

**Q. So if Hima San Pablo Caguas Hospital --**

[Court reporter requests clarification.]

MS. LOBEL: Certainly. Let me reask.

If Hima San Pablo Caguas Hospital says We cannot accept a patient suffering from a stroke, are you telling me there isn't another single hospital on the island capable of treating a patient with a stroke?

MR. SALDAÑA: Objection.
You may answer.
THE WITNESS: Okay. For the best care it would be Hima. Whether another hospital can --
BY MS. LOBEL:
**Q. That's not my question --**
A. -- can treat another case, I mean it depends on the level of care. Obviously you can go to another hospital, but I don't know that the level of care would be the best, no, ma'am.
**Q. That's not my question. My question is:**
**Are there other hospitals capable of treating stroke other than Hima San Pablo Caguas on the island?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Objection.
MR. DRAHOS: Asked and answered.
BY MS. LOBEL:
**Q. You may answer.**
A. Based on our experience, no. We've been refused at most other hospitals, the major hospitals.
**Q. All right. Okay.**

So you're telling me there's only one hospital on the island capable of treating patients with strokes and that's the Hima San Pablo Caguas?

MR. SALDAÑA: Objection. That's the fourth time the witness has been asked the very same question, so I'm going to allow him to answer this last time.

MR. DRAHOS: Join. Argumentative.

MR. SALDAÑA: Objection.

THE WITNESS: In our experience, no, ma'am.

BY MS. LOBEL:

Q. Okay. In your 25 years working with Royal Caribbean, was this the first time that you [inaudible] with a patient, whether it be crew or passenger, suffering a stroke?

A. Probably not.

Q. Okay. In your experience have there been other cruise passengers, with either Royal Caribbean or Celebrity, who suffered from a stroke and needed to be disembarked?

A. Most likely, yes.

Q. Sir --

MR. SALDAÑA: He already answered.

THE WITNESS: Most likely, yes.
BY MS. LOBEL:
**Q. Okay. All right.**
**So would it be fair to say that your company has worked with this cruise line before this incident in assisting to disembark a patient suffering from a stroke?**
**MR. SALDAÑA: Objection. Asked and answered.**
MR. DRAHOS: Join.
MR. SALDAÑA: You may answer.
THE WITNESS: Oh. Please repeat the question. I'm sorry.
MR. SALDAÑA: And wait for my objection and then answer.
You may answer. Ask the question again.
MS. LOBEL: You want me to re-ask? Okay, not a problem.
BY MS. LOBEL:
**Q. Would you agree with me that in your 25 years this is not -- this was not the first time Continental Shipping assisted Royal Caribbean in disembarking a patient who was suffering from a potential stroke?**

MR. SALDAÑA: Objection. Asked and answered.
MR. DRAHOS: Join.
THE WITNESS: Yes, ma'am.
MR. SALDAÑA: You have to speak up.
THE WITNESS: Okay, sorry.
Yes, ma'am.
BY MS. LOBEL:
Q. Okay. Would you agree with me that a stroke is a very time-sensitive medical condition?
MR. SALDAÑA: Hold on. Objection.
You may answer.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. Would you agree with me that when it comes to handling a patient who may be suffering from a stroke, it is of the utmost importance to transfer that patient as fast as humanly possible?
MR. SALDAÑA: Hold on. Objection.
You may answer.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. And does Continental Shipping know

**that based off of working with Royal Caribbean doctors?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Objection.

THE WITNESS: Repeat, please. Sorry.

COURT REPORTER: He is asking for a repeat.

BY MS. LOBEL:

**Q. He's asking for a repeat? Okay.**

**Would you agree with me that Continental Shipping has learned that strokes are a time-sensitive medical emergency in part from working with Royal Caribbean doctors?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

THE WITNESS: Specifically it is just a general experience of all cases that we handle for all of the different variety of cruise ships -- in part.

BY MS. LOBEL:

**Q. But would part of that knowledge come from -- strike that.**

A. Yes, ma'am.

**Q. But would part of that knowledge**

**come from working with Royal Caribbean?**
**MR. SALDAÑA: Object to form.**
MR. DRAHOS: Join.
MR. SALDAÑA: Give me a few seconds before you answer so I can state my objection on the record.
THE WITNESS: All right.
Yes, ma'am.
BY MS. LOBEL:
**Q. Okay.**
**MR. SALDAÑA: Do you have much more, Ms. Lobel?**
MS. LOBEL: Is there a time problem?
MR. SALDAÑA: Well, it's already 12:15. We usually do lunch here in Puerto Rico at 12:00. So I'm asking you if you have much more. And if not, and if you're going to end, we can go on and finish the deposition or start thinking about breaking for lunch.
MS. LOBEL: Okay. Understood.
I apologize. I forgot the time zone difference.
MR. SALDAÑA: Remember, there's an hour gap between us.

MS. LOBEL: Yes. Yes. You're 12:15, I am 11:15. I recall; thank you.
I don't have that much further, so I will just wrap it up with the rest of my questions, if that's okay with the group.
MR. SALDAÑA: Yes.
MS. LOBEL: Lovely. Thank you.
BY MS. LOBEL:
**Q. Sir, are you aware -- strike that.**
[Court reporter requests clarification.]
Did Continental Shipping know the distance between the Port of San Juan where Royal Caribbean ships dock and Hima San Pablo Caguas before this incident?
A. Yes, ma'am.
**Q. Had the Continental Shipping assisted Royal Caribbean with transferring patients to Hima San Pablo Caguas before this incident?**
A. I don't know. Probably, but I can't specifically say when.
**Q. Okay. Fair enough.**
**Would it be fair to say that Royal Caribbean would know about the difficulties with**

**limitations of roads and traffic, and based on their years of operating ships through that port?**

**MR. SALDAÑA: Objection to form.**

MR. DRAHOS: Join.

THE WITNESS: I don't know if that specifically medical team was aware, because they rotate medical teams on board. So --

BY MS. LOBEL:

**Q. My question is, would the company -- strike that.**

**Would the company of Royal Caribbean know about the difficulties involved with traffic, and the conditions with the roads in the Port of San Juan before this incident?**

**MR. SALDAÑA: Objection. This witness is a Continental Shipping representative, so he can't speak about what Royal Caribbean knows or doesn't know. So objection.**

BY MS. LOBEL:

**Q. You may answer, if you know.**

MR. DRAHOS: Join in the objection.

THE WITNESS: It's hard to say. I

don't know.
BY MS. LOBEL:
**Q. Have the road conditions or traffic conditions changed at all in the 25 years that you have been working with Royal Caribbean?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.
THE WITNESS: Constantly changing.
BY MS. LOBEL:
**Q. Have the roads available for accessing the port and traffic in San Juan been more or less the same throughout your career?**
MR. DRAHOS: Form.
MR. SALDAÑA: Objection.
THE WITNESS: No, because there is constant repairs, fixing, changing, closed down the bridge, so it's constantly an evolution.
BY MS. LOBEL:
**Q. Okay. Does Continental Shipping advise the cruise line if there are issues that may arise such as traffic, when dealing with a medical disembark?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.

THE WITNESS: If we're aware of it, absolutely.

BY MS. LOBEL:

**Q. Okay. In this case did you ever speak with the family involved with this incident?**

A. I did not, no.

**Q. I didn't hear you.**

A. I did not, no, ma'am.

**Q. Okay. Is it the policy between Royal Caribbean and Continental Shipping that Royal Caribbean has all communications with the patient and the patient's family and not the port agent?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

MS. LOBEL: Okay. I didn't hear the answer.

THE WITNESS: Oh, not necessarily.

BY MS. LOBEL:

**Q. Under what circumstances would the port agent have communications directly with the patient or the patient's family?**

MR. DRAHOS: Object.

MR. SALDAÑA: Objection.

THE WITNESS: Usually upon debarkation, the accompanying the family members are provided our contact information. And usually there's some communication back and forth if they require additional assistance, transportation, or anything they might concern.

So not necessarily will Royal reach out to them.

BY MS. LOBEL:

**Q. Okay. Who provides contact information for the port agent to the patient or the patient's family, Continental or the cruise line?**

MS. LOBEL: Objection.

MR. SALDAÑA: Objection.

THE WITNESS: I've seen both. Usually it is the agent though. The agent, Jennifer, she probably would have written down her cell phone plus our office number.

BY MS. LOBEL:

**Q. Do you know if Jennifer Robles told the family or the patient that she worked for**

**Continental Shipping as opposed to Royal Caribbean?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Object to form.

THE WITNESS: Specifically did I know that she said those words? No, ma'am.

BY MS. LOBEL:

**Q. Okay. Does Continental Shipping have contracts with specific ambulance companies in the area?**

**MR. SALDAÑA: Objection.**

THE WITNESS: No, ma'am.

BY MS. LOBEL:

**Q. Which ambulance companies does the port agent in San Juan work with?**

A. We usually have a list. And we operate by -- I guess the easiest way to say this, we will operate on the context that they provide consistent and the best service possible. We usually have a list of four or five, or six different ambulance companies, just in case we have a problem with the first one we go to the second one, the third one, fourth one and so forth.

**Q. Understood.**
**Do you know which ambulance companies were on the list back in February of 2019?**
A. No, Sunny would have been -- and Sunny is a subcontracted, I believe, through another ambulance company, which is Fast Ambulance, which probably was the number that she called and they contacted through them.
**Q. And what number does the company use if they want to communicate with Sunny Ambulance?**
A. Cell phone -- usually it's a contact number where they originated the contact.
**Q. The contact number --**
A. That would be the number and we usually -- just like we have the hospital numbers in our phones, we also have the ambulance numbers.
**Q. Would Sunny Ambulance phone number have been on the list that was provided to the cruise ship along with the Coast Guard, local hospitals --**
MR. DRAHOS: Objection to the form.
MR. SALDAÑA: Objection.

THE WITNESS: I'm not 100 percent sure.
BY MS. LOBEL:
**Q. Is it possible that it may have been on that list?**
MR. DRAHOS: Objection.
MR. SALDAÑA: Objection.
THE WITNESS: Possible, yes, ma'am.
BY MS. LOBEL:
**Q. Okay. Are local ambulance numbers on the list of services available in San Juan that are provided to cruise lines?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Join.
THE WITNESS: Please repeat. I'm sorry.
BY MS. LOBEL:
**Q. If you recall, a few minutes ago we spoke that -- strike that.**
**Continental Shipping provides a list of certain service provides includes local hospitals, Coast Guard, agents, port agents.**
**Does that list also include phone numbers for ambulances?**
A. Yes, ma'am.

MR. DRAHOS: Objection to the form.
BY MS. LOBEL:
**Q. I didn't hear your answer.**
A. Yes, ma'am.
**Q. Okay. I'm just checking over my notes to dot my I's and cross my T's. Thank you.**
**Did Continental Shipping have meetings with Royal Caribbean or other cruise lines to discuss how everybody expects medical disembarks involving medical emergencies to be done?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.
THE WITNESS: We have received visits from personnel from, Royal, yes, that have asked us to take them to different hospitals and to see, yes, ma'am.
BY MS. LOBEL:
**Q. How frequently did that happen?**
MR. DRAHOS: Object to form.
THE WITNESS: I wouldn't say yearly, but maybe every few years, but that was pre-pandemic.

BY MS. LOBEL:

**Q. Okay. Who from the Royal Caribbean would go with Continental Shipping to go to local hospitals?**

A. Please repeat; sorry.

**Q. My pleasure.**

**Who from Royal Caribbean would go to the local hospitals with Continental Shipping?**

A. I don't at the point recall specifically who it was. There were different representatives.

**Q. What was the purpose of those visits to local hospitals with Royal Caribbean's representatives?**

MR. DRAHOS: Object to form.

THE WITNESS: Well, to investigate the facilities and visit the hospitals, basically I guess, to get a feel for the services.

BY MS. LOBEL:

**Q. Was the purpose of these visits just to see the abilities of the local hospitals?**

**MR. SALDAÑA: Objection. Speculation.**

MR. DRAHOS: Objection. Calls for

speculation.

THE WITNESS: I would assume that would be part of the reason for the visit, absolutely.

BY MS. LOBEL:

**Q. Are how do you know that these visits took place?**

A. Because usually they contacted us and asked to coordinate a visit to the hospitals.

And usually Ms. Line García was the one that coordinated the visits and she would accompany them to the hospitals.

**Q. Which hospitals would Royal Caribbean go to visit?**

A. There were cases when --

MR. DRAHOS: Objection to form.

THE WITNESS: Sorry.

MR. DRAHOS: Go ahead.

THE WITNESS: There were cases where they would want a general, and she would try to visit as many hospitals as possible.

And sometimes they would occasionally ask to go see a specific

hospital in particular.

BY MS. LOBEL:

**Q. Did Royal Caribbean ever visit Hima San Pablo Caguas?**

MR. DRAHOS: Form.

THE WITNESS: Yes, ma'am, I believe so.

MR. DRAHOS: Form.

BY MS. LOBEL:

**Q. How many times, to your knowledge?**

MR. DRAHOS: Form. Time frame?

THE WITNESS: One that I think I'm aware of, if I can recall; it was a while back.

BY MS. LOBEL:

**Q. I'm sorry?**

A. I can remember one time and it was many years ago.

**Q. Okay. All right.**

**The Royal Caribbean would request to arrange for these visits at local hospitals every year, every few years; were those requested by email or were those verbal conversations?**

MR. DRAHOS: Object to form.

MR. SALDAÑA: Join.
THE WITNESS: I would have to -- I would say most of the time, if I recall correctly, were telephone conversations.
BY MS. LOBEL:
**Q. Okay. Were these visits planned well in advance of the representatives coming to see the hospitals?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.
THE WITNESS: The call would occur usually, maybe a week before, if I am guessing correctly. And then Line would reach out to the hospitals and coordinate it and get together a meeting or whatever.
BY MS. LOBEL:
**Q. Okay. Now, would there be a meeting with Continental and Royal Caribbean representatives before actually going to the hospitals?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Object to form.
THE WITNESS: Not that I recall.
Usually time was critical and they

had to go usually to see a lot of hospitals, so usually it was straight to the task at hand, so to speak.
BY MS. LOBEL:
**Q. Okay. When Royal Caribbean would go with Continental Shipping to the local hospitals, would there be a meeting with local hospital administration?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.
THE WITNESS: Usually, yes.
BY MS. LOBEL:
**Q. Do you know what was discussed during the meetings with local hospital administration with Continental Shipping and with Royal Caribbean?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Form.
THE WITNESS: I've never attended any of these meetings --
MS. LOBEL: Okay, fair enough.
THE WITNESS: But I would assume --
BY MS. LOBEL:
**Q. Okay. Would Ms. García be the sole person who would attend these meetings, to your**

knowledge?
A. Yes, yes, ma'am.
Q. Okay. Do you know if anyone else from Continental Shipping would ever attend these meetings over the course of your 25 years with the company?
MR. SALDAÑA: Objection.
MR. DRAHOS: Join.
THE WITNESS: No, because Line has been here about 30 years, so...
BY MS. LOBEL:
Q. Okay. Fair enough. Fair enough.
Do you know where Line currently works?
A. I don't believe she's working now at this time.
Q. Okay. Do you know if she has any intention of coming back to the company eventually?
MR. SALDAÑA: I am going object to that line of questioning.
Mr. Threadgill here is the representative of the company. He's not here in that capacity, and the company has a policy of not providing that kind

**of information unless ordered by a court.**

BY MS. LOBEL:

**Q. I'm sorry, I missed the last part of your objection.**

**MR. SALDAÑA: "Unless ordered by a court."**

MS. LOBEL: Okay.

MR. SALDAÑA: It's not an area of inquiry per the 30(b)(6) notice, so, yeah.

MS. LOBEL: I don't know which ones we are going on, but it's okay.

[Bell ringing.]

MR. SALDAÑA: Do you hear that bell? Were you able to hear that bell here?

MS. LOBEL: Yeah, I don't have a bell here.

MR. SALDAÑA: It marks 12:30.

MS. LOBEL: I apologize. If you want to take a break before Mr. Drahos questions.

MR. SALDAÑA: No. I just want to know if you can wrap this up relatively quick.

MS. LOBEL: Sure.

I don't have any further on cross.
MR. DRAHOS: So, Mr. Threadgill, you have the right to read the transcript in order to confirm that everything was taken down accurately, or you can waive that right.
It's up to you.
MR. SALDAÑA: He's not going to waive that right.
MR. DRAHOS: Mr. Court Reporter, he's going to read. All right. I don't have any questions. I'm going to order the transcript please. And --
VIDEOGRAPHER: This is the end of video number 2 of the deposition of Mr. Threadgill.
The time is 12:34 p.m. We are off the record.
MR. SALDAÑA: Thank you.
COURT REPORTER: Sarah, do you get a copy?
MS. LOBEL: Please.
(Whereupon, the deposition was concluded at 12:34 p.m.)

CERTIFICATE OF NOTARY PUBLIC

I, SAUL BERRIOS, duly commissioned and qualified in and for the Commonwealth of Puerto Rico.

DO HEREBY CERTIFY that the deponent was first duly sworn before the commencement of the taking of the deponent's testimony.

IN WITNESS WHEREOF I sign these presents and affix my notarial seal in San Juan, Puerto Rico, this _______________ day of ______________________ 2022.

____________________________
Saul Berrios, Notary Public

# E R R A T A S H E E T

Pursuant to the Federal Rules of Civil Procedure, any changes in form or substance which you desire to make to your deposition testimony shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach them to this errata sheet.

I, the undersigned, DANIEL THREADGILL-COLÓN, do hereby certify that I have read the foregoing deposition and that to the best of my knowledge said deposition is true and accurate (with the exception of the following corrections listed below).

Page ___ Line ___ Should read:___________________
Reason for change:________________________________
Page ___ Line ___ Should read:___________________
Reason for change:________________________________
Page ___ Line ___ Should read:___________________
Reason for change:________________________________
Page ___ Line ___ Should read:___________________
Reason for change:________________________________
Page ___ Line ___ Should read:___________________
Reason for change:________________________________

Page ___ Line ___ Should read:____________________
Reason for change:__________________________________
Page ___ Line ___ Should read:____________________
Reason for change:__________________________________
Page ___ Line ___ Should read:____________________
Reason for change:__________________________________
Page ___ Line ___ Should read:____________________
Page ___ Line ___ Should read:____________________
Reason for change:__________________________________
Page ___ Line ___ Should read:____________________
Reason for change:__________________________________
Page ___ Line ___ Should read:____________________
Reason for change:__________________________________

________________________ ____________________
Daniel Threadgill-Colon Notary Public

Sworn to and Subscribed before me________________
Notary Public. This ____day of_______, 2022.
My Commission Expires:

COURT REPORTER'S CERTIFICATE

City of San Juan )
) ss.:
Commonwealth of Puerto Rico )

I, DENNIS ZAMBATARO, Certified Court Reporter in the United States, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within entitled and numbered cause on January 27, 2022; and I do further certify that the foregoing transcript has been prepared under my direction.

DENNIS ZAMBATARO, RPR and
N.M. and GA CSR

February 2, 2022

**Exhibits**

**ColonD A** 3:7

**ColonD B** 3:8

**(**

**(787)** 92:12

**0**

**0-5** 92:14

**1**

**1** 4:4

**100** 87:21 114:1

**100-mile** 26:3

**10:23** 4:13

**10:59** 42:22 43:8,14 44:19 51:13

**11:15** 107:2

**11:19** 61:22, 23

**11:21** 50:21 51:1,17

**11:26** 61:24 62:1

**12** 11:4

**12:00** 106:16

**12:15** 106:15 107:2

**12:21** 50:1, 22 51:1,17

**12:30** 122:18

**12:34** 123:17,24

**130** 14:2

**15** 56:2,5

**16** 11:4 14:1

**18** 70:17

**19-what** 10:12

**1974** 9:6,10

**1996** 9:21 10:15

**1:20-cv-20687** 4:11

**2**

**2** 123:15

**20** 56:3 100:3

**200** 78:23 79:6,17

**2019** 10:25 11:1,5,14 14:13,21 15:9,18 16:1,11,19 36:19 37:20 38:9 39:17 40:13 42:21 46:16 47:9 48:23 50:19 61:10 88:12 92:17 113:4

**2021** 65:11, 14,18 68:5 73:20

**2022** 4:12

**21** 37:20 38:9 39:17 40:13 42:21 46:15 47:9 48:23 50:18 61:10 88:12

**21st** 38:5

**22** 51:19 52:12 60:11

**22-minute** 60:19

**24/7** 35:7, 13,18 36:1

**25** 13:7 49:17 77:13,25 81:3 102:14 103:22 109:4 121:5

**25-some** 17:18

**250** 78:23 79:7,17

**27** 4:12 60:14

**3**

**3.5** 28:10

**30** 17:10 38:22 56:3 80:20,25 121:10

**30(b)(6)** 7:22 71:4 122:9

**30-plus** 24:25

**35** 25:23 77:16

**35-mile** 26:3

**360** 7:10

**4**

**40** 56:3,5 80:20,22, 25

**6**

**667-53** 92:12
**6:30** 40:15

**7**

**787 667-5305** 92:11
**7:00** 40:13

**8**

**80** 8:8

**9**

**9** 14:20
**90** 8:8 11:16
**911** 31:2,4, 9,19 32:5, 13,15 33:4
**911's** 32:20
**96** 10:13
**9:59** 42:25 43:17 44:18 51:13

**A**

**a.m.** 4:13 40:13 43:8,14,17 50:21 51:1,13 61:23,24
**abilities** 116:22
**aboard** 18:17 37:17 44:20,24 47:8
**above-average** 60:21
**absolutely** 21:23 29:12 45:24 55:21 85:8 97:4 110:2 117:4
**accept** 21:19 22:13,24 23:25 25:2 38:24 56:15 100:21
**accepted** 25:11 49:13,19 50:9,11 57:9
**accepting** 59:7 89:24
**accepting-facility** 25:3
**access** 13:22 42:15
**accessible** 73:2
**accessing** 109:11
**accident** 20:17 29:8
**accompany** 117:13
**accompanying** 111:2
**accomplished** 51:15,16
**accounts** 44:8,11
**accreditation** 35:2
**accurate** 13:10 80:2 98:8
**accurately** 14:10 123:5
**ACL** 28:3
**actual** 24:4 27:3 32:16
**addition** 67:7
**additional** 75:23 111:6
**address** 42:3,6
**administering** 5:22
**administration** 8:12 96:4, 5 120:8,15
**administrative** 23:11
**admonition** 65:20 66:7
**advance** 119:7
**advanced** 28:3 35:24
**advise** 56:21 66:14 109:21
**afternoon** 40:1 62:4, 5,21,23
**agency** 8:8, 11 12:25 97:12,17 99:22
**agent** 10:20 11:6,10,13 12:24 13:11 17:1,23 18:8 19:16,21 24:6 38:8, 15,21 39:12 48:16 52:15 58:1

80:10 85:23 89:4 93:10 94:11 98:4,7,19 99:19 110:14,22 111:13,19, 20 112:16

**agent's** 91:23

**agents** 15:24 40:7 47:5 58:9 85:15 90:5 91:21 92:20,25 93:9 100:2 114:22

**agents'** 97:18

**agree** 14:20 15:6,13,22 16:7,15 18:6 45:11 46:13 76:24 84:15 89:10 103:21 104:9,16 105:11

**agreement** 12:24 13:11 66:23

**ahead** 5:18

12:15 23:24 44:2 79:14 117:19

**alert** 46:2

**allowed** 85:23

**alongside** 39:3

**alternative** 23:15

**ambulance** 24:7,13, 15,19 25:2 27:8,15, 22,24 28:4,6,9, 12 30:18, 21,23,24 32:4,12,16 49:24 50:20 51:6,25 57:8 59:9, 14 60:11 82:20 85:25 97:22 112:10,15, 22 113:2, 7,8,12,19, 20 114:10

**ambulances** 28:2 114:24

**amount** 8:17

**annual** 18:18

**apologize** 70:1 81:19 91:4 106:22 122:19

**appears** 43:4

**appropriately** 84:18

**approval** 85:25

**approximately** 9:25 18:15,21 19:3 68:23,25 78:22

**area** 18:8 100:6 112:11 122:8

**areas** 25:25 30:15

**Argumentative** 102:9

**arise** 18:11 109:22

**arrange** 118:21

**arrangement** 23:24 25:20

**arrival** 38:18,22, 24 39:7,8, 9 88:5

**arrive** 24:21 27:22 28:2,5 31:8 32:17 40:12 98:13

**arrived** 39:18

**arrives** 28:1 38:15 39:12 82:21

**arriving** 79:7

**Article** 14:19

**Ashford** 49:9,12,18

**assigned** 38:8 40:2 87:19 91:23 92:5,9 94:12

**assignments** 8:19

**assist** 85:16

**assistance** 80:1 84:25 111:6

**assisted** 103:23 107:18

**assisting** 83:1 103:6

**assists** 83:18

**assume** 50:7 82:18 96:21 97:4 117:2 120:22

**assuming** 51:25

**assure** 38:22

**AT&T** 92:18

**Atlantic** 43:24 44:1,9,19 50:22 51:2,14,17

**attempted** 96:25

**attempting** 50:17

**attend** 46:3 120:25 121:4

**attended** 120:19

**attention** 14:1 37:15 41:13 43:1

**attorney** 5:20 66:20 67:8 71:1

**attorney-client** 65:20,24 66:7 71:6

**attuned** 53:17

**availability** 50:3 60:7

**average** 60:20,23

**aware** 49:21 63:2,6,18 64:2 74:7,17 75:24 76:3 96:7 100:11 107:9 108:7 110:1 118:13

**B**

**back** 10:25 11:5,13 14:12,20 15:9,17,25 16:10,18 41:8 44:5 52:8 54:21 56:21 59:10 60:8 61:25 70:19 73:16 74:1,3 92:17 111:5 113:3 118:14 121:18

**backup** 42:7

**barely** 34:1

**barrier** 53:14

**based** 18:3 34:2,17 35:21 42:18 45:10,19 49:2,12 60:14 101:22 105:1 108:1

**basic** 28:4

**basically** 8:16 29:2 30:16 54:7 71:16 116:18

**basis** 10:23 18:18 36:1 66:11,19,21

**Bates** 11:20 12:6 14:2 40:25

**bathroom** 61:18

**Bautista** 5:20

**Bayamon** 54:8

**began** 70:16

**begin** 19:24 94:1

**beginning** 4:3

**behalf** 5:11,14,17 7:22

**bell** 94:5 122:13,14,15,17

**below-average** 60:20

**benefit** 52:3

**benefits** 15:15

**Berrios** 5:20

**Best-case** 56:2

**binds** 8:2

**birth** 20:1

**bit** 8:6,13 16:23 19:7 27:7 28:16 37:2

**board** 19:17 20:10 47:15 57:2

58:4 96:4, 21 108:9

**boarded** 40:16

**boarding** 38:7,14 39:12 88:4

**bonuses** 37:13

**Border** 39:2

**bottom** 43:8

**brain** 36:1

**branch** 54:8, 9

**branches** 54:13

**break** 38:17 61:18,20 122:20

**breaking** 91:4 106:20

**bridge** 29:2 109:17

**broke** 39:6

**brought** 9:22 10:9 63:18

**Building** 29:19

**buildings** 30:7

**Burgess** 4:9 7:21 30:20 37:18 42:21 44:18 46:23 48:22 49:25 51:1 56:12 59:20 60:18 61:8 90:13 91:18 96:19

**business** 9:8,12 10:19 13:15,17

**Busto** 9:6 64:23 68:6 69:5

**Busto's** 10:1

**busy** 89:5

**C**

**Caguas** 34:14,15 37:6,10 48:24 50:24 54:1,9 55:9 59:21 100:7,8, 14,20 101:15 102:4 107:15,19 118:4

**Caguas's** 36:7

**call** 22:15 26:16,21 27:4,21 28:6,8 30:14 31:2 32:9 39:5 40:8 50:14 53:7,13 54:6,12, 15,21,23, 24 57:8,15 58:2,5 59:9,13 76:11 81:16 94:22 95:12 97:9 100:1 119:11

**called** 6:17 27:23 33:6 53:12 54:2 57:24 60:5 66:22 95:17 96:18 113:9

**calling** 95:15 99:4

**calls** 14:14 15:1 16:2 21:16 45:5 53:6 54:16 55:2 56:21 78:23,25 79:17 94:3,10 116:25

**capabilities** 21:19

**capable** 21:5 35:13,25 100:6,24 101:14 102:2

**capacity** 121:24

**Capitol** 29:19

**captain** 96:14

**car** 20:17

**care** 17:24 20:20 21:6,20 34:8,16 35:3,7,13, 19 46:22 82:19,22 83:4,8 84:18 86:22 101:4,9,11

**career** 109:12

**Caribbean** 4:10 7:21 11:7 13:2,

12 14:11, 23 15:7,25 16:8,9,17 37:17 42:19 45:12,18 46:15 47:8 51:13 61:7 63:23 66:2 67:17 75:2,11 77:1,9,17 78:1,7,15 79:8,19 80:15 81:1,23 82:2 83:17 84:6,16 85:16 86:1,22 98:5 102:15,21 103:24 105:1,14 106:1 107:14,18, 25 108:13, 20 109:5 110:11,12 112:2 115:9 116:2,7 117:15 118:3,20 119:19 120:5,16

**Caribbean's** 65:18 67:7 68:22 116:13

**case** 4:10 7:20 8:2 20:10 21:25 22:6 30:19 31:17 40:25 49:23 50:8 52:14 54:19 55:8,14 56:23 58:20 59:4,5,7 94:1 101:8 110:4 112:23

**cases** 18:11 28:1 33:13 34:21 49:13 53:12 81:12,16 105:18 117:16,20

**castle** 29:20 30:9

**categories** 39:7

**CBP** 39:1

**Celebrity** 102:21

**cell** 57:20 58:14 74:10,12 90:21 91:19,21, 23 92:16, 19,24 93:4,12 94:4,11,16 97:18 111:21 113:13

**center** 34:20 45:1,4,5 52:21 57:16 58:18 88:12

**challenge** 28:7

**challenges** 25:19 26:14 53:10,16, 17 61:1

**challenging** 26:9,18 27:6 50:6

**change** 44:4, 7

**changed** 109:4

**changing** 109:8,16

**chat** 90:5

**check** 90:18

**checking** 115:5

**choice** 34:7, 16

**Christian** 64:23 68:6 69:5

**circumstances** 110:21

**city** 30:2, 16

**clarification** 87:10 92:22 94:6 100:17 107:11

**clear** 45:13 68:2

**cleared** 39:4

**client** 66:13,20

**clients** 78:8

**clinic** 33:6, 8,11,20 34:5

**clocks** 44:4

**close** 11:15 20:14 25:22

**closed** 109:17

**closer** 97:21

**Coast** 97:19 98:6 113:22 114:22

**code** 46:10

**comma** 42:5

**Commission** 35:2

**communicate** 18:8 113:11

**communicated** 24:13 57:22 75:1,10

**communicating** 99:9

**communication** 19:16,20 20:7,8 22:1 32:1, 3 47:14,17 54:3 55:16 57:13 58:19 75:18 111:5

**communications** 21:25 22:20 31:7 87:4 110:12,22

**companies** 16:16,18 27:15,17 85:25 97:22 112:10,15, 22 113:3

**company** 24:13,19 25:2 30:24 32:4 57:8 59:9 63:5, 23 64:23 69:22 70:3,13 73:1 74:3 76:13 80:9 90:9 92:4, 17 94:12, 21 95:9 96:8 97:8 99:16,18 103:5 108:11,13 113:7,10 121:6,18, 23,24

**company's** 17:10 67:8

**competing** 28:10 30:6

**complete** 31:6

**Composite** 11:19,23 12:4,19,22 13:10 14:9 40:21 41:5,14

**comprehensive** 45:13

**computer** 5:4,7 62:12,16

**concern** 111:8

**concluded** 123:24

**conclusion** 14:15 15:1 16:3

**condition** 31:12 53:2 104:11

**conditions** 99:20 108:15 109:3,4

**conducting** 37:25

**confer** 21:1

**confirm** 57:6,8 60:7 88:8 123:4

**confirmation** 50:8,15 51:7,14,15 52:2 59:12

**confirmed** 25:4 50:3, 25

**confusion** 45:17

**congestion** 26:8

**connect** 20:9 55:10

**considered** 20:21

**consistent** 27:18 81:2,10 112:20

**constant** 109:16

**constantly** 32:9 109:8,18

**constraints** 10:4

**consult** 57:2

**contact** 20:6,25 53:8 55:12 56:24,25 74:6,8 95:18,24 96:2,7 98:7 111:3,12 113:13,14, 15

**contacted** 60:3,10 93:22,23

96:9 113:9 117:8

**contacts** 58:10

**contained** 41:14 43:9,11,16

**content** 90:12

**context** 112:19

**Continental** 4:4 5:17 7:4,13,23 8:6,7 9:3,5,15,20,23 10:11 11:2,6 13:1,3,11,17 14:11,20 15:6,8,9,14,17,23,24 16:8,10,16,25 17:9,24 18:6,16 19:22 26:15 36:14 37:9,21 42:2,20 43:6 45:11,22 46:12,21 48:1,8,9,15 49:15,18 50:23 51:19 52:4,10 53:24 59:13 60:16,21 61:7 68:9 69:5,7,8 71:1,4 73:17 75:1,10 76:3,25 77:8,16 78:2,8 81:4 82:3,18 83:8,17 84:1 85:2,15 90:21 91:19 103:23 104:25 105:12 107:12,17 108:18 109:20 110:11 111:14 112:1,9 114:20 115:8 116:3,8 119:19 120:6,15 121:4

**Continental's** 24:25

**continental@coqui.net** 42:6,16

**continue** 70:18

**continued** 10:6

**contract** 12:20 72:20,22

**contracts** 72:16 112:10

**control** 15:7 31:6

**convenient** 46:7

**conversations** 118:24 119:4

**convey** 14:10

**convoluted** 78:18

**coordinate** 8:22 24:14 117:9 119:14

**coordinated** 20:25 26:5 40:4 117:12

**coordinating** 24:7

**copy** 12:8 13:10 90:14,16,17 93:11 123:21

**corporate** 4:6 7:12,22 48:1 50:23

**corporation** 8:2

**correct** 23:17 25:14 32:22 51:10 55:20 69:12,17 72:1 79:21 80:10 84:9,25 85:18 86:1 88:1,12,18 99:11

**correctly** 98:4 119:4,13

**counsel** 4:18 66:24 93:15

**country** 34:23 36:6

**court** 4:15 6:5,9 62:11 66:15,17

67:3 100:16 105:7 107:10 122:1,6 123:10,20

**crash** 42:14

**crew** 18:17 102:17

**critical** 119:25

**cross** 115:6 123:1

**cross-examination** 87:11

**cruise** 8:9, 15 9:7 11:7,10 12:25 17:1,4,9 18:17 19:9 25:6 33:4 38:15,24 57:14,18 78:15 79:25 80:7 82:10,21 83:7 85:3, 17 102:20 103:5 105:20 109:21 111:14 113:22 114:12 115:9

**cruises** 4:10 7:21 8:25 13:2,12 14:11,23 15:7 16:17

**cruising** 8:12

**customs** 8:19 39:1

**cuts** 27:3

**D**

**D-U-E-Ñ-A-S** 86:19

**Daniel** 4:7 6:15,16 7:3

**date** 4:12 19:25 85:3 87:13 88:1 92:5 94:23

**dates** 79:7

**day** 29:7 30:3 37:22 39:24,25 75:15 83:12 88:8 89:9

**day-to-day** 9:16 10:23 38:1

**dealing** 109:22

**debarkation** 111:2

**December** 10:13,15

**decide** 71:3

**decided** 70:18

**decision** 55:20

**defendant** 5:15

**Defendants** 6:17

**Defendants'** 11:23 12:19,22 13:9 14:9 41:5,14

**Defense** 66:23

**deferred** 63:19

**Dennis** 4:16 6:9

**department** 11:4

**departments** 60:6

**depending** 21:25

**depends** 101:9

**deponent** 6:12

**deposition** 4:4 5:23 11:19 12:5 40:22 63:1 64:6,18 71:4 72:10 76:18 106:19 123:15,23

**destination** 32:21 33:2

**details** 47:2

**determined** 57:5

**Dfreitas** 4:14 6:2

**diagnosis** 20:1

**dial** 58:13

**difference** 106:23

**differences** 32:2

**difficult** 26:4,6,7, 13

**difficulties** 107:25 108:14

**difficulty** 42:10

**diligence** 56:1,7

**direct** 19:16 32:8 37:15 98:7

**direction** 54:22

**directive** 33:5

**directly** 11:3 52:21 53:12 93:24 95:17 99:4 110:22

**director** 7:17 9:14 10:16 13:21 17:15

**disclosed** 40:25

**discrepancy** 43:20

**discuss** 65:17 66:5 115:10

**discussed** 48:3 53:15 64:20 67:16 71:5,9,17, 20 94:4 120:13

**discussing** 72:17

**discussion** 58:23

**disembark** 42:20 44:18 46:6 80:16 81:2,24 83:18 89:11 96:15 103:6 109:23

**disembarked** 102:22

**disembarking** 103:24

**disembarks** 17:3 82:4 115:11

**dispatch** 27:24,25 32:9

**dispatched** 50:1,12, 13,21

**dispensary** 33:11 34:5

**distance** 107:13

**distinction** 20:15

**distribute** 97:24 98:13

**distributed** 93:8

**dock** 107:14

**doctor** 20:7, 8,9,10 21:1 47:15,21 48:4,8,17 53:2,23 55:10,13 57:1,6,14, 17,18,21, 25 58:23 59:1,2,3, 6,8,22 60:9 83:25 96:20,21 99:8

**doctor's** 20:20

**doctor-to-doctor** 20:21,22 57:13

**doctors** 21:1 22:2 34:19 55:13 105:2,14

**doctrines** 71:7

**document** 13:6,22 14:2 88:22 89:19

**documentation** 38:20

**documented** 89:12

**documents** 63:5,22 71:13 72:11

**door** 74:4

**dot** 115:6

**Drahos** 4:22, 25 5:6,13, 14,18 6:24 11:25 12:11,14, 16 14:3,6, 18 15:5, 12,21 16:6,14,22 17:7,14,21 18:5,13,23 19:5 22:11 23:3,9,20 24:3,18 25:8,15 26:11 27:19 28:15 29:14 30:13 31:24 32:18 33:1,17,24 34:11 35:6,11,

17,23 36:4,18 39:16 40:23 41:9,11 43:19 44:16 45:9,16,21 46:20 47:6,24 48:13,21 50:16 51:5,11,23 52:24 55:6,23 56:10 58:11 59:18 60:1 61:13 62:7,11 63:10,25 64:10,22 65:1,3,5, 14,23 66:1,4 67:9,17 68:4,5,18, 24 70:6 71:18,23 74:16,22 75:12,20 76:12,14 77:4,11,21 78:4,11 79:4 80:4, 18 81:5 82:8,24 83:10,21 84:10,21 85:19 86:2 87:1,17 88:13 89:13 93:19 94:18 95:3 97:2 98:11 99:5,12 100:9 101:17,19 102:9 103:10 104:3 105:4,16 106:3 108:5,24 109:7,13, 25 110:16, 24 112:4 113:24 114:6,13 115:1,14, 22 116:15, 25 117:17, 19 118:5, 8,11,25 119:10,23 120:10,17 121:8 122:20 123:2,10

**drop** 52:16 56:14

**dropped** 46:2

**drops** 27:3

**due** 55:25 56:7 70:14

**Dueñas** 86:19

**duly** 6:3, 10,18

**duties** 16:24

**duty** 20:7,9 53:23

**E**

**earlier** 31:4,25 50:11 53:16

**easiest** 112:18

**Eastern** 43:23 44:2,12,19 50:21 51:1,13,17

**easy** 25:16

**economically** 10:6

**economics** 10:3

**educated** 18:20 56:8 80:20

**Edward** 4:7

**effective** 23:23

**efficiency** 55:17

**efficient** 23:22

**effort** 85:4 96:14

**El** 29:20

**electronic** 4:5

**email** 19:15 42:2,7,9, 22,24 43:9,11, 14,16 44:8,11 45:19 75:14,16, 19 93:8 97:25 118:23

**emails** 40:24 42:15 43:21 72:16,22 93:4,7,11 95:11

**emergencies** 42:8 81:9 82:4,18 85:17 97:10 115:11

**emergency** 20:18 31:2 46:10

95:14 105:13
**employee** 15:15,23 69:21
**employees** 11:1 15:8,16,25
**employer** 68:4
**encountered** 29:9
**end** 56:1 83:12 106:18 123:14
**engage** 85:23,24
**ensure** 84:17
**ensuring** 84:7
**entire** 88:7
**ER** 20:7,9 53:23
**essentially** 28:10
**establish** 20:6 27:17 53:8
**established** 20:8 24:11
**estimate** 18:14
**estimated** 81:8
**et al** 4:9,10
**eventually** 27:2 55:20 121:19
**evidence** 49:22
**evolution** 109:18
**ex-employee** 69:8
**ex-employees** 73:24
**EXAMINATION** 6:23 62:2
**examined** 6:18
**exception** 43:13
**exchanged** 19:23 62:8
**excuse** 68:19 77:23 81:17 86:8
**excused** 6:20
**Exhibit** 11:19,23 12:5,19,23 14:9 40:21 41:1,5,15
**existed** 14:12
**existence** 17:11
**expects** 115:10
**expedite** 53:19 99:9
**experience** 10:18 17:16,22 18:4 22:18 23:21 33:16 34:2,17,22 35:22 36:15,23 49:2,12 55:24 56:6 57:11 58:8 82:2 101:22 102:11,19 105:18
**experiences** 29:16 37:6
**Explain** 26:14

**F**

**face** 25:19
**face-to-face** 47:18
**faces** 26:15
**facilitate** 17:3 25:20 29:11 32:3 47:14,20 51:20 52:11 53:19 59:14
**facilitated** 18:16 57:14
**facilitates** 53:25
**facilitating** 17:17 18:9 19:8 46:24
**facilitator** 54:17
**facilities** 116:17
**facility** 19:9,21 20:19 21:18 24:12 25:10 31:11 33:15 34:23 52:17 89:23 93:25 96:6
**fact** 26:12 32:20 56:12 59:20
**fair** 81:21

82:1 83:6, 16,24 94:17 103:4 107:23,24 120:21 121:12

**fairly** 36:25 37:3

**Fajardo** 54:10

**fall** 44:4,5

**falls** 27:12

**familiar** 8:11 86:6, 9,18

**family** 29:24 36:10 110:5,13, 23 111:2, 14,25

**family-owned** 9:8,11

**fast** 104:19 113:7

**faster** 61:9

**February** 10:25 11:5 14:12,21 15:9,18,25 16:10,19 36:19 37:20 38:5,9 39:17 40:13 42:21 46:15 47:9 48:23 50:18 61:10 88:12 113:3

**feedback** 4:5

**feel** 116:18

**female** 70:7, 8

**field** 38:10 64:24 68:10 69:6 88:5 89:3

**figure** 99:25

**finally** 55:14 70:16

**financial** 37:8

**find** 10:7 22:3 32:10 76:10

**fine** 62:14, 23

**finish** 79:9 106:19

**finished** 79:15

**fire** 97:19

**fixing** 109:16

**floating** 8:16

**focus** 39:8

**folder** 89:7

**follow** 33:5 75:14 89:25

**follow-up** 75:16,19, 23

**food** 8:21

**forgive** 70:10 85:12 95:22,25

**forgot** 106:22

**form** 15:11, 20 16:13, 21 17:5,13 18:2,10,19 21:22 23:1,7,18 24:1,9 25:7,12,21 27:11 28:14 29:13 30:12 31:23 32:6,24 33:23 34:10 35:5,10, 15,20 36:3,17 39:14 43:18 44:15 45:8,15,20 46:19,25 47:22 48:12,20 50:4 51:4, 8,22 52:23 55:3,22 56:9 58:6 59:17,24 61:12 63:10,25 64:8,10 65:19,23 67:9 68:24 73:3,15 74:16,22 75:12,20 76:5,14 77:2 79:3, 22 80:18 81:5 82:20 83:10,11, 21 84:10, 21 85:19 86:2 87:1, 17 88:13 89:13 93:19 94:18 95:3 97:2 99:5, 12 100:9 101:17

106:2 108:4 109:13 112:4 113:24 114:13 115:1,22 116:15 117:17 118:5,8, 11,25 119:23 120:17,18

**formalities** 8:19

**forward** 44:5

**forwarded** 93:11

**founded** 9:5

**fourth** 102:6 112:24

**frame** 52:6 118:11

**Francisco** 7:10,11

**free** 99:11

**frequently** 78:14 115:21

**front** 12:18 41:15

**full** 5:25 22:21

**function** 18:7

**G**

**gangway** 40:18 57:24,25 58:1

**gangways** 39:3

**gap** 106:25

**garbage** 8:20

**García** 68:11 69:7,11, 16,21,23, 24 70:2,4, 5,6,12,17, 21 75:13, 19 90:1 95:20 117:11 120:24

**gauge** 73:24

**gave** 98:5

**general** 54:16 105:18 117:21

**generated** 96:22

**give** 8:13 12:13 18:14 59:10 95:9 98:1,19,25 106:4

**Global** 4:17

**goal** 21:17 23:10

**good** 6:25 10:2,8 62:4,5,21, 23

**gophers** 40:8

**government** 30:7

**governmental** 8:18

**governor's** 29:18

**GR100** 43:3, 10

**GR107** 41:1

**GR115** 12:7, 12

**GR142** 12:7

**GR87** 41:1

**GR88** 41:13 42:18,24 43:11,17 45:11

**GR99** 43:2, 4,10,13

**ground** 10:17,19 84:8

**group** 107:5

**Guard** 97:19 98:6 113:22 114:22

**guess** 18:20 56:8 80:20 81:9 112:18 116:18

**guessing** 119:13

**guest** 30:20 33:3 37:17 96:3,5

**guests** 17:4 18:17

**guide** 54:21 55:5

**guys** 44:5

**H**

**H-E-A-R-T-L-E-I-N** 86:11

**H-O-A-R-E** 33:6

**half** 4:22 26:2 72:19 76:8,22

**hand** 5:25 6:7,13 11:18 12:3,8 40:20

57:1,17 85:7,8 120:3

**handed** 58:22

**handle** 34:21 105:19

**handled** 23:12

**handling** 82:3 89:4 104:17

**happen** 42:8, 13 76:17, 19 115:21

**happened** 48:16 50:18 58:24 75:11 89:8

**happening** 65:9

**happy** 80:7

**hard** 108:25

**Harmony** 37:18 38:8 39:18 40:11 44:20 47:9 87:9,12

**head** 98:17

**heading** 41:19

**headquarters** 7:12

**hear** 19:1 62:15 72:19 74:11 75:5 79:12,15 85:10 91:3,6 94:25 97:13 110:8,17 115:3 122:14,15

**heard** 5:8 22:20 60:8 86:14

**Heartlein** 86:7,11

**helping** 17:2

**highest** 35:1

**Hima** 34:14, 15,22 36:6,7,14, 21 37:6,10 47:19 48:24 49:1 50:2,24 51:16 53:6,25 54:7,25 55:9,16, 18,25 56:7,13, 15,21 57:18 58:13,19 59:2,21 60:3,7,10 61:9 96:23 100:7,14, 20 101:4, 15 102:3 107:14,19 118:3

**hired** 10:11, 15

**history** 20:2 94:22

**HM** 41:19

**Hoare** 33:6, 8,20

**hold** 26:23 27:2 104:12,21

**hospital** 20:6,14 21:2,4,8, 11 22:4, 10,12,16, 24 23:5, 14,25 24:12,16, 22,23 34:1,6,13, 23 35:12 36:6 47:15,19 49:10,11, 19 50:2 53:6 55:16 57:9,15 58:10 61:9 84:2,18 96:17 99:10 100:1,15, 20,23 101:5,10 102:2 113:17 118:1 120:8,14

**hospitals** 18:9 22:5 54:7 55:2 96:25 97:9,20,21 98:6,15,21 99:4,19 100:5 101:14,23, 24 113:23 114:22 115:18 116:4,8, 13,17,22 117:10,13, 14,22 118:21 119:8,14, 21 120:2,7

**hotel** 8:16

**hour** 43:20 44:2 51:19 52:12 60:11,19 65:16 68:15 106:25

**hours** 64:20 69:1 88:24 93:14 96:22 102:16

**hub** 29:17

**humanly** 104:19

**hundred** 18:21 19:4

**Huseby** 4:17

## I

**I's** 115:6

**identical** 43:10,22

**identification** 11:24 41:6

**identified** 17:2

**identify** 11:20 55:19

**imagine** 23:13

**imaging** 35:25

**immediately** 46:8 52:16 53:22

**immigration** 8:19

**importance** 104:18

**inaudible**

**incentive** 37:8

**incident** 75:2,11,15 81:22 87:13 88:1 89:20 92:6,10 93:18 94:16,23 96:9 103:6 107:15,20 108:16 110:6

**incidents** 33:13

**include** 114:23

**includes** 98:5,20 114:21

**inconsistent** 31:5

**Incorporated** 7:23

**independent** 14:21 16:18 38:3

**industry** 8:13

**info** 99:23

**inform** 99:19

**information** 19:22 20:4 21:15 53:1 55:11 59:10 60:2 74:8 90:12 93:14 94:15 95:10 96:7 97:12,18 98:7 99:1 111:4,13 122:1

**informed** 88:6

**initial** 95:10

**injuries** 36:1

**inquiry** 122:9

**inside** 57:19,22

**instance** 52:18 56:11 59:19

**instances** 22:15 23:4

**instructed** 85:17

**instructing** 65:21 66:8 67:18

**insurance** 15:16 20:2

**intention** 121:18

**interested** 22:17 73:25

**intermediaries** 83:1

**INTERPRETER** 70:1

**interpreting** 36:1

**introduce** 4:18 7:1

**investigate** 116:16

**involved** 24:7 108:14 110:5

**involves** 8:14 37:17

**involving** 82:4 89:11 115:11

**iphone** 93:1

**island** 17:25 25:23 26:3 27:9 28:11,17,

21 29:6 100:24 101:16 102:2

**issue** 29:10

**issues** 53:14 109:21

**J**

**January** 4:12

**JDA** 66:23

**Jeff** 45:6

**Jennifer** 38:10 39:19 40:14 44:19 47:7,18 48:3,9,17 52:19,25 53:6 54:12,24 55:11 56:23 57:15 58:3,17 59:7,22 60:8 68:10 73:7,9,13 90:25 91:2 96:22 111:20,24

**job** 16:9,10 39:9 91:25

**Join** 64:10 75:21 76:15 77:4,11,21 78:4,11 79:4 80:4 82:8,24 86:3 87:2 98:11 99:14 102:9 103:10 104:3 105:16 106:3 108:5,24 109:7,25 110:16 114:14 115:14 119:1,10 120:10 121:8

**Joint** 35:2 66:23

**Joseph** 86:19

**José** 9:6 38:11 64:24 68:9 69:6

**Juan** 7:7,8, 13 8:24 17:23 25:2 28:21,22, 23 29:1, 17,25 33:3 39:5 40:12 60:18 78:16 80:17 82:5 83:19 84:2 100:6 107:13 108:16 109:11 112:16 114:11

**jury** 7:2 52:4

**K**

**kickbacks** 37:13

**kind** 13:22 25:20 29:24 36:20 49:13 54:21 121:25

**knowledge** 17:24 27:8 105:22,25 118:10 121:1

**L**

**lacking** 25:25

**laid** 70:15

**landmark** 30:14,17

**lane** 27:13

**language** 53:14

**last-ditch** 31:16

**last-known** 74:8

**lawsuit** 76:4

**lawyer** 63:18,20 64:15 65:18 68:4,22 69:4

**lawyers** 67:7

**learn** 76:13

**learned** 105:12

**leave** 70:2, 12 91:18

**left** 40:5 51:25

**legal** 14:15 15:1 16:3

**level** 10:17, 19 13:19 101:9,11

**lie** 86:10

**life** 25:23 28:3,4

**limitations**

108:1

**limited** 8:17

**lines** 8:9 11:10,15 17:1,9 18:17 32:8 114:12 115:10

**linesman** 38:23

**list** 97:8, 12,15,16, 18,22,23 98:4,16,20 99:16,18, 23 112:17, 21 113:3, 21 114:5, 11,20,23

**listed** 97:22 98:16

**listen** 56:22 58:19

**literally** 31:19

**Litigation** 4:17

**live** 74:14

**lived** 25:22

**Lobel** 4:21, 24 5:10,11 6:21 11:22 12:13 14:5 15:11,20 16:13,21 17:5,13,20 18:2,10,19 19:1 21:22 23:1,7,18 24:1,9 25:7,12,21 27:11 28:14 29:13 30:12 31:23 32:6,24 33:23 34:10 35:5,10, 15,20 36:3,17 39:14 41:7,10 43:18 44:15 45:8,15,20 46:19,25 47:22 48:12,20 50:4 51:4, 8,22 52:23 55:3,22 56:9 58:6 59:17,24 61:12,14, 19 62:3, 10,14,18, 20,24 63:11,21 64:3,11,16 65:24 66:3,10,18 67:4,10, 13,14,20 68:7 70:24 71:10 72:1,3,18 73:3,6,12, 18 74:19, 24 75:17 76:1,9,20 77:7,15,22 78:6,13, 20,24 79:11,22, 24 80:6, 13,21 81:7,18 82:15 83:5,14,23 84:5,13,23 85:9,21 86:5 87:5, 23 88:9,14 89:14,16 91:10,12 92:23 94:2,7,20 95:7 96:12 97:5 98:14 99:2,7,15, 24 100:13, 18 101:6, 20 102:13 103:2,18, 20 104:8, 15,24 105:9,21 106:9,12, 13,21 107:1,7,8 108:10,22 109:2,9,19 110:3,17, 20 111:11, 16,23 112:8,14 114:3,9,17 115:2,20 116:1,20 117:5 118:2,9,15 119:5,17 120:4,12, 21,23 121:11 122:2,7, 11,16,19, 25 123:22

**local** 8:24 18:7 20:6 98:6,20 113:22 114:10,21 116:4,8, 13,22 118:21 120:6,7,14

**located** 28:21

**logistical** 8:20

**logistics** 8:8,10 24:5 28:17

**long** 9:3,19 39:21 55:25 65:13 68:13,17, 21 77:1,8

**longer** 70:18

**lose** 31:6, 25

**lost** 4:22 43:7 92:13

**lot** 21:23 22:4 26:20 30:1 89:3 120:1

**love** 25:23

**loved** 10:5 36:12

**Lovely** 107:7

**Luis** 5:16 70:22,25

**lunch** 106:15,20

**Lynn** 69:15

M

**made** 26:12 32:19 33:19 44:17 45:12 46:15 51:12

**main** 29:19

**maintains** 82:21

**major** 11:15 29:10,17 30:8 78:8 101:23

**majority** 100:2

**make** 9:17 21:1,17 23:11 26:16 28:8 39:1,2 40:4 55:20 58:1

**makes** 55:2

**making** 21:16

**manager** 7:4, 18

**mandate** 31:10

**manner** 45:13

**mansion** 29:18

**mark** 11:18 12:4 40:21

**marked** 11:24 41:6

**marks** 122:18

**material** 72:14

**materials** 72:11 73:1

**materials-wise** 71:13

**matter** 4:8 30:3 37:16

**measure** 31:16

**media** 4:3

**medical** 8:20 17:3,17,24 18:9,15 19:8,21 20:2,19 21:12 25:1 26:1 29:11 30:4 31:2 35:7 36:20 37:19 41:19 42:20 44:18 45:1,4,5, 23 46:1,2, 6,22 52:17,21 53:3,25 54:18 57:16 58:18 80:16 81:2,9,23 82:3,4,11, 17,20 83:2,8,18 84:25 85:16 88:12 89:11 93:25 95:14 96:6,14 99:20 104:10 105:13 108:7,8 109:23 115:10,11

**medically** 36:9

**meet-and-greet** 65:8

**meeting** 64:19,21 65:7,13 68:3,13, 17,22 71:2 119:15,18 120:7

**meetings** 64:25 115:9 120:14,20, 25 121:5

**member** 36:10

**members** 7:2 52:4 111:3

**memory** 58:9, 12

**mention** 26:12

32:19
**mentioned** 31:4 65:8
**message** 89:22 90:3,4,7, 8,12,20,24 91:1,7,18
**messages** 93:17 94:22
**met** 9:8 65:2,4
**metal** 57:19
**Michael** 5:14
**microphone** 62:16
**midway** 43:5
**million** 26:2 28:10
**mine** 43:2
**minor** 33:12
**minute** 46:1, 10 52:1
**minutes** 38:22 51:19 52:12 56:3,4,6 60:12 114:18
**missed** 122:3
**mistaken** 10:14 33:7 65:7 92:11,18
**moment** 4:2 7:16
**monitor** 4:13 40:3 62:16
**monitors** 83:17
**month** 73:21 81:14
**months** 70:17
**morning** 7:1
**Morro** 29:20
**move** 25:13 33:21 59:11 62:13
**moved** 51:10 62:17
**movement** 30:1
**moving** 46:11
**multiple** 11:10 89:4
**myriad** 27:16

**N**

**named** 30:20 37:18
**Nancy** 86:7, 10
**nature** 8:22 28:17 46:14 71:14 76:19
**nearest** 20:19 31:11 32:21 33:2 49:10
**necessarily** 27:23 28:11 110:19 111:9
**needed** 60:2 102:22
**negative** 37:5
**Nelson** 4:14 6:2
**neuro-intensive** 35:19
**notary** 4:19 5:19,20 6:3,5,11, 12,18,20
**note** 14:19
**notes** 115:6
**notice** 122:9
**notification** 19:14 52:14,19
**notify** 42:19
**November** 65:6,10, 14,18 68:5
**number** 4:4, 11 12:6 14:2 40:25 58:5 90:19,23 91:15,17 92:9 97:6 111:22 113:8,10, 14,15,16, 20 123:15
**numbers** 11:21 97:9,19,20 98:6,20 113:18,19 114:10,24
**numerous** 63:4
**nurse** 26:22

**O**

**oath** 5:22
**object** 14:25 63:10,25 65:19 74:16,22 75:12 76:5,14 77:2 79:3,

22 80:18 81:5 83:10,11, 21 85:19 86:2 87:1, 17 88:13 89:13 93:19 94:18 95:3 100:9 101:17 106:2 110:24 112:4 114:13 115:22 116:15 118:25 119:23 120:17 121:20

**objection** 14:14 16:2 17:20 64:8 65:23 66:6,19,22 67:9 68:24 72:13 73:3,15 75:20 77:10,20 78:3,10,18 80:3,11 81:6 82:6, 23 83:20 84:3,10, 11,20,21 85:5 88:2 89:14 96:10 97:2 98:9,22 99:5,12,21 100:10 101:1,18 102:5,10 103:8,15 104:1,12, 21 105:3, 4,15 106:6 108:4,17, 21,24 109:6,14, 24 110:15, 25 111:16, 17 112:3, 12 113:24, 25 114:6,7 115:1,13 116:23,25 117:17 119:9,22 120:9 121:7 122:4

**obtain** 20:3

**obtained** 59:23

**obtaining** 21:15

**occasionally** 117:25

**occur** 119:11

**occurred** 75:2

**occurs** 21:3 30:4

**October** 73:9,14,20

**offer** 34:4 35:7,18

**office** 37:25 62:25 93:7,25 95:21 111:22

**officer** 96:4,5

**officially** 20:11

**open** 74:4

**operate** 43:24 53:18 112:18,19

**operates** 43:23

**operating** 108:2

**operation** 33:12 82:10

**operations** 7:4,17,18 9:15,17 10:16 11:3 13:15,17, 21 17:16 38:1,17

**Operations@continentalshipping.com** 41:24

**operator** 32:15

**opportunity** 61:15

**opposed** 112:1

**option** 31:16,19 42:15,17

**order** 52:5, 11 54:2 72:12,25 96:18 123:4,12

**ordered** 122:1,5

**originated** 113:14

**overburdened** 27:15

**oversee** 9:16

**oversees** 83:25

**P**

**p.m.** 50:1, 22 51:17 123:17,24

**Pablo** 100:8,

14,20 101:15 102:4 107:14,19 118:4

**pandemic** 70:15 73:22 78:15 79:2

**paperwork** 8:18

**paragraphs** 71:13

**parent** 23:23

**part** 9:17 18:7 19:2 21:16 23:10 24:10 39:9 53:19 97:12 105:13,20, 22,25 117:3 122:3

**participation** 70:23 71:2

**parties** 85:2

**party** 66:1, 11

**passenger** 30:20 102:17

**passengers** 102:20

**past** 17:10 33:14 49:13 53:11

**patient** 19:25 20:14 21:18 22:13,19 23:12,16, 25 24:23, 24 25:11, 14 31:11, 20 32:21 33:19 37:9 49:20 51:10 53:3 57:5,9 59:11 60:17 82:19,22 83:4,8,19 84:2,8,17 89:23 96:21 99:10 100:21,24 102:16 103:7,24 104:17,19 110:13,23 111:13,25

**patient's** 22:25 84:19 110:13,23 111:14

**patients** 33:14 34:24 100:7 102:3 107:19

**people** 10:22 26:2 28:11

**percent** 8:8 11:16 87:21 114:1

**perform** 79:20

**performance** 60:21

**performed** 80:8

**period** 9:19 39:21

**person** 21:20 47:18 48:6 86:25 120:25

**personal** 72:25 74:10,12

**personnel** 60:6 115:16

**phone** 5:4 19:15 21:16 26:16,18 28:8 45:5 47:17 55:2 57:1,17 58:12,14, 22 74:10, 13 90:19, 21,23 91:15,17, 19,23 92:4,8,16 93:1,4,12 94:4,10, 12,16 96:24 97:6,8,19 98:5,20 111:21 113:13,20 114:23

**phones** 57:20 91:21 92:19,21, 24 113:18

**physically** 39:12 44:25 45:3 57:16 58:18 87:20

**physician** 24:17 47:8 57:3,10 60:10 89:24

**pick** 26:22

**picking** 4:25 5:1
**picks** 53:14
**pier** 8:18 38:21,23 40:6
**pinpoint** 50:6
**place** 28:6 37:20 48:7 49:3,6 51:7 117:7
**plaintiffs** 5:12
**plan** 23:16
**planned** 119:6
**pleasantries** 62:8
**pleasure** 116:6
**point** 26:7 31:13 45:6 50:7 52:25 53:5 56:24,25 57:1,4 59:3 76:18 95:24 96:2 116:9
**pointblank** 33:18
**policy** 32:20 110:10 121:25
**politics** 29:18
**port** 8:17, 25 11:6,9, 13 12:24 13:11 16:25 17:23 18:8 24:6 28:21 31:3 33:3 38:16 39:5,12,18 40:12,14 49:11 52:15 60:18 78:16 79:6,20 80:10,16 82:5 83:19 85:23 92:25 94:11 98:4,7,19 99:19 107:13 108:3,16 109:11 110:14,22 111:13 112:16 114:22
**positive** 33:15 36:25 37:3,4
**possibility** 65:8
**post** 38:18 39:8
**potential** 49:7 103:25
**potentially** 58:16
**pre-arrival** 38:18,19 39:7
**pre-pandemic** 115:25
**preferred** 34:7,15
**preparation** 38:24 71:24 72:10
**prepare** 38:19 64:18 72:12,25
**Presbyterian** 49:10,19
**present** 13:19 20:10 54:19 55:14 65:1 66:1,12 68:3 69:3
**preserve** 94:21
**preserved** 90:9
**president** 68:8 69:5
**pretty** 23:13 47:4
**preventing** 99:3
**previous** 10:18
**previously** 61:2
**primary** 42:9
**prior** 36:19 38:22
**private** 22:16 30:24,25 32:4,7 60:10
**privilege** 65:21,25 66:8,13,20 71:7
**privileges** 67:1
**problem** 41:9 86:17 103:19 106:13 112:23
**procedure**

46:4

**process** 19:8,13, 19,25 24:11 25:16 26:21 56:13,19 83:17,25 99:9

**processes** 8:18

**produced** 7:20

**product** 71:7

**pronounced** 69:15

**Protection** 39:2

**provide** 112:20

**provided** 17:8 97:16 111:3 113:21 114:12

**provider** 42:12,14 85:24 92:16

**providing** 9:9 21:5 25:1 35:13 121:25

**provisioning** 8:21

**public** 5:19, 21 6:4,5, 11,12,18, 20 30:23

**Puerto** 5:21 7:7,9,14 8:9 17:25 19:10 20:16 21:4,8,11 22:13 29:22 34:7,16 35:12 36:8 54:10 74:15 98:16 106:16

**pull** 13:23

**purpose** 116:12,21

**purposes** 12:6 40:24

**pursuant** 71:6

**pursue** 10:7

**put** 12:18 22:2 26:22 27:2 40:18 55:13 60:9 89:7

**Q**

**quarter** 41:18

**question** 12:2 64:9 67:16 72:5,8 75:3,6 77:3 78:19 91:5,9,11 101:7,12 102:7 103:13,16 108:11

**questioning** 121:21

**questions** 61:4,14,16 66:9 87:7 107:5 122:21 123:12

**quick** 61:18 122:24

**quickly** 46:11

**R**

**raise** 5:24 6:6,13

**rarely** 40:6 42:13 53:22

**re-ask** 103:18

**re-calling** 32:13

**reach** 111:9 119:14

**reached** 47:19

**reaches** 53:21

**read** 123:3, 11

**reading** 35:25

**ready** 6:25 12:1 21:2

**reask** 72:4,7 91:8 100:19

**reason** 22:17 23:5 74:5 117:3

**recall** 37:7 87:13 107:2 114:18 116:9 118:13 119:3,24

**receive** 52:14 57:5 93:4,11 94:3,15 95:10

**received** 42:22 50:14 52:1,19 76:11 89:22 90:2,6,20, 24 91:7 94:9,11 96:20 115:15

**receiving** 24:12,17, 24 57:3,10 89:23

**Recess** 61:23

**recognize** 12:17 13:5

**recollection** 38:4

**record** 6:1, 8,14 12:6 13:16 61:22,25 62:1 106:6 123:18

**records** 94:17 95:5 96:24

**recreate** 50:17

**red** 23:11 46:10

**referred** 34:18 63:13

**refused** 64:6 101:23

**refusing** 67:15,23, 24

**regard** 29:16 96:14

**regular** 13:14,16, 22

**regularly** 18:8

**related** 30:9

**relationship** 10:2,8 14:10,22 36:14 77:13 85:1

**reliant** 55:17

**remain** 39:22

**remember** 38:2 106:24 118:17

**render** 21:20

**repairs** 109:16

**repeat** 68:20 75:3,6 86:8 91:5 103:12 105:5,8,10 114:15 116:5

**rephrase** 10:24

**report** 44:25 50:19 96:13

**reporter** 4:15 6:6,9 62:11 87:10 92:22 94:5 100:16 105:7 107:10 123:10,20

**reports** 89:7

**represent** 71:3

**representative** 4:7 7:22 8:24 48:1 50:23 55:1,18 60:4,5,9 108:19 121:23

**representatives** 116:11,14 119:7,20

**represented** 67:6

**representing** 70:20

**represents** 66:2 67:17

**reputation** 36:5,8

**request** 22:25 25:3 28:9 30:4 33:19 37:19 44:17 45:23 46:6,14 51:12 64:7 84:24 118:20

**requested** 45:18 63:4,24 81:1,23 118:23

**requests** 45:12 80:16 87:10 92:22 94:5 100:16 107:10

**require** 57:7 111:6

**required** 17:23 46:23 59:10

**requires** 85:2

**research** 72:25

**resort** 31:18

**resources** 21:9 27:8

**response** 43:5 60:19 63:6

**responsibility** 83:7 89:25

**responsible** 15:14 84:7,16

**rest** 92:13 107:4

**restart** 70:16

**retrospectively** 50:18

**returned** 73:24

**review** 52:8 71:12 72:11,14

**reviewed** 45:10 71:21,22, 23 72:2, 15,20

**reviewing** 72:23

**Richard** 4:9 7:20 30:20 37:18 42:21 44:18 48:22 50:25 56:12 59:20 60:17 61:8

**Rico** 5:21 7:7,9,14 8:9 18:1 19:10 20:16 21:5,9,12 22:13 29:22 34:7,16 35:13 36:8 54:11 74:15 98:16 106:16

**rights** 66:25

**ringing** 94:5 122:13

**road** 29:4,5 30:5 109:3

**roads** 28:25 108:1,15 109:10

**roadways** 28:18

**Robles** 38:10 39:19 40:14 44:20 45:6 47:7,18 48:4,9,17 52:19 53:1,6 54:12,24 57:15 58:3,17 59:22 60:8 68:10 69:9 73:7,20 74:2,14 87:8,12 88:22 90:20 91:17 92:9 93:3,18 94:9,15 95:9 96:9, 13 111:24

**Robles'** 94:22 95:24 96:1

**role** 17:16 37:24

**rotate** 82:12 108:8

**Royal** 4:9 7:21 11:7 13:2,12 14:11,22 15:7,25 16:8,9,16 37:17 42:19 45:12,18 46:15 47:8 51:13 61:7 63:23 65:17 66:2 67:6,17 68:22 75:1,10 77:1,9,17 78:1,7,15 79:8,19 80:15 81:1,23 82:2 83:16 84:6,16 85:16 86:1,22 98:5 102:15,20 103:23 105:1,14 106:1 107:14,18, 24 108:13, 20 109:5 110:11,12 111:9 112:1 115:9,16 116:2,7,13 117:14 118:3,20 119:19 120:5,16

**rudimentary** 34:3

**Rule** 7:21

**run** 9:8,18 40:9 44:8, 12 50:19

**runs** 43:2

**S**

**S-U-N-N-Y** 30:21

**safety** 23:23

**salaries** 15:15

**Saldaña** 5:16 6:22 12:8, 10,15 14:14,25 16:2 63:15 64:8,13,22 65:19 66:6,16,21 67:12,18, 22 68:1,12 69:2,4,18, 20,23 70:4,8,11, 22,25 71:1,11, 15,22 72:13 73:10,15 75:21 76:5,15 77:2,5,10, 20 78:3, 10,18 79:3,9 80:3,11 81:6 82:6, 23 83:11, 20 84:3, 11,20 85:5 86:3 87:2 88:2 91:8 96:10 98:9,22 99:14,21 100:10 101:1,18 102:5,10, 25 103:8, 11,14 104:1,5, 12,21 105:3,15 106:2,4, 11,14,24 107:6 108:4,17 109:6,14, 24 110:15, 25 111:17 112:3,12 113:25 114:7,14 115:13 116:23 119:1,9,22 120:9,18 121:7,20 122:5,8, 14,18,22 123:8,19

**San** 7:7,8, 10,11,13 8:24 17:23 25:2 28:21,22, 23 29:1, 17,25 33:3 36:7 37:6, 10 39:5 40:12 50:24 53:25 59:21 60:18 78:16 80:17 82:5 83:19 84:2 100:6,8, 14,20 101:15 102:3 107:13,14, 19 108:16 109:11 112:16 114:11 118:4

**Sarah** 4:21, 22 5:11 11:19 12:11 14:3 40:23 61:17 62:24 123:20

**Saul** 5:19

**scenario** 56:2,3 58:17

**scheduled** 40:12

**scope** 13:15, 17

**scroll** 41:8

**Seas** 37:18 38:9 39:18 40:11 44:21 47:9 87:9,12

**secondary** 42:16

**seconds** 106:4

**secretary** 41:20 54:18

**section** 29:20

**seeking** 82:10

**send** 20:13 21:18 23:16 75:14 93:13

**sending** 33:20 91:1

**sentence** 72:20

**separate** 16:17

**serve** 8:23 11:6,9

**served** 14:21

**service** 17:8

25:3 27:18 28:9 30:18 42:12,13 60:11 73:25 85:24 112:20 114:21

**services** 8:20 9:9 24:7 25:1 26:1 27:9 28:12 31:6 34:4 40:4 78:17 79:21 114:11 116:19

**serving** 11:13 16:25 17:22 18:7 37:24

**set** 96:18

**she'll** 26:22 53:22 57:1

**ship** 8:15 17:3 19:9 25:6 33:4 38:25 39:13,19, 22 40:17 44:11 47:8 48:16 57:15,18, 19,22 58:4 59:1 79:5, 25 81:13 82:21 87:16,20, 21,25 88:4,11, 16,23 93:24 95:18,23 96:1 98:21 99:4 113:22

**ship's** 19:21 20:10 48:4,8 52:21 57:23 58:22 59:22 82:11

**shipboard** 83:25

**Shipping** 4:5 5:17 7:5, 13,23 8:6, 7 9:4,5, 15,20 10:12 11:2,6 13:1,3,12, 18 14:11, 20 15:8,9, 14,17 16:16,25 17:9 18:16 19:22 26:15 36:14 37:9,22 42:20 43:6 45:11,22 46:12,21 48:2,8,9, 15 49:15, 18 50:24 51:19 52:5,10 53:24 59:13 60:17,22 61:7 68:9 69:6,7,8 71:4 73:17 75:1,10 76:3,25 77:8,17 78:2 81:4 82:3,18 83:9,18 84:1 85:2, 15 90:21 91:19 103:23 104:25 105:12 107:12,17 108:18 109:20 110:11 112:1,9 114:20 115:8 116:3,8 120:6,15 121:4

**Shipping's** 42:2 71:1 78:8

**ships** 9:7 53:11 78:15 79:1,7,20 105:20 107:14 108:2

**shoreside** 19:9

**show** 96:24

**shut** 70:14

**sic** 36:7 41:2

**sights** 29:25 30:8

**similar** 93:1

**simply** 22:19 26:16

**single** 100:23

**sir** 5:18 6:21,22 7:15,18,24 8:3,5 9:2, 13 11:8,11 12:10,21 13:4,13, 20,24 14:17,24 15:4,10,19 16:5,12,20

17:12,19 18:4,12 19:10 20:23 21:7,10,14 22:14 23:2,19 24:2 25:5,17 26:10 28:13,24 30:2,11 31:21 32:23 33:22 34:9 35:4,9,16,22 36:2,16,22 37:7,11,14,23 39:15,20 40:10 41:16,22,25 42:1,4 43:12,15 44:10,13,22,23 45:2,7,14,19 46:11,18 47:1,4,11 48:5,10,18 49:8,21 51:3,21 52:6,22 53:4 54:4,14 55:5 56:8,17,20 58:15,17 60:13 61:11 62:4,21 66:11 67:5,15,21 71:12 72:9 79:14 86:13 92:15 102:24 107:9

**sit** 47:25

**sitting** 87:25

**situation** 46:1,9 47:4 89:6

**situations** 27:1 29:9 89:4

**small** 26:3 29:6 33:11

**Smart** 92:20 93:1

**smoothly** 9:18

**sole** 120:24

**son** 10:1

**sort** 54:18

**sorts** 80:1

**sound** 5:1,2,3

**speak** 31:16 37:1 47:7 48:6,15 53:22 54:17,25 57:18 73:7,14 96:25 104:5 108:19 110:5 120:3

**speaking** 10:6 88:25 93:15

**specialist** 22:21

**specialists** 21:12,13 22:8

**specific** 82:10 91:22 99:20 112:10 117:25

**specifically** 7:8 11:1 19:17 37:19 38:1 66:24 80:15,19 88:19 105:17 107:22 108:7 112:5 116:10

**specifics** 48:3,7

**speculating** 93:23 94:10

**speculation** 116:24 117:1

**speed** 55:17

**spell** 30:22 38:12

**spoke** 59:22 60:3 61:2 73:13,20 114:19

**spoken** 47:21 73:8

**spring** 44:5,6

**stabilize** 31:12

**staff** 70:15

**standard** 21:5 43:24,25 44:2,3,9,12 46:4

**start** 8:4 106:19

**started** 9:7,9,21 10:19 77:12 79:2

**state** 5:25 6:7,13 106:5

**states** 66:24

**stating** 89:22

**status** 32:11

**stay** 44:6

**step** 19:12 20:5

**stopped** 52:20

**straight** 120:2

**street** 7:10, 11 20:17

**strike** 10:24 28:19 29:8 36:6 85:12 91:13,16 95:25 97:7 99:17 105:23 107:9 108:12 114:19

**stroke** 33:19 34:8,16,24 35:2,8,13 47:1,3 49:7,20 60:17 89:12 100:1,22, 25 101:15 102:17,22 103:7,25 104:10,18

**strokes** 100:7 102:3 105:12

**structure** 57:20

**studies** 35:25

**subcontracted** 113:6

**subcontractor** 14:22

**subpoena** 63:1,6 64:5,7

**suffered** 102:21

**suffering** 100:21 102:17 103:7,25 104:17

**summary** 8:14

**Sunny** 30:21, 23 49:23 50:20 51:6,25 113:5,6, 11,20

**supervise** 10:23 11:2

**supervisor** 38:11 64:24 68:10 69:6 88:6

**supervisors** 32:8

**support** 4:17 28:3,4

**supposed** 71:19 85:15

**suspicion** 49:6

**swear** 4:19

**sworn** 6:3, 10,18

**system** 27:14 28:3,5 55:19

**T**

**takes** 29:24 56:7

**talk** 59:2 68:16 71:19

**talked** 64:20

**talking** 16:23 73:22 82:9

**tape** 23:11

**task** 80:8 120:3

**tasks** 17:2

**taxes** 15:15

**teacher** 9:24 10:1

**teaching** 10:4,6

**team** 86:22 108:7

**teams** 82:11 108:8

**technical** 42:10

**telephone** 26:5,13 119:4

**telephones** 57:23

**telling** 100:22 102:1

**ten** 9:25

**ten-minute** 61:20

**term** 34:5

**terms** 50:2

**terrible** 23:13

**testified** 6:19 49:25 87:11

**testify** 48:2

**testimony** 8:1 71:24

**text** 89:22 90:3,4,7, 8,12,20,24 91:1,7,18 93:14,17 94:22

**texted** 95:8, 13

**thing** 23:14 24:15 46:3 52:9,13

**things** 9:18 10:7 53:15

**thinking** 106:19

**thirty** 80:22

**Threadgill** 6:15 7:3,6 12:17 33:18 41:12 121:22 123:2,16

**Threadgill-colón** 4:8 6:16

**Threeadgill** 14:8

**time** 4:13 8:17 9:19 10:3 23:24 27:22,23 39:21 40:10,13, 16 42:19, 23 43:24, 25 44:2,3, 7,9,12,19, 21 50:13, 14,21 51:2 52:6 60:19,20 61:22 62:1 63:19 65:2,4 73:19 74:25 75:9 76:2 77:1 79:5 81:22 88:7,19 92:10 94:14 102:6,8,15 103:23 106:13,22 118:11,17 119:3,25 121:16 123:17

**time-sensitive** 46:14 104:10 105:13

**times** 21:24 22:4 26:20 80:14,20, 22,25 81:14 89:3 118:10

**today** 7:6,20 8:2 12:18 37:16 47:25 63:2 64:5 72:17,23 73:1 87:25

**today's** 4:12 64:18 72:10

**told** 22:7 111:24

**top** 29:21 98:17

**top-ranked** 34:23

**total** 11:12

**touch** 60:9 73:23 74:9

**tourist** 29:20 30:8

**town** 54:10

**tradition** 29:22

**traffic** 26:8 29:10 30:6,7,9 108:1,15 109:3,11, 22

**trained** 36:9

**training** 10:20 40:7 83:2

**transcript** 123:3,13

**transfer** 20:22 21:2 24:5,23 25:1 26:23,25 29:11 30:4 31:12,20 32:4,20 33:19 37:9,19 46:24 47:10,20 49:9,20,25 51:20 52:11 53:25 59:14 96:18 99:10 104:19

**transferred** 26:21 32:14 33:4,14 48:23 49:1 56:12 59:20 61:8 84:17

**transferring** 84:1 107:18

**transfers**

17:17 18:9,15 19:8 36:20

**transport** 82:20 84:8

**transportation** 111:7

**transportations** 8:21

**treat** 101:8

**treating** 100:6,24 101:15 102:2

**trip** 29:24

**turn** 14:1 22:18 23:5 28:5 32:5 41:13 43:1 59:6

**turned** 23:15

**twenty-five** 49:16 60:15,16 77:19,23

**type** 33:11,12 60:18

**types** 40:7 80:1 99:20

**typically** 31:10 55:24 96:3

**U**

**U-B-I-Ñ-A-S** 38:13

**Ubiñas** 38:11 64:24 68:9 69:6

**ultimate** 80:9 83:7

**ultimately** 48:23 84:6,16

**understand** 7:19 8:1 14:12 20:12 31:1 45:23 46:22 47:3 53:18 66:10,18 81:20 82:14

**understanding** 46:17 62:25 67:5 85:1,14,22 89:21 98:3

**understood** 46:13 81:19 82:16 88:21 106:21 113:1

**unemployment** 15:16

**unidentified** 88:24

**unique** 28:17

**unit** 35:8,14

**urgency** 45:23

**utmost** 104:18

**V**

**variety** 22:22 105:20

**verbal** 118:23

**versus** 4:9 7:21

**vessel** 19:15 38:15,18 39:3,7,8,11 40:2,10 43:23 44:25 52:15 81:15 96:4

**vessel's** 40:3

**vessels** 97:17,25 98:1

**video** 123:15

**virtue** 56:11 59:19

**visit** 116:17 117:4,9,15,22 118:3

**visits** 115:16 116:12,21 117:7,12 118:21 119:6

**voice** 88:24

**W**

**wait** 41:4 46:6 55:11 103:14

**waive** 66:25 123:5,9

**waived** 65:25 66:12,20

**wanted** 13:23 70:18 74:8 99:8

**ways** 19:18 57:12

**week** 29:23 30:4 79:2 119:12

**weekends** 29:23

**wide** 26:3

**wife** 9:9

**willingness** 50:25

**wise** 33:20

**word** 52:1

**words** 31:18 37:12 46:5 48:14 112:6

**work** 23:24 55:18 57:20 70:19 71:7 73:17 79:1 112:16

**worked** 10:21 15:17 49:14,18 81:3 86:24 103:5 111:25

**working** 5:7 9:20 36:13 37:21 74:21 76:25 77:9,12,17 78:1 82:2 83:25 94:1 102:14 105:1,14 106:1 109:5 121:15

**works** 8:13 19:8 86:22 121:14

**worst-case** 56:3

**wrap** 107:4 122:23

**write** 96:13

**written** 43:5 69:14 111:21

**Y**

**year** 18:22 19:4 76:7,21 78:23 79:18 80:15,23 81:1 118:22

**yearly** 115:23

**years** 9:7,25 13:7 17:10,18 23:22 24:25 25:23 49:14,16,17 58:7 60:14,16 77:13,16,25 81:3 100:3 102:14 103:22 108:2 109:4 115:24 118:18,22 121:5,10

**yesterday** 64:19 65:3,5 68:17,18,22 70:21

**Z**

**Zambataro** 4:16 6:10

**zero-five** 92:14

**zone** 106:22

# PORT AGENT AGREEMENT

**Port Agent:** **Continental Shipping Inc.**
**960 San Francisco St.**
San Juan, Puerto Rico 00901

**RCL:** **Royal Caribbean Cruises Ltd.**
1050 Caribbean Way
Miami, Florida 33132

**Agreement:** This Port Agent Agreement dated as of the Commencement Date (the "Agreement") is made by and between **Continental Shipping, Inc., Puerto Rico]** ("Port Agent") and **Royal Caribbean Cruises Ltd.**, a Liberian corporation ("RCL").

**TERM:** **The term of this Agreement ("Term") shall begin on the Commencement Date and shall expire on the Expiration Date, unless sooner terminated in accordance with the terms of this Agreement. In addition, so long as Port Agent is not in default hereunder, the parties hereby agree that the Term shall automatically renew for additional one (1) year terms unless RCL or Port Agent provides the other party with a written notice of termination prior to the end of the applicable Term.**

Commencement Date is **February 1, 2019.**

Expiration Date is **January 31, 2020.**

**Port Cities:** **Ponce, San Juan** with such other Port Cities as may be added by amendment or supplement to this Port Agent Agreement from time to time.

K3

**Scope of Services:** RCL, through its cruise lines Royal Caribbean International, Celebrity Cruises Inc., Azamara Club Cruises, and any other passenger cruise line now or hereafter acquired by or affiliated with RCL, offers cruises to guests throughout the world, excluding Pullmantur, S.A. In connection with those cruise services, Port Agent agrees to provide, in the port cities specified above (the "Port City" or "Port Cities"), Port Agent services specified in Article 1 of Exhibit A attached hereto and incorporated herein (collectively, the "Services"). Port Agent agrees that it will, during the Term (as defined above), maintain the applicable staffing levels specified in Exhibit A, and otherwise comply with the personnel requirements of this Agreement.

**Compensation:** As compensation for the Services provided hereunder, RCL will pay Port Agent (i) a Basic Service Fee (as defined in Exhibit A) for all of the Basic Services (as defined in Exhibit A) in accordance with the rates and terms set forth in Section 1.2 of Exhibit A, and (ii) when applicable, the Other Services Rates (as defined in Exhibit A) in accordance with the terms set forth in Section 1.4 of Exhibit A.

**Standard Terms and Conditions:** This Agreement is subject to the Standard Terms and Conditions attached hereto as Exhibit B, and such Standard Terms and Conditions shall be considered an integral part of this Agreement.

[Signature Page to Follow]

EXHIBIT
PENGAD 800-631-6989
D-Comp. A
1/27/22 [illegible]

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date written below.

**ROYAL CARIBBEAN CRUISES LTD.,**
a Liberian corporation

By: [signature]

Name: Hernan Zini

Title: Vice President, Port Services

Date: 2/26, 2019

LEGAL [stamp]

**Continental Shipping Inc.,**

By: [signature]

Name: Kristian Busto

Title: President

Date: February 25, 2019

**EXHIBIT A**

***PORT AGENT SERVICES DESCRIPTION***

Port Agent is RCL's representative in the Port Cities. As more specifically described herein, Port Agent shall act to protect the interests of RCL in all matters involving the safety of any RCL vessel (the "Vessel") calling at a Port City, as well as the safety of RCL guests and crew.

**Article 1. Services and Compensation**

***Section 1.1 Description of Basic Port Agent Services***

Port Agent shall provide the basic services set forth below (collectively, the "Basic Services") for the Basic Service Fee described in Section 1.2 of this Exhibit A. As defined herein, "arrange" is defined as, but not limited to, provide, obtain, handle, coordinate, inform, advise, submit, supply, support, sustain, order, prepare, adapt, accommodate, perform, aid, assist, avail, furnish, help, give, and oblige, from beginning to end. Basic Services provided may vary from port to port, call to call, or otherwise.

| | | | |
|---|---|---|---|
| 1.1.1 | Ship Husbandry | Berthing | Arrange for safe berthing for vessels, ensuring berthing is in accordance with RCL preferences (berthing at approved berths only unless cleared in advance with Marine Operations) regarding vessel size and berth dimension. |
| 1.1.2 | Ship Husbandry | Berthing | Upon notice from RCL, request berth reservation from the local port authority, or official entity that administers berthing on behalf of the port authority, and confirm berth reservation to RCL upon receipt of same from the local port authority. In cases where confirmed berthing is changed, Agent shall notify RCL immediately and will assist with sourcing and resolving alternative berthing as needed. |
| 1.1.3 | Ship Husbandry | Reporting | Inform, give notice to (as required), handle, and arrange vessel clearance with local Customs, Immigration, Agriculture (including USDA if domestic), Health, Sanitation and any other governmental authorities needed upon vessel entry/exit. This includes Port Agent's time to process all documents needed and arranging for local authorities (Customs, Immigration, Agriculture, etc.) to board the vessel on arrival for clearance procedures. Provide Customs bond (if required). Fee includes any service charges for processing forms, including all documentation required to obtain the vessel's clearance (arrival, departure and in route) for each ship call. |
| 1.1.4 | Ship Husbandry | Reporting | Provide to the local port authority, vessel arrival and departure reports as needed or required. For U.S. calls, includes US Coast Guard 24 hour Notice of Arrival or equivalent. |
| 1.1.5 | Ship Husbandry | Reporting | Obtain passenger and crew counts from vessels and notify counts to stevedoring company, port authority, terminal operator, or any other entity as directed by RCL, as applicable, in the format requested by RCL. |
| 1.1.6 | Ship Husbandry | Reporting | For non-U.S. sailing, fee includes facilitating, completing filing, and any other action required to satisfy any government or quasi-governmental agency as required.<br><br>For U.S. sailings, fee includes facilitating, completing, filing and any other action required to satisfy U.S. Government Regulations as required by the following documents (as Agent if applicable):<br>• CBP Form 1-92 (Vessel Arrival)<br>• CBP Form 1-94 (Vessel Departure)<br>• CBP Form 1-94A (Arrival/Departure Record)<br>• CBP Form 1-95 (Conditional Landing Permit)<br>• CBP Form 1-259 (Notice to Detain, Remove, or Present Alien (Depart Foreign under Safeguard)<br>• CBP Form 1-408 (Application to Payoff of Discharge Alien Crew)<br>• CBP Form 1-409 (Report of Deserting Crewman)<br>• CBP Form 1-418 (Crew List – Arrival/Departure)<br>• CBP Form 1-510 (Guarantee of Payment)<br>• Form 1-184 (Alien Crewman Landing Permit and Identification Card) |

| | | | |
|---|---|---|---|
| | | | • DHS Form 1-193 (Application for Waiver of Passport and/or Visa) |
| 1.1.7 | Ship Husbandry | Vessel Guidance | Advise the Vessel, prior to its arrival, of all necessary documents (Customs, Immigration, Agriculture, Health, Sanitation and any other governmental authorities) required in order to minimize delays. Provide guidance to the vessel's officers, crew, and guests regarding disembarking clearance procedures with local Customs and Immigration. |
| 1.1.8 | Ship Husbandry | Waste Removal Coordination | For domestic calls, arrange appointment(s) between Customs Border Protection (CBP)/USDA inspector and vessel during the off-loading of any waste, including without limitation APHIS waste. |
| 1.1.9 | Ship Husbandry | Agent Attendance | Vessel attendance, including making a Port Agent representative available, and remaining, on-site at the pier upon the arrival of the vessel, and at any time throughout the day until the vessel's departure to handle service requests of the Master, Captain, Hotel Director, Vessel Officers or other RCL representatives. |
| 1.1.10 | Ship Husbandry | Arranging Services | Fee includes service charges for arranging needed ship services. As defined herein, "arranging" is defined as, but not limited to, provide, obtain, handle, coordinate, inform, advise, submit, supply, support, sustain, order, prepare, adapt, accommodate, perform, aid, assist, avail, furnish, help, give, and oblige, from beginning to end.<br><br>Fee includes arranging services such as pilots, tugs (only if requested or compulsory), line handlers, waste removal (all types), security services, stevedoring labor and equipment, potable water, repair technicians, etc. Only compulsory port services can be arranged by the port agent without obtaining prior authorization from RCL. Additional expenses (for example: port adviser, signaling station, port interpreter, ship agent association fees, etc.) not approved in advance and not documented as compulsory will not be reimbursed.<br><br>Fee includes arranging other miscellaneous items and services, such arranging visitor's lists, early disembarkation of luggage, cash on board formalities, and any other service as may be requested by RCL for its Vessels.<br><br>Services charges that are incremental, or in addition to the cost of providing a service, must be disclosed, presented, discussed, and agreed to by an approved requestor of the service prior to service delivery. Requestor shall not be obligated to accept the cost of service or service fee(s) quoted by Agent. Requestor retains the right to negotiate any and all service fees prior to the rendering of services. |
| 1.1.11 | Ship Husbandry | Fuel Bunkering | Fee includes service charges for arranging and coordinating all aspects related to fuel bunkering, including arranging permitting if necessary. Arranging the collection and courier or samples is not covered by the Basic Services Fee and should be arranged directly with the proper department. Costs related to sending samples shall be covered in Section 1.4 Other Services. |
| 1.1.12 | Ship Husbandry | Arranging Services | Services or products requested by RCL (vessel or shore) that are not governed or covered by a previously agreed upon fee structure or contract (if unsure if one exists, please ask requestor or contact Port Operations) require a cost quote and approval prior to rendering service. Services must be requested via ERS, RCCL's electronic requisition system. ERS replaces the manual request process using the Port Agent Request Form (known as a "PARF"). The process for providing services and obtaining reimbursement is:<br>1. Requester (ship or shore) initiates request for service via RCL's electronic requisition system – ERS, which is used to request products or services. Request is sent electronically to Agent.<br>2. Agent obtains quote or approximate expected cost, including taxes that may apply, and provides back to requestor via ERS system.<br>3. If quote is accepted, requestor obtains proper approval (signature). Ship approvers are Master, Staff Captain, Hotel Director, and Chief Engineer. Shoreside approvers are designated department approvers.<br>4. Agent renders services at cost without any service fee.<br>5. Requestor (person or department requesting the service or product), via ERS system, acknowledges receipt of product or service. Unless acknowledged, invoice cannot be processed for payment.<br>6. Agent generates request for reimbursement via IMS by submitting supporting documentation, which is routed to requesting department for review and processing for payment.<br>7. RCL validates and pays invoice. |

KB

| | | | |
|---|---|---|---|
| 1.1.13 | Ship Husbandry | Local Representation | Agent shall maintain in good standing the relationship between RCL and the local authorities, and any other Governmental or Statutory authority as required by National and/or Local regulation or Law, at all times, and coordinate and assist ship's officers during any inspection performed by governmental and quasi-governmental agencies before, during and after the port call, providing support as needed and according to the situation. An example of such service could be PSC Inspection, Registry visits, etc. |
| 1.1.14 | Ship Husbandry | Local Representation | Serve as advocate on all local, state, regional, national governmental or private authority matters that potentially impact the vessel, RCL, our guests. The Agent is expected to proactively serve the best interests of RCL and its vessels at all times. |
| 1.1.15 | Ship Husbandry | Reporting | At Port Operation's direction and instruction, complete and submit to Port Operations a vessel call report upon ship's departure. Failure to provide report may result in withholding of agency fee for call, and possible termination of contract. |
| 1.1.16 | Ship Husbandry | Agent Travel, En-route Clearance, and No Local Agent | Fee includes travel expenses, including meals, time, transportation (air, land or sea) and lodging for Agent or Contractor to reach the ship's berth, terminal, any other office, authority, building and or facility involved with the ship's call. This includes relocating a Port Agent to attend the vessel at any contracted port where the Agency has no local representation, or there is no subagent, or in cases where agent must join the vessel in a previous port (domestic or foreign) to perform or oversee en-route clearance) Fee includes ENS/EXS formalities, and all costs will be reimbursed based on actual expenses supported by receipts. |
| 1.1.17 | Ship Husbandry | Permitting | If agreed to in advance and support by a rate structure, assist and arrange any special work that is extraordinary and unusual, such as welding works (hot works), mechanical works and any other similar work that is provided through the port agent. Includes arranging and granting access on board the ship of RCL staff, technicians, vendors and clients (any third party cost will be reimbursed by the third party or as arranged by RCL). |
| 1.1.18 | Ship Husbandry | Tariffs Changes | Advise RCL of all potential or declared port tariff increases as they occur and work individually or with an association to mitigate the increase for RCL's benefit. |
| 1.1.19 | Ship Husbandry | Supporting Documentation | Agent shall provide all supporting documentation for expenses submitted regardless of vendor. |
| 1.1.20 | Ship Husbandry | Compliance | At RCL's direction, Agent shall assist RCL's Compliance and Audit Departments in cases where additional clarification is needed on expenses, transactions, tariffs and cost calculations. |
| 1.1.21 | Ship Husbandry | Operations Planning | Participate in advance planning with vessel staff/corporate office prior to first call and periodically during season as requested. |
| 1.1.22 | Ship Husbandry | Visa, Work Letter, and Other Documents | Fee includes coordination of any documentation arrangements (as needed), including (but not limited to): documents, stamps, applications, work letters, immigrations documents, safeguarding, embassy letters, guarantee letter, letter of invitation, letter of invitation no show, LOE Letter of Employment, LOI, no shows; OTB - Ok To Board letter; shore passes for crew subject to visa, without limitation to the number of passes issued. For documentation pertaining to crew, unless separately arranged with Crew Department for specific services, documentation services contained herein shall be included in cost of agency fee. |
| 1.1.23 | Ship Husbandry | Communication Costs | Fee includes all communication costs (fax, e-mail, cell phone, courier fees, postage, etc.). |
| 1.1.24 | Ship Husbandry | Bank Fees | Fee includes bank fees (e.g., wire transfer fee, etc.) to process money received from RCL, or other party on behalf of RCL. Fee also includes full processing, customs clearance and delivery of cash to master to the ship as requested by RCL or vessel's officers, inclusive of security guards where requested/compulsory (security costs are reimbursed when utilized). Fee does not include government tax or tariff on foreign exchange transactions. Such fee must be noted in advance and detailed on invoices submitted for reimbursement, including supporting government documentation which governs the tax, and rate it is calculated. |

K3

| | | | |
|---|---|---|---|
| 1.1.25 | Ship Husbandry | Payments To 3rd Parties | Make and/or facilitate all legal payments required or authorized by the vessel and RCL with respect to:<br>i) Payment in full regarding all port services in the time frame set by the applicable port and local authorities and other port service providers;<br>ii) Payment for special services as requested by the Vessel or RCL not related to the Other Services (as set for in Section 1.3 Description of Other Port Agent Services), such as fines, emergency repairs or provisions, etc.<br>So long as RCL has paid Port Agent within required timeframe for services rendered, Port Agency shall be liable for any charges related to late payments of RCL invoices to third parties.<br>No payments for fines shall be reimbursed unless such payment was approved in advance by RCL. No Port Agent commission shall be added to RCL fines paid by Port Agent. |
| 1.1.26 | Ship Husbandry | Prefunding | Agents shall notify RCL of expenses that require advance funding as per law or tariff, and provide RCL with supporting documentation of said requirements; or as mutually agreed upon between Agent and RCL. |
| 1.1.27 | Ship Husbandry | Use of RCL Funds | Agent shall only use RCL funds paid by Port Operations for port services incurred or arranged on behalf of RCL by the Agent. Agent shall track all payment amount(s) and date of payment(s) made to vendors or 3rd parties servicing RCL vessels or providing services to RCL. RCL reserves the right to audit payments to 3rd parties made by the Agent on RCL's behalf. Agent shall not use Port Operations funds to pay for any other monies owed by other RCL Department's. Any unauthorized use of RCL Port Operations department funds may result in immediate termination. |
| 1.1.28 | Ship Husbandry | Discounts, Rebates, Refunds | Agent shall notify RCL of rebates, refunds, discounts, or any other financial benefit RCL has earned or is entitled to as a result of vessel or company operations, including those yielded by Port Agent's individual efforts (all rebates, refunds, and discounts received by Port Agent shall be provided to RCL). Agent shall return any earned financial benefit without delay. Agent shall not withhold for any reason funds or monies due or owed to RCL, and Agent shall not net monies owed to Agent for services rendered and owed by RCL unless agreed upon with RCL in advance. Withholding of funds may result in termination and legal action against Agent. |
| 1.1.29 | Ship Husbandry | DA Expense Submission | Fee includes all courier and/or postage fees necessary to send RCL call invoices to RCL, including any resubmission of copies of invoices or documentation. |
| 1.1.30 | Ship Husbandry | DA Submission | Port Agent shall utilize (RCL will train Agent) RCL's Invoice Management System (IMS) to submit ALL invoices for products and services rendered or arranged for any and all RCCL departments, unless otherwise agreed upon in advance with Port Operations. Invoices for services described in *Section 1.3 Other Services*, including crew movement, crew/guest medical, logistics, direct ship or shore requests shall be made directly to the department or entity initiating the request (*Refer to Section 1.4 Other Services Rates*). Failure to utilize IMS will result in delay of payment. Failure to submit any and all invoices for services rendered to RCCL, regardless of department, may result in immediate termination. |
| 1.1.31 | Ship Husbandry | DA Submission | Port Agent shall invoice RCL for all services rendered by Agent or 3rd parties, or vessel expenses incurred, as promptly as possible after they are rendered, but no later than thirty (30) days after each <u>ship call date</u> where such services were rendered. Agents are encouraged to submit expenses as soon as they are received from third parties to avoid payment delays. <u>IMPORTANT: RCL will not be required to pay services and products not invoiced via IMS to RCL within twelve (12) months after the date such services and products are performed.</u> |
| 1.1.32 | Ship Husbandry | Payment Currency and Rate of Exchange | RCL will settle all invoices in the currency invoiced, unless otherwise agreed upon in advance, and as documented in Section 1.2. Agent understands and accepts that arranging and providing services, and receiving payments in other currencies other than the one submitted, can result in exchange rates risk. For all invoices submitted through RCCL's Invoice Management System (IMS), the market exchange rate for the call date (if multiple days in port, the exchange rate for the first day in port will be used) will be applied as provided by <u>www.XE.com</u>, an independent 3rd party provider of global currency rates. In the event that the exchange rate within IMS is not used and Port Agent uses a non-agreed upon exchange rate to convert local charges to payment currency to be paid by RCL, Port Agent may be subject to termination unless agreed upon in advance. Port Agent shall repay RCL for any overpayments due to use of unauthorized exchange rate(s). If required by national or bank law that Agent must use the central bank rate, or other required official rate, Agent shall covert expense from local currency to invoice currency (as agreed upon in |

KB

| | | | |
|---|---|---|---|
| | | | advance) using the official rate required by law, and shall include with the submission official bank documentation or tariff that evidences the exchange rate from local currency to USD for the date(s) in which the expense was incurred, if other than the call date. For multi-call days in port, Agent shall apply the official exchange rate as it occurred on the first day of the call. Agent must also provide RCL with the central bank, or exchange rate source bank, website URL that provides the official rate of exchange (ROE) from local currency to USD for the date of the call, or incurrence of the expense being submitted for reimbursement. |
| 1.1.33 | Guest and Crew Medical | CARE Team | Agent shall understand the role and responsibilities of the Royal Caribbean Cruise Lines, CARE Team. The CARE team is a group of professionals, under medical direction, who are able to support guests and crew members who are in the process of being disembarked from the vessel due to a medical emergency or other crisis, such as a psychiatric emergency or sexual assault. Agent shall ensure that they have current 24 hour contact information (please refer to *Exhibit C – General Operations Contact List*) for the RCL CARE Team. |
| 1.1.34 | Guest and Crew Medical | Coordination of Services | From time to time as needed, unless otherwise agreed upon and documented separately, agent shall at no extra charge, and as part of agency fee:<br>• Coordinate medical appointment with specialist per ship request (crew or guest medical referral)<br>• Coordinate transportation to/from medical appointment<br>• Procure/obtain prescription of medication not available onboard (pick-up/ purchase/delivery)<br>• Coordinate ground ambulance as requested by ship medical facility/crew medical / Care Team<br>• Coordinate hotel accommodations for crew, guests, relatives or Care Team Associates (CTAs), if applicable<br>• Coordinate ground transfers between hotel and hospital for crew, relatives of guests or CTAs<br>• Coordinate with Crew Medical or Care Team in arranging transfer home or to rejoin ship in other port<br>• Secure and submit medical records/reports to ship, Crew medical department or Care Team<br>• Provide phone card / pre-paid phone at rate specified by Crew Medical department or Care Team (Phone card at cost)<br>• Assistance with luggage and fees as approved by Crew Medical department or Care Team (pick-up/delivery-transportation at cost).<br>• Arrange emergency medical transportation (see Section 1.1.34)<br>• Coordinate medical parole / re-parole / customs and immigration clearance of disembarking crew, guest, relatives and/or Care Team Associates (CTAs)<br>• Assist/Communicate with Crew Medical or Care Team with coordination of medical air ambulance (RCL will order, quote, negotiate rates for air ambulance)<br>• Where necessary and appropriate, obtain the sanction/approval of the local port health physician or public health agency, where the medical reason for disembarkation may involve a disease or illness of public health concern. Such sanction/approval may require the involvement of the RCL Medical & Public Health Department and so the port agent should retain the 24 hour contact information for the Medical Operations Department: +001-305-539-4957.<br>• Assist with deceased crew or guest (funeral home, local authorities, clearance and/or repatriation of remains). |
| 1.1.35 | | Guest/Crew Attendance/Support | Unless otherwise agreed upon and documented separately, accompany or meet guest/crew at hospital or clinic:<br>• If hospitalized, attend/visit/support through one visit to the patient or crew member at the hospital or clinic on the day (day 1) of disembarkation and the day after (day 2) for a total of two (2 days) of attendance. Agent shall ensure and coordinate local hotel accommodation, as needed or directed, (any incremental or additional costs shall be disclosed, discussed, and agreed upon with CARE Team, if a guest, or with Crew Medical Team, if a crew member) for family member or traveling companions.<br>• Ensure crew/guest family has the contact information for the appropriate CARE Team member and/or the number for the insurance/assistance company, who will be following up their case.<br>• If necessary, assist the patient's family with contacting the CARE team.<br>• In the event there are additional third party expenses incurred, the Medical department or |

KW

| | | | |
|---|---|---|---|
| | | | CARE team shall agree on the fee prior to the service being rendered.<br>• Assist with repatriating or returning the guest, crew, vendor, and their travel companions or family that is accompanying them, to the point of origin, or other designated gateway. |
| 1.1.36 | Guest and Crew Medical | Medical Emergencies | Agent shall assist, without condition, with medical emergencies as instructed. Agent must assist the vessel with obtaining medical assistance, whether such medical service or need exists at the Port City or not. Agent is expected to assist any and all RCL guests, crewmembers or vendors experiencing a medical emergency, and who remains after the vessel departs. Any anticipated incremental expenses incurred by the Agent in connection with the medical event shall be disclosed and discussed with RCL and crew/guest/vendor, and arrangements for paying these incremental costs shall be agreed upon in advance.<br><br>Port Agent shall use best efforts to minimize medical costs and prevent price gouging. |
| 1.1.37 | Guest and Crew Medical | Translation Services | Where needed and/or required, provide translation services and additional support, beyond that normally offered to the guests or crew member undergoing medical care. If additional professional translation is needed beyond, Agent shall discuss with RCL prior to incurring any expense, and all incremental costs shall be agreed upon prior to rendering service. |
| 1.1.38 | Crew Movement | Assisting Crew | Respond timely to requests by Crew HR and Crew Assist for assistance (regardless of whether contract exists between Crew HR and Agent). If assistance or services required are not governed by a previously agreed upon fee structure or provided for elsewhere within these scope of services, Agent shall disclose the total anticipated cost for providing the service prior to the service being delivered. Service must be requested via procurement process (ERS), or as directed by RCL. If services are non-contracted or rate for service has not been previously agreed on, Port Agent shall invoice the requesting department directly, or via IMS for reimbursement. Agent shall not charge any service fee in connection with providing the requested service. |
| 1.1.39 | Logistics | Logistics | As directed by RCL, provide support or intercede, on matters related to container movement, and deliveries and supplies to/from the vessel. As requested, play supporting role to designated logistics provider, and as needed, collaborate with provider to resolve problems. Unless Agent is contracted as the designated logistics provider, defer handling of landed goods (LGA) to designated logistics provider unless directed otherwise by vessel or Supply Chain. In the event that significant incremental effort is needed with handling matters related to logistics, Agent shall directly contact RCL Logistics representative to discuss and agree to any incremental service charges that may apply. Charges not agreed upon in advance will result in non-payment. |
| 1.1.40 | Safety and Security | Security Services | Provide or arrange all security services required by RCL at the Port City. Address any security staffing shortages with security supervisor and vessel Security Officer when detected. |
| 1.1.41 | Safety and Security | Security Plan | Become familiar with and assist with implementation of port security plan (as devised by RCL) to RCL security standards; participate in RCL security drills, exercises and training. The RCL security plan is devised and managed by RCL's Global Security Department and may include security and safety measures beyond those provided, implemented, considered or executed by the port or terminal operator. |
| 1.1.42 | Safety and Security | Assisting Law Enforcement | Cooperate with RCL, U.S. Coast Guard and other applicable government and law enforcement authorities in matters relating to the Maritime Transportation Security Act |
| 1.1.43 | Safety and Security | Security Notifications | Immediately notify RCL Global Security Department (via telephone or e-mail) whenever there is a significant change in the safety or security environment of any port-of-call for which the Port Agent is responsible. This notification will be made without regard to whether or not an RCL ship is imminently scheduled to visit that port-of-call. Examples of significant changes in the safety or security environment of a port-of-call include, but are not limited to, the following:<br>-Higher than average incidence of serious crime such as murder, shootings, robbery, rape, assault, or theft;<br>-Work stoppages, slowdowns, or strikes that may impact ship operations or tourist activities;<br>-Serious accidents impacting tourists, whether cruise related or not.<br>-Infrastructure problems that may impact ship operations or tourist activities. For example, interruptions in electrical service; disruption of communications networks; prolonged breakdowns in the transportation sector; significant road closures; shortages of basic supplies; etc. |

K3

| | | | |
|---|---|---|---|
| | | | -Medical outbreaks or environmental hazards that might affect ship operations or tourist activities.<br>-New Government warnings concerning any increased risk of terrorist activity. |
| 1.1.44 | Safety and Security | Emergency Support | Port Agent agrees to render assistance to RCL crew, guests, vendors and affiliates as needed during emergencies, regardless of their nature or duration. Port Agent will render all necessary operational, technical, manual, technological, logistical, transportation, and labor assistance needed by RCL to safely and effectively manage emergencies or contingencies that may occur. Port Agent will also interface and liaise with all government authorities to ensure emergencies are managed accordingly and they will act on the best interest of RCL and its guests and crew. Additionally, Port Agent will source and provide food and shelter for RCL guests and crew, on a best efforts basis, during any crisis requiring so. Any valid and reasonable expenses incurred as a result of providing assistance shall be reimbursed but must include detailed supporting documentation. Where possible, requesting department or entity shall request cost in advance for services or products Port Agent will supply or arrange. Invoices shall be submitted to RCL for reimbursement via IMS unless otherwise directed or agree to by RCL. |
| 1.1.45 | Safety and Security | Assisting Law Enforcement | Unless restricted or prohibited by law, Port Agent agrees that upon the request of the Ship's Master, Staff Captain, or Security Officer; Port Agent will report an alleged security incident to the appropriate local law enforcement agencies and/or Governmental authorities. |
| 1.1.46 | Safety and Security | Assisting Law Enforcement | Cooperate with RCL (including its on board security staff) and any other applicable government and law enforcement authorities in matters relating to the investigation of incidents or alleged criminal acts on RCL vessels. |
| 1.1.47 | Dry Dock | Providing Dry Dock Services | Agent shall engage RCL to discuss, plan, and provide a quote for all relevant services requested by RCL in connection with planned or unplanned dry-docks. In the event products and services are not negotiated and mutually agreed upon in advance, the terms and conditions herein shall govern until such a time that an agreed upon rate schedule is established, with automatic caps on total cost once agent provides the same service or transaction ten (10) times in a twenty four (24) hour period. Products and services rendered before such a rate agreement is in place shall be retroactively billed according to the new rate schedule. |

*Section 1.2* *Basic Service Fee*

For the Basic Services described herein (*Section 1.1*), RCL shall pay a fee (the "Basic Service Fee") to Port Agent per ship call as follows:

| PORT AGENT BASIC SERVICES COST | | | |
|---|---|---|---|
| **Call Type** | **Port Name and Country** | **Basic Service Fee per ship call[1]** | **Payment Currency** |
| Turnaround Call | San Juan, Puerto Rico | 800.00 | USD |
| Transit Call | San Juan, Puerto Rico | 800.00 | USD |
| Transit Call | Ponce, Puerto Rico | 800.00[2] | USD |

[1] Second day or overnight additional fee for each ship call for San Juan or Ponce: $800.00 flat fee.
[2] Ponce attendance additional fee per ship call: $250.00 flat fee.

As new Port Cities are added to this Agreement from time to time, the above chart will be amended or supplemented to include the rates for the Basic Services agreed upon by the parties for such Port Cities.

Port Agent and RCL agree that the above rates for the Basic Service Fee are effective throughout the Term of this Agreement, including any extension.

The Basic Service Fee shall be invoiced and paid in the currency specified above and may not be adjusted during the Term (or any subsequent renewals) of this Agreement unless the parties agree to do so in writing. The Basic Service Fee is a flat fee that includes compensation for all of the Basic Services identified in this Agreement, inclusive of items specified in Section 1.1 of this Agreement, and includes any and all applicable taxes.

In connection with the invoicing of all fees under this Agreement, Port agent must follow the guidelines set forth in Exhibit D attached hereto and incorporated herein. Failure to do so will delay reimbursement of all or some of the disbursement account (DA) Port Agent submits, and may result in rejection of the submission.

*Section 1.3* *Other Port Agent Services ("Other Services")*

| ROYAL CARIBBEAN CRUISES LTD. LUGGAGE | | | |
|---|---|---|---|
| Cost For Handling Piece of Luggage | | | |
| Port Name | Currency | Cost Per Piece of Luggage | Maximum Applicable Per Call Date |
| N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A |
| Cost For Transportation of Luggage | | | |
| Port Name | Distance To Airport (KM) | Cost Per Delivery of Luggage (See note below) | Maximum Applicable Per Call Date |
| N/A | N/A | N/A | N/A |

*Notes:*

1. The transportation of lost luggage should be optimized, charging the fewest number of transportation moves/trips possible by gathering as many pieces of luggage as possible. Transportation cost is only applicable when not paid for by airline.

KB

2. If additional space to list port names is needed, please provide on a separate sheet and include cost per each piece of luggage and maximum cost.

Port Agent shall also provide other services (collectively, the "Other Services") when requested, the actual cost of which shall, if applicable, be reimbursed by RCL to Port Agent as provided in Section 1.4 of this Exhibit A. The Other Services shall be provided directly by Port Agent or through subcontractors or subagents pursuant to written contracts or other agreements approved by RCL as provided in Section 1.11 below.

All rates and charges for Other Services shall be agreed upon by RCL and Port Agent in advance, whether such Other Services are provided by Port Agent directly or through a subcontractor or subagent. **The costs for Other Services are not covered by the Basic Service Fee and should be tracked, billed and invoiced separately as provided in Section 1.4 of this Exhibit A.** Port Agent must deal directly with the department requesting such Other Services to discuss the total cost of the service, arrange disbursement, invoice and payment procedures. Any questions regarding payment and disbursements for such Other Services must be addressed directly to the department requesting such Other Services. Attached as Exhibit C to this Agreement is a contact list for the departments that may request Other Services from Port Agent.

*Section 1.4* *Other Services Rates*

For Other Services requested by RCL to Port Agent, Port Agent shall supply RCL with the total cost of providing the Other Service prior to providing the service, unless the cost for the service has been agreed upon in advance in writing between RCL and Port Agent. RCL must acknowledge and declare in writing that such rate has been accepted, and that Port Agent shall charge RCL the rate as agreed upon. Services arranged by Agent shall not incur any services fees, as stated in Section 1.1.10 Arranging Services. In the unlikely, unusual, or extraordinary event that the service requested requires a significant and uncommon level of effort or resources to provide the service, a one-time service fee may be discussed and agreed to in writing between RCL and Agent prior to the service being provided, when

possible; otherwise, Port Agent shall not charge a service fee for performing the Other Services. Any service fee charged by Port Agent that has not been previously acknowledged and agreed upon in writing with RCL will be disputed and not paid. Rates not agreed upon in advance of the service request and not previously acknowledged and agreed upon in writing with RCL shall be subject to RCL's approval process, require a requisition via ERS to disclose all costs, obtain authorized approvals, and shall be submitted for payment with all supporting documentation related to the transaction. RCL reserves the right to contest and negotiate the price quote provided by the Agent for requested services, and RCL is not obligated to accept the services quoted by the Agent, Sub-Agent, or any other vendor. For more information on the requisition process, please refer to Section 1.1.12 (Arranging Services) of this Agreement.

Port Agent shall make all payments due to the service providers providing Other Services under Service Contracts directly. RCL shall reimburse Port Agent for the cost of all Other Services (collectively, the "Other Service Rates"), whether provided by Port Agent directly or service providers under Service Contracts. Port Agent shall invoice RCL for the Other Service Charges as promptly as possible after the Other Services are rendered, but no later than thirty (30) days after each ship call date where such services were rendered.

In connection with invoices generated pursuant to this Agreement for Other Services, Port Agent shall:

a) Follow RCL service delivery protocols for services not contracted in advance by obtaining a requisition for each service requested (For example, a request to transport a crew member from the ship to a clinic, and to also pick up medication for the crew member, would require two requisitions – one for each service if a mutually agreed upon rate structure or schedule for the type of service proposed has not been established in advance of rendering the service. Agent must submit all actual or anticipated cost information, inclusive of any incremental service fees (excluding any service fees that are covered as part of the scope of services included in Section 1.1 Description of Basic Port Agent Services, Subsection 1.1.10 Arranging Services), via ERS to the requestor for review. Requester reserves the right to accept, negotiate or reject the proposed cost of the service directly with Agent, if needed. Requestor shall obtain authorized RCL approval (approvers are limited to Master, Staff Captain, Hotel Director, Chief Engineer, and designated shoreside approver) before the Agent shall fulfill the service request(s). Requestor must acknowledge receipt of service prior to Agent submission for reimbursement via IMS. **It is strongly recommended that Port Agent obtain from the requesting department the exact supporting documentation and detail needed and required by paying department to process the request for payment without delay. Failure to provide required expense details needed and required will result in a delay to process payment. RCL shall not be responsible to pay any late fees or interest on invoices delayed due to lack of required documentation.**
b) Directly provide the applicable RCL department with separate disbursements (port, medical, guests/crew, etc) as instructed. The Port Operations department shall be responsible only for port expenses. Port Agent is responsible for establishing direct communication with the individual departments to address specific questions regarding any Other Services (refer to Exhibit C).
c) Maintain a statement of account for RCL invoices by disbursement type (port, medical, guest/crew, etc) to reconcile any outstanding amounts with each specific department.
d) Provide appropriate and reasonably detailed back-up documentation for any disbursements.
e) Have direct contact with individual departments within RCL to discuss invoice settlement.
f) Be paid in U.S. Dollars (USD) for crew and guest medical costs submitted for reimbursement, unless otherwise agreed upon, or arranged, in advance with RCL Medical Department.

RCL shall pay the Other Service Rates reflected in such invoice within forty-five (45) days following receipt by RCL. RCL will not be required to pay Other Services Rates for any Other Services (including services performed by third party providers) that (i) exceed the cost, fees and/or charges for such Other Services approved in advance by RCL pursuant to the terms of this Agreement, (ii) were not approved in advance by RCL as required herein, or (ii) are invoiced to RCL **more than twelve (12) months after the date such Other Service is performed.**

Port Agent from time to time may be asked by the Vessel to purchase or arrange personal items/services for the Vessel's officers and crew. Port Agent is not obligated to provide these services and will not be reimbursed by RCL for such services (or for any overtime or travel costs associated with same). Port Agent shall not be responsible for coordinating and/or shipping personal mail, packages or belongings for RCL employees and crewmembers unless Port

Agent receives sufficient money in advance from such employee or crewmember to cover the costs of shipping said items. Port Agent acknowledges and agrees that none of the foregoing personal services described in this provision shall be reimbursed by RCL under any circumstances.

*Section 1.5* *Most Favored Rates*

In no event will RCL pay a greater amount for any Services rendered to RCL by Port Agent in a particular Port City than that charged by Port Agent for similar services rendered to any other cruise line generating a similar amount of volume in said Port City to Port Agent. Adjustments in the Basic Service Fee and Other Service Charges and other RCL payments necessitated by this provision shall be coordinated and implemented as reasonably requested by RCL.

*Section 1.6* *Scope of Authority; Responsibility*

Port Agent shall be authorized to provide the required Services listed in Sections 1.1 through 1.4 above and use its discretion while acting in the best interests of RCL. Port Agent's scope of authority is limited to providing the Services expressly set forth in this Agreement, and representing RCL only in matters that protect the interests of RCL, its Vessels, guests and crew at all times with other local authorities and other service providers. Port Agent shall at all times act within the scope of its authority provided in this Agreement. Port Agent shall indemnify RCL for any loss of or damage to such items while such items are under Port Agent's control resulting from Port Agent's negligence or fault.

*Section 1.7* *Staffing Levels and Requirements; Port Agent Personnel*

Port Agent will provide (and will cause each service provider under a Service Contract to provide) sufficient and qualified personnel to perform the Services in accordance with the terms and conditions of this Agreement. All such personnel shall be fully conversant in English and the core language of the applicable Port City, and shall be sufficiently trained in their duties and shall otherwise be fully qualified to perform Port Agent's obligations hereunder in a professional, courteous and efficient manner in accordance with RCL expectations and standards. Should an Agent not meet these specification, Agency may be required to replace said Agent with another meeting the qualifications set herein.

KB

Port Agent at all times has the right and obligation to control all of the personnel engaged by Port Agent to perform its obligations hereunder, and the personnel are solely the employees of Port Agent. Port Agent is solely responsible for the payment of all wages, overtime and vacation pay, benefits and repatriation expenses for each of its personnel.

It shall be Port Agent's sole responsibility to assure that its personnel and the personnel of anyone at the port operating by, through or under Port Agent (including its subcontractors) have all permits required by any governmental authority in order to provide the Services.

*Section 1.8* *Financial Responsibilities*

Port Agent shall be required to facilitate all payments required by the Vessel and RCL with respect to:

a) Payment in full regarding all port services in the time frame set by the applicable port and local authorities and other port service providers.
b) Payment for other services requested by the Vessel NOT related to medical and transportation services for the guests, officers and crew (for example fines, emergency repairs or provisions).

Port Agent shall obtain the least cost provider of services when bidding out services between two or more providers that offer the same level of service.

*Section 1.9 Hours of Operation*

Port Agent will be open for business during ship calls and at all other times agreed upon between the parties in writing from time to time, consistent with the hours permitted by local authorities. Agent will provide 24 hours emergency attendance 365 days per year, and contact information for after-hours contact with designated Port Agent personnel must be provided to RCL.

*Section 1.10 Port Agent Financial Interest in Service Providers*

Port Agent shall be held responsible to declare upon request by RCL any ownership interests in service providers that provide services to any RCL Vessels.

*Section 1.11 Subcontracts for Additional Services or Franchising of Services*

If Port Agent intends to enter into a contract or agreement with other providers of port services for any of the Other Services (a "Service Contract" or "Service Contracts"), the following provisions shall apply:

a) Port Agent shall not engage any service provider without the prior written approval of RCL, and each Service Contract shall likewise be subject to the prior written approval of RCL. Without limiting the generality of the foregoing, Port Agent shall submit to RCL evidence of the ownership, qualifications and financial wherewithal of each service provider prior to or contemporaneously with any request for approval hereunder.
b) Each Service Contract shall be in the name and at the expense of Port Agent, shall have a term not in excess of one year (whenever possible) and shall include a provision for cancellation by Port Agent with thirty (30) days written notice, without payment of a penalty or premium. Fees for services shall be agreed upon by RCL and Port Agent in advance. The Service Contracts shall not be binding on RCL unless otherwise agreed to in writing by RCL.
c) Each Service Contract shall require the service provider to transition services to the subsequent service provider in a cooperative, professional and orderly manner in the event that the Service Contract is terminated for any reason.
d) All service providers shall be required to perform the Other Services in a manner and level that meets or exceeds the quality and level of port services provided at other first class Port Cities and RCL's standards for such Additional Services.
e) All service providers shall be required to conduct the Other Services strictly in compliance with all applicable present and future laws, rules, orders, ordinances, regulations (including EU Regulation 1177/2010), statutes, requirements, decisions, codes and executive orders, extraordinary as well as ordinary (collectively, "Legal Requirements"), of all governmental and quasi-governmental authorities (including all federal, state and local authorities, and any agency, department, commission, board, bureau or other subdivision of the foregoing) with jurisdiction over the service provider or Service. All service providers shall also be required to conduct the Additional Services strictly in compliance with RCL's environmental policies and requirements.
f) Port Agent and RCL shall have the right from time to time, with or without notice, to observe and inspect service providers in the performance of the Additional Services to confirm and/or determine compliance with Legal Requirements as required herein. In addition, Port Agent and RCL shall have the further right, upon reasonable advance notice to the service provider, to audit and inspect all books, records and other information related to the Other Services provided at the Port City, including without limitation all such books, records and other information (including any information stored electronically) relating to compliance with and/or reporting requirements under Legal Requirements, and costs, expenses and other charges passed through to Port Agent under the Service Contract.
g) RCL shall be named as a third party beneficiary in all Service Contracts with the express right to enforce the provisions thereof and to exercise the inspection and audit rights provided herein. Port Agent agrees that it shall terminate any Service Contract upon RCL's request to do so, subject to the terms and conditions of such Service Contract.
h) Each Service Contract shall incorporate provisions comparable to and consistent with the "Standard Terms and Conditions" attached to this Agreement as Exhibit B.
j) Violation of RCL's compliance and ethics policies or applicable anti-corruption laws.

**EXHIBIT B**

***STANDARD TERMS AND CONDITIONS***

**Article 1. Audit Rights**

Port Agent or Contractor shall retain all books and records relating to this Agreement and the Services provided hereunder for at least two (2) years from the date of expiration or termination of this Agreement. RCL shall have the right to audit such books and records at any time during the Term of this Agreement and for a period of two (2) years after expiration or termination of this Agreement. RCL shall retain this right to audit notwithstanding any assignment of this Agreement by RCL.

**Article 2. Termination**

*Section 2.1* Either party may terminate this Agreement upon thirty (30) days prior written notice if the other party has failed to perform or observe any material term or condition of this Agreement, unless such default or breach can be and has been cured within that notice period.

*Section 2.2* Any of the following acts or omissions by Port Agent shall be considered a material breach of this Agreement and grounds for immediate termination by RCL pursuant to the provisions of this Section 2.2:

a) Withholding payment of funds for port and government fees unless instructed by RCL.
b) Withholding funds for expenses related to port service providers unless instructed by RCL.
c) Use of RCL's funds for purposes not in the best interest of RCL.
d) Application of RCL's funds to any liability or obligation other than the specific liability or obligation for which RCL has earmarked such funds.
e) Service level below RCL standards.
f) Not providing timely invoices to RCL in accordance with the terms of this Agreement
g) Abuse of the scope of authority to act in RCL's best interest when dealing with local authorities and service providers.
h) Port Agent's financial condition is such that RCL believes, in its sole discretion, that Port Agent is no longer able to effectively perform its obligations hereunder.
i) Making arrangements with third-party vendors to boost fees in vendor's invoices to RCL, or any other type of similar arrangements designed to "pad" charges paid or reimbursed by RCL for the benefit of Port Agent or other vendors.

*Section 2.3* Either party may terminate this Agreement immediately upon written notice to the other party if:

a) The non-terminating party shall admit in writing its inability to pay its debts or shall make a general assignment for the benefit of creditors,
b) Any proceeding shall be instituted by the non-terminating party, or shall be instituted against the non-terminating party, seeking to adjudicate the non-terminating party a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or recomposition of it, or its debts under any law relating to bankruptcy, insolvency, or reorganization, or relief of debtors, or seeking appointment of a receiver, trustee, or other similar official for it, or for any substantial part of its properties; or
c) The non-terminating party shall take any corporate action to authorize any of the actions set forth in this subparagraph.

*Section 2.4* RCL shall have the right to terminate this Agreement for convenience upon thirty (30) days prior written notice to Port Agent.

*Section 2.5* In the event that this Agreement is terminated for any reason, Port Agent shall transition the Services to the subsequent port agent and/or service provider(s) in a cooperative, professional and orderly manner to enable a smooth transition of all such services without interruption or hindrance to RCL's business.

*Section 2.6* Upon any termination set forth above, RCL shall have no further obligations under this Agreement.

**Article 3. Vessels**

Port Agent acknowledges that RCL, in its sole discretion and without liability to Port Agent, may change the itineraries of any of its vessels or remove any of them from service at any time. RCL may sell or charter any vessel to bona fide unaffiliated third parties, or otherwise remove the vessels from the cruise trade. Upon such removal, this Agreement shall terminate with respect to any of RCL's rights or obligations relating to that vessel. Reimbursement of the service fees incurred by the Port Agent before the notification of the removal of the vessels are owed by RCL.

**Article 4. Insurance**

*Section 4.1* Port Agent shall maintain, during the term of this Agreement and at its own expense, the following types of insurance bearing the characteristics and in the amounts specified below with insurers of recognized responsibility, licensed to do business in the applicable state/country, and having at least an AM Best's rating of A 8, a Standard & Poor's rating of A, or a Moody's rating of A2. If any work provided for or to be performed under this Agreement is subcontracted, Port Agent shall require the subcontractor(s) to maintain and furnish it with insurance equivalent to that which is required hereunder from Port Agent by RCL.

a) General liability insurance on a comprehensive basis, including contractual and marine liability, in an amount not less than $5,000,000 combined single limit.
b) Business automobile liability insurance that includes coverage for owned, hired, leased, rented and non-owned vehicles for a minimum of $1,000,000 combined single limit per accident.
c) Crime Insurance which covers at a minimum employee dishonesty with a minimum of $50,000 per occurrence, and/or Port Agent (and any permitted subcontractor(s)) agrees to indemnify RCL for any theft or loss of property (for which they are legally liable) which occurs while such property is in Port Agent's (or subcontractor's) care, custody or control.
d) Worker's Compensation and Employer's Liability Insurance. The coverage provide shall meet the following minimum standards:

    i. Workers' Compensation - Statutory limits
    ii. Employers' Liability:
        Bodily Injury by Accident: $100,000 each accident
        Bodily Injury by Disease: $500,000 policy limit
        Bodily Injury by Disease: $100,000 each employee; and/or proof of government-funded coverage for work-related accidents.

K3

e) Protection and Indemnity coverage if Port Agent or any of its subcontractors is operating any vessels or other watercraft.
f) U.S. Longshoreman and Harbor Workers coverage, and Maritime Employer's Liability coverage.
g) D&O coverage.

*Section 4.2* Port Agent will submit to RCL a standard "Acord" insurance certificate (or such other form as may be acceptable to RCL) signed by an authorized representative of such insurance company(ies), certifying that the insurance coverage(s) required hereunder is (are) in effect for the purposes of this Agreement. Said insurance certificate shall certify that prior to any cancellation or termination of such coverage(s) the insurance company will endeavor to provide at least thirty (30) days advance written notice to RCL.

*Section 4.3* All policies of Port Agent (and any permitted subcontractors, if applicable), except for Workers' Compensation insurance, shall name RCL and its subsidiaries and affiliates as Additional Insured as respects work



GR000129

performed under this Agreement. Furthermore, all policies of Port Agent (and any permitted subcontractors, if applicable) shall provide a waiver of subrogation in favor of RCL and its subsidiaries and affiliates.

**Article 5. Indemnity**

Each party agrees to hold harmless and indemnify the other party, and its subsidiaries, affiliates, shareholders, directors, officers, agents and employees against any loss, liabilities and expenses (including attorneys' fees and costs) arising from any third party claims, suits or proceedings which arise out of, or in the course of the performance under this Agreement, or the failure of the other party to carry out its obligations under this Agreement, or rising out of the acts or omissions of the other party, its respective employees, other agents or invitees in any way relating to the Services. The indemnifying party shall defend all suits brought upon such claims and bear all costs and expenses incidental thereto (including attorney's fees); but the indemnified party shall have the right, at its option, to participate at its own expense in the defense of any such suit without relieving the indemnifying party of any obligation hereunder. This provision shall survive the termination of this Agreement.

**Article 6. Limitation of Liability**

The parties agree that in the event either breaches this Agreement, no party will be entitled to recover consequential, indirect or special damages.

**Article 7. Liens**

Port Agent agrees that neither Port Agent nor its employees nor any subcontractors or third party service providers shall have the right to assert maritime liens on, or actions *in rem* against any RCL vessel for any matter arising in connection with this Agreement, including actions under the Jones Act. In consideration of Port Agent's waiver of this lien, RCL shall promptly settle all outstanding balances due agent upon receipt of account renderings (i.e. invoices) within forty-five (45) days of receipt, except as otherwise provided in Exhibit A. Any items in dispute must be advised within seven (7) business days and shall not inhibit remittance of sums not in dispute. It is the desire of both parties to have all port call accounts fully settled within ninety (90) days of sailing, subject to the terms of Exhibit A.

K3

**Article 8. Subagents/ Third Party Vendors**

In the event Port Agent subcontracts any of the Services to a subagent or other third party vendor, Port Agent shall contract directly with such subagents and vendors and shall at all times be solely responsible for the obligations and fees incurred thereunder (including after the termination of this Agreement). Port Agent agrees to hold harmless and indemnify RCL against any loss, liabilities and expenses (including attorneys' fees and costs) arising from any third party claims, suits or proceedings which arise out of, or in the course of the performance of, any subagent or vendor contract. This provision shall survive the termination of this Agreement.

**Article 9. Relationship of the Parties**

The relationship of the parties to this Agreement shall be and at all times shall remain one of an independent contractor and the parties agree that this Agreement does not in any way create a partnership or joint venture relationship between RCL and the Port Agent. Except as may be specifically provided herein, RCL reserves no control over Port Agent, or any of Port Agent's employees, subordinates or associates as to how the Services to be rendered by Port Agent hereunder should be performed.

Port Agent shall be solely responsible for all salaries, employee benefits, social security taxes, federal and state unemployment insurance and any and all similar expenses or taxes relating to Port Agent or its employees or agents. Neither Port Agent nor its employees or agents shall be entitled to participate in, or to receive any benefits from RCL employee benefit or welfare plans, specifically including but not limited to coverage under RCL's workers' compensation program. Neither Port Agent nor any of its employees or agents are employees of RCL.

**Article 10. Representations**

*Section 10.1* Each party warrants and represents that:

a) It is duly organized, validly existing and in good standing.
b) It has all necessary power and authority to execute and deliver this Agreement, and to perform its obligations under this Agreement.
c) This Agreement constitutes a valid, legal and binding obligation, enforceable against it, in accordance with its terms.
d) The execution, delivery and performance of this Agreement will not constitute a violation of any law, rule, regulation or court order applicable to it.
e) It is adequately financed to meet any financial obligation it may be required to incur hereunder.
f) It has obtained all licenses and permits as may be required by any competent governmental or administrative authority (collectively, the "Licenses") to observe and perform the terms, covenants, conditions and other provisions on its part to be observed or performed under this Agreement.
g) It shall maintain the Licenses throughout the Term of this Agreement.
h) It has obtained all necessary consents, permissions or releases, and will timely make all payments to third parties that may be required to provide the Services as contemplated by the terms of this Agreement.

*Section 10.2* Port Agent hereby warrants and represents to RCL that:

a) It has the experience, staff, skill and authority to perform the Services;
b) It is adequately financed to meet any financial obligation it may be required to incur hereunder;
c) It has obtained all licenses and permits as may be required by any competent governmental or administrative authority (collectively, the "Licenses") to observe and perform the terms, covenants, conditions and other provisions on its part to be observed or performed under this Agreement;
d) It shall maintain the Licenses throughout the Term of this Agreement;
e) It has obtained all necessary consents, permissions or releases, and will timely make all payments to third parties that may be required to provide the Services;
f) There is no actual or potential conflict of interest between the Services to be performed by Port Agent under this Agreement and Port Agent's family, business, financial or other interests, and Port Agent shall immediately notify RCL of any actual or potential conflict of interest of which Port Agent becomes aware during the Term of this Agreement;
g) It will not engage any employee of RCL or any RCL affiliate to perform any part of the Services; and
h) It has no commitment, express or implied, with any other person, firm or corporation that is in conflict with the terms, conditions and understandings contained in this Agreement.

K3

**Article 11. Confidentiality; Privacy**

*Section 11.1* Confidentiality. The terms and conditions of this Agreement and any information and data of any nature including, but not limited to, proprietary, technical, business plans, customer lists, pricing information, operating plans and all record-bearing media containing or disclosing such information and techniques furnished by RCL to Port Agent in connection with this Agreement shall be deemed confidential information and shall not be disclosed by Port Agent to any third party without RCL's prior written consent. This provision shall survive the termination of this Agreement.

*Section 11.2* Privacy.

a) Port Agent shall comply with all privacy and security laws, including without limitation any data protection laws and regulations, applicable to Port Agent in the processing of Personal Data under this Agreement. The term "Personal Data" means any information relating to an identified or identifiable natural person, in any form, format or media (including paper, electronic and other records) that Port Agent has access to, obtains, uses, maintains, or otherwise handles in connection with the performance of the Agreement. Examples of Personal Data include, but are not limited to, an individual's name, address, email address, date of birth, IP

address, bank and payment details, preferences as well as sensitive personal data including, but not limited to, disability, sexual orientation, political affiliation and personal preferences. If RCL provides to Port Agent any Personal Data relating to an Individual, RCL shall at all times be the owner of that Personal Data and Port Agent may only process such Personal Data for the purpose(s) set forth in the Agreement.

b) Port Agent shall at all times during the term of this Agreement utilize and maintain appropriate technical, organizational and security measures to ensure the safety and security of such Personal Data. Port Agent shall not share, sell, publish, or give away such Personal Data to any third parties (including subcontractors or sub-processors) without RCL's express written consent. Unless RCL indicates otherwise, Port Agent shall destroy or return all records of such Personal Data on demand by RCL, on completion of any services and/or earlier termination of this Agreement. If Port Agent fails to adhere to the requirements in this Section 11.2, Port Agent shall defend, indemnify, and hold RCL harmless from and against any Losses (as defined herein) that RCL may incur arising out of or related to Port Agent's failure to adhere with these conditions. The term "Losses" means fines, penalties, charges, costs, expenses, compensation, damages, and fees (including attorneys' fees).

*Section 11.3* Data Protection. The parties recognize that Personal Data may be Transferred (as defined in Exhibit E) for the provision of services under this Agreement. The parties further recognize the data protection requirements for Personal Data in the European Union (EU) General Data Protection Regulation 2016/679 (the "GDPR") may apply to the Processing of Personal Data under this Agreement. Accordingly, the parties agree to the terms and conditions set forth in the Processor Addendum, attached to this Agreement as Exhibit E.

**Article 12. Miscellaneous**

*Section 12.1* Governing Law; Arbitration. Any disagreement regarding the interpretation or the operation of this Agreement shall be determined by final and binding arbitration under the rules of the American Arbitration Association ("AAA"). The arbitration shall be conducted in Miami, Florida before a panel of three arbitrators. One arbitrator shall be selected by each of the parties and the third arbitrator shall be selected by the two arbitrators designated by the parties. Each Party shall bear its own costs and expenses in preparing for and participating in the arbitration hearing except that each Party shall pay one-half of the compensation payable to the arbitrators, one-half of any fees to the AAA and one-half of any other costs related to the hearing proceedings. The arbitration award shall be in accordance and consistent with applicable and governing laws of the State of Florida, and shall be final and binding on the parties, and judgment on the award may be entered in any court having jurisdiction.

*Section 12.2* Assignment. Port Agent shall not assign or otherwise transfer, either explicitly or by operation of law, any right or interest in this Agreement nor delegate any duty owed hereunder without the express written consent of RCL. Any such attempted assignment or delegation shall be wholly void and totally ineffective for all purposes. Any change in control of Port Agent, whether by merger, stock or asset acquisition, or otherwise, will be deemed to be an attempted assignment of this Agreement and will be grounds for termination. Any attempted assignment or transfer by Port Agent without RCL's prior written consent, whether voluntary or involuntary, is void and grounds for termination of this Agreement with immediate effect. RCL may, however, without Port Agent's consent, transfer or assign this Agreement.

*Section 12.3* Compliance with Laws and Regulations. Port Agent shall comply with all laws, regulations (including EU Regulation 1177/2010), codes or ordinances established by the governmental and administrative authorities that govern or apply to Port Agent's performance under the Agreement.

*Section 12.4* Invalidity of Provision. If any provision of this Agreement is invalidated or voided by operation of law, all remaining terms and conditions will remain binding and the Agreement enforceable, unless such change materially alters this Agreement. If such material alteration occurs, the parties hereto may either terminate this Agreement and be excused from all remaining responsibilities and obligations, or enter into a new agreement.

*Section 12.5* Waiver. A failure or delay by any party to require strict performance or enforcement of any provision of this Agreement or a previous waiver or forbearance by such party to any performance or provision shall in no way constitute or be construed as a waiver or continuing waiver of any provision of this Agreement by such party.

*Section 12.6* Headings. The headings in this Agreement are for purposes of reference only and shall not in any way limit or otherwise affect the meaning or interpretation of any of the terms of this Agreement.

*Section 12.7* Notices. All notices, request, demands or other communications hereunder will be deemed given upon delivery and will be delivered personally or sent by overnight mail, facsimile or certified mail, return receipt request, to the parties at the addresses for each party set forth in the preamble to this Agreement. For notices sent to RCL, a copy shall be sent to:

General Counsel
1050 Caribbean Way
6th Floor
Miami, FL 33132-2096
Fax: 305.539.0562

Any of the above addresses may be changed on written notice. Any notice given by facsimile or teletype which is received after 4:45pm local time of the recipient shall be deemed given the following business day.

*Section 12.8* Entire Agreement; Modification. This written Agreement, including any Exhibits hereto, constitutes the entire Agreement between the parties. All prior negotiations, agreements, proposals, statements, understandings and communications, whether written or oral, are merged in this Agreement and superseded by it. There are no representations, warranties or obligations by any party to the other except those set forth in this Agreement. Except as expressly provided herein, the terms of this Agreement may not be waived, altered, modified, amended or supplemented in any manner whatsoever except by a written document duly executed by both RCL and Port Agent.

K3

*Section 12.9* Supplier Management System; Fee(s). Port Agent consents to registration with, and monitoring on, RCL's third-party supplier management system. In connection therewith, RCL may require Port Agent to incur an annual fee. Port Agent will incur the fee upon registering with the supplier management system and annually thereafter. If the fee cannot be collected from Port Agent within a reasonable time, RCL, in its sole discretion and without prior notice to Port Agent, may deduct the fee from any invoice issued by Port Agent pursuant to, or any amount due Port Agent under, this Agreement. The fee is non-refundable; Port Agent will not be reimbursed the fee, or any portion thereof, if its business relationship with RCL ceases, including by termination by RCL.

***Article 13.*** **Anti-Bribery Provision.**

Port Agent represents, warrants and agrees that it, its subcontractors and agents: (a) will comply with all anti-corruption laws applicable to its business operations; (b) has not and will not offer, promise, give or authorize the payment of anything of value (e.g. cash or cash equivalents, gifts, travel and entertainment, stock, offers of employment, etc.), directly or indirectly, to any Government Official with the intention of inducing him or her to engage in improper or unlawful conduct or to secure an improper business advantage; (c) has not and will not make facilitation payments or "grease payments" to Government Officials or others in a position of authority to expedite routine non-discretionary government or lawful actions (e.g. processing permits, visas and licenses, scheduling inspections, clearing customs, etc.); and (d) has not and will not offer, promise, give, request, receive or accept anything of value, directly or indirectly, to or from any person for the purpose of influencing, inducing or rewarding the improper performance of an act or decision. For purposes of this clause, the term "Government Official" means any (a) officer or employee of government, department, agency, or instrumentality of a government (government-controlled enterprise); (b) officer or employee of a public international organization; (c) political party or party official; (d) candidate for political office; or (e) other person acting in an official capacity. Port Agent agrees that failure to comply with this section will constitute a material breach of this Agreement.

Port Agent hereby agrees to complete and submit to RCL on a biennial basis RCL's Anti-Bribery Compliance Certification Form, upon request by RCL.

If Port Agent subcontracts any of the Services to a subagent pursuant to Article 8, Port Agent will notify, in writing, the subagent of the above Anti-Bribery Provision and obtain a written assent of the subagent of such provision. Where a written agreement exists between Port Agent and the subagent, Port Agent will include similar anti-bribery representations as a material term of that agreement.

**Article 14. Fair Labor Practices.**

RCL is committed to ensuring that its workers and employees and those of its contractors and suppliers be treated with dignity and respect, and in accordance with fundamental fair labor principles as recognized by the International Labor Organization core conventions on Labor Rights. Accordingly, Port Agent agrees that it: (i) shall not use forced labor, whether in the form of prison labor, indentured labor, bonded labor or otherwise; (ii) shall not use any child labor; (iii) should treat its employees with respect and dignity and shall not subject them to any physical, sexual, psychological or verbal harassment or abuse; (iv) shall not discriminate in respect of employment and occupation and shall be committed to attracting and developing a diverse, motivated and dedicated workforce without regard to race, color, age, religion, gender, sexual orientation and disability; (v) shall provide its employees safe and healthy working environment with opportunities to express their opinions without fear of retaliation; (vi) shall recognize and respect the right of its employees to freedom of association and collective bargaining; (vii) shall guarantee that its employees receive fair compensation and benefits in accordance with applicable law and/or union negotiated agreements; and, (viii) shall not require its employees to work more than legally permitted limits.

**Article 15. OFAC/ Export Control**

Port Agent represents, warrants, and agrees that neither it, nor any person that Port Agent engages to provide services for or on behalf of RCL, will present business to RCL, or otherwise provide services or engage in transactions on RCL's behalf that (i) involve persons, countries or dealings targeted by Economic Sanctions, or (ii) cause RCL to be in violation of Economic Sanctions.

For purposes of this provision, "Economic Sanctions" means (i) prohibitions and asset-blocking requirements implemented pursuant to the U.S. International Emergency Economic Powers Act and related executive orders and regulations, including prohibitions against commercial and financial transactions with Cuba, Iran, Sudan, North Korea and Syria and with any person or entity named on the U.S. Department of the Treasury's Office of Foreign Assets Control List of Specially Designated Nationals and Blocked Persons, and (ii) prohibitions and asset-blocking requirements authorized under regulations or measures implemented by the European Union and its Member States.

**Article 16. Due Diligence**

RCL conducts appropriate due diligence of RCL port agents. Port Agent shall comply with RCL's due diligence procedures as instructed by RCL. All information provided by Port Agent in connection with the due diligence procedures shall be complete, truthful and accurate, and Port Agent agrees to inform RCL if any responses to RCL's due diligence inquiries change during the term of this Agreement. Port Agent shall require its subagents performing Services in connection with this Agreement to comply with and complete RCL's due diligence procedures or other similar vetting process chosen by Port Agent that is previously approved by RCL. Port Agent shall notify RCL of any red flags identified during the due diligence process.

If, through the due diligence process or through performance of the subcontracted services, Port Agent knows, reasonably suspects or has reason to believe that the subagent is being or has been investigated, charged, prosecuted or convicted for bribery, corruption, or fraud or violation of applicable anti-bribery laws and regulations, including, but not limited to the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act, Port Agent shall immediately notify RCL and discontinue use of the subagent.

**EXHIBIT C**

*GENERAL OPERATIONS CONTACT LIST*

**RCL Contract Contacts**

Hernan Zini (hzini@rccl.com) – Vice President, Port Operations – (305) 982-2394
Jaime Castillo (jaimecastillo@rccl.com) – Director, Worldwide Port Operations – (954) 539-6000

**Tariff notifications should be sent to the following:**

- Matthew Isaacs (portoperationstariffupdates@rccl.com)

**Department Contacts**

1. **Port Operations**
   - Matthew Isaacs (misaacs@rccl.com) – Analyst, Port Operations – (305) 982 -2851
2. **Guest Port Service (Guest transportation and guest check-in)**
   - Erika De Cardenas (edecardenas@rccl.com) – Manager, GPS – (305) 539-4441, (Cellular) (786) 395-6909 (Cellular)
3. **CBP and Law Enforcement**
   - Ofir Bar (obar@rccl.com) – (Cellular) (305) 539-6236 Manager, Global Security
4. **Logistics or Supply Chain**
   - Doris Miranda (dmiranda@rccl.com) – Director, Global Logistics – (Cargo Handling) – (954) 517-6735
   - Robert Del Pozo (rdelpozo@rccl.com) – Logistics Manager- (Transportation) (954) 517-6730, (Cellular) 786-295-6730
   - Eric Bokobza (ebokobza@rccl.com) – Logistics Finance Manager (Invoice) – (954) 517-6734
5. **Crew Medical**
   - Carlos Martinez (carlosmartinez@rccl.com) – Manager, Risk Management – (305) 539-4241, (Cellular) (305) 389-0221
   - Lashawn Knight (lknight@rccl.com) – Manager, Crew and Guest Medical – (305) 539-6645, (305) 987-2326
   - Fabio Acevedo (facevedo@rccl.com) – Team Leader, Crew and Guest Medical – (305) 982-4766
   - General Email – (crewmedical@rccl.com) – https://my.rcclims.com
6. **Guest Medical (Care Team)**
   - Nancy Hertlein (nhertlein@rccl.com) – Manager, Medical and Public Health – (305) 539-4076, (954) 451-6022

- Joseph Duenas (jduenas@rccl.com) – Care Team Specialist
- General Email – (careteaminvoices@rccl.com)

7. **Crew Transportation and Lodging (Travel Services)**
   - Carla Arnedo (carlaarnedo@rcclagac.com) – CAM Invoicing Lead – (954) 517-3668
   - Calle Rodriguez (callerodriguez@rccl.com) – Shipboard Services Analyst – (305) 539-4574
   - Matthew Pereda (mpereda@rccl.com) – Lead, Global Logistic & Vendor Management (305) 982-2038, (Cellular) (786) 757-8491
   - Tanay Alonso (talonso@rccl.com) – Director, HR Operations Employees – (305) 982-4926
8. **Medical Supply**
   - Jun Oishi (joishi@rccl.com) 305-539-5378- Analyst, Sr. Security, Environmental & Health
9. **Crew Lost Luggage**
   - Donna Brown- (donnabrown1@rccl.com) – Lost & Found Lead – (954) 628-9260
10. **Marine Operations**
    - Royal Caribbean – Leonardo Esquea (lesquea@rccl.com) – Port Manager, Global Marine (305) 539-6844, (786) 440-1642
    - Royal Caribbean – Chantal Moise (cmoise@rccl.com) – Executive Secretary – (305)982-4843
    - Celebrity and Azamara Cruises – Manolis Alevropoulos – AVP, Marine Operations (ealevropoulos@celebrity.com) – (305) 982 -2907 or (Cellular) (954) 278-1122
    - Celebrity- Anna Danzig-Flowers – (adanzig@celebritycruises.com) – Executive Secretary – (305) 982-2720
11. **Hotel Operations**
    - Royal Caribbean- Richard Nentwich (rnentwich@rccl.com) – Director, Hotel Operations 305-982-2508, (Cellular) 954-904-4404
    - Royal Caribbean – Jacqueline Aguayo – (jaguayo@rccl.com) – Executive Administrator – (305) 982-2242
    - Royal Caribbean- Michele Nyakas-Cepero – (mnyakas@rccl.com ) Executive Secretary – (305) 539-6782, (Cellular) (954) 670-9192
    - Celebrity – Jason Montes DeOca (jmontesdeoca@celebrity.com) – Manger, Hotel Operations – (305) 539-6881
    - Celebrity - Thomas Brady – (tbrady@celebrity.com) - Director, Hospitality- 305-420-7749, (Cellular) (954) 937-8563
    - Celebrity – Alina Ocampo - (aocampo@rccl.com) – Sr. Executive Secretary – (305) 539-4167



GR000136

- Azamara - Martha Owen- Vourtsis – (mowen-vourtsis@azamaraclubcruises.com) – Sr. Executive Administrator – (305) 982-2029

**Continental Shipping Inc.**

| Name | Job Title | Office Phone | Cellular Phone | Email |
|---|---|---|---|---|
| Kristian Busto | President | (787) 725-2532 | (787) 565-0922 | kbusto@continentalshipping.com |
| Daniel Threadgill | Operations Manager | (787) 725-2532 | (787) 565-0924 | operations@continentalshipping.com |
| Elizabeth Ortiz | Lead, Accounting | (787) 725-2532 | | eortiz@continentalshipping.com |

**EXHIBIT D**

*SUPPORTING DOCUMENTATION GUIDELINES*

For reimbursement of Port Operations expenses, Port Agent must follow the below guidelines. Failure to do so will delay reimbursement of all or some of the disbursement account (DA) Port Agent submits, and may result in rejection of the submission.

RCL strongly recommends that Port Agent contact its designated Port Operations point of contact to obtain guidance on documentation requirements, and what may or may not be acceptable, prior to submission of DA with the expense(s) in question. Doing so will help avoid unnecessary delays in reimbursement of submitted expenses.

For each expense, an invoice must be submitted:

1. Each invoice line item must be fairly and accurately described with a clear and legible description of the service and expense/charge.
2. The description and amount of the expense/charge must match what is on the service provider invoice/receipt.
3. If the invoice and/or supporting documentation are not made available in English, the Port Agent must provide a translation.
4. All invoice line items and supporting documentation must be reviewed by the Port Agent for "red flags" such as cash payments, facilitation payments, etc. to ensure compliance with RCL anti-bribery policies, UK Bribery Act, FCPA and other existing anti-bribery laws.
5. All expenses must be supported with an invoice or receipt from the original service provider.
6. The invoice should provide a detailed description of the services rendered and a calculation of charges for such services.
7. All expenses must be supported by law, regulation, rule, order, rate sheet, other official documentation, or documented steps taken to validate the charge directly with the service provider.
8. Invoices, vouchers, receipts and other documentation should contain the service provider's letterhead, or address and other contact information for the original service provider.
9. Invoices for Government expenses may contain a stamp from the government agency to help validate the charge/expense and distinguish it from charges/expenses originating from the Port Agent.
10. Invoices, receipts and other documentation created by the Port Agent are not acceptable as support for reimbursement of expenses paid if the services were not provided by the Port Agent.
11. All charges and expenses related to transportation, lodging and/or meals must be supported by invoices/receipts from the service provider (e.g., hotel, airline, restaurant, etc.).
12. Fees for services performed by the Port Agent must be supported by an agency invoice/receipt, including a detailed description of the services rendered and a calculation of the expenses charged for such services.
13. Quality of the invoice and supporting documents should be checked to ensure they are legible.

KM

## EXHIBIT E

### *PROCESSOR ADDENDUM*

In connection with the Agreement, the parties acknowledge that RCL shall be the Controller of Personal Data and Port Agent shall be the Processor of Personal Data, as the terms "Controller" and "Processor" are defined in Article 4 of the GDPR.

1. **Definitions.** Any term not defined below or within this Addendum shall carry the meaning as described in Article 4 of the GDPR.

(a) **"Affiliate"** means, with respect to any entity, any other entity Controlling, Controlled by, or under common Control with such entity.

(b)**"Controller Group"** means the Controller and its Affiliates.

(c) **"Personal Data"** means any information relating to an identified or identifiable natural person (data subject) owned or provided by Controller, in any form, format or media (including paper, electronic, or other record) that Processor has access to, obtains, uses, maintains or otherwise handles in connection with the performance of the Agreement. For purposes of this definition, an "identifiable natural person" is a person who can be identified, directly or indirectly, by reference to an identifier such as name, an identification number, location data, an online identifier, or one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person.

K3

(d) **"Personal Data Breach"** means any breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, Personal Data transmitted, stored, or otherwise Processed.

(e)**"Processing"** means any operation or set of operations which is performed on Personal Data or on sets of Personal Data, whether or not by automated means, such as collection, recording, organization, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction, and in relation to this Agreement, as more particularly described in Annex 1, which is attached and incorporated herein.

(f) **"Sub-processor"** means any natural or legal person, public authority, agency or other body that Processes the Personal Data on Processor's behalf (including any Affiliate of Processor).

(g) **"Transfer"** means to disclose or otherwise make Personal Data available to a third party (including to any Sub-processor), either by physical movement of the Personal Data to such third party, or by enabling access to the Personal Data by other means.

2. **Limitation on Use.** Processor shall Process the Personal Data only (i) as needed to provide the services; (ii) in accordance with the Agreement or other documented instructions from the Controller, including with regard to any Transfers; and (iii) as needed to comply with law (in which case, Processor shall provide prior notice to Controller of such legal requirement, unless that law prohibits this disclosure). Processor shall inform Controller if Processor believes that any instructions of Controller regarding the Processing of Personal Data may not comply with the GDPR or other applicable EU protection provisions.

3. **Scope.** The duration of the Processing shall be the same as the duration of the Agreement, except as otherwise agreed to in writing by the Parties.

4. **Confidentiality.** Processor shall ensure that persons authorized to Process the Personal Data have agreed in writing to an obligation of confidentiality to maintain the privacy and security of the Personal Data, or are under an appropriate statutory obligation of confidentiality.

5. **Security.** Processor shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk presented by the Personal Data Processing. Such technical and organizational measures shall include, as appropriate: (a) the pseudonymization and encryption of Personal Data; (b) the ability to ensure ongoing confidentiality, integrity, availability, and resilience of processing systems and services; (c) the ability to restore the availability and access to Personal Data in a timely manner in the event of a physical or technical incident; and (d) a process for regularly testing, assessing, and evaluating the effectiveness of technical and organizational measures for ensuring the security of the Processing.

6. **Personal Data Breaches.** Processor shall notify Controller in writing without undue delay whenever Processor reasonably believes that there has been a Personal Data Breach. After providing notice, Processor shall investigate the Personal Data Breach, take all necessary steps to eliminate or contain the exposure of the Personal Data, and keep Controller informed of the status of the Personal Data Breach and all related matters. Processor further agrees to provide reasonable assistance and cooperation requested by Controller in the furtherance of any correction or remediation of any Personal Data Breach, and the mitigation of any potential damage, including any notification that Controller may determine appropriate to send to affected individuals, regulators, or third parties. Taking into account the nature of Processing and the information available to Processor, Processor shall comply with, and shall assist Controller in complying with the obligations regarding Personal Data Breaches as set forth in GDPR Articles 33 and 34.

7. **Return or Disposal.** At Controller's discretion, Processor shall destroy or return all Personal Data to Controller after the end of the provision of services relating to Processing and shall destroy existing copies unless applicable European Economic Area member state law requires storage of the Personal Data. If Processor has such a legal obligation to retain Personal Data beyond the period otherwise specified by this Section 7, Processor shall notify Controller in writing of that obligation, to the extent permitted by applicable law, and shall return or destroy the Personal Data in accordance with this Section 7 as soon as possible after that legally required retention period has ended.

KB

8. **Documentation.** Processor shall maintain all records required under the GDPR, and to the extent they are applicable to Processor's activities for Controller, Processor shall make them available to Controller upon request.

9. **Audits.** Processor shall make available to Controller all information necessary to demonstrate compliance with this Addendum and the Agreement, and allow for and contribute to audits, including inspections, conducted by the internal and external auditors and personnel of Controller and regulators at Controller's cost. In the event that the Processor is found to be non-compliant with this Addendum, the Processor shall reimburse any costs and expenses incurred by Controller in connection with this audit, and any fees or costs that may be imposed as a result of the non-compliance.

10. **Sub-processors.** Processor shall not Transfer Personal Data to any Sub-processor without Controller's express prior written consent; provided, however, that Processor may Transfer Personal Data to the Sub-processor for purposes of providing the services, subject to the following conditions: (a) Processor shall maintain a list of the Sub-processors to which it makes the Transfers and shall provide this list to Controller upon request; (b) Processor shall provide Controller at least 30 days' prior notice of the addition of any Sub-processor to this list and the opportunity to object to such addition(s); and (c) if Controller makes such an objection on reasonable grounds and Processor is unable to modify the services to prevent the Personal Data Transfer to the additional Sub-processor, Controller shall have the right to terminate the relevant Processing. Processor shall, prior to any Transfer, enter into an agreement with such Sub-processor that is at least as restrictive as the Agreement, including this Addendum, which shall be provided to Controller promptly upon request. Processor shall be liable for the acts and omissions of such Sub-processor to the same extent Processor would be liable if performing the services of each Sub-processor directly under the terms of this Addendum.

11. **Processor Assistance.** Processor shall assist Controller by appropriate technical and organizational measures, taking into account the nature of the Processing with Controller's obligation to respond to data subjects' requests to exercise their rights, including their rights of access, correction, objection, erasure and data portability. Taking into account the nature of the Processing and the information available to the Processor, Processor shall assist Controller in meeting its compliance obligations regarding: (i) ensuring the security of the Personal Data; and (ii) carrying out privacy and data protection impact assessments and related consultations of data protection authorities.

12. **Cross-Border Data Transfers.** Processor shall ensure that Personal Data is not Transferred to any country other than those specified in the Agreement unless Controller agrees in writing. Processor shall comply with the applicable cross-border data transfer requirements set forth in the GDPR.

13. **Survival.** Processor's obligations under this Addendum shall continue for so long as Processor continues to have access to, is in possession of, or acquires Personal Data, even if the Agreement between Processor and Controller has expired or has been terminated.

14. **Controller Group.** In addition to the Controller, any member of the Controller Group that benefits from the provision of services under the Agreement may enforce the terms of this Addendum against the Processor as if it were a Party to this Addendum. The Controller may assign any of its rights under this Addendum to any such member of the Controller Group.

15. **Other.** In the event any provision of this Addendum is held to be invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision of the Addendum or any other contract between Processor and Controller. Unless a provision in the Agreement is more protective of Controller, this Addendum shall control in the event of any inconsistency between the Agreement and this Addendum.

KB

16. **Indemnification.** Port Agent shall indemnify RCL against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other reasonable professional costs and expenses) suffered or incurred by RCL arising out of or in connection with the breach of the Data Protection Legislation by Port Agent, its employees or agents, provided that RCL gives Port Agent prompt notice of such claim, full information about the circumstances giving rise to it, reasonable assistance in dealing with the claim and sole authority to manage, defend and/or settle it.

## Annex 1 – Data Processing Details

**Data Subjects.** The Personal Data relates or may related to the following data subjects:

| | Data Subject | Description |
|---|---|---|
| X | Controller employees | Employees of the Controller |
| X | Affiliate employees | Employees of an Affiliate of the Controller |
| X | Guests | Persons who booked a cruise or travel service with Controller |
| ☐ | Others | [Please specify] |

**Data Categories.** The Personal Data that is Processed or may be Processed includes the following data categories:

| | Data Categories | Description |
|---|---|---|
| X | Job related data | Surname, given name, sex, address, email address, phone number, mobile phone number, group company, area, department, cost center, portrait photo, career, tasks, etc. |
| ☐ | IT usage data | User ID, roles, rights, log-in-times, PC name, IP address, etc. |
| X | Private data | Private contact details or email address, phone number, mobile phone number, date/place of birth, identification numbers, nationality, family status, etc. |
| ☐ | Contract data | Purchased products, (financial) services, date of contract, purchase price, extras, warranties, etc. |
| ☐ | Payment and time management data | Wage group, payroll accounting, special payments, daily attendance times, absence reasons, etc. |
| X | Financial data | Payment behavior, balance sheets, scorings, bank account, credit card number, etc. |
| X | Sensitive personal data | Racial and ethnic origin, political opinions, religious or philosophical convictions, trade union membership, genetic data, biometric data for the purpose of uniquely identifying a natural person data, data concerning health or data concerning a natural person's sex life or sexual orientation, data which refer to criminal actions or the suspicion of it. |
| ☐ | Other | [Please define] |

KB



Standard Port Agent Agreement
Commercial Shipping for Port Agent Agreement [illegible] 2019 Final
For Use by Port Operations
Must be Stamped by Legal and Signed by a Vice President of Royal Caribbean Cruises Ltd. to be Binding
[illegible] 2019

GR000142

**Michael Drahos**

| | |
|---|---|
| **From:** | HM Medical Secretary <hm_medicalsecretary@rccl.com> |
| **Sent:** | Friday, February 22, 2019 8:12 AM |
| **To:** | Antoinette Murray |
| **Cc:** | HM Doctor Sr; HM Doctor 02; HM Doctor 03; HM Senior Nurse; HM Nurse; CareTeam@rcclapac.com; CareTeamSupport |
| **Subject:** | Fw: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21 (LANDING REPORT) |
| **Attachments:** | BURGESS, RICHARD PASSPORT COPY.pdf; BURGESS, RICHARD LANDING REPORT.pdf; BURGESS, RICHARD INSURANCE COPY.pdf |

Good Day Antoinette,

I send the email yesterday at 12:27pm.

Please find attachment below.

Thank you.

Best Regards,

James Russel | Medical Secretary | Harmony of the seas
Royal Caribbean International®|1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com
Royal Caribbean International | Celebrity Cruises | Azamara Club Cruises

----- Forwarded by HM Medical Secretary/HM/RCLShip on 02/22/2019 08:06 AM -----

From: HM Medical Secretary/HM/RCLShip
To: CareTeam@MSO365, CareTeamSupport@RCL
Cc: HM Doctor Sr/HM/RCLShip@RCLSHIP, HM Doctor 02/HM/RCLShip@RCLSHIP, HM Doctor 03/HM/RCLShip@RCLSHIP, HM Senior Nurse/HM/RCLShip@RCLSHIP, HM Nurse/HM/RCLShip@RCLSHIP
Date: 02/21/2019 12:27 PM
Subject: Fw: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21 (LANDING REPORT)

---

Good Day Team,

Just to inform that the guest left the ship with paramedics and heading to **Hospital HIMA•San Pablo Caguas,** here in Puerto Rico, San Juan.

Please find attach landing reports and other relevant documents.

*(See attached file: BURGESS, RICHARD LANDING REPORT.pdf)(See attached file: BURGESS, RICHARD PASSPORT COPY.pdf)(See attached file: BURGESS, RICHARD INSURANCE COPY.pdf)*

Should you have any questions, please let me know.

Thank you.

EXHIBIT
PENGAD 800-631-6989
D. Comp B
1/27/22 DL



GR000087

Best Regards,

James Russel | Medical Secretary | Harmony of the seas
Royal Caribbean International®|1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office☎: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com
Royal Caribbean International | Celebrity Cruises | Azamara Club Cruises

----- Forwarded by HM Medical Secretary/HM/RCLShip on 02/21/2019 12:12 PM -----

From: HM Medical Secretary/HM/RCLShip
To: operations@continentalshipping.com, continental@coqui.net
Cc: HM Doctor Sr/HM/RCLShip@RCLSHIP, HM Doctor 02/HM/RCLShip@RCLSHIP, HM Doctor 03/HM/RCLShip@RCLSHIP, HM Senior Nurse/HM/RCLShip@RCLSHIP, HM Nurse/HM/RCLShip@RCLSHIP, CareTeam@MSO365, CareTeamSupport@RCL
Date: 02/21/2019 09:59 AM
Subject: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

---

Good Day Team,

Requesting BLS Ambulance to assist guest mentioned below.

**DX: ?Stroke**




Best Regards,

James Russel | Medical Secretary | Harmony of the seas
Royal Caribbean International®|1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office☎: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com
Royal Caribbean International | Celebrity Cruises | Azamara Club Cruises

CONFIDENTIALITY NOTE: This message may contain confidential or legally privileged information.If you are not the intended recipient, you are hereby notified that any disclosure, copying,distribution, or taking any action in reliance on these contents is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this e-mail and then delete it from your system.

SEACARE HARMONY OF THE SEAS MEDICAL CENTER

## Guest Landed Report

**(This is not a death certificate)**

| | | |
|---|---|---|
| **E-mail Report & Medical Notes / Referral to: CareTeam@rccl.com** | | Vessel: Harmony of the Seas<br>Voyage Name: 34160 |
| Report Submitted(date): Feb 21, 2019 12:15 | Security notified? ☑ Yes ☐ No | Sailing Date: Feb 21, 2019 |
| Ship's Doctor: PEREIRA, JOAO | Ship's Nurse: BREMNER, MARY | Cabin Number: 8660 |
| Date/Time Guest Landed: Feb 21, 2019 12:15 | Date/Time CareTeam notified: Feb 21, 2019 12:15 | Booking Number: |

## Guest Information(*Compulsory field)

| | | |
|---|---|---|
| *Name: BURGESS, RICHARD | Gender: ◉Male ○Female | Date of Birth: Mar 14, 1957 |
| *Home Address: 50 SOUTH YALE STREET, YORK P.A. 17403 | *E-mail(If available):<br>*Cellphone Number: 7178187001 | |
| ☑ Emergency Contact ☑ Next of Kin | *Name: DARREN HENZE | *Cellphone Number: 7175784490 |
| *Documentation: ☑ Passport ☐ Visa ☐ Birth Certificate ☐ Alien Registration | | *Primary Language Spoken: |
| *Document No. 532737714 | *Issuing Country USA | *Country of Citizenship: United States |
| *Travel Insurance Company: | *Policy No.: | *Phone: |
| *Health Insurance Company: DEVON HEALTH SERVICES | *Policy No.: CPT8805DHEN | *Phone: |

## Travelling Companion Information(*Compulsory field)

| | | | | |
|---|---|---|---|---|
| *Traveling Companion's Name: DARREN HENZE | *Stateroom No.: 8660 | Booking No.: | *Cellphone Number.: 7175784490 | Primary language spoken: ENGLISH |
| Total Number of People in Party: | Number of Children in Party: | | Ages of Children: | |

## Medical Evaluation((*Compulsory field))

☑ Medical Referral / Evacuation ☐ Death - Was Next of Kin notified? ☐ Yes ☐ No

*Location.: SAN JUAN, PUERTO RICO

*Date of Onset of Symptoms or Injury: Feb 21, 2019

*Description of Illness or Injury / event: STROKE

*Diagnosis or presumed Cause of Death: STROKE

*Specialty required:

*Type of transportation required (Taxi / BLS / ALS ambulance): BLS AMBULANCE

Additional requirements for transfer (ventilator/nurse/doctor/oxygen):

*Mobility (wheelchair/stretcher/walks with assistance/fully mobile): STRETCHER

*Request for Private or Public Hospital:

## Landed Information(*Compulsory field)

*Date landed: Feb 21, 2019

*Port landed: SAN JUAN, PUERTO RICO

*Landed to (hospital/hotel name, telephone number, city and country): Hospital HIMA•San Pablo Caguas 100 Luis Munoz Marin Avenue, Caguas, 00725, Puerto Rico +1 787-653-6060

Disposition of Personal Property: YES

Was Guest allowed to re-board? ○ Yes ⊙ No

*Port Agent Notified?
⊙ Yes ○ NO If "Yes", indicate agent's name and telephone number: JENNIFER ROBLES 1 787-667-5305

| Disembarking Traveling Companion 1 Name: | *Stateroom No.: | Booking No.: | Cellphone Number.: | Primary Language: | Mobility/ Special needs: |
|---|---|---|---|---|---|
| DARREN HENZE | 8660 | | 7175784490 | | |

| Disembarking Traveling Companion 2 Name: | *Stateroom No.: | Booking No.: | Cellphone Number.: | Primary Language: | Mobility/ Special needs: |
|---|---|---|---|---|---|
| | | | | | |

*Was a CTA assigned to the guest? ○ Yes ⊙ No

*If yes, contact cellphone number for CTA:

*Name of CTA and position:

*CTA disembarking with guest? ○ Yes ⊙ No

*If yes, confirm CTA given contact details for CareTeam Specialist, Port Agent, petty cash and medical facility cellphone (if necessary): ○ Yes ⊙ No

*Confirm landing letter supplied to guest: ○ Yes ⊙ No

## Vessel Deviated (complete this section only if vessel's schedule / itinerary was affected by landing)

☐ Turned around? ☐ Speed increased? Details:
☐ Port changed? ☐ Evacuation at Sea?



We the People
Of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

3

PASSPORT
PASSEPORT
PASAPORTE

UNITED STATES OF AMERICA

Type / Type / Tipo: P
Code / Code / Código: USA
Passport No. / No du Passeport / No. de Pasaporte: 535088662
Surname / Nom / Apellidos: HENZE
Given Names / Prénoms / Nombres: DARREN LEE
Nationality / Nationalité / Nacionalidad: UNITED STATES OF AMERICA
Date of birth / Date de naissance / Fecha de nacimiento: 04 Jun 1960
Place of birth / Lieu de naissance / Lugar de nacimiento: PENNSYLVANIA, U.S.A.
Sex / Sexe / Sexo: M
Date of issue / Date de délivrance / Fecha de expedición: 07 Jul 2015
Authority / Autorité / Autoridad: United States Department of State
Date of expiration / Date d'expiration / Fecha de caducidad: 06 Jul 2025
Endorsements / Mentions Spéciales / Anotaciones: SEE PAGE 27

USA

P<USAHENZE<<DARREN<LEE<<<<<<<<<<<<<<<<<<<<<<
5350886623USA6006048M2507064268876334<993046



We the People
Of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

3

PASSPORT
PASSEPORT
PASAPORTE

UNITED STATES OF AMERICA

Type / Type / Tipo: P
Code / Code / Código: USA
Passport No. / No du Passeport / No. de Pasaporte: 532737714
Surname / Nom / Apellidos: BURGESS
Given Names / Prénoms / Nombres: RICHARD WAYNE
Nationality / Nationalité / Nacionalidad: UNITED STATES OF AMERICA
Date of birth / Date de naissance / Fecha de nacimiento: 14 Mar 1957
Place of birth / Lieu de naissance / Lugar de nacimiento: MARYLAND, U.S.A.
Sex / Sexe / Sexo: M
Date of issue / Date de délivrance / Fecha de expedición: 22 Jun 2015
Authority / Autorité / Autoridad: United States Department of State
Date of expiration / Date d'expiration / Fecha de caducidad: 21 Jun 2025
Endorsements / Mentions Spéciales / Anotaciones: SEE PAGE 27

USA

P<USABURGESS<<RICHARD<WAYNE<<<<<<<<<<<<<<<<<
5327377147USA5703144M2506218791587134<801918

GR000091


Central Pennsylvania Teamsters
Health And Welfare Fund
Participant
ID No.
Devon
DELTA DENTAL

**Michael Drahos**

| | |
|---|---|
| **From:** | Operations@ContinentalShipping.Com |
| **Sent:** | Tuesday, February 26, 2019 8:40 AM |
| **To:** | HM Medical Secretary; Continental@Coqui.net |
| **Cc:** | HM Doctor Sr; HM Doctor 02; HM Doctor 03; HM Senior Nurse; HM Nurse; CareTeam; CareTeamSupport |
| **Subject:** | [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21 |

CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you know the sender. If you are not sure, please contact the sender separately to verify.

Good morning,
I spoke yesterday afternoon with Mr. Henze and Mr. Richard Burgess was stable but they were traveling back home via air ambulance.
Thanks,
Line Garcia

**From:** Continental Shipping Inc.
**Sent:** Friday, February 22, 2019 2:47 PM
**To:** 'HM_MedicalSecretary@rccl.com' ; 'continental@coqui.net'
**Cc:** 'HM_DoctorSr@rccl.com' ; 'HM_Doctor02@rccl.com' ; 'HM_Doctor03@rccl.com' ; 'HM_SeniorNurse@rccl.com' ; 'HM_Nurse@rccl.com' ; 'CareTeam@rccl.com' ; 'CareTeamSupport@rccl.com'
**Subject:** RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21
Good afternoon,
Spoke to Darren Henze, Mr. Burgess husband and he was under surgery due to a blood clot.
Mr. Henze is staying at the Four Point in Caguas. His cellular is (717) 578-4490.
Thanks,
Line Garcia
**From:** HM_MedicalSecretary@rccl.com <HM_MedicalSecretary@rccl.com>
**Sent:** Thursday, February 21, 2019 10:59 AM
**To:** operations@continentalshipping.com; continental@coqui.net
**Cc:** HM_DoctorSr@rccl.com; HM_Doctor02@rccl.com; HM_Doctor03@rccl.com; HM_SeniorNurse@rccl.com; HM_Nurse@rccl.com; CareTeam@rccl.com; CareTeamSupport@rccl.com
**Subject:** HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21
Good Day Team,

Requesting BLS Ambulance to assist guest mentioned below.

**DX:** **?Stroke**



○ Guest

## BURGESS, RICHARD (61)

| | | | |
|---|---|---|---|
| Passenger Id | 86630643 | Date of birth | Mar 14, 1957 |
| Booking Re... | N/A | Gender | M |
| Folio | 9841000202505200 | Country | United States |
| Cabin | 8660 | Signed On | Harmony of the Seas |

Current Location

Clinic | $ Quick Charge | Start | Action ▾

Best Regards,

**James Russel | Medical Secretary | Harmony of the seas**
Royal Caribbean International®|1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com
Royal Caribbean International |Celebrity Cruises |Azamara Club Cruises

CONFIDENTIALITY NOTE: This message may contain confidential or legally privileged information.If you are not the intended recipient, you are hereby notified that any disclosure, copying,distribution, or taking any action in reliance on these contents is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this e-mail and then delete it from your system.

**Michael Drahos**

**From:** Priscilla Isaacs <pisaacs@rccl.com>
**Sent:** Tuesday, February 26, 2019 12:04 PM
**To:** Operations@ContinentalShipping.Com; CareTeam
**Cc:** CareTeamSupport
**Subject:** RE: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Thank you Line.

Thank You and Kind Regards,
Priscilla Isaacs
Specialist, CareTeam
Royal Caribbean Cruises Ltd.
1080 Caribbean Way
Miami, Florida 33132

**Need CareTeam Now?** Call: 954-266-1800 Email: CareTeamSupport@RCCL.Com

**From:** Continental Shipping Inc. [mailto:operations@continentalshipping.com]
**Sent:** Tuesday, February 26, 2019 12:03 PM
**To:** CareTeam <careteam@rccl.com>
**Cc:** CareTeamSupport <CareTeamSupport@rccl.com>
**Subject:** RE: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

**CAUTION:** This email originated from outside of our organization. Do not click links or open attachments unless you know the sender. If you are not sure, please contact the sender separately to verify.

Hello,

Spoke to the hospital and they have indicated that Mr. Burgess was discharged and that Mr. Darren Henge made all arrangements directly.

That is as much information as they have.

Best regards,
Line Garcia
Continental Shipping Inc.

**From:** CareTeam <careteam@rccl.com>
**Sent:** Tuesday, February 26, 2019 12:32 PM

**To:** operations@continentalshipping.com
**Cc:** CareTeamSupport <CareTeamSupport@rccl.com>
**Subject:** FW: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Hello Line
Can you please confirmed that the guest was successfully transferred back to his home hospital via Air Ambulance.
Do you have the name of the Air Ambulance that handled the mission or the receiving hospital info.

Thank You and Kind Regards,
Priscilla Isaacs
Specialist, CareTeam
Royal Caribbean Cruises Ltd.
1080 Caribbean Way
Miami, Florida 33132

**Need CareTeam Now?** Call: 954-266-1800 Email: CareTeamSupport@RCCL.Com

Begin forwarded message:

**From:** "Continental Shipping Inc." <operations@continentalshipping.com>
**Date:** February 26, 2019 at 8:39:32 AM EST
**To:** <HM_MedicalSecretary@rccl.com>, <continental@coqui.net>
**Cc:** <HM_DoctorSr@rccl.com>, <HM_Doctor02@rccl.com>, <HM_Doctor03@rccl.com>, <HM_SeniorNurse@rccl.com>, <HM_Nurse@rccl.com>, <CareTeam@rccl.com>, <CareTeamSupport@rccl.com>
**Subject: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21**

CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you know the sender. If you are not sure, please contact the sender separately to verify.

Good morning,

I spoke yesterday afternoon with Mr. Henze and Mr. Richard Burgess was stable but they were traveling back home via air ambulance.

Thanks,
Line Garcia

**From:** Continental Shipping Inc. <operations@continentalshipping.com>
**Sent:** Friday, February 22, 2019 2:47 PM
**To:** 'HM_MedicalSecretary@rccl.com' <HM_MedicalSecretary@rccl.com>; 'continental@coqui.net' <continental@coqui.net>
**Cc:** 'HM_DoctorSr@rccl.com' <HM_DoctorSr@rccl.com>; 'HM_Doctor02@rccl.com' <HM_Doctor02@rccl.com>; 'HM_Doctor03@rccl.com' <HM_Doctor03@rccl.com>; 'HM_SeniorNurse@rccl.com' <HM_SeniorNurse@rccl.com>; 'HM_Nurse@rccl.com' <HM_Nurse@rccl.com>; 'CareTeam@rccl.com' <CareTeam@rccl.com>; 'CareTeamSupport@rccl.com'

<CareTeamSupport@rccl.com>
**Subject:** RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good afternoon,

Spoke to Darren Henze, Mr. Burgess husband and he was under surgery due to a blood clot.

Mr. Henze is staying at the Four Point in Caguas. His cellular is (717) 578-4490.

Thanks,
Line Garcia

**From:** HM_MedicalSecretary@rccl.com <HM_MedicalSecretary@rccl.com>
**Sent:** Thursday, February 21, 2019 10:59 AM
**To:** operations@continentalshipping.com; continental@coqui.net
**Cc:** HM_DoctorSr@rccl.com; HM_Doctor02@rccl.com; HM_Doctor03@rccl.com; HM_SeniorNurse@rccl.com; HM_Nurse@rccl.com; CareTeam@rccl.com; CareTeamSupport@rccl.com
**Subject:** HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good Day Team,

Requesting BLS Ambulance to assist guest mentioned below.

**DX: ?Stroke**




Best Regards,

James Russel | Medical Secretary | Harmony of the seas
Royal Caribbean International®|1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com
Royal Caribbean International | Celebrity Cruises | Azamara Club Cruises

CONFIDENTIALITY NOTE: This message may contain confidential or legally privileged information.If you are not the intended recipient, you are hereby notified that any disclosure, copying,distribution, or taking any action in reliance on these contents is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this e-mail and then delete it from your system.

Royal Caribbean International | Celebrity Cruises | Azamara Club Cruises

RoyalCaribbean INTERNATIONAL Celebrity Cruises AZAMARA CLUB CRUISES

CONFIDENTIALITY NOTE: This message may contain confidential or legally privileged information.If you are not the intended recipient, you are hereby notified that any disclosure, copying,distribution, or taking any action in reliance on these contents is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this e-mail and then delete it from your system.

## Michael Drahos

**From:** Operations@ContinentalShipping.Com
**Sent:** Tuesday, February 26, 2019 8:40 AM
**To:** HM Medical Secretary; Continental@Coqui.net
**Cc:** HM Doctor Sr; HM Doctor 02; HM Doctor 03; HM Senior Nurse; HM Nurse; CareTeam; CareTeamSupport
**Subject:** [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you know the sender. If you are not sure, please contact the sender separately to verify.

Good morning,

I spoke yesterday afternoon with Mr. Henze and Mr. Richard Burgess was stable but they were traveling back home via air ambulance.

Thanks,
Line Garcia

**From:** Continental Shipping Inc. <operations@continentalshipping.com>
**Sent:** Friday, February 22, 2019 2:47 PM
**To:** 'HM_MedicalSecretary@rccl.com' <HM_MedicalSecretary@rccl.com>; 'continental@coqui.net' <continental@coqui.net>
**Cc:** 'HM_DoctorSr@rccl.com' <HM_DoctorSr@rccl.com>; 'HM_Doctor02@rccl.com' <HM_Doctor02@rccl.com>; 'HM_Doctor03@rccl.com' <HM_Doctor03@rccl.com>; 'HM_SeniorNurse@rccl.com' <HM_SeniorNurse@rccl.com>; 'HM_Nurse@rccl.com' <HM_Nurse@rccl.com>; 'CareTeam@rccl.com' <CareTeam@rccl.com>; 'CareTeamSupport@rccl.com' <CareTeamSupport@rccl.com>
**Subject:** RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good afternoon,

Spoke to Darren Henze, Mr. Burgess husband and he was under surgery due to a blood clot.

Mr. Henze is staying at the Four Point in Caguas. His cellular is (717) 578-4490.

Thanks,
Line Garcia

**From:** HM_MedicalSecretary@rccl.com <HM_MedicalSecretary@rccl.com>
**Sent:** Thursday, February 21, 2019 10:59 AM
**To:** operations@continentalshipping.com; continental@coqui.net
**Cc:** HM_DoctorSr@rccl.com; HM_Doctor02@rccl.com; HM_Doctor03@rccl.com; HM_SeniorNurse@rccl.com; HM_Nurse@rccl.com; CareTeam@rccl.com; CareTeamSupport@rccl.com
**Subject:** HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good Day Team,

Requesting BLS Ambulance to assist guest mentioned below.

**DX: ?Stroke**




BURGESS, RICHARD (61)

| | | | |
|---|---|---|---|
| Passenger Id | 86630643 | Date of birth | Mar 14, 1957 |
| Booking Re... | N/A | Gender | M |
| Folio | 9841000202505200 | Country | United States |
| Cabin | 8660 | Signed On | Harmony of the Seas |
| Current Location | | | |

Clinic | $ Quick Charge | Start | Action

Best Regards,

James Russel | Medical Secretary | Harmony of the seas
Royal Caribbean International® | 1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com
Royal Caribbean International | Celebrity Cruises | Azamara Club Cruises

CONFIDENTIALITY NOTE: This message may contain confidential or legally privileged information.If you are not the intended recipient, you are hereby notified that any disclosure, copying,distribution, or taking any action in reliance on these contents is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this e-mail and then delete it from your system.

## Michael Drahos

| | |
|---|---|
| **From:** | CareTeam <careteam@rccl.com> |
| **Sent:** | Tuesday, February 26, 2019 11:32 AM |
| **To:** | Operations@ContinentalShipping.Com |
| **Cc:** | CareTeamSupport |
| **Subject:** | FW: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21 |

Hello Line
Can you please confirmed that the guest was successfully transferred back to his home hospital via Air Ambulance.
Do you have the name of the Air Ambulance that handled the mission or the receiving hospital info.

Thank You and Kind Regards,
Priscilla Isaacs
Specialist, CareTeam
Royal Caribbean Cruises Ltd.
1080 Caribbean Way
Miami, Florida 33132

**Need CareTeam Now?** Call: 954-266-1800 Email: CareTeamSupport@RCCL.Com

Begin forwarded message:

**From:** "Continental Shipping Inc." <operations@continentalshipping.com>
**Date:** February 26, 2019 at 8:39:32 AM EST
**To:** <HM_MedicalSecretary@rccl.com>, <continental@coqui.net>
**Cc:** <HM_DoctorSr@rccl.com>, <HM_Doctor02@rccl.com>, <HM_Doctor03@rccl.com>, <HM_SeniorNurse@rccl.com>, <HM_Nurse@rccl.com>, <CareTeam@rccl.com>, <CareTeamSupport@rccl.com>
**Subject: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21**

CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you know the sender. If you are not sure, please contact the sender separately to verify.

Good morning,

I spoke yesterday afternoon with Mr. Henze and Mr. Richard Burgess was stable but they were traveling back home via air ambulance.

Thanks,
Line Garcia

**From:** Continental Shipping Inc. <operations@continentalshipping.com>
**Sent:** Friday, February 22, 2019 2:47 PM

**To:** 'HM_MedicalSecretary@rccl.com' <HM_MedicalSecretary@rccl.com>; 'continental@coqui.net' <continental@coqui.net>
**Cc:** 'HM_DoctorSr@rccl.com' <HM_DoctorSr@rccl.com>; 'HM_Doctor02@rccl.com' <HM_Doctor02@rccl.com>; 'HM_Doctor03@rccl.com' <HM_Doctor03@rccl.com>; 'HM_SeniorNurse@rccl.com' <HM_SeniorNurse@rccl.com>; 'HM_Nurse@rccl.com' <HM_Nurse@rccl.com>; 'CareTeam@rccl.com' <CareTeam@rccl.com>; 'CareTeamSupport@rccl.com' <CareTeamSupport@rccl.com>
**Subject:** RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good afternoon,

Spoke to Darren Henze, Mr. Burgess husband and he was under surgery due to a blood clot.

Mr. Henze is staying at the Four Point in Caguas. His cellular is (717) 578-4490.

Thanks,
Line Garcia

**From:** HM_MedicalSecretary@rccl.com <HM_MedicalSecretary@rccl.com>
**Sent:** Thursday, February 21, 2019 10:59 AM
**To:** operations@continentalshipping.com; continental@coqui.net
**Cc:** HM_DoctorSr@rccl.com; HM_Doctor02@rccl.com; HM_Doctor03@rccl.com; HM_SeniorNurse@rccl.com; HM_Nurse@rccl.com; CareTeam@rccl.com; CareTeamSupport@rccl.com
**Subject:** HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good Day Team,

Requesting BLS Ambulance to assist guest mentioned below.

**DX: ?Stroke**




Best Regards,

James Russel | Medical Secretary | Harmony of the seas
Royal Caribbean International®|1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com
Royal Caribbean International | Celebrity Cruises | Azamara Club Cruises

CONFIDENTIALITY NOTE: This message may contain confidential or legally privileged information.If you

are not the intended recipient, you are hereby notified that any disclosure, copying,distribution, or taking any action in reliance on these contents is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this e-mail and then delete it from your system.

**Michael Drahos**

---

**From:** CareTeam <careteam@rccl.com>
**Sent:** Tuesday, February 26, 2019 12:48 PM
**To:** Operations@ContinentalShipping.Com; CareTeam
**Cc:** CareTeamSupport
**Subject:** RE: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Thanks Line!!

Best Regards,

**Maria Pelleya**
*Specialist, CareTeam*
Royal Caribbean Cruises Ltd.
1080 Caribbean Way
Miami, Florida 33132
Email: mpelleya@celebrity.com
O: 305-539-5339

**Need CareTeam Now?** Call: 954-266-1800 Email: CareTeamSupport@RCCL.com

CONFIDENTIALITY NOTE: This message may contain confidential or legally privileged information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking any action in reliance on these contents is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this e-mail and then delete it from your system.

**From:** Continental Shipping Inc. <operations@continentalshipping.com>
**Sent:** Tuesday, February 26, 2019 12:03 PM
**To:** CareTeam <careteam@rccl.com>
**Cc:** CareTeamSupport <CareTeamSupport@rccl.com>
**Subject:** RE: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

**CAUTION:** This email originated from outside of our organization. Do not click links or open attachments unless you know the sender. If you are not sure, please contact the sender separately to verify.

Hello,

Spoke to the hospital and they have indicated that Mr. Burgess was discharged and that Mr. Darren Henge made all arrangements directly.

That is as much information as they have.

Best regards,
Line Garcia
Continental Shipping Inc.

**From:** CareTeam <careteam@rccl.com>
**Sent:** Tuesday, February 26, 2019 12:32 PM
**To:** operations@continentalshipping.com
**Cc:** CareTeamSupport <CareTeamSupport@rccl.com>
**Subject:** FW: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Hello Line
Can you please confirmed that the guest was successfully transferred back to his home hospital via Air Ambulance.
Do you have the name of the Air Ambulance that handled the mission or the receiving hospital info.

Thank You and Kind Regards,
Priscilla Isaacs
Specialist, CareTeam
Royal Caribbean Cruises Ltd.
1080 Caribbean Way
Miami, Florida 33132

**Need CareTeam Now?** Call: 954-266-1800 Email: CareTeamSupport@RCCL.Com

Begin forwarded message:

> **From:** "Continental Shipping Inc." <operations@continentalshipping.com>
> **Date:** February 26, 2019 at 8:39:32 AM EST
> **To:** <HM_MedicalSecretary@rccl.com>, <continental@coqui.net>
> **Cc:** <HM_DoctorSr@rccl.com>, <HM_Doctor02@rccl.com>, <HM_Doctor03@rccl.com>, <HM_SeniorNurse@rccl.com>, <HM_Nurse@rccl.com>, <CareTeam@rccl.com>, <CareTeamSupport@rccl.com>
> **Subject: [EXTERNAL] RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21**
>
> CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you know the sender. If you are not sure, please contact the sender separately to verify.
>
> Good morning,
>
> I spoke yesterday afternoon with Mr. Henze and Mr. Richard Burgess was stable but they were traveling back home via air ambulance.

Thanks,
Line Garcia

**From:** Continental Shipping Inc. <operations@continentalshipping.com>
**Sent:** Friday, February 22, 2019 2:47 PM
**To:** 'HM_MedicalSecretary@rccl.com' <HM_MedicalSecretary@rccl.com>; 'continental@coqui.net' <continental@coqui.net>
**Cc:** 'HM_DoctorSr@rccl.com' <HM_DoctorSr@rccl.com>; 'HM_Doctor02@rccl.com' <HM_Doctor02@rccl.com>; 'HM_Doctor03@rccl.com' <HM_Doctor03@rccl.com>; 'HM_SeniorNurse@rccl.com' <HM_SeniorNurse@rccl.com>; 'HM_Nurse@rccl.com' <HM_Nurse@rccl.com>; 'CareTeam@rccl.com' <CareTeam@rccl.com>; 'CareTeamSupport@rccl.com' <CareTeamSupport@rccl.com>
**Subject:** RE: HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good afternoon,

Spoke to Darren Henze, Mr. Burgess husband and he was under surgery due to a blood clot.

Mr. Henze is staying at the Four Point in Caguas. His cellular is (717) 578-4490.

Thanks,
Line Garcia

**From:** HM_MedicalSecretary@rccl.com <HM_MedicalSecretary@rccl.com>
**Sent:** Thursday, February 21, 2019 10:59 AM
**To:** operations@continentalshipping.com; continental@coqui.net
**Cc:** HM_DoctorSr@rccl.com; HM_Doctor02@rccl.com; HM_Doctor03@rccl.com; HM_SeniorNurse@rccl.com; HM_Nurse@rccl.com; CareTeam@rccl.com; CareTeamSupport@rccl.com
**Subject:** HM-OTS // REQUESTING BLS AMBULANCE TODAY IN SAN JUAN // FEB 21

Good Day Team,

Requesting BLS Ambulance to assist guest mentioned below.

**DX: ?Stroke**




BURGESS, RICHARD (61)

| | | | |
|---|---|---|---|
| Passenger Id | 86630643 | Date of birth | Mar 14, 1957 |
| Booking Re... | N/A | Gender | M |
| Folio | 9841000202505200 | Country | United States |
| Cabin | 8660 | Signed On | Harmony of the Sea |
| Current Location | | | |

Clinic | $ Quick Charge | Start | Action

Best Regards,

James Russel | Medical Secretary | Harmony of the seas
Royal Caribbean International®|1050 Caribbean Way, Miami, FL 33132-2096 U.S.A.
Office: 21113 | Dect. Phone: 50303 | Email: HM_medicalsecretary@rccl.com

**Notes**

| Description | SR # | Created By | Created By Name | Created Date | Sailing Note |
|---|---|---|---|---|---|
| Ship Log Level 1 = Ship Log Level 2 = Medical Level Minor Ship Log Level 3 = Guest Log Complaint: DATE OF ACCIDENT : 02-18-2019 STATEMENT : BECOME UNSTABLE - FELL IN FOYER HITTING HIS HEAD Vacation Impact Score : MILD Guest Log Action Resolution: GSOGaby called gst in SR NA **2/18/19@9:35pm RR Alena called SR, guest is fine and no assistance needed, futher assistance offered. | 22838428 | SADMIN | Siebel Administrator | 02/27/2019 12:13:42 PM | ☐ |
| Ship Log Level 1 = Ship Log Level 2 = SeaPass Account Ship Log Level 3 = Seapass-Copy of Sta Guest Log Complaint: Guest Log Action Resolution: | 22838572 | SADMIN | Siebel Administrator | 02/27/2019 12:13:42 PM | ☐ |
| Ship Log Level 1 = Ship Log Level 2 = SeaPass Account Ship Log Level 3 = Inactive account Guest Log Complaint: *8888* SPA open account Guest Log Action Resolution: | 22838720 | SADMIN | Siebel Administrator | 02/27/2019 12:13:42 PM | ☐ |
| Ship Log Level 1 = Ship Log Level 2 = SeaPass Account Ship Log Level 3 = Cash Payment Guest Log Complaint: $700.00 Guest Log Action Resolution: | 22841025 | SADMIN | Siebel Administrator | 02/27/2019 12:13:42 PM | ☐ |
| Ship Log Level 1 = Ship Log Level 2 = SeaPass Account Ship Log Level 3 = Add Credit Card Guest Log Complaint: va ***2312 /// $ 1037.91 ///code: 32458A Guest Log Action Resolution: | 22841026 | SADMIN | Siebel Administrator | 02/27/2019 12:13:42 PM | ☐ |

## Service History Remarks

| Status | SR # | Service History Remark | Created By | Created By Name | Created Date |
|---|---|---|---|---|---|
| Sent | 1-32145366031 | RGEM ANNE** DG Darren called req copy of onboard statement. Sent to his email. NFA | 130289 | Glorianne Ong | 03/19/2019 05:13:23 PM |