University of Missouri

**Department of Neurology**
School of Medicine

CS & E Building, One Hospital Drive, CE507
Columbia, MO 65212

**PHONE** 573-882-8668
**FAX** 573-884-4249

September 13th, 2022

Sarah A. Lobel, Esq.
Hickey Law Firm
1401 Brickell Avenue
Suite 510
Miami, FL 33131

Re: Richard Burgess v. Royal Caribbean Cruises LTD., et al.,
United States District Court Southern District of Florida Case No.: 1:20-cv-20687- OTAZO-REYES

Dear Ms. Lobel:

As per your request, in addition to all of the previous records, documents and images reviewed in support of my original report, I have now also reviewed the additional materials you sent me regarding the case captioned above. The present constitutes the work product of my review, as well as my expert rebuttal opinions relative to the defendant's expert reports reviewed.

**ADDITIONAL MATERIALS RECEIVED & REVIEWED**

1. Medical Records & Clinical Items
   a. Endovascular Neurosurgery Report (Images Not Available Yet)
2. Legal Documents
   a. RCCL's Expert Witness Disclosure
3. Medical Literature (REFERENCES AT THE END OF THE REPORT)
4. Additional Documents & Materials
   a. Expert Report from Nure Khoury, MD
   b. Expert Report from Rodolfo E. Alcedo-Guardia, MD
   c. Expert Report from Alexander Merkler, MD
   d. Expert Report from Gordon Sze, MD
   e. Expert Report from Dileep Yavagal, MD
   f. Expert Report from Thomas Groomes, MD
   g. Expert Report from Cathlin Mitchell, RN, BSN

**DEFENDANT'S EXPERT OPINIONS & REBUTTALS**

Opinion #1: *"…he would not have been a candidate for t-PA regardless of reported symptom onset time. This is because t-PA would have been contraindicated due to the recent head trauma he sustained when he fell in his cabin on 2/18/19 [ specifically a 10 cm long laceration through the full depth of his scalp across the occiput that resulted in the need for suturing]. In my opinion, a head injury that requires stitches meets "serious" head trauma per guidelines."* [Dr. Yavagal]

Rebuttal: This opinion is incorrect and, contrary to how it is phrased, not supported by the currently

published stroke care guidelines, which the author misquotes. [1] The original contraindication for intravenous thrombolysis (IV-tPA) administration in the context of a head injury, introduced in the original guidelines that I personally co-authored in 1996, indeed used the adjective *"serious"* to qualify the type of traumatic incident of concern. However, the entire passage reads *"another stroke or a serious head injury in the previous 3 months"*, placing it within the context of a cerebral injury. [2] However, nearly 30 years later, following all the existing experience using intravenous Alteplase, the published guidelines available in 2019 carries over the changes made in the early 2000's by specifying that IV-tPA is contraindicated if *"...recent <u>severe</u> head trauma (within 3 mo)..."*. [1] In this context, the widely accepted definition of a "severe" head injury is illustrated in the table below [3, 4]:

| (If a patient meets criteria in more than one category of severity, the higher severity level is assigned) | | | |
|---|---|---|---|
| **Criteria** | **Mild** | **Moderate** | **Severe** |
| Structural imaging | Normal | Normal or abnormal | Normal or abnormal |
| Loss of Consciousness (LOC) | 0-30 min | >30 min and <24 hours | >24 hours |
| Alteration of consciousness/ mental state (AOC)* | up to 24 hours | >24 hours; severity based on other criteria | |
| Posttraumatic amnesia (PTA) | 0-1 day | >1 and <7 days | >7 days |
| Glasgow Coma Scale (GCS) (best available score in first 24 hours)** | 13-15 | 9-12 | <9 |

Classification of Traumatic Brain Injury Severity [3, 4]

It specifies the following criteria: a) Loss of consciousness greater than 24 hours, b) Alteration of consciousness greater than 24 hours, c) Post-traumatic amnesia greater than 7 days, and d) Glasgow Coma Scale (GCS) score less than 9 in the first 24 hours. Clearly Mr. Burgess's head injury did not meet any of these criteria. In fact, the opinion of Dr. Yavagal is contradicted by other defendant's experts, as they assert: a) *"There was no loss of consciousness"* and *"...neurological exam was documented as within normal limits"* [Dr. Alcedo-Guardia], b) *"There was no loss of consciousness and no focal neurologic deficit on examination after the fall."* [Dr. Merkler], c) *"There was no indication for head imaging following Mr. Burgess' fall on February 18, 2019... ...guidelines for head imaging following mild traumatic brain injury..."* [Dr. Merkler], and d) *"...head CT would not be appropriate as GCS was 15, no suspected open or depressed skull fracture, no sign of basilar skull fracture, > 2 episodes of vomiting, age > 65, retrograde amnesia to the event > 30 minus, no dangerous mechanism ( struck by motor vehicle or fall from >3 feet or> 5 stairs)."* [Dr. Khoury], all indicative of a mild head injury.

<u>Opinion #2</u>: *"...the initial read of imaging studies taken of Mr. Burgess' brain was suggestive of a possible SAH, which again would have been an absolute contraindication unless/until definitively ruled out."* [Dr. Yavagal]

<u>Rebuttal</u>: Although, technically, any intracranial hemorrhage is a contraindication for the administration of IV-tPA for the treatment of acute ischemic stroke, Dr. Yavagal's opinion is incorrect as it ignores two important facts in evidence: a) There was no subarachnoid hemorrhage, as it was never demonstrated to be present in the original computed tomography (CT) scan or in any of the subsequent imaging studies, and b) The official interpretation of the original CT scan did not include any indication that the radiologist reviewing the study thought there was a subarachnoid hemorrhage. In fact, our rebuttal is supported by another of the defendant's experts [Dr. Sze], a neuroradiologist whose interpretation of the original CT scan images clearly did not support the presence of a subarachnoid hemorrhage. Moreover, Dr. Yavagal's stipulated qualification noted as *"unless/until definitively ruled out"* implies his agreement that, had Mr. Burgess been transported from the ship to a stroke-capable hospital with haste, according to the standard of care [1], and using the available resources [5, 6], it would have been feasible to solve any discrepancy of interpretation of the original CT, and effectively "rule out" the concern for a subarachnoid hemorrhage. In this context, the statements introduced by another one of the defendant's experts that *"While Dr. Mins interpreted the CT as not being consistent with subarachnoid hemorrhage, Dr. Nobo was the treating physician and was responsible for making a life-or-death judgment call… …As part of their training, Neurologists are taught how to interpret CT scans as in an acute stroke and often cannot rely on waiting for radiologists"* [Dr. Merkler], overlook the ability to reach a practical consensus when two specialists have conflicting opinions, provided there is time to discuss the matter. The failure to transport the patient to a stroke-capable hospital in a timely manner directly prevented such a discussion from ever taking place and, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient.

<u>Opinion #3</u>: *"…the time of stroke symptom onset could not be determined with absolute certainty…"* [Dr. Yavagal]

<u>Rebuttal</u>: This opinion is not supported by the clinical facts in evidence. The entire set of medical records consistently specify two important points: a) The patient woke up that morning without any symptoms, and b) The symptom onset could reliably by estimated to be between 0900 – 0915 hours (1000 – 1015 San Juan time). These facts, not materially different from the type and quality of information available to all us who treat stroke on a daily basis, were recorded by the ship's triage nurse Mary Bremner, by the ship's physician Dr. Joao Pereira, and by the vascular neurologist Dr. Ulises Nobo at HIMA San Pablo Caguas Hospital. In fact, several of the defendant's experts acknowledged that this was the information available at the time of treatment, as follow: *"Was asymptomatic when he woke up"* [Dr. Merkler], and *"… documented a last known well time of 9:30 AM…"* [Dr. Alcedo-Guardia]. In addition, both our original report and the one from the defendant's neuroradiology expert [Dr. Sze] concur in that the infarcted tissue visible in the original CT as involving the left posterior cerebral artery corresponded to a few hours of evolution, perfectly consistent with the timeline estimated from the history and evident in the medical records (see below for additional commentary regarding Opinion #6). The connotation of this CT finding translates into the fact that the inordinate delay in getting the patient from the ship to the ED resulted in the brain tissue already showing radiographic evidence of infarction, impeding his

qualification for treatment with IV-tPA and, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient.

Opinion #4: *"...the patient was not a candidate for mechanical thrombectomy at presentation as the presenting CT angiogram a right vertebral artery V1 segment occlusion, but the basilar artery was open."* [Dr. Yavagal]

Rebuttal: This opinion is misleading due to the way in which it is phrased. Clearly, thrombectomy of the basilar artery itself was not indicated upon arrival to the emergency department (ED) of the HIMA San Pablo Caguas Hospital since this vessel was patent. That said, IV-tPA administration in a patient such as Mr. Burgess (had he had been emergently transported in a timely manner to a stroke-capable ED) is commonly followed by a discussion of the possible need for endovascular intervention of the original proximal right vertebral artery occlusive process. Examples of such an approach exist in the literature [7, 8] and, in fact, it is something we have personally carried out 2-3 times just in the last 4-6 weeks. This should have been possible and reasonable at the HIMA San Pablo Caguas Hospital, considering the degree of intramural expertise claimed by another of the defendant's experts [Dr. Alcedo-Guardia]. Therefore, the implication of this opinion that *"there was nothing that could be done"* is contradictory and not supported by the reality of the situation at the time of the patient's presentation. Once again, had the patient presented for care along an expeditious timeline, he would have been able to receive IV-tPA and would have had a much better chance of benefitting from additional therapeutic considerations. As it is, however, the failure to transport the patient to a stroke-capable hospital in a timely manner directly prevented these considerations and therapeutic steps and, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient.

The erroneous opinion regarding the lack of endovascular therapeutic alternatives is echoed by another of the defendant's experts, who categorically states that the patient *"was not a candidate for thrombectomy at his initial evaluation on February 21, 2019, based on the location of the occlusions"* [Dr. Merkler]. This statement, also displaying a misleading construct, is tainted by the fact that this expert, and with all due respect, is simply not qualified by virtue of training, experience, and expertise to comment on the IF, WHAT, HOW or WHEN an urgent neuroendovascular procedure would have been reasonable and feasible in the care of this patient. In this context, when he later goes on to state that the interventionist *"...was unable to pass the clot despite several attempts. This was likely due to the calcified, hard nature of the clot."* he demonstrates that he is commenting outside his scope of practice, since: a) Clots are not calcific, even when organized; they are typically fibrin-rich (i.e., "white clots") or red blood cells-rich (i.e., "red clots") [9-11], and b) There is no radiographic evidence of calcification in the proximal right vertebral artery. Moreover, our focused measurements in the maximum intensity projections (MIP) of the original CT angiogram (CTA) returned Hounsfield Units (HU) consistent with soft tissue and contrast, not calcium. In fact, another of the defendant's experts [Dr. Sze], a neuroradiologist, upon review of the original CTA images failed to identify the presence of calcium in the right vertebral artery origin. As to the failure to cross the occluded point of the proximal right vertebral artery, we may be in a better position to comment once the angiographic images of the procedure

become available for review. Presently, we only have the procedural report, which leaves many interventional questions unanswered and, therefore, we reserve our right to further add to our neuroendovascular opinions once such images become available for review.

One more of the defendant's experts also adheres to the erroneous Opinion #4, expressing it by means of the following statement: *"…a vertebral occlusion that was triggered by a chronically calcified stenotic plaque at the V1 segment, at the ostium of the vertebral artery origin. There was no initial indication for mechanical thrombectomy…"* [Dr. Alcedo-Guardia]. Even in this instance, coming from a specialist who professes himself to have the expertise require to comment on this topic, the opinion is both imprecise (i.e. thrombectomy of what vessel?) and wholly incorrect (i.e., there is no radiographic evidence of a calcific plaque in the origin of the right vertebral artery; see above paragraph).

<u>Opinion #5</u>: *"Mr. Burgess was transported directly to the only medical center in the island that managed strokes at that time. This was the best possible course of action that could have been taken…"* [Dr. Alcedo-Guardia]

<u>Rebuttal</u>: This opinion is not supported by the facts, including those advanced by the expert himself. As we noted in our original report, HIMA San Pablo Hospital Caguas is about 17 miles ("as the crow flies") inland from the port of San Juan (i.e., in the community of Caguas). According to existing information at that time, there were other stroke-capable hospitals closer to the ship, including the University of Puerto Rico Hospital, where Dr. Alcedo-Guardia practices. [5] Moreover, such disingenuous and defeatist opinion is compounded by the following incorrect assertions *"There was and there is no stroke protocol established for the Island of Puerto Rico"* and *"HIMA San Pablo Caguas was the only stroke center with stroke neurology on call 24/7 at that time"*, which go against the existing literature and information available about the local systems. [5, 6] Moreover, if in fact the emergency medical transport of patients in Puerto Rico is in such dismal state, it should have behooved Royal Caribbean Cruises, LTD (RCCL) to assure some level of preparedness for this type of eventuality, including but not limited to controlling the request for emergency evacuation of patients with time-critical diagnoses [6] rather than, as another of the defendant's experts asserted, *"defer/rely upon port agent to identify the best local site for care"* [Dr. Khoury]. The danger of this approach is that it assumes that the port agent knows the importance of a time-critical diagnosis transfer, and/or that the ship's physician explicitly demands that a certain degree of expediency is used for the transfer. Neither of these two conditions seemed to have been met in Mr. Burgess' case, and so his transportation to a stroke-capable hospital was excessively delayed, taking a total of approximately three hours [i.e., The port agent received the transfer request at approximately 0959 hours (1059 San Juan time); Sunny Ambulance, Inc. were first contacted at 1221 hours (San Juan time), and the actual transfer of the patient from the ship to the HIMA San Carlos Caguas Hospital took place between 1310 and 1404 hours (San Juan time)]. Such a delay assured that patient could not possibly qualify for treatment with IV-tPA and, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient, despite what the defendant's experts opine.

Opinion #6: *"Intravenous tPA would not have improved Mr. Burgess' neurologic outcome."* [Dr. Merkler]

Rebuttal: This opinion is misleading and defies the existing body of knowledge regarding the benefits of IV-tPA for acute ischemic stroke. [1, 12-14] The reason IV-tPA administration is the mainstay of the standard of care for these patients is because the literature accumulated over the last 30 years consistently supports the notion that it leads to superior outcomes, as compared with not administering it. Curiously, the defendant's expert rests this opinion on the fact that the patient already had evidence of infarction on the original CT scan in the ED. From our point of view, however, such justification further demonstrates that it was, in fact, the inordinate delay in getting the patient from the ship to the ED that resulted in the brain tissue already showing radiographic evidence of infarction, directly leading to his disqualification for treatment with IV-tPA and, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient. The comparable opinion of another defendant's expert, expressed as: *"Within a reasonable degree of medical certainty, even if intravenous tPA had been administered, it is unlikely that it would have helped"* [Dr. Sze], is likewise incorrect. Moreover, the various supporting arguments advanced by the defendant's neuroradiology expert represent conveniently hand-picked references of dubious relevance, introduced by a specialist who is commenting outside of his scope of practice and that, with all due respect, lacks the experience and expertise of treating stroke patients on a daily basis.

In the context of the impact of the original CT scan findings on the treatment decisions, it is important that we comment on additional opinions expressed by the defendant's neuroradiology expert [Dr. Sze]. The first one implies that the patient *"had already suffered a prior stroke in the same vascular distribution as the later strokes at issue"*. This opinion is incorrect, as it refers to post-operative changes found in the left occipital pole (i.e., Series 3, Images 38-46), dating to a surgical procedure the patient had at the age of 16, and that had been described in prior imaging studies, as early as 2010 (images not available for review). In addition, his statement that *"the age of the small medial inferior left cerebellar foci is at least 12 hours and most likely up to 36 hours old."* is also incorrect, as there is no such lesion. It has never been identified by anyone interpreting the original CT scan and it is not consistent at all with the timeline of cerebrovascular evolution, as currently evidenced. Therefore, the notion that such a finding constitutes a contraindication for the administration of IV-tPA has no proper foundation in the factual evidence. The actual acute abnormality found in the original CT corresponds to the index cerebrovascular event suffered by the patient on the morning of 21FEB19. It consists of a somewhat discreet hypodense volume of tissue corresponding to a portion of the left posterior cerebral artery territory, with early edema, and consistent with an ischemic injury of several hours of evolution (i.e., Series 3, Images 26-38). The defendant's neuroradiology expert agrees with my assessment, as evidenced by his statement that *"the large left posterior cerebral artery territory infarct demonstrates mild low density and mass effect and may be as recent as several hours old"* [Dr. Sze]. It is precisely this lesion, that which is consistent with the temporal evolution of the stroke since approximately 1015 hours and with the delay in emergency transport, that disqualified the patient for treatment with IV-tPA and, as we

stipulated in our original report, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient.

Opinion #7: *"The basilar artery occlusion was also the result of the clot breaking off from his right vertebral artery occlusion. tPA therefore would not have prevented the basilar artery occlusion from occurring."* [Dr. Merkler]

Rebuttal: This opinion is not supported by either the existing historical experience or by the literature. [13, 14] This component of the pathogenic mechanism of Mr. Burgess's stroke, as delineated by the defendant's expert, aligns with our own conclusions about the case. However, if we are to accept that the original incident resulted from thrombotic occlusion of a pre-existing vertebral artery stenotic lesion, it is also likely, **within a reasonable degree of medical probability**, that IV-tPA administration would have resulted in reduction of the thrombus burden at the point of occlusion, diminished the risk of fragmentation with downstream migration, and would be even reasonable to expect the transformation of the lesion from occlusion to a residual highly stenotic underlying process. [8] This would have resulted, **within a reasonable degree of medical probability**, on a decreased risk for the subsequent basilar artery embolism and provided a much better framework for additional therapeutic endovascular options (i.e., angioplasty, stenting, thrombectomy). [7, 8, 15-19]

In conclusion, it is still my opinion, **within a reasonable degree of medical probability**, that the medical management Mr. Burgess received when he suffered his stroke was well below the standard of care, and that the excessive delay incurred in transferring him from the Harmony of the Seas cruise ship to a stroke-capable hospital triggered a "domino effect" of consequences that included the inability of the ED and vascular neurology team at HIMA San Pablo Caguas Hospital to treat him with IV-tPA and, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient.

I hope this report answers all your questions. Please let me know if there are any additional topics you need me to address, any additional evidence I need to review, or any additional queries from any of the parties involved in the case.

Best regards,

Camilo R. Gomez, MD, MBA
Professor of Neurology
Vascular and Interventional Neurologist

CRG/ym

## REFERENCES

1. Powers, W.J., A.A. Rabinstein, T. Ackerson, O.M. Adeoye, N.C. Bambakidis, K. Becker, J. Biller, M. Brown, B.M. Demaerschalk, B. Hoh, E.C. Jauch, C.S. Kidwell, T.M. Leslie-Mazwi, B. Ovbiagele, P.A. Scott, K.N. Sheth, A.M. Southerland, D.V. Summers, D.L. Tirschwell, and C. American Heart Association Stroke, *2018 Guidelines for the Early Management of Patients With Acute Ischemic Stroke: A Guideline for Healthcare Professionals From the American Heart Association/American Stroke Association.* Stroke, 2018. **49**(3): p. e46-e110.
2. Adams, H.P., Jr., T.G. Brott, A.J. Furlan, C.R. Gomez, J. Grotta, C.M. Helgason, T. Kwiatkowski, P.D. Lyden, J.R. Marler, J. Torner, W. Feinberg, M. Mayberg, and W. Thies, *Guidelines for Thrombolytic Therapy for Acute Stroke: a Supplement to the Guidelines for the Management of Patients with Acute Ischemic Stroke. A statement for healthcare professionals from a Special Writing Group of the Stroke Council, American Heart Association.* Stroke, 1996. **27**(9): p. 1711-8.
3. Management of Concussion/m, T.B.I.W.G., *VA/DoD Clinical Practice Guideline for Management of Concussion/Mild Traumatic Brain Injury*. 2016.
4. Woodson, J., *Traumatic Brain Injury: Updated Definition and Reporting*. 2015, THE ASSISTANT SECRETARY OF DEFENSE: MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY, ASSISTANT SECRETARY OF THE NAVY, ASSISTANT SECRETARY OF THE AIR FORCE, DIRECTOR, JOINT STAFF. p. 1-5.
5. Ciliberti-Vargas, M.A., H. Gardener, K. Wang, C. Dong, L. Yi, J.G. Romano, M. Robichaux, S.P. Waddy, U. Nobo, S. Diaz-Acosta, T. Rundek, M.F. Waters, and R.L. Sacco, *Stroke Hospital Characteristics in the Florida-Puerto Rico Collaboration to Reduce Stroke Disparities Study.* South Med J, 2017. **110**(7): p. 466-474.
6. Sauri, H., *Manual de Procedimientos Operacionales*, C.d.E.M.d.P. Rico, Editor. 2012: Guaynabo, PR.
7. Feng, L., S. Mangla, and J. Pile-Spellman, *Rheolytic thrombectomy of acute stent thrombosis of cervical vertebral artery. Case report and literature review.* Interv Neuroradiol, 2002. **8**(3): p. 305-12.
8. Hassan, A., T. ul Haq, F. Khimani, S. Ali, S. Dhakam, and N.A. Syed, *Acute vertebrobasilar artery thrombosis: long-term benefit of vertebral artery stenting.* Singapore Med J, 2007. **48**(10): p. e277-80.
9. Yuki, I., I. Kan, H.V. Vinters, R.H. Kim, A. Golshan, F.A. Vinuela, J.W. Sayre, Y. Murayama, and F. Vinuela, *The impact of thromboemboli histology on the performance of a mechanical thrombectomy device.* AJNR Am J Neuroradiol, 2012. **33**(4): p. 643-8.
10. Hashimoto, T., M. Hayakawa, N. Funatsu, H. Yamagami, T. Satow, J.C. Takahashi, K. Nagatsuka, H. Ishibashi-Ueda, J.I. Kira, and K. Toyoda, *Histopathologic Analysis of Retrieved Thrombi Associated With Successful Reperfusion After Acute Stroke Thrombectomy.* Stroke, 2016. **47**(12): p. 3035-3037.
11. Shin, J.W., H.S. Jeong, H.J. Kwon, K.S. Song, and J. Kim, *High red blood cell composition in clots is associated with successful recanalization during intra-arterial thrombectomy.* PLoS One, 2018. **13**(5): p. e0197492.
12. Wardlaw, J.M., V. Murray, E. Berge, and G.J. del Zoppo, *Thrombolysis for acute ischaemic stroke.* Cochrane Database Syst Rev, 2014(7): p. CD000213.

13. Grond, M., J. Rudolf, S. Schmulling, C. Stenzel, M. Neveling, and W.D. Heiss, *Early intravenous thrombolysis with recombinant tissue-type plasminogen activator in vertebrobasilar ischemic stroke.* Arch Neurol, 1998. **55**(4): p. 466-9.
14. Frankowska, E., K. Brzozowski, J. Staszewski, N. Kolmaga, A. Stepien, and R. Boguslawska-Walecka, *Combined thrombolysis in posterior circulation stroke caused by bilateral vertebral artery dissection in squash player.* Neurol Neurochir Pol, 2014. **48**(4): p. 299-304.
15. Bissay, F., S. Allard, F. Van Tussenbroek, T. Stadnik, and A. Michotte, *Vertebral artery dissection complicated by a thrombosis of the basilar artery was successfully treated with endovascular thrombolysis.* Eur Neurol, 2004. **51**(2): p. 110-3.
16. Nedeltchev, K., L. Remonda, D.D. Do, C. Brekenfeld, C. Ozdoba, M. Arnold, H.P. Mattle, and G. Schroth, *Acute stenting and thromboaspiration in basilar artery occlusions due to embolism from the dominating vertebral artery.* Neuroradiology, 2004. **46**(8): p. 686-91.
17. Wang, H., K. Fraser, D. Wang, J. Alvernia, and G. Lanzino, *Successful intra-arterial basilar artery thrombolysis in a patient with bilateral vertebral artery occlusion: technical case report.* Neurosurgery, 2005. **57**(4 Suppl): p. E398; discussion E398.
18. Matsubara, N., S. Miyachi, T. Kojima, and Y. Nakai, *Acute vertebral artery origin occlusion leading to basilar artery thrombosis successfully treated by angioplasty with stenting and intracranial fibrinolysis.* Neurointervention, 2013. **8**(1): p. 41-5.
19. Abe, A., S. Okubo, S. Onozawa, M. Nakajima, K. Suzuki, M. Harada-Abe, M. Ueda, K. Katsura, and Y. Katayama, *Acute vertebral artery origin occlusion leading to basilar artery thrombosis successfully treated by angioplasty with stenting and thrombectomy.* Interv Neuroradiol, 2014. **20**(3): p. 325-8.