UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

RICHARD BURGESS, Individually
and by and through DARREN HENZE,
as Guardian of the Person and
Estate of RICHARD BURGESS,
Incapacitated and as Agent Under
That Durable Power of Attorney,
dated November 20, 2006,

Plaintiff,

v 1:20-CV-20687-OTAZO-REYES

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian Corp., d/b/a ROYAL
CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL,
JOAO PEREIRA, MICHIEL ADRIAAN
ETSEBETH,

Defendants.

______________________________X

VIDEO DEPOSITION OF: DR. DAVID NIDORF

DATE: October 14, 2022

TIME: 9:00 a.m. to 10:35 a.m.

LOCATION: Courtyard by Marriott
2641 South Road
Poughkeepsie, New York 12601

Page 2

APPEARANCES:

FOR THE PLAINTIFF:

HICKEY LAW FIRM
BY: SARAH ANNE LOBEL, ESQ.
1401 Brickell Avenue, Suite 510
Miami, Florida 33131

FOR THE DEFENDANTS:

GRAY ROBINSON, P.A.
MICHAEL J. DRAHOS, ESQ.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401

Page 3

INDEX OF PROCEEDINGS


| | |
|---|---|
| DR. DAVID NIDORF: Sworn | |
| Direct Examination by Mr. Drahos | 10 |
| Cross Examination by Ms. Lobel | 87 |


Page 4

EXHIBIT INDEX


| Marked as / Described as | |
|---|---|
| A | 49 |
| 10/12/2022 6-page U.S. News, Stroke Scorecard for Doctors' Center Hospital, San Juan | |
| B | 54 |
| 10/12/2022 6-page U.S. News, Stroke Scorecard for Ashford Presbyterian Community Hospital | |
| C | 60 |
| 12/20/2021 5-page U.S. News, Stroke Scorecard for Hospital Pavia-Santurce | |
| D | 63 |
| 10/12/2022 6-page U.S. News Stroke Scorecard for Hospital Pavia-Hato Rey | |
| E | 64 |
| 10/12/2022 6-page U.S. News Stroke Scorecard for University Hospital San Juan | |
| F | 68 |
| 10/12/2022 6-page U.S. News Stroke Scorecard for Hospital San Francisco | |
| G | 71 |
| 12/20/2021 5-page U.S. News Stroke Scorecard for Auxilio Mutuo Hospital | |


Page 5


| | |
|---|---|
| H | 73 |
| 10/12/2022 7-page U.S. News Professional Hospital Guaynabo | |
| I | 75 |
| 10/12/2022 6-page U.S. News Stroke Scorecard for Hospital Metropolitano | |
| J | 79 |
| Hospitales HIMA San Pablo, 3 pages | |
| K | 82 |
| 10/12/2022 6-page Stroke Scorecard for HIMA San Pablo Caguas Hospital | |

Page 6

STIPULATIONS

It is HEREBY STIPULATED by and among the attorneys for the respective parties, in accordance with the Federal Rules of Civil Procedure, that this deposition may be taken by the Defendant at this time, pursuant to subpoena;

FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until trial;

FURTHER STIPULATED, that the witness may read and sign the deposition and make any corrections to same before any Notary Public;

AND FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time of trial or any hearing in this cause, a certified copy of the deposition may be used as though it were the original

Page 7

(The deposition commenced at 9:00 a.m.)

MS. LOBEL: Yeah, I forgot my paralegal cross (unintelligible).

VIDEOGRAPHER: It's okay. So, yeah, I can --

MS. LOBEL: Yeah.

VIDEOGRAPHER: -- I have two -- two ways to get -- okay. So, we're going to wait for him. I have two solutions --.

MS. LOBEL: Yeah. And depending on what he does, we'll deal with it. Otherwise, it will just be verbal with whatever --.

VIDEOGRAPHER: Please use your microphones, Doctor.

DR. NIDORF: Yes.

VIDEOGRAPHER: Your microphone.

DR. NIDORF: Got you.

VIDEOGRAPHER: Yes. Can I have your name, please?

DR. NIDORF: David Nidorf.

VIDEOGRAPHER: All right. Very good. Can I have your name, please?

MS. LOBEL: Sarah Lobel.

MR. DRAHOS: Hello, Michael Drahos.

Page 8

VIDEOGRAPHER: Excellent. Okay. This is the beginning of video one of Dr. David Nidorf in the matter of Richard Burgess et al versus Royal Caribbean Cruises L.T.D. Case number 1:20-cv-20687-OTAZO-REYES. Today's date is October 14, 2022, and the time on the monitor is nine o one a.m. My name is David Hernandez. I am the videographer. And the court reporter is Annette Lainson. We are here for his deposition before litigation. Counsel, please introduce yourselves. After which, the court reporter will swear in the witness.

MS. LOBEL: Sarah Lobel on behalf of the Plaintiffs.

MR. DRAHOS: Michael Drahos on behalf of the Defendant.

COURT REPORTER: Okay. Could you please raise your right hand? Do you swear or affirm the testimony you're about to give is the truth, the whole truth, and nothing but the truth?

DR. NIDORF: I do.

COURT REPORTER: You can put your hand down. Could you please state and spell your full name for the record, please?

DR. NIDORF: David Nidorf. D-A-V-I-D N-I-D-O-R-F.

Page 9

COURT REPORTER: Thank you. The witness has been sworn.

WITNESS; DR. DAVID NIDORF; Sworn

DIRECT EXAMINATION

BY MR. DRAHOS:

**Q. Thank you. Good morning, doctor. How are you?**

A. Good. Thank you.

**Q. Good. My name is Michael Drahos. I represent the Defendant, Royal Caribbean in this matter. So, as I understand it, you are a medical doctor, correct?**

A. Correct.

**Q. Okay. And what is your area of specialty?**

A. I'm board certified in family practice and in emergency medicine.

**Q. How long has that been the case?**

A. I've been board certified in family practice for twenty-nine years and emergency medicine for twenty-two years.

**Q. Who is your current employer?**

A. TeamHealth.

Page 10

Q. What's TeamHealth?
A. It's a staffing organization for emergency physicians. They subcontract with hospitals to staff emergency departments.
Q. So, do you serve as a -- as a locum at various hospitals?
A. Yeah.
Q. Which particular hospitals do you work at?
A. Northern Dutchess Hospital in Rhinebeck, New York.
Q. Northern Dutchess?
A. Uh-huh.
Q. In Rhinebeck?
A. Correct. And Vassar Brothers Hospital, which is here in Poughkeepsie.
Q. Okay. And at both those hospitals, you serve as emergency room physician?
A. Correct.
Q. Has your license ever been suspended?
A. No.
Q. Ever received any type of disciplinary action?
A. No.

Page 11

Q. Are you licensed in New York?
A. Yes.
Q. Where else?
A. Nowhere.
Q. Are you a member of the American College of Emergency Physicians?
A. Yes.
Q. For how long?
A. I don't know.
Q. More or less than five years?
A. More than twenty years.
Q. Have you ever been a member of the Cruise Ship Medicine Section of the American College of Emergency Physicians?
A. No.
Q. Have you ever reviewed the American College of Emergency Physician guidelines written for cruise ship medicine?
A. I may have -- I may have. I don't recall specifically.
Q. When was the last time you reviewed it?
A. I don't -- I don't recall.
Q. Didn't review them for this case?

Page 12

A. I did not.
Q. Why not?
A. I take that back. I may have. I just don't remember.
Q. You have your expert report there, don't you?
A. Yes.
Q. Can you take a look at for me and tell me whether or not listed within the materials you've iden -- or reviewed in this case, is the American College of Emergency Physician cruise ship medicine guidelines?
A. I don't see it here.
Q. Which means you didn't review this case.
A. That's correct.
Q. Why didn't you take time to review that if you were going to express opinions about cruise ship medicine?
A. I have a working knowledge of emergency departments in general.
Q. You may have a working knowledge of emergency rooms in general. But wouldn't you agree, you've never served on a cruise ship medical center?

Page 13

A. I've never served on a cruise ship.
Q. All right. And so, as you sit here today, wouldn't you also agree that you have no idea what the American College of Emergency room physician guidelines for cruise ship medicine say about this case?
A. About this case, definitely not.
Q. Okay. So, you have served as an expert in the past, right?
A. Correct.
Q. How many times?
A. Are you referring to how many cases I've reviewed or how many times I've testified?
Q. How many times have you testified as an expert?
A. I've done probably eight or nine depositions. And I've done -- I think I've testified in court four times.
Q. And you provided a testimonial history in this case, correct?
A. Correct.
Q. And wouldn't you agree that each and every time that you've ever served as an expert, you've done so for the plaintiff?
A. Correct.

Q. Why have you never taken a case for the defendant?
A. I have taken many cases for defendant.
Q. Why have you never testified for a defendant as an expert?
A. They've not gone all the way to court.
Q. Can you tell me the name of the case that you've served as an expert in that involved stroke medicine?
A. I'm sorry. Can you repeat that?
Q. Yes. Can you tell me the name of a case you've testified in as an expert, whether it'd be for the plaintiff or the defendant that involves stroke medicine?
A. I don't recall them.
Q. Is this the first one?
A. I believe so.
Q. Have you ever had a Daubert challenge filed against you?
A. I don't know what that is.
Q. Have you ever had a lawyer challenge the extent of expert opinions that you wish to address in court?



A. Not that I'm aware of.
Q. Are you aware of the court ever entering any rulings limiting or excluding your opinions in a case?
A. I don't believe so.
Q. How many times have you testified in court in total?
A. Four times.
Q. Are those listed in your testimonial history that you've provided?
A. I believe -- I believe so.
Q. Have you ever been sued for malpractice?
A. Yes.
Q. How many times?
A. Three times.
Q. Can you tell me the names of the cases, please?
A. Without some documentation, I don't think so.
Q. In the interest of time, why don't I help you since I've done some research on this?
A. Okay.



Q. So, the lawsuit, Susan Townsend. Does that sound familiar?
A. Yes.
Q. And that was filed in the State of New York, correct?
A. Uh-huh.
Q. And you were a defendant in that case?
A. Yes.
Q. And what was that case about?
A. There were two cases. I don't -- I want to make sure I get this right. Basically, the two cases that had been settled, one was a subtle forearm fracture that was missed. And the other was a wood splinter that was missed, a foreign body that was missed.
Q. So, the Susan Townsend matter, is that the forearm fracture case?
A. When was that?
Q. 2012.
A. No, that would have been the -- the first one.
Q. This is the missed splinter that you recall?



A. Yes. And so, wood splinter, it was taken care of by the physician assistant. I -- I was only named because I was the supervising doctor.
Q. And the allegations were that Ms. Townsend came in to the emergency room.
A. She had a laceration. I did initially evaluate her asked the physician assistant to take care of the wound, and look for foreign bodies, and clean it, and repair it. And then, I actually was off duty, and I left the emergency department, and the physician assistant did what they did, which was to repair the wound. They did not find a foreign body, but it turned out there was one, and then she got a subsequent infection.
Q. And how did that case resolve?
A. It was settled. My portion was less than forty thousand dollars.
Q. In the lawsuit, Dorothy Poranski, Northern Dutchess Hospital was a codefendant in that case, that was filed in 2017.
A. Yes, that was a very subtle forearm fracture that I saw in the emergency department. I spoke to her and sent her for follow up, and turned out to be on subsequent studies found to be a fracture.

Page 18

Q. So, you missed the fracture on the x-ray, is that what the allegation was?
A. Correct.
Q. How did that case get resolved?
A. That was settled. And that was also about forty thousand dollars.
Q. I didn't hear you list the Northern Dutchess as a hospital that you have privileges at. Do you no longer work there?
A. That's the first one, it was --
Q. Did you -- you said you're right in Rhinebeck, that's in --
A. Yeah.
Q. And then, there's a new lawsuit that's been filed by a Vladimir. I'm not even going to attempt. I'm going to spell it.
A. It's a Russian name. Yes.
Q. N-A-H-I-T-C-H-E-V-A-N-S-K-Y. And you're named as a defendant in that lawsuit. What is that case about?
A. That's a patient I never saw in the emergency department. But there was a subsequent culture that came back, a wound culture that I reviewed, and I saw in the case that during the ER that the

Page 19

patient had been given an appropriate antibiotic for that particular infection. So, I clicked it off as finished. And the patient ultimately got sicker and had a worse infection.
Q. So, the allegation is that the proper infection was not diagnosed, or a proper antibiotic wasn't prescribed?
A. Something about the antibiotic not being prescribed. Yes.
Q. An antibiotic wasn't prescribed at all, or not the correct antibiotic?
A. The correct antibiotic was given in the emergency department, but there was no subsequent prescription for antibiotic.
Q. Was the allegation that you missed, the subsequent anti -- need for antibiotic?
A. Yes.
Q. So, that was three lawsuits. By the way, this one is still pending?
A. Yes.
Q. Have you given a deposition in that case yet?
A. I have not.
Q. So, that was three. I thought you

Page 20

said it was four?
A. No, I testified four times in court.
Q. Correct.
A. That's where you came up with four.
Q. So, those are all four of your malpractice suits?
A. Three of my --
Q. Sorry. You're right, doctor, three. Have you ever had a pre-suit matter asserted against you that was ultimately resolved before formal litigation?
A. No.
Q. So, I -- I think I asked you this in the beginning, let me make sure I got the answer. You've never actually worked as a cruise ship doctor, correct?
A. Correct.
Q. And as a matter of fact, you've never worked for any cruise lines in any capacity before, have you?
A. That's correct.
Q. Okay. Have you ever been asked by any cruise lines to consult on any particular aspect of medical care aboard a cruise ship?
A. No.

Page 21

Q. Have you ever been asked by any cruise lines to serve as an expert?
A. No.
Q. Have you ever been on the Royal Caribbean Harmony of the Seas?
A. I don't believe so.
Q. Have you ever been in a Royal Caribbean Medical Center aboard one of their vessels?
A. No.
Q. Have you ever been in a cruise ship medical center at all?
A. No.
Q. Have you ever been on a Royal Caribbean vessel?
A. Possibly.
Q. Which ones?
A. I wouldn't know. When I was sixteen, I went on a cruise with my family. That's the only time I've been on a cruise. I have no idea what type of boat that was.
Q. I'm sorry to ask, but how old are you?
A. How old am I now?
Q. Yes.

Page 22

A. Fifty-eight.
Q. Okay. So, it's been forty-two years since you've been on a cruise ship of any sort?
A. Yes.
Q. Have you ever interacted with a cruise ship doctor for any reason?
A. No.
Q. Have you ever interacted with a cruise ship nurse for any reason?
A. No.
Q. Do you have any experience treating a patient who has come off of a cruise ship for medical care?
A. Many times, I've seen sick patients in the emergency department who have been on a cruise in the previous week.
Q. Understood. But let me ask my question a little bit differently.
A. Sure.
Q. Have you ever been a treater who has provided care to a patient who has been medically disembarked from a vessel to a shore site facility? Meaning, from a vessel directly to your care.
A. No, I don't believe I have.

Page 23

Q. Do you have any experience at all facilitating a medical disembark from a cruise ship to a shore side hospital?
A. No.
Q. Have you ever interacted with a cruise ship captain for any reason?
A. No.
Q. Do you have any experience at all communicating with port agents at ports of call?
A. No.
Q. So, would you agree that you have no personal experience coordinating medical care from a port of call, whether it be in the United States or a foreign port of call in the Caribbean or in Puerto Rico?
A. That's right.
Q. Have you ever been to San Juan, Puerto Rico?
A. No.
Q. So, you've never been to the Port of San Juan?
A. Well, I shouldn't say that. I was in -- I didn't stay in San Juan. I don't know. I was in Puerto Rico once, but I don't believe I flew into San Juan. So, I don't think so.

Page 24

Q. How long ago was it that you were in Puerto Rico?
A. Ten years ago.
Q. And in that occasion, you were not in San Juan?
A. That's right.
Q. So, you've never been to San Juan?
A. I don't believe so.
Q. You've never been to the port in San Juan?
A. That's correct.
Q. So, you've never spoken to the port agent in San Juan, correct?
A. Correct.
Q. You have no experience dialing nine-one-one for medical care in Puerto Rico, do you?
A. No.
Q. And you've never spoken to a paramedic or an ambulance driver in Puerto Rico, have you?
A. I have not.
Q. So, you have no personal experience with regard to ambulance service in Puerto Rico, do you?
A. Correct.

Page 25

Q. You have no idea as you sit here, what the average response time is for an ambulance in Puerto Rico?
A. Correct.
Q. You have no idea as you sit here, what resources are available in San Juan, Puerto Rico for ambulance service?
MS. LOBEL: Form.
MR. DRAHOS: What was your answer?
MS. LOBEL: I said form, but go ahead.
BY MR. DRAHOS: (Cont'g.)
A. That's correct.
Q. And you did not do any research in support of your opinions in this case to determine what policies or protocols are in place for ambulance services in Puerto Rico, did you?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. No.
Q. Why didn't you do any research on what policies and protocols are in San Juan, Puerto Rico for ambulance services?
A. I'm basing my testimony on my experience.

Page 26

Q. Your experience here in the United States, correct?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. My experience over thirty years of being a physician includes working in other countries and includes working in rural Alaska. But yes, in the United States, for the most part.
Q. That may be so. But it's your experience outside of Puerto Rico?
A. Correct.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. And you didn't read the deposition of Alberto Pedro Sanchez in this case, did you?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Who is that?
Q. Exactly. He's not listed on your expert report, is he?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. No.
Q. All right. So, you don't know who he

Page 27

is as you sit here today?
A. No.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. You have no idea what he testified to in this case?
A. I didn't read it. I wouldn't have any idea.
Q. And you don't even know why, as you sit here, you didn't read it. Since you don't really know what he had to say.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Did you ever have any discussion at all with Plaintiff's counsel about testimony of people in Puerto Rico or what the ambulance services and resources are like?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't recall.
Q. You didn't think to inquire about that when you were coming up with your opinions in this case?
MS. LOBEL: Form.

Page 28

BY MR. DRAHOS: (Cont'g.)
A. I can't tell you what I thought about and didn't think about at another time.
Q. So, how much time did you spend on this report that you wrote?
A. You may have an invoice, but I don't -- I don't know.
Q. As you sit here today, you don't know how much time you spent preparing your opinions in this case?
A. No, I don't.
Q. I actually didn't get any invoices from you. Have you produced them?
A. I don't know if you've got invoices or not.
Q. Well, how much time in total have you spent in your involvement with this case?
A. I don't know.
Q. How many hours have you spent?
A. I don't know.
Q. How much have you charged?
A. I don't know.
Q. Before you signed this report to formalize your opinions in this case, did you review it?

Page 29

A. Yes.
Q. Did you make sure that everything that you wrote in here was accurate?
A. I try.
Q. Did you spend enough time on this report to ensure that the representations that you made in here were correct?
A. I did my best.
Q. You didn't misrepresent anything in this report, did you?
A. I attempted not to.
Q. Okay. So, you have the report with you, don't you?
A. Yes.
Q. Okay. Would you mind turning to the section that involves what you reviewed, please? Which I think -- believe is on page one, starts on page one.
A. Yes.
Q. All right. And this is a list of everything that -- that you reviewed in support of your opinions, right?
A. That's correct.
Q. Okay. And that list goes all the way to number fifty-seven.

Page 30

A. Yes.
Q. And specifically, numbers fifty-six and fifty-seven are deposition of Dr. Reynaldo Desai and deposition of Dr. Camilo Gomez, correct?
A. Correct.
Q. What's today's date?
A. October, I don't know, 13 or 14.
Q. October 14th, correct?
A. Uh-huh.
Q. How did you read the deposition of Dr. Desai and Dr. Gomez when they didn't even happen yet in this case?
A. I must have added those later.
Q. You added depositions that don't exist?
A. They do exist.
Q. Doctor, unless there's some alternate universe, I haven't taken those depositions yet. Those doctors haven't been deposed.
A. I'm sorry. Deposition of Dr. Gomez, no, it was -- should have -- should say a report of Dr. Gomez.
Q. So, you stated deposition of Dr. Desai, deposition with Dr. Gomez. But we can both agree

Page 31

those have not happened yet?
A. That's correct.
Q. So, apparently, when you were reviewing your report, you didn't catch that part?
A. I did not catch that.
Q. I also noticed here -- strike that. Have you reviewed any expert reports from the Defendant?
A. I don't believe so.
Q. Why not?
A. It must not have been supplied to me.
Q. Did you review the deposition transcript of Dr. Ramos?
A. No.
Q. Do you know who Dr. Ramos is?
A. No.
Q. Sorry, was that a no?
A. No.
Q. He's a neurosurgeon in Puerto Rico. He actually operated on Mr. Burgess.
A. Uh-huh.
Q. He spoke specifically about resources and timing of -- of transfers in Puerto Rico.
A. Okay.
Q. At this point, you have no idea what

Page 32

he said or what his opinions are in that regard?
A. Correct.
Q. Do you think he's more qualified than you are to provide an opinion in that regard?
A. I don't know.
Q. You don't?
A. I don't know.
Q. You don't know. How about Dr. Rodolfo Alseto Gardea, do you know who he is?
A. No.
Q. He's an expert neurosurgeon as well. He was actually hired by the Defendant to provide medical opinions in this case. Being that he's a neurosurgeon in Puerto Rico, who actually works at HIMA San Pablo Caguas as well, wouldn't you agree that he's more qualified in this case to render opinions about medical resources and timing of transfers than you are?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't know.
Q. Would you be surprised to learn that Dr. Ramos has testified in this case, they could take over three hours to transfer a patient from one building to the next door building in San Juan, Puerto Rico?

Page 33

MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Would I be surprised?
Q. Yes, sir.
A. Yeah, I would be surprised.
Q. That's a lot different than what you're used to here in New York, correct?
A. Correct.
Q. Did you assume in coming to your opinions that Puerto Rico operates the same way as it does here in New York?
A. No.
Q. So, what do you know about Puerto Rican medicine, if anything?
A. It's based on the same medical system that we have in the United States.
Q. It may be based on the same system, but what do you know about their resources?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. They're similar resources everywhere in the United States.
Q. How many neurosurgeons are on the island of Puerto Rico?

Page 34

A. I don't know.
Q. How many vascular neurologists are on the island of Puerto Rico?
A. I don't know.
Q. How many hospitals in Puerto Rico have neurosurgeons and neurologists on staff?
A. Can you repeat that?
Q. Sure. How many hospitals in Puerto Rico have neurosurgeons and vascular neurologists on their staff?
A. I don't know.
Q. How many hospitals in Puerto Rico offer twenty-four/seven diagnostic imaging?
A. I don't know.
Q. How many radiologists are on call in Puerto Rico?
A. I don't know.
Q. How many hospitals in Puerto Rico provide endovascular therapy?
A. I don't know.
Q. How many hospitals in Puerto Rico carry tissue plasminogen activator known as T.P.A.?
A. I don't know.
Q. How many comprehensive stroke centers

Page 35

are there in Puerto Rico?
A. I don't know
Q. How many primary stroke centers are there in Puerto Rico?
A. I don't know.
Q. You didn't bother to look into any of this, did you?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I did not research that specifically.
Q. So, I actually would like to go through your methodology. Since you've never ordered an ambulance in Puerto Rico, and you've never spoken to an ambulance driver, why didn't you do any independent research to determine what ambulance services are like in San Juan?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I didn't think it was necessary.
Q. Okay. One of the opinions that you are -- actually, one of the primary things you have in this case is that it took too long to get Mr. Burgess to HIMA San Caguas, correct?
A. Yes.

Page 36

Q. Okay. And so, do you know how many public ambulances there are available in San Juan, Puerto Rico on any given day?
A. No.
Q. Do you know how many ambulances were available on February 21st of 2019?
A. No.
Q. So, in your report, you compiled a list of alternative locations that you believe would have been faster to deliver Mr. Burgess to on the day in question, didn't you?
A. Yes.
Q. Okay. And what did you do to come up with that particular list of alternative locations?
A. Basically, just researched on the internet, the different hospitals in San Juan. And I was able to see what -- which of those hospitals provided neurologic care to patients on the internet, and --.
Q. Go ahead, I didn't mean to step on you there.
A. And then, I called them.
Q. So, when you say that you've researched on the internet, what particularly did you

Page 37

do? What websites did you go to? What search engines did you use?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I just Googled hospitals in San Juan as my starting point. I just went from there.
Q. And wouldn't you agree that you Googled hospitals in San Juan because you didn't personally know what hospitals were in San Juan?
A. Yes.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. All right. And what did you type in your search when you went to the Google website?
A. I don't remember.
Q. So, you don't remember the search term you used?
A. No.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Okay. So, you -- you went to Google, you typed in or you somehow or another reached a response from that search engine, which led you to hospitals that are located in San Juan, am I kind of

Page 38

summarizing the process, correctly?
A. Yes.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Okay. And then, what did you do from there once you got this list?
A. Well, I was able to tell where they were in relation to the port. So, I researched the distance from the port and the average time it would take to drive to those hospitals.
Q. So, how did you find out where they were located in relation to the port?
A. It's not that difficult on the internet.
Q. Well, I'm sorry, Doctor, but this is the one and the only time I get to ask you of your methodology. So, I'd like to ask for some more specifics. Why is it so easy to determine locations of hospitals in San Juan from the port for you?
A. Because I know the address of the --
Q. My apologies. Okay. Go ahead, Doctor.
A. -- because I know the address of the port, and I was able to basically, MapQuest the distance

Page 39

and the average time to each of the hospitals.
Q. So, you were able to MapQuest the address of the port to the address of the hospital?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Correct.
Q. All right. And you said that came up with an average distance?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Average distance and an average time.
Q. An average try -- time, when?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't know.
Q. Five in the morning, or at seven o'clock at night?
A. The numbers I used were in comparison to HIMA San Pablo Caguas. And so, I did, you know, use terms for that hospital as well. So, I was able, when I put that time, they were all based on the same time.
Q. Where is this data that you compiled?
A. In my report.
Q. Okay. But where is the -- the

Page 40

arithmetic? Where is your -- where is your work? If I wanted to see what time you searched this and how, what would I do to be able to determine that?
A. You wouldn't be able to.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. All right. So, if you went to MapQuest and you wanted to see how long it would take to get to HIMA San Caguas at three in the morning versus how long it would take at noon, you really don't know, do you?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. This could be off for a couple of minutes, but their comparison to HIMA San Pablo Caguas at the same time.
Q. Based on some search that was done on MapQuest at some indeterminate time of the day?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Correct. All done at approximately the same time.
Q. You've never obviously practiced in any of these hospitals that you've listed, right?

Page 41

A. Of course.
Q. Okay. Of course, you have not?
A. Of course, I have not.
Q. Okay. Which means you've never treated any patients in any of these particular facilities?
A. That's correct.
Q. And you've never referred a patient to any of these particular facilities?
A. Correct.
Q. Okay. Do you know the names of any doctors at any of these hospitals?
A. No.
Q. Which means you've never spoken to any doctors on any of these hospitals, correct?
A. That's correct.
Q. Do you know anyone by name who's ever received care at any one of these facilities?
A. No.
Q. And you've never obviously visited any of them, correct?
A. Correct.
Q. So, as I understand your report, and correct me if I'm wrong, once you compiled this list of

Page 42

alternative locations, you picked up the phone and made phone calls?
A. Yes.
Q. Okay. And what were you asking?
A. I was just confirming that they provided twenty-four-hour service for neurologic emergencies.
Q. Twenty-four-hour service for neurologic emergencies, that's what you asked?
A. Yes.
Q. So, the person would pick up the phone and you would say, hi, I'm David Nidorf, and I'd like to know if you offer twenty-four-hour service for neurologic emergencies?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I identified myself as a physician in the United States. And I asked if I had a patient who was in San Juan, if that is something that they offer.
Q. Emergency neurologic service?
A. Yes.
Q. You didn't qualify it any further than that?
A. I did not ask what type of neurologic

Page 43

services they have specifically.
Q. Did you ask whether or not they carry T.P.A.?
A. No.
Q. Did you ask if they offer twenty-four/seven diagnostic imaging?
A. I did not.
Q. Did you ask whether or not they offer endovascular therapy?
A. I did not.
Q. Did you even ask if they were open on February 21st, 2019?
A. No.
Q. So, according to your report, you stated that it took you approximately five minutes to verify this information. You're not saying that you called all nine hospitals in five minutes, are you?
A. Of course, not.
Q. So, you're saying it took five minutes per call?
A. Approximately.
Q. For a total of forty-five minutes?
A. Yes.
Q. Calling all these hospitals?

Page 44

A. Yes.
Q. Did you get the names of anyone that you spoke to?
A. No.
Q. Did you get the title of anyone that you spoke to?
A. No.
Q. Did you record these phone calls?
A. No.
Q. What date did you make them?
A. I don't know.
Q. What time of the day did you make the call?
A. Middle of the day.
Q. What does that mean?
A. That means it could have been any time from nine a.m. to five p.m.
Q. Did you call from your cell phone?
A. I believe so.
Q. What's your cell phone number?
A. 845-706-2761.
Q. Who is your carrier?
A. AT&T.
Q. So, there's no record of these phone

Page 45

calls anywhere?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. No.
Q. Did the person on the other end of the line know that you're making this call as an expert witness in a litigated case?
A. No.
Q. Did you speak to any attorneys at any of these hospitals?
A. No.
Q. So, the first location that you have listed is called Doctors' Center Hospital. And according to your report, that's located two point four miles away from the Port of San Juan, is that correct?
A. Correct.
Q. And you indicate here in your report that it would have taken anywhere from eleven to fifteen minutes to get there, correct?
A. Correct.
Q. All right. But you didn't indicate in the report, what time of the day or what day of the week, did you?
A. Correct?

Page 46

Q. All right. What number did you call when you call Doctors' Center Hospital?
A. What was listed on the website.
Q. What number was that?
A. You're asking if I've memorized the number I called that many months ago?
Q. I'm just wondering if you wrote it down anywhere?
A. No.
Q. And you don't know who you spoke to, correct?
A. Correct.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. What information that this person provided other than an acknowledgement of your question?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't recall specifically for this phone call.
Q. You indicated in your report that this was a -- a viable location that Mr. Burgess could have been sent to you on February 19th -- I'm sorry, February 21st of 2019, correct?

Page 47

A. Correct.
Q. All right. And what independent research did you do about Doctors' Center Hospital other than making this phone call?
A. I researched on the -- on their website, if they provide twenty-four-hour neurology coverage, and if they're capable of taking care of strokes.
Q. So, what were you looking for to determine what -- whether or not they were capable of providing stroke care?
A. Their declaration on their website that they take care of patients with strokes.
Q. So, if I go to the Doctors' Center Hospital website, there's going to be some declaration around there somewhere that says that they are capable of treating stroke patients?
A. Either the declaration will be on their website, or the person I spoke to on the phone said that that's the case.
Q. Yeah, but that person, you don't know who that is, right?
A. Correct.
Q. Yeah. So, all right, you didn't do

Page 48

any other research beyond that. And I didn't get a printout of the website that you relied upon. Do you have it somewhere?
A. No.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Okay. So, I'm going to hand you what we're going to mark as Defendant's Composite Exhibit A to this deposition. This is a report of stroke rankings by U.S. News and World Report. And specifically, this is Doctors' Center Hospital. Can you turn the page two, please?
A. Uh-huh.
Q. One of the categories that they're ranked on is reperfusion therapy, you know what that is, don't you?
A. Yes.
Q. That's T.P.A., isn't it?
A. Yes.
Q. Okay. And that's the medicine that you're saying Mr. Burgess could have received faster, which would have changed his outcome, correct?
A. Yes.
Q. And according to the U.S. News and

Page 49

World Report, this hospital doesn't offer T.P.A. Do you see that there?
A. Yes.
Q. Do you have any personal knowledge that will refute this report?
A. No.
Q. Do you have any evidence that you can point to here today to indicate that Doctors' Center Hospital in San Juan had T.P.A. available for Mr. Burgess on February 21st, 2019?
A. I don't have that knowledge.
Q. And you would agree that you don't know what staffing was available at Doctors' Center Hospital on February 21st, 2019, correct?
A. Correct.
Q. You didn't know what their capabilities were on that particular day?
A. That's correct.
Q. Nor do you know what the patient population was in the hospital on that day?
A. Of course not.
Q. The next location that you identified was a hospital called Ashford Presbyterian Hospital, correct?

Page 50

A. Correct.
Q. And according to your report, that was two point files -- two point five miles away from the port in San Juan, correct?
A. Correct.
Q. And you indicated here an eleven-minute drive, correct?
A. Yes.
Q. And again, you don't know what time of the day or what day of the week, this is simply a MapQuest estimate.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Correct?
A. It's a comparison amongst all these that were caught -- that were called around the same time, yes.
Q. Right. You don't know whether or not that person is driving a Maserati from the port to the hospital or an ambulance, do you?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. These are comparison times.
Q. Okay.

Page 51

A. So, I can assume they're approximately proportionate.
Q. And you didn't do anything to look into what the traffic was like on February 21st, 2019?
A. Correct.
Q. All right. And you would agree that if there is a accident, or construction work, or something like that, it could throw off your estimates?
A. Yes.
Q. Okay. So, what number did you call at Ashford Presbyterian Hospital?
A. I don't know.
Q. Who did you speak to there?
A. I don't know.
Q. What was their title?
A. I don't know.
Q. And again, you are telling the members of the jury that Ashford Presbyterian Hospital would have been a viable location for Mr. Burgess, correct, on the day in question?
A. No, I'm not saying that that was specifically the case.
Q. What is it about Ashford Presbyterian Hospital that would have made it a better location to

Page 52

transfer Mr. Burgess than where he ultimately was sent on the date in question?
A. I'm not saying that that specific hospital would have been better on that specific date. I've given a list of many choices that were possible for that date that provide stroke care.
Q. So, are you saying that you don't know whether or not Ashford Presbyterian Hospital would have been a better location or not?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I can say that it was closer. That's all I can say.
Q. Okay. But whether or not it was closer, is kind of irrelevant if they're not capable of treating Mr. Burgess, right?
A. Of course.
Q. Okay. And you said that you did independent research to make sure that these hospitals were capable of providing twenty-four-hour neurologic care, correct?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Correct.

Page 53

Q. But what you didn't check, did you Doctor, was whether or not they were capable of providing critical care, like rendering or administering T.P.A.?
A. That's right.
Q. All right. So, let me -- we'll mark it as Composite Exhibit B. Do you have staplers?
MONITOR: I do. Do you want them?
MR. DRAHOS: Yeah. I didn't grab them the first time around. Let me just throw a stapler on this beforehand so I can just --. Thank you.
MONITOR: Sure.
BY MR. DRAHOS: (Cont'g.)
Q. Okay. Doctor, I'm going to hand you what was marked as Exhibit B. This is a U.S. News and World Report ranking for Ashford Presbyterian Community Hospital and their capabilities to provide stroke care. Do you see that there that according to U.S. News and World Report, Ashford Presbyterian Hospital has a below average stroke score rating?
A. I see that.
Q. Do you have any personal knowledge to refute that?
A. I do not.

Page 54

Q. Okay. And if you turn the page two, do you see there, it indicates that Ashford Presbyterian Hospital did not have T.P.A. or does not offer T.P.A. services?
A. I see that.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Okay. So, the medicine that you're claiming Mr. Burgess needed is not available at Ashford Presbyterian, as far as you're aware of?
A. Correct.
MS. LOBEL: Form. Mischaracterized is what it says. It says percentage of stroke patients treated. Doesn't means they're not capable. Just says they --.
MR. DRAHOS: It says therapy provided, zero percent.
MS. LOBEL: That means the --.
MR. DRAHOS: Well, you can interpret it any way you want --.
MS. LOBEL: It's not what I interpret. I just want it clear on the record that the document --
MR. DRAHOS: No. No. I don't -- I don't want you speaking --.

Page 55

MS. LOBEL: -- that you're saying is clear that the document you're referring to says reperfusion therapy --
MR. DRAHOS: Speaking objection is totally improper.
MS. LOBEL: -- percentage of stroke patients treated with reperfusion therapy. This measure quantifies how often the hospital provide a time --
MR. DRAHOS: Ms. Lobel.
MS. LOBEL: -- sensitive medical intervention --
MR. DRAHOS: It's inappropriate, what you're doing.
MS. LOBEL: -- is intravenous tissue plasminogen activator or mechanical thrombectomy. It doesn't say they don't have it. I just want to make sure the record is clear. Doctor, you may go ahead.
MR. DRAHOS: Well, you can make the record clear on your cross exam --
MS. LOBEL: Excellent.
MR. DRAHOS: -- but what you just did was totally appropriate. And I'm sure the judge will agree.
MS. LOBEL: I don't know that she will. And that's very presumptuous. But go ahead.

Page 56

MR. DRAHOS: I know what speaking objections are not an egregious one. But that's all right because it doesn't make a difference.
MS. LOBEL: I don't think I've committed any egregious crimes here. Okay, go ahead.
BY MR. DRAHOS: (Cont'g.)
Q. So, Doctor, do you know whether or not Ashford Presbyterian Hospital had T.P.A. available on February 21st, 2019?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't know that.
Q. And you don't know what their staffing was?
MONITOR: I'm sorry. I didn't hear your answer.
THE WITNESS: I don't know.
MONITOR: Thank you.
BY MR. DRAHOS: (Cont'g.)
Q. You don't know what their staffing was on February 21st of 2019, do you?
A. Correct.
Q. Nor do you know what their capabilities are?

Page 57

A. Correct.
Q. Nor do you know what their patient population was?
A. Correct.
Q. The next hospital you listed in your report is called Hospital Pavia-Santurce. Did I say that correctly? I think I did.
A. Pavia-Santurce.
Q. Yeah. Okay. And according to your report, that was three point four miles away, correct?
A. Correct.
Q. And you're indicating here, an eight- to nine-minute drive, right?
A. Correct.
Q. Okay. And this is a hospital that was or was not a better alternative than HIMA where Mr. Burgess was sent on February 21st, 2019?
A. Just to be clear, I'm not claiming that any of these are specifically a better choice or not a better choice. I'm simply saying that these are possible facilities because of their ability to take care of strokes and because of their twenty-four-hour neurologic coverage. And because they're closer, and San Pablo costs -- I'm not claiming any one of these

Page 58

specifically better -- sorry, would have been a better choice on that particular day.

Q. Okay. And so, we're going to get a little bit more definitive in that regarding this deposition. So, whether or not it was a possibility, maybe what you attempted to do in your report. But we're going to go through each one of them and do this exercise.

A. That's fine.

Q. Okay. So, who did you call at Hospital Pavia to find out whether or not they were capable of rendering stroke care to Mr. Burgess on February 21st of 2019?

A. I called the emergency department.

Q. Who did you speak to?

A. I don't recall.

Q. And you didn't do any independent research with regards Hospital Pavia either, did you?

A. Correct.

Q. All right. So --

A. Well, excuse me, I did do research. We've talked about how I did my research.

Q. Oh, you went on the websites?

A. Yes.

Page 59

Q. Okay. By the way, when you were doing this exercise, did you rule out certain facilities?

A. Yes.

Q. And what would be required for you to rule them out?

A. If they didn't have twenty-four-hour coverage by a neurologist.

Q. Okay. So, what about the capabilities of the center itself?

A. I didn't make a claim in this report, again, I'll say about any one facility being a better choice than any other facility.

Q. So, let me ask you the question this way. If a hospital does not have T.P.A., or they did not have T.P.A. on February 21st of 2019, do you think Mr. Burgess should have been sent there anyway --

A. No.

Q. -- or would that be appropriate to rule that center out?

A. That would have been appropriate to rule that center out.

Q. Okay. So, let me hand you what we'll mark as Exhibit C to the deposition. This is a U.S. News and World Report ranking for Hospital Pavia-Santurce. Sorry, sir, I don't have another, just one. You can look at where it says seventeen.

Page 60

MS. LOBEL: Please, yeah. Hold on one second.

BY MR. DRAHOS: (Cont'g.)

Q. Doctor, according to the U.S. News and World Report ranking, Hospital Pavia had a below average rating for stroke medicine, do you see that there?

A. I do.

Q. Do you have any personal knowledge to refute that?

A. I do not.

Q. All right. Page two. Turn to page two of Exhibit C.

A. Yeah, okay.

Q. Oh, thank you. It indicates there that they do not offer reperfusion therapy or T.P.A.

MS. LOBEL: Objection, form.

BY MR. DRAHOS: (Cont'g.)

A. It says they don't used it.

Q. Okay. Do you have any personal knowledge to indicate whether or not Hospital Pavia on February 21st, 2019, had T.P.A. services available?

Page 61

A. I don't.

Q. Or I should say T.P.A. medi -- medication.

A. They do not.

Q. All right. Next location in your report is Hospital Pavia de Hato Rey, correct?

A. Yes.

Q. Which you indicated was six point two miles away from the port?

A. Correct.

Q. And a seventeen-minute drive?

A. Yes.

Q. Okay. Who did you speak to there?

A. Somebody in the emergency department.

Q. Do you know what their title was?

A. No.

Q. And outside of calling this person in the emergency department and doing -- reviewing of their website, did you do any other research --

A. No.

Q. -- that relates to this hospital? Do you think it would have been appropriate for Royal Caribbean to transfer Mr. Burgess on February 21st,

2019, to a below average hospital for stroke care?
A. I don't have an opinion on that.
Q. Why not?
A. Because one person -- one agency's ratings could be different from another agency. I don't have a way of evaluating the accuracy of that rating.
Q. Is the U.S. News and World Report a credible agency?
A. I don't know.
Q. So, do you have any information as you sit here today to indicate whether or not Hospital Pavia de Hato Rey was anything other than a below average hospital for stroke care?
A. I don't have an opinion on that.
Q. This is what's marked as Exhibit D in the deposition. As you'll see there, the U.S. News and World Report indicates that this hospital is below average for stroke care. Do you see that?
A. Yes.
Q. All right. And as you sit here, you have no evidence to refute that, do you?
A. I do not.
Q. All right. And according to Hospital Pavia, they provide no reperfusion therapy either?



MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. They've not used it. I don't know if it's available.
Q. So, as you sit here today, you don't know whether this hospital had T.P.A. on --
A. Correct.
Q. -- February 21st, 2019?
A. Sorry. Correct.
Q. The next hospital on your report is University Hospital. Do you see that there?
A. Yes.
Q. And according to your report, it was seven miles away from the port. Approximately a fourteen-minute drive?
A. Correct.
Q. Okay. Are you aware of University Hospital? Do you know what that is?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. The question is too broad.
Q. Okay. What do you know about University Hospital if anything?
A. Nothing specific.



Q. Okay. So, when you were doing your research, did you learn anything beyond the fact that apparently, they're capable of handling a stroke patient?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. It's too broad a question.
Q. Do you know that the University Hospital had their stroke designation stripped from them?
A. I wouldn't know that no.
Q. Okay. And it's because they didn't have the resources available to provide stroke medicine to their patients?
A. Okay.
Q. You -- you are familiar with the concept that a hospital can receive a particular accreditation --
A. Yes.
Q. -- which renders them capable of rendering medical or stroke care to stroke patients?
A. Yes.
Q. All right. And if they're not able to meet certain criteria, that accreditation can be



taken away?
A. Correct,
Q. And as you sit here today, you are unaware of the fact that Centro Medico, as it's known in Puerto Rico --
A. Uh-huh.
Q. -- had their accreditation stripped before February of 2019?
A. I didn't know that.
Q. Okay. Do you think a hospital that had their accreditation stripped, meaning that because they didn't have the capabilities to render stroke care, is a viable location to take Mr. Burgess?
A. It would not be.
MS. LOBEL: Form.
THE COURT REPORTER: I'm sorry.
THE WITNESS: It would not be.
THE COURT REPORTER: Thank you.
BY MR. DRAHOS: (Cont'g.)
Q. So, if according to U.S. News and World Report, University Hospital or better known as Centro Medico, had a below average rating for stroke care, as you sit here today, do you have any evidence to refute that?

Page 66

A. I don't.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. And you see how it says there, they have reperfusion therapy available?
A. Yes.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. That according to this ranking, they provide less than ten percent to their patients, do you see that?
A. I do.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Do you have any evidence to refute that?
A. No.
Q. The next location is Hospital San Francisco. According to your report, that was seven point nine miles away from the Port of San Juan, correct?
A. Yes.
Q. And approximately, a sixteen-minute drive as you estimated it per MapQuest?

Page 67

A. Yes.
Q. Who did you speak to there?
A. I don't recall.
Q. And what was their title?
A. I don't recall.
Q. And it's your testimony that you went on their website and determined that they were capable of providing stroke care?
A. Yes.
Q. Is there any research beyond that?
A. My phone call.
Q. Okay. When you ask these people on the phone, are you capable of providing care to stroke patients, did you happen to ask them how many stroke patients they typically see?
A. No.
Q. And we will mark as Exhibit F, this is a U.S. News and World Report ranking for Hospital San Francisco relative to their stroke care. If you turn to page two, it indicates there that they did not provide reperfusion therapy to their patients.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Do you see that?

Page 68

A. They've not used T.P.A., correct.
Q. As you sit here today, are you aware of whether or not they've used T.P.A. over the last five years on any stroke patient they've seen?
A. I'm not aware.
Q. Okay. And you see there, it has an average of the number of stroke patients they've seen over a five-year period, do you see that?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. No.
Q. It has a range of fifty-three to a hundred and ninety-seven, do you see that?
A. Yes.
Q. So, at most, they've seen under two hundred patients over a five-year period, correct?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I see that number. I'm not exactly sure what that means. It's a quite high range. So, I don't know how they're counting them.
Q. Okay. And you didn't do any research to determine how many stroke patients this hospital has seen?

Page 69

A. Correct.
Q. You don't know what their staffing was like on February 21st of 2019, correct?
A. That's correct.
Q. Nor do you know what their capabilities were?
A. Correct.
Q. Okay. The next hospital listed is Auxilio Mutuo. I probably didn't say that correct, but --
A. Mutuo.
Q. -- you know what I'm referring to, right?
A. Yes.
Q. Okay. And according to your record, they were ten miles from the Port of San Juan, correct?
A. Correct.
Q. Okay. And you estimated per MapQuest, a twenty-minute drive?
A. Correct.
Q. Do you know who you spoke to there?
A. No.
Q. Outside of reviewing their website, did you do any other research about their capabilities?

Page 70

A. Just my phone call.
Q. And you -- we'll mark as Exhibit G of the deposition. And we only have one of those also, sorry, sir.
A. Yeah.
MS. LOBEL: Thank you.
BY MR. DRAHOS: (Cont'g.)
Q. According to the U.S. News and World Report, Auxilio -- how did you say that? Because you sounded like you said it more accurately than that.
A. Mutuo.
Q. Mutuo?
A. Correct.
Q. Had a below average rating for stroke care, do you see that?
A. Yes.
Q. Do you have any evidence to refute that rating?
A. No.
Q. And according to U.S. News and World Report, they don't provide T.P.A. therapy either, do you see that there?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)

Page 71

A. They've not used it.
Q. Do you have any knowledge as to whether or not Auxilio Mutuo has used T.P.A. on a patient over the last five-year period?
A. I don't.
Q. And do you have any knowledge as to what their specific staffing was on February 21st, 2019?
A. No, I do not.
Q. Or their capabilities?
A. I do not.
Q. The next hospital you have listed here is Professional Hospital Guaynabo.
A. Guaynabo.
Q. Guaynabo, thank you. And according to your report, this hospital was over ten miles from the port. I think it's ten point six miles, correct?
A. Correct.
Q. Twenty-minute drive according to MapQuest?
A. That's right.
Q. Who did you call there?
A. I don't recall.
Q. What was their title?
A. I don't know.

Page 72

Q. What do you know about the capabilities of this hospital?
A. That they have -- they -- that they take care of stroke patients, and they have twenty-four-hour neurology coverage.
Q. And this would be based on -- upon some representation on their website?
A. Yeah. And the questions I asked when I was on the phone with them.
Q. Okay. So, do you know what other med -- medical services, if any, that this hospital provides?
A. No.
Q. And then, we'll mark as Exhibit H to the deposition. And according to the U.S. News and World Record, this is psychiatric hospital. Do you have any evidence as you sit here today to refute that?
A. I don't.
Q. And if the U.S. News and World Report doesn't even rank this hospital for stroke care, do you have any information that would lend any credibility to your representation that they were capable of doing so?
A. No.
Q. And you don't know what their

Page 73

staffing was like on February 21st, 2019, correct?
A. Correct.
Q. Nor do you know what their capabilities were?
A. That's right.
Q. We got one more. Hospital Metropolitano is the last one you have listed there in your report, correct?
A. Correct.
Q. And this one was located twelve point seven miles from the port according to your research?
A. Correct.
Q. And it was a twenty-seven-minute drive per the MapQuest, correct?
A. Correct.
Q. Who did you call there?
A. The emergency department.
Q. And what's the name of the person that you spoke to?
A. I don't know.
Q. What was their title?
A. I'm not sure.
Q. And you said that you reviewed this website as well?

Page 74

A. Yes.
Q. And outside of doing that, did you do any other research?
A. No.
Q. And what's been marked as Composite Exhibit I. And according to the U.S. News and World Report, this hospital had a below average ranking for stroke care. Do you have any evidence as you sit here today to refute that?
A. No.
Q. All right. And if according to U.S. News and World Report, they don't offer reperfusion therapy either. Do you have any evidence to suggest that they had T.P.A. on February 21st of 2019?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't know if they had T.P.A. or not.
Q. And you don't know what their staffing was?
A. Correct.
Q. Nor do you know what their capabilities were?
A. That's right.

Page 75

Q. So, you listed all these locations as alternative locations, why?
A. Simply to point out that there were other hospitals that take care of strokes that were closer than San Juan.
Q. Take care of strokes how?
A. In various ways.
Q. You don't know if any of these hospitals offered T.P.A. on February 21st of 2019, correct?
A. Correct.
Q. All right. And so, wouldn't you then agree that if Mr. Burgess was sent to a hospital that did not offer T.P.A., that would lengthen the amount of time that it would take for him to ultimately receive this medicine that you're claiming he should have received?
A. That's right.
Q. Okay. So, it would make sense, would it not, to deliver him to a hospital that you were sure had T.P.A. available and the capabilities to administer it than to send him somewhere that didn't even offer that service?
A. That's correct.

Page 76

Q. So, what do you know about HIMA Caguas?
A. That they have -- they're a stroke capable center.
Q. Okay. They're a little bit more than a stroke capable center, aren't they?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. That's a general question.
Q. Well --
A. I don't have an answer.
Q. -- are you aware of the fact that they're the only primary stroke center accredited by the Joint Commission, the J.C.A.H.O., on the island of Puerto Rico?
A. I don't --
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't know.
Q. Okay. so, as you sit here today, you are not aware of that fact?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I know that they're accredited. Yes.

Page 77

Q. Okay. Do you know of any other accredited facility on the island for stroke care?
A. I did not look at that specifically.
Q. You said that you went on the websites of all these hospitals, though, right?
A. Yes.
Q. Did you go on HIMA's?
A. Yes.
Q. Okay. Because if you've gone on HIMA's, you would have been aware of the fact,, would you have not that HIMA had two certified vascular neurologists on staff, correct?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I believe I -- I -- I don't have independent knowledge of that.
Q. Well, why didn't you do any analysis in your report as it relates to the capabilities of HIMA?
A. Well, I knew based on reviewing the records that they had all of the facilities required to take care of strokes.
Q. Sorry, I want to look at this one as well.

Page 78

MS. LOBEL: It’s partially cut off. I don’t know, it looks like part of the website is cut off on this, but go ahead.
BY MR. DRAHOS: (Cont'g.)
**Q. So Doctor Nidorf I have marked this as Exhibit J.**
A. Yes.
**Q. That's actually a printout of the website on HIMA San Pablo Caguas.**
A. Uh-huh.
**Q. And if you look down there towards the bottom, it indicates that they had two certified vascular neurologists, correct?**
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. The bottom of page one?
**Q. Yes, sir.**
A. Yes.
**Q. All right. And they actually list the names of those doctors, don't they?**
A. Correct.
BY MR. DRAHOS: (Cont'g.)
**Q. And one of the names that they provide is a Dr. Ulises Nobo?**

Page 79

A. Yes.
**Q. Does that name sound familiar to you?**
A. It does sound familiar, but -- I mean, is that the physician that took care of Mr. Burgess?
**Q. You tell me.**
A. I believe it was.
**Q. Okay. So, we know that on February 21st of 2019, HIMA San Pablo Caguas had a certified vascular neurologist ready and available to treat Mr. Burgess, correct?**
A. Correct.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
**Q. Okay.**
A. Actually, yeah, I don't know if they were ready in --.
**Q. Well, you looked at the HIMA records, didn't you?**
A. Yes.
**Q. I mean, we can pull them up if you want.**
A. No, I -- I -- I think that's correct.
**Q. All right. So, we do know and you can state here today --**
A. Yes.
**Q -- that they had a certified vascular neurologist on staff?**
A. That's correct.
**Q. Okay. And by virtue of the fact -- well, strike that. Do you know what the criteria is for a hospital to receive a primary stroke center accreditation?**
A. I don't -- I can't list all of the criteria, no.
**Q. What is some of the criteria?**
A. I believe it has to have twenty-four-hour coverage by a neurologist. And I believe they have to have twenty-four hour imaging available with at least a CT scan. And I'm not sure about the neuro interventional capability --
**Q. Okay.**
A. -- in terms of the criteria.
**Q. How about whether or not they're able to administer T.P.A.?**
A. Yes, I believe that's part of the criteria.
**Q. Okay. So, we know that on February 21st of 2019, by virtue of the fact that this was a primary stroke center accredited by the J.C.A.H.O., that HIMA San Pablo Caguas had all those capabilities, correct?**
A. Correct.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
**Q. Okay. And the Defendant's Composite Exhibit K, this is a U.S. News and World Report ranking for HIMA San Pablo Caguas, is it not?**
A. It is.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
**Q. All right. And their ranking according to U.S. News and World Report for stroke care was high performing. Do you see that?**
A. I do.
**Q. Okay. As you sit here today, do you have any evidence to refute that?**
A. No.
**Q. All right. And according to U.S. News and World Report, their quality indicators for survival of their patients is excellent, correct?**
MS. LOBEL: Form.

Page 80 / Page 81 (right column)

Page 82

BY MR. DRAHOS: (Cont'g.)
A. Their survival is excellent, yes.
Q. Okay. And if we turn to page two --
A. Yes.
Q. -- as it relates to reperfusion therapy, that being T.P.A., their ranking is above average, correct?
A. Correct.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. As it relates to the number of patients they see, it's very high, correct?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Very high. I don't know what that means.
Q. Well, they offer a range there. They've seen anywhere between four hundred and eighty-six --
A. That's -- it was more in place, yes.
Q. -- to three thousand eight hundred and eighty-seven patients, right?
A. Yes.
Q. Okay. And they also have been

Page 83

ranking or -- or received confirmation that they're transparent with their stroke data, meaning they turn this in to the American Heart Association to verify these figures, correct?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Where do you see that?
Q. Down on the bottom under public transparency.
A. Yes.
Q. So, do you have any evidence as you sit here today that any of this information is inaccurate?
A. I don't.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Okay. And so, can we agree that HIMA San Caguas was the highest-rated stroke center in Puerto Rico on February 21st of 2019?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Based on these rankings, yes.
Q. As you sit here today, do you have any evidence to refute that HIMA San Pablo Caguas was

Page 84

the highest-rated stroke center on the island of Puerto Rico?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Can you repeat the question?
Q. Sure, as you sit here today --
A. Yes.
Q. -- do you have any evidence to refute that HIMA San Pablo Caguas was the highest-rated stroke center on the island of Puerto Rico on February 21st of 2019?
A. No.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. Okay. And so, would you agree that HIMA San Pablo Caguas was the most capable hospital to treat Mr. Burgess on February 21st of 2019?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. Based on these rankings, yes.
Q. Do you have any evidence to suggest that HIMA San Pablo was not the most capable hospital to treat Mr. Burgess on February 21st of 2019?
A. No.

Page 85

Q. Would you agree that even if Mr. Burgess was taken to any of these hospitals that you've listed in your report, these alternative locations, in order to receive T.P.A., he would have to have been transferred to HIMA San Caguas?
A. I don't know.
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
Q. As you sit here today, do you have any evidence to refute the Defense's position that the only place capable of providing T.P.A. to Mr. Burgess on February 21st, 2019, was HIMA San Caguas?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I don't know.
Q. Based upon what you know of stroke care in the island of Puerto Rico, regardless of whether or not T.P.A. was available, wouldn't you agree that Mr. Burgess's best chance for the best outcome was at HIMA San Pablo Caguas?
MS. LOBEL: Form.
BY MR. DRAHOS: (Cont'g.)
A. I would say that's true.
Q. Those are all the of the questions I

Page 86

have. Thank you, Doctor.
CROSS EXAMINATION
BY MS. LOBEL:
Q. Doctor, since we didn't get into your credentials, and obviously, Mr. Drahos is going to try to Dauber challenge you, can you please give me some background as to where you trained?
MR. DRAHOS: I move to strike counsel's comments.
BY MS. LOBEL: (Cont'g.)
Q. You may answer.
A. I went to -- you mean my medical training?
Q. Yes. Please give me your full background of your medical training up to today's date?
A. I attended medical school at Baylor College of Medicine in Houston, Texas, where I got my M.D. degree.
Q. After you got your M.D. degree, did you do a residency?
A. Yes.
Q. Where?
A. Modesto, California.
Q. How long?

Page 87

A. Three years.
Q. In what specialty?
A. Family practice.
Q. And after you completed the three-year residency in family practice, what was the next portion of your medical training?
A. I started working as an emergency room physician after that.
Q. How -- where did you first started -- start working as an emergency medicine physician out of residency?
A. I worked in -- well, first, I worked -- well, I suppose I worked in many small, rural emergency departments in the foothills of California.
Q. Okay. And when you say rural, what do you mean by that?
A. Meaning they're outside of cities, and they're quite small. In rural cities.
Q. Were there limited resources in those areas?
A. Yes.
Q. Did you have to research in order to practice within this rural area as to what resources were available for you to practice emergency medical --

Page 88

emergency medicine? Excuse me.
A. Yes.
Q. Would that include knowing response times for ambulance in the area?
A. Yes.
Q. Would that include knowing where you would need to be able to transfer the patient if the hospital you were working at could not provide the care and treatment that a particular patient needed?
A. Yes.
Q. Okay. Would that includes knowing which facilities could or could not treat patients with strokes?
A. Correct.
Q. Would that include knowing which facilities did or did not have T.P.A., which is a medication used to treat patients with a stroke?
A. Yes.
Q. Okay. Would that include knowing where neurovascular care would be available should medications not be able to be used to adequately treat a patient suffering stroke?
A. Yes.
MR. DRAHOS: Objection, form.

Page 89

BY MS. LOBEL: (Cont'g.)
Q. Okay. Now, how long did you work in this rural area before moving to a different location to practice?
A. I've worked off and on in those rural areas up until 2008.
Q. And in 2008, where did you begin practicing medicine -- emergency medicine? Excuse me.
A. Here in New York.
Q. Okay.
A. In current hospitals I work at.
Q. Okay. And the hospitals that you work here in Upstate New York, would you characterize this area as being rural as well?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. I'm not -- I'm not sure.
Q. Okay. How do the emergency medicine resources differ in Upstate New York as opposed to the rural areas in California that you worked on?
A. There's a better network system here, just in terms of number of resources, number of ambulance companies, number of hospitals, et cetera.
Q. Okay. And you mentioned on direct

Page 90

examination that you've worked abroad?
A. Correct.
Q. Okay. When you said you worked abroad, was that in your capacity as a family physician, or in emergency medicine, or both?
A. Both.
Q. Okay. And where did you practice medicine?
A. I practiced in Dagoretti, Kenya, and I've practiced in Vietnam. I also practiced in rural Alaska.
Q. Okay. And how long --?
A. Sorry, in Guatemala as well.
Q. Okay. And in these more remote locations, did you have to be able to determine resources for emergency transport?
A. Yes.
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
Q. Would you have to be able to determine what facilities would be capable of treating a patient for a specific type of medical emergency?
A. Yes.
Q. Would that include strokes?

Page 91

A. Yes.
Q. Okay. Is the methodology used in order to determine the availability of medical resources, for example, stroke-capable facilities, the same around the world or different?
A. They're different, so.
Q. Okay. Is the methodology that you used in order to find and appropriately locate facilities to treat patients in rural California, Alaska, and abroad the same methodology that all doctors use?
A. Yes.
MR. DRAHOS: Form.
BY MS. LOBEL: (Cont'g.)
Q. Okay. Is the methodology that you used in this particular case to research stroke-capable hospitals the same methodology as every E.R. medicine doctors used -- used to perform their duties?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Yes.
Q. Is the methodology that you used in this case, the same methodology that you were trained to use when you were in medical school?

Page 92

A. Yes.
Q. Is the methodology that you employed in this particular case the same methodology that you were trained to use in medical residency?
A. Yes.
Q. And then when you started your practice out of residency, when you were practicing emergency medicine, is the methodology that you used to employ to determine medical resources and location for transfers for certain medical emergencies the same methodology that you used in this case?
A. Yes.
Q. All right. Now, on direct examination, do you recall advising opposing counsel that you looked at the internet in order to find different hospitals?
A. Yeah.
Q. Do you recall that?
A. Yes.
Q. Is that standard practice for -- for an emergency physician to use the internet to locate hospital facilities?
A. That's one of the ways, yes.
Q. Okay. And is one of the other ways

Page 93

to determine a hospital's abilities to actually call the hospital directly?
A. Yes.
Q. Is that standard practice if you need to transfer a patient from one hospital -- from your care, for example, to another facility for different care, to make a phone call to the hospital?
A. That would be one way.
Q. Okay. Is the practice of calling the hospital directly and asking their ability a standard practice within emergency medicine to do -- to determine whether another facility is capable of treating the patient?
A. That's one of the ways.
Q. Okay. Is it your opinion that the shipboard doctor in this particular case had the means and ability to research and call local facilities?
MR. DRAHOS: Objection.
BY MS. LOBEL: (Cont'g.)
A. Yes.
Q. Okay. And you saw in his testimony that he had access to a computer with internet?
A. Yes.
Q. And you saw in his testimony that he

had access to numerous phones?
A. Yes.
Q. And did you review Royal Caribbean's medical procedures?
A. Yes.
Q. Okay. And you'd agree with me that Royal Caribbean has decided to engage in medical -- in the business of medical care and treatment on its ships?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. I don't know about the business. I'm not sure what you mean by that.
Q. Certainly. They have a medical center on all of their ships throughout their fleet, correct?
A. Correct.
Q. And they have a shoreside department that oversees all the physicians within their fleet, correct?
MR. DRAHOS: Objection, form.
A. Correct.
BY MS. LOBEL: (Cont'g.)
Q. And they've developed their own procedure and how they expect doctors to conduct


themselves on their ships.
MR. DRAHOS: Form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
Q. And one of the procedures is that a patient remains in their care until they're transferred to the next facility, correct?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
Q. And that's standard practice for U.S. medicine, correct?
A. The same in everyone's department.
Q. Okay. Okay. Was that essentially the same experience that you've had working abroad as well, that a patient remains in your care until they're transferred to the next facility?
A. Yes.
Q. Okay. And in this particular case, do you see any documentation whatsoever of any phone calls made by Dr. Pereira to any local hospitals?
A. No.
Q. He just testified that he spoke to somebody, didn't know the name of, after hours, of the


port agent who isn't a doctor, doing something, we don't know what exactly they did, correct?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
Q. All right. And there's no evidence of any e-mail correspondence between Dr. Pereira and the hos -- any local hospitals?
A. That's correct.
Q. Okay. And you saw the testimony from one of the other doctors on the ship that they actually had a list of phone numbers for Puerto Rico for local ambulances and hospitals as well, correct?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Yes.
Q. And Dr. Pereira had made no testimony or mention as to that list?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
Q. Okay. And you've been shown a whole host of exhibits from U.S. News?
A. Correct.


Q. Okay. Is U.S. News the source that emergency doctors use in order to determine the capability of a hospital?
A. No.
Q. Okay. So, would you also agree, and you can look at them if you need, that these printouts range from being printed out on October 12, 2022, and I believe I saw one from December -- December of 2021, did you notice that?
A. Yes.
Q. Would you also agree that you're asked a lot of questions as to whether based off of these documents, you could determine whether or not a facility had T.P.A., do you recall that?
A. Yes.
Q. Would you agree with me that the documents actually don't mention one way or the other whether these facilities have T.P.A., but get -- state whether or not T.P.A. that actually had been given to a patient for purposes of treatment?
A. That's correct.
Q. There's a significant difference between when T.P.A. is actually administered or needed by a patient versus patients being treated in other

Page 98

methods to treat a stroke, correct.
A. Yes.
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
Q. Okay. So, in truth, and in practice, these documents don't really mean anything with regard to whether or not these hospitals had T.P.A. or not.
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Based on the language that's in these reports, that's correct.
Q. Okay. And you would rely on the phone calls that you made to speaking to an actual individual who worked at the facility and their representation that they are capable of treating patients suffering a neurovascular emergency, correct?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Yes.
Q. Okay. And your method of calling these hospitals to ask if they were neurovascular -- neurovascularly capable would be more reliable than relying on some U.S. News Report printed out of, you know, two days ago or December 2021?

Page 99

MR. DRAHOS: Objection.
BY MS. LOBEL: (Cont'g.)
A. Yes.
Q. Okay. And you would agree me -- with me that what time you called the hospital would be irrelevant as to whether or not their representations as to whether they're stroke capable or not?
A. Correct.
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
Q. Okay. And assuming arguendo from opposing counsel that HIMA San Pablo Caguas is the best hospital in Puerto Rico, would you agree with me that's something that the corporation should know?
A. Corporation, meaning the cruise line?
Q. Yes. The cruise line should know that information when they're sending their ships on a weekly basis to a port --
MR. DRAHOS: Objection, form
MS. LOBEL: -- with thousands of patients?
MR. DRAHOS: Sorry, it's --.
MS. LOBEL: It's okay.
BY MS. LOBEL: (Cont'g.)

Page 100

A. Yes.
Q. Okay. And that's something that -- strike that. And the cruise line would be able to determine the distance between the port as well -- the distance between the port and where HIMA San Pablo Caguas is located?
A. Yes.
Q. So, they would be able to reasonably know, okay, if this facility is located -- located relatively far away from the port, we need to act quickly to get transport even faster because of the distance, correct?
A. Of course.
Q. So, a doctor on the ship should know if I'm dealing with somebody who is suffering a potential stroke, I need to act even faster than normal to get transport because of the potential distance between or traffic between the port and the hospital?
A. That's correct.
Q. Okay. And you saw the testimony from the corporate representative of the -- the port agent, correct?
A. Correct.
Q. Okay. And that port agent, do you

Page 101

recall him testifying to the fact that he was aware that there are officials from Royal Caribbean's corporate office that would come meet with another lady who worked within the company to meet with local hospitals in Puerto Rico?
A. At the time, yes.
Q. Okay. So, clearly, Royal Caribbean, their corporate office was meeting with hospitals and presumptively, that would give them the means and ability to reasonably ask local facilities what they are or are not capable of?
A. Yes.
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
Q. And that information would then be able to be given to the fleet so shipboard doctors know this information?
A. I hope so.
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
Q. And that would be the reasonable thing for a corporation offering medical care and treatment on its ships to do?
MR. DRAHOS: Objection, form.

Page 102

BY MS. LOBEL: (Cont'g.)
A. Yes.
**Q. Okay. Now, do you recall being asked whether or not you reviewed the American College of Emergency Physician's protocols for cruise lines?**
A. Yes.
**Q. Would you agree with me that that wouldn't be relevant for this particular case because the ship was at port docked in a U.S. port?**
MR. DRAHOS: Objection, form. Sarah, these are all argumentative. I don't want to keep objecting to the form because I feel like it's interference. So, if you'll give me a standing objection to the argumentive -- argumentative nature of these questions, so I don't have to keep doing it. Otherwise, I'm just going to quietly continue to object.
MS. LOBEL: Whatever you feel comfortable with, Michael.
MR. DRAHOS: Okay.
MS. LOBEL: I'm not going to tell you what to -- how to do your job.
MR. DRAHOS: Well, I'm not asking you -- I'm asking would you prefer I continue to object.
MS. LOBEL: I -- I don't care.

Page 103

MR. DRAHOS: Or continue saying objections.
MS. LOBEL: I don't care. It's up to you.
MR. DRAHOS: Okay.
MS. LOBEL: It doesn't bother me. Can you tell me what my last question was, and I'll re-ask my question? Forgive me.
THE COURT REPORTER: I can play it back if you want me to.
MS. LOBEL: If you could just read it back to me?
THE COURT REPORTER: If you --.
MS. LOBEL: Just the gist of it.
MR. DRAHOS: Was that not relevant to the use of guidance.
THE COURT REPORTER: Something about --.
MS. LOBEL: Oh, whoa. Whoa. Okay. Okay. Okay.
BY MS. LOBEL: (Cont'g.)
**Q. Would you agree with me that at the time Mr. Burgess was suffering his medical emergency, the cruise ship was already docked at the port of San Juan?**

Page 104

A. Correct.
**Q. And when the cruise ships dock at the port of San Juan, the ship is not in the middle of the water. It's touching, you know, a --**
A. Land mass.
**Q. -- a land mass, correct. Okay. So, in essence -- strike that. And you would agree with me that Puerto Rico is part of the United States --**
A. Yes.
**Q. -- as a com -- Commonwealth entity?**
A. Yes.
**Q. Okay. And therefore, Mr. Burgess would not have to go through immigration to get off the ship?**
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. I don't know that.
**Q. Will you agree with me when traveling to Puerto Rico, you don't need your passport and to go through immigration in order to get onto the island?**
A. I assume so.
**Q. Okay. So, insofar as Mr. Burgess's need to get off the ship, he literally just needed to be wheeled off the ship and then transported, correct?**

Page 105

MR. DRAHOS: Form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
**Q. All right. So, for purposes of what procedures would really apply here, this is not a situation where we're dealing with cruise ship medicine, it's really literally a local-to-local transport on the island?**
A. Essentially.
MR. DRAHOS: Form.
BY MS. LOBEL: (Cont'g.)
**Q. And your ca-, you have years of experience to do -- doing local transport of a patient from one medical facility to another?**
A. Almost thirty years of experience, yes.
**Q. Okay. Would you agree with me that this situation is more akin to a patient being at a family doctor's practice, and then being transported to a hospital for a medical emergency?**
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. I don't know that it's closer to that or closer to a rural hospital emergency department or --

Page 106

or even an urban hospital emergency department somewhere -- somewhere in all of those, in that range, yes.
Q. Okay. But we're not dealing with a situation where somebody, for example, is at a restaurant, needs to call nine-one-one, and there's no doctor, and then gets picked up by an ambulance and transported?
A. This is different, correct.
Q. This is a situation where Mr. Burgess was under Royal Caribbean's -- under the care of Royal Caribbean's shipboard doctor?
A. Yes.
Q. Okay. And at the time that his emergency began, he was not at sea?
A. Correct.
Q. And it's very clear, based off of the medical records, that Royal Caribbean knew or should have appreciated the fact that Mr. Burgess was suffering from a stroke especially as he presented?
A. Yes.
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
Q. And would you agree with me that the point of the research that you did in reviewing and

Page 107

calling the other hospitals, it was to determine if there were other options and quicker options to care and treat for Mr. Burgess?
A. Correct.
Q. And there's no evidence that they -- these hospitals were not capable of administering T.P.A. to this patient?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Yeah, I don't know whether they did or did not.
Q. Based off of your phone calls and the research that you did, there were many other facilities closer to the port that could have administered T.P.A.?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. I didn't ask specifically about T.P.A. I asked about twenty-four-seven coverage for neurologic emergencies --
Q. Okay.
A. -- including neurologic consultation coverage.
Q. Okay. And that would be what a doctor -- in a normal emergency physician doctor would

Page 108

do if he -- he or she's facility was incapable of treating a stroke?
MR. DRAHOS: Form.
BY MS. LOBEL: (Cont'g.)
A. Most emergency departments would have knowledge already --
Q. Right.
A. -- before making phone calls --
Q. Right.
A. -- of who's stroke capable and who's not stroke capable.
Q. Okay.
A. That research should have been done by the facility.
Q. Okay. So, is it your position that the corporation should have already have done the research before the ship had even gotten to port to understand and appreciate which facilities and which facilities did not have the ability to treat a patient suffering a stroke?
A. Yes, I believe so.
Q. Understood. Let me just check my notes. Pretty good doing it from memory, but. Doctor, based off of your -- well, strike that. You reviewed

Page 109

the shipboard medical records and communications between Royal Caribbean and the port agent, correct?
A. Yes.
Q. Okay. And you also reviewed the ambulance records in this case, correct?
A. Correct.
Q. Okay. Did you also, in reviewing the ambulance records, see the timing with their response time?
A. I did.
Q. Would you agree with me that the response time from the ambulance in this particular case was reasonable and appropriate?
A. Can you repeat that question?
Q. Certainly. That the response time from the ambulance from the time that they were dispatched to come and -- to come and the time that they actually arrived was a relatively reasonable response time?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. From the time the ambulance left or dispatched to the time they --
Q. Correct.

Page 110

A. -- arrived at the boat?
Q. Correct.
A. Correct.
Q. Okay.
A. It was reasonable.
Q. And then, the -- the -- forgive me, the ambulance records also indicate the time that they - - the individuals get on the ship and then pick up the patient from the ship, correct?
A. Correct.
Q. And then, the records indicate the time that the ambulance left the ship and arrived at the hospital, correct?
A. Correct.
Q. You do agree with me that there's a significant -- significant amount of time that elapses between the time that the ship appreciated that Mr. Burgess was suffering a potential stroke through the time that the ambulance was actually dispatched?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
Q. Would you agree with me that the duration of time between that first appreciation or when

Page 111

the ship should have appreciated the emergency through the time that the ambulance was actually dispatched is an unreasonably long period of time?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. It seemed excessive, yes.
Q. Okay. Would you agree with me that these records indicate that ambulances on the island at the time of this incident could reasonably respond in an appropriate amount of time?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Yes, they could.
Q. But they can only respond as fast as they're actually called, is that fair to say?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
Q. Okay. And based off of your review of the records, there's no indication that there was any difficulty reaching an ambulance service on the island?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. There's no indication of that.

Page 112

Q. And there's no indication from the doctor, Dr. Pereira, who Mr. Burgess was under the care of, did anything to questions or make any efforts to get an ambulance?
A. Correct.
Q. And there's no indication from the port agent to the ship indicating that they were having any difficulty reaching an ambulance?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Correct.
Q. And if they were, wouldn't you agree with me that under the circumstances that's something that should reasonably have been reported to the doctor?
A. Yes.
Q. And would you agree with me that's something that the doctor as the person who the patient is under their care should have been proactively asking where's the ambulance?
A. Yes.
Q. Okay. But there's no evidence whatsoever that that even occurred?
A. Correct.
MR. DRAHOS: Objection, form.

Page 113

BY MS. LOBEL: (Cont'g.)
Q. One second, doctor. Forgive me. And would you agree with me from the time of presentation when it reasonably should have been appreciated that Mr. Burgess was suffering a potential stroke, and through the time that he actually was delivered at the facility that he was outside the window for administration of T.P.A.?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Yes.
Q. Okay. And had an ambulance been called earlier, and Royal Caribbean had appreciated, you know, whether or not HIMA San Pablo Caguas is the only place that can or cannot treat stroke, that they took way too long in transporting this patient?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)
A. Yes.
Q. And had they transported him earlier, he would have been able to have been administered T.P.A. within the window?
MR. DRAHOS: Objection, form.
BY MS. LOBEL: (Cont'g.)

A. Correct.
**Q. Okay. Would you agree with me that a family physician or a physician who practices emergency medicine should appreciate the fact that a potential stroke is always a medical emergency?**
A. Yes.
**Q. And that those types of medical emergencies are always time sensitive?**
A. Yes.
**Q. And would you agree with me that under those circumstances, that's when a emergency physician or a family physician needs to aggressively work to transport a patient to a facility with appropriate care?**
A. Correct.
**Q. Okay. One second.**
MR. DRAHOS: ... just in the --
MS. LOBEL: Yeah.
MR. DRAHOS: Thank you.
MS. LOBEL: Doctor, that's all I have for you on cross examination unless there's something really special that Doc -- Mr. Drahos brings up.
MR. DRAHOS: So, you have the right to read the transcript to make sure everything was taken


down accurately or you can waive that right. It's up to you.
THE WITNESS: I'll waive the right.
MR. DRAHOS: Okay.
MS. LOBEL: Okay.
MR. DRAHOS: That's it. Thank you, Doctor.
MS. LOBEL: That's it. Doctor, thank you.
THE WITNESS: Thank you.
VIDEOGRAPHER: This is the end of the video deposition of Dr. David Nidorf. The time is --
(The deposition concluded at 10:35 a.m.)


STATE OF )
COUNTY OF )

I, DR. DAVID NIDORF, have read the foregoing record of my testimony taken at the time and place noted in the heading hereof and do hereby acknowledge:
(Please check one)
( ) That it is a true and correct transcript of same.
( ) With the exceptions noted in the attached errata sheet, it is a true and correct transcript of same.

X
DR. DAVID NIDORF

Sworn to before me this
______day of ______, 2022.
X______________________
NOTARY PUBLIC
My Commission Expires:
___________________


I, ANNETTE LAINSON, do hereby certify that the foregoing testimony of DR. DAVID NIDORF was taken by me, in the cause, at the time and place, and in the presence of counsel, as stated in the caption hereto, at Page 1 hereof; that before giving testimony said witness was duly sworn to testify the truth, the whole truth and nothing but the truth; that the foregoing typewritten transcription, consisting of pages number 1 to 115, inclusive, is a true record prepared by me and completed by Associated Reporters Int'l., Inc. from materials provided by me.

ANNETTE LAINSON, Reporter

ASSOCIATED REPORTERS INTERNATIONAL, INC.

(800) 523-7887

Date:
Case Name: Burgess, et al v Royal Caribbean Cruises, et al
Index Number: 1:20-CV-20687-OTAZO-REYES
Deponent: Dr. David Nidorf
Deposition Date: 10/14/2022
Examining Attorney: Michael J. Drahos, Esq.
Dear Dr. Nidorf:

Please read and make any changes and/or corrections in your testimony and sign the transcript in the presence of a notary public. Please do so within thirty (30) days. If you fail to sign the transcript within thirty (30) days, it will be delivered to the appropriate parties without signature.
Return the transcript with corrections, if any, to:

GRAY ROBINSON, P.A.
MICHAEL J. DRAHOS, ESQ.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401

CORRECTIONS:

________ Word or phrase: ______________________________
Corrected to: ______________________________
________ Word or phrase: ______________________________
Corrected to: ______________________________
________ Word or phrase: ______________________________
Corrected to: ______________________________
________ Word or phrase: ______________________________
Corrected to: ______________________________
________ Word or phrase: ______________________________
Corrected to: ______________________________
________ Word or phrase: ______________________________
Corrected to: ______________________________
________ Word or phrase: ______________________________
Corrected to: ______________________________

_________
Date Signed
__________________
DR. DAVID NIDORF

**Exhibits**

**NidorfD- A** 4:4 48:8
**NidorfD- B** 4:7 53:7, 15
**NidorfD- C** 4:10 59:24 60:16
**NidorfD- D** 4:13 62:15
**NidorfD- E** 4:16
**NidorfD- F** 67:17
**NidorfD- G** 4:22 70:2
**NidorfD- H** 5:1 72:14
**NidorfD- I** 5:3 74:6
**NidorfD- J** 5:6 78:6
**NidorfD- K** 5:8 81:9

**1**

**10** 3:3
**10/12/2022** 4:5,8,14, 17,20 5:2, 4,9
**10:35** 115:13
**12** 97:7
**12/20/2021** 4:11,23
**13** 30:7
**14** 8:5 30:7
**14th** 30:8
**19th** 46:23
**1:20-cv-20687-otazo-reyes** 8:4

**2**

**2008** 89:6,7
**2012** 16:20
**2017** 17:20
**2019** 36:6 43:12 46:24 49:10,14 51:4 56:9, 21 57:17 58:13 59:16 61:1 62:1 63:8 65:8 69:3 71:7 73:1 74:14 75:9 79:9 81:1 83:19 84:11,17, 23 85:12
**2021** 97:8 98:24
**2022** 8:5 97:7
**21st** 36:6 43:12 46:24 49:10,14 51:4 56:9, 21 57:17 58:13 59:16 61:1,24 63:8 69:3 71:7 73:1 74:14 75:9 79:9 81:1 83:19 84:10,17, 23 85:12

**3**

**3** 5:7

**4**

**49** 4:4

**5**

**5-page** 4:11, 23
**54** 4:7

**6**

**6-page** 4:5, 8,14,17,20 5:4,9
**60** 4:10
**63** 4:13
**64** 4:16
**68** 4:19

**7**

**7-page** 5:2
**71** 4:22
**73** 5:1
**75** 5:3
**79** 5:6

**8**

**82** 5:8
**845-706-2761** 44:21
**87** 3:4

**9**

**9:00** 7:1

**A**

**a.m.** 7:1 8:6 44:17 115:13
**abilities** 93:1
**ability**

57:21 93:10,17 101:10 108:19

**aboard** 20:23 21:8

**abroad** 90:1, 4 91:10 95:15

**access** 93:22 94:1

**accident** 51:7

**accordance** 6:3

**accreditation** 64:18,24 65:7,11 80:9

**accredited** 76:13,24 77:2 81:2

**accuracy** 62:6

**accurate** 29:3

**accurately** 70:10 115:1

**acknowledgement** 46:16

**act** 100:10, 16

**action** 10:23

**activator** 34:22 55:15

**actual** 98:13

**added** 30:13, 14

**address** 14:24 38:20,23 39:3

**adequately** 88:21

**administer** 75:21 80:21

**administered** 97:23 107:14 113:21

**administering** 53:3 107:6

**administration** 113:7

**advising** 92:14

**affirm** 8:17

**agency** 62:5, 8

**agency's** 62:4

**agent** 24:13 96:1

100:21,24 109:2 112:7

**agents** 23:9

**aggressively** 114:12

**agree** 12:23 13:3,21 23:11 30:24 32:15 37:7 49:12 51:6 55:22 75:13 83:17 84:15 85:1,18 94:6 97:5, 11,16 99:4,13 102:7 103:21 104:7,18 105:17 106:23 109:11 110:15,23 111:7 112:12,16 113:3 114:2,10

**ahead** 25:10 36:20 38:21 55:17,24 56:5 78:3

**akin** 105:18

**Alaska** 26:7 90:11 91:10

**Alberto** 26:15

**allegation** 18:2 19:5, 15

**allegations** 17:4

**Alseto** 32:9

**alternate** 30:17

**alternative** 36:9,14 42:1 57:16 75:2 85:3

**ambulance** 24:19,23 25:2,7,15, 22 27:16 35:13,14, 15 50:20 88:4 89:23 106:6 109:5,8, 12,16,22 110:7,12, 19 111:2, 21 112:4, 8,19 113:12

**ambulances** 36:2,5

96:13 111:8

**American** 11:5,13,16 12:10 13:4 83:3 102:4

**amount** 75:14 110:16 111:10

**analysis** 77:17

**Annette** 8:8

**answers** 6:7

**anti** 19:16

**antibiotic** 19:1,6,8, 10,11,12, 14,16

**apologies** 38:21

**apparently** 31:3 64:3

**apply** 105:5

**appreciated** 106:18 110:17 111:1 113:4,13

**appreciation** 110:24

**appropriately** 91:8

**approximately** 40:21 43:15,21 51:2 63:14 66:23

**area** 9:15 87:23 88:4 89:3,14

**areas** 87:20 89:6,20

**arguendo** 99:11

**argumentative** 102:11,14

**argumentive** 102:14

**arithmetic** 40:1

**arrived** 109:18 110:1,12

**Ashford** 4:8 49:23 51:11,18, 23 52:8 53:16,19 54:2,9 56:8

**aspect** 20:22

**asserted** 20:9

**assistant** 17:2,7,11

**Association** 83:3

**assume** 33:9 51:1 104:21

**assuming** 99:11

**AT&T** 44:23

**attempt** 18:16

**attempted** 29:11 58:6

**attended** 86:16

**attorney** 6:14

**attorneys** 6:2 45:9

**Auxilio** 4:23 69:9 70:9 71:3

**availability** 91:3

**average** 25:2 38:9 39:1, 8,11,12 53:20 60:9 62:1,13,18 65:22 68:7 70:14 74:7 82:7

**aware** 15:2,3 54:10 63:17 68:2,5 76:12,21 77:10 101:1

**B**

**back** 12:3 18:23 103:9,12

**background** 86:7,15

**based** 33:15, 17 39:21 40:17 72:6 77:20 83:22 84:20 85:16 97:12 98:10 106:16 107:12 108:24 111:19

**basically** 16:12 36:15 38:24

**basing** 25:23

**basis** 99:18

**Baylor** 86:16

**began** 106:14

**begin** 89:7

**beginning** 8:2 20:13

**behalf** 8:12, 14

**bit** 22:18 58:4 76:5

**board** 9:17, 20

**boat** 21:19 110:1

**bodies** 17:8

**body** 16:15 17:12

**bother** 35:6 103:6

**bottom** 78:12,16 83:8

**brings** 114:22

**broad** 63:21 64:7

**Brothers** 10:15

**building** 32:23,24

**Burgess** 8:3 31:19 35:22 36:10 46:22 48:21 49:10 51:19 52:1,16 54:9 57:17 58:12 59:17 61:24 65:13 75:13 79:5,11 84:17,23 85:2,11 103:22 104:12 106:9,18 107:3 110:18 112:2 113:5

**Burgess's** 85:19 104:22

**business** 94:8,11

**C**

**ca-** 105:12

**Caguas** 5:9 32:15 35:23 39:19 40:9,15 76:2 78:9 79:9 81:3, 10 83:18, 24 84:9,16 85:5,12,20 99:12 100:6 113:14

**California** 86:23 87:14 89:20 91:9

**call** 23:9, 13,14 34:15 43:20 44:13,18 45:6 46:1, 2,20 47:4 51:10 58:10 67:11 70:1 71:21 73:16 93:1,7,17 106:5

**called** 36:22 43:17 45:13 46:6 49:23 50:16 57:6 58:14 99:5 111:15 113:13

**calling** 43:24 61:18 93:9 98:20 107:1

**calls** 42:2 44:8 45:1 95:21 98:13 107:12 108:8

**Camilo** 30:4

**capabilities** 49:17 53:17 56:24 59:10 65:12 69:6,24 71:9 72:2 73:4 74:23 75:21 77:18 81:3

**capability** 80:17 97:3

**capable** 47:7,10,16 52:15,20 53:2 54:14 58:12 64:3,20 67:7,13 72:22 76:4,6 84:16,22 85:11 90:21 93:12 98:15,22 99:7 101:11 107:6 108:10,11

**capacity** 20:18 90:4

**captain** 23:6

**care** 17:2,8

20:23 22:13,21, 23 23:12 24:16 36:18 41:18 47:7,11,13 52:6,21 53:3,17 57:22 58:12 62:1,13,18 64:21 65:12,23 67:8,13,19 70:15 72:4,20 74:8 75:4, 6 77:2,22 79:4 81:15 85:17 88:8,20 93:6,7 94:8 95:6, 16 101:22 102:24 103:3 106:10 107:2 112:2,18 114:14

**Caribbean** 8:3 9:11 21:5,8,14 23:14 61:24 94:7 101:7 106:17 109:2 113:13

**Caribbean's** 94:3 101:2 106:10

**Caribbean's** 106:11

**carrier** 44:22

**carry** 34:22 43:2

**case** 8:4 9:19 11:24 12:10,15 13:5,6,19 14:1,9,14 15:5 16:8, 10,18 17:15,20 18:4,20,24 19:22 25:14 26:15 27:6,23 28:10,17, 24 30:12 32:13,16, 22 35:22 45:7 47:20 51:22 91:16,23 92:3,11 93:16 95:19 102:8 109:5,12

**cases** 13:11 14:3 15:19 16:11,13

**catch** 31:4,5

**categories** 48:14

**caught** 50:16

**cell** 44:18, 20

**center** 4:6 12:24 21:8,11 45:13 46:2 47:3,14 48:11 49:8,13 59:10,20, 22 76:4,6, 13 80:8 81:2 83:18 84:1,10 94:14

**centers** 34:24 35:3

**Centro** 65:4, 22

**certified** 6:15 9:17, 20 77:11 78:12 79:9 80:3

**cetera** 89:23

**challenge** 14:20,23 86:6

**chance** 85:19

**changed** 48:22

**characterize** 89:13

**charged** 28:21

**check** 53:1 108:22

**choice** 57:19,20 58:2 59:13

**choices** 52:5

**circumstances** 112:13 114:11

**cities** 87:17,18

**Civil** 6:4

**claim** 59:11

**claiming** 54:9 57:18,24 75:16

**clean** 17:9

**clear** 54:22 55:2,17,19 57:18 106:16

**clicked** 19:2

**closer**

52:12,15 57:23 75:5 105:23,24 107:14

**codefendant** 17:19

**College** 11:6,13,17 12:11 13:4 86:17 102:4

**comfortable** 102:17

**commenced** 7:1

**comments** 86:9

**Commission** 76:14

**committed** 56:4

**Commonwealth** 104:10

**communicating** 23:9

**communications** 109:1

**Community** 4:9 53:16

**companies** 89:23

**company** 101:4

**comparison** 39:18 40:15 50:15,23

**compiled** 36:8 39:22 41:24

**completed** 87:4

**Composite** 48:8 53:7 74:5 81:8

**comprehensive** 34:24

**computer** 93:22

**concept** 64:17

**concluded** 115:13

**conduct** 94:24

**confirmation** 83:1

**confirming** 42:5

**construction** 51:7

**consult** 20:22

**consultation** 107:21

**Cont'g** 25:11,18 26:4,13, 17,22 27:4,13,19 28:1 32:19 33:2,20 35:9,18 37:4,12,20 38:4 39:5, 10,14 40:6,13,20 42:16 45:3 46:14,18 48:6 50:13,22 52:11,23 53:13 54:7 56:6,11,19 60:6,21 63:2,20 64:6 65:19 66:3,8,14 67:23 68:10,18 70:7,24 74:16 76:8,18,23 77:14 78:4,15,22 79:14 81:7,13 82:1,10,14 83:6,16,21 84:4,14,19 85:8,14,22 86:10 89:1,16 90:19 91:14,20 93:19 94:10,22 95:3,9 96:4,15,20 98:4,9,18 99:2,10,24 101:14,20 102:1 103:20 104:16 105:2,11, 22 106:22 107:9,16 108:4 109:21 110:21 111:5,12, 17,23 112:10 113:1,10, 18,24

**continue** 102:16,23 103:1

**coordinating** 23:12

**copy** 6:15

**corporate** 100:21 101:2,8

**corporation** 99:14,15 101:22 108:16

**correct**

9:13,14 10:15,19 12:16 13:9,19, 20,24 16:5 18:3 19:11,12 20:3,15, 16,20 24:11,13, 14,24 25:4,12 26:2,11 29:7,22 30:4,5,8 31:2 32:2 33:7,8 35:23 39:6 40:21 41:7,10, 15,16,21, 22,24 45:15,16, 19,20,24 46:11,12, 24 47:1,23 48:22 49:14,15, 18,24 50:1,4,5, 7,14 51:5, 20 52:21, 24 54:11 56:22 57:1,4,10, 11,14 58:19 61:7,11 63:7,9,16 65:2 66:21 68:1,16 69:1,3,4, 7,9,16,17, 20 70:13 71:16,17 73:1,2,8, 9,12,14,15 74:21 75:10,11, 24 77:12 78:13,21 79:11,12, 23 80:5 81:4,5,23 82:7,8,12 83:4 88:14 90:2 94:15,16, 19,21 95:4,7,10, 12 96:2,5, 9,13,21,24 97:21 98:1,11,16 99:8 100:12,19, 22,23 104:1,6,24 105:3 106:8,15 107:4 109:2,5,6, 24 110:2, 3,9,10,13, 14,22 111:18 112:5,11, 23 114:1, 15

**corrections** 6:10

**correctly** 38:1 57:7

**correspondence** 96:7

**costs** 57:24

**counsel** 8:9 27:15 92:14 99:12

**counsel's** 86:8

**counting** 68:21

**countries** 26:6

**couple** 40:14

**court** 8:7, 10,16,21 9:2 13:17 14:8 15:1, 3,8 20:2 65:16,18 103:9,13, 17

**coverage** 47:7 57:23 59:8 72:5 80:14 107:18,22

**credentials** 86:5

**credibility** 72:21

**credible** 62:8

**crimes** 56:5

**criteria** 64:24 80:7,11, 12,19,23

**critical** 53:3

**cross** 3:4 7:3 55:19 86:2 114:21

**cruise** 11:13,18 12:11,18, 24 13:1,5 20:14,18, 22,23 21:2,10, 18,19 22:3,6,9, 12,15 23:2,6 99:15,16 100:3 102:5 103:23 104:2 105:6

**Cruises** 8:4

**CT** 80:16

**culture** 18:23

**current** 9:23 89:11

**cut** 78:1,2

D

**D-A-V-I-D** 8:24

**Dagoretti** 90:9

**data** 39:22 83:2

**date** 8:5 30:6 44:10 52:2,4,6 86:15

**Dauber** 86:6

**Daubert** 14:20

**David** 3:2 7:20 8:2, 6,24 9:4 42:12 115:12

**day** 36:3,10 40:18 44:12,14 45:22 49:17,20 50:10 51:20 58:2

**days** 98:24

**de** 61:7 62:12

**deal** 7:11

**dealing** 100:15 105:6 106:3

**December** 97:8 98:24

**decided** 94:7

**declaration** 47:12,15, 18

**defendant** 6:5 8:15 9:11 14:2, 4,6,15 16:7 18:19 31:7 32:12

**Defendant's** 48:8 81:8

**Defense's** 85:10

**definitive** 58:4

**degree** 86:18,19

**deliver** 36:10 75:20

**delivered** 113:6

**department** 17:10,22 18:22 19:13 22:15 58:14 61:15,19 73:17 94:17 95:13 105:24 106:1

**departments** 10:4 12:21 87:14 108:5

**depending** 7:10

**deposed** 30:19

**deposition** 6:4,10,12, 14,15 7:1 8:8 19:21 26:14 30:3,4,10, 20,23,24 31:11 48:9 58:5 59:24 62:16 70:3 72:15 115:12,13

**depositions** 13:16 30:14,18

**Desai** 30:3, 11,24

**designation** 64:9

**determine** 25:14 35:15 38:18 40:3 47:10 68:23 90:15,21 91:3 92:9 93:1,11 97:2,13 100:4 107:1

**determined** 67:7

**developed** 94:23

**diagnosed** 19:6

**diagnostic** 34:13 43:6

**dialing** 24:15

**differ** 89:19

**difference** 56:3 97:22

**differently** 22:18

**difficult** 38:13

**difficulty** 111:21

112:8

**direct** 3:3 9:5 89:24 92:13

**directly** 22:23 93:2,10

**disciplinary** 10:23

**discussion** 27:14

**disembark** 23:2

**disembarked** 22:22

**dispatched** 109:17,23 110:19 111:2

**distance** 38:9,24 39:8,11 100:4,5, 12,17

**Doc** 114:22

**dock** 104:2

**docked** 102:9 103:23

**doctor** 7:14 9:7,12 17:3 20:8, 14 22:6 30:17 38:15,22 53:2,14 55:17 56:7 60:7 78:5 86:1,4 93:16 96:1 100:14 106:6,11 107:24 108:23 112:2,14, 17 113:2 114:20 115:7,8

**doctor's** 105:19

**doctors** 30:19 41:12,15 45:13 78:20 91:10,18 94:24 96:11 97:2 101:16

**Doctors'** 4:5 46:2 47:3, 14 48:11 49:8,13

**document** 54:22 55:2

**documentation** 15:20 95:20

**documents** 97:13,17 98:6

**dollars** 17:17 18:6

**don't** 69:2 78:2

**door** 32:24

**Dorothy** 17:18

**Drahos** 3:3 7:24 8:14 9:6,10 25:9,11,18 26:4,13, 17,22 27:4,13,19 28:1 32:19 33:2,20 35:9,18 37:4,12,20 38:4 39:5, 10,14 40:6,13,20 42:16 45:3 46:14,18 48:6 50:13,22 52:11,23 53:9,13 54:7,16, 19,23 55:4,9,12, 18,21 56:1,6,11, 19 60:6,21 63:2,20 64:6 65:19 66:3,8,14 67:23 68:10,18 70:7,24 74:16 76:8,18,23 77:14 78:4,15,22 79:14 81:7,13 82:1,10,14 83:6,16,21 84:4,14,19 85:8,14,22 86:5,8 88:24 89:15 90:18 91:13,19 93:18 94:9,20 95:2,8 96:3,14,19 98:3,8,17 99:1,9,19, 22 101:13, 19,24 102:10,19, 22 103:1, 5,15 104:15 105:1,10, 21 106:21 107:8,15 108:3 109:20 110:20 111:4,11, 16,22 112:9,24

113:9,17, 23 114:17, 19,22,23 115:4,6

**drive** 38:10 50:7 57:13 61:12 63:15 66:24 69:19 71:18 73:14

**driver** 24:19 35:14

**driving** 50:19

**duly** 6:13

**duration** 110:24

**Dutchess** 10:10,12 17:19 18:8

**duties** 91:18

**duty** 17:10

**E**

**e-mail** 96:7

**E.R.** 91:17

**earlier** 113:13,20

**easy** 38:18

**efforts** 112:3

**egregious** 56:2,5

**eight-** 57:12

**eighty-** 82:18

**eighty-seven** 82:22

**elapses** 110:16

**eleven** 45:18

**eleven-** 50:6

**emergencies** 42:7,9,14 92:10 107:19 114:8

**emergency** 9:18,21 10:3,4,18 11:6,14,17 12:11,21, 23 13:4 17:5,10,22 18:22 19:13 22:15 42:20 58:14 61:15,19 73:17 87:7,10, 14,24 88:1 89:8,18 90:5,16,22 92:8,21 93:11 97:2 98:16 102:5 103:22 105:20,24 106:1,14 107:24 108:5 111:1 114:3,5,11

**employ** 92:9

**employed** 92:2

**employer** 9:23

**end** 45:5 115:11

**endovascular** 34:19 43:9

**engage** 94:7

**engine** 37:23

**engines** 37:1

**ensure** 29:6

**entering** 15:4

**entity** 104:10

**ER** 18:24

**essence** 104:7

**essentially** 95:14 105:9

**estimate** 50:11

**estimated** 66:24 69:18

**estimates** 51:8

**et al** 8:3

**evaluate** 17:7

**evaluating** 62:6

**everyone's** 95:13

**evidence** 49:7 62:21 65:23 66:15 70:17 72:17 74:8,13 81:19 83:11,24 84:8,21 85:10 96:6 107:5 112:21

**exam** 55:19

**examination** 3:3,4 9:5 86:2 90:1 92:14 114:21

**excellent**

8:1 55:20 81:23 82:2
**excessive** 111:6
**excluding** 15:4
**excuse** 58:21 88:1 89:8
**exercise** 58:8 59:2
**Exhibit** 48:8 53:7,15 59:24 60:16 62:15 67:17 70:2 72:14 74:6 78:6 81:9
**exhibits** 96:23
**exist** 30:15, 16
**expect** 94:24
**experience** 22:11 23:1,8,12 24:15,22 25:24 26:1,5,10 95:15 105:13,15
**expert** 12:5 13:8,14,22 14:6,10, 14,24 21:2 26:20 31:7 32:11 45:6
**express** 12:18
**extent** 14:24

**F**

**facilitating** 23:2
**facilities** 41:6,9,18 57:21 59:3 77:21 88:12,16 90:21 91:4,9 92:22 93:17 97:18 101:10 107:13 108:18,19
**facility** 22:22 59:12,13 77:2 93:6, 12 95:7,17 97:14 98:14 100:9 105:14 108:1,14 113:6 114:13
**fact** 20:17 64:2 65:4 76:12,21 77:10 80:6 81:1 101:1 106:18 114:4
**fair** 111:15
**familiar** 16:2 64:16 79:2,3
**family** 9:17, 20 21:18 87:3,5 90:4 105:19 114:3,12
**fast** 111:14
**faster** 36:10 48:21 100:11,16
**February** 36:6 43:12 46:23,24 49:10,14 51:4 56:9, 21 57:17 58:13 59:16 61:1,24 63:8 65:8 69:3 71:7 73:1 74:14 75:9 79:8 80:24 83:19
84:10,17, 23 85:12
**Federal** 6:3
**feel** 102:12,17
**fifteen** 45:18
**Fifty-eight** 22:1
**fifty-seven** 29:24 30:3
**fifty-six** 30:2
**fifty-three** 68:12
**figures** 83:4
**filed** 14:21 16:4 17:20 18:15
**files** 50:3
**find** 17:12 38:11 58:11 91:8 92:15
**fine** 58:9
**finished** 19:3
**five-year** 68:8,16 71:4
**fleet** 94:14, 18 101:16

**flew** 23:23

**follow** 17:23

**foothills** 87:14

**forearm** 16:13,18 17:21

**foreign** 16:15 17:8,12 23:14

**forgive** 103:8 110:6 113:2

**forgot** 7:2

**form** 6:7 25:8,10,17 26:3,12, 16,21 27:3,12, 18,24 32:18 33:1,19 35:8,17 37:3,11,19 38:3 39:4, 9,13 40:5, 12,19 42:15 45:2 46:13,17 48:5 50:12,21 52:10,22 54:6,12 56:10 60:20 63:1,19 64:5 65:15 66:2,7,13 67:22 68:9,17 70:23 74:15 76:7,17,22 77:13 78:14 79:13 81:6,12,24 82:9,13 83:5,15,20 84:3,13,18 85:7,13,21 88:24 89:15 90:18 91:13,19 94:9,20 95:2,8 96:3,14,19 98:3,8,17 99:9,19 101:13,19, 24 102:10, 12 104:15 105:1,10, 21 106:21 107:8,15 108:3 109:20 110:20 111:4,11, 16,22 112:9,24 113:9,17, 23

**formal** 20:10

**formalize** 28:24

**forty** 17:17 18:6

**forty-five** 43:22

**forty-two** 22:2

**found** 17:24

**four/seven** 43:6

**fourteen-minute** 63:15

**fracture** 16:14,18 17:22,24 18:1

**Francisco** 4:21 66:19 67:19

**full** 8:22 86:14

**G**

**Gardea** 32:9

**general** 12:21,23 76:9

**gist** 103:14

**give** 8:18 86:6,14 101:9 102:13

**Gomez** 30:4, 11,20,22, 24

**good** 7:21 9:7,9,10 108:23

**Google** 37:14,21

**Googled** 37:5,8

**grab** 53:9

**Guatemala** 90:13

**Guaynabo** 5:2 71:12,13, 14

**guidance** 103:16

**guidelines** 11:17 12:12 13:5

**H**

**hand** 8:17, 21 48:7 53:14 59:23

**handling**

64:3

**happen** 30:11 67:14

**happened** 31:1

**Harmony** 21:5

**Hato** 61:7 62:12

**hear** 18:7 56:15

**hearing** 6:15

**Heart** 83:3

**Hernandez** 8:6

**high** 68:20 81:16 82:12,15

**highest-rated** 83:18 84:1,9

**HIMA** 5:7,9 32:14 35:23 39:19 40:9,15 57:16 76:1 77:11,19 78:9 79:9, 18 81:3,10 83:17,24 84:9,16,22 85:5,12,19 99:12 100:5 113:14

**HIMA's** 77:7, 10

**hired** 32:12

**history** 13:19 15:11

**Hold** 60:4

**hope** 101:18

**hos** 96:8

**hospital** 4:6,9,11, 14,18,20, 24 5:2,4, 10 10:10, 16 17:19 18:8 23:3 39:3,20 45:13 46:2 47:3,15 48:11 49:1,9,14, 20,23 50:20 51:11,18, 24 52:4,8 53:17,19 54:3 55:8 56:8 57:5, 6,15 58:11,18 59:15 60:1,8,24 61:7,22 62:1,11, 13,17,23 63:6,10, 11,18,23 64:9,17 65:10,21 66:18 67:18 68:23 69:8 71:11,12, 15 72:2, 11,16,20 73:6 74:7 75:13,20 80:8 84:16,22 88:8 92:22 93:2,5,7, 10 97:3 99:5,13 100:18 105:20,24 106:1 110:13

**hospital's** 93:1

**Hospitales** 5:7

**hospitals** 10:3,6,8, 17 34:5,8, 12,18,21 36:16,17 37:5,8,9, 24 38:10, 19 39:1 40:24 41:12,15 43:17,24 45:10 52:19 75:4,9 77:5 85:2 89:11,12, 23 91:17 92:16 95:21 96:8,13 98:7,21 101:4,8 107:1,6

**host** 96:23

**hour** 72:5 80:14,15

**hours** 28:19 32:23 95:24

**Houston** 86:17

**hundred** 68:13,16 82:18,21

**I**

**I-D-O-R-F** 9:1

**idea** 13:3 21:19 25:1,5 27:5,8 31:24

**iden** 12:10

**identified** 42:17 49:22

**imaging** 34:13 43:6 80:15

**immigration** 104:13,20

**improper** 55:5

**inaccurate** 83:13

**inappropriate** 55:12

**incapable** 108:1

**incident** 111:9

**include** 88:3,6,15, 19 90:24

**includes** 26:6,7 88:11

**including** 107:21

**independent** 35:14 47:2 52:19 58:17 77:16

**indeterminate** 40:18

**indicating** 57:12 112:7

**indication** 111:20,24 112:1,6

**indicators** 81:22

**individual** 98:14

**individuals** 110:8

**infection** 17:14 19:2,4,6

**information** 43:16 46:15 62:10 72:21 83:12 99:17 101:15,17

**initially** 17:7

**inquire** 27:21

**interacted** 22:5,8 23:5

**interest** 15:22

**interference** 102:13

**internet** 36:16,18, 24 38:14 92:15,21 93:22

**interpret** 54:19,21

**intervention** 55:11

**interventional** 80:17

**intravenous** 55:14

**introduce** 8:9

**invoice** 28:6

**invoices** 28:12,14

**involved** 14:10

**involvement** 28:17

**involves** 14:15 29:16

**irrelevant** 52:15 99:6

**island** 33:24 34:3 76:14 77:2 84:1, 10 85:17 104:20 105:8 111:8,21

**It's** 78:1

**I'm** 25:23 89:17

**J**

**J.C.A.H.O.** 76:14 81:2

**job** 102:21

**Joint** 76:14

**Juan** 4:6,18 23:16,20, 22,24 24:5,7,10, 13 25:6,21 32:24 35:16 36:2,16 37:5,8,9, 24 38:19 42:19 45:15 49:9 50:4 66:20 69:16 75:5 103:24 104:3

**judge** 55:22

**jury** 51:18

**K**

**Kenya** 90:9

**kind** 37:24 52:15

**knew** 77:20

106:17

**knowing** 88:3,6,11, 15,19

**knowledge** 12:20,22 49:4,11 53:22 60:12,24 71:2,6 77:16 108:6

L

**L.T.D.** 8:4

**laceration** 17:6

**lady** 101:3

**Lainson** 8:8

**land** 104:5, 6

**language** 98:10

**lawsuit** 16:1 17:18 18:14,19

**lawsuits** 19:18

**lawyer** 14:23

**learn** 32:21 64:2

**led** 37:23

**left** 17:10 109:22 110:12

**lend** 72:21

**lengthen** 75:14

**license** 10:20

**licensed** 11:1

**limited** 87:19

**limiting** 15:4

**lines** 20:18, 22 21:2 102:5

**list** 18:7 29:19,23 36:9,14 38:6 41:24 52:5 78:19 80:10 96:12,18

**listed** 12:9 15:10 26:19 40:24 45:13 46:3 57:5 69:8 71:11 73:7 75:1 85:3

**literally** 104:23

105:7

**litigated** 45:7

**litigation** 8:9 20:10

**Lobel** 3:4 7:2,6,10, 23 8:12 25:8,10,17 26:3,12, 16,21 27:3,12, 18,24 32:18 33:1,19 35:8,17 37:3,11,19 38:3 39:4, 9,13 40:5, 12,19 42:15 45:2 46:13,17 48:5 50:12,21 52:10,22 54:6,12, 18,21 55:1,6,9, 10,14,20, 23 56:4,10 60:4,20 63:1,19 64:5 65:15 66:2,7,13 67:22 68:9,17 70:6,23 74:15 76:7,17,22 77:13 78:1,14 79:13 81:6,12,24 82:9,13 83:5,15,20 84:3,13,18 85:7,13,21 86:3,10 89:1,16 90:19 91:14,20 93:19 94:10,22 95:3,9 96:4,15,20 98:4,9,18 99:2,10, 20,23,24 101:14,20 102:1,17, 20,24 103:3,6, 11,14,18, 20 104:16 105:2,11, 22 106:22 107:9,16 108:4 109:21 110:21 111:5,12, 17,23 112:10 113:1,10, 18,24

114:18,20 115:5,8

**local** 93:17 95:21 96:8,12 101:4,10 105:13

**local-to-local** 105:7

**locate** 91:8 92:21

**located** 37:24 38:12 45:14 73:10 100:6,9

**location** 45:12 46:22 49:22 51:19,24 52:9 61:6 65:13 66:18 89:3 92:9

**locations** 36:9,14 38:18 42:1 75:1,2 85:3 90:15

**locum** 10:5

**long** 9:19 11:8 24:1 35:22 40:8,10 86:24 89:2 90:12 111:3 113:16

**longer** 18:9

**looked** 79:18 92:15

**lot** 33:6 97:12

**M**

**M.D.** 86:18,19

**made** 29:6 42:1 51:24 95:21 96:17 98:13

**make** 6:10 16:12 20:13 29:2 44:10,12 52:19 55:16,18 56:3 59:11 75:19 93:7 112:3 114:24

**making** 45:6 47:4 108:8

**malpractice** 15:14 20:6

**Mapquest** 38:24 39:2 40:8,18 50:11 66:24 69:19 71:19 73:14

**mark** 48:8 53:6 59:24 67:17 70:2 72:14

**marked** 4:2 53:15 62:15 74:5 78:5

**Maserati** 50:19

**mass** 104:5,6

**materials** 12:9

**matter** 8:3 9:11 16:17 20:9,17

**meaning** 22:23 65:11 83:2 87:17 99:15

**means** 12:14 41:4,14 44:16 54:14,18 68:20 82:16 93:16 101:9

**measure** 55:7

**mechanical** 55:15

**med** 72:10

**medi** 61:3

**medical** 9:12 12:24 20:23 21:8,11 22:12 23:2,12 24:16 32:13,17 33:15 55:10 64:21 72:11 86:12,15,16 87:6,24 90:22 91:3,24 92:4,9,10 94:4,7,8,13 101:22 103:22 105:14,20 106:17 109:1 114:5,7

**medically** 22:21

**medication** 61:4 88:17

**medications** 88:21

**medicine** 9:18,21 11:13,18 12:11,19 13:5 14:11,16 33:14 48:20 54:8 60:9 64:13 75:16 86:17 87:10 88:1 89:8,18 90:5,8 91:17 92:8 93:11 95:12 105:6 114:4

**Medico** 65:4, 22

**meet** 64:24 101:3,4

**meeting** 101:8

**member** 11:5, 12

**members** 51:18

**memorized** 46:5

**memory** 108:23

**mention** 96:18 97:17

**mentioned** 89:24

**method** 98:20

**methodology** 35:12 38:17 91:2,7,10, 15,17,22, 23 92:2,3, 8,11

**methods** 98:1

**Metropolitano** 5:5 73:7

**Michael** 7:24 8:14 9:10 102:18

**microphone** 7:16

**microphones** 7:14

**middle** 44:14 104:3

**miles** 45:15 50:3 57:10 61:10 63:14 66:20 69:16 71:15,16 73:11

**mind** 29:15

**minute** 50:7

**minutes** 40:15 43:15,17, 20,22 45:19

**Mischaracterized** 54:12

**misrepresent** 29:9

**missed** 16:14,15, 16,23 18:1 19:15

**Modesto** 86:23

**monitor** 8:6 53:8,12 56:15,18

**months** 46:6

**morning** 9:7 39:16 40:9

**move** 86:8

**moving** 89:3

**Mutuo** 4:24 69:9,11 70:11,12 71:3

**N**

**N-** 8:24

**N-A-H-I-T-C-H-E-V-A-N-S-K-Y** 18:18

**named** 17:3 18:19

**names** 15:18 41:11 44:2 78:20,23

**nature** 102:14

**needed** 54:9 88:9 97:23 104:23

**network** 89:21

**neuro** 80:16

**neurologic** 36:18 42:6,9,14, 20,24 52:20 57:23 107:19,21

**neurologist** 59:8 79:10 80:4,14

**neurologists** 34:2,6,9 77:12 78:13

**neurology** 47:6 72:5

**neurosurgeon** 31:18 32:11,14

**neurosurgeons** 33:23 34:6,9

**neurovascular** 88:20 98:16,21

**neurovascularly** 98:22

**News** 4:5,8, 11,14,17, 20,23 5:2, 4 48:10,24 53:15,18 60:1,7 62:7,16 65:20 67:18 70:8,20 72:15,19 74:6,12 81:9,15,22 96:23 97:1 98:23

**Nidorf** 3:2 7:15,17,20 8:2,20,24 9:4 42:12 78:5 115:12

**night** 39:17

**nine-** 24:15

**nine-minute** 57:13

**nine-one-one** 106:5

**ninety-seven** 68:13

**Nobo** 78:24

**noon** 40:10

**normal** 100:16 107:24

**Northern** 10:10,12 17:19 18:7

**Notary** 6:11

**notes** 108:23

**notice** 97:9

**noticed** 31:6

**number** 8:4 29:24 44:20 46:1,4,6 51:10 68:7,19 82:11 89:22,23

**numbers** 30:2 39:18 96:12

**numerous** 94:1

**nurse** 22:9

**O**

**object** 102:16,23

**objecting** 102:12

**objection** 55:4 60:20 88:24 89:15 90:18 91:19 93:18 94:9,20 95:8 96:3, 14,19 98:3,8,17 99:1,9,19 101:13,19, 24 102:10, 14 104:15 105:21 106:21 107:8,15 109:20 110:20 111:4,11, 16,22 112:9,24 113:9,17, 23

**objections** 6:6 56:2 103:2

**occasion** 24:4

**occurred** 112:22

**October** 8:5 30:7,8 97:7

**offer** 34:13 42:13,19 43:5,8 49:1 54:3 60:19 74:12 75:14,22 82:17

**offered** 75:9

**offering** 101:22

**office** 101:3,8

**officials** 101:2

**one-one** 24:16

**open** 43:11

**operated** 31:19

**operates** 33:10

**opinion** 32:4 62:2,14 93:15

**opinions** 12:18 14:24 15:4 25:14 27:22 28:9,24 29:21 32:1,13,16

33:10 35:20
**opposed** 89:19
**opposing** 92:14 99:12
**options** 107:2
**order** 85:4 87:22 91:3,8 92:15 97:2 104:20
**ordered** 35:12
**organization** 10:2
**original** 6:12,16
**outcome** 48:22 85:19
**oversees** 94:18

P

**p.m.** 44:17
**Pablo** 5:7,9 32:15 39:19 40:15 57:24 78:9 79:9 81:3, 10 83:24 84:9,16,22 85:20 99:12 100:5 113:14
**pages** 5:7
**paralegal** 7:2
**paramedic** 24:19
**part** 26:8 31:4 78:2 80:22 104:8
**partially** 78:1
**parties** 6:3
**passport** 104:19
**past** 13:8
**patient** 18:21 19:1,3 22:12,21 32:23 41:8 42:18 49:19 57:2 64:4 68:4 71:4 88:7, 9,22 90:22 93:5,13 95:6,16 97:20,24 105:13,18 107:7 108:19 110:9 112:17 113:16 114:13
**patients** 22:14 36:18 41:5 47:13,17 54:13 55:7 64:14,21 66:10 67:14,15, 21 68:7, 16,23 72:4 81:23 82:12,22 88:12,17 91:9 97:24 98:16 99:21
**Pavia** 58:11, 18 60:8,24 61:7 62:12,24
**Pavia-** 60:1
**Pavia-hato** 4:15
**Pavia-santurce** 4:12 57:6, 8
**Pedro** 26:15
**pending** 19:19
**people** 27:15 67:12
**percent** 54:17 66:10
**percentage** 54:13 55:6
**Pereira** 95:21 96:7,17 112:2
**perform** 91:18
**performing** 81:16
**period** 68:8, 16 71:4 111:3
**person** 42:11 45:5 46:15 47:19,21 50:19 61:18 62:4 73:18 112:17
**personal** 23:12 24:22 49:4 53:22 60:12,23
**personally** 37:9
**phone** 42:1, 2,12 44:8,

18,20,24 46:20 47:4,19 67:11,13 70:1 72:9 93:7 95:20 96:12 98:13 107:12 108:8

**phones** 94:1

**physician** 10:18 11:17 12:11 13:4 17:2,7,11 26:6 42:17 79:4 87:8, 10 90:4 92:21 107:24 114:3,12

**Physician's** 102:5

**physicians** 10:3 11:6, 14 94:18

**pick** 42:11 110:8

**picked** 42:1 106:6

**place** 25:15 82:20 85:11 113:15

**plaintiff** 13:23 14:15

**Plaintiff's** 27:15

**Plaintiffs** 8:13

**plasminogen** 34:22 55:15

**play** 103:9

**point** 31:24 37:6 45:14 49:8 50:3 57:10 61:9 66:20 71:16 73:10 75:3 106:24

**policies** 25:15,21

**population** 49:20 57:3

**Poranski** 17:18

**port** 23:9, 13,14,19 24:9,12 38:8,9,12, 19,24 39:3 45:15 50:4,19 61:10 63:14 66:20 69:16 71:16 73:11 96:1 99:18 100:4,5, 10,18,21, 24 102:9 103:23 104:3 107:14 108:17 109:2 112:7

**portion** 17:16 87:6

**ports** 23:9

**position** 85:10 108:15

**possibility** 58:5

**Possibly** 21:15

**potential** 100:16,17 110:18 113:5 114:4

**Poughkeepsie** 10:16

**practice** 9:18,21 87:3,5,23, 24 89:4 90:7 92:7, 20 93:4,9, 11 95:11 98:5 105:19

**practiced** 40:23 90:9,10

**practices** 114:3

**practicing** 89:8 92:7

**pre-suit** 20:9

**prefer** 102:23

**preparing** 28:9

**Presbyterian** 4:9 49:23 51:11,18, 23 52:8 53:16,19 54:2,10 56:8

**prescribed** 19:7,9,10

**prescription** 19:14

**presentation** 113:3

**presented** 106:19

**presumptively** 101:9

**presumptuous** 55:24

**Pretty** 108:23

**previous** 22:16

**primary** 35:3,21 76:13 80:8 81:2

**printed** 97:7 98:23

**printout** 48:2 78:8

**printouts** 97:6

**privileges** 18:8

**proactively** 112:18

**procedure** 6:4 94:24

**procedures** 94:4 95:5 105:5

**process** 38:1

**produced** 28:13

**Professional** 5:2 71:12

**proper** 19:5, 6

**proportionate** 51:2

**protocols** 25:15,21 102:5

**provide** 32:4,12 34:19 47:6 52:6 53:17 55:8 62:24 64:13 66:10 67:20 70:21 78:24 88:8

**provided** 13:18 15:11 22:21 36:18 42:6 46:16 54:16

**providing** 47:11 52:20 53:3 67:8,13 85:11

**psychiatric** 72:16

**public** 6:11 36:2 83:8

**Puerto** 23:14,17, 23 24:2, 16,19,23 25:3,6,16, 21 26:10 27:16 31:18,22 32:14,24 33:10,13, 24 34:3,5, 8,12,16, 18,21 35:1,4,13 36:3 65:5 76:15 83:18 84:1,10 85:17 96:12 99:13 101:5 104:8,19

**pull** 79:21

**purposes** 97:20 105:4

**pursuant** 6:5

**put** 8:21 39:21

**Q**

**qualified** 32:3,16

**qualify** 42:22

**quality** 81:22

**quantifies** 55:8

**question** 22:18 36:11 46:16 51:20 52:2 59:14 63:21 64:7 76:9 84:5 103:7,8 109:14

**questions** 6:7 72:8 85:24 97:12 102:15 112:3

**quicker** 107:2

**quickly** 100:11

**quietly** 102:16

**R**

**radiologists** 34:15

**raise** 8:17

**Ramos** 31:12, 14 32:22

**range** 68:12, 20 82:17 97:7 106:2

**rank** 72:20

**ranked** 48:15

**ranking** 53:16 60:1,8 66:9 67:18 74:7 81:9,14 82:6 83:1

**rankings** 48:9 83:22 84:20

**rating** 53:20 60:9 62:6 65:22 70:14,18

**ratings** 62:5

**ray** 18:2

**re-ask** 103:7

**reached** 37:22

**reaching** 111:21 112:8

**read** 6:9 26:14 27:7,10 30:10 103:11 114:24

**ready** 79:10,17

**reason** 22:6,9 23:6

**reasonable** 101:21 109:13,18 110:5

**recall** 11:20,23 14:17 16:24 27:20 46:19 58:16 67:3,5 71:22 92:14,18 97:14 101:1 102:3

**receive** 64:17 75:15 80:8 85:4

**received** 10:22 41:18 48:21 75:17 83:1

**record** 8:23 44:8,24 54:22 55:17,19 69:15 72:16

**records** 77:21 79:18 106:17 109:1,5,8 110:7,11 111:8,20

**referred** 41:8

**referring** 13:11 55:2 69:12

**refute** 49:5 53:23 60:13 62:21 65:24 66:15 70:17 72:17 74:9 81:19 83:24 84:8 85:10

**regard** 24:23 32:1,4 98:6

**relates** 61:22 77:18 82:5,11

**relation** 38:8,12

**relative** 67:19

**relevant** 102:8 103:15

**reliable** 98:22

**relied** 48:2

**rely** 98:12

**relying** 98:23

**remains** 95:6,16

**remember** 12:4 37:15,16

**remote** 90:14

**render** 32:16 65:12

**rendering** 53:3 58:12 64:21

**renders** 64:20

**repair** 17:9,12

**repeat** 14:12 34:7 84:5 109:14

**reperfusion** 48:15 55:3,7 60:19 62:24 66:5 67:21 74:12 82:5

**report** 12:5 26:20 28:5,23 29:6,10,12 30:21 31:4 36:8 39:23

41:23 43:14 45:14,17, 22 46:21 48:9,10 49:1,5 50:2 53:16,19 57:6,10 58:6 59:11 60:1,8 61:7 62:7, 17 63:10, 13 65:21 66:19 67:18 70:9,21 71:15 72:19 73:8 74:7,12 77:18 81:9,15,22 85:3 98:23

**reported** 112:14

**reporter** 8:7,10,16, 21 9:2 65:16,18 103:9,13, 17

**reports** 31:7 98:11

**represent** 9:11

**representation** 72:7,22 98:15

**representations** 29:6 99:6

**representative** 100:21

**required** 59:5 77:21

**research** 15:23 25:13,20 35:10,15 47:3 48:1 52:19 58:18,21, 22 61:20 64:2 67:10 68:22 69:24 73:11 74:3 87:22 91:16 93:17 106:24 107:13 108:13,17

**researched** 36:15,24 38:8 47:5

**reserved** 6:8

**residency** 86:20 87:5,11 92:4,7

**resolve** 17:15

**resolved** 18:4 20:10

**resources** 25:6 27:17 31:21 32:17 33:18,21 64:13 87:19,23 89:19,22 90:16 91:4 92:9

**respective** 6:3

**respond** 111:9,14

**response** 25:2 37:23 88:3 109:8,12, 15,18

**responsiveness** 6:7

**restaurant** 106:5

**returned** 6:13

**review** 11:24 12:14,17 28:24 31:11 94:3 111:19

**reviewed** 11:16,21 12:10 13:12 18:23 29:16,20 31:7 73:23 102:4 108:24 109:4

**reviewing** 31:4 61:19 69:23 77:20 106:24 109:7

**Rey** 4:15 61:7 62:12

**Reynaldo** 30:3

**Rhinebeck** 10:11,14 18:12

**Rican** 33:14

**Richard** 8:3

**Rico** 23:14, 17,23 24:2,16, 19,23 25:3,6,16, 21 26:10 27:16 31:18,22 32:14,24 33:10,24 34:3,5,9,

12,16,18, 21 35:1,4, 13 36:3 65:5 76:15 83:19 84:2,10 85:17 96:12 99:13 101:5 104:8,19

**Rodolfo** 32:9

**room** 10:18 13:4 17:5 87:8

**rooms** 12:23

**Royal** 8:3 9:11 21:4, 7,13 61:23 94:3,7 101:2,7 106:10,17 109:2 113:13

**rule** 59:2, 6,20,22

**Rules** 6:3

**rulings** 15:4

**rural** 26:7 87:13,15, 18,23 89:3,5,14, 20 90:10 91:9 105:24

**Russian** 18:17

**S**

**San** 4:6,18, 20 5:7,9 23:16,20, 22,23 24:5,7,9, 13 25:6,21 32:15,24 35:16,23 36:2,16 37:5,8,9, 24 38:19 39:19 40:9,15 42:19 45:15 49:9 50:4 57:24 66:18,20 67:18 69:16 75:5 78:9 79:9 81:3,10 83:18,24 84:9,16,22 85:5,12,20 99:12 100:5 103:23 104:3 113:14

**Sanchez** 26:15

**Santurce** 60:2

**Sarah** 7:23 8:12 102:10

**scan** 80:16

**school** 86:16 91:24

**score** 53:20

**Scorecard** 4:5,8,11, 14,17,20, 23 5:4,9

**sea** 106:14

**search** 37:1, 14,16,23 40:17

**searched** 40:2

**Seas** 21:5

**section** 11:13 29:16

**send** 75:22

**sending** 99:17

**sense** 75:19

**sensitive** 55:10 114:8

**serve** 10:5, 18 21:2

**served** 12:24 13:1,7,22 14:10

**service** 24:23 25:7 42:6,8,13, 20 75:23 111:21

**services** 25:16,22 27:16 35:15 43:1 54:4 61:1 72:11

**settled** 16:13 17:16 18:5

**seventeen** 60:3

**seventeen-minute** 61:12

**ship** 11:13, 18 12:11, 19,24 13:1,5 20:14,23 21:10 22:3,6,9, 12 23:2,6 96:11 100:14 102:9 103:23 104:3,14, 23,24 105:6 108:17

110:8,9, 12,17 111:1 112:7

**shipboard** 93:16 101:16 106:11 109:1

**ships** 94:8, 14 95:1 99:17 101:23 104:2

**shore** 22:22 23:3

**shoreside** 94:17

**shown** 96:22

**sick** 22:14

**sicker** 19:3

**side** 23:3

**sign** 6:9

**signed** 6:13 28:23

**significant** 97:22 110:16

**similar** 33:21

**simply** 50:10 57:20 75:3

**sir** 33:4

60:2 70:4 78:17

**sit** 13:2 25:1,5 27:1,10 28:8 62:11,20 63:5 65:3, 23 68:2 72:17 74:8 76:20 81:18 83:12,23 84:6 85:9

**site** 22:22

**situation** 105:6,18 106:4,9

**sixteen** 21:17

**sixteen-minute** 66:23

**small** 87:13, 18

**solutions** 7:9

**sort** 22:3

**sound** 16:2 79:2,3

**sounded** 70:10

**source** 97:1

**speak** 45:9 51:13

58:15 61:14 67:2

**speaking** 54:24 55:4 56:1 98:13

**special** 114:22

**specialty** 9:16 87:2

**specific** 52:3,4 63:24 71:7 90:22

**specifically** 11:20 30:2 31:21 35:10 43:1 46:19 48:10 51:22 57:19 58:1 77:3 107:17

**specifics** 38:18

**spell** 8:22 18:16

**spend** 28:4 29:5

**spent** 28:9, 17,19

**splinter** 16:15,23 17:1

**spoke** 17:23 31:21 44:3,6 46:10 47:19 69:21 73:19 95:23

**spoken** 24:12,18 35:13 41:14

**staff** 10:4 34:6,10 77:12 80:4

**staffing** 10:2 49:13 56:14,20 69:2 71:7 73:1 74:20

**standard** 92:20 93:4,10 95:11

**standing** 102:13

**stapler** 53:10

**staplers** 53:7

**start** 87:10

**started** 87:7,9 92:6

**starting** 37:6

**starts** 29:17

**state** 8:22 16:4 80:1 97:18

**stated** 30:23 43:15

**States** 23:13 26:2,8 33:16,22 42:18 104:8

**stay** 23:22

**step** 36:20

**STIPULATED** 6:2,6,9,12

**STIPULATIONS** 6:1

**strike** 31:6 80:7 86:8 100:3 104:7 108:24

**stripped** 64:9 65:7, 11

**stroke** 4:5, 8,11,14, 17,20,23 5:4,9 14:10,15 34:24 35:3 47:11,17 48:9 52:6 53:17,20 54:13 55:6 58:12 60:9 62:1,13,18 64:3,9,13, 21 65:12, 22 67:8, 13,14,19 68:4,7,23 70:14 72:4,20 74:8 76:3, 6,13 77:2 80:8 81:2, 15 83:2,18 84:1,9 85:16 88:17,22 98:1 99:7 100:16 106:19 108:2,10, 11,20 110:18 113:5,15 114:5

**stroke-capable** 91:4,16

**strokes** 47:8,13 57:22 75:4,6 77:22 88:13 90:24

**studies** 17:24

**subcontract** 10:3

**subpoena** 6:5

**subsequent** 17:14,24 18:22 19:13,16

**subtle** 16:13 17:21

**sued** 15:13

**suffering** 88:22 98:16 100:15 103:22 106:18 108:20 110:18 113:5

**suggest** 74:13 84:21

**suits** 20:6

**summarizing** 38:1

**supervising** 17:3

**supplied** 31:10

**support** 25:14 29:20

**suppose** 87:13

**surprised** 32:21 33:3,5

**survival** 81:23 82:2

**Susan** 16:1, 17

**suspended** 10:20

**swear** 8:10, 17

**sworn** 3:2 9:3,4

**system** 33:15,17 89:21

**T**

**T.P.A.** 34:22 43:3 48:18 49:1,9 53:4 54:3 56:8 59:15,16 60:19 61:1,3 63:6 68:1, 3 70:21 71:3 74:14,17 75:9,14,21 80:21 82:6 85:4,11,18

88:16 97:14,18, 19,23 98:7 107:6,14, 18 113:8, 21

**taking** 6:14 47:7

**talked** 58:22

**Teamhealth** 9:24 10:1

**telling** 51:17

**ten** 24:3 66:10 69:16 71:15,16

**term** 37:17

**terms** 39:20 80:19 89:22

**testified** 13:12,13, 16 14:5,14 15:7 20:2 27:5 32:22 95:23

**testifying** 101:1

**testimonial** 13:18 15:10

**testimony** 8:18 25:23 27:15 67:6 93:21,24 96:10,17 100:20

**Texas** 86:17

**That's** 96:9

**therapy** 34:19 43:9 48:15 54:16 55:3,7 60:19 62:24 66:5 67:21 70:21 74:13 82:6

**thing** 101:22

**things** 35:21

**thirty** 26:5 105:15

**thought** 19:24 28:2

**thousand** 17:17 18:6 82:21

**thousands** 99:20

**three-** 87:4

**thrombectomy** 55:15

**throw** 51:8 53:10

**time** 6:5,14 8:5 11:21 12:17 13:22 15:22 21:18 25:2 28:3,4,9, 16 29:5 38:9,16 39:1,11, 12,21 40:2,16, 18,22 44:12,17 45:22 50:9,17 53:10 55:8 75:15 99:5 101:6 103:22 106:13 109:9,12, 15,16,17, 19,22,23 110:7,12, 16,17,19, 24 111:2, 3,9,10 113:3,6 114:8 115:12

**times** 13:10, 12,13,17 15:7,9,16, 17 20:2 22:14 50:23 88:4

**timing** 31:22 32:17 109:8

**tissue** 34:22 55:14

**title** 44:5 51:15 61:16 67:4 71:23 73:21

**today** 13:3 27:1 28:8 49:8 62:11 63:5 65:3, 23 68:2 72:17 74:9 76:20 80:1 81:18 83:12,23 84:6 85:9

**today's** 8:5 30:6 86:15

**total** 15:8 28:16 43:22

**totally** 55:5,22

**touching** 104:4

**Townsend** 16:1,17 17:5

**traffic** 51:4 100:18

**trained** 86:7

91:23 92:4

**training** 86:13,15 87:6

**transcript** 31:12 114:24

**transfer** 32:23 52:1 61:24 88:7 93:5

**transferred** 85:5 95:6, 17

**transfers** 31:22 32:17 92:10

**transparency** 83:9

**transparent** 83:2

**transport** 90:16 100:11,17 105:7,13 114:13

**transported** 104:24 105:19 106:7 113:20

**transporting** 113:16

**traveling** 104:18

**treat** 79:10 84:17,23 88:12,17, 21 91:9 98:1 107:3 108:19 113:15

**treated** 41:5 54:14 55:7 97:24

**treater** 22:20

**treating** 22:11 47:17 52:16 90:21 93:12 98:15 108:2

**treatment** 88:9 94:8 97:20 101:23

**trial** 6:8,14

**true** 85:23

**truth** 8:18, 19 98:5

**turn** 48:11 54:1 60:15 67:19 82:3 83:2

**turned** 17:13,23

**turning** 29:15

**twelve** 73:10

**twenty** 11:11

**twenty-** 43:5

**twenty-four** 80:15

**twenty-four-** 72:4 80:13

**twenty-four-hour** 42:6, 8,13 47:6 52:20 57:22 59:7

**twenty-four-seven** 107:18

**twenty-four/seven** 34:13

**twenty-minute** 69:19 71:18

**twenty-nine** 9:21

**twenty-seven-minute** 73:13

**twenty-two** 9:22

**type** 10:22 21:19 37:13 42:24 90:22

**typed** 37:22

**types** 114:7

**typically** 67:15

**U**

**U.S.** 4:5,8, 11,14,17, 20,23 5:2, 4 48:10,24 53:15,18 59:24 60:7 62:7,16 65:20 67:18 70:8,20 72:15,19 74:6,11 81:9,15,21 95:11 96:23 97:1 98:23 102:9

**Uh-huh** 10:13 16:6 30:9 31:20 48:13 65:6 78:10

**Ulises** 78:24

**ultimately** 19:3 20:10 52:1 75:15

**unaware** 65:4

**understand** 9:12 41:23 108:18

**Understood** 22:17 108:22

**unintelligible** 7:3

**United** 23:13 26:1,8 33:16,22 42:18 104:8

**universe** 30:18

**University** 4:17 63:11,17, 23 64:8 65:21

**unreasonably** 111:3

**Upstate** 89:13,19

**urban** 106:1

**V**

**vascular** 34:2,9 77:11 78:13 79:10 80:3

**Vassar** 10:15

**verbal** 7:12

**verify** 43:16 83:3

**versus** 8:3 40:9 97:24

**vessel** 21:14 22:22,23

**vessels** 21:8

**viable** 46:22 51:19 65:13

**video** 8:2 115:12

**Vietnam** 90:10

**virtue** 80:6 81:1

**visited** 41:20

**Vladimir** 18:15

**W**

**wait** 7:8

**waive** 115:1, 3

**wanted** 40:2, 8

**water** 104:4

**ways** 7:7 75:7 92:23,24 93:14

**website** 37:14 46:3 47:6,12, 15,19 48:2 61:20 67:7 69:23 72:7 73:24 78:2,9

**websites** 37:1 58:23 77:5

**week** 22:16 45:23 50:10

**weekly** 99:18

**whatsoever** 95:20 112:22

**wheeled** 104:24

**whoa** 103:18

**window** 113:7,22

**wondering** 46:7

**wood** 16:14 17:1

**work** 10:9 18:9 40:1 51:7 89:2, 11,13 114:13

**worked** 20:14,18 87:12,13 89:5,20 90:1,3 98:14 101:3

**working** 12:20,22 26:6,7 87:7,10 88:8 95:15

**works** 32:14

**world** 48:10 49:1 53:16,19 60:1,8 62:7,17 65:21 67:18 70:8,20 72:16,19 74:6,12 81:9,15,22 91:5

**worse** 19:4

**wound** 17:8, 12 18:23

**written** 11:17

**wrong** 41:24

**wrote** 28:5 29:3 46:7

**X**

**x-** 18:1

**Y**

**year** 87:5

**years** 9:21, 22 11:10, 11 22:2 24:3 26:5 68:4 87:1 105:12,15

**York** 10:11 11:1 16:5 33:7,11 89:9,13,19

**you'll** 102:13