University of Missouri

**Department of Neurology**
School of Medicine

CS & E Building, One Hospital Drive, CE507
Columbia, MO 65212

PHONE 573-882-8668
FAX 573-884-4249

August 26th, 2022

Sarah A. Lobel, Esq.
Hickey Law Firm
1401 Brickell Avenue
Suite 510
Miami, FL 33131

Re: Richard Burgess v. Royal Caribbean Cruises LTD., et al.,
United States District Court Southern District of Florida Case No.: 1:20-cv-20687- OTAZO-REYES

Dear Ms. Lobel:

As per your request, I have reviewed all the records you have sent me regarding the case captioned above. The present constitutes the work product of my review, as well as my expert opinions about the medical care received by Mr. Burgess.

**MATERIALS RECEIVED & REVIEWED**

1. Medical Records & Clinical Items
   a. Pre-Incident Photos & Videos of Richard Burgess
   b. Pre-Incident Medical Records: York ENT Associates
   c. Pre-Incident Medical Records: WellSpan Good Samaritan Hospital
   d. Pre-Incident Medical Records: WellSpan York Hospital
   e. Incident Medical Records: Royal Caribbean Cruises, Ltd. (RCCL) Harmony of the Sea Infirmary
   f. Incident Medical Records: Sunny Ambulance, Inc.
   g. Incident Medical Records: Hospital HIM San Pablo – Caguas, PR
   h. Post-Incident Medical Records: Express Air Medical Transport
   i. Post-Incident Medical Records: Select Specialty Hospital
   j. Post-Incident Medical Records: Magee Rehabilitation Hospital
   k. Post-Incident Medical Records: WellSpan Pulmonary and Sleep Medicine
   l. Post-Incident Medical Records: WellSpan VNA Home Care
   m. Post-Incident Medical Records: WellSpan York Hospital
   n. Post-Incident Medical Records: WellSpan Physiatry
   o. Post-Incident Medical Records: York ENT Associates
   p. Post-Incident Medical Records: Mobilex USA
   q. Post-Incident Medical Records: Aspire Prosthetics & Orthotics, Inc.
   r. Post-Incident Medical Records: Young's Medical Equipment
   s. Post-Incident Photos & Videos of Richard Burgess

DRAFT

2. Imaging Studies (ACTUAL IMAGES ON COMPUTER DISC)s
    a. Brain MRI - 03DEC18 – 1500 hrs.
    b. Extracranial Neurovascular Ultrasound – 03DEC18 – 1500 hrs.
    c. Brain CT – 21FEB19 – 1400 hrs.
    d. CTA – Extra & Intracranial – 21FEB19 – 1430 hrs.
    e. Brain MRI – 22FEB19 – 0530 hrs.
    f. Brain CT – 22FEB19 – 0845 hrs.
    g. CTA – Intracranial – 22FEB19 – 0945 hrs.
    h. CTP – 22FEB19 – 0945 hrs.
    i. Brain CT – 22FEB19 – 2000 hrs.
3. Legal Documents
    a. RCCL's Answers to Plaintiff's Interrogatories
    b. RCCL's Answers to Plaintiff's Second Interrogatories
    c. RCCL's Responses to Plaintiff's Requests for Production
    d. RCCL's Responses to Plaintiff's Second Request for Production
    e. RCCL's Responses to Plaintiff's Request for Admissions
    f. RCCL's Responses to RFA
    g. RCCL's Responses to RFP
    h. Defendant's Rule 26 Disclosures
    i. Plaintiff's Answers to Interrogatories
    j. Plaintiff's Responses to Discovery
    k. Plaintiff's Responses to RFP
    l. DE 30 – Plaintiff's Amended Complaint
    m. DE 63 – Second Amended Scheduling Order
4. Depositions
    a. Joao Pereira, MD
    b. Ben Shore, MD
    c. Daniel Threadgill-Colón
    d. Darren Henze
    e. Ilene Landrum
    f. Jimmie Landrum
    g. Joseph Hiatt
    h. Susan Hiatt
    i. Richard Burgess
5. Medical Literature (REFERENCES AT THE END OF THE REPORT)
6. Additional Documents & Materials
    a. Expert Report from David Nidorf, MD
    b. Expert Report from Mahul Desai, MD
    c. ACEP - CRUISE LINE CONTACTS FOR JOBS

d. ACEP - Cruise Ship Medicine Section - Cruise Line Directory
e. ACEP - Clinical Policy - TIA - 2016
f. ACEP – Clinical Policy - tPA for Stroke – 2015
g. Negociado del Cuerpo de Emergencias Médicas de Puerto Rico Manuals and Protocols (Medical Emergency Services of Puerto Rico)
    i. Manual De Operaciones CEMPR Revision Oct 2012 (Manual of Procedural Operations)
    ii. Flujograma de Despacho (Dispatch Flowchart)
    iii. 4-2 CVA y TIA Rev-16 (Flowchart – Stroke & TIA)
    iv. 1-0 Protocolo de evaluation inicial de pacientes Rev. 16 (Initial On Scene Evaluation Protocol)
h. RCCL Emails/Communications regarding Richard Burgess
i. Harmony of the Seas Infirmary Pictures
    i. Waiting Area
    ii. Interior
j. Index of Hospitals and Medical Centers in the Region of the Port of San Juan, Puerto Rico
k. Maps – Hospitals in San Juan, Puerto Rico

**CLINICAL SUMMARY OF THE CASE**

On the morning of 21FEB19, at approximately 0925 hours (1025 San Juan time), Mr. Richard Burgess (DOB 14MAR57) a 61-year-old man, was seen in medical triage at the infirmary of the Harmony of the Seas cruise ship by nurse Mary Bremner as a "*911 call*" for *"inability to move fingers of the right hand"* and *"unstable gait"*. He had sustained a fall three days earlier during the cruise, resulting in a scalp laceration that required sutures. The history recorded by the physician on duty, Dr. Joao Pereira, indicated that the estimated time of onset (ETO) of the symptoms was approximately 0915 hours (1015 San Juan time), with the syndrome including *"sudden onset of weakness of the right lower limb, plus vision changes in the right eye"*. Until such time, there is no record of the patient having had any symptoms. In fact. Dr. Pereira clearly recorded that the patient *"was asymptomatic when he woke up"*. By 0955 hours (1055 San Juan time), Dr. Pereira had already concluded that the patient needed a neurologic consultation and made a referral stating: *"Please evaluate (including CT scan if you see fit) and treat accordingly"*. In fact, his closing remarks in the clinical note include a final diagnosis of *"Acute cerebrovascular insufficiency"* (i.e., acute stroke) and a plan for *"immediate neurological/neurosurgical evaluation"*.

The ship's medical secretary, Mr. James Russell, requested a Basic Life Support (BLS) ambulance from the San Juan agent at 0959 hours (1059 San Juan time). However, the records from Sunny Ambulance, Inc. note that they were first contacted at 1221 hours (San Juan time), and the actual transfer of the patient from the ship to the HIMA San Carlos Caguas Hospital took place between 1310 hours San Juan time (i.e., as evidenced by the first and only set of recorded vital signs) and 1350 hours (also San Juan time).

The Emergency Department (ED) Medical Evaluation Form at the HIMA San Pablo Caguas Hospital, logged at 1404 hours (San Juan time for this and all subsequent time entries) on the same 21FEB19 (i.e., ~ 3.5 – 4.0 hours after the ETO of the stroke), indicates the patient to have *"right side weakness"* by physical examination. The Acute Stroke Screening Sheet, completed by a nurse at 1359 hours, recorded *"Weakness R"* and *"Abnormal"* speech. At 1406 hours, the records show the first National Institutes of Health Stroke Scale (NIHSS) recorded, with a score of *"6"*. The vascular neurologic consultation, recorded at 1359 hours, indicates a history that the patient *"woke up today without any problems. At 9:30 am, developed visual loss over the right side and right-side weakness, worse in the leg"*. The vascular neurologist's impression was recorded as *"Acute, L PCA ischemic stroke"* and, additionally, *"Needs to exclude a cervicocephalic dissection involving posterior circulation"*. His recommendations explicitly included entries indicating *"No use of IV r-tPA"*, based on two disqualifications: 1) *"Outside window"* and *"Already completed stroke / small SAH"*. The formal report of the CT scan obtained in the ED (at 1400 hours), transcribed (and presumably available) at 1504 hours, reads *"No detectable acute territorial infarcts"*. The report of the CT Angiogram (CTA), obtained at 1430 hours, was transcribed (and presumably available) at 1524 hours and read as *"Normal Neck CTA"*. NOTE: An addendum to the latter was signed (and presumably was available) the next day, 22FEB19 at 1341 hours, and indicated *"A filling defect is seen in the proximal V1 segment of the right vertebral artery, likely due to an intraluminal blood clot"*.

Mr. Burgess was then admitted to the *"Stroke Unit"* and orders to treat him using the protocol of *"Ischemic stroke"* were issued. On the same day, at 1900 hours, the nursing notes refer to the patient's status as *"awake and conscious"*. This pattern is repeated through multiple notes over the course of hours.

On 22FEB19, at 0400, the nursing notes record the patient having *"shaking and convulsions"* and he is noted to have *"weakness more marked on the right side"*. Then, at 0530 hours, the patient underwent the requested MRI study. The report of this MRI, however, was not transcribed (and presumably unavailable) until 1413 hours, demonstrating *"focal restricted diffusion at the left thalamus/internal capsule. There is also diffuse restricted diffusion of the left occipital lobe and hippocampal formation at the mesial temporal lobe"*. In addition, the report continued with *"there is also restricted diffusion about the left anterior superior cerebellar hemisphere to the distribution of the left anterior superior cerebellar artery and at the inferior most left cerebellar hemisphere, vermis, and inferior cerebellar peduncle to the distribution of the left PICA. Findings are in keeping with findings on the same date CT angiography of occlusion or very slow flow of the basilar artery. There is occlusion of the left PCA as well"*.

Next, at 0845 hours, Mr. Burgess had to have a repeat urgent CT scan due to a clinical neurologic change (described by the vascular neurologist as *"new left hemiparesis and inability to speak plus vomitus"*) and, at 0910 hours, a "Code Green" was called. The patient was urgently intubated for airway protection, with a Glasgow Coma Scale score = 9. This was carried out via rapid sequence using a Miller #3 blade and a 7.5 mm endotracheal (ET) tube. He then underwent repeat urgent CTA and CT Perfusion (CTP) studies at 0945 hours. The report of that repeat CT scan, transcribed (and presumably available) on

22FEB19 at 1202 hours, indicated *"Acute left PCA territory ischemic infarction involving the left occipital lobe and the posterior left temporal lobe"*. The report of the CTA, transcribed (and presumably available) at 1208 hours, described *"Left posterior artery territory ischemic infarction as per recent CT"* and *"non visualization of the distal vertebral or basilar arteries"*. Concurrently, the CTP report indicated *"abnormal MTT map in the right cerebellum, and brainstem which suggests at risk tissue"*.

The neurosurgery consultation, completed at 1020 hours, concluded with the diagnosis of *"basilar artery stroke"* with an apparent onset at *"3:30 am"*. The recommendation was to proceed with thrombectomy, and the pre-procedure note was completed at 1030 hours. A formal procedure note and report were not found among the medical records. Although radial arteriotomy care orders were logged at 1345 hours, the completion time of the procedure appears to be 1400 hours, as evidenced by the hand-written post-procedure note. In addition, the femoral arteriotomy orders were entered at 1430 hours. The procedural nursing notes record how the thrombectomy could not be carried out, and the procedure was aborted at 13:35 hours. Another *"STAT Head CT"* was ordered at 1730 hours, and the formal report was transcribed (and presumably available) at 2103 hours. It demonstrated *"ill-defined decreased attenuation at the left thalamic nucleus, the left occipital lobe, the left lateral cerebellar hemisphere and the right superior cerebellar hemisphere, concerning for evolving acute ischemic changes"*. The patient had one final CT scan of the head on 23FEB19, and its report was transcribed (and presumably available) at 1935 hours. It demonstrated *"Multiple areas of infarction involving the posterior circulation without significant change when compared to prior"*. The final summary by the vascular neurologist describes the clinical outcome of the patient by stating that he *"evolved in a state almost complete locked-in syndrome with preserved eye movements, minimal motor activity in the left lower extremity and mechanical ventilation"*.

Finally, on 25FEB19, Mr. Burgess was transferred via air ambulance to WellSpan York Hospital in York, Pennsylvania. There, he remained until 05MAR19, when he was transferred to Select Specialty Hospital, a long-term acute care (LTAC) facility also in York, Pennsylvania. Then, on 29MAY19, he was transferred to McGee Rehabilitation Hospital in Philadelphia, Pennsylvania.

We had the opportunity to meet and interview Mr. Burgess in his home by videoconferencing on 21AUG22. He and his husband report that he continues to have issues with his affect, their description resembling a pseudobulbar state, as well as a considerably diminished capacity for remembering recently acquired information (i.e., abnormal registration of new memories). He is able to communicate verbally, although it is often difficult to understand him due to his marked dysarthria, and he still has a tracheostomy in place. On direct questioning, they noted that his otolaryngologist has indicated that he is *"still aspirating"* and is not ready to have the tracheostomy closed. Presently, it is not known if and when this will be carried out. He requires maximal assistance and a bedside lift to transfer from his bed to his wheelchair, and maximal assistance to stand up and be able to complete only a few steps at a time. Otherwise, his wheelchair is his primary means of mobility and, for practical purposes, he is bound to it. He also requires moderate-maximal assistance with dressing, toileting, and bathing. He is somewhat able use his hands to feed himself, partially and slowly, although he remains incapable of using a fork and knife. They noted that, although he is improved in comparison to how he was one year ago, there has

been no visible improvement for the last six months. Neurologically, to our examination, he appears awake, alert, severely dysarthric, and with evidence of a considerable visual field defect. He also displays conspicuous truncal and upper appendicular ataxia, as well as significantly loss of dexterity of both hands. We did not inspect his lower limbs as he cannot stand without maximal assistance.

## EXPERT QUALIFICATIONS

I am a board-certified vascular neurologist and have been practicing this specialty for over 40 years, both as a faculty member of different academic institutions (i.e., Saint Louis University, University of Alabama at Birmingham, Loyola University - Chicago and, currently, University of Missouri Columbia) and in private practice. I have also been medical director of three separate stroke centers and have been in the medical staff of two more. In addition, I am one of the most senior interventional neurologists in these United States, and the current Chair of the Certification Committee of this specialty for the United Council for Neurologic Subspecialties (UCNS), the current national board-certifying organization. Along my career, I have been directly or indirectly involved in the care of over 40,000 stroke patients and have acquired expertise in the acquisition and interpretation of imaging studies pertaining to the central nervous system. In this context, I was also medical director of a neuroimaging center, as well as the program director for a UCNS-Accredited neuroimaging fellowship, for approximately 10 years. I believe that all of these attributes qualify me to examine, analyze, and comment on the particulars of the care Mr. Burgess received for his stroke.

## EXPERT CEREBROVASCULAR OPINIONS

Diagnosis: In my opinion Mr. Burgess suffered an acute ischemic stroke with onset on the morning of the 21st of February of 2019, at approximately 0915 – 0930 hours (1015 – 1030 hours San Juan time). Such a time of onset (i.e., the ETO to which I referred above) is of critical importance and has been consistently documented in the medical records by multiple physicians. Presently, we have seen no evidence that the patient experienced any stroke symptoms prior to the ETO and, therefore, the only possible conclusion, **within a reasonable degree of medical probability,** is that the ischemic process driving the stroke onset began at approximately 0915 hours (1015 San Juan time). The time course of evolution of Mr. Burgess' stroke event followed a bimodal pattern, with the earlier symptoms resulting from downstream embolization of the left posterior cerebral artery from *in situ* thrombosis of the most proximal segment of a dominant right vertebral artery. The second, and clearly catastrophic, phase of his stroke occurred in the morning of the 22nd of February of 2019, sometime between 0530 and 0845 hours, when additional vertebrobasilar thromboembolism resulted in occlusion of his basilar artery. The facts in evidence from the medical record support my opinions on this matter **within a reasonable degree of medical probability**.

Outcome: Unfortunately, yet not surprisingly, Mr. Burgess has been left in a most severely disabled state, one equivalent to a Modified Rankin Score (mRS) = 5, which is the current standard for measuring disability and mortality outcomes following stroke. [1] Placing this in perspective, a mRS = 5 is the worst possible outcome within the scale, other than death (i.e., mRS = 6). Based upon the clinical information available, it is my opinion that, **within a reasonable degree of medical probability**, Mr.

Burgess will not experience any additional and meaningful neurologic improvement in the future.

Also, as it is evident following our videoconference interview and examination of Mr. Burgess, that he requires total or near-total nursing care for his daily existence. It follows that, **within a reasonable degree of medical probability**, his lifespan will be shorter than otherwise would have been expected had he not suffered such a devastating stroke. Moreover, in his current health status, he is vulnerable to experience recurrent complications such as pneumonia, decubitus ulcers, urosepsis, deep venous thrombosis, and such, all common to patients in his condition. Although it is impossible for me to assign a cost to his future care since this is not my area of expertise, I suspect it will be considerable.

Quality of Stroke Care Received: It is my opinion, **within a reasonable degree of medical probability**, that the medical care Mr. Burgess received when he suffered his stroke was well below the standard expected for any stroke victim in these United States of America. More specifically, the delay incurred in transferring him from the Harmony of the Seas cruise ship to a stroke capable hospital was unnecessarily excessive, and deprived Mr. Burgess of the possibility of being treated with intravenous thrombolysis and, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient.

This breach of the standard of care appears to be more flagrant when we consider the following facts: a) The patient presented to the emergency infirmary of the cruise ship within minutes of the inception of his stroke symptoms (i.e., the stroke onset or ETO), b) The triage nurse recognized the symptoms as a possible stroke and processed the patient accordingly, c) Dr. Pereira obtained an appropriate history, including an accurate timeline of the clinical syndrome since the ETO, d) The neurologic deficit caused by the stroke was identified and recorded, and e) Having made the right diagnosis, Dr. Pereira recognized and documented the urgency of the need for "*immediate*" transfer of the patient for neurologic consultation. Notwithstanding, Dr. Pereira failed to provide the necessary supervision over the RCCL personnel in order to expedite the transport of Mr. Burgess to the closest "stroke-capable" hospital, as demanded both by the standard of care [2] and by federal regulations [i.e., Emergency Medical Treatment and Active Labor Act (EMTALA) – 42 CFR Part 489.24]. [3] In this context, I found Dr. Pereira's testimony during his deposition to be disingenuous, more specifically his persistent assertion that the emergency nature of stroke *"depends"*, presumably on some obscure attributes that he was never able to enumerate. This is simply not supported by the medical literature of the last 30-40 years. [2] In fact, even the Federal Government's definition of a medical emergency is clearly applicable to stroke (see EMTALA - 42 CFR Part 489.24).

The facts evidenced in the materials reviewed support the conclusion that Mr. Burgess presented for emergency care at the Harmony of the Seas infirmary with an acute clinical stroke profile that was ideal to qualify him intravenous thrombolysis, the indicated and required urgent treatment. This could have been administered in any nearby stroke-capable hospital had he been transferred using the 911-based emergency services available. Instead, and despite such an optimal prospect, the patient's transfer to a stroke-capable hospital took approximately three hours (i.e., From 1059 to 1400 hours, San Juan Time), by virtue of not taking advantage of the local 911-based emergency transport services, and by sending

the patient to a hospital approximately 17 miles inland ("as the crow flies"), when hospitals with similar capabilities were much closer. Such an unjustified delay resulted in a waste of precious time that, **within a reasonable degree of medical probability**, directly contributed to the ultimate bad outcome and disability of the patient.

## SUPPORTING MEDICAL EVIDENCE

At the time Mr. Burgess suffered his stroke, in early 2019, the standard of care of acute ischemic stroke victims was comprehensively summarized in the most recent Guidelines of the American Heart & American Stroke Association (AHA/ASA) (i.e., the "Guidelines"). [2] A review of these Guidelines uncovers the following relevant passages [including Class of Recommendation (COR) and Level of Evidence (LOE)]:

*1.1. Prehospital Systems*

2. *Activation of the 9-1-1 system by patients or other members of the public is strongly recommended. 9-1-1 dispatchers should make stroke a priority dispatch, and transport times should be minimized (COR I; LOE B-NR).*

*1.3. EMS Systems*

2. *Regional systems of stroke care should be developed. These should consist of the following: (a) Healthcare facilities that provide initial emergency care, including administration of IV alteplase, and (b) Centers capable of performing endovascular stroke treatment with comprehensive periprocedural care to which rapid transport can be arranged when appropriate (COR I; LOE A).*
3. *Patients with a positive stroke screen and/or a strong suspicion of stroke should be transported rapidly to the closest healthcare facilities that can capably administer IV alteplase (COR I; LOE B-NR).*

*3.5. IV Alteplase*

1. *IV alteplase (0.9 mg/kg, maximum dose 90 mg over 60 minutes with initial 10% of dose given as bolus over 1 minute) is recommended for selected patients who may be treated within 3 hours of ischemic stroke symptom onset or patient last known well or at baseline state. Physicians should review the criteria outlined in Table 6 to determine patient eligibility (COR I; LOE A).*
2. *IV alteplase (0.9 mg/kg, maximum dose 90 mg over 60 minutes with initial 10% of dose given as bolus over 1 minute) is also recommended for selected patients who can be treated within 3 and 4.5 hours of ischemic stroke symptom onset or patient last known well. Physicians should review the criteria outlined in Table 6 determine patient eligibility (COR I; LOE B-NR).*

12. *Because time from onset of symptoms to treatment has such a powerful impact on outcomes, treatment with IV alteplase should not be delayed to monitor for further improvement (COR III; LOE C-EO).*

*3.7. Mechanical Thrombectomy*

*1. Patients eligible for IV alteplase should receive IV alteplase even if EVTs are being considered (COR III; LOE BR).*

In the context of these well-known and established Guidelines, it is possible to make the following arguments regarding the care received by Mr. Burgess:

1. Once the patient had been identified by Dr. Pereira to have a clinical syndrome consistent with an acute stroke (as evidenced by his own clinical note), the next step should have been to summon emergency medical transport via the existing 911-based system in Puerto Rico (i.e., Cuerpo de Emergencias Médicas de Puerto Rico) [4], rather than negotiate a less-than-urgent ambulance transfer via Sunny Ambulances, Inc. Had Dr. Pereira and the ship's staff utilized the existing emergency transport system, they would have maximized the chances of expediting the arrival of Mr. Burgess to a stroke-capable hospital and, **within a reasonable degree of medical probability**, would have eliminated the two barriers that prevented him from being treated with intravenous thrombolysis: a) The late time window of opportunity for treatment, and b) The identification of ischemic tissue in the ED CT scan. The existing literature shows that the use of 911-based emergency transport systems conveys odds ratios of 1.5 – 2.0 (i.e., One and half to twofold chances) of early ED arrival, quicker ED evaluation, more rapid treatment, and more eligible patients treated with intravenous thrombolysis. [2, 5] Such a system, operational at the time in Puerto Rico [4], incorporates protocols for initial evaluation of emergency patients, as well as workflows specific for the management of stroke, including transport to the closest stroke capable hospital. Once Dr. Pereira concluded that the patient needed *"immediate"* neurological consultation, the next logical and optimal step would have been to instruct the secretary to contact the 911-based emergency transport system while identifying the nearest stroke-capable hospital. Instead, using a regular non-emergent ambulance service negated the time-critical dimension of the need for urgent transport and, **within a reasonable degree of medical probability,** directly contributed to the ultimate bad outcome and disability of the patient

2. Since the Harmony of the Seas and other cruise ships operated by RCCL come to port in San Juan, PR on a regular basis, it seems reasonable to expect that the company would have set up emergency care protocol for stroke victims (i.e., a system of care consistent with the Guidelines [2]), particularly since: a) Stroke constitutes the most common life-threatening neurologic emergency, b) There is life-saving and disability-sparing treatments available (e.g. intravenous thrombolysis and thrombectomy), c) Such treatment is accessible in local hospitals in Puerto Rico [6], and d) The effectiveness of treatment is time-critical, requiring expeditious pre-hospital transport and care. [2] Had such a company protocol existed, the transfer of Mr. Burgess to a stroke-capable hospital could have been executed within a noticeably shorter interval. Instead, the way in which the transfer was administered, **within a reasonable degree of medical probability**, disqualified him from being treated with intravenous thrombolysis and directly contributed to the ultimate bad outcome and disability of the patient.

3. Considering that the clinical syndrome of presentation was not only sufficient to generate a *"strong suspicion"* of a diagnosis of acute ischemic stroke, but also that it was recognized as such by both

nurse Bremner and Dr. Pereira, their burden of responsibility was to see that the patient was transferred as quickly as possible to the *"closest healthcare facility that can capably administer IV alteplase"*. [2] The failure to follow through after having made such a time-critical diagnosis (even if presumptive) goes against contemporary recommendations and available medical knowledge [2, 5, 7] and, **within a reasonable degree of medical probability** , directly contributed to the ultimate bad outcome and disability of the patient.

4. 


5. From Ciliberti-Vargas et al [6]

6. The fact is that HIMA San Pablo Hospital Caguas, which is about 17 miles ("as the crow flies") inland from the port of San Juan (i.e., in the community of Caguas), was not the closest stroke-capable hospital to the ship, and that others much closer were available for transfer of the patient, most within a radius of less than 5 miles. [6] The medical literature available in 2019 noted that, as a group, the stroke-capable hospitals in Puerto Rico (n = 9) offered approximately two in three chances for any qualified ischemic stroke patient to be treated with intravenous thrombolysis within the standard of care. [6] This information, as well as details about the effectiveness of the system [4], have been corroborated by colleagues who practiced vascular neurology and neurosurgery in Puerto Rico on 2019. Such a capability makes the transfer of Mr. Burgess to HIMA San Pablo Hospital Caguas, bypassing other stroke-capable facilities, an unnecessary delay. This breached the standard of care specified by the Guidelines [2] and, **within a reasonable degree of medical probability**, compromised his treatment while directly contributing to the ultimate bad outcome and disability of the patient.

7. Since the patient presented to the ship's infirmary within minutes of the ETO, and the stroke

syndrome was immediately recognized and diagnosed, an emergency transfer to one of the nearby stroke-capable hospitals should have been possible within a conservative interval of 30-45 minutes (Based on our knowledge of San Juan from previous academic visits). **Within a reasonable degree of medical probability**, this would have allowed the patient to arrive inside an acceptable time window to qualify for treatment with intravenous thrombolysis. [2] In addition, also **within a reasonable degree of medical probability,** a much shorter transfer interval would have likely resulted in the initial CT scan not demonstrating any cerebral tissue changes that would disqualify the patient from being treated with intravenous thrombolysis. [8, 9] Such early tissue changes, dependent on the temporal evolution of the ischemic process and the size of the affected brain region, carry a 1% per minute chance of becoming apparent after the first three hours of the ischemic process. [8] As it happened, the findings in the initial CT scan, consistent the temporal evolution of the stroke since approximately 1015 hours, prevented the treatment team from qualifying the patient for treatment with intravenous thrombolysis and, **within a reasonable degree of medical probability** , directly contributed to the ultimate bad outcome and disability of the patient.

8. Finally, the effectiveness of intravenous thrombolysis for the management of a patient such as Mr. Burgess is indisputable, both in the general and the specific senses. In general, the reason the Guidelines include an unequivocal (i.e., COR I; LOE A) recommendation for its use in patients who present within three hours of their ETO is the overall efficacy supported by the world's literature. [2, 7] Thus, we can conclude that if Mr. Burgess had been treated with intravenous thrombolysis, his outcome would have been, **within a reasonable degree of medical probability,** improved and his disability avoided. From a more specific point of view, occlusion of the posterior cerebral artery has been particularly shown to respond well to treatment by either intravenous thrombolysis or thrombectomy. [10] In regard to recanalization of an occluded or nearly occluded vertebral artery, the data on intravenous thrombolysis is more heterogeneous and yet, **within a reasonable degree of medical probability**, consistent with this treatment being effective, irrespective of the underlying cause of the acute occlusive process. [11, 12] It follows that the failure to transport Mr. Burgess to a stroke-capable hospital in a timely manner, **within a reasonable degree of medical probability** , directly contributed to the ultimate bad outcome and disability of the patient.

I hope this report answers all your questions. Please let me know if there are any additional topics you need me to address, any additional evidence I need to review, or any additional queries from any of the parties involved in the case.

Best regards,

Camilo R. Gomez, MD, MBA
Professor of Neurology
Vascular and Interventional Neurologist

CRG/ym

## REFERENCES


1. Saver, J.L., N. Chaisinanunkul, B.C.V. Campbell, J.C. Grotta, M.D. Hill, P. Khatri, J. Landen, M.G. Lansberg, C. Venkatasubramanian, G.W. Albers, and X.I.S.T.A.I. Roundtable, *Standardized Nomenclature for Modified Rankin Scale Global Disability Outcomes: Consensus Recommendations From Stroke Therapy Academic Industry Roundtable XI.* Stroke, 2021. **52**(9): p. 3054-3062.
2. Powers, W.J., A.A. Rabinstein, T. Ackerson, O.M. Adeoye, N.C. Bambakidis, K. Becker, J. Biller, M. Brown, B.M. Demaerschalk, B. Hoh, E.C. Jauch, C.S. Kidwell, T.M. Leslie-Mazwi, B. Ovbiagele, P.A. Scott, K.N. Sheth, A.M. Southerland, D.V. Summers, D.L. Tirschwell, and C. American Heart Association Stroke, *2018 Guidelines for the Early Management of Patients With Acute Ischemic Stroke: A Guideline for Healthcare Professionals From the American Heart Association/American Stroke Association.* Stroke, 2018. **49**(3): p. e46-e110.
3. Zibulewsky, J., *The Emergency Medical Treatment and Active Labor Act (EMTALA): what it is and what it means for physicians.* Proc (Bayl Univ Med Cent), 2001. **14**(4): p. 339-46.
4. Sauri, H., *Manual de Procedimientos Operacionales*, C.d.E.M.d.P. Rico, Editor. 2012: Guaynabo, PR.
5. Ekundayo, O.J., J.L. Saver, G.C. Fonarow, L.H. Schwamm, Y. Xian, X. Zhao, A.F. Hernandez, E.D. Peterson, and E.M. Cheng, *Patterns of emergency medical services use and its association with timely stroke treatment: findings from Get With the Guidelines-Stroke.* Circ Cardiovasc Qual Outcomes, 2013. **6**(3): p. 262-9.
6. Ciliberti-Vargas, M.A., H. Gardener, K. Wang, C. Dong, L. Yi, J.G. Romano, M. Robichaux, S.P. Waddy, U. Nobo, S. Diaz-Acosta, T. Rundek, M.F. Waters, and R.L. Sacco, *Stroke Hospital Characteristics in the Florida-Puerto Rico Collaboration to Reduce Stroke Disparities Study.* South Med J, 2017. **110**(7): p. 466-474.
7. Wardlaw, J.M., V. Murray, E. Berge, and G.J. del Zoppo, *Thrombolysis for acute ischaemic stroke.* Cochrane Database Syst Rev, 2014(7): p. CD000213.
8. Gao, J., M.W. Parsons, H. Kawano, C.R. Levi, T.J. Evans, L. Lin, and A. Bivard, *Visibility of CT Early Ischemic Change Is Significantly Associated with Time from Stroke Onset to Baseline Scan beyond the First 3 Hours of Stroke Onset.* J Stroke, 2017. **19**(3): p. 340-346.
9. Muir, K.W. and C. Santosh, *Imaging of acute stroke and transient ischaemic attack.* J Neurol Neurosurg Psychiatry, 2005. **76 Suppl 3**: p. iii19-iii28.
10. Strambo, D., B. Bartolini, V. Beaud, J.P. Marto, G. Sirimarco, V. Dunet, G. Saliou, S. Nannoni, and P. Michel, *Thrombectomy and Thrombolysis of Isolated Posterior Cerebral Artery Occlusion: Cognitive, Visual, and Disability Outcomes.* Stroke, 2020. **51**(1): p. 254-261.
11. Grond, M., J. Rudolf, S. Schmulling, C. Stenzel, M. Neveling, and W.D. Heiss, *Early intravenous thrombolysis with recombinant tissue-type plasminogen activator in vertebrobasilar ischemic stroke.* Arch Neurol, 1998. **55**(4): p. 466-9.
12. Engelter, S.T., J. Dallongeville, M. Kloss, T.M. Metso, D. Leys, T. Brandt, Y. Samson, V. Caso, A. Pezzini, M. Sessa, S. Beretta, S. Debette, C. Grond-Ginsbach, A.J. Metso, V. Thijs, C. Lamy, E. Medeiros, J.J. Martin, A. Bersano, T. Tatlisumak, E. Touze, P.A. Lyrer, D. Cervical Artery, and G. Ischaemic Stroke Patients-Study, *Thrombolysis in cervical*

*artery dissection--data from the Cervical Artery Dissection and Ischaemic Stroke Patients (CADISP) database.* Eur J Neurol, 2012. **19**(9): p. 1199-206.