UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:20-cv-20687-OTAZO-REYES

RICHARD BURGESS, Individually, and by and through DARREN HENZE as Guardian of the Person and Estate of Richard Burgess, incapacitated and as agent under that certain durable Power of attorney dated November 20, 2006,

Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES, LTD., A Liberian Corporation d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL, JOAO PEREIRA, MICHIEL ADRIANN ETSEBETH.

Defendants.
_____________________________________________/

VIDEO DEPOSITION OF

CAMILO GOMEZ, MD

VOLUME 1 (PAGES 1 - 230)

Wednesday, November 16, 2022
7:30 a.m. - 12:25 p.m.

THE BROADWAY HOTEL
1111 East Broadway
Columbia, Missouri 65202

Reported by:
Lisa M. Banks, CCR, CVR

Job No.: 419709

APPEARANCES:

On behalf of Richard Burgess:

Gray Robinson, P.A.
1080 Caribbean Way
Miami, Florida 33132
(561)268-5727
BY: MR. MICHAEL J. DRAHOS
Michael.drahos@gray-robinson.com

On Behalf of Royal Caribbean, et. al.,:
Hickey Law Firm, P.A.
1401 Bickell Avenue, Suite 510
Miami, Florida 33131-3504
(305)371-8000

BY: MS. SARAH A. LOBEL
slobel@hickeylawfirm.com

Also present: Sam Schneiders, videographer



I N D E X


| Examination: | Page: |
|---|---|
| Testimony of CAMILO GOMEZ, M.D. | |
| Direct Examination by Mr. Drahos | 5 |
| Cross-Examination by Ms. Lobel | 156 |
| Redirect Examination by Mr. Drahos | 224 |
| Certificate of Reporter | 227 |
| Errata Sheet | 228 |


E X H I B I T S


| Letter: | | |
|---|---|---|
| A | Notice of Deposition | 6 |
| B | August 26, 2022 report | 9 |
| C | September 13, 2022 report | 9 |
| D | Electronic link to Dr. Gomez file | 10 |




Proceedings began at 7:32 a.m.:

THE VIDEOGRAPHER: We are on the record. Today's date is November the 16th of 2022. The time is approximately 7:32 a.m. This is the video deposition of Camilo.

THE WITNESS: Camilo. C-a-m-i-l-o.

THE VIDEOGRAPHER: I'm sorry.

THE WITNESS: No problem.

THE VIDEOGRAPHER: Gomez, MD and it's being held at the hotel, Broadway Hotel in Columbia, Missouri. It's in the matter of Burgess versus Royal Caribbean Cruises.

If the attorneys can please state their appearance.

MS. LOBEL: Sarah Lobel on behalf of plaintiff.

MR. DRAHOS: Matt Drahos on behalf of the defendant.

THE VIDEOGRAPHER: And now the court reporter will please swear in the witness.

THE COURT REPORTER: Could you raise your right hand, sir?

Do you solemnly swear or affirm the testimony you're about to give in this matter shall be the truth, the whole truth, and nothing but the truth so



help you God?

THE WITNESS: I do.

Thereupon:

CAMILO GOMEZ

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DRAHOS:

**Q. Good morning, Doctor.**

A. Good morning.

**Q. Can you please state your name for the record?**

A. My name is Camilo, C-A-M-I-L-O, Armiro, A-R-M-I-R-O. Gomez, G-O-M-E-Z.

**Q. Thank you, Doctor. And would you agree that you were retained in this case to be an advocate for the plaintiff?**

MS. LOBEL: Form.

THE WITNESS: I was retained by the plaintiff's attorney, that's correct.

BY MR. DRAHOS:

**Q. To advocate for the plaintiff?**

MS. LOBEL: Form.

THE WITNESS: No. I was retained to issue an opinion regarding the matter of Burgess versus

Page 6

Royal Caribbean.
BY MR. DRAHOS:
Q. Do you consider yourself, as you sit here today, to be an advocate for the plaintiff?
MS. LOBEL: Form.
THE WITNESS: I'm an advocate of the truth, of what I believe to be the truth.
BY MR. DRAHOS:
Q. Okay. And is it your belief in the truth, one, that advocates on behalf of the plaintiff?
MS. LOBEL: Form.
THE WITNESS: I think my opinions support my expert -- my report that Mr. Burgess did not get treated by -- according to the standard of care. That's basically all I'm here testify to.
BY MR. DRAHOS:
Q. And so you are here today pursuant to a notice of deposition that my office served upon you, correct?
A. I think so. Yes, sir.
(WHEREIN; Exhibit A was marked for identification.)
BY MR. DRAHOS:
Q. Okay. And I'm going to hand you what we've marked as Exhibit A to the deposition. Have you

Page 7

seen that before today?
A. I have, yes.
Q. Okay. And Exhibit A has a duces tecum attached to it, which requires you to bring certain items to today's deposition; is that right?
A. I did.
Q. And did you review that duces tecum before today?
A. I did review it, yes.
Q. And have you brought those items with you today that are responsive to the duces tecum?
A. I think I brought whatever I had of all of this in an electronic fashion. I don't know if you shared it with him or not.
Q. I don't have anything as I sit here.
MS. LOBEL: I got it last night. Let me see if I can transfer it because it's not Dropbox. It's a different form I've never used before.
BY MR. DRAHOS:
Q. Do you have a zip drive, Doctor, of everything that's on your computer?
A. I don't have a zip drive.
Q. So the Dropbox link or whatever this computer link is that's going to be sent to me, is the entirety of your file for this matter?

Page 8

A. It's a file I have, that's correct.
Q. All right. So as that's being transmitted, let me ask you some specifics.
A. Sure.
Q. So up to this moment in time, it's my understanding that you charge $450 an hour for your review of the case?
A. That is correct.
Q. And when were you first retained?
A. The original email that I have dates October of 2020.
Q. This was an email received from whom?
A. For Ms. Lobel.
Q. In October of 2020?
A. That is correct.
Q. Okay. And have you maintained an involvement in the case from October '20, up through present day?
A. That is correct.
Q. And how much time in total have you billed for your services to date?
A. I have three invoices that I've sent totaling roughly about $15,000.
Q. Do you have any other pending charges that have accumulated in the case that have not been

Page 9

invoiced?
A. I'm sure of it. I haven't looked recently, but yes, I'm pretty sure of it.
Q. Approximately how many more charges do you have that have yet to be invoiced?
A. I don't know, sir. Probably several thousand dollars. That's the best I can tell you off the top of my head.
Q. And so the invoices that have been produced here today to me, one dated November 6th of 2020, the other September 19th of 2022, and August 2022, those are the total of the three invoices you've levied to date?
A. That's correct.
Q. Okay. So you've issued two reports. One that was dated August 26th of 2022, and a rebuttal report that was dated September 13, 2022; is that correct?
A. That is correct.
Q. Have you generated any other reports in this case other than those two?
A. I have not.
(WHEREIN; Exhibits B and C were marked for identification.)
MR. DRAHOS: Okay. We're going to mark

Page 10

here August 26, 2022, report, Exhibit B. Your September 13, 2022 report is Exhibit C, and the entirety of the file that's been produced here from today will be composited Exhibit D. And we will transmit that to the court reporter afterwards.
(WHEREIN; an electronic link identified as Exhibit D was sent to and received by court reporter and submitted as an electronic-only exhibit to transcript.)
BY MR. DRAHOS:
**Q. Does this file contain all of the research that you've done as well? I see your medical literature.**
A. Correct.
**Q. So the citations that you've provided in your reports, they're contained within this file that you've produced here today?**
A. That is correct.
**Q. All right. Is there anything cited to in your reports that is not contained within this file that you produced here for me today?**
A. I don't think so, no.
**Q. So you have access to your August 26th report?**
A. I do.

Page 11

**Q. I'm just going to let you refer them to your computer screen, and we'll keep a copy of this. If there's any discrepancies at some point in time we'll need to clarify that.**
**And I guess let me just ask to be sure, since the time of your August 26, 2022 report, have you made any revisions to it?**
A. I have not.
**Q. And is it written entirely in your words?**
A. That's correct.
**Q. Did anyone else contribute in any way, shape, or form, to the content of this report other than yourself?**
A. No.
**Q. Why is the report of August 26, 2022 have a draft watermark across it?**
A. Because I forgot to take it out.
**Q. Okay. So we're in agreement then that this report of August 26th is the final report?**
A. That is correct.
**Q. And there hasn't been any revisions to it at some point in time thereafter?**
A. No. There have not.
**Q. So have you reviewed any of the materials other than what is specifically delineated in your August 26th report and your September 13th report?**

Page 12

A. I think I have reviewed materials that have to do with what I read in depositions that became available after these reports were written.
**Q. So can you identify for me, please, what materials you have reviewed since the time of your reports?**
A. It's hard for me to just give you a list because it's really been an ad hoc basis on things that I read in a deposition and I go look it up, issues relative to the performance of emergency medical services in the Island of Puerto Rico, issues that have to do with US News and World Report, issues that have to do with stroke center certification; just details about questions that have been asked during depositions, things like that.
**Q. So let me ask it a different way then.**
A. Okay.
**Q. In your August 6th report you identified nine depositions that you have read in total. In your September 13, 2022 rebuttal report you don't list any depositions. So what additional depositions beyond those that are listed in your August 26th report have you reviewed?**
A. The deposition of Alberto,

Page 13

A-L-B-E-R-T-O, Padro, P-A-D-R-O-Sanchez, S-A-N-C-H-E-Z, the deposition of Dr. Ulises, U-L-I-S-E-S, Nobo, N-O-B-O, the deposition of Dr. David Nidorf, N-I-D-O-R-F.
I think -- I think those are the ones that just became available in the last week or so.
**Q. So the deposition of Alberto Padro-Sanchez, what's the date of that deposition?**
A. It is dated December 21, 2021.
**Q. You would agree that that deposition was taken before either of your reports were written in this case?**
A. It appears to be, yes.
**Q. All right. And why did you not review that deposition before finalizing your opinions in this case?**
A. I don't think that I had it available.
**Q. Did you know that it existed?**
A. I don't think so.
**Q. How did you come to learn that it existed?**
A. Well, you taking a deposition of either Dr. Nidorf or Dr. Nobo, I don't recall which one, it was brought up and it became apparent to me that I didn't know what the name was or who the person was.
**Q. Okay. Did anything you've read in --**

strike that.
Q. Did anything you read in Alberto Padro-Sanchez's deposition change your opinions in the case?
A. No, it did not.
Q. Did anything you read in Dr. Nobo's deposition change your opinions in this case?
A. No, it did not.
Q. Did anything you read in Dr. Nidorf's deposition change your opinions in this case?
A. No, it did not.
Q. Anything else that you reviewed other than those three depositions since the time of your reports?
A. Off the top of my head, I couldn't list anything specific. As I said, I may have reviewed things on an ad hoc basis, but the gist of it was what I told you.
Q. That's difficult for me to understand, Doctor, when I have really this only opportunity to ask you these kind of questions. So is there anything else that you can do as you sit here to specifically identify for me anything else you've read since the time of your reports?
A. The only thing I can do is refer to



things that you may have brought up in my questioning that I can say yeah I have reviewed that. But off the top of my head, topically speaking, the topics that I have addressed are the ones that have been of concern to me.
Q. Any additional research done?
A. No.
Q. In other words, did you go on any websites on the internet or review any other literature beyond what's specifically listed in your reports?
A. Well, those are two questions. As far as websites are concerned, as I said, some of the questions that you were asking certain depositions took me to various websites that had to do with the emergency medical services in Puerto Rico, the joint commission accreditation, stroke centers, simply to refresh my memory on details.
And also on U.S. News and World Report, which we have covered. As far as medical literature, no. The medical literature that I had was contained in the material that we gave you.
Q. Did you visit websites for any hospitals in Puerto Rico?
A. I did at some point in time.
Q. Which websites did you visit?



A. The hospital HIMA San Pablo for example.
Q. Any others?
A. I think in reviewing the emergency medical services, maybe one or two came up, but it wasn't -- things that you click on and you open it up and there's no information there that's of any relevance to my opinion. So I didn't spend any material on that time.
Q. So in other words, none that you can identify by name as you sit here?
A. Correct.
Q. Have you spoken to anyone else?
A. Such as --
Q. Have you spoken with anyone else outside of what's specifically listed here in your reports in support of your opinions?
A. No, I have not.
Q. Have you ever spoken to any of Mr. Burgess's treating physicians?
A. I have not.
Q. Did you speak with any doctors at HIMA?
A. I did not. On the other hand, in this period of full disclosure, I do know Dr. Nobo personally, which has came up in one of the depositions. And he did text me after he had his deposition to tell me he had been asked about me and to say hello.



Q. Okay. So other than exchanging pleasantries --
A. No.
Q. -- you didn't discuss the substance of any opinions in this case?
A. Correct. We did not.
Q. So let me cover a little bit of background.
A. Sure.
Q. And see if there's some easy things that we can just kind of cut to the chase on some stuff. You're a vascular neurologist. Correct?
A. That is correct.
Q. And you studied undergraduate in Venezuela?
A. I did.
Q. And you went to medical school in the Dominican Republic?
A. I did.
Q. And I see that you obtained a master's degree in business from the University of Tennessee in 2006?
A. That is correct.
Q. Can you tell me a little bit about that? Was that a one-, two-, three-year program?

Page 18

A. It's a one-year program designed and catered specifically for physicians.
**Q. So, what, from 2005 to 2006 you were attending these classes?**
A. It's from -- actually, it's the calendar year of 2006, from January to December. And it is weekly online live classes and a total of four weeks of live presence in Knoxville, Tennessee in the University.
**Q. So is that four consecutive weeks or is that intermittent?**
A. No, intermittent.
**Q. So four weeks live and weekly online classes. And this went on for a period of 11 months, 12 months?**
A. Something like that. Correct.
**Q. And during this time were you still seeing patients?**
A. I was.
**Q. So were these evening classes, day classes? How did you work that into your schedule?**
A. The online classes were Saturday morning. They were always Saturday morning. And then the weeks that I was off, I was off.
**Q. And so what would be the longest period of time that you'd be sitting in a classroom for an entire week?**

Page 19

A. Yeah. If I was there for a week it was essentially all day long for a week.
**Q. Why were you pursuing this type of degree?**
A. Because at the time I was in private practice and it was apparent to me that in order to navigate the issues of practice, particularly at Dellwood Hospital administrations and so on, it seemed reasonable to gain some working knowledge of business processes. That's basically it.
**Q. So are you still in private practice?**
A. No. I work for the University of Missouri in Columbia.
**Q. So what period of time were you working in private practice?**
A. 2003 to 2016.
**Q. Where were you physically located during that time period?**
A. Birmingham, Alabama.
**Q. And where did you have hospital privileges during that time?**
A. Where?
**Q. Yeah. Where?**
A. Brookwood Medical Center and Medical Center East.

Page 20

**Q. Were you seeing patients in the emergency room at these two hospitals?**
A. Yes, sir.
**Q. What percentage of your time from the years of 2003 until 2016 were spent in the ER?**
A. Well, let me see how to answer the question. We don't live in the ER. We see emergency patients and we see them in consultation at the request of the emergency physicians. From that point of view, it's a hundred percent of my time. I was on-call all the time unless I was out of town or somebody else was taking the call.
**Q. Okay. And so --**
A. But it's important, I wasn't in the emergency room a hundred percent of my time. Does that make sense?
**Q. So when you're consulting, is that done -- back then, were they doing telemedicine consult?**
A. No. You go see the patient. But you don't live in the emergency department. Does that make sense?
**Q. So you had a brick-and-mortar office that you worked from?**
A. I did.

Page 21

**Q. And you would appear in the ER if you were called upon by an emergency room physician?**
A. That's correct.
**Q. Okay. So when you were not seeing patients in the emergency room physician, you were seeing patients in your brick-and-mortar office?**
A. Yes. Or I was in the hospital making rounds, or doing cases in the catheterization laboratory. The practice involved multiple dimensions.
**Q. So of those dimensions, what percentage would have been times where you're being called in an acute setting to make a quick decision on whether or not tPA should be administered?**
A. I couldn't tell you a number. I think that was the bulk of what I did since I was stroke center director.
**Q. So, I mean, you would agree that when you're seeing patients in your brick-and-mortar office, you're not making decisions on whether or not they need to be administered tPA. Right?**
A. That makes sense, yes.
**Q. Okay. So there must have been some percentage of your one hundred percent that did not involve making acute decisions like that?**
A. True. On the other hand, it is

Page 22

conceivable to be seeing patients in an ambulatory clinic and be called by the emergency department to make emergency decisions. Also on the phone. That's why it's so difficult to assign a number. The bulk of my practice was vascular neurology, although I saw other things. So I'm not sure how to assign a number because it's not compartmentalized necessarily.
**Q. So let's try it this way.**
A. Okay.
**Q. More or less than 50 percent of your time was spent in an acute setting making a decision on whether or not to administered tPA?**
A. More than 50 percent.
**Q. More or less than 70 percent?**
A. More than 70 percent.
**Q. Okay. So more or less than 90?**
A. That's where it becomes difficult to ascertain. I would say probably three-quarters at a minimum of my time was acute care.
**Q. What is Ranger Soft?**
A. It was a company that I had years ago. I don't know how old you all are, but there used to be prior to iPhones something called PDAs, Personal Digital Assistants. And we used a write software for that, for that kind of platform to collect data and things like

Page 23

that.
**Q. So when you say we used to write software, were you physically writing software?**
A. I was.
**Q. So you got a computer background?**
A. Of sorts.
**Q. So Ranger Soft from 2001 to 2005, you were the CEO and president?**
A. Yeah, it was my company.
**Q. Okay. And what percentage of your time was spent devoted towards your Ranger Soft company versus your medical practice during that time frame?**
A. That, probably less than five percent of my time was Ranger Soft.
**Q. What happened to the company?**
A. It became defunct, technology changed, practice patterns changed.
**Q. Did this Ranger Soft company offer any type of platform or service related to acute medical care?**
A. No, it did not.
**Q. Okay. So what type of software were you offering?**
A. Two kinds, data collection. Particularly when it came to registries, particular

Page 24

stroke registries. And we had a software for running a Coumadin clinic, anticoagulation clinic. And deciding dosing and adjustment of dosing. This was the era where Coumadin, now known as Warfarin because it's generic environment now, was the main anticoagulant used for stroke prevention.
**Q. So would you agree that you've never worked as a cruise ship doctor at any point in time in your career?**
A. I would agree with that.
**Q. Okay. And that would mean that you've never treated a patient in a cruise ship medical center?**
A. That is correct.
**Q. Okay. Have you ever consulted with a cruise ship doctor for any reason?**
A. I have not.
**Q. Have you ever been involved in any capacity in facilitating a medical transfer from a cruise ship to a shoreside facility?**
A. I have not.
**Q. Have you ever been involved in any capacity in the medical transfer from a port to a land-based facility?**
A. I have not.
**Q. Have you ever been inside of a cruise ship medical center?**

Page 25

A. I have not.
**Q. Have you ever been aboard the Royal Caribbean Harmony of the Seas?**
A. I have not.
**Q. Have you ever been aboard any Royal Caribbean cruise ship?**
A. I have not.
**Q. Have you ever been aboard any cruise ship at all?**
A. I have not.
**Q. When is the last time you were in Puerto Rico?**
A. 2019.
**Q. What was the occasion?**
A. I was lecturing at the American Society of Neuroimaging.
**Q. American Society of Neuroimaging?**
A. Correct.
**Q. Where was the lecture held?**
A. Give me one second and I will tell you. At the Wyndham Grand Rio Mar in Puerto Rico.
**Q. That's a hotel?**
A. Say that again.
**Q. That's a hotel, right, the Wyndham**

Page 26

Hotel?
A. It is. That's correct.
Q. And what period of time were you there for?
A. All right. 23rd to the 27th of January of 2019.
Q. Did you speak there?
A. I did.
Q. What was the topic that you spoke about? Let me see if I can make it easier for you, Doctor.
A. Yeah.
Q. When you were there, were you speaking on any issues that related to the medical healthcare system in Puerto Rico?
A. No. No, I was not.
Q. Would it be simply a matter of Puerto Rico being the host for this American Society of Neuroimaging?
A. Yes, that's correct.
Q. All right. And so did you go anywhere outside of Rio Grande while you were there?
A. Yes. We went to San Juan. We visited the City of San Juan.
Q. For how long a period of time were you in the City of San Juan during this conference?

Page 27

A. Probably a number of hours.
Q. Doing what?
A. Visiting.
Q. Just sightseeing?
A. Correct.
Q. Did you go to the port?
A. No.
Q. Did you visit any hospitals while you were in the area?
A. I did not.
Q. I don't mean this question to sound crass, but did you have occasion to use an ambulance or 9-1-1 service at all while you were on the island in January of 2019?
A. I did not.
Q. Did you speak to any doctors on the island in January of 2019 while you were there?
A. I'm sure I did.
Q. Well, let me ask it a better way. Because you were at a conference, so I'm sure you were talking to doctors. What I meant to ask was, while you were there did you have any discussions with any Puerto Rican doctors regarding the Puerto Rican healthcare system?
A. I'm pretty sure I had some conversations

Page 28

with Puerto Rican doctors. I'm not entirely sure that I can recall the specific topics, or if that topic ever -- with any aspect of that topic was brought up.
Q. Did you see Dr. Nobo there?
A. I do not recall seeing him, no.
Q. Do you recall the names of any of the doctors, Puerto Rican doctors that you would've spoken to there?
A. No, sir, I do not.
Q. Prior to this conference in January of 2019 -- strike that.
Is this the only time you've ever been to Puerto Rico?
A. No. I've been to Puerto Rico multiple times.
Q. When was the last time prior to January, 2019 was it?
A. I could not tell you. Years ago.
Q. Could you give me an estimate?
A. No, I'm afraid not. I'd have to really go look it up.
Q. Before or after 2010?
A. I don't know. I really don't know. I don't remember. Because I've been there multiple times.
Q. Okay. So whether or not you've been

Page 29

there within the last ten years prior to this 2019 conference, you just don't know as you sit here; is that what you're saying?
A. Say that again.
Q. Sure. So whether or not you've been to Puerto Rico within the last ten years, other than this 2019 visit you've spoken about, you just simply don't know as you sit here?
A. I just don't remember, no.
Q. Okay. Have you ever treated a patient in Puerto Rico?
A. I have not.
Q. Have you, yourself, ever required medical care in Puerto Rico?
A. I have not.
Q. Have you known somebody that ever required medical care in Puerto Rico?
A. I'm sure I have simply because of people that I've known over the years. But I'm sure they required care at some point in time. I couldn't tell you the details.
Q. Okay. Have you ever consulted with a Puerto Rican doctor regarding medical care that was being rendered in Puerto Rico?
A. I think that's very possible too over

the years that people, some of the colleagues that I've had we have talked about this, particularly back in the day when I was at the University of Alabama in Birmingham, we had a really robust Latin American program. And so we used to consult quite a bit with Latin American physicians.

Again, this was years ago, I couldn't tell you the details of any of that.

**Q. Okay. So similar question I wanted to ask you before, but a little bit different. Have you ever been involved in any medical transfers of a patient in Puerto Rico? So I'd asked you earlier about cruise ships. What I'm asking now, is have you ever had any involvement in medical transfers of patients within the island of Puerto Rico?**

A. No, I have not.

**Q. Have you ever had any involvement at all at any point in time in using the 9-1-1 system in Puerto Rico?**

A. I have not.

**Q. Have you ever been to HIMA?**

A. I have not.

**Q. And I'm talking about the HIMA --**

A. The Caguas.

**Q. -- Caguas that's involved in this case?**



A. No.

**Q. You've never been to any HIMA facility at all?**

A. I have not.

**Q. Have you been to any hospitals in Puerto Rico?**

A. I've been to the University of Puerto Rico. That was years ago also.

**Q. Could you give me an estimate of when that was?**

A. No, sir. A long time ago.

**Q. And when you say University of Puerto Rico, are you referring to Centro Medico?**

A. I'm not sure what the exact name is. It's the University of Puerto Rico Medical Center.

**Q. So if I asked you whether or not you'd ever been to Centro Medico, could you tell me one way or another?**

A. I couldn't tell you what --

**Q. Could not?**

A. I could not tell you what that means centro medico. Because that just means medical centers. So I'm not so sure what we're talking about.

But I have been to the University of Puerto Rico Medical Center. If that's the one that was



called Centro Medico, then that would be it.

**Q. Okay. And so would you agree with me -- you read my expert's report, Dr. Rodolpho Alcedo?**

A. I did.

**Q. Okay. And would you agree that Dr. Alcedo is more experienced than you are as it relates to rendering patient medical care in Puerto Rico?**

A. I would agree in the concept that he has more experience in that system, yeah.

**Q. Okay. And would you agree then that by virtue of the fact that he has more experience, he's more qualified to render an opinion as it relates to the nature of medical care in Puerto Rico?**

A. Yeah, I'm not sure about that. Because I think that he has his opinions. I know what his opinions are by virtue of reading his expertise. But the idea is what is -- what are the facts as we know them in terms of what's available. And yes, he has more experience treating patients there than I do, but that doesn't necessarily mean that all of his opinion are correct and mine are not.

**Q. So the question I asked though was very specific. I know that you have different opinions than Dr. Alcedo in this case. But what I'm asking you for is by virtue of the fact that you would agree that he has**



**more experience treating patients in Puerto Rico; wouldn't you then have to agree that he's more qualified to explain to the jury what patient care is like in Puerto Rico as it relates to limitations, weakness, problems in the system?**

MS. LOBEL: Form.

THE WITNESS: I don't think I can agree with that in the sense that what he's going to be able to explain is his point of view, his experience. But my problem is as I look at the existing literature and the existing facts, those opinions and those points of view are not quite supported by the facts.

And so we are left with a point of view. So yeah, his point of view is different than mine. Is it a better point of view, I can't agree to that. Not when the facts just don't support it.

BY MR. DRAHOS:

**Q. So how about your colleague Dr. Ulises Nobo.**

A. Yes.

**Q. Would you agree that he's also more experienced than you are as it relates to treating patients in Puerto Rico?**

A. I think he has more experience in using the system within which he works, yes.

**Q. And do you think that Dr. Nobo is more qualified than you are to render opinions as it relates to the system in Puerto Rico and how it works?**
A. No, I don't agree with that. And the reason for that is, again, it's a matter of point of view. I think that opinions are opinions. The question is what are the facts. And when those opinions diverge from the facts, then I have to question whether those opinions are solid.
**Q. I think you're answering something different than what I'm asking though.**
A. Okay.
**Q. I'm not asking whether or not the opinions are any better. What I'm asking you is whether or not you would agree that they're more qualified to render those opinions than you are?**
MS. LOBEL: Form.
THE WITNESS: Yeah. But the only way that for me to assess somebody's qualifications is by virtue of the quality of their opinion. And if I'm -- if I have disagreement with those opinions, and I feel that those opinions are not based on the facts at hand, then I cannot say that they are more qualified than I am.
BY MR. DRAHOS:
**Q. So how about Dr. Nure Khoury, do you know who he is?**



A. Yes. Isn't he the physician we used to work for at -- as a cruise physician at some point in time.
**Q. Former medical director at Carnival Cruise Lines.**
A. Correct.
**Q. Okay. He's worked on cruise ships that have ported in and out of Puerto Rico?**
A. Correct.
**Q. Puerto Rico. Would you agree that he's more experienced than you are as it relates to rendering patient care aboard cruise ships?**
A. Oh, I would agree with that.
**Q. All right. And would you agree that he's then more qualified to render opinions as it relates to how patients are managed on cruise ships?**
MS. LOBEL: Form.
THE WITNESS: Yes and no. I think that there are principles of care that transcend where the care is being rendered. So I think that, again, from my point of view when somebody issues an opinion, that doesn't really -- is not congruent with the principles of care, I have to disagree.
BY MR. DRAHOS:



**Q. So let me make sure I understand what you're telling the members of the jury.**
A. Yes.
**Q. What you're saying is although you can see that Dr. Khoury and Dr. Nobo are the only two doctors in this case who actually have personal experience transferring patients from cruise ships to the medical centers, you don't believe that they're more qualified than you are to tell the jury how that process works in Puerto Rico?**
MS. LOBEL: Form.
THE WITNESS: No. What I'm saying is that even though they have more experience working on that environment, that doesn't necessarily mean that that makes them more qualified by virtue of expertise in making certain decisions that I think are fairly absolute when it comes to the principles of medical care, particularly stroke. That's what I'm saying.
BY MR. DRAHOS:
**Q. So are you telling us then that experience does not correlate to qualifications?**
A. No. I'm telling you that experience does not constitute expertise. Experience is just amount of time spent on something. Expertise is a degree of knowledge that transcend experience in of itself.



**Q. What qualifies you to speak on the topic of how a transfer from a cruise ship to a shoreside facility should be done in Puerto Rico?**
A. Okay. The virtue -- the principals of transferring a patient from one facility to another are independent of where the transfer is occurring. And the principals of prioritization of care are the same. The priorities of urgency of transfer are the same. And I have been transferring patients between facilities for various levels for over 40 years.
**Q. So when you say they're independent of where the transfer is occurring, is what you're telling the members of the jury is that it doesn't matter where the transfer is happening, it should all be done the same way?**
A. No. What I'm saying is the principals of prioritization of urgency care are independent of where the transfer is occurring. So if a patient needs care within 15 minutes and requires a certain amount of level of care, it doesn't matter where the patient is, the needs of the patient are going to be exactly the same. How is that executed is another story.
**Q. So the principles of prioritization of care, do you believe that that is affected at all by the environment of where the care is being rendered?**

Page 38

A. No, I do not.
**Q. So you don't believe that the resources that that environment may or may not have will not in any way, shape, or form affect how a transfer can occur?**
A. That is not what I said. What is said is it doesn't apply to the principals. It's the execution that needs to be adapted when necessary.
**Q. Okay.**
A. That said, that adaptation does not negate the principals.
**Q. So the execution of the transfer, would you agree that that can be affected by the resources that are available?**
A. Undoubtedly.
**Q. And so if the execution of the transfer can undoubtedly affect the -- be affected by the resources available, wouldn't you agree that the best person to tell the jury what resources were available on February of 2019, is the port agent who was actually involved in those communications?**
A. I do not.
**Q. How are you more qualified than the port agent to explain what resources were available in February of 2019?**
A. By virtue of reading the material in

Page 39

this case.
**Q. What material?**
A. The responsibility for transfer of this patient landed square on the shoulders of the treating physician in the ship. And the physician who's seeking the patient in an emergency basis is responsible for that patient until the time somebody else takes responsibility at the acceptance of transfer and arrival of the patient elsewhere.
Those are the principles of urgent care that apply in this case. And the fact of the matter is there is absolutely zero evidence anywhere that there was a sense of urgency in the transfer of this patient. That's the problem I have with this entire case.
**Q. So you say there's zero evidence of a sense of urgency.**
A. Yes.
**Q. That's your opinion?**
A. That is my opinion.
**Q. All right. So let's do this then.**
A. Okay.
**Q. Let's go through a chronology real quick and see what you believe to be the timing of events that took place. It's your opinion in this case that the symptom onset occurred at 10:15 a.m.?**

Page 40

MS. LOBEL: Form.
THE WITNESS: That's accurate, yes.
BY MR. DRAHOS:
**Q. Okay. And you believe that Mr. Burgess reported to the medical center at 10:25 a.m. Correct?**
A. That is correct.
**Q. Does that reflect to you a sense of urgency?**
A. Absolutely.
**Q. And according to the chronology that you've laid out in your report, a request was made by the ships physician by 10:55 a.m. for an ambulance to be -- to take Mr. Burgess to a hospital for further diagnostic studies. Correct?**
A. 10:59.
**Q. No, sir. If you look at your report.**
A. Okay.
**Q. Page 3 of 13. It's about midway down. Dr. Pereira clearly recorded that the patient was asymptomatic. When he woke up by 0955, 10:55 San Juan time, Dr. Pereira had already concluded that the patient needed a neurologic consultation and made a referral stating, please evaluate, including CT scan if you see fit and treated accordingly. Correct?**
A. Correct.

Page 41

**Q. Okay. So by 10:55 a.m. Dr. Pereira in this case had concluded that Mr. Burgess needed further diagnostic imaging studies?**
A. That is correct.
**Q. That would've been within 30 minutes of his arrival to the medical center?**
A. That is correct.
**Q. Does that demonstrate to you evidence of a sense of urgency?**
A. At first I did.
**Q. Okay.**
A. But then the question is what did he do to request that ambulance. Because what happens after that, you can't take that out of context of what happens after that. What happens after that is nearly an hour and a half goes by before the ambulance is summoned.
And I can tell you that on one hand, if any of the transferring physicians from whom I receive patients on a daily basis, had to go through this, they would've been on the phone every five minutes until they got that ambulance there. That would've been a sense of urgency.
In addition to that, when you read Dr. Pereira's deposition, he can't even come out to say with convincing statements that the stroke is an

Page 42

emergency. He keeps saying it depends. So it's hard for me to say what sense of urgency did he actually have. It seemed at the beginning that that was the case. That's what -- that's what was so socking about this. So yes, it almost seemed like he recognized the problem. But his execution was not commiserate with a sense of urgency.

**Q. So at 10:55 a.m. Dr. Pereira makes the request and it's your opinion in the case that by 10:59 a.m., four minutes later, a formal request is made by the ship's medical staff to the port agent requesting an ambulance. Correct?**

A. That's correct.

**Q. A four-minute time frame?**

A. Yes, that is correct.

**Q. Would you agree that that four-minute time frame evidences a sense of urgency?**

A. No. Because we don't know what request was made or how it was made. On the surface it appears that it is, but there's the details. The devil is all in the details. What was requested and what sense of urgency was requested.

For example, he could've said -- we don't know. He could've said to the secretary get me an ambulance to transfer this patient X, Y, or Z. As opposed to get me an ambulance right now as quickly as

Page 43

possible and get the patient here and let me know in five minutes if the ambulance is not on the way. Because that's a sense of urgency. So yes, the appearance is that there may be a sense of urgency, but that's not what happened.

**Q. So you weren't in the medical center obviously. Correct?**

A. I was not.

**Q. All right. And so you don't know what Dr. Pereira said specifically, what words he said to the medical secretary?**

A. I do not know. I know exactly what happened though.

**Q. Okay. But point being here is everything up until this point demonstrates a sense of urgency, at least on paper; does it not?**

A. No. What it demonstrates is that he had a notion that something needed to be done, but it's hard for me to, based upon his own words -- what did he -- either he did know that this was a critical -- a time-critical emergency that required expeditiously to bring the transport of the patient, or do we believe his deposition where he says it depends. It depends on what? I can't tell his thinking.

**Q. Are you critical of a four-minute time**

Page 44

**frame between the time Dr. Pereira made the decision and the time that the email went out to the port agent?**

A. No. I'm critical of what happened after the fact. Is that the patient took forever to be transferred for reasons that we don't know that, in fact, anybody really expedited this transfer.

**Q. All right. So we're going to get to that in just a second.**

A. Sure.

**Q. But what I'm up to right now is the point of 10:59 a.m. And so would you agree that up until at least 10:59 a.m. on paper it appears that a proper and appropriate sense of urgency was in place on the part of the Royal Caribbean at this time?**

A. I would agree that until 10:59 there is the appearance that things are moving at least on the surface the way they're supposed to move.

**Q. Okay. So did you misspeak a little bit ago then when you told the members of the jury that there was zero evidence of a sense of urgency? Because clearly up until 10:59 there is?**

A. Yes. But you're splitting hairs. I think you have to take the entire thing as the entire transfer. So if I -- if I tell you something within a certain time frame, but I'm not quite sure this is what I

Page 45

mean, is that the truth or is that just appearance.

No, the appearance is until 10:59 I had no problem with the appearance that things are moving in the right direction. The question is if, in fact, the intent was -- this was about intent of prioritizing the care was true, then why wasn't there any follow through.

**Q. So at 10:59 a.m., would you agree that you have never been in the position Dr. Pereira was in at that time?**

MS. LOBEL: Form.

THE WITNESS: What position would that have been?

BY MR. DRAHOS:

**Q. A cruise ship doctor on a cruise ship in San Juan requesting an ambulance?**

A. I agree with that.

**Q. All right. So your criticism begins then from 10:59 a.m. until -- yeah, 10:59 a.m. until you believe Sunny Ambulance was contacted at 12:21 p.m.?**

A. No. My criticism begins before that. Because as I said before, I'm not entirely sure from listening to Dr. Pereira's deposition that, in fact, he recognized the urgency of this equation to the degree that it was.

**Q. When you say listening to his**

Page 46

deposition, you read it?
A. I did. That's correct.
Q. You didn't watch his testimony?
A. No, I did not.
Q. And you've never spoken to him obviously?
A. I have not.
Q. Okay. So I think what I'm understanding this to mean then, correct me if I'm wrong, is that you believe your concerns began to arise that Dr. Pereira was not executing -- or not exercising an appropriate sense of urgency beginning at 10:59 a.m.?
A. No. I think that my concerns are that the sense of urgency of the transfer of this patient, the need of this patient, was either misunderstood or misexecuted, or both. I think that in the surface, as I said, four minutes, seems like a reasonable time to request an ambulance. But the question is, what was requested and why. And if it was requested with the absolutely utmost priority, why wasn't there any follow through.
So you cannot take those four minutes out of context with the entire situation.
Q. Okay. So let's take -- let's dial it back now. Let's say at 10:59 a.m., in the moment of time

Page 47

where Dr. Pereira expresses in some fashion that he wants an ambulance to come to get Mr. Burgess. And it's your opinion that Sunny Ambulance was not contacted until 12:21 p.m. And so your criticism begins from 10:55 a.m. until this 12:21 p.m. as it relates to this urgency you're talking about?
MS. LOBEL: Form.
THE WITNESS: No, sir. I think my criticism has to move back to not only the 10:59, but also what was the prioritization and urgency for that request for an ambulance.
BY MR. DRAHOS:
Q. You said that already. That's why I dialed it back. So we can debate what happened between 12:55 a.m. and 12:59 a.m. and what words Dr. Pereira used. Okay. But if I understood your opinions correct, you're not critical of the amount of time it took Dr. Pereira to reach the conclusion that an ambulance was needed?
A. No. In the way you're phrasing it, no. I think when I started reviewing this case, I think it was a reasonable decision-making time.
Q. Okay. So then if we're using that parameter, where your criticism begins is at this 10:55 a.m. and you just believe that from 10:55 a.m. until

Page 48

12:21 p.m., that was an unreasonable amount of time to pass before this ambulance company was contacted; that's what you're saying. Right?
MS. LOBEL: Form.
THE WITNESS: No. That's not what I'm saying. What I'm saying is that in reaching the conclusion that the patient needed an ambulance, everything that happened afterwards is a domino effect in the sense that we don't know what was requested, what degree of urgency was placed on that, and there was no follow through, and that led to the delay.
BY MR. DRAHOS:
Q. So you are surmising in your opinion as an advocate for the plaintiff that because too much time passed, there must not have been an appropriate sense of urgency?
MS. LOBEL: Form. Mischaracterizes his testimony. Go ahead.
THE WITNESS: Yeah. I'm not sure that -- let me see if I can explain myself a little bit better because it's like we're going around in circles. The entire transfer as a whole was delayed. Why was it delayed. We look back at what we have at hand; Dr. Pereira looked at the patient, thought the patient had a cerebral vascular emergency.

Page 49

And then instead of the patient being transported very quickly, there's this delay. Well, why was there a delay? Well, then we read Dr. Pereira's deposition where he is hesitant about calling stroke and emergency. Maybe his words in the medical record that this patient needs an ambulance does not necessarily mean he needs an ambulance right now, quickly before anything else happens.
So we are left with the conclusion that although the diagnosis or presumptive diagnosis he made was made within a reasonable amount of time, the actions that followed do not seem to be.
BY MR. DRAHOS:
Q. How soon would an ambulance have needed to have been contacted for it to be an appropriate period of time?
A. Two minutes.
Q. Two minutes.
A. Very quickly. Yes.
Q. Okay. So let's say the contact was made at 10:59 a.m.
A. Yes.
Q. Okay. What is your understanding for why Sunny Ambulance wasn't contacted until 12:21 p.m.?
A. I have no idea why that happened.

Page 50

Q. So would you agree that you don't know how many phone calls were made?
A. I don't know how many phone calls were made.
Q. You don't know who made what phone calls?
A. That's correct. I don't know who made the phone calls.
Q. And you don't know what entities or how many entities were contacted?
A. Don't know that either.
Q. Okay. And you don't know what response, if any, those persons who were making those phone calls were getting from any accepting ambulance companies in Puerto Rico on that day?
A. Correct.
Q. Okay. Do you know what the requirements are for a private ambulance company to accept a transfer request?
A. No, I do not.
Q. Okay. If it was the testimony of the port agent that in order for an ambulance company to accept a transfer request there must be acceptance from a hospital facility for ambulance security.
A. Correct.

Page 51

Q. Do you have any reason to dispute the accuracy of that testimony?
A. No. I don't have any reason to dispute that.
Q. Okay. So according to your timeline Sunny Ambulance arrived at 1:10 p.m.?
A. That's what I think happened, yes.
Q. Do you know why, if Sunny Ambulance was contacted at 12:21 p.m., they arrive at 1:10 p.m.?
A. No, I do not.
Q. Do you know what resources were available to Sunny Ambulance that particular day?
A. I do not.
Q. Do you know what private ambulance companies were alternatively available other than Sunny Ambulance on that particular day?
A. No, I do not.
Q. Do you know whether or not there were any public ambulances available on that particular day?
A. I'm sure there were, but I couldn't tell you which ones or how many.
Q. Do you read the deposition testimony of Mr. Padro. Right?
A. Yes.
Q. I think his name is Padro.

Page 52

A. Padro. P-A-D-R-O-- Sanchez.
Q. And so you must've seen the part of his testimony where he explained that there was only one public ambulance available to that region in San Juan?
A. That's not what he said. He said there was one public ambulance to all San Juan.
Q. Devoted to San Juan?
A. To all San Juan. And then there were others. And never -- seems to me never got to the actual number of the region. Because EMS service systems in Puerto Rico is divided in regions.
Q. So do you have any contrary evidence to Mr. Padro's deposition testimony that there was only one public service ambulance available in the old San Juan region?
A. Well, I think the information that is available is that -- I don't have the number of ambulances. I couldn't tell you what the number of ambulances are.
Q. All right. And so according to your timeline, you said that Mr. Burgess had a stroke screening sheet completed at HIMA at 1:59 p.m.. Correct?
A. I think that's what I read in the chart.
Q. Okay. And a CT image had been taken by two o'clock p.m.?

Page 53

A. Correct.
Q. Okay. So do you agree that HIMA Caguas was the best stroke center on the island of Puerto Rico in February of 2019?
A. I have no way of agreeing or disagreeing to that.
Q. So you have no opinion?
A. I have no opinion.
Q. Would you agree that HIMA Caguas was the only certified stroke center in Puerto Rico?
A. By the joint commission?
Q. Yes, sir.
A. Yes.
Q. It was the only certified stroke center by any accreditation body; isn't that accurate?
A. That's correct.
Q. Okay. And they were the only facility that employed two board-certified vascular neurologists. Correct?
A. That's correct.
Q. They were the only facility that offered an acute neurologist ICU?
A. Actually that's not accurate. I think that there were at least two others that have ICU, if memory serves, from the date I published.

Page 54

Q. And what were those other two facilities?
A. I couldn't tell you off the top of my head because it's not specified in the papers, in the peer-reviewed papers. But if memory serves, I think there's a couple of others that were stroke units specifically. And so I'm not sure that I agree with that.
Q. But as you said you can't name a single one other than HIMA. Correct?
A. I can't name them, no.
Q. That's can't?
A. Cannot.
Q. Make sure it's correct.
A. Yeah.
Q. Okay. Would you agree that HIMA Caguas was the only facility offering endovascular therapy back in February of 2019?
A. I do not.
Q. You do not agree with that?
A. No. One of your experts works at the University of Puerto Rico.
Q. Currently?
A. Well, he works there.
Q. And he also testified and listed in his

Page 55

report that HIMA was the only place offering endovascular therapy?
A. That's what he said, but I find that kind of disingenuous. Because at the time in 2019 the Secretary of Health of Puerto Rico was an endovascular neurosurgeon who worked at the University of Puerto Rico too.
So we have -- we have all of these opinions so it's hard to tell who offered what. But it's possible, I don't know.
Q. Okay. You're talking about the Secretary of Health being in endovascular surgeon. He was working in the capacity as being the Secretary of Health at the time. Right?
A. Correct. But if you know the man that I've known for many years, there have been some of his pupils and colleagues that work at the University of Puerto Rico. So the University of Puerto Rico has a history of endovascular surgery. So to say this is the only place it's being offered, it could've been that week. Who knows.
But I cannot just blatantly agree with that, that's the answer.
Q. Do you have any evidence to the contrary other than the fact that this man who's the Secretary of

Page 56

Health has privileges at the University Hospital?
A. Well, I'm not sure what you call evidence. But I just cannot agree with the statement that that's the only time, the only place that can offer that.
Q. Do you know when Centro Medico or the University Hospital as you're calling it, lost their stroke certification?
A. I do not.
Q. Do you know why they lost their stroke certification?
A. I do not.
Q. So you were part of the Stroke Council that had been convened by the American Heart Association to formulate guidelines back in 1994. Correct?
A. Yes. I was part of that committee.
Q. Okay. Those guidelines have been updated several times since then?
A. That is correct.
Q. And you were not on any of those stroke councils?
A. That is correct.
Q. You would agree that my expert, Dr. Yavagal was?
A. Yes. I think he has been.

Page 57

Q. Okay. Do you know Dr. Yavagal?
A. I do.
Q. When's the last time you talked to him?
A. 2018 or '19.
Q. Is he a good doctor?
A. I think so.
Q. Is he considered an expert in the field of endovascular therapy?
A. I think he's regarded as such.
Q. Okay. Would he be an appropriate member of the Stroke Council?
A. I think so.
Q. Qualified, in other words?
A. Yeah, I think so.
Q. Okay. So when you were part of the Stroke Council that was convened in 1994 to write these guidelines -- first of all, you were a part of a number of persons that were tasked with that job. Right?
A. Correct.
Q. It wasn't just you?
A. Yes.
Q. Okay. You relied upon the National Institute of Neurological Disorders and Stroke studies that had been performed as it relates to the safety and efficacy of tPA, didn't you?

A. Relied for what purpose?
**Q. Well, that's kind of the next question. What was your task?**
A. If memory serves, at the time we were supposed to -- if we were talking about the same subject -- is to write a set of guidelines for the administration of intravenous thrombolysis for acute stroke.
**Q. Okay. And those guidelines were premised upon findings that had been made by the National Institute of Neurologic Disorders and Stroke as it relates to the efficacy and safety of tPA?**
A. Yes, sir.
**Q. Okay. Would you agree that not all stroke patients qualify for intervening as tPA?**
A. Yes. As a general statement, yes.
**Q. And your opinions in this case are that Mr. Burgess should have received intravenous tPA?**
A. No, that's not my opinion in this.
**Q. Okay. So do you believe that Mr. Burgess was a candidate for intravenous tPA?**
A. Not at the time he showed up. By the time he showed up it was too late. That's the whole point of this.
**Q. Prior to arrival to HIMA, are you of the opinion that Mr. Burgess was a candidate for intravenous tPA?**



A. I think if he had not shown up that late, if his transfer had not been delayed, he could've easily been a candidate for IV tPA.
**Q. All right. Other than time, are there any other exclusionary criteria that apply to Mr. Burgess on the date in question?**
A. Yes. But they all relate to timing.
**Q. And my question is very specific. Other than timing. So absent timing, was there any other --**
A. Yes. But your question implies that those disqualifying attributes are independent and they're not.
**Q. So is what your telling the members of the jury time was the only factor that applies for Mr. Burgess?**
A. No. I'm telling the members of the jury that it is the delay in transfer that led to the appearance of other disqualifiers. And particularly, the appearance of already infarcted tissue of the CT scan.
**Q. Okay. So when your group convened to formulate these guidelines -- first of all, you'd agree -- they're called guidelines for a reason. Right? They're not called rules. They're not mandates. They're guidelines.**



MS. LOBEL: Form.
THE WITNESS: Well, I would agree with that.
MR. DRAHOS:
**Q. And how would you distinguish a rule from a guideline?**
A. Well, probably because the guidelines are more general and they are more malleable to be applied under specific scenarios and circumstances in different ways. Rules perhaps are a little less flexible.
**Q. So, I mean, in other words, guidelines allow for the clinician to exercise their own independent judgment?**
A. To some degree, yes.
**Q. If they stray from the guidelines they're taking on potential risks, but they have the freedom to do that if they want to?**
A. I think that's a mischaracterization. I think what it allows is physicians to identify, based upon expertise, when certain guidelines apply and when they do not apply. And then decide whether they need to be followed or not.
**Q. So the conclusion that your Stroke Council reached back in 1994 is that tPA can be administered to, quote, carefully selected patients, end quote, within three hours of the onset of their symptoms. Correct?**



A. At the time I think that's what it said.
**Q. Why did your council use those words, carefully selected patients?**
A. Fear.
**Q. Okay. Fear of what?**
A. Of everything. Neurologists -- Neurologists -- you may chuckle, but I can tell you those who have lived through the era, I can tell you that this was a major departure for the practice of neurology. Neurology in general, traditionally, has been a very conservative, very nonaggressive specialty.
And this was a major step forward for neurologists and the fear of causing hemorrhage pervaded and has highlighted a lot of what has happened with IV tPA over the years.
**Q. Is IV -- is tPA administered intravenously a dangerous -- potentially dangerous drug?**
A. Not if it's used correctly.
**Q. Okay. Every drug is not dangerous if it's used correctly. But don't you agree that there are considerable risk factors to the use of tPA intravenously?**

Page 62

MS. LOBEL: Form.
THE WITNESS: As I said, not if used correctly. I think that every drug as you mentioned, when used within the appropriate scenario is used because the benefits supersede the risks.
BY MR. DRAHOS:
**Q. Okay.**
A. And by how much. In this case, it's by a lot.
**Q. So let's just say you're wrong, a doctor makes the wrong decision on the application, or administration of intravenous tPA, it could have fatal consequences. Correct?**
A. It could. But at the same time you're not talking about how dangerous the drug is. You're talking about how wrong the doctor is. That's a different conversation.
**Q. Why is there a three-hour time limit imposed by the FDA from symptom onset?**
A. Because they had it moved to four and a half hours.
**Q. Okay. Why is there a four-and-a-half-hour time limit?**
A. Because of bureaucracy, that takes time. Let me give you an example, we're using tenecteplase now

Page 63

instead of alteplase. Did you know that? Within three hours. And tenecteplase is not even approved by the FDA at all and everybody is using it.
**Q. With all due respect.**
A. Sure.
**Q. Your opinion on the four-and-a-half-hour time frame being a matter of bureaucracy is somewhat cynical. Wouldn't you agree that there was a clinical reason for why everybody agreed to this four-and-a-half-hour time frame in these guidelines that were written by the Stroke Council?**
A. Well, I'm not sure that I understand your question.
**Q. All right. Well, let me --**
A. As far as being cynical, yeah, when it comes to politics and bureaucracy I'm cynical, I'm sorry.
**Q. Okay. Well, I'll ask it a different less aggressive way then, Doctor.**
A. I appreciate that.
**Q. What was the clinical reasoning for why tPA can only be administered up to four and a half hours from symptom onset in some select patients?**
A. Well, what has happened -- it's very difficult to answer that question based on a snapshot of time. Since the approval of IV tPA, even before the

Page 64

approval of IV alteplase, which is really what we're talking about -- alteplase is A-L-T-E-P-L-A-S-E.
A lot has happened, a lot more publications, a lot more studies. Different studies have shown that up to four and a half hours in patients that meet certain criteria may be quite beneficial. So the practice has moved on. And what I meant by bureaucracy is that the wheels of bureaucracy haven't really caught up even though it is standard of practice at the present time in both the United States and Europe and everywhere else that I know of, to treat patients within four and a half hours.
**Q. So if a clinician administers tPAs to a patient beyond three hours from symptom onset, they're doing it adverse to FDA recommendations?**
A. Well, they're not doing it with the FDA approval, if that's what you mean.
**Q. I'm going to use your words. So you would agree that if a clinician gives tPA to a patient beyond three hours from symptom onset they are doing it -- what was the word you used? Adverse. I used adverse. What word did you use?**
A. Without their approval.
**Q. Contrary.**
A. Without their approval.

Page 65

**Q. Okay.**
A. Not contrary, but without their approval. But on the other hand, we are administering tenecteplase, T-E-N-E-C-T-E-P-L-A-S-E, tenecteplase, one hour, two hours, three hours without FDA approval. And everybody's doing it.
**Q. Okay. So this tenecteplase, were you using it in 2019?**
A. Not in 2019. No.
**Q. All right. So --**
A. But what I'm trying to say is that the FDA approval is one thing. That doesn't necessarily cover the entire practice, an appropriate practice of standard care. So we have to be very careful for the jury that they -- they should not believe that it is not FDA approved it shouldn't be done. That's not correct.
**Q. I'm getting to that.**
A. Okay.
**Q. So the FDA is still to this day held to a three-hour time frame from symptom onset?**
A. For alteplase?
**Q. For tPA?**
A. For alteplase.
**Q. Well, when you say alteplase, what other type of tissue -- plasma -- I always have trouble saying**

this, plasminogen activator is there other than alteplase?
A. Tenectaplase is one of them. There's a couple of others.
Q. I'm talking 2019.
A. Well,in 2019, tenectaplase was available, but it was not being used.
Q. All right.
A. So they been available multiple ones. The one that was used in 2019 was alteplase.
Q. Okay. Thank you. So for purposes of my questions then I'm only putting alteplase. I'm not really interested in tenectaplase.
A. True, but when you start bringing issues about the FDA, we have to put into context that there's more to the story. So anyway.
Q. Okay. So getting back to my earlier question though, if a clinician in 2019 were to give alteplase to a patient four and a half hours from symptom onset, they would be doing it outside of the AHA/ASA guidelines?
A. I think that's correct.
Q. Okay. So would you agree that even from the time of your first Stroke Council in 1994 up until the present day, the standard of care is that if a CT



demonstrates possible signs of hemorrhage, intracranial hemorrhage, that tPA is contraindicated?
A. I think that's correct. Except in this case there was no hemorrhage.
Q. Okay. We're gonna get to that in a little bit.
A. Okay. All right.
Q. My questions though right now are just a little bit more academic in nature.
A. All right. Can we take a break?
MR. DRAHOS: Absolutely. Let's take a break.
THE VIDEOGRAPHER: We're off the record. It's 8:43 a.m.
(OFF THE RECORD.)
THE VIDEOGRAPHER: Okay. We are back on the record at 8:51 a.m.
BY MR. DRAHOS:
Q. Okay. Doctor, so where we left off we were talking about generally your thoughts about alteplase, particularly back to 2019. Let me ask you a slightly different question.
Would you agree that the Stroke Council that you were a part of back in 1994 when these guidelines were originally being written, concluded that



if a CT image demonstrated possible hemorrhage, that alteplase should be avoided and that was a Grade A recommendation, meaning the highest recommendation that your committee provided?
MS. LOBEL: Form.
THE WITNESS: I would have to review the guidelines to see if that's the exact wording, but, you know, I have no reason to dispute the concept.
BY MR. DRAHOS:
Q. Okay. And so would you also agree that your Stroke Council had determined that if a patient suffered a serious head injury within three months of the stroke, they also were not to receive alteplase?
A. At the time that was correct. That's the wording that was used.
Q. Okay.
A. But as I said in my report also, in my rebuttal report, that was done in the concept of a brain injury. So the implication if you read the entire passage, is that the seriousness or the attribute of seriousness of the head injury, has to do with the fact that there is a brain injury of sorts.
Q. We're going to get there in a minute.
A. Okay.
Q. But would you agree -- I'm going to ask



you that in a little. So in 2016 there was a separate Stroke Council convened and they were tasked with the responsibility of updating these guidelines. You would agree. Right?
A. Well, Stroke Council exists all the time. The Stroke Council of the American Heart Association existed for years. What they do is the committees change hands over the course of time like any other committee.
So there was a different committee and there was then another different committee and it's changed through the years.
Q. Okay. I appreciate the explanation, but the concept still is the same. You would agree that this Stroke Council in 2016 convened for the purpose of updating these guidelines?
MS. LOBEL: Form.
THE WITNESS: Well, what I would agree is that the Stroke Council had an update of the guidelines in 2016 by another committee.
BY MR. DRAHOS:
Q. Okay. And so would you also agree that the Stroke Council in 2016 had reviewed clinical data and peer-reviewed studies and determined that only 6 to 8 percent of patients suffering from ischemic stroke are

**eligible for tPA?**
MS. LOBEL: Form.
THE WITNESS: I have to look at the data if that's the case.
BY MR. DRAHOS:
**Q. So do you have a copy of those guidelines?**
A. From 2016?
**Q. Yes, sir.**
A. I don't know. Let me see if I have a copy.
**Q. I actually have a hardcopy, I think. It was one of those questions I asked you earlier. I said if you cited to something in your report, do you have a copy of the report with you. I think you told me that you did.**
A. So if I cited it, I probably have it somewhere.
**Q. Okay.**
A. Let me see if I have it here. Do you have 2018?
**Q. No.**
A. Because I have a 2018.
**Q. And I'm going to get to 2018. But 2016 in particular had an introductory, rather introductory.**


A. I didn't cite the 2016, that's why it's not readily available.
**Q. Okay. Let me read it to you, and you tell me whether or not you agree or disagree with at least the belief of the AHA/ASA Stroke Council as it relates to this 2016 amendment.**
**In their report, particularly on Page 582 --**
MS. LOBEL: Are you attaching this?
MR. DRAHOS: No.
BY MR. DRAHOS:
**Q. It states estimates of eligibility for alteplase within a population of ischemic stroke patients range from 6 to 8 percent of all strokes. Do you agree or disagree with that conclusion?**
A. I neither agree nor disagree. I have to see where they come up with the data. Because what I want to be sure that we understand is that the eligibility is not equivalent to the patients who are actually being treated. Because I think one of the problems that we have faced through the years, and continue to face through the years, is that a minority of patients are being treated, but there's always an opportunity for people who qualify and are still not being treated for a variety of reasons.


So I have to look at where the statement comes from, what is the source of the statement.
**Q. So as you sit here today though, do you dispute the accuracy of that?**
A. No. What I say is that in order for me to agree or disagree with that statement is I need to review the data and see what is it that they're talking about.
**Q. So also within this report drafted by the Stroke Council, they reported that only 22 to 31 percent of patients with ischemic stroke actually present to the emergency room within three hours of symptom onset. Do you agree or disagree with that finding?**
A. I neither agree nor disagree. I have to look at what -- where the source of information. At the time that may have been accurate.
**Q. And according to the Stroke Council back in 2016, even stroke patients who arrived to the emergency room within the applicable window of three hours, only 29 percent of them actually would receive alteplase in the end?**
A. And that's precisely what I was talking about. Is that you start confounding percentages. So who presents within the appropriate window, who presents with the right criteria, and who actually is being


treated. So those numbers are -- they have changed through the years to some degree and it depends who you quote.
**Q. So would you be surprised then with that statistic that according to the 2016 Stroke Council even patients who presented within the applicable time window for stroke, only 29 percent actually received alteplase in the end?**
A. No. It doesn't surprise me. That's been the problem through the years is that despite presenting within a regular or within the appropriate window, with the appropriate criteria, and qualifying, not everybody gets treated for one reason or another.
**Q. Do you agree with the Stroke Council -- it's the 2016 Stroke Council, that symptom onset is the most important exclusion criteria in determining whether or not to administer tPA?**
A. I don't agree with that. I'm not sure that I agree with that.
**Q. Okay.**
A. I think that there's multiple attributes. Either the patient fits the profile or doesn't fit the profile. But symptom onset is one of them.
**Q. So do you agree that symptom onset time,**

according to the Stroke Council, is defined as either time that the onset of symptoms were actually witnessed, or the last known normal of the onset if not witnessed?

A. That is reasonable, yes.

Q. Okay. And so in this -- strike that. Would you agree that according to the 2018 guidelines written by the Stroke Council, tPA would not be recommended for patients who have an unclear symptom onset time and/or an unwitnessed symptom onset time?

A. I think that's a general concept. I think that's a reasonable concept particularly in 2018.

Q. Have you ever given an opinion as an expert that the symptom onset time was unavailable because it was unwitnessed?

A. I'm sorry, say that again.

Q. Sure. Have you ever given an opinion as an expert in the cases you've testified in, that the symptom onset time was unavailable because it had not been witnessed?

A. Off the top of my head, I don't remember such a statement. But as a general concept, if the -- if the event or the incident is not witnessed and the patient cannot provide a history of symptom onset, and we simply don't know, then we don't know.



Q. Well, you're saying something a little bit different, I believe.

A. Okay.

Q. You're providing two possible options. Either the patient can give you a symptom onset time or it's witnessed by somebody else. But wouldn't you agree that the most reliable means upon which to determine symptom onset time is to have it witnessed by someone other than the patient?

MS. LOBEL: Form.

THE WITNESS: No. I don't agree with that. I think symptoms are symptoms. They are subjective. So the fact that somebody says I can't feel my hand, even though I can't witness that the patient doesn't feel the hand, that statement has to have a bearing. So symptoms come before signs. Signs are objective. And they're witnessed. They can be observed. So we cannot observe symptoms. Symptoms are something somebody feels. So to me the report of a patient is equivalent to the report of a witness.

BY MR. DRAHOS:

Q. Okay. You just answered the question. Do you know what time Mr. Burgess woke up on the date in question in this case?

A. Sometime -- no. Off the top of my head



I do not.

Q. And do you know what time he left his cabin on the date in question?

A. Not off the top --

Q. When I say date in question, just so that we're clear --

A. Yeah, I don't -- off the top of my head, I think that that has been covered in some of the depositions, but I don't know.

Q. Okay. But let me just qualify this for fairness. When I say the date in question, I'm talking about the date that he was in San Juan.

A. Correct.

Q. Okay. All right. So do you know what he was doing that morning before he arrived to the medical center?

A. I'm sorry. I read too many documents, too many depositions to look at the details. He was sitting around looking at his phone or something like that. I don't remember the details.

Q. Do you know how long he had been experiencing symptoms before he decided to call anyone?

A. I also think that that was covered in one of the depositions. And it probably was a few minutes.



Q. Do you know for sure?

A. I do not.

Q. Okay. And you would agree that no one witnessed the onset of Mr. Burgess's symptoms in this case?

A. You mean other than himself?

Q. Of course.

A. No. I mean, but he is, himself, a witness of symptom information.

Q. Okay. Outside of Mr. Burgess, other than Mr. Burgess, you would agree that there were no other witnesses to his symptom onset in this case?

A. Not that I know of.

Q. Okay. So these stroke councils that have convened or have written these updates to the guidelines over the years, have been tasked with identifying particular contraindications to tPA?

A. Among other things, yes.

Q. Okay. And so would you agree -- well, strike that.

What is a contraindication to tPA mean? What does that mean in layman's terms?

A. Anything that deviates from the ideal profile of somebody who has a good benefit-risk ratio.

Q. Okay.

Page 78

A. For treatment with IV tPA.
Q. In other words, there may be certain aspects of a particular patient's clinical presentation or history, which would render them disqualified for tPA?
A. Correct.
Q. Okay. And so would you agree that regardless of the amount of time that passed from symptom onset, if a patient presents to an ER, has a diagnostic imaging study taken and it shows evidence of a fully evolved stroke, they do not qualify for tPA?
A. Let me answer a little bit differently simply because I'm trying to stay away from the concept of, quote, fully evolved stroke. Because generally speaking, nobody knows what that actually means. If the imaging study shows evidence of already infarcted tissue, this is not a patient that typically would receive IV tPA. Does that answer your question?
Q. When you say "typically would not receive," wouldn't you agree that infarcted tissue means dead tissue?
A. No. It depends. There is a whole concept of ischemic tissue developing early edema. And the problem is we cannot tell, it's not a flipping switch that one moment you have loss of blood flow with edema, and then the other you have dead tissue. Infarction

Page 79

means dead tissue. If the CT scan is consistent with infarct tissue, then tPA is probably not a good idea.
Q. All right. And you heard of the concept of dry Earth theory?
A. No, I have not.
Q. Okay. In other words, if dead tissue is seen on exam, if one were to do something to reinvigorate that area with blood flow, couldn't it cause additional complications including dead? In other words, pouring water on dry Earth?
A. Well, I've never heard of the concept of dry Earth, but let me answer your question. It is -- it is probably a bad idea to give IV tPA to somebody who has infarcted tissue because restoring flow to already injured tissue increases their risk of hemorrhagic transformation. Does that answer your question?
Q. So this four-and-a-half-hour time frame that has been identified as the maximum amount of time that's acceptable underneath the guidelines, wouldn't you agree that at least clinical studies have shown that administering tPA after that four-and-a-half-hour time frame increases the risk for complications?
A. And decreases the benefit of the drug.
Q. Okay. Do all patients' brains react the same to a stroke?

Page 80

A. No, they do not.
Q. And so wouldn't you agree that the rate of death of brain tissue will suffer in response to a stroke can vary from patient to patient?
A. It also varies from different portions of the brain.
Q. Okay. So in other words, there are things called collaterals that can feed regions of the brain even when a major pathway is cut off that some patients have and others don't?
A. That's a general statement, yes.
Q. Okay.
A. That does exist.
Q. And so in this particular case, according to the chronology that you've identified, you believe the symptom onset occurred at 10:15 a.m. and Mr. Burgess had CT imaging by two o'clock p.m.? Agreed?
A. That is correct.
Q. That would mean that the image was done at three hours and forty-five minutes from symptom onset?
A. Something like that, yes.
Q. And that would mean that at least according to the AHA guidelines, if Mr. Burgess qualified, arguably he had 45 more minutes to receive this medication?

Page 81

A. Yes. But the CT scan already showed infarcted tissue.
Q. Okay. So did you read the CT image?
A. I did.
Q. And would you agree that Dr. Nobo concluded that the tissue he saw showed infarct already?
A. I would agree with it.
Q. So that would mean that Mr. Burgess's tissue died before the four-and-a-half-hour time frame that he could've potentially received this tPA?
A. I would agree with the fact that there was already evidence of some of the tissue that was involved was already infarcted.
Q. So that would mean one of two things; either Mr. Burgess's brain tissue died faster than other patients potentially, or the stroke had been going on for a longer period of time than 10:15 a.m.?
A. Or he presented so late to the emergency department that by then the tissue was infarcted.
Q. I know that --
A. That's what it means.
Q. That the version -- that's the advocate for the plaintiff talking, but let's go back over it again.
MS. LOBEL: I move to strike that. He

testified repeatedly he's not an advocate.
BY MR. DRAHOS:
Q. Let's go back over it again. If the onset happened at 10:15 a.m. --
A. Yes.
Q. -- and image was taken at two o'clock, and infarction had already been shown on the images --
A. Yes.
Q. -- then only one of two things could've happened; either his brain tissue died faster than someone who potentially had collaterals and could've fed that area for a longer period of time, such that they would've qualified for tPA within four and a half hours, or he had the stroke going on longer than 10:15 a.m.?
A. Or a third option, which is the scan was taken so late that by then the tissue was infarcted.
Q. Well, we know the scan was taken at two o'clock?
A. Right.
Q. So we know it was taken within three hours and 45 minutes of symptom onset according to your chronology?
A. Correct.
Q. Okay. And so then wouldn't you agree there's only two possible sceneries there. Either the



strokes been going on longer or his brain tissue died faster?
A. I don't think that those are the only two explanations. A third explanation is that the scan was obtained so late that by then, yes, there was infarcted tissue.
Q. What would the scan have looked like at 1:30?
A. Perhaps completely normal.
Q. Do you know for sure?
A. No, we don't. We don't know.
Q. Can you state within a reasonable degree of medical probability that the scan would look normal at 1:30?
A. Yes.
Q. What's the basis for that opinion?
A. The basis is I've been practicing vascular neurology for 42 years. And I can tell you that the changes of a scan being normal at one hour out, or two hours out, is better than the three and a half hours out.
Q. Okay.
A. That's more likely than not.
Q. My question was at 1:30. So you may want to say okay at 11:15 based upon your 42 years of



experience it would've been normal.
A. Yeah.
Q. At 12:15 based upon your 42 years of experience it would've been normal. But can you say the same thing for 1:30?
A. I can say the same thing in the sense that it's more likely than not. But again, we will never know.
Q. So when you say more likely than not at 1:30 it would've been normal, you're basing that solely upon the fact that you've been doing this for 42 years?
A. Yes. I mean, I think that the knowledge that we have about ischemic stroke is such that the early -- that's the reason we rushed this patient. The earlier the better. The earlier the chance that the scan is going to be normal. Every minute that goes by two million cells die.
Q. So are you saying that --
A. And the chances of the scan is abnormal increases.
Q. I'm sorry.
A. Sorry about that.
Q. No, I don't mean to be talking over you. Are you saying at 1:30 Mr. Burgess would have qualified for tPA?



A. We don't know that. We will never know.
Q. Okay.
A. But he had a better chance.
Q. So the guidelines as they were written in 1994 indicated that serious head trauma was a contraindication to tPA within three months of the incident.
A. Which guidelines are we talking about?
Q. It was a little awkward of a question. So the guidelines as you wrote them in 1994, the first version of these, indicated that serious head trauma was a contraindication to tPA?
A. Yes. But as I mentioned, this was -- the passage is written in the context of a brain injury.
Q. I'm getting to that. Would you agree that those guidelines written in 1994 do not define "serious" in any way, shape, or form?
A. Correct.
Q. All right.
A. Other than referring to brain injury.
Q. In 2016, would you agree that the Stroke Council determined that significant head trauma was a contraindication to tPA?
A. Again, I don't have the 2016 guidelines in front of me, but I will have to look at them. I don't

have them.
Q. Are you pulling them up?
A. No. I have the 2018, the ones that I referenced.
Q. So I'm handing you -- I'm going to show you what is entitled Scientific Graphs for the Conclusion and Exclusion Criteria for Intravenous Alteplase in Acute Ischemic Stroke, the AHA/ASA scientific statement that was published in October of 2015. And I'm going to turn your attention to Page 601. You're welcome to review.
MR. DRAHOS: You want to look at them first?
MS. LOBEL: I'll let him look at them first and then --
MR. DRAHOS: You're welcome to review that as I asked these questions.
BY MR. DRAHOS:
Q. So would you agree according to that 2016 statement that the FDA had determined that intracranial trauma would be an absolute contraindication to tPA and that extracranial would be a warning?
A. Well, but if you read the passage, what they're actually quoting, the FDA. What they're doing is -- it's a passage that says according to the original FDA label, quote, recent intracranial or intra spinal trauma



as a contraindication to alteplase whereas recent extracranial and extraspinal trauma is a warning.
Q. Right.
A. And they're passages -- really, this is not a recommendation as much as it's a review of the knowledge that was at the time. And then it says the major trauma, major trauma. Okay. Major trauma within 14 days and severe head trauma within three months recommendations. That's the recommendations of the committee.
Q. And would you agree that in nowhere within that statement do they define "major," "significant," and "serious," whatsoever?
A. They don't.
Q. Okay.
A. Themselves, they did not.
Q. And so would you also agree that at least according to this 2016 report, there was a 2007 review, which determined that of 273 patients who had suffered a serious head injury, only one received tPA?
A. Yes. And --
Q. You agree that that's accurate?
A. No. There's a quote. I haven't read the paper, but I'm not sure what that means. So one received tPA. How do we know the risk aversion of the



person who treated these patients. I'm not sure what that means. I'm not sure what implication does that tell me.
Q. The risk aversion of the clinician?
A. Yeah. It could be.
Q. Which means that not all clinicians are going to feel the same. You, Dr. Gomez, may be embolden to provide tPA to somebody who you feel like the head trauma is not significant enough. But there may be another doctor out there who feels like, you know what, if you bump your head and get stitches, I'm not giving you tPA. Either one of those two clinicians would be reasonable in their thinking. Wouldn't they be?
A. I think that it depends on the clinical situation. We give tPA to people who have had head injury that's considered mild all the time. In fact, I submit to you that a very significant percentage of patients who have stroke because they're found down or they drop down with the symptom onset, they may have a head injury as a result of it that is minor, it doesn't stop us from giving tPA.
Yes. There is some variability of risk aversion, but I would say that the overwhelming majority of vascular neurologists of experience would not hesitate about giving tPA unless there are signs of a severe head



injury.
Q. Well, Dr. Yavagal disagrees with you, doesn't he? I mean, you're aware of that?
A. I disagree with him too.
Q. Okay. And so I guess the point here though is, even though there's been all of these guidelines, written, updated, all these stroke experts who have been on these various stroke councils over the years, no one has ever stopped to define what exactly is a serious head trauma, what is a significant head trauma, or what is the head trauma that is going to result in a contraindication; it is left to the commission to decide?
A. Yeah. On the other hand, we also don't practice based on paper and what set of guidelines. And the concept of a severe head injury is well-established in the literature and it meets certain criteria. And in fact, a couple of the other experts that you had, you know, they thought that the injury was mild. And so, I think -- yes, there's a variability of opinion. But --
Q. So if a patient presents to the medical center showing signs and symptoms of a stroke who had suffered a head trauma days prior that resulted in sutures to their head, and that clinician does not administer tPA because he feels that injury is significant enough of a head trauma to warrant alteplase

Page 90

being contraindicated; is that doctor negligent?
A. He may be. I don't know. It could lead to another discussion and another lawsuit of a different kind. I don't know that.
Q. Okay.
A. But it is certainly something that it's open for discussion and opinion.
Q. Okay. So one thing though that you would agree is a little bit more definitive, and is a little bit less open to discussion, is that if a clinician believes they have found evidence of a hemorrhage, they are not to provide tPA, it is absolutely contraindicated?
A. No. I would agree that if there is an intracranial hemorrhage, tPA should not be administered.
Q. If there is, is what you're saying?
A. That is correct.
Q. But if a clinician believes it's possible?
A. Well, we don't work on beliefs, sir. We work on facts. And we can believe whatever we want. But some things are true whether we believe in them or not.
Q. All right.
A. I think that it is my duty to show cause why I'm not giving tPA to somebody. If I think there's a

Page 91

hemorrhage, I'm bound to prove it. And part of the problem with this whole delay of the care of this patient, is that even though Dr. Nobo's suggestion that there could've been a hemorrhage, had the patient arrived with plenty of time and nothing else showed up in the CT scan, it would've been time to actually discuss that with the radiologist and come to a consensus.
Q. So now that you bring up Dr. Nobo --
A. Sure.
Q. -- would you agree that he was qualified on the date in question to determine whether or not Mr. Burgess received tPA?
A. I think he was wrong.
Q. Okay. That's not the question I asked. Move to strike.
A. I don't know what his expertise on imaging is. I do not know because that's very variable across the spectrum of clinicians.
Q. He's a board-certified vascular neurologist just like you?
A. Unders-- well, not just like me. I have more years of experience. I've been a neuroimager for many years. And I run a neuroimaging center for many years. Not everybody, particularly the generations that came after me, have the same degree of expertise in

Page 92

imaging interpretation. And I'm not suggesting he's not qualified. I just don't know. But he was wrong.
Q. All right. So are you telling the members of the jury, yes or no, was Dr. Nobo on the date in question unqualified to determine whether or not Mr. Burgess received tPA?
MS. LOBEL: Form.
THE WITNESS: I'm telling the jury that I don't know whether he was -- how qualified he was to make that interpretation.
BY MR. DRAHOS:
Q. That's a different answer. You're saying how qualified. I'm asking you, on paper as a board-certified vascular neurologist, is he qualified to make a decision as to whether or not a patient can receive tPA?
MS. LOBEL: Form.
THE WITNESS: All right. What I'm trying to tell you that the virtue of having board certification in vascular neurology does not -- it's not equivalent to a single level of qualification for imaging interpretation. It varies. And within that imaging interpretation, expertise, then there's different levels depending upon what findings you are looking at.
BY MR. DRAHOS:

Page 93

Q. Okay. So is it a deviation of the standard of care for a vascular neurologist to determine that what they see on CT imaging disqualifies a patient from receiving tPA? Just that general basis, who cares if it's Nobo or you, just a vascular neurologist; are they qualified to review and make determinations based upon those images whether or not a patient qualifies for tPA?
A. Generally speaking, they are.
MS. LOBEL: Form.
THE WITNESS: But I think the question is, what are the specific findings that we're talking about when they're very subtle, it is conceivable for experts and board-certified vascular neurologists to overextend themselves in the interpretation. And this is why we have other people look at images too.
Again, I'm not suggesting that he's not qualified. But I do think that in a complex case of interpretation, not everybody has the same degree of expertise.
BY MR. DRAHOS:
Q. In the context of this scenario, clinician sees an image and is not sure if it's a hemorrhage or not, do they give tPA?
A. No. They pick up the phone and call

somebody and ask about it.
Q. Wouldn't you agree you err on the side of caution?
A. That's why you pick up the phone and call somebody and get a consensus. Get another set of eyes.
Q. So do you agree that Dr. Nobo was only one of two board-certified vascular neurologist in Puerto Rico in February of 2019?
A. I agree with that. I think that's true.
Q. And so if Dr. Nobo was the only board-certified vascular neurologist working at HIMA on -- in February of 2019 on the date in question, would you agree that he was the most qualified vascular neurologist at that particular moment in time to make that decision?
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. Meaning there are no other colleagues, there are no other vascular neurologists for him to confer with?
MS. LOBEL: Form.
THE WITNESS: Yes. But was he qualified, yes. Was he the only qualified vascular neurologist, yes. But I think that you cannot take that out of context that the interpretation of images included



a radiologist whose qualifications I don't know, but who has been credentialed in that hospital to interpret a test. And you cannot escape the fact that the so called subarachnoid hemorrhage never existed.
Q. So is it a deviation of the standard of care for a vascular neurologist to rely upon their own personal read of an image versus deferring to a radiologist?
MS. LOBEL: Form.
THE WITNESS: I think that it depends how you look at it. In the sense that it really depends on what credentials you have, what have you been certified to do and what your expertise is. And you always take a chance of being -- if you're wrong, it's going to be a problem, like in this case was. From this particular point of view.
BY MR. DRAHOS:
Q. Do you defer to radiologists?
A. I do not necessarily. It depends on what the findings are.
Q. What do you mean?
A. Well, every scan is a different situation. And if I have questions, I ask for a second opinion.
Q. Okay. So let me -- what would be an



instance where you'd have a question? Have you ever questioned whether or not there's evidence of hemorrhage?
A. Yes.
Q. And you've asked for a second opinion?
A. Yes.
Q. Okay. And have you also made decisions on whether or not there's evidence of a hemorrhage without seeking a second opinion?
A. Say that again, I'm sorry.
Q. Sure. Have you ever concluded that you believe there's evidence of hemorrhage without having to seek a second opinion?
A. I have. And I've been right.
Q. So you read Dr. Nobo's deposition?
A. I did.
Q. Okay. And in your opinion in this case is that Dr. Nobo needed more time, that had he had more time he could've ruled out the hemorrhage that he believed he saw in the ipsilateral region of the brain. Correct?
MS. LOBEL: Form.
THE WITNESS: I'm not sure that that characterizes my opinion. My opinion is that had this patient been transported and sent to the hospital as expedited as he should've been, there would have been



more time for; A, the scan to be better time table, the scan to be either normal because it didn't show any infarct tissue. And if there was a question about the potential subarachnoid hemorrhage, time to discuss those findings and decide as a group if, in fact, that was the case or not.
BY MR. DRAHOS:
Q. All right. So you believe that if there had been more time for imaging and review and discussion, there would've been a different conclusion; is what you're saying?
A. From a certain point of view, I guess that's one way.
Q. What other point of view is there?
A. Well, I mean, you're paraphrasing what I said.
Q. But am I paraphrasing it correctly?
A. Well, to some degree, I think that -- I think that in your statements you make them so absolute that it doesn't really consider the interdependency of the fact that the factored time leads to consequences. And that's really what my point is. Is that if the transfer would have occurred faster, there would have been consequences to that.
One, that the scan would've been easily

interpreted as normal. B, that there was no infarcted tissue. C, that the possible subarachnoid hemorrhage could've been discussed and that would've lead to different decision perhaps.

**Q. So I think I did paraphrase it correctly. Are you saying more time would've resulted in a different conclusion?**

A. Okay. I can live with that.

**Q. Yes.**

A. Yeah, I can live with that.

**Q. Okay. And so you disagree with Dr. Nobo's impression that he believed there was evidence of a subarachnoid hemorrhage in the ipsilateral region of the brain. Correct?**

A. Correct. I do.

**Q. And do you believe that it was unreasonable for Dr. Nobo to consider the fact that Mr. Burgess had had a recent trauma in that particular region that could've resulted in that finding that he was seen as a potential hemorrhage?**

A. No. I don't think that's an unreasonable thought to have. I think the problem is that by virtue of the fact that there was already infarcted tissue, there really was no need to even question whether, in fact, the subarachnoid hemorrhage



would've made any difference or not at the time the decision was already made.

**Q. So this issue of time being a factor and it would've led to a different conclusion, how do you reconcile that opinion with his testimony? This is from Dr. Nobo's deposition, October 25, 2022, Page 66, Line 5.**

**So once you saw that finding that believed to be blood in the head, did that mean that definitively Mr. Burgess was not going to qualify for tPA no matter what.**

**Answer: Correct. Even if I saw him an hour from the onset, two hours, three hours, with that kind of imaging studies, I would not have give him tPA.**

**Question: So let me ask it this way; if Mr. Burgess was flown by helicopter the moment he shown signs and symptoms of a stroke and delivered directly to you at HIMA Caguas on February 21, 2019, as soon as you saw that image that showed the blood, would you have given him tPA or not?**

**Answer: No.**

**Dr. Nobo is stating here rather definitively that time wasn't a factor for him. Why do you believe that it was?**

A. Because it was. There's no question that time was a factor. I think the question really is



how that question was asked in his deposition. It simply takes the presence or absence of the subarachnoid hemorrhage as an absolute finding outside of the context of the infarcted tissue on the CT scan. So had we asked the question a little bit differently in terms of what would have been the impact of time in all of the findings, we may have gotten a different answer.

**Q. So wouldn't you agree that in this case really the only thing that matters is what Dr. Nobo's thought process was on February 21, 2019?**

MS. LOBEL: Form.

THE WITNESS: No. I disagree with that.

BY MR. DRAHOS:

**Q. He's the only one making the decision. You're not there to make the decision.**

A. Yeah. But that's not all that matters.

**Q. Okay. And you may disagree with him, but can you tell me a more qualified vascular neurologist or a better center that Mr. Burgess could've been sent to on February 21, 2019?**

A. No. But that's not the question you're asking. You're asking if that's all that matters. That's not all that matters. What matters are the facts.

**Q. And the facts in this case are that Dr. Nobo reviewed a film, believed there was evidence of**



**a hemorrhage that was consistent with the reported history and determined that he was not going to give tPA to Mr. Burgess no matter what?**

A. No. I think the facts are that this patient showed up at HIMA San Pablo Caguas late, later than he should've shown up and therefore the findings in the CT scan set Dr. Nobo for failure based upon the delay.

**Q. Here's Dr. Nobo's testimony on Page 124 Line 17.**

**So if Mr. Burgess was delivered from the Royal Caribbean cruise ship to HIMA San Pablo Caguas via private ambulance, do you think that there could've been anything done differently to get him to HIMA faster in a safer manner than what was ultimately done.**

**There was an objection to the form and then the answer.**

**I don't remember how long it took. And the point is even if they came faster, with what I saw on the CT it would not change the way I treated him.**

**Again, doesn't that testimony conflict with what you're telling the members of the jury.**

A. No. On the contrary. What you're looking -- that actually supports my argument. That you are framing the questions on what he was seeing in the CT

scan. If I had seen the CT scan with an infarcted tissue, I would have agreed, but that's not the issue.
The issue is why did the scan look that way. And the reason it looked that way largely was because of the delay.
**Q. So you are advocating for the theory -- strike that.**
**You have raised the theory in this case that the better means upon which to transfer Mr. Burgess would've been to use the 9-1-1 system?**
A. That's one way.
**Q. Okay. Is there any other way that he could've got from the cruise ship --**
A. Certainly not the way it was done.
**Q. -- to HIMA any faster?**
A. Certainly, not the way it was done.
**Q. All right. And as we've talked about before, you have no personal experience using the 9-1-1 system in Puerto Rico?**
A. No, I do not.
**Q. All right. And so you've cited to, in your report, quote, literature of 9-1-1 providing patients with greater chance of receiving tPA than without it. Let me see if I can go specifically to Page 9 of your report.**



**Your words, the existing literature shows that the use of 9-1-1 based emergency transport systems conveys odd ratios of 1.5 to 2.0, one and a half to twofold chances of early ED arrival, quicker ED evaluation, more rapid treatment, and more eligible patients treated with intravenous thrombosis. Those were your words. Correct?**
A. Yes.
**Q. All right. And the study, the literature that you're referring to, does that refer to Puerto Rico?**
A. Yes.
**Q. Tell me where that refers to Puerto Rico?**
A. It's the Ciliberti paper. Table 1, Table 4, Table 5.
**Q. Whoa. Whoa. You're going to have to slow down for me. Where, specifically in the quote, existing literature, does it say that the use of 9-1-1 transport systems in Puerto Rico provides greater odds for tPA than without them?**
A. Okay. The University of Miami had a project of looking at stroke care for disparities together with Puerto Rico. Nine hospitals in Puerto Rico were participating at the time the latest publication,



which date back to 2017.
And the historical data show that at the time nearly half of the patients with acute stroke in Puerto Rico arrived via EMS, which was a little bit less than the average in Florida, in the State of Florida. So it wasn't that much different. And that the chances of giving tPA or getting tPA, in patients who arrive under two hours of onset was about 16 percent and it was 16 to 20 percent in Florida. So the comparability of performing below was not too bad. It's about two-thirds the chances.
**Q. Where does this study -- first of all, where was the study from?**
A. It's in the medical literature. You can find it in the stuff that I sent you.
**Q. You got to let me finish the question.**
A. I'm sorry.
**Q. Where does this study you're referencing make a mention of the use of the 9-1-1 system in Puerto Rico? You're saying it's talking about door -- arrival to needle. Right?**
A. Uh-huh.
**Q. But I'm talking first about where does it say in here that using an ambulance in Puerto Rico via 9-1-1 gives you a better chance?**



A. As I said, if you look at the papers, the paper show --
**Q. I need you to tell me specifically where. Because I don't see that anywhere in any paper that you cited.**
A. Okay. Well, I'll look it up. I'll read it to you. Do you want to open the paper?
**Q. So which paper is it that you're referring?**
A. If you look at the medical literature folder.
**Q. Okay.**
A. And look for a paper that says Stroke Center Florida & PR 2017. Okay. And there is a second paper. Stroke Center Florida & PR Racial Ethnic and Disparities. All right. So if you look at in the Sacco paper, Table One.
**Q. Sacco paper. Hold on a second. Which one is that?**
A. The first author is Sacco.
**Q. Right. But where is the title?**
A. Racial-Ethnic Disparities in Acute Stroke Care in Florida and Puerto Rico.
**Q. Okay. Hold on one second. That's not the one I had up. So I had Stroke Center Florida & PR**

2017. Where is the other one you were referring to?
A. The other one is Stroke Center Florida & PR Racial-Ethic Disparities 2017.
Q. Where is this one cited in your paper before we go into any further? Your report?
A. Only one of them is cited in the paper.
Q. So this one is not cited in your report?
A. No.
Q. So you're producing this here today for the very first time for me to see. I have not had an opportunity to review this with my experts. But go ahead and show me where it says in here that showed up by ambulance we get a 9-1-1 system in Puerto Rico that gives you a better chance of receiving tPA?
A. Well, that's not what the paper say.
Q. That's what we talked about.
A. Here's what -- no. What we're talking about is looking at the existing literature and data. The paper shows that about half of the patients that arrive to hospitals in Puerto Rico, nearly half of the patients, not very different from those in Florida, receive tPA. And that the time tables and the percentage of those that are treated with IV tPA are not very different from those in Florida by the same reason.
So the conclusion that one can draw from


this is that the EMS services do work to some degree, are used to some degree, and the patients are being treated similarly.
Q. So there isn't a specific study that says that showing up by ambulance using the 9-1-1 system in Puerto Rico gives you a better chance?
A. That doesn't work that way.
Q. All right.
A. In medicine opinions are based upon the aggregate of the literature. And the literature that supports it says there is -- there is a system that has been in existence for years on transporting patients with a goal target of ten minute of response is being used. There is evidence in the literature that a system is being used in about half of the cases.
And that, in fact, you know, Dr. Nobo is one of the authors of these papers. That it is being used and that the performance, although less than that in Florida, is better than not showing up.
Q. So I want to go back to my original question.
A. Sure.
Q. You put in your report the existing literature shows that the use of 9-1-1 based emergency transport system conveys odd ratios of 1.5 to 2.0 of


early ED arrival, more rapid treatment, more eligible patients for tPA. Where is that written anywhere?
A. Well, it's not written in those words. That's my opinion.
Q. You're extrapolating that.
A. No. This is how medical literature works.
Q. I have to disagree with you, sir.
A. Well, that's okay. But I've been practicing for 42 years and I can tell you that the expert opinion is based on the aggregate of the evidence in the literature. And these papers show that, A, there is an EMS system in Puerto Rico that seems to work to some degree, that, B, it is being used in about half of the cases. And that the performance of the system is about two-thirds of the efficiency of that in Florida compared to the continental United States.
Q. So you've cited a paper here today that I haven't had an opportunity to see. You're telling me that you're extrapolating information from it to reach this conclusion of yours. And you're also telling me that Dr. Nobo was an author of these papers that they're relying upon.
A. Yeah.
Q. Okay. So, I mean, surely when you're


doing your work as an expert, do you only look to information that's favorable to your case, or do you consider alternative evidence as well?
MS. LOBEL: Form.
THE WITNESS: I consider all of the evidence available. But I haven't found anything at least to the contrary.
BY MR. DRAHOS:
Q. Okay. And I asked you after you had read Dr. Nobo's opinions whether or not they changed -- or his testimony whether or not they changed any of your opinions in the case?
A. Yes. They have not.
Q. Agreed?
A. Yes.
Q. Okay. And so let me ask you about this particular answer.
Question. This is from Dr. Nobo's deposition, Page 29, Line 14.
So I'd like to ask you a little bit about challenges in facilitating patient transfers around the island of Puerto Rico as well. Back in February of 2019 was Puerto Rico experiencing difficulties with ambulance resources.
Answer: We're still struggling with

Page 110

that.

Question: Tell me what it was like back in February of 2019 trying to facilitate a patient transfer by ambulance in Puerto Rico.

Answer: Literally a nightmare. So they call you to transfer the patient to you, and if I remember correctly in this case, they called me to accept this patient, which I did. On the typical experiences that you might accept the patient now, and I don't know what time it is, 11:24, and the patient might come to you an hour, two hours, five hours, eight hours later easily, depending on where they find an ambulance that will accept the transfer the patient or that is available to transfer the patient.

So transferring patients in Puerto Rico by ambulance is a huge issue. It's a huge problem. It was a problem in 2019 and it's still a major issue now.

Does that sound the same as an ambulance system that works as well as Florida?

A. No, sir. But I -- we are going from the specific to the theoretical. There's two aspects to this. One --

Q. I agree.

A. Yeah. Well, the theoretical -- you're calling the theoretical also. The idea that -- are there problems with emergency medical services in Puerto Rico, I don't doubt it. I never doubted it. Does that mean that is zero performance, which is what is trying to be implied here. No, that's not the case. It certainly does not work if you don't call them.

So I think specifically in this case had somebody said, you know, we tried and it didn't work. It's different than we never tried at all.

Q. Page 30, Line 14. Question to Dr. Nobo.

Why is it such a big issue.

Answer: Because the way the system works. I mean, here it's not like 9-1-1 in the States. 9-1-1 in the States in a matter of a few minutes you have an ambulance to your house. Here, you know, you call 9-1-1 and they may activate the State ambulance or they may activate the private system. And some in the private system might be transferring some other patients for different stuff and they're not available right away.

So at the end of the day and being completely honest with you, I would message to patients and their families that when they come to our facility, when they leave, we always tell them, you know what, call the ambulance but if you don't get an ambulance in five or ten minutes just put them in a car and come to the hospital. Because chances are that the patient might come really, really late and too late to do anything.

Question: So back in February of 2019 there was a national shortage of ambulance resources.

Answer: I don't know if there was a national shortage or not, but the system was working like crap.

Does that convey to you any level of confidence that 9-1-1 would've been a better option for Mr. Burgess on February 21, 2019?

A. As I said before, I think that we are equating the difficulties of a system with the fact that it doesn't work at all. And it really doesn't work at all if you don't use it at all. So the question is, is the system -- how is it similar to the United States.

I think that they have a system that is organized, it's not working too optimally, but that doesn't mean that it doesn't work. And it certainly doesn't work if you don't use it.

Q. So let's talk about how it does work.

A. Sure.

Q. Even though you don't have any personal knowledge of how it works, did you do any research to determine how actually these 9-1-1 services function in Puerto Rico?

A. I looked at some of what they have published themselves and some of the work that they done. They have four different dispatch centers. They have a number of regions. They have computerized systems with geo-locators. They have protocols in place that call for a response time within ten minutes. I'm sure these people are doing the best they can to perform that.

The best information we have available in 2019 is the average response time was about 20 minutes, which is twice what their goal was. So yeah, are there problems, yeah. But --

Q. I'm talking more specifically, my expert in this case, Dr. Alcedo, who has personal knowledge of how it works, as well as Dr. Nobo who's testified in depositions in this case that you reviewed, have both opined that the way the system works in Puerto Rico is that when you call 9-1-1 they take the patient to the nearest facility. Not the most capable, but the nearest.

Do you have any evidence to refute that that was the policy and procedure in Puerto Rico back in February of 2019?

A. I don't have any evidence to refute something like that. But I think that concept is a little bit out of context. Their protocols are to take the patient -- and they're written as well. To take the patient to the nearest capable hospital. And those

Page 114

nearest capable hospitals -- if they're, for example, they're not capable of administering IV tPA, they can call somebody and get the information on the phone.

There's evidence that about 33 percent of the hospitals in Puerto Rico were engaged in tele-stroke as of 2017, that's the latest data we have. So there are some ways about getting these patients treated. So although I feel for my colleagues and the fact that the system is not as good, the truth of the matter is that Dr. Nobo himself says that they treat about 120 patients or so with IV tPA a year. How do they arrive because they're not crawling into the hospital. They must be arriving to some degree by ambulance and the data that we have that is published even by himself is about nearly half of them arrive by EMS services.

So is the system akin to the one in the United States, probably not. Do they struggle, yes. Were there shortages, probably so. But again, that's not the issue. The issue is that what was done did not work, it was designed for failure. And the idea is try something different if you're going to prioritize the care of this patient.

So it would've been different if we were sitting here and said we called 9-1-1 and there were no ambulances. Or we called 9-1-1 and they gave us the

Page 115

runaround. At least you can tell the patient and the family, gee, we can't get an ambulance in here, might as well get in your car and drive up there.

But that's not what is going on. And on top of everything else, when you go online with places like HIMA San Pablo, they still have videos, educational videos on stroke and they're still recommending dialing 9-1-1.

So which is it? I mean, do we recommend 9-1-1 or do we not recommend 9-1-1; do we use it or we don't use it. So I find it a little disingenuous.

**Q. So if Mr. Burgess -- strike that.**

**If the medical staff aboard the Harmony of the Seas had called 9-1-1 on February 21, 2019, where would Mr. Burgess have been taken?**

A. That, I don't know.

**Q. And if Mr. Burgess was taken to the nearest facility that did not have tPA, what would've happened?**

A. They would've called somebody who would've taken care of the patient. See, I think that the problem, all of this discussion --

**Q. Taking care of them how?**

A. Well, by phone. We do it all the time. I give tPA by phone all the time.

Page 116

**Q. But the facility doesn't have tPA --**

MS. LOBEL: Is your answer done?

THE WITNESS: No. I mean, I'm still -- still --

MS. LOBEL: Go ahead.

THE WITNESS: -- trying to wrap around, my arms around it. But -- what was I going to say? Sorry. So, you know, so the patient -- if a patient is picked up and taken to a place that does not give tPA, it happens in the United States every single day. They call one of us. We give them tPA on the phone and then transport the patient. We do that all the time, sight unseen.

Now the other problem is, which is what I was trying to get to is, this whole idea that only vascular neurologists and only certified stroke centers give tPA, that's not true. The jury needs to understand that giving tPA, we have probably about ten, maybe ten, twelve hospitals that are in our network. And they give tPA, and only half of them have any certification of any kind.

So we got to be very careful that the availability of IV tPA goes beyond the certification and accreditation and so on. And that the critical aspect of it is get the patient to the hospital on time.

Page 117

BY MR. DRAHOS:

**Q. All right. When you say we give tPA and there's eight or nine networks, you're talking about here in the United States?**

A. Correct.

**Q. In your area of Columbia, Missouri?**

A. Correct.

**Q. Okay. So can you tell me by name how many hospitals in Puerto Rico in February of 2019 were administering tPA to stroke patients?**

A. I can tell you the nine hospitals that were listed in that paper, which were all involved in treating patients with IV tPA.

**Q. Well, wait. So you're referring to the paper Stroke Hospital Characteristics in Florida, Puerto Rico, in collaboration to reduce stroke disparity study?**

A. Correct.

**Q. That's what we're talking about?**

A. Yes.

**Q. Which Dr. Nobo was an author of that report as well?**

A. That's correct.

**Q. All right. And so you're referencing the fact that there were nine hospitals that participated in the survey. Correct?**

A. Yes. There were at the time involving giving tPA one way or another, to one degree or another.

**Q. So where does that say that anywhere in this paper that these nine hospitals that you're referring to were actually administering tPA to stroke patients?**

A. That's the reason that we're doing the paper. At least -- that's what we have.

**Q. Tell me where in this paper it says the name of the hospital and it confirms that they were giving tPA?**

A. The name of the hospital you're not going to find it in the paper.

**Q. All right. So we can agree that there are no names then?**

A. No. But I know which ones they are. But, yeah. So it's impossible for me or anybody to tell you which hospitals on that very day were capable of giving IV tPA.

**Q. You don't know?**

A. I don't know. I mean, I wasn't there so I don't know.

**Q. You know that HIMA San Caguas or HIMA Caguas was capable?**

A. Yes. And if had the patient arrived



within time he may have gotten tPA.

**Q. I know that's your opinion.**

A. Of course it is.

**Q. Other than HIMA Caguas, can you give me the name of any other hospital in Puerto Rico that was capable of providing tPA to Richard Burgess on February 21, 2019?**

A. I cannot. We don't have that information. But my point is that even if you say HIMA Caguas is the only one, again, back to my point, had he arrived to HIMA Caguas in time he would've gotten tPA correctly.

**Q. And the only other mechanism that you believe would've gotten him there on time would've been to call 9-1-1?**

A. No. You could have get him into a car and drive him there. But that's not the point. My point is that the system that was used did not work.

**Q. You're not recommending that?**

A. No, I'm not recommending that. I'm just trying to tell you. That A, Dr. Nobo was recommending people to get in a car. So let's not go in that direction.

But my point is that the system that was used was flawed, delayed, unnecessarily. And nothing



else was tried. And I think the question is why didn't we try something expeditiously. Why wasn't the doctor on the phone every five minutes, where is my ambulance, how can we get this guy to a hospital so he can be treated.

**Q. What makes you think that's going to create any different result?**

A. Well, it won't if you don't try it.

**Q. Okay. But I appreciate your aspiration let's try and make a better effort because that seems to be the theme --**

A. Well, that's the whole point. Isn't that the duty that we have.

**Q. Wait, let me ask the question.**

A. Sure. Sorry about that.

**Q. Can you tell me -- you've offered 9-1-1 as an alternative. Can you tell me any other way that Mr. Burgess could've been delivered to the hospital at HIMA on February 21, 2019 that would've been faster other than what the port agent did or calling 9-1-1?**

A. Well, I don't want to be facetious, but, you know, the delay was so pronounce, this hour and a half of getting an ambulance that you have to actually think about Dr. Nobo's idea of getting the patient in a car. Of course, you can't do that if somebody was on a ship or anything like that.



But I think that we are -- we are missing the forest for the trees, which is what was done. I was asked to comment on what was done. What was done was incorrect. It was delayed unnecessarily. And there was at least one other option that has a protocol that is established and been working for years. And there's published data that it does work to some degree. It's not perfect. You know, it has problems, no doubt. I have no argument with it. I mean, I feel for my colleagues working -- I've been in Latin America. Things are different.

**Q. Including Dr. Pereira?**

A. You know, but he never tried any system. All he did was maybe get me an ambulance. And that's where ended. This is not what we would have done. I mean, I -- you would think that if there's a problem you would document that there's a problem. You would talk to somebody. There's no evidence that that ever took place.

**Q. So let's imagine then that Dr. Pereira is in the Port of Miami. He makes a request for an ambulance. Is he in the same situation that he was in in Puerto Rico?**

A. What do you mean?

**Q. If Dr. Pereira had done exactly what the records show in this case, he made a conclusion that an**

Page 122

**ambulance was needed and he made a request that was administered within five minutes of the request, do you think the same result would've occurred in Miami as what happened in Puerto Rico?**
A. It would've occurred better in Miami.
**Q. It would've been faster?**
A. Yeah, I would think so.
**Q. Okay. So when you say you feel for your colleagues, do you include Dr. Pereira in that circumstance?**
A. No. I was actually referring to Dr. Nobo and the colleagues in there because they live in that system.
**Q. Don't you think Puerto Rico is really the defendant in this case?**
A. No.
**Q. Well, if Dr. Pereira made a timely diagnosis, he made a timely request --**
A. Yes.
**Q. -- the reason for the delay was because of the system in Puerto Rico?**
A. Yeah. But the question -- we're going back to the original question you were asking me; what did he request and to what degree of urgency. And what was the follow through. Because he -- the physician that

Page 123

passed the patient in this emergency base is responsible for that patient.
So did he, in fact, recognize the urgency or didn't he. Or was it just a saying. Because his deposition makes it look like he wasn't even sure it was an emergency. So again, what do I -- there's a difference between say to somebody get me an ambulance, and saying get me an ambulance, get it to me right now. I'm going to come to you in five minutes. If this ambulance is not here, find me an ambulance somehow because time is of the essence.
**Q. So when Mr. Burgess arrived to HIMA Caguas based upon all the evidence that you've reviewed, was he at the time of his initial presentation a candidate for thrombectomy?**
A. Okay. Sorry. I mean it is -- could you repeat the question, please?
**Q. Sure. It's not clear, and maybe it's just that I'm not picking up on the nuances of your writing. But what I'm trying to find out is, do you believe that Mr. Burgess was a candidate for endovascular therapy/mechanical thrombectomy at the time of his initial presentation to HIMA Caguas?**
A. He was, in my opinion. But I tried to stay away from that because this is not -- from the

Page 124

endovascular point of view, this is not a very straightforward case. And I'm not convinced that they had the expertise to deal with this at the time.
So I don't know that that's -- that's a separate conversation because I don't think it affects the decision for giving IV tPA or not.
**Q. Okay. So what I'm trying to get at then, I'm trying to understand, when Mr. Burgess first presented to HIMA Caguas during that initial presentation, was IV tPA the only treatment modality that could've prevented the ultimate outcome?**
A. It was -- it was the best treatment modality. Was it the only one, perhaps not, but that's a little bit more difficult to discuss because it depends on levels of expertise and experience in endovascular therapy. Certainly, the first line of therapy for him, the best treatment that he would've gotten would've been IV tPA by hands-off.
**Q. Okay. So I think what I'm hearing you say is there may have been some institutions in this world that may have done a mechanical thrombectomy on him, but if there was a physician who didn't, that's not a departure from the standard of care. Is that what you're saying?**
A. No. Well, it's a little bit more

Page 125

complicated than that. I figured we would get into that discussion. If this patient were to have endovascular treatment, urgent endovascular treatment, thrombectomy, this is not a simple thrombectomy. This is a little bit more complex than that because he would've required angioplasty and stenting of the vertebral artery, which was causing the process. And that's a little bit more complex. It carries different benefit-risk ratio. The technique is not quite as well mastered.
And it's something that does not need to be done urgently. It can wait. And it can wait particularly to see what the effects of the tPA is on the clot. So it becomes a little bit more really complicated.
**Q. So the filling defect that was found in the vertebral artery in the addendum you would agree it was present when he first came to the medical center?**
A. Yeah. The question is what is the filling defect. I saw those testimonies on and on and on. This filling defect doesn't seem to be very well defined in all the depositions. I think we're talking apples and oranges.
Let me explain to you what a filling defect is. Okay. Is the column of contrast instead of occupying the entire vessel does not fill a segment of

the vessel. The question is what is producing the lack of contrast filling. In this case, it was lacking two things.
One, a plaque in the origin of the vertebral artery that was either occluded or nearly occluded, plus a clot that formed on that vessel at the time of occlusion, which is what precipitated the stroke. So that's what the so-called filling defect. So it's a little bit more complex because you have to deal with both issues.
**Q. Do you know how long the clot was there for?**
A. That's impossible to know, but we do know that at approximately 10:15 that morning, a fragment went into the left posterior cerebral artery.
**Q. So in other words, would it be anatomically correct for me to describe it like this; there was a mother ship in the vertebral artery that sent an initial warning up into the brain and that that mother ship later moved into the basilar artery and occluded it?**
A. Well, I think that there is a blood clot formed in the proximal vertebral artery. The first fragment went into the left posterior cerebral artery. The second fragment went into the basilar artery.
**Q. Okay. So the second fragment --**


A. Uh-huh?
**Q. -- if it had been noticed at the time of Mr. Burgess's original presentation to HIMA, do you extract it surgically or not?**
A. The second fragment?
**Q. Yes, sir.**
A. If the second fragment, if the basilar artery occlusion had been present at the time he arrived at HIMA San Pablo -- isn't that what you asked?
**Q. I think that's a little different than what I was asking. So it sounds to me like you and Dr. Yavagal are both in agreement that the vessel itself was open at the time of the first stroke was diagnosed?**
A. Which vessel?
**Q. The right vertebral artery.**
A. It was not. It was either closed or nearly closed.
**Q. Closed or nearly closed. All right. Let's say it was closed, was it an asymptomatic?**
A. No. A fragment had been -- a fragment of the clot had already got to --
**Q. The first fragment. I'm talking about the second one. The second one was asymptomatic at the time.**
A. The second one was not there. The


second fragment was still in the original clot.
**Q. Okay. So let me try and use the same terms. If I'm using the mother ship, right, first fragment is the initial sort of signal that goes up into, what was it, the posterior.**
A. Cerebral artery, yes.
**Q. Yes. So the mother ship is still hanging out where at that point in time?**
A. In the vertebral artery.
**Q. Okay. And at that point would you agree that the mother ship is not symptomatic?**
A. It is symptomatic. Because that fragment came from there. That's what caused the stroke in the first place.
**Q. The fragment was symptomatic.**
A. Yes.
**Q. But the mother ship being present in the vertebral artery at that point in time is not symptomatic?**
A. You can't separate the two. This is all part of the same process. It's one process.
**Q. So could you tell the members of the jury within a reasonable degree of medical probability whether or not the right vertebral artery was opened or closed at the time Mr. Burgess first presented?**


A. All we can tell is it was either occluded or near occluded.
**Q. Okay. And so --**
A. And the reason -- I don't mean to be hedging. Okay. I just want you to understand something. The imaging studies have -- all imaging studies have difficulty discriminating between a vessel that is completely occluded, and one that has just enough flow. Just nearly occluded. And that occlusion in the vertebral artery was produced by a plaque. And because of the plaque occlusion or near occlusion, a blood clot because of the flow stagnation, a blood clot formed. A fragment of which went first to the posterior cerebral artery and the second fragment to the basilar artery.
**Q. Okay. So do you think --**
A. Does that make any sense?
**Q. Yeah. No. I have it.**
A. Okay. All right.
**Q. Do you think that a surgical extraction of this second clot, the mother ship, should have been done at any point in time prior to when it occluded the basilar artery?**
A. Well, and that's the part that is dicey because the medical literature is not -- that's what we do typically.

**Q. We, being you at the University?**
A. At the university, yeah. And our team does that very frequently. But it's not necessarily something that everybody should be attempting because it takes a certain amount of expertise. And the medical literature is not -- is not solid and clear what is the best answer.
So you typically, patients like this they get tPA and we sit. And the reason for that is because if we can get rid of the clot altogether with the tPA, then it's much easier and safer to attack the plaque itself.
**Q. Okay. So let's talk about that then. Is your theory in this case that had tPA been given to Mr. Burgess --**
A. Yes.
**Q. -- sooner -- or given to him, let's just say sooner?**
A. Appropriately.
**Q. Okay. Appropriately. That it would've dissolved the first clot in the PCA before a tissue --**
A. Yeah, it would've. But it would've done more than that. It would have reduced the clot burden on the vertebral artery.
**Q. I'm getting there.**



A. Okay.
**Q. So what you're saying is the clot in the PCA would've dissolved before any tissue to the brain died?**
A. If it's given appropriately, yes.
**Q. Okay. And so are you then saying that the tPA would've also dissolved the mother ship?**
A. Yes.
**Q. In its entirety?**
A. That we don't know.
**Q. All right.**
A. But at least it would've decreased the clot burden significantly.
**Q. Can you tell me to what degree it would've decreased?**
A. That's unpredictable.
**Q. So isn't it --**
A. But we do know -- we do know two things. First of all, let me back up a little bit on your statement. There is no way that anybody can tell you that if you give IV tPA to a patient like Mr. Burgess the clot in the posterior cerebral artery will be dissolved to the point that there is no brain injury.
Typically, the treatment of stroke is taking what is going to be this much brain injury and



minimizing it. But they're, you know, minimizing it to the point that the functional outcome and the mortality. The functional outcome is better and the mortality is reduced.
There is no way anybody can predict to what degree the clot in the vertebral artery would've been dissolved. But we do know that patients with this kind of pathology when given tPA have about a 30 percent chance of a better outcome than when they do not get IV tPA. And it gives people time to think about what do they want to do about that plaque. Because sooner or later, you know, whether the tPA dissolves the entire clot or not, when the effect of the tPA is gone you still have that plaque there. You have to deal with it. Because this may happen a week later or two weeks later if you don't deal with it.
**Q. Understood. So let me ask you an alternative scenario. You've offered the optimistic one, that tPA would have dissolved the PCA clot before any tissue resulted in damage and that it may have possibly reduced the mother ship. Couldn't tPA have just as likely broken up the mother ship and caused a number of additional clots to throw throughout the remainder of the brain?**
A. I think that's an area of concern. But



the outcome data don't support that, number one. I mean, most of the outcome data that you look at on papers on vertebral artery occlusion, the tPA patients treated do better.
The other thing that's interesting is that if the tPA breaks the clot into multiple small fragments, then those multiple small fragments the tPA also attacks them and dissolves them much better. The problem is the clot burden. When you have a large clot that has fragmented that way.
So the answer to your question, the short answer is that more likely than not it would have been beneficial to the patient.
**Q. And when you say beneficial you say 30 percent chance of a better outcome?**
A. The average.
**Q. And so can you state within a reasonable degree of medical probability that had tPA been given to Mr. Burgess that the mother ship would not have broken up into several difficult clots and caused several different strokes?**
A. Well, those are two questions. I think that within a reasonable degree of medical probability it is unlikely they would have caused multiple other strokes, multiple other areas of injury. It is difficult

to predict 50 percent plus or more whether it would've broken up into other pieces. Because as I told you, it can happen. And that's how clots break up. But the fragmented clots are much better target because of the small clot burden to the IV tPA that is circulating, in the plasma that is circulating than the large clot itself. I hope that answers your question.

**Q. But does that mean that there would be a number of -- now you're chasing several clots instead of --**

A. You don't have to chase them. They're circulating IV tPA takes care of them. That's what we see all the time.

**Q. Yeah. But under that scenario what you're saying is that the mother ship gets dissolved even though it breaks up into several pieces, it eventually gets dissolved before it causes brain injury.**

**My suggestion or my request, or my question is, isn't it also likely or a possibility that it breaks up into several clots and those several clots cause several strokes?**

A. Yes. And my answer is that more likely than not the breaking of the clot in the vertebral artery into multiple pieces would still lead to a better outcome. That's what the outcome data suggests and we



think that's the mechanism for it.

**Q. So your rebuttal report made comment about the fact that there was -- you haven't seen imaging studies -- let me just go to it so I can read it specifically how you wrote it. You don't know as you sit here today why Dr. Ramos (ph.) was unable to get to the clot in the basilar artery, do you?**

A. Let me see how I answer that question without sounding obnoxious. I think -- and I mean this without disrespect, I think it was lack of expertise.

**Q. So you say here -- well, why do you think it was lack of expertise?**

A. Because I've done that procedure a number of times and I looked at the angiogram pictures and there is no way on this green earth the way he went about it that it was going to open that vessel.

**Q. So you think that this is a method that he used was inferior and that he could've done it a different way? What way would you have done it?**

A. I think there is -- again, I don't want to be disrespectful because that's unfair. I think that this is not a commonly done procedure. And I think that this is not something that is done very frequently. Some of us who have been around for years and years have done it more often and have learned along the way.



So I just don't think he has the experience to have been able to open this vessel the way he went about it. And, you know, there's no -- I don't want it to be a negative reflection. It's what it is. And this is not something that is commonly done.

**Q. Well, see, that part I don't get about what you're saying. Because you're telling me that you're here today not as an advocate for the plaintiff, but you're so resistant to question the skills and the capabilities of the surgeon who did the surgery that could've prevented this outcome.**

A. Yeah. But I'm also telling you -- I'm not questioning the skills. I'm questioning the technique on a specific procedure that is not commonly done. And so I don't -- and I'm trying to be respectful because I think being critical is -- it's unnecessary roughness. I think that this is not a procedure that is commonly done. And we do it because we have more years doing this stuff. And done under other circumstances.

And again, I never brought it up. I'm answering the question because you asked it. I never -- in my reports I never went about saying that these people were unskilled or ineffective.

**Q. Well, I had to ask you because in your you wrote we only have the procedural report, which leads**



**many interventional questions unanswered, and therefore we reserve our right to further add to our neuro endovascular opinions.**

A. Yes.

**Q. Once such images become available.**

A. Yes.

**Q. So you have since reviewed the images?**

A. Yes.

**Q. But you didn't enter any type of a supplemental report. So I'm hearing this all for the very first time.**

A. Correct. Because I don't think it was necessary. The only reason I'm issuing this opinion is because you asked me.

**Q. Okay. But you leave it open to you specifically reserve the right to further add to your opinion.**

A. Correct. Because I wasn't sure what I was going to find.

**Q. Okay. And so what you're saying is what you found in those images left you with the opinion that you could have gotten to this clot, you, Dr. Gomez?**

A. Yes, I would've.

**Q. And so do you disagree then with Dr. Ramos's testimony that he found evidence of -- strike**

Page 138

that.
Q. Do you dispute the pathway that he went, through the right vertebral artery?
A. No. I think that was the way to do it.
Q. And he said it was totally occluded?
A. Yes, it was. Well, again, it was either occluded or nearly occluded. And there's still --
Q. He said total occlusion.
A. Well, that's what he said. But I saw the images. And I'm telling you it's not quite certain. But yeah, it could've been occluded, no doubt.
Q. Okay. So just tell me then, how do you get through a totally occluded right vertebral artery?
A. Very carefully.
Q. Okay. But you're saying it can be done?
A. It can be done. I do it all the time.
Q. So is there a degree of occlusion that renders these arteries more or less capable of getting through?
A. Yeah. No doubt about it. The more open the vessel is the easier it is to treat it.
Q. All right.
A. Occlusions are difficult to tackle.
Q. So if Dr. Ramos was the guy there at the time of doing the surgery, isn't he in a better position

Page 139

than you are to be able to explain the degree of occlusion he was facing?
A. No.
Q. And you're saying you can do that off of your review of the images?
A. Yes.
Q. You said there was no radiographic evidence of calcification in the right vertebral artery?
A. Correct.
Q. But Dr. Ramos testified differently?
A. I disagree with him.
Q. So you're basing it off of what you reviewed in the radiographic evidence?
A. That's what we're talking about radiographic evidence.
Q. Okay. And so explain to me what that means. Does that mean that you can look at a picture and say I don't see calcification and the same person can look at that same picture and say, no, I think that's calcification, it's just a matter of your subjective interpretation?
A. It depends on the picture that you're looking at. And it depends on the person. But I'm right.
Q. Why are you right?

Page 140

A. Because there's no evidence of calcification in vertebral artery.
Q. Well, isn't the fact that he couldn't get through the artery evidence of calcification?
A. No, it is not.
Q. All right. So when you say there's no evidence of calcification, what would you need to see in order to be able to determine there is calcification?
A. Calcium.
Q. And so, what, is it a certain signal --
A. Yes.
Q. -- brightness that looks like calcium?
A. Correct. The Hounsfield units are different?
Q. The what?
A. Hounsfield, S-O-- H-O-U-N-S-F-I-E-L-D.
Q. Okay. I'm rounding third base, Doctor.
A. That's okay.
MS. LOBEL: Can we take a brief break if you're going into --
MR. DRAHOS: Sure.
MS. LOBEL: I would like to use the restroom. Sorry.
THE VIDEOGRAPHER: We're off the record at 10:20 a.m.

Page 141

(OFF THE RECORD.)
THE VIDEOGRAPHER: We're back on the record at 10:27 a.m.
BY MR. DRAHOS:
Q. So Doctor, you made reference in your report to an examination that you did of Mr. Burgess. I wanted to ask you about.
A. Sure.
Q. First of all, it wasn't clear the way you wrote it. Did you do this on August 22, 2021 or August 21, 2022?
A. No. We -- we videoconferenced in 21 August of 2022.
Q. So it was August 21st of 2022?
A. Correct.
Q. Okay. It's on Page 5. Do you see the way it's written there --
A. Yeah. I see it.
Q. -- 21 August of '22. I was just not clear to me what that meant. All right. And this was done by video?
A. That's correct.
Q. How long was it?
A. I don't remember. I think I may have that written somewhere. Half-hour, 45 minutes, something

Page 142

like that.
Q. And the report states: We had the opportunity to meet in an interview?
A. Uh-huh.
Q. So who were you referring to when you say "we"?
A. It was -- who else was in that? I think Ms. Lobel was in there and Dr. Nidorf. That's -- we did it together.
Q. Okay. So you, Nobel -- Ms. Lobel, and Dr. Nidorf. Correct?
A. That's correct. And -- yes, and the patient and his husband.
Q. And did you lead the discussion?
A. No.
Q. Who led the discussion?
A. I'm not sure there was a leader. We just talked to them. We both -- Dr. Nidorf and I got to ask questions about how was he doing, how was he -- asked him to -- just medical questions about how he is doing, how he is fairing, what -- about his tracheostomy and his movements and so on.
Q. Okay. And so were you able to speak to Richard Burgess directly?
A. I did.

Page 143

Q. Was Mr. Henze on the line as well?
A. Yes, both of them.
Q. Okay. So when you asked questions about, like, his functionality and how he was doing, was Mr. Henze answering the questions or Mr. Burgess?
A. Both.
Q. Okay. Were there particular questions you recall Mr. Burgess answering himself?
A. Not off the top of my head. I don't know what particular questions each of one of them answered. You just wanted kind of a global sense of how he was feeling.
Q. Were there particular questions you recall asking yourself?
A. No, I do not.
Q. Okay. It says: Neurologically, to our examination, he appears awake, alert, severely dysarthric, with evidence of a considerable visual field defect.
What did you do to examine him neurologically by teleconference?
A. Just like we do telehealth all of the time. I mean, you ask questions. Most of it is inspection, awake, alert, severe dysarthric. All you have to do is talk to the patient and you'll know it. As

Page 144

far as the visual field defect, we ask them, well, what sort of things can you see; and they'll say, well, I can't see my hand here, I can't see my hand here.
Q. Okay.
A. Which is expected.
Q. And so would you agree -- I mean, you weren't able to, obviously, measure range of motion and sensation and things like that by virtue of the fact you were doing it virtual?
A. Yeah. Well, sensation we never measure. There really isn't a good way to measure sensation, and it's because it's probably the least reliable of all the aspects of the neurologic examination.
As far as range of motion, range of motion is very interesting to the physical therapist, but the real issue is how functional the patient is. And he was considerably imbalanced, even given the stroke, as -- as he sat and moved. And he -- he could show his hands and we could ask him to move his hands and you could see that his dexterity was not there.
We didn't see his lower limbs because he never stood up from his wheelchair, so --
Q. Okay. So you reached this conclusion that he had a modified Rankin score of 5, and how did you come to that conclusion?

Page 145

A. There are criteria for it, and you don't really need to examine the patient. Modified Rankin scale, we can do it -- people can do it on the phone, which is what we do 60 days. And I probably -- I struggle with this because he's -- he -- in some aspect, he's a five and in some aspects he's a four.
I think that irrespective of whether you call it a four, four and a half, or five, or whatever, it's clearly a disability, much more than -- that -- that what we consider a good functional outcome.
Q. So what you're saying, you came to that Rankin score based upon his verbal answers?
A. Yeah. I mean, and what he can and cannot do of the criteria really have to do with the amount of nursing care somebody that -- the amount of ambulatory capacity that they have, different things like that. So they don't really require a physical examination, as I said.
Q. And you reached the conclusion that you felt like his lifespan would be shorter as a result of this modified Rankin score; is that correct?
A. That's correct.
Q. And how much shorter?
A. Oh, that, I don't know. That, I don't know. It really -- a lot of it because there's many

variables involved. If you take the same patient with the same neurologic deficit and he gets care from somebody like his husband who is taking care of him is different than going in a nursing home. It's an unknown, where he doesn't get care and doesn't get complications or he gets more complications.
So -- but the problem with these patients who are disabled in any way, so they're prone to infections and pneumonia, urine infection -- and unfortunately, for everybody, what we don't -- cannot control, no matter what we do, is the passage of time. So aging itself affects patients differently when they have been injured.
**Q. So what you're saying is, you know his lifespan is going to be shorter, you just don't know to what degree. Is that what you're saying?**
A. I do not.
**Q. Okay. So you don't have a life expectancy opinion in this case?**
A. I do not.
**Q. Okay.**
A. Other than the general statement that I think it's going to be what -- on the average is not going to be what -- what would have been to somebody who doesn't have this injury.


**Q. I have received your testimonial history. Have you testified in any other matter since the time that you disclosed that? Have you given --**
A. No, I have not.
**Q. -- a deposition -- okay.**
A. No, I have not.
**Q. Have there been Daubert challenges filed against you?**
A. Not that I know of.
**Q. Do you know what a Daubert challenge is?**
A. I do.
**Q. Okay. And so you're not aware of any being filed against you?**
A. Not that I know of.
**Q. Are you aware of any courts entering any orders either restricting or excluding any opinions that you had planned to give?**
A. Not that I know of.
**Q. I saw that you've been to trial twice as an expert?**
A. As an expert? That's probably right.
**Q. I saw one where you testified for the plaintiff and I saw one where you testified for the defendant, but in both instances the verdict went against you?**


A. That's right. There is a third -- I remember that case.
**Q. But that's accurate, right, both times you have been to trial, you've lost?**
A. But I've been three times.
**Q. What is the third time?**
A. I've testified -- maybe more than that. I've testified over the years -- and I may not be in that list. I've testified in a couple of criminal trials, one on the defense side, one on the plaintiff side. That was years ago. I'm talking like 1987 or '88.
**Q. So --**
A. And then the other one was in probably 2004, maybe.
**Q. All right. And --**
A. So, anyway -- so, yeah.
**Q. That's interesting. But really what I'm interested in, particularly, is your testimonial history that you disclosed to me --.**
A. Sure.
**Q. In both instances when you testified in trial, you lost?**
MS. LOBEL: Form.
THE WITNESS: Well, I don't -- I don't lose. This is not my case.


BY MR. DRAHOS:
**Q. Well, the verdict went against you testifying?**
A. Well, that's -- that's -- well, it went against the case for whatever reason.
**Q. Okay. So in these cases where you have testified for the defendant, were these all stroke cases?**
A. Let me see. The Hans' case was not a stroke. It was a -- if memory serves, it was a subdural hemorrhage or something like that. I don't remember the details.
**Q. Okay.**
A. And the other one -- I don't remember. I'm sorry. I don't remember.
**Q. Let me do it this way. So in this case, Enyard v. KFC, you're testifying for the defendant in that matter. Correct?**
A. Yes.
**Q. Did you give a deposition?**
A. No, not yet.
**Q. Okay. And how about in the Huelskamp v. for Votapka?**
A. I have not given a deposition in that yet even. I don't even know where that is anymore, to tell you the truth.

Page 150

Q. How about Vrazel v. Lacour, did you give a deposition?
A. No.
Q. How about Robinson v. USA Truck?
A. I think that settled before I even was deposed.
Q. How about Crawford v. Haynes Ambulances?
A. Yeah, that was settled before I was deposed.
Q. How about Hudson v. Select Hospitals?
A. I don't know where that is. This is one of those cases where they come, I issue an opinion and then they -- the attorneys disappear for who knows.
Q. So have you ever testified in a deposition for the defendant?
A. I think so.
Q. Which of those on the list here have you testified in the deposition for the defendant?
A. For the defendant? You know what, I may have misspoken. Some of these settled cases, I may have testified in deposition. I don't -- I really don't remember because I don't keep track of this stuff.
Q. Well, this list is supposed to be a list of instances when you've testified, either in deposition or trial?

Page 151

A. Oh, that I don't -- this is a list that I have of everything that I have.
Q. So you're saying you can't identify in one of this list any cases where you've testified for the defendant?
A. Not off the top of my head, sir. I can't. I don't keep track of that stuff.
Q. Have you ever been sued for malpractice?
A. Yes, sir.
Q. How many times?
A. Seven times.
Q. Are any of those cases still pending?
A. No.
Q. When was the last one?
A. The last one -- the last one was dropped -- 2021 was -- it was finalized.
Q. Okay. And what was the name of the plaintiff?
A. The name of the plaintiff was the Larry Brown.
Q. And were you the named defendant?
A. I was.
Q. Where was the case filed?
A. It was in Jefferson County, Alabama.
Q. And what was the basis for Mr. Brown's claim against you?

Page 152

A. This was a patient who had an intracranial stent procedure. And during the procedure, unfortunately, he had a dissection of the carotid artery and the vessel closed and he had a stroke as a consequence of that.
Q. And how about before Mr. Brown, when was the last one before that?
A. It was a case in Chicago against Loyola.
Q. Cook County?
A. Yeah, I think Loyola was Cook County.
Q. I'm sorry. It was a case against who?
A. Yeah.
Q. Were you a named defendant?
A. I was.
Q. What was the name of the plaintiff?
A. Suarez, S-U-A-R-E-Z.
Q. And what was Mr. or Ms. Suarez's claim against you?
A. This is a patient that had a -- a stroke as a complication of embolization of intraventricular managing.
Q. And how about before that? By the way, the Suarez case, when was that one filed?
A. The case against me was dismissed in 2021, but it was -- it was 2016.

Page 153

Q. Suarez was 2016?
A. 2016, that's correct.
Q. Did you give a deposition in that case?
A. I think I did.
Q. And how about the case of Mr. Brown, did you give a deposition in that one?
A. I did. In this very room, actually.
Q. Prior to Mr. Suarez's case, when was the last one?
A. The last -- the other one was also in Chicago.
Q. Okay.
A. And the name of the plaintiff is Kelley, K-E-L-L-E-Y, and I was one of tons of defendants.
Q. You were named specifically?
A. Well, I was named, but so were many other people.
Q. What was that case about?
A. It was a case that allegedly we had missed a diagnosis of herpes encephalitis.
Q. Did you give a deposition in that case?
A. No. That case against me was dismissed very quickly.
Q. Okay. Prior to the Kelley case? Four

Page 154

**to go.**
A. I'm sorry. Some of these documents are encrypted.
**Q. That's okay. Take your time.**
A. Let me see if this works now. Turner, T-U-R-N-E-R, 2003, also in Jefferson County.
**Q. Were you named as a defendant?**
A. I was.
**Q. What was the case about?**
A. A complication of the femoral artery, artery following an endovascular treatment of a carotid dissection.
**Q. Okay. So there's three more that I'm --**
A. Yep.
**Q. According to my notes. Are you able to pull them up by name?**
A. I'm working on it.
**Q. Okay.**
A. I'm working on it. Let's see, 2006.
**Q. Okay.**
A. Last name Darden, D-A-R-D-E-N.
**Q. And you were a named defendant?**
A. I was.
**Q. Okay. Where was that one filed?**
A. Where?

Page 155

**Q. Yes.**
A. It was also Jefferson County.
**Q. Okay. And what was that case about?**
A. I'm trying to remember what this was about. I believe the allegation had something to do with a procedure, something about a malfunctioning machine during a procedure.
**Q. Okay. How about the other two?**
A. Very, very unusual. 2002, last name Davis.
**Q. And you were a named defendant?**
A. I was a named defendant.
**Q. Okay. Where was that one filed?**
A. Where? In Jefferson County. No. I take that back. Etowah, E-T-O-W-A-H, County.
**Q. E-t-, double --**
A. E-T-O-W-A-H.
**Q. Okay. What was that one about?**
A. Failure to operate on somebody.
**Q. Okay. And the last one?**
A. Douglas.
**Q. You were named defendant?**
A. I was. And it was in St. Louis in 1991. I guess it would be St. Louis County.
**Q. Okay.**

Page 156

A. And it was -- I was a named defendant. It was a patient who had a pulmonary embolism during rehabilitation after we had taken care of her for a stroke.
**Q. Okay. Thank you, Doctor. Those are --**
A. I'm sorry.
**Q. -- all of my questions.**
THE WITNESS: I'm sorry. I have everything on the encrypted system, and it doesn't trigger the encrypted software. It just -- I can't open anything.
MR. DRAHOS: Okay. Those are all the questions I have. I'm going to turn it over to my colleague. And if it's all right, I'm just going to take a quick second to go get my luggage real quick.
MS. LOBEL: Yeah. Why don't we go off the record.
THE VIDEOGRAPHER: We're off the record at 10:55 a.m.
(OFF THE RECORD.)
THE VIDEOGRAPHER: Okay. We're back on the record. It's eleven o'clock a.m.

CROSS-EXAMINATION

BY MS. LOBEL:
**Q. All right. Dr. Gomez, I have some**

Page 157

**follow-up -- follow-up questions for you, but I am going to get a little bit more detail on your particular education, training and history in the field of intravascular neurology, particularly as it relates to stroke care and management.**
**So if you could, for me -- aside from you graduated from medical school, can you explain more of what you've done to educate and train yourself in becoming experienced in intravascular stroke and management care?**
A. Well, when I finished my residency in 1986, I went to become the founding director of the stroke center at St. Louis University Medical Center in St. Louis.
In those days, the stroke center -- all -- all that was required to have a stroke center was to be able to put a sign that you have a stroke center. There was no certification. There was nothing.
In fact, when I decided as chief resident that I was going to be a vascular neurologist, several of the faculty members came to tell me I was throwing my life away. True story. As I told you earlier, denialism in neurology was popular at the time.
And over the course of the years, we built the stroke center. In circa 1993, it became

evident that the treatment of acute stroke was moving towards cardiology and towards intravascular management; particularly, for what we now call large arterial occlusions.

And so I have tried to find a way to educate myself, and I started by working with cardiologists. I actually started working in the catheterization laboratory at St. Louis University and then spent some time in Mexico City at the Neurological Institute there. And the chief of interventional neuroradiology is a good friend of mine, and spent years doing that.

Eventually, moved to the University of Alabama, Birmingham, committed to working with Gary Rubin, who was a gifted and a very well-known interventional cardiologist who developed programs.

And one thing led to another, and basically, as time went by, I continued to work on this and a major part of my process is interventional neurology. As of late, we just gave, this past September, the first ever board-certification in interventional neurology, and I chair the committee that put that together. And it's a recognized subspecialty and that is where we are.

Our group, here at The University of



Missouri, we do probably about 800 procedures a year and divided among three operators. So we do close to 300 procedures. We have post-graduate fellowship in interventional neurology. We always have two fellows. We do a lot of research. And basically that is how I spend most of my time.

**Q. Do you publish literature within your field?**

A. I do. More lately because one of my partner, Dr. Qureshi, he's a publishing machine. I've never seen anything like it. And he -- he has a knack for getting the data together and analyzing and publishing it. So we publish a lot of stuff.

In fact, one of our fellows right now is in L.A. doing -- the Society of Vascular and Interventional Neurology is meeting in L.A. as we speak, and that's where I'm flying tonight to give a lecture tomorrow. So on accreditation.

**Q. And how long have you been training fellows within your field?**

A. Oh, since 1996.

**Q. Have you trained anyone --**

A. Let me back that up. Let me go back up.

**Q. Yep.**

A. Before that, since, like, 1987 on



vascular neurology.

**Q. Okay.**

A. And then we started training interventional neurology around 1996, 1997. So, I guess, in 1987 or so we had our first fellows in vascular neurology. And then when I moved to UAB, the fellowship became both. You could do -- actually, three ways. You can do one year as vascular neurology; two years, you do vascular and critical-care neurology; three year, you do vascular, critical care, and interventional neurology. That's the program as we had it at that time before there was any accreditation or anything.

**Q. Okay. Now, with your education, training, and experience, do you specialize in just intravascular neurology, vascular neurology or critical acute care, or all three?**

A. All three to different degrees. I don't do as much critical care now as I used to because we have a dedicated critical care team, and you really cannot be the orchestra man. You cannot be everywhere. I'm not as young as I once was anyway. And so it's what it is. But I -- it allows me to dedicate myself more to vascular interventional neurology.

I am one of three faculty members that lead the stroke team at The University. So a third of my



time I am on service, on call. You can tell how busy we are because you cannot get a hold of me for those two weeks at a time.

We take about -- we assess probably 1,500 stroke patients a year. And out of those, about half of them or a third of them end up with an intervention or a procedure of some sort. Any day of the week, when we are rounding on service, we have a census of probably 20 to 30 patients that we round on. They're complex stroke patients. We give tPA hundreds and hundreds of times a year, and that's basically how I live my life.

**Q. Okay. Now, have you trained any of the -- anybody, any of the physicians associated with this case, whether it be plaintiff's retained experts, doctors who have been the treaters, or defense-retained experts, even?**

A. Well, since you asked.

**Q. Okay.**

A. The first time Dr. Yavagal ever stroke in a case it was with me in Birmingham. And I think he was a medical student at the time. So I've known him many, many years. I have a lot of respect for him.

**Q. How long did you train him?**

MR. DRAHOS: Object to form.

THE WITNESS: Well, he just spent some -- he was just observing with us, spent some time. It wasn't any formal training. A lot of people come to spend time with us to see if this what they want to do with there life. It turns out that he did, and he's done very good for himself.

BY MS. LOBEL:

**Q. Okay. Now, is there anybody else -- and I know you mentioned Dr. Nobo that you either personally knew before this case or trained or trained with?**

A. Yeah. I -- I know Dr. Nobo, and it wasn't -- and I was trying to rack my brain how we met. And when I read his deposition, I realized how we met. He came to interview at Loyola for a faculty position because his mentor was Jose Biller, B-I-L-L-E-R, who is the chair of neurology there, who is the one that hired me at Loyola. So I've known Biller for many, many, many years. And I think that's where -- I think Nobo is correct. I think that's how we met.

But it's a small community. We all sort of know each other, if not personally, via email, via committees, like -- like Stroke Council committees. And I don't do as much committee work anymore because, frankly, there's no time. I leave the new generations to do it. But we actually know a lot of us.



**Q. What committees are you currently active with?**

A. Well, right now, I'm still chairing the certification committee for the interventional neurology for the United Council of Neurologic Subspecialties, and then the editorial board of the Journal of Stroke and Cerebrovascular diseases. I don't know. I think that's -- that's just about it, I think. I don't know that I -- I have a lot of internal responsibilities at The University.

Our stroke center director just became the interim chair of neurology, so she wanted me to be the stroke center director and I said no. I've seen that job and I don't want it. But I will pinch hit until we get some new person. So I have taken over some of that and I've taken over some of the quality and safety projects; Six Sigma and so on forth at the Stroke Center.

**Q. And what are those quality safety projects?**

A. We have two that are very important going on right now. One has to do with shortening the time to -- administration of IV tPA from arrival to our institution. And we identified, through historical data, that our biggest problem was the time from the moment the patient has a CT scan to the moment the decision is made



to administer tPA. So it's running probably around 20 minutes or so, 20, 25 minutes. And we want to cut that in half.

In order to do that, we had to, A, modify the workflow and be -- we created, actually, something very interesting, which is -- our electronic medical records is Cerner, is the company. It's a Kansas City company. And Cerner has a relationship with the University of Missouri, you know.

I don't want to go into the details, but we decided that part of expediting the process was to create a tool that will allow us to qualify the patient for IV tPA faster. And we essentially -- I designed a form for the -- for the electronic medical record and handed it over to our programming people. And we are about to do the -- the simulation feasibility session to see how it works. We expect to deploy it probably by the beginning of the calendar year, right before we get our next accreditation visit.

And it's very cool because the people from Cerner are actually coming to view it because they are interested in possibly deploying it across the system of hospitals that use their EMR.

And the second project, which is actually we are about to start collecting data on the



improvement part, is expediting endovascular treatment for acute stroke. And we -- we realize that one of the problems we were having had to do with getting the general anesthesia going and so on. And so we changed the workflow, increased the resources that they're buying from anesthesia. Now, we're collecting data.

So we are going -- the goal is to go from about a 30-minute from the trigger of the alert that we are going for endovascular management to growing time or puncture time. Because we use the radial artery, too, and cut it in half. And we're now running around 15 minutes. So it's an important progress.

**Q. Okay. So would it be fair to say that a lot of your work has to do with creating the most expeditious treatment for stroke care management?**

A. That's fair to say.

**Q. Okay. Would some of that include with -- work with, you know, trying to get a patient transported to a hospital?**

A. Yes.

**Q. For tPA treatment or consideration?**

A. Yeah. No. Yes. I mean, as a matter of fact, when I was at UAB, we got a grant, a federal grant. We piggyback -- mind you, that this is mid-1990s when we started this. When I moved to UAB in 1995, I had an idea

Page 166

in St. Louis that I took with me, which was to create a regional stroke system. This was before stroke centers were ever accredited.

So I pitched it to the Birmingham Regional EMS Authority. The director came to my office and we talked about it, and he thought it was a brilliant idea. I was flattered. But we got -- actually, by piggybacking into the trauma system, we got about $800,000 from the federal government to create a software.

And we, essentially, networked the six counties that surround the city of Birmingham, and we created our own stroke center certification process. That system became operational in the year 2000. It is still operational and it still does not have anything that matches it anywhere in the United States because we used the money to generate our own software that ties all of the systems together.

So what happens is that any facility in the system -- let's say, for example, the CT scanner blows up, they don't have a CT scanner. Okay. It's an exaggeration, but you can go on the computer and turn yourself red for a CT. If you don't have a CT, you can turn yourself red, and you will be bypassed by the ambulances. So only the ones that are in green will be

Page 167

accepting -- will be -- the ambulances will take you there.

And then as a result of that, I became the medical director for the Hoover Fire Department, who is H-O-O-V-E-R, which is one of the townships that surrounds the city of Birmingham. Hoover Fire Department has the second largest paramedic squad in the state of Alabama, second also to Birmingham Fire and Rescue. They have 750 paramedics. We train every single one of these guys on acute stroke.

We created a one-day educational program that was similar to ACLS, but for stroke. It was called FAST, Fundamental of Acute Stroke Treatment. And we trained all those people. And -- so, yeah, we -- we were very interested in bringing people in quickly, as quickly as possible.

**Q. Okay. So would it be fair to say that part of your work, you know, is to be able to analyze a situation or location, be it Alabama or in Puerto Rico, being able to readily understand the strengths, weaknesses of the situation for stroke management in any given location?**

MR. DRAHOS: Object to the form.

THE WITNESS: I think that's fair to say. In some cases, better than others. One of the

Page 168

problems that we see -- it's no secret that I'm a little bit critical of the -- of the joint commission accreditation of stroke centers.

I mean, I think it serves a purpose, but I think it leaves us a little bit hanging. I am not sure that we could do any better at the present time, but the problem is, for example, when we look at the data with a different set of glasses, with six Sigma glasses, which for the benefit of the jury, it's just a system of quality improvement that is available in -- you know, to all sectors of our economy, other than medicine.

We are still performing at a two Sigma, three Sigma, at the best, which is a lot of defects, a lot of errors. So by trying to analyze the data and come up with a new process, our goal is to try to continue to push to a much better quality for all the systems.

So, yes, I think that joint commission certification or DMV certification, they serve the purpose. They -- they assure a certain level, a certain threshold of performance. But I think we can still do better, and I think we should still do better. And I think that this is -- this is why we are interested in this.

BY MS. LOBEL:

**Q. Okay. And in this particular case, you**

Page 169

**used your expertise to -- analyzing the system and the system function for acute stroke management, you've arrived at opinions as it relates to that in this particular case in San Juan Puerto Rico. Correct?**

MR. DRAHOS: Object to form.

THE WITNESS: That's correct, with the information that I had available.

BY MS. LOBEL:

**Q. Okay. And that information was the type of information any doctor doing this type of analysis would use. Correct?**

MR. DRAHOS: Object to the form.

THE WITNESS: I would hope so, yeah. I think that -- I relied on as much of the information -- particularly, data that was available to anybody at the time.

BY MS. LOBEL:

**Q. Okay. And do you recall on direct examination where my colleague had asked you whether, you know, it's really Puerto Rico that should be the named defendant in this case. Do you recall that?**

A. I recall that.

**Q. Okay. I want to ask you some more questions about that. Is this really a case of a failed system or is this a failure to act?**

Page 170

MR. DRAHOS: Object to the form.
THE WITNESS: Well, I think that it's a failure to act. That's my opinion. And I think that the -- that's where the evidence points at. We don't -- as I said before, you know, we don't see any sense of urgency of utilizing whatever resources are available.
So this is not a case where you say, Well, I tried my best, but the resources were simply not there, not available and nonperforming. No, if you don't try, you don't know what resources you're going to have. So a system -- the performance of a system depends on multiple factors; physical resources, human resources, protocols.
So it turns out, when we look into the data -- and with all due respect to my colleagues that practice in Puerto Rico -- and again, I sense their frustration because the system is not what, perhaps, should be, but that doesn't mean that it is zero.
And when you look at the system itself, they have protocols, they have systems in place. I think that it is different to use them and fall short than not even try using them at all.
BY MS. LOBEL:
**Q. Okay. So if I'm hearing you correctly, there was an active system in place which included EMS,**

Page 171

**ambulance. And while it may not have been functioning ideally, it was functional?**
A. To some degree, yes.
MR. DRAHOS: Object to form.
BY MS. LOBEL:
**Q. And when I say that -- you know, based on the data and the evidence that you collected in this particular case, as you would do in any, you know, system, region, wherever it's located, was it consistent or inconsistent with the testimony?**
MR. DRAHOS: Object to the form.
THE WITNESS: Say that again, I'm sorry.
BY MS. LOBEL:
**Q. Certainly. Based on what I am hearing is, you know, the methodology and the analysis that you conducted in the functionality of the system in place in Puerto Rico at this time -- at the time of this particular incident, you did that as you would anywhere else in the country?**
A. Correct.
**Q. All right. Now, with that being said, part of the evidence that you did consider in your analysis was the testimony of Dr. Nobo, Dr. Acevedo, the port agents and all those other folks. Correct?**
MR. DRAHOS: Object to the form.

Page 172

THE WITNESS: Yes.
BY MS. LOBEL:
**Q. Okay. Now, was their testimony consistent or inconsistent with the actual data collected by even some of those own witnesses?**
A. I found the opinions inconsistent in multiple dimensions. It begins with the ship doctor, who seems to think there's an emergency, but either doesn't -- quite sure what kind of time critical emergency there is or he does, but either way, he doesn't really convey the sense of urgency to the staff to get this patient to care as quickly as possible. So his actions and his testimony just leaves room to think, what is he thinking, because it clearly is not working.
I think Dr. Nobo's and -- is Dr. Acevedo the neurosurgeon? I think that their testimony really, to me, is representative of their frustration on working on a system that is not optimal to what they think the standard should be, and yet system does perform to some degree better than it is implied that it doesn't work at all. And I think that that's -- I find it inconsistent.
And it's not -- I can't fault him. I think that it is difficult -- it is difficult to remember that your job was to clean the swamp when you're up to your armpits in alligators. You know, it's essentially,

Page 173

they are -- they're working a system that is not -- that is not what they think it needs to be, and yet, you know, they are able to treat 120 patients with tPA a year, so somebody's being transported, somehow.
And if you look at the data that is published, and which Dr. Nobo himself is an author, I mean, about half of -- nearly half of their patients are transported via EMS to the hospitals in Puerto Rico, and their -- and their chances of being treated with IV tPA are not a lot of different that those in Florida transported over the same period of time. And the -- the system performs -- yes, not at the 90 percent level of efficiency, but perhaps two-thirds; that's 63, 66 percent level of efficiency.
So, again, this is a -- this is a case of a missed opportunity, of not being able to -- to take a patient to where the patient needed to be treated in the most timely fashion to allow all of the benefits of being qualified properly for treatment of IV tPA, which more likely than not would have changed the outcome of this case.
**Q. Okay. Now, with what little evidence we have with what actually was done, would you agree with me that you reviewed the email that was sent from the ship's medical center to the port agent requesting the**

Page 174

**ambulance?**
A. I did review it.
**Q. Okay. You would agree with me that was not an email sent by Dr. Pereira, but the medical secretary?**
MR. DRAHOS: Object to the form.
THE WITNESS: If memory serves, I think that's the case, yes.
BY MS. LOBEL:
**Q. Okay. So it wasn't even Dr. Pereira, himself, who actually made the request. It was the medical center's medical secretary?**
A. Correct.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
**Q. Okay. And that email expressed no sense of urgency whatsoever, with regards to how quickly an ambulance was needed?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah, I don't think it did. I really -- I don't -- I don't recall seeing anything that says, you know, we've got to get this priority -- for one thing, sending an email in an emergency is a mistake. You know, emails are not answered timely. They don't arrive timely. So dealing

Page 175

with email in a moment of an urgency, you need to pick up the phone and get somebody on the phone and say, this is what I need, this is how I need it, and I need it now. It's the fastest, most expeditious way to do it.
Interestingly enough, if you look at the information on the -- on the emergency medical services system in Puerto Rico, they implemented a number of years ago a texting system, which was -- I found it very intriguing because I am not sure that I have seen it anywhere else, where you can actually text the emergency to assist them. And they get -- in the first year, they got, like, 1,800 texts of emergencies to deal with.
So I think that -- you know, I think that this business of using email, as if it's some sort of a routine communication, probably is not -- it's not the best idea.
BY MS. LOBEL:
**Q. And if there was a phone call, as Dr. Pereira alleged, but couldn't recall the time frame, isn't it something that doctors are supposed to document?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yes. There are a lot of things that need to be recorded particularly. You know, one extreme if you practice, quote, defensive medicine, you want to protect yourself that you are making the

Page 176

right thing. Particularly, if you think the system is not going to respond to your -- to your own standards. You might as well at least document two things, document it but also inform the family and the patient: You know, we have a problem. I think he needs to be in a place where he can be treated quickly, and I can't get anybody -- and this is what I have tried. You know, we have to find another way.
I mean, clearly, an hour and 20 minutes, or whatever it was, for the ambulance to be contacted is just simply not acceptable. It's not sustainable.
BY MS. LOBEL:
**Q. Would you also agree with me that if the cruise line is making the choice to operate it ships within a particular area, such as San Juan, and enters the business of medicine, they should know the status of the local system in order to appropriately manage care of patients when their ships come to that port. Right?**
MR. DRAHOS: Objection to the form.
THE WITNESS: Yeah. I'm not so sure that I understand all the nuances of your question. I do think that if you are going to be carrying people, you've got to have some protocols, particularly for the time-critical emergencies, which there's three at the top that we always deal with; trauma, myocardial infarction,

Page 177

and stroke, not necessarily in that order. So you've got to have -- because the time is critical. Everybody recognizes that you've got to get these people to a definitive treatment as quickly as possible.
And -- and if it were me -- and I don't know anything about these ship companies -- but chances are that you should have a protocol for what happens when you are not at port versus what happens when you are at port. And what's going to happen when you're at port -- at least, the way I would plan it, and I would design it, would be -- what happens when you're at port -- Port A versus Port B, you should be able to know what are your assets that will get you through all of that.
Because what you don't want is for somebody to either die or get maimed because you couldn't get them to definitive treatment in time. That's just not -- not cool.
BY MS. LOBEL:
**Q. Okay. And you saw the deposition testimony from the port agent at -- you know, folks from the Miami office of Royal Caribbean would come to the island and meet with different hospitals. Correct?**
A. I saw that somewhere, yes.
**Q. Okay. So clearly, Royal Caribbean should have known what was -- what systems were in place**

Page 178

on the island, including at the time of this particular incident, in order to create appropriate procedures for itself to operate?

MR. DRAHOS: Object to form.

THE WITNESS: So if, in fact, they're meeting on a regular basis with the hospitals in the region, they should -- they should have those protocols in place. That should -- this should have been an easy -- easy and painless transfer.

BY MS. LOBEL:

Q. Okay. And you would agree with me that the medical records show no documentation, there's no deposition testimony, either, of any conversation with the family that there was any issue with getting the ambulance timely?

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. I -- I didn't see that anywhere.

BY MS. LOBEL:

Q. Okay. There was no communication to the family, whatsoever, that there was even an issue to begin with?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not even sure what was communicated to the family, to be quite honest with you.

Page 179

They -- the notes are -- are very succinct, and to the point of not specifying how much of an urgent situation are they going to declare this.

BY MS. LOBEL:

Q. And you would agree with me that this particular patient was a 9-1-1 call from the deck that he was at with a suspected stroke?

A. This was definitely a 9-1-1 call. I mean, even the -- if memory serves, the nurse and the ship called it a 9-1-1 call. You would think that -- you know, if we have been -- which we have been. I'm telling you, 42 years we've been doing this. Our message, our mantra is unequivocal and homogeneous across every I've ever worked, dial 9-1-1. Do not come in, do not crawl in, do not call your neighbor, do not call you primary doctor. You are going to waste time. Dial 9-1-1.

So it seems to me that if I pick up the phone and I say: Well, I want an ambulance and I want it now. Well, it's going to be an hour. No. We have to find another system. If nothing else, dial 9-1-1. What's the worst that can happen, they tell you no, they won't come to you. At least you have an answer. But if you don't try, that hour and a half is going to cost you, cost you brain cells.

Q. My question is a little bit different.

Page 180

My point is that when -- when the patient was -- the notes indicate in the medical records from Royal Caribbean that there was a 9-1-1 call within the ship --

A. Yes.

Q. -- for the medical center to go retrieve and bring this patient down to the medical center due to a suspected stroke.

A. Okay.

Q. Correct? That's what the medical records say?

MR. DRAHOS: Object to the form. Who's testifying here? I mean --

THE WITNESS: Yeah. They --

MS. LOBEL: This is cross-examination, Michael. I don't need the speaking objection.

MR. DRAHOS: To the extent --

MS. LOBEL: Thank you.

MR. DRAHOS: To the extent you're going to try to play this at trial as direct, because you brought a videorecorder here, you can't lead him through and basically testify for him, which is what you're doing.

MS. LOBEL: Note your objection and I'd ask that you limit it to object to form. Thanks.

BY MS. LOBEL:

Page 181

Q. So --

MR. DRAHOS: Well, I'm then objecting to the form on all these questions because they're all leading.

MS. LOBEL: Great.

BY MS. LOBEL:

Q. So Dr. Gomez, let me ask my question again. In this particular scenario, this was a -- there was a 9-1-1 call to deal with a patient with a suspected stroke on a deck that was then brought to the medical center. Correct?

A. The call -- the call from whom to whom?

Q. Within the ship, from the upstairs deck alerting the medical center that this person was a 9-1-1 call, there was emergency going on with a suspected stroke.

And if you need to review the medical records, please take your time.

A. Yeah. That's -- that's what -- that's what was documented by Nurse Bremner.

Q. Okay.

A. That this was a -- it came as a 9-1-1 call.

Q. Would you agree with me that, therefore, Dr. Pereira, at the time of this 9-1-1 call, should have

**been advised or had known that he was receiving a patient with a medical emergency?**
A. You would think so, yes.
**Q. Okay. Shouldn't he have been the one who would have been the first receiving individual for this patient?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah, ideally. I can see why he may have been delayed a few minutes. I don't -- you know, it's hard for me to comment on that. But on an ideal basis, if you get -- if you get enough warning, yes, you need to be ready to rock 'n' roll because it's -- time is of the essence.
BY MS. LOBEL:
**Q. Okay. And under the -- based off of the notes here, his first documentation is, you know, much later, correct, on the initial 9-1-1 call, initial note? And then he requests for the referral to neurology?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah. He's -- the patient in my -- yeah, it's about -- it's about 30 minutes, the documentation is there. Now, in all fairness, during those 30 minutes, a lot of things can occur; examining the patient, et cetera, et cetera, and sometimes you don't get to document. And the problem with electronic


records is there is timestamp that -- you know, you may have made a decision, already, five minutes ago and then document it at that time.
Irrespective of that, the problem is -- is -- the problem continues to be the mismatch between what was needed to be done and what was actually done. That's -- that's where -- to me, this is where the core of the problem is.
BY MS. LOBEL:
**Q. Do you find it surprising that, based of what you just explained, that the request -- the email requesting the ambulance comes after the typing up of the referral note and after the 30 minutes of whatever the doctor Was doing after the patient was first received, shouldn't this have been a situation where -- it should have been self-evident immediately we need to request an ambulance for this particular patient and then I go type my notes?**
MR. DRAHOS: Object to the form.
THE WITNESS: Well, it depends. We don't know what happened during those four minutes.
Ms. LOBEL: Okay.
THE WITNESS: But the truth be told, is that, yes. In principal, you document after you to take care of business. The question is: How do you take care


of business? And this is my problem with the whole thing, because if we believe Dr. Pereira on his own words, that the stroke is an emergency depending on some attribute that is not clear to me, then maybe he really thought immediate -- is immediate, but not quite that immediate -- or I don't know. We can't tell.
But if -- to rely on an email to request evac of a patient, it doesn't make a lot of sense to me. It's not -- there's a mismatch between that workflow and the sense of urgency, which what doesn't seem to prevail.
BY MS. LOBEL:
**Q. Okay. Now, do you recall being asked on direct examination, you know, whether you have any experience dealing with cruise ships, cruise ship medicine, et cetera. Do you recall that?**
A. Yes.
**Q. In this particular case, would you agree with me that at the time of onset of symptoms, the ship was docked at the Port of San Juan?**
A. That's my understanding, yes.
**Q. Okay. And at the Port of San Juan -- which you've been to Old City, the port it is right next to land. You just walk across the bridge from ship to shore?**
A. It's right there.


**Q. Okay. So would you agree with me, that when analyzing the situation, the fact that the patient is on a ship in a medical facility is actually really irrelevant and the transfer is akin to a shoreside transfer?**
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah. I think that we have to be very careful when we look at all of this material. And somehow, somewhere in there, we are calling this a medical -- a ship's medical center because that is not a medical center. It is an infirmary. It's essentially a small room where you go with some emergency; bruises, headaches, et cetera. It's less than -- perhaps, akin to some degree, not completely, an urgent care. It's not even really an emergency department. So what do you do?
Think about if anyone shows up in their doctor's office and tells the doctor, on the way from the parking lot, I had slurred speech -- sudden slurred speech and hand weakness, do you know what the doctor is going to do? He's going to dial 9-1-1, get an ambulance and take you to the emergency department. That's what happens -- it happens every day because -- you know, it happens to people who are in the waiting area to their doctor's office.

Page 186

So this is very similar to that. I mean, this is non-- a really high-level trauma or emergency setting. And the moment you recognize the potential emergency and that it is time critical, you've got to move and you've got to move quickly.

If, in fact, you know that there are problems in system, you move even faster because you want to shorten that distance in that time interval as much as you can.

BY MS. LOBEL:

**Q. Okay. And in this particular case, did you review the data or speak to anyone in order to get the data as to the average response time back in 2019 in San Juan?**

A. Well, I went on a couple of things. Number one is, I went -- the protocols, as they are explicitly noted and -- I think -- I think it was Mr. Padro that mentioned that -- the expectation of a 10-minute response time to any 9-1-1 call.

And in 2019, following the hurricane and some the problems we were having, the commissioner of medical emergencies, which is -- you know, went on some interview noting that the average response time was running about 20 minutes, which is twice what the expectation is.

Page 187

But, again, 20 minutes is better than an hour and 20 minutes. You have a whole -- an extra 60 minutes there that could have been saved, that would have made a difference, in my opinion, on the appearance of the brain and the ability to treat this patient with IV tPA.

**Q. Okay. And where are you getting the data on the 20-minute committed average response time in San Juan, Puerto Rico back in 2019?**

A. I think -- I think your opposing counsel asked a question about a report that was a publication or an interview that Mr. Torwella (ph.) had given, so I went and looked it up. And it says right here that his opinion was 20 minutes.

**Q. And who is that individual you're referring to?**

A. She was the commissioner of medical emergency.

**Q. Okay. Did you speak with anyone who was in charge medicine or medical operation on the other island back in 2019?**

A. Yeah. Actually, I spoke with Dr. Rafael Rodriguez, who was the secretary of health at the time, who was an endovascular neurosurgeon that I have known for many years. And I just simply asked simple

Page 188

questions. You know, what is the status? And he said, well, you know, We have our troubles. It's -- it's not always as consistent as we think it is, but we are doing the best we can to improve it, which is essentially the perspective that I have. Yes, the system is not perfect. Yes, the system has had some problems. Probably had more trouble than -- on the average, simply in 2019 after the hurricane and what have you.

But again, there's a difference -- and we come back to the same thing. There's a difference between, I tried the system and it didn't perform, to I never tried the system in the first place. That's my problem. That's where I said, you know, wait a minute. You cannot assume that it's not going to work and you not even try it.

**Q. Okay. So let's look at the objective evidence as to what we have with regard to response time in this particular case.**

**Did you review the ambulance records in this particular case?**

A. I did.

**Q. Okay. And did you reach a conclusion with regard to the response time for the ambulance that actually did respond to this particular case?**

A. Well, that's very interesting, too,

Page 189

because the ambulance records says that they were contacted at 12:21. Okay. 12:21 is essentially an hour and 20 minutes after the original request for an ambulance. That's -- that's a long time.

And then it says that the physician decided where to take the patient. So they had no latitude. And the problem that I have is that we don't have any record to say what was -- what information was conveyed to the -- to the -- to the ambulance people?

In other words, if I call the ambulance and say: Well, you know, I have a possible stroke victim that needs to go to HIMA San Pablo Caguas, that's one conversation. Now, notice the difference if I say, I have a patient that needs to be picked up as quickly as possible because he may require intravenous thrombolysis and we need to get him to the closest capable hospital. That's a different conversation.

So we don't know what was transpired, but it took them 49 Minutes to drive from the moment they were contacted to arrive at the hospital. And them from the -- from the first set of vital signs that they got from the patient on the ship, to the hospital arrival, is 40 minutes.

**Q. So is the response time based off of the documentation that we have in this case consistent or**

Page 190

**inconsistent with the data that you have been talking about with the average 20-minute response time it would take?**
A. Yeah. It's --
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sorry. I think it is consistent. It's consistent with a slow process. But it also -- think about this: Let's say for the sake of argument that it is 40 minutes and they were driving as fast as they could, where all the sirens, pushing people out of the way, and it took them 40 minutes. Okay. Let's imagine that.
But if they pick up the patient and they have been not been told of the sense of urgency, they may -- those 40 minutes could have been 20 minutes, perhaps. You can say: Well, maybe it was 20 minutes, if they had rushed, because they didn't rush because they were never told what is the urgency for this patient. So there's too many uncertainties and inconsistencies that we don't have documented that lead us to believe that Mr. Burgess had the best urgent transportation that he could've had, which is the problem.
BY MS. LOBEL:
**Q. Okay. Now, is there any documentation or evidence that you have been able to see in your review**

Page 191

**of the file, testimony, et cetera, with regard to, speaking -- you know, calling any other ambulance companies, what efforts were made, or is the only documentation is one ambulance and one email from a medical secretary?**
MR. DRAHOS: Object to the form.
THE WITNESS: That's all we have. There's no evidence of anything else. No data.
BY MS. LOBEL:
**Q. No phone records?**
A. No, I don't -- not that I know of.
**Q. No text messages?**
A. Not that I know of.
**Q. And no -- no additional emails?**
A. No additional emails.
**Q. Okay.**
A. And no documentation in the record to suggest, you know, we want to transport this patient, but we're running into roadblocks after roadblocks.
**Q. Now, do you recall testifying -- forgive me at this point, I've forgotten the specifics -- about the -- you know, the U.S. News reports having to do with capabilities or accreditation of hospitals in Puerto Rico?**
A. Do -- I'm sorry. What was your

Page 192

question?
**Q. Certainly. You made mention on direct examination that part of the materials you reviewed since you had very recently gotten the transcripts of Dr. Nobo, Nidorf, and Dr. Acevedo, that you had done some review of U.S. News report having to do with the hospitals in San Juan?**
A. Yes.
**Q. Okay. Can you tell me what it is that you did after reading this transcripts with regards to, you know, information coming from the U.S. News about stroke capability, tPA administration in San Juan?**
MR. DRAHOS: Object to the form.
THE WITNESS: Well, the whole thing came about when I read Dr. Nidorf's deposition because he kept being asked about U.S. News and World Report. So I looked at the exhibits that were part of that, and the first thing that caught my eyes was I am not sure that those were the 2019 U.S. News and World Report; which, you know, today's U.S. News and World Report may or may not have any relevance at all to the ones in 2019.
So I went back and found the 2019. There were two hospitals in Puerto Rico listed in U.S. News and World Report, both of them in HIMA. HIMA San Pablo Caguas and HIMA San Pablo Bayamon. Bayamon is

Page 193

B-A-Y-A-M-O-N.
But, again, I mean, my problem is that I am not sure that that -- what the relevance of that is because of the methodology of -- of U.S. News and World Report is more about reputation than anything else.
BY MS. LOBEL:
**Q. What do you mean?**
A. Well, there are certain --
MR. DRAHOS: Object to the form.
THE WITNESS: -- components to what gets a hospital in -- in a U.S. News and World Report list. And the literature -- the published literature, peer-reviewed, suggest that reputation has a much greater bearing than the actual metrics themselves and people have questioned whether that's the case.
Now, for example, if you have the Mayo Clinic, the Mayo Clinic is the Mayo Clinic versus if you have an unknown place. So it's important. I think it is an important list, but I'm not so sure how it applies to this equation, because if we were to believe -- there's two -- two arguments here.
One is that if we were to believe that only those hospitals listed in U.S. News and World Report are worthy of treating stroke patients, we would never treat anybody. And as I said earlier today, we have

about ten hospitals in our network, none of those was in the U.S. News & World Report, and they treat tPA with us all the time. So being in the U.S. News and World Report, although is interesting, it may or may not make a difference.

The second thing is the notion that you hear from some of these depositions and discussions that you want to go to the best hospital. Well, in the absolute, yes, absolutely. I think Dr. Nidorf was asked that question. I mean, yes, who would not want to go to the best hospital?

But you also have to realize the practicality of things. When it comes -- you know, if you want to go to the best hospital and you want to use the U.S. News and World Report, we would all being going to Cleveland Clinic or Mayo Clinic, so that's impractical. Nobody is going to do that.

So what you want is, you want a hospital that is capable, in some measure, to deliver the care that you need. And as I said, outside of accreditation and U.S. News and World Report and the joint commission and all of that jazz, IV tPA is being administered to qualified stroke patients in many places that don't meet any of those criteria.

So I think it's important for the jury



to understand that everyone wants the best hospital. The best hospital may not be available for one reason or another for a specific treatment. And what you want is a hospital that is capable of managing that, and that's -- that's the best anybody can do; otherwise, the system doesn't work.

BY MS. LOBEL:

**Q. And that's because of -- it goes back to the issue of timing. Correct?**

A. In a time-critical diagnosis, absolutely. You've got go to, you know, somebody who can deliver the goods as quickly as possible, and -- because -- and, again, in our place, as I said, if you are in Moberly, you want to go to Moberly hospital, Moberly Regional Medical Center. It's a little, small-town hospital.

You get there and one of those guys will call us up, tell us what is the situation with the patient, they have a CT scanner. Do a CT. Give them tPA and ship them. That's it. That's what people call drip and ship, which is done everywhere else on the planet. I don't particularly care for the term because I think it is a little bit too minimized for me, but it's done all the time. It works.

**Q. Now, is the U.S. News reports a reliable**



**source to understand who is or is not administering tPA to patients?**

MR. DRAHOS: Object to the form.

THE WITNESS: I think in the general sense, it is does provide us an idea, a global sense of the people who are doing a good job. Here's the problem. The fact that Hospital A, B, and C are doing a good job administering tPA, does not mean that Hospitals D, E and F are not, just because they are not on the list, because they may not meet all of the criteria to be on the list. They don't have the number of beds, they don't have the number of programs. They don't have the number of specialists. They work through a workaround system. They each tell a telestroke now.

So I think that we've got to be careful that the awards we confer to certain operators do not necessarily diminish the worthiness of others.

BY MS. LOBEL:

**Q. I guess what I am going at is: Do you recall seeing the line of questions to Dr. Nidorf of, you know, when he was being shown some of the U.S. News reports from 2021 and 2022, where it was read to him -- not necessarily what it said -- it was read to him that, you know, Hospital X, Y, Z is not administering tPA?**

**My question to you is: Is that actually**



**what is going on, and is that what doctors rely on to determine which hospitals are actually administering tPA?**

A. Yeah. I --

MR. DRAHOS: Wait. Wait. Wait. object to the form. At this point, you're going down this long road of questioning about issues that he could have issued in some sort of a rebuttal report. So these are all new opinions. It's an adverse, the epitome of an adverse. And if he had opinions about Dr. Nidorf's deposition, he should have put them in a report so I could question him about it.

MS. LOBEL: And that's why we're here today.

MR. DRAHOS: No. You can't just ambush me --

MS. LOBEL: So you can get them an answer --

MR. DRAHOS: -- with new opinions, Sarah. You have to put them in a report.

BY MS. LOBEL:

**Q. If you -- well, let me put it this way: Doctor, when did you receive those transcripts?**

MR. DRAHOS: That's not my fault.

MS. LOBEL: This is not a conversation between you and me, Michael, so if you've got --

Page 198

MR. DRAHOS: Well, I don't --
MS. LOBEL: Let me speak.
MR. DRAHOS: I've heard this -- this is -- I -- this in the light of day in a courtroom. It's a big waste of time.
MS. LOBEL: Let me speak. Thank you. Interrupting me and trying to filibuster me is not going to work with me or with the judge, either.
MR. DRAHOS: Neither is you raising your voice and yelling at me, so --
MS. LOBEL: I never -- no one is yelling, Michael.
MR. DRAHOS: Well, it's recorded.
Ms. LOBEL: I can't get a word in. I can't get a word in.
BY MS. LOBEL:
**Q. So, Doctor, can you see when you received a copy of the transcript?**
A. I think it is 31 October.
**Q. Okay.**
A. About two weeks ago.
MR. DRAHOS: Three weeks ago.
THE WITNESS: Three weeks ago.
MS. LOBEL: Michael, can you stop with the side commentary?

Page 199

MR. DRAHOS: This is just ridiculous, Sarah.
MS. LOBEL: It's rude.
MR. DRAHOS: I've never seen this before in all my time doing this.
MS. LOBEL: It's rude. It's rude. it's rude. You're Crossing your arms. You're being very untoward. It's not appropriate. I'm asking questions. You have an opportunity to ask questions, as well. Please let me do my job. Thank you.
MR. DRAHOS: What we should have done was have him do a report like what the rules require, which is what the basis --
MS. LOBEL: Michael, asked -- fine. I've heard your objection, let me ask my questions. Please let me do my job. Thank you.
BY MS. LOBEL:
**Q. Doctor, when did you receive the transcripts?**
A. I think it was October 31st.
**Q. Okay. And in the past two weeks have you been on call?**
A. Well, I've been on call, seems like perpetually, yes.
**Q. Did you have an opportunity to write any**

Page 200

**additional reports with regard to these transcripts by that time you were done reading them while you've been working in the past two weeks?**
A. Yeah, I have not.
**Q. Okay. And what was the date of these depositions?**
A. October 14th.
**Q. Okay. And are you aware that it takes time to get copies of transcripts, Doctor?**
MR. DRAHOS: Object to the form.
THE WITNESS: I am.
BY MS. LOBEL:
**Q. All right. And you've been in this process before?**
A. Yes.
**Q. Okay. So as I was asking you: Are the U.S. News reports a reliable source that doctors rely on to determine whether or not a facility is or is not administering tPA to patients in a given area?**
MR. DRAHOS: Object to the form.
THE WITNESS: I can't speak for anybody else. I don't.
BY MS. LOBEL:
**Q. All right.**
A. And one of the things that is -- needs

Page 201

to be understood, is that when I mentioned earlier today that a lot of what happens is -- with the U.S. News and World Report has to do with -- what's the word -- reputation. That reputation largely comes about because people get asked to medical/social network called Doximity, D-O-X-I-M-I-T-Y, to issue opinions, and that is a lot of what goes on that gets people on -- or gets hospitals on there. If you are an unknown hospitals, the chances are you will not be listed that way.
**Q. Okay. Now, do you recall being termed an advocate for the plaintiff on direct examination?**
A. I was asked.
**Q. Okay. Did my office retain you to be an advocate of any particular theory, one way or the other, on this particular case?**
A. No, ma'am.
**Q. Are your opinions your opinions or opinions that some lawyer asked you to put forth?**
A. No, ma'am.
**Q. Is the basis --**
A. My opinions are only mine.
**Q. Okay. And is the basis of your opinions, review of the data, the literature, the medical records, deposition testimony and your 42 years of education and training and experience within the field of**

**stroke management and acute-care in endovascular surgery?**

A. That's correct, but I would call it interventional neurology.

**Q. Okay. Fair enough. Which encompasses both the acute care and the interventional work --**

A. Correct.

**Q. -- in an endovascular setting?**

A. Correct. I just -- I just don't want to be called a surgeon.

**Q. Understood. But part of your work does entail surgery?**

A. It's the equivalent. Well, but this is not surgery. Intervention is not surgery. This is what the neuro surgery community want people to believe because they want to take over, but that is a political statement. Sorry. I just couldn't resist.

**Q. Fair enough. But would it be fair -- let me put -- let me back it up, then.**

**Would it be fair to say that -- and I think you've alluded to this before, that a lot of your work correlates with that of which a cardiologists does?**

A. The cardiologist or endovascular neurosurgeon. I mean, this is -- it's the same type of work.

**Q. Okay.**



A. We just -- we call it tomato or tomato.

**Q. Okay. And your work isn't, you know, cutting somebody's head open --**

A. No.

**Q. -- in order to intervene?**

A. No.

**Q. That would be a neurosurgeon?**

A. That would be -- a neurosurgeon would do that, yes.

**Q. And that's not what is at issue in this particular case?**

A. Not at all.

**Q. Okay. In this particular case, it has to do with going in with a catheter and a tube, and then opening up --**

A. Correct.

**Q. -- a vessel that's blocked?**

A. Correct.

**Q. Which is basically like a hose that's either torn --**

A. Yes.

**Q. -- or has a piece in it, blocking it?**

A. I think, for the benefit of the jury, the work we do is equivalent to what the interventional cardiologists do, because it's much more frequently



understood that way, which is minimally invasive; that is to the artery in the wrist or in the groin and how cardiologists puts stents in and treat heart attacks and so on, we do the same thing in the brain. So instead of a cardiac catheterization, it's a brain catheterization, so to speak.

**Q. Okay. Now, forgive me for not asking this, but -- earlier. But do you recall on direct examination being asked questions about the number of ambulances and available vehicles in the San Juan area?**

A. Yes.

**Q. Okay. And while you may not know the exact number of vehicles, did you, in your analysis of this case, look to see how many paramedics, EMS, were employed?**

MR. DRAHOS: Object to the form.

THE WITNESS: There -- there are some data that are -- that are published in various places. The most salient that I have is that by 2019 that same report from the -- from the -- what do you call it -- the supervisor of the medical services, the commissioner, whatever it is, he mentioned that there were running around 570 EMT paramedics at the time, which they felt was the lowest point that they had in their history and they were actively recruiting. And, you know, that's,



basically, what -- the only information we have available at the present time.

BY MS. LOBEL:

**Q. Okay. And I just want to fill in the blank of something that I think may have been missed in the -- do you recall on direct examination being asked questions about the additional deposition transcripts that were made available to you? Do you recall being asked about that?**

A. Yeah, I think so.

**Q. Okay. Did you review the neurosurgeon's deposition transcript, in this case, of Dr. Acevedo?**

A. I did.

**Q. Okay. All right. I just wanted to make sure that's done. Sorry. A lot of these questions I've asked you already.**

THE WITNESS: Okay. Do you mind if I go to the bathroom real quick?

MS. LOBEL: Sure. We can go off for a second.

THE VIDEOGRAPHER: We're off the record at 11:57 a.m.

(OFF THE RECORD.)

THE VIDEOGRAPHER: We are back on the record at 12:00, noon.

BY MS. LOBEL:
**Q. Okay. Doctor, do you recall being asked lines of questions having to do with an article having to do with the 2016 guidelines with regard to stroke care and management?**
A. Yes.
**Q. Okay. Why is it that you, in arriving in your opinions, did not rely on the 2016 guidelines?**
A. Because the 2018 was available.
**Q. And what was the difference between the 2016 information versus the 2018?**
A. I -- I couldn't tell you the exact differences, but it was the most updated at the time of Mr. Burgess's stroke. The 2018 was available.
**Q. Okay. Was the data and literature different in 2016 versus 2018?**
MR. DRAHOS: Object to form.
THE WITNESS: It probably was to some degree, because there was several years of difference. So, you know, they would continue to accumulate, but I couldn't tell you the specifics.
BY MS. LOBEL:
**Q. Okay. And do the guidelines, the 2018 guidelines, would those have -- would those guidelines have then formed to the standard of care that should've**



**been followed by the physicians in this case?**
A. It would've provided a framework for it, yes.
**Q. Okay. And what was the standard of care at the time of this particular case, with regard to managing a patient, in Dr. Pereira's shoes?**
MR. DRAHOS: Object to the form.
THE WITNESS: Well, it includes multiple things. One of them, a quick transport to a stroke-capable institution, rapid assessment, use of imaging, and qualifying the patient for intravenous thrombolysis treatment within -- certainly, in three hours, within four and a half hours for a specific patient and then endovascular treatment. It includes a whole variety of different things.
BY MS. LOBEL:
**Q. Okay. Now, in this particular case, do you have an opinion as to whether Dr. Pereira and the medical infirmary's care was within the standard of care at the time?**
MR. DRAHOS: Object to the form.
THE WITNESS: I do have an opinion.
BY MS. LOBEL:
**Q. And what is that, just so we're clear?**
A. That -- that it was below the standard



of care.
**Q. And why is that?**
A. Because of failure to transport the patient and evac the patient to a stroke-capable hospital in a timely fashion.
**Q. And what was the effect of that once the patient was brought to the hospital at HIMA San Pablo Caguas?**
A. There were several consequences to that. The most important which is, by the time the patient arrived, he could not be qualified for treatment with intravenous tPA.
**Q. Is that because of his subarachnoid hemorrhage or for other reasons?**
A. No. The most important -- there was no subarachnoid hemorrhage. I think that this continues to be discussed, but the jury needs to understand that there was no -- there was no hemorrhage. And this is -- this is not the issue.
But what has happened -- what had happened is that, by the time the patient arrived in the area of the original portion of the stroke had already become infected, which made it relatively unsafe to give this patient tPA. And because that is a consequence, to some degree, of the time lapsed from the moment of



discovery of symptoms to the moment of arrival to the hospital, it is a consequence of the delay in treatment that that CT scan was like that.
Otherwise, had the patient been transferred within an optimal interval, more likely than not, with a good degree of certainty, the patient would have had a CT scan that didn't show already infarcted tissue. It looked essentially, relatively normal from the perspective of the -- of the incident and could have been treated with IV tPA.
**Q. Now, is your opinion within a good degree of medical probability or a reasonable degree of probability or you can't say?**
A. Well, I think it's within a reasonable degree of medical probability, more than 50 percent, for sure.
**Q. Okay. And just so we're clear, that -- your opinion is that more likely than not, had Mr. Burgess been timely and appropriately transferred from ship to a capable facility, the CT image would not have shown infarcted tissue?**
A. Correct.
**Q. Meaning, he was not having an active bleed and a stroke?**
A. Correct.

Page 210

**Q. Meaning, he could have and should have been given tPA?**
A. Correct.
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
**Q. And then the rest of the outcome would not -- we wouldn't even be having a conversation about the rest of the outcome because the tPA would have, ultimately, changed the whole game?**
MR. DRAHOS: Object to the form.
THE WITNESS: More likely than not.
BY MS. LOBEL:
**Q. Okay.**
A. More likely than not, it would have changed the outcome, yes.
**Q. Okay. Because I believe you made a comment to something having to do with 30 percent -- you know, you would've seen a better outcome.**
**Can you clarify that statement, because I don't think I -- at least, based off what I've heard -- fully understood what you meant.**
A. Yeah. If you take all --
MR. DRAHOS: Object to the form.
THE WITNESS: Excuse me. If you take all corners with the cerebral artery occlusion, you can

Page 211

count on a gain of 33, 30 percent over the baseline of not treating this patient, having a better outcome.
So that, in my view, with those odds, put the patient on the -- on the realm of more likely than not, we would benefit -- they will benefit from this treatment than not -- that if they're not treated with IV tPA.
BY MS. LOBEL:
**Q. Okay. And if I'm understanding your testimony on direct correctly, your opinion is -- is it your opinion that there was one stroke, two strokes, how many strokes?**
A. No. This is one stroke. And I thought I made it as clear as I could in my original report, because it needs to be understood that this is a biphasic incident, but it is a single incident. It is the occlusion of the right vertebral artery that first threw a fragment into left posterior cerebral artery.
And because of the passage of time, there was a second fragment that then closed the basilar artery, but it's the same process. There are two time intervals to injury that adds to one another, but this is the same thing as one would see, for example, if you have a patient with a head injury that comes to the emergency department now. And it looks good, you do a CT scan, not

Page 212

much shows up, maybe a little bit of hemorrhage here and there. And within a matter of 12 hours, you see that they have now a subdural hematoma and they have swelling in the brain and so on.
It is the same head injury. It just has its own time course. So these are not two separate incidents. It's one incident that has to be understood as a composite of the two phases.
**Q. Okay. Now, I also want to go back to ask you some questions about the head injury that's been discussed. Would you agree with me that a head injury in this case related to a slip and fall that happened a couple of days before the onset of the stroke symptoms --**
A. Yes.
**Q. -- that required some stitches at the back of the head?**
A. That is correct.
**Q. Okay. Now, did that event automatically exclude Richard Burgess from eligibility of tPA?**
A. Absolutely not.
**Q. Why?**
A. Because there is absolutely no evidence in the literature that a scalp laceration, when in a patient given tPA -- and it's certainly not our experience -- results in a bad outcome. There is no

Page 213

injury to the brain, which is really the issue.
You don't want to give tPA to somebody who's had a recent brain injury of any kind because that's where they're going to bleed. This is the scalp. And if you read carefully -- and I don't -- I don't -- I'm not sure how it reads in 2018, but I remember the original guidelines we wrote, they were -- one of the things that were written were -- was that the patient cannot have an arterial puncture in a noncompressible site.
**Q. What does this mean?**
A. That means that you would not give tPA to somebody who has had an artery stuck in a place you cannot compress it if it starts bleeding. Well, guess what, the scalp, you can just put a dressing on it and compress it, and you'll contain the bleeding very easily in the scalp.
The problem is the brain. So the injury that you want to avoid giving tPA is a brain injury, not just any head injury. And as I said earlier today to Mr. Drahos, is that we see it quite a bit. Patients have developed acute stroke, have weakness in one side, drop to the ground, their spouse comes and finds them with a scalp laceration, brings them -- quickly, we give them tPA. And we -- we compress and control the scalp

laceration without a lot of difficulty, actually. Yeah, within 24 hours, it is all over, because the effect of the tPA goes away.

**Q. And is the standard of care based off of the circumstances which you just described to give tPA to the patient?**

MR. DRAHOS: Object to the form.

THE WITNESS: The standard of care is to show cause that why would you not give tPA? If you -- the standard of care is to give tPA. If you're not going to do it, you have to have show cause.

And in order to show cause, you have to be able to say, well, this is -- this is a -- this patient has a severe head injury -- or had it three weeks ago, and you know, we have scans to prove it. This was never a severe head injury, even though the experts on the plaintiff's -- on the defendants' side also agreed that this was a minor injury. This, by itself, should not be an argument.

BY MS. LOBEL:

**Q. Now, do you recall being asked questions about the physical exam and some of the conclusions that you arrived off of -- based off of -- well, in part, based off of that physical exam of Richard Burgess via Zoom?**



A. You mean the videoconference?

**Q. Yes.**

A. Yes, I remember.

**Q. Okay. In contemplation with your assessment of this patient, did you also take in consideration, you know, his -- for example, his physical -- physical therapy records, his occupational records, and the care and treatment he's received from his managing neurologist, Dr. Contract?**

A. Yeah. I looked at some of that. But to be quiet honest with you, this is -- to me, is -- is -- the status of this patient is predictable. Frankly, I'm surprised he's alive. I think that this is a devastating injury, by all accounts.

And if you read Dr. Nobo's discharge summary, you know, he tells you that; that, in fact, this was a devastating injury. And so when I saw Mr. Burgess, I feel for him because he has significant disability and neurologic dysfunction that, simply, is not going to come back.

So I can -- after, you know, 50,000 stroke patients later, I can tell you that this is pretty predictable how bad he's going to be.

**Q. Now, based off of your 42 years of education, training and experience within the field, had**



**Mr. Burgess been given tPA timely, more likely than not, what would have been the outcome of this particular case?**

MR. DRAHOS: Object to the form.

THE WITNESS: Well, I don't think anybody can -- can predict that with 100 percent certainty. Here's what we do know, more likely than not, he would not be disabled. His chances would have been, more likely than not, not to be disabled from it. And more likely than not, because the second phase may have never occurred simply by virtue of the treatment of IV tPA.

And the problem is that by him not having been given IV tPA, we will never know how good he could've had it and how good of an outcome. This could have been a success story.

BY MS. LOBEL:

**Q. More likely than not, would he have had a worse outcome, if he'd been given tPA?**

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MS. LOBEL:

**Q. Why is that?**

A. There is no reason to suspect that. There is absolutely no reason to suspect that giving this man tPA -- had he met the criteria, let's just be certain



about that, that the CT scan showed no acute infarction, he's -- there was no evidence that that would have related -- resulted in -- in a worse outcome of any kind.

**Q. Okay. Because it sounds like -- and I don't fully understand the analogy, but it sounds like the questioning is -- and correct me if I'm wrong -- that if giving tPA to bust the larger clot would have caused an embolic shower, is that something that would have happened here?**

A. Well --

MR. DRAHOS: Object to the form. Move to strike counsel's comments.

THE WITNESS: As I said, that the likelihood is that it happens all the time. That does not translate into a worse outcome or worsening of the patient because those fragments are still going to be affected by the circulating tPA and plasma that it generates, and they are handled much better by the brain and the body than a big, large clot burden.

So the evidence is to the contrary because chances are every single blood clot we treat fragments after given tPA. It fragments and that's how it dissipates. It fragments into smaller places -- smaller fragments that can be -- can be essentially filtered through.

BY MS. LOBEL:
**Q. Okay. Is there any evidence in this case to support that it was Richard Burgess's particular brain that just physically was dying faster than the average person's in this situation?**
A. None whatsoever.
**Q. Okay. If tPA had been timely administered with this patient, and if that occlusion into vertebral artery was there, would it be easier or more difficult to retrieve?**
A. If he had been given IV tPA, my expectation is it would have been easier to fix the vertebral artery because in -- in dissolving the original blood clot, it would have made it much easier to deal with that -- that plaque. And what happens -- it's very interesting. It's a very interesting question you asked.
What happens is that the plaque is either narrowing the vessel critically to begin with, or very likely narrowing to some degree, and then there is a plaque change, and then the vessel either closes or nearly closes.
But that last straw that breaks that camel's back, that last closure is a blood clot that forms there. So if you dissolve it, all of a sudden you restore flow, you can dissolve the rest of it. Then, all



you have left is the narrow, the blocked artery that can be fixed with a stent. It takes about us 15 minutes to fix that.
**Q. Is that the complicated procedure that you were talking about before that you wouldn't expect Dr. Acevedo to be able to do based off of expertise or a totally different procedure?**
A. No. It's -- it's a similar procedure, but it's not quite the same. There's a difference between putting a stent in a vessel that doesn't have a blood clot and is open, which would have been much easier. And I'm fairly certain Dr. Acevedo would have been able to pull that off. That's a much more frequent procedure.
The problem is, when the vessel is either closed or nearly closed and you can't see a way through, you need a different technique; a technique that involves certain changes in your vectors of your devices to be able to go through the occluded point. And that's -- that's where it becomes a little tricky.
**Q. Okay. And what actually -- the actual fallout here, since there was no tPA and Dr. Acevedo had the fully or nearly fully occluded vertebral artery, he didn't perform the surgery correct-- or the procedure correctly. Correct?**



A. Well, I think --
MR. DRAHOS: Object to the form.
THE WITNESS: I don't think that is fair. I think he -- he was unsuccessful. I think he was unsuccessful, in my opinion, because of lack of experience, not -- again, this is not -- there are procedures that are Level I procedures, Level II, Level III.
There are procedures we do on a daily basis that I admonish my fellows, when you finish your fellowship and you go onto practice, this is not something you can tackle on your first week. This takes a little bit more experience and expertise and so on. And so -- because this is not a frequently done procedure, I think this is where he ran into a wall, no pun intended, that he couldn't -- he couldn't go.
But I think it would be unfair to say that it was incorrect. I think it was just not successful because the technique was not the best to technique to ensure a successful procedure.
BY MS. LOBEL:
**Q. I understand.**
A. And that's just -- it's what it is.
**Q. But it's your opinion, within a reasonable degree of medical probability, that more**



**likely than not, if Dr. Acevedo's services were even needed had tPA been administered, it would've been an easier procedure that would have involved a stent that would have been successful?**
MR. DRAHOS: Object to the form.
THE WITNESS: I think so.
BY MS. LOBEL:
**Q. Okay.**
A. I think more likely than not. I think that -- I think that that's a procedure that is much with -- it's -- it's much more within the realm of average degree of experience.
**Q. Okay. I have some follow-up questions with regard to your -- the medical malpractice suits that you've mentioned on direct examination.**
**Did any of those cases go to trial?**
A. Yes, the first one.
**Q. Which one was that?**
A. Douglas, if I remember correctly.
**Q. Okay. That's the one from 1991 in St. Louis?**
A. That's correct.
**Q. Okay. What was the outcome of that trial?**
A. We won it, that case.

Page 222

Q. It was a defense verdict, finding no malpractice?

A. No.
Q. Okay.
A. There was no --
Q. Okay. With regard to the other six suits, did you settle those cases? Were you dropped from those cases? What was the outcome?
A. I've been dropped and dismissed from every one of them.
Q. And when you say --
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
Q. When you say "dropped from the suit," does that mean, you know, you were dropped as a party and no longer participating because no -- because it was agreed to that you didn't do anything wrong?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, generally speaking, that's -- that's the gist of it. And then there's one of those cases where there was so many defendants you couldn't even count them. So I don't know -- I don't know whatever happened after that, in my case. But the case against me was dismissed and I don't know whatever

Page 223

happened after that.
BY MS. LOBEL:
Q. Okay. How much of your work or practice or time spent is doing expert work like this particular case?
A. Very little. Although, this past weekend, on this case, it seems like an eternity. Sorry.
Q. Fair enough.
A. No. It's very little. I mean, I usually don't like to have more than one or two active cases. And the problem is, as I expressed to Mr. Drahos earlier, you know, the -- you attorneys kill us because you come over and we give an opinion, and then you disappear for a year. And -- and then, you know, somebody else comes and you talk to them. And then all of a sudden, out of nowhere, Oh, do you remember that case? Oh, okay. Here we go again.
But generally speaking, I spend very little time on this because frankly, I don't have the time.
Q. Okay. Now, in your experience, are you more often retained by defense teams or plaintiffs' teams?
A. Yeah. Usually, it's about half. And it's just relationships that I've made through the years,

Page 224

people that I have helped in the past. But I -- I usually look at the cases on their merit, and I would need -- if I tell you from the get-go I don't think you have a case, you better listen because I won't -- I won't pursue it.
Q. So it would be fair to say you reject cases?
A. I do. Oh, yes.
Q. Is there anything else that you have an opinion with regards to in this particular case that we haven't already discussed?
MR. DRAHOS: Object to the form.
THE WITNESS: Probably. I have opinions about everything, but, you know, nothing comes to mind right now.
MS. LOBEL: I just want to make sure I give you an opportunity.
THE WITNESS: Yeah. I --
MS. LOBEL: Let me just quadruple-check my notes. Doctor, those are all the questions I have for you at this time.

REDIRECT EXAMINATION

BY MR. DRAHOS:
Q. Doctor, one point of clarification there.

Page 225

A. Sure.
Q. Is it your testimony that other than the defense verdict in 1991, all other six lawsuits that you were a party to, none of those were any monies paid on your behalf that resulted in your dismissal?
A. No monies have been paid on my behalf. I've been dismissed on all of them. It is conceivable that some of them paid some monies at some point later on, but by then I had been dismissed.
Q. You were being represented by insurance defense counsel, or did you hire your own lawyer?
A. No. I don't -- I never hired my own lawyer.
Q. All right. So the insurance company was monitoring and running the litigation, so to speak?
A. Yeah. I think for the most part, yeah.
Q. All right. So are you -- I'm still not clear with your answer.
A. I think, for example, it is -- I think Loyola, they hired an attorney, but I think they do their own insurance.
Q. So you may have never personally paid any monies of your own pocket, but are you able to tell us whether or not in any of these other six insurance companies made payments which resulted in your dismissal?

A. Well, I don't think they made any payments on my behalf. I think I was dismissed. What happened after that, I don't know.

**Q. Okay. There's a difference between the two. You were dismissed because the attorney thought they didn't have a case, or you were dismissed because the insurance company paid money to prompt your dismissal?**

A. I don't --

**Q. You don't, one way or the other, recall?**

A. I don't know. I don't know.

MR. DRAHOS: Okay. All right. Read or waive?

MS. LOBEL: Do you want me to explain?

THE WITNESS: No. I know what it is.

MS. LOBEL: Okay. Okay.

THE WITNESS: It's a tough choice because -- yeah, go ahead. I'll read.

MR. DRAHOS: Okay.

THE VIDEOGRAPHER: This concludes the deposition. It's 12:25. We're off the record.

(The proceedings concluded at 12:25 p.m.)

(PRESENTMENT WAIVED; SIGNATURE REQUESTED.)



CERTIFICATE OF REPORTER

STATE OF MISSOURI )
COUNTY OF BOONE )

I, Lisa M. Banks, CCR within and for the State of Missouri, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Signed this 5th day of December 2022.

Lisa M. Banks, CCR, CVR



STATE OF MISSOURI)
COUNTY OF )

I, CAMILO GOMEZ, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance within the deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _________ of _________, 2022 at _________________________________________

Notary Public

My commission expires: ______________________

______________________
CAMILO GOMEZ, MD

Signature page to Ms. Lobel
LMB/CG, 12/22



WITNESS ERRATA SHEET

Witness Name: CAMILO GOMEZ, MD
Case Name: Richard Burgess v. Royal Caribbean et al.
Date Taken: November 16, 2022

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Page: Line: Should read:
Reason for change:

Reporter: Lisa M. Banks
JOB NO. 419709

**Exhibits**

**GomezC- A** 3:9 6:21,25 7:3

**GomezC- B** 3:10 10:1

**GomezC- C** 3:11 10:2

**GomezC- D** 3:12 10:4,7

**$**

**$15,000** 8:23

**$450** 8:6

**$800,000** 166:9

**0**

**0955** 40:20

**1**

**1** 103:15

**1,500** 161:5

**1,800** 175:12

**1.5** 103:3 107:25

**10-minute** 186:19

**100** 216:5

**10:15** 39:25 80:16 81:17 82:4,14 126:14

**10:20** 140:25

**10:25** 40:5

**10:27** 141:3

**10:55** 40:12,20 41:1 42:7 47:4,24,25 156:19

**10:59** 40:15 42:8 44:11,12,15,21 45:2,7,18 46:12,25 47:9 49:21

**11** 18:13

**11:15** 83:25

**11:24** 110:10

**11:57** 205:22

**12** 18:13 212:2

**12/22** 228:18

**120** 114:11 173:3

**124** 101:9

**12:00** 205:25

**12:15** 84:3

**12:21** 45:19 47:4,5 48:1 49:24 51:9 189:2

**12:25** 226:21,22

**12:55** 47:15

**12:59** 47:15

**13** 9:17 10:2 12:21 40:18

**13th** 12:2

**14** 87:8 109:19 111:9

**14th** 200:7

**15** 37:19 165:11 219:2

**16** 104:8 229:3

**16th** 4:3

**17** 101:10

**19** 57:4

**1986** 157:12

**1987** 148:11 159:25 160:5

**1991** 155:23 221:20 225:3

**1993** 157:25

**1994** 56:15 57:16 60:25 66:24 67:24 85:5,10,16

**1995** 165:25

**1996** 159:21 160:4

**1997** 160:4

**19th** 9:11

**1:10** 51:6,9

**1:30** 83:8,14,24 84:5,10,24

**1:59** 52:22

**2**

**2.0** 103:3 107:25

**20** 8:17 104:9 113:8 161:9 164:1,2 176:9 186:24 187:1,2,14 189:3 190:15,16

**20-minute** 187:8 190:2

**2000** 166:14

**2001** 23:7

**2002** 155:9

**2003** 19:17 20:6 154:6

**2004** 148:14

**2005** 18:3 23:7

**2006** 17:22 18:3,6 154:19

**2007** 87:18

**2010** 28:22

**2015** 86:9

**2016** 19:17 20:6 69:1, 15,20,23 70:8,24 71:1,6 72:18 73:5,15 85:21,24 86:19 87:18 153:1,2,3 206:4,8, 11,16

**2017** 104:1 105:14 106:1,3 114:6

**2018** 57:4 70:21,23, 24 74:7,12 86:3 206:9,11, 14,16,23 213:6

**2019** 25:14 26:6 27:14,17 28:11,17 29:1,7 38:19,24 53:4 54:18 55:4 65:8, 9 66:5,6, 10,18 67:21 94:9,13 99:17 100:10,20 109:23 110:3,17 112:2,9 113:8,20 115:14 117:9 119:7 120:18 186:13,20 187:9,21 188:7 192:19,21, 22 204:19

**2020** 8:11, 14 9:11

**2021** 13:8 141:10 151:16 153:1 196:22

**2022** 4:3 9:11,16,17 10:1,2 11:6,16 12:21 99:6 141:11,13, 14 196:22 227:18 228:12 229:3

**21** 13:8 99:17 100:10,20 112:9 115:14 119:7 120:18 141:11,12, 19

**21st** 141:14

**22** 72:10 141:10,19

**23rd** 26:5

**24** 214:2

**25** 99:6 164:2

**26** 10:1 11:6,16

**26th** 9:16 10:23 11:20 12:2,23

**273** 87:19

**27th** 26:5

**29** 72:20 73:7 109:19

**3**

**3** 40:18

**30** 41:5 111:9 132:8 133:14 161:9 182:21,23 183:13 210:17 211:1

**30-minute** 165:8

**300** 159:2

**31** 72:10 198:19

**31st** 199:20

**33** 114:4 211:1

**4**

**4** 103:16

**40** 37:10 189:23 190:9,11, 15

**419709** 229:24

**42** 83:18,25 84:3,11 108:10 179:12 201:24 215:24

**45** 80:24 82:21 141:25

**49** 189:19

**5**

**5** 99:6 103:16 141:16 144:24

**50** 22:10,13 134:1 209:15

**50,000** 215:21

**570** 204:23

**582** 71:8

**5th** 227:18

**6**

**6** 69:24 71:14

**60** 145:4 187:2

**601** 86:10

**63** 173:13

**66** 99:6 173:13

**6th** 9:10 12:19

**7**

**70** 22:14,15

**750** 167:9

**7:32** 4:1,4

**8**

**8** 69:24 71:14

**800** 159:1

**88** 148:11

**8:43** 67:14

**8:51** 67:17

**9**

**9** 102:25

**9-1-1** 27:13 30:18 102:10,18, 22 103:2, 19 104:19, 25 106:13 107:5,24 111:12,13, 15 112:8, 23 113:16 114:24,25 115:8,10, 14 119:15 120:15,19 179:6,8, 10,14,16, 20 180:3 181:9,14, 22,25 182:17 185:21 186:19

**90** 22:16 173:12

**A**

**A-L-B-E-R-T-O** 13:1

**A-L-T-E-P-L-A-S-E** 64:2

**A-R-M-I-R-O** 5:14

**a.m.** 4:1,4 39:25 40:5,12 41:1 42:7, 9 44:11,12 45:7,18 46:12,25 47:4,15,25 49:21 67:14,17 80:16 81:17 82:4,14 140:25 141:3 156:19,22 205:22

**ability** 187:5 227:10

**abnormal** 84:19

**aboard** 25:3, 6,9 35:13 115:13

**absence** 100:2

**absent** 59:10

**absolute** 36:16 86:20 97:19 100:3 194:9

**absolutely** 39:12 40:9 46:20 67:11 90:12 194:9 195:11 212:20,22 216:24

**academic** 67:9

**accept** 50:18,23 110:7,9,13

**acceptable** 79:19

176:11

**acceptance** 39:8 50:23

**accepting** 50:14 167:1

**access** 10:23

**accounts** 215:14

**accreditation** 15:16 53:15 116:24 159:18 160:12 164:19 168:3 191:23 194:20

**accredited** 166:3

**accumulate** 206:20

**accumulated** 8:25

**accuracy** 51:2 72:4

**accurate** 40:2 53:15,23 72:16 87:22 148:3

**Acevedo** 171:23 172:15 192:5 205:12 219:6,12, 22

**Acevedo's** 221:1

**ACLS** 167:12

**act** 169:25 170:3

**action** 227:13,17

**actions** 49:11 172:13

**activate** 111:15,16

**activator** 66:1

**active** 163:1 170:25 209:23 223:10

**actively** 204:25

**actual** 52:9 172:4 193:14 219:21

**acute** 21:12, 24 22:11, 19 23:19 53:22 58:7 86:7 104:3 105:22 158:1 160:16 165:2 167:10,13 169:2 202:5 213:22 217:1

**acute-care** 202:1

**ad** 12:10 14:17

**adaptation** 38:9

**adapted** 38:7

**add** 137:2, 16

**addendum** 125:16

**addition** 41:23

**additional** 12:22 15:6 79:8 132:23 191:14,15 200:1 205:7

**addressed** 15:4

**adds** 211:22

**adjustment** 24:3

**administer** 73:17 89:24 164:1

**administered** 21:13,20 22:12 61:1,19 63:21 90:15 122:2 194:22 218:8 221:2

**administering** 65:3 79:21 114:2 117:10 118:5 196:1,8,24 197:2 200:19

**administers** 64:13

**administration** 58:6 62:12 163:22 192:12

**administrations** 19:9

**admonish** 220:10

**adverse** 64:15,21

197:8,9

**advised** 182:1

**advocate** 5:16,22 6:4,6 48:14 81:22 82:1 136:8 201:11,14

**advocates** 6:10

**advocating** 102:6

**affect** 38:4, 16

**affected** 37:24 38:12,16 217:17

**affects** 124:5 146:12

**affirm** 4:23

**afraid** 28:20

**agent** 38:19, 23 42:10 44:2 50:22 120:19 173:25 177:20

**agents** 171:24

**aggregate** 107:10 108:11

**aggressive** 63:18

**aging** 146:12

**agree** 5:15 13:9 21:17 24:7,10 32:2,5,8, 10,25 33:2,7,15, 21 34:4,15 35:11,14, 15 38:12, 17 42:15 44:11,15 45:7,16 50:1 53:2, 9 54:7,16, 20 55:22 56:3,23 58:13 59:22 60:2 61:23 63:8 64:19 66:23 67:23 68:10,25 69:4,14, 18,22 71:4,14,16 72:6,13,14 73:14,18, 19,25 74:6 75:6,11 77:3,11,19 78:6,19 79:20 80:2 81:5,7,11 82:24 85:15,21 86:18 87:11,17, 22 90:9,14 91:10 94:2,7,10, 14 100:8 110:23 118:14 125:16 128:10 144:6 173:23 174:3 176:13 178:11 179:5 181:24 184:17 185:1 212:11

**agreed** 63:9 80:17 102:2 109:14 214:17 222:18

**agreeing** 53:5

**agreement** 11:19 127:12

**AHA** 80:23

**AHA/ASA** 66:20 71:5 86:8

**ahead** 48:18 106:11 116:5 226:18

**akin** 114:16 185:4,14

**Alabama** 19:20 30:3 151:24 158:14 167:8,19

**Alberto** 12:25 13:6 14:2

**Alcedo** 32:3, 6,24 113:12

**alert** 143:17,24 165:8

**alerting** 181:14

**alive** 215:13

**allegation** 155:5

**alleged** 175:19

**allegedly** 153:20

**alligators** 172:25

**alluded** 202:20

**alteplase** 63:1 64:1, 2 65:21, 23,24 66:2,10, 12,19 67:21 68:2,13 71:13 72:21 73:7 86:7 87:1 89:25

**alternative** 109:3 120:16 132:18

**alternatively** 51:15

**altogether** 130:10

**ambulance** 27:12 40:12 41:13,16, 21 42:11, 24,25 43:2 45:15,19 46:18 47:2,3,11, 18 48:2,7 49:6,7,14, 24 50:14, 18,22,24 51:6,8,12, 14,16 52:4,6,14 101:13 104:24 106:13 107:5 109:24 110:4,12, 16,18 111:14,15, 23 112:3 114:13 115:2 120:3,22 121:14,21 122:1 123:7,8,10 171:1 174:1,18 176:10 178:15 179:18 183:12,17 185:21 188:19,23 189:1,4,9, 10 191:2,4

**ambulances** 51:19 52:18,19 114:25 150:7 166:25 167:1 204:10

**ambulatory** 22:1 145:16

**ambush** 197:14

**amendment** 71:6

**America** 121:10

**American** 25:16,18 26:17 30:4,6 56:14 69:6

**amount** 36:23 37:19 47:17 48:1 49:11 78:7 79:18 130:5 145:15

**analogy** 217:5

**analysis** 169:10 171:15,23 204:13

**analyze** 167:18 168:14

**analyzing** 159:12 169:1 185:2

**anatomically** 126:17

**and/or** 74:9 228:5

**anesthesia** 165:4,6

**angiogram** 135:14

**angioplasty** 125:6

**answering** 34:10 136:21 143:5,8

**answers** 134:7 145:12

**anticoagulant** 24:5

**anticoagulation** 24:2

**anymore** 149:24 162:23

**apparent** 13:23 19:7

**appearance** 4:14 43:3 44:16 45:1,2,3 59:19,20 187:4

**appears** 13:12

42:18 44:12 143:17 227:8

**apples** 125:22

**applicable** 72:19 73:6

**application** 62:11

**applied** 60:9

**applies** 59:15 193:19

**apply** 38:6 39:11 59:6 60:21,22

**appropriately** 130:19,20 131:5 176:17 209:19

**approval** 63:25 64:1,17,23,25 65:3,5,12

**approved** 63:2 65:16

**approximately** 4:4 9:4 126:14

**area** 27:9 79:8 82:12 117:6 132:25 176:15 185:24 200:19 204:10 208:22

**areas** 133:25

**arguably** 80:24

**argument** 101:24 121:9 190:9 214:19

**arguments** 193:21

**arise** 46:10

**Armiro** 5:13

**armpits** 172:25

**arms** 116:7 199:7

**arrival** 39:8 41:6 58:24 103:4 104:20 108:1 163:22 189:22 209:1

**arrive** 51:9 104:7 106:20 114:12,15 174:25 189:20

**arrived** 51:6 72:18 76:15 91:4 104:4 118:25 119:11 123:12 127:8 169:3 208:11,21 214:23

**arriving** 114:13 206:7

**arterial** 158:3 213:9

**arteries** 138:18

**artery** 125:6,16 126:5,15,18,20,22,23,24 127:8,15 128:6,9,18,24 129:10,14,22 130:24 131:22 132:6 133:3 134:23 135:7 138:3,13 139:8 140:2,4 152:4 154:10,11 165:10 204:2 210:25 211:17,18,21 213:13 218:9,13 219:1,23

**article** 206:3

**ascertain** 22:18

**aspect** 28:3 116:24 145:5

**aspects** 78:3 110:21 144:13 145:6

**aspiration** 120:8

**assess** 34:19 161:4

**assessment** 207:10 215:5

**assets** 177:13

**assign** 22:4,6

**assist** 175:11

**Assistants** 22:24

**Association** 56:14 69:7

**assume** 188:14

**assure** 168:19

**asymptomatic** 40:20 127:19,23

**attached** 7:4

**attaching** 71:9

**attack** 130:11

**attacks** 133:8 204:3

**attempting** 130:4

**attending** 18:4

**attention** 86:10

**attorney** 5:20 225:20 226:5 227:15

**attorneys** 4:13 150:13 223:12

**attribute** 68:20 184:4

**attributes** 59:12 73:22

**August** 9:11, 16 10:1,23 11:6,16,20 12:2,19,23 141:10,11, 13,14,19

**author** 105:20 108:22 117:20 173:6

**Authority** 166:5

**authors** 107:17

**automatically** 212:18

**availability** 116:23

**average** 104:5 113:8 133:16 146:23 186:13,23 187:8 188:7 190:2 218:5 221:11

**aversion** 87:25 88:4,23

**avoid** 213:19

**avoided** 68:2

**awake** 143:17,24

**awards** 196:16

**aware** 89:3 147:12,15 200:8

**awkward** 85:9

**B**

**B-A-Y-A-M-O-N** 193:1

**B-I-L-L-E-R** 162:15

**back** 20:19 30:2 46:25 47:9,14 48:23 54:17 56:15 60:25 66:17 67:16,21, 24 72:17 81:23 82:3 104:1 107:20 109:22 110:2 112:2 113:19 119:10 122:23 131:19 141:2 155:15 156:21 159:23 186:13 187:9,21 188:10 192:22 195:8 202:18 205:24 212:9,16 215:20 218:23

**background** 17:8 23:5

**bad** 79:13 104:10 212:25 215:23

**Banks** 227:6, 23 229:24

**base** 123:1 140:17

**based** 34:22 43:19 60:20

63:24 83:25 84:3 89:14 93:6 101:7 103:2 107:9,24 108:11 123:13 145:12 171:6,14 182:15 183:10 189:24 210:20 214:4,23, 24 215:24 219:6

**baseline** 211:1

**basically** 6:15 19:11 158:18 159:5 161:11 180:21 203:19 205:1

**basilar** 126:20,24 127:7 129:14,22 135:7 211:20

**basing** 84:10 139:12

**basis** 12:10 14:17 39:6 41:19 83:16,17 93:4 151:25 178:6 182:11 199:13 201:20,22 220:10

**bathroom** 205:18

**Bayamon** 192:25

**bearing** 75:16 193:14

**beds** 196:11

**began** 4:1 46:10

**begin** 178:21 218:18

**beginning** 42:3 46:12 164:18

**begins** 45:17,20 47:4,24 172:7

**behalf** 4:15, 17 6:10 225:5,6 226:2

**belief** 6:9 71:5

**beliefs** 90:20

**believed** 96:19 98:12 99:8 100:25

**believes** 90:11,18

**beneficial** 64:6 133:13,14

**benefit** 79:23 168:9 203:23 211:5

**benefit-risk** 77:24 125:8

**benefits** 62:5 173:18

**big** 111:10 198:5 217:19

**biggest** 163:24

**billed** 8:21

**Biller** 162:15,17

**biphasic** 211:15

**Birmingham** 19:20 30:4 158:14 161:21 166:4,12 167:6,8

**bit** 17:7,24 30:5,10 44:18 48:20 67:6,9 75:2 78:11 90:9,10 100:5 104:4 109:20 113:23 124:14,25 125:4,7,13 126:9 131:19 157:2 168:2,5 179:25 195:23 212:1 213:21 220:13

**blank** 205:5

**blatantly** 55:22

**bleed** 209:24 213:4

**bleeding** 213:14,16

**blocked**

203:17 219:1
**blocking** 203:22
**blood** 78:24 79:8 99:8, 18 126:21 129:11,12 217:21 218:14,23 219:11
**blows** 166:21
**board** 92:19 163:6
**board-certification** 158:21
**board-certified** 53:18 91:19 92:14 93:14 94:8,12
**body** 53:15 217:19
**BOONE** 227:4
**bound** 91:1
**brain** 68:18, 22 80:3,6, 9 81:15 82:10 83:1 85:14,20 96:19 98:14 126:19 131:3,23, 25 132:24 134:17 162:12 179:24 187:5 204:4,5 212:4 213:1,3, 18,19 217:18 218:4
**brains** 79:24
**break** 67:10, 12 134:3 140:19
**breaking** 134:23
**breaks** 133:6 134:16,20 218:22
**Bremner** 181:20
**brick-and-mortar** 20:23 21:6,18
**bridge** 184:23
**brightness** 140:12
**brilliant** 166:6
**bring** 7:4 43:22 91:8 180:6
**bringing** 66:14 167:15
**brings** 213:24
**Broadway** 4:10
**broken** 132:22 133:19 134:2
**Brookwood** 19:25
**brought** 7:10,12 13:23 15:1 28:3 136:20 180:20 181:10 208:7
**Brown** 151:20 152:7 153:6
**Brown's** 151:25
**bruises** 185:13
**built** 157:25
**bulk** 21:15 22:4
**bump** 88:11
**burden** 130:23 131:13 133:9 134:5 217:19
**bureaucracy** 62:24 63:7,16 64:7,8
**Burgess** 4:11 5:25 6:13 40:4,13 41:2 47:2 52:21 58:17,20, 25 59:6,16 75:23 77:10,11 80:17,23 84:24 91:12 92:6 98:18 99:9,15 100:19 101:3,11 102:9 112:9 115:12,15, 17 119:6 120:17 123:12,21 124:8 128:25 130:15 131:21 133:19

141:6 142:24 143:5,8 190:20 209:19 212:19 214:24 215:17 216:1 229:2

**Burgess's** 16:18 77:4 81:8,15 127:3 206:14 218:3

**business** 17:21 19:10 175:14 176:16 183:25 184:1

**bust** 217:7

**busy** 161:1

**buying** 165:5

**bypassed** 166:24

**C**

**C-A-M-I-L-O** 4:6 5:13

**cabin** 76:3

**Caguas** 30:24,25 53:2,9 54:16 99:17 101:5,12 118:23,24 119:4,10, 11 123:13, 23 124:9 189:12 192:25 208:8

**calcification** 139:8,18, 20 140:2, 4,7,8

**calcium** 140:9,12

**calendar** 18:5 164:18

**call** 20:13 56:2 76:22 93:25 94:5 110:6 111:5,14, 22 113:4, 16 114:3 116:10 119:15 145:8 158:3 161:1 175:18 179:6,8, 10,15 180:3 181:9,12, 15,23,25 182:17 186:19 189:10 195:18,20 199:22,23 202:2 203:1 204:20

**called** 21:2, 11 22:2,23 32:1 59:23,24 80:8 95:3 110:7 114:24,25 115:14,20 167:12 179:10 201:5 202:9

**calling** 49:4 56:7 110:25 120:19 185:10 191:2

**calls** 50:2, 3,6,8,13

**camel's** 218:23

**Camilo** 4:5,6 5:4,13 228:3,16 229:2

**candidate** 58:20,25 59:4 123:15,21

**capabilities** 136:10 191:23

**capability** 192:12

**capable** 113:17,25 114:1,2 118:18,24 119:6 138:18 189:16 194:19 195:4 209:20

**capacity** 24:18,22 55:13 145:16

**car** 111:24 115:3 119:16,22 120:24

**cardiac** 204:5

**cardiologist** 158:16 202:22

**cardiologists** 158:7 202:21

203:25 204:3

**cardiology** 158:2

**care** 6:14 22:19 23:20 29:14,17, 20,23 32:7,13 33:3 35:13,20, 21,24 36:17 37:7,17, 19,20,24, 25 39:10 45:6 65:14 66:25 91:2 93:2 95:6 103:23 105:23 114:22 115:21,23 124:23 134:12 145:15 146:2,3,5 156:3 157:5,10 160:10,16, 18,19 165:15 172:12 176:17 183:25 185:15 194:19 195:22 202:5 206:4,25 207:4,19 208:1 214:4,8,10 215:8

**career** 24:9

**careful** 65:14 116:22 185:8 196:15

**carefully** 61:1,6 138:14 213:5

**cares** 93:4

**Caribbean** 4:12 6:1 25:4,7 44:14 101:12 177:21,24 180:3 229:2

**Carnival** 35:5

**carotid** 152:4 154:11

**carries** 125:8

**carrying** 176:22

**case** 5:16 8:7,17,25 9:21 13:11,15 14:4,7,10 17:5 30:25 32:24 36:6 39:1,11, 14,24 41:2 42:3,8 47:21 58:16 62:8 67:4 70:4 75:24 77:5,12 80:14 93:18 95:15 96:16 97:6 100:8,24 102:8 109:2,12 110:7 111:4,6 113:12,14 121:25 122:15 124:2 126:2 130:14 146:19 148:2,25 149:5,8,15 151:23 152:9,12, 24,25 153:4,6,9, 19,20,22, 23,25 154:9 155:3 161:15,21 162:10 168:25 169:4,21, 24 170:7 171:8 173:15,21 174:8 184:17 186:11 188:18,20, 24 189:25 193:15 201:15 203:11,13 204:14 205:12 207:1,5,17 212:12 216:2 218:3 221:25 222:24,25 223:5,7,17 224:4,10 226:6 229:2

**cases** 21:8 74:18 107:15 108:15 149:6,7 150:12,20 151:4,12

167:25 221:16 222:8,9,22 223:11 224:2,7

**catered** 18:2

**catheter** 203:14

**catheterization** 21:8 158:8 204:5

**caught** 64:8 192:18

**caused** 128:13 132:22 133:20,24 217:7

**causing** 61:16 125:7

**caution** 94:3

**CCR** 227:6, 23

**cells** 84:17 179:24

**census** 161:8

**center** 12:15 19:25 20:1 21:15 24:12 25:1 31:15,25 40:5 41:6 43:6 53:3, 10,14 76:16 89:21 91:23 100:19 105:14,15, 25 106:2 125:17 157:13,15, 16,17,25 163:11,13, 17 166:13 173:25 180:5,6 181:11,14 185:10,11 195:15

**center's** 174:12

**centers** 15:16 31:22 36:8 113:2 116:16 166:2 168:3

**centro** 31:13,17, 22 32:1 56:6

**CEO** 23:8

**cerebral** 48:25 126:15,23 128:6 129:13 131:22 210:25 211:18

**Cerebrovascular** 163:7

**Cerner** 164:7,8,21

**certainty** 209:6 216:6

**CERTIFICATE** 227:1

**certification** 12:15 56:8,11 92:20 116:20,23 157:18 163:4 166:13 168:18

**certified** 53:10,14 95:13 116:16

**certify** 227:7 228:3

**cetera** 182:24 184:15 185:13 191:1

**chair** 158:22 162:16 163:12

**chairing** 163:3

**challenge** 147:10

**challenges** 109:21 147:7

**chance** 84:15 85:3 95:14 102:23 104:25 106:14 107:6 132:9 133:15

**chances** 84:19 103:4 104:6,11 111:25 173:9 177:6 201:9 216:7 217:21

**change** 14:3, 7,10 69:8 101:20 218:20 229:4,6,7, 9,10,12, 13,15,16, 18,19,21, 22

**changed** 23:16,17 69:12 73:1 109:10,11 165:4 173:20 210:9,15

**Characteristics** 117:15

**characterizes** 96:23

**charge** 8:6 187:20

**charges** 8:24 9:4

**chart** 52:23

**chase** 17:11 134:11

**chasing** 134:9

**Chicago** 152:9 153:12

**chief** 157:19 158:10

**choice** 176:14 226:17

**chronology** 39:22 40:10 80:15 82:22

**chuckle** 61:10

**Ciliberti** 103:15

**circa** 157:25

**circles** 48:21

**circulating** 134:5,6,12 217:17

**circumstance** 122:10

**circumstances** 60:9 136:19 214:5

**citations** 10:15

**cite** 71:1

**cited** 10:19 70:14,17 102:21 105:5 106:4,6,7 108:18

**city** 26:23,25 158:9 164:8 166:12 167:6 184:22

**claim** 152:1,18

**clarification** 224:24

**clarify** 11:4 210:19

**classes** 18:4,7,13,19,20,21

**classroom** 18:25

**clean** 172:24

**clear** 76:6 123:18 130:6 141:9,20 184:4 207:24 209:17 211:14 225:18

**Cleveland** 194:16

**click** 16:5

**clinic** 22:1 24:2 193:17 194:16

**clinical** 63:8,20 69:23 78:3 79:20 88:14

**clinician** 60:13 64:13,19 66:18 88:4 89:23 90:11,18 93:23

**clinicians** 88:6,12 91:18

**close** 159:2

**closed** 127:16,17,18,19 128:25 152:5 211:20 219:16

**closes** 218:20,21

**closest** 189:16

**closure** 218:23

**clot** 125:13 126:6,11,21 127:21 128:1 129:11,12,20 130:10,21,23 131:2,13,22 132:6,13,19 133:6,9 134:5,6,23 135:7 137:22 217:7,19,21 218:14,23 219:11

**clots** 132:23 133:20 134:3,4,9, 20

**collaboration** 117:16

**collaterals** 80:8 82:11

**colleague** 33:18 156:14 169:19

**colleagues** 30:1 55:17 94:18 114:8 121:10 122:9,12 170:15

**collect** 22:25

**collected** 171:7 172:4

**collecting** 164:25 165:6

**collection** 23:24

**Columbia** 4:10 19:14 117:6

**column** 125:24

**comment** 121:3 135:2 182:10 210:17

**commentary** 198:25

**comments** 217:12

**commiserate** 42:6

**commission** 15:15 53:11 89:12 168:2,17 194:21 228:15

**commissioner** 186:21 187:17 204:21

**committed** 158:14 187:8

**committee** 56:16 68:4 69:9,10, 11,20 87:10 158:22 162:23 163:4

**committees** 69:8 162:22 163:1

**commonly** 135:22 136:5,14, 18

**communicated** 178:25

**communication** 175:15 178:20

**communications** 38:20

**community** 162:20 202:14

**companies** 50:14 51:15 177:6 191:3 225:25

**company** 22:21 23:9,11, 15,18 48:2 50:18,22 164:7,8 225:14 226:7

**comparability** 104:9

**compared** 108:17

**compartmentalized** 22:7

**completed** 52:22

**completely** 83:9 111:20 129:8 185:14

**complex** 93:18 125:5,8 126:9 161:10

**complicated** 125:1,14 219:4

**complication** 152:21 154:10

**complications** 79:9,22 146:5,6

**components** 193:10

**composite** 212:8

**composited** 10:4

**compress** 213:14,16, 25

**computer** 7:21,24

11:2 23:5 166:22

**computerized** 113:3

**conceivable** 22:1 93:13 225:7

**concept** 32:8 68:8,18 69:14 74:11,12, 22 78:12, 22 79:3,11 89:15 113:22

**concern** 15:4 132:25

**concerned** 15:12

**concerns** 46:10,13

**concluded** 40:21 41:2 67:25 81:6 96:10 226:22

**concludes** 226:20

**conclusion** 47:18 48:7 49:9 60:24 71:15 86:6 97:10 98:7 99:4 106:25 108:21 121:25 144:23,25 145:19 188:22

**conclusions** 214:22

**conducted** 171:16

**confer** 94:20 196:16

**conference** 26:25 27:20 28:10 29:2

**confidence** 112:8

**confirms** 118:10

**conflict** 101:21

**confounding** 72:23

**congruent** 35:23

**consecutive** 18:9

**consensus** 91:7 94:5

**consequence** 152:6 208:24 209:2

**consequences** 62:13 97:21,24 208:9

**conservative** 61:14

**considerable** 61:24 143:18

**considerably** 144:17

**consideration** 165:21 215:6

**considered** 57:7 88:16

**consistent** 79:1 101:1 171:9 172:4 188:3 189:25 190:7

**constitute** 36:23

**consult** 20:19 30:5

**consultation** 20:9 40:22

**consulted** 24:14 29:22

**consulting** 20:18

**contact** 49:20

**contacted** 45:19 47:3 48:2 49:15,24 50:10 51:9 176:10 189:2,20

**contained** 10:16,20 15:20

**contemplation** 215:4

**content** 11:13

**context** 41:14 46:23 66:15 85:14 93:22 94:25 100:3 113:23

**continental** 108:17

**continue** 71:22 168:15 206:20

**continued** 158:18

**continues** 183:5

208:16

**Contract** 215:9

**contraindicated** 67:2 90:1,13

**contraindication** 77:21 85:6,12,23 86:20 87:1 89:12

**contraindications** 77:17

**contrary** 52:12 55:24 64:24 65:2 101:23 109:7 217:20

**contrast** 125:24 126:2

**contribute** 11:12

**control** 146:11 213:25

**convened** 56:14 57:16 59:21 69:2,15 77:15

**conversation** 62:17 124:5 178:13 189:13,17 197:24 210:7

**conversations** 27:25

**convey** 112:7 172:11

**conveyed** 189:9

**conveys** 103:3 107:25

**convinced** 124:2

**convincing** 41:25

**Cook** 152:10,11

**cool** 164:20 177:17

**copies** 200:9

**copy** 11:2 70:6,11,15 198:18

**core** 183:7

**corners** 210:25

**correct** 5:20 6:19 8:1,8,15,19 9:14,18,19 10:14,18 11:11,21 16:10 17:6,12,13,23 18:15 21:3 24:13 25:19 26:2,19 27:5 32:21 35:7,10 40:5,6,14,24,25 41:4,7 42:11,12,14 43:7 46:2,9 47:16 50:7,16,25 52:22 53:1,16,19,20 54:10,14 55:15 56:15,19,22 57:19 61:3 62:13 65:16 66:22 67:3 68:14 76:13 78:5 80:18 82:23 85:18 90:17 96:20 98:14,15 99:11 103:7 117:5,7,17,22,25 126:17 137:12,18 139:9 140:13 141:15,22 142:11,12 145:21,22 149:17 153:3 162:19 169:4,6,11 171:20,24 174:13 177:22 180:9 181:11 182:17 195:9 202:2,6,8 203:16,18 209:22,25 210:3 212:17 217:6 219:25 221:22 228:7,11

**correct--** 219:24

**correctly** 61:21,23 62:3 97:17 98:6 110:7

119:12 170:24 211:10 219:25 221:19

**correlate** 36:21

**correlates** 202:21

**cost** 179:23,24

**could've** 42:22,23 55:20 59:3 81:10 82:9,11 91:4 96:18 98:3,19 100:19 101:13 102:13 120:17 124:11 135:18 136:11 138:11 190:21 216:14

**Coumadin** 24:2,4

**council** 56:13 57:11,16 60:25 61:5 63:11 66:24 67:23 68:11 69:2,5,6, 15,19,23 71:5 72:10,17 73:5,14,15 74:1,7 85:22 162:22 163:5

**councils** 56:21 77:14 89:8

**counsel** 187:10 225:11 227:11,15

**counsel's** 217:12

**count** 211:1 222:23

**counties** 166:12

**country** 171:19

**County** 151:24 152:10,11 154:6 155:2,14, 15,24 227:4 228:2

**couple** 54:6 66:4 89:17 148:9 186:15 212:13

**court** 4:19, 21 10:5,7

**courtroom** 198:4

**courts** 147:15

**cover** 17:7 65:13

**covered** 15:19 76:8,23

**crap** 112:6

**crass** 27:12

**Crawford** 150:7

**crawl** 179:14

**crawling** 114:12

**create** 120:6 164:12 166:1,9 178:2

**created** 164:5 166:13 167:11

**creating** 165:14

**credentialed** 95:2

**credentials** 95:12

**criminal** 148:9

**criteria** 59:6 64:6 72:25 73:12,16 86:7 89:16 145:1,14 194:24 196:10 216:25

**critical** 43:20,25 44:3 47:17 116:24 136:16 160:10,15, 18,19 168:2 172:9 177:2 186:4

**critical-care** 160:9

**critically** 218:18

**criticism** 45:17,20 47:4,9,24

**cross-examination** 156:23

180:14

**Crossing** 199:7

**cruise** 24:8, 12,15,18, 25 25:7,9 30:12 35:3,6,8, 13,17 36:7 37:2 45:14 101:12 102:13 176:14 184:14

**Cruises** 4:12

**CT** 40:23 52:24 59:20 66:25 68:1 79:1 80:17 81:1,3 91:5 93:3 100:4 101:7,20, 25 102:1 163:25 166:20,21, 23 195:19 209:3,7,20 211:25 217:1

**cut** 17:11 80:9 164:2 165:11

**cutting** 203:3

**CVR** 227:23

**cynical** 63:8,15,16

**D**

**D-A-R-D-E-N** 154:21

**D-O-X-I-M-I-T-Y** 201:6

**daily** 41:19 220:9

**damage** 132:20

**dangerous** 61:20,22 62:15

**Darden** 154:21

**data** 22:25 23:24 69:23 70:3 71:17 72:7 104:2 106:18 114:6,14 121:7 133:1,2 134:25 159:12 163:23 164:25 165:6 168:7,14 169:15 170:15 171:7 172:4 173:5 186:12,13 187:8 190:1 191:8 201:23 204:18 206:15

**date** 4:3 8:21 9:13 13:7 53:25 59:7 75:23 76:3,5,11, 12 91:11 92:4 94:13 104:1 200:5 229:3

**dated** 9:10, 16,17 13:8

**dates** 8:10

**Daubert** 147:7,10

**David** 13:3

**Davis** 155:10

**day** 8:18 18:19 19:3 30:3 50:15 51:12,16, 19 65:19 66:25 111:19 116:10 118:18 161:7 185:23 198:4 227:18

**days** 87:8 89:22 145:4 157:15 212:13

**dead** 78:20, 25 79:1,6, 9

**deal** 124:3 126:9 132:14,16 175:12 176:25 181:9 218:14

**dealing** 174:25 184:14

**death** 80:3

**debate** 47:14

**December** 13:8 18:6 227:18

**decide** 60:22 89:12 97:5

**decided** 76:22 157:19 164:11 189:6

**deciding** 24:2

**decision** 21:12 22:11 44:1 62:11 92:15 94:15 98:4 99:2 100:14,15 124:6 163:25 183:2

**decision-making** 47:22

**decisions** 21:19,24 22:3 36:16 96:6

**deck** 179:6 181:10,13

**declare** 179:3 228:10

**decreased** 131:12,15

**decreases** 79:23

**dedicate** 160:22

**dedicated** 160:19

**defect** 125:15,19, 20,24 126:8 143:19 144:1

**defects** 168:13

**defendant** 4:18 122:15 147:24 149:7,16 150:15,18, 19 151:5, 21 152:14 154:7,22 155:11,12, 22 156:1 169:21

**defendants** 153:15 222:22

**defendants'** 214:17

**defense** 148:10 222:1 223:22 225:3,11

**defense-retained** 161:16

**defensive** 175:24

**defer** 95:18

**deferring** 95:7

**deficit** 146:2

**define** 85:16 87:12 89:9

**defined** 74:1 125:21

**definitive** 90:9 177:4,16

**definitively** 99:9,22

**defunct** 23:16

**degree** 17:21 19:5 36:24 45:23 48:10 60:15 73:2 83:12 91:25 93:19 97:18 107:1,2 108:14 114:13 118:2 121:7 122:24 128:23 131:14 132:6 133:18,23 138:17 139:1 146:16 171:3 172:20 185:14 206:19 208:25 209:6,12, 15 218:19 220:25 221:12

**degrees** 160:17

**delay** 48:11 49:2,3 59:18 91:2 101:8 102:5 120:21 122:20 209:2

**delayed** 48:22,23 59:3 119:25 121:4 182:9

**delineated** 12:1

**deliver** 194:19 195:12

**delivered** 99:16 101:11 120:17

**Dellwood** 19:8

**demonstrate** 41:8

**demonstrated** 68:1

**demonstrates** 43:15,17 67:1

**denialism** 157:23

**department** 20:21 22:2 81:19 167:4,6 185:16,22 211:25

**departure** 61:12 124:23

**depending** 92:24 110:12 184:3

**depends** 42:1 43:23 73:2 78:21 88:14 95:10,11, 19 124:14 139:22,23 170:11 183:20

**deploy** 164:17

**deploying** 164:22

**deposed** 150:6,9

**deposition** 4:4 6:18, 25 7:5 12:11,25 13:2,3,6, 7,9,14,21 14:3,7,10 16:24 41:24 43:23 45:22 46:1 49:4 51:22 52:13 96:14 99:6 100:1 109:19 123:5 147:5 149:19,23 150:2,15, 18,21,24 153:4,7,22 162:13 177:19 178:13 192:15 197:10 201:24 205:7,12 226:21 227:8,13 228:4,6,9

**depositions** 12:4,16, 20,22

14:13 15:13 16:23 76:9,18,24 113:14 125:21 194:7 200:6

**describe** 126:17

**design** 177:10

**designed** 18:1 114:20 164:13

**detail** 157:2

**details** 12:15 15:17 29:21 30:8 42:19,20 76:18,20 149:11 164:10

**determinations** 93:6

**determine** 75:7 91:11 92:5 93:2 112:23 140:8 197:2 200:18

**determined** 68:11 69:24 85:22 86:19 87:19 101:2

**determining** 73:16

**devastating** 215:13,17

**developed** 158:16 213:22

**developing** 78:22

**deviates** 77:23

**deviation** 93:1 95:5

**devices** 219:18

**devil** 42:19

**devoted** 23:11 52:7

**dexterity** 144:20

**diagnosed** 127:13

**diagnosis** 49:10 122:18 153:21 195:10

**diagnostic** 40:13 41:3 78:8

**dial** 46:24 179:14,16, 20 185:21

**dialed** 47:14

**dialing** 115:7

**dicey** 129:23

**die** 84:17 177:15

**died** 81:9, 15 82:10 83:1 131:4

**difference** 99:1 123:7 187:4 188:9,10 189:13 194:5 206:10,19 219:9 226:4

**differences** 206:13

**differently** 78:11 100:5 101:14 139:10 146:12

**difficult** 14:19 22:4,17 63:24 124:14 133:20,25 138:23 172:23 218:10

**difficulties** 109:23 112:11

**difficulty** 129:7 214:1

**Digital** 22:23

**dimensions** 21:9,10 172:7

**diminish** 196:17

**direct** 5:7 169:18 180:19 184:13 192:2 201:11 204:8 205:6 211:10 221:15

**direction** 45:4 119:23 227:11

**directly** 99:16 142:24

**director** 21:16 35:5 157:12 163:11,13 166:5 167:4

**disability** 145:9 215:18

**disabled** 146:8 216:7,8

**disagree** 35:24 71:4,15,16 72:6,13,14 89:4 98:11 100:12,17 108:8 137:24 139:11

**disagreeing** 53:5

**disagreement** 34:21

**disagrees** 89:2

**disappear** 150:13 223:14

**discharge** 215:15

**disclosed** 147:3 148:19

**disclosure** 16:22

**discovery** 209:1

**discrepancies** 11:3

**discriminating** 129:7

**discuss** 17:4 91:6 97:4 124:14

**discussed** 98:3 208:17 212:11 224:11

**discussion** 90:3,7,10 97:9 115:22 125:2 142:14,16

**discussions** 27:22 194:7

**diseases** 163:7

**disingenuous** 55:4 115:11

**dismissal**

225:5,25 226:8

**dismissed** 152:25 153:23 222:10,25 225:7,9 226:2,5,6

**Disorders** 57:23 58:10

**disparities** 103:23 105:16,22 106:3

**disparity** 117:16

**dispatch** 113:2

**dispute** 51:1,3 68:8 72:4 138:2

**disqualified** 78:4

**disqualifiers** 59:19

**disqualifies** 93:3

**disqualifying** 59:12

**disrespect** 135:10

**disrespectful** 135:21

**dissection** 152:4 154:12

**dissipates** 217:23

**dissolve** 218:24,25

**dissolved** 130:21 131:3,7,22 132:7,19 134:15,17

**dissolves** 132:12 133:8

**dissolving** 218:13

**distance** 186:8

**distinguish** 60:5

**diverge** 34:7

**divided** 52:11 159:2

**DMV** 168:18

**docked** 184:19

**doctor** 5:9,15 7:20 14:20 24:8,15 26:10 29:23 45:14 57:5 62:10,16 63:18 67:19 88:10 90:1 120:2 140:17 141:5 156:5 169:10 172:7 179:16 183:14 185:18,20 197:22 198:17 199:18 200:9 206:2 224:20,24

**doctor's** 185:18,25

**doctors** 16:20 27:16,21,23 28:1,7 36:5 161:15 175:20 197:1 200:17

**document** 121:17 175:20 176:3 182:25 183:3,24

**documentation** 178:12 182:16,22 189:25 190:24 191:4,17

**documented** 181:20 190:20

**documents** 76:17 154:2

**dollars** 9:7

**Dominican** 17:18

**domino** 48:8

**door** 104:20

**dosing** 24:3

**double** 155:16

**doubt** 111:2 121:8 138:11,20

**doubted** 111:2

**Douglas** 155:21 221:19

**Doximity** 201:6

**draft** 11:17

**drafted** 72:9

**Drahos** 4:17 5:8,21 6:2,8,16, 23 7:19 9:25 10:10 33:17 34:24 35:25 36:19 40:3 45:13 47:12 48:12 49:13 60:4 62:6 67:11,18 68:9 69:21 70:5 71:10,11 75:21 82:2 86:11,15, 17 92:11, 25 93:21 94:17 95:17 97:7 100:13 109:8 117:1 140:21 141:4 149:1 156:12 161:25 167:23 169:5,12 170:1 171:4,11, 25 174:6, 14,19 175:21 176:19 178:4,16, 23 180:11, 16,18 181:2 182:7,19 183:19 185:6 190:5 191:6 192:13 193:9 196:3 197:4,14, 18,23 198:1,3,9, 13,22 199:1,4,11 200:10,20 204:16 206:17 207:7,21 210:4,10, 23 213:21 214:7 216:3,19 217:11 220:2 221:5 222:13,19 223:11 224:12,23 226:12,19

**draw** 106:25

**dressing** 213:15

**drip** 195:20

**drive** 7:20, 22 115:3 119:17 189:19

**driving** 190:9

**drop** 88:19 213:22

**Dropbox** 7:17,23

**dropped** 151:15 222:8,10, 15,16

**drug** 61:20, 22 62:3,15 79:23

**dry** 79:4, 10,12

**duces** 7:3,7, 11

**due** 63:4 170:15 180:6

**duly** 5:5 227:8

**duty** 90:24 120:12

**dying** 218:4

**dysarthric** 143:18,24

**dysfunction** 215:19

**E**

**E-T-** 155:16

**E-T-O-W-A-H** 155:15,17

**earlier** 30:12 66:17 70:13 84:14,15 157:23 193:25 201:1 204:8 213:20 223:12

**early** 78:22 84:13 103:4 108:1

**earth** 79:4, 10,12 135:15

**easier** 26:10 130:11 138:21 218:9,12, 14 219:12 221:3

**easily** 59:4 97:25

110:11 213:16

**East** 20:1

**easy** 17:10 178:8,9

**economy** 168:11

**ED** 103:4 108:1

**edema** 78:22, 24

**editorial** 163:6

**educate** 157:8 158:6

**education** 157:3 160:13 201:25 215:25

**educational** 115:6 167:11

**effect** 48:8 132:13 208:6 214:2

**effects** 125:12

**efficacy** 57:25 58:11

**efficiency** 108:16 173:13,14

**effort** 120:9

**efforts** 191:3

**electronic** 7:13 10:6 164:6,14 182:25

**electronic-only** 10:8

**eleven** 156:22

**eligibility** 71:12,19 212:19

**eligible** 70:1 103:5 108:1

**email** 8:10, 12 44:2 162:21 173:24 174:4,16, 23 175:1, 14 183:11 184:7 191:4

**emails** 174:24 191:14,15

**embolden** 88:7

**embolic** 217:8

**embolism** 156:2

**embolization** 152:21

**emergencies** 175:12 176:24 186:22

**emergency** 12:12 15:14 16:3 20:3,8,10, 16,21 21:2,5 22:2,3 39:6 42:1 43:21 48:25 49:5 72:12,19 81:18 103:2 107:24 111:1 123:1,6 172:8,10 174:24 175:6,10 181:15 182:2 184:3 185:13,15, 22 186:3,4 187:18 211:24

**employed** 53:18 204:15 227:12,15

**employee** 227:14

**EMR** 164:23

**EMS** 52:10 104:4 107:1 108:13 114:15 166:5 170:25 173:8 204:14

**EMT** 204:23

**encephalitis** 153:21

**encompasses** 202:4

**encrypted** 154:3 156:9,10

**end** 61:1 72:21 73:8 111:19 161:6

**ended** 121:15

**endovascular** 54:17 55:1,5,12, 19 57:8 123:21

124:1,15 125:2,3 137:3 154:11 165:1,9 187:24 202:1,7,22 207:14

**engaged** 114:5

**ensure** 220:20

**entail** 202:11

**enter** 137:9

**entering** 147:15

**enters** 176:15

**entire** 19:1 39:14 44:23 46:23 48:22 65:13 68:19 125:25 132:12

**entirety** 7:25 10:2 131:9

**entities** 50:9,10

**entitled** 86:6

**environment** 24:5 36:14 37:25 38:3

**Enyard** 149:16

**epitome** 197:8

**equating** 112:11

**equation** 45:23 193:20

**equivalent** 71:19 75:20 92:21 202:12 203:24

**ER** 20:6,8 21:1 78:8

**era** 24:3 61:11

**err** 94:2

**ERRATA** 229:1

**errors** 168:14

**escape** 95:3

**essence** 123:11 182:13

**essentially** 19:3 164:13 166:11 172:25 185:12 188:4 189:2 209:8 217:24

**established** 121:6

**estimate** 28:19 31:9

**estimates** 71:12

**et al** 229:2

**eternity** 223:7

**Ethnic** 105:15

**Etowah** 155:15

**Europe** 64:10

**evac** 184:8 208:4

**evaluate** 40:23

**evaluation** 103:5

**evening** 18:19

**event** 74:23 212:18

**events** 39:23

**eventually** 134:16 158:13

**everybody's** 65:6

**evidence** 39:12,15 41:8 44:20 52:12 55:24 56:3 78:9,15 81:12 90:11 96:2,7,11 98:12 100:25 107:14 108:11 109:3,6 113:18,21 114:4 121:18 123:13 137:25 139:8,13, 15 140:1, 4,7 143:18 170:4 171:7,22 173:22 188:17 190:25 191:8 212:22 217:2,20 218:2

**evidences**

42:16

**evident** 158:1

**evolved** 78:10,13

**exact** 31:14 68:7 204:13 206:12

**exaggeration** 166:22

**exam** 79:7 214:22,24

**examination** 5:7 141:6 143:17 144:13 145:18 169:19 184:13 192:3 201:11 204:9 205:6 221:15 224:22

**examine** 143:20 145:2

**examined** 5:5

**examining** 182:23

**exchanging** 17:1

**exclude** 212:19

**excluding** 147:16

**exclusion** 73:16 86:7

**exclusionary** 59:6

**Excuse** 210:24

**executed** 37:22 228:12

**executing** 46:11

**execution** 38:7,11,15 42:6

**exercise** 60:13

**exercising** 46:11

**exhibit** 6:21,25 7:3 10:1, 2,4,7,8

**exhibits** 9:23 192:17

**exist** 80:13

**existed** 13:17,20 69:7 95:4

**existence** 107:12

**existing** 33:10,11 103:1,19 106:18 107:23

**exists** 69:5

**expect** 164:17 219:5

**expectancy** 146:19

**expectation** 186:18,25 218:12

**expected** 144:5

**expedited** 44:6 96:25

**expediting** 164:11 165:1

**expeditious** 165:15 175:4

**expeditiously** 43:21 120:2

**experience** 32:9,11,19 33:1,9,24 36:6,13, 21,22,23, 25 84:1,4 88:24 91:22 102:18 124:15 136:2 160:14 184:14 201:25 212:25 215:25 220:6,13 221:12 223:21

**experienced** 32:6 33:22 35:12 157:9

**experiences** 110:8

**experiencing** 76:22 109:23

**expert** 6:13 56:23 57:7 74:14,18 108:11 109:1 113:11 147:20,21 223:4

**expert's** 32:3

**expertise** 32:16 36:15,23,

24 60:21 91:16,25 92:23 93:20 95:13 124:3,15 130:5 135:10,12 169:1 219:6 220:13

**experts** 54:21 89:7,17 93:14 106:11 161:15,16 214:16

**expires** 228:15

**explain** 33:3,9 38:23 48:20 125:23 139:1,16 157:7 226:14

**explained** 52:3 183:11

**explanation** 69:13 83:4

**explanations** 83:4

**explicitly** 186:17

**expressed** 174:16 223:11

**expresses** 47:1

**extent** 180:16,18

**extra** 187:2

**extracranial** 86:21 87:2

**extract** 127:4

**extraction** 129:19

**extrapolating** 108:5,20

**extraspinal** 87:2

**extreme** 175:24

**eyes** 94:6 192:18

**F**

**face** 71:22

**faced** 71:21

**facetious** 120:20

**facilitate** 110:3

**facilitating** 24:18 109:21

**facilities** 37:9 54:2

**facility** 24:19,23 31:2 37:3, 5 50:24 53:17,21 54:17 111:21 113:17 115:18 116:1 166:19 185:3 200:18 209:20

**facing** 139:2

**fact** 32:11, 25 39:11 44:4,5 45:4,22 55:25 68:21 75:13 81:11 84:11 88:16 89:17 95:3 97:5,21 98:17,23, 25 107:16 112:11 114:9 117:24 123:3 135:3 140:3 144:8 157:19 159:14 165:23 178:5 185:2 186:6 196:7 215:16

**factor** 59:15 99:3,22,25

**factored** 97:21

**factors** 61:24 170:12

**facts** 32:17 33:11,12, 16 34:7,8, 22 90:21 100:23,24 101:4

**faculty** 157:21 160:24 162:14

**failed** 169:24

**failure** 101:7 114:20 155:19 169:25

170:3 208:3
**fair** 165:13,16 167:17,24 202:4,17, 19 220:4 223:8 224:6
**fairing** 142:21
**fairly** 36:16 219:12
**fairness** 76:11 182:22
**fall** 170:21 212:12
**fallout** 219:22
**families** 111:21
**family** 115:2 176:4 178:14,21, 25
**fashion** 7:13 47:1 173:18 208:5
**fast** 167:13 190:10
**faster** 81:15 82:10 83:2
97:23 101:14,19 102:15 120:18 122:6 164:13 186:7 218:4
**fastest** 175:4
**fatal** 62:12
**fault** 172:22 197:23
**favorable** 109:2
**FDA** 62:19 63:2 64:15,16 65:5,12, 16,19 66:15 86:19,23, 24
**fear** 61:7, 8,16
**feasibility** 164:16
**February** 38:19,24 53:4 54:18 94:9,13 99:17 100:10,20 109:22 110:3
112:2,9 113:20 115:14 117:9 119:6 120:18
**fed** 82:11
**federal** 165:23 166:9
**feed** 80:8
**feel** 34:21 75:13,15 88:7,8 114:8 121:9 122:8 215:18
**feeling** 143:12
**feels** 75:19 88:10 89:24
**fellows** 159:4,14, 20 160:5 220:10
**fellowship** 159:3 160:6 220:11
**felt** 145:20 204:23
**femoral**
154:10
**field** 57:7 143:18 144:1 157:3 159:8,20 201:25 215:25
**figured** 125:1
**file** 7:25 8:1 10:3, 11,16,20 191:1
**filed** 147:7, 13 151:23 152:24 154:24 155:13
**filibuster** 198:7
**fill** 125:25 205:4
**filling** 125:15,19, 20,23 126:2,8
**film** 100:25
**filtered** 217:25
**final** 11:20
**finalized** 151:16

**finalizing** 13:14

**financially** 227:16

**find** 55:3 104:15 110:12 115:11 118:13 123:10,20 137:19 158:5 172:21 176:8 179:20 183:10

**finding** 72:13 98:19 99:7 100:3 222:1

**findings** 58:9 92:24 93:12 95:20 97:5 100:7 101:6

**finds** 213:23

**fine** 199:14

**finish** 104:16 220:10

**finished** 157:11

**Fire** 167:4, 6,8

**fit** 40:24 73:23

**fits** 73:22

**fix** 218:12 219:3

**fixed** 219:2

**flattered** 166:7

**flawed** 119:25

**flexible** 60:11

**flipping** 78:23

**Florida** 104:5,9 105:14,15, 23,25 106:2,21, 24 107:19 108:16 110:19 117:15 173:10

**flow** 78:24 79:8,14 129:8,12 218:25

**flown** 99:15

**flying** 159:17

**folder** 105:11

**folks** 171:24 177:20

**follow** 45:6 46:20 48:11 122:25

**follow-up** 157:1 221:13

**foregoing** 227:8 228:4,11

**forest** 121:2

**forever** 44:4

**forgive** 191:20 204:7

**forgot** 11:18

**forgotten** 191:21

**form** 5:18, 23 6:5,11 7:18 11:13 33:6 34:17 35:18 36:11 38:4 40:1 45:10 47:7 48:4, 17 60:1 62:1 68:5 69:17 70:2 75:10 85:17 92:7,17 93:10 94:16,21 95:9 96:21 100:11 101:16 109:4 148:23 161:25 164:14 167:23 169:5,12 170:1 171:4,11, 25 174:6, 14,19 175:21 176:19 178:4,16, 23 180:11, 24 181:3 182:7,19 183:19 185:6 190:5 191:6 192:13 193:9 196:3 197:5 200:10,20 204:16 206:17 207:7,21 210:4,10, 23 214:7 216:3,19 217:11

220:2 221:5 222:13,19 224:12 228:5

**formal** 42:9 162:3

**formed** 126:6,22 129:12 206:25

**forms** 218:24

**formulate** 56:15 59:22

**forty-five** 80:20

**forward** 61:15

**found** 88:18 90:11 109:6 125:15 137:21,25 172:6 175:8 192:22

**founding** 157:12

**four-and-a-half-hour** 62:23 63:6,10 79:17,21 81:9

**four-minute** 42:13,15 43:25

**fragment** 126:14,23, 24,25 127:5,7, 20,22 128:1,4, 13,15 129:13,14 211:18,20

**fragmented** 133:10 134:4

**fragments** 133:7 217:16,22, 23,24

**frame** 23:12 42:13,16 44:1,25 63:7,10 65:20 79:17,22 81:9 175:19

**framework** 207:2

**framing** 101:25

**frankly** 162:24 215:12 223:19

**freedom** 60:18

**frequent** 219:13

**frequently** 130:3 135:23 203:25 220:14

**friend** 158:11

**front** 85:25

**frustration** 170:17 172:17

**full** 16:22

**fully** 78:9, 13 210:21 217:5 219:23

**function** 112:23 169:2

**functional** 132:2,3 144:16 145:10 171:2

**functionality** 143:4 171:16

**functioning** 171:1

**Fundamental** 167:13

**G**

**G-O-M-E-Z** 5:14

**gain** 19:10 211:1

**game** 210:9

**Gary** 158:14

**gave** 15:21 114:25 158:20

**gee** 115:2

**general** 58:15 60:8 61:13 74:11,22 80:11 93:4 146:22 165:4 196:4

**generally** 67:20 78:13 93:9 222:20 223:18

**generate** 166:17

**generated** 9:20

**generates** 217:18

**generations** 91:24 162:24

**generic** 24:4

**geo-locators** 113:4

**get-go** 224:3

**gifted** 158:15

**gist** 14:17 222:21

**give** 4:24 12:9 25:21 28:19 31:9 62:25 66:18 75:5 79:13 88:15 93:24 99:13 101:2 115:25 116:9,11, 17,19 117:2 119:4 131:21 147:17 149:19 150:1 153:4,7,22 159:17 161:10 195:19 208:23 213:2,12, 24 214:5, 9,10 223:13 224:17

**giving** 88:11,21, 25 90:25 104:7 116:18 118:2,11, 19 124:6 213:19 216:24 217:7

**glasses** 168:8

**global** 143:11 196:5

**goal** 107:13 113:9 165:7 168:15

**God** 5:1

**Gomez** 4:9 5:4,14 88:7 137:22 156:25 181:7 228:3,16 229:2

**good** 5:9,10 57:5 77:24 79:2 114:9 144:11 145:10 158:11 162:6 196:6,7 209:6,11 211:25 216:13,14

**goods** 195:12

**government** 166:9

**Grade** 68:2

**graduated** 157:7

**Grand** 25:22

**Grande** 26:21

**grant** 165:23

**Graphs** 86:6

**Great** 181:5

**greater** 102:23 103:20 193:13

**green** 135:15 166:25

**groin** 204:2

**ground** 213:23

**group** 59:21 97:5 158:25

**growing** 165:9

**guess** 11:5 89:5 97:12 155:24 160:4 196:19 213:14

**guideline** 60:6

**guidelines** 56:15,17 57:17 58:6,8 59:22,23, 25 60:7, 12,16,21 63:10 66:21 67:25 68:7 69:3,16,20 70:7 74:7 77:16 79:19 80:23 85:4,8,10, 16,24 89:7,14 206:4,8, 23,24 213:7

**guy** 120:4 138:24

**guys** 167:10 195:17

**H**

**H-O-O-V-E-R**

167:5

**H-O-U-N-S-F-I-E-L-D** 140:16

**hairs** 44:22

**half** 41:16 62:21 63:21 64:5,12 66:19 82:13 83:20 103:3 104:3 106:19,20 107:15 108:14 114:15 116:20 120:22 145:8 161:6 164:3 165:11 173:7 179:23 207:13 223:24

**Half-hour** 141:25

**hand** 4:22 6:24 16:21 21:25 34:22 41:17 48:23 65:3 75:14,15 89:13 144:3 185:20

**handed** 164:15

**handing** 86:5

**handled** 217:18

**hands** 69:8 144:18,19

**hands-off** 124:18

**hanging** 128:8 168:5

**Hans'** 149:8

**happen** 132:15 134:3 177:9 179:21

**happened** 23:15 43:5,13 44:3 47:14 48:8 49:25 51:7 61:17 63:23 64:3 82:4,10 115:19 122:4 183:21 208:20,21 212:12 217:9 222:24 223:1 226:3

**happening** 37:14

**hard** 12:9 42:1 43:18 55:9 182:10

**hardcopy** 70:12

**Harmony** 25:4 115:13

**Haynes** 150:7

**head** 9:8 14:15 15:3 54:4 68:12,21 74:21 75:25 76:7 85:5,11,22 87:8,20 88:8,11, 15,20,25 89:10,11, 15,22,23, 25 99:8 143:9 151:6 203:3 211:24 212:5,10, 11,16 213:20 214:14,16

**headaches** 185:13

**health** 55:5, 12,14 56:1 187:23

**healthcare** 26:13 27:23

**hear** 194:7

**heard** 79:3, 11 198:3 199:15 210:20

**hearing** 124:19 137:10 170:24 171:14

**heart** 56:14 69:6 204:3

**hedging** 129:5

**held** 4:10 25:20 65:19

**helicopter** 99:15

**helped** 224:1

**hematoma** 212:3

**hemorrhage** 61:16 67:1,2,4 68:1

90:12,15 91:1,4 93:24 95:4 96:2,7,11, 18 97:4 98:2,13, 20,25 100:3 101:1 149:10 208:14,16, 18 212:1

**hemorrhagic** 79:15

**Henze** 143:1, 5

**herpes** 153:21

**hesitant** 49:4

**hesitate** 88:24

**high-level** 186:2

**highest** 68:3

**highlighted** 61:17

**HIMA** 16:1, 20 30:21, 23 31:2 52:22 53:2,9 54:10,16 55:1 58:24 94:12 99:17 101:5,12, 14 102:15 115:6 118:23 119:4,9,11 120:18 123:12,23 124:9 127:3,9 189:12 192:24,25 208:7

**hire** 225:11

**hired** 162:16 225:12,20

**historical** 104:2 163:23

**history** 55:19 74:24 78:4 101:2 147:2 148:18 157:3 204:24

**hit** 163:14

**hoc** 12:10 14:17

**hold** 105:18,24 161:2

**home** 146:4

**homogeneous** 179:13

**honest** 111:20 178:25 215:11

**Hoover** 167:4,6

**hope** 134:7 169:13

**hose** 203:19

**hospital** 16:1 19:9, 21 21:7 40:13 50:24 56:1,7 95:2 96:24 111:25 113:25 114:12 116:25 117:15 118:10,12 119:5 120:4,17 165:19 189:16,20, 22 193:11 194:8,11, 14,18 195:1,2,4, 14,16 196:7,24 208:4,7 209:2

**hospitals** 15:22 20:3 27:8 31:5 103:24 106:20 114:1,5 116:19 117:9,11, 24 118:4, 18 150:10 164:23 173:8 177:22 178:6 191:23 192:6,23 193:23 194:1 196:8 197:2 201:8

**host** 26:17

**hotel** 4:10 25:23,25 26:1

**Hounsfield** 140:13,16

**hour** 8:6 41:15 65:5 83:19 99:12 110:11 120:21 176:9 179:19,23 187:2 189:2

**hours** 27:1 61:2 62:21 63:2,21 64:5,12, 14,20 65:5 66:19 72:12,20 80:20 82:13,21 83:20 99:12 104:8 110:11 207:13 212:2 214:2

**house** 111:14

**Hudson** 150:10

**Huelskamp** 149:21

**huge** 110:16

**human** 170:12

**hundred** 20:11,16 21:23

**hundreds** 161:10,11

**hurricane** 186:20 188:8

**husband** 142:13 146:3

**I**

**ICU** 53:22, 24

**idea** 32:17 49:25 79:2,13 110:25 114:20 116:15 120:23 165:25 166:7 175:16 196:5

**ideal** 77:23 182:11

**ideally** 171:2 182:8

**identification** 6:22 9:24

**identified** 10:6 12:19 79:18 80:15 163:23

**identify** 12:6 14:22 16:9 60:20 151:3

**identifying** 77:17

**II** 220:7

**III** 220:8

**image** 52:24 68:1 80:19 81:3 82:6 93:23 95:7 99:18 209:20

**images** 82:7 93:7,16 94:25 137:5,7,21 138:10 139:5

**imagine** 121:19 190:12

**imaging** 41:3 78:9,15 80:17 91:17 92:1,21,22 93:3 97:9 99:13 129:6 135:3 207:11

**imbalanced** 144:17

**immediately** 183:16

**impact** 100:6

**implemented** 175:7

**implication** 68:19 88:2

**implied** 111:4 172:20

**implies** 59:11

**important** 20:15 73:16 163:20 165:12 193:18,19 194:25 208:10,15

**imposed** 62:19

**impossible** 118:17 126:13

**impractical** 194:17

**impression** 98:12

**improve** 188:4

**improvement** 165:1 168:10

**incident** 74:23 85:7 171:18 178:2 209:9 211:16 212:7

**incidents** 212:7

**include** 122:9 165:17

**included** 94:25 170:25

**includes** 207:8,14

**including** 40:23 79:9 121:12 178:1

**inconsistencies** 190:19

**inconsistent** 171:10 172:4,6,21 190:1

**incorrect** 121:4 220:18

**increased** 165:5

**increases** 79:15,22 84:20

**independent** 37:6,11,17 59:12 60:13

**individual** 182:5 187:15

**ineffective** 136:23

**infarct** 79:2 81:6 97:3

**infarcted** 59:20 78:15,19 79:14 81:2,13,19 82:16 83:6 98:1,24 100:4 102:1 209:7,21

**infarction** 78:25 82:7 176:25 217:1

**infected** 208:23

**infection** 146:9

**infections** 146:9

**inferior** 135:18

**infirmary** 185:11

**infirmary's** 207:19

**inform** 176:4

**information** 16:6 52:16 72:15 77:9 108:20 109:2 113:7 114:3 119:9 169:7,9, 10,14 175:6 189:8 192:11 205:1 206:11

**initial** 123:14,23 124:9 126:19 128:4 182:17

**injured** 79:15 146:13

**injury** 68:12,19, 21,22 85:14,20 87:20 88:16,20 89:1,15, 18,24 131:23,25 133:25 134:17 146:25 211:22,24 212:5,10, 11 213:1, 3,18,19,20 214:14,16, 18 215:14, 17

**inside** 24:25

**inspection** 143:24

**instance** 96:1

**instances** 147:24 148:21 150:24

**Institute** 57:23 58:10 158:10

**institution** 163:23 207:10

**institutions** 124:20

**insurance** 225:10,14, 21,24 226:7

**intended** 220:16

**intent** 45:5

**interdependency** 97:20

**interested** 66:13 148:18

164:22 167:15 168:22 227:16

**interesting** 133:5 144:15 148:17 164:6 188:25 194:4 218:16

**Interestingly** 175:5

**interim** 163:12

**intermittent** 18:10,11

**internal** 163:9

**internet** 15:9

**interpret** 95:2

**interpretation** 92:1,10, 22,23 93:15,19 94:25 139:21

**interpreted** 98:1

**Interrupting** 198:7

**interval** 186:8 209:5

**intervals** 211:22

**intervene** 203:5

**intervening** 58:14

**intervention** 161:7 202:13

**interventional** 137:1 158:10,16, 19,22 159:4,16 160:4,10, 23 163:4 202:3,5 203:24

**interview** 142:3 162:14 186:23 187:12

**intra** 86:25

**intracranial** 67:1 86:20,25 90:15 152:3

**intravascular** 157:4,9 158:2 160:15

**intravenous** 58:7,17, 20,25 62:12 86:7 103:6 189:15 207:11 208:12

**intravenously** 61:20,25

**intraventricular** 152:21

**intriguing** 175:9

**introductory** 70:25

**invasive** 204:1

**invoiced** 9:1,5

**invoices** 8:22 9:9, 12

**involve** 21:24

**involved** 21:9 24:17,21 30:11,25 38:20 81:13 117:12 146:1 221:3

**involvement** 8:17 30:14,17

**involves** 219:18

**involving** 118:1

**iphones** 22:23

**ipsilateral** 96:19 98:13

**irrelevant** 185:4

**irrespective** 145:7 183:4

**ischemic** 69:25 71:13 72:11 78:22 84:13 86:8

**island** 12:13 27:13,17 30:15 53:3 109:22 177:22 178:1 187:21

**issue** 5:25 99:3 102:2,3 110:16,17 111:10

114:19 144:16 150:12 178:14,21 195:9 201:6 203:10 208:19 213:1

**issued** 9:15 197:7

**issues** 12:11,13, 14 19:8 26:13 35:22 66:14 126:10 197:6

**issuing** 137:13

**items** 7:4,10

**IV** 59:4 61:17,19 63:25 64:1 78:1,16 79:13 106:23 114:2,11 116:23 117:13 118:19 124:6,10, 18 131:21 132:9 134:5,12 163:22 164:13 173:9,19 187:5 194:22 209:10 211:6 216:10,13 218:11

**J**

**January** 18:6 26:5 27:14,17 28:10,16

**jazz** 194:22

**Jefferson** 151:24 154:6 155:2,14

**job** 57:18 163:14 172:24 196:6,7 199:10,16 229:24

**joint** 15:15 53:11 168:2,17 194:21

**Jose** 162:15

**Journal** 163:6

**Juan** 26:22, 23,25 40:20 45:15 52:4,6,7, 8,14 76:12 169:4 176:15 184:19,21 186:14 187:9 192:7,12 204:10

**judge** 198:8

**judgment** 60:14

**jury** 33:3 36:2,9 37:13 38:18 44:19 59:15,17 65:15 92:4,8 101:22 116:17 128:23 168:9 194:25 203:23 208:17

**K**

**K-E-L-L-E-Y** 153:15

**Kansas** 164:7

**Kelley** 153:14,25

**KFC** 149:16

**Khoury** 34:25 36:5

**kill** 223:12

**kind** 14:21 17:11 22:25 55:4 58:2 90:4 99:13 116:21 132:8 143:11 172:9 213:3 217:3

**kinds** 23:24

**knack** 159:11

**knew** 162:10

**knowledge** 19:10 36:25 84:12 87:6 112:22 113:12

**Knoxville** 18:8

**L**

**L.A.** 159:15,16

**label** 86:25

**laboratory**

21:8 158:8

**laceration** 212:23 213:24 214:1

**lack** 126:1 135:10,12 220:5

**lacking** 126:2

**Lacour** 150:1

**laid** 40:11

**land** 184:23

**land-based** 24:23

**landed** 39:4

**lapsed** 208:25

**large** 133:9 134:6 158:3 217:19

**largely** 102:4 201:4

**larger** 217:7

**largest** 167:7

**Larry** 151:19

**late** 58:22 59:3 81:18 82:16 83:5 101:5 112:1 158:20

**latest** 103:25 114:6

**Latin** 30:4,6 121:10

**latitude** 189:7

**lawsuit** 90:3

**lawsuits** 225:3

**lawyer** 201:18 225:11,13

**layman's** 77:22

**lead** 90:2 98:3 134:24 142:14 160:25 180:20 190:20

**leader** 142:17

**leading** 181:4

**leads** 97:21 136:25

**learn** 13:19

**learned** 135:25

**leave** 111:22 137:15 162:24

**leaves** 168:5 172:13

**lecture** 25:20 159:17

**lecturing** 25:16

**led** 48:11 59:18 99:4 142:16 158:17

**left** 33:13 49:9 67:19 76:2 89:12 126:15,23 137:21 211:18 219:1

**level** 37:20 92:21 112:7 168:19 173:12,14 220:7

**levels** 37:10 92:23 124:15

**levied** 9:12

**life** 146:18 157:22 161:12 162:5

**lifespan** 145:20 146:15

**light** 198:4

**likelihood** 217:14

**limbs** 144:21

**limit** 62:18, 23 180:24

**limitations** 33:4

**lines** 35:6 206:3

**link** 7:23, 24 10:6

**Lisa** 227:6, 23 229:24

**list** 12:9, 21 14:15 148:9 150:17,23 151:1,4 193:11,19 196:9,10

**listed** 12:23 15:10 16:14 54:25 117:12 192:23 193:23 201:9

**listen** 224:4

**listening** 45:22,25

**Literally** 110:5

**literature** 10:13 15:9,19,20 33:10 89:16 102:22 103:1,10, 19 104:14 105:10 106:18 107:10,14, 24 108:6, 12 129:24 130:6 159:7 193:12 201:23 206:15 212:23

**litigation** 225:15

**live** 18:7, 12 20:8,21 98:8,10 122:12 161:11

**lived** 61:11

**LMB/CG** 228:18

**Lobel** 4:15 5:18,23 6:5,11 7:16 8:13 33:6 34:17 35:18 36:11 40:1 45:10 47:7 48:4,17 60:1 62:1 68:5 69:17 70:2 71:9 75:10 81:25 86:13 92:7,17 93:10 94:16,21 95:9 96:21 100:11 109:4 116:2,5 140:19,22 142:8,10 148:23 156:16,24 162:7 168:24 169:8,17 170:23 171:5,13 172:2 174:9,15 175:17 176:12 177:18 178:10,19 179:4 180:14,17, 23,25 181:5,6 182:14 183:9,22 184:11 186:10 190:23 191:9 193:6 195:7 196:18 197:12,16, 20,24 198:2,6, 11,14,16, 24 199:3, 6,14,17 200:12,23 205:3,19 206:1,22 207:16,23 210:5,12 211:8 214:20 216:16,21 218:1 220:21 221:7 222:14 223:2 224:16,19 226:14,16 228:18

**local** 176:17

**located** 19:18 171:9

**location** 167:19,22

**long** 19:3 26:24 31:11 76:21 101:18 126:11 141:23 159:19 161:24 189:4 197:5

**longer** 81:17 82:12,14 83:1 222:17

**longest** 18:24

**looked** 9:2 48:24 83:7 102:4 112:25 135:14 187:13 192:17 209:8 215:10

**lose** 148:25

**loss** 78:24

**lost** 56:7, 10 148:4, 22

**lot** 61:17 62:9 64:3, 4 145:25 159:5,13 161:23

162:3,25 163:9 165:14 168:13,14 173:10 175:22 182:23 184:8 185:19 201:2,7 202:20 205:15 214:1

**Louis** 155:23,24 157:13,14 158:8 166:1 221:21

**lower** 144:21

**lowest** 204:24

**Loyola** 152:9,11 162:14,17 225:20

**luggage** 156:15

M

**machine** 155:6 159:10

**made** 11:7 40:11,22 42:9,18 44:1 49:10,11, 20 50:2,4, 5,7 58:9 96:6 99:1, 2 121:25 122:1,17, 18 135:2 141:5 163:25 174:11 183:2 187:4 191:3 192:2 205:8 208:23 210:16 211:14 218:14 223:25 225:25 226:1 228:5,8

**maimed** 177:15

**main** 24:5

**maintained** 8:16

**major** 61:12, 15 80:9 87:7,12 110:17 158:19

**majority** 88:23

**make** 20:17, 21 21:12 22:2 26:10 36:1 54:14 92:10,15 93:6 94:15 97:19 100:15 104:19 120:9 129:16 184:8 194:4 205:14 224:16

**makes** 21:21 36:15 42:7 62:11 120:5 121:20 123:5

**making** 21:7, 19,24 22:11 36:16 50:13 100:14 175:25 176:14

**malfunctioning** 155:6

**malleable** 60:8

**malpractice** 151:8 221:14 222:2

**man** 55:15, 25 160:20 216:25

**manage** 176:17

**managed** 35:17

**management** 157:5,10 158:2 165:9,15 167:21 169:2 202:1 206:5

**managing** 152:22 195:4 207:6 215:9

**mandates** 59:24

**manner** 101:15

**mantra** 179:13

**Mar** 25:22

**mark** 9:25

**marked** 6:21, 25 9:23

**master's** 17:20

**mastered** 125:9

**matches** 166:16

**material** 15:21 16:7 38:25 39:2 185:9

**materials** 12:1,3,7 192:3

**Matt** 4:17

**matter** 4:11, 24 5:25 7:25 26:16 34:5 37:13,20 39:11 63:7 99:10 101:3 111:13 114:10 139:20 146:11 147:2 149:17 165:22 212:2

**matters** 100:9,16, 22,23

**maximum** 79:18

**Mayo** 193:16,17 194:16

**MD** 4:9 228:16 229:2

**meaning** 68:3 94:18 209:23 210:1

**means** 31:21, 22 75:7 78:14,19 79:1 81:21 87:24 88:2,6 102:9 139:17 213:12

**meant** 27:21 64:7 141:20 210:21

**measure** 144:7,10, 11 194:19

**mechanical** 124:21

**mechanism** 119:13 135:1

**medical** 10:12 12:12 15:15,19, 20 16:4 17:17 19:25 23:12,19 24:12,18, 22 25:1 26:13 29:14,17, 23 30:11, 14 31:15, 22,25 32:7,13 35:5 36:7, 17 40:5 41:6 42:10 43:6,11 49:5 76:16 83:13 89:20 104:14 105:10 108:6 111:1 115:13 125:17 128:23 129:24 130:5 133:18,23 142:20 157:7,13 161:22 164:7,14 167:4 173:25 174:4,12 175:6 178:12 180:2,5,6, 9 181:10, 14,17 182:2 185:3,10, 11 186:22 187:17,20 191:5 195:15 201:23 204:21 207:19 209:12,15 220:25 221:14

**medical/social** 201:5

**medication** 80:25

**medicine** 107:9 168:11 175:24 176:16 184:15 187:20

**medico** 31:13,17, 22 32:1 56:6

**meet** 64:6 142:3 177:22 194:23

**meet all** 196:10

**meeting**

159:16 178:6

**meets** 89:16

**member** 57:10

**members** 36:2 37:13 44:19 59:14,17 92:4 101:22 128:22 157:21 160:24

**memory** 15:17 53:25 54:5 58:4 149:9 174:7 179:9

**mention** 104:19 192:2

**mentioned** 62:3 85:13 162:9 186:18 201:1 204:22 221:15

**mentor** 162:15

**merit** 224:2

**message** 111:20 179:12

**messages** 191:12

**met** 162:12, 13,19 216:25

**method** 135:17

**methodology** 171:15 193:4

**metrics** 193:14

**Mexico** 158:9

**Miami** 103:22 121:20 122:3,5 177:21

**Michael** 180:15 197:25 198:12,24 199:14

**mid-1990s** 165:24

**midway** 40:18

**mild** 88:16 89:18

**million** 84:17

**mind** 165:24 205:17 224:14

**mine** 32:21 33:14 158:11 201:21

**minimally** 204:1

**minimized** 195:23

**minimizing** 132:1

**minimum** 22:19

**minor** 88:20 214:18

**minority** 71:22

**minute** 68:23 84:16 107:13 188:13

**minutes** 37:19 41:5,20 42:9 43:2 46:17,22 49:17,18 76:25 80:20,24 82:21 111:13,24 113:5,9 120:3 122:2 123:9 141:25 164:2 165:12 176:9 182:9,21, 23 183:2, 13,21 186:24 187:1,2,3, 14 189:3, 19,23 190:9,11, 15,16 219:2

**mischaracterization** 60:19

**Mischaracterizes** 48:17

**misexecuted** 46:16

**mismatch** 183:5 184:9

**missed** 153:21 173:16 205:5

**missing** 121:2

**Missouri** 4:11 19:14 117:6 159:1 164:9 227:3,7 228:1

**misspeak**

44:18

**misspoken** 150:20

**mistake** 174:24

**misunderstood** 46:15

**Moberly** 195:14

**modality** 124:10,13

**modified** 144:24 145:2,21

**modify** 164:5

**moment** 8:5 46:25 78:24 94:15 99:15 163:24,25 175:1 186:3 189:19 208:25 209:1

**money** 166:17 226:7

**monies** 225:4,6,8, 23

**monitoring** 225:15

**months** 18:13,14 68:12 85:6 87:8

**morning** 5:9, 10 18:22 76:15 126:14

**mortality** 132:2,3

**mother** 126:18,19 128:3,7, 11,17 129:20 131:7 132:21,22 133:19 134:15

**motion** 144:7,14, 15

**move** 44:17 47:9 81:25 91:15 144:19 186:5,7 217:11

**moved** 62:20 64:7 126:20 144:18 158:13 160:6 165:25

**movements** 142:22

**moving** 44:16 45:3 158:1

**multiple** 21:9 28:14,24 66:9 73:21 133:6,7, 24,25 134:24 170:12 172:7 207:8

**must've** 52:2

**myocardial** 176:25

**N**

**N-I-D-O-R-F** 13:3

**N-O-B-O** 13:2

**named** 151:21 152:14 153:16,17 154:7,22 155:11,12, 22 156:1 169:20

**names** 28:6 118:15

**narrow** 219:1

**narrowing** 218:18,19

**national** 57:22 58:9 112:3,5

**nature** 32:13 67:9

**navigate** 19:8

**nearest** 113:17,25 114:1 115:18

**necessarily** 22:7 32:20 36:14 49:6 65:12 95:19 130:3 177:1 196:17,23

**needed** 40:22 41:2 43:18 47:19 48:7 49:14 96:17 122:1 173:17 174:18 183:6 221:2

**needle** 104:21

**negate** 38:10

**negative** 136:4

**negligent**

90:1

**neighbor** 179:15

**network** 116:19 194:1 201:5

**networked** 166:11

**networks** 117:3

**neuro** 137:2 202:14

**neuroimager** 91:22

**neuroimaging** 25:17,18 26:18 91:23

**neurologic** 40:22 58:10 144:13 146:2 163:5 215:19

**Neurological** 57:23 158:9

**neurologically** 143:16,21

**neurologist** 17:12 53:22 91:20 92:14 93:2,5 94:8,12, 14,24 95:6 100:18 157:20 215:9

**neurologists** 53:18 61:9,10,16 88:24 93:14 94:19 116:16

**neurology** 22:5 61:12,13 83:18 92:20 157:4,23 158:20,22 159:4,16 160:1,4,6, 8,9,10,15, 23 162:16 163:4,12 182:18 202:3

**neuroradiology** 158:11

**neurosurgeon** 55:6 172:16 187:24 202:23 203:7,8

**neurosurgeon's** 205:11

**News** 12:14 15:18 191:22 192:6,11, 16,19,20, 24 193:4, 11,23 194:2,3, 15,21 195:25 196:21 200:17 201:2

**Nidorf** 13:3, 22 142:8, 11,18 192:5 194:9 196:20

**Nidorf's** 14:9 192:15 197:9

**night** 7:16

**nightmare** 110:5

**Nobel** 142:10

**Nobo** 13:2, 22 16:22 28:4 33:19 34:1 36:5 81:5 91:8 92:4 93:5 94:7,11 96:17 98:17 99:21 100:25 101:7 107:16 108:22 111:9 113:13 114:10 117:20 119:21 122:12 162:9,11, 18 171:23 173:6 192:4

**Nobo's** 14:6 91:3 96:14 98:12 99:6 100:9 101:9 109:10,18 120:23 172:15 215:15

**non--** 186:2

**nonaggressive** 61:14

**noncompressible** 213:9

**nonperforming** 170:9

**noon** 205:25

**normal** 74:3 83:9,13,19

84:1,4,10, 16 97:2 98:1 209:8

**Notary** 228:14

**note** 180:23 182:17 183:13

**noted** 186:17

**notes** 154:15 179:1 180:2 182:16 183:18 224:20

**notice** 6:18 189:13

**noticed** 127:2

**noting** 186:23

**notion** 43:18 194:6

**November** 4:3 9:10 229:3

**nuances** 123:19 176:21

**number** 21:14 22:4,6 27:1 52:10,17, 18 57:17 113:3 132:22 133:1 134:9 135:14 175:7 186:16 196:11,12 204:9,13

**numbers** 73:1

**Nure** 34:25

**nurse** 179:9 181:20

**nursing** 145:15 146:4

**O**

**object** 161:25 167:23 169:5,12 170:1 171:4,11, 25 174:6, 14,19 175:21 178:4,16, 23 180:11, 24 182:7, 19 183:19 185:6 190:5 191:6 192:13 193:9 196:3 197:4 200:10,20 204:16 206:17 207:7,21 210:4,10, 23 214:7 216:3,19 217:11 220:2 221:5 222:13,19 224:12

**objecting** 181:2

**objection** 101:16 176:19 180:15,23 199:15

**objective** 75:17 188:16

**obnoxious** 135:9

**observe** 75:18

**observed** 75:17

**observing** 162:2

**obtained** 17:20 83:5

**occasion** 25:15 27:12

**occluded** 126:5,6,20 129:2,8,9, 21 138:5, 7,11,13 219:19,23

**occlusion** 126:7 127:8 129:9,11 133:3 138:8,17 139:2 210:25 211:17 218:8

**occlusions** 138:23 158:4

**occupational** 215:7

**occupying** 125:25

**occur** 38:4 182:23

**occurred** 39:25 80:16 97:23 122:3,5 216:10

**occurring** 37:6,12,18

**October**

8:11,14,17 86:9 99:6 198:19 199:20 200:7

**odd** 103:3 107:25

**odds** 103:20 211:3

**offer** 23:18 56:4

**offered** 53:21 55:9,20 120:15 132:18

**offering** 23:23 54:17 55:1

**office** 6:18 20:23 21:6,18 166:5 177:21 185:18,25 201:13

**on-call** 20:11

**one-** 17:25

**one-day** 167:11

**one-year** 18:1

**online** 18:7, 12,21 115:5

**onset** 39:25 61:2 62:19 63:22 64:14,20 65:20 66:20 72:13 73:15,23, 25 74:2,3, 9,14,19,24 75:5,8 77:4,12 78:8 80:16,20 82:4,21 88:19 99:12 104:8 184:18 212:13

**open** 16:5 90:7,10 105:7 127:13 135:16 136:2 137:15 138:20 156:10 203:3 219:11

**opened** 128:24

**opening** 203:15

**operate** 155:19 176:14 178:3

**operation** 187:20

**operational** 166:14,15

**operators** 159:2 196:16

**opined** 113:15

**opinion** 5:25 16:7 32:12,20 34:20 35:22 39:18,19, 24 42:8 47:3 48:13 53:7,8 58:18,25 63:6 74:13,17 83:16 89:19 90:7 95:24 96:4,8,12, 16,23 99:5 108:4,11 119:2 123:24 137:13,17, 21 146:19 150:12 170:3 187:4,14 207:18,22 209:11,18 211:10,11 220:5,24 223:13 224:10

**opinions** 6:12 13:14 14:3,7,10 16:15 17:5 32:15,16, 23 33:11 34:2,6,7, 9,14,16, 21,22 35:16 47:16 55:9 58:16 107:9 109:10,12 137:3 147:16 169:3 172:6 197:8,9,18 201:6,17, 18,21,23 206:8 224:13

**opportunity** 14:20 71:24 106:11 108:19 142:3

173:16 199:9,25 224:17

**opposed** 42:25

**opposing** 187:10

**optimal** 172:18 209:5

**optimally** 112:16

**optimistic** 132:18

**option** 82:15 112:8 121:5

**options** 75:4

**oranges** 125:22

**orchestra** 160:20

**order** 19:7 50:22 72:5 140:8 164:4 176:17 177:1 178:2 186:12 203:5 214:12

**orders** 147:16

**organized** 112:16

**origin** 126:4

**original** 8:10 86:24 107:20 122:23 127:3 128:1 189:3 208:22 211:14 213:7 218:13

**originally** 67:25

**outcome** 124:11 132:2,3,9 133:1,2,15 134:25 136:11 145:10 173:20 210:6,8, 15,18 211:2 212:25 216:2,14, 18 217:3, 15 221:23 222:9 227:16

**overextend** 93:15

**overwhelming** 88:23

**P**

**P-A-D-R-O--** 52:1

**P-A-D-R-O-SANCHEZ** 13:1

**p.m** 52:22

**p.m.** 45:19 47:4,5 48:1 49:24 51:6,9 52:25 80:17 226:23

**Pablo** 16:1 101:5,12 115:6 127:9 189:12 192:25 208:7

**Padro** 13:1 51:23,25 52:1 186:18

**Padro's** 52:13

**Padro-sanchez** 13:7

**Padro-sanchez's** 14:3

**paid** 225:4, 6,8,22 226:7

**painless** 178:9

**paper** 43:16 44:12 87:24 89:14 92:13 103:15 105:2,4,7, 8,13,15, 17,18 106:4,6, 15,19 108:18 117:12,15 118:4,8,9, 13

**papers** 54:4, 5 105:1 107:17 108:12,22 133:2

**paramedic** 167:7

**paramedics** 167:9 204:14,23

**parameter** 47:24

**paraphrase** 98:5

**paraphrasing** 97:15,17

**parking**

185:19

**part** 44:13 52:2 56:13,16 57:15,17 67:24 91:1 128:21 129:23 136:6 158:19 164:11 165:1 167:18 171:22 192:3,17 202:10 214:23 225:16

**participated** 117:24

**participating** 103:25 222:17

**parties** 227:12,15

**partner** 159:10

**party** 222:16 225:4

**pass** 48:2

**passage** 68:20 85:14 86:22,24 146:11 211:19

**passages** 87:4

**passed** 48:15 78:7 123:1

**past** 158:20 199:21 200:3 223:6 224:1

**pathology** 132:8

**pathway** 80:9 138:2

**patient** 20:20 24:12 29:10 30:11 32:7 33:3 35:13 37:5,18, 20,21 39:4,6,7, 8,13 40:19,21 42:24 43:1,22 44:4 46:14,15 48:7,24 49:1,6 64:14,19 66:19 68:11 73:22 74:24 75:5,9,14, 19 78:8,16 80:4 84:14 89:20 91:3,4 92:15 93:3,7 96:24 101:5 109:21 110:3,6,8, 9,10,13,14 111:25 113:16,24, 25 114:22 115:1,21 116:8,12, 25 118:25 120:23 123:1,2 125:2 131:21 133:13 142:13 143:25 144:16 145:2 146:1 152:2,20 156:2 163:25 164:12 165:18 172:12 173:17 176:4 179:6 180:1,6 181:9 182:1,6, 20,24 183:14,17 184:8 185:2 187:5 189:6,14, 22 190:13, 18 191:18 195:19 207:6,11, 14 208:4, 7,10,21,24 209:4,6 211:2,4,24 212:24 213:8 214:6,14 215:5,12 217:16 218:8

**patient's** 78:3

**patients** 18:17 20:2,9 21:5,6,18 22:1 30:14 32:19 33:1,23 35:17 36:7 37:9 41:19 58:14 61:1,6 63:22 64:5,11

69:25 71:13,19, 23 72:11, 18 73:6 74:8 80:10 81:16 87:19 88:1,18 102:23 103:6 104:3,7 106:19,21 107:2,12 108:2 110:15 111:17,20 114:7,11 117:10,13 118:6 130:8 132:7 133:3 146:8,12 161:5,9,10 173:3,7 176:18 193:24 194:23 196:2 200:19 213:21 215:22

**patients'** 79:24

**patterns** 23:17

**payments** 225:25 226:2

**PCA** 130:21 131:3 132:19

**PDAS** 22:23

**peer-reviewed** 54:5 69:24 193:13

**penalty** 228:10

**pending** 8:24 151:12

**people** 29:18 30:1 71:24 88:15 93:16 113:6 119:22 132:10 136:22 145:3 153:18 162:3 164:15,20 167:14,15 176:22 177:3 185:24 189:9 190:10 193:14 195:20 196:6 201:5,7 202:14 224:1

**percent** 20:11,16 21:23 22:10,13, 14,15 23:13 69:25 71:14 72:11,20 73:7 104:8,9 114:4 132:8 133:15 134:1 173:12,13 209:15 210:17 211:1 216:5

**percentage** 20:5 21:10,23 23:10 88:17 106:22

**percentages** 72:23

**Pereira** 40:19,21 41:1 42:7 43:10 44:1 45:8 46:10 47:1,15,18 48:24 121:12,19, 24 122:9, 17 174:4, 10 175:19 181:25 184:2 207:18

**Pereira's** 41:24 45:22 49:3 207:6

**perfect** 121:8 188:5

**perform** 113:6 172:19 188:11 219:24

**performance** 12:12 107:18 108:15 111:3 168:20 170:11

**performed** 57:24

**performing** 104:10 168:12

**performs** 173:12

**period** 16:22 18:13,24 19:15,19

26:3,24 49:15 81:17 82:12 173:11

**perjury** 228:10

**perpetually** 199:24

**person** 13:24 38:18 88:1 139:18,23 163:15 181:14

**person's** 218:5

**personal** 22:23 36:6 95:7 102:18 112:21 113:12

**personally** 16:22 162:9,21 225:22

**persons** 50:13 57:18

**perspective** 188:5 209:9

**pervaded** 61:16

**ph** 135:6 187:12

**phase** 216:9

**phases** 212:8

**phone** 22:3 41:20 50:2,3,5, 8,13 76:19 93:25 94:4 114:3 115:24,25 116:11 120:3 145:3 175:2,18 179:18 191:10

**phrasing** 47:20

**physical** 144:15 145:17 170:12 214:22,24 215:6,7

**physically** 19:18 23:3 218:4

**physician** 21:2,5 35:2,3 39:5 40:12 122:25 124:22 189:5

**physicians** 16:18 18:2 20:10 30:6 41:18 60:20 161:14 207:1

**pick** 93:25 94:4 175:1 179:17 190:13

**picked** 116:9 189:14

**picking** 123:19

**picture** 139:17,19, 22

**pictures** 135:14

**piece** 203:22

**pieces** 134:2,16, 24

**piggyback** 165:24

**piggybacking** 166:8

**pinch** 163:14

**pitched** 166:4

**place** 39:24 44:13 55:1,20 56:4 113:4 116:9 121:18 128:14 170:20,25 171:16 176:5 177:25 178:8 188:12 193:18 195:13 213:13

**places** 115:5 194:23 204:18 217:23

**plaintiff** 4:16 5:17, 22 6:4,10 48:14 81:23 136:8 147:23 148:10 151:18,19 152:16 153:14 201:11

**plaintiff's** 5:20 161:15 214:17

**plaintiffs'** 223:22

**plan** 177:10

**planet** 195:21

**planned** 147:17

**plaque** 126:4 129:10,11 130:11 132:11,14 218:15,17, 20

**plasma** 65:25 134:6 217:17

**plasminogen** 66:1

**platform** 22:25 23:19

**play** 180:19

**pleasantries** 17:2

**plenty** 91:5

**pneumonia** 146:9

**pocket** 225:23

**point** 11:3, 23 15:24 20:10 24:8 29:20 30:18 33:9,13, 14,15 34:5 35:3,22 43:14,15 44:11 58:23 89:5 95:16 97:12,14, 22 101:19 119:9,10, 17,24 120:11 124:1 128:8,10, 18 129:21 131:23 132:2 179:2 180:1 191:21 197:5 204:24 219:19 224:24 225:8

**points** 33:11 170:4

**policy** 113:19

**political** 202:15

**politics** 63:16

**popular** 157:23

**population** 71:13

**port** 24:22 27:6 38:19,22 42:10 44:2 50:22 120:19 121:20 171:24 173:25 176:18 177:8,9, 11,12,20 184:19,21, 22

**ported** 35:9

**portion** 208:22

**portions** 80:5

**position** 45:8,11 138:25 162:14

**possibility** 134:19

**possibly** 132:20 164:22

**post-graduate** 159:3

**posterior** 126:15,23 128:5 129:13 131:22 211:18

**potential** 60:17 97:4 98:20 186:4

**potentially** 61:20 81:10,16 82:11

**pouring** 79:9

**PR** 105:14, 15,25 106:3

**practicality** 194:13

**practice** 19:7,8,12, 16 21:9 22:4 23:12,17 61:12 64:7,9 65:13 89:14 170:16 175:24 220:11 223:3

**practicing** 83:17 108:10

**precipitated** 126:7

**precisely** 72:22

**predict** 132:5

134:1 216:5
**predictable** 215:12,23
**premised** 58:9
**presence** 18:8 100:2
**present** 8:18 64:9 66:25 72:11 125:17 127:8 128:17 168:6 205:2
**presentation** 78:3 123:14,23 124:10 127:3
**presented** 73:6 81:18 124:9 128:25
**presenting** 73:11
**PRESENTMENT** 226:24
**presents** 72:24 78:8 89:20
**president** 23:8
**presumptive** 49:10
**pretty** 9:3 27:25 215:22
**prevail** 184:10
**prevented** 124:11 136:11
**prevention** 24:6
**primary** 179:15
**principal** 183:24
**principals** 37:4,7,16 38:6,10
**principles** 35:20,23 36:17 37:23 39:10
**prior** 22:23 28:10,16 29:1 58:24 89:22 129:21 153:9,25
**priorities** 37:8
**prioritization** 37:7,17,23
47:10
**prioritize** 114:21
**prioritizing** 45:5
**priority** 46:20 174:23
**private** 19:6,12,16 50:18 51:14 101:13 111:16
**privileges** 19:22 56:1
**probability** 83:13 128:23 133:18,23 209:12,13,15 220:25
**problem** 4:8 33:10 39:14 42:5 45:3 73:10 78:23 91:2 95:15 98:22 110:16,17 115:22 116:14 121:16,17 133:9 146:7
163:24 168:7 176:5 182:25 183:4,5,8 184:1 188:13 189:7 190:22 193:2 196:6 213:18 216:12 219:15 223:11
**problems** 33:5 71:21 111:1 113:10 121:8 165:3 168:1 186:7,21 188:6
**procedural** 136:25
**procedure** 113:19 135:13,22 136:14,17 152:3 155:6,7 161:7 219:4,7,8,14,24 220:15,20 221:3,10

**procedures** 159:1,3 178:2 220:7,9

**proceedings** 4:1 226:22

**process** 36:9 100:10 125:7 128:21 158:19 164:11 166:13 168:15 190:7 200:14 211:21

**processes** 19:10

**produced** 9:10 10:3, 17,21 129:10

**producing** 106:9 126:1

**profile** 73:22,23 77:24

**program** 17:25 18:1 30:5 160:11 167:11

**programming** 164:15

**programs** 158:16 196:12

**progress** 165:12

**project** 103:23 164:24

**projects** 163:17,19

**prompt** 226:7

**prone** 146:8

**pronounce** 120:21

**proper** 44:12

**properly** 173:19

**protect** 175:25

**protocol** 121:5 177:7

**protocols** 113:4,23 170:13,20 176:23 178:7 186:16

**prove** 91:1 214:15

**provide** 74:24 88:8 90:12 196:5

**provided** 10:15 68:4 207:2

**providing** 75:4 102:22 119:6

**proximal** 126:22

**public** 51:19 52:4,6,14 228:14

**publication** 103:25 187:11

**publications** 64:4

**publish** 159:7,13

**published** 53:25 86:9 113:1 114:14 121:7 173:6 193:12 204:18

**publishing** 159:10,13

**Puerto** 12:13 15:15,23 25:12,22 26:14,16 27:22,23 28:1,7,13, 14 29:6, 11,14,17, 23,24 30:12,15, 18 31:5,7, 12,15,25 32:7,13 33:1,4,23 34:3 35:9, 11 36:10 37:3 50:15 52:11 53:3,10 54:22 55:5,6,18 94:8 102:19 103:11,13, 20,24 104:4,19, 24 105:23 106:13,20 107:6 108:13 109:22,23 110:4,15 111:1 112:24 113:15,19 114:5 117:9,15 119:5 121:22 122:4,14, 21 167:19

169:4,20 170:16 171:17 173:8 175:7 187:9 191:23 192:23

**pull** 154:16 219:13

**pulling** 86:2

**pulmonary** 156:2

**pun** 220:16

**puncture** 165:10 213:9

**pupils** 55:17

**purpose** 58:1 69:15 168:4,19

**purposes** 66:11

**pursuant** 6:17

**pursue** 224:5

**pursuing** 19:4

**push** 168:16

**pushing** 190:10

**put** 66:15 107:23 111:24 157:17 158:23 197:10,19, 21 201:18 202:18 211:4 213:15

**puts** 204:3

**putting** 66:12 219:10

## Q

**quadruple-check** 224:19

**qualification** 92:21

**qualifications** 34:19 36:21 95:1

**qualified** 32:12 33:2 34:2,15,23 35:16 36:8,15 38:22 57:13 80:24 82:13 84:24 91:10 92:2,9,13, 14 93:6,18 94:14,23 100:18 173:19 194:23 208:11

**qualifies** 37:1 93:7

**qualify** 58:14 71:24 76:10 78:10 99:9 164:12

**qualifying** 73:12 207:11

**quality** 34:20 163:16,18 168:10,16

**question** 20:8 27:11 30:9 32:22 34:6,8 41:12 45:4 46:18 58:2 59:7,9,11 63:13,24 66:18 67:22 75:22,24 76:3,5,11 78:17 79:12,16 83:24 85:9 91:11,14 92:5 93:11 94:13 96:1 97:3 98:25 99:14,24, 25 100:1, 5,21 104:16 107:21 109:18 110:2 111:9 112:2,13 120:1,13 122:22,23 123:17 125:18 126:1 133:11 134:7,19 135:8 136:9,21 176:21 179:25 181:7 183:25 187:11 192:1 194:10 196:25 197:11 218:16

**questioned** 96:2 193:15

**questioning** 15:1 136:13 197:6

217:6

**questions** 12:15 14:21 15:11,13 66:12 67:8 70:13 86:16 95:23 101:25 133:22 137:1 142:19,20 143:3,5,7,10,13,23 156:7,13 157:1 169:24 181:3 188:1 196:20 199:8,9,15 204:9 205:7,15 206:3 212:10 214:21 221:13 224:20

**quick** 21:12 39:22 156:15 205:18 207:9

**quicker** 103:4

**quickly** 42:25 49:2,7,19 153:24 167:15 172:12 174:17 176:6 177:4 186:5 189:14 195:12 213:24

**quiet** 215:11

**quote** 61:1,2 73:3 78:13 86:25 87:23 102:22 103:18 175:24

**quoting** 86:23

**Qureshi** 159:10

**R**

**Racial** 105:15

**Racial-ethic** 106:3

**Racial-ethnic** 105:22

**rack** 162:12

**radial** 165:10

**radiographic** 139:7,13,15

**radiologist** 91:7 95:1,8

**radiologists** 95:18

**Rafael** 187:22

**raise** 4:21

**raised** 102:8

**raising** 198:9

**Ramos** 135:6 138:24 139:10

**Ramos's** 137:25

**ran** 220:15

**range** 71:14 144:7,14

**Ranger** 22:20 23:7,11,14,18

**Rankin** 144:24 145:2,12,21

**rapid** 103:5 108:1

207:10

**rate** 80:2

**ratio** 77:24 125:8

**ratios** 103:3 107:25

**reach** 47:18 108:20 188:22

**reached** 60:25 144:23 145:19

**reaching** 48:6

**react** 79:24

**read** 12:4,11,20 13:25 14:2,6,9,23 32:3 41:23 46:1 49:3 51:22 52:23 68:19 71:3 76:17 81:3 86:22 87:23 95:7 96:14 105:6 109:10 135:4 162:13 192:15 196:22,23

213:5 215:15 226:12,18 228:4 229:4,5,7, 8,10,11, 13,14,16, 17,19,20, 22

**readily** 71:2 167:20

**reading** 32:16 38:25 192:10 200:2

**reads** 213:6

**ready** 182:12

**real** 39:22 144:16 156:15 205:18

**realize** 165:2 194:12

**realized** 162:13

**realm** 211:4 221:11

**reason** 24:15 34:5 51:1, 3 59:23 63:9 68:8 73:13 84:14 102:4 106:24 118:7 122:20 129:4 130:9 137:13 149:5 195:2 216:23,24 229:4,6,7, 9,10,12, 13,15,16, 18,19,21, 22

**reasonable** 19:9 46:17 47:22 49:11 74:4,12 83:12 88:13 128:23 133:17,23 209:12,14 220:25

**reasoning** 63:20

**reasons** 44:5 71:25 208:14

**rebuttal** 9:16 12:21 68:18 135:2 197:7

**recall** 13:22 28:2,5,6 143:8,14 169:18,21, 22 174:21 175:19 184:12,15 191:20 196:20 201:10 204:8 205:6,8 206:2 214:21 226:10

**receive** 41:18 68:13 72:20 78:16,19 80:24 92:16 106:22 197:22 199:18

**received** 8:12 10:7 58:17 73:7 81:10 87:20,25 91:12 92:6 147:1 183:14 198:18 215:8

**receiving** 93:4 102:23 106:14 182:1,5

**recent** 86:25 87:1 98:18 213:3

**recently** 9:3 192:4

**recognize** 123:3 186:3

**recognized** 42:5 45:23 158:23

**recognizes** 177:3

**recommend** 115:9,10

**recommendation** 68:3 87:5

**recommendations** 64:15 87:9

**recommended** 74:8

**recommending** 115:7 119:19,20, 21

**reconcile** 99:5

**record** 4:2 5:12 49:5 67:13,15,

17 140:24 141:1,3 156:17,18, 20,22 164:14 189:8 191:17 205:21,23, 25 226:21

**recorded** 40:19 175:23 198:13

**records** 121:25 164:7 178:12 180:2,10 181:18 183:1 188:19 189:1 191:10 201:24 215:7

**recruiting** 204:25

**red** 166:23, 24

**REDIRECT** 224:22

**reduce** 117:16

**reduced** 130:23 132:4,21

227:10

**refer** 11:1 14:25 103:10

**reference** 141:5

**referenced** 86:4

**referencing** 104:18 117:23

**referral** 40:22 182:18 183:13

**referring** 31:13 85:20 103:10 105:9 106:1 117:14 118:5 122:11 142:5 187:16

**refers** 103:13

**reflect** 40:7

**reflection** 136:4

**refresh** 15:16

**refute**

113:18,21

**regard** 188:17,23 191:1 200:1 206:4 207:5 221:14 222:7

**regarded** 57:9

**region** 52:4, 10,15 96:19 98:13,19 171:9 178:7

**regional** 166:2,5 195:15

**regions** 52:11 80:8 113:3

**registries** 23:25 24:1

**regular** 73:11 178:6

**rehabilitation** 156:3

**reinvigorate** 79:7

**reject** 224:6

**relate** 59:8

**related** 23:19 26:13 212:12 217:3 227:12

**relates** 32:6,12 33:4,22 34:2 35:12,16 47:5 57:24 58:11 71:6 157:4 169:3

**relationship** 164:8

**relationships** 223:25

**relative** 12:11 227:14

**relevance** 16:6 192:21 193:3

**reliable** 75:7 144:12 195:25 200:17

**relied** 57:22 58:1 169:14

**rely** 95:6

184:7 197:1 200:17 206:8

**relying** 108:23

**remainder** 132:23

**remember** 28:24 29:9 74:21 76:20 101:18 110:7 141:24 148:2 149:10,13, 14 150:22 155:4 172:23 213:6 215:3 221:19 223:16

**render** 32:12 34:2,16 35:16 78:4 228:7

**rendered** 29:24 35:21 37:25

**rendering** 32:7 35:12

**renders** 138:18

**repeat** 123:17

**repeatedly** 82:1

**report** 6:13 9:17 10:1, 2,24 11:6, 13,16,20 12:2,14, 19,21,23 15:18 32:3 40:11,16 55:1 68:17,18 70:14,15 71:7 72:9 75:19,20 87:18 102:22,25 106:5,7 107:23 117:21 135:2 136:25 137:10 141:6 142:2 187:11 192:6,16, 19,20,24 193:5,11, 23 194:2, 4,15,21 197:7,10, 19 199:12 201:3 204:20

211:14

**reported** 40:5 72:10 101:1

**reporter** 4:20,21 10:5,7 227:1 229:24

**reports** 9:15,20 10:16,20 12:5,8 13:10 14:14,24 15:10 16:14 136:22 191:22 195:25 196:22 200:1,17

**representative** 172:17

**represented** 225:10

**Republic** 17:18

**reputation** 193:5,13 201:4

**request** 20:9 40:11 41:13 42:8,9,17

46:18 47:11 50:19,23 121:20 122:1,2, 18,24 134:18 174:11 183:11,16 184:7 189:3

**requested** 42:20,21 46:19 48:9 226:25

**requesting** 42:10 45:15 173:25 183:12

**requests** 182:18

**require** 145:17 189:15 199:12

**required** 29:13,17, 20 43:21 125:5 157:16 212:15

**requirements** 50:17

**requires** 7:4

37:19

**Rescue** 167:8

**research** 10:12 15:6 112:22 159:5

**reserve** 137:2,16

**residency** 157:11

**resident** 157:20

**resist** 202:16

**resistant** 136:9

**resources** 38:2,12, 17,18,23 51:11 109:24 112:3 165:5 170:6,8, 10,12

**respect** 63:4 161:23 170:15

**respectful** 136:15

**respond** 176:2 188:24

**response** 50:12 80:3 107:13 113:5,8 186:13,19, 23 187:8 188:17,23 189:24 190:2

**responsibilities** 163:9

**responsibility** 39:3,7 69:3

**responsible** 39:6 123:1

**responsive** 7:11

**rest** 210:6, 8 218:25

**restore** 218:25

**restoring** 79:14

**restricting** 147:16

**restroom** 140:23

**result** 88:20 89:11 120:6 122:3 145:20 167:3

**resulted** 89:22 98:6,19 132:20 217:3 225:5,25

**results** 212:25

**retain** 201:13

**retained** 5:16,19,24 8:9 161:15 223:22

**retrieve** 180:5 218:10

**review** 7:7,9 8:7 13:13 15:9 68:6 72:7 86:10,15 87:5,19 93:6 97:9 106:11 139:5 174:2 181:17 186:12 188:19 190:25 192:5 201:23 205:11

**reviewed** 11:25 12:3,7,24 14:12,16 15:2 69:23 100:25 113:14 123:13 137:7 139:13 173:24 192:3

**reviewing** 16:3 47:21

**revisions** 11:7,22

**Rican** 27:23 28:1,7 29:23

**Richard** 119:6 142:24 212:19 214:24 218:3 229:2

**Rico** 12:13 15:15,23 25:13,22 26:14,17 28:13,14 29:6,11, 14,17,24 30:12,15, 19 31:6,8, 13,15,25 32:7,13 33:1,4,23

34:3 35:9, 11 36:10 37:3 50:15 52:11 53:3,10 54:22 55:5,6,18 94:9 102:19 103:11,14, 20,24 104:4,20, 24 105:23 106:13,20 107:6 108:13 109:22,23 110:4,15 111:1 112:24 113:15,19 114:5 117:9,16 119:5 121:22 122:4,14, 21 167:19 169:4,20 170:16 171:17 173:8 175:7 187:9 191:24 192:23

**rid** 130:10

**ridiculous** 199:1

**Rio** 25:22 26:21

**risk** 61:24 79:15,22 87:25 88:4,22

**risks** 60:17 62:5

**road** 197:6

**roadblocks** 191:19

**Robinson** 150:4

**robust** 30:4

**rock** 182:12

**Rodolpho** 32:3

**Rodriguez** 187:23

**roll** 182:12

**room** 20:3, 16 21:2,5 72:12,19 153:8 172:13 185:12

**roughly** 8:23

**roughness** 136:17

**round** 161:9

**rounding** 140:17 161:8

**rounds** 21:8

**routine** 175:15

**Royal** 4:11 6:1 25:3,6 44:14 101:12 177:21,24 180:2 229:2

**Rubin** 158:15

**rude** 199:3, 6,7

**rule** 60:5

**ruled** 96:18

**rules** 59:24 60:10 199:12

**run** 91:23

**runaround** 115:1

**running** 24:1 164:1 165:11 186:24 191:19 204:22 225:15

**rush** 190:17

**rushed** 84:14 190:17

S

**S-A-N-C-H-E-Z** 13:1

**S-O--** 140:16

**S-U-A-R-E-Z** 152:17

**Sacco** 105:16,18, 20

**safer** 101:15 130:11

**safety** 57:24 58:11 163:16,18

**sake** 190:8

**salient** 204:19

**San** 16:1 26:22,23, 25 40:20 45:15 52:4,6,7, 8,14 76:12 101:5,12 115:6 118:23 127:9 169:4 176:15 184:19,21 186:14 187:9 189:12 192:6,12,

24,25 204:10 208:7

**Sanchez** 52:1

**Sarah** 4:15 197:19 199:2

**sat** 144:18

**Saturday** 18:21,22

**saved** 187:3

**scale** 145:3

**scalp** 212:23 213:4,15, 17,24,25

**scan** 40:23 59:20 79:1 81:1 82:15,17 83:4,7,13, 19 84:15, 19 91:6 95:22 97:1,2,25 100:4 101:7 102:1,3 163:25 209:3,7 211:25 217:1

**scanner** 166:20,21 195:19

**scans** 214:15

**scenario** 62:4 93:22 132:18 134:14 181:8

**scenarios** 60:9

**sceneries** 82:25

**schedule** 18:20

**school** 17:17 157:7

**scientific** 86:6,8

**score** 144:24 145:12,21

**screen** 11:2

**screening** 52:22

**Seas** 25:4 115:14

**secret** 168:1

**secretary** 42:23 43:11 55:5,12, 13,25 174:5,12 187:23 191:5

**sectors** 168:11

**security** 50:24

**seek** 96:12

**seeking** 39:5 96:8

**sees** 93:23

**segment** 125:25

**select** 63:22 150:10

**selected** 61:1,6

**self-evident** 183:16

**sending** 174:23

**sensation** 144:8,10, 11

**sense** 20:17, 22 21:21 33:8 39:13,16 40:7 41:9, 21 42:2,6, 16,20 43:3,4,15 44:13,20 46:11,14 48:9,15 84:6 95:11 129:16 143:11 170:5,16 172:11 174:16 184:8,10 190:14 196:5

**separate** 69:1 124:5 128:20 212:6

**September** 9:11,17 10:1 12:2, 21 158:21

**seriousness** 68:20,21

**serve** 168:18

**served** 6:18

**serves** 53:25 54:5 58:4 149:9 168:4 174:7 179:9

**service** 23:19 27:13 52:10,14 161:1,8

**services** 8:21 12:12 15:15 16:4 107:1 111:1 112:23

114:15 175:6 204:21 221:1

**session** 164:16

**set** 58:6 89:14 94:5 101:7 168:8 189:21

**setting** 21:12 22:11 186:3 202:7

**settle** 222:8

**settled** 150:5,8,20

**severe** 87:8 88:25 89:15 143:24 214:14,16

**severely** 143:17

**shape** 11:13 38:4 85:17

**shared** 7:14

**sheet** 52:22 229:1

**ship** 24:8, 12,15,19 25:1,7,10 37:2 39:5 45:14 101:12 102:13 120:25 126:18,20 128:3,7, 11,17 129:20 131:7 132:21,22 133:19 134:15 172:7 177:6 179:10 180:3 181:13 184:14,18, 23 185:3 189:22 195:20,21 209:20

**ship's** 42:10 173:24 185:10

**ships** 30:13 35:8,13,17 36:7 40:12 176:14,18 184:14

**shoes** 207:6

**shore** 184:24

**shoreside** 24:19 37:2 185:4

**short** 133:12 170:21

**shortage** 112:3,5

**shortages** 114:18

**shorten** 186:8

**shortening** 163:21

**shorter** 145:20,23 146:15

**should've** 96:25 101:6 206:25

**shoulders** 39:4

**show** 86:5 90:24 97:2 104:2 105:2 106:12 108:12 121:25 144:18 178:12 209:7 214:9,11, 12

**showed** 58:21,22 81:1,6 91:5 99:18 101:5 106:12 217:1

**shower** 217:8

**showing** 89:21 107:5,19

**shown** 59:2 64:5 79:20 82:7 99:15 101:6 196:21 209:21

**shows** 78:9, 15 103:2 106:19 107:24 185:17 212:1

**side** 94:2 148:10 198:25 213:22 214:17

**sight** 116:12

**sightseeing** 27:4

**Sigma** 163:17 168:8,12, 13

**sign** 157:17

**signal** 128:4 140:10

**Signature**

226:24 228:18

**Signed** 227:18

**significant** 85:22 87:13 88:9,17 89:10,25 215:18

**significantly** 131:13

**signs** 67:1 75:16 88:25 89:21 99:16 189:21

**similar** 30:9 112:14 167:12 186:1 219:8

**similarly** 107:3

**simple** 125:4 187:25

**simply** 15:16 26:16 29:7,18 74:25 78:12 100:1 170:8 176:11

187:25 188:7 215:19 216:10

**simulation** 164:16

**single** 54:9 92:21 116:10 167:9 211:16 217:21

**sir** 4:22 6:20 9:6 20:4 28:9 31:11 40:16 47:8 53:12 58:12 70:9 90:20 108:8 110:20 127:6 151:6,9

**sirens** 190:10

**sit** 6:3 7:15 14:22 16:9 29:2, 8 72:3 130:9 135:5

**site** 213:10

**sitting** 18:25 76:19

114:24

**situation** 46:23 88:15 95:23 121:21 167:19,21 179:2 183:15 185:2 195:18 218:5

**skills** 136:9,13

**slightly** 67:22

**slip** 212:12

**slow** 103:18 190:7

**slurred** 185:19

**small** 133:6, 7 134:5 162:20 185:12

**small-town** 195:15

**smaller** 217:23,24

**snapshot** 63:24

**so-called** 126:8

**Society** 25:16,18 26:17 159:15

**socking** 42:4

**Soft** 22:20 23:7,11, 14,18

**software** 22:24 23:3,22 24:1 156:10 166:10,17

**solely** 84:10

**solemnly** 4:23

**solid** 34:9 130:6

**somebody's** 34:19 173:4 203:3

**sooner** 130:17,18 132:11

**sort** 128:4 144:2 161:7 162:20 175:14 197:7

**sorts** 23:6 68:22

**sound** 27:11 110:18

**sounding** 135:9

**sounds** 127:11 217:4,5

**source** 72:2, 15 196:1 200:17

**speak** 16:20 26:7 27:16 37:1 142:23 159:16 186:12 187:19 198:2,6 200:21 204:6 225:15

**speaking** 15:3 26:12 78:14 93:9 180:15 191:2 222:20 223:18

**specialists** 196:13

**specialize** 160:14

**specialty** 61:14

**specific** 14:16 28:2 32:23 59:9 60:9 93:12 107:4 110:21 136:14 195:3 207:13

**specifically** 12:1 14:22 15:10 16:14 18:2 43:10 54:7 102:24 103:18 105:3 111:6 113:11 135:5 137:16 153:16

**specifics** 8:3 191:21 206:21

**spectrum** 91:18

**speech** 185:19,20

**spend** 16:7 159:6 162:4 223:18

**spent** 20:6 22:11 23:11 36:24 158:9,11 162:1,2 223:4

**spinal** 86:25

**splitting** 44:22

**spoke** 26:9 187:22

**spoken** 16:11,13, 17 28:7 29:7 46:5

**spouse** 213:23

**squad** 167:7

**square** 39:4

**St** 155:23, 24 157:13, 14 158:8 166:1 221:21

**staff** 42:10 115:13 172:11

**stagnation** 129:12

**standard** 6:14 64:9 65:14 66:25 93:2 95:5 124:23 172:19 206:25 207:4,19, 25 214:4, 8,10

**standards** 176:2

**start** 66:14 72:23 164:25

**started** 47:21 158:6,7 160:3 165:25

**starts** 213:14

**state** 4:13 5:11 83:12 104:5 111:15 133:17 167:7 227:3,6 228:1

**statement** 56:3 58:15 72:1,2,6 74:22 75:15 80:11 86:8,19 87:12 131:20 146:22 202:16 210:19

**statements** 41:25 97:19

**states** 64:10 71:12 108:17 111:12,13 112:14 114:17 116:10 117:4 142:2 166:16

**stating** 40:23 99:21

**statistic** 73:5

**status** 176:16 188:1 215:12

**stay** 78:12 123:25

**stent** 152:3 219:2,10 221:3

**stenting** 125:6

**stents** 204:3

**step** 61:15

**stitches** 88:11 212:15

**stood** 144:22

**stop** 88:21 198:24

**stopped** 89:9

**story** 37:22 66:16 157:22 216:15

**straightforward** 124:2

**straw** 218:22

**stray** 60:16

**strengths** 167:20

**strike** 14:1 28:11 74:5 77:20 81:25 91:15 102:7 115:12 137:25 217:12

**stroke** 12:14 15:16 21:15 24:1,6 36:18 41:25 49:4 52:21 53:3,10,14 54:6 56:8, 10,13,20 57:11,16, 23 58:7, 10,14 60:24 63:11 66:24 67:23 68:11,13 69:2,5,6, 15,19,23, 25 71:5,13 72:10,11, 17,18 73:5,7,14, 15 74:1,7 77:14 78:10,13 79:25 80:4 81:16 82:14 84:13 85:21 86:8 88:18 89:7,8,21 99:16 103:23 104:3 105:13,15, 23,25 106:2 115:7 116:16 117:10,15, 16 118:5 126:7 127:13 128:13 131:24 144:17 149:7,9 152:5,20 156:4 157:5,9, 13,15,16, 17,25 158:1 160:25 161:5,10, 20 162:22 163:6,11, 13,17 165:2,15 166:2,13 167:10,12, 13,21 168:3 169:2 177:1 179:7 180:7 181:10,16 184:3 189:11 192:12 193:24 194:23 202:1 206:4,14 208:22 209:24 211:11,13 212:13 213:22 215:22

**stroke-capable** 207:10 208:4

**strokes** 71:14 83:1 133:21,25 134:21 211:11,12

**struggle** 114:17 145:5

**struggling** 109:25

**stuck** 213:13

**student** 161:22

**studied** 17:14

**studies** 40:14 41:3 57:23 64:4 69:24 79:20 99:13 129:6 135:4

**study** 78:9, 15 103:9 104:12,13, 18 107:4 117:16

**stuff** 17:11 104:15 111:18 136:19 150:22 151:7 159:13

**Suarez** 152:17,24 153:2

**Suarez's** 152:18 153:9

**subarachnoid** 95:4 97:4 98:2,13,25 100:2 208:13,16

**subdural** 149:9 212:3

**subject** 58:5

**subjective** 75:13 139:20

**submit** 88:17

**submitted** 10:8

**subscribe** 228:9

**Subspecialties** 163:5

**subspecialty** 158:23

**substance** 17:4 228:6

**subtle** 93:13

**success** 216:15

**successful** 220:19,20 221:4

**succinct** 179:1

**sudden** 185:19 218:24 223:16

**sued** 151:8

**suffer** 80:3

**suffered** 68:12 87:20 89:22

**suffering** 69:25

**suggest** 191:18 193:13

**suggesting** 92:1 93:17

**suggestion** 91:3 134:18

**suggests** 134:25

**suit** 222:15

**suits** 221:14 222:8

**summary** 215:16

**summoned** 41:16

**Sunny** 45:19 47:3 49:24 51:6,8,12, 15

**supersede** 62:5

**supervisor** 204:21

**supplemental** 137:10

**support** 6:13 16:15 33:16 133:1 218:3

**supported** 33:12

**supports** 101:24 107:11

**supposed** 44:17 58:5 150:23 175:20

**surely** 108:25

**surface** 42:18 44:17 46:16

**surgeon** 55:12 136:10 202:9

**surgery** 55:19 136:10 138:25 202:1,11, 13,14 219:24

**surgical** 129:19

**surgically** 127:4

**surmising** 48:13

**surprise** 73:9

**surprised** 73:4 215:13

**surprising** 183:10

**surround** 166:12

**surrounds** 167:6

**survey** 117:25

**suspect** 216:23,24

**suspected** 179:7 180:7 181:9,15

**sustainable** 176:11

**sutures** 89:23

**swamp** 172:24

**swear** 4:20, 23

**swelling** 212:3

**switch** 78:23

**sworn** 5:5 227:9

**symptom** 39:25 62:19 63:22 64:14,20 65:20 66:19 72:12 73:15,23, 25 74:9, 14,19,24 75:5,8 77:9,12 78:7 80:16,20 82:21 88:19

**symptomatic** 128:11,12, 15,19

**symptoms** 61:2 74:2 75:12,16, 18 76:22 77:4 89:21 99:16 184:18 209:1 212:13

**system** 26:14 27:24 30:18 32:9 33:5,25 34:3 102:10,19 104:19 106:13 107:5,11, 14,25 108:13,15 110:19 111:11,16, 17 112:5, 11,14,15 113:15 114:9,16 119:18,24 121:13 122:13,21 156:9 164:22 166:2,8, 14,20 168:9 169:1,2,25 170:11,17, 19,25 171:9,16 172:18,19 173:1,12 175:7,8 176:1,17 179:20 186:7 188:5,6, 11,12 195:5 196:13

**systems** 52:10 103:3,20 113:3 166:18 168:16 170:20 177:25

**T**

**T-E-N-E-C-T-E-P-L-A-S-E** 65:4

**T-U-R-N-E-R** 154:6

**table** 97:1 103:15,16 105:17

**tables** 106:22

**tackle** 138:23 220:12

**takes** 39:7 62:24 100:2 130:5 134:12 200:8 219:2

220:12

**taking** 13:21 20:12 60:17 115:23 131:25 146:3

**talk** 112:19 121:17 130:13 143:25 223:15

**talked** 30:2 57:3 102:17 106:16 142:18 166:6

**talking** 27:21 30:23 31:23 47:6 55:11 58:5 62:15,16 64:2 66:5 67:20 72:7,22 76:11 81:23 84:23 85:8 93:12 104:20,23 106:17 113:11 117:3,18 125:21 127:22 139:14 148:11 190:1 219:5

**target** 107:13 134:4

**task** 58:3

**tasked** 57:18 69:2 77:16

**team** 130:2 160:19,25

**teams** 223:22,23

**technique** 125:9 136:14 219:17 220:19,20

**technology** 23:16

**tecum** 7:3,7, 11

**tele-stroke** 114:6

**teleconference** 143:21

**telehealth** 143:22

**telemedicine** 20:19

**telestroke** 196:14

**telling** 36:2,20,22 37:12 59:14,17 92:3,8 101:22 108:19,21 136:7,12 138:10 179:11

**tells** 185:18 215:16

**ten** 29:1,6 107:13 111:24 113:5 116:18 194:1

**tenectaplase** 66:3,6,13

**tenecteplase** 62:25 63:2 65:4,7

**Tennessee** 17:21 18:8

**term** 195:22

**termed** 201:10

**terms** 32:18 77:22 100:5 128:3

**test** 95:3

**testified** 5:5 54:25 74:18 82:1 113:13 139:10 147:2,22, 23 148:7, 8,9,21 149:7 150:14,18, 21,24 151:4

**testify** 6:15 180:21

**testifying** 149:3,16 180:12 191:20

**testimonial** 147:1 148:18

**testimonies** 125:19

**testimony** 4:24 46:3 48:18 50:21 51:2,22 52:3,13 99:5 101:9,21 109:11 137:25 171:10,23 172:3,13, 16 177:20 178:13

191:1 201:24 211:10 225:2 227:8,9

**text** 16:24 175:10 191:12

**texting** 175:8

**texts** 175:12

**theme** 120:10

**theoretical** 110:21,24, 25

**theory** 79:4 102:6,8 130:14 201:14

**therapist** 144:15

**therapy** 54:17 55:2 57:8 124:16 215:7

**therapy/ mechanical** 123:22

**thereon** 228:8

**thereto** 227:15

**thing** 14:25 44:23 65:12 84:5,6 90:8 100:9 133:5 158:17 174:23 176:1 184:2 188:10 192:14,18 194:6 204:4 211:23

**things** 12:10,16 14:16 15:1 16:5 17:10 22:5,25 44:16 45:3 77:18 80:8 81:14 82:9 90:22 121:10 126:3 131:18 144:2,8 145:16 175:23 176:3 182:23 186:15 194:13 200:25 207:9,15 213:8

**thinking** 43:24 88:13 172:14

**thought** 48:24 89:18 98:22 100:10 166:6 184:5 211:13 226:5

**thoughts** 67:20

**thousand** 9:7

**three-hour** 62:18 65:20

**three-quarters** 22:18

**three-year** 17:25

**threshold** 168:20

**threw** 211:17

**thrombectomy** 123:15,22 124:21 125:3,4

**thrombolysis** 58:7 189:15 207:12

**thrombosis** 103:6

**throw** 132:23

**throwing** 157:22

**ties** 166:17

**time** 4:3 8:5,20 11:3,6,23 12:7 14:13,23 15:24 16:7 18:16,25 19:6,15, 19,22 20:5,11, 12,16 22:11,19 23:10,12, 14 24:8 25:12 26:3,24 28:12,16 29:20 30:18 31:11 35:4 36:24 39:7 40:21 42:13,16 43:25 44:1,2,14, 25 45:9 46:17,25 47:17,22 48:1,14 49:11,16 55:4,14 56:4 57:3

58:4,21,22 59:5,15 61:4 62:14,18, 23,24 63:7,10,25 64:10 65:20 66:24 68:14 69:6,8 72:16 73:6,25 74:2,9,10, 14,19 75:5,8,23 76:2 78:7 79:17,18, 21 81:9,17 82:12 87:6 88:16 91:5,6 94:15 96:17,18 97:1,4,9, 21 98:6 99:1,3,22, 25 100:6 103:25 104:3 106:10,22 110:10 113:5,8 115:24,25 116:12,25 118:1 119:1,11, 14 123:11, 14,22 124:3 126:7 127:2,8, 13,24 128:8,18, 25 129:21 132:10 134:13 137:11 138:16,25 143:23 146:11 147:3 148:6 154:4 157:23 158:9,18 159:6 160:11 161:1,3, 20,22 162:2,4,24 163:22,24 165:9,10 168:6 169:16 171:17 172:9 173:11 175:19 177:2,16 178:1 179:16 181:18,25 182:13 183:3 184:18 186:4,8, 13,19,23 187:8,23 188:17,23 189:4,24 190:2 194:3 195:24 198:5 199:5 200:2,9 204:23 205:2 206:13 207:5,20 208:10,21, 25 211:19, 21 212:6 217:14 223:4,19, 20 224:21

**time-critical** 43:21 176:24 195:10

**timeline** 51:5 52:21

**timely** 122:17,18 173:18 174:25 178:15 208:5 209:19 216:1 218:7

**times** 21:11 28:15,24 56:18 135:14 148:3,5 151:10,11 161:11

**timestamp** 183:1

**timing** 39:23 59:8,10 195:9

**tissue** 59:20 65:25 78:15,19, 20,22,25 79:1,2,6, 14,15 80:3 81:2,6,9, 12,15,19 82:10,16 83:1,6 97:3 98:2, 24 100:4 102:2 130:21 131:3 132:20 209:8,21

**title** 105:21

**today** 6:4,17 7:1,8,11 9:10 10:3, 17,21 72:3 106:9 108:18

135:6 136:8 193:25 197:13 201:1 213:20

**today's** 4:3 7:5 192:20

**told** 14:17 44:19 70:15 134:2 157:22 183:23 190:14,18

**tomato** 203:1

**tomorrow** 159:18

**tonight** 159:17

**tons** 153:15

**tool** 164:12

**top** 9:8 14:15 15:3 54:3 74:21 75:25 76:4,7 115:5 143:9 151:6 176:24

**topic** 26:9 28:2,3 37:1

**topically** 15:3

**topics** 15:3 28:2

**torn** 203:20

**Torwella** 187:12

**total** 8:20 9:12 12:20 18:7 138:8

**totaling** 8:23

**totally** 138:5,13 219:7

**tough** 226:17

**town** 20:12

**townships** 167:5

**tpa** 21:13, 20 22:12 57:25 58:11,14, 17,20 59:1,4 60:25 61:18,19, 24 62:12 63:21,25 64:19 65:22 67:2 70:1 73:17 74:7 77:17,21 78:1,4,10, 17 79:2, 13,21 81:10 82:13 84:25 85:6,12,23 86:21 87:20,25 88:8,12, 15,21,25 89:24 90:12,15, 25 91:12 92:6,16 93:4,8,24 99:9,13,19 101:2 102:23 103:21 104:7 106:14,22, 23 108:2 114:2,11 115:18,25 116:1,9, 11,17,18, 20,23 117:2,10, 13 118:2, 5,11,19 119:1,6,11 124:6,10, 18 125:12 130:9,11, 14 131:7, 21 132:8, 10,12,13, 19,21 133:3,6,7, 18 134:5, 12 161:10 163:22 164:1,13 165:21 173:3,9,19 187:6 192:12 194:2,22 195:19 196:1,8,24 197:2 200:19 208:12,24 209:10 210:2,8 211:7 212:19,24 213:2,12, 19,25 214:3,5,9, 10 216:1, 11,13,18, 25 217:7, 17,22 218:7,11 219:22 221:2

**tpas** 64:13

**tracheostomy** 142:21

**track** 150:22 151:7

**traditionally** 61:13

**train** 157:8 161:24 167:9

**trained** 159:22 161:13 162:10 167:14

**training** 157:3 159:19 160:3,14 162:3 201:25 215:25

**transcend** 35:20 36:25

**transcript** 10:9 198:18 205:12

**transcripts** 192:4,10 197:22 199:19 200:1,9 205:7

**transfer** 7:17 24:18,22 37:2,6,8, 12,14,18 38:4,11,15 39:3,8,13 42:24 44:6,24 46:14 48:22 50:18,23 59:3,18 97:23 102:9 110:4,6, 13,14 178:9 185:4,5

**transferred** 44:5 209:5,19

**transferring** 36:7 37:5, 9 41:18 110:15 111:17

**transfers** 30:11,14 109:21

**transformation** 79:16

**translate** 217:15

**transmit** 10:4

**transmitted** 8:3

**transpired** 189:18

**transport** 43:22 103:2,20 107:25 116:12 191:18 207:9 208:3

**transportation** 190:21

**transported** 49:2 96:24 165:19 173:4,8,11

**transporting** 107:12

**trauma** 85:5, 11,22 86:20,25 87:2,7,8 88:9 89:10,11, 22,25 98:18 166:8 176:25 186:2

**treat** 64:11 114:10 138:21 173:3 187:5 193:25 194:2 204:3 217:21

**treated** 6:14 24:12 29:10 40:24 71:20,23, 25 73:1,13 88:1 101:20 103:6 106:23 107:2 114:8 120:4 133:3 173:9,17 176:6 209:10 211:6

**treaters** 161:16

**treating** 16:18 32:19 33:1,22 39:4 117:13 193:24 211:2

**treatment** 78:1 103:5 108:1 124:10,12, 17 125:3 131:24 154:11 158:1 165:1,15, 21 167:13 173:19 177:4,16

195:3 207:12,14 208:11 209:2 211:6 215:8 216:10

**trees** 121:2

**trial** 147:19 148:4,22 150:25 180:19 221:16,24

**trials** 148:9

**tricky** 219:20

**trigger** 156:10 165:8

**trouble** 65:25 188:7

**troubles** 188:2

**Truck** 150:4

**true** 21:25 45:6 66:14 90:22 94:10 116:17 157:22 228:7,11

**truth** 4:25 6:7,10 45:1 114:9 149:25 183:23

**tube** 203:14

**turn** 86:9 156:13 166:22,24

**Turner** 154:5

**turns** 162:5 170:14

**twelve** 116:19

**two-** 17:25

**two-thirds** 104:10 108:16 173:13

**twofold** 103:4

**type** 19:4 23:19,22 65:25 137:9 169:9,10 183:17 202:23

**typewriting** 227:11

**typical** 110:8

**typically** 78:16,18 129:25 130:8 131:24

**typing** 183:12

**U**

**U-L-I-S-E-S** 13:2

**U.S.** 15:18 191:22 192:6,11, 16,19,20, 23 193:4, 11,23 194:2,3, 15,21 195:25 196:21 200:17 201:2

**UAB** 160:6 165:23,25

**Uh-huh** 104:22 127:1 142:4

**Ulises** 13:2 33:18

**ultimate** 124:11

**ultimately** 101:15 210:9

**unable** 135:6

**unanswered** 137:1

**unavailable** 74:14,19

**uncertainties** 190:19

**unclear** 74:8

**undergraduate** 17:14

**underneath** 79:19

**Unders--** 91:21

**understand** 14:19 36:1 63:12 71:18 116:17 124:8 129:5 167:20 176:21 195:1 196:1 208:17 217:5 220:22

**understanding** 8:6 46:8 49:23 184:20 211:9

**understood** 47:16 132:17 201:1

202:10 204:1 210:21 211:15 212:7

**undoubtedly** 38:14,16

**unequivocal** 179:13

**unfair** 135:21 220:17

**United** 64:10 108:17 112:14 114:17 116:10 117:4 163:5 166:16

**units** 54:6 140:13

**university** 17:21 18:8 19:13 30:3 31:7,12, 15,24 54:22 55:6,17,18 56:1,7 103:22 130:1,2 157:13 158:8,13, 25 160:25 163:10

164:9

**unknown** 146:4 193:18 201:8

**unnecessarily** 119:25 121:4

**unnecessary** 136:16

**unpredictable** 131:16

**unqualified** 92:5

**unreasonable** 48:1 98:17,22

**unsafe** 208:23

**unseen** 116:13

**unskilled** 136:23

**unsuccessful** 220:4,5

**untoward** 199:8

**unusual** 155:9

**unwitnessed** 74:9,15

**update** 69:19

**updated** 56:18 89:7 206:13

**updates** 77:15

**updating** 69:3,16

**upstairs** 181:13

**urgency** 37:8,17 39:13,16 40:8 41:9, 22 42:2,6, 16,21 43:3,4,16 44:13,20 45:23 46:12,14 47:5,10 48:10,16 122:24 123:4 170:5 172:11 174:17 175:1 184:10 190:14,18

**urgent** 39:10 125:3 179:2 185:15 190:21

**urgently** 125:11

**urine** 146:9

**USA** 150:4

**utilizing** 170:6

**utmost** 46:20

**V**

**variability** 88:22 89:19

**variable** 91:17

**variables** 146:1

**varies** 80:5 92:22

**variety** 71:25 207:15

**vary** 80:4

**vascular** 17:12 22:5 48:25 53:18 83:18 88:24 91:19 92:14,20 93:2,5,14 94:8,12, 14,19,23 95:6 100:18 116:16

157:20 159:15 160:1,5,8, 9,10,15,22

**vectors** 219:18

**vehicles** 204:10,13

**Venezuela** 17:15

**verbal** 145:12

**verdict** 147:24 149:2 222:1 225:3

**version** 81:22 85:11

**versus** 4:11 5:25 23:11 95:7 177:8,12 193:17 206:11,16

**vertebral** 125:6,16 126:5,18, 22 127:15 128:9,18, 24 129:10 130:24 132:6 133:3 134:23 138:3,13 139:8 140:2 211:17 218:9,13 219:23

**vessel** 125:25 126:1,6 127:12,14 129:7 135:16 136:2 138:21 152:5 203:17 218:18,20 219:10,15

**victim** 189:11

**video** 4:4 141:21

**videoconference** 215:1

**videoconferenced** 141:12

**videorecorder** 180:20

**videos** 115:6,7

**view** 20:10 33:9,11, 13,14,15 34:6 35:22 95:16 97:12,14 124:1 164:21 211:3

**virtual** 144:9

**virtue** 32:11,16, 25 34:20 36:15 37:4 38:25 92:19 98:23 144:8 216:10

**visit** 15:22, 25 27:8 29:7 164:19

**visited** 26:22

**Visiting** 27:3

**visual** 143:18 144:1

**vital** 189:21

**voice** 198:10

**Votapka** 149:22

**Vrazel** 150:1

## W

**wait** 117:14 120:13 125:11 188:13 197:4

**waiting** 185:24

**waive** 226:13

**WAIVED** 226:24

**walk** 184:23

**wall** 220:15

**wanted** 30:9 141:7 143:11 163:12 205:14

**Warfarin** 24:4

**warning** 86:21 87:2 126:19 182:11

**warrant** 89:25

**waste** 179:16 198:5

**watch** 46:3

**water** 79:10

**watermark** 11:17

**ways** 60:10 114:7 160:7

**weakness** 33:4 185:20 213:22

**weaknesses** 167:21

**websites** 15:9,12, 14,22,25

**week** 13:5 19:1,2,3 55:21 132:15 161:8 220:12

**weekend** 223:7

**weekly** 18:6, 12

**weeks** 18:7, 9,12,23 132:15 161:3 198:21,22, 23 199:21 200:3 214:14

**Well,in** 66:6

**well-established** 89:15

**well-known** 158:15

**whatsoever** 87:13 174:17 178:21 218:6

**wheelchair** 144:22

**wheels** 64:8

**When's** 57:3

**Whoa** 103:17

**window** 72:19,24 73:6,12

**witnessed** 74:2,3,20, 23 75:6,8, 17 77:4

**witnesses** 77:12 172:5

**woke** 40:20 75:23

**won** 221:25

**word** 64:21, 22 198:14, 15 201:3

**wording** 68:7,15

**words** 11:10 15:8 16:8 43:10,19 47:15 49:5 57:13 60:12 61:5 64:18 78:2 79:6,9 80:7 103:1,7 108:3 126:16 184:3 189:10

**work** 18:20 19:13 35:3 55:17 90:20,21 107:1,7 108:13 109:1 111:5,7 112:12,17, 18,19 113:1 114:19 119:18 121:7 158:18 162:23 165:14,18 167:18 172:20 188:14 195:6 196:13 198:8 202:5,10, 21,24 203:2,24 223:3,4

**workaround** 196:13

**worked** 20:24 24:8 35:8 55:6 179:14

**workflow** 164:5 165:5 184:9

**working** 19:10,15 36:13 55:13 94:12 112:5,16 121:6,10 154:17,19 158:6,7,14 172:14,17 173:1 200:3

**works** 33:25 34:3 36:9 54:21,24 108:7 110:19 111:12 112:22 113:13,15 154:5 164:17 195:24

**world** 12:14 15:18 124:21

192:16,19, 20,24 193:4,11, 23 194:2, 3,15,21 201:3

**worse** 216:18 217:3,15

**worsening** 217:15

**worst** 179:21

**worthiness** 196:17

**worthy** 193:24

**would've** 28:7 41:5, 20,21 82:13 84:1,4,10 91:6 97:10,25 98:3,6 99:1,4 102:10 112:8 114:23 115:18,20, 21 119:11, 14 120:18 122:3,5,6 124:17 125:5 130:20,22 131:3,7, 12,15 132:6 134:1 137:23 207:2 210:18 221:2

**wrap** 116:6

**wrist** 204:2

**write** 22:24 23:2 57:16 58:6 199:25

**writing** 23:3 123:20

**written** 11:9 12:5 13:10 63:11 67:25 74:7 77:15 85:4,14,16 89:7 108:2,3 113:24 141:17,25 213:8

**wrong** 46:9 62:10,11, 16 91:13 92:2 95:14 217:6 222:18

**wrote** 85:10 135:5 136:25 141:10 213:7

**Wyndham** 25:22,25

### Y

**Yavagal** 56:24 57:1 89:2 127:12 161:20

**year** 18:6 114:11 159:1 160:8,9 161:5,11 164:18 166:14 173:3 175:11 223:14

**years** 20:6 22:21 28:18 29:1,6,19 30:1,7 31:8 37:10 55:16 61:18 69:7,12 71:21,22 73:2,10 77:16 83:18,25 84:3,11 89:9 91:22,23, 24 107:12 108:10 121:6 135:24 136:18 148:8,11 157:24 158:11 160:8 161:23 162:18 175:7 179:12 187:25 201:24 206:19 215:24 223:25

**yelling** 198:10,12

**young** 160:21

### Z

**zip** 7:20,22

**Zoom** 214:25