UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO: 1:20-cv-20687-AOR
AT LAW AND IN ADMIRALTY

RICHARD BURGESS individually and by and through DARREN HENZE as Guardian of the Person and Estate of Richard Burgess, incapacitated and as agent under that certain durable power of attorney dated November 20, 2006.

Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, d/b/a ROYAL CARIBBEAN CRUISE LINE and/or ROYAL CARIBBEAN INTERNATIONAL,

Defendants.
__________________________________/

REMOTE VIDEOCONFERENCE DEPOSITION OF
DR. BEN SHORE

TAKEN ON BEHALF OF THE PLAINTIFFS

Friday, November 5, 2021

10:08 a.m. - 6:32 p.m.

Stenographically Reported By:
Paul C. Haferling, RPR, FPR
- - - - -

APPEARANCES

On Behalf of the Plaintiff:
HICKEY LAW FIRM, P.A.
1401 Brickell Avenue
Suite 510
Miami, Florida 33131
Slobel@hickeylawfirm.com
BY: SARAH A. LOBEL, ESQ.
APPEARED BY VIDEOCONFERENCE

On Behalf of the Defendant:
GRAY ROBINSON, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
michael.drahos@gray-robinson.com
BY: MICHAEL DRAHOS, ESQ.
APPEARED BY VIDEOCONFERENCE

ALSO PRESENT:

Roderick Pratt
Videographer



INDEX OF PROCEEDINGS


| | | |
|---|---|---|
| Deposition of Dr. Ben Shore | | Page |
| Direct Examination by Ms. Lobel | | 5 |
| Certificate of Oath | | 301 |
| Certificate of Reporter | | 302 |
| Notification Letter | | 303 |
| Errata Sheet | | 304 |
| | Plaintiff's Exhibits | |
| 1 | Notice | 40 |
| 2 | Bill of Rights | 40 |
| 3 | Website | 60 |
| 4 | Bates Stamp Document | 279 |
| 5 | Document | 288 |
| 6 | PDF Bates 1 through 80 | 299 |
| 7 | Bates 81 through 444 | 299 |
| 8 | Bates 445 and 446, | 299 |
| 9 | Bates 447 through 465 | 300 |
| 10 | Bates 446 through 545 | 300 |


(Exhibits Were Retained by Ms. Lobel, Esq.)



Deposition taken before Paul Haferling, Registered Professional Reporter, Florida Professional Reporter, and Notary Public in and for the State of Florida at Large, in the above cause.

*******

THE VIDEOGRAPHER: Good morning. We are now on the record. Participants should be aware that these proceedings are being recorded and as such all conversations will be recorded unless there is an agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface. For the purpose of creating a witness only video record, the witness is being spotlighted or locked on all video screens while in speaker view. The witness should not remove the spotlight setting during the deposition as it may cause other participants to appear on final video rather than just the witness. For anyone who does not want the witness to take up a large part of the screen, you may push the gallery view button in the upper right-hand corner of the remote depo interface. This remote video recorded deposition of the corporate representative for Royal Caribbean Cruises, LTD, Dr. Ben Shore, is being taken by counsel. Today is



Friday, the 5th day of November of 2021. The time now on the video monitor is 1402 UTC Time. Local time is 10:02 a.m., Eastern Standard Time Zone. We are here in the matter of Richard Burgess versus Royal Caribbean Cruises, LTD. My name is Roderick Pratt, remote video technician on behalf of U.S. Legal Support. I am not related to any party in this action nor am I financially interested in the outcome. At this time will the reporter, Paul Haferling, on behalf of U.S. Legal Support, please give a statement for remote proceedings into the record.

*****

THE COURT REPORTER: Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

Thereupon,

DR. BEN SHORE,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LOBEL:

MS. LOBEL: Dr. Shore, before I start asking you questions as Royal Caribbean's representative, I just

want to put on the record that the parties spoke off the record regarding the production of documents in this case, and my understanding is there is a stipulation from Royal Caribbean as to the authenticity of all documents produced as of today's date.

MR. DRAHOS: Royal Caribbean has stipulated to the authenticity of records produced today by Royal Caribbean.

BY MS. LOBEL:

Q. Dr. Shore, you came here to speak as Royal Caribbean's corporate representative today; is that correct?

A. Yes, ma'am.

Q. In anticipation of your deposition today, you are aware that you were brought in order to speak with regard to specific issues that were designated in our notice of deposition?

A. Yes, ma'am.

Q. Did you review that notice of the deposition in anticipation of today?

A. Yes, ma'am.

Q. Dr. Shore, give me one second. I will share my screen with you and confirm the notice that you reviewed. Can you see the document? It is a 10-page document. It's up on --



A. No, I cannot.

Q. One second. It looks like I am frozen. Can you see the ten pages on your screen?

A. You can see the top page.

Q. What I will do is I will scroll down, and I am going to keep moving down until we get to the section with the designations, which was attached as Exhibit A. Do you see that portion?

A. I do.

Q. Did you review all of the designations, one through -- I will keep going down, one through 47.

A. I reviewed the designations with counsel in preparation for this deposition.

Q. In anticipation for today's deposition, are there any designations which you are not prepared to spoke to?

A. Let me address that one.

Q. I just want it on the record.

MR. DRAHOS: Dr. Shore will not be presented today to discuss areas of inquiry 44 through 47. We have also raised objections to some particular areas, one, two, six, seven, 10, 13 and 39. We will obviously attempt to get through the deposition with as little interference or objection as possible. We did put that on the record in advance in an abundance



of caution. I did advise counsel that the two areas that we absolutely will not testify to today, absent that court order, is areas 10 and 13. The rest of those areas we will just take them question by question, hopefully be able to get through the deposition today without difficulty. Thanks.

MS. LOBEL: Thank you, Michael. For the 10 and 13, I may ask questions, and if you raise your objection, just raise your objection and we will preserve it to take it to the court, okay?

MR. DRAHOS: Thank you.

THE WITNESS: Can I ask counsel to notify me if we are entering into those areas. I don't know what is being dealt with.

BY MS. LOBEL:

Q. We will take it as we go, and if there is something that you are not prepared or are not the person who has full knowledge, and it does fit within one of the areas of inquiry, just let me know and tell me who, if you know, is the person who would have that knowledge or best be able to speak to something should that come up, and we will address it question by question; is that fair?

A. Yes.

Q. So in anticipation of today's deposition, did



you speak with Royal Caribbean's attorneys?

A. No.

Q. What did you do to prepare for today's deposition?

A. I spoke with Mr. Drahos, who represents Royal Caribbean.

Q. You did speak with Royal Caribbean's attorneys?

A. I don't want to split hairs, but I have not spoken to any attorney who worked at Royal. I have spoken with Mr. Drahos, who represents Royal.

Q. When I say Royal Caribbean's attorneys, I mean any attorney that represents Royal Caribbean, okay?

A. Okay.

Q. With that understanding, have you spoken with any attorney that represents Royal Caribbean?

A. Yes.

Q. Who did you speak with?

A. Mr. Michael Drahos.

Q. Did you speak to anybody else?

A. No, ma'am.

Q. How many times did you speak with Mr. Drahos in anticipation of today's deposition?

A. Approximately three times.

Q. Was anyone else present?

A. No.

Page 10

Q. Were those conversations in person?
A. They were by video.
Q. Similar to what we are doing right now?
A. Yes.
Q. Do you recall when the first video conference you had with Mr. Drahos?
A. Yes.
Q. When was that?
A. November 1st, 2021.
Q. How long was that conversation?
A. One and one half hours.
Q. Did you review anything during that session?
A. Yes.
Q. Can you tell me all of the items you reviewed, without telling me what you discussed?
A. We reviewed the deposition notebook listing the various documents that were to be produced, and we reviewed the various documents that were listed in the index that was prepared by Mr. Drahos.
Q. Did you review anything else?
A. No, ma'am.
Q. So after the session that you had on November 1st of 2021, when was the second conference that you had?
A. November 3, 2021.
Q. How long was that conference?

Page 11

A. Two hours.
Q. Can you tell me everything that you did to prepare during those two hours without telling me what was discussed?
A. The same, a review of documents and similar review of the interrogatories prepared by your office.
Q. Were any additional documents given to you for your review between the first session and the second session?
A. No, ma'am.
Q. The last conference that you had to prepare for today's deposition was when?
A. November 4, 2021.
Q. How long was that session?
A. Two hours and 45 minutes.
Q. Without telling me what was discussed, can you tell me everything that you did during that prep session?
A. Similarly to the other two sessions, we reviewed the documents and we prepared responses to your interrogatories.
Q. Were any new documents or any other items given to you for your review during that session that you had previously seen on November 1st -- November 3 of 2021?
A. No, ma'am.
Q. Did you do any preparation without Mr. Drahos

Page 12

or anyone else in anticipation for today?
A. Yes.
Q. Can you tell me everything that you did?
A. Yes, I can.
Q. Okay. Go ahead, please tell me everything that you did. I apologize.
A. I reviewed the deposition of Mr. Darren Henze.
Q. What else?
A. That's the total review.
Q. How long did you spend doing that?
A. Three hours.
Q. Did you watch the video or did you just read the transcript?
A. I read the transcript.
Q. Did you review the transcript of Richard Burgess?
A. No, ma'am.
Q. Were you given a copy of the transcript of Richard Burgess?
A. I don't know the answer to that as part of this deposition, I am sorry, but I have a very large amount of documents listed, I am not sure.
Q. Understood. If it makes you feel better, I reviewed those huge number of documents as well.
All right. So is it your understanding, just

Page 13

the simple basics of this case, that this case involves a former RCCL passenger by the name of Richard Burgess?
A. Yes, ma'am.
Q. And Richard Burgess was a passenger on Royal Caribbean's Harmony of the Seas?
A. Yes, ma'am.
Q. And he was disembarked from the Harmony of the Seas on February 21, 2019?
A. Yes.
Q. And the disembarkation was related to the fact that he was suspected of suffering from a stroke at the time?
A. That was the suspicion. That was a preliminary diagnosis.
Q. And you worked for Royal Caribbean, correct?
A. Can you say that again?
Q. You worked for Royal Caribbean, correct?
A. I did work for them in the past, yes.
Q. Do you currently work for Royal Caribbean?
A. Only in the purpose of providing corporate representation.
Q. My understanding is that at some point you were working as kind of on a consultancy basis for Royal Caribbean?
A. Correct.

Page 14

Q. Has that changed as of today's date?
A. Yes.
Q. When did that change occur?
A. July, 2020.
Q. What was the reason for the change in the role?
A. End of my consultancy.
Q. Did you end the consultancy relationship or did Royal Caribbean?
A. Royal Caribbean.
Q. Do you know why?
A. No, ma'am.
Q. How many corporate representative depositions have you given since July of 2021 until today's date since Royal Caribbean ended your consultancy position?
A. Only this one so far.
Q. Understood. Who has now assumed your former role as the head consultant for the company?
A. There is no head consultant at this point.
Q. So I understand, I understand you were working as a consultant, but what was your former title when you were acting as the consultant for Royal Caribbean?
A. Chief medical consultant.
Q. Are you saying that Royal Caribbean, as of today's date, no longer has a chief medical consultant?
A. There is no chief medical consultant.

Page 15

Q. Who assumed the roles and responsibilities which you previously assumed for Royal Caribbean as of today's date?
A. Dr. Calvin Johnson.
Q. What is his title?
A. Chief medical officer.
Q. Was Mr. Calvin Johnson part of the company back in 2019?
A. It is Dr. Calvin Johnson.
Q. Sorry. I apologize. Dr. Calvin Johnson?
A. Correct.
Q. Was he with the company back in 2019?
A. No, ma'am.
Q. When was he hired, if you know?
A. I don't know the exact date, but it was approximately July -- June or July of 2020.
Q. Back in 2019 you were still acting as chief medical consultant for Royal Caribbean?
A. Yes, ma'am.
Q. Was that position as an actual employee of Royal Caribbean?
A. No, ma'am.
Q. What was your business relationship with the company when you were formerly as chief medical consultant?

Page 16

A. As a consultant.
Q. Did you have an office in the Miami Royal Caribbean offices?
A. Yes, ma'am.
Q. Did you do all of your work as chief medical consultant for Royal Caribbean through that office?
A. Large part of it. There is also telephonic communications. There is computer based communications. There is video team meetings and such, and, of course, COVID shifted the bulk of that from presence in the office in its entirety in March, 2020. It was shifted entirely to telephonic communications.
Q. Understood. You and me both. As you can see, I am in my house. We are going back to 2019. Back in 2019 were you -- what percentage of work would you say you were doing from within your office at Royal Caribbean's offices when doing work on their behalf?
A. I would say over 90 percent.
Q. Can you tell me about all of the responsibilities and duties you had as chief medical consultant back in 2019?
A. It would be hard for me to list all of the duties, but I can highlight some of the aspects of the job.
Q. Please do.

Page 17

A. I was responsible to give advice to public health, the public health program and their employees. I was responsible for participating with the legal team in reviewing any forensic issues with the company. I was responsible for providing support to the teams on the ships. I was partially responsible for review of any new built plans. I was responsible for participating in board of directors meetings, higher level meetings with the executives, and that is a short list of the duties. That is essentially a brief review of some of the duties.
Q. Now, you mentioned that you would assist the legal team with forensic issues. What do you mean by that?
A. That means that if there was any legal matters to review, I would participate in that review from the medical side.
Q. So, for example, for all reviews of situations involving a passenger or crew member who was medically disembarked and there may not have been a legal issue, you would have participated in the review?
A. Yes, it was not only for legal issues necessarily, but it was to make sure that we cooperated correctly and we abided by the various requirements, policies, that we adhere to the guidelines that were established, and it is a variety of different, you know,

different situations, whether it was a legal case that had come up, whether it was a review of a crew member that wished to come back to work, whether he met certain guidelines and requirements. It was quite an expansive duty, but the only way I can summarize it is by saying it was a review of any forensic concerns for the company.
Q. Aside from when a legal issue would come up, say there is a claim or an actual lawsuit having to do with a medical disembark or evacuation, what other instances, which you have done, what you are terming as a forensic review of other instances involving a disembark or medical evacuation?
A. It would be -- sorry.
MR. DRAHOS: Objection.
THE WITNESS: May I answer that?
MR. DRAHOS: Yes. Do not reveal any discussions that you may have had with counsel or why counsel wanted to do a certain type of review. You can answer the question as it's been asked, which is what did you do. Please don't reveal any internal discussions or strategies or thoughts of counsel.
A. Very good. There would be -- again, to name a few, I am not sure I can cover the expanse of services. That may have come to my attention, but it would be such issues as whether a crew member was medically stable to



return to duty, who is appealing to return to duty. I would participate in meetings with other various departments who would have input into that decision. There were issues as to whether a new applying crew member met standards as established in the MSN guidelines, the merchant shipping notices. Any issues that might have had a legal bend to it, I would participate in from purely from medical advisory purposes.
BY MS. LOBEL:
Q. Understood. My question is a little bit more narrow than that. Focussing purely on medical disembarks and medical evacuations, you mentioned if there was a claim or a lawsuit, you would be consulted for those instances. What I want to know is aside from when there was an actual formal claim or lawsuit, when else would you be involved in a forensic review of a situation involving a medical disembark or a medical evacuation of either passenger or crew?
A. If there is a need, if it was felt by management that there was a need to review a case, I would participate in the review.
Q. Were there instances where that occurred, where management asked to review an instance?
A. Not that I can remember at this time.



Q. Had you reviewed a situation involving a medical disembark or evacuation that was not related to a claim or lawsuit and management asked you to do it, would you have documented that?
A. No, ma'am.
Q. Why not?
A. Because there would or would not -- there may or may not have been an attorney present, and we discussed those kinds of issues internally.
Q. Were there ever instances where an attorney was not present, where you would have a conversation about a medical disembark or evacuation, just internally with the medical department or any form of management?
A. We could have had conversations, but I can't recall.
Q. Is that something you would have sent e-mails about perhaps?
A. Not likely, no.
Q. You also mentioned that your responsibilities included supporting teams on the ships. Are the teams that you are referring to the medical teams?
A. Yes, ma'am.
Q. What sort of support would you provide the medical teams on board ships?
A. There were occasions where I might have been



called and asked if I had any further input to a case, and if there was, I would provide whatever support that I could provide.
Q. Was that support that you provided sort of like a shoreside on call?
A. We had a help -- I am sorry.
MR. DRAHOS: Go ahead. I am stating my objections. Objection.
A. We had a help line available to oversee and to overhear what was going on on the ships when advice was assumed to be beneficial. So at times I might participate in some of those calls.
BY MS. LOBEL:
Q. So the help line that Royal Caribbean has for support for medical teams on the ships, was there a rotation as to who would be answering the line?
A. Yes, ma'am.
Q. And is it fair to say you were on that rotation at times?
A. I was available in case someone could not be reached.
Q. So you were the backup if whoever was designated to the help line was unavailable to answer a call, you would therefore be the person to call?
A. That is exactly correct.

Page 22

Q. Understood. Who would have been on rotation on the help line? Would those folks have been personnel from Royal Caribbean or elsewhere?
A. Yes, ma'am. Employees at Royal Caribbean.
Q. How many employees from Royal Caribbean are designated to be on the rotation for the help line?
A. Approximately four to five.
Q. Are the four to five individuals who are on rotation for the help line all doctors?
A. Yes, ma'am.
Q. And those doctors were shoreside employees for Royal Caribbean?
A. Yes, ma'am.
Q. What title would those individuals hold?
MR. DRAHOS: Can I ask you all to put us on hold for a second. It is my daughter's school calling.
THE VIDEOGRAPHER: Off the video record at 1429 UTC time. Local time is 10:29 a.m.
(Brief recess.)
THE VIDEOGRAPHER: Back on the video record at 1432 UTC time. Local time is 10:32 a.m.
BY MS. LOBEL:
Q. So Dr. Shore, before we went off the record, we were talking about the four to five employees who were on

Page 23

rotation to receive calls, from the help line from RCCL ships. My question to you is, the doctors who are employed by RCCL to do that, what job title do they hold?
A. Doctor.
Q. Is the job description the same as the doctors who are on the ships?
A. There is no job description for that position.
Q. Aside from answering calls on the help line, what other job responsibilities do RCCL shoreside doctors have?
MR. DRAHOS: I object to form.
A. A variety of different positions that assisted with the coverage of the help line, and that is all I can say, there is just various job titles.
BY MS. LOBEL:
Q. What various job titles would there be for the four or five people?
A. One doctor was a ship physician, who was not on duty at the time. Another doctor was a medical manager in the office. Another doctor was in the United Kingdom servicing our compliance with UK and EU rules. I am trying to remember the various people that supported the help line. That gives you pretty much an idea of the various nature of the positions that help support the help line.

Page 24

Q. If I am understanding you correctly, the shipboard physician who would be on the rotation, would be off duty, does that mean they would be off the ship?
A. Yes, ma'am.
Q. Would they be off contract or on contract?
A. Off contract.
Q. Understood. That individual could be from whatever country they are located in the world?
A. It happened to be from the United States.
Q. Understood. Do you recall where in the United States?
A. One of the northern states, but I don't remember which.
Q. Just curious. And then the position that you described as medical manager?
A. Yes.
Q. Do you recall that? What does the medical manager do?
A. Medical manager is someone who works in the office, and has a variety of duties. It would include, for example, reviewing vaccination adherence on the ships. Preparing reports, assisting a public health team, participating in return to work committee meetings for crew members. It is a variety of duties for medical managers.

Page 25

Q. When you say they work in the office, would that would be the Miami office?
A. Yes, ma'am.
Q. Understood. My understanding is that your medical license is a D.O., as an osteopath?
A. Yes, ma'am.
Q. When did you receive that license initially?
A. 1977.
Q. Is your license still current?
A. Yes, ma'am.
Q. My understanding is that you also -- you have certifications in both pediatrics and emergency medicine; is that correct?
A. No. I am still board certified in pediatrics, and I chose to allow my certification in emergency medicine to expire as of December of 2020. It was a personal choice. I recertified three times in the past and chose not to go through that process at this time.
Q. When was the last recert that you did for pediatrics?
A. There is no recert required.
Q. That is what I thought. I know for M.D.s it is a lifetime. Is the same true for osteopaths?
A. Yes, ma'am. I happen to be board certified by the medical -- the allopathic profession. I am a fellow

in the American Academy of Pediatrics.
Q. Understood.
A. I was board certified -- I was a fellow in the College of Emergency Physicians.
Q. Are you still a fellow with ACEP?
A. No. You have to be board certified to be a fellow.
Q. Your fellowship lapsed with the certification lapse?
A. Correct.
Q. What is the recertification period for osteopaths for board certification?
A. It would have been for allopathic recertification.
Q. I keep saying that.
A. That's correct. That's okay. That is every five years. I am sorry. I could be mistaken. It may be every 10 years, I am sorry. I would have to look it up. I just don't remember.
Q. It is either five or 10 years?
A. Yes, ma'am.
Q. My understanding is that you never worked as a shipboard physician for any cruise line?
A. That's correct.
Q. Before you started doing the medical



consultancy work for Royal Caribbean, you worked for Norwegian Cruise Line?
A. That's correct.
Q. From when until when did you work for Norwegian Cruise Line?
A. I would have to do a bit of math, but basically I was the chief medical consultant for Royal for approximately six to seven years, and before that I was the chief medical consultant for Norwegian for 13 years. So it goes back approximately 20 years.
Q. Why did you leave Norwegian?
A. There was a change in management, and I felt that I was approaching retirement age, and it was a personal decision.
Q. How did the change in management affect your personal decision to switch cruise lines?
A. It is a difficult conversation. It is just a different way of handling new people managing me, and I just was not comfortable remaining.
Q. Did you pursue Royal Caribbean or did they pursue you?
A. In terms of hiring me?
Q. Yes.
A. They pursued me.
Q. Did you replace somebody, or were you in a new



position that was created within the company?
A. I replaced someone.
Q. Who did you replace?
A. Dr. Arthur Diskin.
Q. Now, when you were working for Royal as the chief medical consultant, did you oversee just one cruise line or several lines within the Royal Caribbean group?
A. I was chief medical consultant for all the various lines under the Royal Caribbean banner.
Q. Did that include Azamara?
A. Yes, ma'am.
Q. Did that include Celebrity?
A. Yes.
Q. We know that included Royal Caribbean?
A. Yes, ma'am.
Q. Did that include Pullmantur?
A. Pullmantur operated out of Spain. They had their own chief medical doctor. I think her title was director of medical operations, and so they operated somewhat independently.
Q. Did you have any participation in the medical operation with that line?
A. Very little, if any.
Q. What about T-u-i-c?
A. Tuic? Very little. Similar to Pullmantur.



Q. What about Silver Seas?
A. Silver Seas came late in my tenure with Royal. It was just in the process of being incorporated into the works of the Royal Caribbean group.
Q. Did you participate in setting up the medical -- strike that.
Did you have any participation in anything from the medical perspective or setting up the acquisition of Silver Seas?
A. Very small amount of participation.
Q. Approximately how many cruise ships did you participate in the oversight from a medical perspective?
A. Approximately 60 plus.
Q. That was across all the different cruise lines, correct?
A. Yes, ma'am.
Q. How many vessels would you have been responsible for, specifically to the Royal brand, the Royal Caribbean cruise line brand?
MR. DRAHOS: Objection to form.
A. I can't answer that accurately. I don't know the exact number.
BY MS. LOBEL:
Q. Were the medical procedures used for the Royal Caribbean Cruise Line brand used across all of the lines

Page 30

that you oversaw, or were there specific procedures for each line?
A. Generally the lines adhere to the SQM, which is the management policy living document. However, Tui and Pullmantur would like -- they had a process of maintaining their own I guess you would say policy manual.
Q. If I am understanding you correctly, the SQMs used for Royal Caribbean would also be used for the Azamara line and the Celebrity line and eventually the Silver Seas line?
A. Correct.
Q. Did the same medical department -- strike that. Was the same medical department shared across all of the lines that we discussed.
A. I don't understand the question.
Q. Certainly. My understanding is within the Royal Caribbean group, there is something known as shared services?
A. Yes, ma'am.
Q. Was the medical department considered a shared service across Azamar, Celebrity, Royal Caribbean, Pullmantur, Tui and Silver Seas?
A. To be specific, the shoreside program was a shared service. The doctors, however, were generally

Page 31

focussed on or provided service to a specific line.
Q. So the shared service was the shoreside department, and this is exactly what my next question was. For example, if a doctor had a contract with Royal Caribbean and hired Royal Caribbean, they would not be used on a Celebrity ship?
A. Generally that is very true, but on occasion there was a need to move a doctor from one ship to another, so we did not hesitate to move a physician from one line to another. As a rule we like to maintain the various physicians on the lines which they were familiar.
Q. If a doctor worked on a Royal Caribbean ship, were the job and responsibilities, essentially what they were hired to do, the same as a doctor on a Celebrity cruise ship?
A. Can you state that again? I want to make sure I answered it accurately.
Q. Absolutely. If I am a Royal Caribbean doctor, and I only worked on Royal Caribbean ships, but the shoreside department decided they wanted me to work on the Celebrity ship, would my job responsibilities and role be essentially the same as when I worked on the Royal Caribbean ship?
A. Yes, ma'am.
Q. Would there be any differences in job

Page 32

responsibilities or procedures if I worked on a Royal Caribbean ship as opposed to a Celebrity ship?
A. There would be minor differences, but I don't believe you would have any problem accommodating it.
Q. And are you aware that Royal Caribbean is incorporated in the Bahamas?
A. Yes.
Q. Have you ever worked in any Bahamian office on behalf of Royal Caribbean?
A. No, ma'am.
Q. You only worked out of the Miami office?
A. Correct.
Q. Although you have not been a shipboard doctor, have you ever done work in the scope of your duties aboard any of the Royal Caribbean group vessels?
A. No, ma'am.
Q. Would there ever be an occasion when in the scope of your employment you would go on to a Royal Caribbean or one of the other line ships?
A. I would go on them, yes.
Q. For what purpose would you go on a vessel?
A. To take a cruise with my wife. That would be one instance. Another instance would be to visit a group of doctors and nurses who are shoreside in Miami, and on certain occasions I would visit a ship. If it was an

Page 33

inaugural, that would be another reason I might visit, or to take a look to see the operations of a ship.
Q. How frequently would you go to see the operations of a ship, specifically the medical department?
A. Possibly quarterly.
Q. Was that one of your job responsibilities?
A. It was not a delineated responsibility.
Q. During those possible quarterly visits, what specifically would you do?
A. I would like to become familiar with the nurses and doctors personally. I would like to look around the medical center to see that things appeared to be clean and well maintained. I would ask if there were any questions. I would review with the various staff members how they enjoyed working with Royal, and ask them if there was anything we can do shoreside to provide even better support than we did.
Q. Is there anyone designated to do routine inspections of the medical centers on Royal or any of the other brands' medical centers?
A. Yes, ma'am.
Q. Can you tell me about that?
A. Yes. There are various levels of inspection. The Coast Guard has an inspection schedule. We have an

internal nurse who visits the various ships and uses that opportunity also to update the advanced cardiac life support, pediatric advanced life support certifications of the doctors and nurses on board. And in terms of inspections, there are drug reviews to make sure that the drugs are adequate and that they are properly maintained and counted if they are controlled substances, and that was done on a monthly basis, and it was done anytime there is a change in staff members.

Q. Who would perform that job?

A. The nurses and doctors who were on duty.

Q. Would they send a report shoreside to show that the monthly inspection was done?

A. They would keep it in the records on the ship.

Q. In what system would that be kept?

A. In the Tritan software known as SeaCare.

Q. With regard to the internal visits from the nurse having to do with the recertifications, is that nurse a Royal Caribbean employee?

A. Yes, ma'am.

Q. Was that nurse a shoreside based position?

A. Yes, ma'am.

Q. What was the title of that position?

A. I don't know her exact title.

Q. Understood. I know this is self-evident, but



we need to go through it. Royal Caribbean offers medical care to its passengers on its ships?

A. Yes, ma'am.

Q. And Royal Caribbean also has an entire medical department shoreside?

A. Yes, ma'am.

Q. That medical department we have already discussed is a shared service across all the Royal Caribbean group lines, correct?

A. Yes, ma'am.

Q. How many employees, more or less, are there within the shoreside medical department?

A. It fluctuates, but I would like to say approximately 10.

Q. Are all of those individuals employees of the company or independent contractors?

A. Yes, ma'am.

Q. Are they employees or are they independent contractors?

A. They are employees, and I am an independent contractor.

Q. Got it. Would you be the 11th person or are you within the 10?

A. I would say it's an approximation, so I would say I am probably within the 10th.



Q. Understood. So as part of Royal Caribbean's choice in providing shipboard medical care, does the company advertise the fact that it provides medical care to potential cruise purchasers?

A. There are documents that your law firm was provided I think, that shows the various presentations that are available on the internet.

Q. And one of the ways that Royal Caribbean advertises shipboard medical care is on its website, correct?

A. To be honest with you, I am not privy to the various public relations that are available to the general public. It is not what I do, but I have been shown some of those sites that your law firm pointed out.

Q. I understand it may not have been your duty, but I am not deposing you in your individual capacity. From a corporate representative perspective, did the company advertise the fact that it offers medical care on its ships?

A. Yes, ma'am.

Q. And the company decided to make that advertisement in part on its website?

A. Yes, ma'am.

Q. Would the company also advertise the fact that it provides shipboard medical care through other means



other than the website?

A. That's a vague question. I am sorry, I can't answer it.

Q. The company advertised that it provides medical care on its ships, on its website. We have already established that. Would it send out, and part of its paper, written material, like the mailers I get in the mail from Royal Caribbean, is there information about the fact that medical care is provided in that type of capacity?

A. I have looked at the various mailings that I received as well as a consumer, as a customer, and I really don't recollect any references to the medical care available in any of the mailers that I received.

Q. With regard to the advertisement that addresses the medical care or the medical department, who would have participated in writing those advertisements?

A. That was done quite a while ago, and I don't believe I ever participated in it as the chief medical consultant.

Q. Would the medical department have been involved?

A. Yes. I believe they were.

Q. My understanding is that part of the advertisement tells potential purchasers of a cruise that

Page 38

there is, in fact, a shipboard medical center on board Royal Caribbean ships; is that accurate?
A. Yes.
Q. The advertisement also informs the public that the medical centers on Royal Caribbean ships are there to provide medical care to passengers and crew?
A. That's correct.
Q. One of the purposes of informing the public on their web page about the presence of the medical center and the ability to provide medical care is to entice people to purchase tickets so they feel safe on Royal Caribbean ships?
MR. DRAHOS: I object to the form.
A. I don't believe that that is the case. I can handle that question in two fashions. One is I can't read the minds of people who read this, so I can't tell you whether customers feel that they are enticed. That is not something I can answer in a deposition. And second of all, the purpose of mentioning that is not to encourage people to buy tickets on Royal specifically. It is to meet the general appreciation in the community that when you go on a cruise ship, medical care will be available.
Q. Would you agree with me that that is a business decision that Royal Caribbean made though, correct?

Page 39

A. I was not there when any decision like that was made.
Q. Well, I am talking to you in your individual capacity, but Royal Caribbean, as a company, made the decision to provide medical centers that provide medical care to you as passengers?
A. That is a prudent thing to provide to people on board a ship, yes.
Q. And the advertisement also indicates that if there is a medical emergency that a passenger experiences, that the medical center is present and the medical staff is there to provide assistance?
A. Correct.
Q. Are you familiar that Royal Caribbean puts on its website the international cruise line passenger bill of rights, correct?
A. I am not certain about that. I am sorry. I don't know.
Q. My understanding -- well, let me back up. You are familiar with who CLIA is, correct?
A. Yes.
Q. CLIA is the Cruise Lines International Association, which is an industry group of cruise lines, correct?
A. That's correct.

Page 40

Q. Royal Caribbean was a member of that industry group?
A. Yes.
Q. As well as all the other lines within the umbrella of Royal Caribbean, correct?
A. Yes, ma'am.
Q. I am going to share my screen. Before I do that, let me label this so I have a happy court reporter.
MS. LOBEL: I am going to make the notice, as I did not announce it, and forgive me, the notice of today's deposition is Plaintiff's Exhibit 1, and I am going to title the next document as Plaintiff's Exhibit 2. Bear with me.
(Plaintiff's Exhibit Number 1, Notice, was marked for identification.)
(Plaintiff's Exhibit Number 2, Bill of Rights, was marked for identification.)
BY MS. LOBEL:
Q. Dr. Shore, I am bringing up Plaintiff's Exhibit 2, which is the Bill of Rights. I will represent to you, I made the highlights, since we are remote, and can't sit next to each other, I am doing this for ease, for areas where I have specific questions, okay?
A. Okay.
Q. Are you familiar with this document?

Page 41

A. I am with that it exists, I know about it, but I never reviewed it in detail for the purposes of this deposition.
Q. I will represent to you that I pulled it from Royal Caribbean's website. I want to draw your attention specifically to sections four and five. We will talk about four first. Section four reads, the right to timely information updates as to any adjustments in the itinerary of the ship. In the event of a mechanical failure or emergency as well as the timely updates of the status of efforts of mechanical failure. Did I read that correctly?
A. You did.
Q. My understanding is that this gives the passenger the right to have all updates to emergencies that occur on the ship, whether it's mechanical or otherwise?
MR. DRAHOS: I object to the form.
A. May I answer?
BY MS. LOBEL:
Q. Yes.
A. The answer is yes, and in my experience with Royal, that was a procedure that was very much adhered to. We were very proud of the fact that we did make timely updates to passengers in the event that there were

any issues that would impact the itinerary.
Q. Would that include a situation where there is a medical emergency having to do with a passenger on the ship and the itinerary would be affected?
MR. DRAHOS: I object to the form.
A. If the itinerary was remarkably affected, then an announcement would be made to notify the passengers if there would be a change in the itinerary. If the ship arrived to port early because the ship was sped up, that would not require a notification, for example, and that was something that was the prerogative of the ship captain to decide.
BY MS. LOBEL:
Q. If there was a situation, for example, where the emergency occurred while somebody -- while the ship was docked at a port and because of the emergency the ship could not leave on time, is that something that would have been relayed to passengers?
MR. DRAHOS: Objection.
A. I am not sure that was a need, because if the ship was delayed in its departure from the port, I don't believe that was something of concern to the passengers or crew.
BY MS. LOBEL:
Q. Would you also -- okay, let's talk about


paragraph number five, having to do with the passenger right of -- the right to a ship crew that is properly trained in emergency and evacuation procedures; do you see that?
A. Yes, I do.
Q. Would that paragraph have to do with medical disembarks or medical evacuations?
MR. DRAHOS: I object to the form.
A. Not entirely.
BY MS. LOBEL:
Q. In part, would this refer to the passengers would have the right to a ship's crew that were properly trained in emergency and evacuation procedures having to do with medical care?
MR. DRAHOS: I object to form.
A. It would incorporate medical care as well as a variety of other emergencies and evacuations.
BY MS. LOBEL:
Q. Understood. For example, if there was an emergency while a passenger was at sea, the passengers had the right to have crew that are properly trained how to deal with a medical evacuation at sea?
A. That's correct.
Q. Similarly if there is a medical emergency while the ship is docked at a port, passengers are entitled to


have crew that are properly trained how to handle that situation as well?
A. Yes, ma'am.
Q. Now, the shipboard infirmaries or medical centers are equipped with medical equipment, correct?
A. Yes, ma'am.
Q. Royal Caribbean would have purchased all medical equipment in all of its medical facilities?
A. Either purchased or leased.
Q. Would it be fair that Royal Caribbean would, whether purchased or leased, would have paid for it in some capacity for the provision of all medical equipment on shipboard medical facilities?
A. Yes, ma'am.
Q. The medical equipment in the medical centers were there, on ships, the doctors or nurses can use that as part of their medical duties?
A. The equipment that is on board the ship is used by the medical center staff in order to provide the care that they provide to guests and crew members.
Q. That would include doing a medical workup?
A. Could you be more specific?
Q. Certainly. For example, when a patient comes in you have to do a physical examination, and you may need to take a patient's blood pressure, for example,


correct?
A. Correct.
Q. So the cuff that would be used, or whatever device that was being used to measure blood pressure, that would be equipment provided for Royal Caribbean in order to start working on a medical workup, to then come to a diagnosis or provide care and treatment for a passenger?
A. That's all correct.
Q. Essentially where I am going with this, the shipboard nurses and doctors and medical personnel are not required to bring their own equipment or medical tools to perform their job duties on Royal Caribbean ships?
A. They are not required to, but they may bring, for example, documents that assist them in making diagnoses, books, literature that they care to bring along. They are not precluded from bringing any assistive information that they may want to bring with them.
Q. Information, but insofar as equipment, all equipment that is supposed to be used on the ships is Royal Caribbean's equipment, correct?
A. That is correct.
Q. Because Royal Caribbean wants to ensure that it

maintains a certain quality and maintenance over the equipment used by its staff?
A. That is correct.
Q. Because you don't want me, as a doctor, bringing my own x-ray machine and goodness knows, the quality of my own x-ray machine?
A. That is fair.
Q. Let me bring up specific Bates numbers, since we have that stipulation. One second.
MS. LOBEL: Michael, I am going to Bates 476 and 477.
MR. DRAHOS: Okay. Doctor, you are welcome to go to that if you can.
MS. LOBEL: I am not sure if you had everything with you or not. I will put it on the screen so it is on the video, too.
THE WITNESS: Can you tell me the Bates numbers again.
BY MS. LOBEL:
Q. Absolutely. I am going to 476 and 477, for the record.
A. Okay.
Q. Can you see my screen, that I am sure you have it in front of you as well?
A. Should I work off of my documents, or should I


look at your documents?
MR. DRAHOS: Whatever is easier for you. She is providing it to you as a courtesy. You are welcome to look at whatever you want.
BY MS. LOBEL:
Q. If you are looking at something that does not look like what I am showing, to please let me know because I want to know what you are looking at as opposed to what I am looking at. That would be my only request, okay?
A. Very good.
Q. We are looking at, at least on my screen, 476?
A. Correct.
Q. Is this photograph the same photograph as you have in your 476?
A. Yes, ma'am.
Q. Is this a photograph of a portion of the shipboard medical center on the Harmony of Seas?
A. I don't see any identifying markings that would tell me that this is the Harmony, but if you tell me -- if you will substantiate that this is the Harmony medical center, I would have no objection to that.
Q. I have no idea because I did not take these photographs. They were provided to me, which is why I was hoping you would let me know.


A. Because I am under a sworn deposition, I can't certify that these are the Harmony's photographs, but this is a photograph of a typical medical center in the Royal Caribbean fleet.
Q. Understood. Now, what portion of the medical center, in a Royal medical center, are we looking at?
A. This looks to be the waiting area.
Q. Since I don't have the full view of the medical center, if we are the photographer, we are looking at the vantage point we are looking at, if I turn to the left, what would be to our left?
A. I can't answer that. I don't know. It looks to be further areas of plants and chairs.
Q. Because what I don't see or I don't think what I see here is a window or a desk is for a person or a passenger coming into the medical center would be able to communicate with personnel, so where would that be?
A. I can't answer that. I don't know the answer to the specific medical center picture. I can't answer it.
Q. In your experience going into various medical centers on Royal Caribbean ships, is there a desk or a window where passengers and crew can interact with the personnel in the medical center?
A. Yes, ma'am.


Q. Can you please describe what that area typically looks like?
A. It would be on a typical ship. It would be a triage area where a nurse can encounter a patient, take down the initial vital signs, understand why the desk or crew member is presenting to the medical center, and this is done with the hope that it is totally confidential because of partitions, curtains or windows.
Q. Would it be fair to say that this triage area would be in this waiting area?
A. It is not likely.
Q. It would be, you would have to go through a door into a more private area of the medical center, correct?
A. Generally, yes.
Q. My question is, forgive me if it was a poor question, if I am a patient walking into the medical center, and I am walking into this waiting room, is there a desk or a window where there is someone for me to speak to in order to have my initial contact with the medical center to communicate, I am having a problem?
A. Yes, ma'am.
Q. What would that area be?
A. In name? It would be an intake area or triage area as we refer to.

Q. Because I assume the passenger just can't go through the door into the triage area, to the private area without being first screened by the first point of contact in the medical center, correct?
A. Yes, and those rules had been enhanced since COVID, to prevent people who are ill from mixing with people who are not in the medical center, to treat an infectious or contagious illness.
Q. If I am walking into the medical, and I go to that intake personnel, I say, "I think I am having a stroke," is the person who I go to for that first point of intake, what position would they hold? Would it be a nurse? Who would it be?
A. That would generally be the nurse.
Q. And then they would be taken back into the triage area?
A. You would be taken from the triage area to a cubicle to be seen.
Q. How many cubicles typically are there in medical centers on Royal ships?
A. That depends entirely on the size of the ship, the number of passengers and crew on board. It can range anywhere from as little as two, up to six or eight.
Q. Do you know approximately how many there would be for the Harmony of the Seas?


A. For the purposes of the deposition, I don't know the exact number.
Q. In addition to having this waiting room area, the triage area, what other rooms or facilities would be part of the medical center that we don't see in this photograph, which is Bates 476?
A. There would be a trauma room, which would allow 360 degree access to a patient. There would be various storage cabinets. There would be an oxygen storage cabinet. There would be various patient treatment rooms, and anywhere from one to several bathrooms within the medical center itself.
Q. Are there any offices or private areas for medical personnel only?
A. The doctors on board would each have their own medical room where they would be able to interview a patient. In the room would be a stretcher, so the patient can lie down and be examined.
Q. Is there an area where we are not seeing patients and just doing routine paperwork or working on notes or what have you, that where doctors and nurses work, separate from these treating rooms?
A. Yes.
Q. Where would those be?
A. Within the medical center proper. They would


be a nursing station, generally with books, computer screens, printers, Xerox machines and such.
Q. I understand there would be a nursing station. Is there a location specific to shipboard doctors separate from the nurses?
A. No, ma'am.
Q. It would be a shared area between nurses and doctors to do work separate and apart from seeing patients?
A. Correct.
Q. Understood. And there would have been one on the Harmony of the Seas?
A. Yes.
Q. Everything you just described.
I am going to scroll down to what is Bates 477, which appears to be a photograph of the medical center door with the operation hours; do you see that?
A. I do.
Q. Did Royal Caribbean set these operational hours for its medical centers?
A. The staff captain on board is the head of the department, and the staff captain can, if necessary, alter the hours as they see fit with the advice of the medical center staff, but for general purposes these would be the hours of operation as posted.


Q. That would be the initial opening hours would be 8:00 a.m. through 11:00 a.m., correct?
A. Yes.
Q. And then there would be a closure between 12:00 p.m. and then until it reopens at 4:00 p.m.?
A. Yes, ma'am.
Q. Then the operational hours would be 4:00 p.m. until 7:00 p.m., correct?
A. Correct.
Q. It looks like the doctors' hours mimic the opening hours?
A. That's correct. I want to make it clear for the purpose of our discussion that the hours set are not rigid. That if it's required to remain longer hours in order to complete the care of a patient, that is done. And if the medical center encounters any kind of an emergency, there is no concern for adhering to these hours.
Q. That was my next point. If there is an emergency, there are doctors and nurses available on call 24/7, 365 days a year, if the ship is running?
A. That is more of a succinct way of saying what I said.
Q. Just to make sure we are on the same page.
The shipboard -- let me take this down. The

shipboard medical center's operations are part of the regular overall operation of the ship, correct?
A. Correct.
Q. Royal Caribbean has ownership over the medical center, just like it has ownership over the shipboard dining rooms, correct?
A. That's correct.
Q. It has control over the operations of the medical center, just like it would a shipboard restaurant?
MR. DRAHOS: I object to the form.
A. Yes, ma'am.
BY MS. LOBEL:
Q. How many shipboard doctors does Royal Caribbean provide per ship?
A. Depends on the size of the ship and the number of crew and guests on board.
Q. What would be the range, and let's start with the lowest number of doctors and nurses provided, and then I will ask you about the largest number that would be provided. So let's start with the lower end. What would be the lowest scope?
A. On very small ships, it would have very few customers and very low number of crew members. You would have one doctor and two nurses.



Q. Now, would the doctor on the smaller ships be a senior doctor, or could it just be a regular doctor?
A. Generally, it would be a senior doctor, someone with at least five years experience.
Q. Then for the larger ships within the fleet, how many doctors and nurses would be provided?
A. On the moderately large ships, three doctors and five nurses, and on the larger ships I believe there are five doctors, and seven or eight nurses.
Q. Do you know where in this range the Harmony of the Seas would fit?
A. No, I don't.
Q. Do you know how many doctors were on the Harmony of the Seas at the time of this particular incident back in February of 2019?
A. I know there were at least two doctors.
Q. Do you know how many nurses there were at the time of this particular incident?
A. No, I don't.
Q. Is that something that would be documented by Royal Caribbean?
A. Yes, ma'am.
Q. So we still would be able to figure that out without relying on somebody's memory, for example?
A. Yes, ma'am.



Q. How many doctors are on call during the 24/7 on call?
A. I am not sure what you mean by that. Again, I am not trying to be evasive. The term on call was vague and I not sure where you are going.
Q. Forgive me. I use colloquialisms because of family -- if I am on call, I am on call. So if there is an emergency and somebody is what I will call on call to address an emergency on a Royal Caribbean ship, okay, are all of the doctors on call, or is there a rotational system as to who is on call on a particular day?
A. Generally there will be an alternating doctor. Each doctor will be on call for one day and then turn over call to the next doctor; however, in any circumstance where there is a difficult case, even if it is an individual case or if, of course, there are multiple cases that require emergency treatment, no doctor is considered off base, no doctor is considered not on duty.
Q. What about nurses? Is it a similar rotational system?
A. Yes.
Q. We mentioned this briefly, and I did hear the name that you used, but let's get into a little bit more detail. Royal Caribbean provides a computer system for



shipboard doctors and nurses to use, correct?
A. Yes, ma'am.
Q. And Royal Caribbean pays for a subscription to use that service?
A. Yes.
Q. My understanding this service is Triden?
A. No, ma'am.
Q. Forgive me. The company that provides the service is Triden, correct?
A. That's correct.
Q. Then the actual name of the program is EcCare?
A. It could be called EcCare. Triden branched out. They had chosen to change the name of the product as SeaCare.
Q. I was wondering, because I see some documents that say one thing and others that say SeaCare. Understood.
Now, SeaCare uses a satellite system in order to synchronize the program?
A. Yes.
Q. And this allows for continuous operation of the service on it, on Royal Caribbean ships, correct?
A. I am not sure what you mean by continuous operation. Can you explain what you want to know?
Q. Certainly. Since there is a satellite, that is

a satellite system that is used, regardless of where the ship is located or the hour, the system is operational and functional?
A. Providing that there is satellite connectivity activity, the situation is immediately -- what is the word? Concatenated with the major database. In the instance where there is no satellite communication, this can happen in the Fjords, in the Scandinavian countries. That is maintained on board the ship and at such time as the satellite is reconnected, the data is updated.
Q. If I understand you correctly, it is kind of like a cloud base system. The data will be generated on shipboard computer, and if it gets disconnected, it is contained on the computer, but the second there is a connection, it goes into the cloud?
A. Understood. Correct.
Q. This system allows for realtime visibility of the program throughout the fleet, correct?
A. Not throughout the fleet, no.
Q. Does it allow for realtime visibility on the ship as well as shoreside --
A. Yes.
Q. -- as it relates to a specific ship?
A. Yes, it does.
Q. So if I am a doctor and I am on the Harmony of


the Seas and I am typing in a medical record in SeaCare, the medical department shoreside can see exactly what I am doing realtime?
A. Correct.
MR. DRAHOS: I object to form.
BY MS. LOBEL:
Q. Now is SeaCare just a medical recordkeeping system, or does it perform other functions?
A. It has other functions.
Q. What are those other functions?
A. It can be used to trace, among other things, there is quite a bit of information, so I am just giving a few of the examples. It can be used to track acute gastroenteritis incidents. It can be used to track any other infectious disease. It can be used to track immunization records of crew members. It can be used to store any type of instructions that the staff wishes to have on a permanent basis. It has many, many functions. Those are just a few.
Q. I will pull up an exhibit. I will use the actual website. It looks better. I will share my screen, and I will make a note that this is Plaintiff's Exhibit Number 3. I know I saved it somewhere. Is this the website for Tritan, for the software we were talking about?


MR. DRAHOS: I object to the form.
A. It appears to be the Tritan software website.
(Plaintiff's Exhibit Number 3, Website, was marked for identification.)
BY MS. LOBEL:
Q. Let me make a note of Exhibit 3, Tritan SeaCare.
This will help me follow along with some of the program, the functions of the SeaCare program. It talks about a global dashboard. It says control your fleet from anywhere in the world through one centralized view of the entire organization's activities and all medical operation indicators in realtime; did I read that correctly?
A. Yes, you did.
Q. Is that what we were talking about, the ability of the shoreside ship department can in realtime review the records from the ships as they are being inputted?
A. Yes, and the mistake you made in your question was can the fleet see all the information of a particular ship? The answer is no. It has strict security protocols that only allow people authorized to see the information, to see it, and that would not be the entire fleet. That would be the ship where the information is being produced, and shoreside people with the appropriate


security plans to just review the information.
Q. Those security clearances were generated -- well, the restrictions were generated by Royal Caribbean in setting up the program, correct?
A. Correct.
Q. For example, if I am the shipboard doctor on the Symphony of the Seas, I can't see the medical records for patients on the Harmony of the Seas?
A. That's correct.
Q. And Royal Caribbean chose to make that restriction for privacy reasons?
A. And also to adhere to HIPAA and to regulations.
Q. The next section it has is case management. It says centralize and manage all crew and guest information, whether a referral, emergency, repatriation or legal case, your organization will have direct access to realtime information. Did I read that correctly?
A. Yes, you did.
Q. With regard to a referral, is that so that if there is a situation where a shipboard doctor wants to refer either a crew member or a passenger for treatment shoreside, that referral can be done through the SeaCare program?
A. No, ma'am.
Q. What does that refer to, whether a referral is

needed?
MR. DRAHOS: I object to the form.
A. Can you ask me a question? I did not understand the question.
BY MS. LOBEL:
Q. Absolutely. Under case management it says centralize and manage all crew and guest information, whether a referral, emergency, repatriation or legal case, your organization will have direct access to realtime information. In the context of this statement, what is it referring to with regards to a referral?
A. That means that a medical center's staff arranges a referral on board the ship, the shoreside as well as other medical members of the medical center staff on board the ship have access to read about the referral which was arranged.
Q. Would the same be true with regards to a medical emergency on the ship?
MR. DRAHOS: I object to the form.
A. Yes, that would be true. The people who have authorized access to the information can see what preparations or what strategies were used to handle the emergency.
BY MS. LOBEL:
Q. Is there a specific section within SeaCare in



which either ship or doctors or shoreside personnel input information into the system with regards to either a referral or a medical emergency?
MR. DRAHOS: I object to the form.
A. Again, I am so sorry, I don't understand your question. Can you ask again?
BY MS. LOBEL:
Q. Absolutely. So in the SeaCare system, is there a specific section within the system in which either shoreside or shipboard medical personnel are supposed to input information into the SeaCare system about medical emergencies?
A. It is not that they are supposed to. It is where they have the opportunity to enter any information that they feel was necessary that will help to document a referral or the handling of an emergency.
Q. You are calling it an opportunity. Where is the opportunity -- where within the system is there an opportunity to input information about medical emergency, for example?
MR. DRAHOS: I object to the form.
A. There are various sections. There is a section that would last for the history of the patient's illness. There is a section that will discuss that physical exam. There is a section that discusses or that holds



information I should say about the procedures that were done. There is a section that will describe the medications that were administered. The section will hold information about the medications that the patient took prior to boarding the ship. And there is a section that will tell about any management of patient's care while on board. Any referrals, the treatment of any emergency, et cetera, so yes, all this information is available within SeaCare.
BY MS. LOBEL:
Q. So with the situation -- say there is a situation where somebody is having a heart attack on the ship, and they are in the middle of the Gulf, but within the range for USCG to come to the ship and to pick up the passenger and take them to shore. In that scenario is the doctor expected by Royal Caribbean to input the status of following the procedures for the disembark in that hypothetical?
MR. DRAHOS: I object to the form.
A. The answer is, the doctors are routinely expected to enter information about any care rendered or any steps taken to handle an emergency.
BY MS. LOBEL:
Q. Now, my question is, if I wanted to print out that section where it indicates all the steps taken to



handle the emergency and handle the medical evacuation, is that in the medical record note itself, or is that in a separate section within the system?
A. That is part and parcel of the note.
Q. Is that in the section of the note, and I am doing this from memory, in the addendum?
MR. DRAHOS: I object to the form.
A. There is a section in the note where you can add your comments.
BY MS. LOBEL:
Q. Is there a portion of the software that is used for trend analysis or analyzing all of Royal Caribbean's shipboard medical records or whatever the particular reason is?
A. Yes.
Q. Can you explain what sort of trend analysis is done through that program by Royal Caribbean?
MR. DRAHOS: I object to the form.
A. It depends. It depends on what type of analysis you wish to do. For example, we can look in on the gastroenteritis cases, if we are requested to by public health. For example, the CDC, that is a sanitation program, they want to ask how we are monitoring cases we had of acute a gastroenteritis, and that would be available. There is an overlay, the

ability to generate reports.
BY MS. LOBEL:
Q. What if you wanted to do a trend analysis of how many heart attacks occurred on Royal Caribbean ships in the year of 2017, is that something that can be called and analyzed within the program?
MR. DRAHOS: I object to form.
A. Yes. We can have specific software requests made for a report to be generated.
BY MS. LOBEL:
Q. Does Royal Caribbean do that in the regular course of its business in order to check trends for certain conditions on their ships?
MR. DRAHOS: I object to the form.
A. There are certain trends that we must follow that we do. And, you know, if it's required by public health, for example, then yes, the answer is yes. But generally we don't have these reports on a regular basis, let me put it that way.
BY MS. LOBEL:
Q. Is it something -- are these reports, these trend reports something that can be done at any point in time so long as there is the subscription to the software?
MR. DRAHOS: I object to the form.



A. Some reports are standardized. Other reports have to request the software be generated.
BY MS. LOBEL:
Q. What do you mean by that request the software be generated?
MR. DRAHOS: I object to form.
THE WITNESS: Could I answer?
MR. DRAHOS: If you understand it.
A. Certain report you can have generated on a realtime basis, other reports you have to ask Tritan to generate the report.
BY MS. LOBEL:
Q. Now, does -- are there -- strike that.
Is part of Royal Caribbean's operations, does it track or create trend reports related to every time there has been either a medical emergency disembark or evacuations from its ships in order to analyze those situations?
A. No, ma'am.
MR. DRAHOS: I object to form.
BY MS. LOBEL:
Q. Is that something that could be done where if I wanted to see, for example, in 2017 all of the medical emergency disembarks cannot be culled?
MR. DRAHOS: I object to the form.



A. There is a lot of variables that make that very difficult to do. For example, you are dealing -- when you are dealing with a shipboard issue, you are not dealing with it similarly as you would with a shoreside, so each situation is different. It is not like if you were admitted to a local hospital, and you have an admission and a discharge diagnosis, so I don't believe your information would be terribly accurate. You don't have the capability of doing a CAT scan on board. You don't have the capability of doing an MRI on board. So the final diagnoses in many cases catheterizations for heart attacks and such. There is no ability to make a definitive diagnosis when you are on board ship, and because of that, a lot of the disembarkations, a lot of the diversions are done on a preliminary basis. They are done as a rule out on a -- there is a word I can't think of. It is it an expected result. So in the -- I am sorry. There are some words that are important that I can't think of at the moment. The point being you can't make definitive diagnoses on board a ship with the equipment that is available. Even in a well stocked, highly sophisticated medical center. So the data that you would pull would necessarily be very inaccurate.
BY MS. LOBEL:
Q. My question is a little bit different. My



question is not about the final diagnosis or final outcome. I just want to know if I wanted to know every single time a patient or whether it be crew or passenger was medically disembarked on an emergency basis, can that information be culled from the system, or it is flagged that this was a medical disembark or sea evacuation?
MR. DRAHOS: I object. I think we have gone far afield now of the scope of what this witness is prepared to answer. There was not an area of inquiry where he was asked to be an expert on SeaCare and its capabilities or as a representative of Tritan, so at this point he is giving a lot of answers as Dr. Ben Shore and not as a corporate representative. So unless you can point to me where any areas of inquiry we were put on notice he has to be an expert about this computer system, he is not here today to testify on behalf of the company on these subjects.
MS. LOBEL: Understood.
BY MS. LOBEL:
Q. Dr. Shore, you seem to have a lot of knowledge how the system works. Based off of your knowledge, having to do with your experience after six to seven years with the company and your familiarity with the program, do you know whether that can be done?
MR. DRAHOS: I object to the form and ask the

witness not to speculate and to remember that we are here to talk today as the corporate representative and we don't want you guessing on what you think --
MS. LOBEL: I would ask you not cue the witness with speaking objections. I note your objections.
MR. DRAHOS: I don't have a choice, go outside the areas of inquiry now and asking him to testify about things that I have not had an opportunity to discuss with him, so he will have a misunderstanding of what you are asking him and we will have a hearing on something that is completely misunderstood, so I am trying to avoid a problem down the line.
MS. LOBEL: I can only ask what he knows, whether it is under the heading of the 30(b)(6). If you know you know; if you don't know, you don't know.
MR. DRAHOS: I want to make it clear, he is answering these questions not as a corporate rep, so he has gone far afield now of what I think allow him to say without having to step into advising you now you are asking him questions that I have not had a chance to go over with him.
MS. LOBEL: Okay.
BY MS. LOBEL:
Q. Sorry. I wanted to read something on Tritan's website. Going back to the culling of information, based


off of your knowledge of the system as Dr. Shore, do you know whether or not medical disembarkations and medical evacuations are flagged within the system such that information could be culled?
A. I don't believe they are.
Q. Does the program have the ability to do that?
MR. DRAHOS: I object to the form.
BY MS. LOBEL:
Q. To cull situations where there was a medical disembark or medical evacuation of any type?
A. I think it would be best if you speak with Tritan Corporation and ask if that could be done, because I don't know the answer.
Q. With regard to RCCL's procedures and support facilities, since we already discussed that shoreside in realtime see the medical records inputted in SeaCare by shipboard physicians, is there anyone designated shoreside to monitor or watch the inputting of medical records to look for anything of note?
A. No, ma'am.
Q. How frequently does shoreside -- strike that. How frequently does the shoreside medical department review or look at the inputted medical records in SeaCare?
A. It is really too vague a question because that


would require me to know what other people are accessing, what records and when. It would require me to know what committees might be looking into, cleaned records that are stripped of any identifying features. I can't answer that question.
Q. Is there a policy or procedure within the medical department that we can in X amount of frequency review all medical records inputted by shipboard doctors or nurses?
A. No.
Q. Does anyone from any department do a review of shipboard medical records, for example, for quality control purposes?
A. There might be departments who do that, but I am not aware of any specific department.
Q. As far as you know that is not the medical department where they would do like a quarterly review of medical records to look at, how they can being imputed?
A. No, ma'am.
Q. So if there is a particular type of diagnosis, such as a heart attack, that shoreside gets an alert and they can see that, and they look at that instance?
A. That would be a specific software component that I don't have knowledge about.
Q. Is there a policy or procedure within the


department in which they have created in a word, or they are supposed to be notified through the system, the SeaCare system, with regard to certain medical diagnoses?
A. If the diagnoses involves a diversion, we are issued what are called sitreps, which are situational notices, so that the different departments that are impacted by diversion be notified.
Q. You said sitreps. Is that s-i-t-r-e-p-s?
A. Yes.
Q. Now, you said that is for diversion. Would that include situations where somebody is disembarked at a port?
MR. DRAHOS: Form.
A. It depends. Each situation is different. It depends. If it involves a major change in the itinerary, if it involves a major change in the timing of the itinerary and other departments would require notification, then a sitrep would be issued.
THE VIDEOGRAPHER: We are off the record at 1546 UTC, and the local time is 11:47 a.m.
(Brief recess)
THE VIDEOGRAPHER: We are on the record at 1255 UTC time and 11:55 a.m.
BY MS. LOBEL:
Q. Dr. Shore, does RCCL have meetings during which

medical records are reviewed and discussed?
A. No. Not to my knowledge, no.
Q. How long has Royal Caribbean been using SeaCare as its computer system for medical records, in the medical facilities?
A. Since before I was the chief medical officer.
Q. So before like 2013, 2012?
A. Yes.
Q. Can the medical notes on SeaCare be edited?
MR. DRAHOS: I object to form.
A. Again I am not an expert in SeaCare, so I would rather not comment on that.
BY MS. LOBEL:
Q. Do you know based off of your experience that the shipboard doctor in their duties can log into the program and edit their note?
A. Edit the note? Yes, I can. I am not an expert, but I would be encouraged to add an addendum at any point if I need to add something that I neglected to add.
Q. Can anything be deleted though?
A. I would have to refer you to an expert. I don't know the answer.
Q. Are the timestamps in the medical records inputted by the physician or is it part of their job or



is it something the system generates?
A. To the best of my knowledge it is generated automatically.
Q. Now, the timestamp or the shipboard medical record, is that based off the ship's time or the local time?
MR. DRAHOS: I object to the form.
A. You are getting into the kind of detail that I am not really comfortable testifying about. I don't know the answer, and I am not an expert in SeaCare.
BY MS. LOBEL:
Q. My question is, there is a lot of medical records in this case, and I just don't know if the timestamp in those medical records that were produced in this case are local time or if they are ship time or some other time, so when I look at the medical records in this case, what time zone am I looking at?
MR. DRAHOS: I object to form.
A. I would again defer it to an expert that knows the SeaCare documents, the time.
BY MS. LOBEL:
Q. Who would that person be from the company to know what the timestamp is from the medical records, Royal Caribbean makes and keeps in the ordinary course of their business of operating a medical center?



A. It would be someone from Tritan Corporation.
Q. Tritan does not manage the program that is actually used on the ships for purposes of RCCL operations, correct? It is managed by the company?
A. I don't even know that. I believe the software is installed and managed by SeaCare -- by Tritan Corporation.
Q. So I can't tell or Royal Caribbean does not know, one way or the other, whether the medical records in this case are Pacific Coast Time, Central Time, Atlantic Time; is that accurate?
A. -- I do know that they record UTC, so based on that I believe you would do your calculations to confirm the numbers. But if you wanted to be specific for the purposes of a deposition and a legal concern, I think you would be best to contact Tritan and ask their software engineers how their timing is done.
Q. So for purposes of in Royal Caribbean's medical procedures, if a disembark is required and shoreside is looking at the medical records to see when things occurred in order to assist, how would they know what time an actual event occurred when looking at the medical record if Royal Caribbean does not know the exact time of each timestamp on the medical record?
MR. DRAHOS: I object to form.



A. Because the doctor on board the ship would be managing the care.
BY MS. LOBEL:
Q. Would that management of the care also include management of the disembark?
A. Yes, ma'am.
Q. Now, with regards to the procedure of imputing notes into the system, so if a patient comes in, and am the nurse and I am doing a triage, does the nurse first do the triage of the patient and then secondarily input the note after the triage is complete?
A. In each case you have to speak with the nurse who entered the record, because everybody has their own pattern, and we don't oversee exactly what is done on each individual case.
Q. Would it be fair to say it is possible a nurse handles the patient who comes in, performs a certain amount of care and then after that care is done, to do an initial eval of the patient, then types up his or her note?
A. It would be as it would be done in any medical center.
Q. Now, each medical center has an inventory of medical supplies and medications, correct?
A. Yes.

Page 78

Q. Is the SeaCare system also used to track and monitor that inventory of medical equipment and supplies?
A. Yes.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q. Does Royal Caribbean rely on the shipboard medical personnel to ensure that the medical center is properly equipped?
A. That is too vague a question, I can't answer that. Can you give me specific examples what you are asking?
Q. I want to know generally. Does the company rely on its shipboard doctors; for example, to make sure that that all the medications on its ships are properly stocked.
A. There is many, many levels of involvement. The nurses would be reviewing medications. The doctors review medication. The staff captain would on occasion review with his staff what medication, if they are controlled substances especially, and disposal of substances, the environmental officer might be involved, so your question is far too vague for me to answer accurately.
Q. My question is, who monitors -- for example, we have 30 cases of Tylenol, correct? And we are supposed

Page 79

to have 30 cases of Tylenol on our ships in order to be deemed properly stocked. Who determines how much Tylenol is supposed to be kept on the ship?
A. That can't be determined.
Q. Who sets the rules as to how much of a specific type of medication is stocked in each medical center?
A. There are no such rules.
Q. Who monitors whether or not there is a sufficient type of each medication needed for care and treatment of passengers or crew on ships?
A. That varies from ship to ship. The itinerary to itinerary, and there are no guidelines to be established to specify exactly what the requirement should be.
Q. Does shoreside personnel monitor the inventory on RCCL ships?
A. No.
Q. Is that done by shipboard personnel?
A. Shipboard personnel can review what is in stock.
Q. If there is something that is low in stock, hypothetical as the Tylenol again. So we are running out of Tylenol. Is the request made by shipboard personnel to shoreside to restock Tylenol, or how does that work?
A. The shipboard personnel will determine if they

Page 80

are running low on a drug and they will decide if they need to order more.
Q. How do they do that?
A. They go on to the ordering system, and they order more medication as they deem necessary to properly stock the medical center.
Q. Is that system -- well, what is the name of that system?
A. There is an Amos ordering system.
Q. Who pays for the restock of medication for shipboard infirmaries?
A. I don't have budgetary information for the purpose of this depo. I don't know the answer.
Q. Does Royal Caribbean pay for medication?
A. I think I answered that. It's that I don't have any information about the budgetary arrangement with Royal.
Q. Does a third party purchase medications for Royal Caribbean's infirmaries?
A. Again, I don't know the financial arrangements that Royal Caribbean has for medication or equipment providers.
Q. So Royal Caribbean does not know whether or not it pays for the medications and equipment it stocks for use, for care and treatment for passengers on its ships?

Page 81

A. Royal Caribbean would know, but it would not be under the purview of my responsibility. I am not the corporate rep being prepared to answer that question.
Q. Shipboard doctors prescribe medications to passengers, though, correct, that is part of their duties?
A. Yes.
Q. Those medications are sold to passengers on the cruise ship?
A. It depends.
Q. Depends on what?
A. The situation as it calls for medication, if the doctor prescribes medication that are given out gratis, then there is no charge. You asked me if the doctor arranges to charge the patient depending on the situation.
Q. When would there be a situation where Royal Caribbean just gratuitously gives medications to passengers with no charge?
A. One example, if there is an acute gastroenteritis outbreak, and it is a known outbreak, then medication could be prescribed without charge.
Q. Typically does Royal Caribbean charge for all the medications prescribed and dispensed from the infirmary, minus the gastro incident?

A. It is specific to each incident, but the charges are not generally put into the folio for the guest.

Q. And the sales for medical care and treatment is documented on Royal Caribbean ships, correct?

A. I did not hear the word you used. The what? The sales?

Q. The sales for the care and treatment -- well, let me back it up. Royal Caribbean charges for the care and treatment it gives to passengers, correct?

A. That's correct.

Q. And those charges are documented by Royal Caribbean?

A. Yes, ma'am.

Q. And those charges get documented through the passengers' account, which I think is through the Fidelio system; is that correct?

A. Yes.

Q. And the Fidelio System is an accounting system used by Royal Caribbean to track billing of passengers for services?

A. Correct.

Q. Royal Caribbean sets the price for the care and treatment provided by its shipboard doctors or nurses to passengers?



A. Is that a question?

Q. Yes. Is that a correct statement, Royal Caribbean sets the billing rates for care and treatment provided to passengers on its ships?

A. Yes, it does.

Q. Similarly Royal Caribbean -- strike that.

Am I correct in saying that Royal Caribbean sets prices for the sale of medications or medical supplies provided on its ships?

A. Yes.

Q. Am I correct in saying that Royal Caribbean runs its shipboard medical centers to profit from the medical care and treatment provided?

MR. DRAHOS: I object to the form.

A. Royal Caribbean provides medication and treatment that are necessary to save lives or treat a patient while they are on board is the answer.

BY MS. LOBEL:

Q. But it does so at a profit, any monies gained from the sale of those services goes into Royal Caribbean's coffers, not the medical providers on the ship?

MR. DRAHOS: I object to the form.

A. The medical providers on the ship are not **
insanobi I LISTENED TEN TIMES? ??



MS. LOBEL:

Q. For example, if Royal Caribbean does not share in any of the profits it gains from the medical services rendered by nurses or doctors on the ships?

A. It does not share with the nurses and doctors or medical staff members, that's correct.

Q. Those profits go back into the company's accounts and then gets reproduced I would presume to then fund the medical center's operation?

MR. DRAHOS: I object to the form.

A. You would have to speak to the financial people in the company. I am not involved in the distribution of the money that is taken in.

BY MS. LOBEL:

Q. Do you know if Royal Caribbean monitors profits and losses from shipboard medical centers?

A. I don't know that.

Q. Does Royal Caribbean -- do you know, as a 30(b)(6), whether that is something that is done?

MR. DRAHOS: I object for the form.

A. I don't understand what you are asking me, the 30(b)(6), I don't know what that means.

BY MS. LOBEL:

Q. As corporate representative, do you know, not in your individual capacity, but does the corporation



know whether or not it tracks profits and losses of medical treatment of passengers and crew on its ships?

MR. DRAHOS: I object to the form.

A. I believe that question is best to ask of the corporate finance people.

BY MS. LOBEL:

Q. You don't know one way or the other?

A. I don't know. I don't.

Q. My understanding is that shipboard doctors are given like an officer rank; is that accurate?

A. Yes.

Q. What rank do shipboard doctors -- strike that.

What rank do shipboard doctors receive from Royal Caribbean?

A. They are generally three stripe officers.

Q. What does a three stripe officer mean?

A. That out of the four stripes, the captain, staff captain, hotel director being examples of the four stripe officer. The doctors would be three or three and a half stripe officers.

Q. Does this striping system enable the doctors to have some level of power over lower ranking officers, such as two stripe, one stripe officers?

MR. DRAHOS: I object to the form.

A. Well, the answer is that the doctors are to

conduct themselves according to their rank and their striping. So they are to provide service on board the ship and they are given the respect and the prerogatives that are attendant to a three or three and a half stripe officer.
Q. Just like any other three stripe officer who may not be a doctor, correct?
A. Yes.
Q. I just want to make sure that a three stripe officer for a doctor does not mean something different from like a three stripe officer in a different department of a ship?
A. No. That is correct. Stripes are uniform across the ship, the designation.
Q. Are shipboard doctors, therefore, held to the same standard as other similarly situated officers on board the ships with respect to their behaviors?
A. Yes.
Q. Would the same be true that shipboard doctors are held to the same standard as other similarly situated officers with respect to exercising their duties on the ship?
A. They are expected to fill their duties according to job description.
Q. Does Royal Caribbean represent to U.S. public


health officials and immigration authorities the shipboard doctors are officers on Royal Caribbean ships?
A. I am not aware of any designation that that is notifying the Customs and immigration. I don't know the answer.
Q. Do shipboard doctors receive a letter from Royal Caribbean for purposes of immigration when working --
A. Yes.
Q. -- for the company? What does that letter indicate with regards to the status of these individuals for their employment, for the company?
A. That is too broad. I don't know what you mean by their status, and I believe you would be best to go to the human resources about the specifics of what they issue each doctor or nurse before they board the ship. I don't have that information for purposes of today's deposition.
Q. Doesn't the medical department participate in the issuance of all necessary documentation, including immigration paperwork for its medical personnel?
A. No, ma'am.
MR. DRAHOS: I object to the form.
BY MS. LOBEL:
Q. Who does then?


A. Human Resources.
Q. You are aware that there is paperwork given by the company to doctors and nurses for purposes of immigration?
A. Yes.
MR. DRAHOS: I object to the form of that question.
BY MS. LOBEL:
Q. We talked a little about the hours of operation for the shipboard medical centers, but I have a few more questions with regard to hours.
Does Royal Caribbean control the minimum hours that medical personnel work on the ships?
A. You can't determine ahead of time what hours a doctor should or should not work specifically because they must be available for any duties that may arise. So there is no specific demand of any particular participation. The work has to be done to the doctor's standard of work.
Q. Is there like a maximum amount of hours a doctor can work that is controlled by Royal Caribbean?
A. I think that the doctors need to respond to an emergency, will respond regardless of what hours they are assigned.
Q. Say there is no emergency, is there a set


amount of maximum hours that a particular doctor is supposed to be operating, for example, the medical center before the next doctor takes over?
A. I don't know the answer.
Q. Do you know if the doctors, the shipboard doctors or nurses create their own schedules as to who works what hours on board?
A. They decide who rotates or who would be -- the word you used on call on certain days, on certain rotation, but as far as the hours, the doctors don't decide the hours that they work.
Q. Who does?
A. They would have to be in the medical center working until the work is done. The patients are seen. The documents are completed. The staff captain on the ship would oversee that the operations are running smoothly.
Q. For example, if there is a situation where there is a ship, say it's a three doctor ship, and we have regular operational hours, is there a schedule who works Monday, Tuesday, Wednesday as opposed to Thursday, Friday, is kind of where I am going with this?
A. There would be a schedule. It would be determined by the doctors for their convenience.
Q. Is that schedule then submitted to the hotel

director?
A. No.
Q. Is there any schedule that is submitted to the hotel director?
A. The hotel director does not oversee the operations of the medical center.
Q. Who approves the hours for the shipboard infirmary operation?
A. That would be the staff captain.
Q. Now, for purposes of hiring shipboard physicians, is that done directly through Royal Caribbean?
A. Yes.
Q. Royal Caribbean does not rely on a third party for hiring shipboard physicians?
A. That is generally true, and it was true before any COVID disrupted any operations.
Q. Understood. Now does Royal Caribbean consider its shipboard doctors employees or independent contractors?
A. Employees.
Q. Does the infirmary provide any warning, either verbal or written, with regards to the limitations of the shipboard infirmaries for care and treatment that it can provide?



A. Not that I am aware of.
Q. Does Royal Caribbean provide passengers any warnings about limitations or abilities to medically disembark whether at sea or on land for its patients?
A. Yes.
Q. What are those warnings?
A. They are given in detail on the contract that the customer is provided on the ticket contract.
Q. And when we are referring to the ticket contract, that is the document with all the fine print about everything having to do with the crews; is that correct?
A. Yes.
Q. There is not any warnings as to the limitations for medical disembarks or ground transport on the website, correct?
A. I don't know that. I am not totally familiar with every document that appears on the website.
Q. How about the medical center, are there written warnings on board shipboard medical infirmaries that are given to passengers about limitations, about medically emergent disembarks, whether by sea or land?
A. That would be I think physically, technically almost impossible, because every case is unique and different and it would it impossible to give a passenger



or crew member an advisory that lists every condition that can or cannot be treated on board.
Q. Is there an advisory having to do with limitations of being able to disembark passengers suffering a medical emergency that is noted at the medical infirmary or verbally given to passengers?
MR. DRAHOS: I object to the form.
A. Yes.
BY MS. LOBEL:
Q. What?
A. Yes.
Q. Can you tell me about that?
A. It is in the ticket contract.
Q. Other than the ticket contract, is that the only location where there is a written warning with regards to the information in the ticket contract?
A. We have already mentioned that several times. It is in the ticket contract, and I am not familiar with absolutely every document that is printed or appears on the web that discusses the ability or inability to disembark a patient. So that is a very broad question, and I don't think I am able to answer it.
Q. Now, the warning that is provided in the ticket contract about limitations and medical disembarks, is that information also provided within the medical center?



A. No.
Q. Is that information verbally relayed by the doctors in instances that there is a medical emergency?
A. When a doctor treats a patient, it's considered the general practice of the physician to keep a patient aware of any issues that would impact on the ability to disembark, but each case is different and unique, and obviously I am not available to oversee each case.
Q. Do doctors note in their records whether or not they have advised the patient whether or not there are issues or limitation with regard to the disembark?
MR. DRAHOS: I object to the form.
A. Every documented patient is different, depends on the situation, depends on the patient, the ability of the patient to comprehend instruction. Every case is different.
BY MS. LOBEL:
Q. What does Royal Caribbean expect with regards to documentation or information or warnings relayed to a patient in the medical records?
A. There is no specific issuance of any instruction on how to advise a patient. It is part of general medical practice to be able to advise the patient accordingly.
Q. My question has to do with documentation. I

Page 94

understand what you are saying about how to advise, but with regards to documenting verbal warnings or admonitions that are given to doctors, is it Royal Caribbean's expectation that any verbal warning or admonition is documented in SeaCare?
A. No.
MR. DRAHOS: I object to the form.
BY MS. LOBEL:
Q. I want to talk to you and shift gears now and focus on the hiring process of shipboard doctors, okay? We have already established that Royal Caribbean does the hiring of shipboard doctors. Can you tell me what is the first step in the process used by Royal Caribbean in the hiring process of a physician?
A. The Human Resource department will review an application by a physician to work on the Royal Caribbean cruise line ships, and see if the person has adequate experience, and then will proceed with the application process.
Q. Now, with regard to the application, is that a document that is filled out by the candidate?
A. Yes.
Q. What is contained within -- strike that.
What components comprise the application, but potential candidates fill out.

Page 95

A. Again, I was not really prepared to discuss it. That would be something that falls under the Human Resources Department.
Q. Who reviews the application within the department?
A. The application would come to the Human Resources Department. They would review the basic application. They would then provide the candidate with a written examination. If the candidate succeeds with the examination, written portion, then the candidate would have a background check, a police check. Then the patient -- the doctor would be interviewed by only one of several people, myself and the director of medical operations, for a scenario, oral examination. If they pass the examination successfully, they then would be considered, based on our need, as a viable candidate to staff the ships.
Q. Now, I did have by designation any procedures for hiring shipboard medical staff and place of time of shipboard medical staff on the subject vessel were hired. So designation 20 -- so with context -- I want to know all the components of the application that was used in the procedures and hiring process, that would have been filled out. What would have been expected at that time?
A. I gave you the process.

Page 96

Q. Okay.
A. The specific document that is filled out, I don't have that available.
Q. Does Royal Caribbean have --
A. I believe I --
Q. Go ahead.
A. I said I gave you the general process requested.
Q. Now, Royal Caribbean keeps the applications of all applicants in its system?
A. I believe they do.
Q. So there should still be the complete original application, for example, Dr. Pereira and Dr. Etsebeth in this case?
A. Right. We have standard retention policies, but beyond those policies retention, I don't believe the records would be kept further.
Q. Do you know with regards to Drs. Etsebeth and Pereira, if their original applications were retained?
A. I don't know that.
Q. Who would know that?
A. That would be in the Human Resources document.
Q. Is there any test aside from the clinical interview that is conducted by Royal Caribbean in the hiring process of its physicians?

Page 97

A. Yes. I mentioned two levels. One would be the written exam that is done.
Q. Okay.
A. If a prospective doctor does not pass the written exam, the hiring process ends there. If they pass the written examination with a passing score, then they are interviewed.
Q. Who wrote the written exam?
A. I did and Dr. Ruben Parejo.
Q. What sort of questions are asked in the written exam?
A. Questions that you would have to be well versed in clinical practice to be able to answer.
Q. What sort of subjects would that cover?
A. It would cover cardiac care, use of a ventilator. It would cover EKG strips that need to be interpreted. A general medical approach to treating a patient.
Q. Was Royal Caribbean still using the same test that you're talking about as of the date that you stopped working as the chief medical consultant?
A. Yes.
Q. How many questions is on that exam?
A. I am going from memory. I believe it's approximately 50 questions.

Q. Is it a multiple choice?
A. Yes.
Q. Who reviews the results of these exams to pass?
A. The Human Resource Department is provided with an answer key, and they review and they determine that the person has or has not a passing grade.
Q. Does this written test have a name?
A. I don't know the specific name of it.
Q. But it would be known as the -- one way or the other, the application, written exam for prospective doctors?
A. Yes. Something along that line.
Q. Okay. Does the exam ever change, like is there a rotating set of exams used or is it the exact same test that is used for every single applicant?
A. For the sake of introducing a standardized approach, we use the same test.
Q. Throughout your tenure, was the exam ever changed or modified in any shape or form?
A. Yes.
Q. Can you explain what changes or modifications were made?
A. Early on with the examination, we felt that some of the duties that were listed in the exam would be more appropriate for nursing care, such as the exact way



to mix a drug, or they were too specific to a treatment of a specific illness and did not show any general knowledge, capability of the physician, so we removed those questions and replaced them with more applicable questions.
Q. Do any of the questions on this exam at any point in time before it was changed or after it was changed, and then we will focus on that, relating to stroke or cerebral vascular incidents or anything to that nature?
A. No.
Q. Is there anything on the medical examination having to do with care, treatment of somebody who sustained head trauma?
A. Keep in mind that this example, this test is not an introduction or it is not a training device. This is a test -- series of test questions to determine whether doctors have a general medical knowledge base. So in terms of it being instructional, it is not that at all.
Q. I understand, but wouldn't Royal Caribbean want to know, one way or the other, if the doctor knows how to identify a cardiovascular incident as opposed to somebody who is suffering a stroke or something to that effect?
MR. DRAHOS: Form.



Q. The scope of their knowledge?
MR. DRAHOS: I object to the form.
A. The knowledge, it has to be broad for anybody conducting an emergency and anybody practicing emergency medicine, so based on that, these were general medical questions of somebody was focussed in order to determine their general medical capability. This was not focussed. On being instructional on how to treat any specific disease.
BY MS. LOBEL:
Q. I understand it is not instructional. How does Royal Caribbean test whether or not somebody knows how to identify very common emergencies that Royal Caribbean sees on its ships? For example, a heart attack. How does Royal Caribbean do that?
MR. DRAHOS: I object to the form.
A. By reviewing their practice, experience, by reviewing their time and practice in medicine. By reviewing their capabilities during an oral examination, seeing how they react to the stress of a pretty, you know, difficult oral exam and by determining their general medical capabilities.
BY MS. LOBEL:
Q. If I am understanding you correctly, the written exam is like a preliminary measure and then there



is more targeted focus on, for example, things having to do with an emergent nature in the verbal exam; is that accurate?
A. That is somewhat accurate.
Q. Let's talk about the verbal exam, or did you call it a clinical interview?
A. Yes.
Q. So for my purposes and understanding, is the clinical interview a type of verbal test to quiz prospective doctors as to their abilities?
A. It is much like an oral board examination.
Q. How long is this examination?
A. Depends on the applicant. If the applicant does poorly, we see there is no point in proceeding, we terminate the interview. If there is an area where the applicant has taken himself down a dead end, we allow them the opportunity to self-correct, or we take them into more difficult challenges. Depending on how they respond, that determines the length of the interview.
Q. Typically for someone who ultimately dead ends because they are really off mark and just not going to be a candidate, how long do these examinations last?
A. Anywhere from a half hour to an hour.
Q. Who administers these examinations?
A. As I said, I do and Dr. Ruben Parejo.

Q. Do you do it together or do you do it separately?
A. We do it separately.
Q. Is it Dr. Pereira who will do 15 minutes and then there will be you for another 15 minutes? How does that get broken down?
A. No. Each of us conducts our own interview. I had him observe my interview process and essentially trained him, and he and I did a similar examination, that is somewhat standardized.
Q. Can you walk me through what the standardized examination contains?
MR. DRAHOS: I object to the form.
A. You mean the specific diagnoses that are discussed?
BY MS. LOBEL:
Q. Let's talk about it this way: When you start a clinical interview, what is the first thing you do to start the exam?
A. First I explain the nature of the examination.
Q. What do you tell the prospective candidate is going to happen during the examination?
A. That these are going to be scenarios that they would encounter on a regular basis. These are not going to be exotic cases that one would see once in a lifetime.



I asked them to let me know if there is something I do or say that is unintelligible, because of the video connection. I ask them to let me know and not to try to bluff their way through because the friendliness is not a determining feature. And I let them know that they need to let me know if there is any equipment that they feel is necessary in order to complete the examination and not to assume what we do or don't have doctors staff on the ship. And once I do the introduction and they understand the ground rules, then I proceed with the interview.
Q. Then when you proceed with the interview, what is the first thing that you do in the interview?
A. Well, the problem I have is that this is a proprietary process that I have developed for the use of the cruise line, and my concern is that if anybody has access to this deposition, will have all the scenarios that we prescribe. That would weaken the entire process, so I need counsel to help me with that.
MR. DRAHOS: I understand the proprietary concerns. If there is a way we can answer these questions in a general nature without having to reveal those proprietary unique aspects of the interview process, then I would recommend you do so, but if you believe in answering these questions, you will have to violate Royal Caribbean's internal



proprietary information, then you go ahead and indicate so. I will an assert an appropriate instruction not to answer, and we will try to preserve what we can, and let's take it question by question I guess.
MS. LOBEL: Because there was no protective order.
MR. DRAHOS: Hold on a second. Don't go there, because you asked the procedures for hiring, which you did. I could never have anticipated that you would ask, okay, tell me the specific questions you asked during the interview process. So in fairness to us both, I can't predict with certainty, I don't have a globe in front of me that will tell me what questions you asked. I am taking it question by question.
MS. LOBEL: I think it is pretty self-evident that I would want to know how they hire.
MR. DRAHOS: He told you --
MS. LOBEL: Hang on. In the clinical interview I would want to know what specifically is asked in order to hire or not hire somebody, which directly involves the issues involved in this particular case. So I do think it is highly foreseeable. I would ask specifically what happens during the clinical



interview because it is part of the hiring procedure, because the procedures are application, written exam, and then we will work our way through the rest of it, so to know what is actually done, I think is very --
MR. DRAHOS: I disagree with you, and if you felt like it was such an important issue that you needed to make sure that this would be covered, because specifically put, any testing for hiring shipboard medical staff in place, including but not limited to the time specific questions that are asked during the oral exam. So I am trying to give you some leeway here, but if you will start making up arguments like that, then I will start strictly holding you to the areas of inquiry in the way they are written. I don't think either of us want a deposition like that.
MS. LOBEL: I don't think so either; however, Michael, I do think I don't need to break down every single area of inquiry to that level of specificity, because I did not know exactly -- I know what Carnival does, but I don't know how it is run by Royal Caribbean. The only way for me to ask is a general, have you hired people? Now he is telling me he does a clinical exam. Okay, what do you do during the clinical exam? Tell me about it. What do you

Page 106

ask? What are you looking for? Because that is part of the hiring procedure.

MR. DRAHOS: I think the record will show he has done that, and now we have reached a point where you are asking information that he is concerned is not internal proprietary information. That is why I am saying, we are going question by question, and if you feel like you absolutely must know the specific question that was asked, then the judge will have to order it. For now, for today, we are going question by question and doing our best to try to avoid having to involve the judge.

MS. LOBEL: Okay.

THE WITNESS: Ms. Lobel, if you don't mind I don't mind telling you how the patient presents. I have to admit I am going to be as cooperative as a witness could be. That's my intention when I have whenever I do a deposition, but to reveal to you what the ultimate diagnosis in the patient is in these cases would violate every promise that I made to Royal to keep our proprietary data proprietary and, you know, within the corporation. So what I would think, if counsel will agree with me, I can provide you how the patient presents, but I would like to not discuss with you what the ultimate outcome of the

Page 107

interview correct answers would be; is that understood?

MR. DRAHOS: You're talking about the doctor, the candidate?

THE WITNESS: I don't mind telling you what I suggest for the candidate, the patient appears like and what problem they need to solve, but I would rather not reveal at the end of the interview what the outcome of what the patient actually had, because to do that would be, if anybody reads this deposition, that will totally abrogate the use of this clinical examination, they would have to reconstruct a brand-new one.

MR. DRAHOS: As I understand it, Doctor, what you are telling us is that the procedure is that you have a hypothetical question asked of the doctor, you ask them to work their way through a differential diagnosis.

THE WITNESS: Correct.

MR. DRAHOS: You said you don't ask any questions about stroke during these --

MS. LOBEL: We have not done that. That was on the written exam, Michael.

MR. DRAHOS: Okay.

MS. LOBEL: That is where I am going with this.

Page 108

If you specifically -- what specific --

BY MS. LOBEL:

Q. Doctor, I am not trying to be difficult, I really am not. I just want to get to the bottom of this. I am not trying to play games, whatsoever, but I do need to know because under the circumstances here, there are two doctors who are in question, and specifically one who appears to have been the lead on the day of the incident with my client, and it deals with the stroke, so obviously I want to know, for purposes of hiring, whether Royal Caribbean has as part of its test an exam or question that would have to either deal with a stroke, a cerebrovascular incident or acute incident or something to that effect. If this is a concern that you are having that these hypotheticals deal with the specific incident and they are real examples with real patients with real names that you have given, tell me, but that is where I am going with this. So with that context in mind, my question to you is, during the clinical examination, is part of the examination test, or have an analyses having to do with something related to a stroke, a cerebrovascular incident or acute incident or anything to that nature?

A. The exam begins with a patient that is found by the medical center staff completely unconscious.

Page 109

Q. Okay.

A. The candidate has to evaluate the various illnesses and acute emergencies that could cause the patient to become unconscious. Now, when we pass over that line, I would have to reveal to you what components of an unconscious patient exam the doctor would have to touch upon, to meet the minimum standard of what a doctor needs to do to evaluate a patient. And then based on those evaluations that the doctor does and those clinical pathways, the doctor would have to indicate -- the applicant would have to indicate what clinical processes have interventions they would administer. So the first test involves an unconscious patient, and the next task would involve a patient, that is a female, that comes in with acute abdominal pain, and the workup has to be thorough and consistent, and has to touch on all the life threatening possibilities. And finally if there is time or the candidate is sort of a borderline, has to make a decision based on the conduct of another exam, we would use an elderly gentleman that loses consciousness and has abdominal pain. And then they would have to make a determination of what would be the likely diagnoses, and what immediate emergency care should be delivered on board a cruise ship.

Q. Is there anything else in the -- it sounds like

Page 110

it is a three prong, if you can get to it.
A. Three scenarios.
Q. Can you tell me whether or not in any -- I think I can tell by two of them at least, if Royal Caribbean is testing or analyzing whether a doctor can identify an acute cerebrovascular incident or accident or a stroke?
A. When I constructed this clinical scenario methodology, I did not feel that that was a necessary scenario to present because we don't have the capability of doing MRI or CT scanning on board a ship. We cannot make a definitive diagnosis, and therefore, it would be a useless inquiry. It would be a dead end evaluation of a doctor's capability. He could just say yes, the patient is having a stroke, and that is all I can do. And that is a very, very weak and inappropriate clinical examination of the doctor's capabilities.
Q. At any point in time during the hiring process, whether it be a clinical interview or otherwise, is there a check to make sure that a prospective doctors knows how to at least identify strokes so that they then know how to handle -- that this is an emergency situation to either disembark or do a sea evacuation of that patient?
A. As the chief medical consultant, I did not see the point in doing that because every stroke presents

Page 111

differently. Every stroke presents with a different clinical presentation and to try to query a doctor on how to evaluate a slight stroke from a massive stroke, it just did not rise to the level of being indicative of a person's skill. Don't forget, again, I can't emphasize this enough. This is not an instructional opportunity where we are teaching our doctors. This is an attempt to evaluate a doctor's ability to take and evaluate an ill patient on board a ship, with a limited amount of time to do an oral examination, and therefore, the examination has to be pertinent and has to be -- you know, has to reveal the capabilities of the doctors that are applying for the job. So there is a limited number of scenarios that we can produce during the time. There is a limited number of clinical presentations that we can present by video, and we have to gauge the doctor's capability and his background, abilities and training based on those scenarios.
Q. What do you mean present via video?
A. Video examination.
Q. Oh, okay. The examinations with the prospective doctors is done via video teleconference, not in person?
A. Correct.
Q. I thought you were insinuating that you might

Page 112

show a video and then --
A. No.
Q. I apologize. Wouldn't you agree with me that Royal Caribbean does anticipate that there are going to be times when either a crew or passenger will suffer a stroke on board a ship?
MR. DRAHOS: I object to form.
A. I agree there that there will be times when there are passengers and crew members who will involve a stroke while on board the ship.
BY MS. LOBEL:
Q. And that has happened during the tenure of your time as being the chief medical consultant, correct?
A. There have been cases of stroke on board, yes.
Q. Would you agree that Royal Caribbean personnel in the medical center should be able to know whether or not somebody might be suffering from a stroke?
MR. DRAHOS: I object to form.
A. Like any doctor should be able to evaluate a patient for any condition, whether it be a heart attack, a low blood sugar, a thyroid storm, a stroke, the doctors are expected to be able to treat patients on board our ships.
BY MS. LOBEL:
Q. Would you agree with me that, therefore, Royal

Page 113

Caribbean's medical personnel should be familiar with stroke symptoms, such as trouble speaking?
A. Doctors should know the general presentations of strokes. It's part of their practice.
Q. That presentation would also include possibly trouble understanding what people are saying, correct?
A. No.
Q. Potential stroke symptoms include, for example, numbness of the face, paresthesia?
MR. DRAHOS: I object to the form.
A. You asked me a question, could the inability to understand someone's speech be indicative of a stroke? My answer is no.
BY MS. LOBEL:
Q. If somebody is experiencing trouble speaking, numbness, whether it be in their arms or legs, or sudden paralysis, difficult seeing, bad headache, trouble walking, would you not agree that all those would be signs and symptoms of a possible stroke?
A. No.
MR. DRAHOS: I object to the form.
BY MS. LOBEL:
Q. No?
A. No. I can sit here and give you three other situations where that would be the case.

Page 114

Q. Would you agree with me that would be part of the differential diagnosis that somebody presented with those signs and symptoms?
MR. DRAHOS: I object to the form.
A. Well, you are asking me now to testify as a medical expert I think. What I am saying to you is if a person's speech can't be determined, that is not necessarily an indication that they are having a stroke. As we go further and further, asking to answer more medical questions, I am really not comfortable doing that for the purpose of this depo.
BY MS. LOBEL:
Q. What I want to know is Royal Caribbean's expectation. Is Royal Caribbean, since it is operating medical facilities to care and treat patients, whether it be crew or passengers, should they, and as Royal Caribbean's expectation, that the personnel should recognize that if somebody walks in here who has trouble speaking, numbness in the face, arms or legs, sudden paralysis, severe headache, inability to see very well, trouble walking, that the expectation is the differential diagnosis should include potentially a stroke?
A. An eventual diagnosis should include a stroke; however, there are quite a few other conditions that can mimic that. We expect our doctors to be well versed and

Page 115

trained in medical care and to recognize many of the differentials that are possible in any case it presents.
Q. Does Royal Caribbean expect that its medical personnel should be familiar with -- and you see it in the hospitals all the time, the acronym FAST having to do with stroke?
A. No.
MR. DRAHOS: Objection.
BY MS. LOBEL:
Q. Does Royal Caribbean have in its medical center, you see them in hospitals all the time, that says FAST, where it says potential stroke symptoms, it mentions face, arms, speech, time, as an acronym?
A. The placards that you are referring to are basically dumb down for the general public, they are for lay people. We expect our doctors to have a higher level of understanding the mechanisms to include that in a differential that could be quite exhaustive.
Q. How does Royal Caribbean ensure that the physicians that they hire are familiar with stroke symptoms in order to either rule in or rule out a stroke as in a differential diagnosis?
A. The same way that we are familiar with whether doctors can treat heart attacks, amputation, crush injuries, abdominal trauma, any other illness, if it can

Page 116

be presented with on board a ship. We do the examination that I described. The hiring process that I described, and we have to evaluate the ability of a sufficient general knowledge capability.
Q. Does Royal Caribbean expect that its doctors will know that a potential stroke is a time sensitive situation?
MR. DRAHOS: I object to form.
A. Well, doctors know that there are limits to the ability to treat certain conditions. It would be the same as knowing whether or not a face could be sewn up so many hours after a laceration or whether a clot buster could be delivered at certain time after a heart attack. It depends on a lot of variable factors, and the doctors are expected to administer the treatment according to the general parameters.
BY MS. LOBEL:
Q. And with regard to general parameters of stroke treatment, you would agree with me that there is a very common saying in the medical community that time is brain; do you agree with that statement?
MR. DRAHOS: I object to form. Are you asking Royal Caribbean or Dr. Shore?
MS. LOBEL: I am asking Royal Caribbean.
MR. DRAHOS: That is outside the scope. Royal

Page 117

Caribbean is not a medical expert.
MS. LOBEL: Royal Caribbean provides medical centers with doctors that it hires and trains them to know a lot of medical things.
BY MS. LOBEL:
Q. Doctor, if you understand my question, go ahead.
MR. DRAHOS: I object to the form.
A. We expect our doctors to know what needs to be administered, whether it is to reattach it, an amputation, whether it's to treat a heart attack, whether it's to suture a face, whether it is to administer a toxic -- you know, a reversal agent for toxidrome. These are all time dependent issues. Our doctors are generally expected to know how and when to treat depending on each individual circumstance.
BY MS. LOBEL:
Q. And you would agree with me that that would include a circumstance where somebody is suffering from a potential stroke?
MR. DRAHOS: I object to form.
A. You are using very vague terminology, a potential stroke can present with multiple different presentations, and to say potential stroke there is no way to make a definitive diagnosis on a ship.

Page 118

BY MS. LOBEL:

Q. I understand that, but if a doctor does not know one way or the other if somebody is suffering from a stroke, but they might be suffering from the stroke, you would agree with me that the doctors are expected to know that may be a very time sensitive emergency that he or she has on his or her hands though, correct?

MR. DRAHOS: I object to the form. Outside the scope.

A. We expect the doctors to be fully trained is my answer and they come to the medical program with knowledge and ability.

BY MS. LOBEL:

Q. And that knowledge and ability would deal with a set of circumstances where somebody might be suffering from a stroke though, correct?

MR. DRAHOS: I object to the form.

A. You keep suggesting the same illness. Our doctors are expected to know the times to treat a variety of illnesses, and that would include the different situations I mentioned, and each is different. Each is unique and each has to be treated locally and in the proper fashion on board the ship based on what is available.

BY MS. LOBEL:

Page 119

Q. Does Royal Caribbean expect that its doctors should be aware that if they cannot handle the care and treatment of the patient in the medical facility, and it's an emergent condition, that they should seek to disembark the patient?

A. Again every case is different, and it depends. Sometimes disembarkation is not available and an evacuation is not possible. Sometimes an illness is unclear. Sometimes a diagnosis is unclear. Each case is handled individually.

Q. Would you agree with me that if a doctor is unsure whether they have a medical emergency, they should act in an abundance of caution that it's a medical emergency and seek to disembark the patient, instead of waiting to find out what happens?

A. No, I don't agree.

MR. DRAHOS: Objection to form.

BY MS. LOBEL:

Q. Why is that?

A. Because there are other resources available. There is another doctor on board. There are nurses with experience, with whom the case could be discussed. There are cases of psychiatric illnesses and dermatology, there is telepsychiatry and teledermatology, consultation is available, so an emergency medical evacuation is not the

Page 120

only option available on board the ship.

Q. That was not my question. So let me make it more specific. If every physician, let's say the nurse, the doctor, everybody agrees we think we have somebody who may be suffering from a stroke, is that a situation where Royal Caribbean expects the medical personnel on the ship to start working to do a disembark or evacuate the patient?

MR. DRAHOS: Objection.

A. I will answer the same way. Each case is an individual case, depending on the presentation, the urgency, the progression of symptoms, among other things. That decision has to be made on board the ship.

BY MS. LOBEL:

Q. Would you not agree that a potential stroke is an urgent situation though?

MR. DRAHOS: I object to the form.

A. You are leading me down a pathway to get an answer that I am not inclined to give you, because you are not allowing me to give you all the variables that are available. The patient can be stuttering and improve. The patient could have a misdiagnosis. The patient could have a variety of other ailments that are compounding the situation. The course of the patient's symptoms can have been waxed and waned. You are asking

Page 121

me to agree to a stipulation of situations where every cause is unique, and I am not willing to do that.

BY MS. LOBEL:

Q. If you have a situation where a patient cannot move one side of their body, they are having trouble speaking, can't see out of their eyes anymore, is the expectation under those circumstances and the doctor's working diagnosis is cerebrovascular incident or stroke, under those circumstances is it Royal Caribbean's expectation that the medical disembark or medical evacuation procedures be initiated by that physician?

MR. DRAHOS: I object to form. Asked and answered.

A. There are too many hypotheticals. I can't possibly answer all of them. You are giving me a very, very hypothetical presentation of maybe this, this might be the case, that might be the case. Every case is unique. I have answered it repeatedly. I would like to maintain that answer to you, each case has to be evaluated. We expect our doctors to have a level of training that would allow them to evaluate each case appropriately and take the necessary steps. Every situation is different. Every patient is different. That is the best answer I can give you.

BY MS. LOBEL:

Page 122

Q. When is there a situation where there is a suspected stroke that a doctor -- that Royal Caribbean expects the doctor to initiate a medical evacuation in the patient?

MR. DRAHOS: I object to form. Asked and answered.

A. When the doctor feels that the patient is definitely having a stroke, to the best of their ability. When there are no other reasonable diagnoses. When two physicians on board, if they are available, concur, if the situation allows for disembarkation. There are so many variables that it would be impossible for me to answer your question.

BY MS. LOBEL:

Q. I want to go back to the hiring process for a second, because we went through -- there is the application. There is the written test, and then there is the clinical interview. I forgot to ask you on the written test, is there a certain percentage in order to pass or fail that test?

A. I believe it's 80 percent.

Q. Now, after somebody goes through -- the written application goes through, they pass the written test, they pass the clinical interview, is there a regular interviewing process done by a group from Royal Caribbean

Page 123

to determine whether they feel that person should be hired?

A. That would have happened before the clinical interview and before the written test. The Human Resources Department would review the person for their affect, for their personability, for their review of the credentials that they present. They would get a police report. The person also would have to have certification in advanced trauma life support, advanced cardiac life support; pediatric advanced life support, and all those factors would be taken into account before the patient{sic} was presented with a written test.

Q. For the credentialing process, does Royal Caribbean, as part of the hiring process, call a doctor's local medical board to see if there were any disciplinary actions?

A. We check and see that the patient -- I am sorry, I keep saying patient. We check to see if the applicant has had proper certification by the local board of medicine, and we -- let's see. You asked me several questions. Can you repeat the question?

Q. I wanted to know if as part of the credentialing process, which is looking at whether they have been boarded or have a medical license locally, I want to know if Royal Caribbean as part of the hiring

Page 124

process checks if there had been any disciplinary actions by the local board or governing authorities?

A. Yes. We leave it to the governing authority to police the issuance of a medical license, but the board license is checked as well as any certifying boards are checked and confirmed, as well as a police record.

Q. But does Royal Caribbean ask when checking if the license is current, if there had been any disciplinary actions?

A. I believe that would appear on the person's medical licensure board, medical license.

Q. Now, does Royal Caribbean check if there had been any disciplinary actions for any candidate at any hospital or medical facility that they previously worked at?

A. We ask for recommendations from two clinicians that work with the candidate and if they are aware of anything that would disqualify that person. I might mention that a lawsuit against a doctor would not be a disqualifying event. But yes, we do check with colleagues that practice, and we ask if there is anything that they would feel would be disqualified.

Q. Do you check from hospital administration who would be the disciplinary authority, whether or not any disciplinary actions have been taken?

Page 125

A. I believe that is part of the application process.

Q. In what part of the process? Where would that come up if I were to look?

A. Human Resources would be the best people to answer that question. I don't get involved in that detail.

Q. Would that information be contained within an applicant's personnel -- an applicant's file if there were any found any disciplinary actions?

A. I believe so, but you would have to confirm that with Human Resources.

(Brief recess.)

BY MS. LOBEL:

Q. Doctor, are you familiar with a medical program -- I am not sure if it is called Med USA or Medusa depending on the acronym.

A. Yes.

Q. Does Royal refer to it as Med USA or Medusa?

A. Medusa.

Q. Can you tell me what that program is?

A. Was.

Q. Was. What was it?

A. It was a general program to maintain contact information and scheduling information for doctors and

Page 126

nurses across the fleets.
Q. When did Royal stop using that program?
A. I don't know the exact date, but I would think it's about a little more than a year and a half ago.
Q. Was it in effect at the time of this particular case?
A. I don't know.
Q. What was the Medusa system replaced with, if anything?
A. The credentialing program and credentialing portions taken over by Human Resources to a program that is in their control, so I am not familiar with the exact name of it, and the scheduling information -- let me see, what else was there? The scheduling information was taken over by the office of Royal Caribbean in the Philippines, the Human Resource office there.
Q. Back in either 2014 or in 2016, would the Medusa system still been in effect for purposes of credentialing and the hiring personnel files I guess for doctors?
A. Yes, ma'am.
Q. Bear with me one second. I am going to go to Bates 398. Doctor, you are more than welcome to look at your own binder. We are looking at the same document.
A. I was looking at --

Page 127

Q. I am sorry. I am on the wrong one. 398, sorry, my fault, here we are.
A. 398?
Q. Yes.
A. If you give me one second.
Q. I want to make sure your 398 and my 398 are the same.
A. It starts actually on 396, am I right?
Q. This section of the document, my questions pertain to 398, but for clarity sake, for the section of the materials I am happy to backtrack. Are you familiar with the Bates stamp starting at 366 being some of the materials from Royal Caribbean related to Med USA or Medusa?
A. No. I have not seen that before.
Q. Are you familiar -- well, is this a Royal Caribbean document? I think I have a stipulation, but I want to make sure you recognize this?
A. I believe it is.
Q. What I wanted to know, scrolling down to 398, in this document, do you see the section where it looks like it's a -- it almost looks like it's a screenshot of the computer screen?
A. Yes.
Q. It looks like there is a section where Royal

Page 128

Caribbean's procedures for purposes of credentialing is located. Am I correct in interpreting this document is the computer screen that is listed below has all of the documents that are supposed to be uploaded for purposes of credentialing shipboard doctors or nurses?
A. I am not really familiar with the specifics of the exact documents that were required to be processed. It is something I am not an expert in.
Q. Would you agree with me that credentialing is part of the hiring process Royal Caribbean uses?
A. Credentialing is part of the hiring process, I agree to that.
Q. And the credentialing process is well delineated in Royal Caribbean's policies and procedures though, correct?
A. What is it you are pointing to on the screen? I am confused.
Q. I am making sure I listed this because one of my designations had to do with any credentialing for hiring shipboard staff that was in place at the time of the incident, so I am going to switch back to where we were. I know you, as a doctor, as Dr. Shore may know this, but for purpose of the corporate representative, I want to make sure that this screen shows the list of all the documents that were supposed to be used for

Page 129

purposes -- that were required for hiring and credentialing.
A. What I can answer is the Medusa program was in use. It was a program that captured the credentialing information as to the specifics of using it and reviewing it as I don't have any detailed information on that.
Q. If we scroll down, there is a credentialing checklist. Can you tell me whether the checklist that is at the bottom of 399 and continues to the top of 400, was the credentialing checklist used by Royal Caribbean or is to this day, I don't know?
A. I am looking. Just a minute, please. This is a basic checklist. I would have to compare this to what the Human Resources department currently uses as our credentialing checklist.
Q. Was this the credentialing checklist that was used in your tenure as the chief medical consultant?
A. In the early portion of it, yes.
Q. Would this checklist have been used for credentialing back in 2014 and 2016 when Drs. Pereira and Etsebeth were initially hired?
A. I believe so.
Q. So once the doctors are formally hired by Royal Caribbean, is the next step to have them sign a contract to see if there is an agreement with Royal Caribbean?

A. That was done by the Human Resources department.
Q. Royal Caribbean would -- strike that.
Royal Caribbean considered shipboard doctors seafarers just like the rest of the crew that works on its ships, correct?
A. That's correct.
Q. And Royal Caribbean paid doctors and nurses their salaries, correct?
A. When they were employees, yes. Before they were made employees they were paid under a consulting agreement.
Q. Understood. Was the payment period for Royal Caribbean doctors a biweekly payment?
A. I don't know.
Q. Now, with regard to -- let me get the Bates stamps so we are looking at the same thing. I believe it is 110? I am going to share my screen. I am starting at Bates 110 and I believe it continues, but would you agree with me this is an example of one of the employment agreements or the first page of the employment agreement for Dr. Pereira? I will be happy to scroll down if you need to see more.
A. I am looking at it under my Bates stamp.
Q. I have my first Bates stamp for the agreement


that I am looking at Bates 110.
A. Yes. That would be his employment agreement.
Q. Am I correct in understanding, the very first date Dr. Pereira was hired was April 23, 2014 based off of this document?
A. Based off of this document, that would seem to be his first date of hire, yes.
Q. Do you know if when Dr. Pereira was initially hired by Royal Caribbean, if he was a senior doctor or if he entered at a lower status?
A. I don't know.
Q. I don't have a copy of it, but is it your understanding that at the time of this particular case, Dr. Pereira was under contract with Royal Caribbean?
A. Yes.
Q. Do you know if Royal Caribbean has found the contract that he was under at the time of the incident yet?
MR. DRAHOS: Can I step in to help? I think we have now produced that.
MS. LOBEL: I thought Etsebeth but not Pereira.
MR. DRAHOS: I think we have Pereira as well.
MS. LOBEL: Let me double check. I know Etsebeth was 445, 446, something like that.
MR. DRAHOS: It is Bates stamped 457.


MS. LOBEL: Let me go there. You know what, I have a gap between 454 and 466.
MR. DRAHOS: Good. So you want me to e-mail it to you right now?
MS. LOBEL: Would you mind? I have a switch in paralegals and that may be why. I can still ask the questions without it. I want to know where the contract started, if he was boarded from San Juan or someplace else when he joined for that specific contract.
MR. DRAHOS: I just gave it to her.
MS. LOBEL: That's fine.
THE WITNESS: Where do I want to look, so I can get the document ready?
MS. LOBEL: My Bates stamp, which I think is somewhere between --
MR. DRAHOS: 457.
MS. LOBEL: I knew it was in the fifties. Doctor, so you know, it's the contract that was in effect back in February of 2019 for Dr. Pereira.
MR. DRAHOS: His CV is also in there. I don't know if you have that, but it's coming.
MS. LOBEL: I go straight from 447, 454, then I have 466, 454.
MR. DRAHOS: You are missing that particular


disclosure.
MS. LOBEL: Which I am sure you sent, I am not contesting that.
MR. DRAHOS: Almost a year to the day, it was like November 3rd of 2020.
MS. LOBEL: Happy anniversary.
MR. DRAHOS: November 3, 2020. I just sent it so you should have it in a second.
BY MS. LOBEL:
Q. Doctor, we are back on the record and we were going to talk about Dr. Pereira's contract that was in place at the time of the case we are here to discuss today.
A. Okay.
Q. Just for the record, that starts on 457 and goes through Bates 460.
A. Okay.
Q. Am I correct in reading that Dr. Pereira for purposes of this contract signed on to the Harmony of the Seas on September 3rd of 2019?
MR. DRAHOS: That's February.
MS. LOBEL: February 3rd, 2019.
A. You confused me there. Yes, February.
BY MS. LOBEL:
Q. It gives a projected signoff date of May 9 of

2019?
A. Yes, ma'am.
Q. When did Dr. Pereira sign off the Harmony of the Seas?
A. I don't have that information available.
Q. Where would that be documented?
A. Payroll and Human Resources would have that information.
Q. Do you know -- I understand the document for purposes of payroll would be, but are there other Human Resource documents that would indicate the signoff date, like the name of the document?
A. I don't know the specific name of the document. I am sorry.
Q. But it would be something that is documented, because I understand the projected date is not the actual date of signoff?
A. Correct.
Q. Do you know if Dr. Pereira was terminated as a result of this incident?
A. I do know.
Q. I am sorry?
A. I do know.
Q. And what is it, what happened?
A. He was not terminated or relieved of duty.


Q. Was he suspended?
A. No, ma'am.
Q. Am I understanding the contract correctly, if we go down, I think it's page 460, that the location of port where the contract was signed is Fort Lauderdale; is that correct?
A. Yes.
Q. Would that be the port where Dr. Pereira would have boarded the ship and when completed the contract had vacated the ship?
A. It means that that is where he would have boarded the ship. It does not necessarily indicate where he disembarked.
Q. For purposes of this contract, understanding that Dr. Pereira would be sailing on the Harmony of the Seas, and part of the itinerary was going to include the Port of San Juan?
A. Is that a question?
Q. Yes. Was it expected that -- strike that.
As part of the contract that we just reviewed for Dr. Pereira, was part of the itinerary going to be for the duration of his contract, sailing with the vessel that was going to, as part of its itinerary, stop at the Port of San Juan?
A. Yes.


Q. From February 2019 through May 9, projected, 2019, the Harmony of the Seas stopped at the Port of San Juan?
A. Part of its itinerary.
Q. Yes, okay.
A. That's not the only port. I want to make that clear.
Q. Understood. It is part of the itinerary where the vessel stopped at other locations, one of the stops throughout the duration of that cruise was the Port of San Juan?
A. That's correct.
Q. And would Dr. Etsebeth's seafarers agreement be identical or nearly identical to Dr. Pereira's?
MR. DRAHOS: I object to the form.
A. Well, I would like to see the document.
BY MS. LOBEL:
Q. I will be happy to pull it up. It is Bates 447 to 456. If I remember correctly. I will get it for you.
A. Are you going to bring it up? I will let you bring it.
Q. Sure. I will be happy to do it, the beauty of Bates.
MR. DRAHOS: Before we go any further on this, this has been mistakenly revealed in this disclosure,


which was a clerical error on my office's part, so I would have to ask you to redact that, particularly if we are going to have it attached as an exhibit.
MS. LOBEL: I don't know how to do it on this program. I know how to do it in my office program. I can accommodate that on the office program.
MR. DRAHOS: Will it be attached as an exhibit?
MS. LOBEL: I will attach the full production, but what I will do I will attach -- since everything is Bated, I am not as concerned about that. I will attach everything and itemize all the exhibits and I will bring out the Bates that the exhibits cover. If it is Bates stamped it is less of an issue, because we know what the exhibits are. What I can do is when I share my screen --
MR. DRAHOS: I see the top part.
MS. LOBEL: I did not even notice.
BY MS. LOBEL:
Q. So, Doctor, do you agree that this is the -- a portion of the seafarer agreement for Dr. Etsebeth that was in effect at the time of the incident?
A. I want to look at the dates, November, 2018; March, 2019. Yes, I agree.
Q. I am passing over, Doctor, at the bottom of that first page of the agreement, but then I am scrolling

through it -- it is four pages just like Dr. Pereira's was four pages, would you agree with me that Dr. Etsebeth's contract is more or less the same as Dr. Pereira's, other than start and stop dates?
A. Without reviewing each and every detail of the document, which is, you know, time consuming, I would agree this was a standard contract that was offered to Dr. Etsebeth.
Q. Similarly, Dr. Etsebeth signed on at Port Everglades, which is the Fort Lauderdale port?
A. That is correct.
Q. Based off of this contract, we can see that Dr. Etsebeth had been sailing on the Harmony of the Seas approximately two months before Dr. Pereira joined?
A. I will take your word for it.
Q. We looked at the agreement where Dr. Pereira had signed on on February 3 of 2019, and this contract shows that Dr. Etsebeth had signed on -- what was it? November 10 of 2018, would you agree that Dr. Etsebeth was already on the vessel at the time that Dr. Pereira signed on?
A. Yes.
Q. Had Dr. Pereira been on the Harmony of the Seas before the contract that was after the time of the incident?



A. I don't know.
Q. Do you know about whether or not Dr. Etsebeth had been on the Harmony of the Seas before this contract?
A. I don't.
Q. Do you know if Dr. Pereira and Etsebeth had worked together or had served in a medical center together at any time before this incident?
A. No, I don't remember.
Q. Is the hiring process for shipboard nurses who work on Royal Caribbean ships similar to that which is done for the doctors?
A. I can only speak in general terms about the hiring of the nurses, because it is not something that I was actively involved in, but speaking on behalf of Royal, it is a somewhat similar process in terms of credentialing, meeting the standards as delineated in the ACEP guidelines and doing the interviewing similar to what the doctors do.
Q. Who is in charge of the hiring and vetting for initial hired nurses for Royal Caribbean?
A. The shoreside nurse who works in the Miami office.
Q. What is that person's name?
A. Anne Bile, B-i-l-e.
Q. Anne with an E?



A. Yes.
Q. So we are clear, I know I asked about doctors, Royal Caribbean nurses are employees just like the doctors are of Royal Caribbean?
A. They have always been employees, yes.
Q. And they also hold crew member status with a ranking?
A. Yes. You are talking with the striping, am I correct?
Q. Correct. The officer ranking, nurses also hold a ranking, but the ranking is below the doctors?
A. Correct.
Q. Do the nurses report to the doctors on the ship?
A. Yes, they do.
Q. Do the doctors on board Royal Caribbean ships supervise -- strike that.
Do the doctors of the ship assign the roles and responsibilities for nurses as to what they are expected to do while working in the infirmaries?
A. No.
Q. How are their duties outlined or assigned?
A. In the job description.
Q. And the doctors are supervised to ensure that they performed their duties as delineated in the job



description?
A. That's correct.
Q. Once doctors are officially hired by Royal Caribbean, do they undergo any form of training?
A. They are expected to maintain their credentialing throughout the process and while they are hired on board.
Q. Is there any like orientation training that is done once doctors are first hired?
A. Are you referring to doctors now or nurses?
Q. Just doctors.
A. You are going back and forth. Ask again.
Q. Doctor, just so you know where I am going with you, doctors, and then I am going to ask you the same thing about nurses. So with that in mind, for purposes when doctors are first hired, is there an orientation training that Royal Caribbean gives to them?
A. Yes.
Q. Can you tell me everything Royal Caribbean does during that orientation training?
A. I can tell you in general terms because the medical program isn't involved in the entire training process. The fact that they have to be treated as any other seaman would be treated, so they have to go through STCW training. They have to do lifeboat drill. They

have to attend public health discussions. They have to actually provide some of the training for the crew members in basic life support, and there are general orientations that are done for every crew member. Sorry, but I am not familiar with the exact details of these orientations.

Q. What does STCW stand for?

A. The -- oh, goodness. I have always used the initials. I don't know. It is a standard -- Mr. Drahos, Can you help me? Do you know what the STCW designation is?

Q. That is why I am asking.

A. I have used it my whole career and I don't know the answer.

Q. Not a problem. So the record is clear for a court or a jury or anyone hears what STCW is, can you explain briefly what that is?

A. It is the requirements of a ship to be maintained in a proper fashion, so that alarms are understood, so that lifeboat procedures are understood, so that the requirements of the crew members are well known to them, and there is a basic training program that has to be followed, including how the swimming capabilities, lifeboat capabilities, and all those types of -- Michael, can you help me on that?



MS. LOBEL: We want the name.

MR. DRAHOS: Standards Of Training Certification and watch keeping Procedures.

BY MS. LOBEL:

Q. Is there any training in the orientation training that is specific to medicine or medical?

A. There is an orientation like a handover that is required of the doctor-on-duty with the doctor, and there is a senior nurse with the nurses. It's a standard medical orientation, but there is no specific medical training required. We have to depend on the fact that the doctors we hired are fully trained and licensed, that they have ATLS, ACLS, PALS certification, and that their license is active, in good standing and, of course, these are the only people who passed our written and our oral clinical exam. So yes, so in that regard we have to -- you know, we go with doctors who are well trained and capable of doing their jobs.

Q. Is there any -- strike that.

Does Royal Caribbean provide training to its shipboard physicians with regard to medical evacuations?

A. We encourage them to review the SQM policies and guidelines. We provide them with a CME, continuing medical education, stipend to encourage them to stay up to date on procedures in general medicine, and we do



require that they be certified in the various certifications that I mentioned that are recognized worldwide, such as advanced cardiac life support, advanced trauma life support, pediatric advanced life support. There is a delineation of policies in SQM for evacuation procedures that the doctors are expected to review.

Q. How does RCCL know whether or not the doctors know the SQM procedures for medical evacuations, whether it be at sea or at port?

A. Because they are responsible officers who are boarded and expected to know their job.

Q. Is there any practical training where there is like a mock emergency, like if there is somebody who is sick at sea, we have to get them off the sea, where you had kind of like a dry run to ensure everybody knows their role?

A. Yes.

Q. How frequently is that done?

A. Monthly.

Q. Now, is that drill done just for hypothetical sea evacuations, or is there also a mock evacuation for if the vessel is at port?

A. That is specifically for evacuation. There is what we call a mock code, so a code alpha or a high level



acuity emergency, they would be treated in a general population on board. That would be what is done on a monthly basis. Each senior doctor takes it on to do a code that demonstrates, you know, the ability of the team to operate consistently and at a high level, to handle the emergencies presented on board. It is not specific to evacuation.

Q. Can you run me through what happens -- if we do a mock code alpha or a real code alpha, what is the procedure that is supposed to be followed?

A. The office is notified, the reception desk is notified. The code alpha call goes out. It will say code alpha. It identifies the location. If it's a mock code or a real code alpha, the medical team has a nurse who is assigned to grab the pack that has all the essential equipment and join the team at the site of the code. If it is a mock code they may bring stretchers, there might be a stretcher team involved that would carry the stretcher and the mock patient. If it a real code, they generally will bring stretchers, oxygen tanks and a basic code pack that is required, a code alpha pack.

Q. Does part of this code alpha, whether it be real or mock, involve, you know, pretending or actually calling shoreside to inform shoreside, that part of the procedure?

A. No.
Q. What about apprising the captain? Would that be part of the code alpha?
A. Again, you are mixing -- I don't know whether you are talking about a mock code or real code. Can you be clear?
Q. Forgive me. For mock code alpha, would the practical include like a mock, I am telling the captain of the code alpha; is that part of the mock-up?
A. Not that I am aware of.
Q. In a real code alpha is the captain or staff captain supposed to be apprised?
A. Yes.
Q. Are shipboard medical personnel given any training as to how to get emergency transport for a medical emergency for either sea or on land?
MR. DRAHOS: I object to form.
A. There are too many variables because, you know, you have to identify more specifics, because there are differences between dealing with an emergency on sea, dealing with emergencies on land, what type of an emergency? It is all up to the doctors' discretion as to what level of emergency they are dealing with and how best to handle it on board. The doctor would be responsible for making the medical determinations. The



captain or staff captain would be responsible for making logistical determinations. So that is why your question is very vague and broad.
BY MS. LOBEL:
Q. I understand. So the doctors, they should know the different options for medical transport that are available to them when working on Royal Caribbean ships?
MR. DRAHOS: I object to the form.
A. The doctors would have to confer with the captain or the staff captain to know what the logistics are, and again, I have to emphasize, your question is so broad and so vague, that it's hard for me to provide an honest response. I am trying the best I can.
BY MS. LOBEL:
Q. Let me give you a more specific hypothetical. Shipboard doctor, shipboard nurse are in agreement we have a patient who is suffering a stroke. The ship is located at sea. The next step would be to tell the captain we have a patient who is likely or we believe to be suffering a stroke; is that correct?
MR. DRAHOS: I object to form.
A. Again, it is far too vague. I don't deal well with hypothetical situations. Every case is different. Depends on the nature of the stroke. Depends on whether, in fact, it is or is not a stroke. Depends on what the



doctor's judgment indicates. Depends on whether the captain feels that the logistics provide opportunity for evacuation. There is just too many balls in the air for me to give you specifics on how each case is handled.
BY MS. LOBEL:
Q. The vessel has limited capabilities to determine -- to diagnose somebody on the ship. You would agree with me if there is any uncertainty as to the definitive diagnosis, that the most likely diagnosis is a stroke and the vessel is at port, that would be a situation where the medical team should be moving to evacuate that patient, correct?
MR. DRAHOS: I object to the form.
A. Again, it is way too vague. I think in each case you would want to speak with the doctor who attended the patient to see what the doctor saw, to see what the patient appeared to be like, to see the progression of the illness, whether it is getting better or worse. You would need to know what the weather is like. You would need to know what facilities are available on shore. You would need to know the disposition of the captain, who is concerned about safety for all people on board the ship, not just the specific patient. There are just so many variables to do a hypothetical for me, it would be irresponsible.



BY MS. LOBEL:
Q. I want to know what Royal Caribbean expects their doctors to do, so if the ship is at port and the doctor believes that the patient is suffering from a stroke, I want to know if Royal Caribbean expects the doctor to work to get that patient off the ship, to get them to a higher facility for care and treatment?
MR. DRAHOS: I object to the form.
A. Royal Caribbean expects the doctor to treat the patient appropriately for the condition as it presents. That is my definitive answer.
BY MS. LOBEL:
Q. But if the condition is a stroke, does Royal Caribbean expect that that would be treated like a medical emergency?
MR. DRAHOS: I object to the form.
A. Can you ask it again? I am sorry.
BY MS. LOBEL:
Q. If the condition that is in question is a stroke, does Royal Caribbean expect its shipboard doctors to treat a stroke as a medical emergency?
MR. DRAHOS: I object to the form.
A. How do we determine that the patient is having a stroke? That is a judgment that the doctor has to provide. It is not something I can answer. It is a

Page 150

hypothetical.
BY MS. LOBEL:
Q. If the doctor believes they have a patient with a stroke, and they have done as much of a differential diagnosis that their resources have, okay, is it Royal Caribbean's expectation to treat that person as a medical emergency and disembark the person from the ship?
MR. DRAHOS: Objection.
A. Each case is different. I am sorry. I interrupted.
MR. DRAHOS: I object to the form. Sorry, I am trying to get them in before you answer.
THE WITNESS: Can you repeat the question?
BY MS. LOBEL:
Q. So a hypothetical is that a ship is at port, we are by a city. The doctor says this patient is having a stroke. Is the expectation for Royal Caribbean that that doctor is going to expedite and move expeditiously to get that patient off a ship to a capable facility?
MR. DRAHOS: I object to the form.
A. Only if the doctor feels that that is what the clinical case requires. That is something I can't opine on as a representative of Royal Caribbean. It is not a corporate decision. This is a decision that is made on board by a physician in consultation with the captain,

Page 151

who must handle the logistics. I mentioned the variables, and if you would like, I can repeat them.
BY MS. LOBEL:
Q. I just want to know -- I understand you're talking about making clinical decisions. I just want to know Royal Caribbean's expectation. If there is a patient who is suffering an ongoing present time sensitive medical emergency, is the expectation from Royal Caribbean that that doctor will do everything within his or her power to disembark and medically evacuate that patient in a timely manner?
MR. DRAHOS: Objection. Go ahead.
A. The answer I was going to give you is that it is up to the doctor to make a clinical decision based on whatever capabilities he has available, and then he has to go in consultation with the captain, who will determine the logistics, and he has to deal with the port agent, who will be more familiar with what is available at shore, because the doctor can't possibly be expected to be up to date in realtime on every possible disembarkation, opportunity or evacuation benefit. So again, as a corporation and speaking for the corporation, not as a doctor, I can say that the corporation does not have a stance on how the doctor should manage a hypothetical case. The case has to be dealt with in

Page 152

realtime by a physician, by a captain to handle logistics and perhaps by a port agent, who can provide more support of the local situation. There is no way that a corporation could determine what needs to be done on a hypothetical.
BY MS. LOBEL:
Q. Does the corporation have a current protocol for how it expects doctors to handle a medical emergency disembark?
MR. DRAHOS: Objection.
A. We have SQM. The corporation maintains policies, SQM, that the doctors are very well versed in.
BY MS. LOBEL:
Q. Let's talk about it. Tell me everything that the doctor is supposed to do when there is a medical emergency, and there is going to be a disembarkation at a port, at a port of call?
MR. DRAHOS: I object to the form.
A. That's a very broad question. I can review the SQM policy. We can go through them step by step. I can't answer as to what every emergency is supposed to look like.
Q. Does Royal Caribbean have a protocol as to what is supposed to be done if there is a medical emergency and disembark is going to be handled at a port?

Page 153

A. Yes. There are policies that are listed in SQM that explain what steps should be taken in the event of an emergency that presents with the capability of disembarkation. Again, I can't emphasize enough that that is a decision that needs to be based on the presentation, to be evaluated by a physician, by the logistics as dictated to the captain, by the resources available, whether it's the Coast Guard and the Coast Guard's senior medical officer in the case, or whether the port agent at a shoreside facility knows what capabilities are available locally. So all of those factors have to play a part in the decision making.
Q. Does Royal Caribbean research the abilities and what medical resources are available and in the course it elects to include in its itinerary?
A. Royal Caribbean encourages our doctors to visit local ports on occasion. It is not on a specific schedule or routine, and that we rely very heavily on the abilities of the port agents to our locals who know their work, who know what facilities are best chosen under certain conditions, because not every center can have the best care available, the best equipment available, specialize in certain illnesses or even have possible -- what the best word? I guess you would say hygiene or hygienic conditions, because these are foreign ports, and

Page 154

the port agents are the best people to make those determinations.
Q. But what I want to know is does Royal Caribbean do its own research into medical abilities, each of the ports that it elects to include on its cruises?
MR. DRAHOS: Objection.
A. No.
BY MS. LOBEL:
Q. Does Royal Caribbean have a shipboard stroke code?
A. I am not sure what a shipboard stroke code is.
Q. You are familiar that hospitals and medical facilities in the United States have stroke codes, correct?
MR. DRAHOS: I object to the form.
A. No, I am not.
BY MS. LOBEL:
Q. You worked in the ER before.
A. For 25 years.
Q. So you are familiar with what a stroke code is.
MR. DRAHOS: I object to the form.
A. Right. I am not aware of a stroke code. I am sorry.
BY MS. LOBEL:
Q. After working you said 25 years?

Page 155

A. Yes, ma'am.
Q. 25 years in an ER you never heard of any codes specific to stroke in an ER?
MR. DRAHOS: I object to form.
A. No. I believe I answered that, no.
BY MS. LOBEL:
Q. Does Royal Caribbean have a special code for strokes?
A. We have the SQMs to dictate how the patients process -- what the process is for disembarkment. A patient for an evacuation, but there is no specific stroke code as such.
Q. Does Royal Caribbean have codes specific to other medical conditions, such as a heart attack or something else?
A. Royal Caribbean relies on the doctors to come on board for training and the ability to handle emergencies. We don't dictate to the doctors how to practice medicine.
Q. If there is a situation where there is an -- a patient is suffering a medical emergency and they need to be disembarked, is there an e-mail blast or a code announced on the ship to apprise the rest of the crew about the medical emergency?
MR. DRAHOS: I object to the form.

Page 156

A. There are various types of emergencies, so if you delineate which types of emergencies you are speaking about, I can tell you whether announcements will be made.
BY MS. LOBEL:
Q. I am asking you because I don't know which emergencies would warrant an announcement and which would not, so if you can advise me as to which would have an announcement and which would not?
A. If we have, for example, a patient that is hemorrhaging, and we might make an announcement that people who are blood donors who have American Hospital Association transfusion cards, we make an announcement to that effect, to have people come down who would like to donate blood for a hemorrhaging patient. That would be one example. The others are sitreps that we mentioned, if there will be an impactful change in the itinerary which would be of importance to, let's say, the port agent to make docking arrangements, or to people on board who have to manage the hotel division, then a sitrep would be released explaining what the concern is, without mentioning the illness or the patient. Those would be types of announcements that might be made.
Q. What about a situation where the doctors decided I have a patient who is suffering a medical emergency. He or she needs to be disembarked. You

Page 157

mentioned before that the disembark is a collaborative effort with the ship's captain, correct?
A. Correct, or the staff captain.
Q. Or the staff captain. How does the doctor -- how does Royal Caribbean expect the doctor to communicate this with the staff captain or the captain of the ship?
MR. DRAHOS: I object to the form.
A. Generally depending on the urgency, it could be done telephonically.
BY MS. LOBEL:
Q. Okay. How else if not telephonically?
MR. DRAHOS: I object to form.
A. Person to person.
BY MS. LOBEL:
Q. Would it be done via email?
A. It is unlikely it would be done that way.
MR. DRAHOS: Objection.
Q. If the communication that we need to initiate a medical disembark, I have a patient undergoing a medical emergency, is done via telephone, is the telephone a landline or is it some other type of phone?
A. It would be through an onboard phone. It could even be through transmitter, through an Intel walkie-talkie.
Q. If I am understanding you correctly, if there

is a medical emergency warranting consideration for a disembark, that is something that should be reported to the captain or staff captain?

A. If that is totally in the doctor's judgment. If the doctor feels this is an emergency, then this needs to be communicated, he can either communicate with the captain or staff captain, and you left out one of the possibilities, the phone. We mentioned the handheld walkie-talkie or person to person.

Q. My question is little bit different. My question is, if a doctor has made the decision this is a patient who needs to be medically disembarked, that doctor should tell the captain or staff captain?

MR. DRAHOS: I object to the form.

A. That is entirely in the discretion of the doctor.

BY MS. LOBEL:

Q. Why would it be in the discretion of the doctor, because I thought it was collaborative with the ship's captain or staff captain?

MR. DRAHOS: I object to the form.

A. I don't understand the question.

BY MS. LOBEL:

Q. Certainly. So my understanding is that we have talked about that the medical disembark is a



collaborative effort between the ship's captain or staff captain and the shipboard doctor, correct?

A. Right.

MR. DRAHOS: I object to the form.

MS. LOBEL: I have not asked a question yet.

MR. DRAHOS: There is a break in communication. I will either speak up now or we will go another 30 minutes trying to figure where it is. I will speak up now. Are you asking him about at sea medical disembarks, sure, because that will affect the communication process. It is not being clear in the way you are asking these questions. Are you asking him about at sea or while the ship is in port?

MS. LOBEL: He said that it would not matter. So if there is a distinguishment, please speak up or forever hold your peace.

MR. DRAHOS: He will answer the questions that are asked of him.

MS. LOBEL: If there is a caveat, I would expect to be told.

BY MS. LOBEL:

Q. Mr. Drahos would like to make the distinguishment, for every medical evacuation is the doctor required to communicate and work with the captain or there are circumstances where the captain is not



involved?

MR. DRAHOS: I object to the form.

A. The answer is every case is unique, and if I am not there to see or hear what is being done, I can't tell you whether or not a captain in a specific case was communicated. The general process involves a doctor making a medical determination. The captain or staff captain discussing logistics. The port agent being contacted to make arrangements locally. The doctor then communicating with the receiving physician to give a report, and the patient is evacuated. As I said, every case is dependent on so many different variables that it's impossible for me to tell you the exact process that is followed. There could be problems in requiring Coast Guard disembarkations, requires air evacuation. There could be a ship to shore where the ship is tendered out in the port where it is not shoreside. There is instances where the ship is docked at the port. There is instances where the ship has to deviate, where the ship has to speed up, where the ship has to return to a previous port. There is weather issues involved sometimes. There is resource issues with the Coast Guard, whether or not a resource is available. You are asking me to give you a structured response to a situation that is, indeed, hypothetical, for which there



are too many variables to give you a reasonable answer.

Q. I am just trying to understand what the procedures are, because my understanding is the procedure is what the procedure is and we either follow it or we don't. For purposes of the procedure when there is a medical disembark for a medical emergency, be specific and say the ship is at a port and docked in a port, can you tell me what is supposed to happen from the start of the initiation of the procedure through the end?

A. If it is not in SQM I can't define what the process should be. Again, there are so many variables, that it depends on the situation, how urgently ill the patient is, what facilities might or might not be available. So in any specific case, I can't tell you exactly what the process will be. The doctor is intelligent. The staff captains are intelligent, and they adapt themselves to the situation to the best benefit of the patient.

Q. When is the situation when the staff captain or captain would not be apprised of the medical emergency when the ship is at a port?

A. If the patient were shoreside and had an emergency and was taken locally to a facility, which I have seen happen on occasion, the captain might not be advised or might not know, and it might come to the point

when people are reboarding the ship, they show that somebody is not available and there would have to be an investigation, where did that person go? We would not want to sail and not have that patient board the ship. So again there are so many different situations that present themselves. You have to rely on the intellect of the people involved to do what is best for the customers at work, the crew members.

Q. So what is Royal Caribbean's expectation if the passenger is on board the ship, while the ship is docked at a port, and suffering a medical emergency, what is Royal Caribbean's expectation that the doctor does?

MR. DRAHOS: I object to the form.

A. Royal Caribbean does not have an expectation. The doctor has to conduct himself to the best advantage of the patient getting the proper care that they need.

BY MS. LOBEL:

Q. When there is a situation when the patient is undergoing a medical emergency on the ship, the ship is at port, what is the captain's role in handling the medical emergency under those circumstances?

MR. DRAHOS: I object to form.

A. The captain -- shall I answer the question?

MR. DRAHOS: I am objecting to the form. I know we are stepping on each other. Try not to.



A. The captain's duty is to be overall aware of the situational, you know, situations -- I hate to use the same word twice. The captain has to be aware whether the patient expected the return to the ship. The captain has to handle the logistics of timing for departing. The captain has to be aware if there is any accommodation that needs to be made, for example, to help somebody or family members disembark the ship, so the captain has general oversight of the situation.

BY MS. LOBEL:

Q. Does the captain participate in the logistics of the removal of the patient suffering the emergency from the ship to shore?

MR. DRAHOS: I object to the form.

A. Every case is different. It depends on the case.

BY MS. LOBEL:

Q. What would it depend on?

A. It would depend on whether the patient was on board at the time that they had the emergency. It would depend on whether or not it impacts the arrival and departure of the ship, it would depend on whether the patient is a national that needs immigration clearance. There is many, many variables.

Q. That helps me, with what you just told me, but



forgive me if I was not clear. If the patient is on the ship and they are a national of the port -- let's say we are in the port in New Orleans, and the patient is a U.S. citizen, what I want to know, under that circumstance if there is a medical emergency disembarked, what would the captain's role be under those circumstances?

MR. DRAHOS: I object to the form.

A. From a corporate standpoint, I don't know what the captain would want to know. The captain is generally in charge of life and limb on the ship. It would help if the captain were notified. I don't believe the captain has any specific role that he must carry out.

BY MS. LOBEL:

Q. When would the captain be responsible for assisting in getting emergency transport for a patient under the hypothetical I just gave you?

MR. DRAHOS: I object to form.

A. Can you restate the hypothetical. I am confused with your hypothetical.

BY MS. LOBEL:

Q. That's fine. I am a patient, and I am suffering from a heart attack, and I am a U.S. citizen. I am on the Symphony of the Seas, which is a Royal Caribbean ship, and I am at the Port of New Orleans, and the doctor says Sarah is suffering from a heart attack,



got to get her off the ship, what is the captain's role, if any, in facilitating ground transport or getting me to the hospital?

MR. DRAHOS: I object to the form.

A. I can't speak for the captain, because I don't run marine operations, but from a corporate standpoint it is the captain's duty to simply be aware and to provide any support that is necessary from a logistical standpoint.

BY MS. LOBEL:

Q. What do you mean by support, just so I know what you mean?

A. Again, I am not in marine operations. I never have run that department, so it is hard for me to give you specifics.

Q. What is the expectation from the medical department of the ship's captain giving support with a medical disembark when a passenger needs to get off the ship for a medical emergency while docked at a U.S. port?

A. It would help if the captain was made aware that the patient is being disembarked, whether or not the patient's belongings go with the patient, whether we can expect the patient to return to the ship, whether it will impact the itinerary, whether it will delay the departure of the ship, whether it interferes with the

Page 166

disembarkation or embarkation of supplies, that would all be under the captain's purview.
Q. Are we in agreement that Dr. Pereira and Dr. Etsebeth at the time of this particular incident were both senior doctors at the time?
A. They both had the titling of senior doctor. When we have two highly qualified doctors on board, they chose among themselves whether to fill the job duties of the senior doctor for the duration of their contract.
Q. Who was the designated senior doctor during the subject voyage?
A. Dr. Pereira.
Q. With that in mind, I am going to turn your attention to Bates 155.
A. Bates 155. Just give me a minute, please.
Q. I will put it up on the screen. Let me know when you are ready.
A. I am almost there, just a moment.
Q. Take your time. Let me know.
A. I have it up now.
Q. Lovely. Okay. Would you agree with me that Bates 155 through 160 is the complete job description for a Royal Caribbean senior doctor?
A. Yes.
Q. This would be the job description for Dr.

Page 167

Pereira at the time of this incident?
A. Yes, ma'am.
Q. So the senior doctor reports to the staff captain, correct?
A. Correct.
Q. The senior doctor is deemed to be part of both the marine and medical department?
A. Can you point to me in this where you are.
Q. Right here, underneath department, it says marine, slash, medical.
A. The staff captain reports to the marine department; the doctors in the medical department, but for sake of efficiencies, there were changes made when I became the senior medical consultant, that included having the doctors reporting specifically to the staff captains rather than hotel directors.
Q. Why was that change made?
A. Because of the efficiencies and the similarities of, you know, I guess intellectual property, the doctors would have to have unequivocal access to the staff captains, and it was important for me that that be uniform across the fleet.
Q. Understood. If I am understanding this job description correctly, that one of the responsibilities of the senior doctor is to ensure that all members of the

Page 168

medical team follow all of Royal Caribbean's protocols; is that correct?
A. Yes, ma'am.
Q. And that the -- strike that.
The senior doctor -- strike that.
The Royal Caribbean senior doctor is also responsible for ensuring that all medical records are appropriately documented in accordance with Royal Caribbean's procedures; is that accurate?
A. Yes.
Q. And in this line here it says he must take efforts to ensure that all members of the medical team are following protocols, documenting their actions and medical records and other company instruments; do you see where I am reading?
A. Yes, I do.
Q. What other company instruments is being referred to there?
A. The references could be to such things as documenting are the accounts of controlled substances. It could mean documenting lab results, so they are entered into the system. I could be documenting EKGs and post arthrometry reports into the record. It could be documenting the status of someone in acute gastroenteritis, when their quarantine period begins and

Page 169

ends, whether they are in quarantine or isolation. Those are the company instruments that need to be followed.
Q. Then it looks like another one of the more collaborative efforts with the staff captain or captain is to assist with health related matters, such as illness prevention, outbreaks, those sorts of things; is that accurate?
A. That is accurate.
Q. There is a bullet point -- well, strike that. There is a bullet point that says advisor of the master of the ship and staff captain. Then it says the senior doctor must be ready to respond to questions from the ship's management in terms of public health evacuations, deviations and budget management of the medical center; do you see where I am reading?
A. I do.
Q. If I am understanding this correctly, the senior doctor is supposed to be the advisor to either the staff captain or the ship's captain for evacuations, correct?
A. Can you state that again?
Q. The Royal Caribbean senior doctor is supposed to act as the advisor to the master, the captain, or the staff captain with regards to evacuations?
A. What that means is that the senior doctor, if

is consulted by the captain, as to the stability of the patient or how amenable the patient is to be disembarked and by what means the doctor recommends, then yes, that would be accurate. It does not require the doctor to contact the ship's captain.
Q. Now, it also states that a senior doctor is the leader to the team, and my question to you is, is the senior doctor supposed to host medical team meetings?
A. Yes.
Q. How frequently are there supposed to be medical team meetings?
A. It is not defined specifically. Go on.
Q. My question was going to be -- I just lost my train of thought. I am so sorry.
How frequently is the senior doctor supposed to host medical team meetings?
A. There is no specific requirement to host meetings, but the doctor is supposed to review the operational aspects of the medical center, with the senior nurse, for example, to see that the medical center is kept clean, to see that the drugs are stocked appropriately for the itinerary that they have, to review the results of them on code, with the doctor on board, any doctors and with the nurses, so there are no specific meeting times designated, but the senior doctor in such a


small group is actively involved in management of the various aspects of the medical center.
Q. Is there an expectation from Royal Caribbean that there be meetings to ensure that the team knows what to do during the course of the medical evacuation for an emergency?
A. There are no specifically defined meetings that are required. The teams are small. They work well together. They all are very much experienced on board. New staff members are put into positions where they are usually -- or I say almost exclusively affiliated with people who have extensive experience, and then meetings are an ongoing process actually.
Q. Does Royal Caribbean monitor the level of experience within the team in handling medical disembarks to ensure there is somebody who has been through this process before at all times?
A. There is no specific process to analyze whether doctors are -- you know, on a specific time schedule, but there is every effort made to try to ensure that the doctors who are put on board, if they are new are put with an experienced staff.
Q. But that could be a situation where even if the doctor is an experienced shipboard doctor, they may never have handled a medical disembark; is that correct?


A. That would be very unlikely.
Q. In your experience, the senior staff members have, generally speaking, all have handled the situation with the medical disembark?
A. I would say yes. I would like to make a point you are not again -- you are trying to compare a medical center on board a ship with a shoreside medical facility that has perhaps scores of emergency medicine folks, who are coming back and forth from home and perhaps hundreds of doctors who operate in the medical center ashore. When you're talking about a ship, you're talking about a very tight-knit group of people who all work together on a daily basis and share experience and advice on a constant level.
Q. You will agree with me that professionally your experience has been that senior doctors help junior doctors, both shore and at sea though, correct?
MR. DRAHOS: I object to form.
A. Yes. The senior doctors and the junior doctors work closely together as do the nurses.
BY MS. LOBEL:
Q. There was a recording system and supervisory system in this shipboard medical center similar to that which is on land though, correct?
MR. DRAHOS: I object to the form.


A. I don't understand what you are asking, sorry.
BY MS. LOBEL:
Q. Would you agree with me that based off of your experience in working in an emergency room, there is a hierarchy in the chain of command in the hospital, correct?
A. In the medical center or on board a ship or in a hospital?
Q. In a hospital.
A. There is a chain of command, yes.
Q. In Royal Caribbean's shipboard medical centers there is also a delineated chain of command, correct?
A. Yes, there is.
Q. We have been talking about the SQMs, and that stands for Safety and Quality System; is that correct?
A. Yes.
Q. And that is a set of Royal Caribbean's governing rules, standards, policies, procedures and protocols which include those for medical treatment, correct?
A. Not for medical treatment, no.
Q. So there is no protocols, rules or procedures for medical treatment on Royal Caribbean ships?
A. Again, it is a very vague statement. There are policies, procedures, guidelines, recommendations on how

to operate a medical center. There is nothing in the SQM that dictates how a medical case should be handled.

Q. How does Royal Caribbean ensure that its doctors across the fleet are adhering to medical standards of care?

A. Because we are not a training institution. We hire doctors that we know have had a certain level of experience, that have handled emergencies, that have been encouraged to maintain themselves, to continuing medical education courses, by providing them with a stipend. They have to maintain advanced cardiac life support and advanced trauma life support, pediatric advanced life support, certification while on board, and they work together on a daily basis, so with all of this, we are hiring professionals to do a professional job. We are not a training institution.

Q. I understand you are not a training institution, but you would agree with me that since Royal Caribbean has accepted the responsibility of providing medical care on its ships, that it should be ensuring that the quality of care throughout its fleet is uniform, correct?

A. The quality of care anywhere can't be uniform because doctors everywhere have different skills and different abilities, so to ask me about ensuring exact



qualifications with the standard across the fleet of physicians that number in the scores, perhaps hundreds, it is too vague and unreasonable a question. I can't answer.

Q. So at the hospital, how is Royal Caribbean ensuring that its doctors are adhering to and meeting and providing medical care that needs or exceeds the standard of care?

A. Exactly the same.

MR. DRAHOS: Objection to form.

A. Exactly the same as a hospital does, by relying on the credentialing agencies that are done in the home where the doctor maintains the license by relying on recertification in the internationally recognized certification programs, by encouraging CME. I know as a practicing physician for 25 years, that is how the hospitals that hired me, the trauma centers where I worked were assured of my abilities, because I maintained my license. I maintained my certification requirements, and I maintained the certification in specific areas of medical practice and that is it. And the same way that a hospital does it shoreside, it's done at Royal Caribbean.

BY MS. LOBEL:

Q. Are there performance reviews to assure that doctors are performing in a manner that meets the



standard of care?

MR. DRAHOS: I object to the form.

A. There is an end of contract review that is provided to each physician.

Q. Who conducts the performance reviews?

A. The performance reviews are done by the staff captain, the participation of the nurses, and if there is any specific issues that the director of medical operations or I need to document we will participate in that review.

Q. How would the chief medical consultant or anyone else from the medical department know that they need to be involved in a performance review?

A. Everyone gets a performance review at the end of their assigned duty, and if there are any issues that have arisen, I would be expected or Dr. Pereira would be expected to document those issues.

Q. What issues are you referring to?

A. Any serious mismanagement of cases or disciplinary actions that needed to be taken. Any issues that anybody on a shoreside occupation would be reviewed for.

Q. So unless there is an issue with mismanagement or specific incidents that occurred, it is the staff captain who predominantly does the performance review at



the end of the contract?

A. Yes.

Q. A staff captain has no medical training, correct?

A. But they can always get the advice and the input from the nursing staff and from the other doctors. There is more than one doctor on board.

Q. So then the staff captain's only other option to rely on the close-knit colleagues of the individual who they were reviewing?

A. And that is quite a reliable thing to rely on, yes.

MR. DRAHOS: When you get another stopping point.

BY MS. LOBEL:

Q. Am I correct in saying that Royal Caribbean's SQMs prohibit shipboard doctors from turning away passengers or crew who require medical care or treatment on its ships?

A. I am not aware of any specific requirement that mentions turning away a patient, but that would not be our practice. Our general practice would be to treat anybody who presents for care.

Q. Am I correct in understanding that the SQMs control all aspects of the operation of the medical

centers?
MR. DRAHOS: I object to the form.
A. The SQMs provide a basis for the policies and procedures that are expected in the medical centers.
BY MS. LOBEL:
Q. Are there SQMs with regard to the use of the SeaCare system?
A. I believe there are. I would have to look through the specific sections, but without looking at any documents I don't know of any specifics. If you would provide me with documentation, I would be happy to review it.
Q. Certainly. I just want to know what you know; and we will look at some documentation specifically. I just want to ask some general questions first.
Did the SQMs have policies to help ensure that the shipboard medical facility adheres to any proper medicolegal requirements?
A. What would be a medicolegal requirement? I am not sure I understand the question.
Q. I can't answer questions unfortunately, but do the SQMs essentially cover or help to prevent what Royal Caribbean deems to be potential legal issues with regard to the medical care and treatment that they provide on its ships?



MR. DRAHOS: I object to form.
A. Again, it is an awfully vague question. All I can say is an SQM provides the basics for managing our processes in the medical center. It can't dictate proper medical treatment parameters. It does not indicate whether somebody should or should not be aware of a legal precedent, no. It deals generally with policies and practices.
BY MS. LOBEL:
Q. Does the SQMs, and I will take a break after this, do the SQMs delineate how a doctor is supposed to document what they have done to facilitate or participate in a medical evacuation?
A. I don't believe so.
Q. Are there any policies and procedures regarding requirements or directions regarding the documentation of passengers or facilitation of medical evacuations by the shipboard medical team?
MR. DRAHOS: Objection to form.
A. Yes, there is a section that I think we have provided as part of this legal process that shows the policies for evacuation in SQM.
Q. My question is a little bit different. My question is where is the doctors or nurse supposed to physically document what they did or did not do or were



requested to do, or anything having to do with the medical disembark or evacuation of the patient?
A. The only place that we document what we are doing is in the SeaCare documentation. There should not be any other extraneous documentation.
THE VIDEOGRAPHER: Off the video record at 1900 UTC Time. Local time is 3:00 p.m.
(Brief Recess.)
THE VIDEOGRAPHER: Back on the video record. It is 1911 UTC Time and 3:11 p.m. local time.
BY MS. LOBEL:
Q. Doctor, I want to briefly go over some of the other supporting positions before I forget.
A. Okay.
Q. The next rung in the pyramid of hierarchy would be underneath the -- I cannot speak. Strike all of that.
The shipboard doctor reports to the senior doctor, correct?
A. That's correct.
Q. And the shipboard doctor is the rank just beneath the designated senior doctor?
A. Correct.
Q. You could, as we discussed before, have multiple senior doctors, but one person has been



designated the senior doctor, quote end quote?
A. Correct.
Q. And the doctors who are just regular doctors on the ship are only three striped officers on the ship?
A. Correct.
Q. What is the difference between the role and responsibility between the senior doctor versus the regular shipboard doctors?
A. The requirements are similar, quite a bit similar. It is just that the senior doctor would have the ultimate prerogative to make certain kinds of judgments or decisions, and has ultimate responsibility to the staff captain over the medical center.
Q. Insofar as medical emergency disembark, is there a difference in roles or responsibilities between the doctor and senior doctor and procedure?
A. The junior doctor or the doctor would be the correct term, can look to the senior doctor for advice and consent, but it is not required.
Q. Do you know how the decision was made that Dr. Pereira was going to be the designated senior doctor as opposed to Dr. Etsebeth?
A. No, I don't. That would be a decision made internally within the medical center staff.
Q. So only the two of them would understand who

decided to be the senior versus the junior?
A. Correct.
Q. Understood. Then the next role there is a designation of something known as the chief nurse, correct?
A. Yes, ma'am. Senior nurse or chief nurse. In Royal's vocabulary it is senior nurse, and in certain -- I am sorry. Chief nurse and in some instances it would be called the senior nurse. It is one and the same depending on the brand.
Q. That is what I wanted to check, if the chief nurse, senior nurse were the same. Is the chief nurse a shipboard position?
A. Yes, ma'am.
Q. And they report to the senior doctor in chain of command?
A. Correct.
Q. And they have 2.5 stripes for their officer ranking?
A. Yes.
Q. Does the chief nurse supervise junior nurses?
A. Yes.
Q. Then there is a position -- I am pulling up the document, it is Bates 528, known as the medical secretary?



A. Yes.
Q. What is a medical secretary?
A. A medical secretary is someone that is brought on as a power medical personnel to provide administrative support to the medical center.
Q. Did they have or required to have any medical qualifications?
A. It is preferable that they have familiarity with medical terminology. We look to hire people who have had background doing clerical work in the medical environment, in the medical arena. So yes, it would be someone who has some familiarity with medical vocabulary and such.
Q. Does the medical secretary have any roles or responsibility with regard to the medical evacuation procedures?
A. The medical secretary, be it a man or a woman, is required to provide any reasonable clerical support to the doctors or the nurses in the event of a patient's needs. So this would be someone who would help make phone calls, someone who would help with bills being prepared for treatment in the medical center. It would be someone who would maintain a filing system, would do any kind of clerical work that is requested by the nurses or the doctors. And as a matter of fact, under the Bates



stamp that you showed me, 528, there is a listing of the various responsibilities, pretty much what I just delineated.
Q. I just wanted to double check if there was any specific responsibility as far as the policies and procedures for handling a medical disembark for a patient suffering emergencies to what the medical secretaries are expected to do, if anything?
A. I am looking through the various requirements of the job description in SQM. There is a point that says in the list, assisting and arrange medical disembarkation of patient.
Q. And what are they expected to do?
A. Those duties and requests from the doctors or the nurses.
Q. What would Royal Caribbean expect those sorts of requests to look like from a practicality standpoint?
A. Well, again, as my answers seems to be over and over again, it depends on the situation. Each medical case is different. It's situational. Issues are different, so the medical secretary could be called on to do a variety of things. It could be anything, assistive or clerical that the doctors and the nurses need.
Q. I am going to apologize for bouncing around. I forgot about this. Bates 171, which has to do with the



chief nurse responsibilities?
A. 171, okay. Give me a second. I am pulling it up.
Q. Certainly. I wanted to know, it says here the nurse will have responsibility for the preparation and maintenance of the medical logs, and then says crew medical records and reports. What medical logs are being referred to here?
A. This might be a holdover from the days when we had handwritten lists, like listings of people who were in quarantine for acute gastroenteritis, or any kind of charts or reports, but I think that that has become somewhat obsolete, since we have electronic medical records at this point. Here it is. There it is right below, and it says exactly what I just mentioned. Daily illness logs. Crew and guest sick lists for the hotel department to know who is sick and in which room, so the staff servicing those rooms can better manage the cases, and they can assist with any kind of infectious disease and diarrhea logs that need to be maintained.
Q. What about the log of shoreside medical referrals? What log is that?
A. That would be obsolete at this point.
Q. Was there something now in SeaCare that is used to log all medical shore referrals?

Page 186

A. Well, there is not any such specific shoreside medical log that I am aware of.
Q. Do you know when, more or less, Royal Caribbean stopped writing these logs?
A. Some of them are generated electronically from SeaCare, like the sick lists that are sent out to the hotel department, and then a narcotic count log is maintained diligently, but most of the other information is available through SeaCare.
Q. How would -- strike that.
How does Royal Caribbean keep a log of shoreside medical referrals so it can keep track of all those?
A. I don't believe there is any such log.
Q. So they completely obliterated or got rid of the logging of shoreside medical referrals?
A. Nothing is obliterated, but there is no services, nothing could be benefited by a logging of all shoreside medical referrals.
Q. Wouldn't the benefit be to keep track of everybody who -- for follow-up purposes you were sent shoreside and where they all went?
A. Well, when we designate someone as being a shoreside disembarkation, the information is sent to the care team on board the ship, and the care team would do

Page 187

any necessary follow-up helping to arrange for a patient's luggage for example, to be brought off or helping to contact family members, providing a telephone for communication if the patient does not have one. So the care team would assume that responsibility.
Q. The shipboard position does not do follow-up. Do you follow through to see what was the outcome after the patient was sent to shore?
A. That is not a required duty.
Q. Then moving down, we look at Bates -- still the same job description, 173 of the chief nurse. I will put it on the screen so you can see it. One of the responsibilities for the chief nurse is to execute air and land evacuation procedures; do you see that?
A. Yes.
Q. What is being referred to here?
A. That the chief nurse will make sure that all the procedures are followed when they are required for a land or air evacuation.
Q. Are they the same procedures that the shipboard medical physicians are expected to follow?
A. There are procedures that are unique to each case, and when there is an evacuation, the nurse helps to oversee that things are done correctly.
Q. I want to make sure we are clear there is not

Page 188

set of procedures for the nurses, a set of procedures for the doctors and insofar as land or air evacuations?
A. No. There are no special procedures for each one.
Q. 445 to 446. Let me scroll down. One second. That is the wrong Bates stamp number. I apologize. While I am looking for that, there is a position known as the medical director, correct?
A. Right.
Q. Is that a shoreside or land based position?
A. That is a land based position.
Q. Who was the medical director at the time of this particular incident?
A. Dr. Ruben Parejo.
Q. What is his job and responsibility?
A. As delineated in Bates stamp 445, there is all physician summaries and essential duties listed.
Q. When I look at Bates -- oh, it is labeled wrong, that is why. Same one. I have it here. Is this the document that you are referring to?
A. Yes, it is.
Q. So if I am understanding this job responsibility, the medical director is the position that creates the business plan and model for the medical department?

Page 189

A. Could you tell me what number you are referring to?
Q. Number one.
A. Create a business plan and model for the medical department. Yes.
Q. Is that still -- strike that.
Back in 2019 was it still the medical director's responsibility to create the business plan and model for the medical department?
A. We shared responsibility among the medical staff members in the Miami office, included myself. Dr. Parejo was the chief medical -- I am sorry, the director of medical operations, and various medical managers assisted with watching the various operations on the ships to which they were assigned.
Q. Did Dr. Parejo -- strike that.
Was Dr. Parejo assigned to just the Royal Caribbean line, or to all of the lines that you oversaw as well?
A. He was responsible for all of the lines as was I.
Q. So Dr. Parejo was responsible for communications with the medical department on each ship?
A. Yes.
Q. Was Dr. Parejo supposed to be part of

shipboard -- strike that.

Was Dr. Parejo a point of contact for shipboard emergencies?

A. He was one of the points of contact. The help line was used for that purpose, and Dr. Parejo was one of the doctors listed as a potential contact.

Q. It states now under section number six that one of the responsibilities was to develop educational training programs for all medical staff with the goal of founding a shipboard medical university, to ensure consistency and maintenance of standards and enterprise;{sic}, do you see that?

A. And expertise.

Q. Expertise. Sorry. It is getting late.

Did Dr. Parejo set up a shipboard medical university?

A. Not shipboard; shoreside, yes.

Q. What is the shoreside medical university that Royal Caribbean manages?

A. It was a conference for the doctors called IACSN. It was an effort to bring in the various medical discussions and unfortunately because of the difficulties of managing the -- what do you call it? In the difficulty of arranging for so many doctors and nurses to attend a single program, we were only able to conduct a



medical university a single time.

Q. When was that singular time?

A. I believe it was around 2017 or 2018. I can't give you the exact date.

Q. What was discussed or done during this one time event?

A. We had various talks about what is the latest in the field for different medical issues. It was like a conference, a medical conference.

Q. Do you recall if anything in that medical conference related to medical disembarks or medical emergencies on board ships?

A. Well, it dealt with various kinds of emergencies, but there was no specific disembarkation protocols discussed.

Q. Was anything -- I am sorry. Go ahead.

A. I was going to say there was a time we all got to meet the various doctors who were generally deployed to the ships. It was like a meet and greet basically for the doctors to have an opportunity to meet one another. But, as I said, the scheduling difficulties and, you know, the problems with arranging for a conference of that nature just became too great, and we only conducted it a single time.

Q. Now do you see on point number 10 it states



develop policies and advise on medical disembarkations. Do you see that?

A. Yes.

Q. Can you tell me what the medical director is supposed to do insofar as advise and develop policies with regard to medical disembarkations?

A. That was to try to maintain SQM, so the doctors could refer to it and see what was required. And that is essentially it. It was to develop, make sure SQM addressed the doctors from an administrative standpoint.

Q. What do you mean the SQMs addressed the doctors? My understanding is that you can access the policies and procedures in a database on a shipboard computer, correct?

A. Yes.

Q. What would the medical director do insofar as advising on medical disembarks?

A. The point was this was not a medical training program. This was a policy program that developed policies for disembarkation, and that was to maintain SQM. That was the intention, to develop the policies and that would help advise the doctors how to handle medical disembarkations in a general sense standpoint.

Q. Was the medical director responsible for having a role or participating in each medical disembark?



A. No.

Q. We talked about this a little bit, that at the end of each contract there would be an end of contract review performed by the staff captain. Should there be a performance review at the end of every single contract for every single shipboard physician?

A. There should be.

Q. Who would be used, if anyone, the performance reviews generated by the staff captains or captains for each doctor?

A. Myself or Dr. Parejo would look them over and would initial them.

Q. And then after the doctors completed their contracts, they had their performance review, how was the decision made to re-sign or recontract a doctor or not?

A. Based on the skill that they demonstrated on board, based on their ability to work in concert with the other doctors or nurses, and their general comportment while on board.

Q. Was all that information documented and relayed shoreside by the staff captain?

A. Yes.

Q. Not by any -- strike that.

Were there any reviews or performances conducted by anyone with a medical degree on a routine

basis for shipboard doctors?
A. Well, Dr. Parejo is a licensed doctor and I am a licensed physician, and we both would review those performance reviews.
Q. Right, but I am saying the performance review is generated by the staff captain, you and Dr. Parejo would just read the documentation from the staff captain, correct?
A. Correct. Not just. Then we would add any issues or concerns or any compliments or any commendations that we felt were appropriate from any interactions that we had with the doctor.
Q. How would you find out if there was an issue or a concern having to do with the performance of a doctor?
MR. DRAHOS: I object to the form. Asked and answered.
A. You are asking me questions how I function as chief medical consultant, or are you asking me as Royal Caribbean's corporate?
BY MS. LOBEL:
Q. Both.
MR. DRAHOS: I object to the form.
A. How would I know? I would be advised by the staff members in the medical center that a doctor is functioning at a high level or at a poor level. I may


have a communication from the doctor on the telephone asking me questions that did not seem appropriate to the level of knowledge and expectation that I had for a doctor. Those are some of the means.
BY MS. LOBEL:
Q. How would Royal Caribbean find out if there was an issue or problem with the performance of the shipboard doctor?
MR. DRAHOS: I object to the form.
A. By contacting Dr. Parejo or one of the medical managers. Either another member of the medical staff can do that. If there was a behavioral issue, we can be contacted by a hotel director or staff captain. If there was -- as I said, if I had a personal communication from the doctor that indicated that they were not operating at the level that we would expect, then I would document that in a shoreside end of contract review.
BY MS. LOBEL:
Q. Would there be any intermittent or randomized checks reviewing cases that shipboard doctors handled or review of records?
A. No.
Q. Was there -- at the end of a contract, would there be any review of the doctor's cases or shipboard medical records generated by anyone?


A. If there was any indication that the doctor was not behaving up to par, then a random sampling would be taken, yes. The answer is yes.
Q. Sorry. There was noise behind me, so I did not hear it. What would trigger the random sampling? I apologize?
A. If there was any indication that the doctor was not performing at a level that we expect, either knowledge or behavior, then the random sampling would be reviewed. The answer is yes.
Q. Then if the random sampling is done and there is a review done and there is a potential problem, would there be a meeting to discuss the doctor's performance?
A. Yes.
Q. Who would attend that meeting?
A. Depends on the situation.
Q. What would the situation depend on?
MR. DRAHOS: Objection.
A. If it was a behavioral issue that could be handled by a medical manager who was responsible for the conduct of the medical center staff on that ship, that might be handled at that level. If there was a question about the doctor's suitability to practice that particular case, we would review with the doctor, you know, the situation, and finally if that meant that the


doctor needed to be terminated, we would have a discussion at the highest levels.
Q. Now, if there was a review of questionable medical records or questionable handling of the medical situation with the doctor, how would that be documented?
A. I guess each situation would be different. It depends on the nature of the transgression. If it involved patient confidentiality, it would probably be handled by a phone call, and in rare cases it might be email, but I can't remember any specifics about any cases.
Q. If there is a situation where there is a claim or a lawsuit that names one of Royal Caribbean's shipboard doctors, is there a meeting that is held without attorneys internally as a normal business practice?
A. No. That would be held with attorneys present.
Q. Understood. Would that be in-house or would counsel be retained from outside, like Mr. Drahos?
A. Generally it would be in-house.
Q. Now, if there is a medical emergency disembark or medical evacuation during a doctor's contract, is there ever a debriefing of what went right, what did not go to plan or anything of that nature?
A. It is hard to say, that because each situation

Page 198

is so unique that to second-guess the doctor after the fact really does not have much value. What is more important is that the patient is well treated and is taken to the facility where they can get good care, and we hope for a favorable outcome for all these patients.

Q. I understand. For purposes of trying to do better, for example, if there are situations where there are medical disembarks or medical evacuations, is there a meeting that is conducted in order to review or analyze those events?

A. On occasion we may have a meeting with an attorney present, but other than that, and I can't discuss that further.

Q. Are there any committee meetings during which personnel from Royal Caribbean or the shared service review are analyzed, performances by doctors?

A. No.

Q. You are aware that -- I think it Dr. Etsebeth -- one second, let me just get my notes. Dr. Etsebeth was involved in a case where there was an allegation made that he failed to timely recognize Mr. Masade's medical condition, and did not timely disembark or evacuate Mr. Masade's back on May 23rd of 2018; are you aware of that incident?

A. Ms. Lobel, I am not an attorney so I don't know

Page 199

if it's my prerogative to discuss anything that I reviewed about a patient due to the confidentiality issue. I am very uncomfortable talking about previous patients or guests or crew members and their medical conditions.

Q. I understand, but this is part of our notice in which -- and I already spoke with Mr. Drahos about the specific prior incidents having to do with allegations for Mr. Burgess with regard to specifically Dr. Pereira and Dr. Etsebeth?

MR. DRAHOS: We will take this question by question. Dr. Shore, for every question asked of you, if Royal Caribbean can answer the question as it is posed without violating information that has been obtained exclusively through attorney-client privilege communications, then you can answer. If in order to answer the question you have to reveal information that has been obtained through attorney-client privilege discussions, then you need to notify her of that. So let's take it question by question. Right now the question is are you aware of Mr. Masade's lawsuit.

THE WITNESS: Yes, I am.

BY MS. LOBEL:

Q. Were you involved in the review of what

Page 200

happened during that incident?

MR. DRAHOS: I object to form.

A. Yes.

BY MS. LOBEL:

Q. What did Royal Caribbean learn occurred during this incident?

MR. DRAHOS: I object to the form.

A. Again, that involved confidential information about the patient, but I guess under court order to be deposed, I have to say that I reviewed the case and I was convinced that the patient self-catheterized and created the damage on his own, and from review of the records and discussions of Dr. Etsebeth, I was very convinced that it was a self-induced damage that did not have anything to do with Dr. Etsebeth's care of the patient.

BY MS. LOBEL:

Q. Did that case involve a medical disembark?

A. As I recall, it did.

Q. What happened with -- what does Royal Caribbean know about that medical disembark?

MR. DRAHOS: I object to the form, same instruction.

A. I don't remember the details of the case. It is quite a while back.

BY MS. LOBEL:

Page 201

Q. Do you agree with me that there was an accusation from Mr. Masade that Dr. Etsebeth failed to timely disembark him from the ship based on his medical condition?

MR. DRAHOS: I object to the form.

A. Based on the record, I am aware that there was an accusation, but I don't believe that that accusation was founded from my review.

BY MS. LOBEL:

Q. Did Royal Caribbean require Dr. Etsebeth to do any additional testing or training as a result of that incident?

A. No.

Q. When there are incidents where Royal Caribbean does not agree with how -- strike that.

Are there situations when Royal Caribbean requires its doctors to do additional training or additional testing?

A. Can you define what you mean by additional training and testing?

Q. I don't know. I can't be more specific than that for you, because I don't know whether you do or not. For example, Royal Caribbean tests as part of its hiring procedures and practices to take the -- I think you said it was a 50 question test?

A. Uh-huh.
Q. Are there times and circumstances when Royal Caribbean requires doctors to do additional written testing?
A. It is required as part of them maintaining their license to practice, by their issuing agency. It's required that they maintain their various certifications which is essentially a review and a retraining, that being ACLS, ATLS and PALS. It is encouraged for them to get continuing medical education for which we pay a stipend. All these are forms of review and training.
Q. Are there situations when Royal Caribbean is not fully satisfied with the performance of the doctor and require them to do additional training or testing in order to maintain their employment with Royal Caribbean?
A. No.
Q. Are you aware of whether or not Dr. Etsebeth has ever been suspended or disciplined by Royal Caribbean at any point in time?
A. No.
Q. Did you work with Dr. Etsebeth when he worked at NCL?
A. I did.
Q. Are you aware of any disciplinary actions that were taken against Dr. Etsebeth when he worked at NCL?



A. No, I am not.
Q. Do you know why Dr. Etsebeth left NCL to work for Royal Caribbean instead?
A. I don't. I don't know the answer.
Q. Now a similar line of questioning. I am familiar with an incident involving Dr. Pereira in the case involving Christopher Pack, in which there was an allegation that Dr. Pereira failed to provide proper medical care for a passenger who had a head injury, and then ultimately suffered a stroke the following day and was not timely medically evacuated. Are you aware of that instance?
MR. DRAHOS: Objection to form.
A. The only awareness I have is the discussions I had under confidential and privileged communication with Michael Drahos.
BY MS. LOBEL:
Q. Were you employed with Royal Caribbean at the time of that incident?
A. I don't know when it was.
Q. If it was back in 2014, would you have been employed with Royal Caribbean?
A. It's not likely.
Q. In 2015 would you have been employed by Royal Caribbean?



A. That would have probably been about the time I began working there, yes.
Q. Is Royal Caribbean aware whether any disciplinary actions were taken against Dr. Pereira as a result of that incident?
A. I don't believe there were any actions taken.
Q. Has Dr. Pereira -- it is getting to that hour -- has Dr. Pereira at any point in time been suspended from employment with Royal Caribbean?
A. No, ma'am.
Q. Has Dr. Pereira ever been refused a contract with Royal Caribbean?
A. Not that I am aware of.
Q. So similarly has Dr. Etsebeth ever been refused a contract with Royal Caribbean at any point in time?
A. Not that I am aware of, but you would have to check with Human Resources to completely be sure of that. I don't know of any instance for either doctor.
Q. If there is a passenger complaint about care and treatment provided by a shipboard medical doctor, how would that get documented?
A. There is a variety of ways that could be done. If the patient had an incident, there would be an incident report prepared. If the patient had any kind of altercation with the security team, that would be



documented in security documentation. If the patient came in and was treated in the medical center, that would be documented in SeaCare. There might be other ways, but I think that pretty well covers it.
Q. I may have miscommunicated. If the patient has a complaint, meaning they were dissatisfied with the care and treatment provided to them by any shipboard doctor or nurse, can you tell me all the different ways that that complaint from the passenger may be documented by Royal Caribbean?
MR. DRAHOS: I object to the form.
A. That is what we just went through. If it was a security incident, security would document it. If there was an injury or illness, it would be a documentation of that, an injury report. If there was something that went on in the medical center that the staff felt rose to the level that it needs to be documented, it would be. And there is a guest services department. They would take phone calls or handle complaints, and that department would be notified, and I might be asked to look through the record to discuss the situation with the doctor.
Q. Is there a comment card or an evaluation that Royal Caribbean sends to people who have received care or treatment from its medical facilities to fill out to say how did we do?

A. There is a reception desk that has a form that could be obtained by the passengers, and they can file any kind of complaint or concern that they have, or if they call, they can be directed to the guest services desk.

Q. Do you know what that form is called where complaints -- where you can request a form to issue a complaint or issue a comment?

A. I don't know the specific name of the form.

Q. You do know it is with guest services?

A. Yes.

Q. Is that form available to passengers on all Royal Caribbean ships?

A. To the best of my knowledge it is, yes.

Q. If the passenger decides to fill out those forms, what do they do with the form? Where does it go?

A. They turn it in to the reception center or it could be mailed after the cruise.

Q. Who reviews those forms, if anyone?

A. Well, the complaint can be about anything. It could be about the food they were served. It could be about the way the room was kept. It could be the way spa manager treated them. So it depends on who would be handling it for what department.



Q. Specifically for the medical department, if there is a complaint from a guest having to do with the medical department, who would review that, or about a doctor?

A. You mean the name of the specific person?

Q. I don't know. Because say I am a passenger, I fill out a form, and I say I am dissatisfied with medical care provided to me by nurse, I don't know, I don't remember the name, I just say nurse, and I did not think the nurse knew what she was doing.

A. There is a gentleman at Royal named Mike Hernandez -- Miguel Hernandez, who would probably receive these forms and would direct them to his team to review, and if it rose to the level of a medically related complaint, then it would be brought to my attention.

Q. What is Mr. Hernandez' job title?

A. I have to look it up. Give me one second.

Q. Take your time.

A. Right. Supervisor of guest claims.

Q. Is there a bonus system structured for doctors?

A. No.

Q. Is there a bonus system for nurses?

A. Not that I am aware of, no. By bonus system do you mean like an incentive pay, if they do a certain amount of cases or if they generated certain income or what does that mean by a bonus?



Q. Any form of bonus, like a good job, here is an extra amount of dollars, or a bonus system where I have achieved -- I have the budget under by $12,000?

A. No, there is no incentive program of that sort.

Q. Are there any non incentive programs for bonuses?

A. No.

Q. Is there a budget that is assigned or delegated to each shipboard medical facility?

A. Yes.

Q. Who determines the budget for each facility?

A. I believe that would fall mostly under the director of medical operations and reviewed by the senior vice-president.

Q. Who is responsible to try to make sure the medical facility on each ship adheres to its budget?

A. The senior vice-president has an assistant that reviews budgetary items, and that would have fallen beyond my perspective as a senior medical consultant.

Q. Does the shipboard doctor or medical staff participate in trying to ensure that the facility stays within its budget?

A. They are encouraged to remain within the budget, but there is no structure or reward or punishment based on the costs on board the ship.



Q. We touched on this a little bit, but I want to make sure we have a clean line of questioning on this. Would you agree with me that the shipboard's medical center's capabilities are limited in what they can and cannot treat?

MR. DRAHOS: Form.

A. Yes, there is limit to what any provider can do on any ship or any shoreside occasion to the patient.

BY MS. LOBEL:

Q. Royal Caribbean's shipboard medical centers don't have the capabilities to treat patients such as a level one trauma center would?

A. No. I don't believe it is fair to compare the treatment available on a cruise ship with a level one trauma center.

Q. If the Royal Caribbean doctor can't provide the care and treatment that a passenger or crew member needs to treat their condition, is that a situation where they should be evacuated from the ship?

MR. DRAHOS: Objection.

A. Depends on each situation. It is a hypothetical that I can't answer.

BY MS. LOBEL:

Q. Do you agree with the proposition that there

are certain medical conditions that Royal Caribbean personnel may encounter where time is important?
MR. DRAHOS: I object to form.
A. It depends on the case.
BY MS. LOBEL:
Q. Okay.
A. There are many situations where time can be one of many factors.
Q. Just because -- well, strike that?
Do you agree with the proposition that if a patient presents with symptoms that may require emergent or urgent care, the doctors should not be waiting to initiate an evacuation procedure if it's possible to execute the procedure?
MR. DRAHOS: I object to the form.
A. That is way, way too broad for me to address. Every situation is different. Every clinical situation presents differently. Every situation from a logistics standpoint is different. Each case has to be discussed on an individual basis.
BY MS. LOBEL:
Q. Do you agree that a stroke is a medical emergency?
A. It depends --
MR. DRAHOS: I am trying to object to the form before you answer.


A. It depends because stroke is a very broad term.
BY MS. LOBEL:
Q. What type of stroke is not a medical emergency?
MR. DRAHOS: I object to form.
A. Hypertensive emergency might be, but now you are asking me to give my medical opinion. But transient ischemic attacks might not be emergent, might not even be recognized by the patient. Hypertensive emergencies, there is a variety of conditions, could be under the broad umbrella of the word stroke. Now I am treading in the area of medical opinion. I prefer not to do that.
BY MS. LOBEL:
Q. I want to know what Royal Caribbean expects, so if Royal Caribbean, you know, has a doctor who is diagnosing a patient with a stroke definitively, I think this person has a stroke, does Royal Caribbean expect the doctor will delineate that for a patient as a medical emergency?
MR. DRAHOS: Objection to form.
A. It depends what the doctor decides on board the ship. The doctor has the ultimate responsibility to make a decision to whether something is or is not an emergency.
BY MS. LOBEL:


Q. Should the Royal Caribbean physician know that early action can help reduce brain damage from somebody suffering a stroke?
MR. DRAHOS: Objection to form, scope.
A. That again, that is beyond the scope of what a Royal Caribbean deponent should be answering. That is more of a medical consideration.
BY MS. LOBEL:
Q. Royal Caribbean runs a medical department, so based off of what Royal Caribbean knows is a medical department who vets, hires and oversees doctors, is it Royal Caribbean's expectation that doctors should know that early action can help reduce brain damage to a patient suffering from a stroke?
MR. DRAHOS: I object.
A. Royal expectation is the doctors recognize what their patient is undergoing and they make the appropriate decisions.
BY MS. LOBEL:
Q. Does Royal Caribbean expect that shipboard doctors should know that early action can help reduce complications of patients suffering a medical emergency?
MR. DRAHOS: I object to form.
A. I think we answered that several times. Royal Caribbean expects the doctors are aware of what the clinical process is in their patients, and they should make appropriate decisions on board.


BY MS. LOBEL:
Q. So you mentioned earlier that Royal Caribbean has port agents assist them to do certain functions?
A. Yes.
Q. And locations, correct?
A. That's correct.
Q. Now, Royal Caribbean would give the port agents specific instructions as to what Royal Caribbean wants or needs them to do, correct?
A. They had a contract --
MR. DRAHOS: Form.
A. They have a contract with the port agent to delineate the duties of the port agent.
BY MS. LOBEL:
Q. If the port agent is unable to perform the requested service, do you agree with me that Royal Caribbean would then have to take over and do the job themselves?
MR. DRAHOS: I object to the form.
A. No.
BY MS. LOBEL:
Q. Who would be responsible for performing the task if the port agent does not do it?

MR. DRAHOS: Objection.
A. What task? What location? What task? Again, your questions are so incredibly vague and broad, it is impossible for me to answer. It depends on what task. It depends on what location. It depends what situation. So no, the cruise line does not necessarily take over the duty of a port agent.
BY MS. LOBEL:
Q. Who would take over the duty if the port agent can't perform a given task requested?
A. I think under contract you have to discuss that with the legal department.
Q. How about in terms of purposes of a medical disembark? If the port agent can't perform the requested task, who is responsible for performing the task?
MR. DRAHOS: I object to the form.
A. Again, I can't answer that, honestly. You are asking me about a hypothetical situation, without a location, without a contract, without knowing the requirements and duties. It is too vague and too broad for me to respond.
BY MS. LOBEL:
Q. Taking you to -- what is this? 412. Do you recognize this as one of Royal Caribbean's SQMs?
A. Yes.



Q. This SQM has to do with chapter 14, medical emergency, disembarkation of guests or crew, correct?
A. That's correct.
Q. I want to turn your attention to the guidance section where it says it should be noted that any time a guest or crew member is disembarked from the vessel, the treating physician is responsible for the care of the patient until she or he arrives at a medical facility or is handed over to the care of another physician. Did I read that correctly?
A. Yes, you did.
Q. So if I am understanding this correctly; for instance, in this situation Dr. Pereira was the doctor overseeing the care and treatment for Mr. Burgess while he was on the ship, correct?
A. Correct.
Q. So until Mr. Burgess was transferred to the hospital in Puerto Rico, he was under the care of Dr. Pereira, correct?
A. That is standard medical procedure at all times. Whenever somebody is caring for a patient, that patient is under the care of the doctor and then the doctor is expected to give a report to the receiving physician who takes over the care.
Q. So is that a yes, Dr. Pereira was, in fact,



in -- Mr. Burgess was in his care until he was received at the hospital in Puerto Rico?
MR. DRAHOS: I object to the form.
A. I think that is more of a legal decision to be made, whether or not a doctor -- at what point a doctor relinquishes the care of a patient. In general terms, the doctor who was treating the patient is responsible to provide the receiving doctor with the information that is needed to care for the patient.
BY MS. LOBEL:
Q. So from Royal Caribbean's perspective, when did Dr. Pereira stop becoming responsible for Mr. Burgess?
A. That would be a legal question.
Q. Based off of these SQMs, which are Royal Caribbean's procedures, correct?
A. This is a guide. This is not a policy.
Q. Okay. Who monitored the disembarkation of Mr. Burgess in this case?
MR. DRAHOS: Objection to form.
A. I don't understand what you are asking.
BY MS. LOBEL:
Q. Who is overseeing? Who is monitoring the disembarkation of Mr. Burgess from the ship to the hospital in Puerto Rico?
A. Medical center staff.



MR. DRAHOS: Objection.
A. Medical center staff was monitoring the patient and the patient was then turned over to the port agent for recommendations on where the patient should be taken.
BY MS. LOBEL:
Q. Who was responsible for monitoring the fact that arrangements were being made to get the patient to a hospital in a timely manner?
A. The port agent.
Q. The port agent was responsible, not the doctor?
MR. DRAHOS: I object to form.
A. Correct.
BY MS. LOBEL:
Q. The doctor was not responsible for ensuring that the patient wasn't emergently transferred to a hospital?
MR. DRAHOS: I object to form.
A. The arrangements for transporting the patient and the receiving physician were the responsibilities of the port agent.
BY MS. LOBEL:
Q. Who was supposed to oversee to make sure the port agent was actually making arrangements for transportation?
MR. DRAHOS: Form.

Page 218

A. This is a standard operating procedure. The doctors contact the port agent. The port agent makes a recommendation where the patient would be best treated. Our doctors then communicate with the receiving physician, as it was done in this case, and then the port agent takes over the transport arrangements, whether they be by ambulance or by other means.
BY MS. LOBEL:
Q. Why wasn't an ambulance immediately called to send Mr. Burgess to a hospital?
MR. DRAHOS: I object to form, argumentative.
A. Oh, boy. I guess I am turning into a lawyer at this point. I believe that that was not a fair question.
BY MS. LOBEL:
Q. Why wasn't an ambulance called the second Dr. Pereira said he believed this patient needs a neurological consult and suspected a stroke? Why wasn't an ambulance not called immediately?
MR. DRAHOS: I object to form.
A. I believe an ambulance was called in a timely fashion, and the arrangements were made as quickly as it is possible under the situation and dictates of a short disembarkation.
BY MS. LOBEL:
Q. What is the basis for your belief that timely

Page 219

arrangements were made?
A. By reviewing the chart.
Q. How?
A. And the documents that were provided to me. I reviewed them. I believe that was a very timely disembarkation.
Q. How much time elapsed between the time that Dr. Pereira decided to disembark the patient to the time the patient was actually transferred to a hospital?
A. I have to look at the documents, 9:59 to 12:02.
Q. What was 12:02?
A. The time that the ambulance arrived.
Q. What was the basis for that?
MR. DRAHOS: I object to form.
A. I reviewed documents that the patient left the ship at 12:02.
BY MS. LOBEL:
Q. What document are you referring to?
A. I reviewed many, many documents. It would be hard for me to find. There is a run sheet from the paramedics. There is a -- I can't remember exactly, but I do remember that I saw a document that said the patient was off the ship, on the disembarkation materials that show when a patient is not on board, and it showed that the patient left at 12:02.

Page 220

Q. I just saw you look over at a sheet. I want to know specifically what document you are looking at to get the times 9:59 and 12:02 as the time of request and the time of actual disembark?
A. I would have to look through my records again.
Q. You just looked over to your right?
A. Yes.
Q. What were you looking at?
A. Just a note that I made about when the patient was disembarked.
Q. But you don't recall the basis of these times that you are giving me, from some record that you don't recall?
MR. DRAHOS: Objection.
A. I can take the time and look through it or Mr. Drahos can help. I can find that record. Did you want me to take the time and look it up?
BY MS. LOBEL:
Q. We will get there in a second. Let's keep trucking along. So there is SQM that is specifically titled medical disembarkation of guest or crew member in a port, and that is on Bates 414, right? Do you see this?
A. Yes, I see that.
Q. My understanding from -- sorry, my emails keep

Page 221

popping up. My understanding from this form there is a critical care patient handover form that is supposed to be filled out, correct?
A. Yes.
Q. Is that critical care patient handover form something that is SeaCare or separate?
A. It was in SeaCare.
Q. Is that the exact title of the document in SeaCare, critical care patient handover?
A. I believe that is an accurate title for it, yes.
Q. Is there one for Mr. Burgess?
A. I believe there is.
Q. I have not seen one. Okay. Who would have filled that out?
MR. DRAHOS: Objection.
A. We could review the documents that I was removing, but I would rather not speak about documents in -- what do you call it in there? What is the word I am looking for? In an arbitrary situation I want to look at the specific documents that we have for this disembarkation.
BY MS. LOBEL:
Q. I don't have a form that is called a critical care patient handover form that I am aware of. Do you

know what the Bates number for that is?
A. It might have been the shoreside referral form that we are talking about, that I did review.
Q. That is a different form because it has a different title. Is there a difference between the shoreside referral form versus a critical care patient handover form?
A. No.
MR. DRAHOS: Do you want me to help you or let you guys work it out?
MS. LOBEL: Michael, if he is telling me the guest shoreside referral form is the critical care form, then that resolves it, but if there is a critical care form, I want to know where that is because I don't recall seeing that.
MR. DRAHOS: There is not a critical care handover form. There is a shoreside referral and there is a guest report.
MS. LOBEL: For purposes of this case or just generally in the scheme of the universe, meaning Royal Caribbean's universe?
MR. DRAHOS: I am not sure how to answer that.
MS. LOBEL: Is there a form that is separate and apart called the critical care patient handover form, but there is not one for this case?



MR. DRAHOS: That is a discretionary thing as to -- I am trying not to answer your question, but I need to answer your question. That one is a discretionary depending on the circumstances and the doctor, the other one, the guest landing report and shoreside referral are much more specific, and for medical disembark you have a shoreside referral every time. For a critical care handover form you will not. That is the best way for me to answer that question without interfering too much with this.
BY MS. LOBEL:
Q. Understood. That helps me, Dr. Shore. With that understanding, under what circumstances within the discretion of the -- strike that.
It sounds like there is a separate form that is the critical care patient handover form, but that is a discretionary form. What is contained within that form?
A. I don't know. I have to look at one. I really don't know. I am talking in hypotheticals now.
Q. I just did not know if you saw one before because I have not seen one before.
A. It is a shoreside referral form, thank Mr. Drahos for clarifying it for me.
Q. The next document or the SQMs that I wanted to ask you some questions for had to do with the chapter 14,



emergency medical disembarkation of guest or crew, transportation to the facility, and that is Bates 418. My understanding from this record is that the medical team is supposed to use the port agent to assist in getting emergency ground transportation, correct?
A. Yes.
Q. To me assistance does not mean that they are the sole entity responsible for getting ground transportation; is that correct?
MR. DRAHOS: Form.
A. No, that is not correct, because under practical purposes and practical operations, the port agent is recognized as being the person in the best position to prepare for a patient evacuation, to arrange for an ambulance to assist the medical center staff in choosing the destination, and that would be falling within the expertise level of the port agent.
Q. I want to draw your attention to the second paragraph of this Royal Caribbean procedure where it says the treating physician shall ensure that the ground transportation arranged is appropriate for the medical condition of the patient and the medical transport crew are fully briefed on the medical condition of the patient; do you see that, the first sentence?
A. Yes.



Q. If I am understanding this correctly, the doctor does have a responsibility with regard to ground transportation?
MR. DRAHOS: I object to the form.
A. Insofar as requesting the transportation be arranged by the port agent.
BY MS. LOBEL:
Q. So for Royal Caribbean, if I am understanding you correctly, all the doctor needs to do is request that the port agent get ground transportation, and then has no further responsibility, whatsoever, insofar as coordinating or arranging ground transportation?
A. That is a negative way of putting it. The positive way of putting it is if the doctor -- she will relay information to the port agent, so that the port agent knows what facility is reasonable and required in order to do safe transport.
Q. Does Royal Caribbean have a list of different hospitals that doctors can send patients to at each port?
A. No.
Q. Why not?
A. Because that is an ever evolving list. It depends on the time of year. It depends on what services are required, and that is something that we can't be expected as a cruise line to maintain for hundreds of

ports of call. That is something we rely on the expertise to provide.

Q. Then it says in the file, in the second sentence of the first paragraph, in most circumstances it is appropriate to request advanced life support or a paramedic based on ground ambulance response team or local equivalent. Would you agree me that there is a difference between an advanced life support and basic care support, which is a different type of ambulance, correct?

A. There is.

Q. What is the difference between the basic support and advanced life support?

A. Basic life support would be able to transfer a patient successfully, that has a stable medical condition, and it does not require immediate life saving cardiopulmonary resuscitation. An ACLS transport assists in providing intubation, defibrillation and highly advanced drug administration for a person who is having an advanced cardiopulmonary arrest or compromise.

Q. Is the standard of care or expectation from Royal Caribbean, or if there is disembark if somebody is suffering a stroke, to send somebody first on the advanced care life support or basic?

MR. DRAHOS: I object to form.



A. There is no such policy.

BY MS. LOBEL:

Q. The port in question in this question is the Port of San Juan, correct?

A. Yes, ma'am.

Q. Throughout the entirety of your tenure working for Royal Caribbean, has Royal Caribbean been porting or sending cruise ships to the Port of San Juan?

A. Yes.

Q. So for at least six to seven years, cruise ships have been going in and out of San Juan from Royal Caribbean or under the Royal Caribbean group?

A. Yes.

Q. All right. I am not trying to insult you with the next question, but Puerto Rico is part of the United States?

A. Yes.

Q. And Puerto Rico, like the mainland of the United States, has a 911 system?

A. If it does, it is not something that I am aware of.

Q. Is Royal Caribbean aware that if you call 911 in Puerto Rico, they will, just like in the United States, what is your emergency and they will send an ambulance, if needed?



A. I am not aware of that.

Q. Are you familiar with the Bureau of Medical Emergency Corps of Puerto Rico?

A. No.

Q. That is the agency that is assigned to the Department of Public Safety in Puerto Rico, correct?

A. I am sorry, say that again, please.

Q. You are aware that the Bureau of Medical Emergency Corps in Puerto Rico is an agency designated to or under the umbrella of the Department of Public Safety?

MR. DRAHOS: I object to the form.

A. I am not aware of that, but I know when you call 911, if it is anything like the structure shoreside here in Miami, the paramedics just exercise discretion to take the patient to whatever facility they want, and they may be totally unaware of what the facility has available; whether it's advanced, you know, stroke treatment, advanced cardiovascular treatment, bypass surgery, trauma care, paramedics generally would not be aware of that. That is something that would be much better relied on by the discretion of the port agent. So when our team is called the port agent, that's what they are expected to provide. It is the best advice on the best center to transfer the patient for the care that is deemed appropriate by the doctor on board the ship.



BY MS. LOBEL:

Q. How do you know that the Puerto Rican dispatch in San Juan does not know which facilities can handle strokes?

MR. DRAHOS: I object to the form.

A. I don't know, but I do know that the port agents give us excellent support, provided that year in and year out.

BY MS. LOBEL:

Q. How do you know the port agent knows better than the local dispatch who handles emergencies on a day to day basis?

A. I have no reason to believe a negative.

Q. Doctor, do you know Commissioner, Dr. Jose Colin Gareau?

A. No, I don't.

Q. Are you aware that he is the director for the Puerto Rican agency that handles 911 calls and emergency dispatch?

A. No.

MR. DRAHOS: I object to the form.

BY MS. LOBEL:

Q. Royal Caribbean ships have WiFi, correct?

A. Yes, we do.

Q. And they have telephone lines on the ship,

correct?
A. Yes.
Q. The medical center has a landline, correct?
A. Yes.
Q. Good. If I wanted to call the ship and I have the phone number, of course, I would be able to call the medical center on the ship?
MR. DRAHOS: I object to form. Who? I am sorry.
A. I did not understand the question. Can you ask it again?
BY MS. LOBEL:
Q. So let's use you. If you wanted to call the Harmony of the Seas medical center, you can do that from your cellphone to the ship, correct?
A. Yes, I could, yes.
Q. Who is the phone provider for the ship?
MR. DRAHOS: I object to the form. He is not designated to speak on what I addressed in the beginning of the deposition.
MS. LOBEL: His communications to and from the ship.
BY MS. LOBEL:
Q. Who is the service provider for the ship?
A. It's satellite --



MR. DRAHOS: Hold on. This is area 45, which I identified in the beginning of the deposition he is not here to talk about today.
BY MS. LOBEL:
Q. What were you saying about satellite?
A. It is a provider that I am not aware of. I don't know about the intricacies of our telecommunications programs.
Q. There is also an internal phone system on the ship where, for example, the doctor in the medical center can call the bridge?
A. There is an internal phone system, yes.
Q. And there is recordkeeping for the phone system, if you know?
A. I don't know.
MR. DRAHOS: I object to the form.
BY MS. LOBEL:
Q. Are you aware that there are emergency cellphones available to shipboard physicians?
A. I don't know what you are referring to. What does that mean?
Q. One second. I can help you out. Let me get to the document page. I refer you to Bates 201. That has to do with emergency medical, CTA, cellphones. This is under chapter one, care team.



A. Okay.
Q. And it says that RCL provides cellphones up to three per ship, for use in emergency situations by members of the medical team and care team associates. CTA is engaged in the assistance of a guest or crew member?
A. I did not know what you were referring to earlier.
Q. Certainly. So you agree with me that there are cellphones available on ships for emergency use?
A. Those are used when a care team member is disembarked with a patient, to accompany a patient that is unable to communicate or various other parameters that we determined are essential for supporting the guests, and those phones can be used either by a nurse who is attending to a critically ill patient or that can be used by a care team associate that is dispatched to assist the crew member.
Q. Can a shipboard doctor use that cellphone as part of a disembarkation or medical evacuation procedure?
A. No. That is not generally done.
Q. It is not generally done or it can't be done?
MR. DRAHOS: I object to the form.
A. I can't imagine a situation where the doctor would be disembarking with the patient and need to use an



emergency phone. It just is not the purpose of those phones.
BY MS. LOBEL:
Q. Well, a doctor could call 911 for an ambulance, correct, with the phone?
MR. DRAHOS: I object to form.
A. Well, I can call 911 right now. I don't understand what we are trying to determine here.
BY MS. LOBEL:
Q. If a doctor is dealing with a patient who is suffering a medical emergency and needs an ambulance in San Juan, Puerto Rico, the United States, they could use the cell phone to call 911 and call for an ambulance themselves?
A. There are better ways to deal with that situation, and that would not be the methodology that would be used for efficient transfer of a patient.
Q. So Royal Caribbean's procedure is for the doctor or somebody else on the ship to call somebody else, who then calls another third party to call an ambulance, as the most efficient way to get ground transportation?
MR. DRAHOS: Objection, form. Argumentative.
A. There is a methodology that has been used successfully for years which is to contact the port

Page 234

agent, who is a specialist, who then contacts the appropriate care as dictated to him by the doctor, and then that patient is transferred to the facility that can best handle the problem that the patient faces.
Q. Are the port agents specialists in medical care?
A. Are the port agents specialists in medical care? No, they rely on the doctor to indicate to them the status of the patient.
Q. Are they medical transport specialists and have expert training having to do with that?
A. No. The doctor gives the port agent the information the port agent needs to make an intelligent decision.
THE VIDEOGRAPHER: Off the video record at 2031 UTC Time, local time is 4:31 p.m.
(Brief Recess.)
THE VIDEOGRAPHER: Back on the video record at 2041, local time is 4:42 p.m.
BY MS. LOBEL:
Q. So picking up where we left off, this incident, Mr. Burgess was transported from the Harmony of the Seas to a hospital called Hima San Pablo Caguas?
A. Correct.
Q. Dr. Shore, Hima San Pablo Caguas is not in San

Page 235

Juan proper, correct?
MR. DRAHOS: I object to form.
A. I am not familiar with the exact location.
BY MS. LOBEL:
Q. My understanding is it is located in Caguas, the city that is outside of the San Juan; have you been told that at any point in time?
A. No.
MR. DRAHOS: I object.
BY MS. LOBEL:
Q. Has Royal Caribbean sent other passengers to Hima San Pablo Caguas before?
A. I don't know.
Q. Would there be documentation of every time Royal Caribbean has sent patients or passengers to that hospital before this incident?
MR. DRAHOS: I object to the form.
A. I don't know where you would find that information.
BY MS. LOBEL:
Q. Does Royal Caribbean shipboard medical records documents when they -- well, where they transport patients for medical disembarks when they do?
A. It is up to the doctor preparing a note.
Q. The care team would have that document though,

Page 236

correct?
A. They may have them.
Q. The port agents certainly would have that information?
A. Yes.
Q. The port agent would inform Royal Caribbean where they recommend sending somebody?
A. Yes.
Q. If a hospital is not within the same city as the city where the ship is ported or docked, the doctor should take into account distance between the port and the hospital in how timely or how quickly the patient is transported, correct?
MR. DRAHOS: I object to form.
A. There are lot of factors that could influence the transport time.
BY MS. LOBEL:
Q. If the doctor knows that the hospital is -- that they decide that they want to transport the patient to is outside of the city of where they are at, that should be factored into the timeliness of transport though, correct?
A. One of the factors. One of the least important factors.
Q. Why is that not important, distance?

Page 237

MR. DRAHOS: Objection.
A. Because there is other factors that probably play a more important role.
BY MS. LOBEL:
Q. Such as?
A. Such as the stability of the patient to be transported, such as the facilities that are -- the equipment and the specialists that are available at the center, the appropriateness of the transfer to a particular center. Weather, traffic. There is many, many concerns. That would be the port agent's decision to assist the doctor with the best recommendation possible.
Q. But the doctor would ultimately decide on the ultimate decision where to send the patient because they are in his or her care, correct?
MR. DRAHOS: I object to the form.
A. It would be a joint decision, like any other medical decision. It would have to be part of what the doctor feels is appropriate, what the port agent recommends, and so there would be many factors that would go together to make that decision.
BY MS. LOBEL:
Q. Does Royal Caribbean have meetings with local hospitals in San Juan?

A. Royal Caribbean encourages the doctors to in their off time to go ashore, but it would be technically difficult for them to canvas every hospital in a reasonable radius, so that is why we rely on a port agent.

Q. But somebody from the medical department who is not ship-bound could go to San Juan to assess the medical situation in the city or research it at least, correct?

A. Yes.

MR. DRAHOS: Objection.

A. We allow the doctors to disembark for day visits to medical centers, and we even encourage it.

BY MS. LOBEL:

Q. But can't the shoreside team do research as to medical capabilities in a given city such as San Juan?

A. It would not be realistic to ask -- I am sorry. Did I interrupt again?

MR. DRAHOS: I am just objecting to the form. Sorry.

A. It would not be reasonable to expect one company to do an exhaustive research of all the hundreds of ports that they travel to. That is why we rely specifically on the port agents in the various port of call who were familiar with the most recent updates, capabilities, et cetera.



BY MS. LOBEL:

Q. Then there is a service within the company known as the care team. We referred to it a few times, correct?

A. Yes, correct.

Q. The care team are Royal Caribbean personnel that assist with medical emergencies or medical situations involving passengers or crew on Royal Caribbean ships, correct?

A. Yes, but it would not have to be necessarily an emergency case.

Q. My understanding is there are two types of physicians. That there is a care team specialist and a care team assistant; is that it?

A. Yes.

Q. My understanding is the care team specialist is a shoreside team member?

A. That's correct.

Q. Are they based in Miami?

A. Generally, yes.

Q. Are they supposed to help provide logistical support to medical facilities?

A. No.

Q. Who are they supposed to provide logistical support to?



A. Can you be more specific about what you mean by logistical support?

Q. From the job description. Let me pull it up. I believe it is 188.

A. You will be bringing up the document?

Q. Yes, I will bring it up, so we can all see it. I just accidently hit a button and jumped. This is 188. This is a general definition where it says care team specialist, the shoreside care team is comprised of specially trained care team specialists who are based shoreside, are dedicated to providing professional, logistical and emotional support to our guests and crew in the event of a crisis. They also manage the shipboard care team associate program.

A. By professional, logistical and emotional support, the implication there is that they provide the logistics of how to best accommodate a guest or a crew member who has been disembarked. They don't provide a location where that patient should be treated. They provide logistical support in terms of where to off-load luggage, how to have family member teams -- the teams of family members join the patient, if it is possible, where the patient might be able to stay, in a hotel after discharge, where a family member might be able to stay. If during the hospitalization of a family member, these



are the kind of logistical support they are referring to, not the choice of a dedicated place to care for a patient.

Q. Are they supposed to be notified when there is a situation when a patient is going is going to be disembarked?

A. Yes, it depends if it meets the criteria we have established in our recommendations to the care team for their involvement, their specific criteria.

Q. What are criteria for when the care team get involved?

A. I will be doing it from memory, but it is basically a patient, that the extremes of age, someone is extremely young or extremely old. Someone who is incapable of communication, that would be someone who has lost the power of speech or someone who does not know the local language. That might be someone who has no funds. That might be someone who has no ability to communicate, someone who has the need for a caretaker to accompany them for their daily needs, so these are the kinds of things that are from memory, as I said. I don't have an exact list in front of me. These are the kinds of things the care team associate would help with. The care team specialist would contact the ship and ask -- the care team specialist would ask a care team associate to

provide those types of services.
Q. Now, in a situation for example with this case that took place in Puerto Rico, the prime language is Spanish. Burgess and Mr. Henze don't speak Spanish, so should somebody have been assigned?
MR. DRAHOS: Objection.
A. No.
BY MS. LOBEL:
Q. Why?
A. Because Mr. Burgess was in stable medical condition -- and when he was disembarked, and English is a well-known language that is spoken in Puerto Rico. They would not have met the criteria for a care team associate to accompany them.
Q. If the team from the ambulance arrived and they did not speak English very well, should a care team associate have gone with the family?
MR. DRAHOS: I object to the form.
A. In this case Mr. Burgess had a caretaker. That was his husband, Mr. Henze. He was accompanied by Mr. Henze.
Q. That was not my question. My question is if the ambulance team that arrived to transport Mr. Burgess did not speak English or did not speak English very well and only Spanish, under those circumstances should a care


team associate have gone with Mr. Burgess?
A. I don't believe so, because the care team associate -- it is quite an imposition on the care team associate to accompany someone. They sometimes miss the deployment of the ship. They have to fly to a strange city in order to rejoin the ship. It is quite a burden on the care team. It is not a service that is provided frivolously and without need. So under the hypotheticals that someone on the ambulance team might not speak English, that would not be a criteria where we dispatch out of necessity.
Q. There is an SQM that I want to talk to you about, under the care team manual, chapter one, 1.02 general care team procedures, and I think this is Bates 191. The top note says liaise with local port agents to arrange ground transportation and hotel accommodations for guests and relatives following disembarkation. So if I am understanding this correctly, the care team specialist should have been liaisoning with the port agent for Mr. Burgess, correct?
A. No.
MR. DRAHOS: Objection to form.
BY MS. LOBEL:
Q. Why? Am I not reading it correctly?
A. No. That is not a requirement in every case.


If the patient met the criteria that we were talking about. It says services provided included but are not limited to. Based on the situation as it presented itself, it would be the job of the care team to liaise with the port agent, if the port agent required further assistance in arranging transportation for family members. If you have a large crowd of family members, you know, we are more concerned with the care of the guest that needs medical care, and this would fall to the secondary level of assisting with other arrangements that would be required beyond medical care.
Q. I thought this meant the ground transportation for the guests, guests pleural, or the relatives, so it was either or, meaning Mr. Burgess needed ground transport or his husband I guess?
A. That is implying that if Mr. Burgess, let's say, had been disembarked as like discharged from hospital care and found himself on the ground in Puerto Rico and needed assistance, then the care team specialist would ask the care team associate to liaise with the local port agent to try to provide hospital accommodation until the patient could either be repatriated or rejoin family members, whatever the situation demanded.
Q. Who is the -- I just want to make sure I understand this correctly because looking at the records


in this case, their team is referenced, the port agent is referenced, the doctor is referenced. Who is the point of contact for the port agent with regard to ground transportation?
MR. DRAHOS: I object to the form.
A. The doctor would contact the port agent in a case like this. The doctor would say we need assistance. We are disembarking a patient. The patient needs a head workup, be it a CT scan or MRI. Then the port agent would say yes, let me make some phone calls. Let me connect you. The doctor would then liaise telephonically with the receiving physician. We generally provide the disembarkation summary, and that would be the whole process. If the care team was required because the patient met any of those policies that I discussed, if he was of extreme age, young girl; if he did not speak the local language and could not communicate with anyone, if he had no money at all, those would be reasons why we would help.
Q. Is there supposed to be a continuing line of communication between the doctor and the port agent with regard to the status of ground transportation for a medical emergency such as in this case?
A. You would have to speak to the doctor in this case to know what the communications status was with this

case. Each case is different.
Q. What does Royal Caribbean know about the communication between the shipboard doctor and the port agent with regards to ground transportation in this case?
A. From the records that I reviewed -- and again, they are voluminous, from whatever record I reviewed I remember seeing the basic life support ambulance was requested.
Q. Understood, but my question is: What about the follow up? I made the request, is there to be communication? What is the ETA? When do I get ready? That is it? I just make the request, game over, no more communication?
MR. DRAHOS: I object to the form.
A. Again, I have to refer you to the doctors to discuss with them what communication they had with the port agent. I don't have that mentioned.
BY MS. LOBEL:
Q. You as in Dr. Shore or Royal Caribbean does not?
A. Royal Caribbean would suggest that you contact the doctor and ask the doctor what communications took place.
Q. I am going to move to a different Bates stamp. Bear with me. I am going to turn your attention to a



portion of the port agent agreement on Bates 121. Let me know when you are ready, if you want to use your record or mine?
A. I can use yours if you want.
Q. I will draw your attention to section 1.133, where it says guest and crew medical. Then we move over a column and it says care team, and then there is a paragraph with some information where it says the agent shall understand the role and responsibilities of the Royal Caribbean cruise line's care team. The care team is a group of professionals under medical direction were able to support guests and crew members who are in the process of being disembarked from the vessel due to a medical emergency or other crisis such as sexual assault, agents shall ensure that they have current 24-hour contact information, and then it references another section.
Am I understanding correctly that part of the services that Royal Caribbean pays the port agent for is to assist with requests from the care team?
MR. DRAHOS: I object to the form.
A. Yes. Generally those requests would come from the patient or the family members accompanying the patient. If the family said to the port agent or communicated to the port agent, we have no money, then



the port agent would know from this policy to contact the care team to assist. If the family mentioned that they had no place to stay because they suddenly disembarked from the ship to accompany a loved one, then the port would know to turn to the care team specialist or care team associate on the ground, to help with the arrangements to accommodate the family member. And this could also apply to situations that are totally out of control with the cruise lines, like if there is a volcano eruption, then this would be a time when care team would become involved and help with unexpected needs.
BY MS. LOBEL:
Q. Then the next section I wanted to ask you questions about, and I will see if it will highlight for me because it is so small. Under 1.134, guest and crew medical coordination of services. Do you see the highlighted bullet point where it says arranged emergency medical transportation, and then it says see section 1.134; do you see that?
A. Yes, I see that.
Q. What section is it cross-referencing, because this is 1.134; do you know?
A. I don't know. Speaking on the part of Royal Caribbean. I am not familiar with the section.
Q. I was confused, and I would hope Royal would



know this better than me. I wanted to ask.
I am going to go down to 1.136 which I think is on the next page, which is Bates 122. All right. Starting where I highlighted the sentence, I will refer you to with regard to medical emergencies for guests and crew. It says the agent must assist the vessel with the obtaining medical assistance whether such medical service or need exists at the port city or not?
A. Right.
Q. My understanding is that this indicates that the agent is supposed to assist. Who are they assisting? The doctor, correct?
A. They are assisting the guest or crew member that needs to be disembarked by arranging whatever services need to be done.
Q. Then it says where my arrow is, agent is expected to assist any and all RCL guest crew members or vendors experiencing medical emergency and who remains after the vessel departs. So then there is another expectation from Royal Caribbean that the agent is supposed to assist with the medical emergency, the personnel that is on the ship, correct?
MR. DRAHOS: I object to the form.
A. It says they are expected to assist Royal Caribbean limited guests, crew members or vendors and

Page 250

those who remain after the vessel departs. That would be the services that we have already discussed repeatedly.
BY MS. LOBEL:
Q. But Royal Caribbean does not just wipe their hands of the guest or the crew member who is undergoing the emergency, they work with the port agent, correct?
MR. DRAHOS: I object to the form.
A. We make an exceptional effort. I don't believe this is done by any other cruise line, to establish, follow through with the care team, so that if there is any unmet needs of guests or crew members or their family members joining them or the people who are accompanying them, we make an extraordinary effort to provide the care team associate on the ground at the site if it meets the policy that we have established, and the port agent needs to communicate with the care team associate, so the care team can advise the port agent, and the port agent can be aware of the needs from the family.
BY MS. LOBEL:
Q. Those needs from the family are after the person has already been brought to a hospital and the emergency is being dealt with, correct?
A. No. It could be at any point during the incident.
Q. In this incident where somebody was suffering

Page 251

from a stroke, there was no care team assisting or specialist involved in the disembark of Mr. Burgess, correct?
A. Not that I am aware.
Q. My next question for you, and I am moving to Bates 127. Let me pull this up for you. So I will draw your attention to Section 1.11, subcontracts for additional services or franchising services, and under Sub A, which I will put in blue, do you see where I am looking?
A. Yes.
Q. I wanted to make sure you saw where I was drawing your attention to.
A. Yes.
Q. Sub A says the port agents shall not engage any service provider without prior written approval of RCL and each service contract shall likewise be subject to the prior written approval of RCL. Each service contract shall likewise be subject to the prior written approval of RCL. Do you see that first sentence?
A. I do.
Q. With regard to the port agent that Royal Caribbean uses in the port of San Juan, is there a contract with a private ambulance company between the port agent and whoever the company is?

Page 252

A. I really don't know the details of our interests with the port agents. I think you would have to discuss that with our contract department or our legal department. It is something I am not familiar with the details of these arrangements.
Q. If there was a contract based off of what we just looked at, if there was a contract with a specific ambulance provider with the port agent, Royal Caribbean would have to approve that contract before the port agent could engage in it?
MR. DRAHOS: I object to the form.
A. From what is seen in that literature, that would be the case, but I am not aware of any private arrangements made by any port agents. In my experience with Royal, we vet various port agents, and they provide the services by contacting the ambulances, and I don't know of any private contracts that are in place that would bias us towards one provider or another.
BY MS. LOBEL:
Q. You don't know one way or the other if the port agent in San Juan had a contract with the private ambulance company at the time of this incident?
A. I don't know that. I don't know that to be the case.
Q. One way or the other?

Page 253

A. Right.
Q. Would you agree with me that if there were a contract with a private ambulance company, that could delay transport because then you can only use that company as opposed to any other ambulances in San Juan?
MR. DRAHOS: Objection.
A. I don't agree with that, because that could work both ways. That could mean that an ambulance company is more familiar with a particular agency, and that the services that they provide are even more accurate and better, and that they may be on standby or available sooner. So no, I don't think that is a negative, but as I said before, I don't believe there is any such agreements or special arrangements or exclusivity contracts.
BY MS. LOBEL:
Q. Has Royal Caribbean sent patients to hospitals in San Juan before with the same ambulance companies as in this case?
A. I don't know.
Q. Doesn't that whole department have routine meetings shoreside?
MR. DRAHOS: I object to the form.
A. We have many different types of meetings on a routine basis.

BY MS. LOBEL:
Q. What types of meetings does the shoreside medical have on a routine basis?
A. We have return to work committee meetings, which review the suitability of a crew member to return to work. We have risk management meetings where we review cases from time to time. We have public health meetings where we discuss how we are handling various public health threats. Meetings with the senior vice-president on a weekly basis to discuss our conduct, our program on board the ships. Those would be examples of some of the meetings.
Q. What other meetings would there be?
MR. DRAHOS: I object to form.
A. Those are the only ones that come to mind.
BY MS. LOBEL:
Q. How frequently are the return to work committee meetings?
A. They were on a weekly basis.
Q. What about the meetings with -- strike that.
What about the meetings to review cases?
A. Those were on an as needed basis with the risk management department.
Q. In your experience, how many meetings with the risk management department did you participate in?



MR. DRAHOS: Objection.
A. Very many.
BY MS. LOBEL:
Q. Sorry?
A. Very many. Many.
Q. Are meeting minutes taken during those meetings?
A. Minutes are attended by legal counsel. It is a cooperative meeting between risk management, between legal, medical. Sometimes Human Resources. So those would be privileged meetings.
Q. Who from legal would appear?
A. It depends on who is asked to attend the meeting.
MR. DRAHOS: Form.
A. I can't really say. It would be one of many people who were available.
BY MS. LOBEL:
Q. Do you remember anyone's names?
A. Yes.
Q. What would those names be?
MR. DRAHOS: I object to form.
A. Paul Hairm might attend. Amanda Campos might attend.
MR. DRAHOS: Objection to form.



A. Ms. Hernandez might attend. Natasha -- I am sorry, I am having troubling remembering. I have not been in the office for close to two years now. I can't remember. There would be quite a few different attorneys who might attend those meetings.
BY MS. LOBEL:
Q. Were there any other meetings where the subject of medical evacuations would come up, other than the meetings with risk management?
MR. DRAHOS: Objection. Form.
A. On occasion we might meet with a newer ambulance company to determine their suitability to provide services.
BY MS. LOBEL:
Q. Are there any committees, disciplinary committees for purposes of the medical department that would meet?
A. Could you repeat the question?
Q. Are there any committees that meet with regard to disciplinary actions for medical department or medical personnel?
A. No, not specifically for that purpose.
Q. Is there any trend analysis that the medical department does throughout the fleet? I know there was a change in structure of the records. I just want to make



sure I am clear on that.
A. Can you suggest to me what would some of those reports include? I don't know the answer.
Q. If any form of trend analysis, case trend analysis that the medical department does?
A. No, not independently.
Q. I am going to take you to, I believe, Bates 37. One second.
A. Did you say number 37?
Q. I want to ask you a question first. Let's go to Bates 1 since it is in front of my nose. I am going to pull it up on my screen. Do you see --
A. Notice of videotape deposition?
Q. No, Bates 1, not Exhibit 1.
A. Would you be able to bring that up on your screen?
Q. Do you see the document, it has to do with gangway activity?
A. Yes.
Q. My question is how can I tell what time zone these timestamps are in for this gangway activity?
A. I would have to have you speak with someone from security, that would have specifics of how those times are determined.
Q. So just because I have a timestamp on this

Page 258

document it may not actually be the local time?
A. Yes, and there are several methods of determining time standards. There is Atlantic Standard Time. There is Eastern Standard. There is Daylight Savings. There is many different times, and I can't be an expert on that issue. I am sorry.
Q. And would you agree with me this document, at least, what was produced does not indicate a time zone, whatsoever?
A. It does not.
Q. I am going to get you to Bates 37. I will put it on the screen for you. Can you see Bates 37, at least the top of it?
A. Yes, ma'am.
Q. Would you agree with me that this is the start of the medical note from Mr. Burgess from February 21st of 2019?
A. Yes, it is.
Q. So you see the first entry here where it says priority urgent, chief complaint, patient attends clinic for 911 call to suite lounge, deck 17: Inability to move fingers of right hand, unstable gait; do you see that?
A. I do.
Q. The note says question mark, CVA, inability to move fingers of right hand, unstable gait to be seen by

Page 259

doctor in ICU. Do you see that?
A. Yes.
Q. What does CVA stand for?
A. Cerebrovascular accident.
Q. What does that mean?
MR. DRAHOS: I object to the form.
A. It's a medical term which means a change in the blood flow to the brain.
BY MS. LOBEL:
Q. Who sort of change would that be?
A. It depends.
Q. What would it depend on?
MR. DRAHOS: I object to the form.
A. You need somebody to testify medically as to what encompasses a CVA, so I don't believe I am here to do medical testimony, but I can interpret what CVA means, but I can't discuss in details what would encompass treatment or care for a stroke.
BY MS. LOBEL:
Q. What is Royal Caribbean's understanding that this note means, that patient attends clinic, 911 call to suite lounge, deck 17, question mark, CVA; what does that indicate?
MR. DRAHOS: Objection.
A. It means that the patient is being brought to

Page 260

evaluate the patient for the symptoms that they presented. It was documented.
BY MS. LOBEL:
Q. This was inputted by nurse, Mary Bremner, correct?
A. That would be usual protocol, yes.
Q. This would be the initial triage note, correct?
A. Correct.
Q. And we can't tell from this note if she first evaluated Mr. Burgess, and then typed her note or vice versa; correct?
A. We don't know that.
Q. She may have observed or told the doctor -- strike that.
She may have asked for the doctor to see the patient in the ICU before she typed the note, correct?
MR. DRAHOS: Form.
A. Not having been there, I think I think you would have to discuss with the nurse what was presenting to her, what was given historically and what she documented in the time she documented it. I can't comment on that.
BY MS. LOBEL:
Q. This is all I have so far as to what she documented, so I have nothing else to go on, so I want to

Page 261

know what Royal Caribbean knows about the initial triage?
MR. DRAHOS: Objection.
A. Royal Caribbean knows what is in the document, that's all.
BY MS. LOBEL:
Q. If we go through the notes, would you agree with me that in the addendum there is no addendum indicated, correct?
A. There is no addendum indicated.
Q. Would you agree with me that there is nothing in this medical note that spans from Bates 37 through 41 with regards to any details about the medical transport or evacuation of this patient?
A. I would have to review all those records with you now.
Q. I will be happy to do that.
A. Let's do that, please. Can you give me the numbers on the record.
Q. I have 37 through 41. Bear with me. Let me scroll down again. Right now I am on page 37, which this was that top page we looked at.
A. I will pull that up on my end, if I may.
Q. Sure.
A. Can you ask the question again?
Q. There is no mention about medical evacuation or

Page 262

what happened during the medical evacuation in this note?
MR. DRAHOS: I object to the form.
A. That is not accurate.
BY MS. LOBEL:
Q. Why is that not accurate?
A. There is a remark made in the record. It says please evaluate, including CT scan. If you see fit, treat accordingly. Knowing that a CT scan is not available on the ship, that is a pretty clear reference to an intention to evacuate the patient. So to say there is no record of any intention to evacuate is incorrect.
Q. It does say -- go ahead.
A. Further in the record it says on Bates stamp 40, for immediate neurological neurosurgical evaluation, including CT scan, referral done. So to say that there is no effort or no mention of any intention to disembark would be totally inaccurate.
Q. There is no indication that this is a medical emergency in the note though, correct?
MR. DRAHOS: I object to the form.
A. No, that is not correct.
BY MS. LOBEL:
Q. Where does it state that this is a time sensitive medical emergency?
MR. DRAHOS: I object to form.

Page 263

A. It says for immediate neurologic neurosurgical evaluation. I am just reading directly from the record.
BY MS. LOBEL:
Q. And what is Royal Caribbean's understanding of what would immediate mean insofar as reasonable time between this note being generated, and when the neurological neurosurgical evaluation should have been done?
A. You have to ask the doctor that, because that is a judgment call, and I am not comfortable making that call.
Q. What is Royal Caribbean's expectation? I am not asking for a judgment call.
MR. DRAHOS: Form.
A. There is no expectation. That is something that the doctor has to decide and that is something the doctor interprets. That is a medical treatment issue.
BY MS. LOBEL:
Q. Royal Caribbean does not have an expectation as to how quickly a doctor who writes immediate neurological neurosurgical evaluation will get a patient to get that sort of evaluation from the ship?
A. That's correct. As a company, we don't have an opinion.
Q. An opinion or an expectation?

Page 264

MR. DRAHOS: I object to the form.
A. Neither. There was no expectation.
BY MS. LOBEL:
Q. Am I correct in understanding that Mr. Burgess had a previous visit to the medical center a couple days before the stroke incident?
A. Yes. You are correct.
Q. Would Dr. Pereira have had access to the complete medical file for Mr. Burgess at the time of his evaluation?
A. Yes, he would.
Q. Should he -- well, strike that.
Is Royal Caribbean's expectation he would have reviewed that note as part of his assessment of the patient?
MR. DRAHOS: I object to the form.
A. That is done generally where someone presents for a second time within a brief period.
BY MS. LOBEL:
Q. Now I will pull it up. Let me ask you this. Is it your understanding that the first visit involved head trauma?
A. There was a head injury.
Q. And is it Royal Caribbean's expectation when somebody sustains a head injury, that the doctor advise

Page 265

them that if there is any dizziness, headaches or continued symptomatology, that they return to the medical center for further evaluation?
MR. DRAHOS: I object to form.
A. I would be more comfortable if you would ask the doctors to testify as to what instructions or what information was given. The record is just a brief review of what occurred to the doctor's best ability generally after the case is over, and to get a more complete review of what was said or done, you have to speak to the doctor that was there.
Q. What I want to know is this Royal Caribbean's expectation that the doctor provide warnings that if you continue to suffer dizziness, nausea, vomiting or certain particularized symptoms after head trauma that they come back to the medical center?
A. That's Royal's expectation to hire doctors that are competent, qualified, that can do the job, that we hire them to do and we rely on them for that. That is our expectation.
Q. Is Royal Caribbean's expectation that the doctors write thorough notes in order for everybody to know what happened for the evaluation, care and treatment of the patient?
MR. DRAHOS: Objection.

A. We expect the doctors to do a review of what was provided, but it is not an exhaustive review.
BY MS. LOBEL:
Q. So Royal Caribbean is, in part -- strike that. Royal Caribbean is relying on the memories of doctors as to the details of the care and treatment to patients?
A. We are relying on a combination of the record, and the ability of the doctors to recall the treatment that they provide.
Q. With regard to a head injury, is the expectation that if a warning about continued symptoms and the need to return for further care, that that would be documented in the notes?
MR. DRAHOS: Form.
A. The notes are a brief review. They are not a novel. It is not a complete book of every moment that was spent in the medical center and every detail of the interactions between a patient and a doctor. So it's a summary, and it is expected to be treated as such as a review, and it is not exhaustive and totally indicative of everything that was done and said.
BY MS. LOBEL:
Q. Would you agree with me that Royal Caribbean knows that after a patient is seen for a concussion or a



head injury, that they are given warnings, if you suffer the following symptoms, please call 911 or return to the medical facility, correct?
MR. DRAHOS: I object to the form.
A. No. Royal Caribbean does not have a medical opinion. Royal Caribbean hires the doctors and expects them to deliver good medical care.
BY MS. LOBEL:
Q. Royal Caribbean does not have an expectation of how care and treatment is provided by their doctors on the ships with regard to head trauma or head injuries?
A. I think we have gone through that repeatedly, as we do not teach the doctors and train the doctors on how to treat patients. They come to the job trained. They come to the job competent. They come to the job capable of handling the case just as they encounter. That is our expectation. Our expectation is not to dictate to them how to practice.
Q. Royal Caribbean does not know one way or the other whether or not Dr. Etsebeth advised Richard Burgess to come back to the medical facility if he experienced nausea, dizziness, vomiting or any other symptoms after a significant head trauma?
A. It is our standard practice to advise patients to seek medical care in our medical centers and no



patients are turned away, so I have to assume that it was standard practice, and you have to speak with the doctor to get more details of that, what was the habit of the doctor to advise his patients.
Q. What was the expectation of Royal Caribbean insofar as advising patients about the need for continued care?
MR. DRAHOS: I object to the form.
A. As a company, Royal Caribbean does not provide patient care instruction to specific patients. That is provided by the medical center staff.
BY MS. LOBEL:
Q. I am going to take you to I think it is Bates 97. I am doing this from memory now. I am trying to get there myself.
A. Ninety-seven you said?
Q. Yes.
A. Give me one second.
Q. I am pulling it up on my screen now too. I am showing you a portion of an email chain because the top of the email chain that I am seeing is after the incident which I am not interested in that. The email from the day of the incident from -- it looks like HM medical secretary, RCCL medical secretary. Am I correct in my assumption that that refers to the Harmony of the Seas



medical secretary?
MR. DRAHOS: Objection to the form.
A. That is the e-mail address for the medical secretary.
BY MS. LOBEL:
Q. So whoever the medical secretary was at the time would have sent this email on Thursday, February 21 of 2019, correct?
MR. DRAHOS: Objection to form.
A. I would have to assume that was the medical secretary who would have access to her own email.
BY MS. LOBEL:
Q. Who else would have access to the medical secretary's emails?
A. Well, it is theoretical. Again, I don't like to do theoreticals, but if a medical secretary had left her computer without a timeout and somebody had walked by, but in most cases this would have been the medical secretary transmitting this message.
Q. Do you have any reason to believe that the medical secretary was not the individual who sent this email?
MR. DRAHOS: I object to the form.
A. No.
BY MS. LOBEL:

Q. Am I correct in reading that this e-mail was sent at 10:59 a.m.?
MR. DRAHOS: I object to the form.
A. I don't know. I can't be sure. Let me look at the rest of the records.
BY MS. LOBEL:
Q. Sure. I want to know if there is any reason why we should doubt this timestamp.
A. I have on Bates stamp 88, I have that this message was transmitted on February 21, 2019, at 9:59 a.m., requesting BLS ambulance in San Juan.
Q. I just scrolled up to -- on my way to 88 to 93, it looks like the same email and it says 10:59 a.m.?
MR. DRAHOS: I object to form. Argumentative.
BY MS. LOBEL:
Q. Which is the correct timestamp?
A. You have to discuss that with someone who is an expert in timestamping in the medical center. I can't answer that.
Q. Part of my designations for today has to do with all the communication having to do with this incident, which these would be; is that fair to say?
MR. DRAHOS: Objection to form.
A. No, because this is very technical data, that I would not be able to speak to without referencing a



specialist.
BY MS. LOBEL:
Q. What do you mean that the email is very technical data? I don't understand.
A. The timestamping on -- we have discussed this already. The timestamping on these documents is a technical -- it requires technical expertise that I simply don't have. I am available to discuss what is in the emails, but if you need accurate information about the stamping and the exact timing of these emails, I would have to refer you to somebody within the company as a telecommunication expert.
Q. Let's scroll down. That was 93, and I think we were at 97. Ninety-seven you would agree with me has the timestamp that the request for the BLS ambulance, was that at 10:59 on the date of incident, correct?
A. No, I don't think I agreed to that.
Q. This document on Bates 97 has a timestamp of 10:59 a.m., correct?
A. That does have a timestamp of 10:59, but if I refer you to the Bates number 88, it looks to be an identical email with a timestamp of 9:59 a.m.
Q. If we look at Bates 93 one more time, it's the same email?
A. Ninety-three, okay.



Q. It is 93. It runs to Bates stamp 94. It's the same email, correct? It has a timestamp of 10:59?
MR. DRAHOS: I object to form.
BY MS. LOBEL:
Q. Could you see that?
A. You know what, ma'am, I don't know where the various emails have been obtained, or from what source they come. I do know that they are in the record here, but as I said repeatedly, I would be much more comfortable if someone were to review these records with their mind towards documenting or giving authoritative information about the timestamping, which I am not qualified to do.
Q. Would you agree with me that this appears to be a printout and scanned email from Mr. Drahos though, correct? Because that is what happens. If I go into Outlook and I print my emails, I have my name -- you know, whoever prints the email at the top of the page; are you familiar with that?
MR. DRAHOS: I object to form.
A. I am losing the chain of questioning here. I really am. All I know is I repeatedly stated I am not an expert in timestamping on medical records. I can't answer these specific timestamping questions, and I don't want be evasive, but I am simply not able to explain the



difference between two emails, and I don't want to be in a situation where I am asked to testify to something I am not familiar with or comfortable about.
BY MS. LOBEL:
Q. Understood, but can we at least agree that on Bates 93, the copy of the email on Bates 93 through 94 gives the timestamp that the email was sent at 10:59?
MR. DRAHOS: I object to form. At this point he has repeatedly advised that he has not the knowledge, skill, training or the preparation to be able to explain what these timestamps mean. So we will produce a separate witness to address this area. It will be the witness who will handle 44, 45, 46 and 47. That is the person who is best suited to answer these questions, so he is not the representative for that today and he will not answer any further questions about timestamps.
MS. LOBEL: I am trying to ask if we can at least agree that is what the document says.
MR. DRAHOS: He does not need to say that as the corporate rep. The document speaks for itself. We will produce the corporate rep who is better suited, more prepared, has better training and experience and expertise to answer your questions.
THE WITNESS: Can I ask counsel how long this is supposed to be scheduled for, because it is

already past 5:40. It has been seven hours, and I am getting kind of tired just as a person.

MR. DRAHOS: How much more do you think you have?

MS. LOBEL: Let me review my notes. Some of this I have not crossed off. Let me make sure I understand because there is a little bit of an overlap. He is handling the communications ship to shore, et cetera, but he is not going to address the email; is that accurate?

MR. DRAHOS: I think where he has carved out the limits of his ability to answer questions is specifically what are these timestamps, how are they generated within the email, and that does fall within a certain area of expertise that he can't cover. If you want him to sit and say these are emails that we produced in the case, he can say that, but if you are asking about how these emails are timestamped, I think he clearly identified here that he can't answer the question, so I have to bring somebody else to do it.

MS. LOBEL: I want to understand, will he be able to talk about -- let's see how we do.

MR. DRAHOS: Hold on, because I need to know how much more we have. We have gone seven hours. It



is not my opposing counsel's feet to the fire. I also understand we have taken breaks. I am not a hard stop seven-hour guy, but do I have sort of a soccer game approach where it is like, all right, we are into the extra time now, and accounting for the breaks, the witness has indicated that he is tired. The court reporter has indicated he is tired. I am tired. I can only imagine how tired you must be. Can you give me a sense of how much more you have so I can make a judgement call how to handle this.

MS. LOBEL: I should wrap up in 30 minutes, I am not trying to drag this out. It is a document issue.

(Brief recess.)

BY MS. LOBEL:

Q. Would you agree with me that there are not any emails regarding the status of the ambulance after -- whenever that email was sent, whether it was at nine or 10:59 a.m. in the morning, would you agree with that?

A. Would I agree with what? I am sorry. I did not understand the question.

Q. There are no emails regarding the status of the ambulance requested in any of the e-mails?

A. I would have to take the time to go through all the emails. Would you mind doing that with me? I can do



that.

Q. Not a problem.

A. I don't want to testify to something I have not reviewed.

Q. You can see what I am seeing, the page I have above here is not the start of the emails. My understanding is the start of the email chains starts at 93. I see an email from February 26, which is after the incident, long after?

A. 93?

Q. There is no follow-up requesting status on the ambulance. And then 94 is the continuation of the initial request, and then if we look at page 95, there is an email from Pricilla Isaacs from Royal Caribbean. This is from February 26. It does not have the status of the ambulance. There is an email from February 26 again from Line Garcia. It does not have anything to do with the status of the ambulance.

There is another email from the same day, February 26. Nothing about the status of the ambulance. It talks about an air ambulance. It has to do with much later taking the patient home.

Bates 96, nothing about the status of the ambulance. Continue on to page 97.

A. These are somewhat repetitive.



Q. Correct. It looks like it is a chain and it has been printed out in some the emails repeat.

A. I will agree there is no emails that I can see for the purpose of this deposition to indicate the status of the ground ambulance.

Q. Who is Line Garcia?

A. Can you point me to where that is.

Q. One example is right here in this -- it is by Continental Shipping or appears to be from Continental Shipping from February 22nd, and it signs off Line Garcia.

A. I don't know Garcia. I don't know who that person is.

Q. Would you agree with me that there are no emails from somebody by the name of I believe it is Jennifer Robles?

A. I don't see any emails from Jennifer Robles. It looks to be Line Garcia, if that is being pronounced correctly, is responding as an agent, a port agent employee, responding as a port agent person it seems.

Q. Okay. Switch here.

A. It is not somebody that I know personally.

Q. Understood, but my understanding is that the port agent who, based off of the discovery responses I have seen, indicate that the point of contact was

Jennifer Robles, but I don't see any emails to, from or copying Ms. Robles; is that accurate?
A. Not that I can see.
Q. Do you know who Jennifer Robles is?
A. No.
Q. Have you or anyone from Royal Caribbean spoken to Jennifer Robles about this case?
A. No.
Q. You would agree with me there are no emails notifying the captain or discussing this incident with the captain, at least what I perceived?
A. From the documents that I reviewed there is nothing in writing addressing the captain, but as we said earlier in the deposition, there are many methods by which the doctor can communicate with the captain.
Q. Is Royal Caribbean aware whether or not the captain was communicated with regarding this incident at any point in time?
A. I don't believe I have any information to that effect.
Q. One second. I want to scroll up on my page. I will show you -- let me pull up Bates 47 is where the document starts.
A. Okay.
Q. My understanding is this is the guest landed



report?
A. Give me a second. I will pull it up. It is document number 47; is that right?
Q. Yes. Starts at 47 and continues, but it starts at 47.
A. It will take a moment. I have that up now.
Q. Who filled out this guest landed report? It goes into 48 from what I have.
A. I see no indication of who filled it out.
Q. Who is supposed to typically fill out the guest landed report?
A. This is something that would be generally handled by the medical secretary. It would be an administrative duty.
Q. I was not sure if it was a shoreside Miami project, okay.
A. No, ma'am.
Q. This is a document that is supposed to be filled out by typically the medical secretary or somebody from the shipboard medical team?
A. Correct.
Q. As we can see at the top, this is part of the SeaCare system?
A. Yes. This is a report that is generated through SeaCare.



Q. Would the dates and times in this document be filled out by either the medical secretary or whoever from the medical team filled out this form?
A. I believe you would have to speak to someone who is familiar with the way Tritan Bates stamps and timestamps as well as someone -- just as we discussed with the telephonics, it would have to be someone for the purpose of the deposition that is familiar with the details of how the timestamps work within SeaCare.
Q. I just wanted to see if that is something you knew?
A. No, it's not.
Q. Thank you.
A. You bet.
Q. Let me take a look at my notes. I am trying to grab the next document. I am not seeing it. Did you review the ambulance records in this case?
A. No, ma'am.
Q. Are you aware that Sunny Ambulance is the company that came to the port?
A. No, ma'am.
Q. Is the ambulance record something that Royal Caribbean would request or have or receive as part of their file?
A. No, ma'am.



Q. Why is that?
A. Because it is a local ambulance record. It would not be something I would document or see.
Q. Okay. One second here. I have to go into my remote.
A. Is this a Bates stamp document that I can look up as well?
Q. It is not, and I apologize. This will be Exhibit 4.
(Plaintiff's Exhibit Number 4, Ambulance Records, was marked for identification.)
BY MS. LOBEL:
Q. I will represent to you that these are the ambulance records that we received, so I will go to the receipt. There we go. All right. I will represent to you that this is the ambulance record that we received from the ambulance company that picked up Mr. Burgess, and I have some questions to you about this. Based off of my understanding of the documents, the ambulance company was dispatched at 12:21 and arrived on the ship at 12:54, and then left at 1308 or nine. I can't tell, which would be 1:00 p.m. Do you see that section of the document I am referring to?
A. I see it. Yes, I do.
Q. Then later down on the record it gives an

indication of 1:10 p.m. Then it looks like it is giving pulse and respiration rate, and SPO two numbers. Do you see that?
A. I do.
MR. DRAHOS: I object to the form.
BY MS. LOBEL:
Q. Do you recognize, more or less, what those numbers mean?
MR. DRAHOS: I object to the form.
A. I recognize this to be vital signs.
BY MS. LOBEL:
Q. Okay. So you would agree with me that based off of this document, there are vital signs taken in the ambulance at 1:10 p.m.?
MR. DRAHOS: Form.
A. I have never seen this document before, and I have not reviewed it with counsel, so I don't really feel I am capable of giving any kind of analysis of this.
BY MS. LOBEL:
Q. My next question to you is, it indicates -- it shows Dr. Pereira's name at the bottom. Then it indicates Hospital Hima Cupey; do you see that?
A. Yes, I do.
Q. Do you know if originally Mr. Burgess was supposed to be transported to Hospital Cupey as opposed



to Hima San Pablo Caguas?
MR. DRAHOS: Form.
A. I don't know anything about the arrangements that were made. I can't comment.
BY MS. LOBEL:
Q. Did Royal Caribbean find out from Dr. Pereira what arrangements he attempted to make?
MR. DRAHOS: I object to form.
A. Not that I am aware of.
BY MS. LOBEL:
Q. My understanding based off of -- sorry, let me scroll down on my notes. From one of the interrogatory responses, is that Dr. Pereira was the one who had communications with the hospital; did you see that?
A. I am sorry. Did you say that Dr. Pereira had -- yes, he had a conversation with the attending physician at the hospital that received Mr. Burgess.
Q. Which hospital?
A. I would have to go back and look at that record.
Q. When did that conversation take place?
MR. DRAHOS: I object to the form.
A. I would have to look at the record for more details.
BY MS. LOBEL:



Q. What record are you referring to, because I don't have a record documenting this communication at all?
A. I think that Dr. Pereira would be the best person to document that for you, because I would be going based on written records that we can all review. So I don't have any independent idea about what was discussed, what took place. I just know there was a note made in the medical record that I can read back to you.
Q. I don't see any notes and any records documenting communications between Dr. Pereira and any attending at a hospital, so I want to know what you are referring to as Royal Caribbean, because I have absolutely no idea.
MR. DRAHOS: Form. If you have to answer that question by revealing discussions that you learned from me, then I will have to assert the attorney-client privilege. If you have an independent basis for that then provide her with the independent basis, but if it is attorney-client privilege information, then I am asserting the privilege.
A. I don't have any information other than what I discussed with Mr. Drahos, and what appears in the record.



BY MS. LOBEL:
Q. What I want to know is what record or records are you referring to? I am not trying to elicit any conversations you had with your attorney. I just want to know what the basis is or the basis for the knowledge is with regard to any conversations Dr. Pereira had with any attending physician or anyone else from the hospital?
A. No, I just have what is on the landing form, and I have what was in the SeaCare record.
Q. Is it Royal Caribbean's understanding that Dr. Pereira spoke with an attending physician?
A. It is Royal's -- that he communicated with an attending physician, but I can't be more specific.
Q. Was that communications via telephone?
A. I don't know. That is the point. I don't know how that communication was made.
Q. How would Royal Caribbean be able to find out through any form of documentation?
MR. DRAHOS: I object to the form.
A. I guess we would have to have Dr. Pereira give details about what the conversations were that took place.
BY MS. LOBEL:
Q. If there was an email sent by Dr. Pereira, and that was the method he communicated with any attending

physician, that would be in Royal Caribbean's email system though, correct?
A. Yes.
Q. If Dr. Pereira had made a phone call from the ship, there should be phone records indicating when he made a phone call from the ship, correct?
A. You would have to speak to somebody from the telecommunications program to document what would or would not have been captured or what is available to this date.
Q. Can you tell me whether Royal Caribbean knows if the attending physician that you are referring to is from the hospital Mr. Burgess ultimately went to or a different hospital apart from where he went?
A. The only information I have is what I have discussed with Mr. Drahos, and I have not spoken about the case with Dr. Pereira.
Q. Again, I just want to know what Royal Caribbean knows. Does Royal Caribbean know, when you are saying an attending, which hospital that was?
A. No.
Q. Does Royal Caribbean know if Dr. Pereira spoke with any other hospital other than whichever hospital this attending physician was at, which was presumptively Hima San Pablo Caguas?


A. No, I would refer that to Dr. Pereira, to his deposition.
Q. Do you know how Dr. Pereira learned or decided -- strike that.
How would Dr. Pereira have gotten a phone number to call the attending physician?
A. You would have to ask Dr. Pereira that specifically.
Q. So Royal Caribbean has no idea how he got contact information or knew to communicate with an attending physician?
MR. DRAHOS: Objection.
A. It would generally be done at the port agent, would assist the doctor in communicating with the attending physician, but I don't have any detailed information about how that contact was done in this case.
BY MS. LOBEL:
Q. Would the port agents -- strike that.
If there was communications from the -- strike that.
If the port agent called the ship to relay this information, there should be records of that phone call communication though, correct?
A. I don't know the answer.
MR. DRAHOS: I object to form.


BY MS. LOBEL:
Q. If the port agent had emailed Dr. Pereira or somebody else on the vessel, here is the hospital to communicate, that email should be within Royal Caribbean's system though, correct?
MR. DRAHOS: I object to the form.
A. I believe that would be the case, yes.
BY MS. LOBEL:
Q. Have you reviewed any e-mails between the port agent and Dr. Pereira?
A. No, I have not.
Q. Did Royal Caribbean know if any exist?
A. No.
Q. No, as in none exist or Royal Caribbean does not know as it sits here today?
A. Royal Caribbean would rely on counsel to provide the records that exist.
Q. The keeper of the records would be Royal Caribbean though, not the attorneys?
A. Correct.
Q. So Royal Caribbean would be in possession of any and all emails that exist?
A. Yes, ma'am.
Q. Okay. Not the attorney?
A. No. The attorney would have been asked to


provide information to you as part of the case, right?
Q. Right, but Royal Caribbean would have been responsible for giving the information to its attorneys though, correct?
A. Correct.
Q. Are you aware of any phone conversations or other communications between Dr. Pereira and the port agent that we have not already discussed?
A. No, ma'am.
Q. Are you aware of any communications between the port agent and anyone else on the ship regarding this case?
A. No.
Q. If that existed, and it was via email, that should still be in Royal Caribbean's possession?
MR. DRAHOS: I object to the form.
A. Yes. I would not have any private separate records of any communication to go on. That would be part of the Royal Caribbean system.
BY MS. LOBEL:
Q. Does Royal Caribbean know what time the -- strike that.
Does Royal Caribbean know what time Mr. Burgess arrived at the hospital?
MR. DRAHOS: Objection to the form.

A. No, ma'am.
MS. LOBEL: This would be Plaintiff's Exhibit 5.
(Plaintiff's Exhibit Number 5, Triage Note, was marked for identification.)
A. Did you need me to consult a record that you are mentioning?
BY MS. LOBEL:
Q. It does not sound like you have it, so I am going to show you what I have from Hima San Pablo Caguas as the triage note.
A. Okay.
Q. My understanding is that a triage note would be -- the first note starting a medical record; is that fair to say?
MR. DRAHOS: I object to form. This is way outside the scope.
BY MS. LOBEL:
Q. You may answer.
A. A triage note is made on the arrival of a patient.
Q. On this document it indicates that the -- if we look here, the date and time for Mr. Burgess at Hima San Pablo Caguas on this triage note is February 21, 2019, at 1:59:09 p.m. Do you have any reason to dispute that that



is an inaccurate triage admission time?
MR. DRAHOS: I object to the form.
A. I have absolutely no clue as to who produced the record, what the record includes, who created the record, based on what the timestamp is incorporated, I have absolutely no way of commenting on this record.
BY MS. LOBEL:
Q. My question to you though is, I will represent -- let me back up.
I will represent to you I received this document from Hima San Pablo Caguas in response to a subpoena for my client, and the indication that we have from this triage note is that the time of first arrival from this first triage note is 1:59:02 p.m. I just want to know if Royal Caribbean has any reason to contest that that was not the time that Richard Burgess first arrived at the hospital?
MR. DRAHOS: I object to the form. Asked and answered.
A. I will put that into a positive statement rather than negative. The positive statement is I have no idea how these records are made. Who documents them, where the information and timing is extracted from, I cannot provide you with any comment about this record.
BY MS. LOBEL:



Q. Does Royal Caribbean know what time the patient arrived at the hospital in this case?
A. No.
MR. DRAHOS: Objection; form. Asked and answered.
A. No.
BY MS. LOBEL:
Q. I am sorry, we spoke on top of each other again. I apologize.
A. The answer is no.
Q. Does Royal Caribbean agree that it is unreasonable to take five hours to transport a patient suffering a stroke when that patient is on a ship docked at a port in a major city?
MR. DRAHOS: Objection to form.
A. No. The answer is no.
BY MS. LOBEL:
Q. Why is that?
A. Because Royal Caribbean -- I am sorry, Michael.
MR. DRAHOS: Objection.
A. Because Royal Caribbean is a corporation. It does not decide medical judgments about handling of individual cases. Speaking for Royal Caribbean, the company does not have a specific, you know, intention of providing that kind of medical information.



BY MS. LOBEL:
Q. Is Royal Caribbean expectation -- strike that.
Does Royal Caribbean expect its -- strike that. I will get my words.
If Royal Caribbean does not know whether that is a reasonable amount of time or unreasonable amount of time to transfer a patient to a hospital, then how does it know if its doctors are doing its jobs in the manner that meets the standard of care?
MR. DRAHOS: Object to the form.
A. Should I answer that question?
BY MS. LOBEL:
Q. Yes.
A. Because we hired doctors who are trained and know their work, and they abide by the standards of medical care in a general medical community. And though as a corporation, we don't dictate to the doctors the specifics of how they practice medicine. So Royal Caribbean as a corporation, leaves it up to the doctors to provide proper care at all times.
Q. How does Royal Caribbean know whether or not they are providing proper care at all times then?
MR. DRAHOS: I object to the form. That has been asked and answered for the last seven hours, and it is argumentative.

BY MS. LOBEL:
Q. You may answer.
A. I am sorry. Can you ask the question again?
Q. You are telling me that the corporation relies on the doctors to use their judgment, but the corporation has made the decision to provide medical care as part of its business in operating ships, correct?
A. Correct.
Q. So what I am struggling to understand is how does Royal Caribbean ensure that its doctors are actually performing and providing medical care that meets the standard of care?
MR. DRAHOS: I object to the form. That has been asked and answered.
A. The answer is because we hire doctors that are well trained, that have certain levels of experience. We encourage them to participate in continuing medical education. We subsidize their medical education to a certain degree. We provide them access to the internet, to maintain their knowledge base. We insist on them being certified by advanced cardiac life support, trauma support, pediatric life support. So with all these methodologies we can ascertain that our doctors are practicing proper medicine. We cannot dictate to each individual doctor how to handle each individual case. We



provide doctors that are properly trained, well trained, and we manage the medical centers in the appropriate method.
BY MS. LOBEL:
Q. You would agree with me that just because somebody has excellent training on their resume and excellent education on their resume, that does not necessarily mean they are a doctor who is providing medical care that meets the standard of care though, correct?
A. I would not agree to that.
MR. DRAHOS: Objection.
BY MS. LOBEL:
Q. Royal Caribbean is not aware of any instances where a doctor looks like they have a perfect background where in actuality they did not provide care and treatment that meets the standard of care?
MR. DRAHOS: I object to the form. Argumentative.
A. I can't answer that. That is just too broad, too vague. I am sorry.
BY MS. LOBEL:
Q. Let me ask you this. I am pretty sure I know the answer to this question. With regards to any timestamps or Bates stamps -- strike that.



With regard to any timestamps having to do with Mr. Burgess or Mr. Henze's Fidelio's account, would that be something that somebody else would be able to testify to?
A. Yes.
Q. I want to make sure it is on the record, so I know that that is going into the next continued depo.
A. Yes.
Q. Forgive me, it has been a while, we have been going for a while. Have you, during your tenure as the Royal Caribbean medical consultant, handled situations or participated in situations where passengers or crew members were medically evacuated off the vessel due to a stroke?
A. I am sorry? In what regard have I handled? Can you explain to me what you mean by that?
Q. Have you ever been consulted or made aware of or participated in any capacity having to do with the medical evacuation or consultation of a passenger or crew member who has suffered or suspected to have suffered from a stroke on a ship?
A. I really can't remember any specific case, no.
Q. Are you aware that other passengers other than Mr. Burgess have been medically evacuated off of ships as a result of a suspected stroke?



MR. DRAHOS: I object to form.
A. I am aware that on occasion there are customers, guests or crew members who suffer strokes while on board cruise ships. The answer is yes, I am aware of that.
BY MS. LOBEL:
Q. Are you aware of any instances where a patient was not timely evacuated when they were suffering a suspected stroke?
MR. DRAHOS: I object to the form.
A. That requires a medical opinion, and I am not able to provide that. That requires me to speculate about circumstances surrounding a case. It requires me to speculate about the condition of the patient, the ultimate diagnosis. I can't really render an opinion on that.
BY MS. LOBEL:
Q. Well, you participated in the meetings where there have been evaluations or assessments having to do with specific instances having to do with shipboard doctors, correct?
A. Yes.
Q. Have any of those incidents involved patients who were suffering from a suspected stroke?
A. I can't remember any details about that, no.

MR. DRAHOS: Form.
BY MS. LOBEL:
Q. Do you know where that would be documented?
MR. DRAHOS: I object to form.
A. No. That would only be documented in meetings that were held with attorneys, so I would not be responsible for those records. It would be under attorney-client privilege.
MS. LOBEL: I am going to do some housekeeping. Bear with me for one second. Michael, hopefully you don't have an objection to this. I did this to make life easier. Michael, what I am going to do, if it is okay with you, is attach as the exhibits -- since we have Bates stamp numbers, to make life easier, instead of having one huge exhibit. Is it all right if I go in numeric order, like one through 80 as they were produced, and then 81 through 444 and start attaching those exhibits, because we referenced the Bates numbers. I want to make sure it is attached, and we know exhibit numbers. I can put it on the record now because it is easier to find where is what.
MR. DRAHOS: I don't know what you mean. Do you mean as a composition exhibit?
MS. LOBEL: Yes. What I was intending to do



because I have Exhibit 1 is the notice. I have Exhibit 2 as the passenger bill of rights. I have Exhibit 3 as the Tritan software, SeaCare website page. I have Exhibit 4 as the Sunny Ambulance record, and I have Exhibit 5 as the triage note from Hima San Pablo Caguas, and what I was going to do was make Exhibit 6 the PDF you gave me of Bates 1 through 80.
(Plaintiff's Exhibit Number 6, PDF of Bates 1 through 80, was marked for identification.)
MR. DRAHOS: Okay.
MS. LOBEL: So I will do that as Exhibit 6. Then make Exhibit 7, 81 through 444.
MR. DRAHOS: Okay.
(Plaintiff's Exhibit Number 7, 81 through 444, was marked for identification.)
MS. LOBEL: And then I have got -- maybe this where the mistake is. Then I have the next one would be -- let me make sure I have the right document. That is wrong. The next document is 445 through 446, would be Exhibit 8.
MR. DRAHOS: Okay.
(Plaintiff's Exhibit Number 8, 445 through 446, was marked for identification.)
MS. LOBEL: Then the next one is 447 through



465 would be Exhibit 9.
MR. DRAHOS: Okay.
(Plaintiff's Exhibit Number 9, 447 through 465, was marked for identification.)
MS. LOBEL: And I think the end of the production, looks like it is 466 through 545, is Exhibit 10.
MR. DRAHOS: Okay.
(Plaintiff's Exhibit Number 10, 466 through 545, was marked for identification.)
MS. LOBEL: Is that all right with you?
MR. DRAHOS: Yes. We will read.
THE COURT REPORTER: Do you want this typed up?
MS. LOBEL: Yes.
THE COURT REPORTER: Do you want a copy?
MR. DRAHOS: Yes.
THE VIDEOGRAPHER: Off the video record at 6:30 p.m.
(Thereupon, the deposition concluded at 6:32 p.m.)
(Reading of the deposition was not waived by the witness and all parties.)



CERTIFICATE OF OATH OF WITNESS

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

I, Paul C. Haferling, Registered Professional Reporter, Florida Professional Reporter, State of Florida, certify that Dr. Ben Shore personally appeared before me on the 5th day of November, 2021, and was duly sworn.

Signed this 29th day of November, 2021

Paul C. Haferling, RPR
Notary Public, State of Florida
Commission No: HH42631
Commission Expires: 10/20/2024

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

I, Paul Haferling, Registered Professional Reporter, Florida Registered Reporter certify that I was authorized to and did stenographically report the Deposition of Dr. Ben Shore, Pages 1 through 304, that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 29th day of November, 2021.

Paul Haferling
Registered Professional Reporter



WITNESS NOTIFICATION LETTER

November 29, 2021
Dr. Ben Shore
c/o Gray Robinson, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
ATTN: Michael J. Drahos, Esq.
IN RE: Richard Burgess vs Royal Caribbean Cruises
Deposition taken on November 5, 2021
U.S. LEGAL SUPPORT JOB NO: 6000853-001

The transcript of the above-referenced proceeding has been prepared and is being provided to your office for review by the witness.

We respectfully request that the witness complete their review within 30 days and return the errata sheet to our office at the below address or via email to:
southeastproduction@uslegalsupport.com

Paul Haferling, RPR, FPR
U.S. Legal Support, Inc.
One Southeast Third Avenue
Suite 1250
Miami, Florida, 33131
305-373-8404

Cc via transcript:
Sarah A. Lobel, Esq.



ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT~ENTER CHANGES ON THIS PAGE
IN RE: Richard Burgess vs Royal Caribbean Cruises
Witness: Dr. Ben Shore
JOB# 6000853-001

| Page No. | Line No. | Change | Reason |
| --- | --- | --- | --- |
| | | | |

Under penalties of perjury, I declare that I have read the foregoing document and that it is true and correct subject to any changes in form or substance entered here.

__________ ________________________
Date DR. BEN SHORE

## $

**$12,000** 208:4

## 1

**1** 40:11,14 257:11,14 299:1,7,9
**1.02** 243:13
**1.11** 251:7
**1.133** 247:5
**1.134** 248:15,19,22
**1.136** 249:2
**10** 7:22 8:3,7 26:18,20 35:14,23 138:19 191:25 300:7,9
**10-page** 6:24
**10:02** 5:3
**10:29** 22:19
**10:32** 22:22
**10:59** 270:2,13 271:16,19,20 272:2 273:7 275:19
**10th** 35:25
**110** 130:18,19 131:1
**11:00** 53:2
**11:47** 73:20
**11:55** 73:23
**11th** 35:22
**121** 247:1
**122** 249:3
**1255** 73:22
**127** 251:6
**12:00** 53:4
**12:02** 219:10,11, 16,25 220:3
**12:21** 281:20
**12:54** 281:21
**13** 7:22 8:3,8 27:9
**1308** 281:21
**14** 215:1 223:25
**1402** 5:2
**1429** 22:18
**1432** 22:22
**15** 102:4,5
**1546** 73:20
**155** 166:14,15,22
**160** 166:22
**17** 258:21 259:22
**171** 184:25 185:2
**173** 187:11
**188** 240:4,7
**1900** 180:6
**191** 243:15
**1911** 180:10
**1977** 25:8
**1:00** 281:22
**1:10** 282:1,14
**1:59:02** 291:14
**1:59:09** 290:25
**1st** 10:9,23 11:23

## 2

**2** 40:13,16,20 299:2
**2.5** 182:18
**20** 27:10 95:21
**201** 231:23
**2012** 74:7
**2013** 74:7
**2014** 126:17 129:20 131:4 203:21
**2015** 203:24
**2016** 126:17 129:20
**2017** 66:5 67:23 191:3
**2018** 137:22 138:19 191:3 198:24
**2019** 13:8 15:8, 12,17 16:14, 15,21 55:15 132:20 133:20,22 134:1 136:1, 2 137:23 138:17 189:7 258:17 269:8 270:10 290:24
**2020** 14:4 15:16 16:11 25:16 133:5,7
**2021** 5:1 10:9,23, 24 11:13,23 14:13
**2031** 234:15
**2041** 234:19
**21** 13:8 269:7 270:10 290:24
**21st** 258:16
**22nd** 277:10

**23**
131:4
**23rd**
198:23
**24-hour**
247:15
**24/7**
53:21 56:1
**25**
154:19,25 155:2 175:16
**26**
276:8,15,16, 20

**3**

**3**
10:24 11:23 59:23 60:3,6 133:7 138:17 299:3
**30**
78:25 79:1 159:7 275:11
**30(b)(6)**
70:14 84:19, 22
**360**
51:8
**365**
53:21
**366**
127:12
**37**
257:7,9 258:11,12 261:11,19,20
**39**
7:22
**396**
127:8
**398**
126:23 127:1,3,6, 10,20
**399**
129:9
**3:00**
180:7
**3:11**
180:10
**3rd**
133:5,20,22

**4**

**4**
11:13 281:9, 10 299:4
**40**
262:14
**400**
129:9
**41**
261:11,19
**412**
214:23
**414**
220:22
**418**
224:2
**44**
7:20 273:13
**444**
298:17 299:13,15
**445**
131:24 188:5,16 299:20,23
**446**
131:24 188:5 299:20,23
**447**
132:23 136:18 299:25 300:3
**45**
11:15 231:1 273:13
**454**
132:2,23,24
**456**
136:19
**457**
131:25 132:17 133:15
**46**
273:13
**460**
133:16 135:4
**465**
300:1,3
**466**
132:2,24 300:6,9
**47**
7:11,20 273:13 278:22 279:3,4,5
**476**
46:10,20 47:12,15 51:6
**477**
46:11,20 52:15
**48**
279:8
**4:00**
53:5,7
**4:31**
234:16
**4:42**
234:19

**5**

**5**
290:3,4 299:5
**50**
97:25 201:25
**528**
182:24 184:1
**545**
300:6,9
**5:40**
274:1
**5th**
5:1

**6**

**6**
299:7,9,12
**60**
29:13
**6:30**
300:17
**6:32**
300:19

**7**

**7**
299:13,15
**7:00**
53:8

**8**

**8**
299:21,23
**80**
122:21 298:16 299:8,9
**81**
298:17 299:13,15
**88**
270:9,12 271:21
**8:00**
53:2

**9**

**9**
133:25 136:1 300:1,3

**90**
16:18
**911**
227:19,22 228:13 229:18 233:4,7,13 258:21 259:21 267:2
**93**
270:12 271:13,23 272:1 273:6 276:8,10
**94**
272:1 273:6 276:12
**95**
276:13
**96**
276:23
**97**
268:14 271:14,18 276:24
**9:59**
219:10 220:3 270:10 271:22

**A**

**a.m.**
5:3 22:19,22 53:2 73:20, 23 270:2,11, 13 271:19,22 275:19
**abdominal**
109:15,21 115:25
**abide**
293:15
**abided**
17:23
**abilities**
91:3 101:10 111:17 153:13,19 154:4 174:25 175:18
**ability**
38:10 60:16 66:1 68:12 71:6 92:20 93:6,14 111:8 116:3, 10 118:12,14 122:8 145:4 155:17 193:17 241:18 265:8 266:9 274:12
**able**
8:5,21 48:16 51:16 55:23 92:4,22 93:23 97:13 112:16,19,22 190:25 226:14 230:6 240:23,24 247:12 257:15 270:25 272:25 273:10 274:23 285:17 296:3 297:12
**aboard**
32:15
**above**
4:4 276:6
**abrogate**
107:11
**absent**
8:2
**absolutely**
8:2 31:18 46:20 62:6 63:8 92:19 106:8 284:14 291:3,6
**abundance**
7:25 119:13
**Academy**
26:1
**accepted**
174:19
**access**
51:8 61:16 62:9,15,21 103:16 167:20 192:12 264:8 269:11,13 294:19
**accessing**
72:1
**accident**
110:6 259:4
**accidently**
240:7
**accommodate**
137:6 240:17 248:7
**accommodating**
32:4
**accommodation**
163:6 244:21
**accommodations**
243:16
**accompanied**
242:20
**accompany**
232:12 241:19 242:14 243:4 248:4
**accompanying**
247:23 250:12
**accordance**
168:8
**account**
82:16 123:11 236:11 296:2
**accounting**
82:19 275:5
**accounts**
84:8 168:20
**accurate**
38:2 68:8 76:11 85:10 101:3,4 168:9 169:7, 8 170:4 221:10 253:11 262:3,5 271:9 274:10 278:2
**accurately**
29:21 31:17 78:23
**accusation**
201:2,7
**ACEP**
26:5 139:17
**achieved**
208:4
**ACLS**
143:13 202:9 226:17
**acquisition**
29:8
**acronym**
115:5,13 125:17
**across**
29:14,25 30:14,22 35:8 86:14 126:1 167:22 174:4 175:1
**act**
119:13 169:23
**acting**
14:21 15:17
**action**
5:8 212:2, 13,21
**actions**
123:16 124:1,9,13,

25 125:10 168:13 176:20 202:24 204:4,6 256:20
**active** 143:14
**actively** 139:14 171:1
**activities** 60:12
**activity** 58:5 257:18, 21
**actual** 15:20 18:8 19:16 57:11 59:21 76:22 134:16 220:4
**actuality** 295:16
**acuity** 145:1
**acute** 59:13 65:24 81:20 108:13,22 109:3,15 110:6 168:24 185:11
**adapt** 161:17
**add** 65:9 74:18, 19,20 194:9
**addendum** 65:6 74:18 261:7,9
**addition** 51:3
**additional** 11:7 201:11, 17,18,19 202:3,14 251:8
**address** 7:17 8:22 56:9 210:16 269:3 273:12 274:9
**addressed** 192:10,11 230:19
**addresses** 37:15
**addressing** 278:13
**adequate** 34:6 94:17
**adhere** 17:24 30:3 61:12
**adhered** 41:23
**adherence** 24:21
**adheres** 178:17 208:17
**adhering** 53:17 174:4 175:6
**adjustments** 41:8
**administer** 109:12 116:15 117:12
**administered** 64:3 117:10
**administers** 101:24
**administration** 124:23 226:19
**administrative** 183:4 192:10 279:14
**admission** 68:7 291:1
**admit** 106:16
**admitted** 68:6
**admonition** 94:5
**admonitions** 94:3
**advance** 7:25
**advanced** 34:2,3 123:9,10 144:3,4 174:11,12 226:5,8,13, 19,20,24 228:17,18 294:21
**advantage** 162:15
**advertise** 36:3,18,24
**advertised** 37:4
**advertisement** 36:22 37:15, 25 38:4 39:9
**advertisements** 37:17
**advertises** 36:9
**advice** 17:1 21:10 52:23 172:13 177:5 181:18 228:23
**advise** 8:1 93:22,23 94:1 156:7 192:1,5,22 250:17 264:25 267:24 268:4
**advised** 93:10 161:25 194:23 267:20 273:9
**advising** 70:19 192:17 268:6
**advisor** 169:10,18,23
**advisory** 19:8 92:1,3
**affect** 27:15 123:6 159:10
**affected** 42:4,6
**affiliated** 171:11
**affirm** 5:14
**afield** 69:8 70:18
**age** 27:13 241:13 245:16
**agencies** 175:12
**agency** 202:6 228:5, 9 229:18 253:9
**agent** 117:13 151:18 152:2 153:10 156:18 160:8 213:14,15, 17,25 214:7, 9,14 217:3, 9,10,20,23 218:2,6 224:4,13,17 225:6,10,15, 16 228:21,22 229:10 234:1,12,13 236:6 237:20 238:5 243:20 244:5,21

245:1,3,6,9, 21 246:4,17 247:1,8,19, 24,25 248:1 249:6,11,16, 20 250:6,15, 17 251:22,25 252:8,9,21 277:19,20,24 287:13,21 288:2,10 289:8,11

**agent's**
237:11

**agents**
153:19 154:1 213:5,9 229:7 234:5, 7 236:3 238:23 243:15 247:15 251:15 252:2,14,15 287:18

**ago**
37:18 126:4

**agree**
38:24 106:23 112:3,8,15, 25 113:18 114:1 116:19,21 117:18 118:5 119:11,16 120:15 121:1 128:9,12 130:19 137:19,23 138:2,7,19 148:8 166:21 172:15 173:3 174:18 201:1,15 209:4,25 210:10,22 213:18 226:7 232:9 253:2, 7 258:7,15 261:6,10 266:24 271:14 272:14 273:5,18 275:16,19,20 277:3,14 278:9 282:12 292:11 295:5,11

**agreed**
271:17

**agreement**
4:10 129:25 130:12,21,25 131:2 136:13 137:20,25 138:16 147:16 166:3 247:1

**agreements**
130:21 253:14

**agrees**
120:4

**ahead**
12:5 21:7 88:14 96:6 104:1 117:7 151:12 191:16 262:12

**ailments**
120:23

**air**
148:3 160:15 187:13,19 188:2 276:21

**alarms**
142:19

**alert**
72:21

**allegation**
198:21 203:8

**allegations**
199:8

**allopathic**
25:25 26:13

**allow**
25:15 51:7 58:20 60:22 70:18 101:16 121:21 238:11

**allowing**
120:20

**allows**
57:21 58:17 122:11

**alpha**
144:25 145:9,12,13, 14,21,22 146:3,7,9,11

**alter**
52:23

**altercation**
204:25

**alternating**
56:12

**Amanda**
255:23

**ambulance**
218:7,9,15, 18,20 219:12 224:15 226:6,9 227:25 233:4,11,13, 21 242:15,23 243:9 246:7 251:24 252:8,22 253:3,8,18 256:12 270:11 271:15 275:17,23 276:12,16, 18,20,21,24 277:5 280:17,19,22 281:2,10,14, 16,17,19 282:14 299:4

**ambulances**
252:16 253:5

**amenable**
170:2

**American**
26:1 156:11

**Amos**
80:9

**amount**
12:21 29:10 72:7 77:18 88:20 89:1 111:9 207:25 208:3 293:6

**amputation**
115:24 117:11

**analyses**
108:20

**analysis**
65:12,16,20 66:3 256:23 257:4,5 282:18

**analyze**
67:17 171:18 198:9

**analyzed**
66:6 198:16

**analyzing**
65:12 110:5

**and/or**
4:11

**Anne**
139:24,25

**anniversary**
133:6

**announce**
40:10

**announced**
155:23

**announcement**
42:7 156:6, 8,10,12

**announcements**
156:3,22

**answer**
12:20 18:15, 19 21:23 29:21 37:3 38:18 41:19, 22 48:12,18, 19 60:21 64:20 66:17 67:7 69:9 71:13 72:4 74:23 75:10 78:9,22 80:13 81:3 83:17 85:25 87:5 89:4 92:22 97:13 98:5 103:20 104:3 113:13 114:9 118:11 120:10,19 121:15,19,24 122:13 125:6 129:3 142:14 149:11,25 150:12 151:13 152:21 159:17 160:3 161:1 162:23 175:4 178:21 196:3,10 199:13,16,17 203:4 209:23 211:1 214:4, 17 222:22 223:2,3,9 257:3 270:19 272:24 273:14,16,23 274:12,19 284:15 287:24 290:19 292:10,16 293:11 294:2,15 295:20,24 297:4

**answered**
31:17 80:15 121:13,18 122:6 155:5 194:16 212:24 291:19 292:5 293:24 294:14

**answering**
21:16 23:8 70:17 103:24 212:6

**answers**
69:12 107:1 184:18

**anticipate**
112:4

**anticipated**
104:10

**anticipation**
6:14,20 7:14 8:25 9:22 12:1

**anybody**
9:19 100:3,4 103:15 107:10 176:21 177:23

**anymore**
121:6

**anyone**
4:19 9:24 12:1 33:19 71:17 72:11 142:16 176:12 193:8,25 195:25 206:20 245:17 278:6 285:7 289:11

**anyone's**
255:19

**anytime**
34:8

**apart**
52:8 222:24 286:14

**apologize**
12:6 15:10 112:3 184:24 188:6 196:6 281:8 292:9

**appealing**
19:1

**appeared**
33:13 148:17

**appears**
52:16 60:2 91:18 92:19 107:6 108:8 272:14 277:9 284:24

**applicable**
99:4

**applicant**
98:15 101:13,16 109:11 123:19

**applicant's**
125:9

**applicants**
96:10

**application**
94:16,18,20, 24 95:4,6,8, 22 96:13 98:10 105:2 122:17,23 125:1

**applications**
96:9,19

**apply**
248:8

**applying**
19:4 111:12

**appreciation**
38:21

**apprise**
155:23

**apprised**
146:12 161:20

**apprising**
146:2

**approach**
97:17 98:17 275:4

**approaching**
27:13

**appropriate**
60:25 98:25 104:2 194:11 195:2 212:17 213:2 224:21 226:5 228:25 234:2 237:20 295:2

**appropriately**
121:22 149:10 168:8 170:22

**appropriateness**
237:9

**approval**
251:16,18,19

**approve**
252:9

**approves**
90:7

**approximately**
9:23 15:16 22:7 27:8,10 29:11,13 35:14 50:24 97:25 138:14

**approximation**
35:24

**April**
131:4

**arbitrary**
221:20

**area**
48:7 49:1,4, 9,10,13,23, 24,25 50:2,

3,16,17 51:3,4,19 52:7 69:9 101:15 105:19 211:12 231:1 273:12 274:15
**areas** 7:20,21 8:1, 3,4,13,19 40:22 48:13 51:13 69:14 70:7 105:14 175:20
**arena** 183:11
**argumentative** 218:11 233:23 270:14 293:25 295:19
**arguments** 105:13
**arise** 88:16
**arisen** 176:16
**arms** 113:16 114:19 115:13
**around** 33:12 184:24 191:3
**arrange** 184:11 187:1 224:14 243:16
**arranged** 62:16 224:21 225:6 248:17
**arrangement** 80:16
**arrangements** 80:20 156:18 160:9 217:7, 18,23 218:6, 21 219:1 244:10 248:7 252:5,14 253:14 283:3,7
**arranges** 62:13 81:15
**arranging** 190:24 191:22 225:12 244:6 249:14
**arrest** 226:20
**arrival** 163:21 290:20 291:13
**arrived** 42:9 219:12 242:15,23 281:20 289:24 291:16 292:2
**arrives** 215:8
**arrow** 249:16
**arthrometry** 168:23
**Arthur** 28:4
**ascertain** 294:23
**ashore** 172:10 238:2
**asked** 18:19 19:24 20:3 21:1 69:10 81:14 97:10 103:1 104:9,12,15, 21 105:10 106:9 107:16 113:11 121:12 122:5 123:20 140:2 159:5,18 194:15 199:12 205:20 255:13 260:15 273:2 288:25 291:18 292:4 293:24 294:14
**asking** 5:24 70:7, 10,20 78:11 84:21 106:5 114:5,9 116:22,24 120:25 142:12 156:5 159:9,12 160:24 173:1 194:17,18 195:2 211:7 214:18 216:20 263:13 274:18
**aspects** 16:23 103:22 170:19 171:2 177:25
**assault** 247:14
**assert** 104:2 284:17
**asserting** 284:21
**assess** 238:7
**assessment** 264:14
**assessments** 297:19
**assign** 140:18
**assigned** 88:24 140:22 145:15 176:15 189:15,17 208:9 228:5 242:5
**assist** 17:11 45:16 76:21 169:5 185:19 213:5 224:4,15 232:17 237:12 239:7 247:20 248:2 249:6,11,17, 21,24 287:14
**assistance** 39:12 224:7 232:5 244:6, 19 245:7 249:7
**assistant** 208:18 239:14
**assisted** 23:12 189:14
**assisting** 24:22 164:15 184:11 244:10 249:11,13 251:1
**assistive** 45:19 184:22
**assists** 226:17
**associate** 232:17 240:14 241:23,25 242:14,17 243:1,3,4 244:20 248:6 250:14,16
**associates** 232:4
**Association** 39:23 156:12

**assume**
50:1 103:8 187:5 268:1 269:10
**assumed**
14:16 15:1,2 21:11
**assumption**
268:25
**assure**
175:24
**assured**
175:18
**Atlantic**
76:11 258:3
**ATLS**
143:13 202:9
**attach**
137:8,9,11 298:13
**attached**
7:7 137:3,7 298:19
**attaching**
298:18
**attack**
64:12 72:21 100:14 112:20 116:13 117:11 155:14 164:22,25
**attacks**
66:4 68:12 115:24 211:8
**attempt**
7:23 111:7
**attempted**
283:7
**attend**
142:1 190:25 196:15 255:13,23,24 256:1,5
**attendant**
86:4
**attended**
148:15 255:8
**attending**
232:16 283:16 284:12 285:7,11,13,25 286:12,20,24 287:6,11,15
**attends**
258:20 259:21
**attention**
18:24 41:5 166:14 207:15 215:4 224:18 246:25 247:5 251:7,13
**attorney**
9:9,12,15 20:8,10 198:12,25 285:4 288:24,25
**attorney-**
199:18
**attorney-client**
4:11 199:15 284:18,20 298:8
**attorneys**
9:1,7,11 197:15,17 256:4 288:19 289:3 298:6
**authenticity**
6:4,7
**authoritative**
272:11
**authorities**
87:1 124:2
**authority**
124:3,24
**authorized**
60:22 62:21
**automatically**
75:3
**available**
21:9,20 36:7,12 37:14 38:23 53:20 64:9 65:25 68:21 88:16 93:8 96:3 118:24 119:7,20,25 120:1,21 122:10 134:5 147:7 148:20 151:15,18 153:8,11,14,22 160:23 161:14 162:2 186:9 206:12 209:15 228:17 231:19 232:10 237:8 253:12 255:17 262:9 271:8 286:9
**avoid**
70:12 106:11
**aware**
4:7 6:15 32:5 72:15 87:3 88:2 91:1 93:6 119:2 124:17 146:10 154:22 163:1,3,6 165:7,20 177:20 179:6 186:2 198:18,24 199:21 201:6 202:17,24 203:11 204:3,13,16 207:23 212:25 221:25 227:20,22 228:1,8,12,20 229:17 231:6,18 250:18 251:4 252:13 278:16 280:19 283:9 289:6,10 295:14 296:17,23 297:2,5,7
**awareness**
203:14
**awfully**
179:2
**Azamar**
30:22
**Azamara**
28:10 30:10

**B**

**B-I-L-E**
139:24
**back**
15:7,12,17 16:14,21 18:3 22:21 27:10 39:19 50:15 55:15 70:25 82:9 84:7 122:15 126:17 128:21 129:20 132:20 133:10 141:12 172:9 180:9 189:7 198:23 200:24 203:21 234:18 265:16 267:21

283:19 284:9 291:9
**background** 95:11 111:17 183:10 295:15
**backtrack** 127:11
**backup** 21:22
**bad** 113:17
**Bahamas** 32:6
**Bahamian** 32:8
**balls** 148:3
**banner** 28:9
**base** 56:18 58:12 99:18 294:20
**based** 16:8 34:21 69:21 70:25 74:14 75:5 76:12 95:16 100:5 109:8, 19 111:17 118:23 131:4,6 138:12 151:14 153:5 173:3 188:10,11 193:16,17 201:3,6 209:1 212:10 216:14 226:6 239:19 240:10 244:3 252:6 277:24 281:18 282:12 283:11 284:6 291:5
**basic** 95:7 129:13 142:3,22 145:21 226:8,12,14, 24 246:7
**basically** 27:6 115:15 191:19 241:13
**basics** 13:1 179:3
**basis** 13:23 34:8 59:18 66:18 67:10 68:15 69:4 102:24 145:3 172:13 174:14 178:3 194:1 210:20 218:25 219:13 220:11 229:12 253:25 254:3,10,19, 22 284:19,20 285:5
**Bated** 137:10
**Bates** 46:8,10,17 51:6 52:15 126:23 127:12 130:16,19, 24,25 131:1, 25 132:15 133:16 136:18,23 137:12,13 166:14,15,22 182:24 183:25 184:25 187:10 188:6,16,18 220:22 222:1 224:2 231:23 243:14 246:24 247:1 249:3 251:6 257:7,11,14 258:11,12 261:11 262:13 268:13 270:9 271:18,21,23 272:1 273:6 276:23 278:22 280:5 281:6 295:25 298:14,19 299:7,9
**bathrooms** 51:11
**Bear** 40:13 126:22 246:25 261:19 298:10
**beauty** 136:22
**began** 204:2
**beginning** 230:20 231:2
**begins** 108:24 168:25
**behalf** 5:6,10 16:17 32:9 69:17 139:14
**behaving** 196:2
**behavior** 196:9
**behavioral** 195:12 196:19
**behaviors** 86:17
**behind** 196:4
**belief** 218:25
**believe** 32:4 37:19, 23 38:14 42:22 55:8 68:7 71:5 76:5,13 85:4 87:14 96:5, 11,16 97:24 103:24 122:21 124:10 125:1,11 127:19 129:22 130:17,19 147:19 155:5 164:11 178:8 179:14 186:14 191:3 201:7 204:6 208:13 209:14 218:13,20 219:5 221:10,13 229:13 240:4 243:2 250:8 253:13 257:7 259:15 269:20 277:15 278:19 280:4 288:7
**believed** 218:16
**believes** 149:4 150:3
**belongings** 165:22
**below** 128:3 140:11 185:15
**Ben** 4:25 5:19 69:12

**bend**
19:7
**beneath**
180:22
**beneficial**
21:11
**benefit**
151:21 161:18 186:20
**benefited**
186:18
**best**
8:21 71:11 75:2 76:16 85:4 87:14 106:11 121:24 122:8 125:5 146:24 147:13 153:20,22,24 154:1 161:17 162:7,15 206:14 218:3 223:9 224:13 228:23,24 234:4 237:12 240:17 265:8 273:14 284:4
**bet**
280:14
**better**
12:23 33:18 59:21 148:18 185:18 198:7 228:21 229:10 233:15 249:1 253:11 273:21,22
**bias**
252:18
**Bile**
139:24
**bill**
39:15 40:16, 20 299:2
**billing**
82:20 83:3
**bills**
183:21
**binder**
126:24
**bit**
19:11 27:6 56:24 59:12 68:25 158:10 179:23 181:9 193:2 209:2 274:7
**biweekly**
130:14
**blast**
155:22
**blood**
44:25 45:4 112:21 156:11,14 259:8
**BLS**
270:11 271:15
**blue**
251:9
**bluff**
103:4
**board**
17:8 20:24 25:14,24 26:3,6,12 34:4 38:1 39:8 44:18 50:22 51:15 52:21 54:17 58:9 62:13, 15 64:7 68:9,10,13, 20 77:1 83:17 86:2, 17 87:16 89:7 91:20 92:2 101:11 109:24 110:11 111:9 112:6,10,14, 22 116:1 118:23 119:21 120:1,13 122:10 123:15,19 124:2,4,11 140:16 141:7 145:2,6 146:24 148:22 150:25 155:17 156:18 162:4,10 163:20 166:7 170:23 171:9,21 172:7 173:7 174:13 177:7 186:25 191:12 193:17,19 209:1 211:21 213:2 219:24 228:25 254:11 297:4
**boarded**
123:24 132:8 135:9,12 144:12
**boarding**
64:5
**boards**
124:5
**body**
121:5
**bonus**
207:20,22,23 208:1,2,3
**bonuses**
208:7
**book**
266:17
**books**
45:17 52:1
**borderline**
109:18
**bottom**
108:4 129:9 137:24 282:21
**bouncing**
184:24
**boy**
218:12
**brain**
116:21 212:2,13 259:8
**branched**
57:12
**brand**
29:18,19,25 182:10
**brand-new**
107:13
**brands'**
33:21
**break**
105:18 159:6 179:10
**breaks**
275:2,6
**Bremner**
260:4
**bridge**
231:11
**brief**
17:10 22:20 73:21 125:13 180:8 234:17 264:18 265:7 266:16 275:14
**briefed**
224:23
**briefly**
56:23 142:17 180:12
**bring**
45:12,15,17, 19 46:8 136:20,21 137:12

145:17,20 190:21 240:6 257:15 274:20
**bringing**
40:19 45:18 46:5 240:5
**broad**
87:13 92:21 100:3 147:3, 12 152:19 210:16 211:2,11 214:3,20 295:20
**broken**
102:6
**brought**
6:15 183:3 187:2 207:15 250:21 259:25
**budget**
169:14 208:4,9,12, 17,23,25
**budgetary**
80:12,16 208:19
**built**
17:7
**bulk**
16:10
**bullet**
169:9,10 248:17
**burden**
243:6
**Bureau**
228:2,8
**Burgess**
5:4 12:16,19 13:2,4 199:9 215:14,17 216:1,12,18, 23 218:10 221:12

234:22 242:4,10,19, 23 243:1,20 244:14,16 251:2 258:16 260:10 264:4,9 267:20 281:17 282:24 283:17 286:13 289:23 290:23 291:16 296:2,24
**business**
15:23 38:24 66:12 75:25 188:24 189:4,8 197:15 294:7
**buster**
116:12
**button**
4:21 240:7
**buy**
38:20
**bypass**
228:18

**C**

**cabinet**
51:10
**cabinets**
51:9
**Caguas**
234:23,25 235:5,12 283:1 286:25 290:10,24 291:11 299:6
**calculations**
76:13
**call**
21:5,24

53:20 56:1, 2,4,7,8,10, 11,13,14 89:9 101:6 123:14 144:25 145:12 152:17 190:23 197:9 206:4 221:19 226:1 227:22 228:13 230:5,6,13 231:11 233:4,7,13, 19,20 238:24 258:21 259:21 263:10,11,13 267:2 275:10 286:4,6 287:6,22
**called**
21:1 57:12 66:5 73:5 125:16 182:9 184:21 190:20 206:6 218:9,15,18, 20 221:24 222:24 228:22 234:23 287:21
**calling**
22:17 63:17 145:24
**calls**
21:12 23:1,8 81:12 183:21 205:19 229:18 233:20 245:10
**Calvin**
15:4,7,9,10
**Campos**
255:23

**candidate**
94:21 95:8, 9,10,16 101:22 102:21 107:4,6 109:2,18 124:13,17
**candidates**
94:25
**canvas**
238:3
**capabilities**
69:11 100:19,22 110:17 111:12 142:24 148:6 151:15 153:11 209:5,12 238:15,25
**capability**
68:9,10 99:3 100:7 110:10,14 111:16 116:4 153:3
**capable**
143:18 150:19 267:16 282:18
**capacity**
36:16 37:10 39:4 44:12 84:25 296:18
**captain**
42:12 52:21, 22 78:18 85:17,18 89:15 90:9 146:2,8,11, 12 147:1,10, 19 148:2,21 150:25 151:16 152:1 153:7 157:2,

3,4,6 158:3, 7,13,20 159:1,2,24, 25 160:5,7,8 161:19,20,24 162:23 163:3,4,6,8, 11 164:9,11, 14 165:5,17, 20 167:4,11 169:4,11,19, 23,24 170:1, 5 176:7,25 177:3 181:13 193:4,21 194:6,7 195:13 278:10,11, 13,15,17

**captain's** 162:20 163:1 164:6 165:1, 7 166:2 177:8

**captains** 161:16 167:16,21 193:9

**captured** 129:4 286:9

**card** 205:22

**cardiac** 34:2 97:15 123:9 144:3 174:11 294:21

**cardiopulmonary** 226:17,20

**cardiovascular** 99:23 228:18

**cards** 156:12

**care** 35:2 36:2,3, 9,18,25 37:5,9,13,16 38:6,10,22 39:6 43:14, 16 44:19 45:7,17 53:15 64:6, 21 77:2,4,18 79:9 80:25 82:4,8,9,23 83:3,13 90:24 97:15 98:25 99:13 109:23 114:15 115:1 119:2 149:7 153:22 162:16 174:5,20,21, 23 175:7,8 176:1 177:18,23 178:24 186:25 187:5 198:4 200:15 203:9 204:19 205:6,23 207:8 209:18 210:12 215:7,9,14, 18,22,24 216:1,6,9 221:2,5,9,25 222:6,12,14, 16,24 223:8, 16 226:9,21, 24 228:19,24 231:25 232:4,11,17 234:2,6,8 235:25 237:16 239:3,6,13, 14,16 240:8, 9,10,14 241:2,8,10, 23,24,25 242:13,16,25 243:2,3,7, 13,14,18 244:4,8,9, 11,18,19,20 245:14 247:7,10,20 248:2,5,10 250:10,13,16 251:1 259:18 265:23 266:6,13 267:7,10,25 268:7,10 293:9,16,20, 22 294:6,11, 12 295:9,16, 17

**career** 142:13

**caretaker** 241:19 242:19

**Caribbean** 4:24 5:5 6:4,6,8 9:6, 12,15 13:15, 17,19,24 14:8,9,14, 21,23 15:2, 18,21 16:3,6 21:14 22:3, 4,5,12 27:1, 20 28:7,9,14 29:4,19,25 30:9,18,22 31:5,12,18, 19,23 32:2, 5,9,15,19 34:19 35:1, 4,9 36:8 37:8 38:2,5, 12,25 39:4, 14 40:1,5 44:7,10 45:5,13,25 48:4,22 52:19 54:4, 14 55:21 56:9,25 57:3,22 61:3,10 64:16 65:17 66:4,11 74:3 75:24 76:8, 23 78:6 80:14,21,23 81:1,18,23 82:5,9,13, 20,23 83:3, 6,7,11,15 84:2,15,18 85:14 86:25 87:2,7 88:12,21 90:12,14,18 91:2 93:18 94:11,13,16 96:4,9,24 97:19 99:21 100:12,13,15 105:22 108:11 110:5 112:4,15 114:14 115:3,10,19 116:5,23,24 117:1,2 119:1 120:6 122:2,25 123:14,25 124:7,12 126:15 127:13,17 128:10 129:10,24,25 130:3,4,8,14 131:9,14,16 139:10,20 140:3,4,16 141:4,17,19 143:20 147:7 149:2,5,9, 14,20 150:17,23 151:9 152:23 153:13,16 154:3,9 155:7,13,16 157:5 162:14

164:24 166:23 168:6 169:22 171:3,14 173:23 174:3,19 175:5,22 178:23 184:16 186:3,11 189:18 190:19 195:6 198:15 199:13 200:5,19 201:10,14, 16,23 202:3, 12,15,18 203:3,18,22, 25 204:3,9, 12,15 205:10,23 206:13 209:17 210:1 211:14,15,17 212:1,6,9, 10,20,25 213:4,9,10, 19 224:19 225:8,18 226:22 227:7,12,22 229:23 235:11,15,21 236:6 237:24 238:1 239:6, 9 246:2,19, 21 247:10,19 248:24 249:20,25 250:4 251:23 252:8 253:17 261:1,3 263:19 266:4,5,24 267:5,6,9,19 268:5,9 276:14 278:6,16 280:23 283:6 284:13 285:17 286:11,18, 19,22 287:9 288:12,14, 16,19,21 289:2,19,21, 23 291:15 292:1,11,19, 21,23 293:2, 3,5,19,21 294:10 295:14 296:11

**Caribbean's**
5:25 6:11 9:1,7,11 13:5 16:17 36:1 41:5 45:23 65:12 67:14 76:18 80:19 83:21 94:4 103:25 113:1 114:13,17 121:9 128:1, 14 150:6 151:6 162:9, 12 168:1,9 173:11,17 177:16 194:19 197:13 209:11 212:12 214:24 216:11,15 222:21 233:18 259:20 263:4,12 264:13,24 265:12,21 285:10 286:1 288:5 289:15

**caring**
215:21

**Carnival**
105:21

**carry**
145:18 164:12

**carved**
274:11

**case**
6:3 13:1 18:1 19:21 21:1,20 38:14 56:15, 16 61:13,16 62:6,9 75:13,15,17 76:10 77:12, 15 91:24 93:7,8,15 96:14 104:23 113:25 115:2 119:6,9,22 120:10,11 121:17,19,21 126:6 131:13 133:12 147:23 148:4,15 150:9,22 151:25 153:9 160:3,5,12 161:14 163:15,16 174:2 184:20 187:23 196:24 198:20 200:10,17,23 203:7 210:4, 19 216:18 218:5 222:19,25 239:11 242:2,19 243:25 245:1,7,23, 25 246:1,4 252:13,24 253:19 257:4 265:9 267:16 274:17 278:7 280:17 286:17 287:16 288:7 289:1,12 292:2 294:25 296:22 297:13

**cases**
56:17 65:21, 24 68:11 78:25 79:1 102:25 106:20 112:14 119:23 176:19 185:18 195:20,24 197:9,11 207:25 254:7,21 269:18 292:23

**CAT**
68:9

**catheterizations**
68:11

**caution**
8:1 119:13

**caveat**
159:19

**CDC**
65:22

**Celebrity**
28:12 30:10, 22 31:6,14, 21 32:2

**cell**
233:13

**cellphone**
230:15 232:19

**cellphones**
231:19,24 232:2,10

**center**
33:13 38:1,9 39:11 44:19 47:18,22 48:3,6,9,16, 19,24 49:6, 13,18,21 50:4,7 51:5, 12,25 52:16, 24 53:16 54:5,9 62:14 68:22 75:25 77:22,23 78:7 79:6 80:6 89:2,13 90:6 91:19 92:25 108:25 112:16 115:11 139:6 153:21 169:14 170:19,20 171:2 172:7, 10,23 173:7 174:1 179:4 181:13,24 183:5,22 194:24 196:21 205:2,16 206:18 209:13,16 216:25 217:2 224:15 228:24 230:3,7,14 231:10 237:9,10 264:5 265:3, 16 266:18 268:11 270:18

**center's**
54:1 62:12 84:9 209:5

**centers**
33:20,21 38:5 39:5 44:5,15 48:22 50:20 52:20 83:12 84:16 88:10 117:3 173:11 175:17 178:1,4 209:11 238:12 267:25 295:2

**Central**
76:10

**centralize**
61:14 62:7

**centralized**
60:11

**cerebral**
99:9

**cerebrovascular**
108:13,22 110:6 121:8 259:4

**certain**
18:3,18 32:25 39:17 46:1 66:13, 15 67:9 73:3 77:17 89:9 116:10,13 122:19 153:21,23 174:7 181:11 182:7 207:24,25 210:1 213:5 265:14 274:15 294:16,19

**certainly**
30:17 44:23 57:25 158:24 178:13 185:4 232:9 236:3

**certainty**
104:13

**certification**
25:15 26:8, 12 123:8,19 143:3,13 174:13 175:15,19,20

**certifications**
25:12 34:3 144:2 202:7

**certified**
25:14,24 26:3,6 144:1 294:21

**certify**
48:2

**certifying**
124:5

**cetera**
64:8 238:25 274:9

**chain**
173:5,10,12 182:15 268:20,21 272:21 277:1

**chains**
276:7

**chairs**
48:13

**challenges**
101:18

**chance**
70:21

**change**
14:3,5 27:12,15 34:9 42:8 57:13 73:15, 16 98:13 156:16 167:17 256:25 259:7,10

**changed**
14:1 98:19 99:7,8

**changes**
98:21 167:13

**chapter**
215:1 223:25 231:25 243:13

**charge**
81:14,15,19, 22,23 139:19 164:10

**charges**
82:2,9,12,15

**chart**
219:2

**charts**
185:12

**check**
66:12 95:11 110:20 123:17,18 124:12,20,23 131:23 182:11 184:4 204:17

**checked**
124:5,6

**checking**
124:7

**checklist**
129:8,10,13, 15,16,19

**checks**
124:1 195:20

**chief**
14:22,24,25 15:6,17,24 16:5,20 27:7,9 28:6, 8,18 37:19 74:6 97:21 110:24 112:13 129:17 176:11 182:4,6,8, 11,12,21 185:1 187:11,13,17 189:12 194:18

258:20
**choice**
25:17 36:2 70:6 98:1 241:2
**choosing**
224:16
**chose**
25:15,18 61:10 166:8
**chosen**
57:13 153:20
**Christopher**
203:7
**circumstance**
56:15 117:16,19 164:4
**circumstances**
108:6 118:15 121:7,9 159:25 162:21 164:6 202:2 223:4, 13 226:4 242:25 297:13
**citizen**
164:4,22
**city**
150:16 235:6 236:9,10,20 238:8,15 243:6 249:8 292:14
**claim**
18:8 19:14, 16 20:3 197:12
**claims**
207:19
**clarifying**
223:23
**clarity**
127:10
**clean**
33:13 170:21

209:3
**cleaned**
72:3
**clear**
53:12 70:16 136:7 140:2 142:15 146:6 159:11 164:1 187:25 257:1 262:9
**clearance**
163:23
**clearances**
61:2
**clearly**
274:19
**clerical**
137:1 183:10,18,24 184:23
**CLIA**
39:20,22
**client**
108:9 199:19 291:12
**clinic**
258:20 259:21
**clinical**
96:23 97:13 101:6,9 102:18 104:20,25 105:24,25 107:12 108:19 109:9,11 110:8,16,19 111:2,15 122:18,24 123:3 143:16 150:22 151:5,14 210:17 213:1
**clinicians**
124:16

**close**
256:3
**close-knit**
177:9
**closely**
172:20
**closure**
53:4
**clot**
116:12
**cloud**
58:12,15
**clue**
291:3
**CME**
143:23 175:15
**Coast**
33:25 76:10 153:8 160:14,22
**code**
144:25 145:4,9,12, 13,14,17,19, 21,22 146:3, 5,7,9,11 154:10,11, 20,22 155:7, 12,22 170:23
**codes**
154:13 155:2,13
**coffers**
83:21
**Colin**
229:15
**collaborative**
157:1 158:19 159:1 169:4
**colleagues**
124:21 177:9
**College**
26:4
**colloquialisms**
56:6

**column**
247:7
**combination**
266:8
**come**
8:21 18:2,3, 7,24 45:6 64:14 95:6 118:11 125:4 155:16 156:13 161:25 247:22 254:15 256:8 265:15 267:14,15,21 272:8
**comes**
44:23 77:8, 17 109:14
**comfortable**
27:19 75:9 114:10 263:10 265:5 272:10 273:3
**command**
173:5,10,12 182:16
**commendations**
194:11
**comment**
74:12 205:22 206:8 260:22 283:4 291:24
**commenting**
291:6
**comments**
65:9
**Commissioner**
229:14
**committee**
24:23 198:14 254:4,17
**committees**
72:3 256:15, 16,19

**common** 100:13 116:20
**communicate** 48:17 49:21 157:5 158:6 159:24 218:4 232:13 241:18 245:17 250:16 278:15 287:10 288:4
**communicated** 158:6 160:6 247:25 278:17 285:12,25
**communicating** 160:10 287:14
**communication** 58:7 157:18 159:6,11 187:4 195:1, 14 203:15 241:15 245:21 246:3,11,13, 16 270:21 284:2 285:16 287:23 289:18
**communications** 16:8,12 189:23 199:16 230:21 245:25 246:22 274:8 283:14 284:11 285:14 287:19 289:7,10
**community** 38:21 116:20 293:16
**companies** 253:18
**company** 14:17 15:7, 12,24 17:4 18:6 28:1 35:16 36:3, 18,21,24 37:4 39:4 57:8 69:17, 23 75:22 76:4 78:12 84:12 87:10, 12 88:3 168:14,17 169:2 238:21 239:2 251:24,25 252:22 253:3,5,9 256:12 263:23 268:9 271:11 280:20 281:17,20 292:24
**company's** 84:7
**compare** 129:13 172:6 209:14
**competent** 265:18 267:15
**complaint** 204:19 205:6,9 206:3,8,21 207:2,15 258:20
**complaints** 205:19 206:7
**complete** 53:15 77:11 96:12 103:7 166:22 264:9 265:9 266:17
**completed** 89:15 135:9 193:13
**completely** 70:11 108:25 186:15 204:17
**compliance** 23:21
**complications** 212:22
**compliments** 194:10
**component** 72:23
**components** 94:24 95:22 109:5
**comportment** 193:18
**composition** 298:24
**compounding** 120:24
**comprehend** 93:15
**comprise** 94:24
**comprised** 240:9
**compromise** 226:20
**computer** 16:8 52:1 56:25 58:13, 14 69:16 74:4 127:23 128:3 192:14 269:17
**Concatenated** 58:6
**concern** 42:22 53:17 76:15 103:15 108:14 156:20 194:14 206:3
**concerned** 106:5 137:10 148:22 244:8
**concerns** 18:6 103:20 194:10 237:11
**concert** 193:17
**concluded** 300:19
**concur** 122:10
**concussion** 266:25
**condition** 92:1 112:20 119:4 149:10,13,19 198:22 201:4 209:19 224:22,23 226:16 242:11 297:14
**conditions** 66:13 114:24 116:10 153:21,25 155:14 199:5 210:1 211:10
**conduct** 86:1 109:19 162:15 190:25 196:21 254:10
**conducted** 96:24 191:23 193:25 198:9
**conducting** 100:4
**conducts** 102:7 176:5
**confer** 147:9

**conference**
10:5,23,25
11:11 190:20
191:9,11,22
**confidential**
49:7 200:8
203:15
**confidentiality**
197:8 199:2
**confirm**
6:23 76:13
125:11
**confirmed**
124:6
**confused**
128:17
133:23
164:19
248:25
**connect**
245:11
**connection**
58:15 103:3
**connectivity**
58:4
**consciousness**
109:20
**consent**
181:19
**consider**
90:18
**consideration**
158:1 212:7
**considered**
30:21 56:18
93:4 95:16
130:4
**consistency**
190:11
**consistent**
109:16
**consistently**
145:5
**constant**
172:14
**constructed**
110:8
**consult**
218:17 290:6
**consultancy**
13:23 14:6,
7,14 27:1
**consultant**
14:17,18,20,
21,22,24,25
15:18,25
16:1,6,21
27:7,9 28:6,
8 37:20
97:21 110:24
112:13
129:17
167:14
176:11
194:18
208:20
296:11
**consultation**
119:24
150:25
151:16
296:19
**consulted**
19:14 170:1
296:17
**consulting**
130:11
**consumer**
37:12
**consuming**
138:6
**contact**
49:20 50:4
76:16 125:24
170:5 187:3
190:2,4,6
218:2 233:25
241:24
245:3,6
246:21
247:16 248:1
277:25
287:10,16
**contacted**
160:9 195:13
**contacting**
195:10
252:16
**contacts**
234:1
**contagious**
50:8
**contained**
58:14 94:23
125:8 223:17
**contains**
102:12
**contest**
291:15
**contesting**
133:3
**context**
62:10 95:21
108:18
**Continental**
277:9
**continuation**
276:12
**continue**
265:14
276:24
**continued**
265:2 266:12
268:6 296:7
**continues**
129:9 130:19
279:4
**continuing**
143:23 174:9
202:10
245:20
294:17
**continuous**
57:21,23
**contract**
24:5,6 31:4
91:7,8,10
92:13,14,16,
18,24 129:24
131:14,17
132:8,10,19
133:11,19
135:3,5,9,
14,20,22
138:3,7,12,
17,24 139:3
166:9 176:3
177:1 193:3,
5 195:17,23
197:22
204:11,15
213:12,14
214:11,19
251:17,18,24
252:3,6,7,9,
21 253:3
**contractor**
35:21
**contractors**
35:16,19
90:20
**contracts**
193:14
252:17
253:15
**control**
54:8 60:10
72:13 88:12
126:12
177:25 248:9
**controlled**
34:7 78:20
88:21 168:20
**convenience**
89:24
**conversation**
10:10 20:11
27:17
283:16,21
**conversations**
4:9,11 10:1
20:14 285:4,
6,21 289:6
**convinced**
200:11,13
**cooperated**
17:22

**cooperative** 106:16 255:9
**coordinating** 225:12
**coordination** 248:16
**copy** 12:18 131:12 273:6 300:15
**copying** 278:2
**corner** 4:22
**corporate** 4:23 6:11 13:20 14:12 36:17 69:13 70:2,17 81:3 84:24 85:5 128:23 150:24 164:8 165:6 194:19 273:20,21
**corporation** 71:12 76:1,7 84:25 106:22 151:22,23 152:4,7,11 292:21 293:17,19 294:4,5
**Corps** 228:3,9
**correct** 6:12 13:15, 17,25 15:11 21:25 25:13 26:10,16,24 27:3 29:15 30:12 32:12 35:9 36:10 38:7,25 39:13,16,20, 24,25 40:5 43:23 44:5 45:1,2,9,23, 24 46:3 47:13 49:14 50:4 52:10 53:2,8,9,12 54:2,3,6,7 57:1,9,10,22 58:16,18 59:4 61:4,5, 9 76:4 77:24 78:25 81:5 82:5,10,11, 17,22 83:2, 7,11 84:6 86:7,13 91:12,16 107:1,19 111:24 112:13 113:6 118:7,16 128:2,15 130:6,7,9 131:3 133:18 134:18 135:6 136:12 138:11 140:9,10,12 141:2 147:20 148:12 154:14 157:2,3 159:2 167:4, 5 168:2 169:20 171:25 172:17,24 173:6,12,15, 20 174:22 177:4,16,24 180:19,20,23 181:2,5,18 182:2,5,17 188:8 192:14 194:8,9 213:7,8,11 215:2,3,15, 16,19 216:15 217:12 221:3 224:5,9,11 226:10 227:4 228:6 229:23 230:1,3,15 233:5 234:24 235:1 236:1, 13,22 237:16 238:8 239:4, 5,9,18 243:20 249:12,22 250:6,22 251:3 260:5, 7,8,11,16 261:8 262:19,21 263:23 264:4,7 267:3 268:24 269:8 270:1, 16 271:16,19 272:2,16 277:1 279:21 286:2,6 287:23 288:5,20 289:4,5 294:7,8 295:10 297:21
**correctly** 17:23 24:1 30:8 41:12 58:11 60:14 61:17 100:24 135:3 136:19 157:25 167:24 169:17 187:24 215:10,12 225:1,9 243:18,24 244:25 247:18 277:19
**costs** 209:1
**counsel** 4:25 7:12 8:1,12 18:17,18,21 103:18 106:23 197:19 255:8 273:24 282:17 288:16
**counsel's** 275:1
**count** 186:7
**counted** 34:7
**countries** 58:8
**country** 24:8
**couple** 264:5
**course** 16:9 56:16 66:12 75:24 120:24 143:14 153:14 171:5 230:6
**courses** 174:10
**court** 5:14 8:3,10 40:8 142:16 200:9 275:7 300:13,15
**courtesy** 47:3
**cover** 18:23 97:14, 15,16 137:12 178:22 274:15
**coverage** 23:13
**covered** 105:7
**covers** 205:4
**COVID** 16:10 50:6

90:17
**create**
67:15 89:6 189:4,8
**created**
28:1 73:1 200:11 291:4
**creates**
188:24
**creating**
4:13
**credentialing**
123:13,23 126:10,19 128:1,5,9, 11,13,19 129:2,4,7, 10,15,16,20 139:16 141:6 175:12
**credentials**
123:7
**crew**
17:18 18:2, 25 19:4,19 24:24 38:6 42:23 43:2, 12,21 44:1, 20 48:23 49:6 50:22 54:17,24 59:16 61:14, 21 62:7 69:3 79:10 85:2 92:1 112:5,9 114:16 130:5 140:6 142:2, 4,21 155:23 162:8 177:18 185:6,16 199:4 209:18 215:2,6 220:21 224:1,22 232:5,18 239:8 240:12,17 247:6,12 248:15 249:6,13,17, 25 250:5,11 254:5 296:12,19 297:3
**crews**
91:11
**crisis**
240:13 247:14
**criteria**
241:7,9,10 242:13 243:10 244:1
**critical**
221:2,5,9,24 222:6,12,14, 16,24 223:8, 16
**critically**
232:16
**cross-referencing**
248:21
**crossed**
274:6
**crowd**
244:7
**cruise**
26:23 27:2, 5,16 28:6 29:11,14,19, 25 31:15 32:22 36:4 37:25 38:22 39:15,22,23 81:9 94:17 103:15 109:24 136:10 206:19 209:15 214:6 225:25 227:8,10 247:10 248:9 250:9 297:4
**cruises**
4:24 5:5 154:5
**crush**
115:24
**CT**
110:11 245:9 262:7,8,15
**CTA**
231:24 232:5
**cubicle**
50:18
**cubicles**
50:19
**cue**
70:4
**cuff**
45:3
**cull**
71:9
**culled**
67:24 69:5 71:4
**culling**
70:25
**Cupey**
282:22,25
**curious**
24:14
**current**
25:9 124:8 152:7 247:15
**curtains**
49:8
**customer**
37:12 91:8
**customers**
38:17 54:24 162:7 297:3
**Customs**
87:4
**CV**
132:21
**CVA**
258:24 259:3,15,16, 22

**D**

**D.O.**
25:5
**daily**
172:13 174:14 185:15 241:20
**damage**
200:12,14 212:2,13
**Darren**
12:7
**dashboard**
60:10
**data**
58:10,12 68:22 106:21 270:24 271:4
**database**
58:6 192:13
**date**
6:5 14:1,13, 24 15:3,15 97:20 126:3 131:4,7 133:25 134:11,16,17 143:25 151:20 191:4 271:16 286:10 290:23
**dates**
137:22 138:4 280:1
**daughter's**
22:16
**day**
5:1 56:11,13 108:8 129:11 133:4 203:10 229:11,12 238:11 268:23

276:19
**Daylight**
258:4
**days**
53:21 89:9 185:9 264:5
**dead**
101:16,20 110:13
**deal**
43:22 108:12,15 118:14 147:22 151:17 233:15
**dealing**
68:2,3,4 146:20,21,23 233:10
**deals**
108:9 179:7
**dealt**
8:14 151:25 191:13 250:22
**debriefing**
197:23
**December**
25:16
**decide**
42:12 80:1 89:8,11 236:19 237:14 263:16 292:22
**decided**
31:20 36:21 156:24 182:1 219:8 287:4
**decides**
206:16 211:21
**decision**
19:3 27:14,16 38:25 39:1,5 109:19 120:13 150:24 151:14 153:5,12 158:11 181:20,23 193:15 211:23 216:4 234:14 237:11,15,18,19,22 294:6
**decisions**
151:5 181:12 212:18 213:2
**deck**
258:21 259:22
**dedicated**
240:11 241:2
**deem**
80:5
**deemed**
79:2 167:6 228:25
**deems**
178:23
**defer**
75:19
**defibrillation**
226:18
**define**
161:10 201:19
**defined**
170:12 171:7
**definitely**
122:8
**definition**
240:8
**definitive**
68:13,20 110:12 117:25 148:9 149:11
**definitively**
211:16
**degree**
51:8 193:25 294:19
**delay**
165:24 253:4
**delayed**
42:21
**delegated**
208:9
**deleted**
74:21
**delineate**
156:2 179:11 211:18 213:15
**delineated**
33:8 128:14 139:16 140:25 173:12 184:3 188:16
**delineation**
144:5
**deliver**
267:7
**delivered**
109:23 116:13
**demand**
88:17
**demanded**
244:23
**demonstrated**
193:16
**demonstrates**
145:4
**departing**
163:5
**department**
20:13 30:13,14,21 31:3,20 33:5 35:5,7,12 37:16,21 52:22 59:2 60:17 71:22 72:7,11,15,17 73:1 86:12 87:19 94:15 95:3,5,7 98:4 123:5 129:14 130:2 165:14,17 167:7,9,12 176:12 185:17 186:7 188:25 189:5,9,23 205:18,19 206:25 207:1,3 212:9,11 214:12 228:6,10 238:6 252:3,4 253:21 254:23,25 256:16,20,24 257:5
**departments**
19:3 72:14 73:6,17
**departs**
249:19 250:1
**departure**
42:21 163:22 165:24
**depend**
143:11 163:18,19,21,22 196:17 259:12
**dependent**
117:14 160:12
**depending**
81:15 101:18 117:15 120:11 125:17 157:8 182:10 223:4

**depends** 50:21 54:16 65:19 73:14, 15 81:10,11 93:13,14 101:13 116:14 119:6 147:24,25 148:1 161:12 163:15 184:19 196:16 197:7 206:24 209:22 210:4,24 211:2,21 214:4,5 225:23 241:7 255:13 259:11
**deployed** 191:18
**deployment** 243:5
**depo** 4:22 80:13 114:11 296:7
**deponent** 212:6
**deposed** 200:10
**deposing** 36:16
**deposition** 4:1,17,23 6:14,17,19 7:13,14,23 8:6,25 9:4, 22 10:16 11:12 12:7, 21 38:18 40:11 41:3 48:1 51:1 76:15 87:18 103:16 105:16 106:18 107:11 230:20 231:2 257:13 277:4 278:14 280:8 287:2 300:19,20
**depositions** 14:12
**dermatology** 119:23
**describe** 49:1 64:2
**described** 24:15 52:14 116:2
**description** 23:5,7 86:24 140:23 141:1 166:22,25 167:24 184:10 187:11 240:3
**designate** 186:23
**designated** 6:16 21:23 22:6 33:19 71:17 166:10 170:25 180:22 181:1,21 228:9 230:19
**designation** 86:14 87:3 95:18,21 142:10 182:4
**designations** 7:7,10,12,15 128:19 270:20
**desk** 48:15,22 49:5,19 145:11 206:1,5
**destination** 224:16
**detail** 41:2 56:25 75:8 91:7 125:7 138:5 266:18
**detailed** 129:6 287:15
**details** 142:5 200:23 252:1,5 259:17 261:12 266:6 268:3 280:9 283:24 285:21 297:25
**determination** 109:22 160:7
**determinations** 146:25 147:2 154:2
**determine** 79:25 88:14 98:5 99:17 100:6 123:1 148:7 149:23 151:17 152:4 233:8 256:12
**determined** 79:4 89:24 114:7 232:14 257:24
**determines** 79:2 101:19 208:12
**determining** 100:21 103:5 258:3
**develop** 190:8 192:1, 5,9,21
**developed** 103:14 192:19
**deviate** 160:19
**deviations** 169:14
**device** 45:4 99:16
**diagnose** 148:7
**diagnoses** 45:17 68:11, 20 73:3,4 102:14 109:22 122:9
**diagnosing** 211:16
**diagnosis** 13:14 45:7 68:7,13 69:1 72:20 106:19 107:18 110:12 114:2,22,23 115:22 117:25 119:9 121:8 148:9 150:5 297:15
**diarrhea** 185:20
**dictate** 155:9,18 179:4 267:18 293:17 294:24
**dictated** 153:7 234:2
**dictates** 174:2 218:22
**difference** 181:6,15 222:5 226:8, 12 273:1
**differences** 31:25 32:3 146:20
**different** 17:25 18:1 23:12 27:18 29:14 68:5, 25 73:6,14

86:10,11 91:25 93:7, 13,16 111:1 117:23 118:20,21 119:6 121:23 147:6,23 150:9 158:10 160:12 162:5 163:15 174:24,25 179:23 184:20,21 191:8 197:6 205:8 210:17,19 222:4,5 225:18 226:9 246:1,24 253:24 256:4 258:5 286:14

**differential** 107:17 114:2,21 115:18,22 150:4

**differentials** 115:2

**differently** 111:1 210:18

**difficult** 27:17 56:15 68:2 100:21 101:18 108:3 113:17 238:3

**difficulties** 190:22 191:21

**difficulty** 8:6 190:24

**diligently** 186:8

**dining** 54:6

**direct** 5:22 61:16 62:9 207:13

**directed** 206:4

**direction** 247:11

**directions** 179:16

**directly** 90:11 104:22 263:2

**director** 28:19 85:18 90:1,4,5 95:13 176:8 188:8,12,23 189:12 192:4,16,24 195:13 208:14 229:17

**director's** 189:8

**directors** 17:8 167:16

**disagree** 105:5

**discharge** 68:7 240:24

**discharged** 244:17

**disciplinary** 123:15 124:1,9,13, 24,25 125:10 176:20 202:24 204:4 256:15,20

**disciplined** 202:18

**disclosure** 133:1 136:25

**disconnected** 58:13

**discovery** 277:24

**discretion** 146:22 158:15,18 223:14 228:14,21

**discretionary** 223:1,4,17

**discuss** 7:20 63:24 70:9 95:1 106:25 133:12 196:13 198:13 199:1 205:21 214:11 246:16 252:3 254:8,10 259:17 260:19 270:17 271:8

**discussed** 10:15 11:4, 16 20:9 30:15 35:8 71:15 74:1 102:15 119:22 180:24 191:5,15 210:19 245:15 250:2 271:5 280:6 284:7,24 286:16 289:8

**discusses** 63:25 92:20

**discussing** 160:8 278:10

**discussion** 53:13 197:2

**discussions** 18:17,21 142:1 190:22 199:19 200:13 203:14 284:16

**disease** 59:15 100:9 185:19

**disembark** 18:9,11 19:18 20:2, 12 64:17 67:16 69:6 71:10 76:19 77:5 91:4 92:4,21 93:7,11 110:23 119:5,14 120:7 121:10 150:7 151:10 152:9,25 157:1,19 158:2,25 161:6 163:8 165:18 171:25 172:4 180:2 181:14 184:6 192:25 197:21 198:23 200:17,20 201:3 214:14 219:8 220:4 223:7 226:22 238:11 251:2 262:16

**disembarkation** 13:10 119:7 122:11 151:21 152:16 153:4 166:1 184:12 186:24 191:14 192:20 215:2 216:17,23 218:23 219:6,23 220:21 221:22 224:1 232:20 243:17 245:13

**disembarkations** 68:14 71:2 160:15 192:1,6,23
**disembarked** 13:7 17:19 69:4 73:11 135:13 155:22 156:25 158:12 164:5 165:21 170:2 215:6 220:10 232:12 240:18 241:6 242:11 244:17 247:13 248:3 249:14
**disembarking** 232:25 245:8
**disembarkment** 155:10
**disembarks** 19:12 43:7 67:24 91:15, 22 92:24 159:10 171:15 191:11 192:17 198:8 235:23
**Diskin** 28:4
**dispatch** 229:2,11,19 243:10
**dispatched** 232:17 281:20
**dispensed** 81:24
**disposal** 78:20
**disposition** 148:21
**dispute** 290:25
**disqualified** 124:22
**disqualify** 124:18
**disqualifying** 124:20
**disrupted** 90:17
**dissatisfied** 205:6 207:7
**distance** 236:11,25
**distinguishment** 159:15,23
**distribution** 84:12
**diversion** 73:4,7,10
**diversions** 68:15
**division** 156:19
**dizziness** 265:1,14 267:22
**docked** 42:16 43:25 160:18 161:7 162:10 165:19 236:10 292:13
**docking** 156:18
**doctor** 23:4,18,19, 20 28:18 31:4,8,12, 14,18 32:13 46:4,12 54:25 55:1, 2,3 56:12, 13,14,18 58:25 61:6, 20 64:16 74:15 77:1 81:13,15 86:7,10 87:16 88:15, 21 89:1,3,19 93:4 95:12 97:4 99:22 107:3,14,16 108:3 109:6, 7,9,10 110:5 111:2 112:19 117:6 118:2 119:11,21 120:4 122:2, 3,7 124:19 125:15 126:23 128:22 131:9 132:19 133:10 137:19,24 141:13 143:8 145:3 146:24 147:16 148:15,16 149:4,6,9,24 150:3,16,18, 21 151:9,14, 19,23,24 152:15 157:4,5 158:5,11,13, 16,19 159:2, 24 160:6,9 161:15 162:12,15 164:25 166:6,9,10, 23 167:3,6, 25 168:5,6 169:12,18, 22,25 170:3, 4,6,8,15,18, 23,25 171:24 175:13 177:7 179:11 180:12,18, 19,21,22 181:1,7,10, 16,17,18,21 182:15 193:10,15 194:2,12,14, 24 195:1,4, 8,15 196:1, 7,24 197:1,5 198:1 202:13 204:18,20 205:7,21 207:4 208:21 209:17 211:15,18, 21,22 215:13,22,23 216:5,7,8 217:10,14 223:5 225:2, 9,14 228:25 229:14 231:10 232:19,24 233:4,10,19 234:2,8,12 235:24 236:10,18 237:12,14,20 245:2,6,7, 11,21,24 246:3,22 249:12 259:1 260:13,15 263:9,16,17, 20 264:25 265:10,13 266:19 268:2,4 278:15 287:14 294:25 295:8,15
**doctor's** 88:18 110:14,17 111:8,16 121:7 123:14 148:1 158:4 195:24

196:13,23 197:22 265:8

**doctor-on-duty**
143:8

**doctors**
22:9,11 23:2,5,9 30:25 32:24 33:12 34:4, 11 44:16 45:11 51:15, 21 52:4,8 53:20 54:14, 19 55:6,7,9, 13,16 56:1, 10 57:1 63:1 64:20 72:8 78:13,17 81:4 82:24 84:4,5 85:9, 12,13,19,21, 25 86:15,19 87:2,6 88:3, 22 89:5,6, 10,24 90:19 93:3,9 94:3, 10,12 98:11 99:18 101:10 103:8 108:7 110:20 111:7,12,22 112:21 113:3 114:25 115:16,24 116:5,9,14 117:3,9,14 118:5,10,19 119:1 121:20 125:25 126:20 128:5 129:23 130:4,8,14 139:11,18 140:2,4,11, 13,16,18,24 141:3,9,10, 11,14,16 143:12,17 144:6,8 147:5,9 149:3,20 152:8,12 153:16 155:16,18 156:23 166:5,7 167:12,15,20 170:24 171:19,21 172:10,16, 17,19 174:4, 7,24 175:6, 25 177:6,17 179:24 180:25 181:3,8 183:19,25 184:14,23 188:2 190:6, 20,24 191:18,20 192:7,10,12, 22 193:13,18 194:1 195:20 197:14 198:16 201:17 202:3 207:20 210:12 212:11,12, 16,21,25 218:2,4 225:19 238:1,11 246:15 265:6,17,22 266:1,6,9 267:6,10,13 293:8,14,17, 19 294:5,10, 15,23 295:1 297:21

**doctors'**
53:10 146:22

**document**
6:24 30:4 40:12,25 63:15 91:10, 18 92:19 94:21 96:2, 22 126:24 127:9,17,21 128:2 131:5, 6 132:14 134:9,12,13 136:16 138:6 176:9,17 179:12,25 180:3 182:24 188:20 195:16 205:13 219:18,22 220:2 221:8 223:24 231:23 235:25 240:5 257:17 258:1,7 261:3 271:18 273:18,20 275:12 278:23 279:3,18 280:1,16 281:3,6,23 282:13,16 284:5 286:8 290:22 291:11 299:19,20

**documentation**
87:20 93:19, 25 178:11,14 179:16 180:4,5 194:7 205:1, 14 235:14 285:18

**documented**
20:4 55:20 82:5,12,15 93:13 94:5 134:6,15 168:8 193:20 197:5 204:21 205:1,3,9,17 260:2,21,25 266:14 298:3,5

**documenting**
94:2 168:13, 20,21,22,24 272:11 284:2,11

**documents**
6:2,4 10:17, 18 11:5,7, 19,21 12:22, 24 36:5 45:16 46:25 47:1 57:15 75:20 89:15 128:4,7,25 134:11 178:10 219:4,10,15, 19 221:17, 18,21 235:22 271:6 278:12 281:19 291:22

**doing**
10:3 12:10 16:16,17 26:25 40:22 44:21 51:20 59:3 65:6 68:9,10 77:9 106:11 110:11,25 114:10 139:17 143:18 180:4 183:10 207:10 241:12 268:14 275:25 293:8

**dollars**
208:3

**donate**
156:14
**donors**
156:11
**door**
49:13 50:2 52:17
**double**
131:23 184:4
**doubt**
270:8
**drag**
275:12
**Drahos**
6:6 7:19 8:11 9:5,10, 18,21 10:6, 19 11:25 18:14,16 21:7 22:15 23:11 29:20 38:13 41:18 42:5,19 43:8,15 46:12 47:2 54:11 59:5 60:1 62:2,19 63:4,21 64:19 65:7, 18 66:7,14, 25 67:6,8, 20,25 69:7, 25 70:6,16 71:7 73:13 74:10 75:7, 18 76:25 78:4 83:14, 23 84:10,20 85:3,24 87:23 88:6 92:7 93:12 94:7 99:25 100:2,16 102:13 103:19 104:8,19 105:5 106:3 107:3,14,20, 24 112:7,18 113:10,21 114:4 115:8 116:8,22,25 117:8,21 118:8,17 119:17 120:9,17 121:12 122:5 131:19,22,25 132:3,11,17, 21,25 133:4, 7,21 136:15, 24 137:7,16 142:9 143:2 146:17 147:8,21 148:13 149:8,16,22 150:8,11,20 151:12 152:10,18 154:6,15,21 155:4,25 157:7,12,17 158:14,21 159:4,6,17, 22 160:2 162:13,22,24 163:14 164:7,17 165:4 172:18,25 175:10 176:2 177:13 178:2 179:1,19 194:15,22 195:9 196:18 197:19 199:7,11 200:2,7,21 201:5 203:13,16 205:11 209:7,21 210:3,15,25 211:5,20 212:4,15,23 213:13,21 214:1,16 216:3,19 217:1,11,17, 25 218:11,19 219:14 220:14,16 221:16 222:9,16,22 223:1,23 224:10 225:4 226:25 228:11 229:5,21 230:8,18 231:1,16 232:23 233:6,23 235:2,9,17 236:14 237:1,17 238:10,18 242:6,18 243:22 245:5 246:14 247:21 249:23 250:7 252:11 253:6,23 254:14 255:1,15,22, 25 256:10 259:6,13,24 260:17 261:2 262:2,20,25 263:14 264:1,16 265:4,25 266:15 267:4 268:8 269:2, 9,23 270:3, 14,23 272:3, 15,20 273:8, 19 274:3,11, 24 282:5,9, 15 283:2,8, 22 284:15,24 285:19 286:16 287:12,25 288:6 289:16,25 290:16 291:2,18 292:4,15,20 293:10,23 294:13 295:12,18 297:1,10 298:1,4,23 299:11,14,22 300:2,8,12, 16
**draw**
41:5 224:18 247:5 251:6
**drawing**
251:13
**drill**
141:25 144:21
**Drs**
96:18 129:20
**drug**
34:5 80:1 99:1 226:19
**drugs**
34:6 170:21
**dry**
144:16
**due**
199:2 247:13 296:13
**duly**
5:20
**dumb**
115:15
**duration**
135:22 136:10 166:9
**duties**
16:20,23 17:9,10 24:20,24 32:14 44:17 45:13 74:15 81:6 86:21,

23 88:16 98:24 140:22,25 166:8 184:14 188:17 213:15 214:20
**duty** 18:5 19:1 23:19 24:3 34:11 36:15 56:19 134:25 163:1 165:7 176:15 187:9 214:7,9 279:14

**E**

**e-mail** 132:3 155:22 269:3 270:1
**e-mails** 20:16 275:23 288:9
**earlier** 213:4 232:8 278:14
**early** 42:9 98:23 129:18 212:2,13,21
**ease** 40:22
**easier** 47:2 298:12,14,21
**Eastern** 5:3 258:4
**Eccare** 57:11,12
**edit** 74:16,17
**edited** 74:9
**education** 143:24 174:10 202:10 294:18 295:7
**educational** 190:8
**effect** 99:24 108:14 126:5,18 132:20 137:21 156:13 278:20
**efficiencies** 167:13,18
**efficient** 233:17,21
**effort** 157:2 159:1 171:20 190:21 250:8,13 262:16
**efforts** 41:11 168:12 169:4
**eight** 50:23 55:9
**either** 19:19 26:20 44:9 61:21 63:1,2,9 67:16 90:22 105:15,17 108:12 110:23 112:5 115:21 126:17 146:16 158:6 159:7 161:4 169:18 195:11 196:8 204:18 232:15 244:14,22 280:2
**EKG** 97:16
**EKGS** 168:22
**elapsed** 219:7
**elderly** 109:20
**electronic** 185:13
**electronically** 186:5
**elects** 153:15 154:5
**elicit** 285:3
**email** 157:15 197:10 268:20,21,22 269:7,11,22 270:13 271:3,22,24 272:2,15,18 273:6,7 274:10,14 275:18 276:7,8,14,16,19 285:24 286:1 288:4 289:14
**emailed** 288:2
**emails** 220:25 269:14 271:9,10 272:7,17 273:1 274:16,18 275:17,22,25 276:6 277:2,3,15,17 278:1,9 288:22
**embarkation** 166:1
**emergencies** 41:15 43:17 63:12 100:13 109:3 145:6 146:21 155:18 156:1,2,6 174:8 184:7 190:3 191:12,14 211:9 229:11 239:7 249:5
**emergency** 25:12,15 26:4 39:10 41:10 42:3,15,16 43:3,13,20,24 53:17,20 56:8,9,17 61:15 62:8,18,23 63:3,16,19 64:8,22 65:1 67:16,24 69:4 88:23,25 92:5 93:3 100:4 109:23 110:22 118:6 119:12,14,25 144:14 145:1 146:15,16,20,22,23 149:15,21 150:7 151:8 152:8,16,21,24 153:3 155:21,24 156:25 157:20 158:1,5 161:6,20,23 162:11,19,21 163:12,20 164:5,15 165:19 171:6 172:8 173:4 181:14 197:21 210:23

211:4,6,19, 24 212:22 215:2 224:1, 5 227:24 228:3,9 229:18 231:18,24 232:3,10 233:1,11 239:11 245:23 247:14 248:17 249:18,21 250:6,22 262:19,24

**emergent** 91:22 101:2 119:4 210:11 211:8

**emergently** 217:15

**emotional** 240:12,15

**emphasize** 111:5 147:11 153:4

**employed** 23:3 203:18, 22,24

**employee** 15:20 34:19 277:20

**employees** 17:2 22:4,5, 11,25 35:11, 15,18,20 90:19,21 130:10,11 140:3,5

**employment** 32:18 87:12 130:20,21 131:2 202:15 204:9

**enable** 85:21

**encompass** 259:17

**encompasses** 259:15

**encounter** 49:4 102:24 210:2 267:16

**encounters** 53:16

**encourage** 38:20 143:22,24 238:12 294:17

**encouraged** 74:18 174:9 202:9 208:24

**encourages** 153:16 238:1

**encouraging** 175:15

**end** 14:6,7 54:21 101:16 107:8 110:13 161:9 176:3,14 177:1 181:1 193:3,5 195:17,23 261:22 300:5

**ended** 14:14

**ends** 97:5 101:20 169:1

**engage** 251:15 252:10

**engaged** 232:5

**engineers** 76:17

**English** 242:11,16,24 243:10

**enhanced** 50:5

**enjoyed** 33:16

**ensure** 45:25 78:7 115:19 140:24 144:16 167:25 168:12 171:4,16,20 174:3 178:16 190:10 208:22 224:20 247:15 294:10

**ensuring** 168:7 174:20,25 175:6 217:14

**enter** 63:14 64:21

**entered** 77:13 131:10 168:22

**entering** 8:13

**enterprise;{ sic** 190:12

**entice** 38:10

**enticed** 38:17

**entire** 35:4 60:12, 23 103:17 141:22

**entirely** 16:12 43:9 50:21 158:15

**entirety** 16:11 227:6

**entitled** 43:25

**entity** 224:8

**entry** 258:19

**environment** 183:11

**environmental** 78:21

**equipment** 44:5,8,12, 15,18 45:5, 12,21,22,23 46:2 68:21 78:2 80:21, 24 103:6 145:16 153:22 237:8

**equipped** 44:5 78:8

**equivalent** 226:7

**ER** 154:18 155:2,3

**error** 137:1

**eruption** 248:10

**essential** 145:16 188:17 232:14

**essentially** 17:10 31:13, 22 45:10 102:8 178:22 192:9 202:8

**establish** 250:9

**established** 17:25 19:5 37:6 79:13 94:11 241:8 250:15

**et** 64:8 238:25 274:9

**ETA** 246:11

**Etsebeth**
96:13,18 129:21 131:21,24 137:20 138:8,9,13, 18,19 139:2, 5 166:4 181:22 198:19,20 199:10 200:13 201:2,10 202:17,21,25 203:2 204:14 267:20
**Etsebeth's**
136:13 138:3 200:15
**EU**
23:21
**evacuate**
120:7 148:12 151:11 198:23 262:10,11
**evacuated**
160:11 203:11 209:20 296:13,24 297:8
**evacuation**
18:9,12 19:18 20:2, 12 43:3,13, 22 65:1 69:6 71:10 110:23 119:8,25 121:11 122:3 144:6,22,24 145:7 148:3 151:21 155:11 159:23 160:15 171:5 179:13,22 180:2 183:15 187:14,19,23 197:22 210:13 224:14 232:20 261:13,25 262:1 296:19
**evacuations**
19:13 43:7, 17 67:17 71:3 143:21 144:9,22 169:13,19,24 179:17 188:2 198:8 256:8
**eval**
77:19
**evaluate**
109:2,8 111:3,8 112:19 116:3 121:21 260:1 262:7
**evaluated**
121:20 153:6 260:10
**evaluation**
110:13 205:22 262:14 263:2,7,21, 22 264:10 265:3,23
**evaluations**
109:9 297:19
**evasive**
56:4 272:25
**event**
41:9,25 76:22 124:20 153:2 183:19 191:6 240:13
**events**
198:10
**eventual**
114:23
**eventually**
30:10
**Everglades**
138:10
**everybody**
77:13 120:4 144:16 186:21 265:22
**Everyone**
176:14
**evolving**
225:22
**exact**
15:15 29:22 34:24 51:2 76:23 98:14, 25 126:3,12 128:7 142:5 160:13 174:25 191:4 221:8 235:3 241:22 271:10
**exactly**
21:25 31:3 59:2 77:14 79:13 105:20 161:15 175:9,11 185:15 219:21
**exam**
63:24 97:2, 5,8,11,23 98:10,13,18, 24 99:6 100:21,25 101:2,5 102:19 105:2,11,24, 25 107:23 108:11,24 109:6,19 143:16
**examination**
5:22 44:24 95:9,10,14, 15 97:6 98:23 99:12 100:19 101:11,12 102:9,12,20, 22 103:7 107:12 108:19,20 110:17 111:10,20 116:1
**examinations**
101:22,24 111:21
**examined**
5:20 51:18
**examples**
59:13 78:10 85:18 108:16 254:11
**exams**
98:3,14
**exceeds**
175:7
**excellent**
229:7 295:6, 7
**exceptional**
250:8
**exclusively**
171:11 199:15
**exclusivity**
253:15
**execute**
187:13 210:14
**executives**
17:9
**exercise**
228:14
**exercising**
86:21
**exhaustive**
115:18 238:21 266:2,21

**exhibit** 7:7 40:11, 13,14,16,19 59:20,23 60:3,6 137:3,7 257:14 281:9,10 290:2,4 298:15,20,24 299:1,2,3,4, 5,7,9,12,13, 15,21,23 300:1,3,7,9
**exhibits** 137:11,12,14 298:13,18
**exist** 288:12,14, 17,22
**existed** 289:14
**exists** 41:1 249:8
**exotic** 102:25
**expanse** 18:23
**expansive** 18:4
**expect** 93:18 114:25 115:3,16 116:5 117:9 118:10 119:1 121:20 149:14,20 157:5 159:20 165:23 184:16 195:16 196:8 211:17 212:20 238:20 266:1 293:3
**expectation** 94:4 114:14, 17,21 121:7, 10 150:6,17 151:6,8 162:9,12,14 165:16 171:3 195:3 212:12,16 226:21 249:20 263:12,15, 19,25 264:2, 13,24 265:13,17, 20,21 266:12 267:9,17 268:5 293:2
**expected** 64:16,21 68:17 86:23 95:24 112:22 116:15 117:15 118:5,19 135:19 140:19 141:5 144:6,12 151:19 163:4 176:16,17 178:4 184:8, 13 187:21 215:23 225:25 228:23 249:17,24 266:20
**expects** 120:6 122:3 149:2,5,9 152:8 211:14 212:25 267:6
**expedite** 150:18
**expeditiously** 150:18
**experience** 41:22 48:21 55:4 69:22 74:14 94:18 100:17 119:22 171:12,15 172:2,13,16 173:4 174:8 252:14 254:24 273:23 294:16
**experienced** 171:9,22,24 267:21
**experiences** 39:11
**experiencing** 113:15 249:18
**expert** 69:10,15 74:11,18,22 75:10,19 114:6 117:1 128:8 234:11 258:6 270:18 271:12 272:23
**expertise** 190:13,14 224:17 226:2 271:7 273:23 274:15
**expire** 25:16
**explain** 57:24 65:16 98:21 102:20 142:17 153:2 272:25 273:10 296:16
**explaining** 156:20
**extensive** 171:12
**extra** 208:3 275:5
**extracted** 291:23
**extraneous** 180:5
**extraordinary** 250:13
**extreme** 245:16
**extremely** 241:14
**extremes** 241:13
**eyes** 121:6

**F**

**face** 113:9 114:19 115:13 116:11 117:12
**faces** 234:4
**facilitate** 179:12
**facilitating** 165:2
**facilitation** 179:17
**facilities** 44:8,13 51:4 71:15 74:5 114:15 148:20 153:20 154:13 161:13 205:24 229:3 237:7 239:22
**facility** 119:3 124:14 149:7 150:19 153:10 161:23 172:7 178:17 198:4 208:10,12, 17,22 215:8 224:2 225:16

228:15,16 234:3 267:3, 21
**fact** 13:10 36:3, 18,24 37:9 38:1 41:24 141:23 143:11 147:25 183:25 198:2 215:25 217:6
**factored** 236:21
**factors** 116:14 123:11 153:12 210:8 236:15,23,24 237:2,21
**fail** 122:20
**failed** 198:21 201:2 203:8
**failure** 41:10,11
**fair** 8:23 21:18 44:10 46:7 49:9 77:16 209:14 218:13 270:22 290:15
**fairness** 104:12
**fall** 208:13 244:9 274:14
**fallen** 208:19
**falling** 224:16
**falls** 95:2
**familiar** 31:11 33:11 39:14,20 40:25 91:17 92:18 113:1 115:4,20,23 125:15 126:12 127:11,16 128:6 142:5 151:18 154:12,20 203:6 228:2 235:3 238:24 248:24 252:4 253:9 272:19 273:3 280:5, 8
**familiarity** 69:23 183:8, 12
**family** 56:7 163:8 187:3 240:21,22, 24,25 242:17 244:6,7,23 247:23,24 248:2,7 250:11,18,20
**far** 14:15 69:8 70:18 72:16 78:22 89:10 147:22 184:5 260:24
**fashion** 118:23 142:19 218:21
**fashions** 38:15
**FAST** 115:5,12
**fault** 127:2
**favorable** 198:5
**feature** 103:5
**features** 72:4
**February** 13:8 55:15 132:20 133:21,22,23 136:1 138:17 258:16 269:7 270:10 276:8,15,16, 20 277:10 290:24
**feel** 12:23 38:11, 17 63:15 103:6 106:8 110:9 123:1 124:22 282:17
**feels** 122:7 148:2 150:21 158:5 237:20
**feet** 275:1
**fellow** 25:25 26:3, 5,7
**fellowship** 26:8
**felt** 19:20 27:12 98:23 105:6 194:11 205:16
**female** 109:14
**Fidelio** 82:16,19
**Fidelio's** 296:2
**field** 191:8
**fifties** 132:18
**figure** 55:23 159:8
**file** 125:9 206:2 226:3 264:9 280:24
**files** 126:19
**filing** 183:23
**fill** 86:23 94:25 166:8 205:24 206:16 207:7 279:10
**filled** 94:21 95:24 96:2 221:3, 15 279:7,9, 19 280:2,3
**final** 4:18 68:11 69:1
**finally** 109:17 196:25
**finance** 85:5
**financial** 80:20 84:11
**financially** 5:8
**find** 119:15 194:13 195:6 219:20 220:16 235:18 283:6 285:17 298:21
**fine** 91:10 132:12 164:21
**fingers** 258:22,25
**fire** 275:1

**firm**
36:5,14
**first**
5:20 10:5 11:8 41:7 50:3,11 77:9 94:13 102:18,20 103:12 109:12 130:21,25 131:3,7 137:25 141:9,16 178:15 224:24 226:4,23 251:20 257:10 258:19 260:9 264:21 290:14 291:13,14,16
**fit**
8:18 52:23 55:11 262:7
**five**
22:7,8,25 23:17 26:17, 20 41:6 43:1 55:4,8,9 292:12
**Fjords**
58:8
**flagged**
69:5 71:3
**fleet**
48:4 55:5 58:18,19 60:10,20,24 167:22 174:4,21 175:1 256:24
**fleets**
126:1
**Florida**
4:2,3
**flow**
259:8
**fluctuates**
35:13
**fly**
243:5
**focus**
94:10 99:8 101:1
**focussed**
31:1 100:6,7
**Focussing**
19:12
**folio**
82:2
**folks**
22:2 172:8
**follow**
60:8 66:15 161:4 168:1 187:7,21 246:10 250:10
**follow-up**
186:21 187:1,6 276:11
**followed**
142:23 145:10 160:14 169:2 187:18
**following**
64:17 168:13 203:10 243:17 267:2
**follows**
5:21
**food**
206:22
**foreign**
153:25
**forensic**
17:4,12 18:6,11 19:17
**foreseeable**
104:24
**forever**
159:16
**forget**
111:5 180:13
**forgive**
40:10 49:16 56:6 57:8 146:7 164:1 296:9
**forgot**
122:18 184:25
**form**
20:13 23:11 29:20 38:13 41:18 42:5 43:8,15 54:11 59:5 60:1 62:2,19 63:4,21 64:19 65:7, 18 66:7,14, 25 67:6,20, 25 69:25 71:7 73:13 74:10 75:7, 18 76:25 78:4 83:14, 23 84:10,20 85:3,24 87:23 88:6 92:7 93:12 94:7 98:19 99:25 100:2, 16 102:13 112:7,18 113:10,21 114:4 116:8, 22 117:8,21 118:8,17 119:17 120:17 121:12 122:5 136:15 141:4 146:17 147:8,21 148:13 149:8,16,22 150:11,20 152:18 154:15,21 155:4,25 157:7,12 158:14,21 159:4 160:2 162:13,22,24 163:14 164:7,17 165:4 172:18,25 175:10 176:2 178:2 179:1, 19 194:15,22 195:9 200:2, 7,21 201:5 203:13 205:11 206:1,6,7,9, 12,17 207:7 208:2 209:7 210:3,15,25 211:5,20 212:4,23 213:13,21 214:16 216:3,19 217:11,17,25 218:11,19 219:14 221:1,2,5, 24,25 222:2, 4,6,7,12,13, 14,17,23,25 223:8,15,16, 17,22 224:10 225:4 226:25 228:11 229:5,21 230:8,18 231:16 232:23 233:6,23 235:2,17 236:14 237:17

238:18 242:18 243:22 245:5 246:14 247:21 249:23 250:7 252:11 253:23 254:14 255:15,22,25 256:10 257:4 259:6,13 260:17 262:2,20,25 263:14 264:1,16 265:4 266:15 267:4 268:8 269:2,9,23 270:3,14,23 272:3,20 273:8 280:3 282:5,9,15 283:2,8,22 284:15 285:8,18,19 287:25 288:6 289:16,25 290:16 291:2,18 292:4,15 293:10,23 294:13 295:18 297:1,10 298:1,4

**formal** 19:16

**formally** 129:23

**forms** 202:11 206:17,20 207:13

**Fort** 135:5 138:10

**forth** 141:12 172:9

**found** 108:24 125:10 131:16 244:18

**founded** 201:8

**founding** 190:10

**four** 22:7,8,25 23:17 41:6,7 85:17,18 138:1,2

**franchising** 251:8

**frequency** 72:7

**frequently** 33:3 71:21, 22 144:19 170:10,15 254:17

**Friday** 5:1 89:22

**friendliness** 103:4

**frivolously** 243:8

**front** 46:24 104:14 241:22 257:11

**frozen** 7:2

**full** 8:18 48:8 137:8

**fully** 118:10 143:12 202:13 224:23

**function** 194:17

**functional** 58:3

**functioning** 194:25

**functions** 59:8,9,10,18 60:9 213:5

**fund** 84:9

**funds** 241:17

**G**

**gained** 83:19

**gains** 84:3

**gait** 258:22,25

**gallery** 4:21

**game** 246:12 275:4

**games** 108:5

**gangway** 257:18,21

**gap** 132:2

**Garcia** 276:17 277:6,11,12, 18

**Gareau** 229:15

**gastro** 81:25

**gastroenteritis** 59:14 65:21, 24 81:21 168:25 185:11

**gauge** 111:16

**gave** 95:25 96:7 132:11

164:16 299:7

**gears** 94:9

**general** 36:13 38:21 52:24 93:5, 23 96:7 97:17 99:2, 18 100:5,7, 22 103:21 105:23 113:3 115:15 116:4,16,18 125:24 139:12 141:21 142:3 143:25 145:1 160:6 163:9 177:22 178:15 192:23 193:18 216:6 240:8 243:14 293:16

**generally** 30:3,25 31:7 49:15 50:14 52:1 55:3 56:12 66:18 78:12 82:2 85:15 90:16 117:14 145:20 157:8 164:9 172:3 179:7 191:18 197:20 222:20 228:19 232:21,22 239:20 245:12 247:22 264:17 265:8 279:12 287:13

**generate** 66:1 67:11

**generated** 58:12 61:2,3 66:9 67:2,5, 9 75:2 186:5 193:9 194:6 195:25 207:25 263:6 274:14 279:24
**generates** 75:1
**gentleman** 109:20 207:11
**getting** 75:8 148:18 162:16 164:15 165:2 190:14 204:7 224:5,8 274:2
**girl** 245:16
**give** 5:11,15 6:22 17:1 78:10 91:25 105:11 113:24 120:19,20 121:24 127:5 147:15 148:4 151:13 160:10,24 161:1 165:14 166:15 185:2 191:4 207:17 211:7 213:9 215:23 229:7 261:17 268:18 275:9 279:2 285:20
**given** 11:7,21 12:18 14:13 81:13 85:10 86:3 88:2 91:7,21 92:6 94:3 108:17 146:14 214:10 238:15 260:20 265:7 267:1
**giving** 59:12 69:12 121:15 165:17 220:12 272:11 282:1,18 289:3
**global** 60:10
**globe** 104:14
**goal** 190:9
**goes** 27:10 58:15 83:20 122:22,23 133:16 145:12 279:8
**going** 7:6,11 16:14 21:10 40:7, 9,12 45:10 46:10,20 48:21 52:15 56:5 70:25 89:22 97:24 101:21 102:22,23,24 106:7,10,16 107:25 108:18 112:4 126:22 128:21 130:18 133:11 135:16,21,23 136:20 137:3 141:12,13,14 150:18 151:13 152:16,25 166:13 170:13 181:21 184:24 191:17 227:11 241:5 246:24,25 249:2 257:7, 11 258:11 268:13 274:9 284:5 290:10 296:7,10 298:9,12 299:6
**good** 4:6 18:22 47:11 132:3 143:14 198:4 208:2 230:5 267:7
**goodness** 46:5 142:8
**governing** 124:2,3 173:18
**grab** 145:15 280:16
**grade** 98:6
**gratis** 81:14
**gratuitously** 81:18
**great** 191:23
**greet** 191:19
**ground** 91:15 103:10 165:2 224:5, 8,20 225:2, 10,12 226:6 233:21 243:16 244:12,14,18 245:3,22 246:4 248:6 250:14 277:5
**group** 28:7 29:4 30:18 32:15, 23 35:9 39:23 40:2 122:25 171:1 172:12 227:12 247:11
**Guard** 33:25 153:8 160:15,23
**Guard's** 153:9
**guess** 30:6 104:5 126:19 153:24 167:19 197:6 200:9 218:12 244:15 285:20
**guessing** 70:3
**guest** 61:14 62:7 82:3 185:16 205:18 206:4,10 207:2,19 215:6 220:21 222:12,18 223:5 224:1 232:5 240:17 244:9 247:6 248:15 249:13,17 250:5 278:25 279:7,10
**guests** 44:20 54:17 199:4 215:2 232:14 240:12 243:17 244:13 247:12

249:5,25 250:11 297:3
**guidance** 215:4
**guide** 216:16
**guidelines** 17:24 18:4 19:6 79:12 139:17 143:23 173:25
**Gulf** 64:13
**guy** 275:3
**guys** 222:10

**H**

**habit** 268:3
**Haferling** 4:1 5:10
**Hairm** 255:23
**hairs** 9:8
**half** 10:11 85:20 86:4 101:23 126:4
**hand** 4:22 258:22, 25
**handed** 215:9
**handheld** 158:8
**handle** 38:15 44:1 62:22 64:22 65:1 110:22 119:2 145:5 146:24 151:1 152:1,8 155:17 163:5 192:22 205:19 229:3 234:4 273:13 275:10 294:25
**handled** 119:10 148:4 152:25 171:25 172:3 174:2,8 195:20 196:20,22 197:9 279:13 296:11,15
**handles** 77:17 229:11,18
**handling** 27:18 63:16 162:20 171:15 184:6 197:4 206:25 254:8 267:16 274:8 292:22
**handover** 143:7 221:2, 5,9,25 222:7,17,24 223:8,16
**hands** 118:7 250:5
**handwritten** 185:10
**Hang** 104:20
**happen** 25:24 58:8 102:22 161:8,24
**happened** 24:9 112:12 123:3 134:24 200:1,19 262:1 265:23
**happy** 40:8 127:11 130:22 133:6 136:18,22 178:11 261:16
**hard** 16:22 147:12 165:14 197:25 219:20 275:3
**Harmony** 13:5,7 47:18,20,21 50:25 52:12 55:10,14 58:25 61:8 133:19 134:3 135:15 136:2 138:13,23 139:3 230:14 234:22 268:25
**Harmony's** 48:2
**hate** 163:2
**head** 14:17,18 52:21 99:14 203:9 245:8 264:22,23,25 265:15 266:11 267:1,11,23
**headache** 113:17 114:20
**headaches** 265:1
**heading** 70:14
**health** 17:2 24:22 65:22 66:17 87:1 142:1 169:5,13 254:7,9
**hear** 56:23 82:6 160:4 196:5
**heard** 155:2
**hearing** 70:10
**hears** 142:16
**heart** 64:12 66:4 68:12 72:21 100:14 112:20 115:24 116:13 117:11 155:14 164:22,25
**heavily** 153:18
**held** 4:12 86:15, 20 197:14,17 298:6
**help** 21:6,9,14,23 22:2,6,9 23:1,8,13, 23,24,25 60:8 63:15 103:18 131:19 142:10,25 163:7 164:10 165:20 172:16 178:16,22 183:20,21 190:4 192:22 212:2,13,21 220:16 222:9 231:22 239:21 241:23 245:19 248:6,11
**helping** 187:1,3
**helps** 163:25

187:23 223:12
**hemorrhaging** 156:10,14
**Henze** 12:7 242:4, 20,21
**Henze's** 296:2
**Hernandez** 207:12 256:1
**Hernandez'** 207:16
**hesitate** 31:9
**hierarchy** 173:5 180:15
**high** 144:25 145:5 194:25
**higher** 17:8 115:16 149:7
**highest** 197:2
**highlight** 16:23 248:14
**highlighted** 248:17 249:4
**highlights** 40:21
**highly** 68:22 104:24 166:7 226:18
**Hima** 234:23,25 235:12 282:22 283:1 286:25 290:10,23 291:11 299:6
**HIPAA** 61:12
**hire** 104:18,22 115:20 131:7 174:7 183:9
265:17,19 294:15
**hired** 15:14 31:5, 14 95:20 105:23 123:2 129:21,23 131:4,9 139:20 141:3,7,9,16 143:12 175:17 293:14
**hires** 117:3 212:11 267:6
**hiring** 27:22 90:10, 15 94:10,12, 14 95:19,23 96:25 97:5 104:9 105:1, 8 106:2 108:10 110:18 116:2 122:15 123:14,25 126:19 128:10,11,20 129:1 139:9, 13,19 174:15 201:23
**historically** 260:20
**history** 63:23
**hit** 240:7
**HM** 268:23
**hold** 22:14,16 23:3 50:12 64:4 104:8 140:6,10 159:16 231:1 274:24
**holding** 105:14
**holdover** 185:9
**holds** 63:25
**home** 172:9 175:12 276:22
**honest** 36:11 147:13
**honestly** 214:17
**hope** 49:7 198:5 248:25
**hoping** 47:25
**hospital** 68:6 124:14, 23 156:11 165:3 173:5, 8,9 175:5, 11,22 215:18 216:2,24 217:8,16 218:10 219:9 234:23 235:16 236:9,12,18 238:3 244:18,21 250:21 282:22,25 283:14,17,18 284:12 285:7 286:13,14, 20,23 288:3 289:24 291:17 292:2 293:7
**hospitalization** 240:25
**hospitals** 115:5,11 154:12 175:17
225:19 237:25 253:17
**host** 170:8,16,17
**hotel** 85:18 89:25 90:4,5 156:19 167:16 185:16 186:7 195:13 240:23 243:16
**hour** 58:2 101:23 204:8
**hours** 10:11 11:1, 3,15 12:11 52:17,19,23, 25 53:1,7, 10,11,13,14, 18 88:9,11, 12,14,20,23 89:1,7,10, 11,20 90:7 116:12 274:1,25 292:12 293:24
**house** 16:14
**housekeeping** 298:9
**huge** 12:24 298:15
**human** 87:15 88:1 94:15 95:2,6 96:22 98:4 123:4 125:5, 12 126:11,16 129:14 130:1 134:7,10 204:17 255:10

**hundreds**
172:9 175:2 225:25 238:21
**husband**
242:20 244:15
**hygiene**
153:24
**hygienic**
153:25
**Hypertensive**
211:6,9
**hypothetical**
64:18 79:22 107:16 121:16 144:21 147:15,23 148:24 150:1,15 151:25 152:5 160:25 164:16,18,19 209:23 214:18
**hypotheticals**
108:15 121:14 223:19 243:8

**I**

**IACSN**
190:21
**ICU**
259:1 260:16
**idea**
23:23 47:23 284:7,14 287:9 291:22
**identical**
136:14 271:22
**identification**
40:15,17
60:4 281:11 290:5 299:10,16,24 300:4,10
**identified**
231:2 274:19
**identifies**
145:13
**identify**
99:23 100:13 110:6,21 146:19
**identifying**
47:19 72:4
**ill**
50:6 111:8 161:12 232:16
**illness**
50:8 63:23 99:2 115:25 118:18 119:8 148:18 156:21 169:5 185:16 205:14
**illnesses**
109:3 118:20 119:23 153:23
**imagine**
232:24 275:8
**immediate**
109:23 226:16 262:14 263:1,5,20
**immediately**
58:5 218:9,18
**immigration**
87:1,4,7,21 88:4 163:23
**immunization**
59:16
**impact**
42:1 93:6
165:24
**impacted**
73:7
**impactful**
156:16
**impacts**
163:21
**implication**
240:16
**implying**
244:16
**importance**
156:17
**important**
68:18 105:6 167:21 198:3 210:2 236:23,25 237:3
**imposition**
243:3
**impossible**
91:24,25 122:12 160:13 214:4
**improve**
120:22
**imputed**
72:18
**imputing**
77:7
**in-house**
197:18,20
**inability**
92:20 113:11 114:20 258:21,24
**inaccurate**
68:23 262:17 291:1
**inappropriate**
110:16
**inaugural**
33:1
**incapable**
241:15
**incentive**
207:24 208:5,6
**incident**
55:15,18 81:25 82:1 99:23 108:8,13,15,22 110:6 121:8 128:21 131:17 134:20 137:21 138:25 139:7 166:4 167:1 188:13 198:24 200:1,6 201:12 203:6,19 204:5,23,24 205:13 234:21 235:16 250:24,25 252:22 264:6 268:21,23 270:22 271:16 276:9 278:10,17
**incidents**
59:14 99:9 176:24 199:8 201:14 297:23
**inclined**
120:19
**include**
24:20 28:10,12,16 42:2 44:21 73:11 77:4 113:5,8 114:22,23 115:17 117:19 118:20 135:16 146:8 153:15 154:5

173:19 257:3
**included**
20:20 28:14
167:14
189:11 244:2
**includes**
291:4
**including**
87:20 105:9
142:23
262:7,15
**income**
207:25
**incorporate**
43:16
**incorporated**
29:3 32:6
291:5
**incorrect**
262:11
**incredibly**
214:3
**indeed**
160:25
**independent**
35:16,18,20
90:19 284:7,
19,20
**independently**
28:20 257:6
**index**
10:19
**indicate**
87:11 104:2
109:10,11
134:11
135:12 179:5
234:8 258:8
259:23
277:4,25
**indicated**
195:15
261:8,9
275:6,7
**indicates**
39:9 64:25
148:1 249:10

282:20,22
290:22
**indicating**
286:5
**indication**
114:8 196:1,
7 262:18
279:9 282:1
291:12
**indicative**
111:4 113:12
266:21
**indicators**
60:13
**individual**
24:7 36:16
39:3 56:16
77:15 84:25
117:16
120:11 177:9
210:20
269:21
292:23
294:25
**individually**
119:10
**individuals**
22:8,14
35:15 87:11
**industry**
39:23 40:1
**infectious**
50:8 59:15
185:19
**infirmaries**
44:4 80:11,
19 90:24
91:20 140:20
**infirmary**
81:25 90:8,
22 92:6
**influence**
236:15
**inform**
145:24 236:6
**information**
37:8 41:8

45:19,21
59:12 60:20,
23,24 61:1,
15,17 62:7,
10,21 63:2,
11,14,19
64:1,4,8,21
68:8 69:5
70:25 71:4
80:12,16
87:17 92:16,
25 93:2,19
104:1 106:5,
6 125:8,25
126:13,14
129:5,6
134:5,8
186:8,24
193:20
199:14,18
200:8 216:8
225:15
234:13
235:19 236:4
247:8,16
265:7 271:9
272:12
278:19
284:21,23
286:15
287:10,16,22
289:1,3
291:23
292:25
**informing**
38:8
**informs**
38:4
**initial**
49:5,20 53:1
77:19 139:20
193:12 260:7
261:1 276:13
**initially**
25:7 129:21
131:8
**initials**
142:9

**initiate**
122:3 157:18
210:13
**initiated**
121:11
**initiation**
161:9
**injuries**
115:25
267:11
**injury**
203:9
205:14,15
264:23,25
266:11 267:1
**input**
19:3 21:1
63:1,11,19
64:16 77:10
177:6
**inputted**
60:18 71:16,
23 72:8
74:25 260:4
**inputting**
71:18
**inquiry**
7:20 8:19
69:9,14 70:7
105:14,19
110:13
**insanobi**
83:25
**insinuating**
111:25
**insist**
294:20
**inspection**
33:24,25
34:13
**inspections**
33:20 34:5
**installed**
76:6
**instance**
19:24 32:23
58:7 72:22

203:12 204:18 215:13
**instances** 18:10,11 19:15,23 20:10 93:3 160:18,19 182:8 295:14 297:7,20
**institution** 174:6,16,18
**instruction** 93:15,22 104:3 200:22 268:10
**instructional** 99:19 100:8, 11 111:6
**instructions** 59:17 213:10 265:6
**instruments** 168:14,17 169:2
**insult** 227:14
**intake** 49:24 50:10, 12
**Intel** 157:23
**intellect** 162:6
**intellectual** 167:19
**intelligent** 161:16 234:13
**intending** 298:25
**intention** 106:17 192:21 262:10,11,16 292:24
**interact** 48:23
**interactions** 4:11 194:12 266:19
**interested** 5:8 268:22
**interests** 252:2
**interface** 4:13,22
**interference** 7:24
**interferes** 165:25
**interfering** 223:10
**intermittent** 195:19
**internal** 18:20 34:1, 17 103:25 106:6 231:9, 12
**internally** 20:9,12 181:24 197:15
**international** 39:15,22
**internationally** 175:14
**internet** 36:7 294:19
**interpret** 259:16
**interpreted** 97:17
**interpreting** 128:2
**interprets** 263:17
**interrogatories** 11:6,20
**interrogatory** 283:12
**interrupt** 238:17
**interrupted** 150:10
**interventions** 109:12
**interview** 51:16 96:24 101:6,9,15, 19 102:7,8, 18 103:10, 11,12,23 104:12,20 105:1 107:1, 8 110:19 122:18,24 123:4
**interviewed** 95:12 97:7
**interviewing** 122:25 139:17
**intricacies** 231:7
**introducing** 98:16
**introduction** 99:16 103:9
**intubation** 226:18
**inventory** 77:23 78:2 79:15
**investigation** 162:3
**involve** 106:12 109:14 112:9 145:23 200:17
**involved** 19:17 37:22 78:21 84:12 104:23 125:6 139:14 141:22 145:18 160:1,21 162:7 171:1 176:13 197:8 198:20 199:25 200:8 241:11 248:11 251:2 264:21 297:23
**involvement** 78:16 241:9
**involves** 13:1 73:4, 15,16 104:23 109:13 160:6
**involving** 17:18 18:11 19:18 20:1 203:6,7 239:8
**irresponsible** 148:25
**Isaacs** 276:14
**ischemic** 211:8
**isolation** 169:1
**issuance** 87:20 93:21 124:4
**issue** 17:19 18:7 68:3 87:16 105:6 137:13 176:23 194:13 195:7,12 196:19 199:3 206:7,8 258:6 263:17 275:13
**issued** 73:5,18
**issues**

6:16 17:4, 12,21 18:25 19:4,6 20:9 42:1 93:6,11 104:23 117:14 160:21,22 176:8,15,17, 18,20 178:23 184:20 191:8 194:10

**issuing**
202:6

**itemize**
137:11

**items**
10:14 11:21 208:19

**itinerary**
41:9 42:1,4, 6,8 73:15,17 79:11,12 135:16,21,23 136:4,8 153:15 156:16 165:24 170:22

**J**

**Jennifer**
277:16,17 278:1,4,7

**job**
16:24 23:3, 5,7,9,14,16 31:13,21,25 33:7 34:10 45:13 74:25 86:24 111:13 140:23,25 144:12 166:8,22,25 167:23 174:15 184:10 187:11 188:15,22 207:16 208:2 213:19 240:3 244:4 265:18 267:14,15

**jobs**
143:18 293:8

**Johnson**
15:4,7,9,10

**join**
145:16 240:22

**joined**
132:9 138:14

**joining**
250:12

**joint**
237:18

**Jose**
229:14

**Juan**
132:8 135:17,24 136:3,11 227:4,8,11 229:3 233:12 235:1,6 237:25 238:7,15 251:23 252:21 253:5,18 270:11

**judge**
106:9,12

**judgement**
275:10

**judgment**
148:1 149:24 158:4 263:10,13 294:5

**judgments**
181:12 292:22

**July**
14:4,13 15:16

**jumped**
240:7

**June**
15:16

**junior**
172:16,19 181:17 182:1,21

**jury**
142:16

**K**

**keep**
7:6,11 26:15 34:14 93:5 99:15 106:21 118:18 123:18 186:11,12,20 220:19,25

**keeper**
288:18

**keeping**
143:3

**kept**
34:15 79:3 96:17 170:21 206:23

**key**
98:5

**kind**
13:23 53:16 58:11 75:8 89:22 144:16 183:24 185:11,19 204:24 206:3 241:1 274:2 282:18 292:25

**kinds**
20:9 181:11 191:13 241:20,22

**Kingdom**
23:20

**knew**
132:18 207:10 280:11 287:10

**know**
8:13,19,20 12:20 14:10 15:14,15 17:25 19:15 25:22 28:14 29:21 34:24, 25 39:18 41:1 47:7,8, 25 48:12,18 50:24 51:2 55:10,13,16, 17 57:24 59:23 66:16 69:2,24 70:15 71:2, 13 72:1,2,16 74:14,23 75:9,13,23 76:5,9,12, 21,23 78:12 80:13,20,23 81:1 84:15, 17,18,22,24 85:1,7,8 87:4,13 89:4,5 91:17 95:21 96:18, 20,21 98:8 99:22 100:21 103:1,3,5,6 104:18,21 105:4,20,21 106:8,22 108:6,10 110:21 111:11 112:16 113:3 114:13 116:6,9 117:4,9,13,

15 118:3,5, 19 123:22,25 126:3,7 127:20 128:22 129:11 130:15 131:8,11,16, 23 132:1,7, 19,22 134:9, 13,19,21,23 137:4,5,14 138:6 139:1, 2,5 140:2 141:13 142:9,10,13 143:17 144:8,9,12 145:4,23 146:4,18 147:5,10 148:19,20,21 149:2,5 151:4,6 153:19,20 154:3 156:5 161:25 162:25 163:2 164:4,8,9 165:11 166:16,19 167:19 171:19 174:7 175:15 176:12 178:10,13 181:20 185:4,17 186:3 191:22 194:23 196:25 198:25 200:20 201:21,22 203:2,4,20 204:18 206:6,9,10 207:6,8 211:14,15 212:1,12,21 220:2 222:1, 14 223:18, 19,20 228:12,17 229:2,3,6, 10,14 231:7, 14,15,20 232:7 235:13,18 241:16 244:8 245:25 246:2 247:2 248:1, 5,22,23 249:1 252:1, 17,20,23 253:20 256:24 257:3 260:12 261:1 265:12,23 267:19 270:4,7 272:6,8,18, 22 274:24 277:12,22 278:4 282:24 283:3 284:8, 12 285:2,5, 15 286:18, 19,22 287:3, 24 288:12,15 289:21,23 291:15 292:1,24 293:5,8,15, 21 295:23 296:7 298:3, 20,23

**knowing** 116:11 214:19 262:8

**knowledge** 8:18,20 69:20,21 71:1 72:24 74:2 75:2 99:3,18 100:1,3 116:4 118:12,14 195:3 196:9 206:14 273:9 285:5 294:20

**known** 30:18 34:16 81:21 98:9 142:22 182:4,24 188:7 239:3

**L**

**lab** 168:21

**label** 40:8

**labeled** 188:18

**laceration** 116:12

**land** 91:4,22 146:16,21 172:24 187:14,19 188:2,10,11

**landed** 278:25 279:7,11

**landing** 223:5 285:8

**landline** 157:21 230:3

**language** 241:17 242:3,12 245:17

**lapse** 26:9

**lapsed** 26:8

**large** 4:3,20 12:21 16:7 55:7 244:7

**larger** 55:5,8

**largest** 54:20

**late** 29:2 190:14

**latest** 191:7

**Lauderdale** 135:5 138:10

**law** 36:5,14

**lawsuit** 18:8 19:14, 16 20:3 124:19 197:13 199:22

**lawyer** 218:12

**lay** 115:16

**lead** 108:8

**leader** 170:7

**leading** 120:18

**learn** 200:5

**learned** 284:16 287:3

**leased** 44:9,11

**leave** 27:11 42:17 124:3

**leaves** 293:19

**leeway** 105:12

**left** 48:10,11 158:7 203:2 219:15,25 234:21 269:16

281:21
**legal**
5:7,10 17:3, 12,14,19,21 18:1,7 19:7 61:16 62:8 76:15 178:23 179:6,21 214:12 216:4,13 252:3 255:8, 10,12
**legs**
113:16 114:19
**length**
101:19
**letter**
87:6,10
**level**
17:8 85:22 105:19 111:4 115:16 121:20 144:25 145:5 146:23 171:14 172:14 174:7 194:25 195:3,16 196:8,22 205:17 207:14 209:13,15 224:17 244:10
**levels**
33:24 78:16 97:1 197:2 294:16
**liaise**
243:15 244:4,20 245:11
**liaisoning**
243:19
**license**
25:5,7,9 123:24 124:4,5,8,11 143:14 175:13,19 202:6
**licensed**
143:12 194:2,3
**licensure**
124:11
**lie**
51:18
**life**
34:2,3 109:16 123:9,10 142:3 144:3, 4 164:10 174:11,12 226:5,8,13, 14,16,24 246:7 294:21,22 298:12,14
**lifeboat**
141:25 142:20,24
**lifetime**
25:23 102:25
**likewise**
251:17,19
**limb**
164:10
**limit**
209:8
**limitation**
93:11
**limitations**
90:23 91:3, 14,21 92:4, 24
**limited**
105:10 111:9,13,14 148:6 209:5 244:3 249:25
**limits**
116:9 274:12
**line**
21:9,14,16, 23 22:2,6,9 23:1,8,13, 23,25 26:23 27:2,5 28:7, 22 29:19,25 30:2,10,11 31:1,10 32:19 39:15 70:12 94:17 98:12 103:15 109:5 168:11 189:18 190:5 203:5 209:3 214:6 225:25 245:20 250:9 276:17 277:6,10,18
**line's**
247:10
**lines**
27:16 28:7,9 29:14,25 30:3,15 31:11 35:9 39:22,23 40:4 189:18, 20 229:25 248:9
**list**
16:22 17:9 128:24 184:11 225:18,22 241:22
**listed**
10:18 12:22 98:24 128:3, 18 153:1 188:17 190:6
**LISTENED**
83:25
**listing**
10:16 184:1
**listings**
185:10
**lists**
92:1 185:10, 16 186:6
**literature**
45:17 252:12
**little**
7:24 19:11 28:23,25 50:23 56:24 68:25 88:9 126:4 158:10 179:23 193:2 209:2 274:7
**lives**
83:16
**living**
30:4
**Lobel**
5:23,24 6:9 8:7,15 19:10 21:13 22:23 23:15 29:23 40:9,18 41:20 42:13, 24 43:10,18 46:10,14,19 47:5 54:13 59:6 60:5 62:5,24 63:7 64:10,23 65:10 66:2, 10,20 67:3, 12,21 68:24 69:18,19 70:4,13,22, 23 71:8 73:24 74:13 75:11,21 77:3 78:5 83:18 84:1, 14,23 85:6 87:24 88:8 92:9 93:17 94:8 100:10, 23 102:16 104:6,17,20

105:17
106:13,14
107:22,25
108:2
112:11,24
113:14,22
114:12 115:9
116:17,24
117:2,5,17
118:1,13,25
119:18
120:14
121:3,25
122:14
125:14
131:21,23
132:1,5,12,
15,18,23
133:2,6,9,
22,24 136:17
137:4,8,17,
18 143:1,4
147:4,14
148:5 149:1,
12,18 150:2,
14 151:3
152:6,13
154:8,17,24
155:6 156:4
157:10,14
158:17,23
159:5,14,19,
21 162:17
163:10,17
164:13,20
165:10
172:21 173:2
175:23
177:15 178:5
179:9 180:11
194:20
195:5,18
198:25
199:24
200:4,16,25
201:9 203:17
209:10,24
210:5,21
211:3,13,25
212:8,19
213:3,16,23
214:8,22
216:10,21
217:5,13,21
218:8,14,24
219:17
220:18
221:23
222:11,19,23
223:11 225:7
227:2 229:1,
9,22 230:12,
21,23 231:4,
17 233:3,9
234:20
235:4,10,20
236:17
237:4,23
238:13 239:1
242:8 243:23
246:18
248:12
250:3,19
252:19
253:16
254:1,16
255:3,18
256:6,14
259:9,19
260:3,23
261:5 262:4,
22 263:3,18
264:3,19
266:3,23
267:8 268:12
269:5,12,25
270:6,15
271:2 272:4
273:4,17
274:5,22
275:11,15
281:12
282:6,11,19
283:5,10,25
285:1,23
287:17
288:1,8
289:20
290:2,8,18
291:7,25
292:7,17
293:1,12
294:1 295:4,
13,22 297:6,
17 298:2,9,
25 299:12,
17,25 300:5,
11,14

**local**
5:2 22:19,22
68:6 73:20
75:5,15
123:15,19
124:2 152:3
153:17
180:7,10
226:7 229:11
234:16,19
237:24
241:17
243:15
244:21
245:17 258:1
281:2

**locally**
118:22
123:24
153:11 160:9
161:23

**locals**
153:19

**located**
24:8 58:2
128:2 147:18
235:5

**location**
52:4 92:15
135:4 145:13
214:2,5,19
235:3 240:19

**locations**
136:9 213:7

**locked**
4:15

**log**
74:15
185:21,22,25
186:2,7,11,
14

**logging**
186:16,18

**logistical**
147:2 165:8
239:21,24
240:2,12,15,
20 241:1

**logistics**
147:10 148:2
151:1,17
152:1 153:7
160:8 163:5,
11 210:18
240:17

**logs**
185:6,7,16,
20 186:4

**long**
10:10,25
11:14 12:10
66:23 74:3
101:12,22
273:24 276:9

**longer**
14:24 53:14

**look**
26:18 33:2,
12 47:1,4,7
65:20 71:19,
23 72:18,22
75:16 125:4
126:23
132:13
137:22
152:22
178:8,14
181:18 183:9
184:17
187:10
188:18
193:11
205:20
207:17
219:10
220:1,5,15,

17 221:20 223:18 270:4 271:23 276:13 280:15 281:6 283:19,23 290:23
**looked**
37:11 138:16 220:6 252:7 261:21
**looking**
47:6,8,9,12 48:6,9,10 72:3 75:17 76:20,22 106:1 123:23 126:24,25 129:12 130:17,24 131:1 178:9 184:9 188:7 220:2,8 221:20 244:25 251:10
**looks**
7:2 48:7,12 49:2 53:10 59:21 127:21,22,25 169:3 268:23 270:13 271:21 277:1,18 282:1 295:15 300:6
**loses**
109:20
**losing**
272:21
**losses**
84:16 85:1
**lost**
170:13 241:16
**lot**
68:1,14 69:12,20 75:12 116:14 117:4 236:15
**lounge**
258:21 259:22
**loved**
248:4
**Lovely**
166:21
**low**
54:24 79:21 80:1 112:21
**lower**
54:21 85:22 131:10
**lowest**
54:19,22
**luggage**
187:2 240:21

M

**M.d.s**
25:22
**machine**
46:5,6
**machines**
52:2
**made**
38:25 39:2,4 40:21 42:7 60:19 66:9 79:23 98:22 106:20 120:13 130:11 150:24 156:3,22 158:11 163:7 165:20 167:13,17 171:20 181:20,23 193:15 198:21 216:5 217:7 218:21 219:1 220:9 246:10 252:14 262:6 283:4 284:8 285:16 286:4,6 290:20 291:22 294:6 296:17
**mail**
37:8
**mailed**
206:19
**mailers**
37:7,14
**mailings**
37:11
**mainland**
227:18
**maintain**
31:10 121:19 125:24 141:5 174:9,11 183:23 192:7,20 202:7,15 225:25 294:20
**maintained**
33:14 34:6 58:9 142:19 175:18,19,20 185:20 186:8
**maintaining**
30:6 202:5
**maintains**
46:1 152:11 175:13
**maintenance**
46:1 185:6 190:11
**major**
58:6 73:15,16 292:14
**make**
17:22 31:16 34:5 36:21 40:9 41:24 53:12,24 59:22 60:6 61:10 68:1,12,20 70:16 78:13 86:9 105:7 109:18,21 110:12,20 117:25 120:2 127:6,18 128:24 136:6 151:14 154:1 156:10,12,18 159:22 160:9 172:5 181:11 183:20 187:17,25 192:9 208:16 209:3 211:22 212:17 213:2 217:22 234:13 237:22 244:24 245:10 246:12 250:8,13 251:12 256:25 274:6 275:10 283:7 296:6 298:11,14,19 299:7,13,19
**makes**
12:23 75:24 218:2
**making**
45:16 105:12 128:18 146:25 147:1 151:5 153:12 160:7 217:23 263:10
**man**
183:17
**manage**
61:14 62:7

76:2 151:24 156:19 185:18 240:13 295:2
**managed**
76:4,6
**management**
19:21,24 20:3,13 27:12,15 30:4 61:13 62:6 64:6 77:4,5 169:13,14 171:1 254:6, 23,25 255:9 256:9
**manager**
23:19 24:15, 18,19 196:20 206:24
**managers**
24:25 189:13 195:11
**manages**
190:19
**managing**
27:18 77:2 179:3 190:23
**manner**
151:11 175:25 217:8 293:8
**manual**
30:7 243:13
**March**
16:11 137:23
**marine**
165:6,13 167:7,10,11
**mark**
101:21 258:24 259:22
**marked**
40:14,16 60:3 281:11 290:4 299:10,15,23 300:3,10
**markings**
47:19
**Mary**
260:4
**Masade**
201:2
**Masade's**
198:22,23 199:22
**massive**
111:3
**master**
169:10,23
**material**
37:7
**materials**
127:11,13 219:23
**math**
27:6
**matter**
5:4 159:14 183:25
**matters**
17:14 169:5
**maximum**
88:20 89:1
**mean**
9:11 17:12 24:3 56:3 57:23 67:4 85:16 86:10 87:13 102:14 111:19 165:11,12 168:21 192:11 201:19 207:5,24 208:1 224:7 231:21 240:1 253:8 259:5 263:5 271:3 273:11 282:8 295:8 296:16 298:23,24
**meaning**
205:6 222:20 244:14
**means**
17:14 36:25 62:12 84:22 135:11 169:25 170:3 195:4 218:7 259:7,16,21, 25
**meant**
196:25 244:12
**measure**
45:4 100:25
**mechanical**
41:9,11,16
**mechanisms**
115:17
**Med**
125:16,19 127:13
**medical**
14:22,24,25 15:6,18,24 16:5,20 17:16 18:9, 12 19:8,12, 13,18 20:2, 12,13,21,24 21:15 23:19 24:15,17,19, 24 25:5,25 26:25 27:7,9 28:6,8,18, 19,21 29:6, 8,12,24 30:13,14,21 33:4,13,20, 21 35:1,4,7, 12 36:2,3,9, 18,25 37:4, 9,13,16,19, 21 38:1,5,6, 9,10,22 39:5,10,11, 12 42:3 43:6,7,14, 16,22,24 44:4,5,8,12, 13,15,17,19, 21 45:6,11, 12 47:18,21 48:3,5,6,8, 16,19,21,24 49:6,13,17, 20 50:4,7,9, 20 51:5,12, 14,16,25 52:16,20,24 53:16 54:1, 4,9 59:1,2,7 60:12 61:7 62:12,14,18 63:3,10,11, 19 65:1,2,13 67:16,23 68:22 69:6 71:2,9,10, 16,18,22,23 72:7,8,12, 16,18 73:3 74:1,4,5,6, 9,24 75:4, 12,14,16,23, 25 76:9,18, 20,22,24 77:21,23,24 78:2,7 79:6 80:6 82:4 83:8,12,13, 21,24 84:3, 6,9,16 85:2 87:19,21 88:10,13 89:2,13 90:6 91:15,19,20 92:5,6,24,25 93:3,20,23 95:13,19,20 97:17,21 99:12,18 100:5,7,22 105:9 108:25

110:24 112:13,16 113:1 114:6, 10,15 115:1, 3,10 116:20 117:1,2,4 118:11 119:3,12,13, 25 120:6 121:10 122:3 123:15,24 124:4,11,14 125:15 129:17 139:6 141:22 143:6,10,21, 24 144:9 145:14 146:14,16,25 147:6 148:11 149:15,21 150:6 151:8 152:8,15,24 153:9,14 154:4,12 155:14,21,24 156:24 157:19 158:1,25 159:9,23 160:7 161:6, 20 162:11, 19,21 164:5 165:16,18,19 167:7,10,12, 14 168:1,7, 12,14 169:14 170:8,10,16, 19,20 171:2, 5,15,25 172:4,6,7, 10,23 173:7, 11,19,21,23 174:1,2,4,9, 20 175:7,21 176:8,11,12 177:3,18,25 178:4,17,24 179:4,5,13, 17,18 180:2 181:13,14,24 182:24 183:2,3,4,5, 6,9,10,11, 12,14,15,17, 22 184:6,7, 11,19,21 185:6,7,13, 21,25 186:2, 12,16,19 187:21 188:8,12,23, 24 189:5,7, 9,10,12,13, 23 190:9,10, 15,18,21 191:1,8,9, 10,11 192:1, 4,6,16,17, 18,22,24,25 193:25 194:18,24 195:10,11,25 196:20,21 197:4,21,22 198:8,22 199:4 200:17,20 201:3 202:10 203:9 204:20 205:2,16,24 207:1,3,7 208:10,14, 17,20,21 209:4,11 210:1,22 211:4,7,12, 18 212:7,9, 10,22 214:13 215:1,8,20 216:25 217:2 220:21 223:7 224:1,3,15, 21,22,23 226:15 228:2,8 230:3,7,14 231:10,24 232:4,20 233:11 234:5,7,10 235:21,23 237:19 238:6,7,12, 15 239:7,22 242:10 244:9,11 245:23 247:6,11,14 248:16,18 249:5,7,18, 21 254:3 255:10 256:8,16,20, 23 257:5 258:16 259:7,16 261:11,12,25 262:1,18,24 263:17 264:5,9 265:2,16 266:18 267:3,5,7, 21,25 268:11,23,24 269:1,3,6, 10,13,16,18, 21 270:18 272:23 279:13,19,20 280:2,3 284:9 290:14 292:22,25 293:16 294:6,11,17, 18 295:2,9 296:11,19 297:11

**medically**
17:18 18:25 69:4 91:3,21 151:10 158:12 203:11 207:14 259:14 296:13,24

**medication**
78:18,19 79:6,9 80:5, 10,14,21 81:12,13,22 83:15

**medications**
64:3,4 77:24 78:14,17 80:18,24 81:4,8,18,24 83:8

**medicine**
25:12,16 100:5,18 123:20 143:6,25 155:19 172:8 293:18 294:24

**medicolegal**
178:18,19

**Medusa**
125:17,19,20 126:8,18 127:14 129:3

**meet**
38:21 109:7 191:18,19,20 256:11,17,19

**meeting**
139:16 170:25 175:6 196:13,15 197:14 198:9,11 255:6,9,14

**meetings**
16:9 17:8 19:2 24:23 73:25 170:8, 11,16,18 171:4,7,12 198:14 237:24 253:22,24 254:2,4,6,8,

9,12,13,18, 20,21,24 255:7,11 256:5,7,9 297:18 298:5
**meets** 175:25 241:7 250:14 293:9 294:11 295:9,17
**member** 17:18 18:2, 25 19:5 40:1 49:6 61:21 92:1 140:6 142:4 195:11 209:18 215:6 220:21 232:6,11,18 239:17 240:18,21, 24,25 248:7 249:13 250:5 254:5 296:20
**members** 24:24 33:15 34:9 44:20 54:24 59:16 62:14 84:6 112:9 142:3, 21 162:8 163:8 167:25 168:12 171:10 172:2 187:3 189:11 194:24 199:4 232:4 240:22 244:7,23 247:12,23 249:17,25 250:11,12 296:13 297:3
**memories** 266:5
**memory** 55:24 65:6 97:24 241:12,21
268:14
**mention** 124:19 261:25 262:16
**mentioned** 17:11 19:13 20:19 56:23 92:17 97:1 118:21 144:2 151:1 156:15 157:1 158:8 185:15 213:4 246:17 248:2
**mentioning** 38:19 156:21 290:7
**mentions** 115:13 177:21
**merchant** 19:6
**message** 269:19 270:10
**met** 18:3 19:5 242:13 244:1 245:15
**method** 285:25 295:3
**methodologies** 294:23
**methodology** 110:9 233:16,24
**methods** 258:2 278:14
**Miami** 16:2 25:2 32:11,24 139:21 189:11 228:14 239:19 279:15
**Michael** 8:7 9:18 46:10 105:18 107:23 142:25 203:16 222:11 292:19 298:10,12
**middle** 64:13
**Miguel** 207:12
**Mike** 207:11
**mimic** 53:10 114:25
**mind** 99:15 106:14,15 107:5 108:18 132:5 141:15 166:13 254:15 272:11 275:25
**minds** 38:16
**mine** 247:3
**minimum** 88:12 109:7
**minor** 32:3
**minus** 81:25
**minute** 129:12 166:15
**minutes** 11:15 102:4, 5 159:8 255:6,8 275:11
**miscommunicated** 205:5
**misdiagnosis** 120:22
**mismanagement** 176:19,23
**missing** 132:25
**mistake** 60:19 299:18
**mistaken** 26:17
**mistakenly** 136:25
**misunderstanding** 70:9
**misunderstood** 70:11
**mix** 99:1
**mixing** 50:6 146:4
**mock** 144:14,22,25 145:9,13,17, 19,23 146:5, 7,8
**mock-up** 146:9
**model** 188:24 189:4,9
**moderately** 55:7
**modifications** 98:21
**modified** 98:19
**moment** 68:19 166:18 266:17 279:6
**Monday** 89:21
**money** 84:13 245:18 247:25
**monies** 83:19

**monitor** 5:2 71:18 78:2 79:15 171:14
**monitored** 216:17
**monitoring** 65:24 216:22 217:2,6
**monitors** 78:24 79:8 84:15
**monthly** 34:8,13 144:20 145:3
**months** 138:14
**morning** 4:6 275:19
**move** 31:8,9 121:5 150:18 246:24 247:6 258:21,25
**moving** 7:6 148:11 187:10 251:5
**MRI** 68:10 110:11 245:9
**MSN** 19:5
**multiple** 56:17 98:1 117:23 180:25

**N**

**name** 5:5 13:2 18:22 49:24 56:24 57:11, 13 80:7 98:7,8 126:13 134:12,13 139:23 143:1 206:9 207:5, 9 272:17 277:15 282:21
**named** 207:11
**names** 108:17 197:13 255:19,21
**narcotic** 186:7
**narrow** 19:12
**Natasha** 256:1
**national** 163:23 164:2
**nature** 23:24 99:10 101:2 102:20 103:21 108:23 147:24 191:23 197:7,24
**nausea** 265:14 267:22
**NCL** 202:22,25 203:2
**necessarily** 17:22 68:23 114:8 135:12 214:6 239:10 295:8
**necessary** 52:22 63:15 80:5 83:16 87:20 103:7 110:9 121:22 165:8 187:1
**necessity** 243:11
**need** 19:20,21 31:8 35:1 42:20 44:25 74:19 80:2 88:22 95:16 97:16 103:5, 18 105:18 107:7 108:5 130:23 148:19,20,21 155:21 157:18 162:16 169:2 176:9,13 184:23 185:20 199:19 223:3 232:25 241:19 243:8 245:7 249:8, 15 259:14 266:13 268:6 271:9 273:19 274:24 290:6
**needed** 62:1 79:9 105:7 176:20 197:1 216:9 227:25 244:14,19 254:22
**needs** 109:8 117:9 152:4 153:5 156:25 158:5,12 163:7,23 165:18 175:7 183:20 205:17 209:18 213:11 218:16 225:9 233:11 234:13 241:20 244:9 245:8 248:11 249:14 250:11,15, 18,20
**negative** 225:13 229:13 253:13 291:21
**neglected** 74:19
**neurologic** 263:1
**neurological** 218:17 262:14 263:7,20
**neurosurgical** 262:14 263:1,7,21
**never** 26:22 41:2 104:10 155:2 165:13 171:24 282:16
**newer** 256:11
**nine** 275:18 281:21
**Ninety-seven** 268:16 271:14
**Ninety-three** 271:25
**noise** 196:4
**normal** 197:15
**northern** 24:12
**Norwegian** 27:2,4,9,11
**nose** 257:11
**Notary** 4:3

**note**
59:22 60:6 65:2,4,5,8 70:5 71:19 74:16,17 77:11,20 93:9 220:9 235:24 243:15 258:16,24 259:21 260:7,9,10, 16 261:11 262:1,19 263:6 264:14 284:8 290:4, 11,13,14,20, 24 291:13,14 299:5

**notebook**
10:16

**noted**
92:5 215:5

**notes**
51:21 74:9 77:8 198:19 261:6 265:22 266:14,16 274:5 280:15 283:12 284:10

**notice**
6:17,19,23 40:9,10,14 69:15 137:17 199:6 257:13 299:1

**notices**
19:6 73:6

**notification**
42:10 73:18

**notified**
73:2,7 145:11,12 164:11 205:20 241:4

**notify**
8:12 42:7 199:19

**notifying**
87:4 278:10

**novel**
266:17

**November**
5:1 10:9,22, 24 11:13,23 133:5,7 137:22 138:19

**number**
12:24 29:22 40:14,16 43:1 50:22 51:2 54:16, 19,20,24 59:23 60:3 111:13,15 175:2 188:6 189:1,3 190:7 191:25 222:1 230:6 257:9 271:21 279:3 281:10 287:6 290:4 299:9,15,23 300:3,9

**numbers**
46:8,17 76:14 261:18 282:2,8 298:14,19,20

**numbness**
113:9,16 114:19

**numeric**
298:16

**nurse**
34:1,18,19, 21 49:4 50:13,14 77:9,12,16 87:16 120:3 139:21 143:9 145:14 147:16 170:20 179:24 182:4,6,7,8, 9,12,21 185:1,5 187:11,13, 17,23 205:8 207:8,9,10 232:15 260:4,19

**nurses**
32:24 33:11 34:4,11 44:16 45:11 51:21 52:5,7 53:20 54:19, 25 55:6,8,9, 17 56:20 57:1 72:9 78:17 82:24 84:4,5 88:3 89:6 119:21 126:1 128:5 130:8 139:9, 13,20 140:3, 10,13,19 141:10,15 143:9 170:24 172:20 176:7 182:21 183:19,24 184:15,23 188:1 190:24 193:18 207:22

**nursing**
52:1,3 98:25 177:6

**O**

**object**
23:11 38:13 41:18 42:5 43:8,15 54:11 59:5 60:1 62:2,19 63:4,21 64:19 65:7, 18 66:7,14, 25 67:6,20, 25 69:7,25 71:7 74:10 75:7,18 76:25 83:14, 23 84:10,20 85:3,24 87:23 88:6 92:7 93:12 94:7 100:2, 16 102:13 112:7,18 113:10,21 114:4 116:8, 22 117:8,21 118:8,17 120:17 121:12 122:5 136:15 146:17 147:8,21 148:13 149:8,16,22 150:11,20 152:18 154:15,21 155:4,25 157:7,12 158:14,21 159:4 160:2 162:13,22 163:14 164:7,17 165:4 172:18,25 176:2 178:2 179:1 194:15,22 195:9 200:2, 7,21 201:5 205:11 210:3,15,25 211:5 212:15,23 213:21 214:16 216:3 217:11,17 218:11,19

219:14 225:4 226:25 228:11 229:5,21 230:8,18 231:16 232:23 233:6 235:2,9,17 236:14 237:17 242:18 245:5 246:14 247:21 249:23 250:7 252:11 253:23 254:14 255:22 259:6,13 262:2,20,25 264:1,16 265:4 267:4 268:8 269:23 270:3,14 272:3,20 273:8 282:5, 9 283:8,22 285:19 287:25 288:6 289:16 290:16 291:2,18 293:10,23 294:13 295:18 297:1,10 298:4

**objecting**
162:24 238:18

**objection**
7:24 8:9 18:14 21:8 29:20 42:19 47:22 115:8 119:17 120:9 150:8 151:12 152:10 154:6 157:17 175:10 179:19 196:18 203:13 209:21 211:20 212:4 214:1 216:19 217:1 220:14 221:16 233:23 237:1 238:10 242:6 243:22 253:6 255:1,25 256:10 259:24 261:2 265:25 269:2,9 270:23 287:12 289:25 292:4,15,20 295:12 298:11

**objections**
7:21 21:8 70:5

**obliterated**
186:15,17

**observe**
102:8

**observed**
260:13

**obsolete**
185:13,23

**obtained**
199:15,18 206:2 272:7

**obtaining**
249:7

**obviously**
7:23 93:8 108:10

**occasion**
31:7 32:17 78:18 153:17 161:24 198:11 209:9 256:11 297:2

**occasions**
20:25 32:25

**occupation**
176:21

**occur**
14:3 41:16

**occurred**
19:23 42:15 66:4 76:21, 22 176:24 200:5 265:8

**off-load**
240:20

**offered**
138:7

**offers**
35:1 36:18

**office**
11:6 16:2,6, 11,16 23:20 24:20 25:1,2 32:8,11 126:15,16 137:5,6 139:22 145:11 189:11 256:3

**office's**
137:1

**officer**
15:6 74:6 78:21 85:10, 16,19 86:5, 6,10,11 140:10 153:9 182:18

**officers**
85:15,20,22, 23 86:16,21 87:2 144:11 181:4

**offices**
16:3,17 51:13

**officially**
141:3

**officials**
87:1

**okay**
8:10 9:12,13 12:5 26:16 40:23,24 42:25 46:12, 22 47:10 56:9 70:22 94:10 96:1 97:3 98:13 104:11 105:24 106:13 107:24 109:1 111:21 133:14,17 136:5 150:5 157:11 166:21 180:14 185:2 210:6 216:17 221:14 232:1 271:25 277:21 278:24 279:16 281:4 282:12 288:24 290:12 298:13 299:11,14,22 300:2,8

**onboard**
157:22

**once**
102:25 103:9 129:23 141:3,9

**one**
6:22 7:2,10, 11,17,22 8:18 10:11 14:15 23:18 24:12 28:6 31:8,10 32:19,23 33:7 36:8

38:8,15 46:9 51:11 52:11 54:25 56:13 57:16 60:11 76:9 81:20 85:7,23 95:12 97:1 98:9 99:22 102:25 107:13 108:7 118:3 121:5 126:22 127:1,5 128:18 130:20 136:9 156:15 158:7 167:24 169:3 177:7 180:25 182:9 187:4, 12 188:4,5, 19 189:3 190:4,5,7 191:5,20 195:10 197:13 198:19 207:17 209:13,15 210:7 214:24 221:12,14 222:25 223:3,5,18, 20,21 231:22,25 236:23 238:20 243:13 248:4 252:18,20,25 255:16 257:8 267:19 268:18 271:23 277:8 278:21 281:4 283:12,13 298:10,15,16 299:18,25

**ones** 254:15

**ongoing** 151:7 171:13

**opening** 53:1,11

**operate** 145:5 172:10 174:1

**operated** 28:17,19

**operating** 75:25 89:2 114:14 195:15 218:1 294:7

**operation** 28:22 52:17, 25 54:2 57:21,24 60:13 84:9 88:9 90:8 177:25

**operational** 52:19 53:7 58:2 89:20 170:19

**operations** 28:19 33:2,4 54:1,8 67:14 76:4 89:16 90:6,17 95:14 165:6, 13 176:9 189:13,14 208:14 224:12

**opine** 150:22

**opinion** 211:7,12 263:24,25 267:6 297:11,15

**opportunity** 34:2 63:14, 17,18,19 70:8 101:17 111:6 148:2 151:21

191:20

**opposed** 32:2 47:8 89:21 99:23 181:22 253:5 282:25

**opposing** 275:1

**option** 120:1 177:8

**options** 147:6

**oral** 95:14 100:19,21 101:11 105:11 111:10 143:15

**order** 6:15 8:3 44:19 45:6 49:20 53:15 57:18 66:12 67:17 76:21 79:1 80:2,5 100:6 103:7 104:7,22 106:10 115:21 122:19 198:9 199:17 200:9 202:15 225:17 243:6 265:22 298:16

**ordering** 80:4,9

**ordinary** 75:24

**organization** 61:16 62:9

**organization's** 60:12

**orientation** 141:8,16,20

143:5,7,10

**orientations** 142:4,6

**original** 96:12,19

**originally** 282:24

**Orleans** 164:3,24

**osteopath** 25:5

**osteopaths** 25:23 26:12

**outbreak** 81:21

**outbreaks** 169:6

**outcome** 5:9 69:2 106:25 107:9 187:7 198:5

**outlined** 140:22

**Outlook** 272:17

**outside** 4:12 70:6 116:25 118:8 197:19 235:6 236:20 290:17

**overhear** 21:10

**overlap** 274:8

**overlay** 65:25

**oversaw** 30:1 189:18

**oversee** 21:9 28:6 77:14 89:16 90:5 93:8 187:24 217:22

**overseeing** 215:14

216:22
**oversees**
212:11
**oversight**
29:12 163:9
**ownership**
54:4,5
**oxygen**
51:9 145:20

**P**

**p.m.**
53:5,7,8 180:7,10 234:16,19 281:22 282:1,14 290:25 291:14 300:18,19
**Pablo**
234:23,25 235:12 283:1 286:25 290:10,24 291:11 299:6
**Pacific**
76:10
**pack**
145:15,21 203:7
**page**
7:4 38:9 53:24 130:21 135:4 137:25 231:23 249:3 261:20,21 272:18 276:5,13,24 278:21 299:4
**pages**
7:3 138:1,2
**paid**
44:11 130:8, 11
**pain**
109:15,21
**PALS**
143:13 202:9
**paper**
37:7
**paperwork**
51:20 87:21 88:2
**par**
196:2
**paragraph**
43:1,6 224:19 226:4 247:8
**paralegals**
132:6
**paralysis**
113:17 114:20
**paramedic**
226:6
**paramedics**
219:21 228:14,19
**parameters**
116:16,18 179:5 232:13
**parcel**
65:4
**Parejo**
97:9 101:25 188:14 189:12,16, 17,22,25 190:2,5,15 193:11 194:2,6 195:10
**paresthesia**
113:9
**part**
4:20 12:20 15:7 16:7 36:1,22 37:6,24 43:11 44:17 51:5 54:1 65:4 67:14 74:25 81:5 93:22 105:1 106:1 108:11,20 113:4 114:1 123:14,22,25 125:1,3 128:10,11 135:16,20, 21,23 136:4, 8 137:1,16 145:22,24 146:3,9 153:12 167:6 179:21 189:25 199:6 201:23 202:5 227:15 232:20 237:19 247:18 248:23 264:14 266:4 270:20 279:22 280:23 289:1,19 294:6
**partially**
17:6
**participants**
4:7,18
**participate**
17:15 19:2, 8,22 21:12 29:5,12 87:19 163:11 176:9 179:12 208:22 254:25 294:17
**participated**
17:20 37:17, 19 296:12,18 297:18
**participating**
17:3,7 24:23 192:25
**participation**
28:21 29:7, 10 88:18 176:7
**particular**
7:21 55:14, 18 56:11 60:20 65:13 72:20 88:17 89:1 104:23 126:5 131:13 132:25 166:4 188:13 196:24 237:10 253:9
**particularized**
265:15
**parties**
6:1 300:21
**partitions**
49:8
**party**
5:7 80:18 90:14 233:20
**pass**
95:15 97:4,6 98:3 109:4 122:20,23,24
**passed**
143:15
**passenger**
13:2,4 17:18 19:19 39:10, 15 41:15 42:3 43:1,20 45:8 48:16 50:1 61:21 64:15 69:3 91:25 112:5 162:10 165:18 203:9 204:19 205:9 206:16 207:6 209:18

296:19 299:2
**passengers**
35:2 38:6 39:6 41:25 42:7,18,22 43:11,20,25 48:23 50:22 79:10 80:25 81:5,8,19 82:10,20,25 83:4 85:2 91:2,21 92:4,6 112:9 114:16 177:18 179:17 206:2,12 235:11,15 239:8 296:12,23
**passengers'**
82:16
**passing**
97:6 98:6 137:24
**past**
13:18 25:17 274:1
**pathway**
120:18
**pathways**
109:10
**patient**
44:23 49:4, 17 51:8,10, 17,18 53:15 64:4 69:3 77:8,10,17, 19 81:15 83:17 92:21 93:4,5,10, 13,14,15,20, 22,23 95:12 97:18 106:15,19,24 107:6,9 108:24 109:4,6,8, 13,14 110:14,23 111:9 112:20 119:3,5,14 120:8,21,22, 23 121:4,23 122:4,7 123:17,18 145:19 147:17,19 148:12,16, 17,23 149:4, 6,10,23 150:3,16,19 151:7,11 155:11,21 156:9,14,21, 24 157:19 158:12 160:11 161:13,18,22 162:4,16,18 163:4,12,19, 23 164:1,3, 15,21 165:21,22,23 170:2 177:21 180:2 184:6, 12 187:4,8 197:8 198:3 199:2 200:9, 11,15 204:23,24 205:1,5 209:9 210:11 211:9,16,18 212:14,17 215:8,21,22 216:6,7,9 217:2,3,4,7, 15,18 218:3, 16 219:8,9, 15,22,24,25 220:9 221:2, 5,9,25 222:6,24 223:16 224:14,22,24 226:15 228:15,24 232:12,16,25 233:10,17 234:3,4,9 236:12,19 237:6,15 240:19,22,23 241:3,5,13 244:1,22 245:8,15 247:23,24 258:20 259:21,25 260:1,16 261:13 262:10 263:21 264:15 265:24 266:19,25 268:10 276:22 290:21 292:1,12,13 293:7 297:7, 14
**patient's**
44:25 63:23 64:6 120:24 165:22 183:19 187:2
**patients**
51:20 52:9 61:8 89:14 91:4 108:16 112:22 114:15 155:9 198:5 199:4 209:12 212:22 213:1 225:19 235:15,23 253:17 266:7 267:14,24 268:1,4,6,10 297:23
**patient{sic**
123:12
**pattern**
77:14
**Paul**
4:1 5:9 255:23
**pay**
80:14 202:10 207:24
**payment**
130:13,14
**payroll**
134:7,10
**pays**
57:3 80:10, 24 247:19
**PDF**
299:7,9
**peace**
159:16
**pediatric**
34:3 123:10 144:4 174:12 294:22
**pediatrics**
25:12,14,20 26:1
**people**
23:17,22 27:18 38:11, 16,20 39:7 50:6,7 60:22,25 62:20 72:1 84:11 85:5 95:13 105:23 113:6 115:16 125:5 143:15 148:22 154:1 156:11,13,18 162:1,7 171:12 172:12 183:9 185:10 205:23 250:12 255:17
**perceived**

278:11
**percent**
16:18 122:21
**percentage**
16:15 122:19
**Pereira**
96:13,19
102:4 129:20
130:22
131:4,8,14,
21,22 132:20
133:18
134:3,19
135:8,15,21
138:14,16,
20,23 139:5
166:3,12
167:1 176:16
181:21 199:9
203:6,8
204:4,7,8,11
215:13,19,25
216:12
218:16 219:8
264:8 283:6,
13,15 284:4,
11 285:6,11,
20,24 286:4,
17,22 287:1,
3,5,7 288:2,
10 289:7
**Pereira's**
133:11
136:14
138:1,4
282:21
**perfect**
295:15
**perform**
34:10 45:13
59:8 213:17
214:10,14
**performance**
175:24
176:5,6,13,
14,25 193:5,
8,14 194:4,
5,14 195:7
196:13
202:13
**performances**
193:24
198:16
**performed**
140:25 193:4
**performing**
175:25 196:8
213:24
214:15
294:11
**performs**
77:17
**period**
26:11 130:13
168:25
264:18
**permanent**
59:18
**person**
8:17,20 10:1
21:24 35:22
48:15 50:11
75:22 94:17
98:6 111:23
123:1,5,8
124:18
150:6,7
157:13 158:9
162:3 180:25
207:5 211:17
224:13
226:19
250:21
273:14 274:2
277:13,20
284:5
**person's**
111:5 114:7
124:10
139:23
**personability**
123:6
**personal**
25:17 27:14,
16 195:14
**personally**
33:12 277:22
**personnel**
22:2 45:11
48:17,24
50:10 51:14
63:1,10 78:7
79:15,18,19,
23,25 87:21
88:13 112:15
113:1 114:17
115:4 120:6
125:9 126:19
146:14 183:4
198:15 210:2
239:6 249:22
256:21
**perspective**
29:8,12
36:17 208:20
216:11
**pertain**
127:10
**pertinent**
111:11
**Philippines**
126:16
**phone**
157:21,22
158:8 183:21
197:9 205:19
230:6,17
231:9,12,13
233:1,5,13
245:10
286:4,5,6
287:5,22
289:6
**phones**
232:15 233:2
**photograph**
47:14,17
48:3 51:6
52:16
**photographer**
48:9
**photographs**
47:24 48:2
**physical**
44:24 63:24
**physically**
91:23 179:25
**physician**
23:18 24:2
26:23 31:9
74:25 93:5
94:14,16
99:3 120:3
121:11
150:25 152:1
153:6 160:10
175:16 176:4
188:17 193:6
194:3 212:1
215:7,9,24
217:19 218:5
224:20
245:12
283:17
285:7,11,13
286:1,12,24
287:6,11,15
**physicians**
26:4 31:11
71:17 90:11,
15 96:25
115:20
122:10
143:21 175:2
187:21
231:19
239:13
**pick**
64:14
**picked**
281:17
**picking**
234:21
**picture**
48:19
**placards**
115:14
**place**
95:19 105:9
128:20
133:12 180:3

241:2 242:3 246:23 248:3 252:17 283:21 284:8 285:22
**plaintiff's** 40:11,12,14, 16,19 59:22 60:3 281:10 290:2,4 299:9,15,23 300:3,9
**plan** 188:24 189:4,8 197:24
**plans** 17:7 61:1
**plants** 48:13
**play** 108:5 153:12 237:3
**please** 5:10 12:5 16:25 18:20 47:7 49:1 129:12 159:15 166:15 228:7 261:17 262:7 267:2
**pleural** 244:13
**point** 13:22 14:18 48:10 50:3, 11 53:19 66:22 68:19 69:12,14 74:19 99:7 101:14 106:4 110:18,25 161:25 167:8 169:9,10 172:5 177:14 184:10 185:14,23 190:2 191:25 192:18 202:19 204:8,15 216:5 218:13 235:7 245:2 248:17 250:23 273:8 277:7,25 278:18 285:15
**pointed** 36:14
**pointing** 128:16
**points** 190:4
**police** 95:11 123:7 124:4,6
**policies** 17:24 96:15, 16 128:14 143:22 144:5 152:12 153:1 173:18,25 178:3,16 179:7,15,22 184:5 192:1, 5,13,20,21 245:15
**policy** 30:4,6 72:6, 25 152:20 192:19 216:16 227:1 248:1 250:15
**poor** 49:16 194:25
**poorly** 101:14
**popping** 221:1
**population** 145:2
**port** 42:9,16,21 43:25 73:12 135:5,8,17, 24 136:2,6, 10 138:9,10 144:10,23 148:10 149:3 150:15 151:17 152:2,17,25 153:10,19 154:1 156:17 159:13 160:8,17,18, 21 161:7,21 162:11,20 164:2,3,24 165:19 213:5,9,14, 15,17,25 214:7,9,14 217:3,9,10, 20,23 218:2, 5 220:22 224:4,12,17 225:6,10,15, 19 227:3,4,8 228:21,22 229:6,10 233:25 234:5,7,12, 13 236:3,6, 11 237:11,20 238:4,23 243:15,19 244:5,21 245:1,3,6,9, 21 246:3,17 247:1,19,24, 25 248:1,4 249:8 250:6, 15,17 251:15,22, 23,25 252:2, 8,9,14,15,20 277:19,20,24 280:20 287:13,18,21 288:2,9 289:7,11 292:14
**ported** 236:10
**porting** 227:7
**portion** 7:8 47:17 48:5 65:11 95:10 129:18 137:20 247:1 268:20
**portions** 126:11
**ports** 153:17,25 154:5 226:1 238:22
**posed** 199:14
**position** 14:14 15:20 23:7 24:14 28:1 34:21, 23 50:12 182:13,23 187:6 188:7, 10,11,23 224:14
**positions** 23:12,24 171:10 180:13
**positive** 225:14 291:20,21
**possession** 288:21 289:15
**possibilities** 109:17 158:8
**possible** 7:24 33:9 77:16 113:19 115:2 119:8 151:20 153:23 210:13

218:22 237:13 240:22
**possibly** 33:6 113:5 121:15 151:19
**post** 168:23
**posted** 52:25
**potential** 36:4 37:25 94:25 113:8 115:12 116:6 117:20,23,24 120:15 178:23 190:6 196:12
**potentially** 114:22
**power** 85:22 151:10 183:4 241:16
**practical** 144:13 146:8 224:12
**practicality** 184:17
**practice** 93:5,23 97:13 100:17,18 113:4 124:21 155:19 175:21 177:22 196:23 197:16 202:6 267:18,24 268:2 293:18
**practices** 179:8 201:24
**practicing** 100:4 175:16 294:24
**Pratt** 5:6
**precedent** 179:7
**precluded** 45:18
**predict** 104:13
**predominantly** 176:25
**prefer** 211:12
**preferable** 183:8
**preliminary** 13:13 68:15 100:25
**prep** 11:17
**preparation** 7:13 11:25 185:5 273:10
**preparations** 62:22
**prepare** 9:3 11:3,11 224:14
**prepared** 7:15 8:17 10:19 11:6, 19 69:9 81:3 95:1 183:22 204:24 273:22
**preparing** 24:22 235:24
**prerogative** 42:11 181:11 199:1
**prerogatives** 86:3
**prescribe** 81:4 103:17
**prescribed** 81:22,24
**prescribes** 81:13
**presence** 4:12 16:10 38:9
**present** 9:24 20:8,11 39:11 110:10 111:15,19 117:23 123:7 151:7 162:6 197:17 198:12
**presentation** 111:2 113:5 120:11 121:16 153:6
**presentations** 36:6 111:15 113:3 117:24
**presented** 7:19 114:2 116:1 123:12 145:6 244:3 260:2
**presenting** 49:6 260:19
**presents** 106:15,24 110:25 111:1 115:2 149:10 153:3 177:23 210:11,18 264:17
**preserve** 8:10 104:4
**pressure** 44:25 45:4
**presume** 84:8
**presumptively** 286:24
**pretending** 145:23
**pretty** 23:23 100:20 104:17 184:2 205:4 262:9 295:23
**prevent** 50:6 178:22
**prevention** 169:6
**previous** 160:21 199:3 264:5
**previously** 11:23 15:2 124:14
**price** 82:23
**prices** 83:8
**Pricilla** 276:14
**prime** 242:3
**print** 64:24 91:10 272:17
**printed** 92:19 277:2
**printers** 52:2
**printout** 272:15
**prints** 272:18
**prior** 64:5 199:8 251:16,18,19
**priority** 258:20
**privacy** 61:11
**private** 4:10 49:13 50:2 51:13 251:24 252:13,17,21 253:3 289:17
**privilege** 199:16,19 284:18,21,22 298:8

**privileged** 203:15 255:11
**privy** 36:11
**probably** 35:25 197:8 204:1 207:12 237:2
**problem** 32:4 49:21 70:12 103:13 107:7 142:15 195:7 196:12 234:4 276:2
**problems** 160:14 191:22
**procedure** 41:23 72:6, 25 77:7 105:1 106:2 107:15 145:10,25 161:3,4,5,9 181:16 210:13,14 215:20 218:1 224:19 232:20 233:18
**procedures** 29:24 30:1 32:1 43:3,13 64:1,17 71:14 76:19 95:18,23 104:9 105:2 121:11 128:1,14 142:20 143:3,25 144:6,9 161:3 168:9 173:18,22,25 178:4 179:15 183:16 184:6 187:14,18, 20,22 188:1, 3 192:13 201:24 216:15 243:14
**proceed** 94:18 103:10,11
**proceeding** 101:14
**proceedings** 4:8 5:11
**process** 25:18 29:3 30:5 94:10, 13,14,19 95:23,25 96:7,25 97:5 102:8 103:14,17,23 104:12 110:18 116:2 122:15,25 123:13,14,23 124:1 125:2, 3 128:10,11, 13 139:9,15 141:6,23 155:10 159:11 160:6,13 161:11,15 171:13,17,18 179:21 213:1 245:14 247:13
**processed** 128:7
**processes** 109:11 179:4
**produce** 111:14 273:11,21
**produced** 6:5,7 10:17 60:25 75:14 131:20 258:8 274:17 291:3 298:17
**product** 57:13
**production** 6:2 137:8 300:6
**profession** 25:25
**professional** 4:2 174:15 240:11,15
**professionally** 172:15
**professionals** 174:15 247:11
**profit** 83:12,19
**profits** 84:3,7,15 85:1
**program** 17:2 30:24 57:11,19 58:18 60:9 61:4,23 65:17,23 66:6 69:24 71:6 74:16 76:2 118:11 125:16,21,24 126:2,10,11 129:3,4 137:5,6 141:22 142:22 190:25 192:19 208:5 240:14 254:11 286:8
**programs** 175:15 190:9 208:6 231:8
**progression** 120:12 148:17
**prohibit** 177:17
**project** 279:16
**projected** 133:25 134:16 136:1
**promise** 106:20
**prong** 110:1
**pronounced** 277:18
**proper** 51:25 118:23 123:19 142:19 162:16 178:17 179:4 203:8 235:1 293:20,22 294:24
**properly** 34:6 43:2, 12,21 44:1 78:8,14 79:2 80:5 295:1
**property** 167:19
**proposition** 209:25 210:10
**proprietary** 103:14,19,22 104:1 106:6, 21
**prospective** 97:4 98:10 101:10 102:21 110:20 111:22
**protective** 104:6
**protocol** 152:7,23 260:6

**protocols**
60:22 168:1, 13 173:19,22 191:15
**proud**
41:24
**provide**
20:23 21:2,3 33:17 38:6, 10 39:5,7,12 44:19,20 45:7 54:15 86:2 90:22, 25 91:2 95:8 106:23 142:2 143:20,23 147:12 148:2 149:25 152:2 165:7 178:3, 11,24 183:4, 18 203:8 209:17 216:8 226:2 228:23 239:21,24 240:16,18,20 242:1 244:21 245:12 250:13 252:15 253:10 256:13 265:13 266:10 268:9 284:19 288:17 289:1 291:24 293:20 294:6,19 295:1,16 297:12
**provided**
21:4 31:1 36:6 37:9 45:5 47:24 54:19,21 55:6 82:24 83:4,9,13 91:8 92:23, 25 98:4 176:4 179:21 204:20 205:7 207:8 219:4 229:7 243:7 244:2 266:2 267:10 268:11
**provider**
209:8 230:17,24 231:6 251:16 252:8,18
**providers**
80:22 83:21, 24
**provides**
36:3,25 37:4 56:25 57:8 83:15 117:2 179:3 232:2
**providing**
13:20 17:5 36:2 47:3 58:4 174:10, 19 175:7 187:3 226:18 240:11 292:25 293:22 294:11 295:8
**provision**
44:12
**prudent**
39:7
**psychiatric**
119:23
**public**
4:3 17:1,2 24:22 36:12, 13 38:4,8 65:22 66:16 86:25 115:15 142:1 169:13 228:6,10 254:7,9
**Puerto**
215:18 216:2,24 227:15,18,23 228:3,6,9 229:2,18 233:12 242:3,12 244:18
**pull**
59:20 68:23 136:18 240:3 251:6 257:12 261:22 264:20 278:22 279:2
**pulled**
41:4
**pulling**
182:23 185:2 268:19
**Pullmantur**
28:16,17,25 30:5,23
**pulse**
282:2
**punishment**
208:25
**purchase**
38:11 80:18
**purchased**
44:7,9,11
**purchasers**
36:4 37:25
**purely**
19:8,12
**purpose**
4:13 13:20 32:21 38:19 53:13 80:13 114:11 128:23 190:5 233:1 256:22 277:4 280:8
**purposes**
19:9 38:8 41:2 51:1 52:24 72:13 76:3,15,18 87:7,17 88:3 90:10 101:8 108:10 126:18 128:1,4 129:1 133:19 134:10 135:14 141:15 161:5 186:21 198:6 214:13 222:19 224:12 256:16
**pursue**
27:20,21
**pursued**
27:24
**purview**
81:2 166:2
**push**
4:21
**put**
6:1 7:25 22:15 46:15 66:19 69:15 82:2 105:8 166:16 171:10,21 187:12 251:9 258:11 291:20 298:20
**puts**
39:14
**putting**
225:13,14
**pyramid**
180:15

**Q**

**qualifications**
175:1 183:7
**qualified**
166:7 265:18

272:13
**quality**
46:1,6 72:12 173:15 174:21,23
**quarantine**
168:25 169:1 185:11
**quarterly**
33:6,9 72:17
**query**
111:2
**question**
8:4,5,22 18:19 19:11 23:2 30:16 31:3 37:2 38:15 49:16, 17 60:19 62:3,4 63:6 64:24 68:25 69:1 71:25 72:5 75:12 78:9,22,24 81:3 83:1 85:4 88:7 92:21 93:25 104:4,5,15, 16 106:7,9, 10,11 107:16 108:7,12,19 113:11 117:6 120:2 122:13 123:21 125:6 135:18 147:2,11 149:19 150:13 152:19 158:10,11,22 159:5 162:23 170:7,13 175:3 178:20 179:2,23,24 196:22 199:11,12, 13,17,20,21 201:25 216:13 218:13 223:2,3,10 227:3,15 230:10 242:22 246:9 251:5 256:18 257:10,20 258:24 259:22 261:24 274:20 275:21 282:20 284:16 291:8 293:11 294:3 295:24
**questionable**
197:3,4
**questioning**
203:5 209:3 272:21
**questions**
5:25 8:8 33:15 40:23 70:17,20 88:11 97:10, 12,23,25 99:4,5,6,17 100:6 103:21,24 104:11,15 105:10 107:21 114:10 123:21 127:9 132:7 159:12,17 169:12 178:15,21 194:17 195:2 214:3 223:25 248:14 272:24 273:14,16,23 274:12 281:18
**quickly**
218:21 236:12 263:20
**quite**
18:4 37:18 59:12 114:24 115:18 177:11 181:9 200:24 243:3,6 256:4
**quiz**
101:9
**quote**
181:1

**R**

**radius**
238:4
**raise**
8:8,9
**raised**
7:21
**random**
196:2,5,9,11
**randomized**
195:19
**range**
50:22 54:18 55:10 64:14
**rank**
85:10,12,13 86:1 180:21
**ranking**
85:22 140:7, 10,11 182:19
**rare**
197:9
**rate**
282:2
**rates**
83:3
**RCCL**
13:2 23:1,3, 9 73:25 76:3 79:16 144:8 268:24
**RCCL's**
71:14
**RCL**
232:2 249:17 251:16,18,20
**re-sign**
193:15
**reached**
21:21 106:4
**react**
100:20
**read**
12:12,14 38:16 41:11 60:13 61:17 62:15 70:24 194:7 215:10 284:9 300:12
**reading**
133:18 168:15 169:15 243:24 263:2 270:1 300:20
**reads**
41:7 107:10
**ready**
132:14 166:17 169:12 246:11 247:2
**real**
108:16 145:9,14,19, 23 146:5,11
**realistic**
238:16
**realtime**
58:17,20 59:3 60:13, 17 61:17 62:10 67:10 71:16 151:20 152:1

**reason**
14:5 33:1 65:14 229:13 269:20 270:7 290:25 291:15
**reasonable**
122:9 161:1 183:18 225:16 238:4,20 263:5 293:6
**reasons**
61:11 245:18
**reattach**
117:10
**reboarding**
162:1
**recall**
10:5 20:15 24:10,17 191:10 200:18 220:11,13 222:15 266:9
**receipt**
281:15
**receive**
23:1 25:7 85:13 87:6 207:12 280:23
**received**
37:12,14 205:23 216:1 281:14,16 283:17 291:10
**receiving**
160:10 215:23 216:8 217:19 218:4 245:12
**recent**
238:24
**reception**
145:11
206:1,18
**recert**
25:19,21
**recertification**
26:11,14 175:14
**recertifications**
34:18
**recertified**
25:17
**recess**
22:20 73:21 125:13 180:8 234:17 275:14
**recognize**
114:18 115:1 127:18 198:21 212:16 214:24 282:7,10
**recognized**
144:2 175:14 211:9 224:13
**recollect**
37:13
**recommend**
103:23 236:7
**recommendation**
218:3 237:12
**recommendations**
124:16 173:25 217:4 241:8
**recommends**
170:3 237:21
**reconnected**
58:10
**reconstruct**
107:13
**recontract**
193:15
**record**
4:7,10,14 5:12 6:1,2 7:18,25 22:18,21,24 46:21 59:1 65:2 73:19, 22 75:5 76:12,23,24 77:13 106:3 124:6 133:10,15 142:15 168:23 180:6,9 201:6 205:21 220:12,16 224:3 234:15,18 246:6 247:2 261:18 262:6,11,13 263:2 265:7 266:8 272:8 280:22 281:2,16,25 283:20,23 284:1,2,9,25 285:2,9 290:6,14 291:4,5,6,24 296:6 298:21 299:5 300:17
**recorded**
4:8,9,23
**recording**
172:22
**recordkeeping**
59:7 231:13
**records**
6:7 34:14 59:16 60:18 61:7 65:13 71:16,19,23 72:2,3,8,12, 18 74:1,4,24 75:13,14,16, 23 76:9,20
93:9,20 96:17 168:7, 14 185:7,14 195:21,25 197:4 200:12 220:5 235:21 244:25 246:5 256:25 261:14 270:5 272:10,23 280:17 281:10,14 284:6,10 285:2 286:5 287:22 288:17,18 289:18 291:22 298:7
**redact**
137:2
**reduce**
212:2,13,21
**refer**
43:11 49:25 61:21,25 74:22 125:19 192:8 231:23 246:15 249:4 271:11,21 287:1
**reference**
262:9
**referenced**
245:1,2 298:18
**references**
37:13 168:19 247:16
**referencing**
270:25
**referral**
61:15,19,22, 25 62:8,11, 13,15 63:3, 16 222:2,6, 12,17 223:6, 7,22 262:15

**referrals** 64:7 185:22, 25 186:12, 16,19
**referred** 168:18 185:8 187:16 239:3
**referring** 20:21 62:11 91:9 115:14 141:10 176:18 188:20 189:1 219:18 231:20 232:7 241:1 281:23 284:1,13 285:3 286:12
**refers** 268:25
**refused** 204:11,14
**regard** 6:16 34:17 37:15 61:19 71:14 73:3 88:11 93:11 94:20 116:18 130:16 143:16,21 178:6,23 183:15 192:6 199:9 225:2 245:3,22 249:5 251:22 256:19 266:11 267:11 285:6 296:1,15
**regarding** 6:2 179:15, 16 275:17,22 278:17 289:11
**Registered** 4:1
**regular** 54:2 55:2 66:11,18 89:20 102:24 122:24 181:3,8
**regulations** 61:12
**rejoin** 243:6 244:22
**related** 5:7 13:10 20:2 67:15 108:21 127:13 169:5 191:11 207:14
**relates** 58:23
**relating** 99:8
**relations** 36:12
**relationship** 14:7 15:23
**relatives** 243:17 244:13
**relay** 225:15 287:21
**relayed** 42:18 93:2, 19 193:20
**released** 156:20
**reliable** 177:11
**relied** 228:21
**relies** 155:16 294:4
**relieved** 134:25
**relinquishes** 216:6
**rely** 78:6,13 90:14 153:18 162:6 177:9, 11 226:1 234:8 238:4, 22 265:19 288:16
**relying** 55:24 175:11,13 266:5,8
**remain** 53:14 208:24 250:1
**remaining** 27:19
**remains** 249:18
**remark** 262:6
**remarkably** 42:6
**remember** 19:25 23:22 24:13 26:19 70:1 136:19 139:8 197:10 200:23 207:9 219:21,22 246:7 255:19 256:4 296:22 297:25
**remembering** 256:2
**remote** 4:12,22,23 5:6,11 40:21 281:5
**removal** 163:12
**remove** 4:16
**removed** 99:3
**removing** 221:18
**render** 297:15
**rendered** 64:21 84:4
**reopens** 53:5
**rep** 70:17 81:3 273:20,21
**repatriated** 244:22
**repatriation** 61:15 62:8
**repeat** 123:21 150:13 151:2 256:18 277:2
**repeatedly** 121:18 250:2 267:12 272:9,22 273:9
**repetitive** 276:25
**replace** 27:25 28:3
**replaced** 28:2 99:4 126:8
**report** 34:12 66:9 67:9,11 123:8 140:13 160:11 182:15 204:24 205:15 215:23 222:18 223:5 279:1,7,11, 24
**reported** 158:2
**reporter** 4:2 5:9,14 40:8 275:7 300:13,15
**reporting** 167:15

**reports**
24:22 66:1, 18,21,22 67:1,10,15 167:3,11 168:23 180:18 185:7,12 257:3

**represent**
40:20 41:4 86:25 281:13,15 291:9,10

**representation**
13:21

**representative**
4:24 5:25 6:11 14:12 36:17 69:11, 13 70:2 84:24 128:23 150:23 273:15

**represents**
9:5,10,12,15

**reproduced**
84:8

**request**
47:9 67:2,4 79:23 206:7 220:3 225:9 226:5 246:10,12 271:15 276:13 280:23

**requested**
65:21 96:8 180:1 183:24 213:18 214:10,14 246:8 275:23

**requesting**
225:5 270:11 276:11

**requests**
66:8 184:14, 17 247:20,22

**require**
42:10 56:17 72:1,2 73:17 144:1 170:4 177:18 201:10 202:14 210:11 226:16

**required**
25:21 45:12, 15 53:14 66:16 76:19 128:7 129:1 143:8,11 145:21 159:24 171:8 181:19 183:6,18 187:9,18 192:8 202:5, 7 225:16,24 244:5,11 245:14

**requirement**
79:13 170:17 177:20 178:19 243:25

**requirements**
17:23 18:4 142:18,21 175:19 178:18 179:16 181:9 184:9 214:20

**requires**
150:22 160:15 201:17 202:3 271:7 297:11,12,13

**requiring**
160:14

**research**
153:13 154:4 238:8,14,21

**resolves**
222:13

**resource**
94:15 98:4 126:16 134:11 160:22,23

**resources**
87:15 88:1 95:3,7 96:22 119:20 123:5 125:5,12 126:11 129:14 130:1 134:7 150:5 153:7,14 204:17 255:10

**respect**
86:3,17,21

**respiration**
282:2

**respond**
88:22,23 101:19 169:12 214:21

**responding**
277:19,20

**response**
147:13 160:24 226:6 291:11

**responses**
11:19 277:24 283:13

**responsibilities**
15:1 16:20 20:19 23:9 31:13,21 32:1 33:7 140:19 167:24 181:15 184:2 185:1 187:13 190:8 217:19 247:9

**responsibility**
33:8 81:2 174:19 181:7,12 183:15 184:5 185:5 187:5 188:15,23 189:8,10 211:22 225:2,11

**responsible**
17:1,3,5,6,7 29:18 144:11 146:25 147:1 164:14 168:7 189:20,22 192:24 196:20 208:16 213:24 214:15 215:7 216:7,12 217:6,10,14 224:8 289:3 298:7

**rest**
8:3 105:3 130:5 155:23 270:5

**restate**
164:18

**restaurant**
54:10

**restock**
79:24 80:10

**restriction**
61:11

**restrictions**
61:3

**result**
68:17 134:20 201:11 204:5 296:25

**results**
98:3 168:21 170:23
**resume**
295:6,7
**resuscitation**
226:17
**retained**
96:19 197:19
**retention**
96:15,16
**retirement**
27:13
**retraining**
202:8
**return**
19:1 24:23 160:20 163:4 165:23 254:4,5,17 265:2 266:13 267:2
**reveal**
18:16,20 103:22 106:18 107:8 109:5 111:12 199:17
**revealed**
136:25
**revealing**
284:16
**reversal**
117:13
**review**
6:19 7:10 10:12,20 11:5,6,8,22 12:9,15 17:6,10,15, 20 18:2,6, 11,18 19:17, 21,22,24 33:15 60:17 61:1 71:23 72:8,11,17 78:18,19 79:19 94:15 95:7 98:5 123:5,6 143:22 144:7 152:19 170:18,22 176:3,10,13, 14,25 178:11 193:4,5,14 194:3,5 195:17,21,24 196:12,24 197:3 198:9, 16 199:25 200:12 201:8 202:8,11 207:3,13 221:17 222:3 254:5,7,21 261:14 265:7,9 266:1,2,16, 21 272:10 274:5 280:17 284:6
**reviewed**
6:23 7:12 10:14,16,18 11:19 12:7, 24 20:1 41:2 74:1 135:20 176:21 196:10 199:2 200:10 208:14 219:5,15,19 246:5,6 264:14 276:4 278:12 282:17 288:9
**reviewing**
17:4 24:21 78:17 100:17,18,19 129:5 138:5 177:10 195:20 219:2
**reviews**
17:17 34:5 95:4 98:3 175:24 176:5,6 193:9,24 194:4 206:20 208:19
**reward**
208:25
**Rican**
229:2,18
**Richard**
5:4 12:15,19 13:2,4 267:20 291:16
**Rico**
215:18 216:2,24 227:15,18,23 228:3,6,9 233:12 242:3,12 244:19
**rid**
186:15
**right**
10:3 12:25 41:7,15 43:2,12,21 96:15 127:8 132:4 154:22 159:3 167:9 185:14 188:9 194:5 197:23 199:21 207:19 220:6,22 227:14 233:7 249:3,9 253:1 258:22,25 261:20 275:4 277:8 279:3 281:15 289:1,2 298:15 299:19 300:11
**right-**
4:21
**rights**
39:16 40:16, 20 299:2
**rigid**
53:14
**rise**
111:4
**risk**
254:6,22,25 255:9 256:9
**Robles**
277:16,17 278:1,2,4,7
**Roderick**
5:5
**role**
14:5,17 31:22 144:17 162:20 164:6,12 165:1 181:6 182:3 192:25 237:3 247:9
**roles**
15:1 140:18 181:15 183:14
**room**
49:18 51:3, 7,16,17 173:4 185:17 206:23
**rooms**
51:4,10,22 54:6 185:18
**rose**
205:16 207:14
**rotates**
89:8
**rotating**
98:14

**rotation**
21:16,18 22:1,6,9 23:1 24:2 89:10

**rotational**
56:10,20

**routine**
33:19 51:20 153:18 193:25 253:21,25 254:3

**routinely**
64:20

**Royal**
4:24 5:5,25 6:4,6,7,10 9:1,5,7,9, 10,11,12,15 13:4,15,17, 19,23 14:8, 9,14,21,23 15:2,18,21 16:2,6,16 21:14 22:3, 4,5,12 27:1, 7,20 28:5,7, 9,14 29:2,4, 18,19,24 30:9,18,22 31:4,5,12, 18,19,23 32:1,5,9,15, 18 33:16,20 34:19 35:1, 4,8 36:1,8 37:8 38:2,5, 11,20,25 39:4,14 40:1,5 41:5, 23 44:7,10 45:5,13,23, 25 48:4,6,22 50:20 52:19 54:4,14 55:21 56:9, 25 57:3,22 61:3,10 64:16 65:12, 17 66:4,11 67:14 74:3 75:24 76:8, 18,23 78:6 80:14,17,19, 21,23 81:1, 17,23 82:5, 9,12,20,23 83:2,6,7,11, 15,20 84:2, 15,18 85:14 86:25 87:2,7 88:12,21 90:11,14,18 91:2 93:18 94:3,11,13, 16 96:4,9,24 97:19 99:21 100:12,13,15 103:25 105:22 106:21 108:11 110:4 112:4,15,25 114:13,14,16 115:3,10,19 116:5,23,24, 25 117:2 119:1 120:6 121:9 122:2, 25 123:13,25 124:7,12 125:19 126:2,15 127:13,16,25 128:10,14 129:10,23,25 130:3,4,8,13 131:9,14,16 139:10,15,20 140:3,4,16 141:3,17,19 143:20 147:7 149:2,5,9, 13,20 150:5, 17,23 151:6, 9 152:23 153:13,16 154:3,9 155:7,13,16 157:5 162:9, 12,14 164:23 166:23 168:1,6,8 169:22 171:3,14 173:11,17,23 174:3,18 175:5,22 177:16 178:22 184:16 186:3,11 189:17 190:19 194:18 195:6 197:13 198:15 199:13 200:5,19 201:10,14, 16,23 202:2, 12,15,18 203:3,18,22, 24 204:3,9, 12,15 205:9, 23 206:13 207:11 209:11,17 210:1 211:14,15,17 212:1,6,9, 10,12,16,20, 24 213:4,9, 10,18 214:24 216:11,14 222:21 224:19 225:8,18 226:22 227:7,11,12, 22 229:23 233:18 235:11,15,21 236:6 237:24 238:1 239:6, 8 246:2,19, 21 247:10,19 248:23,25 249:20,24 250:4 251:22 252:8,15 253:17 259:20 261:1,3 263:4,12,19 264:13,24 265:12,21 266:4,5,24 267:5,6,9,19 268:5,9 276:14 278:6,16 280:22 283:6 284:13 285:10,17 286:1,11,18, 19,22 287:9 288:4,12,14, 16,18,21 289:2,15,19, 21,23 291:15 292:1,11,19, 21,23 293:2, 3,5,18,21 294:10 295:14 296:11

**Royal's**
182:7 265:17 285:12

**Ruben**
97:9 101:25 188:14

**rule**
31:10 68:16 115:21

**rules**
23:21 50:5 79:5,7 103:10 173:18,22

**run**
105:21

144:16 145:8 165:6,14 219:20
**rung** 180:15
**running** 53:21 79:22 80:1 89:16
**runs** 83:12 212:9 272:1

**S**

**s-i-t-r-e-p-s** 73:8
**safe** 38:11 225:17
**safety** 148:22 173:15 228:6,10
**sail** 162:4
**sailing** 135:15,22 138:13
**sake** 98:16 127:10 167:13
**salaries** 130:9
**sale** 83:8,20
**sales** 82:4,7,8
**sampling** 196:2,5,9,11
**San** 132:8 135:17,24 136:2,11 227:4,8,11 229:3 233:12 234:23,25 235:6,12 237:25 238:7,15 251:23 252:21 253:5,18 270:11 283:1 286:25 290:10,23 291:11 299:6
**sanitation** 65:23
**Sarah** 164:25
**satellite** 57:18,25 58:1,4,7,10 230:25 231:5
**satisfied** 202:13
**save** 83:16
**saved** 59:23
**saving** 226:16
**Savings** 258:5
**saying** 14:23 18:5 26:15 53:22 83:7,11 94:1 106:7 113:6 114:6 116:20 123:18 177:16 194:5 231:5 286:19
**says** 60:10 61:14 62:6 115:11, 12 150:16 164:25 167:9 168:11 169:10,11 184:11 185:4,6,15 215:5 224:19 226:3 232:2 240:8 243:15 244:2 247:6, 7,8 248:17, 18 249:6,16, 24 251:15 258:19,24 262:6,13 263:1 270:13 273:18
**scan** 68:9 245:9 262:7,8,15
**Scandinavian** 58:8
**scanned** 272:15
**scanning** 110:11
**scenario** 64:15 95:14 110:8,10
**scenarios** 102:23 103:16 110:2 111:13,18
**schedule** 33:25 89:20, 23,25 90:3 153:18 171:19
**scheduled** 273:25
**schedules** 89:6
**scheduling** 125:25 126:13,14 191:21
**scheme** 222:20
**school** 22:16
**scope** 32:14,18 54:22 69:8 100:1 116:25 118:9 212:4, 5 290:17
**score** 97:6
**scores** 172:8 175:2
**screen** 4:20 6:23 7:3 40:7 46:15,23 47:12 59:22 127:23 128:3,16,24 130:18 137:15 166:16 187:12 257:12,16 258:12 268:19
**screened** 50:3
**screens** 4:15 52:2
**screenshot** 127:22
**scroll** 7:5 52:15 129:7 130:22 188:5 261:20 271:13 278:21 283:12
**scrolled** 270:12
**scrolling** 127:20 137:25
**sea** 43:20,22 69:6 91:4,22 110:23 144:10,15,22 146:16,20 147:18 159:9,13 172:17
**Seacare** 34:16 57:14, 16,18 59:1,7

60:7,9 61:22 62:25 63:8, 11 64:9 69:10 71:16, 24 73:3 74:3,9,11 75:10,20 76:6 78:1 94:5 178:7 180:4 185:24 186:6,9 205:3 221:6, 7,9 279:23, 25 280:9 285:9 299:3

**seafarer** 137:20

**seafarers** 130:5 136:13

**seaman** 141:24

**Seas** 13:5,8 29:1, 2,9 30:11,23 47:18 50:25 52:12 55:11, 14 59:1 61:7,8 133:20 134:4 135:16 136:2 138:13,23 139:3 164:23 230:14 234:22 268:25

**second** 6:22 7:2 10:23 11:8 22:16 38:19 46:9 58:14 104:8 122:16 126:22 127:5 133:8 185:2 188:5 198:19 207:17 218:15 220:19 224:18 226:3 231:22 257:8 264:18 268:18 278:21 279:2 281:4 298:10

**second-guess** 198:1

**secondarily** 77:10

**secondary** 244:10

**secretaries** 184:7

**secretary** 182:25 183:2,3,14, 17 184:21 268:24 269:1,4,6, 11,16,19,21 279:13,19 280:2

**secretary's** 269:14

**section** 7:6 41:7 61:13 62:25 63:9,22,24, 25 64:2,3,5, 25 65:3,5,8 127:9,10,21, 25 179:20 190:7 215:5 247:5,17 248:13,18, 21,24 251:7 281:22

**sections** 41:6 63:22 178:9

**security** 60:21 61:1,2 204:25 205:1,13 257:23

**see** 6:24 7:3,4,8 16:13 33:2, 3,13 43:4 46:23 47:19 48:14,15 51:5 52:17, 23 57:15 59:2 60:20, 22,23 61:7 62:21 67:23 71:16 72:22 76:20 94:17 101:14 102:25 110:24 114:20 115:4,11 121:6 123:15,17, 18,20 126:13 127:21 129:25 130:23 136:16 137:16 138:12 148:16,17 160:4 168:14 169:15 170:20,21 187:7,12,14 190:12 191:25 192:2,8 220:22,24 224:24 240:6 248:14,16, 18,19,20 251:9,20 257:12,17 258:12,19,22 259:1 260:15 262:7 272:5 274:23 276:5,8 277:3,17 278:1,3 279:9,22 280:10 281:3,22,24 282:3,22 283:14 284:10

**seeing** 51:19 52:8 100:20 113:17 222:15 246:7 268:21 276:5 280:16

**seek** 119:4,14 267:25

**sees** 100:14

**self-catheterized** 200:11

**self-correct** 101:17

**self-evident** 34:25 104:17

**self-induced** 200:14

**send** 34:12 37:6 218:10 225:19 226:23 227:24 237:15

**sending** 227:8 236:7

**sends** 205:23

**senior** 55:2,3 131:9 143:9 145:3 153:9 166:5, 6,9,10,23 167:3,6,14, 25 168:5,6 169:11,18, 22,25 170:6, 8,15,20,25 172:2,16,19 180:18,22,25 181:1,7,10,

16,18,21 182:1,6,7,9, 12,15 208:14,18,20 254:9
**sense** 192:23 275:9
**sensitive** 116:6 118:6 151:8 262:24
**sentence** 224:24 226:4 249:4 251:20
**separate** 51:22 52:5,8 65:3 221:6 222:23 223:15 273:12 289:17
**separately** 102:2,3
**September** 133:20
**series** 99:17
**serious** 176:19
**served** 139:6 206:22
**service** 30:22,25 31:1,2 35:8 57:4,6,9,22 86:2 198:15 213:18 230:24 239:2 243:7 249:7 251:16,17,18
**services** 18:23 30:19 82:21 83:20 84:3 186:18 205:18 206:4,10 225:23 242:1 244:2 247:19
248:16 249:15 250:2 251:8 252:16 253:10 256:13
**servicing** 23:21 185:18
**session** 10:12,22 11:8,9,14, 17,22
**sessions** 11:18
**set** 52:19 53:13 88:25 98:14 118:15 173:17 188:1 190:15
**sets** 79:5 82:23 83:3,8
**setting** 4:16 29:5,8 61:4
**seven** 7:22 27:8 55:9 69:22 227:10 274:1,25 293:24
**seven-hour** 275:3
**several** 28:7 51:11 92:17 95:13 123:20 212:24 258:2
**severe** 114:20
**sewn** 116:11
**sexual** 247:14
**shape** 98:19
**share** 6:22 40:7 59:21 84:2,5 130:18 137:15 172:13
**shared** 30:14,18,21, 25 31:2 35:8 52:7 189:10 198:15
**sheet** 219:20 220:1
**shift** 94:9
**shifted** 16:10,11
**ship** 23:18 24:3 31:6,8,12, 15,21,23 32:2,25 33:2,4 34:14 38:22 39:8 41:9,16 42:4,8,9,11, 15,17,21 43:2,25 44:18 49:3 50:21 53:21 54:2,15,16 56:9 58:2,9, 21,23 60:17, 21,24 62:13, 15,18 63:1 64:5,13,14 68:13,20 75:15 77:1 79:3,11 81:9 83:22,24 86:3,12,14, 22 87:16 89:16,19 103:9 109:24 110:11 111:9 112:6,10 116:1 117:25 118:23
120:1,7,13 135:9,10,12 140:14,18 142:18 147:17 148:7,22 149:3,6 150:7,15,19 155:23 157:6 159:13 160:16,18, 19,20 161:7, 21 162:1,4, 10,19 163:4, 8,13,22 164:2,10,24 165:1,19,23, 25 169:11 172:7,11 173:7 181:4 186:25 189:23 196:21 201:3 208:17 209:1,9,15, 20 211:22 215:15 216:23 219:16,23 228:25 229:25 230:5,7,15, 17,22,24 231:10 232:3 233:19 236:10 241:24 243:5,6 248:4 249:22 262:9 263:22 274:8 281:20 286:5,6 287:21 289:11 292:13 296:21
**ship's** 43:12 75:5 157:2 158:20

159:1 165:17 169:13,19 170:5
**ship-bound**
238:7
**shipboard**
24:2 26:23 32:13 36:2, 9,25 38:1 44:4,13 45:11 47:18 52:4 53:25 54:1,5,9,14 57:1 58:13 61:6,20 63:10 65:13 68:3 71:17 72:8,12 74:15 75:4 78:6,13 79:18,19,23, 25 80:11 81:4 82:24 83:12 84:16 85:9,12,13 86:15,19 87:2,6 88:10 89:5 90:7, 10,15,19,24 91:20 94:10, 12 95:19,20 105:9 128:5, 20 130:4 139:9 143:21 146:14 147:16 149:20 154:9,11 159:2 171:24 172:23 173:11 177:17 178:17 179:18 180:18,21 181:8 182:13 187:6,20 190:1,2,10, 15,17 192:13 193:6 194:1 195:7,20,24 197:14 204:20 205:7 208:10,21 209:11 212:20 231:19 232:19 235:21 240:13 246:3 279:20 297:20
**shipboard's**
209:4
**shipping**
19:6 277:9, 10
**ships**
17:6 20:20, 24 21:10,15 23:2,6 24:22 29:11 31:19 32:19 34:1 35:2 36:19 37:5 38:2,5, 12 44:16 45:14,22 48:22 50:20 54:23 55:1, 5,7,8 57:22 60:18 66:4, 13 67:17 76:3 78:14 79:1,10,16 80:25 82:5 83:4,9 84:4 85:2 86:17 87:2 88:13 94:17 95:17 100:14 112:23 130:6 139:10 140:16 147:7 173:23 174:20 177:19 178:25 189:15 191:12,19 206:13 227:8,11 229:23 232:10 239:9 254:11 267:11 294:7 296:24 297:4
**shore**
4:25 5:19,24 6:10,22 7:19 22:24 40:19 64:15 69:13, 20 71:1 73:25 116:23 128:22 148:20 151:19 160:16 163:13 172:17 185:25 187:8 199:12 223:12 234:25 246:19 274:9
**shoreside**
21:5 22:11 23:9 30:24 31:2,20 32:24 33:17 34:12,21 35:5,12 58:21 59:2 60:17,25 61:22 62:13 63:1,10 68:4 71:15,18,21, 22 72:21 76:19 79:15, 24 139:21 145:24 153:10 160:17 161:22 172:7 175:22 176:21 185:21 186:1,12,16, 19,22,24 188:10 190:17,18 193:21 195:17 209:9 222:2,6,12, 17 223:6,7, 22 228:13 238:14 239:17 240:9,11 253:22 254:2 279:15
**short**
17:9 218:22
**show**
34:12 99:2 106:3 112:1 162:1 219:24 278:22 290:10
**showed**
184:1 219:24
**showing**
47:7 268:20
**shown**
36:14
**shows**
36:6 128:24 138:18 179:21 282:21
**sick**
144:15 185:16,17 186:6
**side**
17:16 121:5
**sign**
129:24 134:3
**signed**
133:19 135:5 138:9,17,18, 21

**significant**
267:23
**signoff**
133:25
134:11,17
**signs**
49:5 113:19
114:3 277:10
282:10,13
**Silver**
29:1,2,9
30:11,23
**similar**
10:3 11:5
28:25 56:20
102:9
139:10,15,17
172:23
181:9,10
203:5
**similarities**
167:19
**similarly**
11:18 43:24
68:4 83:6
86:16,20
138:9 204:14
**simple**
13:1
**simply**
165:7 271:8
272:25
**single**
69:3 98:15
105:19
190:25
191:1,24
193:5,6
**singular**
191:2
**sit**
40:21 113:24
274:16
**site**
145:16
250:14
**sites**
36:14
**sitrep**
73:18 156:19
**sitreps**
73:5,8
156:15
**sits**
288:15
**situated**
86:16,20
**situation**
19:17 20:1
42:2,14 44:2
58:5 61:20
64:11,12
68:5 73:14
81:12,16,17
89:18 93:14
110:22 116:7
120:5,16,24
121:4,23
122:1,11
148:11 152:3
155:20
156:23
160:25
161:12,17,19
162:18 163:9
171:23 172:3
184:19
196:16,17,25
197:5,6,12,
25 205:21
209:19,22
210:17,18
214:5,18
215:13
218:22
221:20
232:24
233:16 238:8
241:5 242:2
244:3,23
273:2
**situational**
73:5 163:2
184:20
**situations**
17:17 18:1
67:18 71:9
73:11 113:25
118:21 121:1
147:23 162:5
163:2 198:7
201:16
202:12 210:7
232:3 239:8
248:8
296:11,12
**size**
50:21 54:16
**skill**
111:5 193:16
273:10
**skills**
174:24
**slash**
167:10
**slight**
111:3
**small**
29:10 54:23
171:1,8
248:15
**smaller**
55:1
**smoothly**
89:17
**soccer**
275:4
**software**
34:16 59:24
60:2 65:11
66:8,24
67:2,4 72:23
76:5,16
299:3
**sold**
81:8
**sole**
224:8
**solve**
107:7
**somebody's**
55:24
**someone's**
113:12
**someplace**
132:9
**sooner**
253:12
**sophisticated**
68:22
**sort**
20:23 21:4
65:16 97:10,
14 109:18
208:5 259:10
263:22 275:3
**sorts**
169:6 184:16
**sound**
290:9
**sounds**
109:25
223:15
**source**
272:7
**spa**
206:23
**Spain**
28:17
**Spanish**
242:4,25
**spans**
261:11
**speak**
6:10,15 8:21
9:1,7,17,19,
21 49:19
71:11 77:12
84:11 139:12
148:15
159:7,8,15
165:5 180:16
221:18
230:19
242:4,16,24
243:9
245:16,24

257:22 265:10 268:2 270:25 280:4 286:7
**speaker**
4:15
**speaking**
70:5 113:2, 15 114:19 121:6 139:14 151:22 156:2 172:3 248:23 292:23
**speaks**
273:20
**special**
155:7 188:3 253:14
**specialist**
234:1 239:13,16 240:9 241:24,25 243:19 244:19 248:5 251:2 271:1
**specialists**
234:5,7,10 237:8 240:10
**specialize**
153:23
**specially**
240:10
**specific**
6:16 30:1,24 31:1 40:23 44:22 46:8 48:19 52:4 58:23 62:25 63:9 66:8 72:15,23 76:14 78:10 79:5 82:1 88:17 93:21 96:2 98:8 99:1,2 100:8 102:14 104:11 105:10 106:8 108:1,15 120:3 132:9 134:13 143:6,10 145:6 147:15 148:23 153:17 155:3,11,13 160:5 161:6, 14 164:12 170:17,24 171:18,19 175:20 176:8,24 177:20 178:9 184:5 186:1 191:14 199:8 201:21 206:9 207:5 213:10 221:21 223:6 240:1 241:9 252:7 268:10 272:24 285:13 292:24 296:22 297:20
**specifically**
29:18 33:4, 10 38:20 41:6 88:15 104:21,25 105:8 108:1, 7 144:24 167:15 170:12 171:7 178:14 199:9 207:1 220:2, 20 238:23 256:22 274:13 287:8
**specificity**
105:19
**specifics**
87:15 128:6 129:5 146:19 148:4 165:15 178:10 197:10 257:23 293:18
**specify**
79:13
**speculate**
70:1 297:12, 14
**sped**
42:9
**speech**
113:12 114:7 115:13 241:16
**speed**
160:20
**spend**
12:10
**spent**
266:18
**split**
9:8
**SPO**
282:2
**spoke**
6:1 7:16 9:5 199:7 285:11 286:22 292:8
**spoken**
9:9,10,14 242:12 278:6 286:16
**spotlight**
4:16
**spotlighted**
4:14
**SQM**
30:3 143:22 144:5,9 152:11,12,20 153:1 161:10 174:1 179:3, 22 184:10 192:7,9,21 215:1 220:20 243:12
**SQMS**
30:8 155:9 173:14 177:17,24 178:3,6,16, 22 179:10,11 192:11 214:24 216:14 223:24
**stability**
170:1 237:6
**stable**
18:25 226:15 242:10
**staff**
33:15 34:9 39:12 44:19 46:2 52:21, 22,24 59:17 62:12,14 78:18,19 84:6 85:18 89:15 90:9 95:17,19,20 103:8 105:9 108:25 128:20 146:11 147:1,10 157:3,4,6 158:3,7,13, 20 159:1 160:7 161:16,19 167:3,11,15, 21 169:4,11, 19,24 171:10,22 172:2 176:6, 24 177:3,6,8 181:13,24 185:18 189:11 190:9 193:4,9,21 194:6,7,24 195:11,13 196:21

205:16 208:21 216:25 217:2 224:15 268:11
**stamp** 127:12 130:24,25 132:15 184:1 188:6,16 246:24 262:13 270:9 272:1 281:6 298:14
**stamped** 131:25 137:13
**stamping** 271:10
**stamps** 130:17 280:5 295:25
**stance** 151:24
**stand** 142:7 259:3
**standard** 5:3 86:16,20 88:19 96:15 109:7 138:7 142:9 143:9 175:1,7 176:1 215:20 218:1 226:21 258:3,4 267:24 268:2 293:9 294:12 295:9,17
**standardized** 67:1 98:16 102:10,11
**standards** 19:5 139:16 143:2 173:18 174:5 190:11 258:3 293:15
**standby** 253:11
**standing** 143:14
**standpoint** 164:8 165:6, 9 184:17 192:10,23 210:19
**stands** 173:15
**start** 5:24 45:6 54:18,21 102:17,19 105:12,13 120:7 138:4 161:8 258:15 276:6,7 298:17
**started** 26:25 132:8
**starting** 127:12 130:18 249:4 290:14
**starts** 127:8 133:15 276:7 278:23 279:4
**state** 4:3 31:16 169:21 262:23
**stated** 272:22
**statement** 5:11 62:10 83:2 116:21 173:24 291:20,21
**states** 24:9,11,12 154:13 170:6 190:7 191:25 227:16,19,24 233:12
**stating** 21:7
**station** 52:1,3
**status** 41:11 64:17 87:11,14 131:10 140:6 168:24 234:9 245:22,25 275:17,22 276:11,15, 18,20,23 277:4
**stay** 143:24 240:23,24 248:3
**stays** 208:22
**STCW** 141:25 142:7,10,16
**step** 70:19 94:13 129:24 131:19 147:18 152:20
**stepping** 162:25
**steps** 64:22,25 121:22 153:2
**stipend** 143:24 174:10 202:11
**stipulated** 6:6
**stipulation** 6:3 46:9 121:1 127:17
**stock** 79:20,21 80:6
**stocked** 68:21 78:15 79:2,6
170:21
**stocks** 80:24
**stop** 126:2 135:23 138:4 216:12 275:3
**stopped** 97:20 136:2, 9 186:4
**stopping** 177:13
**stops** 136:9
**storage** 51:9
**store** 59:17
**storm** 112:21
**straight** 132:23
**strange** 243:5
**strategies** 18:21 62:22
**stress** 100:20
**stretcher** 51:17 145:18,19
**stretchers** 145:17,20
**strict** 60:21
**strictly** 105:13
**strike** 29:6 30:13 67:13 71:21 83:6 85:12 94:23 130:3 135:19 140:17 143:19 168:4,5 169:9 180:16

186:10 189:6,16 190:1 193:23 201:15 210:9 223:14 254:20 260:14 264:12 266:4 287:4,18,19 289:22 293:2,3 295:25

**stripe** 85:15,16,19, 20,23 86:4, 6,9,11

**striped** 181:4

**stripes** 85:17 86:13 182:18

**striping** 85:21 86:2 140:8

**stripped** 72:4

**strips** 97:16

**stroke** 13:11 50:11 99:9,24 107:21 108:9,12,21 110:7,15,25 111:1,3 112:6,10,14, 17,21 113:2, 8,12,19 114:8,22,23 115:6,12,20, 21 116:6,18 117:20,23,24 118:4,16 120:5,15 121:8 122:2, 8 147:17,20, 24,25 148:10 149:5,13,20, 21,24 150:4, 17 154:9,11, 13,20,22 155:3,12 203:10 210:22 211:2,4,11, 16,17 212:3, 14 218:17 226:23 228:17 251:1 259:18 264:6 292:13 296:14,21,25 297:9,24

**strokes** 110:21 113:4 155:8 229:4 297:3

**structure** 208:25 228:13 256:25

**structured** 160:24 207:20

**struggling** 294:9

**stuttering** 120:21

**Sub** 251:9,15

**subcontracts** 251:7

**subject** 95:20 166:11 251:17,19 256:7

**subjects** 69:17 97:14

**submitted** 89:25 90:3

**subpoena** 291:12

**subscription** 57:3 66:23

**subsidize** 294:18

**substances** 34:7 78:20, 21 168:20

**substantiate** 47:21

**succeeds** 95:9

**successfully** 95:15 226:15 233:25

**succinct** 53:22

**sudden** 113:16 114:19

**suddenly** 248:3

**suffer** 112:5 265:14 267:1 297:3

**suffered** 203:10 296:20

**suffering** 13:11 92:5 99:24 112:17 117:19 118:3,4,15 120:5 147:17,20 149:4 151:7 155:21 156:24 162:11 163:12 164:22,25 184:7 212:3, 14,22 226:23 233:11 250:25 292:13 297:8,24

**sufficient** 79:9 116:3

**sugar** 112:21

**suggest** 107:6 246:21 257:2

**suggesting** 118:18

**suitability** 196:23 254:5 256:12

**suite** 258:21 259:22

**suited** 273:14,22

**summaries** 188:17

**summarize** 18:5

**summary** 245:13 266:20

**Sunny** 280:19 299:4

**supervise** 140:17 182:21

**supervised** 140:24

**Supervisor** 207:19

**supervisory** 172:22

**supplies** 77:24 78:2 83:9 166:1

**support** 5:7,10 17:5 20:23 21:2, 4,15 23:24 33:18 34:3 71:14 123:9, 10 142:3 144:3,4,5 152:2 165:8, 11,17 174:11,12,13

183:5,18 226:5,8,9, 13,14,24 229:7 239:22,25 240:2,12,16, 20 241:1 246:7 247:12 294:21,22

**supported**
23:22

**supporting**
20:20 180:13 232:14

**supposed**
45:22 63:10, 13 73:2 78:25 79:3 89:2 128:4, 25 145:10 146:12 152:15,21,24 161:8 169:18,22 170:8,10,15, 18 179:11,24 189:25 192:5 217:22 221:2 224:4 239:21,24 241:4 245:20 249:11,21 273:25 279:10,18 282:25

**sure**
12:22 17:22 18:23 31:16 34:5 42:20 46:14,23 53:24 56:3,5 57:23 78:13 86:9 105:7 110:20 125:16 127:6,18 128:18,24 133:2 136:22 154:11 159:10 178:20 187:17,25 192:9 204:17 208:16 209:3 217:22 222:22 244:24 251:12 257:1 261:23 270:4,7 274:6 279:15 295:23 296:6 298:19 299:19

**surgery**
228:19

**surrounding**
297:13

**suspected**
13:11 122:2 218:17 296:20,25 297:9,24

**suspended**
135:1 202:18 204:9

**suspicion**
13:13

**sustained**
99:14

**sustains**
264:25

**suture**
117:12

**swear**
5:14

**swimming**
142:23

**switch**
27:16 128:21 132:5 277:21

**sworn**
5:20 48:1

**Symphony**
61:7 164:23

**symptomatology**
265:2

**symptoms**
113:2,8,19 114:3 115:12,21 120:12,25 210:11 260:1 265:15 266:12 267:2,22

**synchronize**
57:19

**system**
34:15 56:11, 21,25 57:18 58:1,2,12,17 59:8 63:2,8, 9,11,18 65:3 69:5,16,21 71:1,3 73:2, 3 74:4 75:1 77:8 78:1 80:4,7,8,9 82:17,19 85:21 96:10 126:8,18 168:22 172:22,23 173:15 178:7 183:23 207:20,22,23 208:3 227:19 231:9,12,14 279:23 286:2 288:5 289:19

**T**

**T-U-I-C**
28:24

**take**
4:20 8:4,10, 16 32:22 33:2 44:25 47:23 49:4 53:25 64:15 101:17 104:4 111:8 121:22 138:15 166:19 168:11 179:10 199:11,20 201:24 205:18 207:18 213:19 214:6,9 220:15,17 228:15 236:11 257:7 268:13 275:24 279:6 280:15 283:21 292:12

**taken**
4:1,25 50:15,17 64:22,25 84:13 101:16 123:11 124:25 126:11,15 153:2 161:23 176:20 196:3 198:4 202:25 204:4,6 217:4 255:6 275:2 282:13

**takes**
89:3 145:3 215:24 218:6

**taking**
104:15 214:23 276:22

**talk**
41:6 42:25 70:2 94:9 101:5 102:17 133:11 152:14 231:3 243:12

274:23
**talked**
88:9 158:25 193:2
**talking**
22:25 39:3 59:24 60:16 97:20 107:3 140:8 146:5 151:5 172:11 173:14 199:3 222:3 223:19 244:1
**talks**
60:9 191:7 276:21
**tanks**
145:20
**targeted**
101:1
**task**
109:13 213:25 214:2,4,10, 15
**teach**
267:13
**teaching**
111:7
**team**
16:9 17:3,12 24:23 145:4, 14,16,18 148:11 168:1,12 170:7,8,11, 16 171:4,15 179:18 186:25 187:5 204:25 207:13 224:4 226:6 228:22 231:25 232:4,11,17 235:25 238:14 239:3,6,13, 14,16,17 240:8,9,10, 14 241:8,10, 23,25 242:13,15, 16,23 243:1, 2,3,7,9,13, 14,18 244:4, 19,20 245:1, 14 247:7,10, 20 248:2,5, 6,10 250:10, 14,16,17 251:1 279:20 280:3
**teams**
17:5 20:20, 21,24 21:15 171:8 240:21
**technical**
270:24 271:4,7
**technically**
91:23 238:2
**technician**
5:6
**telecommunication**
271:12
**telecommunications**
231:8 286:8
**teleconference**
111:22
**teledermatology**
119:24
**telephone**
157:20 187:3 195:1 229:25 285:14
**telephonic**
16:7,12
**telephonically**
157:9,11 245:11
**telephonics**
280:7
**telepsychiatry**
119:24
**tell**
8:19 10:14 11:2,17 12:3,5 16:19 33:23 38:16 46:17 47:20 64:6 76:8 92:12 94:12 102:21 104:11,14 105:25 108:17 110:3,4 125:21 129:8 141:19,21 147:18 152:14 156:3 158:13 160:4,13 161:8,14 189:1 192:4 205:8 257:20 260:9 281:21 286:11
**telling**
10:15 11:3, 16 105:23 106:15 107:5,15 146:8 222:11 294:4
**tells**
37:25
**ten**
7:3 83:25
**tendered**
160:16
**tenure**
29:2 98:18 112:12 129:17 227:6 296:10
**term**
56:4 181:18 211:2 259:7
**terminate**
101:15
**terminated**
134:19,25 197:1
**terming**
18:10
**terminology**
117:22 183:9
**terms**
27:22 34:4 99:19 139:12,15 141:21 169:13 214:13 216:6 240:20
**terribly**
68:8
**test**
96:23 97:19 98:7,14,17 99:15,17 100:12 101:9 108:11,20 109:13 122:17,19, 20,23 123:4, 12 201:25
**testified**
5:20
**testify**
8:2 69:16 70:7 114:5 259:14 265:6 273:2 276:3 296:4
**testifying**
75:9
**testimony**
5:15 259:16
**testing**
105:8 110:5 201:11,18,20

202:4,14
**tests**
201:23
**thank**
8:7,11
223:22
280:13
**Thanks**
8:6
**theoretical**
269:15
**theoreticals**
269:16
**thing**
39:7 57:16
102:18
103:12
130:17
141:15
177:11 223:1
**things**
33:13 59:11
70:8 76:20
101:1 117:4
120:12
168:19 169:6
184:22
187:24
241:21,22
**think**
28:18 36:6
48:14 50:10
68:16,19
69:7 70:3,18
71:11 76:15
80:15 82:16
88:22 91:23
92:22
104:17,24
105:4,15,17,
18 106:3,23
110:4 114:6
120:4 126:3
127:17
131:19,22
132:15 135:4
148:14
179:20
185:12
198:18
201:24 205:4
207:9 211:16
212:24
214:11 216:4
243:14 249:2
252:2 253:12
260:18
267:12
268:13
271:13,17
274:3,11,19
284:4 300:5
**third**
80:18 90:14
233:20
**thorough**
109:16
265:22
**thought**
25:22 111:25
131:21
158:19
170:14
244:12
**thoughts**
18:21
**threatening**
109:17
**threats**
254:9
**three**
9:23 12:11
25:17 55:7
85:15,16,19
86:4,6,9,11
89:19 110:1,
2 113:24
181:4 232:3
**Thursday**
89:21 269:7
**thyroid**
112:21
**ticket**
91:8,9
92:13,14,16,
18,23
**tickets**
38:11,20
**tight-knit**
172:12
**time**
5:1,2,3,9
13:12 19:25
22:19,22
23:19 25:18
42:17 55:14,
18 58:9
66:23 67:15
69:3 73:20,
23 75:5,6,
15,16,17,20
76:10,11,22,
23 88:14
95:19,24
99:7 100:18
105:10
109:17
110:18
111:9,14
112:13
115:5,11,13
116:6,13,20
117:14 118:6
126:5 128:20
131:13,17
133:12
137:21
138:6,20,24
139:7 151:7
163:20
166:4,5,19
167:1 171:19
180:7,10
188:12
191:1,2,5,
17,24 202:19
203:19
204:1,8,15
207:18
210:2,7
215:5 219:7,
8,12 220:3,
4,15,17
223:8 225:23
234:16,19
235:7,14
236:16 238:2
248:10
252:22 254:7
257:20
258:1,3,4,8
260:21
262:23 263:5
264:9,18
269:7 271:23
275:5,24
278:18
289:21,23
290:23
291:1,13,16
292:1 293:6,
7
**timeliness**
236:21
**timely**
41:8,10,25
151:11
198:21,22
201:3 203:11
217:8
218:20,25
219:5 236:12
297:8
**timeout**
269:17
**times**
9:21,23
21:11,19
25:17 83:25
92:17 112:5,
8 118:19
170:25
171:17 202:2
212:24
215:21
220:3,11
239:3 257:24
258:5 280:1
293:20,22
**timestamp**
75:4,14,23
76:24 257:25

270:8,16 271:15,18, 20,22 272:2 273:7 291:5
**timestamped** 274:18
**timestamping** 270:18 271:5,6 272:12,23,24
**timestamps** 74:24 257:21 273:11,16 274:13 280:6,9 295:25 296:1
**timing** 73:16 76:17 163:5 271:10 291:23
**tired** 274:2 275:6, 7,8
**title** 14:20 15:5 22:14 23:3 28:18 34:23, 24 40:12 207:16 221:8,10 222:5
**titled** 220:21
**titles** 23:14,16
**titling** 166:6
**today** 4:25 6:7,11, 14,20 7:20 8:2,6 12:1 69:16 70:2 106:10 133:13 231:3 270:20 273:15 288:15
**today's** 6:5 7:14 8:25 9:3,22 11:12 14:1, 13,24 15:3 40:11 87:17
**told** 104:19 159:20 163:25 235:7 260:13
**tools** 45:13
**top** 7:4 129:9 137:16 243:15 258:13 261:21 268:20 272:18 279:22 292:8
**total** 12:9
**totally** 49:7 91:17 107:11 158:4 228:16 248:8 262:17 266:21
**touch** 109:7,16
**touched** 209:2
**toxic** 117:13
**toxidrome** 117:13
**trace** 59:11
**track** 59:13,14,15 67:15 78:1 82:20 186:12,20
**tracks** 85:1
**traffic** 237:10
**train** 170:14 267:13
**trained** 43:3,13,21 44:1 102:9 115:1 118:10 143:12,17 240:10 267:14 293:14 294:16 295:1
**training** 99:16 111:17 121:21 141:4,8,17, 20,22,25 142:2,22 143:2,5,6, 11,20 144:13 146:15 155:17 174:6,16,17 177:3 190:9 192:18 201:11,17,20 202:11,14 234:11 273:10,22 295:6
**trains** 117:3
**transcript** 12:13,14,15, 18
**transfer** 226:14 228:24 233:17 237:9 293:7
**transferred** 215:17 217:15 219:9 234:3
**transfusion** 156:12
**transgression** 197:7
**transient** 211:7
**transmitted** 270:10
**transmitter** 157:23
**transmitting** 269:19
**transport** 91:15 146:15 147:6 164:15 165:2 218:6 224:22 225:17 226:17 234:10 235:22 236:16,19,21 242:23 244:15 253:4 261:12 292:12
**transportation** 217:24 224:2,5,9,21 225:3,5,10, 12 233:22 243:16 244:6,12 245:4,22 246:4 248:18
**transported** 234:22 236:13 237:7 282:25
**transporting** 217:18
**trauma** 51:7 99:14 115:25 123:9 144:4 174:12 175:17 209:13,16 228:19 264:22

265:15 267:11,23 294:21
**travel** 238:22
**treading** 211:11
**treat** 50:7 83:16 100:8 112:22 114:15 115:24 116:10 117:11,15 118:19 149:9,21 150:6 177:22 209:6,12,19 262:8 267:14
**treated** 92:2 118:22 141:23,24 145:1 149:14 198:3 205:2 206:24 218:3 240:19 266:20
**treating** 51:22 97:17 215:7 216:7 224:20
**treatment** 45:7 51:10 56:17 61:21 64:7 79:10 80:25 82:4, 8,10,24 83:3,13,16 85:2 90:24 99:1,13 116:15,19 119:3 149:7 173:19,21,23 177:18 178:24 179:5 183:22 204:20 205:7,24 209:15,18 215:14 228:18 259:18 263:17 265:23 266:6,9 267:10 295:17
**treats** 93:4
**trend** 65:12,16 66:3,22 67:15 256:23 257:4
**trends** 66:12,15
**triage** 49:4,9,24 50:2,16,17 51:4 77:9, 10,11 260:7 261:1 290:4, 11,13,20,24 291:1,13,14 299:5
**Triden** 57:6,9,12
**trigger** 196:5
**Tritan** 34:16 59:24 60:2,6 67:10 69:11 71:12 76:1,2,6,16 280:5 299:3
**Tritan's** 70:24
**trouble** 113:2,6,15, 17 114:18,21 121:5
**troubling** 256:2
**trucking** 220:20
**true** 25:23 31:7 62:17,20 86:19 90:16
**truth** 5:15,16
**try** 103:3 104:3 106:11 111:2 162:25 171:20 192:7 208:16 244:21
**trying** 23:22 56:4 70:12 105:11 108:3,5 147:13 150:12 159:8 161:2 172:6 198:6 208:22 210:25 223:2 227:14 233:8 268:14 273:17 275:12 280:15 285:3
**Tuesday** 89:21
**Tui** 30:4,23
**Tuic** 28:25
**turn** 48:10 56:13 166:13 206:18 215:4 246:25 248:5
**turned** 217:3 268:1
**turning** 177:17,21 218:12
**twice** 163:3
**two** 7:22 8:1 11:1,3,15,18 38:15 50:23 54:25 55:16 85:23 97:1 108:7 110:4 122:9 124:16 138:14 166:7 181:25 239:12 256:3 273:1 282:2
**Tylenol** 78:25 79:1, 2,22,23,24
**type** 18:18 37:9 59:17 65:19 71:10 72:20 79:6,9 101:9 146:21 157:21 211:4 226:9
**typed** 260:10,16 300:13
**types** 77:19 142:24 156:1,2,22 239:12 242:1 253:24 254:2
**typical** 48:3 49:3
**typically** 49:2 50:19 81:23 101:20 279:10,19
**typing** 59:1

**U**

**U.S.** 5:6,10 86:25 164:3,22 165:19
**Uh-huh** 202:1

**UK**
23:21
**ultimate**
106:19,25 181:11,12 211:22 237:15 297:15
**ultimately**
101:20 203:10 237:14 286:13
**umbrella**
40:5 211:11 228:10
**unable**
213:17 232:13
**unavailable**
21:23
**unaware**
228:16
**uncertainty**
148:8
**unclear**
119:9
**uncomfortable**
199:3
**unconscious**
108:25 109:4,6,13
**undergo**
141:4
**undergoing**
157:19 162:19 212:17 250:5
**underneath**
167:9 180:16
**understand**
14:19 30:16 36:15 49:5 52:3 58:11 62:4 63:5 67:8 84:21 94:1 99:21 100:11 103:9,19 107:14 113:12 117:6 118:2 134:9, 16 147:5 151:4 158:22 161:2 173:1 174:17 178:20 181:25 198:6 199:6 216:20 230:10 233:8 244:25 247:9 271:4 274:7, 22 275:2,21 294:9
**understanding**
6:3 9:14 12:25 13:22 24:1 25:4,11 26:22 30:8, 17 37:24 39:19 41:14 57:6 85:9 100:24 101:8 113:6 115:17 131:3,13 135:3,14 157:25 158:24 161:3 167:23 169:17 177:24 188:22 192:12 215:12 220:25 221:1 223:13 224:3 225:1,8 235:5 239:12,16 243:18 247:18 249:10 259:20 263:4 264:4,21 276:7 277:23 278:25 281:19 283:11 285:10 290:13
**understood**
12:23 14:16 16:13 19:11 22:1 24:7,10 25:4 26:2 34:25 36:1 43:19 48:5 52:11 57:17 58:16 69:18 90:18 107:2 130:13 136:8 142:20 167:23 182:3 197:18 223:12 246:9 273:5 277:23
**unequivocal**
167:20
**unexpected**
248:11
**uniform**
86:13 167:22 174:21,23
**unintelligible**
103:2
**unique**
91:24 93:7 103:22 118:22 121:2,18 160:3 187:22 198:1
**United**
23:20 24:9, 10 154:13 227:15,19,23 233:12
**universe**
222:20,21
**university**
190:10,16,18 191:1
**unmet**
250:11
**unreasonable**
175:3 292:12 293:6
**unstable**
258:22,25
**unsure**
119:12
**update**
34:2
**updated**
58:10
**updates**
41:8,10,15, 25 238:24
**uploaded**
128:4
**upper**
4:21
**urgency**
120:12 157:8
**urgent**
120:16 210:12 258:20
**urgently**
161:12
**USA**
125:16,19 127:13
**USCG**
64:14
**useless**
110:13
**usual**
260:6
**UTC**
5:2 22:19,22 73:20,23 76:12 180:7, 10 234:16

**V**

**vacated**
135:10

**vaccination** 24:21
**vague** 37:2 56:4 71:25 78:9, 22 117:22 147:3,12,22 148:14 173:24 175:3 179:2 214:3, 20 295:21
**value** 198:2
**vantage** 48:10
**variable** 116:14
**variables** 68:1 120:20 122:12 146:18 148:24 151:2 160:12 161:1,11 163:24
**varies** 79:11
**variety** 17:25 23:12 24:20,24 43:17 118:19 120:23 184:22 204:22 211:10
**various** 10:17,18 17:23 19:2 23:14,16,22, 24 28:9 31:11 33:15, 24 34:1 36:6,12 37:11 48:21 51:8,10 63:22 109:2 144:1 156:1 171:2 184:2, 9 189:13,14 190:21 191:7,13,18 202:7 232:13 238:23 252:15 254:8 272:7
**vascular** 99:9
**vendors** 249:18,25
**ventilator** 97:16
**verbal** 90:23 94:2,4 101:2,5,9
**verbally** 92:6 93:2
**versa** 260:11
**versed** 97:12 114:25 152:12
**versus** 5:4 181:7 182:1 222:6
**vessel** 32:21 95:20 135:22 136:9 138:20 144:23 148:6,10 215:6 247:13 249:6,19 250:1 288:3 296:13
**vessels** 29:17 32:15
**vet** 252:15
**vets** 212:11
**vetting** 139:19
**viable** 95:16
**vice** 260:10
**vice-president** 208:15,18 254:10
**video** 4:14,15,18, 23 5:2,6 10:2,5 12:12 16:9 22:18, 21 46:16 103:2 111:16,19, 20,22 112:1 180:6,9 234:15,18 300:17
**VIDEOGRAPHER** 4:6 22:18,21 73:19,22 180:6,9 234:15,18 300:17
**videotape** 257:13
**view** 4:15,21 48:8 60:11
**violate** 103:25 106:20
**violating** 199:14
**visibility** 58:17,20
**visit** 32:23,25 33:1 153:16 264:5,21
**visits** 33:9 34:1,17 238:12
**vital** 49:5 282:10, 13
**vocabulary** 182:7 183:12
**volcano** 248:9
**voluminous** 246:6
**vomiting** 265:14 267:22
**voyage** 166:11

**W**

**waiting** 48:7 49:10, 18 51:3 119:15 210:12
**waived** 300:20
**walk** 102:11
**walked** 269:17
**walkie-talkie** 157:24 158:9
**walking** 49:17,18 50:9 113:18 114:21
**walks** 114:18
**waned** 120:25
**want** 4:19 6:1 7:18 9:8 19:15 31:16 41:5 45:19 46:4 47:4,8 53:12 57:24 65:23 69:2 70:3,16 78:12 86:9 94:9 95:21 99:21

104:18,21
105:15
108:4,10
114:13
122:15
123:25
127:6,18
128:24
132:3,7,13
136:6 137:22
143:1 148:15
149:2,5
151:4,5
154:3 162:4
164:4,9
178:13,15
180:12
187:25 209:2
211:14 215:4
220:1,17
221:20
222:9,14
224:18
228:15
236:19
243:12
244:24
247:2,4
256:25
257:10
260:25
265:12 270:7
272:25 273:1
274:16,22
276:3 278:21
284:12
285:2,4
286:18
291:14 296:6
298:19
300:13,15

**wanted**
18:18 31:20
64:24 66:3
67:23 69:2
70:24 76:14
123:22
127:20
182:11 184:4
185:4 223:24
230:5,13
248:13 249:1
251:12
280:10

**warning**
90:22 92:15,
23 94:4
266:12

**warnings**
91:3,6,14,20
93:19 94:2
265:13 267:1

**warrant**
156:6

**warranting**
158:1

**watch**
12:12 71:18
143:3

**watching**
189:14

**waxed**
120:25

**way**
18:5 27:18
53:22 66:19
76:9 85:7
98:9,25
99:22 102:17
103:4,20
105:3,14,22
107:17
115:23
117:25 118:3
120:10
148:14 152:3
157:16
159:12
175:21
206:23
210:16 223:9
225:13,14
233:21
252:20,25
267:19
270:12 280:5
290:16 291:6

**ways**
36:8 204:22
205:3,8
233:15 253:8

**weak**
110:16

**weaken**
103:17

**weather**
148:19
160:21
237:10

**web**
38:9 92:20

**website**
36:9,22
37:1,5 39:15
41:5 59:21,
24 60:2,3
70:25 91:16,
18 299:3

**Wednesday**
89:21

**weekly**
254:10,19

**well-known**
242:12

**went**
22:24 122:16
186:22
197:23
205:12,15
286:13,14

**whatsoever**
108:5 225:11
258:9

**whichever**
286:23

**wife**
32:22

**Wifi**
229:23

**window**
48:15,23
49:19

**windows**
49:8

**wipe**
250:4

**wished**
18:3

**wishes**
59:17

**witness**
4:13,14,16,
19,20 5:17
8:12 18:15
46:17 67:7
69:8 70:1,4
106:14,17
107:5,19
132:13
150:13
199:23
273:12,13,24
275:6 300:20

**woman**
183:17

**wondering**
57:15

**word**
58:6 68:16
73:1 82:6
89:9 138:15
153:24 163:3
211:11
221:19

**words**
68:18 293:4

**work**
13:18,19
16:5,15,17
18:3 24:23
25:1 27:1,4
31:20 32:14
46:25 51:22
52:8 79:24
88:13,15,18,
19,21 89:11,
14 94:16
105:3 107:17
124:17
139:10 149:6
153:20
159:24 162:8

171:8 172:12,20 174:13 183:10,24 193:17 202:21 203:2 222:10 250:6 253:8 254:4, 6,17 280:9 293:15

**worked**
9:9 13:15,17 26:22 27:1 31:12,19,22 32:1,8,11 124:14 139:6 154:18 175:18 202:21,25

**working**
13:23 14:19 28:5 33:16 45:6 51:20 87:8 89:14 97:21 120:7 121:8 140:20 147:7 154:25 173:4 204:2 227:6

**works**
24:19 29:4 69:21 89:7, 21 130:5 139:21

**workup**
44:21 45:6 109:15 245:9

**world**
24:8 60:11

**worldwide**
144:3

**worse**
148:18

**wrap**
275:11

**write**
265:22

**writes**
263:20

**writing**
37:17 186:4 278:13

**written**
37:7 90:23 91:19 92:15 95:9,10 97:2,5,6,8, 10 98:7,10 100:25 105:2,15 107:23 122:17,19, 22,23 123:4, 12 143:15 202:3 251:16,18,19 284:6

**wrong**
127:1 188:6, 19 299:20

**wrote**
97:8

**X**

**x-ray**
46:5,6

**Xerox**
52:2

**Y**

**year**
53:21 66:5 126:4 133:4 225:23 229:7,8

**years**
26:17,18,20 27:8,9,10 55:4 69:23 154:19,25 155:2 175:16 227:10 233:25 256:3

**young**
241:14 245:16

**Z**

**zone**
5:3 75:17 257:20 258:8