UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:20-cv-20687- OTAZO-REYES

AT LAW AND IN ADMIRALTY

- - - - - - - - - - - - - - - - - - - - - -
RICHARD BURGESS individually and :
by and through DARREN HENZE, :
as Guardian of the Person and Estate :
of Richard Burgess, incapacitated and :
as agent under that certain durable power :
of attorney dated November 20, 2006, :
:
Plaintiffs, :
:
v. :
:
ROYAL CARIBBEAN CRUISES LTD., :
a Liberian Corporation, d/b/a :
ROYAL CARIBBEAN CRUISE LINE and/or :
ROYAL CARIBBEAN INTERNATIONAL. :
:
Defendants. :
___________________________________________/

The 30(B)(6) deposition of Continental Shipping, Inc., through its designated corporate representative, DANIEL THREADGILL-COLÓN, called as a witness by the Defendants, pursuant to the Federal Rules of Civil Procedure, before Saul Berrios Bautista, Puerto Rico notary public, and Dennis Zambataro, certified and Registered Professional Reporter, held at the offices of Continental Shipping, Inc., 360 San Francisco Street, San Juan, Puerto Rico, commencing at 10:23 a.m. on January 27, 2022.

APPEARANCES OF COUNSEL:

On behalf of the Plaintiffs:

SARAH A. LOBEL, ESQUIRE [Present via teleconference]
Hickey Law Firm, P.A.
SARAH A. LOBEL, ESQUIRE
1401 Brickell Avenue, Suite 510
Miami, FL 33131-3504
Telephone: (305) 371-8000
slobel@hickeylawfirm.com

On behalf of the Defendants:

MICHAEL J. DRAHOS, ESQUIRE
Gray Robinson, P.A.
222 Lakeview Avenue, Suite 800
West Palm Beach, FL 33401
Telephone: (561) 618-4450
Michael.drahos@gray-robinson.com

On behalf of Continental Shipping and the witness:

LUIS SALDAÑA, ESQUIRE
Saldaña, Carvajal & Vélez-Rivé, P.S.C.
166 Avenida de la Constitución
San Juan, PR 00901
Telephone: (787) 289-9250

Also Present: Nelson Dfreitas, Videographer



I N D E X


| Witness: DANIEL THREADGILL-COLÓN | Page |
|---|---|
| Examination by Mr. Drahos | 6 |
| Examination by Ms. Lobel | 62 |

DEFENDANTS' EXHIBITS

| | |
|---|---|
| Composite Exhibit A GR000115 - -142 | 11 |
| Composite Exhibit B GR000087 - -108 | 41 |




- TRANSCRIPT OF DEPOSITION -

VIDEOGRAPHER: One moment, please. This is the beginning of media number 1 in the deposition of Continental Shipping, Inc. -- [electronic feedback].

Sorry -- through the corporate representative, Mr. Daniel Edward Threadgill-Colón, in the matter of Richard Burgess, et al. versus Royal Caribbean Cruises, Ltd., et al., case number 1:20-cv-20687.

Today's date is January 27, 2022, and the time on the monitor is 10:23 a.m.

My name is Nelson Dfreitas, I'm the videographer. The court reporter is Dennis Zambataro. We are here with Huseby Global Litigation Support.

Counsel, please introduce yourself, after which the notary will swear the witness.

MS. LOBEL: Sarah Lobel.

MR. DRAHOS: Sarah, we lost half of your name. Try that again.

MS. LOBEL: Certainly.

MR. DRAHOS: We're not picking up



your sound. We're not picking up your sound.

THE WITNESS: Where is the sound coming from, from the phone, the computer or both?

MR. DRAHOS: It's coming from the computer and it was working and then when you went to say your name we only heard your first name.

MS. LOBEL: Just let me know. This is Sarah Lobel on behalf of the plaintiffs.

MR. DRAHOS: Okay, we've got that. Michael Drahos on behalf of the defendant.

MR. SALDAÑA: The Luis Saldaña on behalf of Continental Shipping.

MR. DRAHOS: Go ahead, sir.

NOTARY PUBLIC: My name is Saul Berrios Bautista, attorney and notary public of Puerto Rico. I'll be administering the oath for this deposition.

To the videographer, raise your right hand and state your full name for

the record.
[The videographer, Nelson Dfreitas, was first duly sworn by the notary public.]
NOTARY PUBLIC: To the court reporter, will you please raise your right hand and state your name for the record?
[The court reporter, Dennis Zambataro, was first duly sworn by the notary public.]
NOTARY PUBLIC: Will the deponent please raise your right hand and state your name for the record?
THE WITNESS: Daniel Threadgill.
DANIEL THREADGILL-COLÓN
was called as a witness by the Defendants, having been first duly sworn by the notary public, was examined and testified as follows:
NOTARY PUBLIC: May I be excused?
MS. LOBEL: Yes, sir.
MR. SALDAÑA: Yes, sir, thank you.
EXAMINATION
BY MR. DRAHOS:
**Q. Okay. Are we ready, everyone? Good**



**morning, can you please introduce yourself to the members of the jury?**
A. Yes. My name is Daniel Threadgill. I am the operations manager for Continental Shipping.
**Q. Mr. Threadgill, where are we today?**
A. We're in San Juan, Puerto Rico.
**Q. And specifically where in San Juan, Puerto Rico are we?**
A. In San Francisco Street, 360 San Francisco Street.
**Q. Is this the corporate headquarters for Continental Shipping here in San Juan, Puerto Rico?**
A. Yes, sir.
**Q. You indicated a moment ago you are the director of operations; is that right?**
A. Operations manager, yes, sir.
**Q. And you understand that you've been produced here today in the case of Richard Burgess versus Royal Caribbean Cruises as Rule 30(b)(6) corporate representative on behalf of Continental Shipping Incorporated.**
A. Yes, sir.



**Q. Do you understand your testimony here today in the case binds the corporation?**
A. Yes, sir.
**Q. All right. So why don't we start out, if we will, please, sir, can you tell us a little bit about Continental Shipping?**
A. Continental Shipping, we're a logistics agency for about 80 to 90 percent of the cruise lines that come into Puerto Rico.
**Q. So when you say you're a logistics agency, for those of us who are not familiar with how the administration of how the cruising industry works, can you give us a little bit of a summary of exactly what that involves?**
A. I would say a cruise ship is a floating hotel, basically. It comes in and out of port in a very limited amount of time, so all the governmental processes, paperwork, pier assignments, immigration, customs formalities, logistical needs, garbage, medical services, transportations, you know, food provisioning, anything of that nature we try to coordinate.
**Q. Okay. And so what you serve as is like the local representative here in San Juan for the various cruises that come into port**



**here?**
A. Yes, sir.
**Q. And how long has Continental Shipping been doing this?**
A. Continental Shipping was founded in 1974 by Mr. José Busto, who was also on the cruise ships for many years. And he started a family-owned and run business here. Met his wife here and started providing these services, I believe, in 1974.
**Q. And so this is a family-owned business?**
A. Yes, sir.
**Q. And what do you do as the director of operations for Continental Shipping?**
A. Well, I oversee the day-to-day operations; make sure for the most part that things run as smoothly as possible.
**Q. For how long of a period of time have you been working for Continental Shipping?**
A. I started in 1996.
**Q. What was it that brought you to Continental?**
A. I used to be a teacher for approximately ten years or so, and I was

actually the teacher for Mr. Busto's son. And we had a very good relationship. And, you know, little by little, time -- time, economics -- you know, the constraints of teaching -- unfortunately, I would have loved to have continued teaching, but economically speaking I had to find better things to pursue.

I had a good relationship with them. They brought me over and I've been here ever since.

**Q. When you were hired at Continental Shipping, when did you say that was, 19-what?**

A. In December of '96, if I am not mistaken.

**Q. In December of 1996 were you hired to be director of operations?**

A. No, no, I came in on ground level. I never had previous experience in this business. And so I started on the ground level as an agent in training. And then little by little worked my way up.

**Q. Okay. And so how many people now do you supervise on a day-to-day basis? Actually let me strike yet and rephrase it.**

**Back in 2019, February,**



**specifically, of 2019, how many employees here at Continental Shipping did you supervise?**

A. Directly in the operations department, probably 12 to 16.

**Q. And back in February of 2019, did Continental Shipping serve as the port agent for Royal Caribbean Cruise Line?**

A. Yes, sir.

**Q. And did you also serve as the port agent for multiple other cruise lines?**

A. Yes, sir.

**Q. How many in total do you believe that you were serving as port agent for back in 2019?**

A. The major lines, I would say close to probably 90 percent.

**Q. Okay. What I would like to do, I'm going to hand you what we are going to mark as Composite Exhibit A to the deposition, and Sarah for your -- I'm going to identify the Bates numbers for you.**

MS. LOBEL: All right.

[Defendants' Composite Exhibit A was marked for identification.]

MR. DRAHOS: You let me know when



you are ready and I'll ask him a question.

So I'm going to hand the witness what we are going to mark as Composite Exhibit A to the deposition. For purposes of the record it is Bates number GR115 through GR142.

I'll hand a copy for Mr. Saldaña as well.

MR. SALDAÑA: Thank you, sir.

MR. DRAHOS: Sarah, let me know when you are there, GR115.

MS. LOBEL: Give me a second.

MR. DRAHOS: Okay.

MR. SALDAÑA: Go ahead.

BY MR. DRAHOS:

**Q. So, Mr. Threadgill, do you recognize what's been put in front of you today as the Defendants' Composite Exhibit A?**

A. I've seen this contract before, yes, sir.

**Q. What is Defendants' Composite Exhibit A?**

A. It's a port agent agreement between the cruise line and the agency, which is



Continental Shipping.

**Q. Between Royal Caribbean Cruises and Continental Shipping?**

A. Yes, sir.

**Q. How is it that you recognize this document?**

A. I've been here 25 years. I've seen them before.

**Q. Okay. And does the Defendants' Composite A appear to be an accurate copy of the port agent agreement between Continental Shipping and Royal Caribbean Cruises?**

A. Yes, sir.

**Q. And is this kept in the regular course and scope of business operations, this record? Is it kept in the regular course and scope of business operations at Continental Shipping?**

A. Normally, at the present level, yes, sir.

**Q. As the director of operations, do you have regular access to this kind of document if you wanted to pull it and take a look at it?**

A. Yes, sir.

**Q. What I would like to do, if you**

would turn your attention, please, to page 16 of the document which would be Bates number 130.

MR. DRAHOS: Sarah, let me know when you are there.

MS. LOBEL: I'm already there.

BY MR. DRAHOS:

Q. You're already there? Okay.

So, Mr. Threeadgill, does the Defendants' Composite Exhibit A truly and accurately convey the relationship between Continental Shipping and Royal Caribbean Cruises as you understand it existed back in February of 2019?

MR. SALDAÑA: Objection. Calls for a legal conclusion, but I'm going to allow the witness to answer.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

Q. And if you will note there Article 9, does Continental Shipping agree back in February 2019 to served as an independent subcontractor in its relationship with Royal Caribbean Cruises?

A. Yes, sir.

MR. SALDAÑA: Again let me object



here. It calls for a legal conclusion, but I'm going to allow the witness to answer.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

Q. Does Continental also agree that Royal Caribbean Cruises had no control over Continental Shipping or any employees of Continental Shipping back in February of 2019?

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. And do you also agree that Continental Shipping was responsible for all salaries, employee benefits, taxes, and any unemployment insurance for any and all employees who worked for Continental Shipping back in February of 2019?

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. And would you agree that neither any -- neither Continental or any employee of Continental or agents of Continental were employees of Royal Caribbean back in February of



2019?

MR. SALDAÑA: Objection. Calls for a legal conclusion, but I'm going to allow the witness to answer that.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

Q. Okay. Would you also agree that Continental could not tell Royal Caribbean how to do its job, nor could Royal Caribbean tell Continental how to do its job back in February of 2019?

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. Would you then agree these two companies, Continental Shipping and Royal Caribbean Cruises, were two separate and independent companies from each other back in February of 2019?

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. So when we were talking a little bit about what some of the duties are for Continental Shipping when serving as a port



agent for the various cruise lines, one of the tasks that you had identified was helping to facilitate medical disembarks from the ship of cruise and guests; is that right?

MS. LOBEL: Form.

THE WITNESS: Yes.

BY MR. DRAHOS:

Q. So has that service been provided to Continental Shipping to various cruise lines over the past 30 years of this company's existence?

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

Q. By the way, have you as director of operations had some role or had some experience in facilitating these medical transfers over the last 25-some years that you have been here?

A. Yes, sir.

MS. LOBEL: Objection.

BY MR. DRAHOS:

Q. Has this experience, serving as a port agent here in San Juan, required Continental to have knowledge of medical care that's available here on the island of Puerto

**Rico?**

MS. LOBEL: Form.

THE WITNESS: Based on that experience, yes, sir.

BY MR. DRAHOS:

**Q. And so does Continental agree then that part of the function of serving as a local port agent is to regularly communicate with area hospitals in facilitating medical transfers?**

MS. LOBEL: Form.

THE WITNESS: When the cases arise, yes, sir.

BY MR. DRAHOS:

**Q. And can you give us even an estimate of approximately how many medical transfers Continental Shipping has facilitated either for crew or guests aboard various cruise lines on an annual basis?**

MS. LOBEL: Form.

THE WITNESS: Educated guess would be approximately around a hundred maybe a year.

BY MR. DRAHOS:

**Q. Okay. So what I would like to do then --**



MS. LOBEL: I didn't hear his answer, the first part of it.

THE WITNESS: Approximately, maybe a hundred a year.

BY MR. DRAHOS:

**Q. Okay. So what I would like to do then is ask you a little bit about how the process works of facilitating medical transfers from a cruise ship to a shoreside facility here in Puerto Rico, okay, sir?**

A. Yes.

**Q. What is the first step in that process?**

A. Well, obviously the notification from the vessel, either by phone, email or sometimes direct communication, if the agent specifically happens to be on board. It could be one of those three ways.

**Q. Okay. And so during this process, when there's a communication had between the ship's medical facility and the agent here at Continental Shipping, what information is exchanged?**

A. Normally we need to begin the process with the name of the patient, the date



of birth, the brief diagnosis, and any of the medical insurance history available.

**Q. And so once you obtain this information, what do you do with it?**

A. Usually the next step would be to contact a local hospital to try to establish a communication with the ER doctor on duty; the ER doctor, once we have established communication with the ER doctor on duty, we connect him with the ship's doctor on board to present the case officially.

**Q. So I don't understand, why do you even have to do that? Why not just send the patient to any hospital that's close?**

A. Well, because there's a distinction, at least here in Puerto Rico, that if you're in the street, and you're in a car accident, and you're in an emergency, well, you have to go to the nearest medical facility.

But if you're under a doctor's care, it's considered more of a doctor-to-doctor transfer, or -- doctor-to-doctor transfer, yes, sir.

So, normally, so that everything is coordinated accordingly, we have to contact the



doctor so the doctors can confer and make sure that the hospital is ready for the transfer when it occurs.

**Q. So is every hospital here in Puerto Rico capable of providing the same standard of care?**

A. No, sir.

**Q. Does every hospital here in Puerto Rico have the same resources?**

A. No, sir.

**Q. Does every hospital here in Puerto Rico have the same specialists, the same medical specialists?**

A. Unfortunately not, no sir.

**Q. So in obtaining this information and in making these phone calls as you do, is part of your goal to make sure that wherever you're going to send this patient that the facility that's going to accept them has the capabilities with which to render that care that that person may need?**

MS. LOBEL: Form.

THE WITNESS: Absolutely. A lot of times, yes, during those first communications, depending on the case,

that's usually the first communication.
Before we actually put the doctors together we will ask -- find out from the hospital -- because a lot of times the hospitals say, What is the particular case? And we'll say, This is what we've been told. And they will say, We don't have specialists or whatever.
And so then we would have to go to the next hospital.
BY MR. DRAHOS:
**Q. So does every hospital here in Puerto Rico have to accept every patient?**
A. Yes, sir.
**Q. So in instances where you call a private hospital, and perhaps they may not be interested for whatever reason, has it been your experience that they will turn you away and just simply say, We don't want the patient?**
A. We've heard from communications that they are full, they don't have a specialist available, for, you know -- yes, for a variety.
**Q. So, then, does that then mean that not every hospital is going to accept every patient's request?**



MS. LOBEL: Form.
THE WITNESS: Yes, sir.
BY MR. DRAHOS:
**Q. There may be instances where for whatever reason the hospital has to turn you away?**
MS. LOBEL: Form.
THE WITNESS: Yes.
BY MR. DRAHOS:
**Q. Is that part of the goal then to make sure that that administrative red tape is handled before a patient is sent? Because I would imagine it would be a pretty terrible thing if you sent somebody to a hospital and they turned you away and you have no alternative plan for where else to send the patient, correct?**
MS. LOBEL: Form.
THE WITNESS: Yes, sir.
BY MR. DRAHOS:
**Q. Has it been your experience in the years of doing this, it's most efficient and most effective for the safety of the parent to work out the arrangement ahead of time that that hospital is going to accept that patient?**



MS. LOBEL: Form.
THE WITNESS: Yes, sir.
BY MR. DRAHOS:
**Q. Okay. And what about the actual logistics of the transfer itself?**
**Does the port agent also get involved in coordinating ambulance services?**
A. Yes.
MS. LOBEL: Form.
THE WITNESS: Yes, it's part of the process. Once we have established a hospital, a receiving facility, that is communicated to the ambulance company, because usually when we coordinate the ambulance the first thing they are going to ask us is the name of the hospital and their receiving physician.
BY MR. DRAHOS:
**Q. So why does the ambulance company want to know that?**
A. Because when they arrive to the hospital they have to have -- to be able to transfer the patient over to the hospital. They will be asked who is receiving this patient.
**Q. So in Continental's 30-plus years of**



**providing medical transfer services here in San Juan, will an ambulance company accept a service request without the accepting-facility being confirmed?**
THE WITNESS: No, sir, not from a cruise ship.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. So they will not come unless you all are able to tell them there is a facility who has accepted the patient?**
MS. LOBEL: Form.
THE WITNESS: They will not move the patient, correct.
BY MR. DRAHOS:
**Q. Is this an easy process?**
A. No, sir.
**Q. Why not? What are some of the challenges that you all face when trying to facilitate this kind of arrangement?**
MS. LOBEL: Form.
THE WITNESS: I've lived her close to 35 years of my life. I love my island very much. But I would say one of the areas that we're definitely lacking is

our medical services. And, you know, it's three and a half million people in a small 100-mile by 35-mile wide island.

It's just difficult. To get anything coordinated via telephone is difficult. Just to get anything from Point A to Point B is difficult because of the congestion, the traffic. You know, it's -- yes, it's challenging, yes, sir.

BY MR. DRAHOS:

**Q. You made mention of the fact that getting anything done by telephone is difficult.**

**Explain to me some of the challenges that Continental Shipping faces when trying to just simply make a phone call.**

A. Well, first, just to get them to answer the phone can be challenging. And once we do get them -- get them answered, if it happens to answer -- then a lot of times we get in the process of being transferred. We'll call and maybe a nurse will pick up and she'll put us on hold or transfer us over to somebody else. And somebody else won't know. And they will transfer us again.



So, then, we've had situations where we eventually have been put on hold and the actual line cuts off and drops and then we have to call again.

So, yeah, it can being quite challenging.

**Q. So tell me a little bit about your knowledge of the resources for ambulance services here on the island as well. What's that like?**

MS. LOBEL: Form.

THE WITNESS: It falls in line in the same lane. I mean everything is -- there's just -- the system is definitely overburdened. And ambulance companies, we've gone through a myriad of different companies just to try to establish consistent service from them also.

BY MR. DRAHOS:

**Q. What do you mean by that?**

A. Well, sometimes you can call an ambulance. And by the time they arrive it might not necessarily be the time that you called when they dispatch the ambulance.

When they dispatch it and it



arrives, we've had cases where we've had ambulances arrive and, you know, we asked for an ACL, a more advanced life support system ambulance, and we get a basic life support system arrive. We've had to turn them away and call the right ambulance to get it into place.

So, yeah, it's a challenge.

**Q. When you make a phone call to request an ambulance service, are you essentially competing with the other 3.5 million people on this island who may necessarily also need ambulance services as well?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So tell me a little bit about the unique nature of the logistics of this island itself; how many roadways are there into -- strike that.**

**Let me ask you first: Where is the Port of San Juan located on island?**

A. In Old San Juan.

**Q. In Old San Juan?**

A. Yes, sir.

**Q. How many roads are there into Old San Juan?**



A. There is basically a bridge. You come in on one in, and one out.

**Q. So there's one road in and there's one road out.**

A. It's a small island on an island.

**Q. So on a particular day, if there happens to be an accident -- or strike that.**

**Have you encountered situations where traffic becomes a major issue in trying to facilitate a medical transfer?**

A. Absolutely.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Tell me about some of the experiences that you have had in that regard.**

A. It is -- San Juan is the major hub for politics; the governor's mansion is there; Capitol Building is there; it's also the main tourist section with El Morro Castle up on the top.

It's a tradition in Puerto Rico that on weekends, more so than during the week, that everybody kind of takes the family, takes a trip to Old San Juan to see the sights.

Page 30

So there's a lot of movement in and out of the city, yes, sir.
**Q. Okay. So no matter what day of the week that a request for medical transfer occurs, that one road in and one road out is also competing with any and all traffic to and from the government buildings; any and all traffic to and from these major tourist sights; and any and all traffic that could be related to the castle and all of the other --**
A. Yes, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. What would you call them, landmark areas that are in this --**
A. The whole city is basically a landmark in itself.
**Q. Okay. So what ambulance service was used in this particular case regarding a passenger or a guest named Richard Burgess?**
A. Sunny Ambulance, S-U-N-N-Y, I believe is the way they spell it.
**Q. Is Sunny Ambulance a public or a private ambulance company?**
A. It is a private.

Page 31

**Q. So I don't understand, why not just call 911 when you have a medical emergency at the port?**
A. As I mentioned earlier, 911, first of all, is very inconsistent as most other services are, so you lose complete control over communications. You don't know when they are going to arrive.
And also with 911 we have no -- they take typically -- their mandate is to take the patient to the nearest facility, regardless of the condition, to stabilize and then transfer from that point.
**Q. So --**
A. So we use that usually as the last-ditch option or last measure, so to speak, if that would be the case.
**Q. In other words, you only resort to 911 when there's literally no other option available to transfer the patient?**
A. Yes, sir.
**Q. And --**
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. -- you said earlier that you lose**

Page 32

**communication with them.**
**Can you tell me the differences in communication between when you would facilitate a transfer with a private ambulance company and when you turn it over to 911?**
MS. LOBEL: Form.
THE WITNESS: Well, with private we have direct lines to their supervisors and dispatch, so we can constantly call and find out, you know, what's the status? What's going on? Where is the ambulance? We're not seeing anything.
But in 911, outside, re-calling 911, which gets you probably transferred to a different 911 operator, there's no way for us to know when the actual ambulance will arrive.
BY MR. DRAHOS:
**Q. Okay. And you also made mention of the fact that it's 911's policy to transfer the patient to the nearest destination; is that correct?**
A. Yes, sir.
MS. LOBEL: Form.

Page 33

BY MR. DRAHOS:
**Q. And what is the nearest destination from the Port of San Juan where a guest from a cruise ship would be transferred if 911 was to follow that directive?**
A. To a clinic called Hoare, H-O-A-R-E, if I'm not mistaken.
**Q. So tell me about the Hoare Clinic; what is that exactly?**
THE WITNESS: I wouldn't say -- it is a very small dispensary type clinic operation, usually for minor type incidents. But we've had cases where patients in the past were transferred to that facility and it was not a positive experience.
BY MR. DRAHOS:
**Q. So, pointblank, Mr. Threadgill: If a request was made to transfer a stroke patient, would sending them to the Hoare Clinic be a wise move?**
A. No, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Why not?**

A. Because they are barely a hospital. Like I said, based on the experience that we have, you know, they have very rudimentary services that they can offer. It's more of a clinic, a dispensary -- I don't know the term.

**Q. Okay. So is there a hospital in Puerto Rico that's the preferred choice for stroke care?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. And what is the name of that of hospital?**

A. The Hima Caguas.

**Q. And why is Hima Caguas the preferred choice for stroke care here in Puerto Rico?**

A. Based on our experience, you know, this has always been where we have been referred by many doctors to go. And they have -- as far as we know, the best -- the only center that can best handle these cases.

**Q. So is Hima, in your experience, the top-ranked hospital facility in the country for stroke patients?**

A. Yes.



**Q. Do they have the highest accreditation by the Joint Commission for stroke care?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Do they offer 24/7 medical care in a stroke unit?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Are they the only hospital in Puerto Rico capable of providing 24/7 care in a stroke unit?**

MS. LOBEL: Form.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

**Q. Do they also offer 24/7 neuro-intensive care?**

MS. LOBEL: Form.

THE WITNESS: Based on our experience, yes, sir.

BY MR. DRAHOS:

**Q. And do they also have advanced imaging studies capable of reading and**



**interpreting brain injuries on a 24/7 basis?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. And what's the reputation in this country -- what is Hima Hospital -- strike that.**

**What is Hima San Caguas's [sic] reputation here in Puerto Rico?**

A. Well, I'm not medically trained or anything, but if it was my family member that's probably where I would want them to go to, a loved one.

**Q. Okay. And how about the working relationship with Hima and Continental Shipping; have you had some experience with them?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Prior to February of 2019, had you ever had any kind of medical transfers sent to Hima before?**

A. Yes, sir.

**Q. And what has the experience been like?**

A. It has been fairly positive.



**Q. Okay. You need to speak up just a little bit.**

A. It's been fairly positive, fairly positive.

**Q. Have you had any negative experiences with Hima San Caguas?**

A. Not that I recall, no, sir.

**Q. Is there any financial incentive for Continental Shipping to transfer a patient to Hima San Caguas?**

A. No, sir.

**Q. In other words, do you get any kickbacks or bonuses?**

A. No, sir.

**Q. So I want to direct your attention to the matter that we're here today about that involves a guest aboard of Royal Caribbean Harmony of the Seas named Richard Burgess, specifically a request for a medical transfer that took place on February 21, 2019.**

**Were you working for Continental Shipping that day?**

A. Yes, sir.

**Q. What role were you serving in?**

A. In the office probably conducting

day-to-day operations, specifically I couldn't -- I wouldn't remember.

**Q. Do you have an independent recollection of what you were doing on February 21st?**

A. No.

**Q. All right. Who was the boarding agent who was assigned to the Harmony of the Seas on February 21, 2019?**

A. Jennifer Robles and the field supervisor Mr. José Ubiñas.

**Q. Can you spell his last name for me?**

A. U-B-I-Ñ-A-S.

**Q. Okay. And so what does a boarding agent do when a cruise vessel arrives at the port?**

A. Well, we break down operations in pre-arrival, vessel arrival, and post arrival.

Pre-arrival we would prepare the documentation and get everything going. And then the agent is to be on the pier about 30 minutes prior to the arrival to assure that the linesman is there, that the pier is in preparation to accept the arrival of the cruise ship.



**what, into the afternoon?**

A. She's assigned the vessel, to monitor and be there for the vessel's needs, and to make sure all services are coordinated.

If she would have had to have left the pier, which rarely happens, because we have other agents in training, or other types of gophers, if you want to call them that, that would run around, but she should be on the vessel most of the time, yes, sir.

**Q. Okay. So if the Harmony of the Seas was scheduled to arrive to the Port of San Juan on February 21, 2019, at 7:00 a.m., what time would Jennifer Robles have been at the port?**

A. Probably at 6:30.

**Q. And what time would she have boarded the ship?**

A. As soon as the first gangway was put up.

**Q. Okay. I'm going to hand you what we are going to mark as Composite Exhibit B to this deposition.**

MR. DRAHOS: And, Sarah, for your purposes, it's the emails that were disclosed in the case. The Bates number



Make sure that CBP is there, Customs and Border Protection, just to make sure that the vessel gets alongside, gets its gangways down, and is cleared to go as soon as possible for its port call in San Juan.

**Q. So when you broke this down into categories of pre-arrival, vessel arrival and post arrival, I want to focus on the vessel arrival part of that job.**

A. All right.

**Q. Does that mean when the vessel arrives into port, the boarding agent physically gets on the ship?**

MS. LOBEL: Form.

THE WITNESS: Yes, sir.

BY MR. DRAHOS:

**Q. So on February 21, 2019, when the Harmony of the Seas arrived into port, did Jennifer Robles get on the ship?**

A. Yes, sir.

**Q. For how long of a period of time did she remain on the ship?**

A. She was probably there most of the day.

**Q. When you say "most of the day,"**



for Exhibit B is GR87 through GR107 [sic].

Let me know when you get there and I'll wait.

[Defendants' Composite Exhibit B was marked for identification.]

MS. LOBEL: Just one second. One second, I have to scroll back.

MR. DRAHOS: No problem.

MS. LOBEL: Okay.

BY MR. DRAHOS:

**Q. Okay. So, Mr. Threadgill, I would turn your attention to GR88, which is the second page contained within Defendants' Composite Exhibit B; do you have it there in front of you?**

A. Yes, sir.

**Q. I would like to ask you, do you see about a quarter of the way down the page there's a heading there that says "From: HM Medical Secretary."**

**Do you see that?**

A. Yes, sir.

**Q. And it says, "To: Operations@ContinentalShipping.com"; do you see that, sir?**

A. Yes, sir.
Q. Is that Continental Shipping's email address?
A. Yes, sir.
Q. It has a comma there, and it says, "Continental@coqui.net"; what address is that?
A. That's a backup email that we use in emergencies should something happen to our primary email, which is the first one. Like a technical difficulty, which happens.
Q. Okay.
A. Sometimes the service provider -- very rarely does it happen -- but the service provider had a crash or something that we cannot access those emails, we have another option which is the secondary continental@coqui.net option.
Q. And so based on what we see in GR88, what time did the Royal Caribbean notify Continental Shipping for a medical disembark for Richard Burgess, on February 21, 2019?
A. We received the email at 10:59.
Q. All right. So what time does it indicate there on GR88 that this email was sent?
A. It's like 9:59.



Q. And can you turn your attention to GR99 -- actually on mine GR99 runs through to GR100.
But do you see on GR99 what appears to be midway down a response written by Continental Shipping; do you see that?
A. I think I'm lost here -- here it is on the bottom, 10:59 a.m.
Q. So does the email that's contained in GR99 through GR100 appear to be identical to the email that's contained within GR88?
A. Yes, sir.
Q. With the exception that the GR99 email indicates that it was sent at 10:59 a.m.?
A. Yes, sir.
Q. And the email that's contained within GR88 says it was sent at 9:59 a.m.?
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. Why is there an hour discrepancy between these two emails, even though they're identical?
A. The vessel operates on Eastern Standard Time, while we operate on Atlantic Standard Time.



Q. So does that then mean that Atlantic Standard Time is an hour ahead of Eastern Standard Time?
A. When the clocks change in the fall, you guys fall back -- or spring forward in spring. We do not. We stay the same. So we do not change the time.
Q. So, then, your email accounts run off of Atlantic Standard Time?
A. Yes, sir.
Q. And the email accounts for the ship run off of Eastern Standard Time?
A. Yes, sir.
Q. Okay.
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. So if the request was made for medical disembark for Richard Burgess at 9:59 Eastern Time, or 10:59 Atlantic, would Jennifer Robles still have been aboard the Harmony of the Seas at the time?
A. Yes, sir, probably most likely, yes, sir.
Q. And if she were still aboard the vessel, would she then physically report to the



medical center herself?
A. Yes, sir.
Q. And if she was physically in the medical center herself, would there be any need for phone calls between the medical center and Jeff Robles at that point?
A. Not if she's there, no sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. Based upon what you reviewed in GR88, does Continental Shipping agree that the requests made by Royal Caribbean was done so in a clear and comprehensive manner?
A. Yes, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. Was there any confusion at all about what was being requested from Royal Caribbean?
A. Based on this email, no, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
Q. And so did Continental Shipping understand the medical urgency of the request?
A. Absolutely.
Q. Okay.

A. Any medical situation, the minute we get an alert to a medical, everything is dropped and it's the first thing they attend to, is our standard procedure.
**Q. In other words, when you get a request for a medical disembark, do you wait around until it's convenient to get to it or do you get to it immediately?**
A. Regardless of what the situation is, the minute we get that emergency code red, we're moving quickly, yes, sir.
**Q. And so does Continental Shipping then agree that they understood the time-sensitive nature of the request that was being made by Royal Caribbean on February 21, 2019?**
A. That would be my understanding, yes, sir.
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. Did Continental Shipping also understand the particular medical care needs that would be required for Mr. Burgess in facilitating this transfer?**
MS. LOBEL: Form.



THE WITNESS: The stroke? Yes, sir. Might not know all of the details of the stroke, but I understand that's a pretty serious situation, yes, sir, and so do our agents.
BY MR. DRAHOS:
**Q. Okay. So did Jennifer Robles speak to the ship physician aboard the Royal Caribbean Harmony of the Seas on February 21, 2019 about this transfer?**
A. Yes, sir.
**Q. How would you know that?**
A. Because she would have had to facilitate the communication between the hospital and the doctor on board.
**Q. Okay. So whether or not this communication was done over the phone or face-to-face, in person, would Jennifer Robles have ever reached out to Hima Hospital to facilitate a transfer without having first spoken to the doctor?**
MS. LOBEL: Form.
THE WITNESS: No.
BY MR. DRAHOS:
**Q. So as you sit here today as the**



**corporate representative for Continental Shipping, are you able to testify to the specifics of what was discussed between Jennifer Robles and the ship's doctor?**
A. No, sir.
**Q. Is the only person who can speak to the specifics of what took place between Continental Shipping and the ship's doctor here at Continental Shipping, Jennifer Robles?**
A. Yes, sir.
**Q. All right.**
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. In other words, there isn't anyone else here at Continental Shipping who can speak to what happened between the agent and the ship doctor other than Jennifer Robles?**
A. Yes, sir.
**Q. Okay.**
MS. LOBEL: Form.
BY MR. DRAHOS:
**Q. So where was Richard Burgess ultimately transferred to on February 21, 2019?**
A. Hima Caguas.
**Q. And why was it that he was**



**transferred to Hima?**
A. Well, based on the experience that we've had, that would have been the best place to take him.
**Q. And that would have been the best place to take him because he was under suspicion for a potential stroke?**
A. Yes, sir.
**Q. Why not just transfer him to Ashford Presbyterian Hospital? That's the nearest hospital on the port.**
A. Based on our experience, Ashford has never accepted these kind of cases in the past.
**Q. How many years have you worked for Continental Shipping?**
A. About twenty-five years.
**Q. So in the 25 years that you've worked for Continental Shipping, Ashford Presbyterian Hospital has never accepted a transfer a stroke patient?**
A. Not that I am aware of, no, sir.
**Q. So I want to ask you if the evidence in this case were to indicate that Sunny Ambulance, which was the ambulance that you testified was used to transfer Mr. Burgess,**

**dispatched at 12:21 p.m., what does that indicate to you in terms of when Hima Hospital confirmed their availability?**

MS. LOBEL: Form.

THE WITNESS: That could be a little challenging to pinpoint, because I would assume that at that point, that is when they had their confirmation that the case was accepted.

However, I don't know, because it might have been accepted earlier.

If they dispatched -- that was the time they dispatched. I don't know the time that they actually received the call and the confirmation.

BY MR. DRAHOS:

**Q. Okay. So in attempting to recreate retrospectively what happened on February 21, 2019, if we were to go off of the run report of Sunny Ambulance, which indicates that they dispatched at 11:21 a.m. Eastern Time, 12:21 p.m. Atlantic, does that then mean to you, as the corporate representative for Continental Shipping, that Hima San Caguas must have confirmed their willingness to take Richard**



**Burgess by at least 11:21 a.m. Eastern, 12:21 Atlantic Time?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. Because Sunny Ambulance wouldn't have come without that confirmation in place?**

MS. LOBEL: Form.

THE WITNESS: They would not have moved the patient, correct.

BY MR. DRAHOS:

**Q. And so if the request was made by Royal Caribbean at 9:59 a.m. Eastern, 10:59 a.m. Atlantic, and the confirmation had to have been accomplished by at least -- the confirmation from Hima had to have been accomplished by at least 11:21 p.m. Eastern, 12:21 p.m. Atlantic, does that then mean that at most it took Continental Shipping an hour and 22 minutes to facilitate this transfer?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So what I would like to do then -- again, assuming that Sunny Ambulance left the**



**minute they received word of this confirmation -- I would like for you to go through with me, please, for the benefit of the members of the jury, everything that Continental Shipping would had to have done in order to get that done within that time frame, okay, sir?**

A. Okay.

**Q. So let's go back over and review.**

**What is the first thing that Continental Shipping would have had to have done in order to facilitate this transfer within one hour and 22 minutes?**

A. Well, the first thing, they would have to receive the notification. In that case if the vessel is in port, the agent would go immediately -- drop everything and go to the medical facility to --

**Q. So in this instance, then, when a notification was received, Jennifer Robles would have stopped what she was doing and gone directly to the ship's medical center?**

A. Yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. And then at that point, Jennifer**



**Robles would need to get the information from the doctor as to what the condition of the patient was and the medical needs?**

A. Yes, sir.

**Q. All right. And so at that point is it Jennifer Robles that calls Hima Hospital?**

A. Normally, yes, we call to try to establish the contact --

**Q. And so --**

A. -- because of the challenges that we've had in the past where, you know, ships have called directly. We've had cases where they tried to call and they can't get through; language barrier issues; nobody picks up.

Just the things that we discussed earlier. The challenges, since we're a little more attuned to those challenges and we understand how they operate, we try to facilitate that part of the -- to expedite as best as possible.

And then usually she reaches out and it's very rarely that she'll immediately speak to the ER doctor on duty.

**Q. So when Continental Shipping facilitates a medical transfer to Hima San**

**Caguas, is there a particular line that has to be called first in order to get that communication under way?**

A. Yes, sir.

**Q. What is that line that you all have to call?**

A. Hima is three hospitals, basically.

They have a branch in Bayamon; they have a branch in Caguas; and they have a branch in Fajardo, which is another town in Puerto Rico.

**Q. So does Jennifer Robles have to call all three of those branches?**

A. No, sir.

**Q. Who does she call?**

A. She calls -- there's a general line where she would speak to a facilitator or a medical secretary, or some sort like that where we present the case.

And then usually they would say, Okay, we'll call you back. And kind of guide you through in the direction that you need to call or go.

**Q. So Jennifer Robles would call this Hima help line; speak to this particular**



**representative; and then that representative makes the phone calls to the various hospitals?**

MS. LOBEL: Form.

THE WITNESS: They would usually be the one to guide, yes, sir.

BY MR. DRAHOS:

**Q. Okay.**

A. I am sure in this particular case they said Hima Caguas, and then they would have to connect us to whoever the doctor is. And Jennifer would have to wait for the information, because once she had that she could contact the doctor and then put those two doctors together to finally present the case.

**Q. So when you are going through this line of communication at Hima Hospital, you are reliant, then, upon the speed and efficiency of this representative at Hima to work through their system and identify somebody who can eventually make the decision; is that correct?**

A. Absolutely.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. In your experience typically, how long does it take for Hima to do this due**



**diligence on their end?**

A. Best-case scenario it would be 15, 20 minutes; worst-case scenario would be 30, 40 minutes.

**Q. So anywhere between 15 to 40 minutes, it's been your experience, that it takes for Hima to do this due diligence?**

A. Yes, sir; educated guess yes, sir.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So in this instance, then, by virtue of the fact that Richard Burgess was transferred to Hima, does that mean that this process must have been followed? You couldn't just drop him off without Hima saying that they would accept him, right?**

A. No, no, sir.

**Q. Does that then mean that that process must have been followed?**

A. Yes, sir.

**Q. So once Hima calls back to advise that they have somebody who's willing to listen to the case, what does Jennifer do then?**

A. At that point she will contact the point of contact given. And usually at that



point she'll hand the phone over to the doctor on board who will then consult with the receiving physician.

And then at that point it's determined if they will receive the patient. And if it is, the doctor will confirm that Dr. -- we usually require a name, so we can then call the ambulance company and confirm that the hospital has accepted the patient, and Dr. X will be the receiving physician.

**Q. All right. So in your experience, is there two different ways that this doctor-to-doctor communication can be facilitated, either the doctor on the cruise ship can call the hospital or if Jennifer Robles is physically in the medical center, she can hand her phone to the doctor and have the doctor on the cruise ship speak to the doctor at Hima?**

A. Inside the ship, being a metal structure, sometimes the cell phones don't work that well. So if the doctor, when they were inside the ship, it was probably communicated through the ship's telephones, or they went out to the gangway and she called from outside the gangway, which I've seen done also. The doctor

and the agent go out to the gangway to make the call.

**Q. How does Jennifer Robles -- if she's on board the ship -- how does she know what number to call?**

MS. LOBEL: Form.

THE WITNESS: After all these years of experience, we have all -- all of the agents have the -- in their memory have all of the hospital contacts.

BY MR. DRAHOS:

**Q. So in the memory of her phone she can go to it, go to Hima, and dial it right off her cell phone?**

A. Yes, sir.

**Q. All right. So is there potentially a scenario, sir, where Jennifer Robles is physically in the medical center, gets the communication that Hima is willing to listen to the case --**

A. Yes.

**Q. And handed her phone to the ship's doctor for this discussion to be had?**

A. It would have had to have happened that way.



**Q. Okay. So once the ship doctor and the Hima doctor talk, what happens next?**

A. At that point the doctor will either say, Okay, I'll take the case or I won't take the case.

And that the doctor will turn to Jennifer and say, They are accepting the case, and the doctor -- whatever his name is -- and that way then she can call the ambulance company back and give them the information required for them to move the patient.

**Q. Okay. So once this confirmation is had then Continental Shipping is able to call the ambulance to facilitate transfer; is that right?**

A. Yes.

MS. LOBEL: Form.

BY MR. DRAHOS:

**Q. So for instance, by virtue of the fact that Richard Burgess was transferred to Hima San Caguas, does that then mean that Jennifer Robles and the ship's doctor spoke; she obtained --**

MS. LOBEL: Form.



BY MR. DRAHOS:

**Q. -- the information that she needed; she contacted Hima, the help line, spoke to that representative.**

**That representative then called various different departments and personnel at Hima to confirm their availability.**

**Jennifer Robles heard back from that representative; put the doctor in touch with the physician for Hima; and then contacted a private ambulance service, all within an hour and 22 minutes?**

A. Yes, sir.

**Q. Based upon your 27 years --**

A. Twenty-five.

**Q. Twenty-five years with Continental Shipping, for a stroke patient like Richard Burgess in the Port of San Juan, would this type of response time, an hour and 22-minute response time, have been a below-average, average or above-average performance by Continental Shipping?**

A. Above average.

**Q. Why is it that you believe it to be above?**



A. Because of the challenges that we spoke about before previously.

**Q. Okay. Those are all of the questions that I have for you.**

**Well, actually, let me ask this: Do you think that there's anything that either Continental Shipping or Royal Caribbean could have done to get Richard Burgess transferred to Hima Hospital any faster than what was done on February 21, 2019?**

A. No, sir.

MS. LOBEL: Form.

MR. DRAHOS: Those are all the questions that I have. Ms. Lobel will have an opportunity to ask you whatever questions that she would like to ask.

Sarah, is it all right if we take a quick bathroom break?

MS. LOBEL: Yeah, we can take a ten-minute break.

VIDEOGRAPHER: We are going off the record. The time is 11:19.

[Recess taken from 11:19 a.m. until 11:26 a.m.]

VIDEOGRAPHER: Back on the record.

The time is 11:26. On the record.

EXAMINATION

BY MS. LOBEL:

**Q. Good afternoon sir; how are you?**

A. Good afternoon, yes, ma'am.

**Q. Sorry?**

MR. DRAHOS: There were just pleasantries being exchanged, How are you doing? That's it.

MS. LOBEL: I'm sorry.

MR. DRAHOS: The court reporter is saying that the computer is too far away; you may want to move it up.

MS. LOBEL: That's fine, because I can't hear him at all.

(Microphone and computer monitor is moved.)

MS. LOBEL: All right. Let's try this again.

BY MS. LOBEL:

**Q. Okay. Good afternoon, sir; how are you?**

A. Good afternoon, yes, fine.

**Q. All right. My name is Sarah Lobel. My understanding is that my office sent you a**



**subpoena for deposition, for a deposition like we're doing here today; were you aware of that?**

A. Yes.

**Q. And we also requested numerous documents from your company, but none were ever sent in response to our subpoena; were you aware of that?**

A. Yes, ma'am.

**Q. Why is that?**

MR. DRAHOS: Object to form.

BY MS. LOBEL:

**Q. You may answer.**

A. It was referred to our --

**Q. You may answer.**

**MR. SALDAÑA: Let him answer, please.**

THE WITNESS: I said as far as I'm aware, that's when our lawyer was brought in and at that time I deferred to my lawyer.

BY MS. LOBEL:

**Q. Okay. Did you get documents over to Royal Caribbean from your company when requested?**

MR. DRAHOS: Object to the form.



THE WITNESS: No, ma'am. Not that I am aware of.

BY MS. LOBEL:

**Q. Okay. Why is it you are willing to appear here today without a subpoena, but refused to come for a deposition when we sent a subpoena with the same request?**

**MR. SALDAÑA: Objection to the form of the question.**

MR. DRAHOS: Form. Join.

BY MS. LOBEL:

**Q. You may answer.**

**MR. SALDAÑA: If you can.**

THE WITNESS: Because I was asked to by the lawyer.

BY MS. LOBEL:

**Q. I see. Can you tell me everything that you did to prepare for today's deposition?**

A. I was at a meeting yesterday. We talked nearly four hours where we discussed it.

**Q. Who was at the meeting?**

A. Mr. Saldaña and Mr. Drahos; Mr. Christian Busto from within our company; Mr. José Ubiñas, who is the field supervisor.

**Q. How many meetings did you have with**



**Mr. Drahos present?**

A. That was the second time I met Mr. Drahos, yesterday.

**Q. When was the first time that you met Mr. Drahos other than yesterday?**

A. He came in, I believe in November, if I'm not mistaken, for a meeting, a meet-and-greet, and mentioned the possibility of this happening.

**Q. Okay. And that was in November of 2021?**

A. Yes, ma'am.

**Q. How long did your meeting with Mr. Drahos last in November of 2021?**

A. I would say probably less than an hour.

**Q. What did you discuss with Royal Caribbean's lawyer in November of 2021?**

**MR. SALDAÑA: Object to form, and admonition of the attorney-client privilege. And I'm instructing the witness not to answer that.**

MR. DRAHOS: Objection to the form.

MS. LOBEL: The attorney-client privilege would have been waived if a

third party was present. Mr. Drahos represents Royal Caribbean.

BY MS. LOBEL:

**Q. So what did you and Mr. Drahos discuss?**

**MR. SALDAÑA: Objection and admonition of the attorney-client privilege and I'm instructing you not to answer any of those questions.**

MS. LOBEL: I don't understand the basis, sir, if there was a third party present which would have waived any client privilege.

Can you please advise me so I can take it up with the Court?

MR. SALDAÑA: Take it up with the Court.

MS. LOBEL: I don't understand the basis of your objection since the attorney client privilege was waived.

MR. SALDAÑA: No, the basis of my objection is that we have what is called a JDA, a Joint Defense Agreement, with counsel. And it specifically states that we do not waive any of those rights and



privileges.

So you can take it up with the Court.

BY MS. LOBEL:

**Q. Okay. Sir, is it your understanding that you are also represented by Royal Caribbean's lawyers in addition to your company's attorney?**

MR. DRAHOS: Objection to the form.

BY MS. LOBEL:

**Q. You may answer.**

**MR. SALDAÑA: No, no, you won't.**

MS. LOBEL: Okay. I see.

BY MS. LOBEL:

**Q. But, sir, are you refusing to answer any question about what you discussed with Mr. Drahos who represents Royal Caribbean?**

**MR. SALDAÑA: I'm instructing you to do that, yes.**

BY MS. LOBEL:

**Q. You may answer, sir.**

**MR. SALDAÑA: You have to say yes, I'm refusing.**

THE WITNESS: Yes, I'm refusing. I'm sorry.



BY MR. SALDAÑA:

**Q. Okay. Just so I'm clear, who else was present during the meeting that you had with Mr. Drahos, the lawyer, and your employer in November of 2021, other than Mr. Drahos?**

A. Okay, Mr. Christian Busto.

MS. LOBEL: Who is that?

THE WITNESS: He is the president of Continental Shipping; Mr. José Ubiñas is field supervisor; Ms. Jennifer Robles and Ms. Line García.

BY MR. SALDAÑA:

**Q. How long was this meeting, would you say?**

A. Less than an hour, I would say.

**Q. All right. Let's talk about your meeting yesterday. How long was your meeting yesterday with Mr. Drahos?**

A. Excuse me? I'm sorry, please repeat.

**Q. Certainly. How long was your meeting with Royal Caribbean's lawyer yesterday?**

A. Approximately --

MR. DRAHOS: Objection to the form.

THE WITNESS: Approximately four



hours.

BY MR. SALDAÑA:

**Q. Who else was present?**

A. Mr. Saldaña, our lawyer here; Mr. Christian Busto, president of Continental Shipping; Mr. José Ubiñas, field supervisor of Continental Shipping; and Ms. Line García, ex-employee of Continental Shipping.

**Q. Was Ms. Robles there?**

A. No, ma'am.

**Q. And Mr. Line García was there, correct?**

A. Yes, ma'am.

It's written as "Line," but it's pronounced "Lynn."

**Q. Okay. Mr. Line García was there too, correct?**

**MR. SALDAÑA: Mrs.**

THE WITNESS: Yes.

BY MR. SALDAÑA:

**Q. And is Mr. García an employee of the company?**

**MR. SALDAÑA: Ms. García please.**

THE WITNESS: Ms. García.

No, ma'am.

THE INTERPRETER: Apologize, Mr. García. When did Mr. García leave the company?

MR. SALDAÑA: Ms. García, Ms. García.

MR. DRAHOS: Line García is a female.

MR. SALDAÑA: It's a female.

THE WITNESS: I'm so sorry. It's not coming through clearly. Forgive me.

BY MR. SALDAÑA:

**Q. When did Ms. García leave the company?**

A. We had to shut down due to the pandemic and all of our staff was laid off.

And when we finally began to restart after 18 months of being down, Ms. García decided that she no longer wanted to continue this line of work and she didn't come back.

**Q. Okay. Who was representing Ms. García yesterday?**

**MR. SALDAÑA: Luis Saldaña as well. Her participation --**

MS. LOBEL: Sorry.

MR. SALDAÑA: It was me; Luis



Saldaña; Continental Shipping's attorney. Her participation in the meeting was to decide who was going to represent in the 30(b)(6) deposition Continental Shipping.

So anything that we discussed with her was pursuant to attorney-client privilege and work product doctrines. And he's not going to answer anything that has to do with what we discussed.

MS. LOBEL: Okay. I see.

BY MR. SALDAÑA:

**Q. Sir, what did you review materials-wise? Any documents? Any paragraphs? Anything of that nature?**

**MR. SALDAÑA: You may answer.**

THE WITNESS: Oh. We basically discussed --

MR. DRAHOS: No, no, you're not supposed to talk about what you discussed. She asked you what you reviewed.

MR. SALDAÑA: What you reviewed.

MR. DRAHOS: What you reviewed in preparation for your testimony, if anything.



MS. LOBEL: Correct.

THE WITNESS: Reviewed.

BY MS. LOBEL:

**Q. Do you need me to reask the question?**

A. Yes, please, I'm sorry.

**Q. Certainly. Let me reask the question.**

**Sir, what I want to know is in preparation for today's deposition, what documents or other materials did you review in order to prepare?**

**MR. SALDAÑA: Objection. You may answer. What material did you review?**

THE WITNESS: We just reviewed the contracts and the emails that we were discussing today.

BY MS. LOBEL:

**Q. I didn't hear the last half of your sentence; you reviewed the contract and what else?**

A. The contract and the emails that we were reviewing today.

**Q. All right. Did you have to do any personal research in order to prepare yourself**



**for today, any materials from the company that would have been accessible to you?**

MS. LOBEL: Objection to the form. You may answer.

THE WITNESS: No, ma'am.

BY MS. LOBEL:

**Q. Did you speak with Jennifer Robles?**

A. Not since -- I haven't spoken to Jennifer in more than -- since I think October.

MR. SALDAÑA: It is a yes or no.

THE WITNESS: I'm sorry. No.

BY MS. LOBEL:

**Q. All right. You spoke with Jennifer in October; what did you speak with her about?**

**MR. SALDAÑA: Objection to the form.**

THE WITNESS: Of her coming back to work for Continental Shipping.

BY MS. LOBEL:

**Q. Okay. When was the last time before October of 2021 that you spoke with Ms. Robles?**

A. Probably the month before.

During the pandemic we were talking, I was trying to keep in touch with our ex-employees to gauge if when we returned to service if they were going to be interested in

coming back.
**Q. Okay. And is Ms. Robles going to be coming back to the company?**
A. No. The door is always open. She has not -- for some reason we have not been able to contact her.
**Q. Okay. Are you aware of her last-known contact information, if you wanted to get in touch with her?**
A. Yes, I have her personal cell phone.
**Q. I can't hear you.**
A. Yes, ma'am, I have her personal cell phone.
**Q. Okay. Does Ms. Robles still live in Puerto Rico?**
MR. DRAHOS: Object to form.
THE WITNESS: As far as I'm aware, yes, ma'am.
BY MS. LOBEL:
**Q. Do you know where she is currently working?**
MR. DRAHOS: Object to form.
THE WITNESS: No, ma'am.
BY MS. LOBEL:
**Q. Okay. When was the first time**



**Continental Shipping communicated with Royal Caribbean after this incident occurred?**
A. Please repeat the question, I'm sorry.
**Q. I can't hear you.**
A. Please repeat the question, I'm sorry.
**Q. Certainly.**
**When was the first time that Continental Shipping communicated with Royal Caribbean about this incident after it happened?**
MR. DRAHOS: Object to the form.
THE WITNESS: Normally Ms. García would follow up and send an email, either a day or two after the incident, a follow-up email.
BY MS. LOBEL:
**Q. Was there any communication as to that follow-up email from Ms. García?**
MR. DRAHOS: Objection to the form.
MR. SALDAÑA: Join.
THE WITNESS: I don't know if there was an additional follow-up or not. I'm not aware.



BY MS. LOBEL:
**Q. Okay. When was the first time that Continental Shipping became aware of this lawsuit?**
**MR. SALDAÑA: Object to the form.**
**You may answer.**
THE WITNESS: About a year, year and a half ago maybe.
BY MS. LOBEL:
**Q. Okay. How did you find out?**
A. I received a call from you Mr. Drahos.
**Q. Okay. What did the company learn?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Join.
THE WITNESS: Well, he just let us know that this was going to happen and at some point this deposition, or something of this nature, was going do happen.
BY MS. LOBEL:
**Q. Okay. And this was about a year and a half ago?**
A. Yes, ma'am.
**Q. All right. Would you agree with me that Continental Shipping has been working with**



**Royal Caribbean for a long time?**
**MR. SALDAÑA: Object to the form of the question.**
MR. DRAHOS: Join.
MR. SALDAÑA: You may answer.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
**Q. How long has Continental Shipping been working with Royal Caribbean?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.
THE WITNESS: When I started working 25 years ago, the relationship was already there.
BY MS. LOBEL:
**Q. Okay. So 35 years ago Continental Shipping was working with Royal Caribbean; is that what you're saying?**
A. Twenty-five, yes, ma'am.
MR. SALDAÑA: Objection.
MR. DRAHOS: Join.
BY MS. LOBEL:
**Q. Twenty-five, excuse me.**
A. Yes, ma'am.
**Q. All right. So in the last 25 years,**

Royal Caribbean has been working with Continental Shipping?

MR. SALDAÑA: Objection.

MR. DRAHOS: Join.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. All right. Is Royal Caribbean one of Continental Shipping's major clients?

A. Yes.

MR. SALDAÑA: Objection.

MR. DRAHOS: Join.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. All right. How frequently before the pandemic did Royal Caribbean cruise ships come to the Port of San Juan, that would need your services?

MR. SALDAÑA: Objection, convoluted. Was that a question?

MS. LOBEL: You may answer.

THE WITNESS: Okay. Approximately -- I would say yeah, about maybe 200 to 250 calls a year.

BY MS. LOBEL:

Q. I'm not asking about calls. I want



to know how many ships would you work with per week, for example, before this pandemic started?

MR. SALDAÑA: Object to form.

MR. DRAHOS: Join.

THE WITNESS: Every time a ship comes to port, that would be about 200, 250 different dates of ships arriving from Royal Caribbean, right.

MR. SALDAÑA: Let him finish his answer.

BY MS. LOBEL:

Q. I can't hear him.

A. I'm sorry.

Q. Go ahead, sir, if you are not finished, I want to hear everything that you have to say.

A. No, that's it. About 200, 250 calls a year.

Q. Okay. When the Royal Caribbean ships come into port they ask you to perform certain services, correct?

MS. LOBEL: Object to form.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. All right. And a cruise ship can



ask for assistance for all sorts of types of needs; would that be accurate?

MR. SALDAÑA: Objection.

MR. DRAHOS: Join.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. And if the cruise line wasn't happy with the way a task was performed by your company, they have the ultimate right to use a different port agent, correct?

MR. SALDAÑA: Objection.

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

Q. Okay. And how many times would you say per year Royal Caribbean specifically requests for medical disembark at the Port of San Juan?

MR. DRAHOS: Object to form.

THE WITNESS: Specifically -- educated guess -- maybe 30, 40 times.

BY MS. LOBEL:

Q. Are the thirty to 40 times, is that per year?

A. Yes, ma'am.

Q. Thank you. And the 30 to 40 times



per year that Royal Caribbean requested a medical disembark, is that relatively consistent for the 25 years that you have worked for Continental Shipping?

MR. DRAHOS: Object to form.

MR. SALDAÑA: Objection.

MS. LOBEL: You may answer.

THE WITNESS: This is an estimated guess. Medical emergencies aren't something that are consistent, other than, you know, when it happens.

So sometimes we'll have cases where it might not be anybody coming off a ship for a month, but other times we might have one particular vessel that has three, four or five cases in one call -- excuse me.

BY MS. LOBEL:

Q. Understood. I apologize. I understand.

But would it be fair to say that this particular incident was not the first time Royal Caribbean had ever requested for a medical disembark?

A. Yes, ma'am.

Q. Okay. Would it be fair to say that Royal Caribbean has experience working with Continental Shipping in handling medical disembarks involving medical emergencies at the Port of San Juan?
MR. SALDAÑA: Objection. You may answer.
MR. DRAHOS: Join.
THE WITNESS: If you're talking about a specific cruise operation seeking the ship's medical teams that they have been at the particular -- they rotate them out sometimes, so -- but normally, yes, they should understand.
BY MS. LOBEL:
Q. Okay. Understood.
Now, when there's medical emergencies, does Continental Shipping assume the patient as being under their care until the ambulance or some form of medical transport arrives, or is it the cruise ship that maintains the care of the patient?
MR. SALDAÑA: Objection.
MR. DRAHOS: Join.
THE WITNESS: No, ma'am. We just



are intermediaries. We are assisting. We don't have any medical training. So, no, ma'am, we would not take over the care of the patient.
BY MS. LOBEL:
Q. Would it be fair to say that the cruise line has the ultimate responsibility for the medical care of the patient, not Continental Shipping?
MR. DRAHOS: Object to the form.
MR. SALDAÑA: Object to form.
THE WITNESS: At the end of the day, yes, ma'am.
BY MS. LOBEL:
Q. You may answer. Okay.
Would it be fair to say that Royal Caribbean monitors the process when Continental Shipping assists with medical disembark of the patient at the Port of San Juan?
MR. SALDAÑA: Objection.
MR. DRAHOS: Object to form.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. Okay. Would it be fair to say that the shipboard doctor oversees process working



with Continental Shipping in transferring the patient to a hospital in San Juan?
MR. SALDAÑA: Objection.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. And Royal Caribbean is ultimately responsible for ensuring that there's appropriate ground transport for the patient; is that correct?
MR. DRAHOS: Objection to form.
MR. SALDAÑA: Objection.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. You may answer. Okay.
And would you agree with me that Royal Caribbean is also ultimately responsible to ensure that the patient is transferred to a hospital that can appropriately care for the patient's needs?
MR. SALDAÑA: Objection.
MR. DRAHOS: Objection to the form.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. Now, when there was a request for a medical assistance or -- am I correct in



understanding that the relationship with the parties requires Continental Shipping to keep the cruise line up to date as to the their effort?
MR. SALDAÑA: Objection. You may answer.
THE WITNESS: Usually it's hand in hand; absolutely, yes, ma'am.
BY MS. LOBEL:
Q. I couldn't hear you.
A. Yes. Yes, ma'am.
Q. Okay. Now -- strike that. Forgive me.
Now, my understanding is that Continental Shipping agents are supposed to assist Royal Caribbean with regards to medical emergencies as instructed by the cruise line; is that correct?
MR. DRAHOS: Object to form.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. Okay. And my understanding is that the port agent is not allowed to engage in a service or engage with a service provider, such as ambulance companies, without the approval of

**Royal Caribbean; is that correct?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Join.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
**Q. Now, are you familiar with somebody by the name of Nancy Heartlein?**
A. Excuse me? Please repeat. Sorry.
**Q. Certainly. Are you familiar with somebody lie by the name of Nancy -- H-E-A-R-T-L-E-I-N -- Heartlein?**
A. No, ma'am.
**Q. Sorry, sir.**
**Can you answer? I haven't heard anything.**
A. I said "no, ma'am."
**Q. Okay. No problem.**
**Are you familiar with someone by the name of Joseph Dueñas? D-U-E-Ñ-A-S.**
A. Yes, ma'am.
**Q. Who is that?**
A. Works for Royal Caribbean Care Team, I believe.
**Q. Have you ever worked with this person before?**



MR. DRAHOS: Object to form.
MR. SALDAÑA: Join.
THE WITNESS: Yes. We've had communications before.
BY MS. LOBEL:
**Q. Now, I want to ask you some questions.**
**You said Ms. Robles was on the Harmony of the Seas --**
[Reporter requests clarification.]
You testified on cross-examination that Ms. Robles was on Harmony of the Seas on the date of incident; do you recall that?
A. Yes, ma'am.
**Q. How do you know that she was on the ship?**
MR. DRAHOS: Object to form.
THE WITNESS: That's where she was assigned. She should have been on the ship. Physically I can't say that she was 100 percent on the ship. But that's where she should have been.
BY MS. LOBEL:
**Q. Okay. But you don't know, as you're sitting here today, if she was on the ship at**



**all on the date of the incident, correct?**
**MR. SALDAÑA: Objection.**
THE WITNESS: I know that she was there for the ship, for the boarding, and was there on arrival because the field supervisor informed me of such.
But if she was there the entire time during the day, I cannot confirm.
BY MS. LOBEL:
**Q. Okay. So you don't know one way or the other if she was on the ship or even at the medical center on February 21, 2019, correct?**
MR. DRAHOS: Object to the form.
BY MS. LOBEL:
**Q. You can answer.**
A. I know that she was on the ship.
**Q. Okay. But you don't know when, correct?**
A. Specifically the whole time, no, ma'am.
**Q. Okay. Understood.**
**And did Ms. Robles document what she did while she was on the ship?**
[Inaudible unidentified voice speaking.]



A. No, ma'am.
**Q. Why not?**
A. A lot of times it's in the field, the agent is handling multiple situations. And we try -- they normally, if they are very busy or whatever the situation might be, we have a folder where she would put any reports of anything that should have -- that happened during the day.
**Q. Well, wouldn't you agree with me that medical disembark involving something as serious as a stroke should be documented?**
MR. DRAHOS: Object to form.
MS. LOBEL: Objection.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
**Q. You may answer.**
A. I did. Yes, ma'am.
**Q. Did she document what she did in regards to this incident?**
A. It's my understanding that she received a text message stating the name of the patient; the receiving facility; and the accepting physician, which then the responsibility would follow up with Ms. Line

García.

**Q. How do you know that she received a text message?**

A. It was a text message that was sent -- it is like a chat; all of the agents have it.

So they would have all received a text message.

**Q. Would the text message have been preserved by the company?**

A. I do not have it.

**Q. Okay. Then how do you know what was the content of the text message with information about Mr. Burgess?**

A. I believe that there's a copy of that around here somewhere, but I don't have it.

**Q. Who has a copy of that?**

A. Who has a copy? I would have to check. I don't know.

**Q. Okay. Now, would the phone number in which Ms. Robles received the text message have been on a Continental Shipping cell phone?**

A. Yes, ma'am.

**Q. Do you know what phone number she would have received this text message?**

A. Jennifer would have been the one who



was sending the text message. Are you asking Jennifer or Line? Sorry.

**Q. I couldn't hear you. You've breaking up. I apologize.**

A. I said repeat the question. I didn't hear the name clearly. Who would have received the text message?

MR. SALDAÑA: Let her reask the question.

MS. LOBEL: Yeah, let me ask the question again.

BY MS. LOBEL:

**Q. I want to know how much -- strike that.**

**Do you know what the phone number was -- strike that.**

**Is the phone number where Ms. Robles would leave the text message about Ms. Burgess, was that a Continental Shipping cell phone?**

A. It would have been sent to all of the cell phones of all the agents, yes, ma'am.

**Q. Okay. Would she have the specific agent's cell phone assigned to her --**

A. Yes, ma'am.

**Q. -- to use while she was on the job?**



A. Yes, ma'am.

Yes. Yes, ma'am.

**Q. Okay. All right.**

**Does the company know which phone was assigned to her on the date of this incident?**

A. Yes, ma'am.

**Q. All right. What was the phone number that was assigned to Ms. Robles at the time of this incident?**

A. (787) 667-5305, if I'm not mistaken.

**Q. I have (787) 667-53 -- and then I lost the rest.**

A. 0-5, zero-five.

**Q. Okay. All right. Thank you, sir.**

**Okay. Now, what cell phone provider did the company use back in 2019?**

A. If I'm not mistaken, it's AT&T.

**Q. Okay. Now, would the cell phones that the agents would use, were they Smart phones?**

[Reporter requests clarification.]

BY MS. LOBEL:

**Q. Certainly. Would the cell phones that the port agents would use, were they like a**



**Smart Phone or an iPhone, or something similar?**

A. Yes, ma'am.

**Q. Okay. Would Ms. Robles have been able to receive emails on her cell phone?**

A. No, ma'am.

**Q. Why not?**

A. Well, emails are sent to our office, email only. And from there they are distributed to the agents.

**Q. Okay. Would the agent be able to receive a copy of the forwarded emails on their cell phone?**

A. No, no, ma'am. We would send information either by text or by -- [Inaudible. Counsel speaking over the witness].

**Q. I'm sorry. Okay.**

**How many text messages were sent to Ms. Robles about this incident?**

MR. DRAHOS: Object to form.

THE WITNESS: Probably none. Because she was probably either contacted -- and this is like I'm speculating -- she was either contacted directly by the ship, or by somebody in our office to go to the medical facility

to begin working the case.
BY MS. LOBEL:
Q. Did she receive all of these calls on the cell phone that we just discussed?
[Ringing bell. Reporter requests clarification.]
BY MS. LOBEL:
Q. Certainly.
Would Ms. Robles have received all of the phone calls that you are speculating that she may have received on her port agent cell phone assigned to her by the company?
A. Yes, ma'am.
Q. So the only way -- the first time -- Ms. Robles would receive information about this incident would be to look at her cell phone records; would that be fair to say?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, ma'am.
BY MS. LOBEL:
Q. Okay. Did the company preserve all of Ms. Robles' text messages and call history from the date of the incident?
A. No, ma'am.
Q. I didn't hear you.



A. Oh. No, ma'am.
Q. Okay. Why not?
MR. DRAHOS: Object to the form.
THE WITNESS: Because it's not our -- we do not keep the records -- sorry -- unfortunately.
BY MS. LOBEL:
Q. Okay. Who would have texted Ms. Robles from the company to give her the initial information, since she can't receive emails?
A. It would have been a call probably. I don't think they would have texted with an emergency. Medical emergency, usually we would be calling.
Q. Okay.
A. Either called through -- directly through her contact on the ship; it could have been that way, or it could have been usually through Ms. Line García, which would have been our -- from our office.
Q. Who would have -- forgive me.
Who from the ship would have been Ms. Robles' point of contact?
Strike that. Forgive me.



Who from the ship was Ms. Robles' point of contact?
A. Typically it's the guest administration officer on board the vessel.
Q. So the guest administration officer.
A. Or the medical facility also would have been aware of her contact information.
Q. Okay. Does the company know who first contacted Ms. Robles about this incident?
MR. SALDAÑA: Objection.
THE WITNESS: No, ma'am.
BY MS. LOBEL:
Q. Did Ms. Robles write a report to the captain with regard to her effort in the medical disembark?
A. No, ma'am.
Q. How can you tell which hospital she called in order to try to set up a transfer of Mr. Burgess?
A. Well, the doctor received the patient, so I assume the doctor on board had to have generated [inaudible] from Jennifer to Hima.
Q. Would her phone records show us which hospitals she attempted to speak with and



when?
MR. DRAHOS: Objection to form.
THE WITNESS: If she was able to get through, absolutely. I would assume so.
BY MS. LOBEL:
Q. Okay. What was the phone number that -- strike that.
Did the company have a list of phone numbers of hospitals to call for particular emergencies?
A. Yes, ma'am.
Part of our agency information list.
Q. I can't hear you.
A. Yes, ma'am.
Q. Where was that list?
A. That list is usually provided to all of the vessels; it has all of our agency information list; it has all of the agents' cell phone numbers on it. It has fire, Coast Guard numbers, some hospitals -- not all the hospitals but some of the closer hospitals -- and ambulance companies also listed on that list.
Q. Where is that list kept?
A. We usually distribute it out to the vessels, they come by email.

**Q. Give it to the vessels?**
A. Yes, ma'am.
**Q. So if I'm understanding you correctly, there's a list that the port agent gave to Royal Caribbean that includes phone numbers for local hospitals, the Coast Guard and direct contact information for the port agent; is that accurate?**
**MR. SALDAÑA: Objection. You may answer.**
MR. DRAHOS: Join.
THE WITNESS: Normally, yes, ma'am, we distribute them when they arrive.
BY MS. LOBEL:
**Q. Do you know which hospitals were listed on this list for Puerto Rico?**
A. Off the top of my head, I don't know, no, ma'am.
**Q. Okay. Why does the port agent give a list of phone numbers which includes local hospitals to the ship?**
**MR. SALDAÑA: Objection. You may answer.**
THE WITNESS: Okay. Just to be as thorough as -- have them give as much



information as possible to everybody.
BY MS. LOBEL:
**Q. Okay. Is there anything preventing the ship from calling the hospitals directly?**
MR. DRAHOS: Objection to the form.
THE WITNESS: No, ma'am.
BY MS. LOBEL:
**Q. Okay. So if a doctor wanted to help expedite the process in communicating with the hospital for transfer of the patient, they would be free to do so; is that correct?**
MR. DRAHOS: Objection to the form.
THE WITNESS: Yes, ma'am. Yes.
MR. SALDAÑA: Join.
BY MS. LOBEL:
**Q. Okay. Did the company have a list to -- strike that.**
**Does the company have a list to inform the port agent which hospitals are best for specific types of medical conditions?**
**MR. SALDAÑA: Objection.**
THE WITNESS: Other than the agency info list, no, ma'am.
BY MS. LOBEL:
**Q. So how would they figure out which**



**hospital to call for a stroke?**
A. The majority of the agents have been with us for more than 20 years, so most of them know that.
**Q. Okay. Are there other hospitals in the San Juan area that are capable of treating patients with strokes other than Hima Caguas and San Pablo Caguas?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Objection.
THE WITNESS: Not that I am aware, no, ma'am.
BY MS. LOBEL:
**Q. So if Hima San Pablo Caguas Hospital --**
[Court reporter requests clarification.]
MS. LOBEL: Certainly. Let me reask.
If Hima San Pablo Caguas Hospital says We cannot accept a patient suffering from a stroke, are you telling me there isn't another single hospital on the island capable of treating a patient with a stroke?



MR. SALDAÑA: Objection.
You may answer.
THE WITNESS: Okay. For the best care it would be Hima. Whether another hospital can --
BY MS. LOBEL:
**Q. That's not my question --**
A. -- can treat another case, I mean it depends on the level of care. Obviously you can go to another hospital, but I don't know that the level of care would be the best, no, ma'am.
**Q. That's not my question. My question is:**
**Are there other hospitals capable of treating stroke other than Hima San Pablo Caguas on the island?**
MR. DRAHOS: Object to form.
MR. SALDAÑA: Objection.
MR. DRAHOS: Asked and answered.
BY MS. LOBEL:
**Q. You may answer.**
A. Based on our experience, no. We've been refused at most other hospitals, the major hospitals.
**Q. All right. Okay.**

**So you're telling me there's only one hospital on the island capable of treating patients with strokes and that's the Hima San Pablo Caguas?**

**MR. SALDAÑA: Objection. That's the fourth time the witness has been asked the very same question, so I'm going to allow him to answer this last time.**

MR. DRAHOS: Join. Argumentative.

MR. SALDAÑA: Objection.

THE WITNESS: In our experience, no, ma'am.

BY MS. LOBEL:

**Q. Okay. In your 25 years working with Royal Caribbean, was this the first time that you [inaudible] with a patient, whether it be crew or passenger, suffering a stroke?**

A. Probably not.

**Q. Okay. In your experience have there been other cruise passengers, with either Royal Caribbean or Celebrity, who suffered from a stroke and needed to be disembarked?**

A. Most likely, yes.

**Q. Sir --**

**MR. SALDAÑA: He already answered.**



THE WITNESS: Most likely, yes.

BY MS. LOBEL:

**Q. Okay. All right.**

**So would it be fair to say that your company has worked with this cruise line before this incident in assisting to disembark a patient suffering from a stroke?**

**MR. SALDAÑA: Objection. Asked and answered.**

MR. DRAHOS: Join.

MR. SALDAÑA: You may answer.

THE WITNESS: Oh. Please repeat the question. I'm sorry.

MR. SALDAÑA: And wait for my objection and then answer.

You may answer. Ask the question again.

MS. LOBEL: You want me to re-ask? Okay, not a problem.

BY MS. LOBEL:

**Q. Would you agree with me that in your 25 years this is not -- this was not the first time Continental Shipping assisted Royal Caribbean in disembarking a patient who was suffering from a potential stroke?**



**MR. SALDAÑA: Objection. Asked and answered.**

MR. DRAHOS: Join.

THE WITNESS: Yes, ma'am.

MR. SALDAÑA: You have to speak up.

THE WITNESS: Okay, sorry.

Yes, ma'am.

BY MS. LOBEL:

**Q. Okay. Would you agree with me that a stroke is a very time-sensitive medical condition?**

**MR. SALDAÑA: Hold on. Objection.**

**You may answer.**

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. Would you agree with me that when it comes to handling a patient who may be suffering from a stroke, it is of the utmost importance to transfer that patient as fast as humanly possible?**

**MR. SALDAÑA: Hold on. Objection.**

**You may answer.**

THE WITNESS: Yes, ma'am.

BY MS. LOBEL:

**Q. And does Continental Shipping know**



**that based off of working with Royal Caribbean doctors?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Objection.

THE WITNESS: Repeat, please. Sorry.

COURT REPORTER: He is asking for a repeat.

BY MS. LOBEL:

**Q. He's asking for a repeat? Okay.**

**Would you agree with me that Continental Shipping has learned that strokes are a time-sensitive medical emergency in part from working with Royal Caribbean doctors?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

THE WITNESS: Specifically it is just a general experience of all cases that we handle for all of the different variety of cruise ships -- in part.

BY MS. LOBEL:

**Q. But would part of that knowledge come from -- strike that.**

A. Yes, ma'am.

**Q. But would part of that knowledge**

**come from working with Royal Caribbean?**
**MR. SALDAÑA: Object to form.**
MR. DRAHOS: Join.
MR. SALDAÑA: Give me a few seconds before you answer so I can state my objection on the record.
THE WITNESS: All right.
Yes, ma'am.
BY MS. LOBEL:
**Q. Okay.**
**MR. SALDAÑA: Do you have much more, Ms. Lobel?**
MS. LOBEL: Is there a time problem?
MR. SALDAÑA: Well, it's already 12:15. We usually do lunch here in Puerto Rico at 12:00. So I'm asking you if you have much more. And if not, and if you're going to end, we can go on and finish the deposition or start thinking about breaking for lunch.
MS. LOBEL: Okay. Understood.
I apologize. I forgot the time zone difference.
MR. SALDAÑA: Remember, there's an hour gap between us.



MS. LOBEL: Yes. Yes. You're 12:15, I am 11:15. I recall; thank you.
I don't have that much further, so I will just wrap it up with the rest of my questions, if that's okay with the group.
MR. SALDAÑA: Yes.
MS. LOBEL: Lovely. Thank you.
BY MS. LOBEL:
**Q. Sir, are you aware -- strike that.**
[Court reporter requests clarification.]
Did Continental Shipping know the distance between the Port of San Juan where Royal Caribbean ships dock and Hima San Pablo Caguas before this incident?
A. Yes, ma'am.
**Q. Had the Continental Shipping assisted Royal Caribbean with transferring patients to Hima San Pablo Caguas before this incident?**
A. I don't know. Probably, but I can't specifically say when.
**Q. Okay. Fair enough.**
**Would it be fair to say that Royal Caribbean would know about the difficulties with**



**limitations of roads and traffic, and based on their years of operating ships through that port?**
**MR. SALDAÑA: Objection to form.**
MR. DRAHOS: Join.
THE WITNESS: I don't know if that specifically medical team was aware, because they rotate medical teams on board. So --
BY MS. LOBEL:
**Q. My question is, would the company -- strike that.**
**Would the company of Royal Caribbean know about the difficulties involved with traffic, and the conditions with the roads in the Port of San Juan before this incident?**
**MR. SALDAÑA: Objection. This witness is a Continental Shipping representative, so he can't speak about what Royal Caribbean knows or doesn't know. So objection.**
BY MS. LOBEL:
**Q. You may answer, if you know.**
MR. DRAHOS: Join in the objection.
THE WITNESS: It's hard to say. I



don't know.
BY MS. LOBEL:
**Q. Have the road conditions or traffic conditions changed at all in the 25 years that you have been working with Royal Caribbean?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.
THE WITNESS: Constantly changing.
BY MS. LOBEL:
**Q. Have the roads available for accessing the port and traffic in San Juan been more or less the same throughout your career?**
MR. DRAHOS: Form.
MR. SALDAÑA: Objection.
THE WITNESS: No, because there is constant repairs, fixing, changing, closed down the bridge, so it's constantly an evolution.
BY MS. LOBEL:
**Q. Okay. Does Continental Shipping advise the cruise line if there are issues that may arise such as traffic, when dealing with a medical disembark?**
**MR. SALDAÑA: Objection.**
MR. DRAHOS: Join.

THE WITNESS: If we're aware of it, absolutely.

BY MS. LOBEL:

**Q. Okay. In this case did you ever speak with the family involved with this incident?**

A. I did not, no.

**Q. I didn't hear you.**

A. I did not, no, ma'am.

**Q. Okay. Is it the policy between Royal Caribbean and Continental Shipping that Royal Caribbean has all communications with the patient and the patient's family and not the port agent?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

MS. LOBEL: Okay. I didn't hear the answer.

THE WITNESS: Oh, not necessarily.

BY MS. LOBEL:

**Q. Under what circumstances would the port agent have communications directly with the patient or the patient's family?**

MR. DRAHOS: Object.

MR. SALDAÑA: Objection.



THE WITNESS: Usually upon debarkation, the accompanying the family members are provided our contact information. And usually there's some communication back and forth if they require additional assistance, transportation, or anything they might concern.

So not necessarily will Royal reach out to them.

BY MS. LOBEL:

**Q. Okay. Who provides contact information for the port agent to the patient or the patient's family, Continental or the cruise line?**

MS. LOBEL: Objection.

MR. SALDAÑA: Objection.

THE WITNESS: I've seen both. Usually it is the agent though. The agent, Jennifer, she probably would have written down her cell phone plus our office number.

BY MS. LOBEL:

**Q. Do you know if Jennifer Robles told the family or the patient that she worked for**



**Continental Shipping as opposed to Royal Caribbean?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Object to form.

THE WITNESS: Specifically did I know that she said those words? No, ma'am.

BY MS. LOBEL:

**Q. Okay. Does Continental Shipping have contracts with specific ambulance companies in the area?**

**MR. SALDAÑA: Objection.**

THE WITNESS: No, ma'am.

BY MS. LOBEL:

**Q. Which ambulance companies does the port agent in San Juan work with?**

A. We usually have a list. And we operate by -- I guess the easiest way to say this, we will operate on the context that they provide consistent and the best service possible. We usually have a list of four or five, or six different ambulance companies, just in case we have a problem with the first one we go to the second one, the third one, fourth one and so forth.



**Q. Understood.**

**Do you know which ambulance companies were on the list back in February of 2019?**

A. No, Sunny would have been -- and Sunny is a subcontracted, I believe, through another ambulance company, which is Fast Ambulance, which probably was the number that she called and they contacted through them.

**Q. And what number does the company use if they want to communicate with Sunny Ambulance?**

A. Cell phone -- usually it's a contact number where they originated the contact.

**Q. The contact number --**

A. That would be the number and we usually -- just like we have the hospital numbers in our phones, we also have the ambulance numbers.

**Q. Would Sunny Ambulance phone number have been on the list that was provided to the cruise ship along with the Coast Guard, local hospitals --**

MR. DRAHOS: Objection to the form.

MR. SALDAÑA: Objection.

THE WITNESS: I'm not 100 percent sure.

BY MS. LOBEL:

**Q. Is it possible that it may have been on that list?**

MR. DRAHOS: Objection.

MR. SALDAÑA: Objection.

THE WITNESS: Possible, yes, ma'am.

BY MS. LOBEL:

**Q. Okay. Are local ambulance numbers on the list of services available in San Juan that are provided to cruise lines?**

MR. DRAHOS: Object to form.

MR. SALDAÑA: Join.

THE WITNESS: Please repeat. I'm sorry.

BY MS. LOBEL:

**Q. If you recall, a few minutes ago we spoke that -- strike that.**

**Continental Shipping provides a list of certain service provides includes local hospitals, Coast Guard, agents, port agents.**

**Does that list also include phone numbers for ambulances?**

A. Yes, ma'am.



MR. DRAHOS: Objection to the form.

BY MS. LOBEL:

**Q. I didn't hear your answer.**

A. Yes, ma'am.

**Q. Okay. I'm just checking over my notes to dot my I's and cross my T's. Thank you.**

**Did Continental Shipping have meetings with Royal Caribbean or other cruise lines to discuss how everybody expects medical disembarks involving medical emergencies to be done?**

**MR. SALDAÑA: Objection.**

MR. DRAHOS: Join.

THE WITNESS: We have received visits from personnel from, Royal, yes, that have asked us to take them to different hospitals and to see, yes, ma'am.

BY MS. LOBEL:

**Q. How frequently did that happen?**

MR. DRAHOS: Object to form.

THE WITNESS: I wouldn't say yearly, but maybe every few years, but that was pre-pandemic.



BY MS. LOBEL:

**Q. Okay. Who from the Royal Caribbean would go with Continental Shipping to go to local hospitals?**

A. Please repeat; sorry.

**Q. My pleasure.**

**Who from Royal Caribbean would go to the local hospitals with Continental Shipping?**

A. I don't at the point recall specifically who it was. There were different representatives.

**Q. What was the purpose of those visits to local hospitals with Royal Caribbean's representatives?**

MR. DRAHOS: Object to form.

THE WITNESS: Well, to investigate the facilities and visit the hospitals, basically I guess, to get a feel for the services.

BY MS. LOBEL:

**Q. Was the purpose of these visits just to see the abilities of the local hospitals?**

**MR. SALDAÑA: Objection. Speculation.**

MR. DRAHOS: Objection. Calls for speculation.



THE WITNESS: I would assume that would be part of the reason for the visit, absolutely.

BY MS. LOBEL:

**Q. Are how do you know that these visits took place?**

A. Because usually they contacted us and asked to coordinate a visit to the hospitals.

And usually Ms. Line García was the one that coordinated the visits and she would accompany them to the hospitals.

**Q. Which hospitals would Royal Caribbean go to visit?**

A. There were cases when --

MR. DRAHOS: Objection to form.

THE WITNESS: Sorry.

MR. DRAHOS: Go ahead.

THE WITNESS: There were cases where they would want a general, and she would try to visit as many hospitals as possible.

And sometimes they would occasionally ask to go see a specific

hospital in particular.
BY MS. LOBEL:
Q. Did Royal Caribbean ever visit Hima San Pablo Caguas?
MR. DRAHOS: Form.
THE WITNESS: Yes, ma'am, I believe so.
MR. DRAHOS: Form.
BY MS. LOBEL:
Q. How many times, to your knowledge?
MR. DRAHOS: Form. Time frame?
THE WITNESS: One that I think I'm aware of, if I can recall; it was a while back.
BY MS. LOBEL:
Q. I'm sorry?
A. I can remember one time and it was many years ago.
Q. Okay. All right.
The Royal Caribbean would request to arrange for these visits at local hospitals every year, every few years; were those requested by email or were those verbal conversations?
MR. DRAHOS: Object to form.



MR. SALDAÑA: Join.
THE WITNESS: I would have to -- I would say most of the time, if I recall correctly, were telephone conversations.
BY MS. LOBEL:
Q. Okay. Were these visits planned well in advance of the representatives coming to see the hospitals?
MR. SALDAÑA: Objection.
MR. DRAHOS: Join.
THE WITNESS: The call would occur usually, maybe a week before, if I am guessing correctly. And then Line would reach out to the hospitals and coordinate it and get together a meeting or whatever.
BY MS. LOBEL:
Q. Okay. Now, would there be a meeting with Continental and Royal Caribbean representatives before actually going to the hospitals?
MR. SALDAÑA: Objection.
MR. DRAHOS: Object to form.
THE WITNESS: Not that I recall. Usually time was critical and they



had to go usually to see a lot of hospitals, so usually it was straight to the task at hand, so to speak.
BY MS. LOBEL:
Q. Okay. When Royal Caribbean would go with Continental Shipping to the local hospitals, would there be a meeting with local hospital administration?
MR. SALDAÑA: Objection.
MR. DRAHOS: Join.
THE WITNESS: Usually, yes.
BY MS. LOBEL:
Q. Do you know what was discussed during the meetings with local hospital administration with Continental Shipping and with Royal Caribbean?
MR. DRAHOS: Object to form.
MR. SALDAÑA: Form.
THE WITNESS: I've never attended any of these meetings --
MS. LOBEL: Okay, fair enough.
THE WITNESS: But I would assume --
BY MS. LOBEL:
Q. Okay. Would Ms. García be the sole person who would attend these meetings, to your



knowledge?
A. Yes, yes, ma'am.
Q. Okay. Do you know if anyone else from Continental Shipping would ever attend these meetings over the course of your 25 years with the company?
MR. SALDAÑA: Objection.
MR. DRAHOS: Join.
THE WITNESS: No, because Line has been here about 30 years, so...
BY MS. LOBEL:
Q. Okay. Fair enough. Fair enough.
Do you know where Line currently works?
A. I don't believe she's working now at this time.
Q. Okay. Do you know if she has any intention of coming back to the company eventually?
MR. SALDAÑA: I am going object to that line of questioning.
Mr. Threadgill here is the representative of the company. He's not here in that capacity, and the company has a policy of not providing that kind

**of information unless ordered by a court.**

BY MS. LOBEL:

**Q. I'm sorry, I missed the last part of your objection.**

**MR. SALDAÑA: "Unless ordered by a court."**

MS. LOBEL: Okay.

MR. SALDAÑA: It's not an area of inquiry per the 30(b)(6) notice, so, yeah.

MS. LOBEL: I don't know which ones we are going on, but it's okay.

[Bell ringing.]

MR. SALDAÑA: Do you hear that bell? Were you able to hear that bell here?

MS. LOBEL: Yeah, I don't have a bell here.

MR. SALDAÑA: It marks 12:30.

MS. LOBEL: I apologize. If you want to take a break before Mr. Drahos questions.

MR. SALDAÑA: No. I just want to know if you can wrap this up relatively quick.

MS. LOBEL: Sure.



I don't have any further on cross.

MR. DRAHOS: So, Mr. Threadgill, you have the right to read the transcript in order to confirm that everything was taken down accurately, or you can waive that right.

It's up to you.

MR. SALDAÑA: He's not going to waive that right.

MR. DRAHOS: Mr. Court Reporter, he's going to read. All right. I don't have any questions. I'm going to order the transcript please. And --

VIDEOGRAPHER: This is the end of video number 2 of the deposition of Mr. Threadgill.

The time is 12:34 p.m. We are off the record.

MR. SALDAÑA: Thank you.

COURT REPORTER: Sarah, do you get a copy?

MS. LOBEL: Please.

(Whereupon, the deposition was concluded at 12:34 p.m.)



CERTIFICATE OF NOTARY PUBLIC

I, SAUL BERRIOS, duly commissioned and qualified in and for the Commonwealth of Puerto Rico.

DO HEREBY CERTIFY that the deponent was first duly sworn before the commencement of the taking of the deponent's testimony.

IN WITNESS WHEREOF I sign these presents and affix my notarial seal in San Juan, Puerto Rico, this _______________ day of ______________________ 2022.

____________________________

Saul Berrios, Notary Public



E R R A T A   S H E E T

Pursuant to the Federal Rules of Civil Procedure, any changes in form or substance which you desire to make to your deposition testimony shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach them to this errata sheet.

I, the undersigned, DANIEL THREADGILL-COLÓN, do hereby certify that I have read the foregoing deposition and that to the best of my knowledge said deposition is true and accurate (with the exception of the following corrections listed below).

Page ___ Line ___ Should read:_________________

Reason for change:____________________________

Page ___ Line ___ Should read:_________________

Reason for change:____________________________

Page ___ Line ___ Should read:_________________

Reason for change:____________________________

Page ___ Line ___ Should read:_________________

Reason for change:____________________________

Page ___ Line ___ Should read:_________________

Reason for change:____________________________

Page ___ Line ___ Should read:_________________
Reason for change:______________________________
Page ___ Line ___ Should read:_________________
Reason for change:______________________________
Page ___ Line ___ Should read:_________________
Reason for change:______________________________
Page ___ Line ___ Should read:_________________
Page ___ Line ___ Should read:_________________
Reason for change:______________________________
Page ___ Line ___ Should read:_________________
Reason for change:______________________________
Page ___ Line ___ Should read:_________________
Reason for change:______________________________

________________________ ___________________
Daniel Threadgill-Colon Notary Public

Sworn to and Subscribed before me_______________
Notary Public. This ____day of_______, 2022.
My Commission Expires:



COURT REPORTER'S CERTIFICATE

City of San Juan )
) ss.:
Commonwealth of Puerto Rico )

I, DENNIS ZAMBATARO, Certified Court Reporter in the United States, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within entitled and numbered cause on January 27, 2022; and I do further certify that the foregoing transcript has been prepared under my direction.

___________________________
DENNIS ZAMBATARO, RPR and
N.M. and GA CSR
February 2, 2022