**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-cv-20687-OTAZO-REYES**

<u>**CONSENT CASE**</u>

RICHARD BURGESS, individually, and
by and through DARREN HENZE as
Guardian of the Person and Estate of
Richard Burgess, incapacitated, and as
Agent under that certain durable power of
attorney dated November 20, 2006,

     Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian Corporation, d/b/a
ROYAL CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL,

     Defendant.

_____/

<u>***DAUBERT* ORDER**</u>

THIS CAUSE came before the Court upon Defendant Royal Caribbean Cruises, Ltd.'s ("Defendant") Daubert Motion to Strike Plaintiff Richard Burgess' ("Plaintiff") Expert Captain Hendrik J. Keijer ("Captain Keijer") (hereafter, "Motion to Strike") [D.E. 86]; and Defendant's Motion in Limine to Exclude Certain Opinions and Testimony of Dr. David Nidorf ("Dr. Nidorf") and Dr. Camilo Gomez ("Dr. Gomez") at Trial (hereafter, "Motion in Limine") [D.E. 87]. The Court held a hearing on these matters on March 17, 2023 (hereafter, "Hearing"). For the reasons stated below, Defendant's Motion to Strike and Motion in Limine are DENIED.

**PROCEDURAL AND FACTUAL BACKGROUND**

On February 14, 2020, Plaintiff commenced this maritime personal injury action against Defendant alleging that he sustained a slip-and-fall accident and a cerebrovascular

incident while he was a passenger aboard Defendant's vessel *Harmony of the Seas*.  See
Compl. [D.E. 1].  In his Second Amended Complaint, Plaintiff alleges that Defendant and its
staff rendered him negligent care on February 18, 2019, after he fell and injured his head
("First Medical Emergency"); and on February 21, 2019, after Plaintiff began to experience
stroke-like symptoms while the *Harmony of the Seas* was docked in San Juan, Puerto Rico
("Second Medical Emergency"), resulting in significant and permanent injuries, including
"locked-in syndrome".  See Sec. Am. Compl. [D.E. 48 ¶¶ 21–40, 44].  Based on these
allegations, Plaintiff asserts the following claims against Defendant:

Count I: negligent medical treatment—vicarious liability of cruise line: actual agency/respondeat superior (First Medical Emergency);

Count II: negligent medical treatment—vicarious liability of cruise line: apparent agency/agency by estoppel (First Medical Emergency);

Count III: negligent failure to evacuate Plaintiff and/or evacuate Plaintiff appropriately—direct liability of the cruise line (First Medical Emergency);

Count IV: negligent medical treatment—vicarious liability of cruise line: actual agency/respondeat superior (Second Medical Emergency);

Count V: negligent medical treatment—vicarious liability of cruise line: apparent agency (Second Medical Emergency);

Count VI: negligent failure to arrange for emergency transport to closest medical facility—direct liability of the cruise line (Second Medical Emergency);

Count VII: negligent hiring and selection of onboard medical staff—direct liability of the cruise line; and

Count VIII: negligent provisioning and equipping of medical facility—direct liability of the cruise line.

See id. ¶¶ 61–122.

On January 20, 2023, Defendant filed its Motion to Strike [D.E. 86] and Motion in
Limine [D.E. 87].  In its Motion to Strike, Defendant seeks to strike Captain Keijer as an

2

expert witness on the following grounds:

> [Captain] Keijer's opinions regarding Defendant's purported inaction to the ambulance's travel time lack reliable methodology and are unhelpful.
>
> …
>
> [Captain] Keijer's opinions regarding alternatives to transfer via ambulance should be stricken because they were never properly disclosed.

See Motion to Strike [D.E. 86 at 5, 8].  In its Motion in Limine, Defendant seeks to exclude several opinions by Dr. Gomez and Dr. Nidorf on the following grounds:

> Drs. Gomez and Nidorf are unqualified to render standard of care opinions concerning the method and manner used to effectuate Plaintiff's medical disembarkation and transfer from the ship to a shoreside hospital and their alternative transfer options are speculative, lack appropriate methodology and are thus unhelpful to the jury.
>
> …
>
> Dr. Gomez's unreliable and speculative opinions regarding [tissue plasminogen activator] ("t-PA") contradict the facts of the case and are ultimately unhelpful to the jury and unfairly prejudicial to the Defendant.

See Motion in Limine [D.E. 87 at 7, 16].

On February 3, 2023, Plaintiff filed his Consolidated Response to Defendant's Motion to Strike and Motion in Limine (hereafter, "Response") [D.E. 105].  On February 10, 2023, Defendant filed its Consolidated Reply to Plaintiff's Response (hereafter, "Reply") [D.E. 106].

### *DAUBERT* STANDARDS

Rule 702 of the Federal Rules of Evidence (hereafter, "Rule 702") provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  A party who seeks to admit expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence.  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).  Thus, before expert testimony may be admitted as evidence at trial pursuant to Rule 702, the district court must act as a gatekeeper and screen the proffered evidence.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596–97 (1993).  In the Eleventh Circuit, this gatekeeping function must be performed as follows:

> [I]n determining the admissibility of expert testimony under Rule 702, [the court must] engage in a rigorous three-part inquiry [and] must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).  "A district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'"  Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison, 184 F.3d at 1311).  Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)). "Rejection of an expert's testimony is the exception rather than the rule . . . ."  Adega v. State Farm Fire & Cas. Ins. Co., No. 07-CV-20696, 2010 WL 11506354, at *1 (S.D. Fla. Mar. 30, 2010).

### DEFENDANT'S MOTION TO STRIKE

As noted above, Defendant seeks to strike Captain Keijer as an expert witness because

"[h]is primary opinion that Defendant did not properly take action in response to slow ambulance travel time is not supported by any reliable methodology and would be unhelpful to the jury"; and the opinions proffered at his November 18, 2022, deposition regarding alternative transportation options were not properly disclosed and are unfairly prejudicial to Defendant.  See Motion to Strike [D.E. 86 at 8, 11].  The undersigned addresses these arguments in turn.

1. ***Whether Captain Keijer's opinions regarding the ambulance's travel time are based on an unreliable methodology and are unhelpful to the trier of fact.***

In his August 25, 2022, expert report (hereafter, "Keijer Expert Report") [D.E. 86-1], Captain Keijer proffered, in part, the following opinions:

> 5.3    ROYAL CARIBBEAN CRUISE LTD.'s inaction to the unreasonable ambulance arrival time at the *HARMONY OF THE SEAS*, deprived BURGESS the opportunity to receive shore-based medical care as soon as possible.

> 5.6    ROYAL CARIBBEAN CRUISE LTD. knew, or should have known, that BURGESS' ambulance travelled at approximately 31 mph for 40 minutes on the 22-mile drive to the shore-based hospital.

> 5.7    ROYAL CARIBBEAN CRUISE LTD. failed to act on BURGESS' 40-minute long, and 31 mph, slow ambulance drive to the shore-based hospital.

See Keijer Expert Report [D.E. 86-1 at 13].[1]  To calculate the ambulance's speed, Captain Keijer used Google Maps to determine that the "shortest distance [from the cruise port to the hospital] was 21.9 miles."  See Exhibit E to Keijer Expert Report [D.E. 86-3] (setting forth Captain Keijer's calculations).  Captain Keijer then divided 21.9 miles by 42 minutes, or the duration of the ambulance ride as noted in the ambulance report, see Sunny Ambulance Report [D.E. 86-4], to calculate that the ambulance had traveled at a rate of 0.52 miles per minute or 31 miles per hour. See Exhibit E to Keijer Expert Report [D.E. 86-3].

---

[1] At the Hearing, Defendant clarified that of the seven (7) opinions that Captain Keijer proffered in his expert report, it only moves to strike the three (3) that are set forth above.  See Hearing Transcript [D.E. 136 at 175:9–11].

Defendant contends that this methodology renders Captain Keijer's conclusions about the ambulance's alleged slow rate of travel and Defendant's organization of Plaintiff's medical evacuation both unreliable and unhelpful to the trier of fact.  Specifically, Defendant argues that Captain Keijer's use of Google Maps and his assumption that the ambulance used the shortest route generated by his search fail under Daubert, as Captain Keijer later "freely admitted [during his deposition] that he had no awareness of the actual route taken by the ambulance, any traffic conditions the ambulance encountered, or what otherwise occurred in the ambulance or on the roads that day."  See Motion to Strike [D.E. 86 at 7].  In response, Plaintiff contends that Captain Keijer's extensive experience as a "master mariner" and "shoreside Commodore" provides a sufficient basis for his evaluation of Plaintiff's medical evacuation; and that his "opinions concerning the logistics of transporting a cruise ship passenger suffering a medical emergency . . . plainly concern matters that are beyond the knowledge of the average layperson", thereby rendering them helpful to the jury.  See Response [D.E. 105 at 22–25, 28–29].

At the Hearing, Captain Keijer explained that he relied on the deposition testimony of Plaintiff's Guardian Darren Henze ("Mr. Henze") to ascertain that, during the ambulance ride, there had been "no accidents along the way…[and] no traffic", which led Captain Keijer to posit that the ambulance could have reasonably been expected to travel "not only the shortest, but also the fastest route" to the hospital.  See Hearing Transcript [D.E. 136 at 159:14–21].  Captain Keijer further explained that he consulted Google Maps because it was a practice that he implemented in his role as a cruise ship captain "all the time . . . to get an understanding of how long it would reasonably take for an ambulance to reach the destination with a patient on board whilst under the responsibility of [the cruise line]".  Id. at 159:22–160:3.  Captain Keijer further testified that "21.9 miles . . . is the shortest route that . . . could reasonably be expected to be taken by [an] ambulance

[that] has an urgent care patient on board", and that the distance in this case "was covered in . . . 42 minutes . . . [at] 31 miles an hour", which was too slow.  Id. at 162:3–11.  Finally, Captain Keijer testified that it took the ambulance approximately two (2) hours to initially arrive at the *Harmony of the Seas* to transport Plaintiff to the hospital, which was "an unreasonable length of time."  Id. at 184:12–19; see also Plaintiff's Notice of Filing at Exhibit 2 [D.E. 127-2 at 6–7] (setting forth timeline from ambulance request to ambulance arrival at the port).

Having considered Captain Keijer's testimony, the undersigned finds that Captain Keijer's methodology is sufficiently reliable, and that Defendant's arguments go to the weight of his expert opinion and are more appropriately addressed by "vigorous cross-examination" and "presentation of contrary evidence."  Daubert, 509 U.S. at 596.

### 2. *Whether Captain Keijer's deposition opinions should be stricken for non-compliance with the Federal Rules of Civil Procedure.*

Defendant further argues that Captain Keijer proffered several "new" opinions at his November 18, 2022, deposition that were not disclosed pursuant to Federal Rule of Civil Procedure 26 ("Rule 26") in his expert report [D.E. 86-1] or his rebuttal report (hereafter, "Keijer Rebuttal Report") [D.E. 86-5]), thereby requiring that they be stricken under Federal Rule of Civil Procedure 37 ("Rule 37").  See Motion to Strike [D.E. 86 at 8–10].  Specifically, Defendant seeks to strike Captain Keijer's testimony that "there were helicopter companies available in Puerto Rico, a Coast Guard station, and an airport nearby that could have been an alternative means of transporting Plaintiff" to the hospital.  Id. at 10 (citing Keijer Deposition Transcript [D.E. 86-2 at 51:10–53:4]).  In response, Plaintiff asserts that "Captain Keijer's testimony, including his discussion of reasonable alternatives for transferring [Plaintiff] off the ship, was simply a permissible elaboration of the opinion in his report that [Defendant] failed to act reasonably under the circumstances to timely transport [Plaintiff]".  See Response [D.E. 105 at 29].

Under Rule 26, an expert's written report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them". Fed R. Civ. P. 26(a)(2)(B)(i)–(ii). An expert is obligated to supplement his report "in a timely manner [and prior to the deadline for pretrial disclosures] if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing". Id. at 26(e)(1)(A), (e)(2). "In the event a party violates Rule 26(a) or (e), Rule 37(c) provides for the exclusion of the expert evidence 'unless the failure was substantially justified or is harmless.'" Ford as Next Friend of Doe v. NCL Bahamas Ltd., No. 17-CV-24404, 2019 WL 3937127, at *4 (S.D. Fla. June 4, 2019). "Whether a failure to make sufficient expert disclosures is harmless is dependent on several factors including: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; and (4) the importance of the evidence." Id. at *5 (citing Ward v. Carnival Corp., No. 17-24628-CV, 2019 WL 1228063, at *2 (S.D. Fla. Mar. 14, 2019)).

At his deposition, Captain Keijer initially testified as follows:

Q:      At no point in time [as the captain of a cruise ship] would you ever have had the authority to overrule the judgment of the medical director [in terms of coordinating the details of where to send a patient]?

A:      I would have certainly been provided the opportunity to come up with suggestions such as contacting the Coast Guard, one option. Or looking for an alternate means of transfer if a transfer was known by the company to take a lengthy amount of time. . . . I did have the authority to come up with suggestions with regard to modes of transport. When it comes to overruling a medical director with decisions based on medical conditions, no, of course I wouldn't overrule them.

See Keijer Deposition Transcript [D.E. 86-2 at 33:16–34:8, 34:23–35:4]. In response to further

8

questioning, Captain Keijer testified that his research indicated that "[t]here were several helicopter companies available in Puerto Rico . . . [t]here was a Coast Guard station that was available[,] [and] [t]here was an airport that was only 10 minutes away", see id. at 51:18–25, which supported his conclusion that "ROYAL CARIBBEAN CRUISES LTD.'s inaction to the unreasonable ambulance arrival time at the HARMONY OF THE SEAS, deprived BURGESS the opportunity to receive shore-based medical care as soon as possible." See Keijer Expert Report [D.E. 86-1 at 13].

The undersigned finds that Captain Keijer's opinions regarding alternative methods of transportation were not disclosed in his expert or rebuttal reports. Captain Keijer focused his analysis on the sufficiency of Plaintiff's transfer via ambulance from the *Harmony of the Seas* to the hospital. See Keijer Expert Report [D.E. 86-1 at 11–12]. Likewise, his opinion regarding Defendant's "inaction" was linked to its purported delay in coordinating and communicating with the ambulance, not to Defendant's failure to explore alternative means of transporting Plaintiff. Id. at 13. Thus, Captain Keijer's deposition testimony does not elaborate on previously disclosed opinions as he had not, until that point, opined as to the availability or feasibility of alternative transportation.

However, the undersigned finds that at this juncture, the non-disclosure of these opinions is harmless. Plaintiff asserts that he "offered [Defendant's] counsel the opportunity to re-depose" Captain Keijer, but that Defendant's counsel did not respond to the offer. See Response [D.E. 105 at 31] (citing Dec. 19, 2022, Email Exchange [D.E. 105-6]). Given that trial in this case has been reset to June 5, 2023, Defendant now has ample time "to cure any prejudice that [it] may have suffered in the form of not being sufficiently prepared to depose [Captain Keijer]" and otherwise "prepare a defense" to his opinions. See Ford as Next of Friend of Doe, 2019 WL 3937127, at *5.

**DEFENDANT'S MOTION IN LIMINE**

In its Motion in Limine, Defendant argues that Dr. Gomez and Dr. Nidorf are unqualified "to render standard of care opinions concerning the method and manner used to effectuate Plaintiff's medical disembarkation and transfer from the ship". See Motion in Limine [D.E. 87 at 7].  Defendant further argues that Dr. Gomez and Dr. Nidorf's "alternative transfer options are speculative, lack appropriate methodology and are thus unhelpful to the jury." Id.  Finally, Defendant argues that Dr. Gomez's opinions regarding t-PA are "unreliable and speculative", "contradict the facts of the case", and are "ultimately unhelpful to the jury and unfairly prejudicial" to Defendant.  Id. at 16.  The undersigned first addresses Defendant's parallel arguments as to Dr. Gomez and Dr. Nidorf before turning to Defendant's arguments as to Dr. Gomez's t-PA opinions.[2]

### 1. *Whether Dr. Gomez and Dr. Nidorf are unqualified to opine as to the standard of care.*

Defendant contends that "[w]hile both [Dr. Gomez and Dr. Nidorf] have experience facilitating medical transfers . . . they have no personal knowledge or experience coordinating any type of medical transfer in Puerto Rico, let alone an emergency medical disembarkation from a cruise ship in a foreign port of call." See Motion in Limine [D.E. 87 at 8–9].  Thus, Defendant contends that both doctors are unqualified to opine as to the standard of care rendered in this case.

---

[2] Defendant initially argues that, "[a]s a threshold matter, Plaintiff's Expert Witness Disclosure [D.E. 87-1 at 1–4] [as to Drs. Gomez and Nidorf] does not meet the requirements set forth under [Rule] 26(a)(2)(A) and Local Rule 16.1(k) in that the [] boilerplate summaries (particularly subparts h through r) are so vague that they fail to provide any substantive detail in order for [Defendant] to have a reasonable opportunity to prepare cross examination questioning or potentially arrange for rebuttal expert testimony." See Motion in Limine [D.E. 87 at 3]. Thus, Defendant "seeks to strike the Disclosure Notice in its entirety and limit Plaintiff's expert witnesses to only those opinions that they have specifically delineated in their summary reports." Id. at 3–4.  The undersigned notes that the December 1, 2011, amendment to the Local Rules for the Southern District of Florida "deleted the prior language of [Local] Rule 16.1(k) because it was duplicative of [Rule] 26(a)(2)." See Rinker v. Carnival Corp., No. 09-23154-CIV, 2011 WL 6370062, at *1 n.1 (S.D. Fla. Dec. 19, 2011).  Regardless, the undersigned finds that Plaintiff's Notice [D.E. 87-1] complies with Rule 26(a)(2) with respect to Drs. Gomez and Nidorf as it attaches both experts' written reports which, in turn, comply with the content requirements set forth in Rule 26(a)(2)(B).  Thus, the undersigned denies Defendant's request to strike Plaintiff's Notice.

Id.  However, as to the qualification prong under Daubert, "[t]here is no stringent requirement: so long as the expert is minimally qualified, objections go to the credibility and weight of the testimony, not its admissibility." Altidor v. Carnival Corp., 550 F. Supp. 3d 1322, 1333 (S.D. Fla. 2021).  At the Hearing, Dr. Gomez testified, in relevant part, that: he is a board-certified vascular neurologist who has been practicing for over 40 years; he has dealt with tens of thousands of stroke patients during his career; and he has experience transferring stroke patients from one facility to another.  See Hearing Transcript [D.E. 136 at 50:14–52:17].  Moreover, Dr. Nidorf testified that: he is board certified in both family practice and emergency medicine and has been practicing for 30 years; and he routinely transfers patients, including stroke patients, from one institution to another. Id. at 119:13–120:4, 121:4–8.

Given Dr. Gomez and Dr. Nidorf's expansive medical background and experience treating stroke patients, the undersigned is satisfied that they are qualified to testify in this case; hence, Dr. Gomez and Dr. Nidorf's testimony may not be excluded on the basis that they are unqualified.

2. ***Whether Drs. Nidorf and Gomez's opinions regarding the availability of alternative transfer options are speculative, lack appropriate methodology, and are unhelpful.***

In his August 25, 2022, expert report (hereafter, "Nidorf Expert Report"), Dr. Nidorf proffered, in part, the following opinions:

> First, once the staff learned how long it would take for the ambulance to arrive, they should have gotten back on the phone with the ambulance company and insisted on a faster arrival and not taken no for an answer. Second, if it became clear that the first ambulance company could not send an ambulance more quickly, then other ambulance companies should have been called. Third, once it became clear how long it would take for the ambulance to arrive, and once it became clear that they could not come sooner or another ambulance was not available to come more quickly, then 911 should have been called to get the fastest possible transport available to bring [Plaintiff] to the hospital.
> …
> Dr. Pereira and staff also failed to send [Plaintiff] to the closest possible hospital. . . . A search of the San Juan area hospitals capable of caring for stroke patients reveal many closer hospitals [than HIMA San Pablo Hospital Caguas]. I called all of the

11

following hospitals to confirm they have a 24/7 emergency room, they take care of stroke patients, and they have an on-call Neurologist 24/7 as well. It took me less than 5 minutes on the phone to verify this with the ER staff at each hospital.

See Nidorf Expert Report [D.E. 87-1 at 71–72].  Similarly, in his August 26, 2022, expert report

(hereafter, "Gomez Expert Report"), Dr. Gomez opined as follows:

[T]he delay incurred in transferring [Plaintiff] from the Harmony of the Seas cruise ship to a stroke capable hospital was unnecessarily excessive . . . . Dr. Pereira recognized and documented the urgency of the need for "*immediate*" transfer of the patient for neurologic consultation. Notwithstanding, Dr. Pereira failed to provide the necessary supervision over [Defendant's] personnel in order to expedite the transport of [Plaintiff] to the closest "stroke-capable" hospital . . . .
…
Once the patient had been identified by Dr. Pereira to have a clinical syndrome consistent with an acute stroke (as evidenced by his own clinical note), the next step should have been to summon emergency medical transport via the existing 911-based system in Puerto Rico . . . .
…
The fact is that HIMA San Pablo Hospital Caguas, which is about 17 miles . . . inland from the port of San Juan . . . was not the closest stroke-capable hospital to the ship, and that others much closer were available for transfer of the patient, most within a radius of less than 5 miles.

See Gomez Expert Report [D.E. 87-1 at 15, 17–18] (emphasis in original).

Defendant moves to exclude these opinions because "neither Dr. Nidorf nor Dr. Gomez have employed any reliable methodology to support their opinions that a delay in medical transfer was due to a 'lack of urgency' on the part of [Defendant's] ship physician or medical staff on the date in question, that a faster alternative method of transfer was readily available, and/or that time could have been saved by choosing a closer hospital location that was suitable for Plaintiff's care needs", thus rendering their opinions speculative and unhelpful.  See Motion in Limine [D.E. 87 at 15].  Defendant further argues that "any opinion Dr. Nidorf offers in this case pertaining to alternative hospital locations on the date in question is dependent upon what he purportedly learned during his review of unidentified internet websites and/or over the telephone—both of which are sources of information that are inadmissible hearsay under Fed. R. Evid. 802." Id. at 14.

12

As to Defendant's methodology argument, both Dr. Nidorf and Dr. Gomez itemized the materials upon which they relied to render their opinions, including fifty-seven (57) assorted medical records provided by Plaintiff in Dr. Nidorf's case; and medical records, imaging studies, legal documents, deposition testimony, and approximately twelve (12) medical literary sources in Dr. Gomez's case.  See Nidorf Expert Report [D.E. 87-1 at 66–69]; Gomez Expert Report [D.E. 87-1 at 9–11, 20–21].  "This satisfies *Daubert*."  Ward, 2019 WL 1228063, at *5 (finding that expert's utilization of "medical documents and information provided by [the] [p]laintiff during the discovery process . . . [and] a list of the publications [the expert] consulted in connection with the preparation of her report" facilitated sufficient connection between facts of the case and expert's conclusions).

As to Defendant's hearsay argument, Federal Rule of Evidence 703 provides that "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  Fed. R. Evid. 703.  Dr. Nidorf explained that "call[ing] [nearby] hospitals to confirm they have a 24/7 emergency room, they take care of stroke patients, and they have an on-call Neurologist 24/7 . . . is exactly the process that ER doctors do routinely when transferring patients to other hospitals."  See Nidorf Expert Report [D.E. 87-1 at 72].  Thus, Dr. Nidorf is permitted to rely on "hearsay (or any other inadmissible evidence) to support his . . . conclusions."  Ward, 2019 WL 1228063, at *6.

Finally, to the extent that Dr. Gomez and Dr. Nidorf opine as to the guidelines and protocol applicable to a medical evacuation and transfer of a stroke patient, their opinions "provide information of a technical and specialized kind not expected to be known by the average lay persons" and will therefore be helpful to the trier of fact in assessing the circumstances of this case.  See Disler v. Royal Caribbean Cruise Ltd., No. 17-CV-23874, 2019 WL 5260249, at *8 (S.D. Fla.

13

July 10, 2019) (concluding that expert's opinion would "aid the trier of fact in understanding the specifics of a USCG helicopter rescue operation and the time it would take to deliver [the] [p]laintiff to [the hospital]").

Thus, the undersigned does not find that Dr. Gomez and Dr. Nidorf's opinions on the issue of delay should be excluded as unreliable or unhelpful to the jury.

3. **Whether Dr. Gomez's t-PA opinions are unreliable, unhelpful to the jury, and prejudicial.**

In his expert report, Dr. Gomez also proffered the following opinion:

[T]he delay incurred in transferring [Plaintiff] from the Harmony of the Seas cruise ship to a stroke capable hospital . . . deprived [Plaintiff] of the possibility of being treated with [t-PA] and, **within a reasonable degree of medical probability,** directly contributed to the ultimate bad outcome and disability of the patient.

See Gomez Expert Report [D.E. 87-1 at 15] (emphasis in original). At his deposition, Dr. Gomez expanded on this opinion by explaining that it was possible that Plaintiff "presented so late to the emergency department that by then [his brain tissue] was infarcted" such that he was no longer a candidate for t-PA; and that "patients with [Plaintiff's] kind of pathology when given tPA have about a 30 percent chance of a better outcome than when they do not get IV tPA". See Gomez Deposition Transcript [D.E. 87-3 at 81:18–19, 132:7–10].

Defendant moves to exclude these opinions as unreliable and speculative because Dr. Gomez "cannot pinpoint when in time Plaintiff's brain tissue died" and therefore "cannot establish at what point Plaintiff needed to be delivered to [the hospital] in order to qualify for t-PA." See Motion in Limine [D.E. 87 at 16]. Defendant further argues that Dr. Gomez's opinion contradicts Dr. Ulises Nobo ("Dr. Nobo"), who treated Plaintiff at the hospital on the day of his medical emergency and testified that he would not have administered t-PA to Plaintiff. Id. at 17–18. Finally, Defendant challenges Dr. Gomez's projection that Plaintiff would have had a 30% chance

14

of a better outcome had he received t-PA as insufficient to meet Florida's more-likely-than-not standard of causation.  Id. at 21.

As to Defendant's reliability arguments, as noted above, Dr. Gomez relies on an exhaustive list of medical sources to support his conclusions, including those regarding Plaintiff's eligibility for t-PA.  Moreover, any assessment as to the accuracy of his t-PA opinions is "a determination for the fact-finder to make".  Goins v. Royal Caribbean Cruise, Ltd., No. 16-21368-CIV, 2017 WL 5749778, at *6 (S.D. Fla. May 17, 2017) (recommending that "the Court should not usurp the role of the jury by weighing the evidence to determine whether Dr. Leavitt's opinion is correct").  Thus, the undersigned finds that Defendant's reliability arguments go to the weight of Dr. Gomez's expert opinion about t-PA treatment and are more appropriately addressed by "vigorous cross-examination" and "presentation of contrary evidence." Daubert, 509 U.S. at 596.

Defendant's helpfulness and prejudice arguments are likewise unavailing.  Defendant contends that Dr. Gomez should not be permitted to "essentially replace Dr. Nobo's thoughts with his own and ultimately re-create an entire hypothetical scenario that directly contradicts [Dr. Nobo's testimony]".  See Motion in Limine [D.E. 87 at 19–20].  This argument is without merit because, as Plaintiff notes, "[Defendant] is free to present [Dr. Nobo's] testimony to the jury at trial" to rebut Dr. Gomez's perspective on the issues in this case.  See Response [D.E. 105 at 18–19].  Moreover, a stroke patient's eligibility for t-PA is a technical matter that is certainly "beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262.  Therefore, Dr. Gomez's t-PA opinions are not excludable on the basis that they will not assist the jury to understand the facts that are at issue in this case.

**CONCLUSION**

Based on the foregoing considerations, it is

ORDERED AND ADJUDGED that Defendant's Motion to Strike [D.E. 86] and Motion

in Limine [D.E. 87] are DENIED.

DONE AND ORDERED in Chambers at Miami, Florida this 1st day of May, 2023.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     Counsel of Record

16