UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-20687-OTAZO-REYES

CONSENT CASE

RICHARD BURGESS, individually, and
by and through DARREN HENZE as
Guardian of the Person and Estate of
Richard Burgess, incapacitated, and as
Agent under that certain durable power of
attorney dated November 20, 2006,

    Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian Corporation, d/b/a
ROYAL CARIBBEAN CRUISE LINE and/or
ROYAL CARIBBEAN INTERNATIONAL,

    Defendant.
_____/

**ORDER**

THIS CAUSE came before the Court upon Defendant Royal Caribbean Cruises, Ltd.'s ("Defendant") Motion for Summary Judgment and Incorporated Memorandum of Law (hereafter, "Motion for Summary Judgment") [D.E. 99]. The Court held a hearing on this matter on April 4, 2023 (hereafter, "Hearing"). For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED as to Counts I, II, III, VII, and VIII and DENIED as to Counts IV, V, and VI of the Second Amended Complaint.

**PROCEDURAL AND FACTUAL BACKGROUND**

On February 14, 2020, Plaintiff Richard Burgess ("Plaintiff" or "Mr. Burgess") commenced this maritime personal injury action against Defendant alleging that he had sustained a slip-and-fall accident and a cerebrovascular incident while he was a passenger

aboard Defendant's vessel *Harmony of the Seas*. See Compl. [D.E. 1]. In his Second Amended Complaint, Plaintiff alleges that Defendant and its staff rendered him negligent care on February 18, 2019, after he fell and injured his head ("First Medical Emergency"); and on February 21, 2019, after he began to experience stroke-like symptoms while the *Harmony of the Seas* was docked in San Juan, Puerto Rico ("Second Medical Emergency"), resulting in significant and permanent injuries, including "locked-in syndrome". See Sec. Am. Compl. [D.E. 48 ¶¶ 21–40, 44].[1] Based on these allegations, Plaintiff asserts the following claims against Defendant:

> Count I: negligent medical treatment—vicarious liability of cruise line: actual agency/respondeat superior (First Medical Emergency);
>
> Count II: negligent medical treatment—vicarious liability of cruise line: apparent agency/agency by estoppel (First Medical Emergency);
>
> Count III: negligent failure to evacuate Plaintiff and/or evacuate Plaintiff appropriately—direct liability of the cruise line (First Medical Emergency);
>
> Count IV: negligent medical treatment—vicarious liability of cruise line: actual agency/respondeat superior (Second Medical Emergency);
>
> Count V: negligent medical treatment—vicarious liability of cruise line: apparent agency (Second Medical Emergency);
>
> Count VI: negligent failure to arrange for emergency transport to closest medical facility—direct liability of the cruise line (Second Medical Emergency);
>
> Count VII: negligent hiring and selection of onboard medical staff—direct liability of the cruise line; and
>
> Count VIII: negligent provisioning and equipping of medical facility—direct liability of the cruise line.

See id. ¶¶ 61–122.

---

[1] "'Locked-in syndrome' [is] a permanent condition where the patient is aware of his surroundings but cannot move or communicate verbally due to complete paralysis of nearly all voluntary muscles in the body." See Sec. Am. Compl. [D.E. 48 ¶ 44].

2

On January 31, 2023, Defendant filed its Motion for Summary Judgment [D.E. 99] and Statement of Material Facts [D.E. 100], arguing that it is entitled to summary judgment on all counts in the Second Amended Complaint. On February 28, 2023, Plaintiff filed his Response in Opposition to Defendant's Motion for Summary Judgment (hereafter, "Response") [D.E. 114] and Statement of Material Facts [D.E. 115]. On March 14, 2023, Defendant filed its Reply in Support of its Motion for Summary Judgment (hereafter, "Reply") [D.E. 122] and Reply Statement of Material Facts [D.E. 123].

In his Response, Plaintiff conceded that summary judgment is appropriate as to Counts I, II, and III (relating to the First Medical Emergency); and VII (negligent hiring and selection of onboard medical staff). See Response [D.E. 114 at 3]. At the Hearing, Plaintiff further conceded that summary judgment is also appropriate as to Count VIII (negligent provisioning and equipping of medical facility). Therefore, the Court grants Defendant's Motion for Summary Judgment as to those counts. However, with regard to the remaining counts, namely, Counts IV, V, and VI, the Court finds that Defendant is not entitled to judgment as a matter of law, as more fully discussed below.

## APPLICABLE LAW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine issue of material fact exists, courts "view all evidence and draw all reasonable inferences in favor of the non-moving party." Smith v. Royal Caribbean Cruises, Ltd., 620 F. App'x 727, 729 (11th Cir. 2015). "Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; 'the requirement is that there be no *genuine* issue

of *material* fact.'" Weiner v. Carnival Cruise Lines, No. 11-CV-22516, 2012 WL 5199604, at *2 (S.D. Fla. Oct. 22, 2012) (emphasis in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Indeed,

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Cohen v. Carnival Corp., 945 F. Supp. 2d 1351, 1354 (S.D. Fla. 2013) (alterations in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Hence, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252.

"A carrier by sea does not serve as an insurer to its passengers; it is liable only for its negligence." Weiner, 2012 WL 5199604, at *2. To prove a claim for negligence, the plaintiff must establish: "(1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; (3) that this breach was the proximate cause of plaintiff's injury; and (4) that plaintiff suffered damages." Isbell v. Carnival Corp., 462 F. Supp. 2d 1232, 1236 (S.D. Fla. 2006). When the incident upon which the negligence action is based "occurred aboard a cruise ship, these elements must be evaluated by reference to federal maritime law." Weiner, 2012 WL 5199604, at *2.

"It is the general rule that cruise ship owners owe a duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Disler v. Royal Caribbean Cruise Ltd., No. 17-CV-23874, 2019 WL 1316995, at *3 (S.D. Fla. Feb. 19, 2019), report and recommendation adopted, 2019 WL 1992929 (S.D. Fla. Mar. 15, 2019). "Within the

4

context of whether a cruise line has a duty to medically evacuate a passenger, courts have declined to find a blanket rule under maritime law that a cruise ship is never required to provide passengers with medical evacuation; nor is there a *de facto* duty requiring a cruise line to provide medical evacuation whenever a passenger requests one." Id. (citations omitted). "Rather, the inquiry is whether [the] cruise line complied with the broad duty to act reasonably under the circumstances of the case." Id.

"[T]he shipowner is only liable to its passengers for medical negligence if its conduct breaches the carrier's more general duty to exercise 'reasonable care under the circumstances.'" Franza v. Royal Caribbean Cruises, Ltd., 772 F.3d 1225, 1233 (11th Cir. 2014) (citing Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 (1959)). Further, "[u]nder admiralty law, causation is a material element of [] negligence and the issue of proximate cause involves the application of law to fact, which is left to the fact finder." Ho v. Royal Caribbean Cruises Ltd., No. 18-23541-Civ, 2020 WL 3314184, at *2 (S.D. Fla. Apr. 2, 2020) (citing Chaparro v. Carnival Corp., 693 F.3d 1333, 1336 (11th Cir. 2012)). "However, the issue may be decided [as a matter of law] by a court when facts are unequivocal, such as where the evidence supports no more than a single reasonable inference." Id. (alteration in original) (quotation marks and citations omitted). "Expert testimony is required to establish medical causation for conditions not readily observable or susceptible to evaluation by lay persons." Mann v. Carnival Corp., 385 F. Supp. 3d 1278, 1285 (S.D. Fla. 2019) (citing Rivera v. Royal Caribbean Cruises Ltd., 711 F. App'x 952, 954 (11th Cir. 2017)).

## UNDISPUTED MATERIAL FACTS

1. On February 17, 2019, Plaintiff, who was 61 years old at the time, boarded the *Harmony of the Seas*.

2. In the early morning hours of February 18, 2019, Plaintiff fell in the foyer of his cabin and injured the back of his head.

3. At 11:00 A.M. on the same day, Plaintiff visited the ship's medical center, where he received stitches for a 10-centimeter laceration on the back of his head and a tetanus injection.

4. Defendant's ship physician, Dr. Michiel Etsebeth, noted that Plaintiff's examination was normal.

5. After he was discharged, Plaintiff remained in his usual state of health over the course of the next two days.

6. On February 21, 2019, at 8:59 A.M. EST,[2] after the *Harmony of the Seas* had docked in San Juan, Puerto Rico, Plaintiff's cousin, Susan Hiatt ("Mrs. Hiatt"), received a call from Plaintiff, who told her that he believed he was having a stroke.

7. At approximately 9:10 A.M., Mrs. Hiatt's husband, Joseph Hiatt ("Mr. Hiatt"), located Plaintiff in a booth in the ship's restaurant. Plaintiff relayed to Mr. Hiatt that he could not walk and "couldn't see good"; and that he was "scared to death."

8. Within five to ten minutes of Mr. Hiatt's request for assistance, a wheelchair attendant arrived at the restaurant and transported Plaintiff to the ship's medical center.

9. At 9:25 A.M., Defendant's ship nurse, Mary Bremner, documented that Plaintiff was unable to move the fingers on his right hand and had an unstable gait.

10. A shoreside referral form bearing the signature of Defendant's ship physician, Dr. Joao Pereira ("Dr. Pereira"), and time-stamped at 9:56 A.M. indicated that Plaintiff was diagnosed with "acute cerebrovascular insufficiency."

---

[2] The Court notes that all times recorded aboard the *Harmony of the Seas* are in Eastern Standard Time ("EST") while all times recorded in San Juan, Puerto Rico are in Atlantic Standard Time ("AST"). At the time of Plaintiff's incident, AST was one hour ahead of EST. For purposes of this Order, all times are noted in EST.

11. At 9:59 A.M., Defendant's medical secretary emailed the port agent, Continental Shipping, to request an ambulance service for Plaintiff.

12. Plaintiff remained under observation in the ship's medical center until the referral was completed.

13. At 12:08 P.M., an ambulance departed from the Port of San Juan with Plaintiff and arrived at HIMA San Pablo Caguas Hospital ("HIMA Caguas") at 12:50 P.M.

14. The standard of care for treating ischemic stroke patients is to administer intravenous tissue plasminogen activator ("t-PA")[3] if they arrive at a hospital within 4½ hours of symptom onset and do not have any other disqualifying conditions or "contraindications."

15. At 12:59 P.M., Dr. Ulises Nobo ("Dr. Nobo") evaluated Plaintiff and ordered a CT scan of Plaintiff's brain. The CT scan revealed that Plaintiff had infarcted brain tissue, which is a contraindication for t-PA. Thus, Plaintiff was not administered t-PA.

16. Another contraindication for t-PA is an intracranial hemorrhage, or bleeding in the brain.

17. Approximately twelve to fourteen hours later, Plaintiff developed new symptoms, including hemiparesis on the lefthand side of his body, vomiting, and an inability to speak. A follow-up CT scan of Plaintiff's brain revealed a total occlusion of the basilar artery.

18. Plaintiff was intubated and underwent emergency surgery, but it was unsuccessful.

## DISCUSSION

As noted above, Plaintiff concedes that summary judgment is appropriate as to Counts

---

[3] "t-PA is given to patients through an IV in the arm, and it works by dissolving blood clots that block blood flow to the brain. When administered quickly after stroke onset . . . t-PA helps to restore blood flow to brain regions affected by a stroke, thereby limiting the risk of damage and functional impairment." See NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE, *Overview of Tissue Plasminogen Activator for Acute Ischemic Stroke*, https://www.ninds.nih.gov/about-ninds/impact/ninds-contributions-approved-therapies/tissue-plasminogen-activator-acute-ischemic-stroke-alteplase-activaser.

I, II, III, VII, and VIII.  Therefore, the Court need not address those counts further.

Defendant argues that summary judgment in its favor is also appropriate on the remaining claims in the Second Amended Complaint, namely, Counts IV, V, and VI (relating to the Second Medical Emergency).  The Court first discusses Defendant's multiple arguments pertaining to Count VI; and then proceeds to discuss Defendant's causation arguments that are common to Counts IV and V.  As explained below, the Court concludes that summary judgment is not appropriate as to any of these counts.

### A. Negligent Failure to Arrange for Emergency Transport to Closest Medical Facility (Count VI)

Defendant argues that Count VI fails because it delegated the duty to oversee Plaintiff's medical transfer to non-party Continental Shipping, an independent contractor, via a Port Agent Agreement [D.E. 100-13].  See Motion for Summary Judgment [D.E. 99 at 16–17].  However, Plaintiff proffers evidence of Defendant's own Disembarkation Policy wherein Defendant specifies that, notwithstanding its arrangement with Continental Shipping, Defendant's treating physician: "is ultimately responsible for the decision to disembark a guest or crew member for emergency medical treatment"; "shall ensure that the ground transportation arranged is appropriate for the medical condition of the patient and that the medical transport crew are fully briefed on the medical condition of the patient"; and "is medico-legally responsible for the care and treatment of the patient until the patient care is taken over by the receiving physician at [the] receiving medical facility."  See Disembarkation Policy [D.E. 115-1 at 2, 8].  Plaintiff also cites the deposition testimony of Continental Shipping's corporate representative, Daniel Threadgill-Colon ("Mr. Threadgill-Colon"), who confirmed that Defendant "is ultimately responsible for ensuring that there's appropriate ground transport for the patient" and that "the patient is transferred to a hospital that can appropriately care for the patient's needs".  See Threadgill-Colon Deposition Transcript

8

[D.E. 87-4 at 84:6–22].  Given this record evidence, it cannot be said as a matter of law that Defendant did not owe Plaintiff a duty to arrange his emergency transport.

Relatedly, Defendant contends that Plaintiff "cannot impute liability to [it] under a non-delegable duty theory" because "[t]his Court has [] explicitly rejected that cruise ship operators owe passengers a non-delegable duty to provide reasonable medical care."  See Motion for Summary Judgment [D.E. 99 at 17] (citations omitted); see also Reply [D.E. 122 at 9].  However, Count VI does not allege, nor does Plaintiff argue, that Defendant owed Plaintiff a non-delegable duty of care.  Indeed, at the Hearing, Plaintiff explained that his argument is not that Defendant *cannot* delegate its duty of care, but that Defendant *did not*, in this case, delegate it to Continental Shipping, given the Disembarkation Policy.  Thus, Defendant's non-delegable duty argument is superfluous.[4]

Defendant further argues that Count VI also fails because Plaintiff's purported theories of liability do not "[rely] on competent evidence, are grounded on fundamental misunderstandings of the conditions in Puerto Rico, rely on inadmissible hearsay or speculation, or did not proximately cause Mr. Burgess's damages."  See Motion for Summary Judgment [D.E. 99 at 4].  Defendant describes Plaintiff's theories of liability as follows: (1) Defendant's medical staff should have called 911 instead of coordinating the transfer through a private transfer service; (2) Defendant should have had an emergency care protocol for stroke victims; (3) Defendant should have directed the ambulance to deliver Plaintiff to a closer hospital; and (4) Defendant should have been more

---

[4] Defendant also appears to invoke the non-delegation of duty argument with respect to Plaintiff's claims for negligent medical treatment (Counts IV and V).  See Motion for Summary Judgment [D.E. 99 at 16] (referring to "all claims").  However, given the foregoing discussion, the argument equally fails as to those claims.

aggressive in facilitating Plaintiff's transport. Id.[5]

As to the first theory of liability, Defendant contends that the opinions of Plaintiff's experts, Dr. Camilo Gomez ("Dr. Gomez") and Dr. David Nidorf ("Dr. Nidorf"), regarding the efficacy of calling 911 in Puerto Rico are "not based on any personal knowledge or evidence", are "purely conjectural", and purportedly contradict the testimony of both Dr. Nobo and Mr. Threadgill-Colon. Id. at 4–5. However, the Court has already rejected Defendant's challenges to Dr. Gomez's and Dr. Nidorf's respective expert opinions in its Daubert Order [D.E. 137]. Moreover, with regard to purportedly contradictory evidence, "[t]he Court does not weigh conflicting evidence" at the summary judgment stage. Price v. Carnival Cruise Lines, No. 20-cv-20621, 2022 WL 2713727, at *2 (S.D. Fla. July 13, 2022). Thus, Plaintiff's first theory of liability survives Defendant's summary judgment challenge.

As to the second theory of liability, Defendant challenges Dr. Gomez's opinion that "the transfer of Mr. Burgess to a stroke-capable hospital could have been executed within a noticeably shorter interval" had a protocol for disembarking passengers suffering strokes been in place. See Motion for Summary Judgment [D.E. 99 at 6]. Dr. Gomez's opinion is based, in part, on the Guidelines of the American Heart Association/American Stroke Association ("Guidelines"), which emphasize the time-sensitive nature of a stroke and the necessity for "expeditious pre-hospital transport and care" to access "disability-sparing treatments". See Gomez Expert Report [D.E. 105-1 at 9]. After considering the evidence and the timeline in this case, Dr. Gomez opined that Plaintiff's transfer was not timely and would have benefited from a Guidelines-compliant protocol. Id. Given that Defendant did not challenge this opinion in its Daubert Motions [D.E.

---

[5] Defendant also challenged a fifth theory of liability purportedly advanced by Plaintiff to the effect that Defendant should have assigned a "Care Team" Associate to accompany Plaintiff on his trip to the hospital. See Motion for Summary Judgment [D.E. 99 at 9–10]. However, at the Hearing, Plaintiff clarified that he is no longer pursuing this argument. Thus, the Court need not address it further.

86, 87], the Court does not find a basis for discounting it at this time. Thus, Plaintiff's second theory of liability survives Defendant's summary judgment challenge.

As to the third theory of liability, Defendant contends that Dr. Gomez's and Dr. Nidorf's respective expert opinions regarding the existence of closer stroke-capable hospitals does not constitute competent evidence to "support the theory that had the ambulance transported Plaintiff to a different medical facility, his outcome would have been different." See Motion for Summary Judgment [D.E. 99 at 7]. In connection with this argument, Defendant attacks Dr. Gomez's declaration in support of Plaintiff's Consolidated Response to Defendant's Daubert Motions [D.E. 86, 87] (hereafter, "Gomez Declaration") [D.E. 105-2], in which Dr. Gomez identifies by name two alternative stroke-capable hospitals, as a sham affidavit on the basis that it contradicts his testimony from his November 16, 2022, deposition. See Reply [D.E. 122 at 4]. However, Dr. Gomez's and Dr. Nidorf's opinions have survived Defendant's Daubert challenge. See Daubert Order [D.E. 137]. Moreover, Dr. Gomez's declaration does not qualify as a sham affidavit because its contents do not directly contradict his November 16, 2022, deposition testimony but simply provides the names of two additional stroke-capable hospitals that he could not provide at this deposition. See Gomez Deposition Transcript [D.E. 87-3 at 119:4–8] ("Q: [C]an you give me the name of any other hospital in Puerto Rico that was capable of providing t-PA to [Plaintiff] on February 21, 2019? A: I cannot. . . ."). "[A] court should not strike an affidavit if it supplements a witness's earlier testimony, presents a variation in the testimony, or represents an instance of failed memory." Lorentz v. Sunshine Health Prods., Inc., No. 09-61529-CIV, 2010 WL 3733986, at *11 (S.D. Fla. Aug. 27, 2010). In sum, Plaintiff's proffer of evidence as to the existence of these alternative stroke-capable hospitals is sufficient to generate an issue of fact as to whether his medical outcome would have differed had he been transported to one of them. Thus, Plaintiff's

11

third theory of liability survives Defendant's summary judgment challenge.

Finally, Defendant challenges the fourth theory of liability, namely, "that an ambulance transfer could have been effectuated faster had [Defendant] been more aggressive." See Motion for Summary Judgment [D.E. 99 at 7]. However, Plaintiff counters that this is not a separate theory, but "part-and-parcel of [his] overarching contention that [Defendant] should have acted more proactively to ensure that [Plaintiff] was taken off the ship and transported to the closest stroke-capable hospital as quickly as possible, and that [Defendant's] failure to do so was unreasonable." See Response [D.E. 114 at 11–12]. As such, Plaintiff's proffer of evidence regarding, in relevant part, the functionality of 911 in Puerto Rico and the location of alternative stroke-capable hospitals in the area is sufficient to generate issues of fact as to whether Defendant's chosen course of action breached its duty to exercise reasonable care under the circumstances of Plaintiff's emergency transport, Franza, 772 F.3d at 1233, and whether such alleged breach proximately caused Plaintiff's damages, Ho, 2020 WL 3314184, at *3. Thus, Plaintiff's fourth theory of liability survives Defendant's summary judgment challenge; and given the foregoing analysis, Defendant is not entitled to summary judgment as to Count VI.

### B. Negligent Medical Treatment (Counts IV and V)

Defendant further argues that Counts IV and V, alleging negligent medical treatment under the theories of actual and apparent agency, respectively, fail because Plaintiff has not proffered competent evidence of causation. Specifically, Defendant argues that "(1) if t-PA had been given [to Plaintiff], there was only a 30% chance of a different outcome [per Dr. Gomez's testimony]; and (2) it is entirely speculative that the delay in transporting Mr. Burgess to HIMA Caguas was the proximate cause of him not qualifying for t-PA." See Motion for Summary Judgment [D.E. 99 at 11]; Reply [D.E. 122 at 6–7]. Defendant's arguments primarily turn on evidence that, by the

time Plaintiff arrived at the hospital, his brain tissue was infarcted; and on Dr. Nobo's interpretation of a CT scan of Plaintiff's brain, which allegedly revealed the presence of a subarachnoid hemorrhage. See Motion for Summary Judgment [D.E. 99 at 11–14]. As a result, Defendant contends that the timing of Plaintiff's arrival at the hospital is irrelevant because the infarction of his brain tissue and the subarachnoid hemorrhage disqualified him from receiving t-PA treatment. Id. at 13.

In response, Plaintiff clarifies that, in citing a 30 percent chance of a better outcome, Dr. Gomez was referring to "statistics concerning the *magnitude* of improvement that stroke patients, in general, typically realize from treatment with t-PA, not the probability that Mr. Burgess would have benefitted from being treated with t-PA." See Response [D.E. 114 at 15] (emphases in original). Plaintiff also proffers evidence that creates issues of fact regarding to what extent the delay in his transport to a stroke-capable hospital contributed to the infarction of his brain tissue and affected the accuracy of Dr. Nobo's subarachnoid hemorrhage diagnosis. Specifically, Plaintiff cites Dr. Gomez's expert testimony that, had Plaintiff arrived at a hospital sooner, the degree of infarction would have been mitigated and it was more likely than not that he would have qualified for t-PA treatment. See Gomez Deposition Transcript [D.E. 87-3 at 209:4–8] ("Otherwise, had the patient been transferred within an optimal interval, more likely than not, with a good degree of certainty, the patient would have had a CT scan that didn't show already infarcted tissue."). Plaintiff also proffers the portion of Dr. Gomez's expert testimony stating that Plaintiff's CT scan did not actually reveal the presence of a subarachnoid hemorrhage; and that Dr. Nobo erroneously detected one because he was pressed for time. Id. at 208:15–18 ("[T]here was no subarachnoid hemorrhage. I think that this continues to be discussed, but the jury needs to understand that there was no—there was no hemorrhage."). To that end, in his rebuttal report, Dr.

Gomez noted that the report of Defendant's own expert neuro-radiologist, Dr. Gordon Sze ("Dr. Sze"), "did not support the presence of a subarachnoid hemorrhage." See Gomez Rebuttal Report [D.E. 105-3 at 3] (referencing Dr. Sze's Expert Report [D.E. 99-1 at 61–62]).  Thus, there is record evidence of the existence of "critical points at which delay may have played a critical role" in Plaintiff's access to treatment; hence, "material questions of fact exist on the record regarding delay and causation."  See Ho, 2020 WL 3314184, at *3.

Thus, Defendant is not entitled to summary judgment on Counts IV and V on the grounds that Plaintiff has not met his burden of proof as to causation.

## **CONCLUSION**

Based on the foregoing considerations, it is

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment [D.E. 99] is GRANTED as to Counts I, II, III, VII, and VIII and DENIED as to Counts IV, V, and VI.

DONE AND ORDERED in Chambers at Miami, Florida this 16th day of May, 2023.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:   Counsel of Record