UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-20687-AOR

RICHARD BURGESS, *et al.*,

Miami, Florida

Plaintiff(s),

April 4, 2023

vs.

ROYAL CARIBBEAN CRUISES, LTD.,

Defendant(s). Pages 1 - 62

---

MOTION HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S): JOHN H. HICKEY, ESQ.
SARAH A. LOBEL, ESQ.
1401 Brickell Avenue
Miami, FL 33131
(305) 547-0690
jhickey@hickeylawfirm.com
slobel@hickeylawfirm.com

PAULO R. LIMA, ESQ.
RUSSO APPELLATE FIRM, P.A.
7300 North Kendall Drive
Miami, FL 33156
(305) 666-4660
prl@russoappeals.com

APPEARANCES (CONT'D)

FOR THE DEFENDANT(S): MICHAEL J. DRAHOS, ESQ.
WALTER COOPER JARNAGIN, ESQ.
GRAYROBINSON, P.A.
515 North Flagler Drive
West Palm Beach, FL 33130
(561) 268-5727
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com

TRANSCRIBED BY: Joanne Mancari, RPR, CRR, CSR
Court Reporter
jemancari@gmail.com

Thereupon,
the following proceedings were held via Zoom videoconference:

THE DEPUTY CLERK: Richard Burgess v. Royal Caribbean Cruises, Ltd., case No. 20 20687, civil, Otazo-Reyes.

Counsel, please state your appearances for the record.

MR. HICKEY: Good afternoon. Jack Hickey on behalf of the plaintiffs Richard Burgess and Darren Henze as the guardian for Richard Burgess.

THE COURT: All right.

MS. LOBEL: Good afternoon, your Honor. Sarah Lobel, also on behalf of the plaintiffs.

MR. LIMA: Good afternoon, your Honor. Paulo Lima, of the Russo Appellate Firm, also on behalf of the plaintiffs.

THE COURT: All right.

MR. DRAHOS: Good afternoon. Michael Drahos, from the law firm of GrayRobinson, on behalf of the defendant Royal Caribbean, and with me off camera is my colleague Cooper Jarnagin.

THE COURT: All right. So we are here on defendant's motion for summary judgment.

I kind of printed the introductory section sort of like to have an outline of the arguments that are being made. Basically, if I'm correct, defendant is seeking summary judgment as to all claims. Is that correct?

MR. DRAHOS: That is correct, your Honor.

THE COURT: Right. So then on the motions, starting -- right. So the bottom of the first page, it kind of starts listing the various claims. Obviously they are all negligence claims, but the listing seems to have like various components. Of course, this is intertwined with the Daubert motions that have been heard and are under advisement. So to the extent that there is interaction, feel free to bring that up.

I will let Mr. Drahos kind of like initially hit the high points of the arguments, sort of phrase the arguments, and maybe in a succinct way, like outline items, and then discuss them, and then I will hear from Mr. Lima.

MR. DRAHOS: OK. Thank you, your Honor. Thank you for the opportunity to be heard on this motion.

So what I wanted to point out, first is that there's been a number of counts that the plaintiff has conceded summary judgment on, and so I don't plan to address any of those. That's Count One, Two, Three, Seven, and then in their response they say partially as it relates to Count Eight.

It is unclear to the defendant, because there wasn't any substantive response relative to Count Eight, so we're not clear exactly what part of that they believe is still viable. But at least as it relates to One, Two, Three, Seven and part of Eight, the plaintiffs have conceded summary judgment on those points.

THE COURT: I'm sorry. So One, Two, Three are out of the box? Everybody agrees on that?

MR. DRAHOS: One, Two, Three, Seven and part of Eight.

THE COURT: OK. One, Two, Three -- OK. So One, Two, Three are out. So we need to concern ourselves with Four, Five, Six.

Then Seven is out.

Then Eight we will need clarity on what part of it plaintiffs still claim is alive or viable.

Is that pretty much the extent of what we need to address, Four, Five and Six and part of Eight?

MR. DRAHOS: Yes, your Honor.

MR. LIMA: Yes, your Honor.

THE COURT: All right. Maybe we could hear from Mr. Lima briefly on what part of Eight, because it sounds like Mr. Drahos is saying that there was no substantive response to the arguments for summary judgment on Count Eight.

MR. LIMA: I'm looking at Count Eight right now, your Honor. It is styled Negligent Provisioning and Equipping of the Medical Facility, Direct Liability of the Cruise Line.

I think where the part of Count Eight came from is the way that it was argued in their motion for summary judgment. It was a little bit vague.

I mean, looking at this, as your Honor will discern from our arguments, our theory of liability doesn't turn on the

way that the medical facility on the ship was provisioned. It has to do with the delay in evacuating Mr. Burgess. So I don't know that this is something we need to go into in depth, but it will become relatively clear that this is all about Counts Four, Five and Six.

THE COURT: So are you saying that whatever claims you have that appeared in Count Eight can be addressed in the context of Four, Five and Six and we can dispense with Count Eight?

MR. LIMA: Yes, your Honor. That's fair.

THE COURT: All right. So we will limit the discussions to Four, Five and Six and basically dispose of One, Two, Three, Seven and Eight as no longer being pursued by the plaintiff.

MR. DRAHOS: OK. Thank you, your Honor.

THE COURT: So that was the clarity that we were seeking. All right.

So let's just start, to get ourselves organized, Four, Five and Six. Let me have the titles so I can make myself a little cheat sheet here.

MR. DRAHOS: OK. So as it relates to Four and Five, the counts concern plaintiffs' allegation that Royal Caribbean either --

THE COURT: I'm sorry. Just give me the titles of Four, Five and Six so I can make myself it.

MR. DRAHOS: Negligent treatment of the plaintiff's stroke.

THE COURT: Four, negligent treatment?

MR. LIMA: Your Honor, I have a copy of the second amended complaint if that would help.

THE COURT: That is OK. I have that also. I'm just working off my notes.

Four, negligent treatment of stroke?

MR. DRAHOS: Medical treatment - vicarious liability of the cruise line.

THE COURT: Right. So that is where the doctor's treatment -- I'm sorry. Is Four direct and Five indirect? I kind of interrupted you.

MR. DRAHOS: So Four is actual agency and Five is negligent medical treatment through an apparent agency argument.

THE COURT: All right. So Four and Five are both agency. One is actual. The other one is apparent. It is for negligent medical treatment.

MR. DRAHOS: Correct, your Honor.

THE COURT: All right. And then Six?

MR. DRAHOS: Six is negligent failure to arrange for an emergency transport to the closest medical facility.

THE COURT: All right. And that is separate and apart from the negligent treatment.

MR. DRAHOS: Yes.

THE COURT: Medical treatment.

All right. So I think Four and Five can be discussed together since they just turn on the type of agency, and then Six separately.

MR. DRAHOS: Thank you, your Honor.

THE COURT: All right. Then obviously the elements of a claim of negligence is the duty, breach, causation, harm. So tell me where they fail in their negligence claim for Four and Five and kind of address it in that fashion.

MR. DRAHOS: OK. Thank you, your Honor.

So the court is aware of the facts of the case. I don't intend to go through that unless there are some specific questions that your Honor would like to seek clarity on.

Today's motion for summary judgment does overlap with the defendant's Daubert motions, and so I will point out where I see those overlaps for the court's benefit. I don't intend to delve into those arguments substantively, again, without the court asking for further details.

The premise of the arguments today, your Honor, are that the plaintiff wants to steer this discussion towards a debate as to whether or not there is a sufficient amount of evidence to establish a breach of a duty of care. That is not exactly the basis of our motion for summary judgment.

What we are arguing before the court is that they have

failed to provide competent evidence for this court to be able to conclude that they can support their theories both of liability and of causation.

So as it relates to specifically their theories concerning our negligent failure to arrange for the transport, which would be Count Six, they have raised five different theories as to how they believe we failed to meet our duty of care and how alternative actions could have led to a different conclusion.

They have argued that on the date in question had our medical staff dialed 911 it would have facilitated a quicker transfer, which would have allowed Mr. Burgess to arrive at a shoreside facility and receive time-sensitive care in a more efficient and expedited manner.

As we have argued in our Daubert motion and as we are reiterating here today, the problem with that theory is that their experts that they brought to try to support it have no personal knowledge as it relates to how the 911 system works in Puerto Rico.

They have raised no competent evidence at any point during discovery that there was a closer facility that was available that could have rendered the appropriate care that Mr. Burgess would have required.

Their experts concede that had 911 been used on the date in question, they have no idea where Mr. Burgess would

have been transferred to. The only evidence that Dr. Gomez has attempted to try and bring to support his theory that 911 would have been a better option was through some indetermined or indeterminate amount of literature that he attempts to sort of extract a conclusion from.

As we exposed during the Daubert hearing, the literature that he is attempting to rely upon doesn't actually exist. There's never been an article or a medical peer-reviewed study that would support his argument that 911 is an efficient process in Puerto Rico. The only article that he cited to, which was questioned during his Daubert hearing, had to do with how EMS services were working back in 2010, which was in upwards of nine years from the date of the incident in question.

So we don't believe they have any evidence here today or that they have been able to formulate throughout the course of discovery to support a theory that 911 would have been a better alternative than those that were used to transfer Mr. Burgess.

They have argued that had Royal Caribbean had some sort of an emergency care protocol that that would have produced a different result. Again, we argue that that theory is totally speculative.

There is no evidence that there was some particular resource that was available on the date in question that would

have produced a faster result. Their experts have provided no specific alternative protocol that they believe would have been better and faster. And ultimately the evidence in this case from the treating physician who saw Mr. Burgess is that even if he had been produced to the hospital sooner, it wouldn't have changed any of his care that he rendered.

So we believe the theory that an emergency care protocol could have changed the outcome is totally speculative.

Again, I touched on this a moment ago, but their third theory is that there were closer locations to the port than HIMA Caguas, which is where he ultimately was taken on the date in question, but they have produced no competent evidence to support that theory.

Their two experts who they brought to attempt to try to support that theory -- Dr. Nidorf limited his methodology to a Google review, and he testified at the Daubert hearing that he made phone calls to various hospitals in the area, yet he didn't get the names of anybody that he spoke to, he didn't get the titles, he didn't even ask whether or not those hospitals were open on the date in question, and he admitted that he could not prove that any of the hospitals that he spoke to had t-PA available.

It is the plaintiffs' theory in this case that had t-PA been given within a certain time period that that would have changed Mr. Burgess' outcome, yet Dr. Nidorf is incapable

of identifying a hospital on the date in question other than HIMA Caguas where Mr. Burgess could have received this medicine. As a matter of fact, he also concedes that the hospital that Mr. Burgess was transferred to would have, quote, provided the best outcome for him on the date in question.

So we believe any theory that is going to be raised by the plaintiff to suggest that there were closer options available is undermined by their own expert's testimony that the place that we sent him to was the best possible location.

So in light of Dr. Nidorf's testimony, they had Dr. Gomez attempt to try to fill in the cracks, but, unfortunately, Dr. Gomez also could not identify a hospital on the date in question that had a t-PA available.

After we moved for summary judgment on that point, Dr. Gomez attempted to prepare an affidavit stating that I didn't ask certain questions of him and that had I asked specific questions, he would have identified two hospitals which would have had t-PA on the date in question.

That directly contradicts his deposition testimony. If the court wants to see that, we have page and lines cited in the motion and we can bring it up here today for your Honor to look at again, wherein it's very clear I asked him point-blank, can you identify any hospitals on the date in question that had t-PA available, and he said no. So his efforts to try and circumvent summary judgment now by producing an affidavit

saying I didn't ask him the right questions not only is inaccurate, but it's a sham.

So we're asking the court under the Van Junkins and Rollins cases, that we have cited to in our motion, to disregard the affidavit and instead rely upon the sworn deposition testimony of Dr. Gomez, which is crystal clear in establishing that he could not pinpoint an area on the date in question that had a t-PA available other than HIMA Caguas, where he was sent to.

Ultimately, neither Dr. Nidorf nor Dr. Gomez can provide any competent evidence that there was a faster option available. They have admitted that they don't know the resources that were available in the area on the date in question. They have conceded that they don't know anywhere elsewhere t-PA would have been available. Ultimately, their deposition testimony is entirely speculative on this theory that had we been, quote, more aggressive on the date in question, it would have produced a different outcome.

If neither Dr. Nidorf nor Dr. Gomez are aware of a specific resource that was available that we didn't use, then I don't know how they can establish, other than purely guessing, that more phone calls or a more stern attitude or yelling and screaming or pounding on the door would have in any way, shape, or form caused anybody in Puerto Rico to act any differently than they did on the day in question. So we believe that this

theory that we should have been more aggressive is entirely speculative.

Dr. Gomez admits he has no idea what efforts we made to try and facilitate a transfer. He doesn't know how many phone calls were made. He doesn't know how many emails were sent. He doesn't know who spoke to what. He isn't even familiar with what the process is in order to transfer somebody from a cruise ship to a shoreside facility.

He admits that he doesn't know this information, yet it is the plaintiffs' intention to attempt to turn the tables and say, well, he can't testify to those critical facts because we haven't produced any documentary evidence to support that. Well, it isn't our burden to disprove their theories of liability.

They're claiming that we should have been more aggressive. They need to produce evidence to show that a more aggressive, specific response would have produced a specific outcome that would have changed Mr. Burgess' entire day.

Because Dr. Gomez and Dr. Nidorf don't know of any alternative resources, ultimately the only one that we know is available is the one that was used, and in this case their argument that that was an insufficient resource is entirely speculative.

They argue, finally, that a Care Team associate should have been called, but they didn't make any arguments

substantively in response to the motion as to how a Care Team would have changed, a Care Team associate would have changed the outcome. So we believe they have abandoned that theory.

So those are the theories of liability as it relates to Count Six.

The reason why I brought them up first, your Honor, is because logic follows that if they can't establish a way to get Mr. Burgess to a shoreside hospital any faster than he was, they can't prove causation.

So when we turn to Counts Four and Five, as it relates to our negligent treatment, I'd like to kind of classify this as the, quote, causation aspect of the case, because what we've established through discovery is that even though the plaintiffs haven't come up with a viable theory for how Mr. Burgess could have been delivered anywhere closer which would have been able to produce any kind of a different result, what we do know is regardless of the time that he was ultimately transferred to HIMA Caguas, it wouldn't have changed the outcome. And the only person in this case who can speak competently to that issue is Dr. Nobo, the board certified vascular neurologist, who evaluated Mr. Burgess upon his entry to HIMA Caguas.

Dr. Nobo's testimony is crystal clear. We have cited it in our motion for summary judgment, and it was a particular point during the Daubert hearings.

Dr. Nobo states that based upon his interpretation of the films that were taken of Mr. Burgess on the date in question, he would not have rendered, he would not have administered t-PA regardless if he had been sent an hour, two hours or three hours from the onset of his symptoms.

He was even questioned further: Had Mr. Burgess been delivered to you via helicopter immediately following the onset of his stroke, would you have given him t-PA? And he said no.

The reason for that is because of the interpretation of the films which he believed showed evidence of internal bleeding in the brain. Everybody in this case, the defendant and plaintiff, agree that evidence of bleeding in the brain is a contraindication to t-PA.

So it does not matter whether or not Dr. Nobo was correct in his interpretation or not. All that matters is that the most qualified guy on the island on the date in question to make that decision determined that the films rendered Mr. Burgess incapable or disqualified him for receiving t-PA.

So all of Dr. Gomez's theories as it relates to how this outcome could have been different, specifically with regard to the administration of t-PA, are entirely speculative. Not only that, but they contradict Dr. Nobo's testimony entirely.

Going further to that point, really one of the more critical answers that Dr. Gomez gave in his deposition, which

we discussed at the Daubert hearing, relates to his opinion as to how t-PA would have actually changed the outcome had it been given.

His deposition testimony in this regard is, again, crystal clear. He, on two different occasions during the deposition, specifically quantified a 30 percent chance of a better outcome had t-PA been given, and under the Gooding v. University Hospital, Florida Supreme Court case, that doesn't cut it.

The more-likely-than-not standard that is required in a medical malpractice case requires the plaintiff to be able to prove beyond 51 percent that any action or inaction of the defendant would have changed the outcome, and in this particular case Dr. Gomez is the one who gave the 30 percent value, not me. So his efforts to try and again circumvent that through this later testimony should be seen for what it is.

He was never at any point in time during his deposition asked to identify what more likely than not means to him, and so the only value that we received from him was 30 percent. So even though the plaintiff relies in their response to repeat testimony from Dr. Gomez where he uses this, quote, more-likely-than-not answer, it's never addressed at any point as to what he believes that to mean.

So his 30 percent chance of a better outcome, again, given twice during his deposition, makes it clear that he does

not reach the Gooding standard of 51 percent that he needs to reach in order to be able to prove that t-PA would have changed Mr. Burgess' outcome.

Finally, your Honor, I'm calling this third argument the catchall argument, which we raised in the summary judgment motion.

We're arguing that we're entitled to summary judgment on all claims in this case because the negligence of the port agent cannot be imputed to Royal Caribbean.

The plaintiffs agree that they did not plead in this case that Royal Caribbean owed a nondelegable duty to coordinate or effectuate the medical transfer in this case, yet they're required to do that, and we have cited case law to that effect.

There is no question in this case that we delegated the medical transfer to the port agent via a contract. That contract has been entered into evidence in support of our motion for summary judgment.

There's a specific clause on page 167 of the docket entry, specifically Section 1.1.34, where it is twice stated that the port agent will be responsible for coordinating ground ambulances as requested by our ship's medical center, and then again they will arrange all emergency medical transportation.

There is no question in the case that the port agent was an independent contractor. The plaintiff concede that

point in their response. Yet they cannot cite, even if the court were to allow them to -- and again, we're arguing that they did not plead a nondelegable duty and they were required to -- but even if the court were to allow them to argue that we had a nondelegable duty to effectuate this transfer on the date in question, which is what they're attempting to do in their response, there's three ways in which they have to try and establish that.

The first is through common law; the second is through statute; and the third is through contract. They have not raised any one of those three elements. Instead what they've done is they have pointed to Royal Caribbean's internal policy, which is not a valid source under the case law. But even if it were, it's being misused in the case.

Specifically, our internal policies discuss the fact that a ship doctor's ultimately responsible for the decision to order a disembark. That is not at issue in this case. We all agree that it is the doctor's decision whether or not to order a medical disembark. This has been litigated for years in maritime medical malpractice cases, and, quite frankly, it is more appropriate when we have the issue of whether or not there's debate between a captain and a ship doctor out in the middle of an ocean as to whether or not a medical transfer should be effectuated.

This policy has been written in such a way to make it

clear that it is the ship doctor who is ultimately responsible for the decision, and in this case we're not challenging that. We're saying, yes, it was Dr. Pereira's decision to ultimately decide whether or not Mr. Burgess was required to be disembarked, and he made that decision.

So anything contrary to that would be nonsensical. We're not saying here that the port agent should have made the decision. It was Dr. Pereira.

Secondly, our internal policies discuss the fact that the doctor's responsible for the care of the patient until arrival. The plaintiffs are trying to point to that argument to support this, quote, nondelegable duty aspect of their response, yet that's not at issue either.

There is no argument or theory in this case that the medical care that was rendered to Mr. Burgess during his transport in the ambulance was in any way below the standard of care. So the medical care that was rendered to him from the point he left our ship until the point he arrived to HIMA Caguas is irrelevant, and it certainly doesn't establish a nondelegable duty on our part.

Then finally they pointed to language that discussed the fact that the ship doctor responsible for ensuring that the transportation that's used is appropriate for the medical condition. Again, your Honor, this is being taken out of context.

In the instance of a ship doctor at sea trying to determine whether or not somebody who is under cardiac arrest is appropriate to hoist into a basket and fly home in a helicopter is why that policy was written.

In this particular case Dr. Pereira made the decision that a private ambulance transportation was required to deliver Mr. Burgess to the shoreside facility, and there has never been any issue as it relates to the type of transportation that was used in this case.

So Royal Caribbean's internal policies do nothing to support the plaintiffs' argument that we owed some sort of a nondelegable duty that would be inappropriate to transfer to the port agent, as the contract stipulates.

It's clear in this particular case that the contract with the port agent only requires us to request an ambulance and to instruct them as to what the need is.

Mr. Treadgill, who is the corporate representative for the port agent, testified unequivocally that they specifically received this request and that they were -- it was a clear request and that they knew it was a time-sensitive issue. So there is no evidence in this case that we did not do what the contract requires, which is notify the port agent of the need and the time-sensitive nature of it.

There is no common law duty, your Honor, that would establish a nondelegable duty -- I'm sorry. There is no common

law that would establish a nondelegable duty under this circumstance. As a matter of fact, there are two cases that we've cited to. They are both cases where I was represented as counsel for the defendant, the McVey and Sexton matters, where the court specifically held that there is no nondelegable duty to render medical care to a patient in the context of a maritime medical malpractice case.

So under all three elements -- common law, statute, contract -- they have no evidence to establish the fact that we had a nondelegable duty. As a matter of fact, we believe all the evidence points to the contrary, that Mr. Treadmill admits that he was notified appropriately and that they were aware of the time-sensitive nature, and any argument as it relates to his deposition testimony, how it should be interpreted, again, would not meet their burden to establish a nondelegable duty.

So we believe under these three prongs, the first being their inability to establish a reliable method and manner and location upon which Mr. Burgess could have been delivered to a hospital, is entirely speculative, that based upon their failure to provide competent evidence to establish a viable alternative transfer option they can't prove causation. But even if the court were to allow that argument to proceed, once they get him to the hospital, they can't establish that any medical care would have been rendered differently to change its outcome and, as a matter of fact, even their own expert

qualifies it as a 30 percent chance at best.

Then finally, as it relates to this argument which I'm calling the catchall, we believe that under contract, because this was the responsibility of the port agent, they should have been the target defendant in this case. They sued Royal Caribbean instead, and we're asking the court to render summary judgment in our favor on all counts.

Thank you.

THE COURT: All right. So to recap, as to Count Six, which I think is the one that you said had the various call 911 and so on, your argument is that the plaintiffs have not established, I guess, sufficient evidence to go to a jury on how doing any of these other things, items one through four at the top of page 2, that those would have made a difference. I think that's been your argument. I'm just zeroing in on that first portion of the argument.

Am I reading that correctly?

MR. DRAHOS: That is correct, your Honor. It's basically entirely built upon a hypothetical.

THE COURT: Right. OK. So then that's as to Count Six. Then on the negligent treatment you have the arguments that -- I'm sort of trying to put it in my own words so I comprehend it. That's where you're saying on causation, because you're saying that there's no 51 percent chance of a better outcome. Is that correct?

MR. DRAHOS: Yes, that's the second part of the argument. So the first would be that nothing would have changed the outcome because Dr. Nobo said that regardless of the time by which Mr. Burgess would have been delivered, and then we're saying secondarily even if the t-PA had been given, they can only establish a 30 percent chance, your Honor.

THE COURT: Right. So that one on causation as to Four and Five, the argument is that the doctors, the attending physician's testimony shows he would not have gotten t-PA, and you're saying even if we accept that t-PA was a possibility, their own expert is saying that would only get them to 30 percent, not 51 percent, which I'm sure the plaintiff will argue that it is semantics of Dr. Gomez's testimony.

Then you were saying that Four and Five go on either apparent or actual agency. Are you arguing that there was no apparent agency or no actual agency vis-a-vis the doctor and the cruise line?

MR. DRAHOS: In this particular case we are not challenging the agency aspect of the relationship --

THE COURT: OK.

MR. DRAHOS: -- with the doctor.

THE COURT: OK. So you're saying Four and Five are based on agency and you're not challenging agency, either actual or apparent.

MR. DRAHOS: We're just challenging the aspects of

the --

THE COURT: The causation.

MR. DRAHOS: Yes.

THE COURT: All right. I wrote down no causation, no different medical care. I think both of those are on what the attending doctor said. Am I right?

MR. DRAHOS: Correct. Also supported by our experts.

THE COURT: Right. And then finally what you are calling a catchall, which is basically they sued the wrong party; they should have sued the port agent for not -- what is the basis of the duty of the port agent to the, or that you assume if you say they should have sued the port agent? I guess their theory is that the port agent was acting as an agent of the cruise line and you're saying no, they were independent actors?

MR. DRAHOS: The plaintiff concedes in his response that the port agent was an independent contractor, and so we are pointing to the contract between the port agent and Royal Caribbean wherein it specifically delineates that coordination and arrangement of emergency medical transportation is the responsibility of the port agent.

THE COURT: Right, but I thought you said they sued the wrong party, they should have sued the port agent.

MR. DRAHOS: What I was trying to say was if they are critical of the amount of time that it took and that they think

that other alternative arrangements should have been made, because that's contractually the responsibility of the port agent, then they should have directed those allegations at the port agent.

THE COURT: Right, but when you make that argument you're assuming the port agent had a duty to your client and his representative -- to their client -- sorry. Let me back it up. I am sort of putting the plaintiffs' hat on you because of the argument you're making.

Your argument is that the plaintiff should have sued the port agent, and my question is for the logic of that argument the plaintiff would have to allege that the port agent had a duty to the plaintiff, and my question is what would be the source of that duty?

MR. DRAHOS: Yes. So I don't want to go too -- I understand the court's question. I think what I want to reemphasize and kind of redirect is we don't believe anybody did anything wrong, of course. So whether or not the plaintiff would have had a viable cause of action against the port agent is not something that we've even addressed in our motion and that I could honestly off the top of my head provide a third-party beneficiary type of argument or something because I'm just not prepared to make it.

So if I said they sued the wrong party, I probably went a little bit too far in the aggressive nature of the

argument. I think what I'm trying to say is they have not alleged appropriately that we had a nondelegable duty to facilitate this transfer and that we did delegate that responsibility by contract, which we are allowed to do, to the port agent.

THE COURT: All right. So you did go too far, then, on that argument, on who should have been sued. I'll just disregard that.

You're basically saying if Royal Caribbean is being sued for defects in the transport based on Royal Caribbean having a duty of care on the transport, you're saying, no, we washed our hands off of that by the contract with the port agent.

MR. DRAHOS: Correct. We delegated that duty to the port agent by contract.

THE COURT: OK. All right. All right.

So, Mr. Lima, if you would do it in the same fashion, in the same order, so I can keep things straight, and give me your counters to Mr. Drahos' arguments.

MR. LIMA: Absolutely, your Honor. Thank you.

I would like to start, though, by clarifying the pleading. There was a lot of discussion of Counts Four and Five versus Count Six.

THE COURT: Right.

MR. LIMA: Which is why I sort of wanted to make sure

we consulted the second amended complaint.

THE COURT: All right. Sure. If you want to put it up, that's fine too.

MR. LIMA: I don't have it in front of me.

THE COURT: That's OK. I can pull it.

MR. LIMA: OK. It is docket entry 48.

THE COURT: Hold on.

(Pause)

THE COURT: I'm sorry. We require a two-factor authentication now on our computers. So it takes time.

MR. LIMA: Quite all right, your Honor.

(Pause)

THE COURT: You said it is docket entry what?

MR. LIMA: 48. I'm trying to screen share here. That's very dangerous. I don't know what the court is seeing. That doesn't look like that is working correctly.

MR. DRAHOS: We're seeing the document.

MR. LIMA: The Zoom page, correct, or are you seeing the complaint?

THE COURT: The complaint.

MR. LIMA: You see the complaint.

THE COURT: OK. Thank you. I'm not seeing it, but as long as you can see it, that is most important.

MR. LIMA: This is Count Four. It is docket entry 48, page 25. As you can see, it is styled Negligent Medical

Treatment - Vicarious Liability of Cruise Line: Actual Agency/Respondeat Superior.

THE COURT: Right. So that is a medical malpractice - vicarious liability, correct?

MR. LIMA: Negligent medical treatment dash, should be what I'm looking at on page --

THE COURT: I know. I'm translating it to Florida law.

MR. LIMA: OK.

THE COURT: Medical malpractice - vicarious liability, right?

MR. LIMA: Yes, your Honor. The point I want to make, though, is it goes beyond the mere medical care in the traditional sense but also as to the transport, and I'll explain sort of what I'm getting at.

If you look at paragraph 88(f), it says: Failing to prescribe that plaintiff be evacuated off the subject ship immediately upon his being diagnosed with a stroke and, instead, allowing RCCL personnel to delay his removal by approximately three-and-a-half hours.

So just to make the point that the allegations in Count Four, and the identical allegation appears in Count Five, also have to do with the delay in removing Mr. Burgess off the ship. So those are Counts Four and Five and they are pled alternatively under actual agency and apparent agency, and, as

Mr. Drahos just acknowledged, the agency sort of is moot because Royal has appropriately admitted that Dr. Periera was an employee and all the ship's medical staff and that Royal is vicariously liable for their acts.

So those are Counts Four and Five, and that clearly includes an allegation of delay, unreasonable delay, in removing Mr. Burgess from the ship. Where Count Six differs, and it's very important to look at the title: Negligent Failure to Arrange for Emergency Transport to Closest Medical Facility -- Direct Liability of the Cruise Line (Second Medical Emergency).

So that is sort of the other independent prong of plaintiffs' theory of negligence here. Prong one is you unreasonably delayed removing Mr. Burgess from the ship in the first place. Prong two is, after you -- and this is Count Six -- once you had him off the ship, there was an additional unreasonable negligent delay in not sending him to the closest medical facility. In other words, they sent him to HIMA Caguas, and, in fact, the relevant allegation is paragraph 102(c), that I'm sharing the screen now.

It says: "Failing to instruct the ambulance crew in San Juan, Puerto Rico, to transport plaintiff to the nearest hospital capable of treating plaintiff's grave and quickly-deteriorating condition and, instead, directing or allowing plaintiff to be transported to HIMA San Pablo Caguas

where he arrived four-and-a-half hours after he first advised RCCL that he was suffering from a stroke."

So my overall point is Counts Four and Five deal with the unreasonable delay on the ship. Count Six deals with the unreasonable delay in not sending him to the closest medical facility. That is important because there are these two independent theories of negligence that even if one is wiped away, the other one remains.

For Royal to be entitled to summary judgment, it would have to prevail on both independent theories, which are, of course, founded on independent acts or alleged acts and omissions.

THE COURT: All right. So hang on just a second. Everything that you just said --

MR. LIMA: Sure.

THE COURT: -- just to tailor that to what Mr. Drahos has been arguing, Four and Five, if you humor me, is medical malpractice - vicarious liability. Are you saying that the Dr. Periera, it's not that Dr. Periera misdiagnosed; it's that Dr. Periera took long in disembarking the plaintiff and that's the nature of his malpractice?

MR. LIMA: Yes, your Honor. It's the failure to appreciate the severity of the situation and act accordingly.

It was approximately three hours between the time Mr. Burgess began exhibiting symptoms and the time when he was

ultimately removed from the ship.

THE COURT: All right. Just to make sure when I come back to Mr. Drahos, you're arguing that the medical malpractice is the failure to act more quickly given the circumstances.

MR. LIMA: The failure to get Mr. Burgess off of the ship and on his way to a hospital more quickly. That's Counts Four and Five.

THE COURT: Four and Five.

MR. LIMA: Yes. Then Count Six is the failure to instruct the ambulance once it arrived to ensure that that ambulance took him to a closer, available medical facility that was capable of treating his stroke. Instead, they said take him -- well, he ended up being taken to HIMA San Pablo Caguas, which was 42 kilometers and a 42-minute ride away. 42 kilometers translates to about 26.1 miles.

THE COURT: So their argument that the transportation was in the hands of the port agent, what is your response to that?

MR. LIMA: Sure. I'll start with that one. That is point three that Mr. Drahos addressed.

Let me be clear. The plaintiffs are not alleging Royal is vicariously liable for the actions of the port agent. OK. Royal is negligent for the actions of Royal and Royal's employees. The port agent is an independent contractor.

Now, as to their secondary argument that, well, the

plaintiffs are relying on some sort of a nondelegable duty and we, as Royal, delegated it via contract to the port agent, our response is twofold.

There is some citation to case law that says that there is no such thing as a nondelegable duty in maritime law and that they can always delegate. That's irrelevant for purposes of this case, and I'm going to tell you why. It is for evidentiary purposes.

To be clear, our argument is not that Royal cannot delegate its duty of care or Royal that on the undisputed facts here Royal did not.

I would ask Ms. Lobel if she could to put up slide No. 8.

There was some discussion of the port agent agreement, which is the agreement between Royal Caribbean and the port agent Continental Shipping. It makes very clear that, with respect to coordination of services -- I will wait for the screen to be shared. There it is. There it is. Coordination of services.

"From time to time, unless otherwise agreed upon and documented separately, agents shall at no extra time and as part of the agency fee coordinate ground ambulance as requested by ship medical facility/crew medical/Care Team."

OK. So it is as requested by Royal.

If Ms. Lobel could go to the next slide, slide No. 9.

That is another paragraph in the port agent agreement, 1.1.36. It says: "Agent shall assist without condition with medical emergencies as instructed."

so again, the port agent is at all times acting under the instructions of Royal Caribbean.

How do we know that is how it actually happened? We have the testimony of the corporate representative of the port agent, Mr. Treadgill-Colon, Daniel Treadgill-Colon, and that is docket entry 87-4.

He says: "we are just intermediaries. We are assisting. We don't have any medical training."

So it stands to reason that the port agent isn't running the show because the port agent is a go-between. They don't have any medical training required.

Later in his deposition, Mr. Treadgill-Colon agreed that Royal is ultimately responsible for ensuring that there is appropriate ground transport for the patient, and also that the patient is transferred to a hospital that can appropriately care for the patient's needs

Mr. Colon said: "Yeah, that's all on Royal. They tell us what to do. They tell us. We help them as directed, as instructed."

THE COURT: So you're saying that that catchall argument made by Mr. Drahos as to the nondelegable duty, port agent, and so on, you're saying that's besides the point.

You're saying that the contract between the ship and the port agent says port agent is going to just be acting at the instruction of the ship and, therefore, there's no issue here that -- that severance that Mr. Drahos is arguing you're saying is nonexistent.

MR. LIMA: Correct, your Honor, based on the port agent agreement, the testimony of the port agent's corporate representative, and the other thing I would point to is Royal's own written internal policies, which if Ms. Lobel can humor me with slide 10, there are two relevant ones that we have cited in our summary judgment response.

This is the first one, Section 14.01.

THE COURT: Right. If you will bear with me, Mr. Drahos was saying you don't rely on internal policy, you rely on common law statute and contract.

MR. LIMA: That's as to a source of a nondelegable duty. Again, the nondelegable duty is out the window. We don't take issue with whether this duty was delegable or nondelegable. Our argument is that regardless of whether it is delegable -- let's assume it was. The facts, the evidence in this case show that Royal did not delegate it, that at all times, both in its contract with the port agent as well as internally, what it was saying to its physicians was that -- I'll read from the screen here.

"The treating ship's physician is ultimately

responsible for the decision to disembark a guest or crew member for emergency medical treatment."

Then later down it says: "The treating physician is responsible for the care of the patient until she or he arrives at a medical facility or is handed over to the care of another physician."

So this argument from Mr. Drahos that, well, no, it only has to do with whether or not somebody gets loaded into a basket and gets taken off a ship on the high seas, no; it clearly extends beyond that, and it, in its own words, extends until the patient reaches the next medical facility, the next treating doctor, he or she is under the care of the Royal treating ship's physician.

THE COURT: So you're saying Mr. Drahos' argument about nondelegable duty is irrelevant because both Royal's internal policies and its contract with the port agent show that they were responsible for the plaintiff until he landed in the hands of another doctor. That's your argument?

MR. LIMA: Yes, your Honor.

THE COURT: All right.

MR. LIMA: It's important to know because point three, this catchall argument, is the only true summary judgment, clean as a matter of law argument that is asserted by Royal.

The others, as I'll get to, have to do with breach and have to do with causation, and it essentially amounts to Royal

citing a whole bunch of evidence, that they will be entitled to argue to a jury, saying, well, we know what plaintiff says but look at our evidence. They're trying to argue to the court that the court should weigh this evidence and determine that theirs is better and that your Honor should enter summary judgment as a matter of law.

THE COURT: So on causation I think their argument is that you need expert witness testimony to establish causation, and they're saying you don't have it. Not that I should weigh it. They're saying you don't have it. You're saying, no, you do have something and they want to minimize its value.

MR. LIMA: Correct, your Honor.

I have prepared some notes here. I will go through the arguments that are made in the summary judgment motion in which Mr. Drahos touched on today.

The first is the more-likely-than-not testimony, where Royal has sort of cherry-picked a snippet of his deposition where Dr. Gomez is talking about a 30 percent over baseline. Actually, the quote is "a gain of 33, 30 percent over the baseline of not treating."

What he was referring to here, as we have said in our summary judgment response, is the magnitude of improvement or the average magnitude of improvement a patient's treated with t-PA, not the probability of whether or not treating Mr. Burgess with t-PA would have made a difference, would have

improved his outcome.

We know that this is a cherrypicked taken-out-of-context comment because throughout his expert report and throughout other locations in his deposition Dr. Gomez continuously says, yes, it's more likely than not that had Mr. Burgess received t-PA he would have had a vastly improved outcome.

We have cited throughout in our response to the motion for summary judgment, at page 13 we have collected several instances of that testimony as well as the citation to the expert report. In fact, if we take a step back here, in his rebuttal expert report Dr. Gomez explains that, and I'll quote: "The reason IV t-PA is the mainstay of the standard of care of these patients is because the literature supports the notion that it leads to superior outcomes as compared with not administering it."

So again, the whole reason t-PA is the standard of care is because, everybody agrees, all experts, the medical literature, that if you give t-PA, there is a good chance, there is a more-likely-than-not chance that there is going to be a significant improvement.

Finally, again, I'll ask Ms. Lobel here if she could indulge me and put up slide No. 6.

Dr. Nobo, who is the treating physician at HIMA Caguas, also agreed with this, I'll put it, an incredibly

uncontroversial statement, that had Mr. Burgess received t-PA he would have had a significantly improved outcome.

THE COURT: All right.

MR. LIMA: There it is. On the right side, if you will see the question is: "His cognitive abilities would have been intact?"

"A. Yes.

"His ability to walk would have been intact?

"Very likely.

"His ability to talk would have been intact?

"Very likely."

So what Dr. Nobo said is that there may have been some additional effects. I think he opines that Mr. Burgess may not have recovered much of his hearing, but he would have been a vastly different patient had he received t-PA, and this is Dr. Nobo talking here.

So the notion that t-PA would have improved the outcome is incredibly uncontroversial and vastly supported by the record.

To the extent that Royal wants to take this snippet and cross-examine Dr. Gomez with it in front of a jury, they're certainly entitled to do so. But at minimum, there is an issue of fact and it certainly is not a basis for entering summary judgment as a matter of law in their favor.

THE COURT: And their argument relating to the doctor,

the treating doctor, I think Mr. Drahos kind of pointed out that it was twofold. It is what we just said about the 30 percent quote from Dr. Gomez and then this other business that the treating doctor said that no matter the delay, the plaintiff would not have received t-PA, and I know I remember from the Daubert hearing that Dr. Gomez was saying, well, this was a misreading of the CT scan, I think.

So how do you address that argument, that with brain hemorrhage you don't get t-PA, and the treating doctor found brain hemorrhage, therefore, no matter what, crystal ball, even if he had gotten there two hours earlier, he wouldn't have gotten it? Do you consider that all factual issues?

MR. LIMA: Yes, your Honor, is the short answer, but we've addressed this very thoroughly in our response, and I'm prepared to address it right now.

THE COURT: Yes. Not extensively, just briefly.

MR. LIMA: Sure.

THE COURT: Just give me the highlights of that argument.

MR. LIMA: Understood.

There are two different elements. Number one is that the CT scan, when Mr. Burgess arrived, was administered at 1:14 p.m. Eastern. That is four hours and 15 minutes after the onset of symptoms. Now the time line reproduced at pages 2 to 4 of our motion for summary judgment, I urge you to --

THE COURT: The response you mean.

MR. LIMA: Thank you. Of our response, lays out in very minute detail, with record citations, the relevant time.

So he arrived, Mr. Burgess, at four hours and 15 minutes after symptom onset. The accepted standard of care by both sides -- there is no question -- is that four hours and 30 minutes, after that t-PA is absolutely contraindicated. It will not be given. At least not under the standard of care. So when he arrived, Mr. Burgess was right up against that window, the very, very edge of it.

One thing that the CT scan showed was what is referred to as infarcted brain tissue -- in essence, dead brain tissue -- an indication that the stroke had progressed to a point where that is a contraindication. So even if you arrive before the four-and-a-half hours, if you have infarcted brain tissue, then t-PA is contraindicated.

So that was one reason why Dr. Nobo said I wouldn't have given t-PA, and Dr. Gomez, our expert, agreed and said, well, yes, with that CT scan, if you have dead brain tissue, then it's contraindicated; should not be given.

Dr. Gomez went on to say: However, the reason there was infarcted brain tissue is because of the significant delay, because it had been such a long time. In fact, at page 83 of his deposition he says: "The scan was obtained so late that by then, yes, there was infarcted tissue."

Dr. Gomez's opinion was that had he arrived sooner, closer to or further away from the four-and-a-half-hour window, there wouldn't have been infarcted brain tissue because that's the nature of strokes; they're progressive. The brain tissue starts to die and it dies progressively. That's why time is always of the essence with treatment of stroke patients.

THE COURT: So I guess I misheard. It is not that Dr. Gomez thought that Dr. Nobo misread the CT scan; it's that he said if the CT scan had been taken earlier, there would not have been dead brain tissue.

MR. LIMA: There's two things. Yes, he did say that, the second part, that had Mr. Burgess arrived sooner there would not have been dead brain tissue, but he also did say that Dr. Nobo misread the CT scan as to a separate element, and that separate element is called a subarachnoid hemorrhage, is how you'll see it referred to in the briefing, which is an indication of some sort of an injury.

Now, everyone agrees, however, that there was no subarachnoid hemorrhage. Dr. Gomez said it was not there. Dr. Maria Muns is the radiologist at HIMA Caguas who also ultimately read Mr. Burgess' CT scan, that same one, and she did not see a subarachnoid hemorrhage. The defense expert neuroradiologist also did not see a subarachnoid hemorrhage.

So the only person who ever thought they saw a subarachnoid hemorrhage on that film was Dr. Nobo, and in fact,

he even acknowledges after the fact that, maybe I got it wrong, because if you look at the post discharge report, and it is docket entry 100-18, Dr. Nobo calls it "a questionable minor subarachnoid hemorrhage." So he's essentially acknowledging after the fact, maybe I messed up on that.

Now I know that Mr. Drahos' point is, well, it doesn't matter if he was right or wrong, but either way he thought he saw it, he wouldn't have given it anyway, right.

THE COURT: Right.

MR. LIMA: Now, there are a fewer answers to that. One is, it is irrelevant what Dr. Nobo thought he saw because remember that one of our theories is that Mr. Burgess should have been taken to an alternative hospital. We'll get to that in a minute. Had he gone to an alternative hospital where a different neuroradiologist, a different radiologist, different neurologist would have read those scans, it's absolute speculation to think, and it is unreasonable speculation, to think that those doctors would have misread it as well.

So if Mr. Burgess goes to a different hospital, there is no reason to think that this phantom subarachnoid hemorrhage would have disqualified Mr. Burgess from receiving t-PA. That's number one.

The other point is that there's also evidence in the record that Dr. Nobo's erroneous reading is, at least in part, a function of the lack of time, of the compressed time frame.

Remember when I started off with this I mentioned to your Honor that he arrived at four hours and 15 minutes after symptom onset. So when Dr. Nobo's reading that CT scan, he knows that he is right up against the window for giving t-PA. He is at four hours and 15 minutes, and within 15 minutes Mr. Burgess turns into a pumpkin, unfortunately. There is just no -- it is against indication that he is going to be able to receive t-PA.

Dr. Nobo testified at his deposition, he was asked, well, do you read your own CT scans? He says, yes, you know, I normally do. He was asked why. He gave a very telling response. He says: Well, the radiologists are good, they know what they're looking for, but the reason I read mine is that I don't have that kind of time to wait. I've got -- sometimes the radiologist takes 15, 20, 30 minutes to show up and read the report. I don't have that time. I have to make a snap decision immediately.

This case is the poster child case for that, where he did have to make a snap decision immediately because he knows that if he dithers regardless, the window closes and Mr. Burgess is no longer eligible.

So, again, that is another reason to show that a reasonable jury could conclude that this subarachnoid hemorrhage would not have been a disqualifier had things transpired differently, had he been taken to a different hospital or had Dr. Nobo received him, let's say, 30, 40

minutes earlier with enough time to consult with Dr. Muns, and we don't have to speculate as to what would Dr. Muns have seen. We know it because we have her report, and we know she didn't see the subarachnoid hemorrhage.

So, again, that would be another reason why that is not a reason for granting summary judgment. Neither the subarachnoid hemorrhage nor the presence of infarcted tissue.

I have already addressed the more-likely-than-not discussion.

If I can progress, I guess, to where we started, which was their point one was a lot of discussion as to arguments why Royal thought it didn't breach any duty of care. In fact, that's what we say in our response. Royal has essentially admitted, yeah, these are no breach arguments.

They're essentially criticisms of plaintiffs' theories of plaintiffs' experts and saying, well, look at this other evidence that we think is stronger and we think it shows that we're entitled to summary judgment. Again, this is not the place for the court to weigh evidence. I know I don't have to repeat that. Your Honor is well-acquainted with the summary judgment standards.

Getting right to the merits then. There is this criticism about the plaintiffs' expert's knowledge of the 911 system in Puerto Rico.

Dr. Gomez has cited published literature. He as an

expert is entitled to rely upon studies, rely upon other evidence that is relied upon by experts in his field that isn't necessarily --

THE COURT: I'm sorry. So to encapsulate those four arguments, calling 911 --

MR. LIMA: Sure.

THE COURT: -- emergency care protocol, take him to a closer hospital, and be more aggressive. You are saying that those arguments that you're making are enough to get you out of summary judgment because you've offered something, and even though Mr. Drahos says it's worthless, it's something.

MR. LIMA: It's something, and it's more than something. I mean, obviously it is --

THE COURT: It has to be admissible evidence, obviously.

MR. LIMA: Right, admissible evidence.

THE COURT: Or that can be made admissible.

MR. LIMA: Exactly. Exactly. So with regard to the testimony about the 911 --

THE COURT: I'm sorry to interrupt, but I thought I heard Mr. Drahos say all of these items are pure speculation.

MR. LIMA: That is a favorite word of their motion, is speculation.

THE COURT: Right.

MR. LIMA: Everything is speculative.

THE COURT: Right.

MR. LIMA: However --

THE COURT: So you're saying these theories -- call 911 and so on -- your view of it is they are beyond speculation and they would provide admissible evidence in support of your case if the case went to the jury.

MR. LIMA: Yes, your Honor. Yes, your Honor.

THE COURT: All right.

MR. LIMA: Specifically as to the 911, Dr. Gomez cited that the average response time --

THE COURT: Yes. I remember all of that from Daubert. So we don't need to rehash it.

MR. LIMA: OK. Got you.

THE COURT: All right.

MR. LIMA: The stroke protocol. There was discussion about that. I think Mr. Drahos, at least in their motion, Royal has called it speculative. That is, stroke protocol would be faster than the system that Royal had in place.

It is not speculative at all. I mean, on summary judgment all reasonable inferences are drawn in favor of the non-movant. It is common sense, frankly, that having a plan in place on how to react if a passenger presents with a stroke is going to be faster and more efficient than, say, winging it or sending an email -- I won't say winging it. That's too flip.

THE COURT: Right.

MR. LIMA: What happened here, which was an email got sent --

THE COURT: Right.

MR. LIMA: -- at 9:59 a.m., and we have no documentation of anything happening for the next hour and 22 minutes until Sunny Ambulance was dispatched at 11:21 a.m.

THE COURT: I think he seemed to think that the business about the Care Team, he seems to think that you did not, I think he said something about abandoning, if I got that one right, the Care Team argument.

MR. LIMA: Right, your Honor. We are not relying on the lack of assigning a Care Team associate here.

THE COURT: So I can take that off the list, No. 5.

MR. LIMA: Yes, ma'am. You can take that off.

THE COURT: OK.

MR. LIMA: And focus on --

THE COURT: 1 through 4.

MR. LIMA: Right.

THE COURT: How about the being more aggressive?

MR. LIMA: Thank you. We make that response. That isn't some sort of an abstract theory or a different theory of the case. That is essentially intertwined with everything we are arguing, is that it was insufficient, grossly insufficient, for a medical clerk, medical secretary, to send an email at 9:59 a.m. and then to have no documentation of anything else

happening until 11:21.

THE COURT: So being more aggressive is sort of tied into having a protocol.

MR. LIMA: Having a protocol, and also we have cited to the actual evidence of what should have happened in this case as far as there should have been followup telephone calls to the first ambulance that was called.

THE COURT: So protocol. Instead of screaming and shouting, you're saying you need a protocol that people are responsible for complying with.

MR. LIMA: Correct, your Honor.

Frankly, it's important to note that there's record evidence that there was sufficient information to have this protocol. The port agent testified that Royal's medical personnel had visited hospitals on the island, including HIMA Caguas. Those meetings were facilitated by the port agent. So Royal had the knowledge.

Also, there was testimony from the port agent that Royal had been provided with telephone numbers of hospitals, of ambulances on the island, where they could have taken these steps. And did Royal have the motivation to do so. Of course, it did.

The testimony is that Royal ships visit San Juan 200 to 250 times per year and that Royal had been going to San Juan for at least 25 years. I checked just this morning. The

Harmony of the Seas, the ship that Mr. Burgess was on when he was injured, has a capacity of 6700 passengers and 2200 crew members. So with each visit -- some ships may be smaller than others.

THE COURT: I'm sorry. Is that part of the record?

MR. LIMA: Yes, it is, your Honor. That is in the report of Captain Keijer, which is in the record.

THE COURT: OK.

MR. LIMA: So just on this ship you have almost 9,000 people. Multiply that by 250 visits a year. Again, maybe some ships are smaller than the Harmony, some ships are bigger. But, again, this notion that a stroke protocol wouldn't have helped and who would have known is simply not supported.

Lastly, I want to talk about the alternative hospital theory, which again is Count Six. We do have record evidence, again, that there were other hospitals on the island that Royal could have directed the ambulance to take Mr. Burgess to. We have named several of them.

Just to take a step back. Obviously, it's pled in Count Six. So Royal has known since at least the second amended complaint, and November of 2020, that one of our theories is they should have taken him to one of these closer hospitals. We also know that in the expert reports of our experts, Dr. Nidorf and Dr. Gomez, they also opine specifically that Royal should have sent him to a closer hospital other than

HIMA Caguas, which, as I mentioned earlier, was 42 kilometers away. Again, 26.1 miles. It was a 42-minute ambulance trip. This after Mr. Burgess had already been languishing in the medical center for three hours aboard the ship.

So, again, they're told in Dr. Gomez's report, they're told in Dr. Nidorf's report, our theory of the case is you should have taken him to a closer hospital.

OK. So Dr. Gomez is deposed, and Mr. Drahos is correct that Dr. Gomez wasn't able to name during his actual deposition a specific hospital. OK. What he does is he then -- we submit a declaration that names, in response to summary judgment, it names two hospitals. One is HIMA San Pablo Bayamon, which is 12.23 kilometers away. The other one is Centro Medico de Puerto Rico, which is 15.45 kilometers away.

So Royal says that's a sham affidavit, it's a newly-disclosed opinion. Well, it's not an opinion at all. It is an objectively verifiable fact that Royal and/or its experts could have easily picked up the phone the day after the second amended complaint was filed and started calling and saying, hey, did you have t-PA, were you available to treat in 2019. They didn't do it. So it is equally discoverable to Royal as it was to Dr. Gomez.

THE COURT: Right, but the argument seems to be that Dr. Gomez did not, could not support his claim that the

plaintiff should have been taken to another hospital with any evidence at the time of the deposition and that then he came back and provided that, and presumably at his deposition he said no, he didn't know of any, and that is where the sham affidavit argument is coming from.

MR. LIMA: Actually, that is not exactly correct. He said at one point I know who they are, I know which hospitals they are. Then at another point -- again, Mr. Drahos is corrected -- he followed up and he says, well, can you tell me which ones they are. He said, no, no, I can't. So he wasn't able to name them.

The point about the sham affidavit doctrine, under the Eleventh Circuit case law, number one, it is discretionary. It is reviewed for an abuse of discretion standard, and the case law says, citing McCormack v. City of Fort Lauderdale, "we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."

THE COURT: The contradiction here that Mr. Drahos is alluding to is, I don't know of any, and then the affidavit points to two.

MR. LIMA: Correct.

THE COURT: Am I right, that that is your contradiction, Mr. Drahos?

MR. DRAHOS: Yes, and I'm also not familiar with that

case that was just cited. I don't think it was in the response. That's the first I'm hearing it.

MR. LIMA: If you want to look it up --

THE COURT: I'm familiar with sham affidavit. Basically, the whole idea is you can't come back and clean it up. So that is his argument. He didn't know of any. But you're saying that at some point in time, you're sort of calling it like he couldn't put his finger on it but he knew there were some.

MR. LIMA: Correct.

THE COURT: And Mr. Drahos is saying he had no idea if there was anything else.

MR. LIMA: Correct, your Honor. It would be directly contradictory. If he had been asked and Dr. Gomez had said no, there aren't any and then turn around he submits an affidavit saying actually there are and here's the ones that they are. That is what the case law shakes out as. It has to be a direct contradiction. It can't be sort of supplementing. It can't be putting meat on the bones. So there isn't a direct contradiction here.

THE COURT: OK. Anything else?

MR. LIMA: Again, as far as the exercising discretion to strike it, we have to think back. This is not something that was exclusively within the control and knowledge of Dr. Gomez. This is something that, if you read his affidavit,

he tells you exactly what he did. He said, I picked up the phone, I called these hospitals, I spoke with the emergency department directors at these hospitals, and they confirmed to me that they had t-PA available on February 19 --

THE COURT: But your argument is that at the deposition he had general knowledge, not specific knowledge, and that then he acquired the specific knowledge and supplemented the deposition. That's your theory, as opposed to Mr. Drahos, he had no idea that there was anything, no basis for it, and then tried to clean it up after.

MR. LIMA: Correct, your Honor.

THE COURT: That is sort of like the juxtaposed positions.

MR. LIMA: Correct, and that is why we say it is not a direct contradiction. We also say, again, to the extent your Honor has discretion, which you do --

THE COURT: Right. You don't need discretion. I got it.

MR. LIMA: This was certainly not a situation where they had no ability to discover it.

THE COURT: OK. Anything else?

MR. HICKEY: Judge, can I, because we're remote here. I am not going to argue, but I just want to send messages or call Mr. Lima with my points?

THE COURT: That's OK. I have heard Mr. Lima. Thank

you.

What else do you have, Mr. Lima --

MR. LIMA: Judge, if I could add one --

THE COURT: -- because we are coming up close to two hours.

MR. LIMA: One last point as far as no identifying hospitals before the depositions. We would cite Dr. Gomez's rebuttal expert report is docket entry 105-3. That was served September 13th of 2022. That was before Dr. Gomez's deposition on November 16, 2022. So about a two-month difference. Two months beforehand.

In his rebuttal expert report Dr. Gomez identifies the University of Puerto Rico Hospital as another hospital, alternative hospital, that Mr. Burgess could have been taken to. So, again, Mr. Drahos could have asked, Doctor, what about the University of Puerto Rico Hospital, I noticed you mentioned this in your rebuttal report. That wasn't done. Again, Dr. Gomez could have.

THE COURT: All right. I think we have beaten this horse to death. OK.

MR. LIMA: OK. Fair enough, your Honor.

THE COURT: Anything else?

MR. LIMA: No, your Honor. I would just ask that your Honor deny the motion for the reasons stated on the record.

THE COURT: Mr. Drahos, anything else from you?

MR. DRAHOS: I do have some rebuttal if the court wants to hear it.

THE COURT: Go ahead, sir.

MR. DRAHOS: I'm sorry?

THE COURT: Go ahead. If you could do it efficiently, yes.

MR. DRAHOS: I will. Thank you, your Honor.

So let me work back.

As it relates to Dr. Gomez and the University of Puerto Rico, he actually named that hospital incorrectly. It's called Centro Medico. I did ask him about it. Without belaboring that point any further, I don't know how much more I could have drilled down --

MR. LIMA: They are two different hospitals. I apologize, but I wanted to make that.

THE COURT: All right.

MR. DRAHOS: I don't know how much more I could have drilled down on that opinion other than to ask him tell me which hospital could have provided t-PA to Mr. Burgess on the date in question, and he told me he didn't know of any, and then he came with this affidavit.

My argument to the court would be that if Dr. Gomez was able to do that in such a way that he could produce a specific affidavit, he had three years to prepare for his deposition. He had two expert reports where he could have done

that. He didn't.

He came to the deposition. He couldn't answer it. Then I filed summary judgment, and he attempted to try and change his testimony.

THE COURT: All right.

MR. DRAHOS: As it relates to the court's comment that these alternative theories of transfer and whether or not they're sufficient to be able to create an issue of fact, the court said, well, because you offered something, is that enough.

THE COURT: Right. I know I said that on purpose.

MR. DRAHOS: Yes. My response to that would be, what they've offered is entirely speculative. They have nowhere else for Mr. Burgess to go. They have no other way that they can think of on how to get him there. They have no specific plan which could have been accomplished.

To the extent that they claim we had no protocol, we did have a protocol. The protocol was the ship's physician contacts the port agent, who is the authority in the area, the expert on resources, and the port agent facilitates that transfer. So they have not come up with an alternative protocol that they think could have worked better. It is just you could have done something differently.

This argument that we are hearing today that their, quote, more aggressive response means we should have had a

protocol is not what they have argued in this case. Their expert specifically said we should not have taken no for an answer, and I have keyed in on that to emphasize to the court how speculatory these arguments are, because not taking no for an answer is really, as I've called it before, it is more appropriate for a politician on a soap box than an expert on a witness stand.

The fact that they've made an argument today that Royal Caribbean apparently knew of other hospitals and there is evidence of visits and telephone numbers being given to us, that's not been established in this case. That's the first I'm hearing of that today. It wasn't in the response, and certainly there is no "evidence" that we have done hospital visits anywhere else.

The only evidence in the case is that we used the port agents to make these decisions for us because they're the ones there day in and day out and know the area.

This continued argument that he could have been taken to a different hospital, again, I would say which hospital. There hasn't been a hospital that they have been able to identify.

Most importantly, your Honor, I wanted to make sure I had an opportunity to address Dr. Nobo's causation testimony.

I don't know how that could be credibly raised to this court. Dr. Nobo specifically was asked objection -- and by the

way, I objected to the form of all those questions when he was asked that by the plaintiffs' counsel. But on redirect, when I had an opportunity to ask for clarity, he specifically told me that he was guessing. I have the page and the line that I could provide the court. It is page 125, line 5, through page 129 all the way up to the end of the deposition. The last question I asked him is to go back and clarify his opinions on prognosis. He said: "I didn't say that they were going to happen no matter what; I said it was a possibility, it was a probability."

I asked him: "So the possibility is just as likely as the possibility that he if had been given t-PA he could have had five or six more strokes?"

He said yes.

Dr. Nobo very clearly clarifies in his deposition that he can't render prognosis or causation testimony, that he would be guessing.

THE COURT: All right.

MR. DRAHOS: The plaintiff has tried to raise these different hospitals, but they don't know of a doctor who would have read the films any differently or would have made any different decisions. What's clear in the case is that Dr. Nobo was the most qualified guy on the island. If they even want to suggest that maybe these other hospitals could have been available, they don't know what doctors were there, they don't

know if those doctors were available, they don't know what the wait times would have been and whether or not they could have got Mr. Burgess into a CT machine in enough time.

The fact that Dr. Gomez has made this claim that more time could have produced a different result, that's been directly refuted by Dr. Nobo. There is no testimony in this case that Dr. Nobo claims he made the decision because he was rushed. At no point in time does Dr. Nobo ever say I needed more time and I determined that there was blood because I was rushing. That is nonexistent. It is Dr. Gomez making up that theory entirely.

Dr. Nobo said all along that regardless of the amount of time, he saw the blood there. I want to direct the court to a specific answer that he gave in that regard, where he even says that if he didn't see the blood, he would have extended the time a little bit.

That's page 118, line 19, through page 119, line 10.

He specifically says that he was aware of the time frame, he knew it was close, and he says he would have extended the time a little bit had he not seen the blood in the head.

So that is the most definitive answer we have gotten from Dr. Nobo to establish the point that time was not the factor, it was the blood that he saw in the brain.

As it relates to the more likely than not and the efficacy of t-PA, Dr. Gomez gives a lot of general statements

in his reports about how t-PA works. We are not here to put t-PA on trial, but what we are saying is that it differs from patient to patient, and when Dr. Gomez was asked about this particular patient, he gave a 30 percent prognosis.

The fact that the argument's being made today that we were ultimately responsible for the transport is just simply false. They can't create their own facts this late in the game. The contract specifically delineates that it is the responsibility of the port agent.

The port agent's corporate representative in the case has testified specifically that the port agent was contacted not only by email but by phone by the ship's physician. The ship's physician clearly gave the instructions that were necessary. They knew what they needed to do and they knew it was a time-sensitive matter.

So we did not, as it's been argued here today, take on the ultimate "responsibility" for the transport. The transport responsibility is (inaudible). We told them what they needed to do as we were required to do, and that's not at issue as to whether or not we gave them the right information.

THE COURT: All right. Anything else?

MR. DRAHOS: Thank you, Judge. That's all, your Honor.

THE COURT: All right. Well, thank you very much.

We will look at this together with the Daubert motions

and, since you have given us a little bit more breathing room, we will look at this very closely ahead of our next deadline, which is the pretrial conference.

All right. Thank you.

MR. LIMA: Thank you, your Honor. Have a good afternoon.

THE COURT: You too.

MR. DRAHOS: Thank you.

THE DEPUTY CLERK: Court's adjourned.

(Adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription to the best of my ability of the digital audio recording in the above-entitled matter.

May 2, 2023

s/ Joanne Mancari
Joanne Mancari, RPR, CRR, CSR
Court Reporter
jemancari@gmail.com

MR. DRAHOS: [37] 3/15 3/25 4/13 5/3 5/12 6/15 6/21 7/1 7/9 7/14 7/20 7/22 8/1 8/6 8/11 23/18 24/1 24/18 24/21 24/25 25/3 25/7 25/16 25/24 26/15 27/14 28/17 52/25 56/1 56/4 56/7 56/17 57/6 57/12 59/19 61/22 62/8
MR. HICKEY: [2] 3/6 54/22
MR. LIMA: [71]
MS. LOBEL: [1] 3/10
THE COURT: [105]
THE DEPUTY CLERK: [2] 3/3 62/9

0

0690 [1] 1/14

1

1.1.34 [1] 18/20
1.1.36 [1] 34/2
10 [2] 35/10 60/17
100-18 [1] 43/3
102 [1] 30/20
105-3 [1] 55/8
118 [1] 60/17
119 [1] 60/17
11:21 [2] 48/6 49/1
12.23 [1] 51/13
125 [1] 59/5
129 [1] 59/6
13 [1] 38/9
13th [1] 55/9
14.01 [1] 35/12
1401 [1] 1/13
15 [6] 40/23 41/4 44/2 44/5 44/5 44/14
15.45 [1] 51/14
16 [1] 55/10
167 [1] 18/19
18 [1] 43/3
19 [2] 54/4 60/17
1:14 [1] 40/22

2

20 [2] 3/4 44/14
20-CV-20687-AOR [1] 1/2
200 [1] 49/23
2010 [1] 10/12
2019 [1] 51/21
2020 [1] 50/21
2022 [2] 55/9 55/10
2023 [2] 1/5 62/18
20687 [1] 3/4
22 [1] 48/5
2200 [1] 50/2
25 [2] 28/25 49/25
250 [2] 49/24 50/10
26.1 [2] 32/15 51/2
268-5727 [1] 2/6

3

30 [14] 17/6 17/14 17/19 17/24 23/1 24/6 24/11 37/18 37/19 40/2 41/6 44/14 44/25 61/4
305 [2] 1/14 1/19
33 [1] 37/19
33130 [1] 2/5
33131 [1] 1/14
33156 [1] 1/18

4

40 [1] 44/25
42 [3] 32/14 32/14 51/1
42-minute [2] 32/14 51/2
4660 [1] 1/19
48 [3] 28/6 28/14 28/24

5

51 [4] 17/12 18/1 23/24 24/12
515 [1] 2/5
547-0690 [1] 1/14
561 [1] 2/6
5727 [1] 2/6

6

62 [1] 1/7
666-4660 [1] 1/19
6700 [1] 50/2

7

7300 [1] 1/18

8

83 [1] 41/23
87-4 [1] 34/9
88 [1] 29/16

9

9,000 [1] 50/9
911 [12] 9/11 9/18 9/24 10/2 10/9 10/17 23/10 45/23 46/5 46/19 47/4 47/9
9:59 [2] 48/4 48/25

A

a.m [3] 48/4 48/6 48/25
abandoned [1] 15/3
abandoning [1] 48/9
abilities [1] 39/5
ability [4] 39/8 39/10 54/20 62/15
able [11] 9/1 10/16 15/16 17/11 18/2 44/7 51/9 52/11 56/23 57/8 58/20
aboard [1] 51/4
about [18] 6/4 32/15 36/15 37/18 40/2 45/23 46/19 47/16 48/8 48/9 48/19 50/14 52/12 55/10 55/15 56/11 61/1 61/3
above [1] 62/16
above-entitled [1] 62/16
absolute [1] 43/16
absolutely [2] 27/20 41/7
abstract [1] 48/21
abuse [1] 52/14
accept [1] 24/10
accepted [1] 41/5
accomplished [1] 57/16
accordingly [1] 31/23
accurate [1] 62/14
acknowledged [1] 30/1
acknowledges [1] 43/1
acknowledging [1] 43/4
acquainted [1] 45/20
acquired [1] 54/7
act [3] 13/24 31/23 32/4
acting [3] 25/13 34/4 35/2
action [2] 17/12 26/19
actions [3] 9/8 32/22 32/23
actors [1] 25/15
acts [3] 30/4 31/11 31/11
actual [9] 7/14 7/18 24/15 24/16 24/24 29/1 29/25 49/5 51/9
actually [7] 10/7 17/2 34/6 37/19 52/6 53/16 56/10
add [1] 55/3
additional [2] 30/16 39/13
address [6] 4/17 5/11 8/10 40/8 40/15 58/23
addressed [6] 6/7 17/22 26/20 32/20 40/14 45/8
adjourned [2] 62/9 62/10
administered [2] 16/4 40/22
administering [1] 38/16
administration [1] 16/21
admissible [4] 46/14 46/16 46/17 47/5
admits [3] 14/3 14/9 22/11
admitted [4] 11/20 13/12 30/2 45/14
advised [1] 31/1
advisement [1] 4/6
affidavit [14] 12/15 12/25 13/5 51/16 52/5 52/12 52/16 52/17 52/20 53/4 53/15 53/25 56/21 56/24
after [12] 12/14 30/15 31/1 40/23 41/5 41/7 43/1 43/5 44/2 51/3 51/19 54/10
afternoon [5] 3/6 3/10 3/12 3/15 62/6
again [30] 8/18 10/22 11/9 12/22 17/4 17/15 17/24 18/23 19/2 20/24 22/14 34/4 35/17 38/17 38/22 44/21 45/5 45/18 50/10 50/12 50/15 50/16 51/2 51/5 52/8 53/22 54/15 55/15 55/17 58/19
against [4] 26/19 41/9 44/4 44/7
agency [15] 7/14 7/15 7/18 8/4 24/15 24/16 24/16 24/19 24/23 24/23 29/2 29/25 29/25 30/1 33/22
Agency/Respondeat [1] 29/2
agent [53] 18/9 18/16 18/21 18/24 20/7 21/13 21/15 21/18 21/22 23/4 25/10 25/11 25/12 25/13 25/14 25/17 25/18 25/21 25/23 26/3 26/4 26/6 26/11 26/12 26/19 27/5 27/13 27/15 32/17 32/22 32/24 33/2 33/14 33/16 34/1 34/2 34/4 34/8 34/12 34/13 34/25 35/2 35/2 35/7 35/22 36/16 49/14 49/16 49/18 57/19 57/20 61/9 61/11
agent's [2] 35/7 61/10
agents [2] 33/21 58/16
aggressive [9] 13/17 14/1 14/16 14/17 26/25 46/8 48/19 49/2 57/25
ago [1] 11/9
agree [3] 16/12 18/10 19/18
agreed [4] 33/20 34/15 38/25 41/18
agreement [4] 33/14 33/15 34/1 35/7
agrees [3] 5/2 38/18 42/18
ahead [3] 56/3 56/5 62/2
al [1] 1/3
ALICIA [1] 1/10
alive [1] 5/9
all [57] 3/9 3/14 3/19 3/24 4/3 5/14 6/4 6/11 6/17 7/17 7/21 7/24 8/3 8/7 16/15 16/19 18/8 18/23 19/17 22/8 22/10 23/7 23/9 25/4 27/6 27/16 27/16 28/2 28/11 30/3 31/13 32/2 34/4 34/20 35/21 36/20 38/18 39/3 40/12 46/21 47/8 47/11 47/14 47/19 47/20 51/17 55/19 56/16 57/5 59/1 59/6 59/18 60/12 61/21 61/22 61/24 62/4
allegation [4] 6/22 29/22 30/6 30/19
allegations [2] 26/3 29/21
allege [1] 26/12
alleged [2] 27/2 31/11
alleging [1] 32/21
allow [3] 19/2 19/4 22/22
allowed [2] 9/12 27/4
allowing [2] 29/19 30/25
alluding [1] 52/20
almost [1] 50/9

A
along [1] 60/12
already [2] 45/8 51/3
also [20] 3/11 3/13 7/6 12/3 12/12 25/7 29/14 29/23 34/17 38/25 42/13 42/20 42/23 43/23 49/4 49/18 50/23 50/24 52/25 54/15
alternative [12] 9/8 10/18 11/2 14/20 22/21 26/1 43/13 43/14 50/14 55/14 57/7 57/21
alternatively [1] 29/25
always [2] 33/6 42/6
am [5] 23/17 25/6 26/8 52/23 54/23
ambulance [11] 20/16 21/6 21/15 30/21 32/10 32/11 33/22 48/6 49/7 50/17 51/2
ambulances [2] 18/22 49/20
amended [4] 7/5 28/1 50/21 51/20
amount [4] 8/22 10/4 25/25 60/12
amounts [1] 36/25
another [8] 34/1 36/5 36/18 44/21 45/5 52/1 52/8 55/13
answer [7] 17/22 40/13 57/2 58/3 58/5 60/14 60/21
answers [2] 16/25 43/10
any [37] 4/17 4/21 9/20 10/15 11/6 11/21 12/6 12/23 13/11 13/23 13/24 14/12 14/19 14/25 15/8 15/16 17/12 17/17 17/22 19/11 20/16 21/8 22/13 22/23 23/13 34/11 34/14 45/12 52/1 52/4 52/20 53/6 53/15 56/12 56/20 59/21 59/21
anybody [3] 11/18 13/24 26/17
anything [11] 20/6 26/18 48/5 48/25 53/12 53/21 54/9 54/21 55/22 55/25 61/21
anyway [1] 43/8
anywhere [3] 13/14 15/15 58/14
AOR [1] 1/2
apart [1] 7/24
apologize [1] 56/15
apparent [6] 7/15 7/18 24/15 24/16 24/24 29/25
apparently [1] 58/9
appearances [3] 1/11 1/20 3/5
appeared [1] 6/7
appears [1] 29/22
APPELLATE [2] 1/17 3/13
appreciate [1] 31/23
appropriate [6] 9/22 19/21 20/23 21/3 34/17 58/6
appropriately [4] 22/12 27/2 30/2 34/18
approximately [2] 29/20 31/24
April [1] 1/5
are [64]
area [5] 11/17 13/7 13/13 57/19 58/17
aren't [1] 53/15
argue [7] 10/22 14/24 19/4 24/13 37/2 37/3 54/23
argued [6] 5/22 9/10 9/15 10/20 58/1 61/16
arguing [8] 8/25 18/7 19/2 24/15 31/17 32/3 35/4 48/23
argument [46] 7/16 10/9 14/22 18/4 18/5 20/11 20/14 21/11 22/13 22/22 23/2 23/11 23/15 23/16 24/2 24/8 26/5 26/9 26/10 26/12 26/22 27/1 27/7 32/16 32/25 33/9 34/24 35/19 36/7 36/14 36/18 36/22 36/23 37/7 39/25 40/8 40/19 48/10 51/24 52/5 53/6 54/5 56/22 57/24 58/8 58/18
argument's [1] 61/5
arguments [16] 3/22 4/10 4/10 5/17 5/25 8/18 8/20 14/25 23/21 27/19 37/14 45/11 45/14 46/5 46/9 58/4
around [1] 53/15
arrange [4] 7/22 9/5 18/23 30/9
arrangement [1] 25/20
arrangements [1] 26/1
arrest [1] 21/2
arrival [1] 20/11
arrive [2] 9/12 41/14
arrived [9] 20/18 31/1 32/10 40/22 41/4 41/9 42/1 42/12 44/2
arrives [1] 36/4
article [2] 10/8 10/10
as [91]
ask [9] 11/19 12/16 13/1 33/12 38/22 55/23 56/11 56/18 59/3
asked [12] 12/16 12/22 17/18 44/8 44/10 53/14 55/15 58/25 59/2 59/7 59/11 61/3
asking [3] 8/19 13/3 23/6
aspect [3] 15/12 20/12 24/19
aspects [1] 24/25
asserted [1] 36/23
assigning [1] 48/12
assist [1] 34/2
assisting [1] 34/11
associate [3] 14/24 15/2 48/12
assume [2] 25/12 35/20
assuming [1] 26/6
at [60] 4/23 5/18 5/24 9/12 9/20 11/16 12/22 17/1 17/17 17/22 19/17 20/13 21/1 23/1 23/13 26/3 29/6 29/15 29/16 30/8 33/21 34/4 35/2 35/21 36/5 37/3 38/9 38/24 39/22 40/22 40/24 41/4 41/8 41/23 42/20 43/2 43/24 44/2 44/4 44/8 45/16 47/16 47/19 48/4 48/6 48/24 49/25 50/20 51/17 52/2 52/3 52/7 52/8 53/7 54/3 54/5 60/8 61/19 61/25 62/2
attempt [3] 11/14 12/11 14/10
attempted [3] 10/2 12/15 57/3
attempting [2] 10/7 19/6
attempts [1] 10/4
attending [2] 24/8 25/6
attitude [1] 13/22
audio [2] 1/9 62/15
authentication [1] 28/10
authority [1] 57/19
available [17] 9/22 10/25 11/22 12/8 12/13 12/24 13/8 13/12 13/13 13/15 13/20 14/21 32/11 51/21 54/4 59/25 60/1
Avenue [1] 1/13
average [2] 37/23 47/10
aware [4] 8/12 13/19 22/12 60/18
away [6] 31/8 32/14 42/2 51/2 51/13 51/15

B
back [10] 10/12 26/7 32/3 38/11 50/19 52/3 53/5 53/23 56/8 59/7
ball [1] 40/10
based [5] 16/1 22/19 24/23 27/10 35/6
baseline [2] 37/18 37/20
basically [6] 3/23 6/12 23/19 25/9 27/9 53/5
basis [4] 8/24 25/11 39/23 54/9
basket [2] 21/3 36/9
Bayamon [1] 51/13
be [48] 4/14 6/7 8/3 9/1 9/6 12/6 17/11 17/16 18/2 18/9 18/21 19/24 20/4 20/6 21/12 22/14 24/2 26/13 29/5 29/17 30/25 31/9 32/21 33/9 33/18 35/2 37/1 38/21 41/8 41/20 44/7 45/5 46/8 46/14 46/17 47/18 47/23 50/3 51/24 53/13 53/17 53/18 53/18 56/22 57/8 57/12 58/24 59/17
Beach [1] 2/5
bear [1] 35/13
beaten [1] 55/19
because [37] 4/20 5/15 14/11 14/19 15/7 15/12 16/9 18/8 23/3 23/24 24/3 26/2 26/8 26/22 30/2 31/6 34/13 36/15 36/21 38/3 38/14 38/18 41/22 41/23 42/3 43/2 43/11 44/18 45/3 46/10 54/22 55/4 57/9 58/4 58/16 60/7 60/9
become [1] 6/4
been [66]
before [6] 1/10 8/25 41/15 55/7 55/9 58/5
beforehand [1] 55/11
began [1] 31/25
behalf [4] 3/6 3/11 3/13 3/16
being [12] 3/22 6/13 19/14 20/24 22/17 27/9 29/18 32/13 48/19 49/2 58/10 61/5
belaboring [1] 56/12
believe [12] 4/22 9/7 10/15 11/2 11/7 12/6 13/25 15/3 22/10 22/16 23/3 26/17
believed [1] 16/10
believes [1] 17/23
below [1] 20/16
beneficiary [1] 26/22
benefit [1] 8/17
besides [1] 34/25
best [4] 12/5 12/9 23/1 62/15
better [8] 10/3 10/18 11/3 17/7 17/24 23/25 37/5 57/22
between [6] 19/22 25/18 31/24 33/15 34/13 35/1
beyond [4] 17/12 29/13 36/10 47/4
bigger [1] 50/11
bit [5] 5/23 26/25 60/16 60/20 62/1
blank [1] 12/22
bleeding [2] 16/11 16/12
blood [5] 60/9 60/13 60/15 60/20 60/23
board [1] 15/20
bones [1] 53/19
both [8] 7/17 9/2 22/3 25/5 31/10 35/22 36/15 41/6
bottom [1] 4/2
box [2] 5/2 58/6
brain [14] 16/11 16/12 40/8 40/10 41/12 41/12 41/15 41/19 41/22 42/3 42/4 42/10 42/13 60/23
breach [5] 8/8 8/23 36/24 45/12 45/14
breathing [1] 62/1
Brickell [1] 1/13
briefing [1] 42/16
briefly [2] 5/15 40/16
bring [3] 4/7 10/2 12/21
brought [3] 9/17 11/14 15/6
built [1] 23/19
bunch [1] 37/1
burden [2] 14/13 22/15
BURGESS [48] 1/3 3/3 3/7 3/8 6/2 9/12 9/23 9/25 10/19 11/4 12/2 12/4 15/8 15/15 15/21 16/2 16/6 16/18 20/4 20/15 21/7 22/18 24/4 29/23 30/7 30/14 31/25 32/5 37/25 38/6 39/1 39/13 40/22 41/4 41/9 42/12 43/12 43/19 43/21 44/5 44/20 50/1 50/17 51/3 55/14 56/19 57/14 60/3
Burgess' [4] 11/25 14/18 18/3 42/21
business [2] 40/3 48/8

**B**

but [35] 4/4 4/23 6/3 11/9 11/12 12/11 13/2 14/25 16/22 19/4 19/13 22/21 25/22 26/5 28/22 29/14 37/2 39/14 39/22 40/13 42/13 43/7 44/12 46/20 50/12 51/24 53/6 53/8 54/5 54/23 56/15 59/2 59/20 61/2 61/12

**C**

Caguas [13] 11/11 12/2 13/8 15/18 15/22 20/19 30/19 30/25 32/13 38/25 42/20 49/16 51/1
call [3] 23/10 47/3 54/24
called [7] 14/25 42/15 47/17 49/7 54/2 56/11 58/5
calling [6] 18/4 23/3 25/9 46/5 51/20 53/8
calls [5] 11/17 13/22 14/5 43/3 49/6
came [4] 5/21 52/2 56/21 57/2
camera [1] 3/17
can [26] 6/7 6/8 6/19 6/25 8/3 9/2 12/21 12/23 13/10 13/21 15/19 24/6 27/18 28/5 28/23 28/25 33/6 34/18 35/9 45/10 46/17 48/13 48/14 52/9 54/22 57/15
can't [11] 14/11 15/7 15/9 22/21 22/23 52/10 53/5 53/18 53/18 59/16 61/7
cannot [3] 18/9 19/1 33/9
capable [2] 30/23 32/12
capacity [1] 50/2
captain [2] 19/22 50/7
cardiac [1] 21/2
care [34] 8/23 9/8 9/13 9/22 10/21 11/6 11/7 14/24 15/1 15/2 20/10 20/15 20/17 20/17 22/6 22/24 25/5 27/11 29/13 33/10 33/23 34/19 36/4 36/5 36/12 38/13 38/18 41/5 41/8 45/12 46/7 48/8 48/10 48/12
CARIBBEAN [14] 1/6 3/3 3/17 6/22 10/20 18/9 18/11 23/6 25/19 27/9 27/10 33/15 34/5 58/9
Caribbean's [2] 19/12 21/10
case [50] 1/2 3/4 8/12 11/3 11/23 14/21 15/12 15/19 16/11 17/8 17/11 17/14 18/8 18/11 18/12 18/13 18/15 18/24 19/13 19/14 19/17 20/2 20/14 21/5 21/9 21/14 21/21 22/7 23/5 24/18 33/4 33/7 35/21 44/17 44/17 47/6 47/6 48/22 49/6 51/6 52/13 52/14 53/1 53/17 58/1 58/11 58/15 59/22 60/7 61/10
cases [4] 13/4 19/20 22/2 22/3
catchall [5] 18/5 23/3 25/9 34/23 36/22
causation [14] 8/8 9/3 15/9 15/12 22/21 23/23 24/7 25/2 25/4 36/25 37/7 37/8 58/23 59/16
cause [1] 26/19
caused [1] 13/24
center [2] 18/22 51/4
Centro [2] 51/14 56/11
certain [2] 11/24 12/16
certainly [5] 20/19 39/22 39/23 54/19 58/13
certified [1] 15/20
certify [1] 62/14
challenging [4] 20/2 24/19 24/23 24/25
chance [7] 17/6 17/24 23/1 23/24 24/6 38/19 38/20
change [2] 22/24 57/4
changed [11] 11/6 11/8 11/25 14/18 15/2 15/2 15/18 17/2 17/13 18/2 24/3
cheat [1] 6/20
checked [1] 49/25
cherry [1] 37/17
cherry-picked [1] 37/17
cherrypicked [1] 38/2
child [1] 44/17
Circuit [1] 52/13
circumstance [1] 22/2
circumstances [1] 32/4
circumvent [2] 12/25 17/15
citation [2] 33/4 38/10
citations [1] 41/3
cite [2] 19/1 55/7
cited [12] 10/11 12/20 13/4 15/23 18/13 22/3 35/10 38/8 45/25 47/9 49/4 53/1
citing [2] 37/1 52/15
City [1] 52/15
civil [1] 3/4
claim [6] 5/9 8/8 8/9 51/25 57/17 60/4
claiming [1] 14/15
claims [6] 3/24 4/3 4/4 6/6 18/8 60/7
clarifies [1] 59/15
clarify [1] 59/7
clarifying [1] 27/21
clarity [4] 5/8 6/16 8/14 59/3
classify [1] 15/11
clause [1] 18/19
clean [3] 36/23 53/5 54/10
clear [14] 4/22 6/4 12/22 13/6 15/23 17/5 17/25 20/1 21/14 21/19 32/21 33/9 33/16 59/22
clearly [4] 30/5 36/10 59/15 61/13
clerk [1] 48/24
client [2] 26/6 26/7
close [2] 55/4 60/19
closely [1] 62/2
closer [10] 9/21 11/10 12/7 15/15 32/11 42/2 46/8 50/22 50/25 51/7
closes [1] 44/19
closest [4] 7/23 30/9 30/17 31/5
cognitive [1] 39/5
colleague [1] 3/17
collected [1] 38/9
Colon [4] 34/8 34/8 34/15 34/20
come [4] 15/14 32/2 53/5 57/21
coming [2] 52/5 55/4
comment [2] 38/3 57/6
common [6] 19/9 21/24 21/25 22/8 35/15 47/21
compared [1] 38/15
competent [5] 9/1 9/20 11/12 13/11 22/20
competently [1] 15/20
complaint [7] 7/5 28/1 28/19 28/20 28/21 50/21 51/20
complying [1] 49/10
components [1] 4/5
comprehend [1] 23/23
compressed [1] 43/25
computers [1] 28/10
concede [2] 9/24 18/25
conceded [3] 4/16 4/24 13/14
concedes [2] 12/3 25/16
concern [2] 5/5 6/22
concerning [1] 9/5
conclude [2] 9/2 44/22
conclusion [2] 9/9 10/5
condition [3] 20/24 30/24 34/2
conference [1] 62/3
confirmed [1] 54/3
consider [1] 40/12
consult [1] 45/1
consulted [1] 28/1
CONT'D [1] 2/1
contacted [1] 61/11
contacts [1] 57/19
context [4] 6/8 20/25 22/6 38/3
Continental [1] 33/16
continued [1] 58/18
continuously [1] 38/5
contract [18] 18/16 18/17 19/10 21/13 21/14 21/22 22/9 23/3 25/18 27/4 27/12 27/15 33/2 35/1 35/15 35/22 36/16 61/8
contractor [3] 18/25 25/17 32/24
contractually [1] 26/2
contradict [1] 16/22
contradicted [1] 52/18
contradiction [5] 52/19 52/24 53/18 53/20 54/15
contradictory [1] 53/14
contradicts [1] 12/19
contraindicated [3] 41/7 41/16 41/20
contraindication [2] 16/13 41/14
contrary [2] 20/6 22/11
control [1] 53/24
COOPER [2] 2/4 3/17
cooper.jarnagin [1] 2/7
coordinate [2] 18/12 33/22
coordinating [1] 18/21
coordination [3] 25/19 33/17 33/18
copy [1] 7/4
corporate [4] 21/17 34/7 35/7 61/10
correct [21] 3/23 3/24 3/25 7/20 16/15 23/18 23/25 25/7 27/14 28/18 29/4 35/6 37/12 49/11 51/9 52/6 52/22 53/10 53/13 54/11 54/14
corrected [1] 52/9
correctly [2] 23/17 28/16
could [40] 5/14 9/8 9/22 11/8 11/21 12/2 12/12 13/7 15/15 16/20 22/18 26/21 33/12 33/25 38/22 44/22 49/20 50/17 51/19 51/25 55/3 55/14 55/15 55/18 56/5 56/13 56/17 56/19 56/23 56/25 57/16 57/22 57/23 58/18 58/24 59/5 59/12 59/24 60/2 60/5
couldn't [2] 53/8 57/2
counsel [3] 3/5 22/4 59/2
Count [22] 4/18 4/19 4/21 5/17 5/18 5/21 6/7 6/8 9/6 15/5 23/9 23/20 27/23 28/24 29/22 29/22 30/7 30/15 31/4 32/9 50/15 50/20
counters [1] 27/19
counts [10] 4/16 6/4 6/22 15/10 23/7 27/22 29/24 30/5 31/3 32/6
course [5] 4/5 10/16 26/18 31/11 49/21
court [26] 1/1 2/10 8/12 8/19 8/25 9/1 12/20 13/3 17/8 19/2 19/4 22/5 22/22 23/6 28/15 37/3 37/4 45/19 56/1 56/22 57/9 58/3 58/25 59/5 60/13 62/19
court's [4] 8/17 26/16 57/6 62/9
cracks [1] 12/11
create [2] 57/8 61/7
credibly [1] 58/24
crew [4] 30/21 33/23 36/1 50/2
critical [3] 14/11 16/25 25/25
criticism [1] 45/23
criticisms [1] 45/15
cross [1] 39/21
cross-examine [1] 39/21
CRR [2] 2/10 62/18
cruise [7] 5/20 7/10 14/8 24/17 25/14 29/1 30/10

C

CRUISES [2] 1/6 3/4
crystal [4] 13/6 15/23 17/5 40/10
CSR [2] 2/10 62/18
CT [11] 40/7 40/22 41/11 41/19 42/8 42/9 42/14 42/21 44/3 44/9 60/3
cut [1] 17/9
CV [1] 1/2

D

dangerous [1] 28/15
Daniel [1] 34/8
Darren [1] 3/7
dash [1] 29/5
date [18] 9/10 9/25 10/13 10/25 11/11 11/20 12/1 12/5 12/13 12/18 12/23 13/7 13/13 13/17 16/2 16/16 19/5 56/20
Daubert [11] 4/5 8/16 9/15 10/6 10/11 11/16 15/25 17/1 40/6 47/11 61/25
day [5] 13/25 14/18 51/19 58/17 58/17
de [1] 51/14
dead [4] 41/12 41/19 42/10 42/13
deadline [1] 62/2
deal [1] 31/3
deals [1] 31/4
death [1] 55/20
debate [2] 8/22 19/22
decide [1] 20/4
decision [12] 16/17 19/16 19/18 20/2 20/3 20/5 20/8 21/5 36/1 44/16 44/18 60/7
decisions [2] 58/16 59/22
declaration [1] 51/11
defects [1] 27/10
defendant [9] 1/7 2/3 3/16 3/23 4/20 16/11 17/13 22/4 23/5
defendant's [2] 3/19 8/16
defense [1] 42/22
definitive [1] 60/21
delay [10] 6/2 29/19 29/23 30/6 30/6 30/17 31/4 31/5 40/4 41/22
delayed [1] 30/14
delegable [2] 35/18 35/20
delegate [4] 27/3 33/6 33/10 35/21
delegated [3] 18/15 27/14 33/2
delineates [2] 25/19 61/8
deliver [1] 21/6
delivered [4] 15/15 16/7 22/18 24/4
delve [1] 8/18
deny [1] 55/24
department [1] 54/3
deposed [1] 51/8
deposition [25] 12/19 13/6 13/16 16/25 17/4 17/6 17/18 17/25 22/14 34/15 37/17 38/4 41/24 44/8 51/10 52/2 52/3 52/18 54/6 54/8 55/9 56/25 57/2 59/6 59/15
depositions [1] 55/7
depth [1] 6/3
detail [1] 41/3
details [1] 8/19
deteriorating [1] 30/24
determine [2] 21/2 37/4
determined [2] 16/17 60/9
diagnosed [1] 29/18
dialed [1] 9/11
did [23] 13/25 18/10 19/3 21/21 26/18 27/3 27/6 33/11 35/21 42/11 42/13 42/22 42/23 44/18 48/8 49/21 49/22 51/21 51/25 54/1 56/11 57/18 61/16
didn't [16] 11/18 11/18 11/19 12/16 13/1 13/20 14/25 45/3 45/12 51/22 52/4 53/6 56/20 57/1 59/8 60/15
die [1] 42/5
dies [1] 42/5
difference [3] 23/14 37/25 55/10
different [21] 9/6 9/8 10/22 13/18 15/16 16/20 17/5 25/5 39/15 40/21 43/15 43/15 43/15 43/19 44/24 48/21 56/14 58/19 59/20 59/22 60/5
differently [5] 13/24 22/24 44/24 57/23 59/21
differs [2] 30/7 61/2
digital [2] 1/9 62/15
direct [7] 5/20 7/12 30/10 53/17 53/19 54/15 60/13
directed [3] 26/3 34/21 50/17
directing [1] 30/24
directly [4] 12/19 52/18 53/13 60/6
directors [1] 54/3
discern [1] 5/24
discharge [1] 43/2
disclosed [1] 51/17
discover [1] 54/20
discoverable [1] 51/22
discovery [3] 9/21 10/17 15/13
discretion [4] 52/14 53/22 54/16 54/17
discretionary [1] 52/13
discuss [3] 4/11 19/15 20/9
discussed [3] 8/3 17/1 20/21
discussion [6] 8/21 27/22 33/14 45/9 45/11 47/15
discussions [1] 6/12
disembark [3] 19/17 19/19 36/1
disembarked [1] 20/5
disembarking [1] 31/20
dispatched [1] 48/6
dispense [1] 6/8
dispose [1] 6/12
disprove [1] 14/13
disqualified [2] 16/18 43/21
disqualifier [1] 44/23
disregard [3] 13/5 27/8 52/16
DISTRICT [2] 1/1 1/1
dithers [1] 44/19
do [32] 6/2 10/12 15/17 18/13 19/6 21/10 21/21 27/4 27/17 29/23 34/6 34/21 36/8 36/24 36/25 37/11 39/22 40/8 40/12 44/9 44/10 49/21 50/15 51/22 54/16 55/2 56/1 56/5 56/23 61/14 61/19 61/19
docket [7] 18/19 28/6 28/13 28/24 34/9 43/3 55/8
doctor [15] 19/22 20/1 20/22 21/1 24/16 24/21 25/6 36/12 36/18 39/25 40/1 40/4 40/9 55/15 59/20
doctor's [4] 7/11 19/16 19/18 20/10
doctors [4] 24/8 43/18 59/25 60/1
doctrine [1] 52/12
document [1] 28/17
documentary [1] 14/12
documentation [2] 48/5 48/25
documented [1] 33/21
does [5] 8/15 16/14 17/25 51/10 60/8
doesn't [10] 5/25 10/7 14/4 14/5 14/6 14/9 17/8 20/19 28/16 43/6
doing [1] 23/13
don't [35] 4/17 6/2 8/13 8/17 10/15 13/12 13/14 13/21 14/19 26/15 26/17 28/4 28/15 34/11 34/14 35/14 35/18 37/9 37/10 40/9 44/13 44/15 45/2 45/19 47/12 52/20 53/1 54/17 56/12 56/17 58/24 59/20 59/25 59/25 60/1
done [5] 19/12 55/17 56/25 57/23 58/13
door [1] 13/23
down [4] 25/4 36/3 56/13 56/18
Dr. [91]
Dr. Gomez [39] 10/1 12/11 12/12 12/15 13/6 13/10 13/19 14/3 14/19 16/25 17/14 17/21 37/18 38/5 38/12 39/21 40/3 40/6 41/18 41/21 42/8 42/19 45/25 47/9 50/24 51/8 51/9 51/23 51/25 53/14 53/25 55/12 55/18 56/9 56/22 60/4 60/10 60/25 61/3
Dr. Gomez's [6] 16/19 24/13 42/1 51/5 55/7 55/9
Dr. Maria [1] 42/20
Dr. Muns [2] 45/1 45/2
Dr. Nidorf [6] 11/15 11/25 13/10 13/19 14/19 50/24
Dr. Nidorf's [2] 12/10 51/6
Dr. Nobo [23] 15/20 16/1 16/14 24/3 38/24 39/12 39/16 41/17 42/8 42/14 42/25 43/3 43/11 44/8 44/25 58/25 59/15 59/22 60/6 60/7 60/8 60/12 60/22
Dr. Nobo's [5] 15/23 16/22 43/24 44/3 58/23
Dr. Pereira [2] 20/8 21/5
Dr. Pereira's [1] 20/3
Dr. Periera [4] 30/2 31/19 31/19 31/20
DRAHOS [25] 2/3 3/15 4/9 5/16 30/1 31/16 32/3 32/20 34/24 35/4 35/14 36/7 37/15 40/1 46/11 46/21 47/16 51/8 52/8 52/19 52/24 53/11 54/9 55/15 55/25
Drahos' [3] 27/19 36/14 43/6
drawn [1] 47/20
drilled [2] 56/13 56/18
Drive [2] 1/18 2/5
during [9] 9/21 10/6 10/11 15/25 17/5 17/17 17/25 20/15 51/9
duty [31] 8/8 8/23 9/7 18/11 19/3 19/5 20/12 20/20 21/12 21/24 21/25 22/1 22/5 22/10 22/15 25/11 26/6 26/13 26/14 27/2 27/11 27/14 33/1 33/5 33/10 34/24 35/17 35/17 35/18 36/15 45/12

E

each [1] 50/3
earlier [4] 40/11 42/9 45/1 51/1
easily [1] 51/19
Eastern [1] 40/23
edge [1] 41/10
effect [1] 18/14
effects [1] 39/13
effectuate [2] 18/12 19/5
effectuated [1] 19/24
efficacy [1] 60/25
efficient [3] 9/14 10/10 47/23
efficiently [1] 56/5
efforts [3] 12/24 14/3 17/15
Eight [13] 4/19 4/21 4/24 5/3 5/8 5/11 5/15 5/17 5/18 5/21 6/7 6/9 6/13
either [5] 6/23 20/13 24/14 24/23 43/7
element [2] 42/14 42/15
elements [4] 8/7 19/11 22/8 40/21
Eleventh [1] 52/13
eligible [1] 44/20
else [10] 48/25 53/12 53/21 54/21 55/2 55/22 55/25 57/14 58/14 61/21
elsewhere [1] 13/15
email [4] 47/24 48/1 48/24 61/12
emails [1] 14/5
emergencies [1] 34/3

E

emergency [10] 7/23 10/21 11/7 18/23 25/20 30/9 30/11 36/2 46/7 54/2
emphasize [1] 58/3
employee [1] 30/3
employees [1] 32/24
EMS [1] 10/12
encapsulate [1] 46/4
end [1] 59/6
ended [1] 32/13
enough [5] 45/1 46/9 55/21 57/10 60/3
ensure [1] 32/10
ensuring [2] 20/22 34/16
enter [1] 37/5
entered [1] 18/17
entering [1] 39/23
entire [1] 14/18
entirely [9] 13/16 14/1 14/22 16/21 16/23 22/19 23/19 57/13 60/11
entitled [7] 18/7 31/9 37/1 39/22 45/18 46/1 62/16
entry [8] 15/21 18/20 28/6 28/13 28/24 34/9 43/3 55/8
equally [1] 51/22
Equipping [1] 5/19
erroneous [1] 43/24
ESQ [5] 1/12 1/13 1/17 2/3 2/4
essence [2] 41/12 42/6
essentially [5] 36/25 43/4 45/13 45/15 48/22
establish [15] 8/23 13/21 15/7 19/8 20/19 21/25 22/1 22/9 22/15 22/17 22/20 22/23 24/6 37/8 60/22
established [3] 15/13 23/12 58/11
establishing [1] 13/7
et [1] 1/3
evacuated [1] 29/17
evacuating [1] 6/2
evaluated [1] 15/21
even [21] 11/4 11/19 14/6 15/13 16/6 17/20 19/1 19/4 19/13 22/22 22/25 24/5 24/10 26/20 31/7 40/10 41/14 43/1 46/10 59/23 60/14
ever [2] 42/24 60/8
everybody [3] 5/2 16/11 38/18
everyone [1] 42/18
everything [3] 31/14 46/25 48/22
evidence [37] 8/23 9/1 9/20 10/1 10/15 10/24 11/3 11/12 13/11 14/12 14/16 16/10 16/12 18/17 21/21 22/9 22/11 22/20 23/12 35/20 37/1 37/3 37/4 43/23 45/17 45/19 46/2 46/14 46/16 47/5 49/5 49/13 50/15 52/2 58/10 58/13 58/15
evidentiary [1] 33/8
exactly [6] 4/22 8/24 46/18 46/18 52/6 54/1
examine [1] 39/21
exclusively [1] 53/24
exercising [1] 53/22
exhibiting [1] 31/25
exist [1] 10/8
expedited [1] 9/14
expert [16] 22/25 24/11 37/8 38/3 38/11 38/12 41/18 42/22 46/1 50/23 55/8 55/12 56/25 57/20 58/2 58/6
expert's [2] 12/8 45/23
experts [10] 9/17 9/24 11/1 11/14 25/7 38/18 45/16 46/2 50/24 51/18
explain [1] 29/15
explains [1] 38/12
exposed [1] 10/6
extended [2] 60/15 60/19
extends [2] 36/10 36/10
extensively [1] 40/16
extent [5] 4/7 5/10 39/20 54/15 57/17
extra [1] 33/21
extract [1] 10/5

F

facilitate [2] 14/4 27/3
facilitated [2] 9/11 49/16
facilitates [1] 57/20
facility [14] 5/20 6/1 7/23 9/13 9/21 14/8 21/7 30/10 30/18 31/6 32/11 33/23 36/5 36/11
facility/crew [1] 33/23
fact [21] 12/3 19/15 20/9 20/22 22/2 22/9 22/10 22/25 30/19 38/11 39/23 41/23 42/25 43/1 43/5 45/12 51/18 57/8 58/8 60/4 61/5
factor [2] 28/9 60/23
facts [5] 8/12 14/11 33/10 35/20 61/7
factual [1] 40/12
fail [1] 8/9
failed [2] 9/1 9/7
Failing [2] 29/16 30/21
failure [8] 7/22 9/5 22/20 30/9 31/22 32/4 32/5 32/9
fair [2] 6/10 55/21
false [1] 61/7
familiar [3] 14/7 52/25 53/4
far [5] 26/25 27/6 49/6 53/22 55/6
fashion [2] 8/10 27/17
faster [6] 11/1 11/3 13/11 15/8 47/18 47/23
favor [3] 23/7 39/24 47/20
favorite [1] 46/22
February [1] 54/4
fee [1] 33/22
feel [1] 4/7
fewer [1] 43/10
field [1] 46/2
filed [2] 51/20 57/3
fill [1] 12/11
film [1] 42/25
films [4] 16/2 16/10 16/17 59/21
finally [6] 14/24 18/4 20/21 23/2 25/8 38/22
fine [1] 28/3
finger [1] 53/8
firm [3] 1/17 3/13 3/16
first [14] 4/2 4/15 15/6 19/9 22/16 23/16 24/2 30/15 31/1 35/12 37/16 49/7 53/2 58/11
five [27] 5/6 5/11 6/5 6/8 6/12 6/19 6/21 6/25 7/12 7/14 7/17 8/3 8/10 9/6 15/10 24/8 24/14 24/22 27/23 29/22 29/24 30/5 31/3 31/17 32/7 32/8 59/13
FL [3] 1/14 1/18 2/5
Flagler [1] 2/5
flip [1] 47/24
FLORIDA [4] 1/1 1/4 17/8 29/7
fly [1] 21/3
focus [1] 48/16
followed [1] 52/9
following [2] 3/2 16/7
follows [1] 15/7
followup [1] 49/6
foregoing [1] 62/14
form [2] 13/24 59/1
formulate [1] 10/16
Fort [1] 52/15
found [1] 40/9
founded [1] 31/11
four [38] 5/5 5/11 6/5 6/8 6/12 6/18 6/21 6/25 7/3 7/8 7/12 7/14 7/17 8/3 8/9 15/10 23/13 24/8 24/14 24/22 27/22 28/24 29/22 29/24 30/5 31/1 31/3 31/17 32/7 32/8 40/23 41/4 41/6 41/15 42/2 44/2 44/5 46/4
four-and-a-half-hour [1] 42/2
frame [2] 43/25 60/19
frankly [3] 19/20 47/21 49/12
free [1] 4/7
front [2] 28/4 39/21
function [1] 43/25
further [5] 8/19 16/6 16/24 42/2 56/12

G

gain [1] 37/19
game [1] 61/8
gave [7] 16/25 17/14 44/10 60/14 61/4 61/13 61/20
general [2] 54/6 60/25
get [12] 6/18 11/18 11/18 15/7 22/23 24/11 32/5 36/24 40/9 43/13 46/9 57/15
gets [2] 36/8 36/9
getting [2] 29/15 45/22
give [4] 6/24 27/18 38/19 40/18
given [14] 11/24 16/8 17/3 17/7 17/25 24/5 32/4 41/8 41/18 41/20 43/8 58/10 59/12 62/1
gives [1] 60/25
giving [1] 44/4
gmail.com [2] 2/11 62/19
go [13] 6/3 8/13 23/12 24/14 26/15 27/6 33/25 34/13 37/13 56/3 56/5 57/14 59/7
go-between [1] 34/13
goes [2] 29/13 43/19
going [10] 12/6 16/24 33/7 35/2 38/20 44/7 47/23 49/24 54/23 59/8
Gomez [39] 10/1 12/11 12/12 12/15 13/6 13/10 13/19 14/3 14/19 16/25 17/14 17/21 37/18 38/5 38/12 39/21 40/3 40/6 41/18 41/21 42/8 42/19 45/25 47/9 50/24 51/8 51/9 51/23 51/25 53/14 53/25 55/12 55/18 56/9 56/22 60/4 60/10 60/25 61/3
Gomez's [6] 16/19 24/13 42/1 51/5 55/7 55/9
gone [1] 43/14
good [7] 3/6 3/10 3/12 3/15 38/19 44/11 62/5
Gooding [2] 17/7 18/1
Google [1] 11/16
got [7] 43/1 44/13 47/13 48/1 48/9 54/17 60/3
gotten [4] 24/9 40/11 40/12 60/21
granting [1] 45/6
grave [1] 30/23
gray [2] 2/6 2/7
gray-robinson.com [2] 2/6 2/7
GRAYROBINSON [2] 2/4 3/16
grossly [1] 48/23
ground [3] 18/21 33/22 34/17
guardian [1] 3/7
guess [4] 23/12 25/13 42/7 45/10
guessing [3] 13/21 59/4 59/17
guest [1] 36/1
guy [2] 16/16 59/23

## H

half [4] 29/20 31/1 41/15 42/2
handed [1] 36/5
hands [3] 27/12 32/17 36/18
hang [1] 31/13
happen [1] 59/9
happened [3] 34/6 48/1 49/5
happening [2] 48/5 49/1
harm [1] 8/8
Harmony [2] 50/1 50/11
has [23] 4/16 6/2 10/1 14/3 18/17 19/19 19/25 21/7 30/2 31/17 36/8 37/17 45/13 45/25 46/14 47/17 50/2 50/20 53/17 54/16 59/19 60/4 61/11
hasn't [1] 58/20
hat [1] 26/8
have [200]
haven't [2] 14/12 15/14
having [4] 27/11 47/21 49/3 49/4
he [156]
he's [1] 43/4
head [2] 26/21 60/20
hear [3] 4/12 5/14 56/2
heard [4] 4/6 4/14 46/21 54/25
hearing [10] 1/9 10/6 10/11 11/16 17/1 39/14 40/6 53/2 57/24 58/12
hearings [1] 15/25
held [2] 3/2 22/5
helicopter [2] 16/7 21/4
help [2] 7/5 34/21
helped [1] 50/13
hemorrhage [12] 40/9 40/10 42/15 42/19 42/22 42/23 42/25 43/4 43/20 44/23 45/4 45/7
Henze [1] 3/7
her [1] 45/3
here [23] 3/19 6/20 9/16 10/15 12/21 20/7 28/14 30/13 33/11 35/3 35/24 37/13 37/21 38/11 38/22 39/16 48/1 48/12 52/19 53/20 54/22 61/1 61/16
here's [1] 53/16
hereby [1] 62/14
hey [1] 51/21
HICKEY [2] 1/12 3/6
hickeylawfirm.com [2] 1/15 1/15
high [2] 4/10 36/9
highlights [1] 40/18
him [27] 12/5 12/9 12/16 12/22 13/1 16/8 16/18 17/19 17/19 20/17 22/23 30/16 30/17 30/18 31/5 32/11 32/13 44/25 46/7 50/22 50/25 51/7 56/11 56/18 57/15 59/7 59/11
HIMA [14] 11/11 12/2 13/8 15/18 15/22 20/18 30/18 30/25 32/13 38/24 42/20 49/15 51/1 51/12
his [53] 10/2 10/9 10/11 11/6 11/15 12/19 12/24 15/21 16/1 16/5 16/8 16/15 16/25 17/1 17/4 17/15 17/17 17/24 17/25 20/15 22/14 25/16 26/7 29/18 29/19 31/21 32/6 32/12 34/15 37/17 38/1 38/3 38/4 38/11 39/5 39/8 39/10 39/14 41/24 44/8 46/2 51/9 51/25 52/3 53/6 53/8 53/25 55/12 56/24 57/4 59/7 59/15 61/1
hit [1] 4/9
hoist [1] 21/3
Hold [1] 28/7
home [1] 21/3
honestly [1] 26/21
Honor [49] 3/10 3/12 3/25 4/13 5/12 5/13 5/19 5/24 6/10 6/15 7/4 7/20 8/6 8/11 8/14 8/20 12/21 15/6 18/4 20/24 21/24 23/18 24/6 27/20 28/11 29/12 31/22 35/6 36/19 37/5 37/12 40/13 44/1 45/20 47/7 47/7 48/11 49/11 50/6 53/13 54/11 54/16 55/21 55/23 55/24 56/7 58/22 61/23 62/5
HONORABLE [1] 1/10
horse [1] 55/20
hospital [31] 11/5 12/1 12/4 12/12 15/8 17/8 22/19 22/23 30/23 32/6 34/18 43/13 43/14 43/19 44/25 46/8 50/14 50/25 51/7 51/10 52/1 55/13 55/13 55/14 55/16 56/10 56/19 58/13 58/19 58/19 58/20
hospitals [18] 11/17 11/19 11/21 12/17 12/23 49/15 49/19 50/16 50/23 51/12 52/7 54/2 54/3 55/7 56/14 58/9 59/20 59/24
hour [3] 16/4 42/2 48/5
hours [14] 16/5 16/5 29/20 31/1 31/24 40/11 40/23 41/4 41/6 41/15 44/2 44/5 51/4 55/5
how [25] 9/7 9/8 9/18 10/12 13/21 14/4 14/5 15/1 15/14 16/19 17/2 22/14 23/13 34/6 34/6 40/8 42/15 47/22 48/19 56/12 56/17 57/15 58/4 58/24 61/1
however [3] 41/21 42/18 47/2
humor [2] 31/17 35/9
hypothetical [1] 23/19

## I

I'd [1] 15/11
I'll [8] 27/7 29/14 32/19 35/24 36/24 38/12 38/22 38/25
I'm [31] 3/23 5/1 5/18 6/24 7/6 7/12 18/4 21/25 23/2 23/15 23/22 24/12 26/23 27/1 28/9 28/14 28/22 29/6 29/7 29/15 30/20 33/7 40/14 46/4 46/20 50/5 52/25 53/2 53/4 56/4 58/11
I've [2] 44/13 58/5
idea [5] 9/25 14/3 53/5 53/11 54/9
identical [1] 29/22
identified [1] 12/17
identifies [1] 55/12
identify [4] 12/12 12/23 17/18 58/21
identifying [2] 12/1 55/6
if [55] 3/23 7/5 11/4 12/20 13/19 15/7 16/4 19/1 19/4 19/13 22/22 24/5 24/10 25/12 25/24 26/24 27/9 27/17 28/2 29/16 31/7 31/17 33/12 33/25 35/9 35/13 38/11 38/19 38/22 39/4 40/11 41/14 41/15 41/19 42/9 43/2 43/7 43/19 44/19 45/10 47/6 47/22 48/9 53/3 53/11 53/14 53/25 55/3 56/1 56/5 56/22 59/12 59/23 60/1 60/15
immediately [4] 16/7 29/18 44/16 44/18
important [5] 28/23 30/8 31/6 36/21 49/12
importantly [1] 58/22
improved [4] 38/1 38/7 39/2 39/17
improvement [3] 37/22 37/23 38/21
imputed [1] 18/9
in [181]
inability [1] 22/17
inaccurate [1] 13/2
inaction [1] 17/12
inappropriate [1] 21/12
inaudible [1] 61/18
incapable [2] 11/25 16/18
incident [1] 10/13
includes [1] 30/6
including [1] 49/15
incorrectly [1] 56/10
incredibly [2] 38/25 39/18
independent [8] 18/25 25/15 25/17 30/12 31/7 31/10 31/11 32/24
indeterminate [1] 10/4
indetermined [1] 10/3
indication [3] 41/13 42/17 44/7
indirect [1] 7/12
indulge [1] 38/23
infarcted [6] 41/12 41/15 41/22 41/25 42/3 45/7
inferences [1] 47/20
information [3] 14/9 49/13 61/20
initially [1] 4/9
injured [1] 50/2
injury [1] 42/17
instance [1] 21/1
instances [1] 38/10
instead [7] 13/5 19/11 23/6 29/19 30/24 32/12 49/8
instruct [3] 21/16 30/21 32/10
instructed [2] 34/3 34/22
instruction [1] 35/3
instructions [2] 34/5 61/13
insufficient [3] 14/22 48/23 48/23
intact [3] 39/6 39/8 39/10
intend [2] 8/13 8/17
intention [1] 14/10
interaction [1] 4/7
intermediaries [1] 34/10
internal [8] 16/10 19/12 19/15 20/9 21/10 35/9 35/14 36/16
internally [1] 35/23
interpretation [3] 16/1 16/9 16/15
interpreted [1] 22/14
interrupt [1] 46/20
interrupted [1] 7/13
intertwined [2] 4/5 48/22
into [8] 6/3 8/18 18/17 21/3 36/8 44/6 49/3 60/3
introductory [1] 3/21
irrelevant [4] 20/19 33/6 36/15 43/11
is [313]
island [5] 16/16 49/15 49/20 50/16 59/23
isn't [6] 14/6 14/13 34/12 46/2 48/21 53/19
issue [11] 15/20 19/17 19/21 20/13 21/8 21/20 35/3 35/18 39/22 57/8 61/19
issues [1] 40/12
it [185]
it's [25] 12/22 13/2 17/22 19/14 21/14 23/18 30/8 31/19 31/19 31/22 36/21 38/5 41/20 42/8 43/16 46/11 46/11 46/12 46/12 49/12 50/19 51/16 51/17 56/10 61/16
items [3] 4/11 23/13 46/21
its [8] 22/24 33/10 35/22 35/23 36/10 36/16 37/11 51/18
IV [1] 38/13

## J

Jack [1] 3/6
JARNAGIN [2] 2/4 3/18
jemancari [2] 2/11 62/19
jhickey [1] 1/15
Joanne [3] 2/10 62/18 62/18
JOHN [1] 1/12
Juan [3] 30/22 49/23 49/24
JUDGE [4] 1/10 54/22 55/3 61/22
judgment [32] 3/20 3/24 4/17 4/24 5/17

J


judgment... [27] 5/22 8/15 8/24 12/14 12/25 15/24 18/5 18/7 18/18 23/7 31/9 35/11 36/22 37/6 37/14 37/22 38/9 39/24 40/25 45/6 45/18 45/21 46/10 47/20 51/12 52/17 57/3
Junkins [1] 13/3
jury [5] 23/12 37/2 39/21 44/22 47/6
just [29] 6/18 6/24 7/6 8/4 23/15 24/25 26/23 27/7 29/21 30/1 31/13 31/14 31/16 32/2 34/10 35/2 40/2 40/16 40/18 44/6 49/25 50/9 50/19 53/1 54/23 55/23 57/22 59/11 61/6
juxtaposed [1] 54/12


K


keep [1] 27/18
Keijer [1] 50/7
Kendall [1] 1/18
keyed [1] 58/3
kilometers [5] 32/14 32/15 51/1 51/13 51/14
kind [10] 3/21 4/2 4/9 7/13 8/10 15/11 15/16 26/17 40/1 44/13
knew [6] 21/20 53/8 58/9 60/19 61/14 61/14
know [40] 6/3 13/12 13/14 13/21 14/4 14/5 14/6 14/9 14/19 14/20 15/17 28/15 29/7 34/6 36/21 37/2 38/2 40/5 43/6 44/9 44/11 45/3 45/3 45/19 50/23 52/4 52/7 52/7 52/20 53/6 56/12 56/17 56/20 57/11 58/17 58/24 59/20 59/25 60/1 60/1
knowledge [7] 9/18 45/23 49/17 53/24 54/6 54/6 54/7
known [2] 50/13 50/20
knows [2] 44/3 44/18


L


lack [2] 43/25 48/12
landed [1] 36/17
language [1] 20/21
languishing [1] 51/3
last [2] 55/6 59/6
Lastly [1] 50/14
late [2] 41/24 61/7
later [3] 17/16 34/15 36/3
Lauderdale [1] 52/15
law [17] 3/16 18/13 19/9 19/13 21/24 22/1 22/8 29/8 33/4 33/5 35/15 36/23 37/6 39/24 52/13 52/15 53/17
lays [1] 41/2
leads [1] 38/15
least [6] 4/23 41/8 43/24 47/16 49/25 50/20
led [1] 9/8
left [1] 20/18
let [5] 4/9 6/19 26/7 32/21 56/8
let's [3] 6/18 35/20 44/25
liability [11] 5/20 5/25 7/9 9/3 14/14 15/4 29/1 29/4 29/10 30/10 31/18
liable [2] 30/4 32/22
light [1] 12/10
like [11] 3/22 4/4 4/9 4/11 5/15 8/14 15/11 27/21 28/16 53/8 54/12
likely [11] 17/10 17/18 17/22 37/16 38/5 38/20 39/9 39/11 45/8 59/11 60/24
LIMA [8] 1/17 3/12 4/12 5/15 27/17 54/24 54/25 55/2
limit [1] 6/11
limited [1] 11/15
line [11] 5/20 7/10 24/17 25/14 29/1 30/10 40/24 59/4 59/5 60/17 60/17
lines [1] 12/20
list [1] 48/13
listing [2] 4/3 4/4
literature [5] 10/4 10/7 38/14 38/19 45/25
litigated [1] 19/19
little [6] 5/23 6/20 26/25 60/16 60/20 62/1
loaded [1] 36/8
LOBEL [6] 1/13 3/10 33/12 33/25 35/9 38/22
location [2] 12/9 22/18
locations [2] 11/10 38/4
logic [2] 15/7 26/11
long [3] 28/23 31/20 41/23
longer [2] 6/13 44/20
look [10] 12/22 28/16 29/16 30/8 37/3 43/2 45/16 53/3 61/25 62/2
looking [4] 5/18 5/24 29/6 44/12
lot [3] 27/22 45/11 60/25
LTD [2] 1/6 3/4


M


ma'am [1] 48/14
machine [1] 60/3
made [18] 3/22 11/17 14/3 14/5 20/5 20/7 21/5 23/14 26/1 34/24 37/14 37/25 46/17 58/8 59/21 60/4 60/7 61/5
MAGISTRATE [1] 1/10
magnitude [2] 37/22 37/23
mainstay [1] 38/13
make [17] 6/19 6/25 14/25 16/17 19/25 26/5 26/23 27/25 29/12 29/21 32/2 44/15 44/18 48/20 56/15 58/16 58/22
makes [2] 17/25 33/16
making [3] 26/9 46/9 60/10
malpractice [8] 17/11 19/20 22/7 29/3 29/10 31/18 31/21 32/3
Mancari [3] 2/10 62/18 62/18
manner [2] 9/14 22/17
many [2] 14/4 14/5
Maria [1] 42/20
maritime [3] 19/20 22/7 33/5
matter [14] 12/3 16/14 22/2 22/10 22/25 36/23 37/6 39/24 40/4 40/10 43/7 59/9 61/15 62/16
matters [2] 16/15 22/4
may [5] 39/12 39/13 50/3 52/15 62/18
maybe [6] 4/11 5/14 43/1 43/5 50/10 59/24
McCormack [1] 52/15
McVey [1] 22/4
me [20] 3/17 6/19 6/24 8/9 17/15 26/7 27/18 28/4 31/17 32/21 35/9 35/13 38/23 40/18 52/9 54/4 56/8 56/18 56/20 59/3
mean [5] 5/24 17/23 41/1 46/13 47/19
means [2] 17/18 57/25
meat [1] 53/19
medical [51] 5/20 6/1 7/9 7/15 7/19 7/23 8/2 9/11 10/8 17/11 18/12 18/16 18/22 18/23 19/19 19/20 19/23 20/15 20/17 20/23 22/6 22/7 22/24 25/5 25/20 28/25 29/3 29/5 29/10 29/13 30/3 30/9 30/10 30/18 31/5 31/17 32/3 32/11 33/23 33/23 34/3 34/11 34/14 36/2 36/5 36/11 38/18 48/24 48/24 49/14 51/4
medical/Care [1] 33/23
medicine [1] 12/3
Medico [2] 51/14 56/11
meet [2] 9/7 22/15
meetings [1] 49/16
member [1] 36/2
members [1] 50/3
mentioned [3] 44/1 51/1 55/16
mere [1] 29/13
merits [1] 45/22
messages [1] 54/23
messed [1] 43/5
method [1] 22/17
methodology [1] 11/15
Miami [3] 1/4 1/14 1/18
MICHAEL [2] 2/3 3/15
michael.drahos [1] 2/6
middle [1] 19/23
miles [2] 32/15 51/2
mine [1] 44/12
minimize [1] 37/11
minimum [1] 39/22
minor [1] 43/3
minute [4] 32/14 41/3 43/14 51/2
minutes [9] 40/23 41/5 41/7 44/2 44/5 44/5 44/14 45/1 48/6
misdiagnosed [1] 31/19
misheard [1] 42/7
misread [3] 42/8 42/14 43/18
misreading [1] 40/7
misused [1] 19/14
moment [1] 11/9
month [1] 55/10
months [1] 55/11
moot [1] 30/1
more [32] 9/13 13/17 13/22 13/22 14/1 14/15 14/16 16/24 17/10 17/18 17/22 19/21 32/4 32/6 37/16 38/5 38/20 45/8 46/8 46/12 47/23 48/19 49/2 56/12 56/17 57/25 58/5 59/13 60/4 60/9 60/24 62/1
more-likely-than-not [5] 17/10 17/22 37/16 38/20 45/8
morning [1] 49/25
most [5] 16/16 28/23 58/22 59/23 60/21
motion [21] 1/9 3/20 4/14 5/22 8/15 8/24 9/15 12/21 13/4 15/1 15/24 18/6 18/18 26/20 37/14 38/8 40/25 46/22 47/16 52/17 55/24
motions [4] 4/1 4/6 8/16 61/25
motivation [1] 49/21
movant [1] 47/21
moved [1] 12/14
Mr. [85]
Mr. Burgess [44] 6/2 9/12 9/23 9/25 10/19 11/4 12/2 12/4 15/8 15/15 15/21 16/2 16/6 16/18 20/4 20/15 21/7 22/18 24/4 29/23 30/7 30/14 31/25 32/5 37/25 38/6 39/1 39/13 40/22 41/4 41/9 42/12 43/12 43/19 43/21 44/5 44/20 50/1 50/17 51/3 55/14 56/19 57/14 60/3
Mr. Burgess' [4] 11/25 14/18 18/3 42/21
Mr. Colon [1] 34/20
Mr. Drahos [23] 4/9 5/16 30/1 31/16 32/3 32/20 34/24 35/4 35/14 36/7 37/15 40/1 46/11 46/21 47/16 51/8 52/8 52/19 52/24 53/11 54/9 55/15 55/25
Mr. Drahos' [3] 27/19 36/14 43/6
Mr. Lima [6] 4/12 5/15 27/17 54/24 54/25 55/2
Mr. Treadgill [1] 21/17
Mr. Treadgill-Colon [2] 34/8 34/15
Mr. Treadmill [1] 22/11

M
Ms. [4] 33/12 33/25 35/9 38/22
Ms. Lobel [4] 33/12 33/25 35/9 38/22
much [5] 5/10 39/14 56/12 56/17 61/24
Multiply [1] 50/10
Muns [3] 42/20 45/1 45/2
my [11] 3/17 7/7 23/22 26/11 26/13 26/21 31/3 54/24 56/22 57/12 62/15
myself [2] 6/19 6/25

N
name [2] 51/9 52/11
named [2] 50/18 56/10
names [3] 11/18 51/11 51/12
nature [5] 21/23 22/13 26/25 31/21 42/4
nearest [1] 30/22
necessarily [1] 46/3
necessary [1] 61/14
need [11] 5/5 5/8 5/10 6/3 14/16 21/16 21/22 37/8 47/12 49/9 54/17
needed [3] 60/8 61/14 61/18
needs [2] 18/1 34/19
negligence [6] 4/4 8/8 8/9 18/8 30/13 31/7
negligent [16] 5/19 7/1 7/3 7/8 7/15 7/19 7/22 7/25 9/5 15/11 23/21 28/25 29/5 30/8 30/17 32/23
neither [3] 13/10 13/19 45/6
neurologist [2] 15/21 43/16
neuroradiologist [2] 42/23 43/15
never [4] 10/8 17/17 17/22 21/7
newly [1] 51/17
newly-disclosed [1] 51/17
next [5] 33/25 36/11 36/11 48/5 62/2
Nidorf [6] 11/15 11/25 13/10 13/19 14/19 50/24
Nidorf's [2] 12/10 51/6
nine [1] 10/13
no [67]
Nobo [23] 15/20 16/1 16/14 24/3 38/24 39/12 39/16 41/17 42/8 42/14 42/25 43/3 43/11 44/8 44/25 58/25 59/15 59/22 60/6 60/7 60/8 60/12 60/22
Nobo's [5] 15/23 16/22 43/24 44/3 58/23
non [1] 47/21
non-movant [1] 47/21
nondelegable [19] 18/11 19/3 19/5 20/12 20/20 21/12 21/25 22/1 22/5 22/10 22/15 27/2 33/1 33/5 34/24 35/16 35/17 35/19 36/15
nonexistent [2] 35/5 60/10
nonsensical [1] 20/6
nor [3] 13/10 13/19 45/7
normally [1] 44/10
North [2] 1/18 2/5
not [107]
note [1] 49/12
notes [2] 7/7 37/13
nothing [2] 21/10 24/2
noticed [1] 55/16
notified [1] 22/12
notify [1] 21/22
notion [3] 38/14 39/17 50/12
November [2] 50/21 55/10
now [10] 5/18 12/25 28/10 30/20 32/25 40/15 40/24 42/18 43/6 43/10
nowhere [1] 57/13
number [4] 4/16 40/21 43/22 52/13
numbers [2] 49/19 58/10

O
objected [1] 59/1
objection [1] 58/25
objectively [1] 51/18
obtained [1] 41/24
obviously [5] 4/3 8/7 46/13 46/15 50/19
occasions [1] 17/5
ocean [1] 19/23
off [12] 3/17 7/7 26/21 27/12 29/17 29/23 30/16 32/5 36/9 44/1 48/13 48/14
offered [3] 46/10 57/9 57/13
OK [27] 4/13 5/4 5/4 6/15 6/21 7/6 8/11 23/20 24/20 24/22 27/16 28/5 28/6 28/22 29/9 32/23 33/24 47/13 48/15 50/8 51/8 51/10 53/21 54/21 54/25 55/20 55/21
omissions [1] 31/12
on [108]
once [3] 22/22 30/16 32/10
one [39] 4/18 4/23 5/1 5/3 5/4 5/4 6/12 7/18 7/18 14/20 14/21 16/24 17/14 19/11 23/10 23/13 24/7 30/13 31/7 31/8 32/19 35/12 40/21 41/11 41/17 42/21 43/11 43/12 43/22 45/11 48/10 50/21 50/22 51/12 51/13 52/7 52/13 55/3 55/6
ones [4] 35/10 52/10 53/16 58/16
only [15] 10/1 10/10 13/1 14/20 15/19 16/22 17/19 21/15 24/6 24/11 36/8 36/22 42/24 58/15 61/12
onset [5] 16/5 16/7 40/24 41/5 44/3
open [1] 11/20
opine [1] 50/24
opines [1] 39/13
opinion [5] 17/1 42/1 51/17 51/17 56/18
opinions [1] 59/7
opportunity [3] 4/14 58/23 59/3
opposed [1] 54/8
opposing [1] 52/17
option [3] 10/3 13/11 22/21
options [1] 12/7
or [54] 5/9 8/22 10/3 10/8 10/16 11/19 13/22 13/22 13/23 13/24 16/5 16/14 16/15 16/18 17/12 18/12 19/18 19/21 19/23 20/4 20/14 21/2 24/15 24/16 24/24 25/11 26/18 26/22 28/18 30/24 31/11 33/10 35/18 36/1 36/4 36/5 36/8 36/12 37/22 37/24 42/2 43/7 44/25 46/17 47/23 48/21 51/18 54/23 57/7 59/13 59/16 59/21 60/2 61/20
order [5] 14/7 18/2 19/17 19/18 27/18
organized [1] 6/18
OTAZO [2] 1/10 3/4
OTAZO-REYES [2] 1/10 3/4
other [22] 7/18 12/1 13/8 13/21 23/13 26/1 30/12 30/18 31/8 35/8 38/4 40/3 43/23 45/16 46/1 50/16 50/25 51/13 56/18 57/14 58/9 59/24
others [2] 36/24 50/4
otherwise [1] 33/20
our [39] 5/25 5/25 8/24 9/5 9/7 9/10 9/15 13/4 14/13 15/11 15/24 18/17 18/22 19/15 20/9 20/18 20/20 23/7 25/7 26/20 27/12 28/10 33/2 33/9 35/11 35/19 37/3 37/21 38/8 40/14 40/25 41/2 41/18 43/12 45/13 50/21 50/23 51/6 62/2
ourselves [2] 5/5 6/18
out [14] 4/15 5/1 5/5 5/7 8/16 19/22 20/24 35/17 38/3 40/1 41/2 46/9 53/17 58/17
outcome [20] 11/8 11/25 12/5 13/18 14/18 15/3 15/19 16/20 17/2 17/7 17/13 17/24 18/3 22/25 23/25 24/3 38/1 38/7 39/2 39/18
outcomes [1] 38/15
outline [2] 3/22 4/11
over [3] 36/5 37/18 37/19
overall [1] 31/3
overlap [1] 8/15
overlaps [1] 8/17
owed [2] 18/11 21/11
own [8] 12/8 22/25 23/22 24/11 35/9 36/10 44/9 61/7

P
P.A [2] 1/17 2/4
p.m [1] 40/23
PA [42] 11/22 11/24 12/13 12/18 12/24 13/8 13/15 16/4 16/8 16/13 16/18 16/21 17/2 17/7 18/2 24/5 24/9 24/10 37/24 37/25 38/6 38/13 38/17 38/19 39/1 39/15 39/17 40/5 40/9 41/7 41/16 41/18 43/21 44/4 44/7 51/21 54/4 56/19 59/12 60/25 61/1 61/2
Pablo [3] 30/25 32/13 51/13
page [14] 4/2 12/20 18/19 23/14 28/18 28/25 29/6 38/9 41/23 59/4 59/5 59/5 60/17 60/17
pages [2] 1/7 40/24
Palm [1] 2/5
paragraph [3] 29/16 30/19 34/1
part [13] 4/22 4/23 5/3 5/8 5/11 5/15 5/21 20/20 24/1 33/22 42/12 43/24 50/5
partially [1] 4/19
particular [7] 10/24 15/24 17/14 21/5 21/14 24/18 61/4
party [4] 25/10 25/23 26/22 26/24
passenger [1] 47/22
passengers [1] 50/2
patient [10] 20/10 22/6 34/17 34/18 36/4 36/11 39/15 61/3 61/3 61/4
patient's [2] 34/19 37/23
patients [2] 38/14 42/6
PAULO [2] 1/17 3/12
Pause [2] 28/8 28/12
peer [1] 10/9
peer-reviewed [1] 10/9
people [2] 49/9 50/10
per [1] 49/24
percent [15] 17/6 17/12 17/14 17/20 17/24 18/1 23/1 23/24 24/6 24/12 24/12 37/18 37/19 40/3 61/4
Pereira [2] 20/8 21/5
Pereira's [1] 20/3
Periera [4] 30/2 31/19 31/19 31/20
period [1] 11/24
person [2] 15/19 42/24
personal [1] 9/18
personnel [2] 29/19 49/15
phantom [1] 43/20
phone [6] 11/17 13/22 14/5 51/19 54/2 61/12
phrase [1] 4/10
physician [9] 11/4 35/25 36/3 36/6 36/13 38/24 57/18 61/12 61/13
physician's [1] 24/9
physicians [1] 35/23
picked [3] 37/17 51/19 54/1
pinpoint [1] 13/7
place [5] 12/9 30/15 45/19 47/18 47/22
plaintiff [25] 1/4 1/12 4/16 6/14 8/21 12/7 16/12 17/11 17/20 18/25 24/12 25/16

P

plaintiff... [13] 26/10 26/12 26/13 26/18 29/17 30/22 30/25 31/20 36/17 37/2 40/5 52/1 59/19
plaintiff's [2] 7/1 30/23
plaintiffs [11] 3/7 3/11 3/13 4/24 5/9 15/14 18/10 20/11 23/11 32/21 33/1
plaintiffs' [10] 6/22 11/23 14/10 21/11 26/8 30/13 45/15 45/16 45/23 59/2
plan [3] 4/17 47/21 57/16
plead [2] 18/10 19/3
pleading [1] 27/22
please [1] 3/5
pled [2] 29/24 50/19
point [32] 4/15 8/16 9/20 12/14 12/22 15/25 16/24 17/17 17/22 19/1 20/11 20/18 20/18 29/12 29/21 31/3 32/20 34/25 35/8 36/21 41/14 43/6 43/23 45/11 52/7 52/8 52/12 53/7 55/6 56/12 60/8 60/22
point-blank [1] 12/22
pointed [3] 19/12 20/21 40/1
pointing [1] 25/18
points [5] 4/10 4/25 22/11 52/21 54/24
policies [5] 19/15 20/9 21/10 35/9 36/16
policy [4] 19/12 19/25 21/4 35/14
politician [1] 58/6
port [55] 11/10 18/8 18/16 18/21 18/24 20/7 21/13 21/15 21/18 21/22 23/4 25/10 25/11 25/12 25/13 25/17 25/18 25/21 25/23 26/2 26/4 26/6 26/11 26/12 26/19 27/5 27/12 27/15 32/17 32/22 32/24 33/2 33/14 33/15 34/1 34/4 34/7 34/12 34/13 34/24 35/1 35/2 35/6 35/7 35/22 36/16 49/14 49/16 49/18 57/19 57/20 58/15 61/9 61/10 61/11
portion [1] 23/16
positions [1] 54/13
possibility [4] 24/10 59/9 59/11 59/12
possible [1] 12/9
post [1] 43/2
poster [1] 44/17
pounding [1] 13/23
premise [1] 8/20
prepare [2] 12/15 56/24
prepared [3] 26/23 37/13 40/15
prescribe [1] 29/17
presence [1] 45/7
presents [1] 47/22
presumably [1] 52/3
pretrial [1] 62/3
pretty [1] 5/10
prevail [1] 31/10
printed [1] 3/21
private [1] 21/6
prl [1] 1/19
probability [2] 37/24 59/10
probably [1] 26/24
problem [1] 9/16
proceed [1] 22/22
proceedings [1] 3/2
process [2] 10/10 14/7
produce [3] 14/16 15/16 56/23
produced [8] 10/22 11/1 11/5 11/12 13/18 14/12 14/17 60/5
producing [1] 12/25
prognosis [3] 59/8 59/16 61/4
progress [1] 45/10
progressed [1] 41/13
progressive [1] 42/4
progressively [1] 42/5
prong [3] 30/12 30/13 30/15
prongs [1] 22/16
protocol [17] 10/21 11/2 11/8 46/7 47/15 47/17 49/3 49/4 49/8 49/9 49/14 50/12 57/17 57/18 57/18 57/22 58/1
prove [5] 11/21 15/9 17/12 18/2 22/21
provide [6] 9/1 13/11 22/20 26/21 47/5 59/5
provided [5] 11/1 12/5 49/19 52/3 56/19
provisioned [1] 6/1
Provisioning [1] 5/19
published [1] 45/25
Puerto [9] 9/19 10/10 13/24 30/22 45/24 51/14 55/13 55/16 56/10
pull [1] 28/5
pumpkin [1] 44/6
pure [1] 46/21
purely [1] 13/21
purpose [2] 52/16 57/11
purposes [2] 33/7 33/8
pursued [1] 6/13
put [7] 23/22 28/2 33/12 38/23 38/25 53/8 61/1
putting [2] 26/8 53/19

Q

qualified [2] 16/16 59/23
qualifies [1] 23/1
quantified [1] 17/6
question [27] 9/10 9/25 10/14 10/25 11/12 11/20 12/1 12/5 12/13 12/18 12/23 13/8 13/14 13/18 13/25 16/3 16/16 18/15 18/24 19/6 26/11 26/13 26/16 39/5 41/6 56/20 59/7
questionable [1] 43/3
questioned [2] 10/11 16/6
questions [5] 8/14 12/16 12/17 13/1 59/1
quicker [1] 9/11
quickly [3] 30/24 32/4 32/6
quickly-deteriorating [1] 30/24
quite [2] 19/20 28/11
quote [9] 12/4 13/17 15/12 17/21 20/12 37/19 38/12 40/3 57/25

R

radiologist [3] 42/20 43/15 44/14
radiologists [1] 44/11
raise [1] 59/19
raised [6] 9/6 9/20 12/6 18/5 19/11 58/24
RCCL [2] 29/19 31/2
reach [2] 18/1 18/2
reaches [1] 36/11
react [1] 47/22
read [8] 35/24 42/21 43/16 44/9 44/12 44/14 53/25 59/21
reading [3] 23/17 43/24 44/3
really [2] 16/24 58/5
reason [12] 15/6 16/9 34/12 38/13 38/17 41/17 41/21 43/20 44/12 44/21 45/5 45/6
reasonable [2] 44/22 47/20
reasons [1] 55/24
rebuttal [5] 38/12 55/8 55/12 55/17 56/1
recap [1] 23/9
receive [2] 9/13 44/7
received [8] 12/2 17/19 21/19 38/6 39/1 39/15 40/5 44/25
receiving [2] 16/18 43/21
record [9] 3/5 39/19 41/3 43/24 49/12 50/5 50/7 50/15 55/24
recording [2] 1/9 62/16
recovered [1] 39/14
redirect [2] 26/17 59/2
reemphasize [1] 26/17
referred [2] 41/11 42/16
referring [1] 37/21
refuted [1] 60/6
regard [4] 16/21 17/4 46/18 60/14
regardless [6] 15/17 16/4 24/3 35/19 44/19 60/12
rehash [1] 47/12
reiterating [1] 9/16
relates [15] 4/19 4/23 6/21 9/4 9/18 15/4 15/10 16/19 17/1 21/8 22/13 23/2 56/9 57/6 60/24
relating [1] 39/25
relationship [1] 24/19
relative [1] 4/21
relatively [1] 6/4
relevant [3] 30/19 35/10 41/3
reliable [1] 22/17
relied [1] 46/2
relies [1] 17/20
rely [6] 10/7 13/5 35/14 35/15 46/1 46/1
relying [2] 33/1 48/11
remains [1] 31/8
remember [4] 40/5 43/12 44/1 47/11
remote [1] 54/22
removal [1] 29/19
removed [1] 32/1
removing [3] 29/23 30/7 30/14
render [3] 22/6 23/6 59/16
rendered [7] 9/22 11/6 16/3 16/17 20/15 20/17 22/24
repeat [2] 17/21 45/20
report [12] 38/4 38/11 38/12 43/2 44/15 45/3 50/7 51/5 51/6 55/8 55/12 55/17
Reporter [2] 2/10 62/19
reports [3] 50/23 56/25 61/1
representative [5] 21/17 26/7 34/7 35/8 61/10
represented [1] 22/3
reproduced [1] 40/24
request [3] 21/15 21/19 21/20
requested [3] 18/22 33/22 33/24
require [1] 28/9
required [8] 9/23 17/10 18/13 19/3 20/4 21/6 34/14 61/19
requires [3] 17/11 21/15 21/22
resource [3] 10/25 13/20 14/22
resources [3] 13/13 14/20 57/20
respect [1] 33/17
Respondeat [1] 29/2
response [27] 4/18 4/21 5/16 14/17 15/1 17/20 19/1 19/7 20/13 25/16 32/17 33/3 35/11 37/22 38/8 40/14 41/1 41/2 44/11 45/13 47/10 48/20 51/11 53/2 57/12 57/25 58/12
responsibility [7] 23/4 25/21 26/2 27/4 61/9 61/17 61/18
responsible [11] 18/21 19/16 20/1 20/10 20/22 34/16 36/1 36/4 36/17 49/10 61/6
result [4] 10/22 11/1 15/16 60/5
review [1] 11/16
reviewed [2] 10/9 52/14
REYES [2] 1/10 3/4
RICHARD [4] 1/3 3/3 3/7 3/8
Rico [9] 9/19 10/10 13/24 30/22 45/24 51/14 55/13 55/16 56/10
ride [1] 32/14

R

right [67]
robinson.com [2] 2/6 2/7
Rollins [1] 13/4
room [1] 62/1
ROYAL [50] 1/6 3/3 3/16 6/22 10/20 18/9 18/11 19/12 21/10 23/5 25/18 27/9 27/10 30/2 30/3 31/9 32/22 32/23 32/23 33/2 33/9 33/10 33/11 33/15 33/24 34/5 34/16 34/20 35/21 36/12 36/23 36/25 37/17 39/20 45/12 45/13 47/17 47/18 49/17 49/19 49/21 49/23 49/24 50/16 50/20 50/25 51/16 51/18 51/22 58/9
Royal's [4] 32/23 35/8 36/15 49/14
RPR [2] 2/10 62/18
running [1] 34/13
rushed [1] 60/8
rushing [1] 60/10
RUSSO [2] 1/17 3/13
russoappeals.com [1] 1/19

S

said [32] 12/24 16/8 23/10 24/3 25/6 25/22 26/24 28/13 31/14 32/12 34/20 37/21 39/12 40/2 40/4 41/17 41/18 42/9 42/19 48/9 52/4 52/7 52/10 53/14 54/1 57/9 57/11 58/2 59/8 59/9 59/14 60/12
same [3] 27/17 27/18 42/21
San [6] 30/22 30/25 32/13 49/23 49/24 51/12
SARAH [2] 1/13 3/10
saw [6] 11/4 42/24 43/8 43/11 60/13 60/23
say [18] 4/19 14/11 25/12 25/24 27/1 41/21 42/11 42/13 44/25 45/13 46/21 47/23 47/24 54/14 54/15 58/19 59/8 60/8
saying [37] 5/16 6/6 13/1 20/3 20/7 23/23 23/24 24/5 24/10 24/11 24/14 24/22 25/14 27/9 27/11 31/18 34/23 34/25 35/1 35/4 35/14 35/23 36/14 37/2 37/9 37/10 37/10 40/6 45/16 46/8 47/3 49/9 51/20 53/7 53/11 53/16 61/2
says [19] 29/16 30/21 33/4 34/2 34/10 35/2 36/3 37/2 38/5 41/24 44/9 44/11 46/11 51/16 52/9 52/15 60/15 60/18 60/19
scan [10] 40/7 40/22 41/11 41/19 41/24 42/8 42/9 42/14 42/21 44/3
scans [2] 43/16 44/9
screaming [2] 13/23 49/8
screen [4] 28/14 30/20 33/18 35/24
sea [1] 21/1
seas [2] 36/9 50/1
second [9] 7/4 19/9 24/1 28/1 30/10 31/13 42/12 50/20 51/19
secondarily [1] 24/5
secondary [1] 32/25
Secondly [1] 20/9
secretary [1] 48/24
section [3] 3/21 18/20 35/12
see [11] 8/17 12/20 28/21 28/23 28/25 39/5 42/16 42/22 42/23 45/4 60/15
seeing [4] 28/15 28/17 28/18 28/22
seek [1] 8/14
seeking [2] 3/23 6/17
seemed [1] 48/7
seems [3] 4/4 48/8 51/24
seen [3] 17/16 45/2 60/20
semantics [1] 24/13
send [2] 48/24 54/23
sending [3] 30/17 31/5 47/24
sense [2] 29/14 47/21
sensitive [5] 9/13 21/20 21/23 22/13 61/15
sent [7] 12/9 13/9 14/6 16/4 30/18 48/2 50/25
separate [3] 7/24 42/14 42/15
separately [2] 8/5 33/21
September [1] 55/9
served [1] 55/8
services [3] 10/12 33/17 33/19
Seven [5] 4/18 4/23 5/3 5/7 6/13
several [2] 38/9 50/18
severance [1] 35/4
severity [1] 31/23
Sexton [1] 22/4
shakes [1] 53/17
shall [2] 33/21 34/2
sham [5] 13/2 51/16 52/4 52/12 53/4
shape [1] 13/23
share [1] 28/14
shared [1] 33/18
sharing [1] 30/20
she [6] 33/12 36/4 36/12 38/22 42/21 45/3
sheet [1] 6/20
ship [23] 6/1 14/8 19/16 19/22 20/1 20/18 20/22 21/1 29/17 29/24 30/7 30/14 30/16 31/4 32/1 32/6 33/23 35/1 35/3 36/9 50/1 50/9 51/4
ship's [7] 18/22 30/3 35/25 36/13 57/18 61/12 61/13
Shipping [1] 33/16
ships [4] 49/23 50/3 50/11 50/11
shoreside [4] 9/13 14/8 15/8 21/7
short [1] 40/13
should [29] 14/1 14/15 14/24 17/16 19/24 20/7 22/14 23/4 25/10 25/12 25/23 26/1 26/3 26/10 27/7 29/5 37/4 37/5 37/9 41/20 43/12 49/5 49/6 50/22 50/25 51/7 52/1 57/25 58/2
shouting [1] 49/9
show [6] 14/16 34/13 35/21 36/16 44/14 44/21
showed [2] 16/10 41/11
shows [2] 24/9 45/17
side [1] 39/4
sides [1] 41/6
significant [2] 38/21 41/22
significantly [1] 39/2
simply [2] 50/13 61/6
since [3] 8/4 50/20 62/1
sir [1] 56/3
situation [2] 31/23 54/19
six [22] 5/6 5/11 6/5 6/8 6/12 6/19 6/25 7/21 7/22 8/5 9/6 15/5 23/9 23/21 27/23 30/7 30/16 31/4 32/9 50/15 50/20 59/13
slide [5] 33/12 33/25 33/25 35/10 38/23
slobel [1] 1/15
smaller [2] 50/3 50/11
snap [2] 44/15 44/18
snippet [2] 37/17 39/20
so [123]
soap [1] 58/6
solely [1] 52/16
some [18] 8/13 10/3 10/20 10/24 21/11 33/1 33/4 33/14 37/13 39/12 42/17 48/21 50/3 50/10 50/11 53/7 53/9 56/1
somebody [3] 14/7 21/2 36/8
something [13] 6/3 26/20 26/22 37/11 46/10 46/11 46/12 46/13 48/9 53/23 53/25 57/9 57/23
sometimes [1] 44/13
sooner [3] 11/5 42/1 42/12
sorry [10] 5/1 6/24 7/12 21/25 26/7 28/9 46/4 46/20 50/5 56/4
sort [19] 3/21 4/10 10/4 10/21 21/11 23/22 26/8 27/25 29/15 30/1 30/12 33/1 37/17 42/17 48/21 49/2 53/7 53/18 54/12
sounds [1] 5/15
source [3] 19/13 26/14 35/16
SOUTHERN [1] 1/1
speak [1] 15/19
specific [13] 8/13 11/2 12/17 13/20 14/17 14/17 18/19 51/10 54/6 54/7 56/24 57/15 60/14
specifically [16] 9/4 16/20 17/6 18/20 19/15 21/18 22/5 25/19 47/9 50/24 58/2 58/25 59/3 60/18 61/8 61/11
speculate [1] 45/2
speculation [5] 43/17 43/17 46/21 46/23 47/4
speculative [11] 10/23 11/8 13/16 14/2 14/23 16/21 22/19 46/25 47/17 47/19 57/13
speculatory [1] 58/4
spoke [4] 11/18 11/21 14/6 54/2
staff [2] 9/11 30/3
stand [1] 58/7
standard [8] 17/10 18/1 20/16 38/13 38/17 41/5 41/8 52/14
standards [1] 45/21
stands [1] 34/12
start [3] 6/18 27/21 32/19
started [3] 44/1 45/10 51/20
starting [1] 4/2
starts [2] 4/3 42/5
state [1] 3/5
stated [2] 18/20 55/24
statement [1] 39/1
statements [1] 60/25
states [3] 1/1 1/10 16/1
stating [1] 12/15
statute [3] 19/10 22/8 35/15
steer [1] 8/21
step [2] 38/11 50/19
steps [1] 49/21
stern [1] 13/22
still [2] 4/22 5/9
stipulates [1] 21/13
straight [1] 27/18
strike [1] 53/23
stroke [12] 7/2 7/8 16/8 29/18 31/2 32/12 41/13 42/6 47/15 47/17 47/22 50/12
strokes [2] 42/4 59/13
stronger [1] 45/17
studies [1] 46/1
study [1] 10/9
styled [2] 5/19 28/25
subarachnoid [10] 42/15 42/19 42/22 42/23 42/25 43/4 43/20 44/22 45/4 45/7
subject [1] 29/17
submit [1] 51/11
submits [1] 53/15
submitted [1] 52/16
substantive [2] 4/21 5/16
substantively [2] 8/18 15/1
succinct [1] 4/11
such [4] 19/25 33/5 41/23 56/23
sued [10] 23/5 25/9 25/10 25/12 25/22

## S

sued... [5] 25/23 26/10 26/24 27/7 27/10
suffering [1] 31/2
sufficient [4] 8/22 23/12 49/13 57/8
suggest [2] 12/7 59/24
summary [32] 3/20 3/23 4/16 4/24 5/17 5/22 8/15 8/24 12/14 12/25 15/24 18/5 18/7 18/18 23/6 31/9 35/11 36/22 37/5 37/14 37/22 38/9 39/23 40/25 45/6 45/18 45/20 46/10 47/19 51/12 52/17 57/3
Sunny [1] 48/6
superior [2] 29/2 38/15
supplemented [1] 54/8
supplementing [1] 53/18
support [13] 9/2 9/17 10/2 10/9 10/17 11/13 11/15 14/12 18/17 20/12 21/11 47/5 51/25
supported [3] 25/7 39/18 50/13
supports [1] 38/14
Supreme [1] 17/8
sure [9] 24/12 27/25 28/2 31/15 32/2 32/19 40/17 46/6 58/22
sworn [1] 13/5
symptom [2] 41/5 44/2
symptoms [3] 16/5 31/25 40/24
system [3] 9/18 45/24 47/18

## T

t-PA [42] 11/22 11/24 12/13 12/18 12/24 13/8 13/15 16/4 16/8 16/13 16/18 16/21 17/2 17/7 18/2 24/5 24/9 24/10 37/24 37/25 38/6 38/13 38/17 38/19 39/1 39/15 39/17 40/5 40/9 41/7 41/16 41/18 43/21 44/4 44/7 51/21 54/4 56/19 59/12 60/25 61/1 61/2
tables [1] 14/10
tailor [1] 31/16
take [10] 32/12 35/18 38/11 39/20 46/7 48/13 48/14 50/17 50/19 61/16
taken [16] 11/11 16/2 20/24 32/13 36/9 38/3 42/9 43/13 44/24 49/20 50/22 51/7 52/1 55/14 58/2 58/18
takes [2] 28/10 44/14
taking [1] 58/4
talk [2] 39/10 50/14
talking [2] 37/18 39/16
target [1] 23/5
Team [7] 14/24 15/1 15/2 33/23 48/8 48/10 48/12
telephone [3] 49/6 49/19 58/10
tell [6] 8/9 33/7 34/21 34/21 52/9 56/18
telling [1] 44/10
tells [1] 54/1
testified [5] 11/16 21/18 44/8 49/14 61/11
testify [1] 14/11
testimony [26] 12/8 12/10 12/19 13/6 13/16 15/23 16/22 17/4 17/16 17/21 22/14 24/9 24/13 34/7 35/7 37/8 37/16 38/10 46/19 49/18 49/23 52/18 57/4 58/23 59/16 60/6
than [23] 10/18 11/10 12/1 13/8 13/21 13/25 15/8 17/10 17/18 17/22 37/16 38/5 38/20 45/8 46/12 47/18 47/23 50/3 50/11 50/25 56/18 58/6 60/24
thank [17] 4/13 4/13 6/15 8/6 8/11 23/8 27/20 28/22 41/2 48/20 54/25 56/7 61/22 61/24 62/4 62/5 62/8
that [489]
that's [34] 4/18 6/10 20/13 20/23 23/15 23/20 23/23 24/1 26/2 28/3 28/5 28/15 31/20 32/6 33/6 34/20 34/25 35/16 36/18 42/3 42/5 43/22 45/13 47/24 51/16 53/2 54/8 54/25 58/11 58/11 60/5 60/17 61/19 61/22
their [37] 4/18 5/22 8/9 9/2 9/4 9/17 9/24 11/1 11/9 11/14 12/8 13/15 14/13 14/21 17/20 19/1 19/6 20/12 22/15 22/17 22/19 22/25 24/11 25/13 26/7 30/4 32/16 32/25 37/7 39/24 39/25 45/11 46/22 47/16 57/24 58/1 61/7
theirs [1] 37/5
them [11] 4/12 15/6 19/2 19/4 21/16 24/11 34/21 50/18 52/11 61/18 61/20
then [37] 4/1 4/11 4/12 4/18 5/7 5/8 7/21 8/4 8/7 13/20 18/22 20/21 23/2 23/20 23/21 24/5 24/14 25/8 26/3 27/6 32/9 36/3 40/3 41/16 41/20 41/25 45/22 48/25 51/11 52/2 52/8 52/20 53/15 54/7 54/10 56/21 57/3
theories [13] 9/2 9/4 9/7 14/13 15/4 16/19 31/7 31/10 43/12 45/15 47/3 50/22 57/7
theory [24] 5/25 9/16 10/2 10/17 10/22 11/7 11/10 11/13 11/15 11/23 12/6 13/16 14/1 15/3 15/14 20/14 25/13 30/13 48/21 48/21 50/15 51/6 54/8 60/11
there [71]
there's [10] 4/15 10/8 18/19 19/7 19/22 23/24 35/3 42/11 43/23 49/12
therefore [2] 35/3 40/10
Thereupon [1] 2/13
these [16] 22/16 23/13 31/6 38/14 45/14 46/21 47/3 49/20 50/22 54/2 54/3 57/7 58/4 58/16 59/19 59/24
they [112]
they're [14] 14/15 18/13 19/6 37/3 37/9 37/10 39/21 42/4 44/12 45/15 51/5 51/5 57/8 58/16
they've [3] 19/11 57/13 58/8
thing [3] 33/5 35/8 41/11
things [4] 23/13 27/18 42/11 44/23
think [27] 5/21 8/3 23/10 23/15 25/5 25/25 26/16 27/1 37/7 39/13 40/1 40/7 43/17 43/18 43/20 45/17 45/17 47/16 48/7 48/7 48/8 48/9 53/1 53/23 55/19 57/15 57/22
third [4] 11/9 18/4 19/10 26/22
third-party [1] 26/22
this [93]
thoroughly [1] 40/14
those [21] 4/17 4/25 8/17 8/18 10/18 11/19 14/11 15/4 19/11 23/14 25/5 26/3 29/24 30/5 43/16 43/18 46/4 46/9 49/16 59/1 60/1
though [5] 15/13 17/20 27/21 29/13 46/11
thought [7] 25/22 42/8 42/24 43/7 43/11 45/12 46/20
three [18] 4/18 4/23 5/1 5/3 5/4 5/5 6/13 16/5 19/7 19/11 22/8 22/16 29/20 31/24 32/20 36/21 51/4 56/24
through [13] 7/15 8/13 10/3 15/13 17/16 19/9 19/9 19/10 23/13 37/13 48/17 59/5 60/17
throughout [4] 10/16 38/3 38/4 38/8
tied [1] 49/2
time [37] 9/13 11/24 15/17 17/17 21/20 21/23 22/13 24/4 25/25 28/10 31/24 31/25 33/20 33/20 33/21 40/24 41/3 41/23 42/5 43/25 43/25 44/13 44/15 45/1 47/10 52/2 53/7 60/3 60/5 60/8 60/9 60/13 60/16 60/18 60/20 60/22 61/15
time-sensitive [5] 9/13 21/20 21/23 22/13 61/15
times [4] 34/4 35/22 49/24 60/2
tissue [11] 41/12 41/13 41/16 41/19 41/22 41/25 42/3 42/4 42/10 42/13 45/7
title [1] 30/8
titles [3] 6/19 6/24 11/19
today [10] 8/20 9/16 10/15 12/21 37/15 57/24 58/8 58/12 61/5 61/16
Today's [1] 8/15
together [2] 8/4 61/25
told [5] 51/5 51/6 56/20 59/3 61/18
too [6] 26/15 26/25 27/6 28/3 47/24 62/7
took [3] 25/25 31/20 32/11
top [2] 23/14 26/21
totally [2] 10/23 11/8
touched [2] 11/9 37/15
towards [1] 8/21
traditional [1] 29/14
training [2] 34/11 34/14
TRANSCRIBED [2] 1/9 2/10
transcription [1] 62/15
transfer [13] 9/12 10/18 14/4 14/7 18/12 18/16 19/5 19/23 21/12 22/21 27/3 57/7 57/21
transferred [4] 10/1 12/4 15/18 34/18
translates [1] 32/15
translating [1] 29/7
transpired [1] 44/24
transport [12] 7/23 9/5 20/16 27/10 27/11 29/14 30/9 30/22 34/17 61/6 61/17 61/17
transportation [6] 18/23 20/23 21/6 21/8 25/20 32/16
transported [1] 30/25
Treadgill [4] 21/17 34/8 34/8 34/15
Treadgill-Colon [1] 34/8
Treadmill [1] 22/11
treat [1] 51/21
treated [1] 37/23
treating [13] 11/4 30/23 32/12 35/25 36/3 36/12 36/13 37/20 37/24 38/24 40/1 40/4 40/9
treatment [15] 7/1 7/3 7/8 7/9 7/12 7/15 7/19 7/25 8/2 15/11 23/21 29/1 29/5 36/2 42/6
trial [1] 61/2
tried [2] 54/10 59/19
trip [1] 51/2
true [1] 36/22
try [9] 9/17 10/2 11/14 12/11 12/24 14/4 17/15 19/7 57/3
trying [7] 20/11 21/1 23/22 25/24 27/1 28/14 37/3
turn [5] 5/25 8/4 14/10 15/10 53/15
turns [1] 44/6
twice [2] 17/25 18/20
two [26] 4/18 4/23 5/1 5/3 5/4 5/4 6/13 11/14 12/17 16/4 17/5 22/2 28/9 30/15 31/6 35/10 40/11 40/21 42/11 51/12 52/21 55/4 55/10 55/10 56/14 56/25
two-factor [1] 28/9
two-month [1] 55/10
twofold [2] 33/3 40/2
type [3] 8/4 21/8 26/22

U

ultimately [14] 11/3 11/11 13/10 13/15 14/20 15/18 19/16 20/1 20/3 32/1 34/16 35/25 42/21 61/6
unclear [1] 4/20
uncontroversial [2] 39/1 39/18
under [14] 4/6 13/3 17/7 19/13 21/2 22/1 22/8 22/16 23/3 29/25 34/4 36/12 41/8 52/12
undermined [1] 12/8
understand [1] 26/16
Understood [1] 40/20
undisputed [1] 33/10
unequivocally [1] 21/18
unfortunately [2] 12/12 44/6
UNITED [2] 1/1 1/10
University [4] 17/8 55/13 55/16 56/9
unless [2] 8/13 33/20
unreasonable [5] 30/6 30/17 31/4 31/5 43/17
unreasonably [1] 30/14
until [7] 20/10 20/18 36/4 36/11 36/17 48/6 49/1
up [23] 4/8 12/21 15/6 15/14 26/8 28/3 32/13 33/12 38/23 41/9 43/5 44/4 44/14 51/19 52/9 53/3 53/6 54/1 54/10 55/4 57/21 59/6 60/10
upon [12] 10/7 13/5 15/21 16/1 22/18 22/19 23/19 29/18 33/20 46/1 46/1 46/2
upwards [1] 10/13
urge [1] 40/25
us [6] 21/15 34/21 34/21 58/10 58/16 62/1
use [1] 13/20
used [6] 9/24 10/18 14/21 20/23 21/9 58/15
uses [1] 17/21

V

vague [1] 5/23
valid [1] 19/13
value [3] 17/15 17/19 37/11
Van [1] 13/3
various [4] 4/3 4/4 11/17 23/10
vascular [1] 15/21
vastly [3] 38/6 39/15 39/18
verifiable [1] 51/18
versus [1] 27/23
very [14] 12/22 28/15 30/8 33/16 39/9 39/11 40/14 41/3 41/10 41/10 44/10 59/15 61/24 62/2
via [4] 3/2 16/7 18/16 33/2
viable [5] 4/22 5/9 15/14 22/20 26/19
vicarious [5] 7/9 29/1 29/4 29/10 31/18
vicariously [2] 30/4 32/22
videoconference [1] 3/2
view [1] 47/4
vis [2] 24/16 24/16
visit [2] 49/23 50/3
visited [1] 49/15
visits [3] 50/10 58/10 58/14

W

wait [3] 33/17 44/13 60/2
walk [1] 39/8
WALTER [1] 2/4
want [10] 26/15 26/16 28/2 29/12 37/11 50/14 53/3 54/23 59/23 60/13
wanted [4] 4/15 27/25 56/15 58/22
wants [4] 8/21 12/20 39/20 56/2
was [122]
washed [1] 27/12
wasn't [5] 4/20 51/9 52/10 55/17 58/12
way [13] 4/11 5/22 6/1 13/23 15/7 19/25 20/16 32/6 43/7 56/23 57/14 59/1 59/6
ways [1] 19/7
we [118]
We'll [1] 43/13
we're [14] 4/21 13/3 18/7 18/7 19/2 20/2 20/3 20/7 23/6 24/5 24/25 28/17 45/18 54/22
we've [4] 15/12 22/3 26/20 40/14
weigh [3] 37/4 37/9 45/19
well [20] 14/11 14/13 32/13 32/25 35/22 36/7 37/2 38/10 40/6 41/19 43/6 43/18 44/9 44/11 45/16 45/20 51/17 52/9 57/9 61/24
well-acquainted [1] 45/20
went [3] 26/25 41/21 47/6
were [31] 3/2 6/16 10/12 10/18 11/10 11/20 12/7 13/13 14/5 14/5 16/2 19/2 19/3 19/4 19/14 21/19 22/12 22/22 24/14 25/14 36/17 49/16 50/16 51/21 53/9 59/8 59/25 60/1 61/6 61/13 61/19
West [1] 2/5
what [58] 4/15 4/22 5/8 5/10 5/15 8/25 14/3 14/6 14/7 15/12 15/17 17/16 17/18 17/23 19/6 19/11 21/16 21/21 25/5 25/8 25/10 25/24 26/13 26/16 27/1 28/13 28/15 29/6 29/15 31/16 32/17 34/21 35/23 37/2 37/21 39/12 40/2 40/10 41/11 43/11 44/12 45/2 45/13 48/1 49/5 51/10 53/17 54/1 55/2 55/15 57/12 58/1 59/9 59/25 60/1 61/2 61/14 61/18
What's [1] 59/22
whatever [1] 6/6
when [14] 15/10 19/21 26/5 31/25 32/2 40/22 41/9 44/1 44/3 50/1 52/17 59/1 59/2 61/3
where [26] 5/21 7/11 8/9 8/16 9/25 11/11 12/2 13/9 17/21 18/20 22/3 22/4 23/23 30/7 31/1 37/16 37/18 41/14 43/14 44/17 45/10 49/20 52/4 54/19 56/25 60/14
wherein [2] 12/22 25/19
whether [16] 8/22 11/19 16/14 19/18 19/21 19/23 20/4 21/2 26/18 35/18 35/19 36/8 37/24 57/7 60/2 61/20
which [43] 9/6 9/12 10/11 10/12 11/11 12/18 13/6 15/15 16/10 16/25 18/5 19/6 19/7 19/13 21/22 22/18 23/2 23/10 24/4 24/12 25/9 27/4 27/25 31/10 32/14 33/15 35/9 37/15 42/16 45/10 48/1 50/7 50/15 51/1 51/13 51/14 52/7 52/10 54/16 56/19 57/16 58/19 62/3
who [17] 11/4 11/14 14/6 15/19 15/21 17/14 20/1 21/2 21/17 27/7 38/24 42/20 42/24 50/13 52/7 57/19 59/20
whole [3] 37/1 38/17 53/5
why [10] 15/6 21/4 27/25 33/7 41/17 42/5 44/10 45/5 45/11 54/14
will [19] 4/9 4/12 5/8 5/24 6/4 6/11 8/16 18/21 18/23 24/12 33/17 35/13 37/1 37/13 39/5 41/8 56/7 61/25 62/2
window [5] 35/17 41/10 42/2 44/4 44/19
winging [2] 47/23 47/24
wiped [1] 31/7
within [3] 11/24 44/5 53/24
without [3] 8/18 34/2 56/11
witness [2] 37/8 58/7
won't [1] 47/24
word [1] 46/22
words [3] 23/22 30/18 38/10
work [1] 56/8
worked [1] 57/22
working [3] 7/7 10/12 28/16
works [2] 9/18 61/1
worthless [1] 46/11
would [84]
wouldn't [7] 11/5 15/18 40/11 41/17 42/3 43/8 50/12
written [3] 19/25 21/4 35/9
wrong [6] 25/9 25/23 26/18 26/24 43/1 43/7
wrote [1] 25/4

Y

yeah [2] 34/20 45/14
year [2] 49/24 50/10
years [4] 10/13 19/19 49/25 56/24
yelling [1] 13/22
yes [29] 5/12 5/13 6/10 8/1 20/3 24/1 25/3 26/15 29/12 31/22 32/9 36/19 38/5 39/7 40/13 40/16 41/19 41/25 42/11 44/9 47/7 47/7 47/11 48/14 50/6 52/25 56/6 57/12 59/14
yet [6] 11/17 11/25 14/9 18/12 19/1 20/13
you [94]
you'll [1] 42/16
you're [22] 23/23 23/24 24/10 24/22 24/23 25/14 26/6 26/9 27/9 27/11 32/3 34/23 34/25 35/1 35/4 36/14 37/10 46/9 47/3 49/9 53/7 53/7
you've [1] 46/10
your [64]

Z

zeroing [1] 23/15
Zoom [2] 3/2 28/18